UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HALEY SPEARS, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO.: |
| | : | 3:11-cv-1807 (VLB) |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE COMPANY | : | |
| OF BOSTON; | : | |
| THE GROUP LIFE | : | |
| INSURANCE AND DISABILITY PLAN | : | |
| OF UNITED TECHNOLOGIES | : | |
| CORPORATION, aka THE UTC CHOICE | : | |
| INTEGRATED DISABILITY BENEFIT | : | |
| PROGRAM, | : | |
| DEFENDANTS. | : | March 31, 2015 |

**MEMORANDUM OF DECISION GRANTING, IN PART, [82] PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING [94] PLAINTIFF'S MOTION TO SUBMIT EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD, AND DENYING [85] DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND REMANDING TO THE PLAN ADMINISTRATOR FOR FURTHER PROCEEDINGS**

This is an appeal of a denial of short and long-term disability benefits brought by the Plaintiff, Haley Spears ("Spears"), against the United Technologies Choice Integrated Disability Benefit Program (the "Plan"), sponsored by her former employer, United Technologies Corporation (UTC), and the plan administrator, Liberty Life Assurance Company of Boston ("Liberty"), acting pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").[1] Spears alleges that the Defendants improperly denied her claim for Long Term Disability ("LTD") benefits under the Plan, in violation of the provisions of 29

---

[1] Spears also named her former employer, UTC, as a defendant in this action, but all claims against UTC were dismissed on August 3, 2012.  *See* [Dkt. #22, Order, at 14-17].

1

C.F.R. § 2560.503-1, which governs processing and handling of claims for ERISA plan benefits.

On March 1, 2013, Spears and the Defendants, respectively, filed motions for summary judgment and for judgment on the administrative record. [Dkt. ## 51, 54]. That day, Spears also filed a motion to submit evidence outside the administrative record. [Dkt. #55]. However, the parties' filings failed to comply with Local Rule of Civil Procedure 56, and on March 21, 2014, the Court denied them without prejudice to refiling in compliance with this Rule. [Dkt. #80].

On April 28, 2014, the parties refiled their motions for summary judgment and for judgment on the administrative record, and on June 13, 2014, Spears refiled her motion to submit evidence outside the administrative record. [Dkt. ## 82, 85, 94].

After consideration of the record, for the reasons stated hereinafter, the Court GRANTS, in part, Spears' Motion for Summary Judgment, DENIES Defendants' Motion for Judgment, and GRANTS Spears' Motion to Submit Evidence Outside the Administrative Record.

<u>**Background Facts**</u>[2]

---

[2] To determine the undisputed facts in this case, the Court relies upon the parties' Local Rule 56(a)(1) Statements and the administrative record. However, the Court notes that, in many instances, the parties have offered vague and ambiguous responses to allegations of fact raised in their voluminous Statements, notwithstanding this Court's previous denial of both parties' sets of dispositive motions due to their failure to comply with Local Rule 56(a). *See* [Dkt. #80]. Indeed, the Court expressly warned the parties that where a fact is denied, the responding party must "cit[e] to specific evidence in the record supporting such denial" and that a "[f]ailure to cite to a specific paragraph or page may result in the fact being admitted." [*Id.*]. Accordingly, where a party has asserted a fact and the opposing party has not denied the assertion and

a. **Spears Applies For And Receives Short-Term Disability Benefits From October 8, 2008 Through February 8, 2009**

Spears worked as an executive administrative assistant at Pratt & Whitney, a division of UTC.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 18; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 18].  Spears' job responsibilities included making travel arrangements, filing documents, and assisting in preparing, gathering and maintaining expense reports.  [Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 4; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 4].[3]  Spears asserts, and the Defendants do not dispute, that, prior to the onset of her symptoms, Spears was a dedicated and bright employee who worked hard and was able to handle a range of job responsibilities.  [AR 481, 487, 489; Dkt. #82-5,

---

offered no evidence to dispute its accuracy, the Court deems the fact admitted. *See* Local Rule 56(a)(1) ("All material facts set forth in said statement *will be deemed admitted* unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)(2).") (emphasis added); *see also Knight v. Hartford Police Dept.*, No. 3:04CV969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006) (deeming as admitted certain statements of fact that the opposing party failed to unambiguously deny and failed to offer a citation to admissible evidence that would support a denial).

[3] Defendants assert that "the only duties that are relevant to Plaintiff's claim and appeal for benefits are those set forth in Plaintiff's position description to the extent those duties correlate to Plaintiff's occupation as it is performed in the national economy."  [Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 4].  The Administrative Record includes a "Job Posting Write-up" for an "Administrative Support" position.  *See* [AR 2174].  Under "Job Responsibilities," the write-up states that the position "[r]equires decision making and problem solving with minimal direction.  Able to work under pressure to meet project deadlines/schedules," educational requirements of a "High School Diploma or better," accompanied by "Excellent computer skills," and additional "Qualifications," which "includ[e] strong written/verbal communication skills." [*Id.*]

P.'s Local Rule 56(a)(1) Statement, at ¶¶ 9-10; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶¶ 9-10].

Beginning in the spring of 2008, Spears began to experience symptoms of ill health. [AR 484; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 11; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 11]. On April 8, 2008, she saw Dr. James O'Brien for nausea, abdominal pain and frequent diarrhea. [AR 2034-36; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 12; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 12]. During this visit, she was diagnosed with unspecified gastritis, gastroduodenitis, and regional enteritis of the large intestine. [*Id.*].

In the summer of 2008, Spears began to suffer from migraines and associated symptoms, including blurred vision and an inability to focus. [AR 484-85; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 12; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 12]. Later that summer, on August 28, 2008, Spears went to the St. Francis Hospital emergency room for a migraine headache. [AR 1429-43; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 12; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 12]. While there, Spears underwent a CT scan which revealed "[l]ow attenuation changes in the white matter of the right temporal lobe" of her brain. [AR 1409]. The examining doctor concluded that they "may represent gliosis[4] or edema."[5] [*Id.*]. As a result, the doctor recommended "[a]

---

[4] "Gliosis is the proliferation of astocytes (cells supporting neurons and contributing to the blood-brain barrier) in the central nervous system after an injury to the brain." *Dahlstrom v. Astrue*, No. CV 10-192-TUC-DCB (JCG), 2011 WL 3799590, at *4 (D. Ariz. Aug. 29, 2011).

follow[-]up brain MRI."  [*Id.*].  Spears underwent her first of two MRIs, on September 2, 2008.  [AR 1410; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 12].  This first MRI revealed a "lobulated lesion" but "no associated edema."  [AR 1410].  Instead, the doctor surmised that the lesion "may represent an inactive demyelinating plaque," and that "[a] low-grade glioma [wa]s less likely."  [*Id.*].  Accordingly, the doctor recommended a follow-up MRI with contrast in 3 months.  [*Id.*].

Spears' migraines and related symptoms persisted, and shortly after this MRI, in September 2008, Spears stopped working and applied for short term disability ("STD") benefits.  [Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 14; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 14].  Based upon these persistent migraine headaches and related symptoms, Liberty approved the payment of benefits, effective October 4, 2008.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 21; AR 69 at Claim Note 2; AR 68 at Claim Note 2].   This initial approval was through October 8, 2008.  [AR 68 at Claim Note 6].  Liberty explained to Spears that in order to receive an extension of her benefits, she would have to request records forms from her treating doctors.  [AR 67-68, Claim Note 7].

On October 6, 2008, Spears underwent a second MRI.  This MRI confirmed the presence of "white matter lesions in the right temporal lobe" but concluded that they were "stable," "not enhance[d]," that there were "no new lesions" and "no associated edema."  [AR 2181].  The examining doctor further concluded that

---

[5] "Edema is a localized or generalized condition in which the body tissues contain an excessive amount of tissue fluid."  *Century Sur. Co. v. Casino West, Inc.*, 677 F.3d 903, 905 n. 1 (9th Cir. 2012).

the "diagnosis favors demyelinating plaque over a low grade glioma" but recommended "a repeat MRI in 6 months."  [*Id.*].  Spears provided these results to Liberty on October 16, 2008.  [AR 67, Claim Note 10].  Liberty also received Restrictions Forms from two of Spears' treating physicians.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 23-24; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 23-24].  Dr. Evan Schiff, a doctor of internal medicine, submitted his form on October 10, 2008, which stated that Spears had "severe migraines," but deferred to Spears' neurologist, Dr. Barry Gordon, as to when she would be able to return to work.  [AR 2189; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 23; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 23].  Three days later, on October 13, 2008, Dr. Gordon submitted a Restrictions Form which stated that Spears did not have any physical, mental, or cognitive restrictions that corresponded to Spears' migraine diagnosis.  [AR 2178; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 24; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 24].  After receiving this information, on October 16, 2008, Liberty extended its approval of STD benefits through November 1, 2008.  [AR 67 at Claim Note 11].

As a result of her migraines and related symptoms, Spears continued to see doctors throughout November and December 2008.  *See* [AR 62-64].  During this period, she submitted reports from her treating doctors and scheduled additional medical procedures.  [*Id.*].  For instance, on November 11, 2008, a different neurologist who examined Spears, Dr. Silvers, prepared a Restrictions Form in which he diagnosed Spears with a migraine and encephalopathy, and stated that she could perform a sedentary occupation on a full-time basis

6

beginning on January 8, 2009.  [AR 2112; Dkt. #85-7, D's Local Rule 56(a)(1)
Statement at ¶ 25; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 25].  Plaintiff's
neuro-oncologist, Dr. Joachim Baeringer, also submitted a Restrictions Form,
dated December 11, 2008, in which he stated that Spears exhibited an "abnormal
brain scan," but he did "not assess[]" any related physical, mental, or cognitive
restrictions, because he was "only seeing [Spears] for [the] MRI scan
abnormality."  [AR 2135; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 26; Dkt.
#91-1, P's Local Rule 56(a)(2) Statement at ¶ 26].  After receiving these reports,
Mary Hayden, a Liberty Disability Case Manager ("DCM"), referred Spears' claim
to Dr. Potts, a neurologist, for a peer review.  [AR 2137; Dkt. #85-7, D's Local Rule
56(a)(1) Statement at ¶¶ 27-28; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶
27-28].  As part of his evaluation, Potts contacted Drs. Gordon and Silvers
regarding any restrictions or impairments from which Spears was presently
suffering.  [AR 2115, 2117; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 29;
Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 29].  Both doctors reported that
Spears suffered from severe and persistent headaches with accompanying
symptoms, which led Dr. Potts to conclude in his December 18, 2008 report that
Spears "appears to have nearly daily headaches, the severity of which is likely to
preclude her from working."  [AR 2116; Dkt. #85-7, D's Local Rule 56(a)(1)
Statement at ¶ 32; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 32].  However,
during follow-up discussions with Drs. Gordon and Silvers, Dr. Gordon told Dr.
Potts that he had not placed any restrictions or limitations on her work capacity
and had not recommended she stay out of work. [AR 2115].  Dr. Silvers stated his

opinion that Spears would be able to return to work by January 7, 2009.  [*Id.*].
Based on Spears' records and Dr. Potts' December 18 and 23 report and
addendum, Liberty extended its approval of STD benefits through January 6,
2009.  [AR 62 at Claim Note 33; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶
34; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 34].

On January 8, 2009 Spears returned to work on a part-time basis.  [Dkt. #85-
7, D's Local Rule 56(a)(1) Statement at ¶ 35; Dkt. #91-1, P's Local Rule 56(a)(2)
Statement at ¶ 35].[6]  Throughout the month, she continued to see several doctors
regarding her symptoms, which included migraine headaches, visual aura,
nausea, and vomiting.  [AR 58 at MDS Note; Dkt. #82-5, P.'s Local Rule 56(a)(1)
Statement, at ¶ 15; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 15  These
symptoms inhibited Spears' ability to perform her job, even when she was given
fewer and simpler tasks.  [Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶¶ 16-
17; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶¶ 16-17].  On January 12, 2009,
Spears visited a neurologist, Dr. Zagar, who noted that her migraines had
improved following her use of medication but still occurred one to two times per
week, lasted approximately four hours, and were accompanied by visual aura,
nausea, and occasional vomiting.  [AR 58 at MDS Note].[7]  The next day, on

---

[6]  Although Dr. Silvers medically approved Spears to return to work full-time on
January 8, Spears' employer asked that she return part-time because of her
need to attend doctors' appointments.  [AR 2112, 2103; Dkt. #85-7, D's Local
Rule 56(a)(1) Statement at ¶ 35; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶
35].

[7]  According to Dr. Zagar, the "[m]ain trigger" of Spears' migraines was "position
change."  [AR 1494].  He also concluded that Spears was not experiencing any

January 13, 2009, one of Spears' doctors, Dr. Silvers, submitted a revised return-to-work recommendation, in which he recommended that Spears work part time upon her return (January 8) and work her way up to full-time status, by February 8, 2009.  [AR 2105-06; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 36].

By mid-January, Liberty began to reassess Spears' STD claim and consider her claim for LTD benefits.  On January 19, 2009, Liberty transmitted Spears' claim file to its LTD unit for review.  [AR 2095; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 38; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 38].  Three days later, on January 22, 2009, Liberty sent Spears a letter requesting additional information in support of her LTD claim and enclosing forms on which Spears was to provide the information.  [AR 374].  The letter stated that Spears was to return the forms "no later than April 28, 2009" and that "[i]n the absence of this information [Liberty] will make a claims determination based on the information in [Spears'] file."  [*Id.*]

That same day, January 22, Liberty referred Spears' file for a medical review to determine whether she was entitled to STD benefits beyond January 7, 2009.  [AR 59 at Phone Note 33; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 39; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 39].  Maureen Dahlmeyer, a nurse, reviewed Spears' medical records that Liberty had received since December 23, 2008.  [AR 58 at MDS Note; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 39; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 39].  The

---

"memory lapses or loss, and no tremor."  [AR 1495; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 51; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 51].

records contained notes from one of Spears' doctors concerning intermittent follow-up visits for peptic ulcer disease and microscopic colitis.  [AR 58 at MDS Note].   Spears' doctors were unsure of the cause of these conditions and ordered "copious lab tests."  [*Id.*].  Dahlmeyer also considered the revised prognosis offered by Dr. Silvers and the report submitted by Dr. Zagar regarding Spears' migraines.  [*Id.*].  After considering these submissions, and in light of Spears' complex medical history and treatment needs, Dahlmeyer concluded that Spears should remain on a reduced schedule, progressing to a full-time schedule by February 8, 2009.  [*Id.*; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 40; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 40].  Accordingly, on January 29, 2009, Liberty approved the extension of partial STD benefits through February 8, 2009.  [AR 57 at Claim Note 57; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 41; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 41].

   b.   Liberty Denies Spears' Claim for LTD Benefits

   However, on the same day Liberty approved the extension of partial STD benefits, it denied Spears' claim for LTD benefits and closed her claim file. According to Liberty, Spears' full-time return to work on February 8 would result in her failure to satisfy the Plan's Elimination Period requirement.  [AR 57 at Phone Note 35; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 41; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 41].

   On February 2, 2009, six days before Spears was to return to work full-time, Liberty sent Spears a written denial of her LTD claim.  [AR 372-73; Dkt. #85-7, D's

Local Rule 56(a)(1) Statement at ¶ 44; Dkt. #91-1, P's Local Rule 56(a)(2)

Statement at ¶ 44].  The letter informed Spears that Liberty

> [C]ompleted a thorough review of [Spears'] claim and ha[s] determined that long term disability benefits are not payable.  The information on file shows a part time return to work date of January 8, 2009, and that the part time period is for one month.  Your Short Term Disability claim is closed as of February 9, 2009 for full time return to work.  The United Technologies Corp.-Choice's Long Term Disability Policy requires that to receive long term disability benefits, you must fulfill an elimination period

[AR 372].

