

GWENDOLYN O. AUSTIN, Plaintiff, - against - GERARD W. FORD and EILEEN O. FORD, Defendants.

95 Civ. 3730 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1998 U.S. Dist. LEXIS 2157*

**February 26, 1998, Decided**
**March 2, 1998, Filed**

**DISPOSITION:**     [*1]  Both Austin's and Defendant's motions for summary judgment granted in part and denied in part.

**COUNSEL:** ROBERT J. BACH, ESQ., New York, NY, for Plaintiff.

MARY C. MONE, ESQ., Of Counsel, HOLLYER, BRADY, SMITH, TROXELL, BARRETT ROCKETT, HINES & MONE, New York, NY, for Defendants.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

*OPINION*

**Sweet, D.J.**

   Ford Models, Inc. ("Ford Models") and Gerard and Eileen Ford, as trustees of the Ford Models pension plan and profit sharing plans (the "Trustees" and collectively, the "Defendants") have moved, pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, for summary judgment dismissing the action brought by plaintiff Gwendolyn O. Austin ("Austin"). Austin has cross-moved for summary judgment. Austin contends in this action that the Defendants have breached fiduciary duties and ERISA statutory requirements in connection with the administration of the Ford Models pension and profit sharing plans. For the reasons set forth below, both Austin's and Defendant's motions are granted in part and denied in part.

*The Parties*

   Austin is a former employee of Ford Models and a New Jersey resident.

   Ford Models, a New [*2]  York State Corporation with principal offices in New York City, is an international model management company.

   Gerard W. Ford and Eileen O. Ford are trustees of the Ford Models Pension Retirement Plan (the "Pension Plan") and Profit Sharing Plan (the "Profit Sharing Plan" and collectively, the "Plans").

*Prior Proceedings*

   Austin filed her initial complaint on May 23, 1995, and subsequently filed amended complaints on January 30, 1996, and January 10, 1997. On July 17, 1997, the Defendants filed the instant motion for summary judgment, and Austin cross-moved for summary judgment on September 19, 1997. Oral argument was held on November 12, 1997, at which time the motions were deemed fully submitted.

*Facts*

   Although the parties vigorously dispute the interpretation of the documents governing the Plans, the applicable facts are essentially undisputed.

   Austin was an employee of Ford Models and participated in the Plans, which are employee benefit pension plans within the meaning of ERISA, *29 U.S.C. § 1002(2)*. Although the Plans have been modified from time-to-time, the version applicable for this action are those dated January 16, 1991 and made effective [*3] as of March 1, 1989.

Ford Models terminated Austin's employment on May 6, 1994, and paid Austin six week's termination pay. At the time of her termination, Austin was 100% vested in the Plans, her account balance exceeded $ 3,500, and the Defendants continued to maintain her account balances in an investment account commingled with all other employee pension and profit sharing funds (the "Pool Account").

On May 7, 1994, the day after her termination, Austin wrote to the Trustees requesting immediate payment of her account balances in the Plans. In her letter, Austin referenced the specific pages in each plan's Summary Plan Description ("SPD") which she believed entitled her to the immediate payment. Austin also wrote: "If there is any conflict between the provisions set forth in the above referenced summary plans and the actual plans, please provide me with a complete copy of each plan." On June 21, 1994, approximately six weeks after her discharge, Austin filed a petition in bankruptcy, claiming debts of approximately $ 185,000.

By letter dated July 5, 1994, the Trustees denied Austin's request for immediate payment, stating "I have reviewed the situation suggested in your letter, [*4] and I am very sorry to tell you as a matter of policy, there is a two year wait before funds are distributed subsequent to departure from the company." The Trustees did not provide her with copies of the Plans as she requested until June 29, 1995, approximately one month after the commencement of this action.

On October 31, 1996, Ford Models paid to Austin $ 24,389.10 in Pension Plan benefits and $ 5,310.81 in Profits Sharing Plan benefits, which reflected her account balances plus bank interest from her termination date.

The Third Amended Complaint alleges nine claims. The first four claims allege breaches of fiduciary duty by (1) failing to advise Austin of her right to appeal; (2) establishing a policy of distributing benefits two-years after termination in contravention of the Plans; (3) failing to apply the two-year policy uniformly; and (4) failing to provide objective criteria for exercising its discretion in the timing of Plan payments. Austin further alleges that Defendants failed to provide to Austin copies of the Plans when requested, which Austin contends in claim five was a violation of 29 U.S.C. § 1132(c)(1) and in claim six was a violation of fiduciary duties. Next, [*5] Austin alleges that, in crediting her account with bank interest, Defendants breached their fiduciary duties: claim seven asserts that Austin should have received her proportionate share of the intermingled investment gains, and claim eight asserts that Defendants deprived her of a right to share in all investment vehicles. Finally, Austin's ninth claim is for consequential damages, alleging that

Defendant's conduct resulted in, among other things, her bankruptcy filing.

***Discussion***

**I. *Standard For Summary Judgment***

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 327,* [*6] *91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (quoting *Fed. R. Civ. P. 1*).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)* (per curiam); *Keywell Corp. v. Weinstein, 33 F.3d 159, 163 (2d Cir. 1994)* (a party is entitled to summary judgment if "resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried"). Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir. 1986).* The disputed facts that must be "material to the outcome of the litigation," *id. at 11.* "The substantive law will identify which facts are material. Only disputes [*7] over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson, 477 U.S. at 248.*

To defeat summary judgment, the non-moving party must present evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id. at 586. See also Anderson, 477 U.S. at 248* (genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party").

**II.** *Austin Was Not Entitled To Immediate Payment of Pension Plan Benefits, But Was Entitled To Immediate Payment of Profit Sharing Benefits*

The Plans' terms must be construed according to "general principles of contract law, looking to the language of the Plan and other indicia of the intent of the Plan's creator." *Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1317 (S.D.N.Y. 1993)* (Sand, J.) (citing *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112-13, 103 L.* [*8] *Ed. 2d 80, 109 S. Ct. 948 (1989))*. The Court reviews the Plans de novo, without affording any additional weight to the Trustees' interpretations. *See Firestone, 489 U.S. at 115*.

Although the parties dispute which version of the Summary Plan Descriptions are applicable to this action, they agree that for purposes of the instant motions the version advanced by Austin shall be used. According to Austin's version, the Pension Plan SPD section entitled "termination of Employment Prior to Retirement" states:

> In the event your employment is terminated prior to your normal retirement date, your nonforfeitable benefits are payable at the same time benefits would have been payable had you retired on your normal retirement date. However, if the balance in your account is $ 3,500.00 or less, the Trustees may pay you the nonforfeitable portion prior to your normal retirement date without your consent. If the balance in your account is more than $ 3,500.00, the Trustees may immediately pay you the vested portion of your account only with your written consent. [1]

The Profit Sharing Plan SPD states:

> If the vested balance in your account is $ 3,500.00 or less, the Trustees [*9] will pay you the nonforfeitable portion as soon as practicable following your termination of employment. However, if the vested balance in your account is more than $ 3,500.00, the Trustees will, as soon as practicable after the termination of your employment, pay you the vested portion of your account, only upon your written request. [2]

---

[1]   The related section of the Pension Plan states in relevant part that "if the vested balance of the Separated participant's Account is in excess of $ 3,500, it may be distributed to him only with the written consent of the Separated Participant and his spouse given within ninety (90) days prior to his Annuity Starting Date.

[2]   Neither party cites the Profit Sharing Plan text in their briefs, and the Court therefore assumes it is consistent with the SPD.

The Defendants contend that these provisions are intended merely to establish their discretion to distribute benefits before normal retirement age, and does not constitute a right held by participants to immediate [*10] distribution. They contend that the language used is intended to comply with the statutory requirement that "if the present value of any nonforfeitable accrued benefit exceeds $ 3,500, a plan meets the requirements of this paragraph only if the plan provides that such benefit may not be immediately distributed without the consent of the participant." [3] *29 U.S.C. § 411(a)(11)(A) (1994)*.

---

[3]   Congress changed the dollar limit to $ 5,000 in 1997. *See* Pub. L. No. 105-34, § 1071(a)(2)(A) (1997).

Defendants' gloss on the relevant text, however, neglects to account for the different wording between the Pension Plan and the Profit Sharing Plan. Whereas the Pension Plan states that the Trustees "may" pay the account upon consent, the Profit Sharing Plan states that the "Trustees will . . . pay you the vested portion of your account" upon a written request. The different language cannot be ignored in constructing the import of these two separate agreements.

Accordingly, the word "may" in the Pension Plan is consistent [*11] with Defendant's interpretation that they reserved the discretion to pay-out the account balances earlier than the normal retirement age, as long as the participant supplied the necessary consent. On the other hand, the use of "will" in the Profit Sharing Plan is consistent with Austin's interpretation, whereby the Defendants agreed to immediately pay-out the benefits "as soon as practicable" upon the single condition that the participant supplied the necessary consent. Accordingly, summary judgment is granted to the Defendants in connection with the Pension Plan, and to Austin in connection with the Profit Sharing Plan.

**III.** *Austin Is Entitled To A Proportionate Share of Gains or Losses*

Austin contends that the Trustees did not actually remove her account balances from the Pool Account and place the funds in a separate account, and therefore she is entitled to her proportionate share of the Pool Account gains or loses. On the other hand, the Trustees contend that, according to the Plans, physical segregation is not

required, and rather a mere accounting entry is sufficient to permit them to credit the terminated employee's account with bank interest.

The proper crediting [*12] of income earned from Austin's account balances is governed by section 5.9 of the Pension Plan, which provides:

> Upon a Participant's termination of employment for any reason other than death, Disability or Retirement, in the event that the Trustees do not distribute the nonforfeitable portion of such Participant's Accrued Benefit in accordance with Section 9.4(a), such Participant's Account shall continue to share in the gains and losses of the Trust Fund except as otherwise provided herein. Alternatively, the Trustees may segregate such Participant's Account in a special account and credit his Account with any income actually earned thereon, but not less than the prevailing savings bank rate of interest.

The Profit Sharing Plan provision is substantively the same. [4]

> 4   Section 5.9 of the Profit Sharing Plan provides that:
>
> > Upon a Participant's termination of employment for any reason other than death, Disability or Retirement, in the event that the Trustees will not distribute the nonforfeitable portion of such Participant's Accrued Benefit in accordance with Section 9.4(a), such Participant's Account shall continue to share in the gains and losses of the Trust Fund except as otherwise provided herein. Alternatively, the Trustees may segregate such Participant's Account in a special account and credit his Account with any income actually earned thereon, but not less than the prevailing savings bank rate of interest.

[*13]  The conclusion that physical separation of the funds is required to trigger the alternative method for crediting income is compelled by the language set forth in the Plans. Each plan provides, among other things, that the income credit for a special account would be "any income actually earned thereon." A plan participant does not "actually earn" income any differently if an accounting entry is made in the company books. Rather, income would be earned differently if the finds were debited from the Pool Account and credited to a separate account, such as a bank account earning a fixed rate of interest. If such a physical transfer had occurred, then it would be the interest earned thereon, not to be less than the "prevailing savings bank rate of interest," that would be the proper credit. Here, Austin earned income no differently than any other non-terminated participant, and therefore, according to the terms of the Plans, she is entitled to a proportionate share of the gain or loss thereon.

### IV. *Statutory Penalties Are Appropriate*

Austin has the statutory right to receive, upon written request, a copy of the relevant plan documents. *See 29 U.S.C. § 1024(b)(4)* ("The [*14]  administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."). Failure to comply with Austin's information request may, in the Court's discretion, result in statutory penalties. The statute provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $ 100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

*29 U.S.C. § 1132(c).*

Although not a model of clarity,  [*15]  Austin's May 7 letter request for a copy of the Plans was sufficient to invoke the statutory requirement that the Trustees send her a copy of the Plans. Austin wrote: "If there is any conflict between the provisions set forth in the

above referenced summary plans and the actual plans, please provide me with a complete copy of each plan."

Defendants contend that they acted within the letter of Austin's request. They contend that her request was conditioned on a conflict between the plan documents, that the SPDs and the Plans were consistent, and that the disagreement was about the interpretation of the documents - not their consistency. In context, however, Austin's letter conveys her understanding of her right under the Plans to the immediate distribution of her account balances upon request. In light of the broad disclosure mandated by ERISA, Austin's request should have been understood as a request for the Plan documents if her interpretation of the SPDs conflicted with the Trustee's interpretation of the Plans -- that is, if they denied her request. The Defendant's conduct in failing to supply the requested documents, or at least in seeking to clarify Austin's request if there [*16] was any ambiguity, contravenes ERISA's disclosure goals, and the Defendants are liable pursuant to *29 U.S.C. § 1132(c)(1)*.

The award of penalties is committed to the discretion of the Court. Although the statute provides no explicit guidance, courts have considered several factors in deciding the appropriate point in the range of allowable penalties, including: (1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary. *See Pagovich v. Moskowitz, 865 F. Supp. 130, 137 (S.D.N.Y. 1994)* (collecting cases). No one of these factors is necessary, and thus even the absence of prejudice does not necessarily defeat the imposition of a penalty. *See id.* ("Lack of prejudice is not a barrier to the imposition of penalties."); *Kascewicz, 837 F. Supp. at 1322* ("Prejudice is just one factor, albeit a significant one, out of the factors which district courts may consider . . . .").

Here, Austin contends that statutory penalties should apply because the Defendants were negligent in not providing the [*17] requested plans. Austin does not contend that the Defendant's failure was intentional and calculated to mislead her or to serve some other impermissible purpose. In *Pagovich*, where the court assessed a seventy-five dollar per day penalty totaling approximately $ 14,000, the defendant offered no reasonable explanation for his failure to comply, and the court concluded that the response was 'deliberate or willful." *See Pagovich, 865 F. Supp. at 139* (defendant's "reprehensible behavior" included "holding the benefits hostage in exchange for [plaintiff's] agreement not to challenge the amount of accrued benefits when [defendant's] own failure to provide plaintiff access to documents prevented her from verifying the validity of the sum"). Lack of due care, while still violating ERISA's strict disclosure rules,

is less egregious than intentional misconduct and therefore the penalty here is properly positioned at the lower end of the scale.

Consideration of the other relevant factors also mitigate the size of the appropriate penalty. Austin made only one request before filing her complaint. Accordingly, although it took over one-year and a federal case before Defendants supplied [*18] the requested documents to Austin, the gravity of this long delay is reduced because Defendants did not ignore repeated follow-up requests. In *Pagovich*, by contrast, the plaintiff requested the documents orally several times before making a written request, and followed up with a second written request before filing a complaint. *Id. at 138*. Furthermore, Austin has not claimed any prejudice. Finally, although the plan documents are important, Austin did receive copies of plan summaries which accurately reflected the actual text at issue in each plan. *Cf. Kascewicz, 837 F. Supp. at 1324* (assessing $ 25 per day penalty for total of $ 22,275 where defendant failed to supply any summary plan description after two written requests from plaintiff's attorney).

Because Austin does not contend Defendants acted intentionally, made only one request for the documents, does not allege any prejudice, and received summary plan descriptions which accurately reflected the relevant plan provisions, it is appropriate to award penalties at $ 10 per day, which is at the low-end of the allowable range from zero to $ 100 per day. Excluding the permitted thirty day delay in responding to Austin's [*19] written request, the Defendant's June 29, 1995, response was 387 days late. Therefore, the appropriate penalty is $ 3,870.

## V. *Consequential Damages Claim Is Dismissed*

Austin contends that the Defendants' failure to immediately pay the amount due to her pursuant to the Plans resulted in her filing for bankruptcy protection, resulting in consequential damages. Defendants, however, contend that Austin's bankruptcy filing could not be a consequence of their denial of immediate payment since she filed for bankruptcy protection on June 21, 1994, which was several weeks before Austin learned that the Defendants would deny her request for immediate payment. Austin fails to provide any factual basis for her claim for consequential damages, and accordingly the claim must be denied. [5]

---

     5    Accordingly, the Court need not reach Defendants contention that consequential damages are not available under the relevant ERISA provision.

## VI. *Attorney's Fees Are Not Appropriate*

*Section 1132(g)(1) of Title 29* [*20] *of the United States Code* provides: "In any action under this subchapter . . . by a participant . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In *Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869 (2d Cir. 1987)*, the Second Circuit set forth five factors for a district court to consider in exercising its discretion over whether to award fees: "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Id. at 871.* Given the factors a court must consider, a mere conclusory claim for fees is insufficient. Here, Austin fails to articulate any basis upon which attorney's fees should be awarded, and, therefore, the claim for fees is denied.

### Conclusion

For the reasons set forth above, both Austin's and Defendant's motions are granted in part and denied in part.

[*21]   Settle judgment on notice.

It is so ordered.

**New York, N.Y.**

**February 26, 1998**

**ROBERT W. SWEET**

   **U.S.D.J.**



FOCUS - 1 of 1 DOCUMENT

**KAREN BARRETT, Plaintiff, -against- HARTFORD LIFE AND ACCIDENT IN-SURANCE COMPANY, Defendant.**

**10 Civ. 4600 (AKH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2012 U.S. Dist. LEXIS 176362*

**November 8, 2012, Decided**
**November 9, 2012, Filed**

**COUNSEL:** [*1] For Karen Barrett, Plaintiff: Scott Madison Riemer, LEAD ATTORNEY, Riemer & Associates, L.L.C., New York, NY.

For Hartford Life and Accident Insurance Company, Defendant: John T Seybert, Michael H Bernstein, Sedgwick LLP (NY), New York, NY.

**JUDGES:** ALVIN K. HELLERSTEIN, United States District Judge.

**OPINION BY:** ALVIN K. HELLERSTEIN

**OPINION**

## ORDER DENYING MOTION FOR ATTORNEYS' FEES AND AWARDING INTEREST

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiff filed this action on June 14, 2010, claiming Defendant wrongfully denied her long-term disability benefits. Plaintiff argued that Defendant failed to provide her "a full and fair review" of her claim as required by the Employee Retirement Income Security Act ("ERISA") and sought a determination that she was entitled to disability benefits. See *29 U.S.C, § 1133*, Following oral argument, I denied both parties' motions for summary judgment on July 5, 2011 and remanded the matter to Defendant to review the case based on a more complete record. On remand, Defendant reversed its earlier determination, and on July 12, 2012, found Plaintiff to be entitled to disability benefits, Plaintiff now moves for attorneys' fees for the second time.

I have already awarded Plaintiff 40 percent of [*2] the attorneys' fees she incurred prior to my decision to remand the action to the Defendant insurer. At the time, I considered that the merits were mixed, and that 40 percent was just compensation. Plaintiff now seeks the remaining 60 percent of her requested fees for that earlier stage of the litigation. Plaintiff argues that when I awarded her 40 percent of fees, she had only achieved "some success" in the litigation, but now that Defendant has reversed its determination and awarded her benefits, she has now achieved complete success and is entitled to 100 percent of her fees.

Courts have discretion to award fees in ERISA actions where plaintiffs claim they were wrongfully denied benefits. See *29 U.S.C. § 1132(g)(1)* ("the court in its discretion may allow a reasonable attorney's fee and costs of action to either party"); *Paese v. Hartford Life and Accident Ins. Co., 449 F.3d 435, 450-51 (2d Cir. 2006)* (finding an award of attorneys' fees was within the discretion of the district court); *Seitzman v. Sun Life Assurance Co. of Canada. Inc., 311 F.3d 477, 484, 487 (2d Cir. 2002)* (holding that the lower court had the discretion to both award attorneys' fees to the insurer and to provide [*3] a lower award amount than requested). Exercising this discretion, I find Plaintiff is not entitled to additional fees for the pre-remand stage of the litigation. When I previously decided to award 40 percent of requested fees I was well aware that Plaintiff might prevail on remand, The fact that this actually occurred does not change my determination that 40 percent was the appropriate level of fees for expenses occurred prior to remand.

Plaintiff also seeks to have Defendant pay her for her attorneys' fees incurred following remand. Plaintiff correctly notes that a court may consider granting attorneys' fees related to administrative proceedings on remand. See *Peterson v. Continental Casualty Co., 282 F.3d 112, 122 (2d Cir. 2002)*. Plaintiff, however, is wrong to suggest that she is entitled to fees simply because she ultimately prevailed in those proceedings. Courts frequently consider the factors outlined in *Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869 (2d Cir. 1987)* in determining whether to award attorneys' fees in ERISA actions. See *Toussaint v. JJ Weiser, Inc., 648 F.3d 108, 110-11 (2d Cir, 2011)* (stating that courts can still consider the Chambless factors [*4] following the Supreme Court's decision in *Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 130 S.Ct. 2149, 176 L. Ed. 2d 998 (2010))*. Those factors are: "(1) [T]he degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987)*.

Here, Defendant did not engage in bad faith conduct, before or after remand. Various submissions by Plaintiff, after Defendant's initial determination and after remand, influenced Defendant's final determination. Defendant fully reviewed Plaintiffs submission and came to the determination that Plaintiff was entitled to benefits. In addition, I disagree with Plaintiffs argument that an award of attorneys' fees at this stage would encourage insurers to act responsibly. Awarding fees in this situation actually might discourage insurers from reconsidering earlier denials of coverage, a result [*5] that could be detrimental to insureds like Plaintiff. I find that the result of the two attorneys' fees decisions in this case--awarding fees for the portion of the litigation related to the insurer's failure to sufficiently communicate with the insured but declining such an award for the portion of the litigation where the insurer's review met ERISA standards--strikes the right balance.

Plaintiff also seeks prejudgment interest on the $184,492.23 in back benefits Defendant paid to her. Courts have discretion to award prejudgment interest in cases where an insurer pays back benefits after initially rejecting a claim. See *Dunnigan v. Metro. Life Ins. Co., 277 F.3d 223, 231 (2d Cir, 2002)* ("[Plaintiff] may recover the interest due her by reason of the Plan's unreasonable delay,"). Defendant argues that interest is unavailable because Plaintiff never won a judgment; instead, Defendant decided on its own to pay Plaintiff benefits.

The Second Circuit, however, implicitly rejected this argument in Dunnigan when it allowed for interest payments where "benefits [were] awarded after internal administrative review and not through litigation." *Id. at 225*; see also *Taaffe v. Life Ins. Co. of North America, 769 F. Supp. 2d 530, 537-38 (S.D.N.Y. 2011)* [*6] (awarding prejudgment interest even though it was the insurer, not the court, that reversed the claims denial). Here, I find an award of prejudgment interest is appropriate. Plaintiff waited more than three years for payment of her benefits. Interest is appropriate for the award to constitute full compensation for her disability. See *Jones v. Unum Life. Ins. Co, of America. 223 F.3d 130, 139 (2d Cir. 1999)* (explaining that the "the need to fully compensate the wronged party for actual damages suffered" is one of the central factors in determining whether prejudgment interest should be awarded).

Since prejudgment interest is not provided for by statute, courts have discretion as to what interest rate to apply. Plaintiff argues that she should receive prejudgment interest at the rate of 9 percent, the statutory prejudgment interest rate adopted by New York State. See *N.Y. C.P.L.R. § 5004*; see also *Alfano v. CIGNA Life Ins. Co., No. 07 Civ. 9661, 2009 U.S. Dist. LEXIS 28118, 2009 WL 890626, at *7 (S.D.N.Y. April 2, 2009)* (holding New York's nine percent rate should apply to an ERISA action in which an insurer wrongly denied disability benefits). Other courts, however, have awarded the federal prime rate. See *Rasile v. Liberty Life Assurance Co. of Boston, No. 03 Civ, 4316, 2004 U.S. Dist. LEXIS 11754, 2004 WL 1444886, at *1 (S.D.N.Y. June 28, 2004)*. [*7] I find the prime rate is the more appropriate rate. Interest rates have been at historic lows for the past three years, and applying a 9 percent rate would provide a windfall to Plaintiff and would serve to punish Defendant, in contravention of the compensatory goal of ERISA. The New York Legislature adopted the 9 percent rate in 1982, a period of high inflation that differed dramatically from our current interest rate environment, and there is no reason to expand the scope of that state statute into the federal arena. See *Denio v. State of New York, 7 N.Y.3d 159, 166, 851 N.E.2d 1153, 818 N.Y.S.2d 802 (2006)*. The federal prime rate, which has held steady at 3.25 percent for the time period in question, is adequate to compensate Plaintiff.

Courts in this circuit typically calculate the prejudgment interest amount in ERISA actions by awarding a daily interest payment and applying it to the midpoint of the "delinquency period," i.e., the period of time during which the insured should have received a benefit payment but was not paid. See *Taaffe v. Life Ins. Co. of North America, 769 F. Supp. 2d 530, 538-39 (S.D.N.Y. 2011)*. [*8] Here, the delinquency period runs from the date Plaintiff became eligible to receive benefits, June

2012 U.S. Dist. LEXIS 176362, *

16, 2009, to the date she was paid, July 31, 2012, a period of 1,142 days. The daily interest payment is $16.43 ($184,492.23 multiplied by 3.25 percent, divided by 365). The total interest payment is therefore $9,381.53 ($16.43 multiplied by 571 days, half the delinquency period).

In sum, Plaintiff's motion for attorneys' fees is denied. Plaintiffs request for prejudgment interest is granted in the amount of $9,381.53.

The Clerk shall terminate the motion (Doc. No. 52) and mark the case closed.

SO ORDERED,

Dated: November 8, 2012

New York, New York

/s/ Alvin K. Hellerstein

ALVIN K. HELLERSTEIN

United States District Judge

 LexisNexis®

FOCUS - 2 of 4 DOCUMENTS



Positive
As of: May 24, 2014

**JERROLD R. BLACK, Plaintiff, -v.- PITNEY BOWES INC., PITNEY
BOWES INC. LONG-TERM DISABILITY PLAN, and PITNEY BOWES
INC. EMPLOYEE BENEFITS COMMITTEE, Defendants.**

**05 Civ. 108 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK**

*2008 U.S. Dist. LEXIS 65338*

**August 26, 2008, Decided
August 26, 2008, Filed**

**PRIOR HISTORY:** *Black v. Pitney Bowes, 2006
U.S. Dist. LEXIS 92263 (S.D.N.Y., Dec. 21, 2006)*

**COUNSEL:** [*1] Christopher P. Foley, McCormick Dunne & Foley, New York, NY, for plaintiff.

Jennifer B. Hein, Nicole A. Diller, Morgan, Lewis & Bockius LLP, New York, NY, for defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Jerrold Black brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. §§ 1001, et seq.,*

challenging denials of disability benefits by defendant Pitney Bowes Inc., his employer, defendant Pitney Bowes Inc. Long-Term Disability Plan, its employee benefits plan, and defendant Employee Benefits Committee of Pitney Bowes, Inc., the plan administrator. Both sides move for summary judgment, or in the alternative, judgment on the administrative record. For the following reasons, plaintiff's motion will be granted in part and denied in part, and defendants' motion will be granted in part and denied in part.

**BACKGROUND**

**I. Factual and Procedural History**

On October 2, 2003, plaintiff Jerrold Black, who had been employed as a technician for defendant Pitney Bowes Inc. ("Pitney Bowes") for over 25 years, stopped working and sought short-term disability ("STD") benefits [*2] from his employer, pursuant to its short-term disability policy (the "STD Policy" or the "Policy"). (STD Adm. Rec. 34, 56-57. [1]) Black's claim was accom-

2008 U.S. Dist. LEXIS 65338, *

panied by a diagnosis from his primary care physician, Dr. Matthew Miller, who reported that Black suffered from "anxiety" and "depression" that prevented Black from being able to "perform his job currently." (Id. 34.) Black's application was evaluated by ValueOptions, a company engaged by Pitney Bowes, which in turn retained Dr. Gabrielle Stutman, a psychologist, to assess Black's condition. [2] (Pl. R. 56.1 Statement P 3.) On October 21, ValueOptions reviewed Dr. Miller's diagnosis and Dr. Stutman's assessment and recommended STD benefits for two weeks in addition to the three weeks that had passed since Black had stopped working. (Id. 47.) Pitney Bowes accepted this recommendation and approved short-term disability benefits through November 5, 2003. (Id. 31.)

> 1   All facts are taken from the administrative records developed in connection with Black's application for short-term disability benefits (the "STD Adm. Rec.") and for long-term disability benefits (the "LTD Adm. Rec."), attached as Exhibits A and B, respectively, to the Declaration [*3] of Nicole A. Diller. Page numbers in citations to these records refer to the Bates stamp numbers appearing on each page.
>
> 2   Defendants assert that ValueOptions Associate Medical Director Dr. Frank Webster conducted the assessment (see Def. Mem. 3), but this appears to be incorrect. Dr. Stutman's name, not Dr. Webster's, appears next to "Assessor's Name & Discipline" on the first page of the form (see STD Adm. Rec. 36), and nothing else in the record supports defendants' contention.

On November 10, ValueOptions recommended rejecting Black's request to extend his disability benefits period, and Pitney Bowes accepted that recommendation as well. (Id. 32, 33, 48.) Black appealed this decision, supported by another letter from Dr. Miller as well as a letter from his dentist. (Id. 49, 50-51, 52.) Pitney Bowes denied the appeal, contending that Black's "level of anxiety does not support extension" of benefits. (Id. 49, 53.)

A year later, in November 2004, Black applied for long-term disability ("LTD") benefits pursuant to the Pitney Bowes Inc. Long-Term Disability Plan (the "LTD Plan" or the "Plan"). (LTD Adm. Rec.

158-59.) Black's application for LTD benefits included a diagnosis from Dr. Neil [*4] Berliner, a psychiatrist, that Black suffered from a "panic disorder," that he was "unable to work because of this disability," and that it was uncertain when he would be "able to perform usual work." (Id. 160.) Black also submitted a third letter from Dr. Miller, stating that Black was "currently totally disabled from work," and that it was uncertain "when or if he will be able to return to work." (Id. 96.) Finding that Black's symptoms "do not meet the definition of disability," Pitney Bowes denied Black's application. (Id. 87, 88.)

In June 2005, Black appealed this decision, submitting all the materials he had previously submitted, plus a letter from the Social Security Administration advising Black that he had been found eligible for Social Security disability benefits, and a report from Dr. Berliner recommending "continuation of current treatment and long term disability." (Id. 92, 102, 103, 104.) In response, Pitney Bowes requested additional information from Black and asked that he submit to an independent medical examination ("IME"). (Id. 185.) Black refused to provide the additional information or to submit to an IME (id. 192), and he refused again upon Pitney Bowes's renewal [*5] of the request (id. 195-96, 198).

Black's appeal was considered by defendant Pitney Bowes Inc. Employee Benefits Committee (the "Employee Benefits Committee" or the "Committee"), the administrator of the LTD Plan. (Id. 208-14.) The Committee denied the appeal, finding that Black's failure to consent to the IME and to provide additional requested information gave rise to a "procedural ground for denial of benefits," and that Black in any event had failed to provide "sufficient objective evidence" that he was disabled. (Id. 212-13.)

Black sued, seeking review and reversal of these decisions. [3] Both sides move for summary judgment or, in the alternative, judgment on the administrative record.

> 3   Black initially filed two separate actions. The claim for STD benefits was made in state court, but removed by defendants to federal court. See Notice of Removal (Doc. # 1). The claim for LTD benefits, pursuant to

ERISA, was made in this Court, and was consolidated with the claim for STD benefits. See Order of July 28, 2006 (Doc. # 13). While the action for STD benefits does not present a federal question, and the amount in controversy is insufficient to sustain diversity jurisdiction, this Court has [*6] supplemental jurisdiction over the STD claim because it and the ERISA claim arise from a "common nucleus of fact." See *United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218, (1966); 28 U.S.C. § 1367.*

## II. The Short-Term Disability Policy

The STD Policy provides that a disabled employee is entitled to a percentage of his normal pay for up to twenty-two weeks. (STD Adm Rec. 5, 10.) An employee is considered "disabled" if he suffers "a non-occupational mental or physical injury or illness which renders the Employee unable to perform the material duties of his or her own job." (Id. 5.) To initiate a claim for benefits, an employee must provide "objective medical evidence" of the "extent and nature of the Disability." (Id. 12.) In addition to such evidence, an employee is required "to submit whatever proof the Company may require . . ., including the statements of one or more duly qualified physicians or clinical psychologists." (Id.) An employee must submit to a "medical or psychological examination or evaluation" as required by Pitney Bowes. (Id. 14.)

In evaluating claims for STD benefits, Pitney Bowes is empowered to "interpret and construe the terms and provisions of the Policy, to apply [*7] such terms and provisions . . ., [and] to determine questions of eligibility and of the status and rights of Employees." (Id. 16.) The Policy provides that Connecticut law governs its construction. (Id. 19.)

## III. The Long-Term Disability Plan

The LTD Plan provides that a disabled employee is entitled to a percentage of his normal pay until that employee is no longer disabled, retires, or dies. (LTD Adm. Rec. 13-14.) An employee is considered disabled during the first twelve months of receiving benefits if he is unable "to perform the material duties of his or her own occupation," and he is considered disabled beyond that point if he is

"unable . . . to engage in any gainful occupation or profession for which he is, or could become, reasonably suited by education, experience, or training." (Id. 11.)

In order to substantiate a claim for disability, an employee must "submit initially and from time to time whatever proof or documentation the Disability Department [4] may require . . ., including the medical records and medical analysis of one or more duly qualified physicians or clinical psychologists." (Id. 18.) In addition, as a "condition to the payment of benefits . . ., the Disability [*8] Department shall have the right to direct such employee to submit from time to time to an independent medical examination by a licensed or board certified physician or clinical psychologist." (Id.)

> 4   Although the Employee Benefits Committee is "responsible for the general administration of the Plan," it "has delegated ongoing, day-to-day administrative responsibility under the Plan to the Pitney Bowes Disability Department." (LTD Adm. Rec. 26.)

