# EXHIBIT 11

## Winona W. Zimberlin
Attorney at Law
2 Congress Street
Hartford, CT 06114-1024

Telephone (860) 249-5291
Facsimile (860) 247-4194

*BY OVERNIGHT MAIL/FEDERAL EXPRESS*

May 9, 2011

Liberty Life Assurance Company of Boston
ACS / Attention: Monique Furgalack
Attention Group Market EDM
1084 South Laurel Road
Liberty Mutual Wallingford Disability Claims
London, KY 40744-7960

Dear Ms. Furgalack:

RE:  Haley Spears
United Technologies Corp.-Choice
Claim # 2500391

This is an appeal of the Liberty Mutual denial of short term and/or long term disability benefits in its letter of November 16, 2010. Legal arguments made in our August 21, 2010 appeal are incorporated herein by reference. Although your denial letter is not clear, it appears that it was based on a belief that Ms. Spears did not meet the 180 day Elimination Period requirement. New and material evidence is submitted:

1. Report of Zane Saul, M.D., a specialist in infectious disease (1 page)
2. Medical records from Zane Saul, M.D. (8-8-10 to 4-8-11) (14 pages)
3. Medical records from Richard M. Shoup, M.D. (1-19-11 to 4-29-11) (15 pages)
4. Social Security Disability Fully Favorable decision (15 pages)
5. Lyme Disease Newsletter (9 pages)
6. Office of the Attorney General Press Release (4 pages)
7. Board certification of Zane Saul, M.D. (2 pages)
8. Infectious Diseases, Nov. 3, 2007, Vol. 335, Lyme Wars (3 pages)
9. The Need for Clinical Judgment in the Diagnosis and Treatment of Lyme Disease, Journal of American Physicians and Surgeons Vol. 14., Nov. 3, Fall 2009 (8 pages)
10. Meeting of the Vaccines and Related Biological Products Advisory Committee (6/7/94) (4 pages)
11. Greater Hartford Lyme Disease Support and Action Group Article (3 pages)
12. Detection of Borrelia burgdorferi DNA by Polymerase Chain Reaction in Cerebrospinal Fluid in Lyme Neuroborreliosis, Journal of Infectious Diseases 1996; 174:623 (5 pages)

Liberty 000195

13. In Vivo Activities of Ceftriaxone and Vancomycin against Borrelia spp. in the Mouse Brain and Other Sites, Antimicrobial Agents and Chemotherapy, Nov. 1996, p. 2632-2636 (5 pages)

14. Invasion of human neuronal and glial cells by an infectious strain of Borrelia burgdorferi, Microbes Infect. 2006 Nov-Dec ; 8(14-15):2832-40. Epub 2006 /seo, 22 (1 page)

15. Fibroblasts Protect the Lyme Disease Spirochete, Borrelia burgdorferi, from Ceftriaxone In Vitro, Medicine Journal of Infectious Diseases, Volume 166, Issue 2, Pp. 440-444 (1 page)

16. A perspective on the treatment of Lyme borreliosis, Rev Infect Dis. 1989 Sept-Oct; 11 Suppl 6:S1518-25 (1 page)

Ms. Spears meets the definition of disability under the Plan for all relevant time periods. As an initial matter, your letter states that Ms. Spears was paid short term disability benefits through March 27, 2009 because of "employer override only." Please note that the UTC Choice Plan is established and maintained by United Technologies Corporation. The employer's payment of benefits through March 27, 2009 is an acknowledgement that Ms. Spears was disabled through March 27, 2009. Contrary to the assertion in your letter of November 16, 2010, this is a de facto alteration of the previous denial. March 27, 2009 is the maximum duration under the short term disability plan. Ms. Spears was disabled prior to the end of the 180 elimination period. She was disabled throughout the Elimination Period. She remains disabled. It is disingenuous to claim that UTC is not responsible for its own actions. Therefore, Ms. Spears has met the Elimination Period requirements.

The denial letter of November 16, 2010 lists two peer medical reviews in support of the denial. The first, dated November 23, 2009, claims that Ms. Spears does not have any history or evidence of Lyme disease. A September 27, 2010 peer medical review report allegedly states that Dr. Raxlen is trained primarily as a psychiatrist and does not have any formal infectious ID training and is not ID board- certified. The report stated, "The best physician to manage lyme disease is a board-certified infectious disease physician." Your denial of November 16, 2010 apparently was prepared prior to your receipt of medical records from Dr. Saul. These were sent to Liberty Life on November 15, 2010. They documented treatment from August 8, 2010 to October 15, 2010. Additional records are now provided through April 8, 2011.

Your discussion of the September 27, 2010 review states that the best physician is a board certified infectious disease physician. Dr. Saul is a board certified infectious disease physician, as is Dr. Donta.

Dr. Saul has prepared a report of March 7, 2011. Dr. Saul states that Ms. Spears remains under his care for advanced, debilitating Lyme disease. He states that she has chronic fatigue, difficulty concentrating, headaches and joint pain. Despite fatigue she has difficulty sleeping at night. He writes that "[s]he is not medically able to work in any capacity at this time. She is not capable of a sedentary work position due to cognitive difficulties. She cannot maintain focus to assigned tasks. Her fatigue prevents any durable or sustained physical work effort. She could not stand, lift, pull, reach or grasp at a job at all at this time. She is clearly motivated to get better and begin working again when she is well." He invites you to call with any questions.

2

Liberty 000196

Ms. Spears received a Fully Favorable decision from a Social Security Administrative Law Judge. The Social Security standard is much more stringent than the definition of disability found in the UTC Plan. A person cannot get Social Security disability unless that person has a medically determinable disability, and is unable to perform any kind of substantial gainful activity for a period of at least 12 months. This inquiry is not limited to an "own occupation" standard, but instead considers any other job in the national economy. A person who is disabled under Social Security's standard is necessarily disabled under the UTC Plan standard.

The Judge found that Ms. Spears was disabled as of August 31, 2008, when she went on sick leave. She attempted to return to work, part time, from January 1, 2009 to March 31, 2009. She returned to work at a lower standard of productivity, with frequent absences for medical appointments and tests. Ms. Spears eventually ceased work due to her impairment. The Judge found that the work in 2009 was an unsuccessful work attempt. He found that Ms. Spears was diagnosed with neurogenic Lyme disease as established by a spinal tap performed in February of 2009.

The Judge found that claimant has the following severe impairments: chronic neurologic Lyme disease with co-infections of chronic Babesiosis and Bartonella; and also other impairments: Hashimoto's thyroiditis and asthma. The Judge found that Ms. Spears required frequent unscheduled breaks from work and absences of an unpredictable duration. He noted that the claimant experienced varying symptoms of advanced stage Lyme disease such as fatigue, headaches, joint inflammation, memory loss, cognitive dysfunction, heart palpitations and a sleep disorder. Neurological consultation at Yale Brain Tumor Center described headaches. One headache was accompanied by vision loss, which returned in 30 minutes. She had speech dysfunction and memory gaps as well as tingling dysesthesias in her entire body. She had word finding difficulties and stuttering. An October 6, 2008 MRI of her brain showed a lesion lateral to the temporal horns of the right lateral ventricle. The Judge also noted that, since February 2009, she was placed on cycles of antibiotics for a 6 to 8 week period with a 1 to 2 week break after which she would resume therapy. At the initiation of the antibiotic treatments, she experienced fever syndromes. She was admitted to Hartford Hospital in September 2009 for an infection of the PICC line.

The Judge further found that Ms. Spears' credibility is bolstered by her treatment history. The record contained numerous office visit notes reflecting regular trips to the doctor to seek relief from symptoms. Additionally, she sought treatment from multiple specialists rather than simply relying on a primary care physician. This was another indication that her symptoms are genuine. The symptoms and resulting functional limitations that Ms. Spears has reported are consistent with the type of symptoms usually associated with the alleged impairments.

The Judge noted that treating neurologist Dr. Dario Zagar reported that Ms. Spears had been in IV antibiotic therapy for 6 to 8 months with minimal improvement. Ms. Spears continued to have issues with memory and thinking. In a June 21, 2010 Physical Residual Functional Capacity questionnaire, Dr. Zagar found objective signs of bilateral cervical paraspinal and trapezius tenderness. He found that Ms. Spears could sit for about 4 hours total in an 8 hour work day, and stand/walk for less than 2 hours total in an 8 hour work day. He added that Ms. Spear's symptoms were severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks. He concluded that Ms. Spears would need to take unscheduled breaks during the workday and would likely be absent from work more than 5 days per month as a result of her impairment or treatments.

Liberty 000197

The Judge reviewed Dr. Raxlen's findings. Dr. Raxlen reported that Ms. Spears experienced severe insomnia and symptoms of abdominal pain due to gallstones caused by treatment with Rocephin. Dr. Raxlen wrote that Ms. Spears suffered from debilitating physical and neurocognitive symptoms consistent with tick associated Poly –organic Syndrome. He concluded that prognosis remained uncertain and claimant would be unable to sustain employment for the foreseeable future.

The Judge reviewed treating physician Kristin Giannini, M.D.'s findings. Dr. Giannini also found that Ms. Spears would need to take unscheduled breaks during the workday.

The Judge reviewed the findings of vocational expert, Raymond Cestar, who concluded that Ms. Spears does not have the physical and mental capacities to do the necessary tasks and duties of gainful employment on a sustained basis.

Lyme disease symptoms mimic other illnesses. This makes it difficult to diagnose. It is not surprising, therefore, that there may be a difference of opinion among medical professionals as to what the exact diagnosis should be. See attached press release, Lyme Disease Foundation article, and journal article re: medical differences of opinion in diagnosing Lyme. In this case, however, an infectious disease specialist has diagnosed Lyme. This meets your objections as stated in the November 16, 2010 denial. In any event, regardless of the exact diagnosis, all the evidence shows that Ms. Spears has a severely disabling illness which meets the Plan's definition of disability. Accordingly, benefits should be reinstated.

The September 27, 2010 review was not provided to me. Please fax me a copy, and hold the record open so that I have a chance to respond to this report. If there are any other documents you used in denying this claim that have not already been provided to me, please provide them.

Very truly yours,

Winona W. Zimberlin

Enclosure
WWZ

CC: Facsimile:  603-422-7905 (letter without enclosures)

4

Liberty 000198

# EXHIBIT 12



Group Market Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

June 15, 2011

Winona W. Zimberlin
Attorney at Law
2 Congress Street
Hartford, CT 06114-1024

RE:     Appeal for Long Term Disability Benefits
        Utc Choice
        Claim #: 2500391  Haley Spears

Dear Ms. Zimberlin:

We have completed our review of your request for reconsideration of Ms. Spears' claim for
Long Term Disability Benefits, and are unable to alter our original determination to deny
benefits effective September 27, 2008. This decision is based upon a review of the medical
and vocational information contained in Ms. Spears' disability claim file, in accordance with
the provisions of the United Technologies Corp – Choice Group Disability Income Policy.

As stated in the February 2, 2009 and November 16, 2010 denial letters, the Policy states:

*"Disability" or "Disabled" means:*

1.      i.      *"Disability" or "Disabled" means that during the Elimination Period and the
                next 24 months of Disability the Covered Person, as a result of Injury or
                Sickness, is unable to perform the Material and Substantial Duties of his Own
                Occupation; and*

                ii.     *thereafter, the Covered Person is unable to perform, with reasonable
                        continuity, the Material and Substantial Duties of Any Occupation.*

*"Own Occupation" means the Covered Person's occupation that he was performing when his
Disability or Partial Disability began. For the purposes of determining Disability under this
policy, Liberty will consider the Covered Person's occupation as it is normally performed in
the national economy.*

*"Material and Substantial Duties" means responsibilities that are normally required to
perform the Covered Person's Own Occupation, or any other occupation, and cannot be
reasonably eliminated or modified.*

And

Liberty 000074

Haley Spears
Page: 2
June 15, 2011

*Elimination Period:*

*The greater of:*

   *a. the end of the Covered Person's sick pay, Short Term Disability Benefits; or*

   *b. 180 days.*

*"Elimination Period" means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.*

*If the Covered Person returns to work for any thirty or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.*

The Policy also states:

*"Active Employment" means the Employee must be actively at work for the Sponsor:*

   *1. on a full-time basis and paid regular earnings;*

   *2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:*

   *a. at the Sponsor's usual place of business; or*
   *b. at a location authorized by the Sponsor.*

*An Employee will be considered actively at work if he was actually at work on the day immediately preceding:*

   *1. a weekend (except where one or both of these days are scheduled work days);*
   *2. holidays (except when the holiday is a scheduled work day);*
   *3. paid vacations;*
   *4. any non-scheduled work day;*
   *5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and*
   *6. an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).*

To provide a full and fair review of your appeal, we reviewed Ms. Spears' claim file. Ms. Spears' last day of work at United Technologies occurred on September 26, 2008, and her disability claim began on September 27, 2008 due to migraines. Other complaints included abdominal pain, diarrhea and generalized body pain. Additional diagnoses noted in her file and considered in the decision included: Lyme disease, asthma/chronic bronchitis, hashimoto's thyroiditis, colitis, and question of connective tissue disorder.