The letter also quoting the language of the policy concerning the

Elimination Period and notified Spears that because of her planned "full time

return to work . . . within [the] short term disability period and prior to satisfying

[the] long term disability elimination period, we are unable to approve your long

term disability claim."  [*Id.*].  The letter concluded by providing Spears with

Liberty's appeal procedure, and instructed her to "include any additional medical

and vocational information which you feel will support your claim" with her

appeal request.  [AR 373].

Although Liberty had determined that Spears was cleared to return to work

full-time on February 8, 2009, Spears never returned to work full time; but instead,

continued to work part-time, through March 24, 2009, when she stopped working

entirely.  [AR 54 at Phone Note 40].  Throughout this period, Spears also

continued to see doctors and undergo testing to determine the cause of her

various symptoms.  For instance, she underwent a spinal tap on February 3,

which yielded a positive result for IgG, an antibody associated with Lyme disease.

[AR 568; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 19; Dkt. #90, D.'s Local

Rule 56(a)(2) Statement, at ¶ 19].  Spears reported the spinal tap procedure to

Liberty employee, Monique Furgalack, on February 9, 2009, and explained that the

exam caused complications requiring her to remain on part-time status beyond

February 8, 2009.  [AR 56 at Claim Note 60].  Furgalack informed Spears that to

receive STD benefits after February 8, Spears would need to submit additional

medical records to support her claim and that Liberty would refer these records

for a medical review.  [*Id.*; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 47-

48; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 47-48].

### c.  Spears Seeks a Further Extension of Her STD Benefits and Liberty Declines to Extend Her Benefits Beyond February 8, 2009

In response, Spears' doctors submitted a number of additional documents.

That same day (February 9, 2009), Spears' rheumatologist, Dr. Kage, transmitted

to Liberty a form which indicated that Dr. Kage had discussed with Spears and

had agreed to recommend a reduction of her work schedule to four hours per day.

[AR 2013-14; Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 20; Dkt. #90, D.'s

Local Rule 56(a)(2) Statement, at ¶ 20].  Three days later, Dr. Kage's

recommendation was seconded by the Medical Department of Spears' employer,

UTC, which, in a February 13, 2009 email, informed Liberty that Spears had been

examined by UTC and was cleared to return to work with the following

restrictions: (i) four-hour work days, beginning on February 13, 2009 until a later

date to be determined by a doctor, and (ii) light duty, which excluded bending,

twisting, and lifting until February 20, 2009.  [AR 1925; Dkt. #82-5, P.'s Local Rule

56(a)(1) Statement, at ¶ 41; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 41].

Three of Spears' doctors, Drs. Zagar, Kage, and Oberstein also submitted medical records in February 2009, which revealed continued pain and discomfort.[8]

On February 26, Spears called Furgalack and stated that she could not return to work full-time because of her many doctor appointments, the uncertainty of the cause of her many symptoms, and fatigue.  [AR 55 at Phone Note 39].  During this call, Spears also informed Furgalack, for the first time, that she had recently been diagnosed with Lyme disease, and that her doctors thought it was possible, but were unable to confirm, that she had some type of autoimmune disorder.  [*Id.*; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 61; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 61].  In response, Furgalack told Spears that she would not send out any medical requests concerning these recent diagnoses because her STD benefits claim was closed.  [AR 55 at Phone Note 39].  However, Furgalack did instruct Spears to send any additional information she wished Liberty to consider for her STD benefits claim.  [*Id.*].

On March 2, 2009, while still working part-time, Spears received a peripherally inserted central catheter (PICC), upon the order of Dr. Zagar.  [Dkt.

---

[8] Dr. Zagar's records indicated that Spears was continuing to suffer from migraines and lumbago (lower back pain), that on February 3, 2009, Dr. Zagar identified a lumbar puncture, and on February 9, Spears received an epidural blood patch.  [AR 56 at Claim Note 63].  His notes also state that "within a few days" of her receipt of the patch, Spears "started to feel better.  Since that time, she has had no recurrence of the headache."  [AR 1596; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 63; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 63].  Dr. Kage reported that on February 5, Spears complained of fatigue, headache, difficulty concentrating, memory loss, and achy arms and legs.  [AR 56 at Claim Note 63].  Dr. Oberstein's records, dated January 21 through February 17, 2009, addressed a possible thyroid condition.  [AR 55 at Claim Note 68].

#82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 21; Dkt. #90, D.'s Local Rule 56(a)(2)

Statement, at ¶ 21].  On March 25, 2009, Spears notified Furgalack that she could

no longer work part-time and that one of her doctors, Dr. Kage, was going to send

Liberty additional medical records.  [AR 54 at Phone Note 40].  Among the records

Kage submitted was a note regarding a telephone call with Spears the previous

day (March 24).  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 69; Dkt. #91-1,

P's Local Rule 56(a)(2) Statement at ¶ 69].  The note stated:

> [P]atient would like us to communicate to disability carrier that as of
> today, she has 'full-time restricted hours' meaning that she will not
> be able to work any hours, will be completely out of work.  Per last
> [office visit] note, plan was to continue decreased schedule . . .
> [Patient] saw rheumatologist in New haven today; [patient] is
> concerned that he feels that neg[ative] lab and pos[itive] fluid cancel
> each out and she does not have Lyme.  He is going to review her
> reports and call patient tomorrow.  Patient states that she and her
> family have been researching and are considering [a] consult with a
> Lyme MD.

[*Id.*; AR 1839].

After Spears ceased working full-time, she began seeing two new doctors,

Dr. Raxlen, a neurologist, and Dr. Gouin, a naturopathic doctor, for Lyme disease

treatment, and she continued to submit medical records to Liberty.  [Dkt. #85-7,

D's Local Rule 56(a)(1) Statement at ¶¶ 67, 72-75; Dkt. #91-1, P's Local Rule

56(a)(2) Statement at ¶¶ 67, 72-75].  On April 23, 2009, Liberty requested a second

consulting physician review, to be performed by Dr. Taiwo, a board-certified

physician specializing in internal, preventative, and occupational medicine.  [Dkt.

#85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 70-71; Dkt. #91-1, P's Local Rule

56(a)(2) Statement at ¶¶ 70-71].  The purpose of this review was to determine

whether the additional medical information supported Spears' claim of "ongoing

restrictions and limitations." [AR 1799; 1804]. Dr. Taiwo was asked to opine on whether Spears' medical condition would prevent her "from working in any capacity . . . [and] [i]f not, what are the restrictions and limitations and what are the capabilities." [*Id.*].

On May 11, 2009, Dr. Taiwo submitted his report to Liberty, which concluded that Spears' "records do not support any specific limitations or restrictions that would prevent her from sitting, standing, or walking at a sedentary physical demand from [March 24, 2009] through the present time." [AR 1799]. Dr. Taiwo reached this conclusion after reviewing updated medical records from two of Spears' neurologists, Drs. Schiff and Donaldson, Spears' rheumatologist, Dr. Kage, whose most recent physical examination of Spears Dr. Taiwo characterized as "unremarkable," [AR 1801],[9] and after speaking with Dr. O'Brien, who reported that "[h]er last endoscopy showed that [her] ulcer had healed," and that "he did not restrict her activities." [AR 1802].

Two days later, on May 13, 2009, Liberty sent Spears a letter denying her claim for STD benefits beyond February 8, 2009. [AR 348-51]. Liberty based this determination on Dr. Taiwo's peer review report. [AR 348-51; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 81, 83]. While Dr. Taiwo's report considered whether Spears suffered from any specific limitations or restrictions that would prevent her from physically performing her job "from 3/24/09 through the present time,"

---

[9] According to a Liberty Claim Note, Dr. Kage's records from January 2009 through March 31, 2009 indicated that Spears suffered from headaches, fatigue, difficulty concentrating, memory loss, and achy appendages, and that Dr. Kage suspected that Spears was suffering from an autoimmune inflammatory disorder which involved multiple organs. [AR 54 at Claim Note 72].

[AR 1799], the denial letter stated that, "[p]er the medical review, the available records do not support any restrictions and limitations or impairment precluding you from performing the duties of your job . . . during the period of February 9, 2009 through present date.  Therefore, you do [not] meet your Plan's definition of disability, and no further benefits are payable."  [AR 349-50].  Finally, the letter provided Spears with information regarding how she could request a review of Liberty's denial and the type of medical records she should include with any review request.  [AR 350].

### d.  <u>Spears Unsuccessfully Appeals Liberty's Denial of an Extension of STD Benefits Beyond February 8, 2009</u>

On October 1, 2009, Spears appealed the May 13 denial of STD benefits. [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 87; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 87; AR 1769-70].  Her appeal letter noted that that Liberty closed her STD claim "on February 9, 2009 even though Dr. Kage stated that [Spears] needed to continue working part-time."  [AR 1770].  Her letter also listed her four treating physicians Drs. Raxlen, Zagar, Kage and Gouin and included a letter from each of them opining that she was disabled.  [*Id.*].  While Dr. Zagar cited the medical condition as Lyme Disease, Drs. Raxlen and Kage cited both Lyme Disease and co-infections, and Dr. Gouin did not posit a diagnosis.  [AR 1772-73; AR 1779-80].

The letter from Dr. Raxlen, dated June 22, 2009, stated that Spears had been a patient since April 21, 2009, she had been diagnosed with Lyme disease along with multiple co-infections, she suffered from numerous related symptoms, she has been prescribed two oral medications, that it was not possible for her to

work full or even part-time, that disability leave was medically necessary for her, and that her treatment was likely to last for at least a year.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 92; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 92; AR 1773].  Dr. Raxlen's letter also stated that he was a member of the Board of Directors of the International Lyme and Associated Disease Society.  [AR 1773]. Dr. Zagar's letter, dated October 6, 2009, stated that he had been treating Spears for neurological issues caused by Lyme disease since January 2009, she has had minimal improvement in symptoms, and remains unable to work, even on a part-time basis.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 93; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 93; AR 1772].  Dr. Kage's letter, dated August 4, 2009, was consistent with those of Drs. Zagar and Raxlen, as the letter noted that Spears tested positive for Lyme disease with multiple co-infections, suffered from a number of related symptoms, including slurred speech and the inability to "find" words, had been prescribed a host of medications, and concluded that Spears was not able to work at all and that full-time disability was medically necessary.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 94; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 94; AR 1779].  Finally, the letter from Dr. Gouin, a naturopathic doctor, stated that Spears "is unable to perform the duties required for her job and needs to continue to seek medical treatments for her condition."  [AR 297; AR 1769-70].

After receiving Spears' submission, Liberty performed two reviews.  First, on October 29, 2009, Jennifer Sullivan, a nurse case manager in Liberty's Managed Disability Services unit, performed a medical review.  Sullivan's

assessment questioned Dr. Raxlen's ability to properly diagnose Spears with Lyme disease, given that he "is a psychiatrist" and Lyme disease "would appear to be outside [his] area of expertise."  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 99; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 99; AR 51 at MDS Note].  Sullivan further noted that Spears did not provide any "new clinical information to contradict the opinions of Drs. Potts and Taiwo."  [*Id.*].  Sullivan then referred the case file for an infectious disease peer review to determine if the medical evidence submitted by Spears supported a Lyme disease diagnosis and any restrictions or limitations.  [*Id.*].

Dr. Silverman, an internal medicine and infectious disease specialist, performed the peer review.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 99; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 99; AR 51 at MDS Note].  On November 23, 2009, Dr. Silverman issued his report.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 104; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 104; AR 50 at MDS Note].  In the preparation of his report, Silverman reviewed medication lists, doctor notes describing office visits and phone calls, evaluations, and MRI and laboratory results from April 2008 through May 2009, Dr. Taiwo's May 11, 2009 report, and the letters submitted by Spears' doctors which Spears submitted in support of her appeal.  [AR 330-33].  Silverman also unsuccessfully attempted to conduct a clinician call with Dr. Raxlen, Spears' primary physician for her Lyme disease diagnosis.  [AR 333; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 103; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 103].

18

Silverman first found that a review of the material in Spears' file did not reveal "any history or evidence of Lyme disease."  [AR 333].  While Silverman acknowledged that Dr. Raxlen, who first diagnosed Spears, is "essentially known as a Lyme specialist,"and Spears' spinal tap results, which yielded a positive test for IgG, he noted that the test was "negative for IgM," a different Lyme disease antibody, and concluded that a positive IgG test, without more, was "not consistent with the diagnosis of [Lyme disease]."  [AR 334].  Silverman further noted the absence of any other diagnostic tests to support evidence of co-infections, or other infectious diseases.  [*Id.*].

As to the overall evidence of Spears' impairment, Silverman opined that there was "no clear[-]cut evidence of impairment from [February 8, 2009] to the present.  Physical exams do not support evidence of restrictions and/or limitations."  [*Id.*].  While Silverman did note that Spears underwent "rheumatology evaluations which revealed fatigue at 7 over 10, tightness in bilateral calves, and upper back pain through the shoulder blades, and also previous history of migraine headaches," [*id.*], he then stated that:

> There are no clear[-]cut findings which suggest impairment from [February 8, 2009] to the present.  The claimant, therefore, does not have any physical restrictions and/or limitations on activities including sitting, standing, walking, reaching, lifting, carrying and performing repetitive fine motor hand motions."

[*Id.*].

By letter dated January 29, 2010, Liberty notified Spears that her appeal was unsuccessful, and that her claim of disability from February 9, 2009 forward was not supported by the medical records she and her doctors submitted.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 113; Dkt. #91-1, P's Local Rule

56(a)(2) Statement at ¶ 113; AR 319-23].  In reaching this determination, Liberty relied on Dr. Silverman's November 2009 peer review report and Dr. Taiwo's earlier May 2009 report.  [AR 320-22.].[10]  The denial letter reiterated the definitions of "sick pay disability" and "short-term disability," summarized Liberty's claim review process to date, quoted excerpts from Dr. Taiwo's and Dr. Silverman's peer review reports, listed the responsibilities from UTC's job posting for an administrative assistant, *see* [AR 2174], and stated that Spears did not meet the definition of disability under the STD Plan.  The letter further informed Spears that she had exhausted her right to an administrative review and that Liberty would conduct no further review.  *See* [AR 322].

### e. Spears Unsuccessfully Appeals Liberty's Denial of STD Benefits For A Second Time

Liberty typically provides claimants with one level of appeal review.  [*Id.*].  However, on February 11, 2010, after a conversation with Spears' employer,

---

[10] Liberty contends that one of its employees, Chuck Johnson, "determined that the information in [Spears' claim] file did not support ongoing impairments." [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 112].  However, the two documents underlying Liberty cites, a two-page Appeal Assessment And Determination, [AR 324-25], and claim note records, [AR 49], make clear that Mr. Johnson's determination was based entirely on Dr. Silverman's peer review report.  The Appeal Assessment And Determination contains a summary of the medical records underlying Liberty's decision to *approve* STD benefits through February 8, 2009, along with the following statement: "[S]ent for an MD review – the information in the file does not support ongoing impairments."  [AR 325]. This is the only statement in the Assessment that concerns the sufficiency of Spears' medical records to support a claim for STD benefits beyond February 8, 2009.  The claim notes Liberty cites merely parrot the language contained in the Assessment.  *See* [AR 49 at Claim Note 95, 96].  In addition, the denial letter Liberty sent Spears following this review does not mention the Assessment. [AR 319-23].  While it did inform Spears that Liberty's internal Managed Disability Services group reviewed her file, the only conclusion it conveyed to Spears regarding this review was that Spears' file should be referred to a physician for a physician peer review.  [AR 320].