The Employee Benefits Committee has "discretion in exercising [the power] to interpret and construe the terms and provisions of the Plan, to apply such terms and provisions as the Committee may exclusively determine, to determine questions of eligibility and of the status and rights" of participants in the plan. (Id. 26, 33-34.)

## DISCUSSION

## I. Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c). Rule 56* "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party [*9] who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The party moving for summary judgment bears the initial burden of explaining the basis for its motion

and identifying those portions of the record which it believes "demonstrate the absence of a genuine issue of material fact." *Id. at 323.* The burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of material fact for trial. *Fed. R. Civ. P. 56(e)(2).* See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

In evaluating a summary judgment motion, a court's responsibility is to determine if there is a genuine issue to be tried and not to resolve disputed issues of fact. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Housing Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001).* An issue is material if it "might affect the outcome of the suit under  [*10] the governing law." Id. A court must draw all "justifiable inferences" in the nonmovant's favor, and construe all of the facts in the light most favorable to the nonmovant. *Anderson, 477 U.S. at 255.* However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment. *Id. at 252.*

The parties have moved, as an alternative to summary judgment, for "judgment on the administrative record." While there is no provision in the rules for this motion, a court may treat such a motion, in an ERISA action, as a request that, should summary judgment be denied, the court immediately conduct "a bench trial 'on the papers.'" *Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003).* This allows a district court to resolve factual disputes and make "explicit findings of fact" based on the administrative record. Id. As all the issues before the Court may be resolved on the undisputed facts, there is no need to conduct such a trial.

## II. Short-Term Disability Benefits

Black claims that Pitney Bowes breached the terms of the STD Policy, which is a part of his employment contract, by denying him benefits.  [*11] The STD Policy is governed by Connecticut law, under which the interpretation of contract terms is normally a question of law for the court. *Smithfield Assocs., LLC v. Tolland Bank, 86 Conn. App. 14, 18, 860 A.2d 738 (2004).* However, where an agreement gives a party discretion to apply or interpret the terms of that agreement, a court's review of that exercise of discretion is "relatively narrow." *Wyper v. Providence Washington Ins. Co., 533 F.2d 57, 62 (2d Cir. 1976)* (applying Connecticut law). In such a situation, the "burden is on the plaintiff to show that the [exercise of discretion] was motivated by bad faith or fraud or the result of arbitrary action." *Id.* Under this standard, "it is not enough to persuade a judge or jury that the decision may have been incorrect," but rather that "no reasonable basis" existed for the decision made by the party exercising discretion. *Gehrhardt v. General Motors Corp., 581 F.2d 7, 11 (2d Cir. 1978)* (applying same standard under New York law).

Here, the STD Policy confers wide discretion on Pitney Bowes, empowering it to "interpret and construe the terms and provisions of the Policy, to apply such terms and provisions . . ., [and] to determine questions of eligibility  [*12] and of the status and rights of Employees." (STD Adm. Rec. 16.) Accordingly, Pitney Bowes breached its obligations under the STD Policy only if its decision was a result of bad faith, fraud, or arbitrary action.

The undisputed evidence establishes that Pitney Bowes's decisions to grant Black benefits only until November 5, 2003, and to refuse to extend them thereafter were arbitrary and contrary to its obligations under the STD Policy. The Policy required Pitney Bowes to find Black "disabled" if it determined that his injury rendered him "unable to perform the material duties of his . . . job." (Id. 5.) There was considerable unrefuted evidence that Black's panic attacks and anxiety rendered him "disabled," which Pitney Bowes overlooked, mischaracterized, or unjustifiably discounted.

The assessments of Dr. Miller and Dr. Stutman offer substantial evidence of Black's disability. Dr. Miller's letter in support of Black's initial application for STD benefits reported that Black was suffering from "anxiety" and "depression" and that Black was "unable to perform his job currently." (Id. 34.) Dr. Miller's report is cursory, but its shortcomings are more than addressed by the thorough assessment  [*13] submitted by Dr. Stutman, the psychologist hired by Pitney Bowes to evaluate

Black's condition. Dr. Stutman reported that Black was experiencing "anxiety attacks" that caused a number of symptoms including "hyperventilation," difficulty concentrating, "tingling in extremities," "dizziness," "wobbl[iness] in legs," and "chestpain." (Id. 36.) According to Dr. Stutman, the anxiety was the manifestation of a "delayed" post-traumatic stress disorder that resulted from the death of Black's brother-in-law on 9/11 and a "loss of emotional stability/security" that Black experienced as a result of the terrorist attacks. [5] (Id. 41.) The assessment reported that Black had been experiencing anxiety attacks for over a year and a half, and that they had increased in intensity within the last several months. (Id. 36.)

> 5   In its reply brief, defendants grudgingly withdraw their entirely baseless argument (D. Mem. 2, 22-23) that Black fabricated the story of his brother-in-law's death. (D. Reply Mem. 2-3.) It is undisputed that Black's wife's brother, an employee of Cantor Fitzgerald, was killed in the destruction of the World Trade Center. Defendants' argument to the contrary is based on their misreading [*14] of Black's deposition testimony, which in turn was caused not (as they claim) by Black's vague answers, but by defendants' inept and indirect questions. See Black Dep. Tr. 11-16.)

Dr. Stutman found that when panicked, Black suffered "severe" impairment of his ability to perform complex tasks, make decisions without supervision, and accept and carry out responsibility for planning. (Id. 40.) It also found "marked" impairment of his ability to influence others and interact with customers and the public. (Id.) The assessment noted that prior to the onset of Black's anxiety, he "love[d]" his job and had no workplace issues or problems. (Id. 39.) However, with the onset of the anxiety, Black had been subject to repeated disciplinary actions for "[u]nsatisfactory attendance," including "[v]erbal counseling," a "[w]ritten warning," and a "[f]inal warning," which had put his "job in jeopardy." (Id.) The assessment concluded that Black was "unable (temporarily) to perform his functions at work" and was "in need of psychotherapeutic intervention to resolve his emotional responses" to 9/11. (Id. 41.) It proposed individual therapy 2-3 times per week and set a target date of

January 15, 2004, for [*15] meeting a number of specific treatment goals. (Id. 42.) The assessment noted that Black's motivation to return to work was "excellent" and that he was a "highly competent [and] skilled worker who enjoys his productivity on the job." (Id.) This assessment - together with Dr. Miller's - provides ample "objective medical evidence" that Black's anxiety made him "unable to perform the material duties of his job."

Pitney Bowes did not, and does not now, question the accuracy or thoroughness of Dr. Stutman's assessment. Indeed, it apparently relied on that assessment in granting Black a total of five weeks of STD benefits. However, in limiting those benefits to just two weeks beyond the date of Dr. Stutman's assessment, Pitney Bowes unreasonably ignored and misread the medical record. No additional assessment was performed by Pitney Bowes to justify the decision. Instead, the company relied on a brief report from ValueOptions, which "reviewed" the diagnoses of Dr. Miller and Dr. Stutman. (Id. 47.) That report significantly understated the evidence regarding Black's condition. The only symptoms noted in the report are that Black appears "disheveled" and has "some impairment of long-term memory," [*16] the latter being a mistake, as Dr. Stutman's assessment indicated that Black's memory was "intact" and Dr. Miller's diagnosis mentions nothing about his memory. (Compare id. with id. 34, 37). ValueOptions neglected to address any of the other physical symptoms noted by Dr. Stutman, or any of the functional impairments, such as the "severe" impairment in Black's ability to perform complex tasks, make decisions, and plan, and the "marked" impairment in Black's ability to interact with customers and the public. (See id. 47.) The ValueOptions recommendation was thus based on an inaccurate characterization of Black's actual condition, as described by the two medical professionals who personally examined him.

Not surprisingly, then, its recommendation that Black return to full-time work in two weeks has no reasonable basis in the record. ValueOptions noted that Black "displays little functional impairment when not having an anxiety attack or panic attack." (Id. 47.) This is correct as far as it goes, as Dr. Stutman indicated that Black is functionally impaired only "when panicked." (Id. 40.) However, the fact that Black was impaired only when pan-

icked made him fit to work only if his attacks [*17] were sufficiently infrequent as not to interfere significantly with his overall job performance. A panic attack suffered every now and again might not unduly interfere with the performance of one's job, but at some point frequent debilitating panic attacks would render an employee "unable to perform the material duties" of his job because they would cause him to miss substantial amounts of work and/or to perform unacceptably. ValueOptions did not even address the frequency of Black's anxiety attacks. But the fact that - as Dr. Stutman noted - Black's anxiety-related absences from work were putting his "job in jeopardy" evidences that his attacks occurred with sufficient frequency to make him unable to satisfactorily perform the material duties of his job.

ValueOptions's other justification for the recommendation that Black return to work full-time was that two weeks of disability leave would allow Black adequate time "to prepare for return to work." (Id. 47.) ValueOptions did not justify this conclusion and there is no evidence in the record to support it. (See id.) At the time of his application, Black had been suffering anxiety attacks for almost two years. (Id. 36.) Dr. Miller's [*18] letter said only that Black was "unable to perform his job currently" and made no prediction as to when he would be able to do so. (Id. 34.) Dr. Stutman's assessment specified January 15, 2004 - *three months* from the date of her assessment - as a target date for Black to meet treatment goals. (Id. 42.) Neither of these reports provided a reasonable basis for concluding that two weeks was sufficient time for Black to regain the capability to perform the material duties of his job, and ValueOptions provided no other evidence or explanation for such a conclusion.

Indeed, ValueOptions's two-week recommendation appears to have been a fall-back from its initial recommendation, which was that Pitney Bowes allow Black to work part-time. (Id. 47, 54.) This initial recommendation was itself arbitrary, as it was based on the mistaken belief that Black's anxiety attacks occurred primarily in the afternoon. (See id. 47, 54.) [6] But in any event, ValueOptions abandoned this recommendation after learning that "part[-]time work [was] not available" for Black. (Id. 47, 54.) Having found (albeit on a mistaken premise) that Black could perform his job only on a part-time basis, ValueOptions provided no [*19] reasonable justification for its fall-back recommendation that Black be required to return to work full time. Rather than being based on an assessment of Black's medical prognosis or vocational capability, the recommendation appears to have been based on a business decision that Black's job required full-time work. If, as ValueOptions believed, Black was capable only of part-time performance, he was not able to fulfill the material obligations of his job, and was disabled under the terms of the STD Policy. The unjustified change thus further evidences the arbitrariness of ValueOptions's recommendation, and of Pitney Bowes's decision to adopt that recommendation.

> 6     The only evidence of the timing of Black's attacks is contained in Dr. Stutman's assessment, which noted that the attacks occurred "usually in [the] *morning* but also in [the] afternoon or evening." (Id. 36; emphasis added.)

Pitney Bowes's subsequent refusal to extend Black's benefits beyond November 5 also lacked a reasonable basis. Again, Pitney Bowes relied on a recommendation from ValueOptions. (See id. 33.) The only new information presented by ValueOptions was a summary of a telephone call with Dr. Miller, who indicated [*20] that Black was continuing to experience anxiety, that he was exhibiting "nervousness" and had "difficulty concentrating." (Id. 48.) Dr. Miller also reportedly conceded that Black was "able to keep an appropriate daily schedule," was "eating and sleeping" without difficulty, was "compliant with treatment," and did not have "suicidal or homicidal ideation." (Id.) It is not apparent what relevance these concessions have to the issue of whether Black's anxiety interfered with his ability to work, and ValueOptions did not attempt to explain their relevance in its recommendation. Nor did ValueOptions follow up with Dr. Stutman, nor address her assessment. Instead, ValueOptions summarily concluded that "there is no proof" that Black was impaired, and that "complaints of nervousness and difficulty concentrating do not support a request for an extension of disability." (Id.) Such cursory conclusions - in the face of a thorough medical assessment that directly contradicts them - do not provide a reasonable basis for rejecting Black's application.

Pitney Bowes's consideration of Black's appeal of the denial of STD benefits was no more reasonable. Dr. Miller's second letter to Pitney Bowes indicated [*21] that he believed that Black was unable to "concentrate" or "perform his job effectively," that he was "disabled due to his psychiatric condition," that he was currently under the care of a psychiatrist and receiving medication, and that he needed "one or two months" more disability time in order to resolve his condition. (Id. 50-51.) Black also submitted a letter from his dentist, which, while not offering a relevant medical opinion, corroborated the reports of Black's symptoms by providing a first-hand description of one of Black's apparent panic attacks. (Id. 52.) Standing alone, these letters are not substantial proof of disability, but they undoubtedly supplement what was already compelling and unrefuted evidence of a disability.

As with the decision to reject Black's initial application, Pitney Bowes's denial of the appeal was not based on any new or contradictory information. Once again, Pitney Bowes does not appear to have reviewed with reasonable care the evidence in the record. Dr. Peter Griffin, a physician consultant for Pitney Bowes, noted in his "[c]linical [s]ummary" that Black submitted a "note from DDS" (the letter from Black's dentist) and a "note from GP" (the letter [*22] from Dr. Miller) in support of his appeal. (Id. 49.) Dr. Griffin dismissed the newly submitted information without explanation, echoing the earlier ValueOptions conclusion that the "[l]evel of anxiety does not support extension of STD." (Id.) He made no mention of Dr. Miller's earlier letter, or more importantly, of Dr. Stutman's thorough assessment. Dr. Griffin's failure to consider the medical opinions of Dr. Miller and Dr. Stutman - the only two doctors who actually examined Black - lacked reasonable justification.

Pitney Bowes's evaluation of Black's STD benefits application was thus flawed in a number of respects. The original ValueOptions recommendation was factually mistaken and analytically inconsistent, and it ignored compelling evidence of disability from Dr. Miller and Dr. Stutman. Pitney Bowes's later reviews did nothing but ratify this flawed recommendation. There was no reasonable basis for Pitney Bowes to conclude - contrary to the thorough assessment by Dr. Stutman and the supporting letters from Dr. Miller - that Black was able

to perform the material duties of his job. Its own consultant in fact concluded that Black could not perform on a full-time basis, and when [*23] the consultant's recommendation that Black be permitted to work part-time met resistance from Pitney Bowes, it failed to adhere to its conclusion that Black could not work full-time, and instead recommended that he be required to do so, in only two weeks. No plausible reason was offered for believing that Black's disabling condition would improve within that time, and the only professional opinions in the record to address Black's prognosis strongly suggested a much longer period of disability. Accordingly, Pitney Bowes's decision to deny Black STD benefits was arbitrary and in breach of its obligations under the STD Policy.

### III. Long-Term Disability Benefits

Black's claim for LTD benefits arises under ERISA, which provides a right of action for employees denied benefits under qualifying retirement and disability plans. See *29 U.S.C. § 1132(a)(1)(B)*. A court reviews such denials "de novo" unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)*. Where the benefit plan confers such discretionary authority, a court should [*24] not "disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995)*. Under the "arbitrary and capricious" standard of review, a court may overturn a decision to deny benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id. at 442*.

Here, the LTD Plan confers upon the Employee Benefits Committee the "discretion" to "interpret and construe" the terms of the plan and to "determine questions of eligibility." Therefore, decisions made by the Committee with regard to the LTD Plan are reviewed under a deferential "arbitrary and capricious" standard.

The Committee rejected Black's application both because of his refusal to undergo the requested IME and on the merits. The unrefuted evidence in the record establishes that the Committee's decision was not arbitrary and capricious. The LTD Plan

required the Committee to find Black "disabled" if it determined that he was unable "to perform the material duties of his . . . occupation." (LTD Adm. Rec. 11.) In contrast to Pitney Bowes's decision regarding Black's STD benefits application, the Committee's conclusion  [*25] that Black did not meet the requirements to be considered "disabled" for purposes of receiving LTD benefits was reasonable and supported by substantial evidence.

Black did submit substantial evidence of disability. His application for LTD benefits included a "proof of claim" form from Dr. Neil Berliner, a psychiatrist, indicating that Black suffered from a "panic disorder" that caused "palpitations, anxiety, hyperventilation, sweating . . ., difficulty concentrating, [and] mid[-]cycle insomnia." (Id. 160.) Dr. Miller also submitted a letter in support of Black's application, which indicated that Black began experiencing "anxiety problems and panic attacks" in February 2002, that he was "currently totally disabled from work," and that Dr. Miller "cannot predict when or if he will be able to return to work." (Id. 96.)

Additionally, as part of Black's appeal, Black submitted a copy of a letter from the Social Security Administration finding him eligible for Social Security disability benefits. (Id. 104.) Black also included a "Psychiatric Narrative Report" from Dr. Berliner. (Id. 102-03.) This report - somewhat more detailed than the one-page proof of claim form submitted earlier - outlined  [*26] the history of Dr. Berliner's treatment of Black, from March 2002 until the time of the letter. (Id.) The report indicates changes in Black's condition, and details the medicines Dr. Berliner prescribed for Black to control his anxiety and to aid him in sleeping. (Id.) The report notes that as of September 2003 Black was in weekly psychotherapy with a person named Elizabeth Prue, though it does not indicate anything substantive about this treatment or describe Prue's credentials. (Id. 103) The report concludes that Black's panic attacks are "under . . . better control since [he] has been in a non-work, lower stress environment" and since the dosage of his medication was increased. The report recommends "continuation of current treatment and long term disability." (Id.)

The Disability Department's initial denial of LTD benefits was marred by some of the same mistakes that marred its denial of Black's STD ben-

efits application. Dr. Griffin's review of Black's application stated that the documentation from Black's "family practitioner" and his "dentist" did not establish a "psychiatric" disability, ignoring the evaluations by Dr. Stutman, a psychologist, and Dr. Berliner, a psychiatrist,  [*27] that were also part of Black's application. (Id. 87.) Dr. Griffin again noted that Black has "work capacity when he is not experiencing anxiety," without addressing the issue of the frequency of his attacks. (Id.) And Dr. Griffin explicitly relied on the ValueOptions recommendations regarding Black's STD benefits application - flawed for the reasons discussed above - for his ultimate conclusion that Black's symptoms "do not meet the definition of disability." (Id.)

Nevertheless, the decision to deny Black's appeal is supported by substantial evidence. Black's failure to submit to an IME and to provide the information the Disability Department requested of him both constitutes an independent procedural default warranting denial of his application, and provides a basis for a reasonable decision-maker to discount the evidence of disability he provided. First, Black's refusal to comply with defendants' reasonable requests for information in itself justified denying his claim. The LTD Plan says the applicant "shall be required to submit initially and from time to time whatever proof or documentation the Disability Department may require." (Id. 18.) The plan also states that an employee may  [*28] be required, as a "condition to the payment of benefits under the plan," to "submit from time to time to an independent medical examination." (Id.) Black failed to satisfy these requirements by refusing repeatedly to submit to an IME and to provide the additional information requested by the Disability Department. Consequently, he had not met an essential "condition to the payment of benefits under the plan."

Black's argument that he was not required to provide such information for his appeal, because the requirements do not apply "after a denial has been issued" (Pl. Reply 4), is without merit. As an initial matter, it is not for the Court to interpret the Plan's provisions de novo. Just as the plan grants the Employee Benefits Committee "discretion" to determine questions of eligibility, so too does it grant the Committee "discretion" to "interpret and construe the terms and provisions of the Plan." (LTD Adm

Rec. 26.) Thus, the Committee's interpretation of the terms of the Plan as empowering it to request additional proof during an appeal is entitled to deference so long as it is not arbitrary or capricious.

Black cites no provision from the Plan that suggests a distinction between [*29] the Committee's powers prior to an appeal and after an appeal. To the contrary, the relevant provision states that the Disability Department (acting on behalf of the Committee) may require an applicant to submit additional proof "from time to time," suggesting that it may do so at any time: prior to, during, or even after an appeal. There is consequently no basis for finding the Committee's interpretation of Black's obligations under the plan to be arbitrary or capricious.

There is similarly no merit to Black's argument that the Committee may only require submission to an IME following an award of benefits. (Pl. Opp'n 4.) Black rests this argument on Section 5.7(d) of the Plan, which states that benefits may be "suspended or discontinued" for a participant's failure to attend a scheduled IME. (LTD Adm. Rec. 20.) Black argues that, since benefits can only be "suspended or discontinued" once they have begun, the IME requirement is "inapplicable where (as here) a claimant is not receiving benefits at the time of refusal." (Pl. Opp'n 4.) Even assuming that Black's interpretation of Section 5.7(d) is correct, however, Section 5.7(d) is not the only provision setting forth the consequences [*30] of failing to submit to an IME. Section 5.4(a) also addresses the issue, expressly providing that submitting to an IME requested by the Disability Department is a "condition to the payment of benefits under the Plan." (LTD Adm. Rec. 18.) Given this clear dictate, it was neither arbitrary nor capricious for the Committee to refuse to pay benefits to Black based on his refusal to submit to an IME.

Second, even if Black's failure to comply with the Committee's requests were not a procedural default of his application for LTD benefits, his recalcitrance prevented the Committee from having "sufficient objective evidence" to evaluate the merits of his claim. The Committee reasonably identified a number of gaps in the evidence submitted by Black. For example, the Committee noted that Black's submissions did not provide "sufficient medical records" - "such as test results, physician personal notes, and consultation reports" - to accompany the submissions from Dr. Miller and Dr. Berliner. (Id. 213.) Dr. Miller's letter is just a short paragraph conveying his conclusion with no documentary evidence to support it, and Dr. Berliner's "proof of claim" is similar. (See id. 96, 97.) Dr. Berliner's [*31] "Psychiatric Narrative Report" is more detailed, but it too is incomplete. It records the changes in the frequency and intensity of Black's anxiety attacks and his prescribed medication, but (unlike Dr. Stutman's earlier assessment) it does not analyze Black's specific functional impairments, the critical issue in assessing whether or not Black is able to perform the material functions of his occupation. Dr. Berliner's ultimate recommendation that Black be approved for LTD benefits rings hollow without any analysis of his ability to perform the functions of his job. Additionally, the Committee noted that Dr. Berliner's report mentions that Black is under the care of Elizabeth Prue, but there is no discussion of the substance of that treatment or its progress, and no report or documentation from Prue. (Id. 213.) The absence of a report from Black's primary therapist provides a substantive basis for the Committee to question the evidence submitted by Black.

As he does with his STD claim, Black places great weight on Dr. Stutman's assessment. But Dr. Stutman's assessment was conducted in October 2003, giving it limited value regarding Black's condition at the time of his LTD benefit claim, [*32] in November 2004, or of his appeal, in June 2005. Indeed, Dr. Stutman's recommended course of treatment set treatment goals to be met as early as January 2004, suggesting that she recognized the possibility that Black would be ready to return to work by that time. (STD Adm. Rec. 42.) While Pitney Bowes's failure to consider and respond to Dr. Stutman's assessment of Black was evidence that its STD benefit determination was arbitrary, the Committee's failure to do so with regard to its LTD benefit determination was not.

Finally, in contrast to Black's application for STD benefits, in which Dr. Stutman's assessment provided evidence of Black's disability from a medical professional of Pitney Bowes's choosing, the only evidence of disability submitted in connection with Black's LTD application came from Black's own care providers. This is not to say that

the evaluations by Dr. Miller and Dr. Berliner are biased or should be disregarded. But there is nothing arbitrary or capricious about defendants' insisting that Black's application be confirmed by an examination from someone other than his own caregivers, particularly when the LTD Plan gives Pitney Bowes the explicit right to require   [*33] such an examination.

Because of inadequacies in the evidence Black provided in his application for LTD benefits, and because of his refusal to submit to an IME, the Committee's decision to deny LTD benefits to Black was neither arbitrary nor capricious and is entitled to deference by this Court. [7]

> 7   Black objects to the Committee's consideration of a report by Dr. Arthur Broder, who reviewed the medical information in Black's file after Black's appeal of the initial denial of his application. (Pl. Mem. 11-13.) Dr. Broder told the Committee that Black's medical records "fail to address in a valid, reliable, professional, [and] comprehensive manner whether he is afflicted with any permanently disabling neuropsychiatric disorder(s)." (LTD Adm. Rec. 91.) Black contends that consideration of Broder's report violated the requirement that the Committee provide Black with a "full and fair review" of the initial adverse benefit determination, because Black was not given an opportunity to respond to Dr. Broder's report. See *29 C.F.R. § 2560.503-1(h)*. Black relies principally on *Abram v. Cargill, Inc., 395 F.3d 882 (8th Cir. 2005)*, for the proposition that failure to provide such an opportunity   [*34] denies a participant "full and fair review."
>
> *Abram* is not binding authority on this Court, and its reasoning has been questioned and rejected elsewhere. See, e.g., *Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1167-68 & n.3 (10th Cir. 2007); Winz-Byone v. Metropolitan Life Ins. Co., No. EDCV 07-238-VAP (OPX), 2008 U.S. Dist. LEXIS 109824, 2008 WL 962867, at *8 (C.D. Cal. Mar. 26, 2008); Skipp v. Hartford Life Ins. Co., No. CCB-06-2199, 2008 U.S. Dist. LEXIS 8884, 2008 WL 346107, at *10-*11 (D. Md. Feb. 6, 2008)*. But even if Dr.

Broder's report is disregarded, the Committee's decision to deny LTD benefits to Black was not arbitrary or capricious. For the reasons discussed above, the Committee had ample basis to conclude that Black had not submitted "sufficient objective evidence" of disability without relying on Dr. Broder's report.

## IV. Production of Plan Documents

Finally, Black claims that Pitney Bowes failed to comply with *29 U.S.C. § 1024(b)(4)*, which requires a plan administrator to provide, upon written request by a plan participant or beneficiary, "a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under   [*35] which the plan is established or operated." An administrator who fails to comply with such a request within 30 days "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $ 100 a day from the date of such failure or refusal." Id. *§ 1132(c)(1)(B)*. By letter of March 11, 2005, Black demanded copies of "[a]ll guidelines and protocols used to make the denial determination" in regards to Black's LTD benefit application. (LTD Adm. Rec. 168-69.) Pitney Bowes failed to provide a copy of a "Policies and Procedures Manual" - which sets forth internal procedures to guide Disability Department employees in processing disability claims - until June 28, 2007. (Defs. Resp. to Pl.'s R. 56.1 Statement P 38.)

However, even assuming that the Policies and Procedures Manual is a "guideline" or "protocol" within the meaning of Black's March 11, 2005, letter, there is no merit to Black's claim. The manual is not one of the documents set forth in *Section 1024(b)(4)*. It is plainly not a "plan description," an "annual report," or a "terminal report." Nor is it "the bargaining agreement, trust agreement, contract, or other instrument[] under which the plan   [*36] is established or operated." While the manual does guide operations at Pitney Bowes for the processing of disability claims, the phrase "instruments under which the plan is . . . operated" refers to "legal documents that govern or confine a plan's operations, rather than the routine documents with which or by means of which a plan conducts its opera-

2008 U.S. Dist. LEXIS 65338, *

tions." *Board of Trustees of the CWA/ITU Negoti-ated Pension Plan v. Weinstein, 107 F.3d 139, 142 (2d Cir. 1997)*. An internal policies and procedures manual is not such a legal document. See, e.g., *Cohen v. Metropolitan Life Ins. Co., No. 00 Civ. 6112, 2003 U.S. Dist. LEXIS 4468, 2003 WL 1563349, *1-*2 (S.D.N.Y. Mar. 26, 2003)* (finding that "Best Practices Manual" and "Claims Management Guidelines" are not "instruments" under which a plan is operated). Accordingly, Black has no claim to recover the statutory penalties under *section 1132(c)(1)(B)*.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion of summary judgment is granted with respect to Pitney Bowes's liability for breach of its obligations under the Short-Term Disability Benefits Policy, and denied in all other respects. Defendants' motion for summary judgment is granted with respect to plaintiff's claims [*37] under ERISA, *29 U.S.C. §§ 1132(a)(1)(B)* and *1132(c)(1)(B)*, and denied in all other respects. The parties are directed to submit a proposed judgment awarding appropriate damages to Black on or before September 19, 2008.

SO ORDERED.

Dated: New York, New York

August 26, 2008

/s/ Gerard E. Lynch

GERARD E. LYNCH

United States District Judge





Analysis
As of: May 24, 2014

**BRIDGET M. CURRAN, individually, and as natural Guardian of C.F.C., a minor, Plaintiff, -against- AETNA LIFE INSURANCE COMPANY, TRINET GROUP, INC., and THE TRINET OPEN ACCESS MANAGED CHOICE PLAN, Defendants.**

**13-cv-00289 (NSR)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2013 U.S. Dist. LEXIS 163162; 57 Employee Benefits Cas. (BNA) 1427*

**November 14, 2013, Decided
November 15, 2013, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Curran v. Aetna Life Ins. Co., 2014 U.S. Dist. LEXIS 65132 (S.D.N.Y., May 12, 2014)*

**COUNSEL:** [*1] For Bridget M. Curran, individually, and as Natural Guardian of C.F.C., a Minor, Plaintiff: David J. Squirrell, LEAD ATTORNEY, Banks Curran Schwam and Squirrell, LLP, Mount Kisco, NY.

For Aetna Life Insurance Company, Trinet Group, Inc., The TriNet Open Access Managed Choice Plan, Defendants: Michael H Bernstein, LEAD ATTORNEY, John T Seybert, Ryan Christopher Chapoteau, Sedgwick, LLP, New York, NY.

**JUDGES:** NELSON S. ROMÁN, United States District Judge.

**OPINION BY:** NELSON S. ROMÁN

**OPINION**

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Bridget M. Curran brings this action on behalf of herself individually and as the natural guardian of her son, C.F.C., a minor against Defendants Aetna Life Insurance Company ("Aetna"), TriNet Group, Inc. ("TriNet"), and the TriNet Open Access Managed Choice Plan's¹ (the "Plan") (collectively, "Defendants"). She seeks (1) to recover benefits due under the Plan pursuant to *ERISA Section 502(a)(1)(B)*; (2) declaratory and injunctive relief and to impose sanctions on Defendants pursuant to *ERISA Section 502(c)* for failure to provide documents pertaining to her claim determination; (3) recover damages for breach of fiduciary duty under *ERISA Section 404(a)(1)(A)*, [*2] *(B)*, and *(D)* against Aetna pursuant to *ERISA Section*

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 22 of 79

Page 2

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

*502(a)(3)(B)*; (4) recover damages for breach of fiduciary duty under *ERISA Section 405(a)(1), (2)*, and *(3)* against TriNet pursuant to *ERISA Section 502(a)(3)(B)*.

> 1   TriNet Group, Inc. Section 125, Section 129, and Flexible Spending Account Plan was erroneously sued under the name TriNet Open Access Managed Choice Plan. Def. Mem. 1.

Defendants move to dismiss the Second, Third, and Fourth claims in Plaintiff's Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted. For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part.

**Background**

For purposes of this motion, this Court accepts as true the facts as stated in Plaintiff's Amended Complaint.[2] Bridget M. Curran was a member-participant and an insured under the TriNet Open Access Managed Plan, as was her son, C.F.C., a minor. Amended Complaint ("Amend. Compl.") ¶1. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. 1001, et seq.* Amended Complaint ¶3. Aetna is the underwriter, insurer, and agent of the Plan and TriNet is the issuer and administrator of the Plan. [*3] Amend. Compl. ¶4-5. The Plan terms and coverage information is contained in a Booklet-Certificate, which Plaintiff was provided by TriNet and had possession of at all relevant times. Amend. Compl. ¶17. Together with "Additional Information," the Booklet-Certificate constituted the Summary Plan Description ("SPD"). *Id.*

> 2   The Court notes Plaintiff's meticulous documentation of Defendants' use of facts contrary to, or outside of the Amended Complaint in its Motion to Dismiss. For purposes of deciding this motion, however, the Court accepted as true the facts in Plaintiff's complaint and analyzed whether Plaintiff stated a claim based on those facts only.

On January 7, 2011, Plaintiff's minor son, C.F.C., underwent scoliosis surgery, which was performed at Stamford Hospital in Stamford, Connecticut by Dr. Rudolph F. Taddonio, an out-of-network health care provider. Amend. Compl. ¶13. Following the surgery, on January 10, 2011, Dr. Taddonio submitted a Claim Form to Aetna in accordance with the plan's terms to recover payment for the surgical procedure in the amount of $168,500. Amend. Compl. ¶14-15. At some point in April 2011, and until September 2011, on Aetna's website, it was indicated   [*4] under its "Claims Listings" that Aetna had approved a payment of $119,658.42 for the scoliosis surgery performed in January 2011 and that such amount was to be "Paid by Plan." Amend. Compl. ¶19. In fact, Dr. Taddonio did not receive that payment and ultimately, received a total payment of $4,443.99 from Aetna, which was made in two installments - $2,988.70 was paid on March 10, 2011 and $1,455.29 was paid on December 26, 2011. Amend. Compl. ¶22. On May 31, 2011, Aetna notified Plaintiff by letter that it had made an error in approving the payment of $119,658.42 and that it had assigned a new case number to the claim. Amend. Compl. ¶23.

Beginning on April 7, 2011, Plaintiff submitted letters to both Aetna and TriNet requesting specific documents relating to the approval and subsequent rescission of the $119,658.42 payment, referencing specific Department of Labor Regulations enacted pursuant to ERISA which require production of certain documents. Amend. Compl. ¶33. Through counsel, Plaintiff sent letters to Aetna on April 7, 2011, July 7, 2011, September 26, 2011, October 28, 2011, November 15, 2011, November 28, 2011, and January 7, 2012 and to TriNet on March 9, 2012 and May 22, 2012.   [*5] *Id.* The letters sent to TriNet also requested specific documentation with regard to the adverse determination of the claim. Amend. Compl. ¶36. TriNet's response, on July 16, 2012, indicated that TriNet was not the claims fiduciary and that it had delegated all claims administration to Aetna, its insurance carrier. Amend. Compl. ¶42; Declaration of Helen Hong Ex. D CURRAN-TRINET000041. To date, Plaintiff has received none of the requested documents pertaining to the adverse claim determination. Amend. Compl. ¶42.