To provide a full and fair review of your appeal, we reviewed Ms. Spears' claim file. Ms. Spears' last day of work at United Technologies occurred on September 26, 2008, and her

Liberty 000075

Haley Spears
Page: 3
June 15, 2011

disability claim began on September 27, 2008 due to migraines. Other complaints included abdominal pain, diarrhea and generalized body pain. Additional diagnoses noted in her file and considered in the decision included: Lyme disease, asthma/chronic bronchitis, hashimoto's thyroiditis, colitis, and question of connective tissue disorder.

Ms. Spears' file indicates that she was released to part-time work effective January 8, 2009 by Dr. Silver (neurology), and she returned to work at United Technologies, on a part-time basis, from January 8, 2009, through February 2, 2009; per Dr. Silver, Ms. Spears was to progress from part-time to full-time work status from January 8, 2009 and be full time as of February 9, 2009. However, Ms. Spears continued working part-time through March 24, 2009, and stopped work again completely on March 25, 2009. Ms. Spears reported that Dr. Kage kept her out of work on a part time basis beyond February 8, 2009.

The Elimination Period would be satisfied and long-term disability benefits would begin on March 28, 2009, if the medical evidence supported Ms. Spears' continuous total and/or partial inability to perform the Material and Substantial Duties of her Own Occupation as an Administrative Assistant, from September 27, 2008 through March 27, 2009. Ms. Spears' claim was denied effective September 27, 2008 because the medical evidence was insufficient to support this. Please refer to the November 16, 2010 denial letter, which thoroughly outlined the reasons for the denial, and provided Ms. Spears' right to appeal, as afforded to her under ERISA guidelines.

The denial letter stated:

*In your request for review please include the following documentation: any additional medical information such as office visit notes, test results, reports, and medications; as well as any additional information which you feel will support your claim.*

In our review and evaluation of Ms. Spears' claim, we considered medical records and restrictions received from Dr. Schiff (primary care), Drs. Gordon, Silver and Zagar (neurology), Dr. Baehring (neuro-oncology), Dr. O'Brien (gastroenterology), Dr. Kage (rheumatology), Dr. Raxlan (psychiatry, specialist in Lyme disease), Dr. Oberstein (endocrinologist), and Dr. Gouin (naturopath).

As noted in the denial letter, Ms. Spears' claim has been thoroughly evaluated on several occasions by an independent Board Certified Infectious Disease physicians. In addition, her file was reviewed by a consulting Board Certified Occupational Medicine physician and by a consulting Board Certified Neurologist.

On December 23, 2008, the Neurologist concluded:

*A return to work date of 1/7/09 appears reasonable. On 12/19/08 I spoke with Dr. Gordon who indicated he had not placed any restrictions or limitations on the claimant's work capacity and had not recommended she stay out of work. Dr. Silvers called me (on 12/23/08) at 1605 EDT and indicated that the claimant would return to work on 1/7/09.*

On May 11, 2009, the Occupational Medicine physician concluded:

Haley Spears
Page: 4
June 15, 2011

*Ms. Spears has been recently evaluated by multiple practitioners including three neurologists,
an internist/gastroenterologist, two rheumatologists, and more recently a neuropsychologist
who specializes in Lyme disease and a naturopathic clinician. Her diagnoses and treatment
plan remains unclear. Further, the medical records provided for review do not support any
specific limitations or restrictions that would prevent her from sitting, standing, or walking at
a sedentary physical demand level from March 24, 2009, through the present time.*

On May 11, 2009, Dr. O'Brien, gastroenterology, spoke with the reviewing occupational
medicine physician and stated he had not specific any restrictions and/or limitations in regard
to Ms. Spears' activities relative to her gastrointestinal symptoms. We received written
confirmation of Dr. O'Brien's agreement with the conversation.

Ms. Spears reported ongoing treatment with two new physicians, Dr. Raxlen (reportedly a
Lyme specialist) and Dr. Gouin, a naturopath.

Ms. Spears had claimed ongoing disability due to systemic Lyme disease. Dr. Raxlen
indicated Ms. Spears had been treating for this since April 2009. Ms. Spears' neurologist,
rheumatologist, and naturopath reiterated her inability to return to work due to her multiple
symptoms.

The Infectious Disease physician reviews of Ms. Spears' file have concluded the following:

**Michael Silverman, MD, November 23, 2009:** *According to the medical records reviewed,
the claimant does not have any history or evidence of Lyme disease. The claimant had two
tests done on 10/1/08 and also 1/7/09. These tests were negative. The claimant was being
evaluated for connective tissue disorder and underwent a spinal tap on 2/3/09. This was
positive by IgG for Borrelia burgdorferi antibodies, but negative for IgM. The significance of
this testing is not consistent with the diagnosis of neuroborreliosis. Furthermore, there are no
other diagnostic tests which support evidence of co-infections of which treatment was based by
Dr. Raxlen. There is no further documentation and no other diagnostic criteria which supports
evidence of infectious disease process.*

And

*There is no clearcut evidence of impairment from 2/8/09 to the present. Physical exams do not
support evidence of restrictions and/or limitations. Physical exams are somewhat limited after
2/9/09 other than rheumatology evaluations which reveal fatigue at 7 over 10 and tightness in
bilateral calves and upper back pain through the shoulder blades and also previous history of
migraine headaches. There are no clearcut findings which suggest impairment from 2/8/09 to
the present. The claimant therefore, does not have any physical restrictions and/or limitations
on activities including sitting, walking, reaching, lifting, carrying, and performing repetitive
and fine motor hand motions.*

**(Dr. Silverman) December 18, 2009:** Attempts to reach Dr. Raxlen via telephone were
unsuccessful and return calls were not received from his office.

The denial of Ms. Spears' STD claim (1676027) was maintained effective February 9, 2010 in
a letter dated January 29, 2010.

Liberty 000077

Haley Spears
Page: 5
June 15, 2011

Following an additional opportunity Ms. Spears was provided by United Technologies to further appeal her STD claim denial, Liberty Life received and reviewed additional information and a letter from Mr. Hulkin at the State of Connecticut Attorney General's office.

On **April 22, 2010**, Dr. Silverman reviewed all additional information and concluded:

*The letters that are included in the current package of information regarding the claimant have been reviewed. It should be noted that the claimant has had previous negative Lyme testing done despite no clearcut evidence of acute infection or evidence of chronic infection with Lyme disease or other tick-borne illnesses in my medical opinion. The claimant underwent a spinal taps. The only result that was reportedly positive was an IgG positive for Borrelia burgdorferi.*

*Nevertheless, the claimant did receive almost a four-week course of intravenous Ceftriaxone, which is standard therapy for this diagnosis. Despite this acceptable standard of four weeks of intravenous Rocephin antibiotic therapy, the claimant had no significant improvement or evidence of any noticeable change in her clinical symptoms. Therefore, it is my opinion, with a reasonable degee of medical certainty, that the diagnoses are not appropriate with respect to Lyme disease, and specifically, neuroborreliosis.*

*In addition, to date there has not been any documentation revealing any evidence of other tick-borne illness supporting these other diagnoses.*

And

*I spoke with Dr. Kage (rheumatology) on 4/8/10. She stated she has seen Ms. Spears for an evaluation of rheumatological disorders to date, although to date all testing has been negative. She stated that the claimant, Ms. Spears, was being evaluated for an astrocytoma with an MRI which reportedly has been stable.....she stated that there was no clearcut evidence of rheumatological disorder which would explain the claimant's current symptomatology from her perspective, she would defer to Dr. Raxlen for evaluation and treatment management of the claimant's current reported diagnoses of tick-borne illnesses.*

On April 29, 2010, Liberty Life received a written confirmation of the confirmation of the conversation between her and Dr. Silverman signed by Dr. Kage. Dr. Kage stated she doesn't follow Ms. Spears for astrocytoma.

Additional attempts by Dr. Silverman to reach Dr. Raxlen were unsuccessful since several messages were again left for Dr. Raxlen but a return call was not received. A letter was sent to Dr. Raxlen, however Dr. Silverman did not receive a written or verbal response.

The additional appeal review of Ms. Spears' claim was completed on May 13, 2010 following the April 22, 2010 peer review; the denial of benefits was maintained effective February 9, 2009, because the medical evidence was insufficient to support Ms. Spears' inability to perform her job as an Administrative Assistant.

In June 2010, United Technologies agreed that Ms. Spears' STD claim would be considered for an additional appeal review and provided until August 31, 2010 to submit all additional information to be considered (refer to the June 18, 2010 letter under STD claim 1676027).

Liberty 000078

Haley Spears
Page: 6  .
June 15, 2011

Therefore, Liberty Life conducted an additional review, including additional medical records
which were submitted by your office.

An additional independent medical review of Ms. Spears' file was conducted on September 27,
2010 by Joseph Brusch, MD, Board Certified in Internal Medicine/Geriatric Medicine and
Internal Medicine/Infectious Disease. Dr. Brusch concluded:

*Although many diseases have been involved to explain the claimant's clinical picture, there are
very few that are substantiated clinically. Among these are peptic ulcer disease, Hashimoto's
thyroiditis, autoimmune disorders, migraine headaches, asthma and irritable bowel syndrome.
From an infectious disease evaluation, the claimant does not have any restrictions and
limitations to her activity from 2/8/09 forward.*

And

*The claimant's Peptic ulcer has been documented on endoscopy; she has antithyroid
antibodies to support the clinical picture of Hashimoto's thyroiditis; she has a highly positive
ANA and slightly low protein C level, supportive of an autoimmune disease or diseases; her
clinical history and pulmonary function tests are consistent with asthma. However, she has no
significant chronic ongoing infectious disease(s) that could explain any degree of impairment.
She does not have Lyme disease of any type including CNS Lyme disease. Her serum Western
blot titers are negative. She has a positive IgG Western blot in the CSF…However this is
overwhelmingly a false positive. It is impossible for someone to have CNS infection and
negative systemic Lyme titers. Also, the lack of cellular reaction and the presence of normal
sugar and protein go against diagnosis. Most likely the cause of this false positive is her
autoimmune type disease that can yield false positives against many spirochetal diseases such
as Lyme. She clinically does not have babesiosis. This type of smear is very nonspecific.
(Helperin JJ. Nervous System Lyme Disease in Infectious Disease Clinics of North America
2008: 22; 2 61-2 74.)*

And

*There is no evidentiary documentation that her listed medications impair her full-time
sustainable capacity; Plaquenil, azithromycin, Mepron, Rifamin, Topamax, Prevacid, Asacol,
Singulair, Zoloft, Oracit vitamins, Advair and Proventil.*

Ms. Spears' job duties were Sedentary in physical demand, and involved mostly sitting, as well
as some standing and walking.  She was required to: provide secretarial and clerical support,
plan and arrange domestic and international travel, schedule appointments and meetings,
reserve facilities, obtain/assemble supporting material, maintain files, review mail, highlight
important items, assist in preparing, gathering, and maintaining expense, reports, vacation
schedules, distribution lists, etc., and assist with mail distribution, maintaining copiers,
printers, and ordering supplies.  She also needed to have strong oral, written, and computer
skills.

Based upon all information in the claim file, the medical evidence was insufficient to support
Ms. Spears' inability to perform the Material and Substantial Duties of her Own Occupation as
of February 9, 2009, and she did not meet the Definition of Disability throughout the
Elimination Period, as outlined in the November 16, 2010 letter. Ms. Spears was provided

Liberty 000079

Haley Spears
Page: 7
June 15, 2011

another right to appeal this decision within 180 days of receipt of the letter, and was provided the opportunity to receive a complete copy of her claim file.

We received your appeal on May 10, 2011, close to the exhaustion of the 180 day period, with additional information consisting of:

*Medical records from Dr. Saul (infectious disease) for August 8, 2010 through April 8, 2011
*March 7, 2011 letter of Dr. Saul
*Social Security Award letter
*Sleep report, January 19, 2011 and sleep medicine treatment records for February 17, 2011, March 24, 2011, April 29, 2011

We have reviewed the submitted information and conclude that it does not alter the decision to deny Ms. Spears' claim effective September 27, 2008 (date of disability), or beyond February 8, 2009. The additional medical information received is for treatment received nearly two years after the beginning of her claim. Therefore, it is not relevant to the period under consideration, and any clinical information from those records cannot be extrapolated back to that period to determine Ms. Spears' condition and associated medically supported restrictions and/or limitations for September 2008 through the Elimination Period, or as of, February 9, 2009. Ms. Spears must be considered in Active Employment as of February 9, 2009 and forward in order to be eligible under the Policy. We have not received any new medical treatment records as of or around February 9, 2009, and Ms. Spears' claim file was previously reviewed by multiple Board Certified Infections Disease physicians; therefore additional clinical review of Ms. Spears' claim file is not warranted. Therefore, Ms. Spears' claim remains denied because she has not provided medical evidence to support Disability throughout the Elimination Period.

We have included a copy of the September 27, 2010 peer review report with this letter, per your request in your May 2011 appeal letter. Given the multiple opportunities to appeal the STD claim, and the STD and LTD denial of benefits, and Ms. Spears' right to receive a copy of her claim file as provided in the November 16, 2010 LTD denial letter, we will not agree to hold open the appeal review for your review of this report and potential submission of additional information, although you requested to that we do so.