Liberty agreed that it would send Spears another complete copy of her file and provide her with an additional 30 days to submit any other medical records to be considered with her appeal.  [AR 49 at Claim Note 98; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 119; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 119]. Approximately a month later, on March 12, 2010, Spears forwarded to Liberty a letter from the Connecticut Attorney General's Office.   [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 120; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 120; AR 287-89].  The letter asserts that Liberty's denial of STD benefits "does not appear to be supported by the evidence," based on Dr. Silverman's alleged "dismissal of the significance" of Spears' positive test for IgG antibodies.  [AR 289].  In support of this conclusion, the letter cites and quotes an article from the Journal of Osteopathic Association, which stated that "[h]igh titers of either . . . IgG . . . or  . . . IgM . . . indicate disease, but lower titers can be misleading."  [AR 288].  Five days later, on March 17, 2010, Liberty received additional materials in support of Spears' appeal, including a list of Spears' current treating physicians in connection with her Lyme diagnosis and cognition problems, an article from a medical journal regarding the diagnosis of Lyme, and, most significantly, a letter from a new doctor, Dr. Donta, an infectious disease specialist.  [AR 1861-76]. After reviewing Spears' long medical history, like Drs. Kage and Gouin, Dr. Donta also found Spears' diagnosis to be elusive.  He opined that she was not simply suffering from Lyme Disease, but likely suffered from a "chronic multi-symptom illness consistent with a chronic fatigue and fibromyalgia syndrome of longstanding duration that may well be due to Lyme Disease in whole or in part.

She has had no obvious overall improvement which may be due to her not having as effective treatment for Chronic Lyme Disease as possible." [AR 1876]. Dr. Donta also recommended adjustments to Spears' medication, in light of the possibility that certain vitamins Spears was taking "might well support . . . Lyme bacteria." [*Id.*].

After receiving Spears' March 2010 submissions, Liberty informed Spears that her claim file had been referred "for further review and assessment," and that a physician would review her "complete file, including all the additional data [Spears] submitted." [AR 286; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 123; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 123]. Spears' file was then returned to Dr. Silverman for a second review. [AR 1699; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 126; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 126]. In the referral email from Liberty, Dr. Silverman was informed that, since his previous review, there was "no new medical, just letters from providers and Attorney General's office." [*Id.*].[11] Liberty also asked Dr. Silverman to "comment on the assertion by Assistant Attorney General Huhn . . . regarding the IgG results" and to state whether this altered Dr. Silverman's opinion. [*Id.*]. Finally, Liberty instructed Dr. Silverman to contact Drs. Raxlen and Kage for input regarding any medically-supported restrictions. [*Id.*].

Dr. Silverman completed his second peer review report on April 22, 2010. [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 127; Dkt. #91-1, P's Local Rule

---

[11] As Spears points out, this statement was not accurate, as Dr. Donta had submitted a letter on Spears' behalf. [Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 126].

56(a)(2) Statement at ¶ 127; AR 277-80].  In generating his report, Dr. Silverman relied upon some, but not all, of the additional medical information Spears had submitted the month before.  [AR 277-78].  Notably, the report did not consider the letter sent by Spears' infectious disease specialist, Dr. Donta.  [*Id.*; P's Local Rule 56(a)(1) Statement at ¶ 126].  Dr. Silverman did speak with Dr. Kage, who stated that "there was no clear[-]cut evidence of rheumatological disorder which would explain [Spears'] symptomatology from her perspective."  [AR 274, 278].  Dr. Silverman attempted, but was unable to reach, Dr. Raxlen.  [AR 278].[12]  With regard to the letter submitted by the Connecticut Attorney General's Office, Dr. Silverman did not contest the assertion that the presence of IgG antibodies is indicative of Lyme disease.  [AR 288].  However, he concluded that the diagnosis was inappropriate, given Spears' failure to respond positively to a four-week standard treatment for the disease, the absence of any other evidence of tick-borne illness to support a Lyme disease diagnosis, and her receipt of intravenous therapies that were not, in Dr. Silverman's view, the standard of care in treatment recommendations for Lyme disease.  [AR 279].

After receiving this report, Liberty informed Spears of its decision in a letter dated May 13, 2010.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 132; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 132; AR 268-73].  Liberty again

---

[12] The record does contain a letter from Dr. Raxlen, dated May 27, 2010, which appears to have been received by Liberty on June 7, 2010, and addresses Liberty's attempts to speak with him about his Lyme disease diagnosis.  [AR 850].  The letter stated that, "[d]ue to the highly contentious nature of the field, it is our policy not to comment on issues involving legal or disability disputes."  [*Id.*].  Indeed, Dr. Raxlen specifically declined "to comment on Dr. Silverstein's report."  [*Id.*].

denied Spears' STD claim, citing to and quoting from Dr. Taiwo's peer review report and the two peer review reports prepared by Dr. Silverman as support for the denial.  *See* [AR 269-72].[13]  The letter also notified Spears that she had exhausted her administrative remedies and had a right to bring a civil action under ERISA.   [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 135; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 135; AR 273].

      **f.**  <u>**Spears Seeks And Receives a Third Review of Her Claim for STD Benefits**</u>

      Eight days later, on May 21, 2010, Spears, through her recently retained counsel, requested an additional 180 days to provide evidence in support of Spears' appeal.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 136; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 136; AR 263-64].  Spears also requested that Liberty produce a number of documents, including copies of Spears' complete claim file, the Summary Plan Description, a complete LTD Plan, a list of all individuals involved in decision-making regarding Spears' claim, Liberty's complete internal guidelines, rules, protocols, and criteria under which the Plan operates, documentation regarding the handling of similar claims, a summary of the Plan's financial report, and the name and address of the Plan Administrator. [AR 264].  While Liberty agreed to accept additional evidence submitted by August 31, 2010, [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 137; Dkt. #91-

---

[13] Although Liberty claims that Chuck Johnson performed a "second appeal review" and concluded "that the information in the file did not support ongoing impairments," [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 131], as Liberty acknowledges and Johnson's Appeal Assessment indicates, *see* [AR 1688-90], his conclusion was entirely "based on Dr. Silverman's report."  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 131].

1, P's Local Rule 56(a)(2) Statement at ¶ 137; AR 261-62], enclosed copies of the

LTD summary plan description and policy, and agreed to produce a second

complete copy of Spears' claim file upon request, Liberty declined "to provide

internal guidelines, rules and protocols" and "documentation of the handling of

similar claims."  [AR 265; Dkt. #82-5, P's Local Rule 56(a)(1) Statement at ¶ 53;

Dkt. #90, D's Local Rule 56(a)(2) Statement at ¶ 53].  By letter dated August 21,

2010, Spears submitted additional materials, which included an August 2010

vocational expert report,[14] an August 2010 notice from Liberty denying Spears'

life insurance coverage, four affidavits from Spears, her mother, and two friends,

a July 2010 neuropsychological evaluation, questionnaires and assessments

completed in June and July 2010,[15] a Connecticut Department of Social Services

notice,[16] and various medical records from 2007 through July 2010.  [Dkt. #85-7,

---

[14] The vocational report, prepared by Raymond Cestar, M.S. M.B.A. on August 20, 2010, found that Spears was unemployable at any job, due to her cognitive deficiencies and her need to frequently alternate positions of sitting and standing and to take frequent naps.  [AR 463-75; Dkt. #82-5, P's Local Rule 56(a)(1) Statement at ¶ 65; Dkt. #90, D's Local Rule 56(a)(2) Statement at ¶ 65].

[15] The questionnaire was from Dr. Zagar and was dated June 21, 2010.  [AR 598-601].  Dr. Zagar concluded that, as of this date, Spears could sit only one hour at a time, she could stand or walk less than two hours in an eight hour work day, she would require unscheduled breaks every hour and would need to rest for fifteen minute increments, and she would likely be absent from work due to her ailments for more than five days per month.  [*Id.*].  The assessment was from Dr. Giannini, dated July 9, 2010, and stated that Spears should rarely lift more than ten pounds, has difficulty with loud noises, is easily fatigued, and was not able to perform numerous work-related tasks on a regular, reliable and sustained schedule.  [AR 611-14; Dkt. #82-5, P's Local Rule 56(a)(1) Statement at ¶ 64; Dkt. #90, D's Local Rule 56(a)(2) Statement at ¶ 64].

[16] The Notice, dated April 22, 2010, stated that Spears had been found "unemployable" for a period of at least 6 months and authorized payment of benefits beginning in April 2010.  Under Connecticut law, an "unemployable

D's Local Rule 56(a)(1) Statement at ¶¶ 138-39; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 138-39; AR 453-57].  Among the reports Spears submitted was a letter from Dr. Robert Schoen, a rheumatologist, who examined Spears on March 26, 2009.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 140; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 140; AR 1119-20].  After reviewing her medical history, including the spinal tap results which revealed the presence of IgG antibodies, Dr. Schoen concluded that Spears "does not have and has not had Lyme disease," and that this disease was "not the cause for her symptoms."  [AR 1120].  Specifically addressing Spears' positive IgG test, Dr. Schoen found that, despite this test, Spears' "peripheral serology was negative, which is also against the diagnosis of Lyme disease."  [*Id.*].  Dr. Schoen's letter also noted that Spears received a four-week treatment for central nervous system Lyme disease and concluded that this was "sufficient treatment" and that Spears should "go off this treatment now."  [*Id.*].  Finally, suggestive of a conclusion that Spears' illness had yet to be diagnosed, the letter recommended that Spears "pursue other diagnostic avenues, certainly following up with Yale neuro-oncology, Dr. Zagar for her persistent headaches, as well as rheumatology, Dr. Kage, and endocrinology." [*Id.*].

Following her August 2010 letter, Spears continued to submit records to Liberty.  By letter dated September 17, 2010, Spears submitted an opinion letter from Dr. Raxlen, dated September 9, 2010.  [Dkt. #85-7, D's Local Rule 56(a)(1)

person" means a person who "has a physical or mental impairment prohibiting such person from working or participating in an education, training or other work-readiness program, which is expected to last at least six months, as determined by the commissioner."  Conn. Gen. Stat. § 17b-194(a)(B).

Statement at ¶ 147; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 147; AR 246-
48].   Despite his stated "policy not to comment on issues involving legal or
disability disputes," [AR 850], Dr. Raxlen's letter reaffirmed his Lyme disease
diagnosis, stated that Spears continued to suffer from debilitating physical and
neurocognitive symptoms, and concluded that Spears "will be unable to sustain
employment for the foreseeable future."  [Dkt. #85-7, D's Local Rule 56(a)(1)
Statement at ¶ 151; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 151; AR 247].
While the letter restated Dr. Raxlen's conclusions, the only bases it offered in
support of them were Spears' symptoms "[a]t the time of her initial visit" in April
2009, the "positive spinal tap in January 2009," and a July 2010
neuropsychological evaluation performed by another of Spears' doctors, Dr.
Rissenberg, which, according to Dr. Raxlen, illustrated "[a] marked decline in
overall intellectual functioning" and overall scores that were "typical of patients
with . . . Lyme disease in the central nervous system."  [AR 246-47].[17]

On September 27, 2010, Liberty, again, referred Spears' claim file for a peer
review.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 156; Dkt. #91-1, P's
Local Rule 56(a)(2) Statement at ¶ 156; AR 243-44].  Dr. John Brusch, board-
certified in internal medicine, geriatric medicine, and infectious disease prepared
a report, dated October 14, 2010.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at

---

[17] Dr. Raxlen's letter also identified Spears' co-infections as Bartonella,
Babesiosis, and Mycoplasma, and stated that "[i]t is frequently necessary to
treat with extended courses of oral and intravenous antibiotic therapy,
changing antibiotic families every several months, as has been the case for Ms.
Spears."  [AR 247].  However, Liberty received reports from at least one of
Spears' other doctors, Dr. Donta, which asserted that there was "no evidence"
Spears had "a chronic Babesiosis or Bartonellosis."  [AR 1876].

¶¶ 158-59; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 158-59; AR 224-42].

Dr. Brusch's report lists fourteen pages of records that he reviewed and notes

that he made three phone calls to Dr. Raxlen, left messages after each, and did

not receive any return call.  [AR 224-39].   Dr. Brusch observed that, while "many

diseases have been involved to explain the claimant's clinical picture, there are

very few that are substantiated clinically."  [AR 240].  However, "among" the

ailments for which Dr. Brusch evidently found clinical support were "migraine

headaches" and "autoimmune disorders."   [*Id.*].  Dr. Brusch further concluded

that, "[f]rom an infectious disease evaluation, [Spears] does not have any

restrictions and limitations to her activity from [February 8, 2009] forward."  [*Id.*].

He also opined that Spears did "have sustainable full time capacity as of

[February 8, 2009]."  [*Id.*].  With regard to Lyme disease, Dr. Brusch stated that

Spears did "not have Lyme disease of any type including CNS Lyme disease,"

finding that her positive antibody test was "overwhelmingly a false positive,"

since "[i]t is impossible for someone to have a CNS infection and negative

systemic Lyme titers.  Also, the lack of cellular reaction and the presence of

normal sugar and protein go against diagnosis."  [*Id.*].  Dr. Brusch found that the

"[m]ost likely cause of this false positive" was Spears' "autoimmune type

disease," as such a disease "can yield false positives against many spirochetal

diseases such as Lyme."  [AR 240-41].  Dr. Brusch also rejected Dr. Raxlen's

diagnosis of a babeiosis co-infection, concluding that the "type of smear" on

which Dr. Raxlen based his diagnosis was "very nonspecific,"  [AR 241], and

noting that Spears tested negative for Babeiosis, Bartonella, and Ehrlichia

antibodies.  [*Id.*].  Finally, Dr. Brusch found that, Spears did "not have any

significant chronic infectious disease that would impair [her] sustainable full time

capacity as of [February 8, 2009].  There is no evidentiary documentation that her

listed medications impair her full-time sustainable capacity."  [*Id.*].   While Dr.

Brusch concluded that Spears suffered from "migraine headaches" and

"autoimmune disorders," he did not offer an opinion of whether and to what

extent these conditions affected her capacity to perform the functions of an

executive assistant.

### g. Spears' Employer, UTC, Directs Liberty to Pay Spears the Maximum Amount of STD Benefits And to Conduct A Second Review of its Denial of Her LTD Benefits Claim, Which Liberty Denies for a Second Time

Shortly after Liberty had completed this third review of Spears' disability

claim, on October 27, 2010, Spears' employer, UTC, contacted Liberty and

requested that Liberty override its short term disability determination and issue

Spears additional short term disability benefits, through the remainder of the

eligibility period (March 27, 2009).  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement

at ¶ 164; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 164; AR 215].

Accordingly, Spears received the maximum level of STD benefits for the period

during which she was eligible.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶

165; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 165].  UTC also requested

that Liberty reopen Spears' LTD claim, make an LTD determination, and notify

UTC of its decision.  [*Id.*].  Liberty informed Spears of this decision in writing.