On January 14, 2013, Plaintiff filed a Complaint against Aetna, TriNet, and the Plan. Plaintiff filed an Amended Complaint on August 2, 2013.

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

## Discussion

### A. Legal Standard

#### a. Motion to Dismiss Under *Rule 12(b)(6)*

On a motion to dismiss for "failure to state a claim upon which relief can be granted," *Fed. R. Civ. P. 12(b)(6)*, this Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ruotolo v. City of N.Y., 514 F.3d 184, 188 (2d Cir. 2008)*. Dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* [*6] (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*; *accord Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)*. "Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 555)*.

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations of a complaint need not be detailed, but they must be sufficient to "nud[ge] . . . claims across the line from conceivable to plausible," *Twombly, 550 U.S. at 570*--in other words, to raise a potential entitlement to relief beyond the "speculative level." *Id. at 555*. Thus, a pleading that merely offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" is insufficient. *Id.* [*7] Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted must be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. at 679*.

#### b. Materials Considered on Motion to Dismiss

On a motion to dismiss, the court may consider the documents that are "asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)*. One way a document may be deemed incorporated by reference is where the complaint "refers to" the document. *EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 224 n. 2 (S.D.N.Y. 2012)*. "Specifically in the ERISA context, '[b]ecause the Plan is directly referenced in the complaint and is the basis of this action, the Court may consider the Plan in deciding the motion to dismiss.'" *Faber v. Metropolitan Life Ins. Co., No. 08-cv-10588, 2009 U.S. Dist. LEXIS 98775, 2009 WL 3415369, at *1 n.1 (S.D.N.Y. Oct. 23, 2009)* (quoting *Steger v. Delta Airlines, Inc., 382 F. Supp. 2d 382, 385 (E.D.N.Y. 2005))*.

### B. Plaintiffs' Second Claim

#### a. [*8] Statutory Penalties

Defendants move to dismiss Plaintiff's Second Claim, which seeks injunctive and declaratory relief as well as statutory penalties under *ERISA §502(c)* against all Defendants for failure to adequately respond to Plaintiff's' requests for documents and information pertaining to Plaintiff's claim for coverage. Def. Mem. 3. Plaintiff seeks statutory penalties against TriNet, the Plan Administrator, Aetna, the insurer and agent of the Plan, and the Plan itself. Amend. Compl. ¶30. *ERISA §502(c)* provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 24 of 79

Page 4

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

*29 U.S.C. §1132(c).* The text of the statute makes it clear that sanctions under *§1132(c)* may be imposed [*9] only against a plan *administrator* and only for refusal to supply information *required* by the relevant *subchapter* of ERISA.

Under ERISA, the plan administrator is defined as "the person specifically so designated by the terms of the instrument under which the plan is operated." *29 U.S.C. §1002(16)(A).* The statute clearly provides that only the plan administrator is subject to statutory penalties under *ERISA §502(c). See Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 631 (2d Cir. 2008)* ("[S]ince Oxford is not [designated as plan administrator], it is not a plan 'administrator' within the meaning of *ERISA § 502(c)(1)* []. [Plaintiffs] therefore cannot recover statutory damages under that provision of ERISA for Oxford's nondisclosure of certain information."); *see also Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 135 (2d Cir. 2001)* ("By its terms, ERISA allows for civil penalties only if an administrator has refused to comply with a request for information." (internal citation omitted)). Here, the plan instrument, the SPD, designates TriNet as the Plan Administrator,[3] and therefore, only TriNet is subject to statutory damages under *ERISA § 502(c).* Statutory penalties may not be [*10] imposed upon non-administrators Aetna and the Plan.

3   Both Plaintiff and Defendant accept this statement as fact. Plaintiff Amend. Compl. ¶4; Opp'n p. 10; Def. Mem. 10

Plaintiffs assert, however, that although Aetna is the insurance carrier and not the designated administrator, Aetna held itself out as the plan administrator and therefore should be considered the *de facto* plan administrator. Both the First Circuit and the Eleventh Circuit have held that an entity that is not specifically designated the administrator by the plan document may nonetheless be held liable for ERISA violations if the circumstances suggest that it is acting as the plan administrator. *Rosen v. TRW, Inc., 979 F.2d 191, 193-94 (11th Cir. 1992)* ("if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document."); *Law v. Ernst & Young, 956 F.2d 364, 372 (1st Cir. 1992)* ("where an entity of which the administrator is part in effect

holds itself out as the plan administrator by officially disseminating such information, we think it is subject to *§1132(c)* liability should it fail to discharge that role in a proper way."). The Second Circuit, [*11] in addressing *Rosen v. TRW, Inc.* and *Law v. Ernst & Young*, stated as follows:

> Some courts have held that under certain circumstances a party not designated as an administrator may be liable for failing to furnish a plan description. [citing *Law* and *Rosen*]. We disagree. "Respect for our proper role requires that we decline . . . to substitute our notions of fairness for the duties which Congress has specifically articulated by imposing liability on the administrator."

*Lee v. Burkhart, 991 F.2d 1004, 1010 n. 5 (2d Cir. 1993)* (citing *Davis v. Liberty Mut. Ins. Co, 871 F.2d 1134, 1138 n. 5, 276 U.S. App. D.C. 394*); *see also McKinsey v. Sentry Insurance, 986 F.2d 401 (10th Cir.1993)* (disagreeing with *Law v. Ernst & Young*). Although there is some disagreement, the majority of courts in this circuit have applied the same principal to non-designated administrator defendants, and held that only designated administrators may be defendants for purposes of actions under *ERISA § 502(a)(1)(B). New York State Psychiatric Ass'n, Inc. v. UnitedHealth Group, No. 13 Civ. 1599 CM, 2013 U.S. Dist. LEXIS 158438, 2013 WL 5878897, at *7 (S.D.N.Y. Oct. 31, 2013)* (listing cases rejecting the notion that an entity may be held liable for benefits *§ 502(a)(1)(B)* under [*12] as a "de facto" administrator); *Del Greco v. CVS Corp., 354 F. Supp. 2d 381, 384 (S.D.N.Y. 2005)* ("An entity that provides services to a plan does not become a de facto plan administrator liable under ERISA[.]"). This Court sees no reason to distinguish *§ 502(a)(1)(B)* liability from *§ 502(c)* sanctions for purposes of whether an entity could be held as a *de facto* administrator. Thus, since courts have refused to apply a de facto test for administrators under ERISA, Aetna cannot be a *de facto* administrator and sanctions under *§ 502(c)* cannot be levied against it.

The second criterion for sanctions under *§ 502(c)* is that the information the plan administrator

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 25 of 79

Page 5

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

refuses to furnish is that information specifically "required by this subchapter." *29 U.S.C. §1132(c).* "The subchapter referred to is Subchapter I of Title 18, entitled 'Protection of Employee Benefit Rights,' which includes Subtitle A, General Provisions, and Subtitle B, Regulatory Provisions, and encompasses *sections 1001 through 1191c.*" *Anderson v. Sotheby's Inc. Severance Plan, No. 04 Civ. 8180SASDFE, 2005 U.S. Dist. LEXIS 10647, 2005 WL 1309056, at *2 (S.D.N.Y. May 31, 2005).* Defendants claim that the only requirement to provide information for purposes [*13] of *section 502(c)* lies in *Section 104(b)(4) of ERISA,* which imposes an obligation on the Plan Administrator, upon request, to provide the Summary Plan Description to any participant or beneficiary. *29 U.S.C. § 1024(b)(4)* ("The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." (internal footnote omitted)). Plaintiff never specifically requested a copy of the SPD because Plaintiff was in possession of the SPD at all times. Amend. Compl. ¶17. Thus, sanctions under *§ 502(c)* cannot be predicated on the failure to provide Plaintiff the SPD.

Plaintiffs identify a provision in the Plan's SPD entitled "Enforce Your Rights" which allows for the beneficiary to request documentation relating to the denial of a claim.[4] Plaintiffs allege that this provision is consistent with, and an implementation of *ERISA §§ 503, 505,* and *502(c),* and the failure to comply with it should expose Defendants to *§ 502(c)* liability. *Section 505 of ERISA* gives [*14] the Secretary of Labor discretion to implement regulations necessary to carry out the provisions of the subchapter.[5] Plaintiff claims that Defendants failed to follow certain Regulations that require the production of documents relating to adverse claim determinations. To the extent Plaintiff is relying on the Department of Labor Regulations implemented pursuant to section 505, *29 U.S.C. §1135,* Plaintiff's requested relief of sanctions must fail. Plaintiff relies in part on *29 C.F.R. § 2560.503-1,* which imposes duties on both the plan and the plan administrator. *29 C.F.R. § 2560.503-1(h)* applies to plans:

> Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

*29 C.F.R. §2560.503-1(h)(1).* The Regulation further provides that a review will not be full and fair unless the plan participant is provided with "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." [*15] *29 C.F.R. §2560.503-1(h)(2)(iii).* Where there is an adverse determination, the plan administrator is required to provide certain documents under *29 C.F.R. §2560.503-1(f):*

> The plan administrator shall provide a claimant with written or electronic notification of a plan's benefit determination on review . . . . In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant-
>
> (1) The specific reason or reasons for the adverse determination;
>
> (2) Reference to the specific plan provisions on which the benefit determination is based;
>
> (3) A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

*29 C.F.R. §2560.503-1(f).* Plaintiff looks to these regulations as a basis for imposing statutory penalties under ERISA upon TriNet and Aetna. However, the language of *ERISA § 502(c)* clearly states that statutory penalties are to be imposed only for failure to provide information as required under Subchapter I of ERISA. This court has followed the

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 26 of 79

Page 6

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

precedent of both the Third [*16] and Seventh Circuits in holding that "statutory penalties may not be assessed against the Plan Administrator under *29 U.S.C. § 1132(c)(1)* for violations of ERISA's implementing regulations." *Mohamed v. Sanofi-Aventis Pharmaceuticals, No. 06 Civ. 1504, 2009 U.S. Dist. LEXIS 119871, 2009 WL 4975260, at *21 (S.D.N.Y. Dec. 22, 2009)* (following the holdings of the Third Circuit case *Groves v. Modified Retirement Plan, 803 F.2d 109, 113 (3d Cir.1986)* and the Seventh Circuit case *Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397 (7th Cir.1996))*; *accord Gates v. United Health Group Inc., No. 11 Civ. 3487(KBF), 2012 U.S. Dist. LEXIS 100831, 2012 WL 2953050, at *12 n. 15 (S.D.N.Y. July 16, 2012)* ("Plaintiff, however, cannot state a claim for statutory penalties against the plan administrator based on the Plan's alleged failure to provide requested information in violation of *ERISA Section 503*."); *Anderson, 2005 U.S. Dist. LEXIS 10647, 2005 WL 1309056, at *4* ("[A] violation of ERISA's implementing regulations cannot support the imposition of sanctions under *section 1132*, regardless of whether the implementing regulations place the burden of disclosure on the plan or the plan administrator."). Plaintiff's reliance on *Juliano v. The Health Maintenance Org. of New Jersey, Inc., 221 F.3d 279 (2d Cir. 2000)* [*17] on this point is misplaced because in that case, the court was not dealing with imposing sanctions for failure to comply with *29 C.F.R. § 2560.503-1(f)* and *29 C.F.R. § 2560.503-1(g)*, but only that Plaintiff was entitled to notice of the reasons for the denial of the benefit. Here, the Court determines only that failure to follow the Department of Labor Regulations does not subject an entity to sanctions under *ERISA § 502(c)*.

4   This provision states, "If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA there are steps to take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay up to

$110 a day until you receive the materials . . . ." Gallion Decl. Ex. A CURRAN-AETNA000183.

5   . The full text of *§505* is as follows: "Subject to subchapter II of this chapter and section 1029 of this title, the Secretary [*18] may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records (subject to section 1134(a) and (b) of this title)." *29 U.S.C. §1135*.

Plaintiff also refers to obligations under *§ 503 of ERISA*, which states,

> Every employee benefit plan shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*29 U.S.C. § 1133(1)-(2)*. This section requires the release of information by the plan, and not the plan administrator, and therefore the plan administrator cannot be subject to sanctions for failure to provide information under *Section 503*. [*19] *See New York Psychiatric Ass'n v. UnitedHealth Group, No. 13 Civ. 1599 CM, 2013 U.S. Dist. LEXIS 158438, 2013 WL 5878897, at *18 (S.D.N.Y. Oct. 31, 2013)* ("*ERISA § 503* imposes obligations only upon the employee benefits plans themselves."); *Gates, 2012 U.S. Dist. LEXIS 100831, 2012 WL 2953050, at *6* ("*Section 503* explicitly imposes obligations only upon employee benefit plans. Numerous courts have ruled that such section does not create liability for administrators . . . ." (internal citations and alterations omitted)); *American Medical Ass'n v.*

*United Healthcare Corp., No. 00Civ.2800(LMM)(GWG), 2002 U.S. Dist. LEXIS 20309, 2002 WL 31413668 (S.D.N.Y. Oct. 23, 2002)* ("The Court now holds that *§ 503* is inapplicable to a plan administrator."). Accordingly, Plaintiffs' requested relief for sanctions under *ERISA § 502(c)* against Defendants TriNet and Aetna cannot be predicated on a violation of *Section 503*. Although *Section 503* imposes an obligation on the plan, sanctions under *section 502(c)* only provide for penalties against the plan administrator and therefore, cannot be imposed against the plan for failure to comply with *section 503*. Simply put, sanctions under *section 502(c)* are not a remedy for violations of *section 503*.

### b. Declaratory & Injunctive (Mandamus) Relief

Plaintiff's [*20] Amended Complaint also seeks injunctive and declaratory relief under its Second Claim compelling Defendants to respond to Plaintiff's requests for documents relating to Plaintiff's claim for coverage under the Plan. Defendant's motion to dismiss does not address the mandamus relief. Therefore, although the Court is granting Defendants' motion to dismiss the Second Claim seeking statutory penalties, the Second Claim is not dismissed with respect to the requested declaratory and injunctive relief.

### C. Plaintiff's Third Claim

Plaintiff's third claim against Aetna alleges breach of fiduciary duty under *ERISA §404(a)(1)*. *Section 404(a)(1)* states, "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. . . ." *29 U.S.C. § 1104(a)*. Plaintiff alleges that Aetna did not act solely in the interest of Plaintiff, a Plan beneficiary, because it served as both an insurer and fiduciary under the Plan and the actions it took were out of self-interest and not in accordance [*21] with Plaintiff's best interests. Amend. Compl. ¶58-59. Plaintiff's Amended Complaint seeks "compensatory damages" for Aetna's alleged breach of fiduciary duty in the amount of $168,500. Plaintiff insists this claim is separate and apart from her first claim for recovery of benefits under *§*

*502(a)(1)(B)* because the denial of Plaintiff's claim resulted in an outstanding bill from Dr. Taddonio of $168,500, whereas if Aetna had approved the payment of $119,658.42, Dr. Taddonio would have accepted that amount as payment in full for his services. Plaintiff asserts that were it not for Aetna's alleged breach of fiduciary duties, she would not have an outstanding bill from Dr. Taddonio for $168,500. Plaintiff concedes in her Opposition that should she prevail on her first claim and recover $119,658.42, that amount would not be recoverable under her Third Claim.

The enforcement mechanism Plaintiff pursues is *ERISA § 502(a)(3)*, which states, in relevant part, that "[a] civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable* [*22] *relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ." *29 U.S.C. § 1132(a)(3)* (emphasis supplied). "We have interpreted the term 'appropriate equitable relief' in *§ 502(a)(3)* as referring to 'those categories of relief' that, traditionally speaking (i.e., prior to the merger of law and equity) 'were typically available in equity.'" *CIGNA Corp. v. Amara, U.S.    , 131 S.Ct. 1866, 1878, 179 L. Ed. 2d 843 (2011)* (quoting *Sereboff v. Mid Atl. Med. Servs., 547 U.S. 356, 361, 126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006)*). Section 502(a)(3) acts as a "safety net, offering appropriate equitable relief for injuries caused by violations that *§ 502* does not elsewhere adequately remedy." *Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)*.[6]

[6] Note that the *second subsection of 502(a)* provides an avenue for a civil suit by a plan beneficiary for "appropriate relief under section 409 [entitled 'Liability for Breach of Fiduciary Duties']." *29 U.S.C. § 1132(a)(2)*. However, recovery under *section 409* accrues to the plan, and not to the individual beneficiary. *29 U.S.C. § 1109* ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties [*23] imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan

any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ."). Further, the court in *Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)* held that *section 409* did not "authorize the plaintiff's suit for compensatory and punitive damages against an administrator who had wrongfully delayed payment of her benefit claim." *Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)*.

Plaintiff bases her claim on the same set of facts as her first claim for recovery of plan benefits - namely, that Aetna erred in rescinding its first determination for payment of $119,658.42 and subsequently approving a lesser payment that totaled $4,443.99 to Dr. Taddonio. The relief that Plaintiff seeks is monetary in nature and not equitable as anticipated by *§ 502(a)(3)*. *See Kendall v. Employees Retirement Plan of Avon Products, 561 F.3d 112, 119 (2d Cir. 2009)* ("Furthermore, *§ 1132(a)(3)* only applies to claims for injunctive relief, and despite [Plaintiff's] assertions to the [*24] contrary, many of [Plaintiff's] claims are effectively claims for money damages outside the scope of *§ 1132(a)(3)*."); *Wilkins v. Mason Tenders District Council Pension Fund, 445 F.3d 572, 582 (2d Cir. 2006)* ("The district court's starting premise is correct: suits may be brought under *§ 502(a)(3)* only for those categories of relief that were typically available in equity, and classic compensatory damages are never included within these categories.") (internal citations and alterations omitted); *Frommert v. Conkright, 433 F.3d 254, 270 (2d Cir. 2006)* ("While the plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under *§ 502(a)(3)*, the gravamen of this action remains a claim for monetary compensation and that, above all else, dictates the relief available."); *Pelosi v. Schwab Capital Markets, L.P., 462 F. Supp. 2d 503, 515 (S.D.N.Y. 2006)* ("[Plaintiff] does not allege facts and conduct with respect to his fiduciary duty claim that are in any way different from the allegations supporting his other ERISA causes of actions. Consequently, the Court finds in this action there is no 'appropriate equitable relief' necessary to remedy the harm [*25] alleged that is

not adequately addressed by the relief available under *§ 502(a)(1)(B)*.").

In *CIGNA Corp. v. Amara*, on which Plaintiff relies, the Supreme Court was faced with a dispute regarding the failure to properly disclose information between an employer and beneficiaries of a pension plan that had been converted to a "cash balance" retirement plan. *CIGNA, 131 S.Ct. at 1870*. The Court found that *ERISA § 502(a)(3)* instead of *§ 502(a)(1)(B)* gave the District Court authority to reform the terms of the plan and enforce the new terms of the plan, which included the payment of money owed already retired beneficiaries. *Id. at 1880*. Although "this relief takes the form of a money payment, [that fact] does not remove it from the category of traditionally equitable relief. Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id*. The circumstances here are distinguishable from *CIGNA* in a critical way. The equitable relief granted by the District Court under *CIGNA* was the reformation of the plan documents, the result of which was the award of monetary [*26] payment. Plaintiff here seeks monetary damages that essentially derive from the claim determination, which is based on the terms of the Plan documents. *Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (2d Cir. 2005)* ("We decline this invitation to perceive equitable clothing where the requested relief is nakedly contractual.").

Plaintiff asserts that she is not seeking contractual-based rights but, instead, is seeking damages flowing directly from Aetna's alleged self-dealing. In *Devlin v. Empire Blue Cross & Blue Shield*, the Second Circuit noted that "should plaintiffs' claim under *ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)*, to enforce their rights under the plan fail, plaintiffs' breach of fiduciary duty claim is their only remaining remedy. *Varity Corp.* clearly provides that, where a plan participant has no remedy under another section of ERISA, she can assert a claim for breach of fiduciary duty under *§ 502(a)(3)*." *Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89 (2d Cir. 2001)*. However, plaintiffs in *Varity* were left with no other remedy under ERISA, specifically for recovery of benefits under *§ 502(a)(1)(B)* because they were no longer plan beneficiaries. *Varity, 516 U.S. at 515*. [*27]

2013 U.S. Dist. LEXIS 163162, *; 57 Employee Benefits Cas. (BNA) 1427

*Varity* made clear that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id at 515*. Plaintiff's First Claim, which is not subject to Defendants motion to dismiss, is for recovery of benefits under *§ 502(a)(1)(B)*, and thus Plaintiff is left with a potential remedy under ERISA. Plaintiff's argument for breach of fiduciary duties is that Aetna was in a conflict of interest position by determining the "recognized charge" for the surgery as $119,658.42 and then rescinding that determination in favor of a lower payment of $4,443.99. This claim is essentially that Aetna erred in its claim determination. Because it is essentially duplicative of her First Claim, and because there is other relief available for this claim under the statute other than the equitable relief available under *§ 502(a)(3)*, Plaintiff's Third Claim should be dismissed. *Wilkins v. Mason Tenders District Council Pension Fund, 445 F.3d 572, 582 (2d Cir. 2006)* ("We believe, however, that Wilkins's claim may be understood not as a claim for equitable relief under *§ 502(a)(3)*, [*28] but as a claim to recover plan benefits under *§ 502(a)(1)(B)*."); *Levin v. Credit Suisse, Inc., No. 11-cv-5252(RJS), 2013 U.S. Dist. LEXIS 49820, 2013 WL 1296312, at *3 (S.D.N.Y. Mar. 19, 2013)* ("Claim 1 [for breach of fiduciary duty] fails because it is duplicative of Claim 5 [for arbitrary & capricious denial of benefits under ERISA *§ 502(a)(1)(B)*]. Claim 1 alleges that MetLife breached its fiduciary duty by denying [Plaintiff's] application for his [LD] benefits without undertaking a responsible investigation. Claim 5 alleges that MetLife arbitrarily and capriciously denied his benefits. Because these claims are coextensive, dismissal of Claim 1 as against MetLife is appropriate." (internal quotations and citations omitted)).

**D. Plaintiff's Fourth Claim**

Plaintiff's Fourth claim seeks compensatory damages against TriNet for breach of fiduciary duty under *ERISA § 405(a)(1), (2) & (3)*, pursuant to *ERISA § 502(a)(3)(B)*. Plaintiff alleges that she put TriNet on notice that Aetna was violating its fiduciary duties in a letter to TriNet's counsel and TriNet failed to take any action to remedy such violation. Under *ERISA § 405(a)*, one fiduciary can be held

liable for a breach of fiduciary duty by another fiduciary:

> (1) [*29] if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

> (2) if, by his failure to comply with *section 1104(a)(1)* of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*29 U.S.C. §1105(a)(1)-(3)*. Plaintiff seeks relief through the same provision of ERISA as its fiduciary claim against Aetna, *section 502(a)(3)(B)*. For the same reasons as stated above in Section C in dismissing the Third Claim against Aetna, the claim against TriNet must fail. Plaintiff seeks a monetary remedy amounting to $168,500, which Plaintiff claims is the amount that it was damaged due to TriNet's failure to appropriately prevent or remedy Aetna's alleged breach. As stated *supra* in Section C, compensatory damages are not the type of "equitable relief" anticipated by the statute, and there is no "appropriate equitable relief" alleged that cannot be adequately remedied [*30] by *§ 502(a)(1)(B)*. *Varity, 516 U.S. at 515*. Accordingly, Plaintiff's Fourth Claim is dismissed.

**Conclusion**

For the foregoing reasons, the Court grants Defendants motion to dismiss Plaintiff's Second Claim as against all Defendants only with respect to the statutory penalties sought under *ERISA § 502(c)*. With respect to the requested injunctive and declaratory relief, Plaintiff's Second Claim is not disturbed. The Court GRANTS Defendants' motion to dismiss Plaintiff's Third Claim against Defendant Aetna and Plaintiff's Fourth Claims against De-

fendant TriNet. The clerk of the court is directed to terminate the motion. (Docket No. 26).

Dated: November 14, 2013

White Plains, New York

SO ORDERED:

/s/ Nelson S. Román

NELSON S. ROMÁN

United States District Judge



FOCUS - 2 of 2 DOCUMENTS

Warning
As of: May 24, 2014

## TIFFANY L. HALO, PLAINTIFF, v. YALE HEALTH PLAN, DEFENDANT.

### CIVIL ACTION NO.: 3:10-cv-1949 (VLB)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

### 2012 U.S. Dist. LEXIS 31447; 53 Employee Benefits Cas. (BNA) 2300

### March 8, 2012, Decided
### March 8, 2012, Filed

**SUBSEQUENT HISTORY:** Vacated by, Remanded by *Halo v. Yale Health Plan, 2013 U.S. App. LEXIS 19232 (2d Cir. Conn., Sept. 18, 2013)*

**COUNSEL:** [*1] Tiffany L. Halo, Plaintiff, Pro se, Denville, NJ.

For Yale Health Plan, Director of Benefits & Records Yale University, Defendant: Anthony D. Sutton, LEAD ATTORNEY, Donahue, Durham & Noonan, P.C., Guilford, CT; Patrick M. Noonan, LEAD ATTORNEY, Donahue, Durham & Noonan, Guilford, CT.

**JUDGES:** Hon. Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [DKT. #14]

The Plaintiff, Tiffany L. Halo ("Halo"), proceeding *pro se*, brings this action against Defendant Yale Health Plan ("YHP"), the student insurance provider at Yale University, under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff principally alleges that Defendant violated *29 C.F.R. §2560.503-1*'s provisions regarding the timing of notification of benefit determinations. Her single count complaint can also be construed to allege a second claim for breach of contract under ERISA. Plaintiff alleges that YHP acted in an arbitrary and capricious manner in denying her claims for coverage of certain out-of-network services. Defendant has moved for judgment on the administrative record to affirm YHP's coverage decisions. [*2] For the reasons stated hereinafter, the Defendant's motion for judgment on the administrative record is granted as to both claims.

Facts

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

Halo was a graduate student at Yale University who was enrolled in the Yale Health Plan in 2008. As an enrollee, Halo was entitled to health benefits under the plan as described therein. The parties agreed that the plan administration was governed by federal law. The issues at hand arose out of a series of incidents which began on May 31, 2008 when Halo developed a visual disturbance in her left eye. She went to the Yale University Health Services Urgent Care Department and was referred to Yale New Haven Hospital for an inpatient consultation. [Dkt. #14, Def.'s Mem., Ex. B, p. 2]. She was diagnosed with a retinal detachment and surgery on her left eye was performed on June 1, 2008. [*Id.* at 4-7]. Follow up appointments were scheduled for June 2 and 9, 2008 with Dr. Huang at Yale New Haven hospital. [*Id.* at 8-12]. On June 11, 2008, Halo was referred for a second opinion with Dr. Liggett at New England Retina Associates. [*Id.* at 13]. It was determined that her retina had not reattached and a vitrectomy was performed on June 13, 2008. [*Id.* at 14]. She returned  [*3] the next day for a follow up and was given a cell phone number to call over the weekend if there were any further complications. [*Id.* at 15-16]. The following Monday, June 16, 2008, Halo returned again due to severe pain in her left eye and was seen by Dr. Ligette's associate Dr. Haffner. Dr. Haffner found that the pain was caused by an increase in intra-ocular pressure and he performed a partial aspiration to reduce it. [*Id.* at 17-19].

On June 16, 2008, after the visit with Dr. Haffner, Halo's mother made a request by telephone to YHP for a second opinion on Halo's condition. Within 24 hours, Dr. Forster, Chief of Ophthalmology at Yale University Health Services, called and approved the referral for a second opinion with Dr. D'Amico of Weill Cornell Ophthalmology Associates ("Weill") who was an out-of-network doctor. YHP expressly informed Halo by letter dated June 17, 2008 that any additional services beyond her visit for a second opinion must be further approved before they would be covered under the plan. [Dkt. #14, Def.'s Mem., p. 3 and Ex. C.].

On June 17, 2008, Dr. D'Amico saw Halo and determined that immediate treatment was necessary. Halo received treatment the same day. The  [*4] Weill treatment record of Halo's June 17, 2008 visit states "Patient will move to her parents in N.J. and would like to transfer her care to WCMC." [Dkt. # 14, Ex.B, p. 23]. Halo went to see Dr. D'Amico the next day for a follow up. [Dkt. #14, Def.'s Mem., Ex. B, p. 20-24]. Halo alleges in her Memorandum in Opposition to Defendant's Motion for Judgment that her parents called Vicki Eisler of Member Services at YHP on June 17, 2008 to inform her that Dr. D'Amico had performed an emergency treatment. Halo alleges that Eisler told her parents that the services provided by Dr. D'Amico were approved as emergency treatment. Halo also alleges that her parents understood from Eisler that all treatment with Dr. D'Amico until June 30, 2008 would also be approved and covered by YHP. [Dkt. #20, Pl.'s Mem., p. 9]. Defendant disagrees that they had authorized all services provided by Dr. D'Amico until June 30, 2008 and points out that the initial authorization was to obtain a second opinion anytime until June 30, 2008. [Dkt. #14, Def. Mem., p. 4 n.3]. The authorization letter, dated June 17, 2008, clearly states that YHP's approval was only for a second opinion. [Dkt. #14, Def.'s Mem., Ex. C].

During  [*5] this time between June 17 and August 6, Halo alleges that she called and left numerous voicemails for YHP seeking to confirm that coverage beyond a second opinion for emergency care had been approved as Eisler had previously allegedly indicated to her parents. [Dkt. #20, Pl's. Mem., pp. 9, 11]. Halo alleges that Shaun Peltor, the Billing Manager of Cornell Weill Ophthalmology, which is not affiliated with YHP, allegedly confirmed to her orally on June 19, 2008 that coverage had been extended by YHP until June 30, 2008. [*Id.* at 9]. However since Peltor is not an employee of YHP, Plaintiff cannot rely on her alleged conversation with Peltor to prove that YHP had approved covered for Dr. D'Amico's services.

The bills for the visits on June 17 and 18, 2008, were received by the plan's claims department on July 8, 2008 as Halo's claim for services rendered. The claims were denied by YHP on July 30, 2008 in a form entitled "Explanation of Benefits" on the basis that the "service [was] not authorized." [Dkt. #14, Def.'s Mem., Ex. E]. Halo returned to Dr. D'Amico for further visits on June 20, June 26 and August 5, 2008. [Dkt. #14, Def.'s Mem., Ex. B, p. 25-38]. On the August 5 visit, Dr. D'Amico  [*6]

recommended further surgery to be performed eight days later on August 13, 2008. [*Id.* at 35-38].

Halo alleges in her Memorandum in Opposition to Defendant's Motion For Judgment that Eisler finally returned her calls on August 6, 2008 and indicated that there was no official determination on whether YHP would cover any of the services provided by Dr. D'Amico beyond the second opinion which was contrary to Halo's parents' understanding from their conversation with Eisler on June 17, 2008. [Dkt. #20, Pl.'s Mem., p. 12]. Eisler advised Halo to submit an appeal for the claims that had already been denied.

On June 20, 2008, June 26, 2008, and August 5, 2008, Halo received medical care at Weill from Dr. D'Amico. [Dkt. #14, Ex. B]. On the treatment notes for these and all subsequent visits the section entitled "Referring Physician Copy" was left blank. [*Id.*]. The June 20, 2008 treatment note indicated Halo was to "follow up in 1 week" with Dr. D'Amico of Weill. [*Id.*]. It also says "Patient voices understanding and agreement to plan as outlined." [*Id.*]. Dr. D'Amico's June 26, 2008 treatment notes states "return in two weeks (around 7/10/09)." [*Id.*]. The August 5, 2008 treatment notes indicate [*7] that Dr. D'Amico instructed Halo to "return in 7 days." [*Id.*]. On August 6, 2008 Halo completed a pre-operative questionnaire for a surgical procedure scheduled for August 13, 2008. [*Id.*].

On August 7, 2008, Halo notified YHP about the upcoming surgery scheduled for August 13, 2008 and in the same letter, appealed the decision to deny coverage for the June 17 and June 18, 2008 visits to Dr. D'Amico. [Dkt. #14, Def.'s Mem., Ex. F]. In this letter, Halo indicated that she was displeased with the treatment she had received at Yale and with Dr. Liggett. She wrote that during her June 17, 2008 visit, Dr. D'Amico "immediately noticed three problems with the surgery performed by Dr. Ligett. First, Tiffany allergic to Vycril sutures; Dr. D'Amico removed sutures, and within 24 hours, redness and irritation in the left eye had decreased by more than fifty percent. Second, Dr. D'Amico was concerned that Tiffany may have an infection; multiple cultures were taken and allowed to grow for 48-72 hours. Third, Tiffany's eye pressure was still greatly elevated and as a consequence Dr. D'Amico aspirated both the anterior and posterior portions of the left eye, removing > 0.5cc gas. Tif-

fany felt almost [*8] immediate relief. Dr. D'Amico also prescribed oral antibiotics for possible infection." [*Id.*].

On August 11, 2008, Dr. Forster called Halo to advise her to stay in network in order for the plan to cover her medical expenses and indicated that YHP would not pre-authorize the August 13 scheduled surgery. [Dkt. #14, Def.'s Mem. p. 6-7 and Ex. H]. Halo elected to undergo surgery on August 13, 2008 with Dr. D'Amico at New York Presbyterian Hospital prior to receiving authorization for the out-of-network service from YHP. [Dkt. #14, Def.'s Mem., Ex. B, p. 43-45]. Dr. D'Amico diagnosed Halo with recurrent retinal detachment for both preoperative and post operative. [Dkt. #14, Ex. B].