While we acknowledge that Ms. Spears was awarded Social Security Disability benefits, an award of SS benefits is not determinative of entitlement to benefits under the specific terms and provisions of the United Technologies Corp. – Choice Group Disability Income Policy. In our review, we fully considered the totality of the medical and vocational information contained in Ms. Spears' claim file. In our review, we fully considered the totality of all medical and vocational documentation received, and in accordance with the terms of the Policy, determined that Ms. Spears' retains the capacity to perform her own sedentary occupation as of February 9, 2009. In the course of our claim review, we conducted a two peer reviews with Board Certified Infectious Disease physicians, one of whom was also Board Certified in Internal Medicine, a peer review with a Board Certified Neurologist, and a Peer Review with a Board Certified Occupational Medicine physician. Our determination was based upon different medical and vocational documentation that was not considered by the SSA. Liberty Life maintains our position as outlined in our letter dated November 16, 2010 and as outlined above.

Liberty 000080

Haley Spears
Page: 8
June 15, 2011

This claim determination reflects an evaluation of the claim facts and policy provisions.

Under the Employee Retirement Income Security Act (ERISA) Appeal guidelines, you were
entitled to appeal the determination made by Liberty Life Assurance Company of Boston
(Liberty), and to submit any additional information wished to be considered as part of the
appeal. Liberty has conducted a full and fair review of your appeal and accompanying
materials, and has determined that the denial of benefits will be maintained.

At this time, your administrative right to review has been exhausted and no further review will
be conducted by Liberty and your claim will remain closed. You may request to receive, free
of charge, copies of all documents relevant to your claim. You have the right to bring a civil
action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company
of Boston rights and defenses under the above captioned policy, and all of these rights and
defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Determinations made by Liberty Life Assurance Company of Boston are based on the
provisions outlined in Ute Choice's Policy. These provisions are not contingent on decisions
made by neither the Social Security Administration nor the Workers' Compensation Carrier.

Sincerely,

Heather Carignan

Heather Carignan, CEBS, HIA
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16392
Secure Fax No.: (603) 422-7909

Liberty 000081

# EXHIBIT 13

01/12/2016  17:03   8602474194          ATTY WINONA ZIMBERLN          PAGE  01/01

 Zimberlin Law LLC
267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:
Hartford Office
2 Congress Street
Hartford, CT 06114

January 12, 2016

Facsimile: 1-603-422-7909, 1 page

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH  03820

Dear Ms. Winterer:

RE:   Haley Spears
DOB: 10/11/1977

This will confirm our discussion today that we would like Liberty to make a decision regarding Ms. Spears' disability claim. In the event that Liberty reinstates her benefits, we reserve the right to add additional documents to the record. As we indicated, Ms. Spears is currently pursuing medical treatment.

Thank you.

Very truly yours,

Winona Zimberlin

WWZ

Liberty002324

# EXHIBIT 14



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

---

Date: June 16, 2016

To:   WINONA ZIMBERLIN
      ATTORNEY AT LAW
      267 MAIN STREET
      MANCHESTER CT 06042

Attn:

Fax:   (860) 247-4194

From: Nancy Winterer
      Appeal Review Consultant
      Phone No.: (888) 437-7611
      Secure Fax No.: (603) 334-5708

Total Pages
(Including Cover):   28

RE:

Claim #:    2500391
Claimant:   Haley Spears

UTC Choice

---

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

June 16, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:     Long Term Disability (LTD) Benefits
        UTC Choice
        Claim #: 2500391
        Claimant: Haley Spears

Dear Winona Zimberlin:

We have completed the remand review of Haley Spears' Long Term Disability (LTD) claim and have maintained the decision to deny benefits.

This remand review and analysis considered all the medical and claim documentation contained in Ms. Spears' Short Term Disability (STD) and Long Term Disability administrative record, whether or not specifically referenced in this document.

Haley Spears submitted a disability claim for her absence from work beginning on September 27, 2008, as a result of headaches. At that time, Ms. Spears was covered under the United Technologies Corporation (UTC) Short Term Disability Plan, a self-insured plan administered by Liberty Life Assurance Company of Boston (Liberty), and for LTD benefits, the UTC Group Disability Income Policy, a fully insured policy administered by Liberty.

Under Ms. Spears' disability income coverage, STD benefits began on 10/4/08 and had a maximum benefit date of 3/27/09. For disability from her own occupation, the LTD benefit begin date is 3/28/09 with a maximum benefit date of 3/27/11. As of 3/28/11 and forward, to be eligible for continued benefits, the Policy requires Ms. Spears to be disabled from any occupation.

At the time Ms. Spears' absence from work began on 9/27/08, her job was titled Administrative Support with the physical demands of sitting 40% of the time in an eight hour day, lifting 1 %, walking 5%, and standing 4%, and typing 50% of an eight hour day. Ms. Spears was required to lift up to 10 pounds, and her job allowed her to change positions frequently. Typical duties included routine secretarial and clerical support, scheduling appointments and meetings, maintaining files, reviewing mail and assisting with mail distribution, and assist in preparation of reports.

## Claim Summary

Liberty002379

During this period, Ms. Spears was being treated by Primary Care Physician (PCP) Evan Schiff, MD, for asthma, was evaluated by Endocrinologist Robert Oberstein, MD, for a multi nodular thyroid goiter, and was being treated by Gastroenterologist James O'Brien, MD, for a history of abdominal pain, diarrhea, gastritis and colitis.

On 5/16/08, Ms. Spears was examined by Dr. Schiff. The results of the physical exam are documented to be within normal limits. On 8/29/08, Ms. Spears reported to Dr. Schiff's office that she had gone to the emergency room the night before with a migraine headache. After an MRI and CT of the brain, Ms. Spears was referred to Neurologist David Silvers, MD.

A 9/23/08 telephone note from Dr. Schiff's office indicates Ms. Spears' mother called the office expressing concern that Ms. Spears was in need of medication for anxiety/depression. Ms. Spears' mother wanted the office to know Ms. Spears had "suffered from Anxiety & BiPolar Disorder following" an assault at the age of 13. Dr. Schiff's office records indicate Ms. Spears called the office on the night of 9/25/08 reporting she did not "feel right about Dr. Silvers, therefore she is not going back to him. She will find another neurologist."

After submitting her STD claim, on 10/7/08, Ms. Spears spoke with the STD Disability Case Manager (DCM). The record of that conversation indicates Ms. Spears reported she was experiencing chronic head and neck pain, severe nausea and vomiting. Upcoming testing was scheduled for 10/8/08 and a neurology appointment was scheduled for 10/24/08. Ms. Spears reported she also has asthma and chronic bronchitis. Ms. Spears reported that she had no more sick pay, and expressed her concern about accruing vacation time while on STD. Ms. Spears also questioned if she was eligible for education benefits while on STD. The DCM referred Ms. Spears to Human Resources at UTC for the answer to these questions.

On 11/3/08, Neurologist Barry Gordon, DO, provided the diagnoses of common migraine, frequent tension headaches, nonspecific white matter lesion, and reported that the episodes of "zoning out" as reported by Ms. Spears, were due to fatigue.

Dr. Silvers completed a Restrictions Form on 11/11/08. Dr. Silvers reported he first saw Ms. Spears on 9/8/08. Dr. Silvers reported the diagnoses of migraine and encephalopathy, and indicated Ms. Spears had the capacity to perform sedentary work. Dr. Silvers' 11/14/08 office visit note reports, "She has frequent migraine, blackout of unclear etiology but doubt epilepsy. Additional complaints including insomnia, stuttering, question of a role of stress may be playing here. I told her that she can follow-up either with myself or Dr. Gordon."

On 11/25/08, Ms. Spears consulted with Joachim Baehring, MD, Neuro-Oncology. Although Ms. Spears reported her speech was "off," "memory gaps," word finding difficulties, and stuttering, on exam, Dr. Baehring reported, "Language is fluent. There are no cognitive deficits." Dr. Baehring did report he noticed Ms. Spear's stuttering, "on a couple of occasions during her visit." No abnormalities were reported on physical exam. Dr. Baehring provided the diagnoses of right temporal lobe signal abnormality of unknown etiology; benign pineal region cyst; headache of unknown etiology, likely multifactorial.

A 12/10/08 Phone Note from Dr. Baehring's office reports Ms. Spears called that date regarding her headache treatment regimen. Since Dr. Baehring was primarily monitoring the MRI abnormalities, Ms. Spears was advised to return to Dr. Silvers or alternatively, contact the Fairfield Neurology

Liberty002380

headache clinic.

All the medical documentation contained in Ms. Spears disability claim file at that time, was reviewed by Liberty's Consulting Neurologist Frisso Potts, MD. Dr. Potts' 12/18/08 report of that review concluded Ms. Spears, "appears to have nearly daily headaches, the severity of which is likely to preclude her from working," and "Concurrently, the claimant's medications are being adjusted and improvement is expected as treatment of the reported headaches progresses." Dr. Potts also indicated, "It appears reasonable to extend the no work recommendation until the end of January, at which time effective treatment from the reported headaches is likely to have occurred." Dr. Potts spoke with Dr. Gordon and Dr. Silvers for this review. Dr. Gordon reported he had placed no restrictions on Ms. Spears' work activity, and Dr. Silvers indicated Ms. Spears was able to return to work on a part-time basis on 1/8/09, and progress to full time work by 2/9/09. Dr. Potts then endorsed Dr. Silvers' plan for Ms. Spears' return to work date of 1/8/09.

At the request of Dr. O'Brien, Ms. Spears was evaluated by Rheumatologist Barbara Kage, MD, on 1/6/09. Dr. Kage documented Ms. Spears report of fatigue, night sweats, weight loss/gain; hands changing color in the cold, dry eyes and dry mouth, stiffness in the morning, jaw pain, headache; eye pain, blurred double vision, floaters, flashes; asthmatic shortness of breath; chest tightness; heartburn, abdominal pain, diarrhea, nausea; recurrent sinus and ear infections; muscle weakness, tingling and numbness; anxiety; bruising easily; ringing in ears. On exam, Dr. Kage reported, "Pt in no acute distress," and she was well developed, had no obvious deformities, had excellent grooming, and was oriented to person, place and time. Dr. Kage reported Ms. Spears' history and current medical conditions suggested an immune-mediated inflammatory disorder, and she would work up Ms. Spears for a connective tissue disease.

Ms. Spears did return to part-time work on 1/8/09.

Ms. Spears was first evaluated by Dario Zagar, MD, Neurologist in Fairfield, CT, on 1/12/09, for management of her migraine headaches. On exam, Dr. Zagar noted Ms. Spears was well appearing, alert, oriented to time place and person, well nourished, and "Patient did not appear uncomfortable." Dr. Zagar reported no disorientation, remote memory was not impaired, short term memory was normal, an adequate fund of knowledge was demonstrated, no language abnormalities were demonstrated, and no abnormalities in attention were demonstrated.   Dr. Zagar's assessment included  common  migraine  inadequately  controlled;  lumbago;  possible  systemic  lupus erythematosus (SLE). Ms. Spears was to maintain a headache diary, continue her medications, and add Migranal nasal spray as an abortive treatment.

The follow up rheumatology office visit was on 1/19/09. Dr. Kage reported that the test results and Ms. Spears' medical history suggested an autoimmune inflammatory disorder. Plaquenil was prescribed.

On 1/20/09, Ms. Spears was seen by Neurologist James Donaldson, MD, of the UConn Medical Group.  Dr. Donaldson reported he observed Ms. Spears to appear depressed, and she reported poor sleep. Dr. Donaldson indicated the patch seen on MRI in Ms. Spears right temporal lobe was likely a low-grade glioma, and her headaches were likely muscle contraction headaches. He recommended Nortriptyline as Dr. Gordon had ordered, amitriptyline, or other antidepressant.

On 1/22/09, all the claim forms required for an LTD application were sent to Ms. Spears for her

Liberty002381

completion, and return to Liberty.  It was requested that Ms. Spears complete and return the forms as soon as possible as the additional information was required for the LTD eligibility decision.  It was noted that the forms were to be returned to Liberty no later than 4/28/09.

After Ms. Spears' 1/24/09 request to see another neurologist, in February 2009 Dr. Schiff documented, "Nurse called to inform that I was uncomfortable with her shopping for neurologists + therefore was uncomfortable with managing her care– She should find a new doctor as an internist."

Ms. Spears followed up with Dr. Beahring on 1/27/09. The MRI of the brain that date was unchanged from the October 2008 MRI.  On exam, Dr. Baerhing reported Ms. Spears was fully awake, alert and oriented, with clear and fluent speech. Impression was reported as right temporal lobe signal of unknown etiology, benign pineal region cyst, and likely multifactorial headaches.

At the 2/5/09 office visit, Dr. Kage prescribed Zoloft. Dr. Kage's 2/9/09 <u>Patient Call In</u> note states, "pt states she agrees to working 4 hours daily per your discussion with her at last appt… pt states her papers should state she needs to work morning hours so she can go home and rest in the afternoons."  The claim file contains a note dated 2/9/09 from Dr. Kage that states, "Due to her medical condition, Ms. Spears should reduce her work schedule to 4 hours per day. I recommend that she be allowed to work mornings only."