[AR 223].  On November 16, 2010, Liberty sent Spears a letter regarding its

reconsideration of her LTD claim.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at

¶ 166; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 166; AR 211-14].  The letter referred Spears to Liberty's "previous letter dated February 2, 2009" and stated that, at that time, Liberty "had completed a thorough review of [Spears'] LTD claim and had determined that benefits were not payable."  [AR 211].  It then reminded Spears that the decision to pay her the full amount of STD benefits was "based on the employer override only.  This employer override for payment of short term disability benefits did not alter the Appeal Review Unit's determination to uphold denial of benefits beyond February 8, 2009."  [AR 212].  Based on Dr. Silverman's November 23, 2009 peer review report and Dr. Brusch's report, [AR 212], Liberty concluded that, as of February 8, 2009, Spears was not disabled, and as a result, she failed to satisfy the LTD Elimination Period.  [AR 213].

   h.  Spears Unsuccessfully Appeals the Denial of Her LTD Claim

   Spears appealed Liberty's denial of LTD benefits on May 9, 2011.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 169; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 169; AR 195-98].  Her submission included an opinion letter and medical records from Dr. Zane Saul, a doctor of internal medicine and infectious disease, records from Dr. Richard Shoup, Social Security determination, in which an administrative law judge concluded that Spears was disabled as of August 31, 2008, that her part-time return to work in January 2009 was an unsuccessful work attempt, and that she was properly diagnosed as suffering from Lyme disease in February 2009, and various articles regarding Lyme disease.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 170; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 170].  The letter, dated March 7, 2011, from Dr. Saul stated Spears

was under his "care for advanced, debilitating Lyme Disease," that Spears

suffered from a number of related symptoms, and that she was "not medically

able to work in any capacity at this time."  [Dkt. #85-7, D's Local Rule 56(a)(1)

Statement at ¶ 173; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 173; AR

100].[18]

Approximately a month later, on June 15, 2011, Liberty reached the

decision to maintain its denial of long-term benefits, on the ground that the

medical records did not support Spears' claim of disability throughout the

Elimination Period, which ran from September 27, 2008 through March 27, 2009.

[Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 187; Dkt. #91-1, P's Local Rule

56(a)(2) Statement at ¶ 187; AR 74-81].  After quoting several Plan definitions and

peer review reports from Liberty's earlier denial letters, [AR 76-80], the letter

examined the new materials Spears submitted in her latest appeal submission.

[AR 80].  The letter explained that

> The additional medical information received is for treatment received
> nearly two years after the beginning of [Spears'] claim . . . it is not
> relevant to the period under consideration, and any clinical information
> from those records cannot be extrapolated back to that period to
> determine Ms. Spears' condition and associated medically supported
> restrictions and/or limitations for September 2008 through the
> Elimination Period, or as of, February 9, 2009, forward in order to be
> eligible under the Policy

> [*Id.*].

---

[18] Dr. Saul began treating Spears on August 8, 2010.  [Dkt. #85-7, D's Local Rule
56(a)(1) Statement at ¶ 175; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶
175].

i.  **The Plan**

By virtue of her employment by a division of the Plan sponsor, UTC, Plaintiff was a participant in the Plan.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 1].  The Plan offers both short-term disability ("STD") and long-term disability ("LTD") payments to eligible claimants.

1.  **STD Provisions**

STD benefits are self-funded under the Plan.  [*Id.* at ¶ 2].  Accordingly, the Plan sponsor, UTC, paid out STD benefits to eligible claimants.  [AR 2235].  UTC also served as the Plan Administrator of the STD Plan.  [AR 2235].  As Plan Administrator of the STD Plan, UTC was provided with

> The full discretionary authority and power to control and manage all aspects of the [STD Plan], to determine eligibility for plan benefits, to interpret and construe the terms and provisions of the plan, to determine questions of fact and law, to direct disbursements, and to adopt rules for the administration of the plan as it may deem appropriate, in accordance with the terms of the plan and all applicable laws.

[*Id.*; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 6; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 6].

UTC was also given the authority to "allocate or delegate its responsibilities for the administration of the plan to others to carry out."  [*Id.*]. Accordingly, UTC contracted with Liberty to act as claims administrator for the STD Plan, and expressly delegated to Liberty its "discretionary authority to interpret and construe the terms and provisions of the [STD] plan."  [*Id.*].

With respect to STD benefits, the Plan states:

**If you are under the care of a doctor and are unable to perform the material and substantial duties of your own job due to an illness, injury, surgery, or pregnancy, you will start to receive short term disability benefits for an approved disability after your Sick Pay benefits, if any, are exhausted**

**[AR 2212; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 4; Dkt. #91-1, P's Local Rule 56(a)(1) Statement at ¶ 4].**

**For STD benefit purposes, a claimant has an approved disability if they have "a medical condition related to an illness, injury, or surgery . . . are unable to perform the material and substantive duties of [their] current or a similar job for more than 5 consecutive scheduled workdays . . . [and their] physician provides medical evidence to support his or her assessment of [their] medical condition." [AR 2213; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 5; Dkt. #91-1, P's Local Rule 56(a)(1) Statement at ¶ 5].**

## 2. LTD Provisions

**Unlike STD payments, which were paid by UTC, LTD benefits under the LTD Plan were provided by a group insurance policy underwritten by Liberty.  [AR 2235; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 7; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 7].  LTD benefits were assessed and paid in accordance with this LTD Plan.  [Dkt. #85-4 at AR 1].  In addition to making payments of LTD benefits, the LTD Plan bestowed upon Liberty "the authority, in its sole discretion, to construe the terms of th[e] policy and to determine benefit eligibility [t]hereunder."  [AR 34; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 15; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 15].  The discretionary authority provision further provided that "Liberty's decisions regarding**

construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  [*Id.*].

LTD benefits are payable under the LTD Plan in accordance with the following:

> When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy.  The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:
>
> 1.  Disability;
> 2.  Regular Attendance of a Physician; and
> 3.  Appropriate Available Treatment.

[AR 20; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 9; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 9].

Several of these terms lie at the core of the dispute in this case.  A claimant has a "Disability" or is "Disabled" under the LTD Plan if:

> [D]uring the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation . . . and . . . thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation

[AR 7; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 11; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 11].

The LTD Plan defined "Elimination Period" as "a period of consecutive days of Disability or Partial Disability for which no benefit is payable."  [AR 8; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 10; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 10].  The Elimination Period is the greater of (i) the end of the

Covered Person's STD benefits or (ii) 180 days.  [AR 4; Dkt. #82-5, P's Local Rule 56(a)(1) Statement at ¶ 37; Dkt. #90, D's Local Rule 56(a)(2) Statement at ¶ 37].

"Material and Substantial Duties" are defined as the "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."  [AR 9; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 12; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 12].

"Own Occupation" is defined as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began," and Liberty was to consider one's "occupation as it is normally performed in the national economy."  [AR 9; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 13; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 13].

"Proof" is defined as "the evidence in support of a claim for benefits and includes . . . a claim form . . . an attending Physician's statement completed and signed . . . and . . . standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits."  [AR 10; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 14; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 14].

   j.   ERISA Claims Procedures

The parties agree that both the STD and LTD Plans were subject to the statutory and regulatory requirements of ERISA and as Plan Administrator, Liberty was an ERISA fiduciary.  *See* [Dkt. #82-5, P's Local Rule 56(a)(1) Statement at ¶ 34; Dkt. #90, D's Local Rule 56(a)(2) Statement at ¶ 37; AR 273].  29 C.F.R.

§2560.503-1 "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. §2560.503-1 (a).

Among the many requirements an ERISA benefits plan must adhere to is the requirement to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination." 29 C.F.R. §2560.503-1(h)(1). The procedures must provide for "a full and fair review of the claim and the adverse benefit determination." *Id*. To satisfy this requirement, a Plan must: (1) provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits. 29 C.F.R. §2560.503-1(h)(2)(ii); (2) provide a claimant, upon request and free of charge, reasonable access to, and copies of all documents and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8)[19] of this section. 29 C.F.R. §2560.503-1(h)(2)(iii); (3) provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. 29 C.F.R. §2560.503-1(h)(2)(iv); (4) provide for a review that does not afford deference to the initial adverse benefit determination

---

[19] 29 C.F.R. §2560.503-1(m)(8)(iv) defines "relevant" documents to include "a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination."

and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.  29 C.F.R. §2560.503-1(h)(3)(ii); (5) provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination.  29 C.F.R. §2560.503-1(h)(3)(iv); and (6) provide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual.  29 C.F.R. §2560.503-1(h)(3)(v).

**Legal Standard**

Plaintiff moves for summary judgment, pursuant to Fed. R. Civ. P. 56, *see* [Dkt. #82], while the Defendants move for judgment on the administrative record. *See* [Dkt. #85].  A motion for judgment on the administrative record is a motion that "does not appear to be authorized in the Federal Rules of Civil Procedure," and thus courts treat such a motion as either a motion for summary judgment or as "essentially a bench trial 'on the papers' with the District Court acting as the finder of fact."  *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d. Cir. 2003). However, courts may construe a motion for judgment on the administrative record as a request for a bench trial on the papers only where the parties have consented to such a trial.  *O'Hara v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, 642

F.3d 110, 116 (2d Cir. 2011).   As the parties have not so consented, the Court treats both parties' motions as motions for summary judgment.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

      a.   <u>Standard of Review</u>

          1.  <u>The Plan Granted Liberty Discretionary Authority to Determine Benefits Eligibility Under the Plan</u>

ERISA jurisprudence determines the standard and scope of review in connection with a challenge to a plan's denial of benefits.  *Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869 at *6 (S.D.N.Y. 2007).  "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations."  *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996).  After analyzing the legislative history of ERISA, the Supreme Court held

that a denial of benefits challenge is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 111-12 (2d. Cir. 1995); *Murphy v. IBM Corp.*, 23 F.3d 719, 721 (2d Cir. 1994) (per curiam), *cert. denied*, 513 U.S. 876 (1994). Generally, federal courts should avoid excessive judicial interference with pension plan administration vested with discretionary authority, by applying a deferential "arbitrary and capricious" standard reviewing a challenge its decisions. *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 829 (1983). Under an arbitrary and capricious standard, a court may overturn an ERISA plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law. *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133 (2d Cir 2010).

In order to determine if a plan confers discretionary authority on its administrator(s), the Court must examine the language of the plan. Discretionary authority can be granted without specific trigger words such as "discretion" or "deference," as long as the benefit plan's language is clear. *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005). In general, objective standards do not grant discretion while subjective standards do. The Second Circuit has instructed that subjective phrases such as "resolve all disputes and ambiguities" or "in our judgment," clearly confer discretionary authority. *Id.*; *see*

39

*also Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-23 (2d Cir. 2008)

(finding that terms such as "may adopt reasonable policies, procedures, rules,

and interpretations" and "determine[s] to be the reasonable charge" confer

discretionary authority).

By contrast, a requirement to "submit satisfactory proof of Total Disability"

is ambiguous and does not clearly confer discretionary authority. *Kinstler v. First*

*Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251-52 (2d Cir. 1999). The Second

Circuit explained that such a phrase is ambiguous because it is unclear whether

the claimant must submit to the administrator satisfactory proof which would

imply an objective standard of "satisfactory proof," or the claimant must submit

proof that is satisfactory to the administrator, which would imply a subjective

standard of "satisfactory proof." *Id.* It is the administrator's burden to prove that

discretionary authority has been granted. *Id.* at 249.

Liberty was expressly vested with discretionary authority over both the

STD and LTD claim determinations. For the STD program, the plan administrator

had:

> The full discretionary authority and power to control and manage all
> aspects of the [STD program], to determine eligibility for plan benefits, to
> interpret and construe the terms and provisions of the plan, to determine
> questions of fact and law, to direct disbursements, and to adopt rules for
> the administration of the plan as it may deem appropriate, in accordance
> with the terms of the plan and all applicable laws.

[*Id.*; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 6; Dkt. #91-1, P's

Local Rule 56(a)(2) Statement at ¶ 6]. Such language is clearly sufficient to

indicate that UTC, as plan administrator, was given and delegated to Liberty

discretionary authority to review benefits claims under the STD program. *See,*

*e.g., Zoller v. INA Life Ins. Co. of New York*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *10 (S.D.N.Y. Aug. 25, 2008).

Similarly, as plan administrator of the LTD program, Liberty was vested with "the authority, in its sole discretion, to construe the terms of th[e] policy and to determine benefit eligibility [t]hereunder," and its determinations of benefit eligibility were deemed "conclusive and binding."  [AR 34; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 15; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 15].  Courts have construed this precise provision as sufficiently conveying discretionary authority to Liberty.  *See, e.g., Fretta v. Liberty Life Assur. Co. of Boston*, 719 F. Supp. 2d 344, 349 n. 2 (D. Vt. 2010).

   2.   The Arbitrary and Capricious Standard Applies in This Case

Once it is clear that the administrator has discretionary authority, as noted above, the standard of review ordinarily shifts from *de novo* to an arbitrary and capricious standard of review.  *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) ("If the insurer establishes that it has [] discretion, the benefits decision is reviewed under the arbitrary and capricious standard.").  However, the Second Circuit has held that, in certain circumstances, a plan administrator's failure to comply with the ERISA claims regulations requires courts to eschew the more deferential arbitrary and capricious review in favor of a more searching *de novo* review.  *See Nichols v. Prudential Ins. Co.*, 406 F.3d 98, 109 (2d Cir. 2005).  While the question of whether a plan administrator must fully or substantially comply with the ERISA claims procedures in order to retain the deferential arbitrary and capricious review remains open, *see Duncan v. CIGNA Life Ins. Co.*

*of New York*, 507 Fed. Appx. 61, 65 (2d Cir. 2013), the majority of courts in this Circuit conduct a fact-specific inquiry to determine whether the plan administrator acted in a dilatory or bad faith manner, or whether the administrator substantially complied with the claims regulations, by maintaining an open dialogue with the claimant and delivering reasonably timely and detailed benefits decisions.  *See, e.g., Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 336-40 (E.D.N.Y. 2013); *Tsagari v. Pitney Bowes, Inc. Long-Term Disability Plan*, 473 F. Supp. 2d 334, 338-40 (D. Conn. 2007); *Wedge v. Shawmut Design & Constr. Grp. Long Term Disability Ins. Plan*, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at *9-11 (S.D.N.Y. Sept. 10, 2013); *Duncan v. Cigna Life Ins. Co. of N.Y.*, No. 10-CV-1164 (SJF)(ARL), 2011 WL 6960621, at *4-5 (E.D.N.Y. Dec. 30, 2011); *Onge v. Unum Life Ins. Co. of Am.*, No. 3:07-CV-01249(AWT), 2010 WL 3802787, at *2-4 (D. Conn. Sept. 20, 2010); *Robinson v. Metropolitan Life Ins. Co.*, No. 06 Civ. 7604, 2007 WL 3254397, at *2 (S.D.N.Y. Nov. 2, 2007); *Pava v. Hartford Life & Accident Ins. Co.*, No. 03 CV 2609 SLT RML, 2005 WL 2039192, at *8-9 (E.D.N.Y. Aug. 24, 2005).

Relying on *Nichols* and a Summary Order issued by the Second Circuit in *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 546 App'x 2 (2d Cir. 2013), Spears asserts that Liberty's "repeated violations" of the ERISA regulations entitle her to "de novo review of her claim."  [Dkt. #82-1 at 30]. Spears maintains that Liberty failed to substantially comply with the claims procedures by (i) failing to provide internal guidelines during the administrative appeals process, (ii) failing to provide a report prepared by a third-party peer reviewer in connection with one of Spears' appeals, (iii) failing to consider

additional records and documentation Spears provided in support of her appeals, (iv) improperly affording deference to prior denials of claim benefits, and (v) failing to identify certain medical experts who reviewed Spears' claim file.  *See* [Dkt. #82-1 at 35-44].