On August 15, 2008, YHP responded to Halo's appeal in a letter in which it affirmed its decision to deny her claims. YHP stated that it would only cover the portion of the June 17 visit to Dr. D'Amico that it had pre-authorized for a second opinion but would not cover the additional services provided during the June 17, 2008 visit and the June 18, 2008 visit. YHP indicated in the letter that "[y]ou elected to leave the New Haven area and requested coverage for a second opinion with a physician, Dr. D'Amico, in [*9] New York. Coverage for non-emergency out of network care is not part of your health care benefit with Yale Health Plan, but we routinely do allow coverage *for consultation only* with an out-of-network clinician for the purposes of obtaining a second opinion. Your request for such a consultation was approved. The services provided by Dr. D'Amico went beyond consultation, resulting in charges that were not covered by the original request." [Dkt. #14, Def.'s Mem., Ex. J] [emphasis in the original]. In addition, YHP indicated in the letter that it had provided "clear and explicit" communication to Halo that further visits and the follow-up surgery scheduled for August 13, 2008 with Dr. D'Amico would be denied and that Halo had been informed of the availability of in-network retinal specialists to provide her with any needed follow up care. [*Id.*].

On September 8, 2008, Halo appealed seeking reimbursement for the services rendered by Dr. D'Amico on June 17, 18 and August 13. [Dkt. #14, Def.'s Mem., Ex. K]. In the letter, Halo indicated that on June 17, 2008 Dr. D'Amico "removed Vicryl sutures (because she had an allergic reaction

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 34 of 79

Page 4

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

to them)" and opined that Dr. D'Amico "aspirated both the anterior [*10] and posterior chambers of her eye in order to relieve the still-elevated pressure and pain, took bacterial and fungal cultures because infection was suspected," and stated that he "started her on an antibiotic regimen." She further stated that "improvement of her eye over the next 24 hours was dramatic: the pain subsided, the pressure decreased to a medically acceptable level, and the scleral redness and swelling reduced significantly. These procedures were medically necessary to protect the integrity of her eye from infection and (further) permanent damage; there were ignored by her unavailable surgeon, Dr. Liggett, and denied by covering ophthalmologist Dr. Haffner." [Id.]. Halo also argues in the letter that the August 13 surgery with Dr. D'Amico was "medically necessary: the surgery entailed removal of the lens because of a cataract that had rapidly developed from the perfluoropropane gas, removal of that gas, which still occupied between 33-50% of the volume of her eye after 8 weeks of recovery performed by Dr. Liggett, laser therapy to reattach the retina, and installation of a silicone oil bubble to stabilize recovery." Lastly Halo states that the "severity of her situation [*11] makes this claim a legitimate one." [Id.].

Halo was seen at Weil on September 10, 2008 on which date Dr. D'Amico scheduled a "RFD repair next Wednesday 9/17/09." [Dkt. #14, Ex. B]. Her final follow-up visit to Dr. D'Amico was on October 3, 2008. [Id.].

On September 18, 2008, YHP sent a letter to Halo indicating that the YHP Claims Committee met on September 9, 2008 to review the appeal and had approved payment in full for Halo's visits to Dr. D'Amico on June 17 and 18, 2008, but upheld its decision to deny payment for the surgery performed on August 13, 2008. [Dkt. #14, Def.'s Mem., Ex. L].

On September 29, 2008, Halo requested another appeal of the decision to deny reimbursement for the August 13, 2008 surgery. [Dkt. #14, Def.'s Mem., Ex. M]. In the letter, Halo simply requests for the "Committee to revisit Dr. D'Amico's surgery of August 13, 2008. [Id.]. On September 18, 2008, YHP sent a letter to Halo indicating that on November 4, 2008, the YHP Claims Committee reviewed her appeal and voted unanimously to deny

payment for the August 13, 2008 surgery. [Dkt. #14, Def.'s Mem., Ex. N].

On September 10, 2008, Halo developed additional eye symptoms and again went to Weill Cornell Ophthalmology [*12] where she was diagnosed with a recurrent retinal detachment. [Dkt. #14, Def.'s Mem., Ex. B, p. 46-48]. Surgery was scheduled for September 17, 2008 and Halo underwent the operation at New York Presbyterian Hospital. [Id. at 53]. On October 3, 2008, Halo filed a claim for the services rendered on September 10 and the September 17 surgery. On November 11, 2008, YHP denied her claims for these additional services again in a form entitled "Explanation of Benefits" on the basis that "service [was] not authorized." [Dkt. #14, Def.'s Mem., Ex. P and Ex. Q]. The November 11, 2008 form also shows a denial of claims for charges incurred on Plaintiff's June 20 and 26, 2008 visits to Dr. D'Amico. [Dkt. #14, Def.'s Mem., Ex. Q]. On December 13, 2010, Plaintiff filed the instant action in federal court.

The provisions of the health plan in which Halo was enrolled and which define the coverage afforded are explained fully in the YHP Student Handbook. See [Dkt. #14, Def.'s Mem., Ex. A]. The plan provides that "[i]f in the course of medical evaluation and treatment, a member requires outpatient services not provided at YUHS, the member's primary care clinician may make a referral to an approved specialist [*13] in the YHP health care network outside YUHS. Prior authorization for coverage of these services must be obtained from the YHP Care Coordination Department. A referral from your primary care clinician is necessary but does not constitute authorization for coverage. Authorization for coverage must be obtained from the Care Coordination Department. Approved claims are covered at 100%. Please note that YHP will not pay for the services of non-YHP network clinician unless those services, including all testing and treatment ordered by the non-network clinician, are authorized in advance by the YHP Care Coordination Department. This is true even if the member was referred for services by a YHP network clinician, except in cases of emergencies." [Id.].

The plan also provides that "[i]n general, outpatient care received out of YHP network of health care clinicians and facilities is not covered under YHP Hospitalization/Specialty Coverage. The two

exceptions to this are outpatient care for an emergency or urgent condition ... and care that has been arranged in advance by a YHP clinician and approved by the Care Coordination Department. In special circumstances when a medical condition or therapy [*14] may require some out-of-network case, a YHP clinician will case manage your condition, which means that the clinician will coordinate in advance medically necessary care out of network and assist in arranging for the pre-authorization of this care. Case managed care is covered out-of-network only when care is coordinated in advance by a YHP clinician and authorized in advance by the Care Coordination Department." [*Id.*].

Under the plan, "[e]mergency care and pre-authorized follow-up care for emergency conditions are covered at 100% regardless of location. An emergency condition is defined as a major acute medical problem or major acute trauma that requires immediate medical attention or a condition that could lead to serious harm or death if care is not received or is delayed." Plan beneficiaries are instructed to "contact YHP Care Coordination Department within 38 hours (or 2 business days) of receiving emergency outpatient treatment or being admitted to an emergency facilities. The Care Coordination Department will (1) notify YHP clinical staff of your condition so that they can coordinate your care as appropriate or make any further arrangement for your care and (2) pre-authorize [*15] any necessary follow-up care. Follow-up care that is not pre-authorized may be denied. If YHP deems it appropriate, YHP may arrange for and cover the expenses of transporting you to a YHP-approved facility to receive follow-up care. If the severity of your medical condition prevents you or your representative from contacting YHP Care Coordination Department within 48 hours, you will still be covered for the emergency, but you should contact Care Coordination as soon as possible." [*Id.*]. The Plan further provides that "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied. This includes all elective admissions or treatments. Coverage will also be denied for condition that could have been treated at YUHS but were not while the student or enrolled dependent was in area." [*Id.*].

Under the plan, "[u]rgent care is covered at 100% when it is received at the Urgent Care Department at YUHS. An urgent condition is defined as he sudden and unexpected onset of an acute medical problem or trauma that requires immediate medical attention. Care for nonacute phases of chronic conditions, maintenance care, and [*16] routine care are not considered urgent. If you are away from New Haven County you are considered out of area and you may receive urgent care at any medical facility and receive the same coverage as for emergency care, including pre-authorized short-term follow-up care. In other words, no distinction is made in coverage is made in coverage between urgent care and emergency care received out of the area; the distinction between urgent care and emergency care applies only when you are within New Haven County. You should contact the YHP Care Coordination Department within 48 hours (or 2 business days) of any care received out of area for an urgent condition to ensure that YHP clinical staff are aware of your condition and to request the Care Coordination Department to pre-authorize follow-up care. Follow-up care that is not pre-authorized may be denied. If, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied. This includes all elective admissions or treatments. Coverage will also be denied for conditions that could have been treated at YUHS but were not while the student or enrolled dependent was in  [*17] area." [*Id.*].

Lastly, the Plan provides that "YHP may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of the policies and coverage plans described in the student handbook." [*Id.*].

The administration of the plan is also subject to ERISA and the regulations promulgated thereunder. [1] *29 C.F.R. §2560.503-1* "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." *29 C.F.R. §2560.503-1(f)(1)*. It provides that in general "if a claim is wholly or partially denied, the plan administrator shall notify the claimant ... of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan." *29 C.F.R. §2560.503-1(f)(1)*. In connection with

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 36 of 79

Page 6

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

urgent care claims, "the plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claim by the plan, unless the claimant fails to provide sufficient information to determine whether, [*18] or to what extent, benefits are covered or payable under the plan. In the case of such a failure, the plan administrator shall notify the claimant as soon as possible, but not later than 24 hours after receipt of the claim by the plan, of the specific information necessary to complete the claim. The claimant shall be afforded a reasonable amount of time, taking into account the circumstances, but not less than 48 hours, to provide the specified information." *29 C.F.R. §2560.503-1(f)(2)(i)*.

> 1    The plan expressly indicates that "[p]articipants and beneficiaries in the Yale Health Plan are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)" and that "[i]f a claim for coverage is denied or ignored, in whole or in part, a participant may file suit in state or federal court." [Dkt. #14, Ex. A].

Under *29 C.F.R. §2560.503-1(f)(2)(iii)(A)* in connection with pre-service claims, "the plan administrator shall notify the claimant of the plan's benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan. This period may [*19] be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 15-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." *29 C.F.R. §2560.503-1(f)(2)(iii)(A)*. In connection with post-service claims, "the plan administrator shall notify the claimant, in accordance with *paragraph (g)* of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan adminis-

trator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." *29 C.F.R. §2560.503-1(f)(2)(iii)(B)*.

Under *29 C.F.R. §2560.503-1(g)*, the administrator is required to provide a [*20] written or electronic notification of any adverse benefit determination and that the notification shall set forth "in a manner calculated to be understood by the claimant (i) the specific reason or reasons for the adverse determination [and] (ii) Reference to the specific plan provisions on which the determination is based." *Id.* In addition, *29 C.F.R. §2560.503-1(h)* provides that the administrator shall provide a "full and fair" review on an appeal of adverse benefit determinations that "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim." Lastly under *29 C.F.R. §2560.503-1(j)*, the administrator shall provide the claimant with written or electronic notification of a plan's benefit determination on appeal that shall set forth "in a manner calculated to be understood by the claimant (i) the specific reason or reasons for the adverse determination [and] (ii) Reference to the specific plan provisions on which the determination is based."

Legal Standard

While a motion for judgment on the administrative record is a motion that "does not appear to be authorized in the Federal Rules of Civil Procedure," courts treat such [*21] motions as motions for summary judgment. *Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d. Cir. 2003)*; *see also Guglielmi v. Northwestern Mutual Life Ins. Co., No. 06-CV-3431, 2007 U.S. Dist. LEXIS 49182, 2007 WL 1975480, at *3 (S.D.N.Y. July 6, 2007)*; *Chitoiu v. UNUM Provident Corp., No. 05-CV-8119, 2007 U.S. Dist. LEXIS 50262, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007)*; *Pava v. Hartford Life and Accident Ins. Co., No. 03-CV-2609, 2005 U.S. Dist. LEXIS 41753, 2005 WL 2039192, at *6 (E.D.N.Y. August 24, 2005)*; *Perezaj v. Bldg. Serv. 32B-J Pension Fund, No. CV-04-3768, 2005 U.S. Dist. LEXIS 17178, 2005 WL 1993392 at *4 (E.D.N.Y. Aug.17, 2005)*; *Katzenberg v. First Fortis Life Ins.*

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 37 of 79

Page 7
2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

*Co., 500 F. Supp. 2d 177, 2007 WL 1541468, at \*14 (E.D.N.Y. 2007)*; *Charles v. First Unum Life Ins. Co., No. 02-CV-0748E, 2004 U.S. Dist. LEXIS 9307, 2004 WL 963907, at \*1 (W.D.N.Y. March 26, 2004).*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit [\*22] all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006)* (internal quotation marks and citation omitted).

ERISA jurisprudence determines the standard and scope of review in connection with a challenge to a plan's denial of benefits. *Gannon v. Aetna Life Ins. Co., 2007 U.S. Dist. LEXIS 72529, 2007 WL 2844869 at \*6 (S.D.N.Y. 2007)*. "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 49 (2d Cir. 1996)*. However, after analyzing the legislative history of ERISA, the Supreme Court has held that a denial of benefits challenge is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility. *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989);* [\*23] *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 111-12 (2d. Cir. 1995); Murphy v. IBM Corp., 23 F.3d 719, 721 (2d Cir. 1994) (per curiam), cert. denied, 513 U.S. 876, 115 S. Ct. 204, 130 L. Ed. 2d 134 (1994); Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension*

*Benefit Plan, 698 F.2d 593, 599 (2d Cir. 1983), cert. denied, 464 U.S. 829, 104 S. Ct. 105, 78 L. Ed. 2d 108 (1983).*

In order to determine if a plan confers discretionary authority on its administrator(s), the Second Circuit has held that discretionary authority can be granted without specific trigger words such as "discretion" or "deference," as long as the benefit plan's language is clear. *Nichols v. Prudential Ins. Co. of America, 406 F.3d 98, 108 (2d Cir. 2005)*. In general, objective standards do not grant discretion while subjective standards do. The Second Circuit has instructed that subjective phrases such as "resolve all disputes and ambiguities" or "in our judgment" clearly confer discretionary authority. *Id.; see also Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 622-23 (2d Cir. 2008)* (finding that terms such as "may adopt reasonable policies, procedures, rules, and interpretations" and "determine[s] to be the reasonable [\*24] charge" confer discretionary authority).

However, the Second Circuit has explained that a requirement to "submit satisfactory proof of Total Disability" is ambiguous and does not clearly confer discretionary authority. *Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-52 (2d Cir. 1999)*. The Second Circuit explained that such a phrase is ambiguous because it is unclear whether the claimant must submit to the administrator satisfactory proof which would imply an objective standard of "satisfactory proof," or the claimant must submit proof that is satisfactory to the administrator which would imply a subjective standard of "satisfactory proof." *Id.* It is the administrator's burden to prove that discretionary authority has been granted. *Id. at 249.*

In this case, the plan clearly reserves discretion for the plan administrator. The plan provides that "YHP may adopt reasonable policies, procedures, rules and interpretations to promote the orderly and efficient administration of the policies and coverage plans described in this handbook." [Dkt. #14, Def.'s Mem., Ex. A, p. 76]. Whether a visit may be characterized as an emergency or not is also explicitly within YHP's discretion [\*25] as the plan provides that, "[i]f, in the judgment of YHP, the illness or injury does not meet the plan definition of an emergency or urgent condition, coverage will be denied." [*Id.* at 63.]. The language of the plan

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 38 of 79

Page 8

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

plainly permits YHP to adopt reasonable interpretations and use their judgment in determining the outcome of particular claims. Accordingly the plan unambiguously grants discretionary authority to the plan administrator to determine eligibility. *See Nichols, 406 F.3d at 108* ("in our judgment" is a phrase clearly granting discretionary authority).

Once it is clear that the administrator has discretionary authority, then the standard of review shifts from *de novo* to an arbitrary and capricious standard of review. *Id.; see also McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 131 (2d Cir. 2008); Krauss, 517 F.3d at 622; Pastore v. Witco Corp. Severance Plan, 196 Fed. Appx. 18, 21 (2d. Cir. 2006); Brockett v. Reed, 78 Fed. Appx. 148, 150 (2d Cir. 2003); Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002)*. A decision that is arbitrary and capricious will not be upheld and is defined as "without reason, not supported by substantial evidence or erroneous as a matter of [*26] law." *Kinstler, 181 F.3d at 249*(citing *Pagan v. NYNEX Pension Plan, 52 F.3d 438 (2d Cir. 1995))*. "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003)* (quoting *Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995))*. "This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker." *Burgio v. Prudential Ins. Co. of America, 06-CV-6793, 2011 U.S. Dist. LEXIS 109682, 2011 WL 4532482, at *4 (E.D.N.Y. Sept. 26, 2011)* (citing *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995)* and *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995))*.

In addition, courts have held that where a plan administrator both evaluates and pays benefits claims out of its own pocket, the administrator has a conflict of interest that must be taken into account in a court's review under an arbitrary and capricious standard. The conflict of interest analysis was articulated by the Supreme [*27] Court in *Glenn. Metropolitan Life Ins. Co. v. Glenn., 554 U.S. 105, 128 S.Ct. 2343, 2349, 171 L. Ed. 2d 299 (2008)* (ERISA "permits a person denied benefits under an em-

ployee benefit plan to challenge that denial in federal court ... Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.") (citations omitted).

A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of "several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials." *McCauley, 551 F.3d at 133*. The Court must "determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, [*28] 'perhaps to the vanishing point.'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 138 (2d Cir.2010)* (citation omitted). The Second Circuit has further instructed that:

> The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood that [the conflict] affected the benefits decision. 'The conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.'

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

*Durakovic, 609 F.3d at 139-140* (quoting *Glenn, 128 S.Ct. at 2351*).

Analysis

### i. Plaintiff's breach of contract claims are pre-empted by ERISA

Although Plaintiff alleges in her complaint that her cause of action arises under [*29] ERISA, she also discusses her view that YHP has engaged in a breach of contract throughout her complaint. For example, Plaintiff alleges that the "second violation of procedure and breach of contract begins with Plaintiff's follow-up visit with Dr. D'Amico on August 5, 2008." *See* [Dkt. #1, Compl. at p.3-4]. Since Plaintiff is proceeding *pro se*, the Court must liberally construe her complaint and submissions. *See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006)* ("This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training") (internal quotation marks and citation omitted). Accordingly, the Court construes Plaintiff's complaint to also contain a state law breach a contract claim.

It is well established that all state law claims, such as breach of contract, that relate to a plan regulated by ERISA are preempted. *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 52-56, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987)* (examining structure and language of the [*30] statute as well as legislative history to conclude that ERISA preempts state claims); *see also Aetna Health Inc. v. Davila, 542 U.S. 200, 200-01, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)* ("Any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted"); *Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 112 (2d Cir. 2008)* (finding breach of contract, among a variety of other claims to be preempted by ERISA); *Devlin v. Transp. Commc'n Int'l Union, 173 F.3d 94, 101 (2d Cir. 1999)* (finding union contract

claims preempted); *Kolasinski v. Cigna Healthplan of CT, Inc., 163 F.3d 148, 149 (2d Cir. 1998)* (preempting breach of contract claims arising out of failure to pay medical benefits); *Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 591 (2d Cir. 1993)*; *Smith v. Dunham-Bush, Inc., 959 F.2d 6, 10 (2d Cir. 1992)* (preempting breach of pension contract claims). Since Plaintiff's breach of contract claims directly relate to a plan covered by ERISA, such claims are preempted by ERISA.

### ii. The Court need not address Plaintiff's claim that YHP violated the timing [*31] requirements under 29 C.F.R. 2560.503-1

The Plaintiff claims that YHP violated the timing requirements under *29 C.F.R. 2560.503-1*. Plaintiff devotes a significant portion of her brief in opposition to Defendant's motion for judgment on the administrative record arguing that YHP did not return her repeated phone calls within 72 hours as is required in connection with urgent care claims under *29 C.F.R. §2560.503-1(f)(2)(i)* or within 15 days as is required in connection with pre-service claims under *29 C.F.R. §2560.503-1(f)(2)(iii)*.

*29 C.F.R. 2560.503-1* expressly provides that the remedy for a "failure of a plan to establish or follow claims procedures consistent with the requirements of this section" is that "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *29 C.F.R. §2560.503-1(l)*. Under section 502(a) of the Act, a participant or beneficiary is entitled to bring a civil action "to recover benefits due to him under the terms [*32] of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" or for the relief provided in section 502(c). *See 29 U.S.C. §1132*.

Section 502(c) provides that a court, in its discretion, may assess civil penalties of up to $110 a day against plan administrators in connection with an administrator's refusal to supply requested information as required under certain subsections of ERISA. *See Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d*

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 40 of 79

Page 10

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

*139, 140 (2d Cir. 1997)* (the "court has discretion to order administrator to pay penalty of $100 per day for each day, in excess of 30, of failure to make a disclosure required by ERISA") (citing 502(c), *29 U.S.C. §1132(c)(1)*). Section 502(c) does not refer to any regulations promulgated under ERISA. Instead Section 502(c) appears to only provide penalties in connection with a violation of a certain subsection of ERISA and does not extend to regulations promulgated under ERISA.

Although the Second Circuit has not addressed this issue, several other circuits have held that the civil penalties provided under Section 502(c) apply only to violations of [*33] a duty imposed by the statute and not a duty imposed by regulations promulgated thereunder. *See e.g., Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397 (7th Cir. 1996)* (holding that Section 502(c) penalties can be assessed only for conduct that breaches an administrator's duty of disclosure created by ERISA subchapter I and that "violations of regulations promulgated thereunder will not suffice."); *Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 147 (3d Cir. 2007)* (noting that the Third Circuit has previously "held that the defendants' failure to provide information required by federal regulations did not state a claim under *ERISA § 502(c)(1)*" and that "502(c) subjects plan administrators to liability only for failure or refusal to release the information that Subchapter 1 of ERISA" requires) (citing *Groves v. Modified Ret. Plan, 803 F.2d 109, 111 (3d Cir. 1986)); see also Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir. 1996)* (holding that civil penalties are available for administrator "who fail to furnish requested documents that are required to be furnished by § 104(b)(4)").

Moreover, several district courts in the Second Circuit have held that Section 502(c) penalties [*34] do not apply to violations of agency regulations and in particular have found that Section 502(c) penalties are not available for purported violations of *29 C.F.R. §2560.503-1. See e.g., Anderson v. Sotheby's Inc. Severance Plan, No.04Civ.8180, 2005 U.S. Dist. LEXIS 10647, 2005 WL 1309056, at *4 (S.D.N.Y. May 31, 2005)* (concluding that plaintiff was not entitled to sanctions for plan's alleged failure to produce requested documents under *29 C.F.R. §§2560.503-1* since "a violation of ERISA's implementing regulations

cannot support the imposition of sanctions under *section 1132* [Section 502(c)]"); *Mohamed v. Sanofi-Aventis Pharmacueticals, No.06CIV.1504, 2009 U.S. Dist. LEXIS 119871, 2009 WL 4975260, at *21 (S.D.N.Y. Dec. 22, 2009)* (holding that plaintiff could not recover for plan's alleged violations of *29 C.F.R. §2560.503-1(h)(2)(iii), (m)(8)* under Section 502(c)(1), *29 U.S.C. § 1132(c)(1)); Gill v. Bausch & Lomb Supplemental Retirement Income Plan, No.09-CV-6043, 2009 U.S. Dist. LEXIS 129718, 2009 WL 3164854, at *4-5 (W.D.N.Y. Sept. 28, 2009)* (holding that Plaintiffs could not seek to impose Section 502(c) penalties for violation of a regulation under *29 C.F.R. §§2560.503-1*). Therefore the Plaintiff would not be entitled to the imposition of any civil penalties under Section 502(c) for YHP's [*35] alleged violations of *29 C.F.R. §2560.503-1*.

Accordingly, Plaintiff's only remedy for YHP's purported violations of *29 C.F.R. §2560.503-1* would be the ability to bring a civil action without having to exhaust her administrative remedies to recover benefits due to her under the terms of her plan or to enforce her rights under the terms of the plan. In effect, the Plaintiff has already received this remedy as she has brought the pending action to challenge YHP's denial of her claims for the out-of-network services provided by Dr. D'Amico. The issue of whether YHP violated or did not violate the timing requirements under *29 C.F.R. 2560.503-1* is therefore moot since Plaintiff has a pending civil action challenging the underlying benefits determination. The Court would have no basis to grant Plaintiff any other relief or recovery upon the Court finding that YHP violated *29 C.F.R. 2560.503-1*. A violation of *29 C.F.R. 2560.503-1* does not entitle the Plaintiff to recover the relief she requests which is the reimbursement of her medical bills in the amount of $47,513.

Consequently, Plaintiff has in effect already received the remedy to which she would be entitled upon a finding that YHP had violated [*36] the regulation. Moreover, Plaintiff would not be entitled to any other recovery based on a finding that YHP violated *29 C.F.R. 2560.503-1*. For these reasons, the Court need not address whether YHP violated the timing requirements of *29 C.F.R. 2560.503-1*.

*iii. YHP's decision to deny Plaintiff's claims for the out-of-network services provided by Dr. D'Amico was not arbitrary and capricious.*

Although Plaintiff's opposition to Defendant's motion for judgment on the administrative record and her complaint are mainly focused on demonstrating that YHP violated the timing requirements under *29 C.F.R. 2560.503-1*, Plaintiff appears to also argue that YHP's denial of coverage was arbitrary and capricious because YPH failed to give its reasons for the approval or denial of her claims. *See* [Dkt.# 1, Compl.].

The parties agree that all services received between May 31, 2008 and June 16, 2008 at both the Yale New Haven Hospital and New England Retina Associates were covered by the Plan. [*See* Dkt. #14, Def.'s Mem., p. 3 and Dkt. #20 Pl.'s Mem., p. 6-7]. Furthermore, since YHP agreed on appeal to reimburse Plaintiff for her claims for the June 17 and June 18, 2008 visits to Dr. D'Amico these claims are [*37] not at issue. [Dkt. #14, Def.'s Mem., Ex. L]. In addition, it is unclear from the record whether Plaintiff has exhausted her administrative remedies in connection with her claims for the services provided on June 20, June 26, August 5, September 10 and September 17, 2008 as there is no indication that Plaintiff internally appealed the denial of her claims for those visits.

Since Plaintiff has failed to demonstrate that she has exhausted her administrative remedies in connection with her claims for the June 20, June 26, August 5, September 10 and September 17, 2008 visits the Court does not have jurisdiction to enter-tain those claims. "Courts within the Second Circuit have long recognized 'the firmly established federal policy' requiring plaintiffs seeking relief under section 502(a)(1)(B) to demonstrate that they have fully pursued the claims procedures prescribed by the relevant employee benefit plan prior to bringing suit." *Kirkendall v. Halliburton, Inc., No. 07-CV-289-JTC, 2011 U.S. Dist. LEXIS 61906, 2011 WL 2360058, at *4 (W.D.N.Y. June 9, 2011)* (quoting *Alfarone v. Bernie Wolff Const. Corp., 788 F.2d 76, 79 (2d Cir. 1986))*. "Adherence to the ex-haustion requirement helps to reduce the number of frivolous lawsuits under [*38] ERISA, promotes the consistent treatment of claims for benefits, provides a non-adversarial method of claims settlement, and minimizes the costs of claims settlement.

Consistent with these purposes, the federal courts regularly dismiss claims for judicial determination of benefits under an ERISA-regulated plan where the plaintiff has failed to plead and prove exhaus-tion of the plan's administrative remedies." *Id.* (internal quotation marks and citations omitted). Ac-cordingly, since Plaintiff has failed to plead and prove exhaustion of the plan's administrative reme-dies for the services provided by Dr. D'Amico on June 20, June 26, August 5, September 10 and September 17, 2008, the Court will only consider whether YHP's denial of coverage for the August 13, 2008 surgery was arbitrary and capricious.

Under the clear and express terms of the plan, Plaintiff would only be entitled to reimbursement for the services provided by an out-of-network phy-sician under two exceptions. First, where the care is for an emergency or urgent condition and second, where the care has been arranged in advance by a YHP clinician and approved by YHP's Care Coor-dination Department. *See* [Dkt. #14, Def.'s Mem., [*39] Ex. A]. Contrary to Halo's contention, YHP did provide its reasons for denying her coverage and informed Halo that it had denied coverage be-cause the services provided by Dr. D'Amico had not been pre-approved and were not care for an emer-gency or urgent condition. YHP issued explanation of benefits for each date of service explaining that the claim for payment was denied because the ser-vices were not pre-approved as required for out-of-network care which was neither emergent nor urgent. YHP also specifically explained to Halo in its August 15, 2008 letter that it "[y]ou elected to leave the New Haven area and requested coverage for a second opinion with a physician, Dr. D'Amico, in New York. Coverage for non-emergency out of network care is not part of your health care benefit with Yale Health Plan, but we routinely do allow coverage *for consultation only* with an out-of-network clinician for the purposes of obtain-ing a second opinion. Your request for such a con-sultation was approved. The services provided by Dr. D'Amico went beyond consultation, resulting in charges that were not covered by the original re-quest." [Dkt. #14, Def.'s Mem., Ex. J] [emphasis in the original]. In addition, [*40] YHP also ex-plained that it had "concluded that the communica-tion informing you that coverage for further visits and follow-up surgery with Dr. D'Amico would be

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 42 of 79

Page 12

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

denied, based on the terms of your coverage, was clear and explicit." [*Id.*].

YHP has therefore complied with the notice requirements under *29 C.F.R. §§2560.503-1(g), (h), (j)* to provide the specific reason or reasons for the adverse determination. The "fundamental purpose of these procedural requirements is to insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *Alternative Care Sys. v. Metropolitan Life Ins. Co., No.92Civ.7208(RPP), 1996 U.S. Dist. LEXIS 1705, 1996 WL 67737, at \*2-3 (S.D.N.Y. Feb. 16, 1996); see also Schnur v. CTC Communications Corp. Group Disability Plan, 413 Fed. Appx. 377, 380 (2d Cir. 2011)* (finding that plan's notice complied *29 C.F.R. §2560.503-1(g)* because the "notice of denial--a thorough, four-and-a-half-page document--amply laid out the basis for the denial, and, by implication, a description of those materials necessary to perfect the claim. Specifically, that notice informed [plaintiff] that 'we do not see any evidence [*41] in the current medical records to establish that your condition imposes a physical or psychological impairment that would preclude you from engaging in the substantial and material duties of your regular occupation on a sustained basis.'"); *Cook v. New York Times Co. Group Long-Term Disability Plan, No.02Civ.9154(GEL), 2004 U.S. Dist. LEXIS 1259, 2004 WL 203111, at \*11 (S.D.N.Y. Jan. 30, 2004)* ("The denial of plaintiff's first appeal was based on deficiencies in plaintiff's submissions that had never been communicated to her in MetLife's initial letter, and that she had never been given the opportunity to cure. A denial of an appeal that is based on insufficient notice as to how the claim might be perfected fails to meet the requirements of ERISA and its implementing regulations, and is therefore unreasonable as a matter of law.").

Here, YHP has amply indicated that the basis for its denial of coverage was that the services were not pre-approved or for emergency or urgent care. The Student Handbook amply describes the coverage afforded by the plan, the exclusions of coverage for out-of-network healthcare of a non-emergency and non-exigent nature absent pre-approval. [Dkt. #14, Ex. A at p. 12, 40, 42, 44,59, 61-63, 69 [*42] and 86]. YHP has therefore also by implication

given Plaintiff a description of how she could perfect or cure her claim and thereby enabled her to have a fair chance to present her case on appeal. It is undisputed that YHP had not pre-approved the August 13, 2008 surgery. Accordingly, YHP's August 15, 2008 letter put Plaintiff on notice that she could potentially cure her claim by presenting evidence that the services provided were for emergency or urgent care. Since YHP provided a sufficient explanation of its reasons for denying coverage, Plaintiff was able to address the determinative issues on appeal and had a fair chance to present her case. Accordingly, YHP's denial of coverage was not arbitrary and capricious.

The Court also notes that the Plaintiff failed to address those determinative issues on appeal and therefore failed to carry her burden to establish that she was entitled to the benefit pursuant to the terms of the plan. *See Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287-88 (2d Cir. 2000)* (Plaintiffs "were required to prove their case; to establish that they were entitled to that benefit pursuant to the terms of the Contract or applicable [*43] federal law); *Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658-59 (8th Cir. 1992)* (burden of proof is on ERISA plaintiff to establish medically necessity where it is prerequisite for entitlement to benefit). On appeal, Plaintiff simply submitted her own letters which were replete with her lay medical conclusions and contained no factual content to support a conclusion that the services were for emergency or urgent care. In Plaintiff's September 8, 2008 appeal letter, she states that in her opinion the August 13 surgery was "medically necessary: the surgery entailed removal of the lens because of a cataract that had rapidly developed from the perfluoropropane gas, removal of that gas, which still occupied between 33-50% of the volume of her eye after 8 weeks of recovery performed by Dr. Liggett, laser therapy to reattach the retina, and installation of a silicone oil bubble to stabilize recovery." Dkt. #14, Def.'s Mem., Ex. K].