Dr. Zagar performed a lumbar puncture on 2/9/09, and reevaluated Ms. Spears on 2/17/09.  Ms. Spears reported increased headaches after the lumbar puncture, no vision problems, no memory lapses, no depression or anxiety. Assessment that date included common migraine, well controlled; probable SLE; probable Lyme disease. Ms. Spears was to continue Topamax 100 mg daily, and was later started on IV antibiotics under the direction of Dr. Zagar.

On 3/5/09, Ms. Spears saw Dr. O'Brien in follow up for her GI issues. She presented as oriented to time, place, and person, and in no acute distress, with normal affect. Dr. O'Brien reported that Ms. Spears upper and lower GI symptoms "seem to be side effects of medicines on several occasions. As the meds change, so do her side effects." The plan was for Ms. Spears to follow up as needed.

All the medical documentation on file was reviewed by Liberty's Consulting Physician Board Certified in Internal Medicine and Board Certified in Occupational Medicine, Oyebode Taiwo, MD. Dr. Taiwo's reports are dated 2/25/09 and 3/9/09. After his phone contact with Dr. O'Brien, and attempted phone contact and attempted written contact (as Dr. Kage specifically requested) with Dr. Kage, Dr. Taiwo reported Ms. Spears currently had "non-specific upper and lower gastrointestinal symptoms. Dr. O'Brien had placed no restrictions on Ms. Spears' activities." [Ms. Spears had no Primary Care Provider at this time for Dr. Taiwo to contact].

Ms. Spears was first evaluated by Family Medicine physician Kristin Giannini, MD, on 3/10/09. Headaches are the only complaint documented. On exam, Dr. Giannini reported Ms. Spears to be alert, cooperative and well groomed, "Not in acute distress or Sickly," well nourished, and well developed with normal posture, with a normal voice. No abnormalities were recorded on physical exam. On the Neuropsychiatric portion of the exam, Dr. Giannini reported, "Mental status exam performed with findings of –Oriented X3 with appropriate mood and affect and demonstrates appropriate judgment and insight."  Assessment that visit included asthma and Lyme disease.

At her 3/16/09 appointment with Dr. Zagar, Ms. Spears was accompanied by her mother.  Ms.

Liberty002382

Spears reported her headaches had improved on the Topamax. Dr. Zagar documented upon review of systems that Ms. Spears reported fatigue, stuttering, "Increase in cognitive problems, spelling, vocabulary, math, etc. Dizziness and memory lapses or loss. No tremor. No difficulty walking. Numbness." On exam, no neurologic, psychiatric or mental status exam findings are documented.

Dr. Kage's 3/9/09 office visit note reports Dr. Kage advised Ms. Spears to consult with an Infectious Disease specialist. There are 3/17/09 and 3/18/09 phone notes from Dr. Kage's office which indicate Dr. Kage advised Ms. Spears that it was okay for Ms. Spears to see the Lyme Clinic at Yale run by Rheumatologists, as they would provide an assessment of all her medical problems.

Ms. Spears' returned to work on a part-time basis on 1/8/09. Although Dr. Silvers indicated Ms. Spears should progress to full time work by 2/9/09, Ms. Spears continued working part-time through 3/24/09, at which time she stopped all work.

On 3/26/09 Ms. Spears was evaluated by Robert Schoen, MD, of New Haven Rheumatology. Dr. Schoen reported Ms. Spears' medical history, current medications as Topamax, Plaquenil, Prevacid, Asacol, folic acid, Singular, and vitamins. Physical exam was documented as within normal limits. Diagnoses provided were headache, fatigue, arthralgias; abnormal MRI scan of the brain; positive Lyme disease Western blot bands on CSF with negative peripheral blood serology. Dr. Schoen reported, "My best estimation is that she does not have and has not had Lyme disease as the cause for her symptoms." Dr. Schoen recommended the antibiotics be stopped, and that Ms. Spears pursue further workup with Dr. Zagar, Dr. Kage, and endocrinology.

On 3/30/09, Dr. Schoen documented:
> I spoke to Dr. Zagar on March 30, 2009. I indicated that, in my opinion, the patient does not have central nervous system Lyme disease and she has been treated adequately for this possibility. He indicated that the patient and her mother were dissatisfied with my opinion. I indicated that I would support their decision to get an additional opinion, if they wish.

As requested by Dr. Giannini, on 3/30/09, Saqib Naseer, MD, evaluated Ms. Spears from a Cardiology perspective due to her reported palpitations, racing heartbeat, occasional dyspnea on exertion, and chest discomfort. Although there were no acute concerns at that time, Dr. Naseer reported he would have Ms. Spears return for an echocardiogram and treadmill test, and Holter monitor. Results of the 4/1/09 pulmonary test reported, "mild reversible airway obstruction," consistent with asthma. Ms. Spears saw Dr. Giannini again on 4/8/09 for ear pain. Dr. Giannini reported Ms. Spears was alert and oriented and in no acute distress.

The benefit begin date for Ms. Spears' LTD claim is 3/28/09. As of 3/28/09, Ms. Spears needed to have fulfilled the Policy's Elimination Period, meet the Policy's definition of disability and all other terms of the UTC Group Disability Income Policy. The Policy states:
*"Disability" or "Disabled" means:*
  i.   *"Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
  ii.  *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"Elimination Period" means a period of consecutive days of Disability or Partial Disability*

Liberty002383

*for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.*

*If the Covered Person returns to work for any thirty or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.*

*Elimination Period:*
*The greater of:*
    *a. the end of the Covered Person's sick pay, Short Term Disability Benefits; or*
    *b. 180 days.*

  *"Own Occupation" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.*

Ms. Spears was first evaluated by Lauren Gouin Young, Naturopathic Doctor, on 4/20/09. Ms. Spears reported symptoms including neck, knee and foot pain, fatigue, migraines, severe brain fog, swollen hands, and night sweats, Dr. Gouin Young recommended dietary changes and dietary supplements. Treatment later included acupuncture.

On 4/21/09, Ms. Spears was first evaluated by Bernard Raxlen, MD, board certified in Psychiatry and specializes in the treatment of Lyme disease.  Ms. Spears reported her symptoms included "Horrible migraines (no medicine worked)," seizures, inability to walk up stairs, non-restorative sleep and insomnia, pain everywhere including joint pain and eye pain with blurred vision, difficulty speaking and slurred speech, night sweats, and palpitations.  IV antibiotics were prescribed.

On 4/27/09, Dr. Zagar indicated Ms. Spears was accompanied by her parents. Ms. Spears reported she had seen Dr. Raxlen and Dr. Raxlen thinks "Lyme disease was the diagnosis and that longer term treatment was required." Dr. Zagar reported, "Headaches are well controlled, physical and cognitive complaints remained unchanged," and the physical findings included "Patient did not appear uncomfortable."  Dr. Zagar advised, "I am skeptical about the utility of further antibiotic treatment, given the paucity of evidence to show that prolonged antibiotics provide additional benefit.  They would like to proceed with treatment as recommended by Dr. Raxlen." On 5/1/09, ConnectiCare issued its denial for services provided by Dr. Raxlen, an out-of-network provider.

Internal Medicine, Occupational Medicine physician, Dr. Taiwo, completed an updated review of the medical documentation in Ms. Spears' claim file. His 5/13/09 report concluded, "Ms. Spears' records do not support any specific limitations or restrictions that would prevent her from sitting, standing or walking at a sedentary physical demand level from 3/24/09 through the present."

The denial for STD benefits was issued on 5/13/09.  Ms. Spears had returned to work part-time on 1/8/09, although she did not progress to full time work on 2/8/09 as had been outlined by Dr. Silvers. Instead Ms. Spears continued working part time until she left work completely beginning 3/25/09. Based on the medical documentation on file and Dr. Taiwo's medical review, STD benefits were denied after 2/8/09, since the medical records on file did not support Ms. Spears' inability to perform the material and substantial duties of her job on a full time basis.

Liberty002384

Dr. Gianinni saw Ms. Spears for an asthma recheck on 6/18/09. Ms. Spears reported improvement with her headaches with an increase in Topamax, and reported her Asthma was "doing fine." On exam, Dr. Giannini reported Ms. Spears was alert, cooperative, well groomed, and "Not in acute distress or Sickly." Dr. Giannini also reported, "Mental status exam performed with findings of-Oriented X 3 with appropriate mood and affect and demonstrates appropriate judgment and insight." There was no tenderness or abnormalities noted on physical exam.

On 7/18/09, Ms. Spears was evaluated by Sam Donta, MD, Infectious Disease. Dr. Donta indicated his impression was, "she has chronic multi-symptom illness consistent with a chronic fatigue and fibromyalgia of long standing duration that may well be due to Lyme Disease in part or in whole." Dr. Donta recommended a different course of treatment over the next two years for Chronic Lyme Disease.

Ms. Spears was evaluated by Dr. Kage on 7/20/09, at which time Dr. Kage reported, "pt feels disabled d/t memory lapses, off/on fatigue… Neck pain & Rt parietal HA pain wakes the patient up at night; Few years ago- "bulls eye" rash '05." Dr. Kage also reported, "I will reevaluate her regarding any Connective Tissue Disease once she completes her antibiotic regimen."

On 7/31/09, Ms. Spears had a follow up visit with Dr. Baehring. Ms. Spears reported her headache had not worsened in frequency or intensity, and denied nausea and vomiting. Dr. Baehring reported, "Apparently she had been diagnosed with babesiosis, Bartonella infections and borreliosis. I am not certain what these diagnoses are based on." On neurologic exam, Dr. Baehring found Ms. Spears to be "fully awake and alert and oriented. Language is fluent. There are no cognitive deficits." There was no change in the MRI of the brain from the previous studies and intervals between scans was increased to one year.

A Patient Call In note from Dr. Kage's office dated 8/3/09, states, "pt wrote letter for you to sign, please review… Inform her that per Dr. B. Kage, Labs July '09- autoimmune rheumatic screen is ok." Liberty received a letter from Dr. Kage dated 8/4/09 reporting Ms. Spears is unable to work "part time or full time, and it is medically necessary for her to be on full time disability."

After her appointment with Dr. Zagar in late June 2009, Ms. Spears saw Dr. Zagar next on 10/26/09. She was accompanied by her mother. Ms. Spears reported she thought she was improving overall-speech and conversation was better, back and neck pain and migraines had improved. Fatigue was still an issue, sleeping 8 to 13 hours per day, trouble sleeping at times, and "She is "shot" for a few days if she is particularly busy." On neurological exam, Dr. Zagar reported no cognitive or speech difficulties or deficits. As for the treatment plan, Dr. Zagar documented his concern regarding treatment with ongoing IV antibiotics. Additionally, Dr. Zagar recommended Ms. Spears' consult with a Psychologist, a Clinical Social Worker for relaxation training and sleep hygiene, and Provigil or Ritalin for fatigue. Ms. Spears was to consider the options.

During the STD appeal review, all the medical documentation in Ms. Spears' disability claim file was reviewed by Michael Silverman, MD, Board Certified in Infectious Disease and in Internal Medicine, and a certified Medical Examiner. Dr. Silverman's 11/23/09 report of that review indicated the medical documentation on file did not support evidence of any infectious disease process, nor did it, despite Ms. Spears' symptoms of headaches, leg and upper back pain, support restrictions and/or limitations for Ms. Spears' work activity, as of 2/8/09 and forward.

Liberty002385

In a letter dated 1/29/10, Ms. Spears was notified that the denial for continued STD benefits beyond 2/8/09 was upheld. At the request of the Plan fiduciary, United Technologies Corporation, Ms. Spears was then provided a second opportunity to appeal the STD denial.

On 1/20/10, Ms. Spears presented to Dr. Giannini's office to have State assistance forms completed. Ms. Spears reported, "Has definitely improved overall. Has been off antibiotics... Memory still not very good. Symptoms not as frequent, often, severe. Has been severely fatigued. Sleep still not good." Dr. Giannini reported on exam, Ms. Spears was alert, in no acute distress, and did not appear sickly.  Mental status exam findings indicated Ms. Spears was oriented in all spheres, had appropriate mood and affect with appropriate judgment and insight.

After her first office visit with Dr. Raxlen on 4/21/09, Ms. Spears saw Dr. Raxlen almost monthly for the remainder of 2009. In 2010, Ms. Spears had four office visits with Dr. Raxlen.  From February 2011 through June 2013, office visits were every other month. From Ms. Spears' Trout Brook Drive residence in West Hartford, CT to Dr. Raxlen's West 79th Street office in New York City, Ms. Spears traveled 117 miles each way. MapQuest indicates with moderate traffic, this is a two hour drive. Dr. Raxlen's 2/16/10 office visit note starts with, "-Pt rode in Mardi Gras parade x 4 hrs on 2/13! –Sleep better but still erratic. –Feels okay if able to sleep 13 hours+ -not depressed or anxiety –off antibiotics x2 months." Ms. Spears also reported continued vision problems, stuttering, night sweats, tingling in right temporal lobe, right foot, and left forearm.  She advised she had a slight improvement in energy, and headaches were controlled with Migranal.

On 3/19/10, in the history of present illness, Dr. Zagar reported, "Stopped all antibiotics in December 2009 as per Dr. Raxlen. She felt that she "hit a plateau" prior to that. Was doing fairly well for some time. "Nowhere near normal. But slight energy increase." "Totally crashed after about 5 weeks... Considering restarting meds. Total of 7 months of antibiotics over the last year." Despite Ms. Spear's self-reported cognitive complaints, Dr. Zagar documented no cognitive issues on exam. Dr. Zagar reported, "Since it has been a year at this point, I am no longer comfortable facilitating their IV antibiotic treatments as prescribed by Dr. Raxlen.... I will prescribe one more month."