As a preliminary matter, it appears that *Nichols* and *Halo* do not apply to the question of standard of review here, as the violations Spears raises do not concern "dilatory conduct [that] could preclude judicial access."  *Wedge*, 2013 WL 4860157, at *9.  The question at the heart of *Nichols*, and that each court must consider in determining whether to alter the standard of review is whether the plan administrator "made a valid exercise of discretion [] to which the Court can defer."  *Varney v. Verizon Comm'cns, Inc.*, No. CV 07-695 (LDW) (AKT), 2013 WL 1345211, at *6, 8 (E.D.N.Y. Mar. 1, 2013) (applying arbitrary and capricious review where plaintiff received a "timely decision on appeal" and "regardless of whether the [plan administrator] complied with the DOL regulations initially"); *accord Demirovic v. Building Srv. 32 B-J Pension Fund*, 467 F.3d 208, 211-12 (2d Cir. 2006) (applying arbitrary and capricious review and distinguishing *Nichols* where the plan administrator provided "a final decision and exercise of [] discretion" despite violating the ERISA claims regulations).  In determining whether a plan administrator has validly exercised its discretion, the Second Circuit examines whether the plan administrator issued a final decision on whether benefits were or were not payable under the policy, and whether this decision explains the basis for the plan administrator's determination.  *See Strom v. Siegel, Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 243-44 (2d Cir. 2007) (holding that

the district court "erred, and should have reviewed the administrators' decision *de novo*" where the "[p]lan administrators specifically reserved decision on [the claimant's] claims" and where the denial letter "did not offer any explanation of why" the claimant did not qualify for benefits); *see also Booth v. Hartford Life & Accident Ins. Co. of Am.*, No. 3:08-CV-0013 (JCH), 2009 WL 652198, at *8 (D. Conn. Feb. 3, 2009) (applying *de novo* review where it was "undisputed that [the plan administrator] never issued a final decision on [the claimant's] claims explaining why, under the terms of the Plan, [the claimant] was ineligible for the benefits he claimed").  Here, Spears does not challenge the timing of Liberty's denial notices, nor does she assert that the letters fail to provide an explanation for Liberty's decision.  Indeed, her principal complaint is that Liberty "did not appropriately consider the voluminous evidence submitted by Spears on appeal and simply repeated the reason for its initial denial decision over and over again."  [Dkt. #82-1 at 31].  In short, Spears challenges Liberty's decision and its basis; she does not assert that her claim was "deemed denied" or that Liberty otherwise failed to reach a decision and provide some explanation for it.  *See, e.g., Morgenthaler v. First Unum Life Ins. Co.*, No. 03-CV-5941, 2006 WL 2463656, at *3 (S.D.N.Y. Aug. 22, 2006) ("The holding of *Nichols* is limited to those cases where the administrator fails to respond at all."); *Duncan v. Cigna Life Ins. Co. of New York*, No. 10-CV-1164 (SJF) (ARL), 2011 WL 6960621, at *5 (E.D.N.Y. Dec. 30, 2011) (holding that arbitrary and capricious standard applied even where plan administrator failed to comply with the ERISA regulations because the administrator "has provided a decision to which the Court can defer, and did so

before it was served with the complaint in this action"), *aff'd*, 507 Fed. App'x 61 (2d Cir. 2013).[20]

A review of each of the denial notices indicates that Liberty did reach a final decision and provided Spears with an explanation.  Beginning with the initial letter Spears was sent on February 2, 2009 denying her claim for LTD benefits, the letter quoted the relevant portions of the LTD Plan defining the "Elimination Period," stated that "[t]he information on file shows a part time return to work date of January 8, 2009, and that the part time period is for one month," [AR 372], and then explained that Spears' "short term disability period runs through March 27, 2009.  Since your full time return to work occurs within your short term disability period and prior to satisfying your long term disability elimination period, we are unable to approve your long term disability claim."  [*Id.*].  The letter then informed Spears of her right to "request a review of this denial," provided her with the address to which to send her appeal, and identified specific types of information Spears should include in support.  [AR 373].  The letter denying

---

[20] The Second Circuit did not hold to the contrary in *Halo*.  There, the Second Circuit, citing exclusively to *Nichols*, instructed "the District Court [to] address . . . [w]hether [the plan administrator] complied with ERISA's procedural requirements" and noted that "[w]hether [the administrator] complied with ERISA's procedural requirements will affect . . . the standard of review."  *Halo v. Yale Health Plan*, 546 Fed. App'x 2, 5 (2d Cir. 2013).  Halo, like the plaintiff in *Nichols* and unlike Spears, lodged her challenge to the standard of review in the plan administrator's alleged failure to comply with "the timing requirements under 29 C.F.R. 2560.503-1."  *Halo v. Yale Health Plan*, No. 3:10-cv-1949 (VLB), 2012 WL 774960, at *11 (D. Conn. Mar. 8, 2012).  On remand, in accordance with the Second Circuit's mandate and other relevant precedent, the district court examined "the substance and timing" of the plan administrator's denial notices to determine whether the administrator "had exercised its discretion."  *Halo v. Yale Health Plan*, 3:10-cv-1949 (VLB), 2014 WL 4954461, at *13 (D. Conn. Sept. 30, 2014).

Spears' appeal of her LTD claim, dated November 16, 2010, similarly quotes the Plan, including the definition of "disability" or "disabled," [AR 211], portions of peer medical review reports generated in connection with Spears' STD benefits claim, [AR 212], and states that, "[p]er the Appeal Review Unit's determination on your short term disability claim, impairment precluding you from working was not supported by the medical documentation beyond February 8, 2009," as a result, Spears did "not meet the LTD policy's definition of disability and did not satisfy the elimination period."  [AR 213].  This letter also informed Spears of her right to appeal the denial decision.  [*Id.*].  Liberty's final denial notice as to Spears' LTD claims (and each of the letters regarding her STD claim) also includes quotations from the Plan, citations to peer medical reviews, and explanations that these reviews indicate that the medical records fail to demonstrate that Spears satisfied the relevant definitions under each of the Plans.  *See* [AR 348-51; AR 268-73; AR 319-23; AR 74-80].  In addition, the final LTD denial letter notified Spears that her "administrative right to review has been exhausted and no further review will be conducted by Liberty," and that Spears had "the right to bring a civil action . . . following an adverse benefit determination on review."  [AR 81].  Taken either individually or as a whole, this correspondence plainly reflects that Liberty rendered a "decision to which to defer."  *Nichols*, 406 F.3d 98, 108 (2d Cir. 2005).

Consideration of the multiple appeals (far more than the one to which Spears was entitled under the Plan), the heavy amount of communication between Liberty and Spears, *see* AR 41-69 (Liberty's claim and phone notes regarding conversations with Spears from October 2, 2008 through June 16,

2011), and Liberty's general responsiveness also militates in favor of retaining an arbitrary and capricious standard of review. *See Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 337 (E.D.N.Y. 2013) ("[T]he weight of authority in the Second Circuit supports the application of arbitrary and capricious review where . . . the plan administrator remains in regular contact with the benefits claimant and issues a decision prior to the commencement of federal litigation.").

All of the above, however, is not to suggest that the review process Liberty employed, or the decision that it reached, was proper.  Indeed, both Spears, and this Court independently, have identified numerous procedural irregularities and failings.  Accordingly, and as will be explained more fully below, *regardless* of whether the Court applies the more deferential arbitrary and capricious standard of review, or the less deferential *de novo* standard, the Court determines that Liberty's decision to deny benefits was rendered arbitrarily and capriciously.

   3.   <u>Given The Procedural Deficiencies That Hampered Liberty's Review Process The Court Gives Some Weight to Liberty's Inherent Conflict</u>

Spears asserts that, when evaluating her LTD benefits claim, Liberty was operating under a conflict of interest.  First, Spears raises a structural conflict, based on the fact that Liberty "both evaluates and pays benefits claims."  [Dkt. #82-1 at 35; *see also* Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 15; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 15; AR 2220].  Spears correctly notes that where, as here, Liberty both paid out LTD benefits and determined benefit eligibility, there is an inherent conflict of interest "that a reviewing court should consider. . . as a factor in determining whether [Liberty] has abused its discretion

in denying benefits." *Glenn*, 554 U.S. at 108.  However, "the significance of the factor will depend upon the circumstances of the particular case." *Id*.  As explained by the *Glenn* court:

> The conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117.

Here, Liberty raises, and Spears does not dispute, several structural aspects of its business which "separate claim determination functions from the underwriting functions of the company." [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 194; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 194].  Liberty underwriting employees and claim handlers, known as disability case managers, were (i) located in separate offices and cities; (ii) belonged to different departments and reported to different individuals in management; (iii) performed their job functions at different times with respect to a particular policy; and (iv) performed their functions without input from one another.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 194-99; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 194-99].  While the separation of claims decision-makers and underwriters may have some bearing on the impact of Liberty's structural conflict of interest, far more significant is the extent to which the compensation of claim

48

administrators is tied to their claim decisions.  *See Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, No. 05-CV-3297 (RJS), 2010 WL 1253481, at *11 (S.D.N.Y. Mar. 29, 2010).

On this issue, the parties are in disagreement.  Liberty contends, and Spears does not deny, that claims administrators "are not evaluated or compensated on the basis of the amount or number of claims paid or denied," and that Liberty does not "discourage[] its employees from paying claims that are payable under all applicable terms and conditions of its policies," [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶¶ 191-92; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶¶ 191-92].   Liberty further claims that it "does not provide its employees with any incentive, remuneration, bonuses, or other compensation based in whole or in part upon the denial or termination of claims." [Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 89].   However, Liberty admits that it has a bonus compensation program which "provides bonuses based upon several factors, including . . . individual job performance, business unit profit and growth, and corporate return on equity."  [Dkt. #82-5, P.'s Local Rule 56(a)(1) Statement, at ¶ 89; Dkt. #90, D.'s Local Rule 56(a)(2) Statement, at ¶ 89].   Notwithstanding Liberty's denial that there is a direct correlation between individual claim handling and an employee's remuneration, it is hard to fathom how the denial of claims would not impact "business unit profit and growth" or the "corporate return on equity."  [*Id.*].   On the other hand, courts typically view the financial incentive Spears raises, *i.e.*, a general "link between [Liberty]'s profits and the individual claims representative's pocketbook," insufficient to establish a

49

compelling conflict of interest.  *Rice v. ADP TotalSource, Inc.*, 936 F. Supp. 2d 951, 964 (N.D. Ill. 2013) (citing and quoting additional cases).  Accordingly, the Court considers the structural conflict of interest Spears identifies, but is cognizant that, without more, the conflict is to be given little to no weight.  *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) ("No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision.").

Here, however, Spears raises *Durakovic v. Building Serv.*, 609 F.3d 133 (2d Cir. 2010), *see* [Dkt. #82-1 at 32], and the Court agrees that a number of serious "decisionmaking deficiencies" occurred in the course of Liberty's review of Spears' claim.  *Durakovic*, 609 F.3d at 140.  These deficiencies, explained *infra* at 52-76, compel the Court to accord some weight to Liberty's conflict of interest.[21]

### 4.   Arbitrary And Capricious Standard of Review

A decision that is arbitrary and capricious will not be upheld and is defined as "without reason, not supported by substantial evidence or erroneous as a matter of law."  *Kinstler*, 181 F.3d at 249 (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a

---

[21] These serious and pervasive deficiencies, coupled with Liberty's structural conflict of interest, also serve as good cause to permit this Court to consider the two extra-record documents Spears offers, Liberty's Variable Incentive Plan and Liberty's response to a document request.  *See Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004) (finding good cause to admit evidence outside the administrative record where the plan administrator was conflicted and where there were "insufficient procedures for internal or appellate review").  However, after reviewing the substance of these documents, it is clear that they are, at most, tangentially relevant to the issues in the parties' motions, and the Court does not rely on either of them to support any of its conclusions.

reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).  "This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker."  *Burgio v. Prudential Ins. Co. of America*, Np.06-CV-6793, 2011 WL 4532482, at *4 (E.D.N.Y.  Sept. 26, 2011) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) and *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).  Accordingly, if a plan administrator's decision is based on substantial evidence, it will be upheld "even if the evidence presently in the record could also reasonably support a contrary determination."  *Piscottano v. Metropolitan Life Ins. Co.*, 118 F. Supp. 2d 200, 211 (D. Conn. 2000) (citation omitted).  Finally, the "plaintiff has the burden of demonstrating that [an administrator's] denial of benefits was arbitrary and capricious."  *Short v. Unum Life Ins. Co. of Am.*, No. 302CV827MRK, 2003 WL 22937720, at *6 (D.Conn. Dec. 3, 2003) (citing *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 220, 230 (2d Cir. 1995)).

<u>Analysis</u>

   a.   <u>Spears Received the Maximum STD Benefits For Which She Was Eligible</u>

To the extent Spears continues to press her claim for STD benefits, both parties agree that Spears was ultimately paid the maximum level of STD benefits for the period during which she was eligible.  *See* [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 165; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 165].

Thus, Spears' complaints about the earlier denial of these claims are moot.  *See Finkel v. Alltek Sec. Sys. Grp., Inc.*, No. 10-CV-4887 (DLI) (VVP), at *1 n.2 (E.D.N.Y. Sept. 29, 2011) (noting that a "claim is moot where defendant paid amount demanded").  However, to the extent Liberty's determination that Spears was not eligible for STD benefits from February 8, 2009 onward bears on its decision to deny her LTD claim, the Court will consider Liberty's treatment and analysis of the STD claim.

> b.   <u>Liberty's Reliance on Fatally Flawed Physician Review Reports In Favor of Spears' Treating Doctors' Records Renders its Decision Arbitrary and Capricious</u>

Beginning with Liberty's initial denial of Spears' STD claim in May 2009, Liberty relied on peer medical review reports to support its multiple denials of Spears' STD and LTD claims.  That Liberty relied upon these reports, which contain "opinion[s] of independent medical reviewers who have not conducted an examination of the [claimant]," is not problematic.  *Fitzpatrick v. Bayer Corp.*, No. 04 Civ 5134 (RJS), 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008).  Indeed, Liberty was entitled to rely on them "even where the reviewer's opinion conflict[ed] with that of treating physicians."  *Id.*  This is because the Second Circuit has rejected any "treating physician rule," *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 114 n. 7 (2d Cir. 2014), and the Supreme Court has further instructed that courts may not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Nevertheless, where a plan administrator relies upon peer medical reports to support its benefit determinations, the reports must contain "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator."  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003).  Here, each and every peer review report upon which Liberty relied to deny STD and LTD benefits suffered from numerous and serious flaws, which render them insufficient to supply the substantial evidence necessary to support Liberty's denial decisions.[22]

> 1. <u>Dr. Taiwo's Peer Review Report Does Not Provide Substantial Evidence in Support of Liberty's Denial of Spears' Initial Claim to Extend Her STD Benefits Beyond February 8, 2009.</u>

---

[22] Aside from the final June 15, 2011 LTD denial letter, which suggests that Liberty reviewed the information Spears provided with her final appeal, [AR 80], in *all* of the prior denial letters (and the remainder of the June 2011 letter) Liberty relies exclusively on the peer medical review reports as evidence to support its benefits determination.  *See* [AR 348-51; AR 319-23; AR 268-73; AR 211-13; AR 74-80].  To the extent Liberty now attempts to raise additional arguments in support of its denials or to rely on "conclusory paragraph(s)" in the denial letters "summing up" the peer review reports, the Court cannot consider these arguments and statements "for purposes of determining whether [Liberty's] decision was arbitrary and capricious."  *Lanoue v. Prudential Ins. Co. of Am.*, No. 3:07-cv-1756 (JBA), 2009 WL 3157545, at *6 (D. Conn. Sept. 25, 2009).  The Court may only consider those rationales which were "articulated in [Liberty's] denial letter[s]."  *Id.*; *see also Zoller v. INA Life Ins. Co. of New York*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *18 (S.D.N.Y. Aug. 25, 2008) (declining to credit denial letters independently from the "flawed" peer review reports upon which they were based despite references in the letters to "claims examiners' independent review of [the claimant's] complete file") (quotations omitted); *Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ. 3874 LAK, 2005 WL 5253336, at *9 (S.D.N.Y. Sept. 2, 2005) ("The 'full and fair review' requirement is normally used to overturn denial of benefits where the denial letter does not provide a clear statement of the evidence that the defendant used in making its decision, and the claims administrator fails to properly support its medical assessment with sufficient evidence.").