Plaintiff did not provide YHP with any quantifiable medical documentation establishing that the services were care for an emergency or urgent condition. For example, Plaintiff did not submit a letter or other documentation from Dr. D'Amico expressing his [*44] medical opinion that the care provided was for an emergency or urgent condition. In

Case 3:11-cv-01807-VLB Document 106-6 Filed 03/21/16 Page 43 of 79

Page 13

2012 U.S. Dist. LEXIS 31447, *; 53 Employee Benefits Cas. (BNA) 2300

fact, the Court has reviewed all of the medical records that Plaintiff has submitted into the record and there is no mention or indication in any of these records that Dr. D'Amico provided Halo with care for an emergency or urgent condition. The medical records describe the majority of the services provided by Dr. D'Amico as "follow up visit" and expressly note that Halo had transferred her care to Dr. D'Amico because she is moving to her parents place in NJ. *See* [Dkt. #20, Ex. B]. There is simply no· evidence in Plaintiff's medical records that she was being provided with care by Dr. D'Amico for an emergency or urgent condition. In fact, the medical records indicate that Halo had transferred her entire care to Dr. D'Amico and thereby had elected to stop seeking treatment with an in-network physician.

On appeal, Plaintiff failed to present any factual basis beyond her own lay opinion that would support the conclusion that YHP's determination that the care provided by Dr. D'Amico was not for an emergency or urgent condition was arbitrary and capricious. Accordingly, YHP's continued denial of coverage based [*45] on its conclusion that the services were not pre-authorized or for emergency or urgent care is supported by substantial evidence. A reasonable mind would accept the evidence in the record as adequate to support the conclusion reached by YHP that the services provided by Dr. D'Amico were not care for an emergency or urgent condition and were not pre-authorized.

Lastly, it is unclear from the record whether YHP both evaluates and pays benefits claims out of its own pocket. Assuming that it does, there is no evidence that YHP's denial of coverage was in any way influenced by a conflict of interest.

## Conclusion

Based upon the above reasoning, the Court GRANTS Defendant's [Dkt. #14] motion for judgment on the administrative record. The Clerk is directed to enter judgment in favor of Defendant and close the file.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 8, 2012



FOCUS - 3 of 20 DOCUMENTS



Analysis
As of: Apr 18, 2014

## TIFFANY L. HALO, Plaintiff-Appellant, v. YALE HEALTH PLAN, DIRECTOR OF BENEFITS & RECORDS YALE UNIVERSITY, Defendant-Appellee. [*]

> \* The Clerk of Court is directed to amend the official caption as shown above.

### No. 12-1447-cv

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

### *2013 U.S. App. LEXIS 19232; 56 Employee Benefits Cas. (BNA) 2943*

### September 18, 2013, Decided

**NOTICE:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
Appeal from a judgment of the United States District Court for the District of Connecticut (Vanessa L. Bryant, Judge).
*Halo v. Yale Health Plan, 2012 U.S. Dist. LEXIS 31447 (D. Conn., Mar. 8, 2012)*

**COUNSEL:** Tiffany L. Halo, APPELLANT, Pro se, Denville, New Jersey.

FOR APPELLEE: Patrick M. Noonan, Anthony D. Sutton, Donahue, Durham & Noonan, P.C., Guilford, Connecticut.

FOR AMICUS CURIAE: H. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, Robert Furst, Senior Trial Attorney, United States Department of Labor, Washington, D.C.

**JUDGES:** PRESENT: REENA RAGGI, GERARD E. LYNCH, RAYMOND J. LOHIER, Jr., Circuit Judges.

**OPINION**

### SUMMARY ORDER

UPON DUE CONSIDERATION, it is hereby ORDERED, ADJUDGED, AND DECREED that the District Court's judgment entered on March 9, 2012, is VACATED and REMANDED.

Plaintiff Tiffany L. Halo, pro se, appeals from an award of summary judgment granted in favor of Defendant Yale Health Plan, the Director of Benefits and Records at Yale University ("Yale"), on its "motion for judgment on the administrative record" on Halo's claims for damages under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001 et seq.* By order dated August 22, 2012, this Court [*2] granted Halo leave to proceed in forma pauperis and directed the

2013 U.S. App. LEXIS 19232, *; 56 Employee Benefits Cas. (BNA) 2943

parties to brief two issues: (1) "whether the notice requirements for pro se litigants opposing summary judgment set forth in *Vital v. Interfaith Medical Center, 168 F.3d 615, 621 (2d Cir. 1999)*, applied to [Yale's] motion for judgment on the administrative record and, if so, whether the apparent lack of notice here warrants reversal in this case"; and (2) "whether civil penalties are available for violations of *29 C.F.R. § 2560.503-1*." We assume the parties' familiarity with the facts and record of prior proceedings, which we reference only as necessary to explain our decision to vacate and remand.

A motion for judgment on the administrative record "does not appear to be authorized in the Federal Rules of Civil Procedure." *O'Hara v. Nat'l Union Fire Ins. Co., 642 F.3d 110, 116 (2d Cir. 2011)* (quotation marks omitted). District courts thus typically treat such a motion as a request for summary judgment or "a bench trial on the papers with the District Court acting as the finder of fact." Id. (quotation marks omitted). Here, the District Court treated the motion as one for summary judgment. See *Halo v. Yale Health Plan, No. 3:10-cv-1949 (VLB), 2012 U.S. Dist. LEXIS 31447, 2012 WL 774960, at *7 (D. Conn. Mar. 8, 2012)*. [*3] In such circumstances, the District Court was required to provide Halo, a pro se plaintiff, with notice "of the consequences of failing to respond to a motion for summary judgment." *Vital, 168 F.3d at 620* (quotation marks omitted); accord *Hernandez v. Coffey, 582 F.3d 303, 308 (2d Cir. 2009)*. The record provides no indication that the District Court afforded Halo the requisite notice.

Such an omission "is ordinarily grounds for reversal." *Vital, 168 F.3d at 620* (quotation marks omitted). Reversal is not warranted, however, where the record indicates that "an opposing party has already provided the litigant with the requisite notice" or the record "otherwise makes clear that the litigant understood the nature and consequences of summary judgment." *McPherson v. Coombe, 174 F.3d 276, 281 (2d Cir. 1999)* (quotation marks omitted). Here, the record does not reflect that Yale provided such notice to Halo, nor does it clearly indicate that Halo understood the consequences of summary judgment.

In the latter regard, while Halo submitted a 28-page memorandum in opposition to Yale's motion that referenced *Federal Rule of Civil Proce-*dure 56 [*4] and cited relevant caselaw, she did not submit affidavits in support of her contention that Dr. Donald D'Amico provided her emergency or urgent treatment on the dates at issue, despite indications in the record that she may have been able to do so. See Nov. 10, 2011 Letter from Dr. D'Amico at 1, *Halo, No. 3:10-cv-1949 (VLB), 2012 U.S. Dist. LEXIS 31447, 2012 WL 774960*, ECF. No. 20-20 ("The extent of Ms. Halo's pain necessitated immediate care . . . ."); Pl.'s Resp. & Mem. in Opp. to Def.'s Mot. for J. on the Admin. R. at 14 ("Pl. Mem."), *Halo, No. 3:10-cv-1949 (VLB), 2012 U.S. Dist. LEXIS 31447, 2012 WL 774960*, ECF No. 20 (stating that, due to "loss of vision because of the retinal detachment, retinal break, acute glaucoma, and traumatic cataract," Halo was "unable to make the trip to New Haven" for treatment). The record also suggests that Halo may have been able to submit affidavits in support of her contention that her ERISA claims for services provided on the dates at issue were properly exhausted. See Pl. Mem. at 12 (asserting that Yale rejected Halo's claim after not responding to it for 51 days); see also *29 C.F.R. § 2560.503-1(l)* (stating that "a claimant shall be deemed to have exhausted the administrative remedies available" where [*5] the plan fails to follow mandatory claims procedures); *Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133 (2d Cir. 2001)* (stating that failure to exhaust an ERISA claim can be excused where the plaintiff makes "clear and positive showing" that exhaustion would have been futile (quotation marks omitted)). In short, the record does not clearly indicate that Halo understood that "in order to avoid summary judgment [s]he needed to submit affidavits or other documentary evidence in support of every assertedly genuine issue of material fact in [her] claim." *McPherson, 174 F.3d at 281.*

Halo's apparent ignorance of her *Rule 56* burden may have hampered her ability to oppose Yale's summary judgment motion. Indeed, in granting that motion, the District Court cited the lack of record evidence supporting Halo's characterization of her condition as an emergency or urgent in nature and her contention that her claims were properly exhausted. See *Halo, 2012 U.S. Dist. LEXIS 31447, 2012 WL 774960, at *16* ("Plaintiff failed to present any factual basis beyond her own lay opinion that would support the conclusion that [Yale's] determination that the care provided by Dr. D'Amico was

not for an emergency or urgent condition was arbitrary [*6] and capricious."); *2012 U.S. Dist. LEXIS 31447, [WL] at *13* (stating that "it is unclear from the record whether Plaintiff has exhausted her administrative remedies").

Based on this record, vacatur of summary judgment is warranted. See *Coffey, 582 F.3d at 308-09* (vacating district court judgment, despite plaintiff's submission of affidavits in support of his claims, because there was "no indication that [he] understood that his affidavits would be his last chance to submit evidence related to exhaustion"); *McPherson, 174 F.3d at 281-82* (vacating district court judgment where, in response to defendants' motion, plaintiff cited *Rule 56* and indicated that he would be able to provide affidavits and other evidence in support of his claims, because "mere fact that the pro se litigant has made some response to the motion for summary judgment" does not necessarily establish that he understood summary judgment process).

In light of our decision to vacate, we do not reach the question of whether civil penalties are available for violations of *29 C.F.R. § 2560.503-1.* Nor do we reach the argument advanced by the Secretary of Labor, as amicus curiae, in support of Halo that, in light of Yale's alleged violations of ERISA regulations, [*7] the court should review Halo's ERISA claims de novo. We also express no opinion on the merits of Halo's claims. We leave it to the District Court--which now has the benefit of the Secretary of Labor's brief-- to consider these issues on remand.

We note, however, that the District Court should address on remand the threshold issue of whether Yale violated the procedural requirements for claim administration under *29 C.F.R. § 2560.503-1.* It should do so with the understanding that the exhaustion requirement under ERISA is not jurisdictional, see *Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 439, 446 (2d Cir. 2006),* but that "there is a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases," *Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 140 (2d Cir. 2000)* (quotation marks omitted). Thus, unless Halo makes a "clear and positive showing" that it would be futile for her to pursue her claim through the internal claim process, id., or unless her administrative remedies are deemed exhausted under *29 C.F.R. § 2560.503-1(l),* "th[ose] remed[ies] must be exhausted prior to the institution of litigation," *Jones, 223 F.3d at 140.* Whether Yale [*8] complied with ERISA's procedural requirements will affect both the issue of exhaustion of remedies and the standard of review that applies to the plan administrator's benefit determinations. See *Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 105, 109 (2d Cir. 2005).* [1]

> 1   In speaking of Yale's "compliance" with the regulations, we imply no view as to whether substantial compliance with EIRSA's regulatory requirements is sufficient to preserve deferential review, a question we have left open. See *Nichols, 406 F.3d at 109-10.*

For the foregoing reasons, the District Court's March 9, 2012 judgment is hereby VACATED and the case is REMANDED for further proceedings consistent with this order.



FOCUS - 4 of 4 DOCUMENTS

**OWEN HARTY, Plaintiff, v. BULL'S HEAD REALTY and JAMES GRUN-BERGER, Defendants.**

**CIVIL ACTION NO. 3:11-CV-01760 (VLB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2015 U.S. Dist. LEXIS 29635*

**March 11, 2015, Decided**
**March 11, 2015, Filed**

**PRIOR HISTORY:** *Harty v. Bull's Head Realty, 2013 U.S. Dist. LEXIS 37193 (D. Conn., Mar. 18, 2013)*

**COUNSEL:** [*1] For Owen Harty, Plaintiff: Anthony V. Zeolla, LEAD ATTORNEY, The Zeolla Law Firm, Avon, CT; John F Ward, LEAD ATTORNEY, PRO HAC VICE, Thomas B. Bacon, P.A., Royersford, PA; Susan Schneiderman, LEAD ATTORNEY, Susan Schneiderman, Bridgeport, CT.

For Bull's Head Realty, James Grunberger, Defendants: Michael S. Lynch, LEAD ATTORNEY, Bai, Pollock, Blueweiss & Mulcahey, Two Corporate Dr., Shelton, CT.

**JUDGES:** Hon. Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

ORDER ON PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Before the Court is Plaintiff's Motion for an order awarding attorney's fees pursuant to his action against Defendants under Title III of the Americans with Disabilities Act, *42 U.S.C. §§ 12181--12189*, et seq. ("ADA"). For the reasons set forth below, Plaintiff's Motion is GRANTED in part and DENIED in part.

I. Background

On November 13, 2011, Plaintiff Owen Harty ("Mr. Harty" or "Plaintiff") filed this action against Bull's Head Realty and James Grunberger (collectively, the "Defendants") alleging violations of Title III of the ADA. Specifically, Mr. Harty, who is "mobility impaired and is bound to ambulate in a scooter or with other assistive devices," claimed that he encountered multiple architectural [*2] barriers upon visiting Defendants' shopping center (the "Center") in November 2010. [Dkt. 1, Compl., at ¶ 1.] These barriers, which were also later noted in a preliminary inspection of the Center, included (a) curb cuts with steep, non-compliant slopes; (b) non-compliant access aisles; (c) handicapped-designated parking spaces without signs; (d) non-compliant changes in level; (e) ramps without handrails; (f) disabled parking spaces which are too far away from the entrances of the facility; and (g) handicapped-designated parking spaces which are improperly dispersed throughout the Center. [*Id.* at ¶ 7; Dkt. 50-11, Ex. F-2.] Plaintiff claimed that these barriers discriminated against him on the basis of his disability, endangered his safety, and prevented him from returning to the Center to enjoy the goods and services offered there. [Dkt. 1 at ¶ 6.]

In April 2012, Defendants moved to dismiss Plaintiff's complaint pursuant to *Fed. R. Civ. P. 12(b)(1)* for lack of subject matter jurisdiction, on the basis that Mr. Harty lacked standing to bring the action because he had not sufficiently alleged an intent to return to the premises in the future, had omitted any allegation that he actually patronized or attempted [*3] to patronize the Shopping Center in good faith, and had not alleged that he regularly, or with any frequency, visited or would visit the area. [Dkt. 13.] The Court denied Defendants' Motion, finding that Mr. Harty had sufficiently alleged an intention to return to the Center consistent with Second Circuit precedent in another of Mr. Harty's cases, and subsequently denied Defendants' Motion for a More Definite State-

ment [Dkt. 30] and a second Motion to Dismiss [Dkt. 42] on the same basis. [Dkts. 21, 40, 43.] Meanwhile, litigation ensued over the scope of the inspection of the Center. [Dkt. 37.] On May 1, 2013, the Court conducted a telephonic conference at which the parties agreed that an inspection of the Center with their respective experts could lead to the resolution of the case. [Dkts. 39, 40]. However, even after the inspection was conducted, the parties were unable to resolve the matter, and in February 2014 Plaintiff filed a Motion for Summary Judgment. [Dkt. 50.]

In August 2014, while that Motion was still pending, the parties participated in a settlement conference with Magistrate Judge Thomas P. Smith and entered into a consent decree ("Consent Decree") in which Defendants [*4] agreed to make certain modifications to the Center. [Dkt. 64 at 3.] The Plaintiff now seeks attorney's fees and costs in the amount of $68,870.01.[1]

> 1   This includes the $64,620.01 reflected in Plaintiff's 9/17/14 invoice, attached to Dkt. 64 as Ex. F, and Plaintiff's further demand for $4,250.00 for attorney's fees incurred by drafting and filing the instant Motion. [Dkt. 65 at 20.]

## II. Discussion

### A. Preliminary Matters: Defendants' General Objections

### 1. Discretionary denial of fees

The ADA is a fee-shifting statute and the Court has discretion to award attorney's fees to a prevailing party in an ADA action. *See, e.g., E*Trade Fin. Corp. v. Deutsche Bank AG, 374 F. App'x 119, 124 (2d Cir. 2010). 42 U.S.C. § 12205* provides in relevant part:

> In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs....

*42 U.S.C. § 12205.* When the prevailing party in a civil rights action (such as a suit under the ADA) is the plaintiff, attorney's fees and costs should normally be awarded "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* (citation and internal quotation marks omitted); *accord Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dept. of Health and Human Resources, 532 U.S. 598, 603 n. 4, 121 S. Ct.*

*1835, 149 L. Ed. 2d 855 (2001)* (applying *Hensley* [*5] to *§ 12205 of the ADA*).

Here, Defendants ask the Court to exercise its discretion to award no fees or only nominal fees because they argue that Plaintiff's suit was meritless and should have been dismissed, and further argue that Plaintiff's history of filing hundreds of ADA lawsuits across the country suggests that he filed the present claim for improper purposes. [Dkt. 64 at 2--6.] Plaintiff maintains that Defendants' arguments are irrelevant to Plaintiff's entitlement to attorney's fees. [Dkt. 65 at 4--11.] The Court agrees.

First, Defendants' various contentions that Mr. Harty's underlying claim would have failed had the case proceeded to trial are both unpersuasive and improperly raised. Defendants argue that the Court erred in ruling that Plaintiff had standing to commence this action, that Mr. Harty allegedly took subsequent actions that weakened or negated the strength of his claim, and that in over 25 years, not one "single person [has] encountered a problem with access to or use of their Center" other than Mr. Harty. [Dkt. 64 at 5.] None of these issues can be considered by the Court on this Motion, as doing so would require the Court to make findings of fact, the basis for which are not before [*6] the Court. Defendants appear to be trying to litigate (and to some extent relitigate) the case on its merits--an opportunity Defendants forfeited when they agreed to settle the case and entered into the Consent Decree. If Defendants felt that the Court's finding of standing was incorrect, or that Mr. Harty's claim was ultimately meritless, their recourse would have been to proceed to trial, and then appeal any adverse determination.

Defendants' position that Plaintiff is a "serial litigator" is also inapposite to a consideration of whether this case was filed for improper purposes. As Plaintiff points out, the central issue is not whether Plaintiff has filed other ADA lawsuits, but whether Defendants' facility is in compliance with the ADA. [Dkt. 65 at 8]; *see Access 4 All, Inc. v. G & T Consulting Co., 06 CIV. 13736 (DF), 2008 U.S. Dist. LEXIS 30594, 2008 WL 851918, at *8, n. 2 (S.D.N.Y. Mar. 28, 2008)* (noting that even where the "sheer number" of ADA lawsuits filed by a plaintiff renders their intention to return less plausible, "[t]his does not mean, however, that, whenever [plaintiff] files an affidavit in one of these cases, attesting to the frequency with which he has visited a particular facility and his reasons for having done so, the Court should simply reject [*7]  his statements as incredible. Rather, the circumstances of the particular case----including the facial plausibility and adequacy of the affidavit at issue, as well as the existence of any conflicting testimony or other evidence----should control the extent to which the Court credits his sworn statements."). The Court has already

ruled on the facial plausibility of Plaintiff's claims in the present case. [Dkts. 21, 40, 43.] Furthermore, Defendants do not offer any facts beyond Mr. Harty's voluminous litigation history that indicate the action before *this* Court was unwarranted by existing law, based on frivolous arguments, or filed solely to harass Defendants. [Dkt. 64 at 6.] They only argue, impermissibly, that they believe Mr. Harty would not have prevailed at trial. These grounds do not represent "special circumstances" upon which to deny Plaintiff's fee request as a matter of discretion.

2. Fees and costs incurred after December 2013 settlement discussions

Defendants also argue that the Court should limit Plaintiff's request for attorney's fees and costs to those incurred before December 5, 2013, which Defendants claim is "the date when plaintiff's counsel rejected defense counsel's offer [*8] to make the minor modifications ultimately agreed to by both parties and set forth in the Consent Decree." [Dkt. 64 at 6--7.] Defendants contend that the work performed after the date of this offer "was simply unjustified given the defendant's offer to make all the modifications that were eventually set forth in the Consent Decree." [*Id.* at 7.] Plaintiff's position is that the parties' December 2013 negotiations failed because Defendants objected to Plaintiff's proposed demand for attorney's fees and expenses, which according to Plaintiff were approximately $15,000 at that time. [Dkt. 65 at 2--3.] Defendants have not subsequently disputed this assertion, and in fact, the affidavit by Defendants' counsel Mr. Lynch submitted in support of Defendants' objection concedes that Plaintiff was seeking attorney's fees "of a substantial amount, so the case could not be resolved at that time." [Dkt. 64, Ex. C at ¶ 10.]

The Court is unpersuaded by Defendants' objection to the fees and costs incurred after December 5, 2013. First, the Court does not see how the offer made by Defendants in 2013, which did not include attorney's fees, can properly be compared to what Plaintiff may be able to recoup today, which [*9] includes such fees as well as costs. Furthermore, the judicial system does not require litigants to wager the ultimate value of their claims in such a way. The Second Circuit has held that "[a] district court should not rely on informal litigation and hindsight to determine whether further litigation was warranted and, accordingly, whether attorney's fees should be awarded. Otherwise, plaintiffs with meritorious claims may be improperly dissuaded from pressing forward with their litigation." *Ortiz v. Regan, 980 F.2d 138, 140--41 (2d Cir. 1992).* Rather, the rule is that "[a]bsent a showing of bad faith, a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award." *Id.* (quoting *Cowan v. Pru-*

*dential Ins. Co. of America, 728 F.Supp. 87, 92 (D. Conn. 1990), rev'd on other grounds, 935 F.2d 522 (2d Cir. 1991)).* Defendants do not submit any facts suggesting Plaintiff rejected Defendants' December 2013 settlement offer in order to drive up attorney's fees, or that the rejection was otherwise made in bad faith. Nor does the Court have any reason to believe that Plaintiff's rejection, if it was indeed a rejection, was unreasonable at the time. Moreover, absent an offer of judgment under *Federal Rule of Civil Procedure 68,* the Court cannot properly determine the finality of any offer that Defendants claim was made.

3. Errors and revisions in [*10]   the Final Invoice

Defendants further argue that certain changes and errors in Plaintiff's invoice "raise important questions concerning the validity of the entire bill" and "how many other 'mistakes' were made." [Dkt. 64 at 9--10.] Plaintiff defends his adjustments and asserts that any errors were *de minimus.* [Dkt. 64 at 12--15.]

Defendants point out that Plaintiff's counsel initially miscalculated Plaintiff's expert's travel costs, which were incurred when Plaintiff's expert traveled to Connecticut to inspect Defendants' Center, and were initially stated to be $500. [Dkt. 64 at 10.] This issue was first raised by Defendants during the status conference held with the Court in September 2014. [*Id.*] Subsequent to that conference, Plaintiff's counsel conceded that he had in fact erroneously charged all of the expert's travel costs to Defendants, despite the fact that the expert had performed work on another case during the trip in question. [Dkt. 65 at 13.] Presumably the expert's bill would have reflected work on both cases, and Plaintiff's counsel has not offered an explanation for how the error occurred. In any case, he agreed to reduce the expert's travel expenses by fifty percent. [ [*11] *Id.*] The total expert's travel costs ultimately came to $785, which after a fifty percent reduction came to a cost to Defendants of $392.50. [*Id.*] Defendants do not appear to dispute that this is an unreasonable amount for the expert to have spent for travel and accommodations during his trip from South Carolina to Connecticut, but argue that this error suggests bad faith and calls the Plaintiff's other calculations into question. [Dkt. 64 at 10.] However, the Court does not share Defendants' concern that this error alone impeaches the credibility of the Final Invoice as a whole, and accepts Plaintiff's counsel's representation that his mistake in calculating expert Mr. Baez's travel costs was innocent, subsequently investigated and corrected. [Dkt. 65 at 13.]

Defendants also point out that Plaintiff's final invoice, which was submitted to Defendants on September 17, 2014 (the "Final Invoice") showed "significant changes" when compared to the initial invoice that Plaintiff shared with Defendants on August 1, 2014 (the "Ini-

tial Invoice"). [Dkt. 64 at 8--9 and Exs. F, G.] Defendants note that it appears the changes were made in response to Defendants' criticisms about the time billed to [*12] draft Plaintiff's opposition to Defendants' Motion to Dismiss, and that the revised entries "undermine plaintiff's counsel's claim that the time entries were contemporaneous and accurate." [*Id.* at 8--9.] Plaintiff maintains that the revisions "were made in a good faith effort to enhance settlement efforts and [to] assure the accuracy of Plaintiff's claim for fees and expenses." [Dkt. 65 at 14.] Plaintiff also objects to Defendants' attempt to introduce the Initial Invoice on the ground that it is evidence of compromise negotiations barred by *Federal Rule of Evidence 408.*

To begin, the Court notes that the Second Circuit has not explicitly ruled on whether or to what extent the Federal Rules of Evidence govern disputes over attorney's fees. *See Rein v. Socialist People's Libyan Arab Jamahiriya, 568 F.3d 345, 352 (2d Cir. 2009).* However, the Second Circuit has acknowledged that assuming "courts may employ hearsay within reasonable limits and have considerable discretion over adherence to Federal Rules" in determining questions of attorney's fees, "the rule forbidding such use of settlement negotiations is a matter of fundamental policy." *Id.*

*Rule 408* states, in relevant part:

> Evidence of the following is not admissible . . . either to prove or disprove the validity or amount of a disputed claim or to impeach by a [*13] prior inconsistent statement or a contradiction: (1) furnishing, promising, or offering----or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim. . . [but] (b) The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

*Fed. R. Evid. 408.* The Rule bars the admission of most evidence of offers of compromise and settlement in furtherance of "the public policy favoring the compromise and settlement of disputes." *See Fed. R. Evid. 408*, Advisory Committee Notes (1972 Proposed Rules). In part, the purpose of *Rule 408* is to "codif[y] the general presumption that the risk of unfair prejudice is too great when the jury is presented evidence of an offer to settle a

claim for which it must determine liability; in that situation, the jury may infer that the party offering to settle perceived a weakness in its claim or defense." *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, 739 F. Supp. 2d 125, 133 (D. Conn. 2010).*

In this light, the Court finds that consideration of Plaintiff's Initial Invoice does not contravene the [*14] fundamental purpose of *Rule 408.* The Initial Invoice is not a statement about the validity or amount of the claims at issue in the underlying case; it is more accurately characterized as a statement regarding the amount of fees and costs incurred *as a result* of litigating those claims. Furthermore, neither party suggests facts indicating that Plaintiff's presentation of the attorney's fee amount in August 2014 was an offer to compromise--for example, in the context of a statement that although the total fees and costs were $77,330, Plaintiff was willing to accept less. Instead, the Initial Invoice appears to have been presented as a statement of fact that to the best of Plaintiff's knowledge on that date, the total fees and costs incurred totaled $77,330. In this context, the policy concerns animating the Rule are not present, because there is no risk that consideration of the Initial Invoice would affect the perceived value, or lack thereof, of Plaintiff's substantive claims. Instead, the Initial Invoice is more appropriately considered as being offered for "another purpose" other than "to prove liability for or invalidity of the claim or its amount" under *Rule 408(b)*: to wit, for the purpose of determining [*15] the reasonableness of Plaintiff's demand for attorney's fees.

However, the Court is persuaded by Plaintiff's position that the changes in the Initial Invoice "merely demonstrate[ ] that Mr. Ward investigated and responded to the arguments made by defense counsel during the settlement conference." [Dkt. 65 at 15.] Defendants characterize Plaintiff's reductions as evidence that Plaintiff went back into the contemporaneous entries and fabricated them or tampered with them to make them appear more reasonable. [Dkt. 64 at 8--9.] However, from the Court's review it appears that the Final Invoice merely represents the wholesale elimination of certain billed entries, and the application of a standard formula to other entries, in order to systematically reduce certain charges for designated categories of work. Plaintiff is clear in his representations to opposing counsel and to the Court that the Final Invoice is an effort to settle the fee dispute, not revise history. [Dkt. 65 at 12--14; Dkt. 64, Ex. F at 1.]

Nevertheless, the Court finds that Plaintiff's attorney's formula for reducing the hours billed to Plaintiff's amended opposition brief, which allots 24 minutes per page for reviewing and [*16] editing portions of arguments used in other cases, is unreasonable. [Dkt. 65 at 13.] First, it should be noted that the brief in dispute was an *amended* submission filed after the Court rejected

2015 U.S. Dist. LEXIS 29635, *

Plaintiff's original memorandum for numerous deficiencies. [Dkt. 19.] Upon review, the amended brief is merely a pared-down version of that first submission, with only one new section which itself was taken from a brief filed by Plaintiff in a different case. [Dkt. 20.] In fact, a comparison of the amended opposition brief filed in this case to briefs authored by the Plaintiff in other cases [Dkt. 64, Ex. I] reveals that every single page of the brief at issue was adopted, often verbatim, from briefs filed by the Plaintiff in those other cases. Specifically, Plaintiff's *Bull's Head Realty* brief is substantively identical--with the exception of portions of the fact section and the substitution of the words "national restaurant chain" for "shopping center"--to the first 30 pages of the brief submitted by Plaintiff's counsel in *Owen Harty v. GDR Associates, Inc.*, No. 3:11-cv-01407(AVC). [Dkt. 64, Ex. I at 37--67.] The only section of Plaintiff's *Bull's Head Realty* brief that is not represented in the [*17] *GDR Associates* brief can be found in another brief submitted by Plaintiff's counsel in *Harty v. Harwill Homes, Inc.*, No. 3:11-cv-01368(AVC). [*Id.* at 99--104.]

The Court recognizes that even when an attorney benefits from work they have done in previous cases, a diligent lawyer will expend some time reviewing and revising his written product. However, the Court does not believe it is reasonable to devote almost half an hour per page to doing so, especially where, as it appears here, no substantial changes or updates were made. The Court therefore declines to apply Plaintiff's formula and will reduce the billable hours for work on the opposition brief to 5 hours. The Court believes this reasonably reflects the amount of time Mr. Ward would have taken to review the Court's Order rejecting the original submission, editing the brief--the contents of which were obviously familiar to him and, having been assembled just a few months prior, likely up-to-date--and proofreading it before its resubmission.

B. Presumptively Reasonable Fee Analysis

Having addressed Defendants' general objections, the Court now considers the reasonableness of Plaintiff's fee demand. As noted above, the parties do not dispute that [*18] Plaintiff is a prevailing party for purposes of determining entitlement to attorney's fees. [Dkt. 64 at 5.] The Court is thus left to determine whether Plaintiff's hourly rate of $425 and the 155.7[2] hours he billed are reasonable.

> 2    Again, this billable hours figure includes the 145.7 hours included in the Final Invoice [Dkt. 64, Ex. F at 6] and the 10 hours Plaintiff's counsel represents he expended to complete his Motion for Attorney's Fees. [Dkt. 65 at 20.]

"To determine reasonable attorney's fees, the Second Circuit has historically implemented the lodestar method of examining the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Silver v. Law Offices Howard Lee Schiff, P.C.*, No. 3:09CV912 (PCD), 2010 U.S. Dist. LEXIS 133612, 2010 WL 5140851, at *1 (D. Conn. Dec. 15, 2010) (internal quotation marks and citation omitted). Recently, however, "the [Second Circuit] determined that "[t]he meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness."" *Id.* (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 182 (2d Cir. 2008)). "In place of the lodestar method, the court used the "presumptively reasonable fee" standard." *Id.*

The Second Circuit has subsequently noted that "[w]hile the *Arbor Hill* panel indicated its preference for abandonment [*19] of the term "lodestar" altogether, the approach adopted in that case is nonetheless a derivative of the lodestar method." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 n. 2 (2d Cir. 2010). In *Arbor Hill*, the Second Circuit instructed that:

> [T]he better course--and the one most consistent with attorney's fees jurisprudence--is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively [*20] reasonable fee."

*Arbor Hill, 522 F.3d at 190.* Consequently, courts have described the "presumptively reasonable fee" analysis as a "process" that is "really a four-step one, as the court

must: "(1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award.'" *Vereen v. Siegler, No. 3:07CV1898, 2011 U.S. Dist. LEXIS 64162, 2011 WL 2457534, at \*1 (D. Conn. June 16, 2011)* (quoting *Adorno v. Port Authority of New York and New Jersey, 685 F. Supp. 2d 507, 510 (S.D.N.Y. 2010))*.

### 1. Reasonable Hourly Rate

In *Arbor Hill*, the Second Circuit indicated that the relevant factors in determining the reasonable hourly rate were articulated in *Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714 (5th Cir. 1974)*:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional [*21] relationship with the client; and (12) awards in similar cases.

*Johnson, 488 F.2d at 717--19* (cited in *Arbor Hill, 522 F.3d at 186 n. 3*). Reasonable hourly rates "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*. "The determination of a prevailing rate requires a 'case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel.'" *M.K. ex rel. K. v. Sergi, 578 F. Supp. 2d 425, 427 (D. Conn. 2008)* (quoting *Farbotko v. Clinton Cnty. of New York, 433 F.3d 204, 209 (2d Cir. 2005))*.

The Second Circuit has held that when determining the prevailing market rate, district courts "should generally use the hourly rates employed in the district in which the reviewing court sits." *Arbor Hill, 522 F.3d at 192* (quoting *In re "Agent Orange" Prods. Liab. Litig., 818 F.2d 226, 232 (2d Cir.1987))*; *see also Simmons v. New York City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009)*. The strong presumption that "a reasonable, paying client would in most cases hire counsel from within his district" can be rebutted "only in the unusual case--if the party wishing the district court to use a higher rate demonstrates that his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill." *Arbor Hill, 522 F.3d at 191*. Specifically, the Second Circuit has held that in order to overcome this "forum rule," the fee applicant "must persuasively [*22] establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons, 575 F.3d at 175*. "Among the ways an applicant may make such a showing is by establishing that local counsel possessing requisite experience were unwilling or unable to take the case . . . or by establishing, in a case requiring special expertise, that no in-district counsel possessed such expertise." *Id. at 176* (internal citation omitted).