In Dr. Kage's <u>Patient Call In</u> note dated 5/6/10, Dr. Kage reported, "I am not going to prescribe treatments for Lyme."

The claim file contains correspondence from ConnectiCare dated 4/9/10 in response to Dr. Raxlen's request for IV hydration three days per week. The letter to Ms. Spears states, "Based upon the medical information submitted for review, there is no physician documentation (office progress notes or laboratory studies) of a disease or condition that requires intravenous hydration several times per week. Additionally, there is no documentation that you cannot maintain hydration by drinking adequate amounts of oral fluids."

During the second STD appeal review, Dr. Silverman was asked to review all the additional documentation received in support of Ms. Spears' claim. As in Dr. Silverman's first review, multiple attempts to reach Dr. Raxlen were unsuccessful. On 4/8/10, Dr. Silverman did speak with Dr. Kage. Dr. Silverman's summary of that conversation reports, "She stated that there was no clearcut evidence of rheumatological disorder which would explain the claimant's current symptomatology from her perspective," and she would defer to Dr. Raxlen regarding Ms. Spears' tick-borne illness. As a result of this second review, Dr. Silverman continued to report the medical documentation on

Liberty002386

file did not support evidence of an infectious disease process, and despite Ms. Spears' self-reported symptoms, the medical documentation did not support restrictions and/or limitations for Ms. Spears' work activity to preclude her from performing her job as of 2/8/09 and forward.

On the <u>Physical Residual Functional Capacity Questionnaire</u> completed by Dr. Zagar on 6/21/10, Dr. Zagar reported Ms. Spears' diagnoses are CNS Lyme disease and migraine.   Symptoms were reported as neck/shoulder pain, migraine, fatigue, cognitive impairment, and joint pains. On this form, Dr. Zagar indicated Ms. Spears has anxiety affecting her physical condition. Dr. Zagar reported Ms. Spears is able to sit one hour at a time before changing position; would need 15 minute breaks every two hours; can lift up to 10 pounds occasionally. Dr Zagar reported, "Main issues are cognitive- trouble with memory, word finding, concentration, and fatigue requiring frequent naps. On the <u>Medical Source Assessment (Mental)</u> form, in the categories of Understanding and Memory, Sustained Concentration and Persistence, and Adaptation, Dr. Zagar indicated Ms. Spears was able to perform the task or function with noticeable difficulty or unable to perform the task or function on a regular, reliable schedule. Under Social Interaction, Dr. Zagar mostly indicated Ms. Spears was able to perform the tasks with no observable limits, other than, "accept instructions and respond appropriately to criticism," that would be performed with noticeable difficulty.

Ms. Spears was seen in the office by Dr. Giannini on 7/9/10.  The office note states:
> Patient words: She is here to fill out disability papers. She has been treated for chronic Lyme and because of this is not able to work. She has had neuroLyme and has serious enough symptoms related to this that she is unable to hold down a job. Cannot focus, poor concentration, cannot perform simple tasks. Can be fine 1 minute and then extreme fatigue and has to go lay down. Also has dizziness, nausea, vomiting, and chronic headaches.

On 7/9/10, Dr. Giannini reported Ms. Spears was alert, cooperative and well groomed, not in acute distress, not sickly, well nourished, well developed, and well hydrated with normal posture and normal voice. Dr. Giannini documented on exam for Neuropsychiatric, "Thought Process/Cognitive Function- attention deficit, reading comprehension impaired, word comprehension impaired and concentration impaired (during conversation in office had trouble staying on task and following conversation. Could not remember dates)." Assessment and Plan stated, "Lyme disease." It is noted that this 7/7/10 treatment record, after Ms. Spears' explicit, self-reported symptoms that date, is the only record on file in which Dr. Giannini reported anything on Neuropsychiatric exam, other than a normal mental status exam.

On 7/9/10 Dr. Giannini then completed the same forms as completed by Dr. Zagar on 6/21/10, and provided a similar assessment to Dr. Zagar's. Dr. Giannini indicated Ms. Spears has depression affecting her physical condition.  Dr. Giannini reported:
> Due to all of Haley's symptoms she is unable to complete a workday due to extreme cognitive dysfunction and fatigue. She can be fine one minute and severely fatigued and needing to go to bed the next. She has minimal to no ability to concentrate, stay on task, focus or remember even simple things at this point. She is unable to work at this time and for likely the next several years and probably beyond.

In 2010, Ms. Spears was treated by Dr. Cynthia Grosso, Chiropractor, for neck and upper back pain. Treatment was recommended two to three times per week and began on 6/2/10. Ms. Spears attended treatment approximately weekly, through 9/9/10. On 9/9/10, Dr. Grosso reported, "The patient's prognosis is guarded because has not received enough treatments to determine a prognosis."  It is

Liberty002387

noted that Dr. Grasso's office in West Springfield, Massachusetts is 32 miles from Ms. Spears' West Hartford, Connecticut residence, and according to Google Maps, a 56 minute drive.

On July 12, July 16, and July 20, 2010, Ms. Spears participated in a neuropsychological evaluation performed by Marian Rissenberg, PhD, as referred by Dr. Raxlen, to determine the nature and extent of Ms. Spears' cognitive impairment. Ms. Spears reported she paid a neighbor to drive her the 90 minutes to Dr. Rissenberg's office, as she is only able to drive short distances due to "fatigue and confusion." Dr. Rissenberg reported:

> At the time of testing, Ms. Spears' symptoms included forgetfulness and poor concentration, difficulty with word-retrieval, new learning, following directions, organizing and completing tasks and keeping track of what she was doing or saying, in addition to fatigue, malaise, chills and sweats, dizziness, neck and back pain, sleep disturbance, increased anxiety and irritability, and sensitivity to noise.

Dr. Rissenberg concluded Ms. Spears demonstrated a "dramatic decline in mental status," with impairment of working memory, and auditory verbal memory. Dr. Rissenberg reported, "The nature and severity of these cognitive deficits, particularly coupled with Ms. Spears' physical symptoms, would preclude gainful employment of any kind at this time." Continued aggressive medical treatment and supportive psychotherapy were recommended.

Dr. Raxlen's 7/18/10 office note reports, "still has cognitive issues, but turns off and on. –short term & long term memory –friends recall events-she does not remember them... can get overloaded easily-overwhelmed   -became confused at brother's wedding-again confused-couldn't follow wedding ceremony."

Ms. Spears returned to see Dr. Zagar on 7/23/10, for her chief complaint of Lyme disease. She reported she had neuropsychological testing due to her issues with memory and thinking. Although Ms. Spears reported dizziness and memory loss/lapses, difficulty walking and numbness, anxiety, and sleep disturbances, on exam, Dr. Zagar reported Ms. Spears was alert, oriented to time, place and person, well nourished, and "patient did not appear uncomfortable." Dr. Zagar documented a normal neurological exam, and, "Attention demonstrated no abnormalities." Topamax was to be decreased to see if the decrease would improve Ms. Spears' cognitive complaints.

Ms. Spears was first seen in the Infectious Disease office of Zane Saul, MD, on 8/8/10. Ms. Spears' extensive history of symptoms and treatment was documented. The Assessment indicates, "Multiple somatic symptoms since 2008 -HA, ? cognition... sleep abnormalities, stuttering, fatigue –multiple specialists... ? lyme vs Psych issues." The plan at that time was to obtain previous records, review, then make an assessment. Dr. Saul then sees Ms. Spears on 9/3/10. Although he circled multiple symptoms in the review of systems including brain fog, there are no cognitive or psychiatric findings documented on exam. Ms. Spears continues to see Dr. Saul for monthly visits throughout May 2011 and then every 2 to 3 month thereafter.

In a letter dated 9/9/10, Dr. Raxlen reported he had last seen Ms. Spears on 7/8/10 and that Ms. Spears had only had "partial improvement in response to extensive treatment" of the co-infections, and she continued to suffer from "debilitating physical and neurocognitive symptoms."

All the medical documentation in Ms. Spears' claim file was reviewed by John Brusch, MD, Board Certified in Internal Medicine and Infectious Disease. The 10/14/10 report of that review indicated,

Liberty002388

"Although many diseases have been involved to explain the claimant's clinical picture, there are very few that are substantiated clinically." Among the substantiated diseases Dr. Brusch listed were peptic ulcer disease, Hashimoto's thyroiditis, migraine headaches, asthma and irritable bowel syndrome. Dr. Brusch reported Ms. Spears "does not have any significant infectious disease that would impair the claimant's sustainable full time capacity as of 02/08/2009," and "There is no evidentiary documentation that her listed medications impair her full-time sustainable capacity; Plaquenil, azithromycin, Mepron, Rifamin, Topamax, Prevacid, Asacol, Singulair, Zoloft, Oracit vitamins, Advair and Proventil."

On 10/19/10, Ms. Spears reported to Dr. Gouin Young that she had increased clarity, decreased brain fog, improved speech and better retention with the antibiotic treatment for Lyme. Ms. Spears also reported that her insomnia was erratic, and she continued to have fevers and night sweats.

After Liberty upheld the STD denial on 1/29/10 and again on 5/13/10, on 10/27/10 the STD fiduciary, UTC, instructed Liberty to release all remaining STD benefits to Ms. Spears. At this time, there was no change in Liberty's determination that the medical evidence on file did not support impairment preventing Ms. Spears from performing her job, rather it was the fiduciary's decision to pay STD benefits to Ms. Spears through the 3/27/09 maximum STD benefit date.

On 11/16/10, Liberty issued the LTD denial letter. LTD benefits were denied since Ms. Spears had not fulfilled the Policy's Elimination Period. As noted previously, the UTC Group Disability Income Policy requires, in order to be eligible for LTD benefits, the claimant must fulfill the 180 day Elimination Period of continuous disability.

The most recent office visit note on file from Dr. Kage is dated 12/23/10. Ms. Spears' chief complaint that date was feeling achy in both shoulders, her neck and joints throughout the day and daytime somnolence. Ms. Spears rated her fatigue as varying from 6/10 to 10/10. Ms. Spears reported she is able to do light housekeeping such as emptying the dishwasher. Dr. Kage explained, "Pronounced migraine headaches triggered an extensive work-up which showed possible astrocytoma, possible tick-borne disease, and perhaps rheumatic autoimmune disease." Dr. Kage noted the possible astrocytoma is being monitored by Yale, she is monitoring the autoimmune inflammatory disorder (with normal repeat rheumatic lab tests and Plaquenil discontinued in December 2009), and Infectious Disease, Dr. Raxlen, is treating the Lyme. Dr. Kage further reported, "The diagnosis of Lyme disease based on CSF Lyme test is not irrefutable since her Lyme serology 1.09 was normal, Lyme c6 test- negative."

At Dr. Saul's request, Ms. Spears had a Sleep Study on 1/19/11. The results of the Sleep Study included periodic limb movement disorder, sleep onset and sleep maintenance insomnia, no "snoring or obstructive sleep apnea observed by Medicare guidelines." On 2/17/11, Ms. Spears met in consultation with Richard Shoup, MD, Sleep Medicine specialist. Ms. Spears reported difficulty falling asleep and staying asleep. In Dr. Shoup's evaluation for the review of systems, Ms. Spears reported she had no palpitations, no abdominal pain, and "No decrease in ability to concentrate, no headaches, no loss of consciousness, no memory loss, no complaints of muscle weakness, no seizures. Seizures before treated for CNS Lyme." On exam, Ms. Spears was found to be alert, well developed, well nourished, "affect is normal and positive. In no acute distress." No cognitive deficits were noted on exam. Dr. Shoup reported Ms. Spears' "internal clock has no regularity," and he recommended Ms. Spear designate a regular wake-up time, get 30 minutes of bright light each morning, and keep a sleep diary. On 3/24/11 and 4/29/11, Dr. Shoup documented no progress with

regulating Ms. Spears' sleep despite multiple additional recommendations.

Dr. Zagar followed up with Ms. Spears and her mother on 2/18/11. Difficulties with cognition and sleep were reported. Ms. Spears indicated at that time she started on vitamin D and B12, was in acupuncture, chiropractic treatment, and on adrenal support as recommended by the naturopath. On exam, Dr. Zagar reported Ms. Spears "did not appear uncomfortable," and "No disorientation was observed, Remote memory was not impaired, Short term memory not impaired, An adequate fund of knowledge was demonstrated... No language abnormalities were demonstrated... Attention demonstrated no abnormalities."

On 3/28/11, the LTD Policy definition of disability would change from Ms. Spears' disability from her own occupation, to disability from *any occupation.* The United Technologies Corporation Group Disability Income Policy states:

*"Disability" or "Disabled" means:*
  i.   *"Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
  ii.  *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"Any Occupation" means any occupation, for which the Covered Person is reasonably fitted considering his training, education, experience, age, physical qnd mental capacity, and the salary of which is at least 80% of the Covered Person's Basic Monthly Earnings.*

On June 15, 2011, the appeal review of the LTD denial was completed. The determination was to uphold the LTD denial since the Policy required Elimination Period had not been fulfilled. It was recognized that Ms. Spears sought medical treatment and she reported various and differing symptoms, Liberty had determined that the medical evidence did not substantiate that Ms. Spears was disabled throughout the entire Elimination Period and beyond.