Liberty's decision to refer Spears' claim to Dr. Taiwo for an evaluation is itself suspect.  Spears raises—and Liberty fails to satisfactorily answer—the initial question of why Liberty chose to consult a different doctor for its second peer review rather than return to Dr. Potts who provided an "original favorable report."  [Dkt. #82-1 at 43].  Liberty claims it "was required to do so by the federal regulations" and cites to several regulations, but none of them support Liberty's claim.  [Dkt. #89 at 46 (citing 29 C.F.R. § 2560.503-1(h)(3)(iii), (iv), (h)(4)].  29 C.F.R. § 2560.503-1(h)(3)(iv) speaks only about "the identification of medical or vocational experts whose advice was obtained on behalf of the plan."  It has nothing to do with the decision of which expert to select.  Similarly, 29 C.F.R. § 2560.503-1(h)(4) merely reiterates that the Plan's claims procedures must comply with the ERISA full and fair review requirements.  While 29 C.F.R. § 2560.503-1(h)(3)(iii) does concern the selection of a consultant, as it requires Liberty to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," Liberty offers no explanation for why Dr. Taiwo was appropriate but Dr. Potts was not.  Instead, Liberty appears to evade this question by explaining why *subsequent* peer reviewers, Drs. Silverman and Brusch, were more appropriate than Dr. Potts.  [Dkt. #82-1 at 43].  Liberty explains that these doctors were appropriately selected for their "[i]nfectious [d]isease training" which would permit them to opine on Spears' "claimed disability purportedly resulting from chronic Lyme disease."  [*Id.*].  Liberty fails to state and the court cannot conjure why the expertise of the subsequent reviewers justifies their initial decision.  Indeed, Liberty does not

contend, nor does the record suggest, that Dr. Taiwo had any such training.[23]
Moreover, Dr. Taiwo was not asked to opine on a Lyme disease diagnosis, but
was instead asked to respond to essentially the same question as Dr. Potts,
namely, whether Spears' medical records supported any ongoing restrictions and
limitations.  *Compare* [AR 2116 (Dr. Potts' report responding to the question of
whether Spears had any impairments and "how any impairment translates into
restrictions and limitations")] *with* [AR 1799 (responding to question of whether
the "medical information support[s] ongoing restrictions and limitations")].

Finally, Liberty could not have known at the time it chose not to return to
Dr. Potts that it would afford Spears additional appeals beyond those provided for
in the Plan.  Liberty's abrupt change to a different peer reviewer for no good
reason is alone suspect.

Liberty's reliance on and the conclusions it drew from Dr. Taiwo's report
raise additional concerns.  First, and most seriously, Liberty appears to have
asked Dr. Taiwo to answer an irrelevant question.  After stating that Spears "was
working part-time through [March 23, 2009]" and as of [March 24, 2009 Spears]
has been back out of work," Liberty asked Dr. Taiwo if the "medical information
support[s] *ongoing* restrictions and limitations."  [AR 1799 (emphasis added)].
Liberty first posed this question to Dr. Taiwo on April 23, 2009, [AR 1820], nearly a
month *after* the applicable Elimination Period had expired (March 27).  *See* [AR 76
(explaining that "[t]he Elimination Period would be satisfied and long-term

---

[23] **Instead, Liberty elsewhere describes Dr. Taiwo as "board certified in Internal
Medicine & Preventative Medicine (Occupational Medicine)."  [Dkt. #85-7, D's
Local Rule 56(a)(1) Statement at ¶ 71].**

disability benefits would begin on March 28, 2009")].  In other words, after the
Elimination Period had expired, Liberty asked Dr. Taiwo to make a prospective
assessment of Spears' medical condition.  Based on the question Liberty asked
of him, Dr. Taiwo understandably offered an opinion concerning the period of
"03/24/09 through the present time."  [AR 1799-1800].  In reaching his conclusion
that Spears had no restrictions or limitations at that time, Dr. Taiwo relied upon
Spears' medical records that fell within and post-dated the termination date of the
Elimination Period.  *See* [AR 1801].  Beyond the fact that the records Dr. Taiwo
reviewed included some from January and February 2009, [AR 1801], *nowhere* in
his four-page report does he consider Spears' condition prior to March 24, 2009,
let alone render any conclusions about whether Spears was disabled prior to this
date.  Nor, based on the question he was asked, should he have.  Notwithstanding
the date restriction Liberty imposed on Dr. Taiwo, Liberty issued Spears a denial
letter which omitted this highly material fact.  Rather than provide Spears with a
complete statement from that report (let alone the report itself), Liberty's denial
letter misleadingly quoted a portion of Dr. Taiwo's conclusion, while leaving out
the critical date restriction:

> The physician's report concludes:
> 'Ms. Spears' records do not support any specific limitations or
> restrictions that would prevent her from sitting, standing or walking
> at a sedentary physical demand level'

[AR 349].  This is a prospective rather than a retrospective statement.

Liberty then concluded that:

> Per the medical review, the available records do not support any
> restrictions and limitations or impairment precluding you from
> performing the duties of your job as administrative support during

the period of February 9, 2009 through present date.  Therefore, you
do [not] meet your Plan's definition of disability, and no further
benefits are payable

[AR. 349-50].

Thus, Liberty gave Spears the false impression that Dr. Taiwo reviewed her records and considered whether or not she was disabled "during the period of February 9, 2009 through [May 2009]," when in reality, Dr. Taiwo opined on, at most, a three-day period within the Elimination Period.  In addition, the above statement makes clear that Liberty reached its conclusion that Spears' medical records did "not support any restrictions and limitations . . . during the period of February 9, 2009 through present date," solely on the basis of Dr. Taiwo's medical review of a later timeframe.  Given that Dr. Taiwo's conclusion did not address the period of February 9 through March 23, and Dr. Taiwo offered no indication in his report that he considered this period in the course of reviewing Spears' records, Liberty's conclusion is baseless.  *See Potter v. SABIC Innovative Plastics US, LLC*, No. 2:10-cv-696, 2011 WL 2183306, at *7 (S.D. Ohio Jun. 6, 2011) (finding that the "conclusion reached in the final denial letter" that the claimant "did not meet the plan definition of 'disabled,' is necessarily arbitrary and capricious" where the plan administrator relied upon two medical reviews neither of which reached the stated conclusion).

This was not the only material defect in Dr. Taiwo's report.  By the time Dr. Taiwo reviewed Spears' claim file, the file contained a large number of records that post-dated Dr. Potts' December 18, 2008 report, including records of a January 12, 2009 consultation with neurologist, Dr. Zagar, who noted that, while

Spears' migraines had improved following her use of medication, they still occurred one to two times per week, lasted approximately four hours, and were accompanied by visual aura, nausea, and occasional vomiting, [AR 58, MDS Note], recommendations from both Spears' rheumatologist, Dr. Kage, *see* [AR 2013-14], and the Medical Department of Spears' employer, UTC, [AR 1925], that Spears continue to work part-time,[24] and records from Dr. Zagar that Spears was receiving treatment via a PICC. [AR 670-72].  Dr. Taiwo's report does not indicate that he reviewed or considered *any* of these records.  *See Zoller*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *17 (finding that a peer review report that failed "to consider relevant evidence" and suffered from other defects did "not constitute evidence that a reasonable mind might accept as adequate to support the rejection of [a claimant's] benefits claim"); *Hardt v. Reliance Standard Life Ins. Co.*, 540 F. Supp. 2d 656, 663 (E.D. Va. 2008) (finding that administrator abused its discretion by relying upon a peer review report which "failed to address the treating physicians' contradictory medical findings" and "ignored the diagnoses of these physicians").

Finally, Dr. Taiwo's report offers little analysis to support his conclusion that Spears' "records do not support any specific limitations or restrictions that would prevent her from sitting, standing, or walking at a sedentary physical demand level."  [AR 1799].  In his two-paragraph "Assessment," [AR 1800], Dr. Taiwo noted that Spears "presented with headache diagnosed as migraine headache.  She also reported generalized body pain and she was evaluated by a

---

[24] Dr. Taiwo's report references a March 24, 2009 telephone call from Spears to Dr. Kage regarding a full-time restriction.  [AR 1801; AR 1839].

rheumatologist for the possibility of an immune mediated inflammatory disorder."
[*Id*.].  As Dr. Taiwo was well aware, Spears had received STD benefits for four
months based on Liberty's determination that her migraine headache and related
symptoms were debilitating to the point that she could not perform her job at first
on a full and then a part-time basis.  [AR 348].  However, his report does not
address the severity or extent of these symptoms and simply notes the
uncertainty of Spears' diagnosis.  [AR 1800].

 After observing that Spears was "evaluated by multiple practitioners" and
that "[h]er diagnoses and treatment plan remains unclear," he offered the wholly
unsubstantiated conclusion that her "medical records provided for review do not
support any specific limitations or restrictions."  [*Id*.].  A review of the remainder
of the report reveals no actual support for this conclusion; moreover, he does not
reconcile the fact that Liberty concluded that Spears was disabled for a
considerable portion of the Elimination Period with his conclusion that she was
not disabled within the meaning of the Plan by citing any objective medical
evidence tending to show the was no longer disabled.

 While Dr. Taiwo noted that Spears' "physical examination did not reveal any
focal neurological deficit,[25]" *id.*, the absence of such a deficit is far from
dispositive on the question of whether Spears had any "limitations or

---

[25] "A focal neurological deficit is a problem with nerve, spinal cord, or brain
function.  It affects a specific location, such as the left side of the face, right
arm, or even a small area such as the tongue.  Speech, vision, and hearing
problems are also considered focal neurological deficits."  *Terwilliger v.
Comm'r of Soc. Sec.*, No. 13-924, 2014 WL 222007, at *2 n.4 (W.D. Pa. Jan. 21,
2014).

restrictions" based on her reported episodic migraines and related symptoms. *See McCollum v. Life Ins. Co. of N. Am.*, 495 Fed. App'x 694, 703 at n.10 (6th Cir. 2012) (concluding that although a reviewing doctor's "notes describe [the claimant's] physical examinations as generally 'non-focal'" such an exam "says little about [the claimant's] pain or degree of functional limitations") (reversing district court's grant of summary judgment in favor of plan administrator and remanding back to the administrator to provide a full and fair review). The only other support for this conclusion that the Court can ascertain are a couple of stray sentences regarding Spears' medical records and a conversation with one of Spears' doctors, Dr. O'Brien, who allegedly told Dr. Taiwo "that he did not restrict her activities."  [AR 1802].  Taken separately or viewed together, these statements do not come close to "adequately and credibly rebut[ting] the findings of [Spears'] treating physicians."  *Rappa*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *11.  Dr. Taiwo merely noted the fact that one of several neurologists whom Spears was seeing, "for possible multiple sclerosis and her headaches . . . stated that he did not need to see her for follow-up," and observed that the results of one physical examination (among dozens) which occurred nearly a month *after* the Elimination Period had ended "was unremarkable."  [AR 1801].

In addition, Dr. O'Brien's statement that he did not restrict Spears' activities is not probative because, as Dr. Taiwo observed, Dr. O'Brien "was taking care of Ms. Spears for her gastrointestinal problems."  [AR 1802].  As both Dr. Taiwo and Liberty were aware, the symptoms which formed the basis for Spears' STD claim were debilitating migraines and related symptoms, *see* [AR 1800; AR

60

68; AR 2116], not gastrointestinal problems.  *See Rappa v. Connecticut General Life Ins. Co.*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *11 (E.D.N.Y. Dec. 11, 2007) (finding that a report prepared by an examining doctor "was not a proper basis on which to deny [the claimant] benefits" where "a logical reading" of the report indicated that the doctor's report was focused on a different condition from the one for which the claimant was seeking benefits and was "not commenting" on the relevant condition).  Finally, in reaching his conclusion, Dr. Taiwo did not cite to any of these statements (nor to any other evidence for that matter) and thus it is impossible to tell how he arrived at it.  *See Hardt*, 540 F. Supp. 2d at 662 (rejecting peer review report in which the reviewing physician "failed to cite to any medical evidence to support his conclusion").

    2.  <u>Dr. Silverman's November 2009 Report Does Not Provide
Substantial Evidence to Support Liberty's Denial of Spears' Appeal
of Liberty's STD Benefit Determination</u>

Following Liberty's unsupported denial of Spears' initial claim for STD benefits, Spears appealed.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 87; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 87; AR 1769-70].  Along with her letter, Spears submitted letters from four different treating doctors, each of whom stated their opinion that she was unable to work.  [AR 1769-80].  Most significantly, Dr. Zagar, who had been treating Spears "since January of 2009," and whose records indicated that Spears' "frequent headaches, severe fatigue, joint pains, digestive problems, and cognitive complaints" had "improved" back in January 2009, characterized that improvement as "minimal," and stated that Spears "continues to have fatigue and cognitive issues which limit her daily

functioning." [AR 1772]. Similarly, Dr. Kage, who had been treating Spears since January 6, 2009, described Spears' extensive list of symptoms and medications and concluded that as a result of "her current clinical status, [Spears] is not able to work part time or full time, and it is medically necessary for her to be on full time disability." [AR 1779]. Dr. Kage further noted that Spears' "treatment [wa]s likely to last for a minimum of 12 months," in light of "the lengthy duration of her illness and the extensive multi-systemic nature of her symptoms," and explained that Spears was undergoing "ongoing antibiotic therapy. [*Id.*].