Plaintiff has requested a rate of $425 per hour. [Dkt. 64 at Ex. F.] In support of this fee rate, Plaintiff attests that he is "principal attorney of the firm of John F. Ward, Esquire, PLLC, and of counsel to Thomas B. Bacon, P.A." and that he has been a licensed attorney since 1997. [Dkt. 65 at 17.] He also avers that he "has specialized in civil rights litigation throughout his sixteen-year career and has litigated more than sixty (60) cases under Title III of the ADA on behalf of various plaintiffs in federal district courts." [*Id.*] Curiously, although Plaintiff's case was filed in the District of Connecticut, and Plaintiff's counsel, who appears pro hac vice, is admitted to practice in the Eastern [*23] District of Pennsylvania, Plaintiff's counsel supports his rate request by citing inexplicably and exclusively to case law from the Southern District of New York determining rates in that District. [Dkt. 65 at 15--17.] Defendants object to Plaintiff's requested rate as being "excessive for the District of Connecticut," specifically in light of the fact that "[t]his case was not difficult or complex, and the claims were relatively straightforward." [Dkt. 64 at 11.] Neither party appears to suggest that the Court should apply the customary hourly rate in the Eastern District of Pennsylvania, within which Plaintiff's Counsel's office appears to be located. Furthermore, the Court is not persuaded by Plaintiff's contention that he retained out-of-district counsel "as a last resort . . . because he could not locate qualified counsel in this District," when that contention is based only on the fact that Plaintiff's initial choice of counsel within the District of Connecticut "proved to be unwilling or unable to handle the responsibilities of this case on a timely basis." [Dkt. 65 at 18.] Numerous members of the Connecticut bar would be qualified to prosecute this case and the bar is not so flush [*24] with cases that a search for Connecticut counsel would have been unavailing. Therefore, the Court will adhere to the

forum rule and looks to the prevailing rates in the District of Connecticut to determine whether Plaintiff's counsel's hourly fee is reasonable.

Defendants contend that their counsel's rate of $175 per hour is indicative of the appropriate attorney's fee for this claim, and urges the Court to determine that an hourly fee of between $175 and $250 is appropriate. [Dkt. 64 at 12.] The Court agrees with Defendants that Plaintiff's requested hourly fee is in excess of the prevailing rates in this District for counsel of similar experience and skill, but finds that Plaintiff's counsel should not be limited to the rate suggested by Defendants. Although there are a limited number of recent District of Connecticut cases for attorney's fees under the ADA, the Court has conducted a review of recent attorney's fee awards for private counsel who prosecute plaintiff's rights cases in this District and has determined that $375 is a more appropriate hourly rate. *See, e.g., Vereen v. Siegler, No. 3:07CV1898 (HBF), 2011 U.S. Dist. LEXIS 64162, 2011 WL 2457534, at *2--3 (D. Conn. June 16, 2011)* (awarding $400 per hour to a plaintiff's civil rights lawyer with 43 years of [*25] experience); *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority, No. 3:03CV599 (CFD), 2011 U.S. Dist. LEXIS 16995, 2011 WL 721582, at * 5--6 (D. Conn. Feb. 22, 2011)* (finding $325--$425 per hour to be reasonable for a partner, but reserving the upper end of that award range for partners with over 30 years' experience); *Negron v. Mallon Chevrolet, Inc., No. 3:08CV182 (TPS), 2012 U.S. Dist. LEXIS 136394, 2012 WL 4358634, at *2 (D. Conn. Sept. 24, 2012)* (noting that "the two preeminent consumer law attorneys" in the District were earning $350/hour and $325/hour).

## 2. Reasonableness of time spent

"The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994).* Defendants claim that the Final Invoice suffers from numerous "excessive, duplicative and vague" entries that should be reduced as unreasonable. [Dkt. 65 at 12--14.] The Court addresses each of Defendants' concerns below.

### i. Time billed for reviewing the docket and file and for telephone conferences

Defendants, without pointing to the entries at issue, object to "all entries regarding the review of docket and file and telephone conferences" on the basis that they lack "any specific detail as to what was reviewed or discussed" and should therefore be disregarded [*26] as overly vague. [Dkt. 64 at 12.] Plaintiff argues that these entries should not be disregarded because "any such en-

tries were made sparingly, involved small increments of time and were necessary under the circumstances." [Dkt. 65 at 18.] Furthermore, Plaintiff maintains that his entries for telephone conferences included references to the subject matter of each conference. [*Id.*]

"Fees should not be awarded for time entries when the corresponding description of work performed is vague and therefore not susceptible to a determination of whether the time billed was reasonably expended." *Connecticut Hosp. Ass'n v. O'Neill, 891 F. Supp. 687, 690 (D. Conn. 1994)* (internal quotations omitted and citation omitted). As a general rule, "[e]ntries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter." *Mr. and Mrs. B. v. Weston Bd. of Ed., 34 F. Supp. 2d 777, 781 (D. Conn. 1999)* (citing *Connecticut Hospital Ass'n, 891 F. Supp. at 691; Ragin v. Harry Macklowe Real Estate Co., 870 F. Supp. 510 (S.D.N.Y. 1994); Orshan v. Macchiarola, 629 F. Supp. 1014 (E.D.N.Y. 1986)).* However, attorneys "are not required to provide the [c]ourt with a detailed accounting of each minute spent performing a task in the case." *Access 4 All, Inc. v. 135 W. Sunrise Realty Corp., No. CV 06-5487(AKT), 2008 U.S. Dist. LEXIS 91674, 2008 WL 4453221, at *10 (E.D.N.Y. Sept. 30, 2008).* Instead, "the records produced should be enough to assess the amount of work performed." *Id.* A court may [*27] attempt to clarify vague entries by looking at the context of the adjacent entries. *Connecticut Hosp. Ass'n, 891 F. Supp. at 691.*

Here, the Court noted two instances in which Plaintiff billed time to "review docket and file" and "review docket and order" without further elaboration. [Dkt. 64, Ex. F, at 2 and 5.] Considered in context, the first entry, on 7/2/12, is consistent with Plaintiff's explanation that he reviewed the docket and case file when he was assigned the case. [Dkt. 65 at 18.] This representation is buttressed by the record showing that Plaintiff's counsel filed his *pro hac vice* motion shortly after this time was billed. [Dkt. 14.] The second entry, on 8/6/14, clearly refers to the Order entered by Judge Smith on that date following the 8/5/14 settlement conference. [Dkt. 57.] The Court does not find that these two entries, which are easily contextualized by the record, support Defendants' request for a fee reduction. Furthermore, the Court confirms that Plaintiff appears to have included the general subject matter of each telephone conference for which he billed, with the exception of the telephonic status conference held with the Court on 9/5/14----the transcript for which is included, in full, as Exhibit H to [*28] Defendants' opposition, and the content of which is verifiable and thus eminently "susceptible to a determination of

whether the time billed was reasonably expended." *Connecticut Hosp. Ass'n, 891 F. Supp. at 690.*

ii. Time billed for filing Mr. Ward's *pro hac vice* motion

"It is within the [c]ourt's discretion whether to award attorney's fees for a pro hac vice motion." *135 W. Sunrise Realty Corp., 2008 U.S. Dist. LEXIS 91674, 2008 WL 4453221 at *11.* As a corollary to the presumption that a reasonable, paying client would in most cases hire counsel from within his district, courts typically reduce or eliminate time billed for *pro hac vice* motions when Plaintiff has not persuasively demonstrated that his retention of out-of-district counsel was necessary. *See, e.g., Imbeault v. Rick's Cabaret Intern. Inc., 08 CIV. 5458(GEL), 2009 U.S. Dist. LEXIS 71562, 2009 WL 2482134, at *8 (S.D.N.Y. Aug. 13, 2009); 135 W. Sunrise Realty Corp., 2008 U.S. Dist. LEXIS 91674, 2008 WL 4453221 at *11.* As noted above, the Court is not convinced that Plaintiff's decision to ultimately retain Mr. Ward was based on the fact that no qualified counsel in the District was available or that out-of-state counsel would "likely (not just possibly) produce a substantially better net result." *Simmons, 575 F.3d at 175.* Furthermore, 1.5 hours is an excessive amount of time to spend on such a boilerplate motion. Accordingly, the Court declines to award Plaintiff attorney's fees for this time.

iii. Time billed for drafting amended [*29] memorandum in opposition to first motion to dismiss the complaint

Defendants also maintain their objection to the amount of time billed for drafting Plaintiff's revised opposition to Defendants' first motion to dismiss [Dkt. 20], arguing that even Plaintiff's reduced calculation of 24.7 hours is unreasonable in light of "virtually identical briefs" submitted by Plaintiff in other cases. [Dkt. 64 at 13; Ex. I.] Plaintiff responds that he has already addressed Defendants' objections by reducing the amount of time billed for work on certain pages of the brief. [Dkt. 65 at 19.] As discussed *supra*, the Court agrees with Defendants that virtually the entire brief in question was appropriated from Plaintiffs' previous briefs, and that furthermore it is merely a pared-down version of the brief originally submitted in this case. For the reasons stated above, the amount of time billed for this brief will be limited to 5 hours.

iv. Time billed for drafting Mr. Harty's affidavit

Defendants contend that the 1.5 hours billed on 11/30/12 for drafting Mr. Harty's affidavit is also excessive and should be reduced in light of the substantially similar affidavits filed by Mr. Harty in other Connecticut [*30] cases. [Dkt. 64 at 13.] In support of this position, Defendants submitted Exhibit J, which consists of the

affidavit submitted by Mr. Harty in this case and three additional affidavits (the fourth appears to be a duplicate) submitted by Mr. Harty in other cases filed in this District. [*Id.*, Ex. J.] Each of these affidavits is approximately 2 pages long, and contains substantially similar allegations with regards to 1) Mr. Harty's disability, 2) his occupation, 3) his ties to the area, and 4) the general effects of the defendant's discrimination on him. [Dkt. 64, Ex. J.] Each affidavit then contains a different paragraph or two alleging the specific barriers and violations at that particular defendant's property. [*Id.*, cf. 1--2 at ¶ 4 with 8 at ¶¶5--6; 2 at ¶ 5.] Plaintiff maintains that the 1.5 hours billed to draft Mr. Harty's *Bull's Head Realty* affidavit is compensable because the factual circumstances of this case differ from those in other cases. [Dkt. 65 at 19.]

The affidavit in question contains one substantially original paragraph consisting of 12 lines of text detailing the barriers and violations specific to Defendants' Center. However, this affidavit was originally submitted [*31] as an exhibit to Plaintiff's *first* memorandum in opposition to defendants' motion to dismiss, which was filed on 8/29/12. [Dkt. 17.] The Final Invoice suggests that on 11/30/12, Plaintiff's Counsel subsequently billed the 1.5 hours in question for work on this affidavit before resubmitting it as an exhibit to the *revised* opposition brief [Dkt. 20]. [Dkt. 64, Ex. F at 2.] However, a comparison of the 8/29/12 submission and the 11/30/12 submission reveals only a slight modification to paragraph 5, the date, and the font. [*Cf.* Dkt. 17-1 with Dkt. 20-1.] Accordingly, the time billed for this affidavit will be reduced to 0.5 hours, which reflects time reasonably expended to confer with Mr. Harty, update the affidavit, and prepare it for resubmission.

v. Time billed for drafting the summary judgment motion, reviewing Defendants' objection, and drafting a reply

Defendants object to the amount of time Plaintiff billed for drafting his motion for summary judgment, reviewing Defendants' objection, and preparing a reply on the same basis as they object to the amended opposition brief and the client affidavit. [Dkt. 64 at 13.] Plaintiff denies this and represents that the amount of time billed is [*32] "entirely reasonable and not subject to reduction." [Dkt. 65 at 19.] Defendants have failed to support their objection to the summary judgment briefing with any evidence--like that submitted in support of a fee reduction for the other two pieces of work product in dispute--that suggests the time Plaintiff spent was excessive or unnecessary. As a result, the Court lacks any basis for determining that 38.9 hours, an otherwise customary amount of time to expend litigating a summary

judgment motion, is unreasonable, and declines to reduce the hours billed.

vi. Time billed for correspondence with Barbara Grady

Defendants contend that the entries for emails with Barbara Grady on 2/18/14 and 2/26/14 do not appear to relate to the case before the Court and should be removed. [Dkt. 64 at 13.] Plaintiff correctly asserts that Barbara Grady is Judge Bryant's Deputy Clerk, and that the time entries relate to the filing of Plaintiff's motion for summary judgment. [Dkt. 65 at 20.] However, upon review of the Final Invoice and docket, it is clear that these exchanges were initiated by Ms. Grady as a result of Plaintiff's failure to comply with the Court's Chambers Practices' requirement that documents [*33] filed electronically be filed in OCR text-searchable PDF format. [Dkt. 65, Ex. F at 4; *see* Dkt. 50-12, replacement PDF for Exhibit D.] Plaintiff's counsel will not be compensated for time spent correcting preventable errors. Furthermore, compliance with this Chambers' Practice was purely administrative and did not require any legal work. The Court will deduct the entries Plaintiff billed on 2/18/14 for time spent emailing with Ms. Grady (0.1 hour), and the time Plaintiff billed on 2/26/14 for time spent exchanging emails with Ms. Grady and preparing the correctly formatted exhibit (0.3 and 0.2 hours, respectively) for a total reduction of 0.6 hours.

vii. Time billed for Plaintiff's counsel's travel

Defendants contend that the travel fees Plaintiff's counsel incurred to attend the 8/5/14 settlement conference in Hartford, Connecticut should be reduced by fifty percent. [Dkt. 64 at 13.] Plaintiff responds that he is not claiming "travel fees" but rather billing for the time he spent in transit to and from the conference. [Dkt. 65 at 20.] Upon review of the Final Invoice, this appears to amount to 9.4 hours of travel between Pennsylvania and Connecticut, and another 0.8 hours traveling [*34] from the hotel to the courthouse. [Dkt. 64, Ex. F at 5.]

As yet another corollary to the "forum rule," "expenses and fees related to travel must be excluded from an award of attorney's fees if 'the hypothetical reasonable client who wishes to spend the least amount necessary to litigate the matter . . . would have retained local counsel.'" *U.S. ex. rel Feldman v. Van Gorp, 03 Civ. 8135 (WHP), 2011 U.S. Dist. LEXIS 14914, 2011 WL 651829, at *3 (S.D.N.Y. Feb. 9, 2011)* (quoting *Imbeault, 2009 U.S. Dist. LEXIS 71562, 2009 WL 2482134 at *8).* Courts have typically found that a "reasonable, paying client would presumptively hire a firm located near the courthouse in which the litigation is to take place" because doing so "minimizes expenses incurred as a result of an attorney's travel time." *Teamsters Loc. 814 Welfare Fund v. Dahill Moving & Storage Co., 545 F. Supp. 2d 260, 266 (E.D.N.Y. 2008)* Thus, hours spent traveling by out-of-district attorneys into the district are not hours "reasonably expended" where competent counsel is available within the district. *U.S. ex. rel Feldman, 2011 U.S. Dist. LEXIS 14914, 2011 WL 651829 at *3 n. 2.* This includes time spent traveling into and out of the district for a settlement conference. *See, e.g., Concrete Flotation Sys., Inc. v. Tadco Const. Corp., 07-CV-319 (ARR)(VVP), 2010 U.S. Dist. LEXIS 60560, 2010 WL 2539771, at *7 (E.D.N.Y. Mar. 15, 2010), report and recommendation adopted, 2010 U.S. Dist. LEXIS 60562, 2010 WL 2539661 (E.D.N.Y. June 17, 2010).* Thus, this Court will not award attorney's fees for Plaintiff's counsel's time spent traveling to attend the settlement conference. Furthermore, for the same reasons [*35] that the Plaintiff's attorney is not entitled to fees for travel time, he is not entitled to recover his $555.01 in costs related to travel between Royersford and Hartford. "Because competent counsel was available within the district, these travel costs were not reasonably incurred." *U.S. ex. rel Feldman, 2011 U.S. Dist. LEXIS 14914, 2011 WL 651829 at *5.*

viii. Time spent preparing fee application

In general, when a plaintiff is awarded reasonable attorney's fees, the plaintiff is also entitled to an award of reasonable attorney's fees in connection with the time spent to prepare the fee application. *See, e.g., Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999); Valley Disposal, Inc. v. Cent. Vermont Solid Waste Mgmt. Dist., 71 F.3d 1053, 1059 (2d Cir. 1995).* Plaintiff's counsel represents that he spent ten hours drafting and filing the memorandum and exhibits in support of his motion for fees. [Dkt. 65 at 20.] Defendants have not objected. The Court finds that this is a reasonable amount of time to expend on the motion and will include it in the final calculation of compensable hours.

ix. Excessive use of the minimum billing unit

In reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case, and excessive, redundant or otherwise unnecessary hours should be excluded from [*36] the attorney's fee calculation. *Mary Jo C. v. Dinapoli, 09-CV-5635 (SJF)(ARL), 2014 U.S. Dist. LEXIS 175686, 2014 WL 7334863, at *9 (E.D.N.Y. Dec. 18, 2014)* (citing *Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir.1997)).* Upon review of the Final Invoice, it is apparent that Plaintiff's attorney has impermissibly billed a minimum of six minutes for every task performed regardless of the time he could have reasonably spent on the matter. By way of example, the Court notes that on 4/11/13, Plaintiff's counsel billed twelve minutes

to review two seven-line consensual motions to extend time, one to extend time to respond to interrogatories and one to extend time to respond to a request to produce. [Dkt. 64, Ex. F at 2.] On the same date, counsel billed another six minutes to review a two-page motion objecting to a Rule 34 Motion for Inspection on the basis of irrelevance because the motion sought to inspect interior portions of the Defendant's property while the Complaint only identified exterior portions of the property as being noncompliant with the ADA. [*Id.*] On 4/12/13, counsel billed twelve minutes to read two docket entries: one which stated "ORDER: the parties are ordered to meet and confer and file, pursuant to *Rule 26(f)*, a Report of Rule 26(f) Planning Meeting by Friday, 4/19/13," and the other which read simply "Docket Entry Correction: Document [*37] [25] Response Entered in Error. Per the local rules, discovery is not to be filed." [*Id.*] In other places, Plaintiff's counsel also appears to have inflated the time billed to complete routine tasks. For example, on 9/11/12, counsel billed thirty minutes to obtain and

file a certificate of good standing. [*Id.*] Plaintiff's counsel also billed a total of thirty-six minutes to review a handful of exceedingly simple, one- and two-line docket entries on 4/26/13--one of which was a calendar entry and two of which merely granted extensions of time. [*Id.*] Each of these entries, as well as multiple others that the Court will not address individually, call into question whether the number of hours included in Plaintiff's Invoice reflect time usefully and reasonably expended. Accordingly, the Court will deduct the entries noted above from Plaintiff's fee request as excessively billed hours.

**3. Calculation of the presumptively reasonable fee and final fee award**

In summation, based upon the Court's adjusted hourly rate, adjusted number of hours, and reduction of travel costs, Plaintiff is awarded $45,412.50 in attorney's fees and $2,142.50 in costs, calculated as follows:

| **Attorney's Fees** | |
| --- | --- |
| *Hours:* | |
| Requested [*38] | 155.7 hours |
| Reductions | -- 1.5 hours (pro hac vice motion) |
| | -- 19.7 hours (amended opposition to first motion to dismiss) |
| | -- 1.0 hours (Mr. Harty's affidavit) |
| | -- 0.6 hour (correspondence with Ms. Grady to correct error) |
| | -- 10.2 hours (travel time) |
| | -- 1.6 hours (excessive use of minimum billing unit) |
| Awarded | 121.1 hours |
| *Hourly Rate:* | |
| Requested | $425/hour |
| Awarded | $375/hour |
| | |
| *Total Attorney's Fees*: | |
| Requested | $66,172.50 |
| **Awarded** | **$45,412.50** |
| **Attorney Travel Costs** | |
| Requested | $555.01 |
| **Awarded** | **$0.00** |
| **Expert Fees & Costs** | |
| (including reinspection fee) | |
| Requested | $2,142.50 |
| **Awarded** | **$2,142.50** |
| **Total Fees and Costs** | |
| Requested | $68,870.01 |
| **Awarded** | **$47,555.00** |

2015 U.S. Dist. LEXIS 29635, *

III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Attorney's Fees is GRANTED in part and DENIED in part. The Clerk is directed to close this file.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 11, 2015



Stephanie Pava, Plaintiff, -against- Hartford Life and Accident Insurance Company, and Pharmanet, Inc. Long Term Disability Plan, Defendants.

03 CV 2609 (SLT) (RML)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2005 U.S. Dist. LEXIS 41753*

**August 23, 2005, Decided**
**August 24, 2005, Filed**

**COUNSEL:** [*1] For Stefanie Pava, Plaintiff: Aba Heiman, Fusco, Brandenstein & Rada, PC, Woodbury, NY.

For Hartford Life and Accident Insurance Company, Pharmanet, Inc. Long Term Disability Plan, Defendants: Kerry Carew Thorburn, Del Mauro DiGiaimo, Knepper & Heck, P.C.; Randi F. Knepper, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ.

**JUDGES:** SANDRA L. TOWNES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SANDRA L. TOWNES

**OPINION**

MEMORANDUM & ORDER

TOWNES, District Judge:

Plaintiff Stephanie Pava ("Plaintiff") brings this civil action against defendants Pharmanet, Inc. Long Term Disability Plan (the "Plan") and Hartford Life and Accident Insurance Company ("Hartford") (collectively the "Defendants") under *29 U.S.C. § 1132(a)(1)(B)*. She claims that she was improperly denied long-term disability benefits under the Plan, an employee welfare benefit plan regulated by the Employee Retirement and Income Security Act, as amended, *29 U.S.C. § 1001-1461* ("ERISA"). Both parties move for judgment on the administrative record. For reasons discussed herein, Defendants' motion is granted and Plaintiff's motion is denied.

STATEMENT [*2] OF FACTS

On December 27, 1999, Plaintiff began her employment with Pharmanet, Inc. as a Medical Writer. (*See* AR 715-23.) [1] Her employer established and maintained the Plan, which is funded by a group insurance policy issued by Hartford (the "Policy"). (*See* AR 1-51.) On February 1, 2000, Plaintiff became a participant in the Plan. (*See* AR 715-23.)

    1   Citations to the Administrative Record are indicated as "AR ___."

The Policy provides coverage to active, full-time employees of Pharmanet, Inc. (AR 27-29.) It defines "Disability or Disabled" as

during the Elimination period [2] and for the next 24 months you are prevented by:

    1. accidental bodily injury;

    2. sickness;

    3. Mental Illness;

    4. Substance Abuse; or

    5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

2005 U.S. Dist. LEXIS 41753, *

After that you must be so prevented from performing one or more of the Essential [*3] Duties of Any Occupation.

(AR 30.) An "Essential Duty" is one that (1) "is substantial, not incidental;" (2) "is fundamental or inherent to the occupation;" and (3) "can not be reasonably omitted or changed." *Id.*

> 2   "The Elimination period is the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following:
>
>> 1.   The first 3 consecutive month(s) of any one period of Disability; or
>>
>> 2.   With the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program."
>
> (AR 28.)

After a participant submits a claim, she must also submit "Proof of Loss." (AR 40.) This includes, but is not limited to, documentation of the date the disability began, its cause, its prognosis; any and all medical information; and the names and addresses of all health care providers. *See id.* The Policy states that "proof of loss must be satisfactory to us." *Id. Plaintiff's Medical Evaluations*

[*4]   Plaintiff claims that she is suffering from Chronic Fatigue Syndrome ("CFS") and Fibromyalgia. Her diagnosis is heavily disputed. Although the parties disagree about when Plaintiff first saw her Primary Care Physician, Dr. Sudhanshu Prasad, [3] his notes indicate that he saw her on November 4, 1999, December 17, 1999, February 14, 1999, [4] and April 24, 2000. (AR 473-74.) He indicated that Plaintiff complained of various ailments including a cold and congestion and, he prescribed medication. *Id.*

> 3   Plaintiff alleges that she originally treated with Dr. Prasad on May 23, May 30, and June 5, 2000. (Pl. 56.1 Stat. P47.) Defendants claim that Plaintiff originally treated with him in August and October 1999. (Def. 56.1 Stat. P47.)
> 4   Since both parties agree that she did not begin seeing Dr. Prasad until at least after August 1999, the Court assumes this date to be February 14, 2000.

In June 2000, Plaintiff first saw Dr. Joseph John, a specialist in infectious diseases and allergies. (*See* AR 557.) In [*5] a letter dated August 8, 2000, Dr. John informed Hartford that Plaintiff has "multiple medical problems," including diabetes, hypertension and morbid obesity. (AR 558.) He also reported: "It is my opinion that Ms. Pava is suffering from a chronic inflammatory state as indicated by her history, my examination and the preponderance of laboratory data...She most likely will be completely or partially disabled for at least three months hence." *Id.* On September 15, 2000, Dr. John signed a form, which was submitted to Hartford with Plaintiff's application for long-term disability benefits, indicating that Plaintiff could only stand for "30 minutes max;" walk for "15 minutes max;" that she would "fatigue after I hour" of sitting; and that her keyboard/repetitive hand motion was limited to "1/2 hour." (AR 709; AR 723.)

On January 16, 2001, Plaintiff saw Dr. Steven Stanzione, an oncologist. (AR 357.) His letter from that date states that he saw Plaintiff "for the problem of lymphnadenopathy, with fevers and night sweats, in the face of continuing [Epstein Barr] virus." *Id.* In a letter dated February 2, 2001, after his review of CT scans of Plaintiff's abdomen, pelvis, and thorax, [*6] Dr. Stanzione concluded that "this does look like chronic [Epstein Barr] virus with a failure to resolve her infection." (AR 356.) He continued: "Most of these patients have smoldering low-grade infections with this, and ultimately they do resolve with an elevated antibody titer to the virus and then resolution of the infection." *Id.*

In March 2001, Plaintiff began treatment with Dr. Susan Levine, whose curriculum vitae reveals a long and questionable history of study of and advocacy about Chronic Fatigue Syndrome ("CFS"). [5] (*See* Pl. Stat. P52; AR 484-86.) In a letter dated October 5, 2001, Dr. Levine wrote that *inter alia* Plaintiff suffers from a "severe sleep disorder" and:

> almost constant fatigue which is made worse by even minimal increases in physical activity but which she tries to manage by frequent 'rests'; she also reports the following: sore throats; low grade fevers (she keeps a temperature log); cognitive problems, including difficulty processing new, incoming information and making calculations or remembering people's names; viral infections; headaches; and palpitations and dizziness.
>
> ***
>
> Based on patient's severe and frequent symptoms which [*7] are com-

pletely debilitating; my wide experience in treating patients with CFS and [Fibromylagia] and in following their natural history over time which does not respond to any interventions; and observing this patient's lack of progress despite her motivation to get better I deem her prognosis to be poor and recommend total and permanent disability.

(AR 468.)

     5  As reported in *Locher v. Unum Life Ins. Co. of Am., 2002 U.S. Dist LEXIS 3745, at *13 n.6 (S.D.N.Y. March 7, 2002),* Dr. Levine has had her license to practice medicine suspended in connection with fraudulent and incomplete CFS diagnoses. *Solaas v. Delta Family-Care Disability & Survivorship Plan, 2005 U.S. Dist. LEXIS 5269, at *9 (S.D.N.Y. March 29, 2005).*

Six months later, Dr. Ekaterina Malievskaia, Associate Medical Director for Hartford, issued a report summarizing her review of Plaintiff's medical records and without conducting a physical examination. (*See* AR 439-44.) Dr. Malievskaia states that Plaintiff [*8] "alleges she is unable to return to work due to FUO (fever of unknown)," and concludes that the records she reviewed did not support this diagnosis. (AR 443.) She also concludes that although Plaintiff demonstrated elevated CD4 count, elevated WBC and elevated antibodies to Epstein-Barr virus which "could be elevated in the presence of chronic infection, they do not constitute the basis for disability in the absence of objective evidence for [*sic*] infection." *Id.* She concluded that Plaintiff was "fully capable of meeting the demands of a sedentary occupation." (AR 444.)

In March 2002, Dr. Kenneth Gold, Psy.D., upon referral from Dr. Levine, examined and tested Plaintiff over three days. (*See* AR 286.) In his report, he wrote: "Overall, intellectual testing revealed significant deficits in speed of mental processing and graphmotor speed as well as a mild, relative deficit in immediate memory and concentration in the context of premorbid functioning in the Superior to Very superior range." (AR 290.) However, he concluded that "test performance failed to support clinical reports of impairment in short-term memory functioning." *Id.* He also noted that "the most salient [*9] areas of deficit...are in the rapid processing of information and graphmotor speed. These findings are consistent with clinical reports of slowed mental processing...However, the relative contributions of several additional factors including depression and pain cannot be completely ruled out." (AR 292.) On May 6, 2002, in

response to a letter from Plaintiff's attorney, Dr. Gold wrote: "While it is impossible to predict future occupational functioning, it is reasonable to assume that if not properly addressed, Ms. Pava's deficits in speed of mental processing would have a considerable impact on any occupation she may have in the future, including that of medical writer." (AR 294.)

On May 17, 2002, Dr. Levine wrote a letter to Plaintiff's attorney updating him on Plaintiff's progress. (AR 279-82.) In this letter, she detailed the results of Plaintiff's neurocognitive testing performed by Dr. Gold; stated that Plaintiff "had the diagnosis of Fibromyalgia confirmed by a rheumatologist;" and concluded that "due to the longevity and severity of Ms. Pava's symptoms, especially her severe exhaustion and neurocognitive complaints, her prognosis remains poor and she is extremely unlikely to [*10] recover any of her physical or mental capabilities." *Id.* Three months later, Dr. Levine informed Hartford that Plaintiff "cannot stand [more than] 10 minutes; cannot walk [more than] 2 blocks; cannot climb [more than] 7 flights of stairs; cannot lift or carry more than 10 pounds for more than 20 feet; cannot read [for more than] 1/2 hours without getting confused." (AR 188.) [6]

     6  Defendants allege that the last phrase is illegible. (Def. Stat. P54.)

After Hartford denied Plaintiff's first appeal and to complete its review of her file upon her second appeal, it commissioned another review of Plaintiff's file. Dr. Scott Yarosh [7] performed this review and submitted it to Hartford in a report dated September 3, 2002. (*See* AR 176-86.) After his review of Plaintiff's medical records, job description, and without a physical examination, he concluded that Plaintiff "may have [CFS]." (AR 185.) However, he also wrote that "there is no objective medical information in the records that would indicate [*11] that Ms. Pava is unable to perform the duties of her job as a medical writer. In fact, her own correspondence indicates that she can carryout [*sic*] the tasks of writing at a high enough cognitive level to be clear and understood." (AR 186.)

     7  Plaintiff characterizes Dr. Yarosh as a psychiatrist. (Pl. Stat. P60.) Defendants point out that Dr. Yarosh is a Diplomate of the American Board of Psychiatry and Neurology, and a Diplomate of the American Board of Internal Medicine. (Def. Stat. P60.)

*Plaintiff's Claims for Benefits*

On October 4, 2000, Hartford received Plaintiff's application for long-term disability benefits. (AR 714-23.) By letters dated October 5, 2000 and October

11, 2000, Hartford acknowledged receipt of Plaintiff's application for benefits, and informed her of the need to submit certain forms to be completed by her medical doctors so that it could evaluate her claim. (AR 72-73.) Thereafter, Plaintiff completed and sent Hartford additional forms as requested. (See AR 74.) By letter [*12] dated January 16, 2001, Hartford informed Plaintiff that it denied her application for long-term disability benefits based on the Policy's pre-existing condition limitation. (AR 532.)

By letter dated January 17, 2001, Plaintiff explained the nature of her illness and requested that Hartford put the review of her claim on hold pending reviews of test results by other medical specialists. (See AR 525-27.) Two weeks later, she informed Hartford by letter that she intended to appeal the denial of her claim and stated that she was in the process of gathering supporting information. See id. By letter dated March 14, 2001, Hartford acknowledged receipt of Plaintiff's appeal and informed her that the review process would not begin until she submitted all supporting documentation. (AR 75.) Two months later, Plaintiff retained counsel, who then requested her file. (See AR 519-20.)

In a letter dated June 6, 2001, Plaintiff's counsel denied the applicability of the preexisting condition limitation, submitted documentation in support of her appeal, and requested a decision within sixty days. (AR 482.) By letter dated June 21, 2001, Hartford acknowledged receipt of these materials [*13] and informed Plaintiff that it would review them in adjudicating her appeal. (AR 70.) A week later, Hartford requested that Dr. Prasad provide Plaintiff's records for certain dates of treatment. (AR 76.) Dr. Prasad did not provide this information until October 11, 2001. (AR 473-74.) By letter dated October 19, 2001, Plaintiff's counsel provided the notes of Dr. Levine in support of Plaintiff's appeal. (AR 466.) Ten days later, Hartford referred Plaintiff's appeal to their Medical Director for further review. (AR 464-65.) By letter dated November 2, 2001, Hartford informed Plaintiff that it had received the additional information provided by Dr. Levine and Dr. Prasad. (AR 461.)