Ms. Spears followed up with Dr. Zagar regarding Lyme disease on 8/19/11.  On exam, Dr. Zagar reported Ms. Spears "did not appear uncomfortable," and "No disorientation was observed, Remote memory was not impaired, Short term memory not impaired, An adequate fund of knowledge was demonstrated... No language abnormalities were demonstrated... Attention demonstrated no abnormalities." This is the last office visit on file that Ms. Spears had with Dr. Zagar.

On 9/7/11, Ms. Spears reported to Dr. Saul that "seems like her cognition is worse," she had new stuttering, and her pain was worse. Dr. Saul provided the diagnosis of CNS Lyme and the plan was to continue current treatment.

Dr. Baehring's 9/23/11 office visit record indicates on that follow up visit Ms. Spears had no neurologic symptoms to report and her headaches were mostly resolved. Again, Dr. Baehring documented Ms. Spears had no cognitive deficits.

Regarding a telephone call to Dr. Gouin Young's office received from Ms. Spears on 11/10/11, the note indicates, "w/be traveling for 3 weeks. Should she up the Ester-C-what strength-Anything else she should increase?"

Liberty002390

On 1/30/12. Ms. Spears was evaluated by John Tagliarini, DC, for head, neck and shoulder pain. Ms. Spears reported on a scale of 0 to 10, her discomfort ranged from 5 to 10.  Ms. Spears reported upper back pain, mid back pain, lower back pain, shoulder pain, wrist pain, hand pain, knee pain. Ankle pain, foot pain, joint swelling/stiffness, fatigue, ringing in the ears, visual disturbances, nausea, loss of appetite, asthma, seasonal allergies, absence seizures, and hypothyroid.  Dr. Tagliarini's assessment on 1/30/12 indicated, "Haley's prognosis is good at this time." Treatment continued with Dr. Talagrini through 8/11/14.

Dr. Raxlen's office visit notes from March and June 2012 report improvement in Ms. Spears' cognition and communication. As of 8/3/12. Ms. Spears reported to Dr. Raxlen that her energy was better, she could do more in a day, and she took 2 walks per day. Dr. Raxlen's 11/9/12 office note indicates Ms. Spears had "infrequent headaches relieved with hydration," was more active with church bible study and other groups, sleep was improved, exercise included elliptical, pilates, and yoga, and she was walking her dogs every day.  Ms. Spears reported that date that she hoped to go back to work in the next few months.

Ms. Spears 11/18/12 Supplemental List as prescribed by Dr. Gouin Young, included 14 supplements for Ms. Spears to take in the morning, and 6 supplements to take at bedtime.

Ms. Spears began treatment with Robert Lang, MD, Endocrinologist in February 2013. The 2/21/13 exam documented Ms. Spears' mental status as normal. A thyroid ultrasound and biopsy were recommended.  On 2/22/13, Ms. Spears had a follow up appointment with Dr. Oberstein, at which time he "strongly recommended excision, now." At Ms. Spears' office visit with Dr. Lang on 3/22/13, based on her history of Hashimoto's and the biopsy report, Dr. Lang recommended a thyroidectomy.

Ms. Spears had her regular follow up visit with Dr. Baehring on 4/22/13. She reported no neurologic symptoms, no cognitive deficits, and no problems with language. Dr. Baehring reported, "The two brain MRI abnormalities have remained entirely stable," and surveillance scans were increased to every 2 years.  This is the last update with Dr. Baehring on file.

Dr. Raxlen's 6/4/13 office note reports Ms. Spears had "clarity in cognition," and she was exercising most days. Ms. Spears was "off shots" and weaning off the Tramadol. Ms. Spears reported her asthma was better, and she was scheduled for the thyroid surgery. Dr. Raxlen reported Ms. Spears had driven to his office from Boston that day. This is the last office note from Dr. Raxlen on file.

After a negative cardiac work-up by Dr. Naseer, the thyroidectomy was performed on 6/27/13 by Robert Udelsman, MD. In the July 1, 2013 follow up office note Dr. Udelsman reported Ms. Spears recovered well postoperatively, and she was to return to the care of Dr. Oberstein. Ms. Spears followed up post-operatively with Dr. Oberstein on 8/30/13, and with Dr. Lang post-operatively on 9/3/13. Ms. Spears reported to Dr. Lang she was "feeling ok but not 100%. Decreased energy. Also sees Endocrinologist in Hartford." At her office visit with Dr. Oberstein on 11/6/13, Ms. Spears reported she was "feeling ok in general." On 11/27/13, Dr. Lang's office note reported Ms. Spears felt better but that she had a sinus infection.  The treatment plan was to obtain lab results from Dr. Oberstein and to get an ultrasound one year from surgery. The diagnoses included hypothyroid after surgery and history of papillary cancer.

The most recent office visit note on file from Dr. Saul is dated 6/9/14. Ms. Spears reported doing

Liberty002391

well off antibiotics, with better energy, and, "Thinking about trying to find work." Dr. Saul's assessment that date was Lyme, now stable off antibiotics and Hypothyroidism. Ms. Spears was to follow up with Dr. Saul as needed.

On 11/17/14, Ms. Spears had an appointment with Zhiheng He, MD, Endocrinologist, in Cambridge, Massachusetts. Dr. He reported Ms. Spears had referred herself to the office for follow up of her thyroid cancer and thyroidectomy. Dr. He reported Ms. Spears had just moved to Boston from Connecticut. Ms. Spears denied any complaints on review of systems and the physical exam was within normal limits. Lab work was recommended in six weeks and a follow up ultrasound was recommended for February 2015.

The medical documentation on file indicates Ms. Spears was treated during the period 12/8/14 through 8/26/15 at Maddalo Chiropractic for back pain. Increased pain was attributed to a fall on ice in January 2014 and an automobile accident on 7/9/15. From 9/16/15 through 12/9/15, Ms. Spears received chiropractic treatment for cervical, thoracic, and lumbar pain and muscle spasm with Robert Rougeau, DC, of Greenacres Clinic in Louisiana.

On 12/17/15, Ms. Spears was evaluated by Melissa Albritton, MD, Endocrinologist, in Bossier City, LA. Regarding Ms. Spears extensive complaints and symptoms, Dr. Albritton reported, "Her complaints tend to fluctuate. It is hard for me to get a good grasp on what complaints she has right now as her complaints tend to vary from day to day." Physical exam was documented as within normal limits. Dr. Albritton provided the diagnoses of Thyroid cancer, Post-surgical hypothyroidism, and Vitamin D deficiency. Dr. Albritton reported, "I did tell her I am not a holistic therapist nor am I a specialist in infectious diseases so if she does want follow up for that issue she will need to speak with her primary care about referrals... I have encouraged her to make sure she establishes with primary care."

We learned from the LTD forms Ms. Spears completed on 9/8/15, that **Ms. Spears returned to work full time in August 2014**. Ms. Spears also reported as of September 2015, she resided in Shreveport, Louisiana. On the Activities Questionnaire completed 9/8/15, Ms. Spears reported:
My condition has varied from 2009-2015: In 2009 I was debilitated + generally could stand/walk for a few minutes at a time. I could walk from the car to the store, often this was a challenge. I had bad days + some not quite as bad. Sitting varied from a few minutes to over an hour. There were times I felt better for a period, then would go down hill again. In Aug 2014 I felt I could go back to work. I was able to sit most of the day at work, at times I would nap in my car during lunch.

Regarding the use of an assistive device, Ms. Spears indicated, "There were times I had to hold onto someone when walking." Regarding sitting in a car Ms. Spears stated she could sit long enough to get to doctors' appointments in 2009 and "short distances generally," and then in "2013ish I was able to drive further but this could vary."

Regarding her ability to perform personal and household activities of daily living, Ms. Spears reported:
I was always able to go to the bathroom myself. Sometimes people would bring me meals, often weekly. I did limited grocery shopping when able, I had help with my finances and mail for a long time. My ability to clean up after myself/after meals varied. I had a cleaner for a significant period of time. Sometimes I needed help drying my hair + getting dressed as well as going up +

Liberty002392

down stairs. Generally I bathed myself but there were periods when I needed help. I had gradual improvement in time, as of Aug. 2014 I did not need assistance in most of these tasks.

Regarding participating in an exercise program, Ms. Spears stated she exercised at times as part of her treatment plan and eventually was able to increase her exercise. She volunteered for the homeless ministry in 2015.  Travel included flying to Florida in 2013; flying to California in December 2014; flying to Louisiana to visit "family/caregivers" (dates not provided); "drove to MA 2013, 2014."

Ms. Spears reported she did experience memory and concentration problems, "I have trouble remembering dates. There were times I could not remember my age or year I was born, how to get home from a nearby intersection, when I had Dr appointments, tasks to complete. While I am much improved, I still struggle at times."

On the Claimant Information Form completed 9/8/15, Ms. Spears provided the names and addresses of 27 providers involved with her medical care. Thus, during this remand review, on Ms. Spears behalf Liberty requested the treatment records (from date of first treatment to the present) of all 27 providers.  Five providers did not respond to Liberty's request, however, Attorney Zimberlin did eventually provide records from two of the five; Drs. Raxlen and Tagliarini.  Additionally, Attorney Zimberlin forwarded records from many of the 22 physicians who did respond to Liberty's request, as well as treatment records from the newest providers, Greenacres Chiropractic and Dr. Alberton.

Based on the information regarding Ms. Spear's recent work activity and wages provided by Attorney Zimberlin, in mid-August 2014, Ms. Spears began working full time for Kforce, Inc. at a location in Boston, MA. Ms. Spears reported her position was Professional Administrator. Ms. Spears worked for Kforce through mid-March 2015. Beginning 3/18/15, Ms. Spears took a full time Recruiter position with WinterWyman. The position was located in Cambridge, MA, and the "expected duration of the assignment" was "four months." In a letter to Liberty dated 12/7/15, Attorney Zimberlin explained, "Please be advised that Ms. Spears is no longer working. She last worked in August 2015. She is seeking additional medical treatment."

**Remand Review**
To understand and thoroughly evaluate Ms. Spears' symptoms and medical conditions from September 27, 2008 to the present, all the medical documentation on file was referred for a physician panel medical review comprised of specialists in Neurology, Neuropsychology, Infectious Disease, and Internal Medicine/ Endocrinology. Additionally, Ms. Spears was asked to attend an Independent Medical Examination (IME) with a Physical Medicine & Rehabilitation (PM&R) specialist.

The 3/4/16 panel review report was completed by Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine; Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine; Daniel Kitei, DO, MA, Neurology; Michael Raymond, PhD, ABN, Neuropsychology.  It was requested for this review, the physicians consider the periods 9/27/08 through 3/27/09, and from 3/28/09 forward. The four review physicians all noted the medical records provided for review and documented Ms. Spears' broad spectrum of medical complaints.

Dr. Cooper reported that he was asked to look at the medical documentation from several perspectives, including endocrinology, rheumatology, GI, cardiology, and internal medicine. From

Liberty002393

an endocrinology perspective, Dr. Cooper reported there is no evidence in the available records to support impairment. Ms. Spears has a history of thyroid issues, including multinodular thyroid and hypothyroidism. In 2009, a biopsy of the thyroid was done by Dr. Oberstein, which was found to be benign. She had her thyroid removed in June 2013, and subsequent thyroid ultrasounds showed no recurrence of cancer. From a rheumatology/musculoskeletal perspective, Dr. Cooper said that the records indicated Dr. Kage performed exams of synovitis and musculoskeletal systems which were unremarkable.

Dr. Cooper further reported that Dr. Giannini opined restrictions and limitations in 2010 due to Ms. Spears' "plethora of symptoms, but provided no clinical evidence to back up her opinion within the medical records provided for review." From a gastroenterology perspective, Dr. Cooper noted that there were no abnormal findings. Finally, Dr. Cooper stated that from a cardiology perspective, all exams were also normal. Additionally, the sleep studies that were conducted were normal. In summary, Dr. Cooper reported there is insufficient evidence within the records to support functional impairment and no restrictions for Ms. Spears' functional capacity including work capacity, during the periods 9/27/08 through 3/27/09, and from 3/28/09 forward.

From an Infectious Disease perspective, Dr. Crossley was looking at whether Ms. Spears has had any infection that would be "responsible for her non-specific symptoms and if these would be functionally impairing." Dr. Crossley reported there is no evidence that Ms. Spears has had Lyme disease or other infections that would be functionally limiting:

This conclusion is based on the absence of any objective findings of late-stage Lyme disease (typically manifest by arthritis, neurologic findings, or a cardiac conduction defect) and the totally nonspecific self-reported symptoms noted by the claimant. Importantly, except for a single CSF test that is impossible to interpret, all of the claimant's testing for tick-borne illnesses was negative.

Dr. Crossley concluded there are no documented impairments for the periods 9/27/08 through 3/27/09, and from 3/28/09 forward, that would be associated with the presence of any infection. "Her symptoms are non-specific and not related to any infection... The claimant's functional capacity would not have been limited by any infection during the periods noted."