Although Liberty first conducted an internal medical review of Spears' appeal, the review itself does not provide *any*, let alone, substantial, evidence upon which Liberty could dismiss Spears' appeal. The review dismisses "notes by [Spears'] neurologist, rheumatologist, and naturopath reiterate[ing] [her] inability to [return to work] due to her multiple symptoms" because there was "no new clinical information to contradict the opinions of Drs. Potts and Taiwo." [AR 51 at MDS Note dated Oct. 29, 2009 at 12:32 PM]. However, this conclusion is baseless, both because Dr. Potts *agreed* with Spears' treating physicians that "the severity" of her "near[] daily headaches" was "likely to preclude her from working," [AR 2116],[26] and because Dr. Taiwo offered no explanation or support

---

[26] Based on his conversations with two of Spears' treating physicians, Drs. Gordon and Silvers, in December 2009, both of whom indicated at that time that Spears could return to work by January 7, 2009, Dr. Potts concluded, on December 23, 2008, that "a return to work date of [January 7, 2009] appears reasonable." [AR 2115]. He did not revise his opinion of December 18 regarding the severity of Spears' migraines. His opinion was clearly prospective in nature and based upon the recommendations of two of Spears' physicians. In addition, one of these physicians, Dr. Silvers, later revised his recommendation, and found that Spears could not return to work full-time until some point in February

for his bare opinion.  *See supra* at 54-61.  The review also questions whether the physician who diagnosed Spears with Lyme disease, Dr. Raxlen, was qualified to do so.  [AR 51 at MDS Note dated Oct. 29, 2009 at 12:32 PM].  While perhaps tangentially relevant, whether or not Spears had Lyme disease is a different question from whether Spears' symptoms rendered her disabled within the meaning of the STD and LTD Plans.  Finally, and most importantly, the only statement regarding this internal review that appears in the denial letter Liberty sent Spears was its conclusion that Liberty "should refer [Spears'] file for a physician peer review."  [AR 320].  Thus, the letter makes clear that Liberty was relying exclusively on Dr. Silverman's and Dr. Taiwo's peer review reports, and not this review, in reaching its conclusion that, "based on the medical documentation," Spears' did "not meet the definition of Disability under the terms of the . . . short-term disability plan."  [AR 322].

Turning to Dr. Silverman's November 23, 2009 report, [AR 330-35], the Court concludes that it suffers from two fatal defects.  First, the bulk of the report concerns whether or not Spears suffered from Lyme disease.  This makes sense given that Liberty asked Dr. Silverman to opine on four questions and three of the questions exclusively pertained to Spears' diagnosis.  *See* [AR 333-34 (asking Dr. Silverman whether "the records support the presence of Lyme disease or any other infectious process," if Spears' "treatment [was] within the standard of care" for a Lyme disease diagnosis and whether "the diagnosis and treatment of late stage Lyme disease [was] within the area of expertise of a physician trained in

---

2009.  [AR 2105-06].  Dr. Potts does not appear to have been consulted after his final December 23, 2008 recommendation.

[p]sychiatry"). However, this is not the relevant question. What is relevant is whether or not Spears' condition rendered her disabled within the meaning of the STD Plan. Thus, even if Dr. Silverman provided "substantial medical evidence" in support of his position that Dr. Raxlen's diagnosis and treatment of Lyme disease was incorrect, Liberty's reliance on this conclusion to deny benefits was "necessarily arbitrary and capricious" because the "decision and the evidence used to support it [we]re based on incorrect premises." *Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ. 3874 LAK, 2005 WL 5253336, at *9 (S.D.N.Y. Sept. 2, 2005) (Kaplan, J.). Here, in asking Dr. Silverman to opine on whether or not Dr. Raxlen's diagnosis and treatment for Lyme disease was correct, Liberty incorrectly assumed that Dr. Silverman's answer to this question also answered (or was at least probative of) the question of whether Spears was disabled within the meaning of the STD plan. *See Peterson v. Continental Casualty Co.*, 77 F. Supp. 2d 420, 426-28 (S.D.N.Y. 1999) (remanding to plan administrator where the administrator concluded that claimant was not disabled based on an incorrect job description and had never analyzed his claim based on his true job duties).

Second, while Liberty asked Dr. Silverman to opine on whether there was any "evidence of impairment [this time for the appropriate timeframe of] [February 8, 2009] to the present" and "[i]f so, please indicate supported restrictions and limitations as well as their duration," [AR 334], Dr. Silverman's response did not provide Liberty with substantial evidence upon which it could properly deny benefits under the STD plan. As Spears points out in her brief, [Dkt. #82-1 at 14], Dr. Silverman appears to have determined that Spears was

64

ineligible for benefits based upon a higher standard of evidence than that called

for under the STD Plan.  The Second Circuit has held that even when a plan vests

the plan administrator with discretionary authority, "where the trustees of a plan

impose a standard not required by the plan's provisions, or interpret the plan in a

manner inconsistent with its plain words . . . their actions may well be found to be

arbitrary and capricious."  *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55

F.3d 109, 112 (2d Cir. 1995).

Here, Dr. Silverman wrote that Spears' medical records revealed "no clear[-

]cut evidence of impairment from [February 8, 2009] to the present," and three

sentences later, stated that there were "no clear[-]cut findings which suggest

impairment from [February 8, 2009] to the present."  [AR 334].  As Spears notes

and Liberty does not dispute, neither the STD nor LTD policies require proof of

"disability by 'clear[-]cut' evidence."  [Dkt. #82-1 at 14].[27]  Indeed, Dr. Silverman's

report is strikingly similar to the report Liberty improperly relied upon to deny

LTD benefits in *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits

Program*, 763 F.3d 598 (6th Cir. 2014).  In *Hayden*, the Sixth Circuit reversed the

district court's affirmance of Liberty's denial of a claimant's mental-disability

claim and ordered the district court to award benefits.  *Id.* at 601.  Just like in the

present case, the LTD Plan at issue in that case contained an Elimination Period

and the same definition of "disability" or "disabled."  *Id.*  In support of her claim,

the claimant "submitted evidence from four doctors detailing her serious

---

[27] The LTD Plan defines "proof" as "evidence in support of a claim for benefits."
[AR 10].  In connection with the STD Plan, the parties have submitted the
Summary Plan Description which does not appear to define the term.  *See* [AR
2196-2239].

psychiatric conditions." *Id.* at 602.  As occurred here, after initially denying the claim, on appeal, Liberty sent the claimant's mental-health records for a paper review by an independent physician.  *Id.* at 604.  Dr. Olivares performed two reviews.  The district court found that his first review was "faulty" and remanded the case back to Liberty for a full and fair review.  *Id.*  Liberty then returned the file to Dr. Olivares, who "reviewed the additional records and reconfirmed his initial conclusions." *Id.* at 604-05.  Relying only on Dr. Olivares' reports, Liberty once again denied the claim.  *Id.* at 605.

At the beginning of its review, the Sixth Circuit noted that, "where a reviewing physician's opinion applies standards that conflict with the terms of the plan, that opinion is not evidence supporting a conclusion that the claimant is not disabled within the meaning of the plan." *Id.* at 607.  It then reviewed the terms of the plan and concluded that, as here:

> Disability under the terms of the Plan means that the claimant is unable to perform the material and substantial duties of her own occupation during the Elimination Period and for a period of 24 months and any occupation thereafter.  The term 'own occupation' is in turn defined to mean the claimant's occupation as it is normally performed in the national economy

*Id.*[28]

Turning to Dr. Olivares' reports, the Sixth Circuit observed that the "reports appear to apply a significantly heightened standard for a disabling mental illness that contravenes the definition provided in the Plan." *Id.*  The court determined

---

[28] To the extent Liberty contends that Dr. Silverman's report was prepared in connection with Spears' STD claim, the Court notes that even under the STD provisions, the same deficiencies would remain.  In addition, Liberty relied upon this report in its later denials of Spears' claim for LTD benefits.  *See* [AR 212; AR 77].

this by examining Dr. Olivares' conclusion, that there was no evidence of "severe psychiatric symptoms, suicidal ideation, homicidal ideation, hallucinations or cognitive impairment that would have precluded the claimant from engaging in a full-time job during the Elimination Period," and reasoning that this conclusion "suggests that [the claimant] would have had to be suffering from 'severe psychiatric symptoms, suicidal ideation, homicidal ideation, [or] hallucinations' to be considered disabled." *Id.* (quotations omitted).  The court further found that the vague reference to "cognitive impairment" did not alter this conclusion because elsewhere in the report, Dr. Olivares used this term in connection with "severe suicidal ideation, homicidal ideation, hallucinations, or reality impairment.'" *Id.* at 607-08 (emphasis omitted).  The court then found that this requirement was "inconsistent with the terms of the Plan, which focus[ed] on whether a claimant can perform the material and substantial duties of her own occupation." *Id.* at 608.

Just as the Sixth Circuit found with Dr. Olivares' report, here, Dr. Silverman's report indicates that in order for him to have found "impairment from [February 8, 2009] to the present," Spears would have had to produce "clear[-]cut evidence." [AR 334].  Further buttressing this conclusion is Dr. Silverman's treatment of a handful of the evidence Spears submitted that concerned her condition during the Elimination Period.  Dr. Silverman stated that her "[p]hysical exams are somewhat limited after [February 9, 2009] other than rheumatology evaluations which reveal fatigue at 7 over 10 and tightness in bilateral calves and upper back pain through the shoulder blades and also previous history of

migraine headaches." [AR 334].  After summarizing this evidence that *supports*
Spears' claim that she was unable to perform the material and substantial duties
of her current or a similar job, Dr. Silverman next wrote that:

> There are no clear[-]cut findings which suggest impairment from
> [February 8, 2009] to the present.  The claimant *therefore*, does not
> have any physical restrictions and/or limitations on activities
> including sitting, standing, walking, reaching, lifting, carrying and
> performing repetitive and fine motor hand motions

[AR 334 (emphasis added)].

There are at least two things wrong with these statements.  First, and most
significantly, Dr. Silverman clearly based his conclusion that Spears did not have
any physical restrictions or limitations upon his determination that Spears failed
to provide "clear[-]cut findings" of impairment.  This conclusion neither follows
logically from its premise nor does it comport with the requirements of the Plan.
Second, nothing in this paragraph (nor elsewhere in his report) provides any
indication that Dr. Silverman considered whether the evidence of Spears' pain
and fatigue and the frequency, severity and duration of Spears' migraines
impacted Spears' ability to perform her material and substantial duties
independently from his conclusion that she failed to provide clear-cut evidence of
impairment.[29]  It was this question, and not whether Spears was properly

---

[29] While Dr. Silverman did write that "[p]hysical exams do not support evidence of
restrictions and/or limitations," [AR 334], he failed to provide any support for
this conclusion.  Indeed, in the very next sentence, he described the fatigue,
pain, and migraine headaches from which Spears was suffering and offered no
explanation as to why these conditions did not support evidence of restrictions
or limitations.  Additionally, while the report does indicate that Dr. Silverman
reviewed the extensive medical documentation Spears submitted, [AR 330-33],
it is unclear how the information he reviewed figured into his conclusion.  His
comments regarding the evidence, which are predominantly summary, as

diagnosed with Lyme disease or had presented clear-cut evidence of impairment, that was the "focus" of the terms of the Plan.  *Hayden,* 763 F.3d at 608.

Finally, as with Taiwo's report, Silverman's report does not reconcile Liberty's finding that Spears was disabled at the beginning of the Elimination Period with its conclusion that she was no longer disabled.  This is an incongruity which permeated all of Liberty's findings and those of its peer reviewers.

> **3.** **Dr. Silverman's Second Report of May 13, 2010 Violated the ERISA Claims Regulations and Did Not Provide Substantial Evidence in Support of Liberty's Decision to Deny Spears' Second Appeal of Her STD Claim**

After Liberty denied Spears' STD appeal, Liberty made two puzzling decisions.  First, on February 11, 2010, following a conversation with Spears' employer, UTC, which involved a discussion of Liberty's decision to maintain its denial, Liberty agreed to send Spears another complete copy of her file and provide her with additional time to submit further records.  [AR 49 at Claim Note 98; Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 119; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 119].  This decision directly contradicted Liberty's denial letter from January 29, 2010, which informed Spears that her "administrative right to review has been exhausted and no further review will be conducted by Liberty."  [AR 322].  Liberty does not offer any other details

---

opposed to analytical, in nature, could be read to support an approval or denial of benefits.  *Compare* [AR 331 (summarizing evidence from January through April 2009 which includes references to "severe headaches" a bevy of medications, that Spears had a "headache, had seizures, could not walk upstairs, [and] wanted to sleep," and that a "[l]imited number of work hours per week is advised") *with* AR 332 ("Laboratory results, basically normal.  Further labs basically all within normal limits.")].

regarding either the substance of this conversation, nor does it provide any explanation for its change of heart.

After learning of this additional round of appeal, Spears submitted records on March 12 and March 17.  [AR 287-89; AR 1861-76].  Among these records was a letter from Charles Hulin, an Assistant Attorney General of the State of Connecticut.  The letter was written "in support" of Spears' claim and was highly critical of Dr. Silverman's initial report.  Hulin asserted that "Dr. Silverman dismisse[d] the importance of a positive testing of IgG antibody" where "[e]ven a cursory internet search reveals that IgG testing is indeed indicative of Lyme disease."  [AR 288].  Hulin further noted the "contrast" between Dr. Silverman's assessment and those of "the great majority of Ms. Spears' physicians [who] believe that she is unable to perform the duties required for her job, and that disability may well be related to Lyme disease."  [AR 289].  Hulin then offered his opinion that "Liberty Life's determination that Ms. Spears is not disabled does not appear to be supported by the evidence."  [*Id.*].

Liberty "referred all the additional information [Spears] submitted for this second appeal review back to [Dr.] Silverman."  [AR 271].  This decision directly violated the ERISA claims regulations, *see* 29 C.F.R. § 2560.503-1(h)(3)(v),[30] and virtually assured that Spears would not receive a full and fair review.  *See, e.g., Steinberg v. R.R. Maint. & Indus. Health & Welfare Fund*, No. 03 C 4539, 2004 WL

---

[30] On appeal, the claims procedures must "[p]rovide that the health care professional engaged for purposes of a consultation . . . shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual."

1151619, at *4 (N.D. Ill. Apr. 13, 2004) (finding that where the administrator "submitted [the claimant's] records for a second review to the same company that reviewed those records the first time around, and the same medical director signed off on both reviews" it was "really insufficient to call the second review 'independent' or to meet the requirements of full and fair review").  It is nearly inconceivable that a consultant whose analysis and conclusion has been called into question by a state prosecutorial office would do anything other than defend that conclusion, particularly when Liberty asked him to "comment on the assertion by Assistant Attorney General Huhn" and whether "this information alter[ed] [the] prior assessment."  [AR 279].

In addition to being hopelessly compromised, the report does not provide Liberty with substantial evidence to support its denial, since it does not even address whether Spears was disabled within the meaning of the STD Plan.  The closest Dr. Silverman's report got to this question was during his description of his conversation with Spears' rheumatologist, Dr. Kage, who purportedly stated "that there was no clear[-]cut evidence of rheumatological disorder which would explain the claimant's current symptomatology from her perspective."  [AR 278]. However, here and throughout the remainder of the report, Dr. Silverman addressed Spears' diagnosis, *not* whether her symptoms rendered her disabled under the Plan.  *See* [AR 277-80].

      **4.**  <u>Dr. Brusch's Peer Review Report Does Not Provide Substantial Evidence in Support of Liberty's Denial of STD and LTD Benefits</u>

Once Liberty agreed to provide Spears with a third appeal of her STD benefits claim, [AR 261-62], Spears submitted a significant number of additional

medical records. [AR 453-57; AR 246-48]. Liberty referred Spears' complete file to

Dr. John Brusch, a board-certified, infectious disease expert, to assist them in

reassessing Spears' STD and LTD claims. [AR 243-44; Dkt. #85-7, D's Local Rule

56(a)(1) Statement at ¶ 158; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶

158].[31] Dr. Brusch prepared a report, dated September 27, 2010. [AR 224-42]. The

first fifteen pages of his report consisted of a list of the records he reviewed. [AR

224-39]. By contrast, the "recommendation," "rationale," and "clinical summary"

sections of the report consisted of approximately one-and-a-half typed pages.