In a letter dated December 10, 2001, Hartford informed Plaintiff that it denied her appeal. (AR 81-83.) In this letter, it explained that "the documentation in [Plaintiff's] file, viewed in whole, does not establish that the conditions of fever of unknown origin, Chronic Fatigue Syndrome, and Fibromyalgia, from which [Plaintiff] claims to be disabled, prevent her from performing the Essential Duties of her Occupation as a Medical Writer since her reported last day of work May 14, 2000." (AR 83.) Thus, although [*14] the initial denial of her claim was based on the application of the pre-existing condition limitation, her appeal was rejected because Hartford found that she was not disabled within the meaning of the Policy. See id.

By letter dated February 4, 2002, Plaintiff's counsel informed Hartford that Plaintiff wished to appeal the denial of benefits again. (AR 435.) At the time of her second appeal, Plaintiff indicated that she would submit additional documentation within 60 days. Id. By letter dated February 14, 2002, Hartford acknowledged her second appeal. (AR 75.) Plaintiff later requested and was granted two extensions of time on March 25, 2002 and May 14, 2002 to submit this documentation, and eventually submitted it on May 28, 2002. (AR 225-30; 432-33.) By letter dated June 10, 2002, Hartford acknowledged receipt of Plaintiff's documentation in a letter to her attorney. (AR 272.) Seven days later, Plaintiff's counsel submitted another medical report in support of Plaintiff's second appeal. (AR 238.)

By letter dated July 9, 2002, Hartford informed Plaintiff that it forwarded her file to Behavioral Management, Inc. ("BMI") "for an independent board certified physician for review. [*15] " (AR 218.) Hartford also requested that Drs. Prasad and Levine consent to speaking with a physician from BMI concerning Plaintiff's medical records by letters also dated July 9, 2002. (AR 219-20.) In an e-mail dated July 18, 2002, a BMI representative informed Hartford that Dr. Levine would not discuss Plaintiff's case over the phone, but would respond to its written inquiries. (AR 217.) Six days later, BMI faxed questions to Dr. Levine. (AR 215.) She did not respond until August 26, 2002. (AR 188-90.)

Throughout September 2002, Plaintiff and Hartford continued to correspond about the status of her appeal. On September 3, 2002, Hartford received the report of the BMI physician, Dr. Scott Yarosh, who completed the independent medical review of Plaintiff's case. (See AR 202-213.) In his addendum to this report dated September 4, 2002, he informed Hartford that Dr. Prasad's notes of Plaintiff's treatment were "vague and illegible for the most part," and therefore he could not determine whether the prescriptions issued were or were not related to CFS. (AR 191.) A week later, Hartford informed Dr. Prasad by letter that BMI would be contacting him regarding Plaintiff's medical condition. [*16] (AR 174.) By letter dated October 8, 2002, Hartford wrote to Plaintiff advising her that their medical consultant was unable to reach Dr. Prasad regarding her ability to function. (AR 168.) It also requested that Plaintiff advise them if she did not wish that the decision on her appeal be made upon consideration of Dr. Prasad's information, and if so, the decision would be made with the information then in her file. Id. In response, by fax dated October 21, 2002, Plaintiff advised Hartford that Dr. Prasad was "in no position to assess plaintiff's ability to function, so Hartford was free to contact Dr. Levine." (AR 157.) On October

2005 U.S. Dist. LEXIS 41753, *

28, 2002, Hartford responded that it needed to discuss Plaintiff's treatment with Dr. Prasad in light of the Policy's pre-existing condition limitation. (AR 156.) The next day, Plaintiff's attorney responded and advised Hartford to prepare a list of questions for Dr. Prasad and that after this list is compiled, he would contact Dr. Prasad and "request his cooperation and assistance." (AR 153.) Hartford affirmed the denial of Plaintiff's claim in a letter dated November 20, 2002. (AR 137-41.)

Both parties moved for judgment on the administrative record, [*17] and exchanged opposition and reply briefs. These were filed with this Court on February 25, 2004.

DISCUSSION

A. Motion for Judgment on the Administrative Record

Both parties move for "Judgment on the Administrative Record." However, they disagree over whether these motions should be analyzed as those brought under *Rule 12(c)* or *Rule 56 of the Federal Rules of Civil Procedure*, claiming that the standard of review of Plaintiff's denial should be determinative of this question. (*See* Plaintiff's Memorandum in Support of Her Motion for Judgment ("Pl. Mem.") at 2; Defendant's Legal Memorandum in Support of Motion for Judgment ("Def. Mem.") at 10-12.) *Rule 12(c)* states:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule* [*18] *56*.

*Fed. R. Civ. R. 12 (c)*. Accordingly, since their motions call for consideration of "matters outside the pleadings," i.e the administrative record, and both parties have had time to present pertinent material, the Court considers their motions as cross-motions for summary judgment.

Plaintiff requests that the Court consider her motion as a "motion for judgment on the administrative record" citing *Muller v. First UNUM Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003)*, because she claims that summary judgment is inappropriate where the Court utilizes a *de novo* review of the denial of benefits. But the *Muller* court concluded that because the district court had al-

ready denied summary judgment on the issue of whether or not the plaintiff was disabled within the meaning of the policy, it treated the defendant's motion for judgment on the administrative record as a bench trial on the papers. *Id.* Thus, the standard of review that applied to the administrator's denial of benefits was not determinative of the treatment of the defendant's motion. The Second Circuit also characterized the motion for judgment on the [*19] administrative record as one that "does not appear to be authorized in the Federal Rules of Civil Procedure." *Id.* Further, it said "many courts have either explicitly or implicitly treated [motions for judgment on the administrative record] as motions for summary judgment under *Rule 56*." *Muller, 341 F.3d at 124*. Similarly, in *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F. Supp. 783 (E.D.N.Y. 1995)*, a case cited by both parties, Judge Korman held that when the court reviews a denial of ERISA benefits applying the arbitrary and capricious standard on a summary judgment motion, it "may be more properly considered as one akin to a motion under *rule 12(c)* for judgment on the pleadings and the transcript of the record before the plan." *Id. at 791*. This statement guides the court on the way in which to view the claim. It does not indicate that because the claim is reviewed under the differential standard, it should therefore be considered a motion for judgment on the pleadings. Moreover, Judge Korman also suggested that the difference between the motions under *Rule 12(c)* and *Rule 56* in this context may be "more [*20] a matter of form than substance." *Id.* Accordingly, Plaintiff's request that the Court treat her motion in the same manner as the *Muller* court is granted; that is, it is treated as a motion for summary judgment.

B. Summary Judgment Standard

*Rule 56(c) of the Federal Rules of Civil Procedure* states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In the process of ruling on a motion for summary judgment, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Childers v. United States Postal Serv., 2003 U.S. Dist. LEXIS 9993, at *5*. "The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994)*. [*21] Specifically, "a 'genuine' issue is one that could be decided in favor of the non-moving party based on the evidence by a reasonable jury." *Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004)*. Yet, "conclusory allegations (by the

non-moving party) will not suffice to create a genuine issue." *Id.*

## C. Standard of Review

In *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989),* the Supreme Court announced the rule governing the review of a denial of benefits challenged under ERISA, *29 U.S.C. § 1132(a)(1)(B).* The Court stated that the denial must "be reviewed under the *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone, 489 U.S. at 115.* "Thus, where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [the court] will not disturb the administrator's conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX, 52 F.3d 438, 441 (2d Cir. 1995).* The burden of proving [*22] that the arbitrary and capricious standard should apply is on the trustee or administrator. *Winter v. Hartford Life and Accident Ins. Co., 309 F. Supp.2d 409, 413-14 (E.D.N.Y. 2004).* "'Any ambiguities must be construed against the administrator and in favor of the party seeking judicial review.'" *Id.* (quoting *Arthurs v. Metropolitan Life Ins. Co., 760 F. Supp. 1095, 1098 (S.D.N.Y. 1991)).*

Plaintiff argues that the Plan did not grant discretionary authority to Hartford to determine benefit eligibility. (Pl. Mem. at 3-4.) She points out that her employer, Pharmanet, Inc., and not Hartford, is listed as the Plan Administrator. (Pl. Mem. at 4.) Defendants argue that discretionary authority is given to Hartford through language in the Policy that states: "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [Policy]." (Def. Mem. at 12.)

A plan regulated by ERISA must, *inter alia,* "describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan." *29 U.S.C. § 1102(b)(2).* It [*23] can do this by "expressly providing for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." *29 U.S.C. § 1105(c)(1).* [8] Pharmanet, Inc., as Plan Administrator, does not explicitly grant discretionary authority to Hartford in the three documents that comprise the Summary Plan Description ("SPD") required by ERISA (*e.g.,* the Policy, the Conforming Instrument, and the Statement of ERISA Rights). (*See* AR 43.) However, after analysis, there is no ambiguity as to whether discretionary authority was delegated to Hartford.

[8]  Further,

> the term 'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

*29 U.S.C. § 1102(a)(2).*

[*24] In this Circuit, an employee welfare benefit plan need not include "magic words" such as "deference" or "discretion" to demonstrate that it delegated discretionary authority to the plan administrator or plan fiduciary. *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).* However, the grant of discretion to the administrator must be clear. *Kinstler v. First Reliance Standard Life Insurance Co., 181 F.3d 243, 251 (2d Cir. 2000).* In the recent case of *Nichols v. Prudential Ins. Co., 406 F.3d 98 (2d Cir. 2005),* the court stated: "Examples of such clear language include authorization to 'resolve all disputes and ambiguities,' or make benefits determinations 'in our judgment.' In general, language that establishes an objective standard does not reserve discretion, while language that establishes a subjective standard does." *406 F.3d at 108* (citations omitted).

Here, the plan informs participants that "the benefits described in your booklet are provided under a group plan by the Insurance Company and are subject to the terms and conditions of that plan." (AR 44.) It also states, under [*25] the heading, "Type of Administration," "The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group policy." *Id.* The Policy, in turn, states that Hartford, the issuer of the Policy, has "full discretion and authority to determine eligibility." (*See* AR 42.) Accordingly, the "magic words" do appear in the policy. *See Winkler v. Metro. Life Ins. Co., 340 F. Supp. 2d 411, 2004 U.S. Dist. LEXIS 16866, at *5 (2004)* ("because the SPD invests [the Insurance Company] with authority to evaluate claims and to review participant's appeals, [it] is a fiduciary for purposes of ERISA and the SPD's reservation of discretionary authority applies to [it]"). Moreover, courts in this Circuit and beyond, have read the exact language in Hartford's plan quoted above as a grant of discretionary authority from the plan to Hartford. *Winter, 309 F. Supp.2d at 413-14; Tripp v.*

*Hartford Life and Accident Ins. Co., 337 F. Supp. 2d 196, 2004 U.S. Dist. LEXIS 18881, at \*12 (D. Me. 2004); Johnston v. Hartford Life and Accident Ins. Co., 2004 U.S. Dist. LEXIS 16683, at \*25 (E. [\*26] D. Pa. August 19, 2004); see also McLeod v. Hartford Life and Accident Ins. Co., 372 F.3d 618 (3d Cir. 2004)* (applying a heightened deferential standard as opposed to *de novo review,* in accordance with Third Circuit precedent, to review claim with similar plan language). [9] Plaintiff's argument therefore fails; discretionary authority was granted to Hartford in the language of the plan. As a result, the Court will review Hartford's decision applying the arbitrary and capricious standard.

> [9]   Also, in cases where a claimant challenges the denial of benefits by Hartford, the parties have agreed to the arbitrary and capricious standard of review. *See O'Reilly v. Hartford Life and Accident Ins. Co., 272 F.3d 955 (7th Cir. 2001); Seddon v. Wal-Mart Stores, Inc., 174 F. Supp. 2d 991, 996 (W.D. Mo. 2001).*

Plaintiff also argues that Hartford's untimely review of her appeal demonstrates that they failed to exercise their discretion, and therefore she is [\*27] entitled to *de novo* review of her claim. (Pl. Mem. at 4-5.) The language of the Plan (*see* AR 46), and ERISA regulations, *29 C.F.R. § 2560.503-1(h)* [10], require that the plan make a decision on an appeal of a denial of benefits within sixty days and, should special circumstances require and if written notice is provided to the claimant, the plan has another sixty days to review the claim. Even with clear guidance from the federal regulations, there is a conflict among courts regarding the consequences of not meeting these deadlines. *Compare Jebian v. Hewlett-Packard Emp. Ben. Org. Income Protection Plan, 349 F.3d 1098, 1107-08 (9th Cir. 2003), cert. denied, 125 S. Ct. 2956, 162 L. Ed. 2d 887, 2005 U.S. LEXIS 5037 (June 27, 2005)* (holding that the administrator's failure to communicate with plaintiff until 119th day of the 120-day review period subjects that decision to *de novo* review); *Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)* (adopting a substantial compliance rule where "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential [\*28]   violations of the deadlines...would not entitle the claimant to *de novo* review."); and *Gritzer v. CBS, Inc., 275 F.3d 291, 295-96 (3d Cir. 2002); with Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993)* (applying the arbitrary and capricious standard, holding, "in our view, the standard of review is no different whether the claim is actually denied or is deemed denied" by virtue of the administrator's failure within sixty-days); and *McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1031 (8th Cir. 2000)* ("the mere presence of procedural irregularity is

not enough to strip a plan administrator of the deferential standard of review").

> [10]   In relevant part, the regulation provides:

> > the plan administrator shall notify a claimant ...of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60-day period. In no event shall such extension exceed a period of 60 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review.

> > *29 C.F.R § 2560.503-1(h)(1) (2001).*

[\*29]   In *Nichols,* the Second Circuit rejected the substantial compliance approach used in *Gilberston* where the administrator argued that plaintiff's federal claim should be dismissed for failure to exhaust her administrative remedies although it failed to decide plaintiff's appeal before the expiration of the regulatory deadline. *See Nichols, 406 F.3d at 107.* The court found that permitting the administrator to avoid the consequences of its failure to comply with regulatory deadline could effectively block the claimant's access to the federal courts. *Id.* Yet, the court explicitly declined to foreclose the application of the substantial compliance exception in situations such as the one presented here. *Nichols, 406 F.3d at 109.* In fact, it stated that "there may be good equitable and policy reasons for a substantial compliance exception to our holding today that may even be sufficient to overcome our analysis of the requirement of Firestone." *Id. at 109-110* (citing *Gilbertson, 328 F.3d at 634-36*).

2005 U.S. Dist. LEXIS 41753, *

Defendants cite *Campanella v. Mason Tenders' District Council Pension Plan*, 299 F. Supp. 2d 274 (S.D.N.Y. 2004), [*30] aff'd on other grounds, 132 Fed. Appx. 855, 2005 U.S. App. LEXIS 3081 (Feb. 22, 2005), as support for their argument that the Court should apply the arbitrary and capricious standard despite their untimely notification of the denial of Plaintiff's benefits on either appeal. (Def. Mem. at 9.) After reviewing the conflicting authority, the *Campanella* court pointed to the fact that although the Trustees were late in making their decision, they did give the claimant the benefit of a written decision explaining the reasons for their denial, at the claimant's request, prior to the commencement of the suit. *Id. at 290.* This approach is consistent with the policy underlining the regulations. *See Gilbertson, 328 F.3d at 635* ("ERISA's procedural regulations are meant to promote accurate, cooperative, and reasonably speedy decision-making."). Also, in *Nichols v. Prudential Ins. Co., 306 F. Supp.2d 418 (S.D.N.Y. 2004), vacated on other grounds, 406 F.3d 98 (2d Cir. 2005)*, the district court wrote that "when the administrator identifies appeals that may warrant additional scrutiny and begins in good faith to investigate and consider [*31] that claim within a period manifesting substantial compliance with the regulatory limits and notifies the claimant that it is doing so, that process should be allowed to run its course for a reasonable time, as long as the administrator continues to exhibit good faith." *Nichols, 306 F. Supp. 2d at 423.* Thus, the case law in this Circuit indicates that where the administrator communicates with the claimant regarding the status of her appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines may be excused.

Here, Hartford was in substantial compliance with the regulatory deadline. Although Plaintiff claims that she submitted her first appeal on June 6, 2001, did not receive a decision until December 10, 2001, requested decision on her second appeal on May 28, 2002, and did not receive a decision until November 20, 2002, the record demonstrates that this dry recitation of dates obfuscates the true circumstances surrounding the adjudication of Plaintiff's appeals. With respect to her first appeal, once Hartford received medical records from Dr. Prasad on October 11, 2001--three and half months after it [*32] requested them, the parties were in regular contact such that Plaintiff's counsel's last letter to Hartford in support of her appeal is dated fifty-two days before Hartford made its decision. (*See* AR 466; 473-74.) Regarding her second appeal, after Hartford forwarded her file to BMI for an independent review in July 2002, it did not receive information from Dr. Levine, Plaintiff's treating physician, until August 26, 2002 although it was requested five weeks earlier. (*See* AR 215; 188-90.) After BMI submitted its report in September 2002, Hartford sought to contact Dr. Prasad to confirm whether the pre-existing

condition limitation in the Policy should apply to Plaintiff's claim. After numerous failed attempts, [11] when Hartford contacted Plaintiff for assistance in contacting Dr. Prasad, she was initially resistant. Although Plaintiff soon thereafter agreed to cooperate, Hartford made its decision without Dr. Prasad's information four weeks later.

> 11   BMI informed Hartford that it had attempted to reach Dr. Prasad six times in September 2002, one time in October 2002, and another time in November 2002 to no avail. (AR 146-47.)

[*33]   The pattern of interaction between the parties demonstrates that Plaintiff sought and waited for Hartford to exercise its discretion, and that she relied on this exercise before coming to this Court. It also shows that the delays in making determinations on her claims cannot be characterized as dilatory or as evidencing bad faith on the part of Hartford. As a result, the delay was nugatory, and should not be held against the Defendants.

Plaintiff also suggests that Defendants' denial should not be reviewed under the *de novo* standard because there may be a conflict of interest where the plan administrator determines entitlement as well as pays the claim. (Pl. Mem. at 8-9.) Specifically, Plaintiff alleges that because Hartford denied her access to Dr. Yarosh's report before making their final determination on her second appeal, they acted in an adversarial manner, and therefore demonstrated a conflict of interest. (Pl. Mem. at 8.) To prevail on this argument, Plaintiff must show that the determination made by Hartford was unreasonable or that Hartford was influenced by this conflict. *Sullivan v. LTV Aero. & Defense Co., 82 F.3d 1251, 1255-1256 (2d Cir. 1996).* In [*34] addition, she has the burden of "showing that the administrator was in fact influenced by the conflict of interest." *Snyder v. First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS 16258, at *7 (W.D.N.Y. Aug. 4, 2004), aff'd, 144 Fed. Appx. 134, 2005 U.S. App. LEXIS 14874 (2d Cir. July 13, 2005) (citing Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000)).* Plaintiff's evidence of a conflict of interest is based on conclusory allegations and therefore does not suffice to meet her burden. Accordingly, the Court will review the denial of Plaintiff's claim under the arbitrary and capricious standard. [12]

> 12   Yet, in accordance with the Supreme Court's decision in *Firestone*, the Court will consider this conflict of interest in applying the arbitrary and capricious standard to review Hartford's denial of Plaintiff's claim. *See Firestone, 489 U.S. at 115* ("If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 66 of 79

Page 9
2005 U.S. Dist. LEXIS 41753, *

weighed as a factor in determining whether there is an abuse of discretion.") (internal quotation marks omitted).

[*35]   C. Adjudication of Plaintiff's Claim

As discussed above, Plaintiff's claim must be reviewed under the arbitrary and capricious standard. Under this standard, the scope of review of the plan's decision is narrow. *Celardo v. GNY Automobile Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003).* Although the court must consider "whether the decision was based on a consideration of the relevant factors," *Jordan, 46 F.3d at 1271,* the court "may overturn a plan administrator's decision to deny benefits only if the decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo, 319 F.3d at 146 (quoting Pagan, 52 F.3d at 442).* The Second Circuit defines substantial evidence as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by [the Plan] and...requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995).* Further, the court may not "substitute its judgment for that of the [plan administrator] to determine eligibility anew." *Pagan, 52 F.3d at 442.* [*36]   Accordingly, on a summary judgment motion, the Court will uphold the administrator's decision "unless it is not grounded on any reasonable basis." *Scannell v. Metropolitan Life Ins. Co, 2003 U.S. Dist. LEXIS 20749, at *19 (S.D.N.Y. Nov. 18, 2003)* (internal quotation marks omitted).

Under the terms of the Plan, Plaintiff had to establish that from May 22, 2000 to August 22, 2002, she was unable to perform "one or more of the Essential Duties" of being a Medical Writer, and from August 2002 to the present, she was unable to perform "one of more of the Essential Duties of Any Occupation." (AR 30.) Plaintiff argues that Hartford "relied upon [a] selective review of medical evidence" to determine that she was not disabled during these time periods, and was therefore arbitrary and capricious. (Pl. Mem. at 9-11.) However, Hartford was under no obligation to "accord special weight to the opinions of a claimant's physician" and did not have the "discrete burden of explaining when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).* Moreover, a decision to deny [*37]   ERISA benefits is neither arbitrary or capricious where it is "essentially a decision to value the opinion of its independent physician above the opinion of Plaintiff's physician." *Solaas, 2005 U.S. Dist. LEXIS 5269, at * 8.* In light of the voluminous record before the Court, it appears that Hartford reviewed all of the material it could obtain from the mul-

titude of doctors who examined Plaintiff, and simply credited the reports of its Associate Medical Director, Dr. Malievskaia, and the independent medical review of Dr. Yarosh to find that Plaintiff was not disabled within the meaning of the Policy. This decision is not unreasonable. *See id.*

In addition, it is reasonable for the administrator to require an objective component to proof of disability. *See Maniatty v. UNUMProvident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), aff'd, 62 Fed. Appx. 413 (2nd Cir. 2003), cert. denied, 540 U.S. 966, 124 S. Ct. 431, 157 L. Ed. 2d 310 (2003)* ("the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that 'proof of continued disability must be provided, and the very concept of proof connotes objectivity"); [*38]   *Alakozai v. Allstate Ins. Co., 2000 U.S. Dist. LEXIS 3816, at *19 (S.D.N.Y. Mar. 28, 2000).* With respect to Plaintiff's claim, although CFS is a "debilitating illness" that is "often difficult to diagnose...[It] is not arbitrary and capricious to deny a difficult-to-prove claim that has not objectively been shown to exist...A physician's statement that a physician feels he is disabled is not enough, nor is a physician's conclusion, without supporting objective medical evidence, that a patient probably has CFS." *Michele v. NCR Corporation, 1995 U.S. App. LEXIS 11608, at *8 (6th Cir. May 15, 1995).* Further, the burden is on the Plaintiff to establish that she was disabled within the meaning of the plan. *Mario v. P & C Food Mkts., 313 F.3d 758, 765 (2d Cir. 2002).* Although Plaintiff provided objective medical evidence to support her claim, *e.g.* the results of her laboratory and neuro-cognitive testing, it is reasonable for Hartford to have concluded that that evidence was insufficient. Likewise, it was reasonable for it to heed the conclusions of Dr. Malievskaia and Dr. Yarosh that there was not enough objective evidence to establish [*39]   that Plaintiff was disabled within the meaning of the Policy. Consequently, Plaintiff has failed to meet her burden to establish that Hartford was unreasonable in denying her claim for disability benefits.

CONCLUSION

The Court considers the parties' motions for judgment on the administrative record as cross-motions for summary judgment. Since discretionary authority was granted to Hartford by the terms of the plan, the Court applies the arbitrary and capricious standard to review of Hartford's decision to deny Plaintiff's long-term disability benefits. Applying this deferential standard, it was reasonable for Hartford to deny Plaintiff's benefits claim. Thus, Plaintiff's motion is denied and Defendants' motion for summary judgment dismissing the complaint is granted.

2005 U.S. Dist. LEXIS 41753, *

**SO ORDERED.**

    SANDRA L. TOWNES

    UNITED STATES DISTRICT JUDGE

Dated: August 23, 2005

Brooklyn, NY



FOCUS - 1 of 1 DOCUMENT

**PAT RASILE, Plaintiff, - against - LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, d/b/a LIBERTY MUTUAL, Defendant.**

**03 Civ. 4316 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 11754*

**June 28, 2004, Decided
June 28, 2004, Filed**

**PRIOR HISTORY:** *Rasile v. Liberty Life Assur. Co., 2004 U.S. Dist. LEXIS 9940 (S.D.N.Y., June 1, 2004)*

**DISPOSITION:**   [*1]  Plaintiff awarded judgment against defendant plus prejudgment interest.

**COUNSEL:** For Plaintiff: Mark Scherzer, Esq., Law Office of Mark Scherzer, New York, NY.

For Defendant: Michael Zaretsky, Chorpenning, Good, Carlet & Zaretsky, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

   **MEMORANDUM**

   **NAOMI REICE BUCHWALD**

   **UNITED STATES DISTRICT JUDGE**

   On June 1, 2004, we issued an order granting plaintiff's motion for summary judgment and directing plaintiff to submit a proposed judgment on notice.

   We have reviewed the parties' submissions outlining their dispute over the proper time period over which to calculate damages and the appropriate prejudgment interest rate to apply. As for defendant's argument that our calculation should only span the period from defendant's cessation of payments to the close of the administrative record in November, 2002, we find that such an approach would be contrary to our holding in this case. Specifical-

ly,  [*2]  our June 1, 2004 opinion held that plaintiff was entitled to continue receiving benefits *unless and until,* at some point in the future, defendant develops a record demonstrating that plaintiff is able to work in an appropriate position with reasonable continuity. Defendant's proposal is also inconsistent with *"ERISA's* remedial purpose of protecting plan beneficiaries." *Lauder v. First Unum Life Ins. Co., 284 F.3d 375, 382 (2d Cir. 2002).*

   On the issue of what interest rate to apply, we find that the federal prime rate for the period in question, which has frequently been applied by courts in ERISA cases, will appropriately compensate plaintiff for the delay in receiving his benefits. *See, e.g., Curtin v. Unum Life Ins. Co., 298 F. Supp. 2d 149, 159 (D. Maine 2004); Deal v. Prudential Ins. Co. of America, 263 F. Supp.2d 1138, 1143-44 (N.D. Ill. 2003)* (citing *Fritcher v. Health Care Serv. Corp., 301 F.3d 811, 820 (7th Cir. 2002)); Wilkes v. UNUM Life Ins. Co. of America, 2002 U.S. Dist. LEXIS 8763, No. 01-C-182-C, 2002 WL 32345374, *2 (W.D. Wis. Jan. 29, 2002).*

   Accordingly, plaintiff is awarded judgment against defendant in the principal [*3]  sum of $ 34,992.49, for long term disability benefits accrued during the period from November 1, 2002 through May 31, 2004, plus prejudgment interest in the sum of $ 1214.46, for a total judgment of $ 36,206.95. The Clerk of the Court is respectfully requested to enter judgment in accordance with this memorandum and our decision of June 1, 2004.

**IT IS SO ORDERED.**

   DATED: June 28, 2004

2004 U.S. Dist. LEXIS 11754, *

NAOMI REICE BUCHWALD                    UNITED STATES DISTRICT JUDGE



**WILLIAM WEDGE, Plaintiff, -v.- THE SHAWMUT DESIGN AND CONSTRUC-
TION GROUP LONG TERM DISABILITY INSURANCE PLAN and RELIANCE
STANDARD LIFE INSURANCE COMPANY, Defendants.**

**12 Civ. 5645 (KPF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2013 U.S. Dist. LEXIS 129119*

**September 10, 2013, Decided
September 10, 2013, Filed**

**SUBSEQUENT HISTORY:** Summary judgment
granted by *Wedge v. Shawmut Design & Constr. Group
Long Term Disability Ins. Plan, 2014 U.S. Dist. LEXIS
75560 (S.D.N.Y., June 2, 2014)*

**COUNSEL:** [*1] For William Wedge, Plaintiff: Mark
Peter Scherzer, The Law Office of Mark Scherzer, New
York, NY.

For The Shawmut Design and Construction Group Long
Term Disability Insurance Plan, Reliance Standard Life
Insurance Company, Defendants: Emily Anna Hayes,
LEAD ATTORNEY, Wilson, Elser, Moskowitz, Edel-
man & Dicker, (WPls), White Plains, NY; Joshua
Bachrach, LEAD ATTORNEY, Wilson, Elser, Mos-
kowitz, Edelman & Dicker LLP (PA), The Curtis Center
Independence Square West, Philadelphia, PA.

**JUDGES:** KATHERINE POLK FAILLA, United States
District Judge.

**OPINION BY:** KATHERINE POLK FAILLA

**OPINION**

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

On July 24, 2012, Plaintiff William Wedge com-
menced this litigation under the Employee Retirement
Income Security Act of 1974 ("ERISA") against the
Shawmut Design and Construction Group Long Term

Disability Insurance Plan (the "Shawmut Plan") and Re-
liance Standard Life Insurance Company ("RSLI") (col-
lectively, "Defendants") to contest a denial of benefits by
RSLI. Pending before the Court is the preliminary ques-
tion of what standard the Court should apply in evaluat-
ing RSLI's decision to deny Plaintiff benefits. For the
reasons set forth in remainder of this Opinion, the Court
will [*2] apply a deferential "arbitrary and capricious"
standard.

**FACTUAL BACKGROUND**[1]

1   The facts contained in this Opinion are drawn
from Plaintiff's Complaint in this matter (Dkt. #
1), as well as from the undisputed factual asser-
tions contained in the parties' letters to the Court
concerning the standard of review, which letters
are dated March 4, 2013 (Dkt. # 23), April 26,
2013 (Dkt. # 26), and May 2, 2013 (Dkt. # 27).

**A. Plaintiff's Employment with Shawmut**

Plaintiff was an employee of Shawmut Design and
Construction ("Shawmut"), a construction management
firm. (Compl. ¶¶ 3, 10, 17). Shawmut established and
maintained the Shawmut Plan, a benefit plan for its em-
ployees. (Compl. ¶ 3). The Shawmut Plan, in turn, pur-
chased Group Long Term Disability Policy No. 114007
(the "Policy") from RSLI to provide long-term disability
benefits to Shawmut Plan beneficiaries. (Compl. ¶ 5).
Under this arrangement, Shawmut was the Shawmut
Plan's Sponsor and Administrator, and RSLI was the
Claim Administrator. (Compl. ¶¶ 12-13). As a Shawmut

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 71 of 79

Page 2
2013 U.S. Dist. LEXIS 129119, *

employee, Plaintiff was a beneficiary of, and received coverage under, the Shawmut Plan. (Compl. ¶¶ 10-11).

**B. Plaintiff's Disability**

In February 2009, while Plaintiff was employed [*3] as a Senior Project Manager at Shawmut, he began to experience visual difficulties that included a "loss of depth perception and a right paracentral scotomoa, which was later diagnosed as resulting from Central Serous Chorioretinopathy ('CSCR')." (Compl. ¶¶ 14-15). The CSCR caused Plaintiff to lose central vision in his right eye, which loss makes it difficult for Plaintiff to focus on computer screens for longer than 20 minutes and written text for more than one hour, causes headaches, and has resulted in Plaintiff experiencing neck tension, musculoskeletal pain, and difficulty focusing on moving objects or images. (Compl. ¶ 16). Due to the consequent impairments from the CSCR, Plaintiff ceased working for Shawmut on March 26, 2009. (Compl. ¶17).

**C. Plaintiff's Coverage Under the Plan**

Under the Shawmut Plan, Plaintiff was entitled to disability benefit payments ("Regular Occupation Benefits") after a 90-day elimination period if, during that elimination period and for the first 24 months thereafter in which Plaintiff was disabled, he could not perform the material duties of his regular occupation. (Compl. ¶ 18). After the expiration of the Regular Occupation Benefits period, the Shawmut [*4] Plan entitled Plaintiff to disability benefit payments ("Any Occupation Benefits") if he could not perform the material duties of any occupation that Plaintiff's "education, training, or experience will reasonably allow." (Compl. ¶ 18).

Plaintiff sought benefits under the Shawmut Plan to cover his CSCR-related disability, and on or about April 8, 2010, RSLI approved Plaintiff for Regular Occupation Benefits (retroactive to June 25, 2009) based on findings that (i) Plaintiff's occupation required visual acuity, depth, color perception, working near machinery, using computers 70% of the time, and traveling by plane or automobile 35% of the time, all of which were impacted by his CSCR; and (ii) Plaintiff's physician's opinion supported Plaintiff's claims of continued functional impairment. (Compl. ¶ 22). After the Regular Occupation Benefits period expired, on June 25, 2011, RSLI terminated Plaintiff's disability benefits, finding that Plaintiff did not satisfy the requirements for Any Occupation Benefits. (Compl. ¶ 24). Specifically, RSLI found that Plaintiff appeared "capable of sedentary work activity," and that "based on the available medical information as well as information about [*5] [Plaintiff's] training, education and experience," RSLI determined that Plaintiff could be employed as an Account Executive, Media Planner, or Estimator. (Id.).

**D. Plaintiff's Appeal from RSLI's Termination of Benefits**

On or about December 20, 2011, nearly six months after RSLI found that Plaintiff did not qualify for Any Occupation Benefits, Plaintiff appealed RSLI's decision. (Compl. ¶ 25). Approximately three weeks later, on January 12, 2012, RSLI contacted Plaintiff to request that he submit to an independent medical examination ("IME"), scheduled for February 7, 2012, with Dr. Robert Josephberg. (Compl. ¶ 26). Plaintiff agreed to submit to the IME on the condition that RSLI provide him with the opportunity to review and respond to Dr. Josephberg's report. (Compl. ¶ 28). Despite RSLI having no obligation to do so, it agreed to Plaintiff's request. (Dkt. # 23 at 10). When RSLI granted Plaintiff's request, it also informed Plaintiff that "the time for its final decision will remain tolled until such time as the investigation is completed and RSL[I] has issued a final decision." (Id.).[2] Although Plaintiff objected to RSLI's tolling of the time period, RSLI nonetheless provided Plaintiff [*6] with a copy of Dr. Josephberg's report to review, while maintaining its position that the time period within which it had to render a decision was tolled. (Id.).