Dr. Kitei reported from a neurology standpoint:

Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support impairment from a neurologic standpoint. The claimant has complained intermittently of headaches but the most recent note including notes from 2009 and 2010 detail that she had significant improvement. When she was seen at Yale Neurology on 7/30/10, she had not had migraines for months, and when she saw Associated Neurologists of Southern Connecticut on 3/29/10, her migraines were well controlled. When she saw Yale Neurology on 4/22/13, she did not have any neurologic symptoms and headaches had largely resolved.

Dr. Kitei emphasized Ms. Spears has had consistently normal neurologic examinations throughout the records, and no neurologic examinations that were abnormal.

Dr. Raymond, Neuropsychologist, noted Ms. Spears' primary complaint in 2008 was vascular headaches, and, "Multiple neurological examinations were negative and nondiagnostic with regard to neurocognitive functioning, sensorimotor abilities, and formal cranial nerve testing." Dr. Raymond

further reported:

Despite the claimant's subjective neurocognitive complaints, she was only evaluated neuro-psychologically on one occasion. This occurred per Dr. Rissenberg in July 2010. As noted, Dr. Rissenberg's conclusion that the neuropsychological test results "are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness" is certainly not confirmed or a viable clinical explanation based on the neuropsychological test results. In fact, the evaluation itself was cursory, non-standardized, and was limited by the exclusion of formal effort testing, as noted above. Premorbid levels of intellectual functioning appeared to be miscalculated based on the method and rationale documented in that prior report. Overall, based on those assessment factors, it is highly unusual that a neuropsychologist would be able to render a clinical opinion with any degree of neuropsychological certainty.

Dr. Raymond concluded, "the preponderance of clinical evidence contained within this file does not support neurocognitive impairment," for the periods 9/27/08 through 3/27/09, and from 3/28/09 forward.

In response to Liberty's request for further clarification, Dr. Raymond reported on 3/22/16 that:

Dr. Rissenberg's neuropsychological evaluation, dated July, 2010, albeit nonstandardized and somewhat cursory, would certainly preclude any conclusions regarding the claimant's current impairments, cause of impairments, severity of impairments, or limitations in functional capacity… the neuropsychological evaluation completed in July, 2010, is obsolete as it is 6 years old. Furthermore, the evaluation was nonstandardized, somewhat cursory, and without formal effort testing. Thus, given the dearth of updated neuropsychological data, the aforementioned information, in and of itself, does not reflect the claimant's impairments, cause of any impairments, severity of impairments, or limits on functional capacity.

On 3/2/16, Dr. Cooper spoke with Dr. Lang. Dr. Cooper's summary of that conversation was sent to Dr. Lang. Dr. Lang signed his agreement to Dr. Cooper's summary on 3/3/16, which stated, "Dr. Lang stated there should be no impact on her functionality from an endocrine perspective."

Since Dr. Lang was the only attending physician that responded to the review physicians' multiple attempts to speak to attending physicians, on 3/16/16, the physician panel review report was faxed to Drs. Zagar, Saul, Rissenberg, Kage, Gouin Young, Giannini, Baehring, and Dr. Raxlen (Dr. Donta had retired). The cover letter requested the providers review the panel report and comment, and should he/she disagree with the medical findings, to please provide his/her medical opinion and the medical basis for his/her disagreement. Additionally, it was offered that if an attending physician would like to speak with a review physician to discuss his/her medical opinion, a telephone consultation would be scheduled at a mutually agreeable time. Follow up calls were made to the physicians' offices to confirm their receipt of the faxed report.

Despite numerous additional calls by Liberty to request the providers' responses, ultimately responses were received from Dr. Zagar, and Dr. Rissenberg. On 4/18/16, Attorney Zimberlin submitted a statement from Dr. Giannini. Dr. Zagar's 4/6/16 response addressed January 2009 through October 2011, the period of time Ms. Spears was under his care. Dr. Zagar reviewed Ms. Spears' symptoms and treatment, indicating:

She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis. At the time I was seeing her, she seemed to do little outside of seeing her doctors because of her various symptoms. She was unable to drive or handle some other basic daily activities. Neuropsychological testing done in

Liberty002395

2010 showed cognitive impairment, which was consistent with her subjective symptoms. While I would agree that the diagnosis of CNS Lyme was not certain, she clearly has had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily function.

In regard to Dr. Raymond's neuropsychological report and conclusions, Dr. Rissenberg's 4/6/16 response defended her testing methodology and conclusions indicating that her "assessment of Ms. Spears was appropriate and comprehensive, reflecting the highest standards and best practices of my field..."

On 4/13/16, Dr. Giannini reported [the dates of the period Dr. Giannini references are unknown]:
    I was treating Haley during the period in question for headaches and fatigue. Headaches and fatigue have no specific objective evidence to indicate quality and severity. They are measured based on the patient subjective report. During this period Haley's headaches and fatigue were severe enough that she would have spent significant amounts of time away from a job. She would have been an unreliable employee and missed many days of work. She was most definitely disabled during this period.

Dr. Rissenberg's comments were sent to Dr. Raymond, and Dr. Zagar's comments were sent to Dr. Kitei, to determine if the attending providers' responses changed their previous conclusions, and to provide the medical rationale to support their conclusions. On 4/29/16, Dr. Kitei reported:
    The current records do not offer any additional information from a neurologic standpoint... From a neurologic standpoint there is no additional information that would alter my previous opinion that the evidence does not support impairment from a neurologic standpoint. As noted previously, the claimant complained intermittently of headaches but notes including 2009 and 2010 detailed that she had significant improvement and she has had consistently normal neurological examinations as detailed previously.

Dr. Raymond discussed methodology and standards for neuropsychological testing in the field. Dr. Raymond concluded:
    Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of neuropsychological certainty that neurocognitive impairment is not supported within the time frame in question (9/27/08 – 3/31/15). While Dr. Rissenberg raised concerns regarding the undersigned's clinical opinions and conclusions, the concerns were addressed by the undersigned as previously referenced. With all due respect, the concerns raised by Dr. Rissenberg did not change or alter the undersigned's opinions as previously stated in the initial and addendum reports dated 2/13/16 and 3/16/16, respectively.

The PM&R Independent Medical Examination took place on 3/14/16, as performed by Jenness Courtney, MD, in Shreveport, LA. Dr. Courtney also reviewed all the medical documentation in Ms. Spears' disability claim file. The IME report indicated, "The claimant is a former administrative assistant who was 31 years old at her date of disability, September 27, 2008, initially due to headaches. This evaluation is to determine the claimant's functional capacity for the periods of September 27, 2008, through March 27, 2009," and from 3/38/09 forward. Regarding the history of Ms. Spears' illness, Dr. Courtney reported:
    A comprehensive medical history was attempted; however, this claimant refused to give any substantial history. Upon questioning concerning her initial migraine headaches, this claimant

Liberty002396

stated that this was only the symptom of her real problems. She stated that she no longer has any problems related to this event. She attributes all of the problems as related to bacterial/parasitic infections. She states that treatment for these infections remedied her symptoms. When asked specific questions about the history and course of events during the time periods stated above, the patient states that she was instructed by her lawyer not to answer these questions.

Regarding Ms. Spears' activity level, Dr. Courtney reported:
   She was questioned concerning her ability to perform activities of daily living. When she was at her worst during the time frame after September 27, 2008, she reports that she had problems with fatigue, pain, and decreased energy. She also reports neurocognitive deficits, where she had difficulties with memory and confusion. She states that her mother and the home health nurse would aid her with activities of daily living such as dressing and bathing. She reports no problems at this time.

Dr. Courtney concluded:
   In summary, my overall impression regarding the insured's current verifiable physical impairments and limitations, as well as her maximum full-time work capacity, again, the patient specifically states that she does not have these problems at this point, that she was fully healed with the treatments that were provided to her. Her only complaints have to do with reduced energy, which she attributes to hypothyroid disease and her history of thyroidectomy.

   As far as to the extent of which the results of this Independent Medical Examination provide any information concerning the periods of September 27, 2008, through March 27, 2009, apparently the patient was placed on work restrictions, from my review, at least from November of 2008 through January of 2009, in which she was to return to work. Again, there was a reviewer that noted that from March 24, 2009, through May 11, 2009, she had no verifiable evidence of why the patient could not work.

Dr. Courtney reported, regarding the period from March 2009 forward:
   it does not appear that the patient had any incapacitating diagnosis. She had apparently been previously taken off work. The chiropractic notations of lumbalgia and cervical segment dysfunction and cervicalgia would not be a reason for the patient to not be able to perform at least sedentary work during that period of time. There are no current restrictions/limitations.

On 3/14/16, Liberty received a letter from Attorney Zimberlin indicating Dr. Courtney was rude and argumentative, unprepared, accused Ms. Spears of failing to cooperate, and did not do his job because he asked Ms. Spears' her diagnoses rather than determining the diagnoses himself. In his letter of reply to Attorney Zimberlin's 3/14/16 letter, Dr. Courtney stated, "It is a patient's job to comply with requests to provide detailed history of the illnesses including diagnosis and prior treatment at doctor's appointments. When asked to do the above, Ms. Spears responded with irritability and refusal to cooperate." Dr. Courtney did review the complete medical records that were provided to him.

In summary, based on a thorough review of all the medical documentation in Ms. Spears' disability claim file, the four specialty medical review and the PM&R IME completed during this remand review, it is determined that the medical evidence does not provide sufficient proof that Ms. Spears was unable to perform her own occupation continuously throughout the Policy's Elimination Period, 24 months Own Occupation period, and the Any Occupation period beginning on 3/28/11.

Liberty002397

**Remand Assessment**

To meet the definition of disability throughout the three phases of this claim, the Elimination Period, the Own Occupation period, and the Any Occupation period, Ms. Spears must provide proof of continued impairment which prevented her from performing her own Administrative Support occupation through 3/27/11, and prevented her from performing any occupation for which she is fitted, from 3/28/11 forward.

The UTC Group Disability Income Policy states:

> *Disability Benefit*
>
> *When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*
>
> *1. Disability;*
> *2. Regular Attendance of a Physician; and*
> *3. Appropriate Available Treatment.*
>
> *The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

Proof is defined by the Policy as:

> *"Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*
>
> *1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
> *2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
> *3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*
> *Proof must be submitted in a form or format satisfactory to Liberty.*

**Elimination Period**

At the onset of the LTD Policy's Elimination Period from 9/27/08 through 3/27/09, Ms. Spears' chief complaint was severe headaches. In the months from September 2008 through January 2009, Ms. Spears was evaluated by five Neurologists, two Rheumatologists, Endocrinology, Gastroenterology, and Cardiology.  Physical examinations were normal.

Ms. Spears' self-reported symptoms increased during the Elimination Period. Reported symptoms progressed from headaches with nausea and vomiting to include blackouts/seizures, insomnia, stuttering, and in November 2008 included memory gaps and stuttering. By January, Ms. Spears complained of fatigue, night sweats, weight loss/gain; dry eyes and dry mouth, stiffness in the morning, jaw pain, headache; eye pain, blurred double vision, floaters, flashes; asthmatic shortness

Liberty002398

of breath; chest tightness; heartburn, abdominal pain, diarrhea, nausea; recurrent sinus and ear infections; muscle weakness, tingling and numbness; anxiety; bruising easily; ringing in her ears.

Despite the increase in self-reported symptoms, Ms. Spears' cognitive and physical exams remained normal, and she was able to return to work on a part time basis beginning on 1/8/09, remained working part time through 3/24/09.

There are multiple inconsistencies noted in Ms. Spears' medical records. There are no findings on exam including the neurological or musculoskeletal exams by Dr. Giannini on 3/10/09. On 4/21/09, Ms. Spears reported to Dr. Raxlen that she experiences "Horrible migraines (no medicine worked)," while on 4/27/09, Dr. Zagar reported, "Headaches are well controlled, only 2 migraines in the last couple of months."

Since Ms. Spears' self-reported symptoms were not consistent with the medical evidence and her actual functional abilities continuously throughout the Elimination Period, Ms. Spears' STD and LTD claims were denied. As noted previously, STD benefits were paid through the 3/27/09 maximum benefit date based on the fiduciary's decision, not based on Liberty's assessment of Ms. Spears' level of impairment.

## Own Occupation Period

During the Own Occupation period from 3/28/09 through 3/27/11, as Drs. Raxlen, Zagar, Giannini, and Saul endorsed the diagnosis of Lyme disease, Ms. Spears' physical examinations remained normal. Although fatigue became a prominently reported symptom, there is no evidence Ms. Spears tried the medications for fatigue that Dr. Zagar recommended in October 2009. Additionally, Ms. Spears appeared to have little, if any, improvement in her sleep, despite Dr. Shoup's February through April 2011 recommendations regarding sleep hygiene.

Ongoing inconsistencies continued, as evidenced in the medical records. On 2/16/10, Ms. Spears reported to Dr. Raxlen that she was able to travel to Louisiana and rode in the Mardi Gras parade for four hours on 2/13/10. On 3/19/10, one month later, Ms. Spears reported to Dr. Zagar that once her antibiotics were stopped in December 2009, and after 5 weeks of feeling "fairly well," she "totally crashed." At this appointment, despite Ms. Spears' cognitive complaints, Dr. Zagar documented no cognitive issues on exam.