[AR 224, AR 240-41]. As was the case with Dr. Silverman's first report, nearly all

of the questions Dr. Brusch was asked to consider concerned the accuracy of

Spears' Lyme disease diagnosis and the quality of the treatment she was

receiving for this disease. *See* [AR 239-40]. In addition, Dr. Brusch's responses

to the two relevant questions Liberty asked did not provide Liberty with

substantial evidence to support its denial decisions.

Dr. Brusch was asked to "list all clinically supported [restrictions and

limitations] and include duration from [February 8, 2009] forward." [AR 240].

Liberty's restriction to "clinically supported" restrictions and limitations is, in

itself troublesome, insofar as the question precludes Dr. Brusch from considering

---

[31] Spears' May 21, 2010 letter requested another appeal of Liberty's STD benefits
determination, [AR 263-64], and Liberty referred Spears' file to Dr. Brusch for
this purpose. [AR 243-44]. However, before Liberty responded to the appeal,
and following a conference call between members of Liberty and Spears'
employer, UTC, David Dirgins of UTC directed Liberty to pay Spears the
remainder of her STD benefits. [AR 215]. The record is silent as to what
transpired on this call, how UTC arrived at this decision, and why Liberty
apparently gave this decision no weight. Following this decision, Liberty relied
on Dr. Brusch's report to deny Spears' appeal of her LTD benefits. *See* [AR 211-
13; AR 74-81].

the extent to which Spears suffered from impairments which did not or could not be demonstrated clinically.  *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (stating that "the plan administrator must give sufficient attention to subjective complaints" and that "it is error to reject subjective evidence simply because it is subjective").  More troubling, however, is Dr. Brusch's response, that "[f]rom an infectious disease evaluation, the claimant does not have any restrictions and limitations to her activity from [February 8, 2009] forward."  [AR 240].  The qualifier Dr. Brusch employed, "[f]rom an infectious disease evaluation," is both extremely vague and renders the remainder of his answer non-responsive to the question he was asked.  This is particularly problematic because Dr. Brusch elsewhere acknowledged that Spears' "migraine headaches" were among the conditions that *were* "substantiated clinically."  [*Id.*].  Dr. Brusch was also asked if, "[b]ased on the clinical findings, does the claimant have sustainable full time capacity as of [February 8, 2009]."  [*Id.*].  Without citing to any support, Dr. Brusch wrote that "[t]he claimant does have a sustainable full time capacity as of [February 8, 2009]."  [*Id.*]

However, a review of the rationale Dr. Brusch provided to support all five of his answers (but which does not address the answers individually) offers little support for his responses to the two relevant questions Liberty asked of him. [AR 240-41].  The bulk of the rationale concerned the tangentially relevant question of what, if any, infectious disease Spears had.  [*Id.*].  Dr. Brusch concluded that Spears had "no significant chronic ongoing infectious disease(s) that could explain any degree of impairment."  [AR 240].  This, once again, does

not respond to the relevant issue of whether Spears' symptoms rendered her disabled under the STD or LTD Plans.  Dr. Brusch later concluded that Spears did "not have any significant chronic infectious disease that would impair [her] sustainable full time capacity as [February 8, 2009].  There is no evidentiary documentation that her listed medications impair her full-time sustainable capacity."  [AR 241].  This conclusion also misses the mark.  Even if Spears did not have a "chronic infectious disease," this would not preclude a finding that her migraines and associated symptoms absent such a disease were sufficient to render her disabled under the terms of the Plans.  While Dr. Brusch's observation that Spears' medications did not impair her ability to work is relevant, neither Spears nor her doctors based her disability claim on the medications she was prescribed.  Her claim was instead based on the severity of her symptoms and their impact on her ability to perform the substantial and material duties of her own occupation.

<ol type="a" start="3">
<li>**Liberty Acted Arbitrarily and Capriciously When it Considered Some of Spears' Post-Elimination Period Records But Not Others Without Explanation**</li>
</ol>

In its final denial letter, dated June 15, 2011, Liberty denied Spears' LTD claim on the basis of its earlier peer reviews and its own review of the materials Spears submitted on May 10, 2011.  [AR 74-81].  These materials included medical records from Dr. Saul, a doctor of internal medicine and infectious disease, and a sleep report.  [Dkt. #85-7, D's Local Rule 56(a)(1) Statement at ¶ 170; Dkt. #91-1, P's Local Rule 56(a)(2) Statement at ¶ 170; AR 119-20].  However, Liberty declined

to consider these new materials, which ranged in date from August 8, 2010

through April 29, 2011, because this

> [A]dditional medical information received is for treatment received
> nearly two years after the beginning of her claim.  Therefore, it is not
> relevant to the period under consideration, and any clinical
> information from those records cannot be extrapolated back to that
> period to determine Ms. Spears' condition and associated medically
> supported restrictions and/or limitations for September 2008 through
> the Elimination Period, or as of February 9, 2009

[AR 80].

In addition to offering no rationale or explanation, Liberty's determination

that such records were "not relevant" had the effect of precluding from

consideration all but a single piece of evidence that Spears submitted with her

final appeal, and was plainly inconsistent with its earlier treatment of such

records.  Among the list of records Liberty provided Dr. Brusch in September

2010 was a "Vocational Analysis of Haley Spears," dated August 20, 2010—

squarely within the date range Liberty later informed Spears was "not relevant."

[AR 225].  Indeed, Liberty provided Dr. Brusch with a host of records from June,

July, and August 2010.  *See* [AR 225-26].  At no point up until Liberty's final letter

did Liberty indicate that such records were "not relevant,"[32] nor would such

indication have made any sense given that Liberty provided them to its

independent consultant for his consideration.  *See Saffon v. Wells Fargo & Co.*

*Long Term Disability Plan*, 552 F.3d 863, 871 (9th Cir. 2008) ("When an

---

[32] Although the very first STD denial letter, dated May 13, 2009, instructed Spears
to include with her appeal documentation "from the period of February 9, 2009
through present date," [AR 350], this does nothing to support Liberty's
subsequent position, since it does not concern records beyond the date of the
letter and whether such records would be considered relevant or not, and all of
Liberty's subsequent reviews considered records dated long after May 2009.

administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.").  Indeed, it is not clear why some post-Elimination Period records would be relevant while others would not be, let alone the point in time in which such a distinction could fairly be made.

Remedy

a. **Where Liberty Failed to Support its Determination with Substantial Evidence And The Review Process Was Encumbered By Numerous Procedural Errors Remand is the Appropriate Remedy**

Having determined that Liberty's denial of LTD benefits was arbitrary and capricious, the Court must remand the matter back to Liberty with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting a denial of the claim or remand would otherwise be a useless formality.  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).  The Second Circuit further instructs that because "[a] full and fair review concerns a beneficiary's procedural rights," when an administrator fails to provide such a review, "the typical remedy is remand for further administrative review."  *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008).  On the other hand, "a remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable."  *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (citation and quotations omitted)

(holding that district court abused its discretion by ordering remand where the administrative record "could only be read to support granting coverage").

Considering the record as a whole, while the Court agrees with Spears that there is evidence to support an award of benefits, "[t]his is not a case in which the evidence indisputably supports a conclusion that [Spears] is entitled to benefits."  *Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ. 3874 LAK, 2005 WL 5253336, at *11 (S.D.N.Y. Sept. 2, 2005).  Some of Spears' "most significant symptoms are subjective" and "it is not the Court's role to determine *de novo*, whether such symptoms would render [Spears] unable to perform h[er] job responsibilities." *Id.*  As Liberty points out, there is some evidence in the record that the severity of Spears' symptoms declined towards the end of the Elimination Period.  *See, e.g.*, [AR 58 at MDS Note; AR 630; AR 1495].  There is also evidence of conflict between Spears' various treating physicians regarding whether Spears' symptoms prevented her from working.  *See, e.g.*, [AR 1802].  In addition, "because [Liberty] made a number of procedural errors in deciding [Spears'] claim . . . [Liberty] failed to consider much of the evidence" Spears presented.  *Magee v. Metro. Life Ins. Co.*, No. 07 Civ. 8816 (WHP), 2009 WL 3682423, at *1 (S.D.N.Y. Oct. 15, 2009).  Indeed, none of the four peer review reports Liberty requested even addressed the question at the heart of this case: whether Spears' symptoms, regardless of the cause, were sufficient to render her continuously disabled, within the meaning of the Plan, through the end of the Elimination Period.

While the Court is sensitive to both the extremely long period of time Spears has waited for a proper review of her benefits claim and is deeply

disturbed by the pervasive errors underlying Liberty's review of her claim, despite its many opportunities to perform a proper review, the Court cannot award benefits based on "speculative concerns regarding [Liberty's] review process, even if those concerns may have merit." *Id.* Rather, in a "close case such as this," where the "medical records were limited, and [Spears] did not 'clearly' show that she was entitled to benefits," remand is the appropriate remedy. *Strope v. Unum Provident Corp.*, No. 06-CV-628C(SR), 2010 WL 1257917, at *8 (W.D.N.Y. Mar. 25, 2010).

That said, the Court remands this case back to Liberty with several instructions, in light of the deeply flawed and inadequate series of reviews Liberty performed on Spears' claim.

First, Liberty is instructed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period.  The question is *not* whether Spears' medical records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis.

Second, while Liberty's reliance on independent paper reviews is not itself improper, the deficiencies present in each of the reviews undertaken so far indicate that Liberty must take much greater care in posing relevant questions to its peer reviewers and ensuring that the responses that they receive are both consistent with the terms of the Plan and are responsive to the question asked. In fact, given the multiple deficiencies in each of these reviews, Liberty "would be

well-advised, upon reconsideration, rather than simply conducting a paper review of [Spears'] claim, to have an independent medical examination performed on [Spears], or at a minimum, to have its medical consultants communicate with [Spears'] treating physicians in order to fully understand the basis for their [opinions]." *Viglietta*, 2005 WL 52533336, at *12.[33]

Third, Liberty is instructed to perform a full and fair review that complies with the ERISA claims regulations. *See Solnin v. Sun Life & Health Ins. Co.*, 766 F. Supp. 2d 380, 393-94 (E.D.N.Y. 2011) (holding that the ERISA claims regulations apply to post-remand benefits determinations) (citing cases). This includes (but is not limited to) having Spears' file reviewed by individuals who were neither "consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual," 29 C.F.R. § 2560.503-1(h)(2)(v), permitting Spears "to submit written comments, documents, records, and other information relating to the claim for benefits," 29 C.F.R. §

---

[33] While the Court is aware that Liberty's peer reviewers spoke or attempted to speak with some of Spears' treating physicians, such efforts were limited, as the reviewers did not attempt to speak with all of the physicians who opined that Spears was unable to work. Indeed, Liberty's and its peer reviewers' decisions in this regard were, at times, puzzling. For instance, Dr. Taiwo conducted a "[c]linician-to-[c]linician [c]all" with Dr. O'Brien, who "was taking care of Ms. Spears for her gastrointestinal problems." [AR 1802]. Since Spears' STD claim was based on migraine headaches and related symptoms, it is curious that he did not also attempt to speak with Dr. Zagar, whose records from February 2009 indicated that Spears was continuing to suffer from migraines. [AR 56 at Claim Note 63]. In a similar vein, Dr. Silverman, while preparing his November 23, 2009 report, attempted unsuccessfully to speak with only Dr. Raxlen. [AR 333]. Meanwhile, by that time, three of Spears' other treating physicians, Drs. Kage (rheumatologist), Zagar (neurologist), and Gouin (naturopathic doctor) had submitted letters stating that Spears was unable to work. [AR 1769-70]. Moreover, even when the reviewers did speak with Spears' doctors, they often did not address the core question of whether Spears' condition prevented her from working. *See, e.g.*, [AR 278].

2560.503-1(h)(2)(ii), "tak[ing] into account all comments, documents, records, and other information submitted by [Spears] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination," 29 C.F.R. § 2560.503-1(h)(2)(iv), and "not afford[ing] deference to the initial adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(3)(ii).

Finally, there is the question of how some or all of Spears' post-Elimination Period medical records (which comprise a substantial amount of the medical records in this case) bear on the question of Spears' eligibility for LTD benefits. As an initial matter, they are certainly relevant to the question of whether Spears was unable to perform the "Material and Substantial Duties of her Own Occupation" "during the Elimination Period *and the next 24 months*," [AR 7 (emphasis added)], and if "thereafter" she was "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." [*Id.*].  In addition, such post-Elimination Period evidence may be relevant to Spears' condition during the Elimination Period, insofar as it "speaks to the credibility and accurateness of [] earlier evaluations and opinions."  *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 605 (6th Cir. 2014) (citing and quoting *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LB Emps.*, 741 F.3d 686, 690 n. 1 (6th Cir. 2014)).  This is particularly true here, where Spears received multiple letters from her treating physicians during the Elimination Period stating that she was unable to work full or even part-time, and where Liberty appears to have given these letters minimal weight in the absence of sufficient amounts of corroborating medical records.

Thus, on remand Liberty may not categorically dismiss some or all of Spears' post-Elimination Period medical records as "not relevant" without a reasonable explanation.

   b. **Spears' Requests for Attorney's Fees and Civil Penalties Are Premature**

   ERISA permits the Court, "in its discretion," to award reasonable attorney's fees and costs to either party.  29 U.S.C. § 1132(g).  Courts within this Circuit typically decline to award fees and costs to a plaintiff following remand of a claim for benefits because such a request is "premature," given that the plaintiff "is not yet the prevailing party in the truest sense of the term."  *Viglietta*, 2005 WL 5253336, at \*13 (quoting and citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 479 (7th Cir. 1998)) ("Because the Court recommends remanding Plaintiff's claim to the administrator for a 'full and fair review,' it would be premature to award attorney's fees at this time."); *see also Jones v. UNUM Life Ins. Co. of Am.*, 14 Fed. App'x 44, 45-46 (2d Cir. 2001) (affirming district court's denial of attorney's fees after concluding that remand rendered the request premature); *Mohamed v. Sanofi-Aventis Pharmaceuticals*, No. 06 Civ. 1504, 2010 WL 2836617, at \*1 (S.D.N.Y. Jul. 19, 2010).[34]

   Finally, at this time, the Court declines to award civil penalties pursuant to 29 U.S.C. § 1132(c) based on "violations of ERISA regulations."  *See* [Dkt. #82-1 at 58].  Plaintiff has not presently briefed this issue sufficiently for the Court to determine whether such penalties are appropriate.  *See Kwon v. Yun*, 606 F. Supp.

---

[34] In addition, although the Court has found that Liberty acted arbitrarily and capriciously in denying Spears' LTD claim, it has not yet determined that it acted in bad-faith.  *See Krizek v. Cigna Group Ins.*, 345 F.3d 91, 102 (2d Cir. 2003).

2d 344, 360 n. 19 (S.D.N.Y. 2009) (deferring resolution of damages question where the parties had not "sufficiently briefed the issue").

Given the Court's decision to remand this matter, "the possibility remains open" that Spears may be awarded attorney's fees or civil penalties "following the conclusion of the administrative proceedings and any judicial review of the administrative decision."  *Jones*, 14 Fed. App'x, at 45.  The Court is also mindful of the fact that part of the delay in this case was occasioned by Liberty's willingness to reexamine, albeit in a flawed manner, Spear's applications for benefits.  Its willingness to provide more consideration than that which it was contractually required to provide does not appear to be an appropriate basis for the Court to impose a penalty.  This logic is especially compelling where, as here, Spears requested the extra-contractual reviews and was not precluded by Liberty from pursuing judicial review.  Should Spears seek an award of civil penalties in the future, she should address these issues in her memorandum of law in support of her motion.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 31, 2015