> 2   The Court does not necessarily accept RSLI's legal conclusion that RSLI had authority to toll the time period until a final decision was made, but it need not decide this issue in order to determine what standard of review applies.

By letter dated January 24, 2012, Plaintiff sent RSLI a copy of the Social Security Administration's ("SSA") "Notice of Decision -- Fully Favorable," dated January 20, 2012. (Compl. ¶ 27). The notice approved Plaintiff's claim for social security benefits, based upon a finding that no jobs existed "in significant numbers in the national economy" that Plaintiff could perform. (Id.). On February 6, 2012, RSLI notified Plaintiff that it would take the full 90 days allowed under ERISA to decide the appeal, exclusive of any periods of time that it believed were tolled while waiting for or considering information from Plaintiff. (Dkt. # 23 at 10). Three days later, on February 9, 2012, RSLI requested a copy of the SSA's medical evaluation, which Plaintiff submitted to RSLI the same day. (Compl. ¶29).

Dr. [*7] Josephberg conducted the IME on February 7, 2012, and RSLI provided Plaintiff with a copy of Dr. Josephberg's report on February 24, 2012, for review and comment. (Compl. ¶¶ 28, 30). At that time, RSLI requested that Plaintiff provide any response to the IME report, including the submission of any new records, within 30 days. (Dkt. # 23 at 10). Shortly before the 30-day deadline, Plaintiff's counsel requested an extension through April 13, 2012, to submit a response, to

which RSLI agreed. (*Id.*). Plaintiff failed to submit a complete response by the extended deadline. Instead, he submitted his response in three tranches, by letters dated April 12, 20, and 24, 2012, of which only the first letter was timely. (Compl. ¶ 31). Upon receipt of Plaintiff's entire response, RSLI provided the information to Dr. Josephberg, who issued a supplemental IME report dated May 9, 2012, that RSLI received sometime between May 9 and 25, 2012. (Dkt. # 23 at 11).[3]

> 3   The parties dispute the date on which RSLI received the supplemental IME report. Plaintiff contends that the report was received on or about May 9, 2012 (Dkt. # 26 at 3), while Defendants maintain that they did not receive the report until after   [*8] May 25, 2012 (Dkt. # 23 at 11).

Also around May 25, 2012, Plaintiff's counsel contacted RSLI, and was informed that the supplemental IME report was expected to be issued imminently. (Compl. ¶ 35). According to Plaintiff's Complaint, in the month that followed, Plaintiff's counsel left voicemails with an RSLI appeals manager on or about June 8, 14, and 15, 2012; attempted without success to contact RSLI on June 20 and 21, 2012; and submitted a letter to RSLI around June 28, 2012, outlining the chronology of counsel's communications with RSLI and contending that Plaintiff had exhausted his administrative remedies under ERISA. (Compl. ¶¶ 36-39).

Assuming that the time period was tolled between February 24, 2012 (when RSLI provided Plaintiff with Dr. Josephberg's report), and April 25, 2012 (when Plaintiff submitted his final response to the report),[4] RSLI's decision was due by May 19, 2012. (Dkt. # 26 at 3). RSLI issued its decision denying Plaintiff's appeal on August 6, 2012, 79 days after the decision was due, and 13 days after Plaintiff filed his Complaint. (Dkt. # 1; *see also* Dkt. # 26 at 3). The decision is included in the Administrative Record for Plaintiff's case. (Dkt. # 23 at [*9] 8).

> 4   Plaintiff acknowledges that this may be the case. (*See* Dkt. # 26 at 3).

### E. The Instant Litigation

On July 24, 2012, Plaintiff commenced this lawsuit against Defendants, claiming that RSLI had improperly terminated his disability benefits and found him ineligible for Any Occupation Benefits. Plaintiff seeks damages for all unpaid disability benefits under the Policy from the time RSLI terminated his benefits on June 25, 2011, until the date a judgment is issued in this case. (Dkt. # 1).

Discovery was completed on April 12, 2013, and the parties anticipate filing dispositive motions. In contemplation of such motions and in resolving the Parties' discovery disputes, the Court raised the issue of the appropriate standard of review to apply to RSLI's denial of Plaintiff's benefits. (Dkt. # 18). In this regard, on January 8, 2013, the Court ordered the parties to submit a joint letter as to whether a *de novo* or an arbitrary and capricious standard would apply. (*Id.*). The parties submitted the joint letter on March 1, 2013. (Dkt. # 23). Subsequently, on March 15, 2013, the Court ordered each party to submit a supplemental letter brief addressing the proper standard of review. (Dkt. # 25). [*10] The parties complied, and the letters were fully submitted on May 2, 2013. (Dkt. # 27).

Significantly, both parties agree that, under the terms of the Shawmut Plan, claims decisions made by RSLI would ordinarily be subject to review under an arbitrary and capricious standard, in light of the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)*, because the Shawmut Plan vests discretion in RSLI. (*See* Dkt. # 26 at 1; Dkt. # 27 at 1). From this common ground, the parties' positions diverge markedly. Plaintiff contends that any deference to which RSLI's decision would otherwise be entitled was forfeited "because [RSLI] did not exercise its discretion in the time or manner required by ERISA" (Dkt. # 26 at 1), and further argues that the "substantial compliance" doctrine used by other courts as a means of preserving deferential review is legally and factually inapposite (*id.* at 2-5). In so doing, Plaintiff relies heavily on *Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 109 (2d Cir. 2005)*, in which the Second Circuit announced an exception to Firestone's deferential review standard for cases in which the plan administrator has discretion, but fails   [*11] to exercise it. Distilled to its essence, Plaintiff's position is that because RSLI did not render a decision within the mandated timeframe, *Nichols* requires that *de novo* review be applied, and no exceptions to that requirement are warranted. (Dkt. # 23, 26).

Defendants, by contrast, argue that the Supreme Court has recognized no exceptions to the deferential review standard established in *Firestone*, and that because the Shawmut Plan grants RSLI discretionary authority, RSLI's termination of Plaintiff's benefits must be reviewed under an arbitrary and capricious standard. Defendants support these arguments with decisions from other courts that have applied a deferential review standard, even for untimely decisions. (Dkt. # 27). Defendants alternatively argue that this Court should adopt the substantial compliance doctrine, under which the Court would apply a deferential standard were it to find that RSLI substantially complied with the ERISA regulations regarding the timing of Plaintiff's appeal. *See generally LaAsmar v. Phelps Dodge Corp. Life, 605 F.3d 789, 799*

*(10th Cir. 2010)* ("If [the] court concluded that the administrator's decision was in substantial compliance with ERISA deadlines, [*12] then, if otherwise warranted, we would still afford deference to the benefits decision.").

## DISCUSSION

### A. Review of Eligibility Determinations Under ERISA

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Fay v. Oxford Health Plan, 287 F.3d 96, 103 (2d Cir. 2002).* The Supreme Court has made clear, however, that courts are to review challenges to a denial of benefits pursuant to ERISA under a *de novo* standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone, 489 U.S. at 115; see also Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)* ("Where the plan ... grant[s] the administrator or fiduciary discretionary authority to determine eligibility for benefits, trust principles make a deferential standard of review appropriate." (internal citations omitted)). Thus, where the administrator or fiduciary is granted discretionary authority, an arbitrary and capricious standard applies. *Firestone, 489 U.S. at 111; see also Duncan v. Cigna Life Ins. Co. of New York, 507 Fed. Appx. 61, 62 (2d Cir. 2013)* [*13] (summary order) ("Where a plan gives the administrator 'authority to determine eligibility for benefits or to construe the terms of the plan,' we review the administrator's interpretation of benefits for abuse of discretion." (quoting *Firestone, 489 U.S. at 115)*).

The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since "the party claiming deferential review should prove the predicate that justifies it." *Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 230 (2d Cir. 1995).*

### B. Analysis

The continuing vitality of the Second Circuit's decision in *Nichols* is far from clear. *Nichols* was decided under an earlier set of ERISA regulations, and the Second Circuit has repeatedly declined to decide whether and to what extent its teachings in *Nichols* apply to the current regulations, which were amended in 2000 and made effective as of 2002. Perhaps more importantly, *Nichols* is at odds with the Supreme Court's post-*Firestone* precedent. Given this confluence of post-*Nichols* developments, the Court finds that an arbitrary and capricious standard applies.

Even were *Nichols* found to have precedential force, it would not compel a finding of *de novo* [*14] review in this case. The Court in *Nichols* was concerned, and understandably so, with a plan administrator's refusal to issue a decision on a claimant's appeal, which refusal operated to deny the claimant access to the courts. Here, the potential for denial of access to the courts has been addressed by amendments to ERISA's regulations, and the record in its totality demonstrates that RSLI fairly attempted to resolve Plaintiff's claims, maintained a dialogue with Plaintiff, and issued a decision shortly after this litigation was filed and well before the Court needed to consider the standard of review. In analogous circumstances, courts have found that such efforts merit deferential review of the plan administrator's decision.

### 1. *Nichols'* Exception to the *Firestone* Rule

ERISA requires that an appeal determination be made within 45 days from the time an appeal is filed; if the claim administrator determines that additional time is required, one extension of 45 days may be permitted when written notice of the extension is provided to the claimant prior to the termination of the initial 45-day period that indicates the special circumstances requiring the extension and the date on which a [*15] decision is expected. *29 C.F.R. § 2560.503-1(i)(3) (2013)* (read in conjunction with *§ 2560.503-1(i)(1)).* Any extension, however, may not exceed a period of 45 days from the end of the initial period, *i.e.,* 90 days from the time the appeal is filed. *Id.* Because the appeal decision was issued on August 6, 2012, it was untimely under the regulations, a fact Defendants do not dispute.

Plaintiff relies primarily on the Second Circuit's decision in *Nichols* to argue that *de novo* review applies. (Dkt. # 23, 26). In *Nichols,* the Court assessed what standard of review should apply to a denial of benefits for a plan that granted the administrator discretionary authority under the pre-2002 version of ERISA. Under that version, if an appeal decision did not issue within the regulatory prescribed time period, the claim was "deemed denied on review." *29 C.F.R. § 2560.503-1(h)(4) (1999).*

The plan administrator in *Nichols* failed even to acknowledge the claimant's appeal until after the time period specified by the regulations had expired. When the administrator did provide notice of the appeal, it informed the claimant that it would not resolve the appeal until the claimant submitted certain medical [*16] records. The claimant refused to comply with the request and filed suit in federal court. The administrator, as a result, never issued an appeal decision. *Nichols, 406 F.3d at 101-02.*

Building on the Supreme Court's decision in *Firestone*, the *Nichols* Court held that it "may give deferential review only to actual exercises of discretion, and that a 'deemed denied' claim is not denied by an exercise of discretion[,] but by operation of law" on the day after the regulations require a decision be issued. *Nichols, 406 F.3d at 101-02*. From this, the Court concluded that "the lack of discretion vested in the plan administrator, or alternatively, failure to exercise any such discretion, requires *de novo* review of the denial of benefits." *Id. at 101*. Without any decision to which to defer, the Court held that *de novo* review would apply.

## 2. The Impact of Post-*Nichols* Developments in ERISA

Preliminarily, it is unclear that *Nichols* controls (or, indeed, influences) the instant decision. A review of the *Nichols* decision makes clear that the Court's principal concern was the possibility that a plan administrator could refuse to decide a claimant's appeal and, by that inaction, prevent the claimant [*17] from obtaining judicial review of the matter. *See 406 F.3d at 106* (noting that prior decisions "strongly suggest that a plan administrator's failure to adhere literally to the regulatory deadlines renders the claimant's administrative remedies exhausted by operation of law and consequently permits the claimant to seek review in the federal courts without further delay"); *id. at 107* (distinguishing several "substantial compliance" cases on the basis that they "assume the plaintiff's access to the courts and support, rather than undermine, our holding today"); *id.* ("[A]dopting the proposition that substantial compliance can delay accrual of the right to sue would permit plan administrators to indefinitely tie up claimants, who are often in immediate need of benefits, with ongoing requests for information. Such a result would render the plain language of *Section 2560.503-1(h)(1)* a nullity."). These concerns stemmed from the Court's analysis of the pre-2002 version of the ERISA regulations, pursuant to which a plan administrator's failure to issue a decision on a claim for benefits within the specified time frame rendered the claim "deemed denied," *id. at 105* (citing the then-applicable [*18] *29 C.F.R. § 2560.503-1(h)(4)*), but said nothing about the claimant's consequent right to judicial access. *Compare 29 C.F.R. § 2560.503-1(h)(4) (1999)* ("If the decision on review is not furnished within such time, the claim shall be deemed denied on review."), *with 29 C.F.R. § 2560.503-1(l) (2013)* ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to [bring a civil action].").

As amended, ERISA now provides that where a plan administrator fails to "follow claims procedures consistent with the [regulatory] requirements, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue" other remedies available under ERISA. *29 C.F.R. § 2560.503-1(l) (2013)*. The amended regulations take no position on whether a claim is approved or denied upon the expiration of the regulatory time period and, therefore, do not terminate an administrator's authority to exercise its discretion. Rather, by use of the "deemed ... exhausted" language, [*19] the current regulations merely allow the claimant to proceed to court if the administrator does not exercise its discretion within the regulatory timeframe. As a result, the concern about the denial of court access that animated the *Nichols* Court has been obviated by regulation.[5]

5   The statement by the Department of Labor ("DOL") accompanying the amendments indicated that DOL intended them to ensure that "claimants denied access to the statutory administrative review process should be entitled to take that claim to a court under *section 502(a)* of the Act for a full and fair hearing on the merits of the claim." *ERISA Claims Procedures, 65 Fed. Reg. 70246, 70256 (Nov. 21, 2000)*. DOL did not specify a standard of review, but observed that "[t]he Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." *Id.* DOL did not indicate whether any variance from the regulations warranted *de novo* judicial review. In any event, several courts reviewing DOL's statement [*20] have concluded that it merits no deference. *See Kohut v. Hartford Life and Acc. Ins. Co., 710 F. Supp. 2d 1139, 1144-45 (D. Colo. 2008)* (finding DOL's commentary to be entitled to no judicial deference because the language of the amendments was not ambiguous; also observing that "[t]he regulation does not purport to state a standard of review under which such an action will be governed"); *Goldman v. Hartford Life and Accident Ins. Co., 417 F. Supp. 2d 788, 803-05 (E.D. La. 2006)* (concluding that commentary was not entitled to deference under either *Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*, or *Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997)*).

In *Krauss v. Oxford Health Plans, Inc.*, the Second Circuit made clear that it has not decided whether it will apply *de novo* review, and consequently *Nichols*, to the amended version of ERISA. *517 F.3d 614, 624 (2d Cir. 2008)* ("Although amended regulations have replaced the 'deemed denied' provision with one that, upon a defendant's failure to follow regulatory time frames, deems a plaintiff's administrative remedies exhausted, and neither we nor any other circuit has, to our knowledge, addressed whether *de novo* review similarly [*21] applies under the revised regulations, we join our sister circuits in delaying resolution of the question for another day." (internal citation omitted)). In a more recent summary order in *Duncan v. Cigna Life Ins. Co. of New York*, the Court reaffirmed its decision to leave open the issue of whether *de novo* review would apply under the current ERISA regulations, holding instead that a denial of benefits would be properly upheld under either *de novo* or an abuse of discretion review. *507 Fed. Appx. at 63.*[6]

> [6] Despite a superficial similarity to the issues before the Court, the Second Circuit decisions in *Eastman Kodak Co. v. STWB, Inc., 452 F.3d 215 (2d Cir. 2006)*, and *Burke v. Pricewaterhousecoopers LLP Long Term Disability Plan, 572 F.3d 76 (2d Cir. 2009)*, are, in fact, wholly inapposite. In *Kodak*, the Court determined whether, under ERISA, an employee benefit plan participant was required to exhaust an administrative claims procedure that the plan had adopted only after the employee brought an action to recover benefits. *452 F.3d at 216.* To answer this issue, the Court focused solely on whether ERISA's "deemed exhausted" provision, *29 C.F.R. § 2560.503-1(l)*, could be "circumvented by [*22] a plan's belated creation of an ERISA-complaint claims procedure." *Id. at 222.* The Court concluded that it could not, and that the employee need not exhaust such a *post hoc* claims procedure.

> The question before the Court in *Burke* was whether plaintiff's ERISA claim was timely -- the answer to which hinged on whether the claim had accrued when plaintiff's benefits were initially denied or when plaintiff had exhausted her administrative remedies. *572 F.3d at 78-79.* In reciting the district court's opinion, the Court noted its prior holding in *Nichols* simply because the district court had relied on *Nichols* to support its conclusion that the

Second Circuit's "strict adherence" to DOL regulations militated in favor of an accrual date at the time benefits are initially denied. *Id. at 80.* The *Burke* Court neither indicated what standard of review would apply in that case (precisely because the issue was not before the Court) nor decided whether the *Nichols* articulation of the applicable standard of review continued to apply under the amended version of ERISA. Indeed, the Court overlooked its own pronouncement in *Krauss* that it had not decided whether to apply *de novo* review to claims arising [*23] under the amended version of ERISA that are no longer deemed "denied." *Krauss, 517 F.3d at 624.*

> Thus, neither *Kodak* nor *Burke* answered the issue of what standard of review should apply under the amended version of ERISA where, as here, the administrator exercises its discretion in an untimely fashion. Like *Nichols*, and unlike the instant case, both opinions concerned balancing a plaintiff's access to the court with ERISA's regulatory regime. *See Kodak, 452 F.3d at 223* ("Like the *Nichols* court, we reject the idea that the small measure of conformity to the regulatory requirements shown in this case can block or delay a plaintiffs' right to sue."); *Burke, 572 F.3d at 81* ("We hold the district court was correct to enforce the policy-prescribed limitations period in its entirely, including its prescribed start date, and to dismiss [plaintiff's] claim as time-barred because it was brought after the expiration of the limitations period.").

In addition, in recent years, district courts have recognized limits to the Nichols holding occasioned by the amendments to ERISA. *See, e.g., Am. Society for Technion-Israel Inst. of Tech., Inc. v. First Reliance Standard Life Ins. Co.*, No. 07 Civ. 3913 (LBS), 2009 U.S. Dist. LEXIS 82306, 2009 WL 2883598, at *3 (S.D.N.Y. Sept. 8,

*2009)* [*24] ("[T]he *Nichols* case relied upon by Plaintiff considered a prior version of the regulations under which failure to comply with regulatory deadlines meant that the benefits were 'deemed denied.'"). Courts have also limited *Nichols'* application to those cases in which an administrator fails entirely to issue a decision. *See, e.g., Robinson v. Metro. Life Ins. Co., No. 06 Civ. 7604 (LLS), 2007 U.S. Dist. LEXIS 81733, 2007 WL 3254397, at *2 (S.D.N.Y. Nov. 2, 2007)* ("[T]he holding of *Nichols* is limited to those cases where the administrator fails to respond at all, not those cases where the response is tardy. Where the response is merely procedurally tardy, the denial is still owed deference."); *Morgenthaler v. First Unum Life Ins. Co., No. 03 Civ. 5941 (AKH), 2006 U.S. Dist. LEXIS 62688, 2006 WL 2463656, at *3 (S.D.N.Y. Aug. 22, 2006)* (same).

### 3. The Impact of Post-*Firestone* Supreme Court Decisions

Separate and apart from the amendments to ERISA, the force of *Nichols* has been undercut by post-*Firestone* precedent. As Defendants note, the Supreme Court has not recognized any exception to the general rule established in *Firestone* that courts must apply an arbitrary and capricious standard where, as here, the plan grants the administrator or fiduciary [*25] discretionary authority to determine eligibility for benefits. (Dkt. # 27 at 1). These more recent cases include *Metropolitan Life Ins. Co. v. Glenn*, in which the Court declined to require *de novo* review even where a conflict existed, as where the plan administrator both evaluates claims and pays benefits. *554 U.S. at 115.* Even as to those facts, the Court "[did] not believe that *Firestone's* statement implies a change in the *standard* of review, say, from deferential to *de novo* review." *Id.* (emphasis in original).

In its most recent teaching on the issue, the Supreme Court observed that "*Firestone* ... set out a broad standard of deference without any suggestion that the standard was susceptible to *ad hoc* exceptions." *Conkright v. Frommert, 559 U.S. 506, 513, 130 S. Ct. 1640, 176 L. Ed. 2d 469 (2010)*. In *Conkright*, the Supreme Court reversed a Second Circuit decision that, like *Nichols*, had "crafted an exception" to the *Firestone* deference rule, in this case concluding that deferential review did not apply where an administrator had previously construed the same plan terms and the Second Circuit had found that construction to have violated ERISA. *559 U.S. at 513-14* (noting that under the Second Circuit's view, "the District [*26] Court here was entitled to reject a reasonable interpretation of the Plan offered by the Plan Administrator, solely because the Court of Appeals had overturned a previous interpretation by the Administrator," and referring to this approach as "one-strike-and-you're-out").

The Court further elucidated why an arbitrary and capricious standard must apply where an administrator has discretionary authority:

> Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation. It also promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review. Moreover, *Firestone* deference serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan ... that covers employees in different jurisdictions -- a result that would introduce considerable inefficiencies in benefit program operation, which might lead those employers with exiting plans to reduce benefits, and those without such plans to refrain from adopting them.

*Id. at 1649;*[7] *see* [*27] *also Bell v. Pfizer, Inc., 626 F.3d 66, 79 (2d Cir. 2010)* (noting that the Supreme Court in *Conkright* "reiterated its longstanding concern with ERISA litigation expenses," including the "increased litigation costs associated with de novo review of a plan administrator's decisions as to plan benefits").

---

7   A review of Circuit Court decisions addressing the relevant standard of review post-*Nichols* bears out these concerns. The First Circuit, for instance, has decided to "eschew automatic rules and to evaluate each case on its own." *Bard v. Boston Shipping Ass'n, 471 F.3d 229, 236 (1st Cir. 2006); see also id.* ("Ultimately, we do not decide whether the Plan's failure to render a timely decision by itself entitles Bard to *de novo* review, whether the Plan's eventual benefits denial after suit was filed was in 'substantial compliance' with ERISA's time limits and other regulations, or whether inquiry into 'substantial compliance' is even relevant in ERISA cases of this nature -- whether brought under the new regulations or otherwise. Those are complicated questions on which the circuits have divided."). The Ninth Circuit, in contrast to both the First Circuit and *Nichols*, allows deferential [*28] review even where there is a measure of procedural irregularity. *Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 971 (9th Cir. 2006)* ("When an

Case 3:11-cv-01807-VLB   Document 106-6   Filed 03/21/16   Page 77 of 79

Page 8
2013 U.S. Dist. LEXIS 129119, *

administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review *de novo* the administrator's decision to deny benefits. We do so because, under *Firestone*, a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract."), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299*. As but a third example, the Tenth Circuit has found that deference is not required where a plan administrator's delay in resolving a claim for benefits renders that claim "deemed denied," but has also, at times, recognized an exception to this rule for cases in which the plan administrator has substantially complied with the regulations in the context of an ongoing, good-faith dialogue with the claimant. *See generally Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1316-17 (10th Cir. 2009)*.

In sum, in light of (i) the amendments [*29] to ERISA that addressed the *Nichols* Court's concern with ensuring claimant access to courts and (ii) the Supreme Court's pointed directive in *Conkright* against *ad hoc* exceptions to *Firestone*, the Court declines to extend *Nichols* to the facts of this case. Put somewhat differently, in the absence of Second Circuit precedent holding that *de novo* review applies under the current ERISA regulations where a plan administrator vested with discretionary authority renders an untimely decision, this Court looks to Supreme Court precedent for guidance. *See Hutto v. Davis, 454 U.S. 370, 375, 102 S. Ct. 703, 70 L. Ed. 2d 556 (1982)* ("[A] precedent of this Court must be followed by the lower federal courts."). That precedent requires deferential review.

### 4. *Nichols* Does Not Govern This Action Because It Is Factually and Logically Inapposite

Even assuming that *de novo* review continued to apply under the current ERISA regulations to certain decisions based on an administrator's discretionary authority, *Nichols* does not support applying *de novo* review to Plaintiff's claim. As discussed in the preceding section, the *Nichols* Court focused on the possibility that dilatory conduct could preclude judicial access -- a possibility not implicated [*30] by Defendants' conduct in this case. A review of the underlying conduct, moreover, makes clear that the instant case is not *Nichols*. The plaintiff in *Nichols*, it bears emphasizing, filed the lawsuit in question after 197 days had passed without receiving a formal decision from the plan administrator concerning the resolution of her appeal. Indeed, the plan administrator had

failed even to acknowledge the claimant's appeal until after the regulatory time period expired, and had refused to issue a decision even during the pendency of the district court proceedings. *Nichols, 406 F.3d at 102*. On this record of inaction, it was understandable for the Second Circuit to conclude that *Firestone* required not merely the vesting, but also the exercise, of discretionary authority. *Nichols, 406 F.3d at 109* ("Alternatively, even if Prudential was vested with discretion, it made no valid exercise of that discretion here.");[8] *see also Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan, 497 F.3d 234, 244 (2d Cir. 2007)* ("We instructed the district court [in *Nichols*] to review the plan administrator's decision *de novo* because Prudential's inaction 'le[ft] the court without any decision or application [*31] of expertise to which to defer.' In the instant case, the Plan administrators explicitly refused to decide Strom's claim, and such a non-decision cannot be deemed an 'exercise of discretion' to which the district court might have deferred." (internal citations omitted)).

> 8   As it happened, the Court also found that the plan in *Nichols* vested no discretion in the plan administrator. *406 F.3d at 109*.

Here, by contrast, RSLI contacted Plaintiff approximately three weeks after it received Plaintiff's appeal to request that Plaintiff submit to an IME. RSLI then exchanged substantial communications with Plaintiff as to the information necessary to reach its final decision, including conducting an IME, obtaining Plaintiff's SSA medical evaluation, and updating Plaintiff as to the status of its decision. Finally, and most importantly, RSLI exercised its discretion when it issued a final appeal decision, and that decision was issued just a few days after the instant litigation was brought. There were delays in the proceeding, to be sure, and the Court was troubled by RSLI's apparent reticence in the month preceding the commencement of this action. That being said, it also appears that some of the [*32] delay was attributable to Plaintiff's efforts at negotiating conditions precedent to appearing for an IME, and to RSLI's efforts at complying with Plaintiff's request for an opportunity to respond to Dr. Josephberg's report.

Plaintiff suggests that *Nichols* should be read to foreclose deference to a plan administrator's exercise of discretion where that discretion was "not exercise[d] in the time or manner required by ERISA." (Dkt. # 26 at 1). *Nichols* itself did not go that far, and with good reason: It would turn *Firestone* on its head to conclude that any transgression -- however minor or technical, and for whatever reason (including claimant-generated) -- from ERISA's requirements resulted in wholesale forfeiture of a plan administrator's discretion. Such stringency would also, necessarily, engender significant (and, to some de-

2013 U.S. Dist. LEXIS 129119, *

gree, needless) consumption of judicial resources in the course of the *de novo* review.

Precisely for this reason, courts have continued to apply discretionary review where the departures from ERISA's requirements (including temporal ones) are minor and/or occur in the larger context of an ongoing, good-faith dialogue between the claimant and the plan administrator [*33] aimed at resolving the claimant's appeal. Broadly speaking, there are two doctrinal vehicles by which this is accomplished. Several courts, including courts in this District, have simply excused technical non-compliance and applied deferential review -- even where the appeal decision was untimely, and even where the decision was issued after the claimant commenced litigation. *See, e.g., Robinson, 2007 U.S. Dist. LEXIS 81733, 2007 WL 3254397, at *2* (applying arbitrary and capricious standard even though appeal decision issued approximately one month after the claimant filed suit, where plan administrator had remained in contact with claimant's attorney, informed the attorney of the reasons for the delay, and took steps to ensure a full and fair review of the claim); *Morgenthaler, 2006 U.S. Dist. LEXIS 62688, 2006 WL 2463656, at *3* (applying an arbitrary and capricious standard where appeal decision issued 113 days after appeal was filed and one week after claimant filed suit).

Other courts, again including courts in this District, have adopted a doctrine of "substantial compliance," where, "in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines [*34] ... would not entitle the claimant to *de novo* review." *Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003); accord Jebian v. Hewlett-Packard Co. Employee Benefits Org, Income Protection Plan, 349 F.3d 1098, 1107 (9th Cir. 2003); Giraldo v. Bldg. Svc. 32B-J Pension Fund, No. 04 Civ. 3595 (GBD), 2006 U.S. Dist. LEXIS 6355, 2006 WL 380455, at *3 n.5 (S.D.N.Y. Feb. 16, 2006)* ("The case law supports the proposition that substantial compliance with the regulations suffices."); *Pava v. Hartford Life & Accident Ins. Co., No. 03 Civ. 2609 (SLT) (RML), 2005 U.S. Dist. LEXIS 41753, 2005 WL 2039192, at *9 (E.D.N.Y. Aug. 24, 2005)* ("[T]he case law in this Circuit indicates that where the administrator communicates with the claimant regarding the status of her appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines may be excused."); *see also Kohut v. Hartford Life and Accident Ins. Co., 710 F. Supp. 2d 1139, 1146-47 (D. Colo. 2008)* (finding substantial compliance where claim was denied 74 days late and two days after claimant filed suit).

The Second Circuit has declined to decide the substantial compliance issue. *See Duncan, 507 Fed. Appx. at*

63 ("As we stated in *Nichols* [*35] *v. Prudential Insurance Co. of America*, our Court has not yet definitely adopted or rejected the substantial compliance doctrine."). However, the *Nichols* Court itself recognized that "[t]here may be good equitable and policy reasons for a substantial compliance exception to our holding today that may even be sufficient to overcome our analysis of the requirements of *Firestone*." *Nichols, 406 F.3d at 110.*[9]

> 9  The Court simply rejected the notion that "substantial compliance can block or delay a plaintiff's access to the federal courts":
>
>> The proposition that substantial compliance can prevent overturning a decision is akin to harmless error analysis, establishing merely that a decision need not be carried out with absolute procedural perfection so long as the regulatory purpose is fulfilled. On the other hand, adopting the proposition that substantial compliance can delay accrual of the right to sue would permit plan administrators to indefinitely tie up claimants, who are often in immediate need of benefits, with ongoing requests for information. Such a result would render the plain language of *Section 2560.503-1(h)(1)* a nullity.
>
> *Nichols, 406 F.3d at 107.*

Whether characterized as "excusable [*36] non-compliance" or "substantial compliance" is, in the Court's estimation, largely a matter of semantics. In both paradigms, courts review the record of the dealings between the claimant and the plan administrator to ensure that the parties acted in good faith, with consideration of the relevant regulatory deadlines and without dilatory intent -- and, more pointedly, that the plan administrator did not attempt to "lead the claimant on," as it were, and thereby cause the claimant (i) to receive late (or not at all) benefits to which the claimant was entitled, or (ii) to lose opportunities for redress of an adverse decision. In short, these reviews are designed to ensure that there is a fair exercise of the plan administrator's discretion for the court to review. In the instant case, were some variant of *Nichols* to remain, the Court would still find that deferential review applies. The dealings between Plaintiff and RSLI were frequent, sufficiently prompt, and informative, and resulted in a decision on the appeal that

post-dated the instant litigation by just 13 days. This record surely merits the Court's deference.[10]

10   The cases cited by Plaintiff in which courts applied *de novo* review   [*37] are not to the contrary. (Dkt. # 26 at 2). In those cases, the plan administrator either failed entirely to communicate with the claimant prior to the regulatory time period expiring or made a minimal attempt to comply with the regulatory requirements. *See LaAsmar, 605 F.3d at 799* (finding that the record was devoid of any "on-going productive evidence-gathering process in which the claimant [was] kept reasonably well-informed as to the status of the claim and the kinds of information that will satisfy the administrator"); *Rasenack, 585 F.3d at 1317* (no contact between the claimant and the administrator between when the appeal was filed and when the regulatory time period expired); *Fershtadt v. Verizon Commc'n, Inc., No. 07 Civ. 6963 (CM), 2010 U.S. Dist. LEXIS 13937, 2010 WL 571818, *11 (S.D.N.Y. Feb. 9, 2010)* (plan administrator failed to acknowledge receipt of and to communicate with plaintiff regarding the appeal prior to the administrative deadline); *Thompson v. Union Sec. Ins. Co., 688 F. Supp. 2d 1257, 1264 (D. Kan. 2010)* (delay in excess of seven months, during which time there was no communication between the plan administrator and the claimant); *St. Onge v.*

*Unum Life Ins. Co. of Am., No. 3:07CV01249 (AWT), 2010 U.S. Dist. LEXIS 98101, 2010 WL 3802787,*3 (D. Conn. Sept. 20, 2010)*   [*38] (plan administrator failed to expressly notify the plaintiff in writing that it was extending the decision period, and there was no evidence of good-faith, informative communications that might excuse the delay).

## CONCLUSION

For the foregoing reasons, RSLI's termination of Plaintiff's disability benefits will be reviewed under an arbitrary and capricious standard.

In addition, it is hereby ORDERED that the parties appear for a pretrial conference to discuss a briefing schedule for any summary judgment motion on October 22, 2013, at 3:00 p.m., to be held in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.

SO ORDERED.

Dated: September 10, 2013

New York, New York

/s/ Katherine Polk Failla

KATHERINE POLK FAILLA

United States District Judge