On the Physical Residual Functional Capacity Questionnaire and Medical Source Assessment (Mental) forms dated 6/21/10, Dr. Zagar reported Ms. Spears experiences symptoms of neck and shoulder pain, migraines, fatigue, joint pains, and cognitive impairment including trouble with memory, word finding, concentration, although he had never documented abnormal findings on exam. Similarly on 7/9/10, Ms. Spears' description of her symptoms were documented in a letter from Dr. Giannini and on the Physical Residual Functional Capacity Questionnaire and Medical Source Assessment (Mental) forms completed by Dr. Giannini. Dr. Giannini's 7/9/10 office visit note is the only of Dr. Giannini's office visit notes (before and after 7/9/10) in which Dr. Giannini documents on exam, any concern regarding cognitive difficulties.

In July 2010, Ms. Spears reported to Dr. Raxlen her cognitive impairment "turns off and on." In August and September 2010, Ms. Spears reported to Dr. Saul she has "brain fog." On 10/19/10, Ms. Spears reports to Dr. Gouin Young that she had increased cognitive clarity, better retention and improved speech.

Liberty002399

**Any Occupation Period**
There have been measurably fewer medical records submitted in support of Ms. Spears' impairing conditions for the Any Occupation phase, beginning 3/28/11. The review physicians, Drs. Cooper, Crossley, Kitei, and Raymond, all reported there is insufficient evidence within the medical records to support functional impairment, and therefore no restrictions for Ms. Spears' functional activity, including work activity, from 3/28/11 forward.

Discrepancies in Ms. Spears' reported symptoms continue to be evident. On 8/19/11, Dr. Zagar documented normal findings on the cognitive and physical portions of his exam; on 9/7/11, Ms. Spears reported to Dr. Saul that her cognition was worse; Dr. Beahring documented a normal neurologic and cognitive exam on 9/23/11. In November 2011 Ms. Spears reported to Dr. Gouin Young's office she would be traveling for three weeks.

In March through August 2012, Dr. Raxlen reported improvement in Ms. Spears' cognition and speech, and as of November 2012, Ms. Spears reported being active with church groups, having improved sleep, and engaging in regular exercise (elliptical, Pilates, yoga), and walking her dogs.

In June 2013, Ms. Spears had the thyroidectomy with no postoperative complications. Ms. Spears reported traveling to Florida in 2013. She continued to have the capacity to travel to her medical appointments in New York City. In June 2014, Ms. Spears reported to Dr. Saul that she had increased energy and was looking for work. Ms. Spears returned to work full time in August 2014.

Based on the claim and medical documentation on file, not only does the medical evidence fail to support impairment precluding Ms. Spears from performing her own Administrative Support occupation, and then any occupation, the documentation on file fails to support Ms. Spears' symptoms were of a frequency, severity, and duration, to have precluded her ability to perform her occupation throughout the 9/27/08 through 3/27/09 Elimination Period, throughout the 3/28/09 through 3/27/11 Own Occupation Period, and at the 3/28/11 beginning of the Any Occupation period, and forward.

**Additional Remand Analysis**
Of note, there have been references to Ms. Spears' mental health and recommendations for mental health treatment throughout the claim file, however, there are no mental health evaluations or treatment records on file. Dr. Silvers questioned the role of stress in Ms. Spears' symptoms. Ms. Spears' mother reported her concern regarding Ms. Spears' mental health. Dr. Donaldson reported Ms. Spears' appeared depressed. Dr. Kage prescribed Zoloft. On forms, Dr. Zagar indicated Ms. Spears has anxiety affecting her physical condition, and Dr. Giannini reported depression was affecting Ms. Spears' physical condition. Dr. Zagar and Rissenberg recommended psychotherapy. Dr. Saul's office also questioned the role of mental health in Ms. Spears' multiple somatic complaints.

As noted previously, Dr. Kage had succinctly explained Ms. Spears medical work-up was set in motion by her complaints of increased, severe headaches; "Pronounced migraine headaches triggered an extensive work-up which showed possible astrocytoma, possible tick-borne disease, and perhaps rheumatic autoimmune disease." Ms. Spears pursued multiple opinions and treatment from numerous specialists for these possible conditions.

Liberty002400

There was no brain tumor although careful surveillance was required to establish that fact. The rheumatology work-up indicated no rheumatic autoimmune disease. The presence of tick-borne disease has been disputed, although Ms. Spears was extensively treated for that condition. Whether or not a specific medical condition or diagnosis existed does not determine whether Ms. Spears met the Policy's definition of disability; it is Ms. Spears' functional capacity that determines whether she had the ability to perform her own occupation through 3/27/11, and any occupation thereafter. Ms. Spears' self-reported symptoms were not consistent with the overwhelmingly normal medical and cognitive exams, and did not coincide with her actual functional abilities.

This remand review has taken into consideration the opinions and assessments of all Ms. Spears' treating physicians. Ms. Spears' attending physicians have had the opportunity to directly observe, listen to, and examine Ms. Spears. The documentation of each attending physician has been fully considered; Ms. Spears' reported symptoms and functional activity, as well as each physician's reported objective physical exam findings, imaging and laboratory test results, and their medical expertise. Alternatively, the expert reviewing physicians who have examined the medical records over the course of Ms. Spears' claim, have their specialized medical expertise, and a comprehensive perspective based on all the medical information from the numerous physicians who have evaluated Ms. Spears. These peer review physicians have had the opportunity to review, compare and contrast all medical evaluator's findings, as well as the frequency, duration, consistency and severity of Ms. Spears' self-reported symptoms.

The review physicians are all board certified in their specialties and are qualified to review and interpret medical records and opine on medical functionality. Additionally, Drs. Taiwo, Silverman, Crossley, and Raymond are certified Medical Examiners. All the attending physicians' documentation and opinions have been fully considered. The reviewing physicians' conclusions are based on the totality of medical documentation on file, including consistencies and inconsistencies in Ms. Spears' self-reported symptoms and functional activity, as well as all the documented medical data.

The UTC Group Disability Income Policy states:
*Discontinuation of the Long Term Disability Benefit*
*The Monthly Benefit will cease on the earliest of:*
1. *the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;*
2. *the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.*
3. *the date the Covered Person refuses to be examined or evaluated at reasonable intervals;*
4. *the date the Covered Person refuses to receive Appropriate Available Treatment;*
5. *the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;*
6. *the date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;*
7. *the date the Covered Person's current Partial Disability earnings exceed 80.00% of his Basic Monthly Earnings;*
   *Because the Covered Person's current earnings may fluctuate, Liberty will average*

Liberty002401

> *earnings over three consecutive months rather than immediately terminating his*
> *benefit once 80.00% of Basic Monthly Earnings has been exceeded.*
> 8.  *the date the Covered Person is no longer Disabled according to this policy;*
> 9.  *the end of the Maximum Benefit Period; or*
> 10. *the date the Covered Person dies.*

According to the earnings records submitted by Attorney Zimberlin, Ms. Spears returned to work, full time, in August 2014. At Kforce, Ms. Spears' averaged earnings of approximately $2749.00 per month. In March 2015, Ms. Spears combined monthly earnings from Kforce and WinterWyman was $1119.00. In April 2015 Ms. Spears earned $4658.00, and in May 2015 she earned $5151.00 with WinterWyman. Ms. Spears' average monthly earnings over the three months March, April, and May 2015, was $3642.00, greater than 80% of Ms. Spears' $4422.00 Basic Monthly Earnings prior to her absence from work in September 2008.

The Policy states:
> *"Basic Monthly Earnings" means the Covered Employee's monthly rate of earnings from the*
> *Sponsor in effect for the calendar year immediately prior to the date Disability or Partial*
> *Disability begins. However, such earnings will not include bonuses, commissions, overtime pay*
> *and extra compensation.*

Although Ms. Spears' earnings' did not exceed 80% of her Basic Monthly Earnings until the Spring of 2015, Ms. Spears did return to work full time in August 2014.

Attorney Zimberlin's 12/7/15 letter states, "Please be advised that Ms. Spears is no longer working. She last worked in August 2015. She is seeking additional medical treatment… Based on Spears' recent decline in health, Liberty should not limit its consideration of this claim to a seven year period." However, it is noted that the WinterWyman Job Order on file, indicates Ms. Spears' position was a four month period only, beginning 3/18/15.

Additionally, Dr. He's 11/17/14 office note reports Ms. Spears had no complaints in the reviews of systems, and the physical exam was within normal limits. Dr. Albritton's 12/17/15 office note indicates Ms. Spears reported extensive complaints and symptoms, although again, the physical exam was reported to be within normal limits. Furthermore, at the March 2016 IME, Ms. Spears reported to Dr. Courtney that she no longer had symptoms from her previous tick-borne infections, and Dr. Courtney reported Ms. Spears currently has no restrictions or limitations for work activities.

The UTC Group Disability Income Policy further states:
> *"Active Employment" means the Employee must be actively at work for the Sponsor:*
> 1. *on a full-time basis and paid regular earnings;*
> 2. *for at least the minimum number of hours shown in the Schedule of Benefits; and either*
>    *perform such work:*
>    *a. at the Sponsor's usual place of business; or*
>    *b. at a location authorized by the Sponsor.*

> *An Employee will be considered actively at work if he was actually at work on the day*
> *immediately preceding:*
> 1. *a weekend (except where one or both of these days are scheduled work days);*
> 2. *holidays (except when the holiday is a scheduled work day);*

Liberty002402

3. *paid vacations;*
4. *any non-scheduled work day;*
5. *an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and*
6. *an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).*

The Policy also indicates:
*"**Employee**" means a person in Active Employment with the Sponsor.*
*"**Sponsor**" means the entity to whom this policy is issued."*

Based on this Active Employment provision, Ms. Spears would not have been in Active Employment since her termination from UTC, and thus not eligible for LTD benefits under the UTC Group Disability Income Policy, for any new period of disability.

Ms. Spears is also not eligible for LTD benefits under the Successive Periods of Disability policy provision. That provision states:

**Successive Periods of Disability**

*With respect to this policy, "**Successive Periods of Disability**" means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.*

*A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:*
1. *returns to his Own Occupation on an Active Employment basis for less than six continuous months; and*
2. *performs all the Material and Substantial Duties of his Own Occupation.*

*To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.*

*Benefit payments will be subject to the terms of this policy for the prior Disability.*

*If a Covered Person returns to his Own Occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.*

*If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.*

In our review of Haley Spears' claim, Liberty did fully consider the ruling by the Social Security Administration (SSA) to approve Social Security Disability Income (SSDI) benefits. Ms. Spears' SSDI benefits were approved at the Administrative Law Judge level on 2/25/11. It should be noted that while we fully considered the SSA's ruling, the decision by the SSA does not determine entitlement to benefits under the terms and conditions of the UTC Group Disability Income Policy. The Administrative Law Judge's Decision reports Ms. Spears' self-reported symptoms and the intensity and persistence of her symptoms, were considered at "face value." Additionally the

opinions of Dr. Raxlen, Zagar, and Giannini were afforded significant weight compared to other examining physicians, and/or medical review physicians.

Prior to the 2/25/11 SSA Decision, Liberty obtained the medical reviews of Dr. Potts, Neurology; Dr. Taiwo, Internal Medicine and Occupational Medicine; Dr. Silverman, Infectious Disease; Dr. Brusch, Infectious Disease. Since the 2/25/11 SSA Decision, Liberty has obtained updated treatment records, and has considered the medical reviews by Dr. Cooper, Internal Medicine and Endocrinology; Dr. Crossley Infectious Disease; Dr. Kitei, Neurology; Dr. Raymond, Neuropsychology; IME performed by Dr. Courtney, PM&R; that were not considered by the SSA in its determination process. Dr. Potts reported it was reasonable for Ms. Spears to remain out of work while medications were being regulated for her headaches; through 1/8/09. All other reviewing physicians reported the medical evidence was insufficient to support impairment precluding Ms. Spears from full time work.

### Conclusion
We conducted a thorough and independent review of Haley Spears' entire claim. In summary, we acknowledge that Ms. Spears has had multiple symptoms associated with her condition. However, the information does not contain physical exam findings, diagnostic test results, valid neuropsychological test results, or other forms of medical documentation supporting her symptoms remained of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the duties of her occupation continuously throughout and beyond the Policy's Elimination Period.

Having carefully considered all of the information submitted in support of Haley Spears' claim, our position remains that proof of Ms. Spears' continued disability in accordance with the Policy provisions has not been provided. Therefore, no Long Term Disability benefits will be paid.

This claim decision reflects an evaluation of the claim facts and United Technologies Corporation Group Disability Income Policy provisions.

Liberty Life Assurance Company of Boston will allow Ms. Spears the opportunity to submit a second, optional request for review. Since this optional review is not required by the Policy or the Court's remand order, it is requested that you notify Liberty within 45 days from your receipt of this letter, of your request for the optional review. At that time, we will determine a schedule for the submission of documents for that review. Your request for the optional review should be submitted to:

> **Liberty Life Assurance Company of Boston**
> **Liberty Mutual Benefits**
> **Attention: Nancy Winterer**
> **P.O. Box 7213**
> **London, KY 40742-7213**
> **Secure Fax No.: (603) 334-5708**

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Liberty002404

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002405