# EXHIBIT 17

# Exhibit 17a.

# Analytical Surveys, Inc. v. Tonga Partners., L.P.

United States District Court for the Southern District of New York

May 28, 2009, Decided; May 29, 2009, Filed

06 Civ. 2692 (KMW)(RLE)

**Reporter**
2009 U.S. Dist. LEXIS 45402 *; 2009 WL 1514310

ANALYTICAL SURVEYS, INC., Plaintiff, -against- TONGA PARTNERS, L.P., CANNELL CAPITAL, L.L.C., and J. CARLO CANNELL, Defendants.

**Subsequent History:** Affirmed by Analytical Surveys, Inc. v. Tonga Partners, L.P., 2012 U.S. App. LEXIS 11241 (2d Cir. N.Y., June 4, 2012)

**Prior History:** Analytical Surveys, Inc. v. Tonga Partners, L.P., 2008 U.S. Dist. LEXIS 75459 (S.D.N.Y., Sept. 26, 2008)

**Counsel:** [*1] For Analytical Surveys, Inc., Plaintiff: Jack Gerald Fruchter, LEAD ATTORNEY, Abraham Fruchter & Twersky LLP, New York, NY; Jeffrey S. Abraham, LEAD ATTORNEY, Abraham & Associates, New York, NY.

For Tonga Partners, L.P., Cannell Capital, L.L.C., J. Carlo Cannell, Defendants: Steven Michael Hecht, LEAD ATTORNEY, James Insun Lee, Lowenstein Sandler PC (NJ), Roseland, NJ.

**Judges:** Kimba M. Wood, United States District Judge.

**Opinion by:** Kimba M. Wood

## Opinion

*OPINION AND ORDER*

KIMBA M. WOOD, U.S.D.J.:

Plaintiff Analytical Surveys, Inc. ("Plaintiff") brought an action pursuant to Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"), 15 U.S.C. § 78p(b). Plaintiff sought disgorgement of alleged short-swing insider trading profits realized by Defendants Tonga Partners, L.P. ("Tonga"); Cannell Capital, L.L.C. ("Cannell Capital"); and J. Carlo Cannell ("Cannell") (collectively, "Defendants").

Plaintiff moved for summary judgment and Defendants cross-moved for summary judgment, or in the alternative, for partial summary judgment. In a September 29, 2008 Order (the "Order"), familiarity with which is assumed, the Court addressed Plaintiff's claim that pursuant to Section 16(b), Defendants were liable for short-swing profits from **[*2]** the November 2004 sale of 171,341 shares of ASI stock ("November 2004 transaction"). [1]

The Court found as a matter of law that Section 16(b)'s strict liability scheme applied to Defendants' November 2004 transaction; Defendants had claimed no applicable exemptions to Section 16(b) liability. [2] Accordingly, the Court granted in part Plaintiff's motion for summary judgment, and denied in its entirety Defendants' motion for summary judgment.

On November 20, 2008, the Court entered a settlement order in which the parties stipulated to the remaining disputed factual issues. Defendants expressly reserved the right to challenge the factual findings and legal conclusions in the Order.

Shortly thereafter, Defendants filed a motion for

[1] To establish Section 16(b) liability, a plaintiff need show only "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

[2] In granting the Plaintiff's motion for summary judgment and in denying the Defendants' motion for summary judgment, the Court rejected Defendants' arguments (1) that Section 16(b) was inapplicable to the November 2004 transaction; (2) in the alternative, that the Section 16(b) debt exception exempted Defendants from Section 16(b) liability; (3) in the alternative, that Section 16(b)'s policy **[*3]** objections would not be served by requiring Defendants to disgorge their profits; and, (4) in the alternative, that only Defendant Cannell should be required to disgorge his profits.

reconsideration of the Order. [3] Defendants argued that the Second Circuit Court of Appeals decision, *Roth v. Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008), entitles them to raise a new argument and that *Roth* constitutes a change in intervening law. Defendants contend that it would be manifestly unjust to deny their motion for reconsideration. For the foregoing reasons, the Court DENIES Defendants' motion for reconsideration.

**I. *Standard for Reconsideration***

Plaintiff seeks reconsideration of the Order pursuant to Federal Rule of Civil Procedure 59(e) ("Rule 59(e)"). The standard for a Rule 59(e) motion for reconsideration is strict.

A Rule 59(e) motion [*4] for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The other limited circumstances in which a Rule 59(e) motion for reconsideration may be granted is if the moving party establishes: (1) a change in the controlling law; (2) new evidence has become available; or (3) reconsideration is necessary to correct a clear error or prevent manifest injustice. *See Donoghue v. Casual Male Retail Group, Inc.*, 427 F. Supp. 2d 350, 354 (S.D.N.Y. 2006); *Grubb v. Barnhart*, 2004 U.S. Dist. LEXIS 3289, *4 (S.D.N.Y. 2004).

Courts should not grant a motion for reconsideration in order to allow a party "[to] advance new facts, issues or arguments not previously presented to the Court." *Shamis v. Ambassador Factors Corp.*, 187 F.R.D. 148, 151 (S.D.N.Y. 1999) (internal quotations and citations omitted). Likewise, courts should not grant a motion for reconsideration when the moving party seeks solely to relitigate an issue already decided. *Id.*

"Reconsideration [*5] of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003)(quoting *In re Health Management Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). The decision to grant or deny the motion is within the sound discretion of the district court. *See Devlin v. Transp. Commc'n Int'l Union*, 175 F.3d 121, 132 (2d Cir. 1999).

**II. *Application***

Defendants raise three argument in support of their motion for reconsideration: (1) Defendants are entitled to raise a new argument in light of *Roth*; (2) *Roth* constitutes a change in controlling law that merits reconsideration of the Order; and (3) the Court's failure to reconsider the Order would result in a manifest injustice.

**A. New Argument**

In the motion for reconsideration, Defendants argue that the Court should reconsider the Order so that Defendants can introduce a new argument. The new argument pertains to the applicability of the Securities and Exchange Commission's Rule 16b-3(d), 17 C.F.R. § 240.16b-3(d), ("Rule 16b-3(d)"). Rule 16b-3(d) exempts from Section 16 liability certain [*6] board-approved transactions between an issuer and a director, a director by deputization, [4] or an officer. *Roth*, 522 F.3d at 244.

Defendants argue for the first time in the motion for reconsideration that they should not be required to disgorge their short-swing profits from the November 2004 transaction because Rule 16b-3(d) applies to this transaction. Defendants assert that they are entitled to this exemption because they are directors by deputization and the transaction otherwise meets the Rule 16b-3(d) exemption requirements.

Defendants argue that they should be allowed to raise this new argument because "at the time the parties briefed their summary judgement order in this case, Defendants believed that the exemption set forth in Rule 16b-3(d) did not apply to them." (Defendants' Memorandum of Law in Support of Motion for Reconsideration, at 2.) Defendants further explain that only now, after the Second Circuit Court of Appeal's April 2008 decision in *Roth*, is it "crystal clear [*7] that the transactions at issue here are exempt from Section 16(b) by virtue of Rule 16b-3(d)." (*Id.*)

The Court recognizes that prior to *Roth*, the Second Circuit Court of Appeals had yet to reach the question of whether Section 16b-3(d) applied to directors by deputization. In *Roth*, the Second Circuit Court of Appeals adopted the SEC's interpretation of Rule 16b-3(d) by finding that the Rule 16b-3(d) exemption is applicable to qualifying transactions between the issuer and a director by deputization, in addition to being applicable to transactions between the issuers and a director or an officer. *Roth*, 522 F.3d at 249.

---

[3] The Court assumes, *arguendo*, that the motion for reconsideration is timely.

[4] An entity may be characterized as a director by deputization under Section 16(b) if it has deputized a person on the board of directors to act on its behalf. *Blau v. Lehman*, 368 U.S. 403, 409-10, 82 S. Ct. 451, 7 L. Ed. 2d 403 (1962).

However, the prior lack of "crystal clear" guidance from the Second Circuit Court of Appeals, is not a basis for permitting a new argument to be introduced at the motion for reconsideration stage. This is especially true because the SEC, [5] the Ninth Circuit, [6] and a judge in this district [7] all had held that the 16b-3(d) exemption was applicable to directors by deputization. Defendants chose not to raise this argument at an earlier stage in the litigation and cannot now advance a new argument that was not previously presented to the Court. [8] *Shamis*, 187 F.R.D. at 151.

**B. Change in Controlling Law**

Defendants also argue that the Court should reconsider the Order because *Roth* constitutes a change in controlling law. *See Grubb*, 2004 U.S. Dist. LEXIS 3289, *4. The Court rejects this argument on the ground that there has been no change in controlling law since the Order was issued. [9]

*Roth* was published in April 2008, while the motions for summary judgment were pending. The Order was not issued until September 2008, *five months* [*10] after *Roth* was decided. Accordingly, there has been no change in controlling law since the Order was issued. [10]

**C. Manifest Injustice**

Defendants argue that it would be manifestly unjust to deny their motion for reconsideration because Rule 16b-3(d) entitles them to relief from Section 16(b) liability. *See Donoghue v. Casual Male Retail Group, Inc.*, 427 F. Supp. 2d at 354. The Court declines to reach the merits of Defendants' argument that pursuant to Rule 16b-3(d) they are entitled to relief from Section 16(b) liability. The Court finds instead that under the circumstances it is not manifestly unjust for the Court to deny Defendants' motion for reconsideration.

Prior to the Court's issuance of the Order, Defendants had ample opportunity to argue that Section 16b-3(d) exempted Defendants from Section 16(b) liability. Defendants chose, however, not to raise the argument before the Order was issued.

As [*11] noted earlier, as of 2006, the SEC, the Ninth Circuit, and at least one judge in this district had found the Rule 16b-3(d) exemption was applicable to deputized directors. Nonetheless, Defendants did not mention Rule 16b-3(d) in their answer or summary judgment briefings.

Likewise, during the five months after *Roth* was published and before the Order was issued, Defendants could have argued that the holding in *Roth* was applicable to the November 2004 transaction. While the cross motions for summary judgment were pending, Defendants otherwise kept the Court apprised of pertinent developments in case law and their applicability to the instant case. [11] However, Defendants waited until after the motions for summary judgment had been decided and the parties had stipulated to the remaining facts before raising the Rule 16b-3(d) argument.

Under the circumstances, Plaintiff should not be

---

[5] Starting [*8] in at least 2006, the SEC interpreted the Rule 16b-3(d) exemption as applying to directors by deputization. *See Dreiling v. Am. Express Co.*, 458 F.3d 942 (9th Cir. 2006). Courts are required to give the SEC's interpretation of Rule 16b-3(d) controlling weight. *Id.* at 949.

[6] In 2006, the Ninth Circuit adopted the SEC's interpretation of Rule 16b-3(d), stating "directors by deputization are entitled to seek the protection of Rule 16b-3(d) to the same extent, and on the same terms, as an individual director or officer." *Dreiling*, 458 F.3d at 953.

[7] In *Segen v. CDR-Cookie Acquisitions, L.L.C.*, 2006 U.S. Dist. LEXIS 3053 (S.D.N.Y. 2006), the defendant alleged that the defendant was a director by deputization because it had a controlling interest in the company at issue and therefore had the right to appoint three directors to the board. Judge Robert Sweet agreed with the defendant that it had alleged facts sufficient to qualify the Defendant as a director "by deputization" for purposes of Section 16(b), and, therefore, that defendant was entitled to the Rule 16b-3(d) exemption.

[8] Despite Defendants' arguments to the contrary, the Court does not interpret any of the *pre-Roth* cases cited by Defendants [*9] as being at odds with the holding in *Roth*. The Second Circuit Court of Appeals in *Roth* does not suggest otherwise.

[9] Defendants argue that the Third Circuit Court of Appeals decision in *Levy v. Sterling Holding Company, LLC.*, 544 F.3d 493 (3d Cir. 2008), which was issued days after this Court issued the Order, also constitutes a change in controlling law. However, "persuasive but nonbinding authority from other circuits does not constitute a point of law or fact that mandates reconsideration." *In re: Trace International Holdings, Inc., et al.*, 04-Civ-1295, 2006 U.S. Dist. LEXIS 98262, *9 (S.D.N.Y. Sept. 15, 2006). Accordingly, the Court rejects Defendants contention that *Levy* constitutes a change in controlling law that requires the Court to reconsider the Order.

[10] At no point prior to the November 2008 motion for reconsideration did Defendants suggest that Rule 16b-3(d) was applicable to the instant case. During the pendency of the cross motions for summary judgment, Defendants otherwise kept the Court apprised of pertinent developments in case law.

[11] For instance, on July 22, 2008, three months after *Roth* was decided, Defendants submitted a letter to the Court in which they sought to distinguish a case decided earlier that month in the Southern District of New York (*Happe v. WPCS International Incorporated et al.*, 565 F. Supp. 2d 495 (S.D.N.Y. 2008)).

[***12**] required to respond to new arguments now. To grant Defendants' motion for reconsideration would unduly undermine Plaintiff's compelling interest in finality; Plaintiff, rather than Defendants, would suffer a manifest injustice. *See Parrish*, 253 F. Supp. 2d at 715.

**III.** ***Conclusion***

The Court finds that Defendants have failed to establish that the Court should grant the extraordinary remedy of reconsidering the Order. Accordingly, Defendants' motion for reconsideration is DENIED (Docket Entry 92).

SO ORDERED.

Dated: New York, New York

May 28, 2009

/s/ Kimba M. Wood

Kimba M. Wood

United States District Judge

---

**End of Document**

# Exhibit 17b.

# Colon v. Town of West Hartford

United States District Court for the District of Connecticut

January 5, 2001, Decided

CIVIL NO: 3:00CV168(AHN)

**Reporter**
2001 U.S. Dist. LEXIS 484; 2001 WL 45464

JOSE COLON v. TOWN OF WEST HARTFORD, ET AL.

**Disposition: [*1]** Newspaper Defendants' motion to dismiss [doc. # 31] GRANTED. Counts one, six, seven and eight of the complaint dismissed as to the West Hartford News, Timothy Kay and Elisabeth Strillacci. Defendants' motion for sanctions [doc. # 22] DENIED.

## Case Summary

### Procedural Posture
Plaintiff sued, inter alia, defendants newspaper, its editor, and one of its reporters alleging a violation of 42 U.S.C.S. § 1983 based on a denial of equal protection, retaliation in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60 (CFEPA), defamation, and intentional infliction of emotional distress. Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and for sanctions.

### Overview
Plaintiff sued the newspaper for printing an article in its opinion and comment section which made disparaging remarks about the circumstances surrounding his wrongful termination from his position as a police officer. The court determined that none of the challenged statements could, when read in context, be reasonably understood as implying the existence of undisclosed facts on which the author's comments were based, and that a reasonable person could only view the article as a personal comment of the author's opinion. Thus the article was unqualifiedly protected by the U.S. Const. amend. I. Because plaintiff's emotional distress claims and CFEPA claims were derivative of the defamation claim, they too were dismissed. The court also dismissed plaintiff's conspiracy claim that defendants acted in concert with others to retaliate against him by publishing private, non-public information from his personnel file which was illegally and unethically

disclosed to the author to be used in the newspaper article. The court found that plaintiff only made vague and conclusory allegations which were insufficient to sustain his pleading burden.

### Outcome
Motion for sanctions was denied, however the motion to dismiss was granted because the newspaper article was determined to be the opinion of the author, and as such was protected by the U.S. Const. amend. I.

**Counsel:** For JOSE DAVID COLON, plaintiff: David K. Jaffe, Spinella & Jaffe, Hartford, CT.

For JOSE DAVID COLON, plaintiff: Otto P. Witt, James S. Brewer, West Hartford, CT.

For TOWN OF WEST HARTFORD, JAMES STRILLACCI, STEPHEN LOVETT, JAY ST. JACQUES, CARL ROSENWEIG, JACK CASEY, GINO GIANSANTI, THEODORE BARAN, defendants: James M. Sconzo, Michelle L. Treadwell, Halloran & Sage, Daniel J. Klau, Wiggin & Dana, Hartford, CT.

For TOWN OF WEST HARTFORD, JAMES STRILLACCI, STEPHEN LOVETT, JAY ST. JACQUES, CARL ROSENWEIG, JACK CASEY, GINO GIANSANTI, THEODORE BARAN, defendants: Kevin J. O'Connor, Jennifer Bullock Majewski, Corporation Counsel's Office, West Hartford, CT.

For TOWN OF WEST HARTFORD, TIMOTHY KAY, ELISABETH STRILLACCI, defendants: Mark Richard Kravitz, Wiggin & Dana, New Haven, CT.

For TIMOTHY KAY, defendant: Daniel J. Klau, Wiggin & Dana, Hartford, CT.

**Judges:** Alan H. Nevas, United States District Judge.

**Opinion by:** Alan H. Nevas

## Opinion

[*2] *RULING ON MOTION OF SOME DEFENDANTS TO DISMISS AND MOTION FOR SANCTIONS*

This action is brought by Jose Colon ("Colon"), a former West Hartford police officer, against the Town of West Hartford ("West Hartford"), numerous members of its police department, the West Hartford News, its editor and one of its reporters. Colon asserts claims under 42 U.S.C. § 1983, Title VII, 42 U.S.C. § 2000e, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, and state law claims of defamation and intentional infliction of emotional distress.

Presently pending is the Fed. R. Civ. P. 12(b)(6) motion of the West Hartford News, Timothy Kay ("Kay") and Elisabeth Strillacci ("E. Strillacci") (collectively the "Newspaper Defendants") to dismiss counts one, six, seven and eight of the complaint [doc. # 31]. Also pending is the Newspaper Defendants' motion for sanctions [doc. # 22] against Colon and his attorney.

*FACTS*

The following facts as alleged in the amended complaint are accepted as true for the purpose of this motion to dismiss.

Colon, a Puerto Rican male, was hired in March, 1994, by West Hartford as a police officer. [*3] He alleges that, during the course of his employment, the defendants violated his right to equal protection and discriminated against him on the basis of race and ethnic origin.

Colon asserts that Stephen Lovett ("Lovett"), the assistant chief of police, told him in August, 1994, that he was too aggressive and cocky and that he shouldn't make friends with other officers. Lovett also denied Colon every educational program he requested. After Colon had been employed for one and one half years, Lovett disciplined him with a one-day suspension for allegedly failing to timely file a case report. Lovett also rejected Colon's application for assignment to the Emergency Response Team ("ERT"). Lovett placed Colon on secret probation and told him he would be included in the ERT if he did not get into trouble for nine months. Lovett also subjected Colon to a four-month period of continuous harassment for the way he attempted to calm victims of an indecent exposure. Specifically, Lovett mischaracterized and criticized Colon's use of the term "woody" in connection with that incident.

On May 17, 1999, while Colon was driving his police cruiser, he was involved in a motor vehicle accident with [*4] a Hartford police cruiser. On June 6, 1999, without notice to Colon's union and without a hearing, Lovett suspended Colon for fifteen days for the motor vehicle accident. Lovett stated that Colon deserved an even greater punishment for the incident.

On July 16, 1999, Colon filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), complaining that his treatment by the department constituted discriminatory, disparate harassment and treatment based on his race in violation of his civil rights.

Colon further alleges that in retaliation for filing the CHRO complaint, the defendants initiated a pattern of harassment, stricter scrutiny and discipline, unlawful disclosure of his personnel file information, and defamation. With regard to the defamation, he contends that the Newspaper Defendants willfully collaborated with, worked in concert with, and jointly engaged in retaliation against Colon by publishing a newspaper article entitled "What Did He Say?" on August 12, 1999. The article was written by E. Strillacci, the wife of defendant James Strillacci ("Chief Strillacci"), Chief of the West Hartford Police Department. The article contained private, non-public [*5] personnel file information about Colon and information from his CHRO complaint. This information had been illegally and unethically disclosed to E. Strillacci by Chief Strillacci. The article, which appeared in the "Around Town" column of the paper on the "Opinion & Comment" page, stated: [1]

---

[1] As a general rule, matters outside the complaint cannot be considered on a motion to dismiss without converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(b). However, where a plaintiff does not attach to the complaint or incorporate by reference a document on which it relies and which is integral to the complaint, a defendant may introduce that document as part of a motion attacking the pleadings. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). The newspaper article is integral to the complaint, but the plaintiff did not incorporate it by reference or attach it as an exhibit to the complaint. Rather, the complaint only quotes selected portions of the article. The Newspaper Defendants submitted as an exhibit to their motion to dismiss a copy of the entire page of the newspaper in which the article appeared. Accordingly, the court considers the article in its entirety as it appeared in the newspaper.

Okay, this column may upset some people, so I want to prepare you.

I want to make it clear what I am taking a stand on here.

A police officer has filed a complaint with the Commission on Human Rights and Opportunities because he thinks that he has been punished for actions based on the fact that he is Hispanic.

Okay, he's got a right to file a complaint, and he's got a right to his opinion, and I am not commenting at all on whether or not his punishment was justified.

I am also not commenting on whether his complaint is valid.

That isn't my purvue, and as they say, "I ain't touching that one."

However, I am taking hard, serious, close to outraged offense at something he has included in his complaint.

This officer received some sort of reprimand for using the word "woody," which refers to a male erection, to be blunt, in talking to the victim of a flasher.

This was a young woman to whom **[*6]** a man exposed his private body parts.

This police officer doesn't think he should have gotten in trouble for making such a comment.

Maybe to some people it doesn't seem like a big issue. But if you are the victim and you are upset by it, you are entitled to your feelings.

Certainly in this day and age, we have all learned that it is wrong to make a victim feel responsible for sexual harassment or sexual assaults, right? Especially in jobs like those of a police officer, where sensitivity training has been incorporated into the job for some time, a person is supposed to know how to handle a victim.

But not this guy. What he said was something to the effect that the victim must have excited the man.

I don't know about you, but I can draw the next inference easily - his behavior must be excused by the fact that he couldn't help his reaction to her beauty. . . .

And this police officer was way out of line to make such a rude, thoughtless and insensitive comment to the victim.

What galls me most of all is that he thinks what he said was no big deal, not worth getting in trouble for.

That kind of comment is simply unacceptable, particularly from a professional who should know better. **[*7]** . .

I'm offended, outraged, insulted, disappointed and, frankly embarrassed for the department, and I think every woman in town, and every man in town who cares about a woman, should be upset at the very least.

With this man's badge comes a great deal of respect from the general public, but with it also comes a great deal of responsibility. It comes with a sworn oath to protect and serve - everyone.

**[*8]** The Newspaper Defendants refused to retract the false and defamatory portions of the article.

Thereafter, on September 28, 1999, Colon was involved in an off-duty arrest of two men who were burglarizing cars. In connection with the arrest, Colon was forced to subdue one of the suspects. The suspect did not complain, but the other officers who were involved in the arrest were coerced into falsely stating that Colon punched the suspect in the back. Colon was suspended indefinitely for this incident. In addition, the defendants applied for an arrest warrant charging him with assault, tampering with a witness and interfering with a police officer. Thereafter, Colon was arrested and falsely charged with third degree assault.

During a local-access cable TV show, Chief Strillacci discussed that incident and the discipline he would impose on Colon. This occurred before the internal affairs investigation was completed and before the pre-termination hearing was held. Also, before the investigation was completed, Chief Strillacci made a statement to the Hartford Courant on November 16, 1999 that Colon struck a suspect in front of five witnesses.

On November 17, 1999, a pretextual pre-termination **[*9]** hearing was held. On December 12, 1999, Colon was wrongfully terminated from his position as a West Hartford police officer.

*STANDARD OF REVIEW*

In deciding a motion to dismiss under Rule 12(b)(6), a court is required to accept as true all factual allegations in the complaint and must construe any well-pleaded factual allegations in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Easton v. Sundram*, 947 F.2d 1011, 1014-15 (2d Cir. 1992). A court may dismiss a complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *see also Still v. Debuono*, 101 F.3d 888, 891 (2d Cir. 1996). The issue on a motion to dismiss "is not whether the plaintiff will prevail, but whether he is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp. 784, 786 (D. Conn. 1990) (*citing Scheuer*, 416 U.S. at 236).

*DISCUSSION*

The Newspaper **[*10]** Defendants are named in four of the eight counts of the complaint. Count one alleges a violation of § 1983 based on a denial of equal protection against the individual police officers and the Newspaper Defendants. Count six alleges a claim for retaliation in violation of the CFEPA against the individual police defendants and the Newspaper Defendants. Count seven is a defamation claim against Chief Strillacci and the Newspaper Defendants. Count Eight is a claim of intentional infliction of emotional distress against all defendants.

The Newspaper Defendants move to dismiss these four counts. They assert that the newspaper article that forms the basis of Colon's claims against them is an editorial and is thus absolutely privileged. They also maintain that the remaining counts are derivative of the non-actionable newspaper column and must also be dismissed. Further, they assert that, regardless of the merits of the defamation claim, the § 1983 claim must be dismissed because they are not state actors and the conclusory allegations of a conspiracy between them and a state actor are insufficient to support the § 1983 claim against private persons.

I. *The Defamation Claim*

The **[*11]** Newspaper Defendants maintain that the August 12, 1999, article in the West Hartford News is an editorial that represents the writer's opinion and as such enjoys an absolute constitutional privilege.

In opposition, Colon maintains that the article is not absolutely privileged because it contains a mixture of fact and opinion as well as unsubstantiated inferences that are drawn from inaccurate statements of fact. He cites three statements that he says convey an inaccurate, false and malicious portrayal of him and which render the article defamatory. Those three statements are:

> (1) the statement "what he said was something to the effect that the victim must have excited the man."
>
> (2) the statement that the officer "doesn't think he should have gotten in trouble for making such a comment. . . What galls me most of all is that he thinks what he said was no big deal, not worth getting in trouble for."
>
> (3) that the officer "has filed a complaint with the Commission on Human Rights and Opportunities because he thinks that he has been punished for actions based on the fact that he is Hispanic."

Contrary to Colon's arguments, the court, after considering the article in **[*12]** its entirety and in the context in which it was published, concludes as a matter of law that the writer was making a statement of opinion, not fact, and as such, the article enjoys an absolute privilege. *See Goodrich v. Waterbury Republican American, Inc.*, 188 Conn. 107, 119, 448 A.2d 1317 (1982) (holding that the determination of whether a statement is a factual assertion or an opinion is a question of law for the court); *Mr. Chow of N.Y. v. Ste. Jour Azur, S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) (same).

It is well settled that expressions of pure opinion, as opposed to factual assertions, may not be the basis of a defamation action. *See e.g., Buckley v. Littell*, 539 F.2d 882, 896 (2d Cir. 1976) (citing *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 401, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)); *Goodrich*, 188 Conn. at 117.

Pure opinion is a personal comment about another's conduct, qualifications or character that has some basis in known or disclosed facts. *See Goodrich*, 188 Conn. at 111 (holding that expressions of opinion based on disclosed facts have virtual complete constitutional protection). However, **[*13]** an opinion that criticizes or comments on facts that are not stated or known is not protected as pure opinion because it implies that the writer knows certain facts that are not disclosed to the reader which support his opinion and are detrimental to

the person he is writing about. *See id.* at 118. Even an opinion that appears to be in the form of a factual statement may still be an opinion "if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated." *Id.* at 111.

However, the critical distinction between opinion and fact is not easy to discern. *See e.g., Mr. Chow*, 759 F.2d at 224; *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) ("it is hard to draw a bright line between 'fact' and 'opinion.'"); *see also* Sanford, Libel and Privacy § 5.1 (Supp. 1997) ("No area of modern libel law can be murkier than the cavernous depths of this inquiry"). The court's task is to determine "whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were **[*14]** spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986) (citing Restatement (Second) of Torts § 566 comment c).

Here, considering the entirety of the writing in the context in which it appeared, the surrounding circumstances, and the language used, it is apparent that it does not state or imply derogatory undisclosed facts about Colon. *See Mr. Chow*, 759 F.2d at 226; *Yavis v. Sullivan*, 137 Conn. 253, 259, 76 A.2d 99 (1950); *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985) (stating that the meaning of a writing "depends not on isolated or detached statements but on the whole apparent scope and intent."). To the contrary, the article is merely the author's personal opinion about Colon's conduct and character and is based on known or disclosed facts.

The article appears on the page entitled "Opinion & Comment." By the very nature of this type of page, the average reader is influenced to read articles found thereon as containing opinions, not facts. *See Aldoupolis v. Globe Newspaper Co.*, 398 Mass. 731, 734, 500 N.E.2d 794 (1986) **[*15]** (noting that reasonable readers expect to read views and opinions as opposed to factual news stories on editorial pages); *Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F.2d 970, 986-87 (D.C. Cir. 1984). In addition, the article expressly states that the writer is "commenting on" and "taking a stand" on the actions and conduct of an unnamed police officer. This type of cautionary language is a strong signal to an average reader that he is reading the writer's opinion, not statements of fact. *See Ollman*, 750 F.2d at 982-83. Moreover, there is nothing in the tenor of the language used that would cause the average reader to believe that the remarks were going beyond opinion into the realm of fact. An author is constitutionally permitted to use exaggeration, hyperbole, ridicule, sarcasm, stylistic touches and figurative expressions to embellish disclosed facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990) (explaining that statements that are within the category of "rhetorical hyperbole" or imaginative expression" are not actionable because they "cannot reasonably [be] interpreted as stating **[*16]** actual facts"); *Goodrich*, 188 Conn. at 122 (noting that opinion writers are not limited to dry recitations but are constitutionally permitted to use colorful expressions as well as exaggeration, hyperbole, ridicule, sarcasm and invective). Finally, the author discloses the factual basis for her opinions--that a police officer filed a complaint with the CHRO because he thought he was punished for actions based on the fact that he is Hispanic and that one of those actions was a reprimand for using the word "woody" in talking to the victim of a flasher. There is nothing in the article that implies the existence of other, nondisclosed facts on which the author's comments are based. *See Milkovich*, 497 U.S. at 18 (stating that the constitution offers no wholesale protection for expressions of opinion if they imply assertions of objective fact)

Even the specific statements that Colon challenges are able to withstand scrutiny when they are viewed in the context of the entire article. The use of the words "something to the effect that" sufficiently gives a signal to a reasonable reader that the statement "what he said was . . . that the victim must have excited **[*17]** the man" was not to be taken literally. Indeed, those cautionary words make it clear that the author is engaging in speculation or conjecture. *See King v. Globe Newspaper Co.*, 400 Mass. 705, 713, 512 N.E.2d 241 (1987).

Similarly, the reasonable reader would not take literally the statement that the officer "doesn't think he should have gotten in trouble for making such a comment. . . What galls me most of all is that he thinks what he said was no big deal, not worth getting in trouble for." Here the author is using Colon's "voice" as a stylistic device to convey her opinion as to what his conduct said to her about his character. There is nothing in this statement that implies the author is basing her opinion on undisclosed facts or is making an assertion of fact.

Finally, the statement that the officer "has filed a

complaint with the Commission on Human Rights and Opportunities because he thinks that he has been punished for actions based on the fact that he is Hispanic" is true and is a known or disclosed fact. Colon had indeed filed a CHRO complaint alleging that he was reprimanded for using the term "woody" in trying to calm the victim of a flasher and that he **[*18]** believed he was reprimanded for doing so because he is Hispanic. The fact that Colon filed the CHRO complaint, as well as the details of Colon's claims of harassment, were reported in the Hartford Courant approximately two weeks before the article at issue was published.

In sum, none of the three challenged statements can, when read in the entire context of the article, be reasonably understood as implying the existence of undisclosed facts on which the author's comments are based. *See Steinhilber*, 68 N.Y.2d at 289 (citing Restatement (Second) of Torts § 566 comment c). A reasonable person could only view the article as a personal comment of the author's opinion and as such, it is unqualifiedly protected by the First Amendment. *See Goodrich*, 188 Conn. at 124; *Gertz v. Robert Welch, Inc.*, 418 U.S. at 401; *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (noting that a statement is not actionable as an opinion where no reasonable reader could conclude that it was conveying undisclosed facts about the plaintiff).

II. *Emotional Distress and CFEPA Claims*

The Newspaper Defendants maintain that Colon's emotional **[*19]** distress and CFEPA claims are derivative of the defamation claim and thus must be dismissed if the defamation claim is found to be constitutionally privileged. They maintain that a plaintiff can not do an end run around the First Amendment by recasting a meritless defamation claim against the media as another cause of action. The court agrees.

The Supreme Court has held that a plaintiff may not use a claim for emotional distress "to circumvent the established and carefully balanced framework of constitutional and state libel law." *Hustler Mag. v. Falwell*, 485 U.S. 46, 56, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988); *see also Howell v. New York Post Co.*, 81 N.Y.2d 115, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993) (dismissing privacy claim where publication of picture was found constitutionally protected and holding that the same constitutionally protected publication could not support a claim for emotional distress); *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995) (citing *Hustler*, 485 U.S. at 46); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1160 (7th Cir. 1995) (dismissing defamation claim because statements were protected by the **[*20]** First Amendment and holding that the same statements could not support a privacy claim); *Cowras v. Hard Copy*, 56 F. Supp. 2d 207, 209 (D. Conn. 1999).

For these reasons, the First Amendment bars Colon from recovering damages for his state law tort claims that are based on the constitutionally protected newspaper article. To hold otherwise would circumvent the established and carefully balanced framework of constitutional and state libel law. *See Hustler*, 485 U.S. at 57; *see also Petyan v. Ellis*, 200 Conn. 243, 254-55, 510 A.2d 1337 (1986) (holding that only unprivileged conduct can support a claim of intentional infliction of emotional distress).

III. *The § 1983 Claim Against the Newspaper Defendants*

The Newspaper Defendants give two grounds for dismissing the § 1983 claim against them. First, they maintain that the factual basis of this claim is the newspaper article. Because the article is privileged, it can not support the § 1983 tort claim, just as it can not support the emotional distress claim. Second, they contend that they are private persons, not state actors and are not subject to § 1983 liability unless they acted **[*21]** jointly with state actors. They maintain that Colon has not alleged facts demonstrating that they acted in concert with state officials and that his conclusory allegations of conspiracy are insufficient.

In opposition, Colon says that the § 1983 claim is sufficiently pleaded in that he alleges that the Newspaper Defendants acted in concert with the other defendants and that Chief Strillacci and his wife agreed to retaliate against Colon by publishing private, non-public information from Colon's personnel file and that the information was illegally and unethically disclosed to E. Strillacci by her husband to be used in the newspaper article. The court does not agree.

A private party involved in a conspiracy with state actors can be liable under § 1983, but to sustain such a claim, the plaintiff must allege facts showing an agreement or meeting of the minds between the state actor and the private actor to engage in a conspiracy to deprive the plaintiff of a constitutional right. *See Marion v. Groh*, 954 F. Supp. 39, 41 (D. Conn. 1997). Mere conclusory allegations of such an agreement are not enough. *E.g., Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993). **[*22]** A plaintiff should "make an effort to provide some details of time and place and the alleged effect of

the conspiracy." *Id.* at 100. Complaints containing only conclusory, vague or general allegations that the defendants engaged in a conspiracy to deprive the plaintiff of constitutional rights are properly dismissed. *See id.* at 100.

Here, Colon has only made vague and conclusory allegations that "the newspaper defendants willfully collaborated with, worked in concert with and jointly engaged in retaliation against the plaintiff for his seeking redress for his [CHRO complaint]." Neither this, nor the allegation that the Chief of the West Hartford police is married to one of the newspaper defendants is sufficient to sustain his pleading burden. Because Colon made no effort to provide the details of the alleged conspiracy, the claim must be dismissed.

IV *The Motion For Sanctions*

The Newspaper Defendants have also moved for Rule 11 sanctions against Colon and his attorney. They claim that Colon's claims are devoid of evidentiary and legal support and reflect plaintiff's and his counsel's failure to conduct a reasonable inquiry before filing **[*23]** his complaint. In support of this motion, they assert that Colon names Kay as a defendant and asserts that he was publisher of the paper "at all relevant times," but that Kay did not become employed by the paper until August 16, 2000, four days after the article was published. They maintain that plaintiff's counsel was told this before he filed the complaint, but he nonetheless asserted the claim against Kay. They also maintain that they are entitled to sanctions because the plaintiff filed the § 1983 claim against them without having any facts to support the existence of the alleged conspiracy. Finally, they claim that sanctions are warranted for the plaintiff's assertion of the defamation claim and the derivative state law claims because the editorial on which those claims are based is absolutely privileged.

In opposition, Colon states that the complaint accurately alleges that Kay was employed by the paper at the time he asked the paper for a retraction. Colon also maintains that the Newspaper Defendants are improperly using Rule 11 as a device to emphasize the merits of their position and that there is no basis for sanctions. The court agrees.

There is no merit whatsoever to **[*24]** the motion for sanctions. The Second Circuit has held on numerous occasions that there is a distinction between a claim that is unsuccessful and one that is both unsuccessful and sanctionable. *See Salovaara v. Eckert*, 222 F.3d 19, 34 (2d Cir. 2000). Colon's claims "were not so untenable as a matter of law to necessitate sanction. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against." *Id.* (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990)).

*CONCLUSION*

For the foregoing reasons, the Newspaper Defendants' motion to dismiss [doc. # 31] is GRANTED. Counts one, six, seven and eight of the complaint are dismissed as to the West Hartford News, Timothy Kay and Elisabeth Strillacci. The defendants' motion for sanctions [doc. # 22] is DENIED.

SO ORDERED this 5th day of January, 2001 at Bridgeport, Connecticut.

Alan H. Nevas

United States District Judge

---

**End of Document**

# Exhibit 17c.

# Hatteras Enters. v. Forsythe Cosmetic Grp., Ltd.

United States District Court for the Eastern District of New York

July 30, 2016, Decided; July 30, 2016, Filed

15-CV-5887 (ADS)(ARL)

**Reporter**
2016 U.S. Dist. LEXIS 100352 *

HATTERAS ENTERPRISES INC, a California corporation, DEBRA MATTES, an individual, and MADMACK LLC, a California limited liability company, Plaintiffs, -against- FORSYTHE COSMETIC GROUP, LTD a New York corporation, HARRIET ROSE, an individual, MICHAEL ROSE, an individual, COLOR CLUB, LLC, a New York Limited Liability Company, HARRIET ROSE 2009 IRREVOCABLE TRUST, and DOES 1 THROUGH 50, inclusive, Defendants.

**Counsel:** [*1] For the Plaintiffs: Bradley J Yourist, Esq., Daniel J Yourist, Esq., Of Counsel, Yourist Law Corporation APC, Los Angeles, CA.

For the Plaintiffs: Franklin Thomas Bigelow, Jr., Esq., Pasadena, CA.

For the Plaintiffs: Michael A J Nangano, Esq., Los Angeles, CA.

For the Defendants: Daniel Adam Osborn, Esq., Of Counsel, Osborn Law. P.C., New York, NY.

For the Defendants: Jay A Woollacott, Esq., Of Counsel, Woollacott LLP, Los Angeles, CA.

**Judges:** ARTHUR D. SPATT, United States District Judge.

**Opinion by:** ARTHUR D. SPATT

## Opinion

**MEMORANDUM OF DECISION & ORDER**

**SPATT, District Judge.**

This case arises from six agreements between the Plaintiffs Hatteras Enterprises Inc. ("Hatteras"), Debra Mattes ("Mattes"), MadMack LLC ("MadMack" and collectively, the "Plaintiffs") with the Defendants Forsythe Cosmetic Group, Ltd ("Forsythe"), Harriet Rose, Michael Rose, Color Club, LLC ("Color Club"), Harriet Rose 2009 Irrevocable Trust (the "Trust"), and Does 1 through 50 (collectively, the "Defendants"). The agreements created a partnership between the parties for the purpose of producing and distributing a special color changing nail polish.

The Plaintiffs originally brought an action against the Defendants in the Superior Court of California, [*2] County of Los Angeles ("Los Angeles Superior Court") alleging that the Defendants made misrepresentations to induce the Plaintiffs into entering agreements with the Defendants. Subsequently, the action was removed by the Defendants from Los Angeles Superior Court to the United States District Court, Central District of California, on the basis of diversity of citizenship jurisdiction, and assigned to Judge R. Gary Klausner. Thereafter, Judge Klausner granted the Defendants' motion to transfer the action to the Southern District of New York, and the case was assigned to Judge Deborah A. Batts. Judge Batts issued an order transferring the action to the Eastern District of New York, and the action was then assigned to this Court.

Presently before the Court is a motion by the Plaintiffs to retransfer this case back to the Central District of California. For the reasons set forth below, the Plaintiffs' motion is denied.

**I. BACKGROUND**

**A. As to the Alleged Facts**

The Plaintiff Mattes is a California resident; the Plaintiff Hatteras is a California corporation with its principal place of business in California; and the Plaintiff MadMack is a California limited liability company with its principal [*3] place of business in California. (Am. Compl., Not. of Removal, Dkt. No. 1-3 [the "Am. Compl."].) at ¶¶ 1-3.) It is undisputed that the Defendant Forsythe is a New York corporation with its principal place of business in New York; and the Defendants Michael Rose and Harriet Rose are New York citizens domiciled in New York. (Compare id. at ¶ 4 with Not. of Removal, Dkt. No. 1 ["Not. of Removal"] at ¶

5(b).) There are disputes of fact as to whether the Defendants Color Club and the Trust are legally recognized entities that have the capacity to be sued. (Compare Am. Compl. at ¶¶ 6-7 with Not. of Removal at ¶¶ 5(c), (d).)

According to the amended complaint, in 1992, the Plaintiff Mattes developed a formula for creating nail polish that changed color in the sunlight due to a chemical reaction to ultraviolet rays. (Am. Compl. at ¶¶ 13-15.) At an unspecified time, Mattes formed and became the chief executive officer of Hatteras, which held registered trademarks associated with Mattes' nail polish formula. (Id.) For a period of twenty-years, Hatteras used Mattes' formula to manufacture and sell nail polish to distributors, retail stores, and other nail polish manufacturers. (Id.)

It is alleged [*4] that in November 2011, Mattes received a request from Avon, apparently a nail polish company, for an order of two million bottles of nail polish. (Id. at ¶ 14.) In December 2011, the Defendant Michael Rose allegedly approached Mattes with a proposal to form a joint partnership with Forsythe, a company that he controlled, for the purpose of helping Mattes fill the Avon order. (Id. at ¶ 16.)

After a period of negotiations, on June 29, 2012, the parties entered into six separate agreements to facilitate the joint partnership (collectively, the "Agreements").

First, Mattes formed the Plaintiff MadMack and entered into a licensing agreement under which Hatteras agreed to grant MadMack a license to use the trademarked products associated with Mattes' nail polish. (See the Licensing Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. C [the "Licensing Agreement"].)

Second, MadMack and the Trust formed Solar Club, LLC ("Solar Club") and entered into an operating agreement under which MadMack and the Trust each acquired fifty percent stakes in Solar Club. (See the Operating Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. A [the "Operating Agreement"].)

Third, MadMack entered into [*5] an agreement to assign its rights to Mattes' nail polish formula under the Licensing Agreement to Solar Club. (See the Assignment and Assumption Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. B [the "Assignment Agreement"].")

Fourth, the Defendant Forsythe entered into a services agreement pursuant to which it agreed to provide general services and operational support to Solar Club in exchange for thirty percent of Solar Club's revenue. (See the Services Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. D [the "Services Agreement"].)

Fifth, the Defendant Forsythe entered into a loan agreement with Solar Club to lend Forsythe an initial amount of $103,651.48 and other unspecified amounts with an interest rate of the prime rate plus one percent. (See the Loan Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. E [the "Loan Agreement"].)

Sixth, the Defendant Forsythe entered into a security agreement with Solar Club pursuant to which Solar Club pledged all of its assets to Forsythe as collateral for Solar Club's repayment obligations under the loan agreement. (See the Security Agreement, Rose's June 19, 2015 Decl., Dkt. No. 7-4, Ex. F [the "Security Agreement"].)

All [*6] six agreements contain New York choice of law provisions. (See Operating Agreement at ¶ 11.6; Assignment Agreement at ¶ 5; Licensing Agreement at ¶ 18(g); Services Agreement at ¶ 11(a); Loan Agreement at ¶ 6.10; Security Agreement at ¶ 6(h).)

In addition, four of the agreements — the Licensing Agreement, the Services Agreement, the Loan Agreement, and the Security Agreement — contain clauses selecting courts in Nassau County as the sole forum for resolving judicial disputes arising from the agreements. (See Licensing Agreement at ¶ 18(g); Services Agreement at ¶ 11(a); Loan Agreement at ¶ 6.10; Security Agreement at ¶ 6(h).)

However, the Operating Agreement and the Assignment Agreement do not contain forum selection clauses.

**B. As to the Procedural History**

On January 21, 2015, the Plaintiffs commenced this action by filing a complaint in California Superior Court against the Defendants.

On April 17, 2015, the Plaintiffs filed an amended complaint, alleging that the Defendants made a number of material misrepresentations in the course of negotiating the Agreements. (See Am. Compl. at ¶¶ 19-54.) Based on these alleged misrepresentations, the Plaintiffs asserted claims against the Defendants [*7] for fraud by intentional misrepresentation; fraud by omission; securities fraud in violation of Section 25401 of the California Corporate Code; and breach of a confidentiality agreement. (See id.) Further, they seek monetary damages; punitive and exemplary damages; rescission of the Agreements; specific performance of the confidentiality agreement; injunctive relief; an accounting; and the imposition of a constructive trust on the Defendants' allegedly wrongfully obtained assets. (See id.)

On June 9, 2015, the Defendants removed the case from California Superior Court to the United States District Court,

Central District of California, pursuant to 28 U.S.C. § 1441(b) on the basis of diversity of citizenship jurisdiction. (See the Defs.' Not. of Removal, Dkt. No. 1.)

On June 19, 2015, the Defendants moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (See the Defs.' Mot. to Dismiss, Dkt. No. 6.)

On the same day, the Defendants filed a motion pursuant to 28 U.S.C. § 1404 ("Section 1404") to transfer the case from the Central District of California to the Southern District of New York. (See the Defs.' June 19, 2015 Mem. of Law in Support of Transfer, Dkt. No. 7-2.) In the alternative, they moved under the doctrine of *forum non conveniens* to transfer the case to a New York **[*8]** State Court in Nassau County. (See id.)

The Plaintiffs opposed both motions. Relevant here, in opposition to the Defendants' motion to transfer, the Plaintiffs asserted that the forum selection clauses were void under California public policy. Specifically, the Plaintiffs relied on Hall v. Superior Court, 150 Cal. App. 3d 411, 416, 197 Cal. Rptr. 757, 761 (Cal. Ct. App. 1983), for the proposition that in securities fraud cases, California public policy discourages the enforcement of contract clauses that select forums outside of California because of the risk that defendants could evade the application of California securities laws. (See the Pls.' July 13, 2015 Opp'n Mem. of Law, Dkt. No. 11, at 9.) The Plaintiffs also asserted that the Defendants failed to demonstrate that the convenience of the parties and witnesses, as well as the interests of justice, justified a transfer of the case under Section 1404. (See id. at 12-13.)

On August 5, 2015, Judge Klausner issued an order granting the Defendants' motion to transfer venue to the Southern District of New York and denying their motion to dismiss as moot (the "August 5, 2015 Order"). (See the Aug. 5, 2015 Order, Dkt. No. 15, at 5.) In so doing, Judge Klausner noted that under the ruling in Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013), "forum selection clauses are considered *prima facie* valid and **[*9]** enforced." To avoid the enforcement of a forum selection clause, Judge Klausner stated that the Plaintiff must show the clauses are not enforceable because:

> (1) incorporation of the clause into the contract was the result of fraud, undue influence, or overt bargaining power; (2) the selected forum is so gravely difficult and inconvenient that the complaining party will for all practical purposes be deprived of its day in court; or (3) enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought.

(*See* the Aug. 5, 2015 Order, Dkt. No. 15, at 3.)

The Plaintiffs did not argue that the forum selection clauses were unenforceable based on the first two factors. Rather, their "primary argument [was] that enforcement of the clause would contravene strong California public policy codified in the Corporate Securities Law of 1968, specifically California Corporations Code sections 25000 - 25704." (Id. at 4.) However, Judge Klausner rejected the Plaintiffs' argument because he found that they had "not shown that a New York court would be unable to protect the interests of California citizens . . . . Nor have Plaintiffs shown that New York law offers no protections similar to those found under California Securities **[*10]** Law." (Id.) He further stated that the burden of proof that the California state court applied in Hall in determining whether a forum selection clause should be enforced was different than the burden imposed in federal court in determining whether a Section 1404 transfer of venue under a forum selection clause is appropriate. (Id.) For this reason, he found that Hall was distinguishable. (See id.)

Accordingly, Judge Klausner ruled that the Plaintiffs had failed to show that the forum selection clauses in the Agreements requiring that the action be brought in New York were unenforceable, and therefore, venue was not proper in the Central District of California. (Id.)

On August 6, 2015, the case was transferred from the Central District of California to the Southern District of New York and assigned to Judge Batts.

On September 9, 2015, Judge Batts issued an order directing the parties to show cause as to why the court should not transfer the case to the Eastern District of New York in light of the forum selection clauses designating Nassau County as the appropriate venue for this case. (See Order to Show Cause, Dkt. No. 18.)

The parties did not respond to the order to show cause. As a result, on October **[*11]** 5, 2015, Judge Batts issued an order transferring the case from the Southern District of New York to the Eastern District of New York, whereupon it was assigned to this Court. (See Transfer Order, Dkt. No. 19.)

**C. The Present Motion**

As noted, presently before the Court is the Plaintiffs' motion to retransfer the case back to the Central District of California. In their memorandum, the Plaintiff assert that (i) the forum selection clauses are not enforceable because the Plaintiffs were not actually parties to the four agreements that contained forum selection clauses; (ii) Judge Klausner did not apply the proper California choice of law rules; (iii) he failed to properly analyze the effect of California public policy on the enforcement of the forum selection clauses; (iv) he failed to recognize the differences between California and New

York rescission law; and (v) the Plaintiffs allegedly rescinded the Agreements prior to the Defendants filing their motion to transfer the case to the Southern District of New York. (See the Pls.' Dec. 11, 2015 Mem. of Law, Dkt. No. 28, 11-24.)

In response, the Defendants assert that the Plaintiffs' motion should be denied under the law of the case doctrine. [*12] (See the Defs.' Mem. of Law, Dkt. No. 31, at 5-6.) They further assert that the forum selection clauses are enforceable; the August 5, 2015 Order rejecting the Plaintiffs' public policy argument was correct; and the Agreements have not been rescinded. (See id. at 6-15.)

In reply, the Plaintiffs argued that the law of the case doctrine does not apply to this case because the August 5, 2015 Order was clearly erroneous. (See the Pls.' Reply Mem. of Law, Dkt. No. 32, at 3-4.)

As set forth below, the Court agrees with the Defendants that the law of the case doctrine applies to the August 5, 2015 Order and that the Plaintiffs have failed to show that the Order was clearly erroneous or resulted in a manifest injustice.

**II. DISCUSSION**

**A. The Legal Standard**

"The 'law of the case' doctrine posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." Sagendorf-Teal v. Cty. of Rensselaer, 100 F.3d 270, 277 (2d Cir. 1996) (quoting DiLaura v. Power Authority of State of New York, 982 F.2d 73, 76 (2d Cir. 1992)). "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." In re PCH Associates, 949 F.2d 585, 592 (2d Cir. 1991) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478, at 788 (1981)). "[T]he doctrine applies as much to [*13] the decisions of a coordinate court in the same case as to a court's own decisions." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S. Ct. 2166, 2177, 100 L. Ed. 2d 811 (1988).

"Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts." Id. (collecting cases). Indeed, "'the policies supporting the [law of the case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation.'" SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 178 n. 7 (2d Cir. 2000) (quoting Christianson, 486 U.S. at 816, 108 S. Ct. at 2177) (alteration in original).

However, the law of the case doctrine is not absolute. Rather, "the doctrine is 'admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 8 (2d Cir. 1996) (quoting Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992). Nevertheless, the Supreme Court has cautioned that although a "court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, . . . courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" Christianson, 486 U.S. at 817, 108 S. Ct. at 2178 (quoting Arizona v. California, 460 U.S. 605, 619, 103 S. Ct. 1382, 1391, 75 L. Ed. 2d 318 (1983)). Stated another way, the law of the case doctrine precludes reconsidering [*14] the basis for a transfer decision, "if the transferee court can find the transfer decision plausible." Id. at 803, 108 S. Ct. at 2171.

The Second Circuit does not appear to have directly endorsed a standard by which district court judges should exercise their discretion in revisiting the decisions of a transferor courts. See SongByrd, Inc., 206 F.3d at 178 n.7 ("A district court considering a retransfer motion *might* be limited by 'law of the case' principles, at least in the absence of changed circumstances.") (emphasis added). However, some lower courts in this Circuit have applied a standard to retransfer motions that is similar to the standard that courts use in analyzing motions for reconsideration. See Clarendon Nat. Ins. Co. v. Lan, 152 F. Supp. 2d 506, 524 (S.D.N.Y. 2001) (analyzing whether the law of the case doctrine applies to a retransfer motion based on the motion for reconsideration standard); Washington Nat. Life Ins. Co. of New York v. Morgan Stanley & Co. Inc., 974 F. Supp. 214, 218 (S.D.N.Y. 1997) (same); cf. Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1370-71 (11th Cir. 2003) ("Courts must rarely invoke the 'clear error' exception, less the exception swallow the rule. With this principle in mind, the exception can be restated this way: in a close case, a court must defer to the legal conclusion of a coordinate court in the same case; only when the legal error is beyond the scope of reasonable debate should the court disregard the prior ruling.").

That is, to justify reconsideration, [*15] a party must point to "'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). With regard to the latter justification for reconsideration — namely, a clear error or the need to prevent a manifest injustice —, the Second Circuit has stated "reconsideration will generally be denied unless the moving

party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

Also, "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Id.; see also Lego A/S v. Best-Lock Const. Toys, Inc., No. 3:11-CV-1586 (CSH), 2013 U.S. Dist. LEXIS 56371, 2013 WL 1611462, at *2 (D. Conn. Apr. 15, 2013) ("A motion for reconsideration is not simply a second bite at the apple for a party dissatisfied with a court's ruling.") (quoting Morien v. Munich Reinsurance Am., Inc., 270 F.R.D. 65, 69 (D. Conn. 2010)). Furthermore, unless the movant makes a showing of manifest injustice, courts generally refuse to consider new arguments made on reconsideration that could have been made in the prior proceedings. See StreetEasy, Inc. v. Chertok, No. 15-2003, 651 Fed. Appx. 37, 2016 U.S. App. LEXIS 10235, 2016 WL 3251877, at *2 (2d Cir. June 7, 2016) (Summary Order) ("No manifest injustice would result from declining to consider Chertok's **[*16]** new argument or depart from the law of the case . . . . Under these circumstances, we will not exercise our discretion to consider this waived argument or depart from the law of the case."); cf. Kahn v. NYU Med. Ctr., No. 06CIV.13455(LAP), 2008 U.S. Dist. LEXIS 3802, 2008 WL 190765, at *1 ("[A] motion to reconsider is not an opportunity to put forward additional arguments that the movant could have made, but neglected to make before judgment."); see also Hom v. Brennan, 840 F. Supp. 2d 576, 581 (E.D.N.Y. 2011) (Spatt, J) ("[A] motion for reconsideration 'is not to be used as a means to reargue matters already argued and disposed of by prior rulings or to put forward additional arguments which it could have made but neglected to make before judgment.'") (quoting Morris v. State of New York, No. 91 Civ. 634, 1995 U.S. Dist. LEXIS 4531, 1995 WL 155953, at *2 (N.D.N.Y. April 5, 1995)).

**B. As to the Legal Analysis**

The August 5, 2015 Order is a decision by a coordinating court to which the law of the case doctrine applies. Indeed, given the procedural ping pong that preceded the transfer of this case to this Court, the Court is cautious with regard to granting a retransfer motion that would only serve to further delay proceeding to the merits of this case. See Hoffman v. Blaski, 363 U.S. 335, 349, 80 S. Ct. 1084, 1092, 4 L. Ed. 2d 1254 (1960) ("Surely a seemly system of judicial remedies . . . regarding controverted transfer provisions of the United States **[*17]** Code should encourage, not discourage, quick settlement of questions of transfer.") (Frankfurter, J, dissenting).

Further, as described below, the Plaintiffs have failed to show any "clear error" or "manifest justice" which would give the Court pause in denying the motion to retransfer under the law of the case doctrine.

With regard to manifest injustice, the Plaintiffs do not argue that a manifest injustice would result from litigating their claims in a New York court. Indeed, it is undisputed that four of the Agreements contained forum selection clauses explicitly selecting New York forums for adjudicating the Plaintiffs' claims; *all* six Agreements contained New York choice of law provisions; and the three principal named Defendants Forsythe, Michael Rose, and Harriet Rose are based in New York and intended to perform their obligations under the Agreements in New York.

Under these circumstances, the Court finds that the possibility that the Plaintiffs would have to litigate their claims in New York was eminently foreseeable and therefore, denying the Plaintiffs' motion to retransfer this back to the Central District of California would not result in a manifest injustice. See Moses v. Bus. Card Exp., Inc., 929 F.2d 1131, 1139 (6th Cir. 1991) (affirming **[*18]** the denial of a retransfer motion and finding no manifest injustice would result from enforcing forum selection clause because the fact that the plaintiffs would have to bear greater litigation expenses than the defendants is a risk "inherent in a forum selection clause").

With regard to clear error, the Court finds that Judge Klausner applied the proper legal standard in analyzing the Defendants' Section 1404 motion to transfer the case to New York. In particular, he correctly cited to Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, *supra*, for the propositions that the party seeking to set aside the forum selection clause bears the burden of establishing that the clause is unenforceable; and that a forum selection clause will not be given controlling weight in only the most exceptional circumstances. (See Aug. 5, 2015 Oder, Dkt. No. 15, at 3.)

Further, the Court is not persuaded by the arguments offered by the Plaintiffs asserting that Judge Klausner committed a clear error by finding that the Plaintiffs failed to meet their heavy burden in showing that the forum selection clauses were unenforceable. First, the Plaintiffs assert that the Judge Klausner failed to address the fact that the Plaintiffs were only signatories to two of the six Agreements **[*19]** — namely, the Operating Agreement and the Assignment Agreement —, and both of those agreements did not contain forum selection clauses. (See the Pls.' Jan. 8, 2016 Reply Mem. of Law, Dkt. No. 32, at 3.) Therefore, according to the Plaintiffs, had Judge Klausner not overlooked this fact, he would have found that they were not bound by the forum selection clauses. (See id.)

However, in opposition to the Defendants' original motion to

transfer, the Plaintiffs' argument was limited to their contentions that enforcing the forum selection clauses contravened California public policy and that the Plaintiff's choice of forum and the convenience of the California forum weighed against transferring venue to New York. (See the Pls.' July 13, 2015 Opp'n Mem. of Law, Dkt. No. 11, at 9-14.) They did not raise the fact that they did not sign the four agreements with forum selection clauses as a basis for not enforcing those clauses against them. For that reason, the Court finds it is inappropriate for the Plaintiffs to raise that contention for the first time here. See Burda Media, Inc. v. Viertel, 604 F. App'x 91, 91-92 (2d Cir. 2015) (Summary Order) ("Viertel's arguments are barred by the law of the case doctrine, which 'forecloses reconsideration of issues that [*20] were decided—or that could have been decided—during prior proceedings' in the same case.") (emphasis added) (quoting United States v. Williams, 475 F.3d 468, 471 (2d Cir. 2007)); Mallard v. Potenza, No. 94-CV-223 (CBA), 2007 U.S. Dist. LEXIS 86336, 2007 WL 4198246, at *4 n.2 (E.D.N.Y. Nov. 21, 2007) ("[T]he Court need not address plaintiff's new arguments to the contrary under the doctrine of 'the law of the case.'").

Further, it is well-established in both the Ninth Circuit and this Circuit that "the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 701 (2d Cir. 2009); see also Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 514 n.5 (9th Cir. 1988) ("Manetti—Farrow argues the forum selection clause can only apply to Gucci Parfums, which was the only defendant to sign the contract. However, 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'") (quoting Clinton v. Janger, 583 F.Supp. 284, 290 (N.D. Ill. 1984)). Thus, even assuming *arguendo* that the Plaintiffs' argument is properly before the Court, the fact that the Plaintiffs were not signatories to the four agreements containing forum selection clauses would not, by itself, alter Judge Klausner's finding that the Plaintiffs were bound by those clauses.

Second, the Plaintiffs contend that Judge Klausner erred by failing to "appl[y] California choice of law rules to determine whether or not to uphold the 'choice [*21] of forum' in the six agreements." (See the Pls.' Dec. 11, 2015 Mem. of Law, Dkt. No. 28-1, at 16.) Again, the Court disagrees.

"The overriding framework governing the effect of forum selection clauses in federal courts . . . is drawn from federal law," and therefore, "federal law should be used to determine whether an otherwise mandatory and applicable forum clause is enforceable." Martinez v. Bloomberg LP, 740 F.3d 211, 217 (2d Cir. 2014) (internal quotation marks and citations omitted); see also Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 32, 108 S. Ct. 2239, 2245, 101 L. Ed. 2d 22 (1988) ("We hold that federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum-selection clause and transfer this case to a court in Manhattan."); Rudgayzer v. Google, Inc., 986 F. Supp. 2d 151, 155 (E.D.N.Y. 2013) ("Questions of venue and forum are procedural, so the enforceability of the forum-selection clause is governed by federal law."). Thus, far from being clearly erroneous, the Court finds that Judge Klausner correctly applied Section 1404 in determining whether to give effect to the forum selection clauses in the Agreements.

Third, the Plaintiffs assert, again relying on Hall, that Judge Klausner should have refused to enforce the forum selection clauses because the clauses contravened California's public policy of protecting securities investors. (See the Pls.' Dec. 11, [*22] 2015 Mem. of Law, Dkt. No. 28-1, at 18.)

The Plaintiffs made this same argument in opposition to the Defendants' original motion to transfer this case to a New York court, and Judge Klausner considered and rejected it. (See Aug. 5, 2015 Oder, Dkt. No. 15, at 3-4.) Without pointing to any controlling authority or data that Judge Klausner overlooked, the Court declines to second-guess Judge Klausner's legal conclusions on this issue. See Washington Nat. Life Ins. Co. of New York v. Morgan Stanley & Co. Inc., 974 F. Supp. 214, 221 (S.D.N.Y. 1997) ("This Court, absent a showing that the previous decision is entirely unsupported by the facts, will not second-guess the Louisiana court's factual conclusions, which were based upon the appropriate factors under the law. Because Plaintiffs have provided no evidence that the previous decision was unsupported by the facts, the Court finds reconsideration on this basis without merit.").

Fourth, the Plaintiffs argue that the August 5, 2015 Order was clearly erroneous because it failed to address the fact that under Section 1691 of the California Civil Code, a party can effect a rescission if he or she (a) promptly "[g]ive[s] notice of rescission to the party as to whom he rescinds"; and (b) "[r]estore[s] to the other party everything of value which he has received from him under the contract or offer to restore [*23] the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." Cal. Civ. Code § 1691. In addition, the California statute provides "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." Id. By contrast, according to the Plaintiffs, New York law

only permits rescission after a judicial determination that rescission is proper. (See the Pls.' Mem. of Law, Dkt. No. 28-1, at 22-23.) According to the Plaintiffs, these purported differences in New York and California rescission law should have provided a sufficient reason for Judge Klausner to deny the Defendants' motion to transfer this case to a New York court. (See id.)

However, as with many other arguments offered in support of their present motion to retransfer, the Plaintiffs did not argue in their original opposition to the Defendants' motion to transfer that there were distinctions between New York and California law with respect to their rescission claims, nor that [*24] these distinctions justified declining to enforce the forum selection clauses selecting a New York forum. (See the Pls.' July 13, 2015 Opp'n Mem. of Law, Dkt. No. 11, at 9-14.) Thus, as already discussed earlier, it is not proper under the law of the case doctrine to raise new theories that could have been raised in the prior proceedings.

In addition, as noted above, forum selections clauses are presumptively valid, and a plaintiff cannot overcome this presumption merely by showing that "the foreign law or procedure [is] different or less favorable than" the plaintiff's preferred choice of forum and choice of law. Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993). Rather, he must show that "for all practical purposes be deprived of his day in court" by being forced to litigate in the forum selected by the agreement. Id.; see also See AJZN, Inc. v. Yu, No. 12-CV-03348 (LHK), 2013 U.S. Dist. LEXIS 2943, 2013 WL 97916, at *4 (N.D. Cal. Jan. 7, 2013) (rejecting an argument by a plaintiff that enforcing a forum selection clause selecting Delaware courts would contravene California public policy because the plaintiff "has not even argued, let alone proven, that a Delaware court will be unable to protect the interests of California citizens").

Here, the Plaintiffs have provided no reason why being compelled to litigate in a New York federal court would [*25] deprive them of a remedy for their rescission claims, or any of their other claims. To the contrary, "under the rule of Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 11 L.Ed.2d 945 (1964), a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.'" Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993). Thus, the fact that this case is in a New York forum has nothing to do with what law will be applied to the Plaintiffs' rescission claims. Rather, like a California federal court, this Court will undertake a conflict of law analysis based on California choice of law rules to determine whether it should apply New York or California law to the Plaintiffs' common law rescission claims. In other words, this Court will apply the same standard as a California federal

court in determining the choice of law to be applied to the Plaintiffs' rescission claims.

The Plaintiffs have not shown that a manifest injustice would result from this Court, as opposed to a California federal court, making that determination. Thus, reconsideration of the August 5, 2015 Order on this basis is also not warranted. See Rosenbloom v. Barclays Bank PLC, No. 13-CV-04087, 2014 U.S. Dist. LEXIS 81396, 2014 WL 2726136, at *4 (N.D. Ill. June 16, 2014) (enforcing a forum selection clause in part, because the plaintiff did not argue "that the forum [defendants] chose for the English Action [*26] is inadequate to handle a contract dispute fairly. Indeed, U.S. courts generally recognize that English courts are more than capable of handling complex commercial litigation."); GLT Technovations, LLC v. Fownes Bros. & Co., No. 12-CV-00466 RMW, 2012 U.S. Dist. LEXIS 56028, 2012 WL 1380338, at *6 (N.D. Cal. Apr. 20, 2012) (rejecting a plaintiff's argument in opposition to a defendant's motion to transfer venue to the Southern District of New York because although "[i]t is true that this court is probably more familiar with California law than other courts, . . . 'it is also true that other federal courts are fully capable of applying California law'") (quoting Foster v. Nationwide Mut. Ins. Co., No. 07-04928, 2007 U.S. Dist. LEXIS 95240, 2007 WL 4410408, at *6 (N.D. Cal. Dec. 14, 2007)); Verizon New Jersey, Inc. v. DMJM Harris, Inc., No. CIV.A. 08-3028 (SRC), 2009 U.S. Dist. LEXIS 37678, 2009 WL 1283173, at *5 (D.N.J. May 1, 2009) (enforcing a forum selection clause, in part, because "New York courts are fully capable of adjudicating the claims in this case").

Finally, the Plaintiffs point to Section 1691 of the California Civil Code, which as noted earlier, states, "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." The Plaintiffs contend that by filing this action, they have satisfied the requirements of rescission under Section 1691 of California Civil Code and therefore, all [*27] obligations under the Agreement, including the forum selection clause, are null and void. (See the Pls.' Dec. 11, 2016 Mem. of Law, Dkt. No. 28-1, at 23.)

Again, the Plaintiffs did not raise this argument before Judge Klausner and therefore, it is not a proper basis for reconsideration of the August 5, 2015 Order. Further, as just described, it is not clear whether Section 1691 of the California Civil Code applies to this case because the Agreements all contain New York choice of law clauses, and this Court has not yet determined what law should be applied

to the Plaintiffs' claims.

In addition, even if the Plaintiffs had properly satisfied the requirements of Section 1691, they offer no legal authority for the proposition that satisfying the requirements for the unilateral rescission of an agreement also renders a forum selection clause null and void. Indeed, most courts appear to have rejected similar arguments. See, e.g., Wholesale Merch. Processing, Inc. v. Orion Commc'ns, Inc., No. 03:12-CV-02003-(HU), 2013 U.S. Dist. LEXIS 48962, 2013 WL 1361863, at *4 (D. Or. Mar. 4, 2013), ("WMP further argues Orion's alleged breach of the Agreement allows WMP to rescind the Agreement in its entirety, including the forum selection clause. The court agrees with Orion that this argument puts the proverbial cart before the [*28] horse. Whether WMP can rightfully rescind the Agreement is one of the questions that must be decided in this case. Interpretation of the forum selection clause is necessary to determine where the rescission claim will be tried."), report and recommendation adopted, No. 3:12-CV-02003-HU, 2013 U.S. Dist. LEXIS 48038, 2013 WL 1353048 (D. Or. Apr. 3, 2013); KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC, 812 F. Supp. 2d 377, 389 (S.D.N.Y. 2011) (rejecting an argument that the plaintiffs' claim for rescission bars the application of a forum selection clause); Starlight Co. v. Arlington Plastics Mach., Inc., No. C011121SI, 2001 U.S. Dist. LEXIS 7997, 2001 WL 677908, at *4 (N.D. Cal. June 8, 2001) (rejecting an argument that a forum selection clause was unenforceable based on allegations of rescission because "plaintiff presents no cases where a court has rescinded an entire contract for the purpose of invalidating a forum-selection clause" and "[g]ranting a rescission of the Contract to invalidate the forum-selection clause would essentially give plaintiff the relief it seeks without requiring it to prove its case").

Thus, the Court finds that the Plaintiffs' have failed to show that Judge Klausner's alleged failure to consider the Plaintiffs' claims of rescission would have changed the outcome of the Defendants' transfer motion.

In sum, the Court holds that the Plaintiffs have not met their heavy burden of showing that the August [*29] 5, 2015 Order was clearly erroneous or resulted in a manifest injustice. Accordingly, the Court adheres to the August 5, 2015 Order under the law of the case doctrine.

**III. CONCLUSION**

For the foregoing reasons, the Plaintiffs' motion to retransfer this case to the Central District of California is denied in its entirety.

Further, on July 5, 2016, the parties filed a proposed stipulation requesting a stay of discovery during the pendency of this motion. In addition, the Plaintiffs indicated that in the event their motion for retransfer is denied, they would likely seek to appeal the August 5, 2015 Order in the Ninth Circuit.

The Plaintiffs are directed to file on ECF within seven days of the date of this Order a letter indicating how they intend to proceed with this case in light of this Order — namely, whether they intend to file an appeal in the Ninth Circuit, and if so, whether the Court must stay this matter during the pendency of that appeal.

**SO ORDERED.**

Dated: Central Islip, New York

July 30, 2016

*/s/ Arthur D. Spatt*

ARTHUR D. SPATT

United States District Judge

---

**End of Document**

# Exhibit 17d.

# Ill. Union Ins. Co. v. Midwood Lumber & Millwork, Inc.

United States District Court for the Eastern District of New York

September 30, 2016, Decided; September 30, 2016, Filed

13-CV-2466 (MKB)

**Reporter**

2016 U.S. Dist. LEXIS 136686 *

ILLINOIS UNION INSURANCE COMPANY, Plaintiff, v. MIDWOOD LUMBER & MILLWORK, INC., IGNATIUS REGIS, CLAYTON LABOARD, DEANNA ROSE SIMMS, as Administratrix of the Estate of Winston Gillette, 231 CARLTON AVENUE, LLC, BORO ARCHITECTS, LLC, KINGS MATERIAL CO., INC., ALBANNA ENGINEERING, P.C., INTEGRITY CONSULTING SERVICES, INC., S&B MASONRY CORP. and PROFESSIONAL GRADE CONSTRUCTION GROUP, INC., Defendants.MIDWOOD LUMBER & MILL WORK, INC., Third-Party Plaintiff, v. ALL RISK BROKERAGE CO., INC., Third-Party Defendant.

**Prior History:** Ill. Union Ins. Co. v. Midwood Lumber & Millwork, Inc., 2014 U.S. Dist. LEXIS 19981 (E.D.N.Y., Feb. 18, 2014)

**Counsel:** [*1] For Illinois Union Insurance Company, Plaintiff: Eric D. Suben, LEAD ATTORNEY, Meghan Ruesch, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY USA; Meryl R. Lieberman, Traub Eglin Lieberman Straus LLP, Mid-Westchester Executive Park, Hawthorne, NY USA.

For Midwood Lumber & Millwork, Inc., Defendant, Cross Defendant, Thirdparty Plaintiff, Counter Claimant: John D. D'Ercole, Michael E. Greene, LEAD ATTORNEYS, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., New York, NY USA; Eric D. Suben, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY USA.

For Deanna Rose Simms, as Administratrix of the Estate of Winston Gillette, Defendant, Cross Defendant: Scott Rynecki, Rubenstein & Rynecki, Brooklyn, NY USA.

For 231 Carlton Avenue, Llc, Defendant: Daniel Pearce Mevorach, Gallo Vitucci & Klar LLP, New York, NY USA; Robert Charles Baxter, Baxter Smith & Shapiro, P.C., Hicksville, NY USA.

For Boro Architects, Llc, Defendant, Cross Defendant: Kenneth Alan Sherman, Lewis Brisbois Bisgard & Smith LLP, New York, NY USA.

For Kings Material Co., Inc., Defendant, Cross Defendant: William Arthur Prinsell, Jr., The Law Offices of Leon R. Kowalski, Brooklyn, NY USA.

For Albanna Engineering, P.C., [*2] Defendant: Dan Toshiki Szajngarten, Dawn Francine Konigsberg, Winget, Spadafora & Schwartzberg, LLP, New York, NY USA; Dianna D. McCarthy, Winget, Spadafora & Schwartberg, LLP, New York, NY USA.

For Intergrity Consulting Services, Inc., Defendant, Cross Defendant: Mark Ronald McCauley, Gogick, Byrne & O'Neill, LLP, New York, NY USA.

For Professional Grade Construction Group, Inc., Defendant: Eric D. Suben, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY USA; Michael Robert Schneider, Carroll McNulty & Kull, LLC, New York, NY USA.

For All Risk Brokerage Co., Inc., Thirdparty Defendant, Cross Claimant: Howard S. Kronberg, LEAD ATTORNEY, Keidel, Weldon & Cunningham, LLP, White Plains, NY USA; John Joseph Iacobucci, Jr., Keidel, Weldon & Cunningham, LLP, West Harrison, NY USA.

For Midwood Lumber & Millwork, Inc., Counter Claimant, Cross Defendant, Thirdparty Plaintiff: John D. D'Ercole Michael E. Greene, LEAD ATTORNEYS, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., New York, NY USA.

For Illinois Union Insurance Company, Counter Defendant, Cross Defendant: Eric D. Suben LEAD ATTORNEY, Meghan Ruesch, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY USA.

For 231 Carlton Avenue, [*3] Llc, Cross Claimant, Cross Defendant, Counter Claimant: Robert Charles Baxter, Baxter Smith & Shapiro,P.C., Hicksville, NY USA.

For Professional Grade Construction Group, Inc., Cross Defendant, Cross Claimant: Michael Robert Schneider, Carroll McNulty & Kull, LLC, New York, NY USA.

For Midwood Lumber & Millwork, Inc., Cross Defendant: John D. D'Ercole, Michael E. Greene, LEAD ATTORNEYS, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., New York, NY USA.

Albanna Engineering, P.C., Cross Claimant, Counter Claimant: Dan Toshiki Szajngarten, Winget Spadafora & Schwartzberg LLP, New York, NY USA; Dianna D. McCarthy, Winget, Spadafora & Schwartberg, LLP, New York, NY USA.

**Judges:** MARGO K. BRODIE, United States District Judge.

**Opinion by:** MARGO K. BRODIE

# Opinion

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge:

On April 23, 2013, Plaintiff Illinois Union Insurance Company ("Illinois Union") commenced the above-captioned declaratory judgment action against Defendants Midwood Lumber & Millwork, Inc. ("Midwood"), Ignatius Regis, Clayton Laboard, Deanna Rose Simms as administratrix of the estate of Winston Gillette, 231 Carlton Avenue, LLC, Boro Architects, LLC, Kings Material Co., Inc., Albanna Engineering, [*4] P.C., Integrity Consulting Services, Inc., S&B Masonry Corp. and Professional Grade Construction Group, Inc. (Compl., Docket Entry No. 1.) Illinois Union seeks a declaratory judgment: (1) that it has no obligation to defend or indemnify Midwood with respect to three lawsuits that are being litigated in the Supreme Court of the State of New York, Kings County (the "Underlying Actions"),[1] in which Midwood has been named as a defendant; and (2) that the remaining Defendants in this action, who are parties to the Underlying Actions, have no right to make any claims against Illinois Union pursuant to Midwood's insurance policy with Illinois Union. (*Id.*) On September 26, 2014, Midwood filed a third-party complaint against All Risk Brokerage Co., Inc. ("All Risk"), Midwood's insurance broker. (Third-party Compl., Docket Entry No. 81.) As described in further detail below, currently before the Court are Illinois Union's motion for summary judgment and cross-motions by Midwood and All Risk for partial summary judgment. For the reasons discussed below, the Court grants in part and denies in part Illinois Union's motion for summary judgment and denies the cross-motions by Midwood and All Risk. [*5]

**I. Background**

Illinois Union brings this action because it claims that it has no obligation to defend or indemnify Midwood based on an addendum to Midwood's insurance policy, entitled "Limitation of Coverage to Designated Premises or Project" (the "Designated Premises Endorsement"), which precludes coverage and, in addition, because the incident from which the Underlying Actions arose involved the use of an automobile, also not covered by Midwood's insurance policy. (Compl. ¶¶ 33-45.)

On December 23, 2013, Illinois Union moved for summary judgment as to its claim that the Midwood insurance policy precluded coverage as a matter of law, and Midwood cross-moved for summary judgment on the grounds that the incident that gave rise to the Underlying Actions was covered by the 2012 Policy. *Ill. Union Ins. Co. v. Midwood Lumber & Millwork, Inc.*, No. 13-CV-2466, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *1 (E.D.N.Y. Feb. 18, 2014).

By Opinion and Order dated February 18, 2014, Judge Allyne R. Ross granted in part and denied in part Illinois Union's motion for summary [*6] judgment and denied Midwood's motion for summary judgment[2] (the "2014 Decision"). *Id.* Judge Ross determined that based on the plain language of the Midwood insurance policy, Illinois Union had no obligation to defend or indemnify Midwood with respect to the Underlying Actions because the Designated Premises Endorsement limited Midwood's insurance coverage to certain designated premises. 2014 U.S. Dist. LEXIS 19981, [WL] at *7-8. Because the incident that gave rise to the Underlying Actions occurred on premises that were not listed on the Designated Premises Endorsement, Illinois Union was not obligated by the Midwood insurance policy to defend or indemnify Midwood. 2014 U.S. Dist. LEXIS 19981, [WL] at *8.

Judge Ross found, however, that Illinois Union's seven-month delay in disclaiming coverage was unreasonable as a matter of law. 2014 U.S. Dist. LEXIS 19981, [WL] at *12. Judge Ross also found that there was a genuine issue of material fact as to whether Midwood was prejudiced by Illinois Union's unreasonable delay, thereby equitably estopping Illinois Union from denying or disclaiming coverage. 2014 U.S. Dist. LEXIS 19981, [WL] at *14. Based on this genuine issue of material fact, Judge Ross denied Illinois Union's summary judgment motion as to Midwood's equitable [*7] estoppel

[1] The Underlying Actions are: *Regis v. 231 Carlton Avenue, LLC*, No. 23520/2012 (N.Y. Sup. Ct. filed Dec. 11, 2012), *Simms v. 231 Carlton Avenue, LLC*, No. 22408/2012 (N.Y. Sup. Ct. filed Nov. 20, 2012), and *Laboard v. 231 Carlton Avenue, LLC*, No. 21547/2012 (N.Y. Sup. Ct. filed Nov. 7, 2012).

[2] The case was reassigned to this Court on April 11, 2016. (Order dated Apr. 11, 2016.)

counterclaim and directed the parties to "conduct further discovery on this issue and . . . renew motions at the conclusion of that discovery." 2014 U.S. Dist. LEXIS 19981, [WL] at *14.

After engaging in further discovery, Illinois Union, Midwood and All Risk now move for relief. Midwood argues that Illinois Union's delay in disclaiming coverage has prejudiced Midwood and that equitable estoppel therefore operates to prevent Illinois Union from not defending it in the Underlying actions. (Midwood Mem. of Law in Opp'n ("Midwood Opp'n") 3, Docket Entry No. 147.)

Midwood also seeks partial summary judgment based on its counterclaim that the policy must be reformed to exclude the Designated Premises Endorsement because its inclusion in the policy was either a mutual mistake or a fraudulently induced unilateral mistake. (*Id.* at 1.)

In addition, Midwood and All Risk alternatively move for partial summary judgment to dismiss Illinois Union's claim that it has no obligation to defend or indemnify Midwood based on the terms in the Designated Premises Endorsement. (Midwood Mot. for Partial Summ. J., Docket Entry No. 145; All Risk Mot. for Partial Summ. J., Docket Entry No. 148.) Midwood and All Risk argue that because the Designated [*8] Premises Endorsement is neither included in the quote nor the binder that they received in advance of the policy, the parties never agreed to include the Designated Premises Endorsement in the 2012 Policy, and that the Designated Premises Endorsement is therefore not a part of Midwood's insurance policy and does not relieve Illinois Union's from its obligation to defend or indemnify Midwood in the Underlying Actions. (Midwood Mem. of Law ("Midwood Mem.") 1, 19-20, Docket Entry No. 145-22; All Risk Mem. of Law ("All Risk Mem.") 6, 15, 22-23, Docket Entry No. 148-36.) Midwood also argues that, despite Judge Ross's determination that the Designated Premises Endorsement precludes insurance coverage, the Court may consider this motion either (1) because Judge Ross did not consider the issue of whether the Designated Premises Endorsement was "properly included" in the policy, and thus the law-of-the-case doctrine does not preclude this argument, or (2) because new evidence and the avoidance of "manifest injustice" provide a basis to reconsider the 2014 Decision. (Midwood Mem. 15-18.)

For its part, Illinois Union moves for summary judgment as to Midwood's equitable estoppel counterclaim, arguing [*9] that Midwood cannot show that the delay in disclaiming coverage caused prejudice to Midwood, and the Court should therefore not apply equitable estoppel, and it also cross-moves for summary judgment as to Midwood's reformation counterclaim.[3] (Illinois Union Mot. for Summ. J., Docket Entry No. 135; Illinois Union Mem. of Law ("Illinois Union Mem.") 1-2, Docket Entry No. 135-1.)

Because the facts are set forth in detail in the 2014 Decision, *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *1-3, the Court provides only a summary of the pertinent facts. The Court also provides the additional facts resulting from the discovery engaged in by the parties after the 2014 Decision.

**a. Summary of underlying facts**

Midwood operates a retail and wholesale lumberyard located at 1169 Coney Island Avenue, Brooklyn, New York.[4] (Midwood's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Midwood 56.1") ¶ 1, Docket Entry No. 145-23; All Risk's Local Rule 56.1 Statement of Facts ("All Risk 56.1") ¶ 4, Docket Entry No. 148-4.) A "significant" portion [*10] of Midwood's business includes delivering and unloading construction materials and equipment outside of its lumberyard location. (Midwood 56.1 ¶ 2.) All Risk is an insurance broker hired by Midwood to procure insurance coverage on Midwood's behalf. (*Id.* ¶ 3; All Risk 56.1 ¶ 7.) Illinois Union is an insurance company that provides insurance in New York. (All Risk 56.1 ¶¶ 1-2.) Partners Specialty Group ("Partners Specialty"), a wholesale broker, acted as an intermediary between All Risk and Illinois Union. (Midwood 56.1 ¶¶ 8-9; All Risk 56.1 ¶¶ 18-19.)

All Risk obtained two general commercial liability insurance policies from Illinois Union on Midwood's behalf, one in 2011 with a coverage period from May 25, 2011 through May 26, 2012 (the "2011 Policy"), and the other in 2012 with a coverage period from May 26, 2012 through May 25, 2013 (the "2012 Policy"), which is the pertinent policy at issue (collectively the "Policies").[5] (Midwood 56.1 ¶ 8-9; 2011 Policy, Docket Entry No. 135-11; 2012 Policy, Docket Entry No. 135-15.)

**i. The 2011 Policy**

---

[3] No party has moved for summary judgment with respect to Illinois Union's claim that it has no obligation to defend or indemnify Midwood because the Incident involved the use of an automobile, for which Midwood's insurance policy does not provide coverage.

[4] The facts are undisputed unless otherwise noted.

[5] In negotiating the Policies, neither Midwood nor All Risk communicated directly with Illinois Union. (All Risk 56.1 ¶¶ [*11] 16-17.) Instead, Partners Specialty acted as an intermediary between All Risk and Illinois Union. (Midwood 56.1 ¶¶ 8-9; All Risk 56.1 ¶¶ 18-19.

Midwood applied for the 2011 Policy on March 23, 2011 (the "2011 Application"). (Midwood 56.1 ¶ 10; 2011 Application, Docket Entry No. 148-6.) The 2011 Application listed as the named insureds Midwood and ten limited liability companies. (2011 Application 3.) The 2011 Application sought insurance for Midwood's business operations at ten different premises, (*id.* at 1-2), with varying levels of insurance coverage, (*id.* at 6-7).

Illinois Union provided a quote for general commercial liability insurance, including pricing and proposed terms (the "2011 Quote"). (2011 Quote, Docket Entry No. 148-7.) The 2011 Quote listed Midwood as the only named insured and included the policy period, the insurance coverage limits, the deductible, the premium and the estimated exposure. (*Id.* at 1.) Under "additional terms and conditions," the quote listed the titles of twenty-eight forms, endorsements and exclusions that would be included in the final policy. (*Id.* at 2.) Based on the 2011 Quote, Midwood paid the advance premium, (Midwood 56.1 ¶ 16), and Illinois Union issued a binder **[*12]** the same day with the same material terms as the 2011 Quote and the same additional terms and conditions to be added to the final policy (the "2011 Binder"), (2011 Binder, Docket Entry No. 148-9). The Designated Premises Endorsement was not listed on either the 2011 Quote or the 2011 Binder as an additional term and condition to be included in the policy. (*See* 2011 Quote at 2-3; 2011 Binder at 2.)

After Illinois Union issued the 2011 Binder, the parties continued to negotiate about the inclusion of the limited liability companies as named insureds in the policy. Based on the 2011 Application, Illinois Union understood that for the limited liability companies whose names corresponded with the premises that were listed on the 2011 Application, Midwood was seeking only "lessor's risk coverage," as opposed to general commercial liability coverage, because the business activities of the limited liability companies consisted only of owning and leasing the premises for which they were named. (Emails from James Williams dated May 25-26, 2011 ("Williams 2011 Emails") at 4, Docket Entry No. 135-9.) Because Midwood sought coverage for two limited liability companies that did not correspond to **[*13]** premises listed on the 2011 Application, Illinois Union agreed to extend coverage to those companies as well — thereby covering all of Midwood's proposed entities under the 2011 Policy — if Midwood agreed to add "CG 21 44 Limitation of Coverage to Scheduled locations" to the insurance policy.[6] (*Id.* at 1.) Partners Specialty forwarded Illinois Union's proposal to All Risk, and All Risk agreed to add the Designated Premises Limitation. (Emails from Karen Bohrer dated May 25-26, 2011 ("Bohrer Emails") at 1, Docket Entry No. 148-11.)

On June 2, 2011, Illinois Union issued the 2011 Policy, which was substantially similar to the 2011 Quote and Binder except that it included the Designated Premises Endorsement among the annexed forms, endorsements and exclusions. (2011 Policy at 65.) The Designated Premises Endorsement stated: "THIS ENDORSEMENT CHANGES **[*14]** THE POLICY. PLEASE READ IT CAREFULLY." (*Id.*) It also stated in relevant part that the insurance policy "applies only to bodily injury, property damage, personal and advertising injury and medical expenses arising out of[] [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises." (*Id.*) The Designated Premises Endorsement included a schedule, which listed the ten premises that Midwood included on the 2011 Application. (*Id.*) The 2011 Policy did not include any provision for automatic renewal upon expiration of the 2011 Policy. (All Risk ¶¶ 94.)

Midwood did not receive or read the 2011 Policy. (Illinois Union 56.1 ¶ 13; Midwood 56.1 ¶ 20.)

**ii. The 2012 Policy**

Approximately one year later, Midwood completed an application for a new insurance policy (the "2012 Application"), (Midwood 56.1 ¶ 12; All Risk 56.1 ¶ 98; 2012 Application, Docket Entry No. 148-14), and Peter D'Souza, a broker for Partners Specialty, forwarded the 2012 Application to Illinois Union. (Partners Specialty Submission Summary, Docket Entry No. 143-4.) Partners Specialty attached a cover sheet entitled "Submission Summary" to the 2012 Application, and under **[*15]** "description of risk," Partners Specialty wrote "same as expiring." (*Id.* at 1.) The 2012 Application was similar to the 2011 Application, listing the same named insured and premises and requesting the same insurance coverage. (*See* 2012 Application.)

On May 9, 2012, Illinois Union gave Midwood a quote for general commercial liability insurance (the "2012 Quote"). (2012 Quote, Docket Entry No. 148-15.) The 2012 Quote stated that the terms contained in the quote could "vary from those [Midwood] requested in [its] submission and/or from the expiring policy." (*Id.* at 1.) The differences between the 2011 Quote and the 2012 Quote were the higher premium and a change in the policy period. (*Id.*) The 2012 Quote did not include the Designated Premises Endorsement as an additional term and condition to be added to the final policy.

[6] The parties do not dispute that the form Williams referenced in his email as "CG 21 44 Limitation of Coverage Scheduled to these premises/locations," (Williams 2011 Emails 1), is the Designated Premises Endorsement, which is entitled "Limitation of Coverage to Designated Premises or Project" and has an identifying code of CG 21 44, (2011 Policy at 65).

(*Id.* at 2-3.) The 2012 Quote also stated that "[a]ctual coverage will be provided by the terms and conditions of the policy as issued" and that "[a]ctual coverage will be determined by and in accordance with the policy as issued by [Illinois Union]." (*Id.* at 3.) After receiving the 2012 Quote, Midwood paid the premium. (Midwood 56.1 ¶ 24.)

On May 24, 2012, Illinois Union issued to Midwood a binder for commercial general **[*16]** liability insurance (the "2012 Binder"). (2012 Binder, Docket Entry No. 148-17.) The 2012 Binder stated that the terms contained in the binder could "vary from those [Midwood] requested in [its] submission and/or from the expiring policy." (*Id.* at 1.) The 2012 Binder had the same terms and conditions as the 2012 Quote. (*Id.*) The 2012 Binder did not include the Designated Premises Endorsement as an additional term and condition to be added to the final policy. (*Id.* at 2-3.) The 2012 Binder also stated that "[a]ctual coverage will be provided by the terms and conditions of the policy as issued" and that "[a]ctual coverage will be determined by and in accordance with the policy as issued by [Illinois Union]." (*Id.* at 3.)

On June 4, 2012, Illinois Union's underwriter, Dana Jones, emailed Illinois Union's underwriter, James Williams, questioning why the 2012 Binder did not include the Designated Premises Endorsement. (Emails from James Williams dated June 4-20, 2012 ("Williams 2012 Emails") 2, Docket Entry No. 143-7.) Williams responded that he did not include the Designated Premises Endorsement to the 2012 Binder because Midwood's insurance "renewal was based on expiring terms" and he did not "see" the Designated Premises Endorsement **[*17]** on the 2011 Quote or the 2011 Binder. (*Id.*) After Jones reminded Williams that the Designated Premises Endorsement had been added to the 2011 Policy after the 2011 Binder had issued, Williams told Jones to "carry them forward for the renewal." (*Id.* at 1-2.)

On June 21, 2012, Illinois Union issued the 2012 Policy. (2012 Policy.) The 2012 Policy included the Designated Premises Endorsement. (*Id.* at 65.) Partners Specialty sent the 2012 Policy to All Risk, (Letter dated July 17, 2012, Docket Entry No. 143-2), but Midwood did not receive or read the 2012 Policy, (Illinois Union 56.1 ¶ 13; Midwood 56.1 ¶ 62).

**iii. The Incident**

On September 10, 2012, a building under construction at 227 Carlton Avenue, Brooklyn, New York, partially collapsed, killing one individual and injuring two others (the "Incident"). (Midwood 56.1 ¶ 64.) The Incident was allegedly caused by a Midwood employee's negligent use of a boom truck. (*Id.* ¶ 64.) On September 12, 2012, All Risk notified Illinois Union of the Incident. (Illinois Union 56.1 ¶ 16.) Illinois Union retained the law firm of Ahmuty, Demers and McManus ("Ahmuty") to represent Midwood's interest with respect to the Incident and to investigate the cause of the Incident. (*[*18] Id.* ¶ 17.)

On September 27, 2012, Ahmuty learned that "the debris at the site [where the Incident occurred] had been disturbed and moved." (*Id.* ¶ 19.) On October 16, 2012, the New York City Department of Buildings permitted the interested parties to conduct a site inspection of the premises on which the Incident occurred. (*Id.* ¶ 21.) Ahmuty retained Frank Ramos, of Rimkus Consulting Group, to conduct the inspection. (*Id.* ¶ 22.) Ramos inspected the construction site on October 16, 2012 on behalf of Illinois Union. (*Id.*)

**iv. The Underlying Actions**

Between November 7, 2012 and December 11, 2012, the two individuals that were injured and the administratrix of the estate of the individual who was killed in the Incident commenced the Underlying Actions, naming Midwood as a defendant. (Midwood 56.1 ¶ 65.) Ahmuty filed answers on behalf of Midwood. (Illinois Union 56.1 ¶ 26.)

On April 23, 2013, Illinois Union informed Midwood that it was denying coverage for the Underlying Actions because the Incident occurred at 227 Carlton Avenue, which was not one of the premises listed on the Designated Premises Endorsement. (Illinois Union 56.1 ¶ 28.) Illinois Union agreed to continue to defend Midwood in **[*19]** the Underlying Actions pending a judicial determination in the instant action, and it reserved the right to seek reimbursement. (Letter dated Apr. 23, 2013 at 1-2, Docket Entry No. 135-37.)

**b. The prior summary judgment litigation**

In its initial motion for summary judgment, Illinois Union argued that, as a matter of law, there was no coverage of the Incident under the 2012 Policy because the Designated Premises Endorsement defined the scope of the 2012 Policy and because the Incident took place at a location that is not listed as a designated premises on the Designated Premises Endorsement. *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *6. Illinois Union also argued that it had no obligation to defend Midwood in the Underlying Actions because neither waiver nor estoppel principles applied to prevent Illinois Union from disclaiming coverage. 2014 U.S. Dist. LEXIS 19981, [WL] at *5.

Midwood argued that the language of the Designated Premises Endorsement should be read to include business-related delivery trips, and that because the 2012 Policy premiums were partially based on sales, it would be illogical for the 2012 Policy to not cover the deliveries from those sales. 2014 U.S. Dist. LEXIS 19981, [WL] at *6. Midwood

also argued that even if there was no coverage under the 2012 Policy, (1) the Designated Premises **[*20]** Endorsement was an exclusion to coverage and not a definition of the scope of coverage, and (2) Illinois Union unreasonably delayed in disclaiming coverage based on that exclusion, and is therefore prevented from denying coverage under New York insurance law. *Id.* Midwood did not argue that the Designated Premises Endorsement was not part of the 2012 Policy.

In deciding the initial summary judgment motions, Judge Ross determined that, based on the plain language of the 2012 Policy, Illinois Union had no obligation to defend or indemnify Midwood with respect to the Underlying Actions because the Designated Premises Endorsement limited Midwood's insurance coverage to certain designated premises. 2014 U.S. Dist. LEXIS 19981, [WL] at *7-8. Judge Ross thus found that because the Incident occurred on premises that were not listed on the Designated Premises Endorsement, Illinois Union was not obligated by the 2012 Policy to defend or indemnify Midwood. 2014 U.S. Dist. LEXIS 19981, [WL] at *8. In reaching this decision, Judge Ross noted that "[b]ecause the [2012] Policy's provisions are unambiguous," she did not have to "look to any extrinsic evidence that Midwood invites it to consider in determining whether there is coverage under the [2012] Policy." 2014 U.S. Dist. LEXIS 19981, [WL] at *8. Judge Ross also determined **[*21]** that, contrary to Midwood's claim, the Designated Premises Endorsement was not a policy "exclusion" for which Illinois Union was required to disclaim coverage under New York insurance law. 2014 U.S. Dist. LEXIS 19981, [WL] at 11.

Judge Ross found, however, that Illinois Union's seven-month delay in disclaiming coverage was unreasonable as a matter of law and that there was a genuine issue of material fact as to whether Midwood was prejudiced by Illinois Union's unreasonable delay, thereby equitably estopping Illinois Union from denying or disclaiming coverage. 2014 U.S. Dist. LEXIS 19981, [WL] at *12, 14. Based on this genuine issue of material fact, Judge Ross denied Illinois Union's summary judgment motion as to Midwood's equitable estoppel counterclaim and directed the parties to "conduct further discovery on this issue and . . . renew motions at the conclusion of that discovery." 2014 U.S. Dist. LEXIS 19981, [WL] at *14.

Midwood filed a third-party complaint against All Risk a few months after the 2014 Decision. (Third-party Compl.) Midwood alleges in the third-party complaint that, contrary to its agreement with Midwood, All Risk failed to obtain an insurance policy to insure Midwood against liability arising from its business. (*Id.*) Midwood also filed an Amended Answer, asserting counterclaims against **[*22]** Illinois Union for reformation of the 2012 Policy and for equitable estoppel. (Midwood Am. Answer, Docket Entry No. 103.)

Since the 2014 Decision, All Risk's broker and Illinois Union's underwriter have been deposed. (Midwood Mem. 16-17.)

**II. Discussion**

**a. Standard of review**

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**b. Illinois Union's summary judgment motion as to Midwood's equitable estoppel [*23] counterclaim**

As discussed above, in the 2014 Decision, Judge Ross determined that Illinois Union's unexplained, seven month delay in disclaiming coverage was unreasonable as a matter of law. *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *12 (collecting cases). Judge Ross also found that there was a genuine issue of material fact as to whether Midwood had been prejudiced by Illinois Union's unreasonable delay, and ordered the parties to conduct further discovery and submit renewed motions for summary judgment.[7] 2014 U.S. Dist. LEXIS 19981, [WL] at *14. The

[7] No party seeks reconsideration of that portion of the 2014 Decision and accordingly, the Court considers only whether Midwood has shown prejudice as a result of Illinois Union's delay in disclaiming coverage under the 2012 Policy.

Court considers whether Midwood has presented evidence that Illinois union's delay caused it prejudice.[8]

Illinois [*24] Union moves for summary judgment as to this counterclaim and argues that it should not be equitably estopped from disclaiming coverage because Midwood has failed to establish any prejudice as a matter of law. (Illinois Union Mem. 12.) Illinois Union further argues that its expert's investigation did not cause Midwood any prejudice because he was a qualified expert, he has not provided an expert opinion, and after Illinois Union disclaimed coverage on April 23, 2013, Midwood retained its own expert. (*Id.* at 12-16.) Midwood argues that it has suffered prejudice from Illinois Union's seven-month delay in disclaiming coverage because the engineer expert who inspected the premises of the Incident was not a qualified structural engineer expert, and because Midwood's current expert cannot conduct her own site inspection as the premises of the Incident has since been repaired.[9] (Midwood Opp'n 3.)

In the insurance context, equitable estoppel "arises where an insurer acts in a manner inconsistent [*25] with a lack of coverage, and the insured reasonably relies on those actions to its detriment." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002) (citing *Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 699, 417 N.E.2d 84, 435 N.Y.S.2d 972 (1980)); *see also N.Y. Cen. Mut. Fire Ins. Co. v. Edwards*, No. 07-1267, 2009 U.S. App. LEXIS 1783, 2009 WL 230146, at *1 (2d Cir. Jan. 30, 2009) ("The doctrine of equitable estoppel 'preclude[s] a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted.'" (alteration in original) (quoting *Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326, 853 N.E.2d 610, 820 N.Y.S.2d 199 (2006)); *Bluestein & Sander v. Chicago Ins. Co.*, 276 F.3d 119, 122 (2d Cir. 2002) ("Under New York common law, an insurer, who undertakes the defense of an insured, may be estopped from asserting a defense to coverage, no matter how valid, if the insurer unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay." (citing *Globe Indem. Co. v. Franklin Paving Co.*, 77 A.D.2d 581, 430 N.Y.S.2d 109, 111 (App. Div. 1980))). Equitable estoppel "requires a showing of prejudice to the insured." *Burt Rigid Box*, 302 F.3d at 95 (citing *Albert J. Schiff Assocs.*, 51 N.Y.2d at 699); *see also Adams v. Chicago Ins. Co.*, 49 F. App'x 346, 349 (2d Cir. 2002) ("Even where an insurer unreasonably delays in disclaiming coverage, the insured must demonstrate prejudice from the delay in order to merit an estoppel." (citing *U.S. Fid. & Guar. Co. v. Weiri*, 265 A.D.2d 321, 696 N.Y.S.2d 200, 201 (App. Div. 1999))). "Whether or not an insured suffered prejudice is typically a question of fact." *Adams*, 49 F. App'x at 349 (citing *Greater N.Y. Sav. Bank v. Travelers Ins. Co.*, 173 A.D.2d 521, 570 N.Y.S.2d 122, 123 (App. Div. 1991)); *James River Ins. Co. v. Power Mgmt., Inc.*, 55 F. Supp. 3d 446, 456 (E.D.N.Y. 2014) (stating whether an insured suffered prejudice by an insurer's delay in disclaiming "is generally a question of fact" (citing *Adams*, 49 F. App'x at 349)).

Although the New York Court of Appeals [*26] "has long recognized that an insurer can be equitably estopped from issuing a disclaimer if at the time it disclaims it has controlled the defense of its insured," the Court of Appeals "has only found estoppel in cases where, by the time the insurer attempted to avoid liability under the policy, the underlying litigation against the insured had reached a point where the course of the litigation had been fully charted." *206-208 Main St. Assocs., Inc. v. Arch Ins. Co.*, 106 A.D.3d 403, 965 N.Y.S.2d 31, 34 (App. Div. 2013) (citing *Gordon, Inc. v. Mass. Bonding & Ins. Co.*, 229 N.Y. 424, 128 N.E. 204 (1920)); *see also Burt Rigid Box*, 302 F.3d at 95 ("Courts may hold that an insurer is estopped from asserting a defense of lack of coverage where, for example, an insurer, though not in fact obligated to provide coverage, defends the case without asserting any policy defenses, and as a consequence the insured reasonably suffers the detriment of losing control over its defense." (citing *Albert J. Schiff Assocs.*, 51 N.Y.2d at 699)). Prejudice is determined as of the time the insurer disclaimed coverage. *Gelfman v. Capitol Indem. Corp.*, 39 F. Supp. 3d 255, 266 (E.D.N.Y. 2014) (adopting report and recommendation) (noting that "the relevant inquiry is whether" the insured "suffered any prejudice as a result of any conduct by [the insurer] up until" the insurer disclaims coverage). An insured's speculative allegation that it would have pursued a different litigation strategy is insufficient to demonstrate prejudice. [*27] *Lumbermens Mut. Cas. Co. v. Flow Int'l Corp.*, 844 F. Supp. 2d 286, 306 (N.D.N.Y. 2012) (finding that the insureds' "claimed prejudice" that they would have structured their litigation strategy differently "if they were aware that [the insurer] would later" disclaim coverage "[wa]s speculative and insufficient to demonstrate

[8] Although Illinois Union is the party moving for summary judgment with respect to Midwood's equitable estoppel counterclaim, because Midwood is the party seeking equitable estoppel, it bears the burden of establishing that it was prejudiced by Illinois Union's unreasonable delay. *Illinois Union Ins. Co. v. Midwood Lumber & Millwork, Inc.*, No. 13-CV-2466, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *13 (E.D.N.Y. Feb. 18, 2014) (stating that Midwood "must demonstrate that [it] suffered prejudice as a result of [Illinois Union's] delay").

[9] Midwood has not moved for summary judgment as to its equitable estoppel counterclaim and raises this argument only in opposition to Illinois Union's motion to for summary judgment as to the equitable estoppel counterclaim.

prejudice"). However, where insureds present evidence that the insurer's defense was deficient, courts have found the insured suffered prejudice. *See James River*, 55 F. Supp. 3d at 457 (denying insurer's motion for summary judgment and finding disputed issues of fact as to insured's prejudice where the insured submitted evidence that the insurer's appointed counsel "failed to obtain the services of an independent expert to examine" the accident site); *Yoda, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 88 A.D.3d 506, 931 N.Y.S.2d 18, 21 (App. Div. 2011) (finding that the insured was prejudiced by the insurer's delay and, therefore, the insurer was estopped from disclaiming coverage because, as a result of the delay, the insured was prevented from timely impleading another party).

Midwood has raised a genuine issue of material fact with respect to whether it was prejudiced by Illinois Union's delay in disclaiming coverage under the 2012 Policy. Midwood's expert, Julie Mark Cohen, Ph.D., P.E., SECB, a consulting structural and forensic engineer, stated in her expert report that because Illinois **[*28]** Union's expert lacked experience as a structural engineer, he was not qualified to inspect the construction site where the Incident occurred. (Midwood Opp'n 5.) Cohen further concluded that the expert's lack of experience resulted in an inadequate inspection of the premises and an erroneous conclusion that the Incident was not caused by a structural problem with the building outside of Midwood's control. (*Id.* at 5-6.) Moreover, because the premises on which the Incident occurred have been repaired, Midwood's current expert is unable to conduct her own investigation of the construction site. (*Id.* at 7-8.) Thus, whether Midwood has been prejudiced necessarily depends on whether the expert retained by Illinois Union was qualified to conduct the inspection of the site of the Incident, whether his conclusion was erroneous, and whether Midwood's expert, who cannot now inspect the site of the Incident, can mitigate this error. Based on this evidence, a reasonable juror could conclude that Midwood has been prejudiced by Illinois Union's conduct. *See James River*, 55 F. Supp. 3d at 457 (finding disputed issues of fact as to whether the insured was prejudiced by the insurer's "fail[ure] to obtain the services of an independent expert to examine" the accident **[*29]** site).

Illinois Union argues that its expert was a properly qualified expert. (Illinois Union Mem. 13.) However, "[w]hen deciding a summary judgment motion, a court's function is not to weigh the evidence, make credibility determinations or resolve issues of fact." *Urbont v. Sony Music Entm't*, 831 F.3d 80, 88, 2016 U.S. App. LEXIS 13775, 2016 WL 4056395, at *6 (2d Cir. 2016). Moreover, Illinois Union's argument that Midwood has not suffered prejudice because the expert did not memorialize his findings in an expert report does not change the analysis. Midwood has presented evidence that the expert testified at a deposition about his findings. Furthermore, although Midwood has engaged its own expert, the expert cannot adequately correct Illinois Union's expert's findings if in error, because she cannot investigate the construction site. (Midwood Opp'n 8.)

Accordingly, the Court denies Illinois Union's motion for summary judgment as to Midwood's counterclaim for equitable estoppel.

**c. Illinois Union's and Midwood's summary judgment motions as to Midwood's counterclaim for reformation of the 2012 Policy**

Midwood moves for summary judgment on its counterclaim against Illinois Union, arguing that the 2012 Policy must be reformed to exclude the Designated Premises Endorsement because the parties never intended **[*30]** for the Designated Premises Endorsement to be part of the 2012 Policy. (Midwood Mem. 20-25.) Midwood argues that the inclusion of the Designated Premises Endorsement was either a mutual mistake or a fraudulently induced unilateral mistake. (*Id.*) Illinois Union cross-moves for summary judgment as to Midwood's reformation counterclaim and argues that Midwood's claim fails as a matter of law. (Illinois Union Mem. 2.) Illinois Union argues that the parties intended to include the Designated Premises Endorsement in the 2012 Policy and that any mistake on the part of Midwood and All Risk was caused by their failure to read the 2012 Policy. (*Id.* at 18-20.)

Under New York law, "mutual mistake or fraud may furnish the basis for reforming a written agreement." *Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002) (quoting *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986)); *see also 313-315 W. 125th St. L.L.C. v. Arch Specialty Ins. Co.*, 138 A.D.3d 601, 30 N.Y.S.3d 74, 76 (App. Div. 2016) ("A claim for reformation of a written agreement must be grounded upon either mutual mistake or fraudulently induced unilateral mistake." (citation omitted)); *Gunther v. Vilceus*, 142 A.D.3d 639, 36 N.Y.S.3d 723, 725 (App. Div. 2016) (noting that "mutual mistake or a unilateral mistake induced by the other party's fraudulent misrepresentation" are grounds for reformation (citing *Chimart*, 66 N.Y.2d at 573)). "Because the remedy of reformation presents the danger 'that a party, having agreed to a written contract that turns **[*31]** out to be disadvantageous, will falsely claim the existence of a different, oral contract,' the New York courts have sharply limited the remedy of reformation both procedurally and substantively." *Collins*, 303 F.3d at 435 (quoting *Chimart*, 66 N.Y.2d at 573-74). Thus, a party seeking reformation of a contract must establish a mutual mistake or a fraudulently induced unilateral mistake

"by clear and convincing evidence." *Id.* (citing *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992); *see also Gunther*, 36 N.Y.S.3d at 725 (stating that a party seeking reformation must establish the grounds by clear and convincing evidence (citing *Chimart*, 66 N.Y.2d at 573)).

**i. Mutual mistake**

Midwood argues that the inclusion of the Designated Premises Endorsement in the 2012 Policy was a mutual mistake because the parties did not intend to include the Designated Premises Endorsement in the 2012 Policy, as demonstrated by the absence of the Designated Premises Endorsement in both the 2012 Quote and the 2012 Binder. (Midwood Mem. 25.) Illinois Union argues that because the 2012 Policy was intended to be a renewal of the terms of the 2011 Policy and because the 2011 Policy included the Designated Premises Endorsement, the 2012 Policy correctly memorializes the parties' intent to include the Designated Premises Endorsement. (Illinois Union Mem. 18.)

In order [*32] to reform a contract on the basis of mutual mistake, "the mutual mistake must exist at the time the contract is entered into" and it "must be so material that it goes to the foundation of the agreement." *Simkin v. Blank*, 19 N.Y.3d 46, 52-53, 968 N.E.2d 459, 945 N.Y.S.2d 222 (2012) (alteration, citations and internal quotation marks omitted); *see also Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 390 (S.D.N.Y. 2014) ("New York law permits reformation of a contract due to mutual mistake 'where the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement such as when an inadvertent secretary's error fails to reflect the actual agreement of the parties.'" (alteration omitted) (quoting *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 440 (E.D.N.Y. 2011))). "The premise underlying the doctrine of mutual mistake is that 'the agreement as expressed, in some material respect, does not represent the meeting of the minds of the parties.'" *Simkin*, 19 N.Y.3d at 52-53 (quoting *Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.*, 81 N.Y.2d 446, 453, 616 N.E.2d 142, 599 N.Y.S.2d 787 (1993)).

Midwood and All Risk have failed to establish the existence of a mutual mistake by clear and convincing evidence. It is undisputed that the 2011 Policy included the Designated Premises Endorsement, (*see* 2011 Policy at 65), that 2012 Application listed the same material terms as the 2011 Application, (*see* 2012 Application), and that Partners Specialty told Illinois Union that the 2012 Policy was intended [*33] to be on the same terms of the 2011 Policy, (Partners Specialty Submission Summary 1). It also undisputed that Illinois Union did not include the Designated Premises Endorsement in the 2012 Quote or the 2012 Binder. (2012 Quote; 2012 Binder.) In addition, it is undisputed that Illinois Union's underwriters noticed that the Designated Premises Endorsement was missing from the 2012 Binder and included it in the 2012 Policy without consulting Midwood, All Risk or Partners Specialty, because Illinois Union understood that the 2012 Policy was intended to be based on the same terms as the 2011 Policy. (Williams 2012 Emails 1-2.)

Based on these undisputed facts, even if Midwood and All Risk mistakenly believed that the 2012 Policy did not include the Designated Premises Endorsement because the 2012 Quote and the 2012 Binder did not include the Designated Premises Endorsement, (Midwood 56.1 ¶¶ 55, 58-59; All Risk 56.1 ¶¶ 143-49), there was no mistake on the part of Illinois Union when it added the Designated Premises Endorsement to the 2012 Policy after noticing that it was missing from the 2012 Quote and the 2012 Binder, based on its understanding that the 2012 Policy was intended to be the [*34] same as the 2011 Policy, (Illinois Union 56.1 ¶¶ 8-10). Because only Midwood and All Risk were mistaken as to the inclusion of the Designated Premises Endorsement in the 2012 Policy, the mistake was not mutual. *See AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir. 2003) (finding that a "mistake was not mutual" where the defendant insured "mistakenly believed" that his insurance policy included a specific term, while the plaintiff insurer "drafted the policy and knew what it provided").

**ii. Unilateral mistake**

Midwood argues, alternatively, that the 2012 Policy should be reformed to exclude the Designated Premises Endorsement because its unilateral mistaken belief that the Designated Premises Endorsement was not included in the 2012 Policy was caused by Illinois Union failing to list the Designated Premises Endorsement in the 2012 Quote or the 2012 Binder and then including it in the 2012 Policy without obtaining Midwood's consent. (Midwood Opp'n 13.) Midwood argues that because Illinois Union "lack[ed] consent to the inclusion of the Designated Premises Endorsement in the [2012 Policy] after issuance of the 2012 Quot[e] and 2012 Binder without this endorsement," Illinois Union's action "can only be inferred to be . . . misleading conduct even though a specific [*35] fraudulent intent may be lacking." (*Id.*) All Risk argues that by including the Designated Premises Endorsement in the 2012 Policy after Midwood agreed to the terms listed on the 2012 Binder and paid the advance premium, Illinois Union reduced the value of Midwood's insurance, and that it was therefore fraudulent for Illinois Union to not reduce the premium to reflect the diminished value of Midwood's insurance caused by the inclusion of the

Designated Premises Endorsement. (All Risk Mem. 32-33.) Illinois Union argues that the mistake by Midwood and All Risk was caused by their failure to read the 2012 Policy, not by Illinois Union's conduct. (Illinois Union. Mem. 20.)

The elements of a reformation claim based on a fraudulently induced unilateral mistake are "misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406-07, 151 N.E.2d 833, 176 N.Y.S.2d 259 (1958))); *see also Barclay Arms, Inc. v. Barclay Arms Assocs.*, 74 N.Y.2d 644, 646-47, 540 N.E.2d 707, 542 N.Y.S.2d 512 (1989) (stating that the "essential elements of a fraud claim [are] misrepresentation of a material fact, falsity, scienter and deception"); *Timber Rattlesnake, LLC v. Devine*, 117 A.D.3d 1291, 986 N.Y.S.2d 278, 279-80 (App. Div. 2014) (stating that a party seeking reformation on the basis of fraudulently induced unilateral mistake must establish **[*36]** "a misrepresentation that is false and that the defendant knows is false, made to induce the other party to rely on it, justifiable reliance on the misrepresentation by the other party, and injury" (citation omitted)). A reformation claim may not be based on a unilateral mistake unless the mistake was the result of the opposing party's fraud. *Barclay Arms, Inc. v. Barclay Arms Assocs.*, 74 N.Y.2d 644, 646, 540 N.E.2d 707, 542 N.Y.S.2d 512 (1989) ("A bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation." (citations omitted)); *see Charron v. Sallyport Glob. Holdings, Inc.*, No. 12-CV-6837, 2014 U.S. Dist. LEXIS 177334, 2014 WL 7336463, at *19 (S.D.N.Y. Dec. 24, 2014) ("In a case of unilateral mistake, a party is only entitled to reformation if the other party is guilty of fraud." (citing *AMEX Assurance*, 316 F.3d at 161)), *aff'd*, 640 F. App'x 80 (2d Cir. 2016); *Ivory Dev., LLC v. Roe*, 135 A.D.3d 1216, 25 N.Y.S.3d 686, 691 (App. Div. 2016) ("A unilateral mistake provides grounds for reformation of a contract only when coupled with fraud." (citing *Timber Rattlesnake, LLC v. Devine*, 117 A.D.3d 1291, 986 N.Y.S.2d 278, 279 (App. Div. 2014)); *see also AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir. 2003) (noting that "reformation is available in cases of fraud").

A party whose unilateral mistake is the result of a failure to read the final contract is generally precluded from claiming that the mistake was fraudulently induced either because of unreasonable reliance or lack of fraudulent intent on the part of the opposing contracting party. *See Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 503-04 (S.D.N.Y. 2004) (finding that although the terms of the **[*37]** binder conflicted with the terms in the policy, the insurer seeking to rely on the binder's terms failed to establish both fraudulent intent on the part of the insured and reasonable reliance because the insurer had the opportunity to read the insurance policy and discover its mistake (first citing *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001); and then citing *John Hancock Mutual Life Ins. v. Carolina Power & Light Co.*, 717 F.2d 664, 671 (2d Cir. 1983))); *U.S. Legal Support, Inc. v. Eldad Prime, LLC*, 125 A.D.3d 486, 5 N.Y.S.3d 1, 2 (App. Div. 2015) ("Defendant's failure to read the final document before signing it precludes its claim of unilateral mistake induced by fraud based on plaintiff's failure to highlight its deletion of the portion of the provision capping the reimbursement amount, before presenting it to defendant's in-house counsel for defendant's signature." (citation omitted)); *see also Timber Rattlesnake*, 986 N.Y.S.2d at 280 (holding that the plaintiff failed to establish fraud where a term not included in an initial real estate contract was later added to the final deed, because the term was added under the belief that it reflected the parties' intent and the plaintiff could have discovered the added term by reading the deed but failed to do so); *Cash v. Titan Fin. Servs., Inc.*, 58 A.D.3d 785, 873 N.Y.S.2d 642, 645 (App. Div. 2009) (finding that the plaintiff failed to establish fraud where the plaintiff failed to read the deed to property because "a party is under an obligation to read a document before he or she signs **[*38]** it, and a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents (alterations, citation and internal quotation marks omitted)); *KNK Enters., Inc. v. Harriman Enters., Inc.*, 33 A.D.3d 872, 824 N.Y.S.2d 307, 307 (App. Div. 2006) ("A party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence." (citing *East 15360 Corp. v. Provident Loan Soc. of New York*, 177 A.D.2d 280, 575 N.Y.S.2d 856 (App. Div. 1991))).

In addition, a party's sophistication and the circumstances of the contract negotiations — whether the negotiations took place at arm's length — are relevant factors when determining whether a failure to read the contract precludes a finding of fraud. *See Chimart Assocs.*, 66 N.Y.2d at 574 (finding that the "sophisticated, counseled" plaintiff, which "deal[t] at arm's length" with the defendant, failed to establish fraudulently induced unilateral mistake where the plaintiff admitted that "he failed to read the agreement"); *Thompson v. McQueeney*, 56 A.D.3d 1254, 868 N.Y.S.2d 443, 447 (App. Div. 2008) (finding that the defendants failed to establish that their unilateral mistake was fraudulently induced because they were "sophisticated business persons who were counseled by attorneys," the language of the agreement was unambiguous and "with a minimum degree of due diligence, defendants' mistake . . . would have been readily apparent").

In deciding whether Midwood's mistake was

fraudulently [*39] induced, the Court finds instructive the Second Circuit's decision in *AMEX Assurance*, 316 F.3d 154, where the court relied on the New York Court of Appeals' decision in *Hay v. Star Fire Ins. Co.*, 77 N.Y. 235 (1879). In *Hay*, the homeowner insured plaintiff requested a renewal of her fire insurance from the defendant insurer on the same terms, and the insurer agreed. *Hay*, 77 N.Y. at 238. However, without informing the plaintiff, the defendant added a subrogation term, requiring that in the event of a loss, the plaintiff would assign to the defendant her right to be compensated by other parties. *Id.* The plaintiff failed to read the policy and, after a fire damaged her home, the defendant attempted to enforce the subrogation term. *Id.* at 238-39. The New York Court of Appeals held that although the plaintiff would have discovered the term if she had read the policy, she was entitled to reformation of the contract to exclude the subrogation term because:

> It was bad faith on the part of the defendant to change so radically the terms of the policy, and deliver it as a policy simply renewing the old one, without notice of the change. A party, whose duty it is to prepare a written contract, in pursuance of a previous agreement, to prepare one materially changing the terms of such previous agreement [*40] and deliver it as in accordance therewith, commits a fraud which entitles the other party to relief according to the circumstances presented.

*Id.* at 240. The court found that "[a]n agreement to renew a policy, implies that the terms of the existing policy are to be continued." *Id.* at 239. Moreover, the court noted that the subrogation term rendered the insurance "contract practically of no benefit" and that it likely violated public policy. *Id.* at 240 (citing *Excelsior Fire Ins. Co. v. Royal Ins. Co.*, 55 N.Y. 343, 343 (1873)).

In *AMEX Assurance*, the defendant, a potential beneficiary to a life insurance policy, relied on *Hay* to seek reformation of the policy. *AMEX Assurance*, 316 F.3d at 161. Prior to his death, the defendant's father had obtained a life insurance policy from the plaintiff insurer. *Id.* at 156. Five years after the father first obtained the life insurance policy, the insurer "replaced" its standard life insurance policy with a new policy, and "le[d] its subscribers to believe that the replacement policy would substantially conform to its predecessor." *Id.* at 157. The insurer failed to alert its insureds that the replacement policy changed the default order of beneficiaries, which precluded the defendant from obtaining any benefits under the policy. *Id.* The defendant's father failed to read the replacement policy and never [*41] discovered the new default order of beneficiaries. *Id.* In rejecting the defendant's claim in *Amex Assurance*, the Second Circuit noted that, like the insurer in *Hay*, the insurer in *AMEX Assurance* led its insured to believe that the new policy "would substantially conform" to the expiring policy and subsequently changed an "important term" without informing its insured. *Id.* The court found, however, that unlike the insurer in *Hay*, the insurer in *AMEX Assurance* did not describe the new policy "as a simple 'renewal' of the preexisting policy." *Id.* In addition, unlike in *Hay* where the undisclosed change benefited the insurer, and it was therefore fraudulent to not bring the change to the insured's attention, the change in *AMEX Assurance* altered the order of beneficiaries but did not benefit the insurer. *Id.* Thus, the defendant in *AMEX Assurance* was not entitled to reformation of the policy because although the insurer "may well have been at fault either in making the change or in failing to call attention to it, that fault seems to be more in the nature of carelessness or negligence; it cannot easily be characterized as fraud, in the usual sense of the word." *Id.*

Here, like the insurer in [*42] *Hay*, Illinois Union's inclusion of the Designated Premises Endorsement in the 2012 Policy benefitted Illinois Union by limiting Midwood's insurance coverage and excluding the "significant" portion of Midwood's business that occurs outside of the premises on which its lumberyard is located. However, unlike the subrogation term in *Hay*, which rendered the insurance "contract practically of no benefit" and likely violated public policy, *Hay*, 77 N.Y. at 240, because the Designated Premises Endorsement did not preclude insurance coverage of the portion of Midwood's business that occurs on the premises on which its lumberyard is located, its inclusion in the 2012 Policy did not render Midwood's insurance practically of no benefit. Moreover, unlike the renewal policy in *Hay*, the 2012 Binder did not state that the 2012 Policy would be based on the same terms but, instead, stated that Midwood's insurance would be governed by the terms included in the 2012 Policy. In addition, Illinois Union has presented evidence that it was told by Partners Specialty that the 2012 Policy was to be on the same terms as the 2011 Policy, that the Designated Premises Endorsement was part of the 2011 Policy, and that the omission [*43] of the Designated Premises Endorsement from the 2012 Quote and the 2012 Binder was inadvertent. When Partners Specialty submitted the 2012 Application to Illinois Union, the submission stated that the 2012 Policy was to be the same based on the same terms as the expiring 2011 Policy. (D'Souza Emails 2.) In addition, when Illinois Union's underwriters noticed that the Designated Premises Endorsement was missing from the Binder, (Williams 2012 Emails 2), they added the Designated Premises Endorsement to the 2012 Policy because they understood that the 2012 Policy was to be based on the same terms of the 2011 Policy and because the Designated Premises Endorsement was part of the 2011 Policy. (*Id.* at 1-2.) Moreover, the 2012 Binder stated that Midwood's insurance coverage would be "provided

by the terms and conditions of the policy as issued" and that the insurance coverage would be "determined by and in accordance with the policy as issued by [Illinois Union]." (2012 Binder at 3.) Thus, the facts in this case are more similar to those in *AMEX Assurance* than to those in *Hay*, suggesting carelessness rather than fraud. *AMEX Assurance*, 316 F.3d at 161 (noting that although the insurer "may well have been at fault either in making [*44] the change or in failing to call attention to it, that fault seems to be more in the nature of carelessness or negligence" rather than fraud).

In addition, because Midwood and All Risk are sophisticated companies that could have discovered their unilateral mistake by reading the 2012 Policy but failed to do so, they have failed to establish by clear and convincing evidence that their unilateral mistake was fraudulently induced by Illinois Union. *See Travelers Indem.*, 322 F. Supp. 2d at 503-04 (finding that the plaintiff insurer failed to establish fraud on the part of the defendant insured, whose broker drafted the final insurance policy and unilaterally changed a material term, where the insurer could have discovered its unilateral mistake by reading the final insurance policy but failed to do so); *Thompson*, 868 N.Y.S.2d at 447 (finding that the defendants failed to establish that their unilateral mistake was fraudulently induced because they were "sophisticated business persons," represented by counsel and would have discovered their mistake had they read the final contract).

The Court grants Illinois Union's motion for summary judgment, and denies Midwood's motion for summary judgment, as to Midwood's reformation counterclaim.

**d. Midwood's and All Risk's [*45] motions for summary judgment as to Illinois Union's claim that the Designated Premises Endorsement precludes coverage of the Incident**

Midwood and All Risk seek partial summary judgment to dismiss Illinois Union's claim that the Designated Premises Endorsement precludes insurance coverage of the Incident. Midwood and All Risk argue that, although the 2012 Policy is a binding agreement between Midwood and Illinois Union, because the Designated Premises Endorsement was neither included in the 2012 Quote nor the 2012 Binder that they received in advance of the 2012 Policy, the parties never agreed to include the Designated Premises Endorsement in the 2012 Policy. (Midwood Mem. 20; All Risk Mem. 22-23.) Midwood and All Risk further argue that Illinois Union was not permitted to include the Designated Premises Endorsement in 2012 Policy without Midwood's consent and that the Designated Premises Endorsement is therefore not a part of Midwood's insurance policy. (Midwood Mem. 19-20; All Risk Mem. 15.) Midwood also argues that, despite Judge Ross's determination that the Designated Premises Endorsement precludes insurance coverage, the Court may consider this motion either (1) because Judge [*46] Ross did not consider the issue of whether the Designated Premises Endorsement was "properly included" in the policy, and thus the law-of-the-case doctrine does not preclude this argument, or (2) because new evidence and the avoidance of "manifest injustice" provide a basis to reconsider Judge Ross' decision. (Midwood Mem. 15-18.)

Illinois Union argues that the Designated Premises Endorsement was properly included in the 2012 Policy because its inclusion reflects the parties' intentions and because the 2012 Binder was a temporary agreement, which was superseded by the 2012 Policy. (Illinois Union Mem. of Law in Opp'n ("Illinois Union Opp'n") 18-19, Docket Entry No. 138.) Illinois Union also argues that in ruling that the Designated Premises Endorsement specifically excluded coverage of the Incident, Judge Ross implicitly decided that the Designated Premises Endorsement was part of the 2012 Policy, making her decision the law of the case. (*Id.* at 21.)

The Court first considers whether the law-of-the-case doctrine forecloses Midwood's and All Risk's motion.

**i. The law-of-the-case doctrine**

Midwood argues that the law-of-the-case doctrine does not prevent the Court from dismissing Illinois Union's [*47] claim that the Midwood insurance policy precluded coverage because, although Judge Ross held that the Designated Premises Endorsement limited Midwood's insurance coverage to certain designated premises, Judge Ross "did not determine whether the Designated Premises Endorsement was properly included in the [2012 Policy]." (Midwood Mem. 15.) Illinois Union argues that the law-of-the-case doctrine does prevent the Court from considering this issue because, in deciding that the Designated Premises Endorsement precludes coverage of the Incident, Judge Ross "[b]y necessary implication" decided that the Designated Premises Endorsement is part of the 2012 Policy. (Illinois Union Opp'n 21.)

"Although not binding," the law-of-the-case doctrine "ordinarily forecloses relitigation of issues" that a court has "expressly or impliedly decided." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 208 (2d Cir. 2013) (citation omitted). The law-of-the-case doctrine applies to "everything decided by necessary implication." *Fogel v. Chestnutt*, 668 F.2d 100, 108 (2d Cir. 1981) (finding that where the court's prior opinion held that the plaintiffs had stated a claim for breach of fiduciary duty pursuant to a federal statute, the court "necessarily assumed" that the federal statute included a private right of action and that the [*48] law of the case doctrine precluded the defendant from arguing that there was no cause of action under the

statute); *Randolph v. Vaugh*, No. 05-CV-3108, 2006 U.S. Dist. LEXIS 6680, 2006 WL 416398, at *2 (S.D.N.Y. Feb. 17, 2006) (finding that "[b]y granting leave to amend the complaint as to specific allegations only, none of which implicated A.D.A. Stolley," the court "implicitly precluded [the plaintiff] from introducing further claims against A.D.A. Stolley").

"[T]he major grounds justifying reconsideration" of decisions that are otherwise not subject to relitigation due to the law-of-the-case doctrine "are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Plugh*, 648 F.3d 118, 123-24 (2d Cir. 2011) (citation and internal quotation marks omitted); *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and internal quotation marks omitted); *see also Starbucks*, 736 F.3d at 208 ("[T]he doctrine counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (citation and internal quotation marks omitted)); *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psych. Ctr.*, 652 F.3d 277, 288-89 (2d Cir. 2011) ("[A] prior order usually may not be changed unless there is an intervening change of controlling law, the **[*49]** availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." (citation and internal quotation marks omitted)).

In its initial motion for summary judgment, Illinois Union argued that, as a matter of law, the 2012 Policy did not cover the Incident because the Designated Premises Endorsement defined the scope of the 2012 Policy, limiting coverage to specified designated premises, and because the Incident took place at a premises not listed on the Designated Premises Endorsement. *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *6. In cross-moving for summary judgment on the grounds that the Incident was covered by the 2012 Policy, Midwood argued that the Designated Premises Endorsement should be read to include business-related delivery trips, and that, because the 2012 Policy premiums were partially based on sales, it would be illogical for the 2012 Policy to not cover the deliveries from those sales. *Id.*

In the 2014 Decision, Judge Ross found that because the Designated Premises Endorsement limited Midwood's insurance coverage to certain designated premises and the location of the Incident was not one of the insured premises, Illinois Union did not have an obligation to defend or indemnify Midwood. **[*50]** 2014 U.S. Dist. LEXIS 19981, [WL] at *8. In reaching this decision, Judge Ross noted that under the Designated Premises Endorsement, the 2012 Policy only applied to "bodily injury or property damage that arises out of the ownership, maintenance or use of the premises shown . . . or incidental to those premises."[10] 2014 U.S. Dist. LEXIS 19981, [WL] at 7.

By finding that the Designated Premises Endorsement precluded coverage of the Incident, Judge Ross necessarily found that the Designated Premises Endorsement is part of the 2012 Policy. *See Samonek v. Pratt*, 112 A.D.3d 1044, 976 N.Y.S.2d 324, 326 (App. Div. 2013) (finding that a contract term was not part of an otherwise valid contract because the parties did not agree to the term and that the term was therefore unenforceable); *see also Fogel*, 668 F.2d at 108 (finding that where the court previously held that the plaintiffs had stated a claim for breach of fiduciary duty pursuant to a federal statute, the court "necessarily assumed" that the federal statute included a private right of action).

Moreover, Judge Ross directed the parties to conduct **[*51]** discovery on the limited issue of determining whether Midwood was prejudiced by Illinois Union's unreasonable delay in disclaiming coverage. *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *14. In so doing, Judge Ross implicitly precluded Midwood from bringing further claims challenging the coverage as set forth in the Designated Premises Endorsement. *See Randolph v. Vaugh*, No. 05-CV-3108, 2006 U.S. Dist. LEXIS 6680, 2006 WL 416398, at *2 (S.D.N.Y. Feb. 17, 2006) (finding that "[b]y granting leave to amend the complaint as to specific allegations only, none of which implicated A.D.A. Stolley," the court "implicitly precluded [the plaintiff] from introducing further claims against A.D.A. Stolley").

Midwood argues that the law-of-the-case doctrine does not apply because Judge Ross did not determine whether the Designated Premises Endorsement is part of the 2012 Policy. (Midwood Mem. 15.) However, because Judge Ross necessarily decided that the Designated Premises Endorsement was part of the 2012 Policy, *see Samonek*, 976 N.Y.S.2d at 326, and because the law-of-the-case doctrine "forecloses relitigation of issues" that a court has "impliedly decided," *Starbucks*, 736 F.3d at 208, the Court concludes that the law-of-the-case doctrine applies.

The Court considers whether Midwood has shown new

---

[10] As discussed above, Judge Ross nevertheless determined that there was a genuine issue of material fact as to whether Illinois Union was equitably estopped from denying coverage under the 2012 Policy and directed the parties to "conduct further discovery on this issue." *Ill. Union Ins.*, 2014 U.S. Dist. LEXIS 19981, 2014 WL 639420, at *14.

evidence or manifest injustice to compel reconsideration of the 2014 Decision.

**ii. Reconsideration of the 2014 Decision** [*52]

Midwood argues that even if the law-of-the-case doctrine applies, the Court should reconsider the 2014 Decision because it was issued before Midwood learned of evidence critical to its case. (Midwood Mem. 16-17.) Midwood specifically argues that because the 2014 Decision was made while discovery was ongoing, Midwood did not have the benefit of the deposition testimonies of All Risk's broker and Illinois Union's underwriter, whose testimonies informed Midwood of the circumstances under which Illinois Union added the Designated Premises Endorsement to the 2012 Policy. (*Id.* at 17.) Midwood also argues that the Court's refusal to reconsider the 2014 Decision would result in manifest injustice because "Midwood is exposed to potentially millions of dollars of potential liability in the [Underlying Actions]" and because the 2012 Policy premiums were partially based on sales, including deliveries from those sales. (*Id.*)

Illinois Union argues that because Midwood's counsel agreed to engage in summary judgment motion practice with limited discovery, Midwood's additional evidence "does not alter" the fact that the 2014 Decision remains law of the case. (Illinois Union Opp'n 21.)

"[W]here litigants have once battled [*53] for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Virgin Atl. Airways, Ltd. V. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and internal quotation marks omitted). "The major grounds justifying reconsideration" of a decision that is the law of the case "are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (citation omitted); *see also Starbucks*, 736 F.3d at 208.

**1. New evidence**

Although the Second Circuit has not addressed precisely when new evidence will support reconsideration of a decision that is the law of the case, district courts in the Circuit use the following standard:

> [T]he proponent must demonstrate that the newly discovered evidence was neither in his possession nor available upon the exercise of reasonable diligence at the time the interlocutory decision was rendered. The party moving for reconsideration based on the newly discovered evidence must show that (1) the proffered evidence was unavailable despite the exercise of due diligence by the movant in procuring evidentiary support, and (2) manifest injustice will result if the court opts not to reconsider its earlier decision.

*Prestige Jewelry Int'l, Inc. v. BK Jewellery HK, BK Jewelry (N.Y.) Inc.*, No. 11-CV-2930, 2015 U.S. Dist. LEXIS 165245, 2015 WL 8481873, at *2 (S.D.N.Y. Oct. 14, 2015) (quoting *In re Rezulin Products Liab. Litig.*, 224 F.R.D. 346, 350 (S.D.N.Y. 2004)). The party [*54] moving for reconsideration of a decision that is the law of the case bears the burden of establishing that the new evidence was not previously available. *Vringo, Inc. v. ZTE Corp.*, No. 14-CV-4988, 2015 U.S. Dist. LEXIS 105140, 2015 WL 4743573, at *8 (S.D.N.Y. Aug. 11, 2015) (citing *In re Rezulin Products*, 224 F.R.D. at 350); *see also Goodman v. AssetMark, Inc.*, 53 F. Supp. 3d 583, 586 (E.D.N.Y. 2014) (noting that the party moving for reconsideration of a decision that is the law of the case bears the burden of establishing the grounds that justify reconsideration (citing *In re Fannie Mae 2008 ERISA Litig.*, No. 09-CV-1350, 2014 U.S. Dist. LEXIS 55682, 2014 WL 1577769, at *3 (S.D.N.Y. Apr. 21, 2014)).

Midwood concedes that it possessed the 2012 Binder when it moved for summary judgment prior to the 2014 Decision and that the 2012 Binder did not include the Designated Premises Endorsement. (Midwood Mem. 16.) Midwood argues, however, that because it did not learn of the circumstances under which the Designated Premises Endorsement was unilaterally added to the 2012 Policy until after the 2014 Decision, this constitutes new evidence compelling reconsideration. (*Id.* at 16-17.) Midwood explains that until it deposed its broker at All Risk and Illinois Union's underwriter, and until Partners Specialty produced documentary evidence about the negotiations, it was not aware of the circumstances surrounding the addition of the Designated Premises Endorsement to the 2012 Policy. (*Id.*)

Based on this record, Midwood has failed to demonstrate that [*55] the evidence it seeks to rely on is new. At the time it agreed to engage in motion practice over the coverage of the 2012 Policy, Midwood knew that the Designated Premises Endorsement was not included in the 2012 Binder. (Midwood Mem. 16.) Midwood also knew that it had not yet deposed its broker at All Risk, who negotiated the 2012 Policy on Midwood's behalf, or Illinois Union's underwriter, who approved the terms of the 2012 Policy, and that Midwood had not yet subpoenaed Partners Specialty, the intermediate between Illinois Union and Midwood. (*Id.*) Nevertheless, in opposing Illinois Union's summary judgment motion and in making its own motion, Midwood chose not to investigate the circumstances of the addition of the Designated Premises Endorsement, despite knowing of its absence from the 2012 Binder. Nor did Midwood seek affidavits from the individuals

who negotiated the 2012 Policy on its behalf. Because Midwood knew that the Designated Premises Endorsement was not included in the 2012 Binder and because Midwood could have discovered the circumstances under which Illinois Union added the Designated Premises Endorsement to the 2012 Policy, Midwood has failed to show that the evidence **[*56]** was not in its possession — the 2012 Binder was — and that the evidence could not be discovered through the exercise of reasonable diligence -- it could have investigated the circumstances under which the Designated Premises Endorsement was added to the 2012 Policy by deposing its broker at All Risk or Illinois Union's underwriter or by subpoenaing Partners Specialty. Thus, Midwood has not met the standard for reconsideration of the 2014 Decision. *See Prestige Jewelry Int'l*, 2015 U.S. Dist. LEXIS 165245, 2015 WL 8481873, at *2 (denying reconsideration based on new evidence where the evidence existed as of the time of the prior decision and "there [was] nothing extraordinary about the methods [p]laintiff used eventually to track down the" new evidence); *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 340 (S.D.N.Y. 2012) (denying reconsideration because "the movant had the opportunity to present the evidence or litigate the issue earlier but did not do so, either because of inadvertence or as a strategic maneuver").

**2. Manifest injustice**

Manifest injustice sufficient to reconsider a decision that is the law of the case cannot be shown by a party's failure to raise an argument that could have been raised prior to the initial decision. *See Official Comm'n of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (finding that the district court's denial of the plaintiff's motion for reconsideration was not "manifestly **[*57]** unjust" because the basis for reconsideration was an argument that the plaintiff could have raised prior to the district court's summary judgment decision and because the plaintiff was not entitled to "yet another bite at the apple" after it lost the prior summary judgment motion); *see also StreetEasy, Inc. v. Chertok*, 651 Fed. Appx. 37, 40, 2016 U.S. App. LEXIS 10235, 2016 WL 3251877, at *2 (2d Cir. 2016) (finding that "[n]o manifest injustice would result from declining to consider [the defendant's] new argument or depart from the law of the case" where the defendant could have raised the argument before the original order).

Midwood concedes that at the time it litigated the coverage of the 2012 Policy, it possessed the 2012 Binder and knew that the 2012 Binder did not include the Designated Premises Endorsement. (Midwood Mem. 16.) Midwood could have argued at that time that, because the Designated Premises Endorsement was not included in the 2012 Binder, it was not part of the 2012 Policy. Midwood nevertheless chose to litigate whether the Incident was covered under the terms of the 2012 Policy, based on its interpretation of the terms included in the 2012 Policy and the Designated Premises Endorsement, in effect conceding that the Designated Premises Endorsement was in fact part of the 2012 Policy. **[*58]** Because Midwood knew that the Designated Premises Endorsement was not included in the 2012 Binder and could have raised this argument prior to the 2014 Decision, Midwood has failed to establish that denying reconsideration of the 2014 Decision would result in manifest injustice. *See Official Comm'n of Unsecured Creditors of Color Tile*, 322 F.3d at 168; *StreetEasy*, 651 F. App'x at 40, 2016 U.S. App. LEXIS 10235, 2016 WL 3251877, at *2.

Accordingly, the Court declines to reconsider the 2014 Decision and, consistent with the law-of-the-case doctrine, denies Midwood's and All Risk's motion for partial summary judgment as to Illinois Union's claim that the Designated Premises Endorsement precludes insurance coverage of the Incident.

**III. Conclusion**

For the foregoing reasons, the Court denies Illinois Union's motion for summary judgment as to Midwood's counterclaim for equitable estoppel. The Court grants Illinois Union's motion for summary judgment as to Midwood's counterclaim for reformation and denies Midwood's cross-motion for summary judgment as to its counterclaim for reformation. The Court declines to reconsider the 2014 Decision and denies Midwood's and All Risk's motion for partial summary judgment as to Illinois Union's claim that the Designated Premises Endorsement precludes insurance coverage of the Incident.

SO ORDERED:

/s/ MKB **[*59]**

MARGO K. BRODIE

United States District Judge

Dated: September 30, 2016

Brooklyn, New York

---

**End of Document**

# Exhibit 17e.

# In re Coudert Bros. LLP

United States Bankruptcy Court for the Southern District of New York

August 19, 2013, Decided

Chapter 11, Case No. 06-12226 (RDD)

**Reporter**

2013 Bankr. LEXIS 3360 *; 2013 WL 4478824

In re: Coudert Brothers LLP, Debtor.

**Subsequent History:** Affirmed by Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP), 2014 U.S. Dist. LEXIS 185145 (S.D.N.Y., Sept. 19, 2014)

**Prior History:** Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP), 673 F.3d 180, 2012 U.S. App. LEXIS 4019 (2d Cir. N.Y., 2012)

**Counsel:** [*1] STERN TANNENBAUM & BELL LLP, by David S. Tannenbaum and Karen S. Frieman for Development Specialists, Inc.

HUGHES HUBBARD & REED LLP by Edward J.M. Little and Lisa A. Cahill for Statek Corporation.

**Judges:** Robert D. Drain, United States Bankruptcy Judge.

**Opinion by:** Robert D. Drain

## Opinion

### MEMORANDUM OF DECISION ON REMAND ON STATEK'S MOTION FOR RECONSIDERATION OF CLAIM DISALLOWANCE ORDER

Robert D. Drain, United States Bankruptcy Judge

**Procedural History**

Statek Corporation ("Statek") filed a proof of claim in this case, Claim 239 (the "Claim"), to which the debtor, Coudert Brothers LLP ("Coudert") obejected.[1] After briefing and a hearing, this Court issued an order on July 21, 2009 disallowing the Claim (the "Claim Disallowance Order"), holding that New York's choice of law rules and New York's borrowing statute, NY CPLR § 202, barred the Claim under New York's statute of limitations. The Court also concluded that, even if federal or English law governed, as Statek had argued, the Claim was time barred.

Statek moved for reconsideration of the Claim Disallowance Order under 11 U.S.C. § 502(j), [*2] and, applying the standard under Fed. R. Civ. P. 59,[2] the Court denied that motion in an order dated September 8, 2009 (the "Reconsideration Order"). In its reconsideration motion, Statek argued that this Court, as the "transferee court" of Statek's prepetition action against Coudert, should follow the law of the "transferor court," Connecticut, including Connecticut's choice of law and timeliness rules, citing Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964), and, in its reply brief, Ferens v. John Deere Co., 494 U.S. 516, 110 S. Ct. 1274, 108 L. Ed. 2d 443 (1990). Statek had not previously made this argument in its response to the Plan Administrator's claim objection; Statek's reconsideration motion was the first time Statek contended that Connecticut's choice of law rules should apply. Previously, the parties had argued that New York, California, federal, or English law should govern the issue of the timeliness of the Claim. As Statek acknowledged in its reply brief on the reconsideration motion, "Statek did not argue for the application of Connecticut's statute of limitations, much less that the Erie doctrine required that result. On the contrary, Statek argued that this Court should apply a federal choice-of-law rule to [*3] the statute of limitations question and that the result of the analysis should be the application of English

---

[1] Couder has been succeeded by Development Specialists, Inc. in its capacity as Plan Administrator under Coudert's confirmed chapter 11 plan.

[2] See In re Enron Corp., 352 B.R. 363, 367-68 (Bankr. S.D.N.Y. 2006) (a motion under 11 U.S.C. § 502(j) that is filed within the time to appeal the order on the claim is analogous to and should be governed by the same principles as a motion under Fed. R. Civ. P. 59); see also In re Pt-1 Communs. Inc., 412 B.R. 85, 89 (Bankr. E.D.N.Y. 2009); In re Best Payphones, Inc., 2008 Bankr. LEXIS 2555, at *6-*8 (Bankr. S.D.N.Y. July 3, 2008); In re Wyatt, Inc., 168 B.R. 520, 522 n.2 (Bankr. D. Conn. 1994) (accord).

law." Statek Reply 4, Aug. 20, 2009.

The Court denied Statek's reconsideration motion on two grounds: first, because Statek had not raised the argument upon which the motion was based before the Court issued the Claim Disallowance Order from which Statek now sought relief, In re Coudert Bros. LLP, 2009 Bankr. LEXIS 2602, at *8-*9 (Bankr. S.D.N.Y. Sept. 8, 2009), and, alternatively, because the Court concluded that it was not the "transferee" court of Statek's prepetition Connecticut tort action but, instead, was determining the Claim that Statek had filed in this case, which required [*4] application of New York's choice of law rules and borrowing statute under Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599 (2d Cir. 2001), cert. denied, 534 U.S. 1042, 122 S. Ct. 618, 151 L. Ed. 2d 540 (2001). In re Coudert Bros. LLP, 2009 Bankr. LEXIS 2602 at *10-*13.

Statek appealed the Claim Disallowance Order and the Reconsideration Order to the District Court, which affirmed both orders in one ruling. In re Coudert Bros. LLP, 2010 U.S. Dist. LEXIS 58467, at *10 (S.D.N.Y. June 11, 2010). The District Court did not, however, address this Court's first alternative basis for the Reconsideration Order, that it was improper to premise a motion to be decided under the Rule 59 standard on a new argument that could have been made before the Court issued the original order. Instead, it affirmed on the basis of this Court's choice of law analysis. Id. at *5-*10. Indeed, Statek does not appear to have addressed the first basis for the Reconsideration Order in its appeal.

On appeal, the Second Circuit found that Statek's appeal of the Claim Disallowance Order was untimely, depriving it and the District Court of appellate jurisdiction, and, therefore, remanded to the District Court with instructions to dismiss. Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP), 673 F.3d 180, 185-86, 191 (2d Cir. 2012). [*5] With regard to the Reconsideration Order, the Second Circuit concluded that this Court and the District Court "should not have applied the choice of law rules of New York, the state in which it sits, but instead the choice of law rules of Connecticut, where Statek filed its pre-bankruptcy action seeking damages that later constituted its claim against the bankruptcy estate." Id. at 182 (citing Van Dusen, 376 U.S. at 638; Ferens, 494 U.S. at 524).

Thust the Second Circuit reversed that portion of the District Court's order affirming this Court's Reconsideration Order and remanded the case to the District Court "with instructions to REMAND IN PART to the bankruptcy court with instructions to apply Connecticut's choice of law rules in deciding Statek's motion for reconsideration." Id. at 191. On August 4, 2012, District Judge Hellerstein entered an order

consistent with the Second Circuit's ruling, in relevant part remanding Statek's reconsideration motion to this Court with instructions to apply Connecticut's choice of law rules in deciding the motion. Case 09 Civ. 9561, Dkt. No. 25.

This Court held a non-evidentiary hearing on the remand, after briefing, and requested supplemental briefs, [*6] which the parties submitted. Having reviewed the Second Circuit's opinion and remand, the District Court's remand, the parties' briefs, including those filed in the District Court and the Second Circuit, and also having listened to the recording of the parties' oral argument before the Second Circuit, the Court concludes that (a) Statek never raised on appeal to either the District Court or the Second Circuit that portion of the Reconsideration Order denying Statek's motion on the basis that its new argument could have been, but was not, raised before the Court entered the Claim Disallowance Order, and (b) the Second Circuit did not explicitly or implicitly decide that alternative ground for the Reconsideration Order. Having applied Connecticut's choice of law rules as required by the remand, the Court therefore continues to conclude that Statek's reconsideration motion should be denied. To do otherwise would negate well established precedent strictly construing reconsideration motions to prohibit a litigant from raising new legal theories that it could have raised but did not until after it lost on its original theories.

## DISCUSSION

### 1. Statek's Claim.

Statek's amended complaint, upon [*7] which the Claim against Coudert is based, states that, having obtained a favorable decision on January 5, 1996 from the Delaware Court of Chancery determining that Hans Frederick Johnston ("Johnston") and Sandra Spillane ("Spillane") were not lawful directors of Statek's parent, Technicorp International II, Inc. ("TCI II"), and had concealed payments to themselves of almost $6 million in undocumented and interest free loans between 1984 and 1992, TCI II caused Johnston and Spillane to be removed as directors and officers of Statek. Amended Complaint ¶¶ 11-13. Then, on June 26, 1996, Statek and TCI II commenced an action against Johnston, Spillane and entities controlled by them for fraud, breach of fiduciary duty and corporate waste, id. ¶ 14; and on May 31, 2000 the Delaware Chancery Court issued an opinion in that action finding that Johnston and Spillane had wrongfully diverted $10,501,329 from TCI II and $19,812,942 from Statek, which was implemented in a joint and several judgment dated September 7, 2000 against Johnston and Spillane in the aggregate amount of $30,314,271. Id. ¶¶ 18, 23.

Statek's sole claim against Coudert, for breach of professional

and fiduciary duties, id. ¶ [*8] ¶ 60-62, is premised on Coudert's failure to provide Statek with complete files and an accounting arising out of services Coudert rendered to Statek or to Johnston and Spillane that were billed to Statek. More specifically, Statek asserts that on July 12, 1996 it requested information from Coudert, including "a complete copy of the files arising out of and relating to the services Coudert had rendered." Id. ¶¶ 27, 28.[3] Coudert provided some information and files in response, id. ¶ 29, but, although "Coudert confirmed that it had no other Statek Files or information about other Statek services it had rendered," id. ¶ 30, Coudert failed to provide additional Statek Files and information about other services that it had rendered related to Statek, id. ¶¶ 31, 32, and did not account to Statek for all Statek's funds that it had disbursed out of a London account. Id. ¶ 37. The amended complaint does not say when Statek learned of this failure, but it states that as a result of investigations between 2002 and 2004 by the trustee appointed in Johnston's English bankruptcy case under the United Kingdom's Insolvency Act of 1986, the trustee learned that Coudert had additional files and other [*9] information related to Statek. Id. ¶¶ 38-56. Statek also asserts that Coudert continues to fail to provide Statek with all of the Statek Files and other Statek-related information and fails to account for Statek's funds that it disbursed from its accounts. Id. ¶ 61.

The amended complaint states that Coudert's incomplete responses to the information demands hindered, delayed and frustrated Statek's ability to discover and recover misappropriated Statek assets from Johnston, Spillane and others and deprived it of capital that it could have used profitably, giving rise to the Claim of approximately $85,000,000, id. ¶¶ 5, 62-63, a figure that Statek reconfirmed in footnote 2 in its Memorandum of Law in reply to Coudert's objection to its Claim.

**2. Connecticut's choice of law rules do not lead to a clear answer on the timeliness of the Claim.**

It is clear that, under Connecticut choice of law rules, Connecticut would apply its own statute of limitations to Statek's Claim [*10] for breach of professional and fiduciary duties. Unlike New York, Connecticut does not have a borrowing statute. Instead, if a limitations statute is "procedural," Connecticut law (the *lex fori*) will govern — that is, Connecticut's limitations statutes will apply — while "if the limitation is so interwoven with the cause of action as to become one of the congeries of elements necessary to establish the right, the limitation goes with the cause of action wherever brought." Baxter v. Sturm, Ruger & Co., Inc., 230 Conn. 335, 644 A.2d 1297, 1299 (Conn. 1994) (citations and internal quotation marks omitted). See also State v. Lombardo Bros. Mason Contrs., Inc., 307 Conn. 412, 54 A.3d 1005, 1025 (Conn. 2012); Cameron v. Olin Corp., 838 F. Supp. 2d 59, 62-65 (D. Conn. 2012). Statek's Claim is not based on a statute with its own substantive limitations period; it is a common law tort claim. Sanborn v. Greenwald, 39 Conn. App. 289, 664 A.2d 803, 810 (Conn. App. Ct. 1995) ("Actions for legal malpractice based on negligence are subject to § 52-577, the tort statute of limitations"). Accordingly, Connecticut's general limitations period for common law torts, Conn. Gen. Stat. § 52-577, would apply to it. Baxter, 644 A.2d at 1299-1300; Cameron, 838 F. Supp. 2d at 64-65.

The [*11] Plan Administrator cites authority for the proposition that "the 'emerging trend' is for courts to 'select the state whose law will be applied to the issue of limitations by a process essentially similar to that used in the case of other issues of choice of law,'" Phillips v. Scott, 446 F. Supp. 2d 70, 83 n.25 (D. Conn. 2006) (quoting cmt. e to § 122 of the Restatement (Second) Conflict of Laws) -- that is, in Connecticut, the "most significant relationship" test found in the Restatement (Second) of Conflicts of Law § 142. However, Connecticut's Supreme Court has not reversed Baxter, 644 A.2d at 1299, and recently cited it positively in State v. Lombardo Bros., 54 A.3d at 1025. Moreover, several courts have reaffirmed Baxter's holding as applied to statutes of limitations, notwithstanding the analysis in Phillips, see, e.g., Doe v. Knights of Columbus, 930 F. Supp. 2d 337, 2013 U.S. Dist. LEXIS 34235, at *36-*44 (D. Conn. Mar. 12, 2013); Bilodeau v. Vlack, 2009 U.S. Dist. LEXIS 45851, at *8-*10 (D. Conn. May 20, 2009), or simply continued to follow Baxter without discussing a contrary approach. See, e.g., Cameron v. Olin Corp., 838 F. Supp. 2d at 62-65; Chien v. Skystar Bio Pharm. Co., 623 F. Supp. 2d 255, 264 n.8 (D. Conn. 2009); [*12] Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 300 (D. Conn. 2009); Moore v. Arvin Indus. Inc., 2011 Conn. Super. LEXIS 3054, at *5-*6 (Conn. Super. Ct. Dec. 2, 2011); Vertefeuille v. Noller, 2008 Conn. Super. LEXIS 70, at *2-*4 (Conn. Super. Ct. Jan. 14, 2008). Baxter's approach, therefore, continues to govern.

Connecticut's limitation period for common law torts, like the Claim based on Statek's amended complaint, is three years from the commission of the tort. Connecticut Gen. Stat. § 52-577. This period "begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." Piteo v. Gottier, 112 Conn. App. 441, 963 A.2d 83, 86 (Conn. App. Ct. 2009); DeCorso v. Watchtower Bible & Tract Soc'y of N.Y., 46 Conn. Supp. 386, 752 A.2d 102, 108

[3] The amended complaint does not specify whether the services rendered by Coudert were to Statek or to other persons or entities, including, for example, Johnston, but defines the information and files as the "Statek Files".

(Conn. Super. Ct. 2000). See also Watts v. Chittenden, 301 Conn. 575, 22 A.3d 1214, 1219 (Conn. 2011) ("In construing our general tort statute of limitations . . . we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred . . . . The date of the act or omission complained of is the date when the [*13] . . . conduct of the defendant occurs.") (citations and internal quotation marks omitted).

Connecticut choice of law principles thus present a significant hurdle for Statek, because Statek commenced its Connecticut action against Coudert on November 5, 2005, over nine years after Coudert's failure to honor its requests in July, 1996. Consequently, Statek must carry the burden[4] to toll the limitations period under Connecticut law for several years beyond the three year period prescribed by Connecticut Gen. Stat. § 52-577.

The only basis Statek asserts to toll the limitations period between July of 1999 and November 5, 2005 is Connecticut's "continuing course of conduct" doctrine.[5] As most recently reiterated by Connecticut's Supreme Court in Watts v. Chittenden, 301 Conn. 575, 22 A.3d 1214 (Conn. 2011),

> [T]o support a finding of a continuing course of conduct that may toll the statute of [*14] limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act.

Id. at 1220. That is, there must be a continuing duty and either a special relationship between the parties or some later wrongful conduct of the defendant related to the prior act. See also Haas v. Haas, 48 A.3d at 719-20.

As [*16] noted by the Seventh Circuit in Taylor v. Meirick, 712 F.2d 1112, 1119 (7th Cir. 1983) (Posner, C.J.) (citation omitted), quoted favorably by the Watts court:

> The principle strikes a balance between the plaintiff's interest in being spared having to bring successive suits, and the two distinct interests that statutes of limitations serve. One is evidentiary — to reduce the error rate in legal proceedings by barring litigation over claims relating to the distant past. The other is repose — to give people the assurance that after a fixed time they can go about their business without fear of having their liberty or property taken through the legal process. . . . When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served . . . by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation.

Watts, 22 A.3d at 1222-23.

Thus, "the concerns that have driven the application of the doctrine have been the following: the relative difficulty of identifying the cause of action, the possibility that the wrong may be remedied before the course of [*17] conduct is completed, and the general concern of avoiding premature litigation." Id. at 1230. See also Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, 69 Conn. App. 151, 795 A.2d 572, 579 (Conn. App. Ct. 2002) ("The continuing course of conduct doctrine reflects the policy that, during an ongoing

---

[4] Statek has the burden of establishing a basis for tolling the statute of limitations. Haas v. Haas, 137 Conn. App. 424, 48 A.3d 713, 720 (Conn. App. Ct. 2012); Collum v. Chapin, 40 Conn. App. 449, 671 A.2d 1329, 1332 (Conn. App. Ct. 1996); Sean O'Kane AIA Architect, P.C. v. Puljic, 2012 Conn. Super. LEXIS 2950, at *29-*30 (Conn. Super. Ct. Nov. 28, 2012).

[5] Statek does not contend that the limitations period should be tolled based on fraudulent concealment. See Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP, 281 Conn. 84, 912 A.2d 1019, 1032-33 (Conn. 2007). Nor does it assert that Connecticut's "continuous representation" doctrine applies. A plaintiff may invoke that doctrine "and thus toll the statute of limitations, when the plaintiff can show: (1) that the [*15] defendant continued to represent him with regard to the same underlying matter; and (2) either that the plaintiff did not know of the alleged malpractice or that the attorney could still mitigate the harm allegedly caused by that malpractice during the continued representation period." DeLeo v. Nusbaum, 263 Conn. 588, 821 A.2d 744, 749-50 (Conn. 2003). However, "the holding of DeLeo is quite limited. In a footnote, the court explicitly limited its holding to 'cases in which an attorney is alleged to have committed malpractice during the course of litigation.'" Rosato v. Mascardo, 82 Conn. App. 396, 407, 844 A.2d 893 (Conn. App. Ct. 2004) (emphasis added) (quoting DeLeo, 263 Conn. 597 n.4); see also Piteo v. Gottier, 112 Conn. App. 441, 963 A.2d 83, 87 n.3 (Conn. App. Ct. 2009). Statek does not allege that Coudert ever represented it in litigation. Moreover, as discussed below, there is no allegation that Statek asked Coudert to do any legal work after the ouster of Johnston and Spillane; it merely requested files and an accounting. Therefore, even if the "continuous representation" doctrine were extended beyond malpractice committed during the course of litigation, it would not apply here. Sin Hang Lee v. Brenner, Saltzman & Wallman, LLP, 128 Conn. App. 250, 15 A.3d 1215, 1218-19 (Conn. App. Ct. 2011).

relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. The doctrine is generally applicable under circumstances where it may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of action to terminate before allowing the repose section of the statute of limitations to run.") (citation and internal quotation marks omitted). See also Targonski v. Clebowicz, 142 Conn. App. 97, 63 A.3d 1001, 1008 (Conn. App. Ct. 2013) ("The doctrine . . . is better suited to claims where the situation keeps evolving after the act complained of is complete.") (internal quotation marks omitted).[6]

Connecticut recognizes the importance of the countervailing policies supporting its statutes of limitations. It is often noted, therefore, that "[p]erhaps because the continuous course of conduct **[*19]** doctrine contravenes, or at least qualifies, the legislatively mandated policies favoring repose as found in the statutes of limitations, the doctrine has been applied narrowly and somewhat sparingly." Partitions, Inc. v. Blumberg Assocs., 2001 Conn. Super. LEXIS 2960, at *10 (Conn. Super. Ct. Oct. 9, 2001); see also Komoroski v. Corso, 2013 Conn. Super. LEXIS 400, at * 11 (Conn. Super. Ct. Feb. 6, 2013); Rimscha v. Rimscha, 2005 Conn. Super. LEXIS 1409, at *9 (Conn. Super. Ct. June 2, 2005); Nosik v. Mastronardi, 2002 Conn. Super. LEXIS 798, at *5 (Conn. Super. Ct. Mar. 11, 2002).

Unlike the general applicability of a statute of limitations defense, which is a question of law, whether the continuing course of conduct doctrine applies to toll a statute of limitations is a mixed question of law and fact. Haas v. Haas, 137 Conn. App. 424, 48 A.3d 713, 719 (Conn. App. Ct. 2012); Giulietti v. Giulietti, 65 Conn. App. 813, 784 A.2d 905, 925 (Conn. App. Ct. 2001), cert. denied, 258 Conn. 946, 788 A.2d 95 (2001). Indeed, it is often noted that the doctrine is "conspicuously fact-bound." Haas v. Haas, 48 A.3d at 720 (citation omitted); Sanborn v. Greenwald, 664 A.2d at 807; see also Allen v. Egan, 303 F. Supp. 2d 71, 79 (D. Conn. 2004).

In its motion **[*20]** for reconsideration, Statek did not address how the period set forth in Conn. Stat. Ann. § 52-577 would be tolled from 1996 to November 5, 2002, three years before the commencement of its Connecticut Action.[7] On remand, based on the amended complaint and documents referred to therein several significant questions remain as to whether § 52-577 should be tolled.

Statek has established one of the continuing **[*21]** course of conduct doctrine's elements. It is clear that Coudert, to the extent that it served as Statek's counsel, at least for a time had the type of fiduciary relationship to Statek that, under the right circumstances, is a necessary element of the doctrine. Several cases applying the continuous course of conduct doctrine involve legal malpractice claims. See, e.g., Vanliner Ins. Co. v. Fay, 98 Conn. App. 125, 907 A.2d 1220, 1230 (Conn. App. Ct. 2006); Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, 69 Conn. App. 151, 795 A.2d 572, 578 (Conn. App. Ct. 2002); Peterson v. Bornhorst, 2012 Conn. Super. LEXIS 1674, at *9-*11 (Conn. Super. Ct. June 26, 2012).

A closer question is whether, although Statek paid the bills, Coudert can be said to have had the type of special relationship to Statek required for the doctrine to apply to requests for files and information arising from Coudert's representation of Johnston, or others, rather than of Statek. Stuart v. Synder, 2009 Conn. Super. LEXIS 3602, at *17-*28 (Conn. Super. Ct. Aug. 25, 2009) (attorney to father's estate

[6] The Watts court also favorably quoted Chief Judge Posner in Knight v. Columbus, 19 F.3d 579, 581-82 (7th Cir. 1994):

> A **[*18]** violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct. The injuries about which the plaintiff is complaining in these cases are the consequences of a numerous and continuous series of events. . . . In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries, as in suits for lost wages. If our plaintiff were seeking backpay for repeated acts of wage discrimination (suppose that every pay day for five years he had received $100 less than he was entitled to), he would not be permitted to reach back to the first by suing within the limitations period for the last.

Watts, 22 A.3d at 1222.

[7] There is some discussion of the tolling issue in the parties' memoranda in connection with the objection to Statek's Claim, but, as noted, Statek contended that federal or English choice of law controlled, including on the limitations issue: "Statek maintains that, on the limitations issue, this Court should apply the federal choice-of-law rule, which points to the application of English limitation law, as England is the jurisdiction with the most significant relationship to the action," Statek's Memorandum of Law in Opposition to Coudert's Motion to Disallow Claim 44, April 13, 2009, and argued for the possibility of tolling under Connecticut law in response to Coudert's argument that under the New York borrowing statute the period would have expired under Connecticut law. Id. at 46.

and trust had no duty to or "special relationship" with plaintiffs; therefore, continuing course of conduct doctrine inapplicable), aff'd, 125 Conn. App. 506, 8 A.3d 1126 (Conn. App. Ct. 2010); [*22] see also Shiffrin v. Bergman, 2000 Conn. Super. LEXIS 3474, at *7-*9 (Conn. Super. Ct. Dec. 12, 2000). In this regard, it is not clear whether the information provided by Coudert to Johnston's trustee in 2002 and 2004 pertained soley to services rendered to Statek or also to Johnston and a crony of Johnston's, Alford. Amended Complaint ¶¶ 32-33, 52.

Additionally, Statek must establish that Coudert's fiduciary relationship to it did not terminate more than three years before the commencement of the Connecticut action on November 5, 2005. As noted above, a continuing duty is insufficient to toll the statute; it must be accompanied by either a special relationship or a continuing, evolving wrong. The basis for tolling would be clearest if Coudert continued to represent Statek at least through November 5, 2002, because once an attorney's representation ends, the prior attorney-client relationship generally does not give rise to a continuing duty sufficient to establish a continuing course of conduct. Targonski v. Clebowicz, 63 A.3d at 1008-09; Sin Hang Lee v. Brenner, Saltzman & Wallman, LLP, 128 Conn. App. 250, 15 A.3d 1215, 1219-20 (Conn. App. Ct. 2011), cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011); Sanborn v. Greenwald, 664 A.2d at 808; [*23] Nosik v. Mastronardi, 2002 Conn. Super. LEXIS 798, at *5-*6. After the attorney-client relationship ends, the attorney owes a duty to the former client that will toll the limitations period only "if he later learns of the negligence at a time when he has the power to remedy the problems arising from it." Targonski, 63 A.3d at 1009; Partitions, Inc. v. Blumberg Assocs., 2001 Conn. Super. LEXIS 2960, at *20 ("There is a consistent theme in our jurisprudence, then, that the duty ends at the specific time that the relationship ends, and there is no ongoing duty to revisit past problems in relationships unless the prior malfeasance becomes known.") (citations omitted).[8]

Here, it appears that, although there is no express termination of Coudert's services in the record, Statek did not retain Coudert to do anything after the 1996 Delaware Chancery Court decision that wrested corporate control from Johnston and Spillane, and it may have had ample reason, given the work that Coudert did for Johnston and Spillane, to distrust the firm. Thus, Statek's relationship with Coudert does not appear to fit the pattern of the ongoing fiduciary or confidential relationships discussed in the case law as supporting the conclusion that the wrong is continuing and difficult to identify and that it therefore was premature to commence a lawsuit before the expiration of the limitations period. See, e.g., Haas v. Haas, 48 A.3d at 721; Giulietti v. Giulietti, 784 A.2d at 925-26.

Statek nonetheless argues that, even if the attorney-client relationship [*25] ended after 1996, Coudert had an ongoing duty to return its files upon request, citing Conn. R. Prof'l Conduct 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled."). However, while such a failure may give rise to a claim for malpractice, or negligence, see Tuccio v. Garamella, 2008 Conn. Super. LEXIS 2999, at *14-*17 (Conn. Super. Ct. Nov. 18, 2008); Coffey v. United States, 906 F. Supp. 2d 1114, 1175-76 (D.N.M. 2012), and, as Statek originally argued in its opposition to the Claim objection,[9] might give rise to a duty of care under English law, as well, such a failure has been held not to give rise to a breach of fiduciary duty claim, the fiduciary relationship having terminated with the attorney-client relationship. Nacholi v. Paul, 2007 Conn. Super. LEXIS 3417, at *4-*6 (Conn. Super. Ct. Dec. 21, 2007); see also Brown v. Yale-New Haven Health Servs., 2011 Conn. Super. LEXIS 231, at *24-*27 (Conn. Super. Ct. Feb. 3, 2011). Thus, unless Statek can show that Coudert continued as its counsel after Johnston and Spillane [*26] were ousted in 1996 or that Coudert knew it had not provided all the client files and their belated disclosure would still have assisted Statek in tracking down assets,[10] it will most likely not be able to show that, despite any ongoing actionable duty to comply fully with the request to provide the client files, Coudert had the type of fiduciary duty or other special relationship that would toll the limitations period. See Sin Hang Lee v. Brenner, Saltzman & Wallman, LLP, 15 A.3d at 1220; Sanborn v. Greenwald, 664 A.2d at 808; Shiffrin v. Bergman, 2000 Conn. Super. LEXIS 3474, at *9-*13.

---

[8] Statek's amended complaint does not state that Coudert knowingly withheld "Statek Files" or other information; instead, it asserts that when Coudert was asked by Johnston's bankruptcy trustee in 2002 and 2004 for information pertaining to Johnston it produced additional "Statek Files" and information. Amended Complaint ¶¶ 42-43, 48-49, 51-52. Moreover, the reason Statek demanded the information was to track down its assets. Id. ¶ 62(a) ("Statek has been hindered, delayed and frustrated in its ability to discover and recover [*24] assets that Johnston and Spillane had misappropriated from Statek and hidden throughout the world."). Without an ongoing fiduciary relationship, there is no evolving wrong; the harm cannot be remedied — the wrong is the failure, in 1996, to provide information that would have given Statek a starting point for tracking down assets.

[9] Statek Memorandum of Law in Opposition to Coudert's Motion to Disallow Claim, 42-3.

[10] And, as noted, Statek has not alleged tolling based on fraudulent concealment.

Finally, there is a question whether Statek discovered Coudert's failure to provide the information at least three years before the commencement of the Connecticut Action. As discussed by the Second Circuit, "knowledge of the injury may well deny a plaintiff (with a claim subject to [Conn. Gen. Stat. § 52-577]) the benefit of the continuous course of conduct doctrine." Int'l Strategies Grp., Ltd. v. Ness, 645 F.3d 178, 183 (2d Cir. 2011) [*27] (citation omitted); see also, Guilani v. Bak (In re Bak), 2013 Bankr. LEXIS 713, at *28-*29 (Bankr. D. Conn. Feb. 20, 2013) (citing Rivera v. Fairbank Mgmt. Props., 45 Conn. Supp. 154, 703 A.2d 808, 811-12 (Conn. Super. Ct. 1997) ("Cases applying the continuing course of conduct doctrine have all involved the conduct of the defendant prior to the discovery of the injury. . . . Cases rejecting the doctrine have done so on the basis that the defendant's duty ends when the cause of action accrues.") (internal citations omitted).[11] Statek's amended complaint does not assert that it first learned of Coudert's failure to provide all of the requested information less than three years before the commencement of the Connecticut action. Nothing else in the record establishes that Statek did not learn of Coudert's incomplete response to its 1996 requests before November 5, 2002, either.

**3. The alternative basis for the Reconsideration Order continues to apply.**

Statek [*28] asserts that as long as the application of Connecticut choice of law principles would force a determination, on the facts, of the tolling issue, the Court must vacate the Reconsideration Order. This argument, however, ignores the limited and extraordinary nature of reconsideration under Fed. R. Civ. P. 59. In light the constraints on obtaining relief under Rule 59, the fact that the foregoing issues that Statek originally did not seek to have decided would still be far from resolved if the Court vacated the Reconsideration Order thus highlights why the Order should not be vacated. There is no manifest answer to whether the Claim should be allowed after applying Connecticut's choice of law rules, certainly no answer overriding the limits on Rule 59 relief.[12]

Statek sought reconsideration of the Claim Disallowance Order under section 502(j) of the Bankruptcy Code, which states in relevant part, "A claim that has been allowed [*29] or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case." 11 U.S.C. § 502(j). Determining "cause" and the "equities of the case" under section 502(j) "falls upon the equitable judgment of the court and is within the sound discretion of the court." In re Flagstaff Foodservice Corp., 56 B.R. 910, 913 (S.D.N.Y. 1986); see also Advisory Committee Note to Fed. R. Bankr. P. 3008. The "the bankruptcy court's discretion in deciding whether to reconsider a claim is virtually plenary." In re Enron Corp, 352 B.R. 363, 367 (Bankr. S.D.N.Y. 2006) (quoting In re Colley, 814 F.2d 1008, 1010 (5th Cir. 1987)); see also In re Best Payphones, Inc., 2008 Bankr. LEXIS 2555, at *5 (Bankr. S.D.N.Y. July 3, 2008); In re Dana Corp, 2008 Bankr. LEXIS 803, at *4-*5 (Bankr. S.D.N.Y. Mar. 17, 2008).

As noted above, when deciding a motion for reconsideration of an order disallowing or allowing a claim under 11 U.S.C. § 502(j), courts follow the analysis that would apply to a motion under Fed. R. Civ. P. 59 (assuming the reconsideration motion was made within the time to appeal, as here) or Fed. R. Civ. P. 60 (assuming the reconsideration [*30] motion was made later). See supra note 1. The Court did so in reaching its initial alternative basis for the Reconsideration Order. Stating, first, that Statek had the burden to show that the Court overlooked controlling decisions or factual matters that might have materially influenced the earlier decision, or the need to correct a clear error or prevent manifest injustice,[13] the Court held,

> 'The rule permitting reargument is strictly construed to avoid repetitive arguments on issues that the court has already fully considered. In addition, parties cannot advance new facts or arguments because a motion for reargument is not a mechanism for presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.' In re Vargas Realty Enters., 2009 Bankr. LEXIS 2040, at *7-8 [(Bankr. S.D.N.Y. Jul. 23, 2009)] (internal citations and quotation omitted). See also In re Adelphia Bus. Solutions, Inc., 2002 Bankr. LEXIS 1604, at *3-4 (Bankr. S.D.N.Y. Oct. 15, 2002); 12 Moore's Federal Practice P 59.30[6] (3d ed. 2008), at 59-116 ('Further, a motion to alter or amend generally may not be used to raise arguments, or to present evidence, that [*31] could

---

[11] The foregoing principle may not appear to apply, however, where the defendant continued to represent the plaintiff on the same matter or could effectively remedy its mistake. Sanborn v. Greenwald, 664 A.2d at 808; Targonski v. Clebowicz, 63 A.3d at 1009.

[12] Accordingly, the Court does not additionally address the Plan Administrator's argument that the Connecticut court lacked personal jurisdiction over Coudert, or Statek's contentions to the contrary, including that the Second Circuit implicitly decided this issue.

[13] The grounds for reconsideration under Rule 59 are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1990) (internal citations and quotation marks omitted).

reasonably have been raised or presented before the entry of judgment.').

Under the foregoing principles, Statek's motion should be denied. The motion is premised on the argument that this Court, 'as the transferee court' of Statek's original tort action against Coudert, among others, which was brought in the Connecticut Superior Court and then removed under 28 U.S.C. §§ 1334(b) and 1452 to the District Court for the District of Connecticut, must follow the law of the 'transferor court,' Connecticut, including Connecticut's choice of law and timeliness rules. Ferens v. John Deere Co., 494 U.S. 516, 524-26, 110 S. Ct. 1274, 108 L. Ed. 2d 443; Van Dusen v. Barrack, 376 U.S. 612, 629-30, 632-33, 639, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964). This 'transferee court' argument was never raised in the parties' briefs or during oral argument on the Plan Administrator's objection to the Claim and, therefore, should not be considered now.[14] In re Vargas Realty Enters., 2009 Bankr. LEXIS 2040, at *7-8; In re Adelphia Bus. Solutions, 2002 Bankr. LEXIS 1604, at *3-4; see also FDIC v. World Univ., Inc., 978 F.2d 10, 16 (1st Cir. 1992) (Rule 59 motion may not be used to argue new legal theory); [*32] Bennett v. Genoa Ag. Ctr., Inc. (In re Bennett), 154 B.R. 140, 155 (Bankr. N.D.N.Y. 1998). The Court cannot be said to have 'overlooked' authority that was never brought to its attention and that was not inherent in the arguments that were brought to its attention. In re Vargas Realty Enters., 2009 Bankr. LEXIS 2040, at *8-9; Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs., Inc.), 360 B.R. 53, 63 (Bankr. S.D.N.Y. 2007) ('If the plaintiffs did not cite these decisions, they are hard-pressed to show that I overlooked them.').

In re Coudert Bros. LLP, 2009 Bankr. LEXIS 2602, at *7-*9.

That holding clearly complies with well-established precedent. [*33] See, e.g., Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008) (Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment.") (internal citation and quotation marks omitted); Smith v. New York City Dep't of Educ., 524 Fed. Appx. 730, 2013 U.S. App. LEXIS 8944, at *7 (2d Cir. May 2, 2013) ("A motion for reconsideration is not the appropriate mechanism for a party to relitigate an issue already decided or to advance new facts, issues, or

arguments not previously presented to the court.") (citing Nat'l Union Fire Ins. Co. v. Stroh Cos. Inc., 265 F.3d 97, 115 (2d Cir. 2001), and Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); Mahadeo v. N.Y. City Campaign Fin. Bd., 514 Fed. Appx. 53, 2013 U.S. App. LEXIS 5287, at *5 (2d Cir. Mar. 18, 2013) ("A party may not use a motion for reconsideration to advance new issues or theories of relief that were not previously presented to the court.") (citation omitted); Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) ("It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a [*34] rehearing on the merits, or otherwise taking a 'second bite at the apple. . . .' 'The standard for granting a Rule 59 motion for reconsideration is strict.'") (quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), cert. denied, 133 S. Ct. 1805, 185 L. Ed. 2d 812 (2013), and Shrader v. CSX Transp. Inc., 70 F.3d at 257). See also McGee v. Dunn, 940 F. Supp. 2d 93, 2013 U.S. Dist. LEXIS 55732, at *9 (S.D.N.Y. Apr. 16, 2013) (parties may not use a motion under Local Rule 6.3, entitled "Motions for Reconsideration or Reargument," to "advance new facts, issues or arguments not previously presented to the court"); Bace v. Babitt, 2012 U.S. Dist. LEXIS 92441, at *35-*36 (S.D.N.Y. May 10, 2012) ("[A] motion to reconsider should not give the moving party another bite at the apple by permitting argument on issues that could have been or should have been raised prior to the original motion.") (citations and internal quotation marks omitted); Cobalt Multifamily Investors I v. Shapiro, 2011 U.S. Dist. LEXIS 119346, at *27 (S.D.N.Y. Sept. 9, 2011) ("A motion for reconsideration is not appropriately filed as a vehicle for a party dissatisfied with the Court's ruling to advance new theories.") (citation and internal quotation [*35] marks omitted); Associated Press v. U.S. Dept. of Defense, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005) ("It is settled law in this District that a motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced[.]") (citations omitted); Richard Feiner & Co. v. BMG Music Spain, 2003 U.S. Dist. LEXIS 10975, 2003 WL 21496812, at *1 (S.D.N.Y. June 27, 2003) ("[P]laintiff is advancing new arguments without excuse as to why these arguments were not raised previously, and these arguments are therefore not cognizable on a motion for reconsideration."); Novomoskovsk Joint Stock Co. "AZOT" v. Revson, 1999 U.S. Dist. LEXIS 15022, at *2-*3 (S.D.N.Y. Sept. 27, 1999) ("New arguments . . . are not to be considered [on a motion for reconsideration] unless there is some valid reason they could not have been previously advanced when the motion was originally argued."); In re Lamberti, 2006 Bankr. LEXIS 2140, at *5 (Bankr. S.D.N.Y. Aug. 16, 2006) ("A party who fails to present their strongest case in the first instance generally has no right to raise new theories or arguments in a motion to reconsider.") (citation

---

[14] Indeed, both Coudert and Statek originally argued that Bianco v. Erkins (In re Gaston & Snow), 243 F.3d at 599, governed. See Statek's Memorandum of Law in Opposition to Coudert's Motion to Disallow Claim 39, 51.

and [*36] internal quotation marks omitted).

The rule prevents litigants from unduly prolonging the trial stage of litigation, limited only by the number of theories they might assert after their initial arguments prove unavailing, or requiring courts to anticipate the parties' potential legal theories even if not raised. Associated Press v. U.S. Dep't of Defense, 410 F. Supp. 2d 147, 152 (S.D.N.Y. 2006) ("Otherwise, disappointed litigants would be forever raising new arguments and there would be no end to litigation.") (citation omitted); Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988) ("The purpose of the rule is to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.") (citation and internal quotation marks omitted); Parrish v. Sollecito, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) ("Reconsideration of a court's previous order is an extraordinary remedy to be implored sparingly in the interests of finality and conservation of scarce judicial resources.") (citation and internal quotation marks omitted).

Because of its adverse effect on the litigation process, [*37] therefore, courts rarely grant a motion for reconsideration, even if it is based on alleged manifest injustice, when the movant could have advanced the legal argument before its motion for reconsideration. See Women's Integrated Network, Inc. v. United States Specialty Ins. Co., 495 Fed. Appx. 129, 131 (2d Cir. 2012) ("Even if we were to assume, without deciding, that the district court misconstrued the insurance policy or misapplied governing law in granting dismissal, we would not conclude that this is a case presenting 'exceptional circumstances' warranting relief. The proper recourse for [appellant] was to file a timely appeal to this court[.]") (citation and internal quotation marks omitted); Som Nath Chitkara v. N.Y. Tel. Co., 45 Fed. Appx. 53, 55 (2d Cir. 2002); Analytical Surveys, Inc. v. Tonga Partners, L.P., 2009 U.S. Dist. LEXIS 45402, at *4-*5 (S.D.N.Y. May 28, 2009), aff'd, 684 F.3d 36 (2d Cir. 2012), cert. denied, 133 S. Ct. 1805, 185 L. Ed. 2d 812 (2013); In re PT-1 Commc'ns, Inc., 463 B.R. 599, 606 (Bankr. E.D.N.Y. 2011), aff'd, 486 B.R. 9 (E.D.N.Y. 2012).

Analytical Surveys is instructive. Although the movant's new legal theory could possibly have changed the outcome of the case, the District [*38] Court found that it was "not manifestly unjust" to deny the motion because the other side "should not be required to respond to new arguments now." Analytical Surveys, Inc. v. Tonga Partners, L.P., 2009 U.S. Dist. LEXIS 45402, at *11-*12. Indeed, to grant the motion for reconsideration "would unduly undermine [the adversary's] compelling interest in finality" and the adversary, rather than the movant, "would suffer a manifest injustice." Id. (citing Parrish v. Sollecito, 253 F. Supp. 2d at 715). The Second Circuit agreed, finding that the trial court had not abused its discretion given that the appellant had not called its present legal argument to the court's attention before it granted summary judgment. 684 F.3d at 52-53. Just as a court cannot be said to have overlooked controlling facts or law that were not raised to it before the motion for reconsideration, rarely if ever will a ruling be manifestly unjust or constitute clear error if the basis for reconsideration was not manifest to the court and the other side until the losing party raised it after the ruling.

A manifest basis to reconsider does not exist here. First, while the decision whether to apply Connecticut choice of law rules [*39] is a pure question of law, the outcome of the choice of law question was not clear to this Court or the District Court even after the argument was raised by Statek's reconsideration motion.[15] It clearly was not evident before Statek filed its reconsideration motion, when both parties argued that other choice of law regimes, not Connecticut's, applied. See supra note 14. Moreover, the actual application of Connecticut choice of law rules to the facts set forth in the Claim is, as noted above, a mixed question of law and fact, and, as discussed above, there is no clear answer to whether the limitations period for Statek's Claim was tolled for approximately 6 years by Connecticut's "conspicuously fact-bound" continuing course of conduct doctrine. Haas v. Haas 48 A.3d at 720. It is decidedly unclear now, therefore, whether the application of Connecticut choice of law principles would prevent Statek's Claim from being time barred, as of course it was unclear when Statek made its reconsideration motion, which did not even mention the tolling issue. Under the circumstances, no "manifest injustice" or "clear error" requires the Court to vacate the Reconsideration Order.

**4. The law-of-the-case doctrine does not require granting the reconsideration motion on remand; instead, it supports its denial.**

Statek has argued, however, that the Second Circuit's remand requires this Court to vacate the Reconsideration Order. Clearly this would be so if the Circuit had directed the vacatur of that order or reversed the Court's first alternative holding,

[15] The Second Circuit acknowledged, [*40] further, "[W]e recognize that our opinion in In re Gaston employs some broad language, in dicta, that could be read as reaching every state law claim in every bankruptcy case without exception." In re Coudert Bros., 673 F.3d at 191 (quoting Gaston & Snow, 243 F.3d at 601-02: "[W]e decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state.").

either expressly or implicitly. "[W]here issues have been explicitly or implicitly decided on appeal," the lower court "is obliged, on remand, to follow the decision of the appellate court." Burrell v. United States, 467 F.3d 160, 165 (2d Cir. 2006) (citing United States v. Minicone, 994 F.2d 86, 89 (2d Cir. 1993); United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001), cert. [*41] denied, 549 U.S. 1344, 127 S. Ct. 2031, 167 L. Ed. 2d 773 (2007)). A lower court "generally may not deviate from a mandate issued by an appellate court" because the lower court "has no discretion in carrying out the mandate," and "the appellate court retains the authority to determine whether the terms of the mandate have been 'scrupulously and fully carried out.'" In re Ivan F. Boesky Sec. Litig., 957 F.2d 65, 69 (2d Cir. 1992) (quoting United States v. E.I. Du Pont De Nemours & Co., 366 U.S. 316, 325, 81 S. Ct. 1243, 6 L. Ed. 2d 318 (1961)). See also Am. Hotel Int'l Grp, Inc. v. OneBeacon Ins. Co., 374 Fed. Appx. 71, 73-74 (2d Cir. 2010).

This result derives from the law-of-the-case doctrine, under which "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation" such that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1991) (citations and internal quotation marks omitted). Thus, the mandate rule "forecloses relitigation of issues expressly or impliedly decided by the appellate court." Ben Zvi, 242 F.3d at 95 [*42] (citations omitted).

The corollary to that rule, however, consistent with its derivation in the law-of-the-case doctrine, is that "if an issue was not part of the appellate decision," the lower court "may consider the matter," Burrell, 467 F.3d at 165 (citing Minicone, 994 F.2d at 89 (citation and internal quotation marks omitted)), and should generally be governed by the prior law of the case -- that is, its prior ruling. In re PCH Assocs., 949 F.2d at 593; Am. Hotel Int'l Grp, Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 378-80 (S.D.N.Y. 2009), aff'd, 374 Fed. Appx. 71 (2d Cir. 2010). See generally United States v. Uccio, 940 F.2d 753, 757-58 (2d Cir. 1991) (where appellate court has not ruled, law of the case governs lower court's ruling on remand, and, while not inviolate, lower court should adhere to its prior rulings "absent cogent or compelling reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" and be "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the [law-of-the-case] [*43] doctrine.") (citations and internal quotation marks omitted). See also United States v. Stanley, 54 F.3d 103, 107 (2d Cir. 1995), cert. denied, 516 U.S. 891, 116 S. Ct. 238, 133 L. Ed. 2d 166 (1995); Gowanus Indus. Park v. Arthur H. Sulzer Assocs., 2013 U.S. Dist. LEXIS 45493, at *10-*12 (E.D.N.Y. Mar. 23, 2013).

To determine whether an issue was decided on appeal, the lower court "should look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate.'" Burrell, 467 F.3d at 165 (citing Ben Zvi, 242 F.3d at 95).

Upon review of the Second Circuit's opinion and order, as well as the argument and briefing before the Circuit, it is clear that the Circuit did not expressly reverse this Court's first alternative holding, which denied Statek's motion to reconsider because it was based on a new legal argument. The opinion does not mention that alternative holding. See In re Coudert Bros. LLP, 673 F.3d at 180.

Did the Second Circuit's mandate implicitly decide the issue? To be implicitly decided, the issue would first need to have been raised to the Circuit, because an issue cannot be implicitly decided unless it was "squarely" presented. Meacham v. Knolls Atomic Power Lab., 358 Fed. Appx. 233, 236 (2d Cir. 2009), [*44] cert. denied, 131 S. Ct. 414, 178 L. Ed. 2d 342 (2010). Failure to raise the issue on appeal is tantamount to its waiver. Parmalat Capital Fin. Ltd. v. Bank of Am., 671 F.3d 261, 270-71 (2d Cir. 2012) (alternative holding that had not been raised either before the District Court or the Second Circuit in the initial appeal was "impliedly decided" to have been waived and should not have been entertained on remand). See also Am. Hotel Int'l Grp. Inc. v. OneBeacon Ins. Co., 374 Fed. Appx. at 74 ("[A] decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for '[i]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.'") (quoting County of Suffolk v. Stone & Webster Eng'g Corp., 106 F.3d 1112, 1117 (2d Cir. 1997) (quoting Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)).

Here, Statek never addressed this Court's alternative holding in its briefs to the District Court and the Second Circuit. See Case No. 10-2723-cv, Dkt Nos. 28, [*45] 46, 63; Case No. 09 Civ. 9561, Dkt. Nos. 9, 13, 18. Statek also did not raise the alternative holding at oral argument before the Second Circuit. See Oral Argument on April 29, 2011, In re Coudert Bros. LLP, 673 F.3d 180 (2d Cir. 2012) (No. 10-2723-cv).

In light of the foregoing, the Court should follow its prior alternative holding. The American Hotel line of cases controls. In American Hotel, the District Court granted a motion for summary judgment on the basis that the oral

agreement at issue and an oral contract modification were unenforceable under New York's Statute of Frauds. Am. Hotel Int'l Grp. Inc. v. CGU Ins. Co., 2004 U.S. Dist. LEXIS 5154, at *24-*25 (S.D.N.Y. Mar. 26, 2004). Alternatively, the court held that, even if New York law did not apply, the oral contract modification was unenforceable under Pennsylvania law because it was not supported by consideration. Id. at *25 n.7. The court subsequently denied a motion for reconsideration, Am. Hotel Int'l Grp. Inc. v. OneBeacon Ins. Co., 2005 U.S. Dist. LEXIS 9420 (S.D.N.Y. May 17, 2005), which was appealed.

The appellant argued that the District Court had improperly held that New York law governed and that Pennsylvania's Statute **[*46]** of Frauds would have allowed enforcement of the oral agreement. Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 Fed. Appx. 562, 564 (2d Cir. 2009). Agreeing, the Second Circuit reversed, holding that the District Court should have applied Pennsylvania law under New York's choice of law rules. Id. at 564-65. However, the Circuit did not reverse or affirm the alternative basis for the District Court's grant of summary judgment. Id. at 565.

On remand, the District Court held that its alternative ruling based on the lack of consideration under Pennsylvania law, "did not run afoul of the Second Circuit's decision" and concluded, further, that this was "not inconsistent with" the Second Circuit's mandate to retry the claim already invalidated under its alternative Pennsylvania law holding. Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 2009 U.S. Dist. LEXIS 29638, at *4 (S.D.N.Y. Apr. 6, 2009). Denying a second motion for reconsideration, the court held that its alternative holding, not having been ruled on by the Circuit, remained the law of the case. Am. Hotel Int'l Grp. Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 378-80 (S.D.N.Y. 2009):

> In the case in which the mandate of the **[*47]** appellate court does not address a particular issue, the appellate judgment, on this issue, *does not establish the law of the case*, and on appeal from the judgment rendered after remand, it may be reviewed by the appellate court. *It remains, however, that the issue was decided by the district court in an earlier case and was not disapproved by the appellate court. It is, therefore, the law of the case.*

Id. at 379 (emphasis in opinion) (quoting In re PCH Assocs., 949 F.2d at 593 (quoting 1B Moore's Federal Practice ¶ 0.404[4.-3], at 131)).

The District Court then declined to exercise its discretion on remand to reconsider and overturn its alternative holding not decided by the Circuit, reasoning as follows,

> Although a district court on remand has the discretion to reconsider an issue that was not decided by the Court of Appeals, the law of the case doctrine counsels against doing so. See Uccio, 940 F.2d at 758. A court's decision on whether to apply the law of the case doctrine turns principally on whether 'reconsideration is necessary to avoid injustice.' Scottish Air, 152 F.R.D. at 25 (internal quotation and citation omitted). The Second Circuit has advised that a court should adhere **[*48]** to its own prior rulings, absent 'cogent' or 'compelling' reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. Uccio, 940 F.2d at 758 (internal quotations and citations omitted).

Am. Hotel, 611 F. Supp. 2d at 379.

On appeal, the appellant argued that the District Court "failed to comply with [the Second Circuit's] previous mandate" because "by vacating the district court's judgment in its entirety, [the order] impliedly rejected the district court's alternative holding." Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 374 Fed. Appx. 71, 73 (2d Cir. 2010). The Second Circuit affirmed the District Court's decision on remand, however. Id. at 73-74. In so ruling, the Circuit recognized that it "did not speak directly to" or "address" the District Court's alternative holding in its first decision: "[n]or did this Court address the district court's alternative finding . . . that the . . . [a]greement, even if valid under the statute of frauds, would have failed for want of consideration." Id. at 73. Therefore, the District Court's alternative holding remained the law of **[*49]** the case because it was not "expressly or implicitly addressed on appeal," and the District Court "did not err in determining that [the Second Circuit's] order left that holding undisturbed." Id. at 74.

As in American Hotel, the Second Circuit did not address this Court's alternative basis for denying Statek's reconsideration motion -- that Statek raised its argument under Van Dusen and Ferens and requested the application of Connecticut law for the first time in its motion for reconsideration. The reversal and remand do not implicitly overrule that holding. As in American Hotel, the alternative holding therefore remains the law of the case and, as discussed above, may not be ignored absent compelling reasons to deviate from it, which do not exist here. See also United States v. Stanley, 54 F.3d at 107-08.

**Conclusion**

For the foregoing reasons, Statek's motion for reconsideration, on remand, should be denied. Counsel for the Plan Administrator should submit a proposed order to chambers consistent with this ruling.

Dated: August 19, 2013

White Plains, New York

/s/ Robert D. Drain

United States Bankruptcy Judge

---

**End of Document**

# Exhibit 17f.

# Lego A/S v. Best-Lock Constr. Toys, Inc.

United States District Court for the District of Connecticut

April 15, 2013, Decided; April 15, 2013, Filed

3:11 - CV- 1586 (CSH)

**Reporter**
2013 U.S. Dist. LEXIS 56371 *; 2013 WL 1611462

LEGO A/S, and LEGO SYSTEMS, INC., Plaintiffs, v. BEST-LOCK CONSTRUCTION TOYS, INC., Defendant.

**Subsequent History:** Later proceeding at Lego A/S v. Best-Lock Constr. Toys, Inc., 2014 U.S. Dist. LEXIS 69216 (D. Conn., May 20, 2014)

**Prior History:** Lego A/S v. Best-Lock Constr. Toys, Inc., 2012 U.S. Dist. LEXIS 175077 (D. Conn., Dec. 11, 2012)

**Counsel:** [*1] For Lego A/S, Lego Systems, Inc., Plaintiffs: Catherine Dugan O'Connor, LEAD ATTORNEY, Day Pitney LLP-Stmfd, Stamford, CT; Elizabeth Ann Alquist, Nicholas A. Pisarsky, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT.

For Best-Lock Construction Toys, Inc., Defendant: Arthur C. Cody, Douglas A. Miro, Robert C. Faber, Stephen J. Quigley, LEAD ATTORNEYS, PRO HAC VICE, Ostrolenk Faber LLP, New York, NY; Dena M. Castricone, LEAD ATTORNEY, Murtha Cullina - NH, New Haven, CT; Michael J. Donnelly, LEAD ATTORNEY, Murtha Cullina LLP, Hartford, CT.

For Best-Lock Limited, Hong Kong, Defendant, Counter Claimant: Dena M. Castricone, LEAD ATTORNEY, Murtha Cullina - NH, New Haven, CT; Michael J. Donnelly, LEAD ATTORNEY, Murtha Cullina LLP, Hartford, CT.

For Lego Juris AS, Consol Defendant, Counter Defendant: Catherine Dugan O'Connor, LEAD ATTORNEY, Day Pitney LLP-Stmfd, Stamford, CT; Elizabeth Ann Alquist, Nicholas A. Pisarsky, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT.

For Best-Lock Group Limited, Best-Lock Construction Toys, Inc., Counter Claimants: Arthur C. Cody, LEAD ATTORNEY, PRO HAC VICE, Ostrolenk Faber LLP, New York, NY; Dena M. Castricone, LEAD ATTORNEY, Murtha [*2] Cullina - NH, New Haven, CT; Douglas A. Miro, Robert C. Faber, Stephen J. Quigley, LEAD ATTORNEYS, Ostrolenk Faber LLP, New York, NY; Michael J. Donnelly, LEAD ATTORNEY, Murtha Cullina LLP, Hartford, CT.

For Lego A/S, Lego Systems, Inc., Counter Defendants: Elizabeth Ann Alquist, Nicholas A. Pisarsky, LEAD ATTORNEYS, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT.

For Best-Lock Group Limited, Counter Claimant: Arthur C. Cody, LEAD ATTORNEY, PRO HAC VICE, Ostrolenk Faber LLP, New York, NY; Douglas A. Miro, Robert C. Faber, Stephen J. Quigley, LEAD ATTORNEYS, Ostrolenk Faber LLP, New York, NY; Michael J. Donnelly, LEAD ATTORNEY, Murtha Cullina LLP, Hartford, CT.

For Best-Lock Construction Toys, Inc., Counter Claimant: Arthur C. Cody, Douglas A. Miro, Robert C. Faber, Stephen J. Quigley, LEAD ATTORNEYS, Ostrolenk Faber LLP, New York, NY; Dena M. Castricone, LEAD ATTORNEY, Murtha Cullina - NH, New Haven, CT; Michael J. Donnelly, LEAD ATTORNEY, Murtha Cullina LLP, Hartford, CT.

For Lego Systems, Inc., Counter Defendant: Catherine Dugan O'Connor, LEAD ATTORNEY, Day Pitney LLP-Stmfd, Stamford, CT; Nicholas A. Pisarsky, LEAD ATTORNEY, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT.

**Judges:** Charles S. Haight, Jr., [*3] Senior United States District Judge.

**Opinion by:** Charles S. Haight, Jr.

# Opinion

**RULING ON PLAINTIFFS' MOTION FOR RECONSIDERATION OF RULING ON MOTIONS FOR PROTECTIVE ORDER**

**HAIGHT, Senior District Judge:**

On December 11, 2012, this Court issued a Ruling [Doc. 99] on the parties' motions for a protective order (the "December 11 Ruling"), familiarity with which is assumed. Plaintiffs, the

LEGO interests, now move for reconsideration of one aspect of the Ruling: specifically, the Court's decision in favor of Defendant Best-Lock with respect to the proper wording of ¶ 5(b) of a proposed protective order.

The wording of ¶ 5(b), as proposed by Best-Lock and accepted by the Court, provides that the party receiving confidential discovery materials from the producing party must notify the producing party that it "desires to disclose specified items of Confidential Information to identified employee(s) of the receiving party." The producing party then has five business days to "disapprove" such disclosure, with a rationale for doing so. Any dispute will be resolved by a Magistrate Judge.

The several disputes concerning the proper wording of the protective order were fully briefed by counsel for the parties. LEGO stated **[*4]** its objections to Best-Lock's suggested ¶ 5(b) language in a brief filed on October 31, 2012 [Doc. 97]. The sole objection LEGO made at that time was that the proposed ¶ 5(b) was burdensome. LEGO said of the notice of disclosure-to-employee provisions: "On its face alone, that requirement is overly burdensome but when considered with certain facts in focus, it becomes unworkable." [Doc. 97] at 4. LEGO sought to develop those facts by references its "employing over 9,000 people worldwide," with the consequent possibility that LEGO might believe it necessary "for 10 employees each to see 10 documents." *Id.* Taking all this into effect, LEGO's brief argued that: "The process would likely bog down the adjudication of this case to a snail's pace and offload much more of the discovery work onto the Court rather than the parties." *Id* at 5.

Undaunted by that prediction, the Court concluded in the December 11 Ruling that Best-Lock's suggested procedure served legitimate interests, and that "LEGO's brief overstates the complexities, delays and expenditures of time that the procedure may generate." December 11 Ruling [Doc. 99] at 5.

Disappointed by the result, LEGO's Brief on the present motion **[*5]** for reconsideration [Doc. 102-1] at 1 argues that the ¶ 5(b) procedure "is both burdensome and harmful, as it has the undesired effect of revealing attorney work product of litigation counsel." The brief is devoted to a disquisition on the importance of the attorney work product doctrine in its several forms ("courts must protect against the disclosure of attorney work product, including the mental impressions, conclusions, opinions, or legal theories of a party's attorney concerning the litigation"), and concludes with the contention that the procedure "brings with it the risk of an invasion into the attorney work product doctrine." *Id.* at 3, 5. LEGO's Reply Brief [Doc. 104] expounds again upon the near-sanctity of an attorney's work product and, ratcheting up the rhetoric, begins with the declaration that "a motion for reconsideration may be granted where, as here, there is a need to prevent manifest injustice."

Given LEGO's post-Ruling perception of the dreadful harm Best-Lock's ¶ 5(b) procedure inflicts upon the work product of LEGO's attorneys, it is surprising that those attorneys said nothing about an imperiled work product in LEGO's original opposition to the procedure. That **[*6]** objection was based solely upon a perceived difficulty in terms of *practical implementation* of the procedure; nothing was said about exposing *attorney work product* to the Perils of Pauline. In consequence, LEGO's present motion for reconsideration runs aground on the reef of established authority, recently summarized by Magistrate Judge Smith in *Morien v. Munich Reinsurance America., Inc.*, 270 F.R.D. 65 (D. Conn. 2010):

> It is well-established that the function of a motion for reconsideration is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence. The scope of review on motions for reconsideration is limited to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging gaps of a lost motion with additional matters. . . . Reconsideration will only be granted if a party can point to an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or to prevent manifest injustice.
>
> A motion for reconsideration may not be used to relitigate an issue the court has already decided. A motion for reconsideration is not **[*7]** simply a second bite at the apple for a party dissatisfied with a court's ruling. . . .
>
> Put simply, a motion for reconsideration is not the proper venue for a party, unhappy with the trial judge's discovery ruling, to buttress its original argument with additional (and previously available) case law in an attempt to obtain a more favorable ruling.

270 F.R.D. at 69, 70 (citations and internal quotation marks omitted).

In the case at bar, the transformation in LEGO's eyes of the attorney work product doctrine, from something not worth mentioning its first brief on the protective order motions to the decisive factor in support of the present motion for reconsideration after those motions were lost, furnishes a paradigmatic example of a disappointed litigant trying to plug gaps in a lost motion by taking a second bite at the apple (to mix well-established metaphors). I need not reach Best-Lock's argument [Brief, Doc. 103] at 3-5 that in fact, LEGO's attorney work product would not be jeopardized by the ¶ 5(b) procedure. It is sufficient for present purposes to say that

LEGO's motion for reconsideration does not pass muster under the distinctly limited scope of review available for applications **[*8]** for such relief.

For the foregoing reasons, the motion [Doc. 102] of Plaintiffs for reconsideration of the Court's Ruling [Doc. 99] is DENIED.

It is SO ORDERED.

Dated: New Haven, Connecticut

April 15, 2013

*/s/ Charles S. Haight, Jr.*

Charles S. Haight, Jr.

Senior United States District Judge

---

**End of Document**

# Exhibit 17g.

# Maryland Cas. Co. v. W.R. Grace & Co.

United States District Court for the Southern District of New York

October 26, 1994, Decided ; October 26, 1994, Filed

88 Civ. 2613 (SWK)

**Reporter**
1994 U.S. Dist. LEXIS 15322 *; 1994 WL 592267

MARYLAND CASUALTY COMPANY, Plaintiff, v. W.R. GRACE & CO. - CONN, THE AETNA CASUALTY & SURETY CO., CONTINENTAL CASUALTY CO., FIRST STATE INSURANCE CO., HARTFORD ACCIDENT & INDEMNITY CO., CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND LONDON COMPANIES, et al., Defendants.

**Counsel:** [*1] For Plaintiff: Wiley, Rein & Fielding, Washington, D.C., By: Laura A. Foggan, Samuel D. Walker, John P. Groarke.

For W.R. Grace & Co., Defendant: Anderson Kill Olick & Oshinsky, New York, New York, By: Jerold Oshinsky, Randy Paar, Philip G. Barber, Kathleen Leslie. For The Aetna Casualty & Surety Co., Defendant: Miller, Cassidy, Larroca & Lewin, Washington, D.C., By: James E. Rocap, III, Jay L. Alexander. Grais & Phillips, New York, New York, By: Kaare Phillips. For Continental Casualty Co., Defendant: Ford Marrin Esposito Witmeyer & Gleser, New York, New York, By: Michael L. Anania. For First State Insurance Co. and Hartford Accident & Indemnity Co., Defendants: Stillman, Friedman & Shaw, New York, New York, By: Michael J. Grudberg. Hogan & Hartson, Washington, D.C., By: William J. Bowman. For Certain Underwriters At Lloyd's and London and London Companies, Defendant: Mendes & Mount, New York, New York, By: Thomas J. Quinn, Eileen T. McCabe, Caroline L. Beers.

For The Celotex Corp. and Carey Canada Inc., Anderson Kill Olick & Oshinsky, New York, New York, By: David G. Roland. Anderson Kill Olick & Oshinsky, Washington, D.C., By: Stephan G. Weil, Barbara M. Tapscott.

**Judges:** KRAM

**Opinion by:** SHIRLEY WOHL [*2] KRAM

## Opinion

MEMORANDUM OPINION AND ORDER

SHIRLEY WOHL KRAM, U.S.D.J.

This action involves a dispute regarding excess insurance policies issued by the Maryland Casualty Company ("Maryland") and several other insurance carriers to W.R. Grace & Co ("Grace"). [1] On September 5, 1989, the case was referred to Magistrate Judge Leonard Bernikow for all purposes, including dispositive motions. Presently before the Court are objections to three Report and Recommendations issued by Magistrate Judge Bernikow. The parties also object to an order issued by Magistrate Judge Bernikow denying Grace's motion for reconsideration of a prior discovery ruling. The Court will consider the three Report and Recommendations and the order in turn.

On April 13, 1988, Maryland commenced this action [2] against Grace seeking a [*3] declaratory judgment that Maryland is under no obligation to defend and indemnify Grace under excess insurance policies issued to Grace between 1955 and 1973. Grace seeks coverage in order to defend against numerous lawsuits claiming personal injuries and property damage arising out of exposure to asbestos products manufactured or sold by Grace and its affiliates.

On April 28, 1988, Maryland amended its complaint seeking declaratory relief against other excess insurers, including: (1) Certain Underwriters at Lloyd's, London, and the London Market Insurance Companies (collectively "London"); (2)

---

[1] This case has been proceeding concurrently with a related case, *Maryland Casualty Co. v. W.R. Grace & Co.,* 83 Civ. 7451, involving the litigation between Grace and its primary insurance carriers (the "primary action").

[2] The facts of this case are set forth in detail in *Maryland Casualty Co. v. W.R. Grace & Co.,* 794 F. Supp. 1206 (S.D.N.Y. 1991), familiarity with which is presumed. Additional facts relevant to the disposition of the motions now before the Court are presented below.

The Aetna Casualty & Surety Co. ("Aetna"); (3) First State Insurance Co. ("First State"); (4) Hartford Accident & Indemnity Co. [*4] ("Hartford"); and (5) Continental Casualty Co. ("CNA") (collectively the "excess insurers"). Specifically, Maryland seeks a declaratory judgment specifying the coverage obligations of the excess insurers that have issued policies to Grace. Subsequently, Grace cross-claimed against the excess insurers in order to obtain a declaratory judgment that the excess insurers owe a duty of coverage to Grace.

I. London's Summary Judgment Motion

A. Background

Defendant London issued four excess policies to Grace between October 1959 and October 1962 (the "London excess policies"). The London excess policies contain the following insuring provision:

> Underwriters hereby agree . . . to indemnify [Grace] . . . for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or, in respect only of operations by or on behalf of the Assured, assumed by the Assured under contract or agreement . . . for damages . . . on account of personal injuries . . . and property damages, caused by or arising out of each occurrence happening during the Policy Period.

*See* London excess policy 59/2209/3, annexed to the affidavit of Philip G. Barber, [*5] sworn to June 7, 1993 (the "Barber Aff.") as Exh. "B," at 65; London excess policy 59/2209/4, annexed to the Barber Aff. as Exh. "C," at 103; London excess policy 59/2209/5, annexed to the Barber Aff. as Exh. "D," at 132. [3] In addition, the named insured provision, which establishes the parties to whom coverage is provided, states:

> It is hereby understood and agreed that the name of the Assured is as follows: W.R. Grace & Company . . . or its subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted.

*See* London excess policy 59/2209/2, annexed to the Barber Aff. as Exh. "A," at 11; London excess policy 59/2209/3, annexed to the Barber Aff. as Exh. "B," at 60; London excess policy 59/2209/4, annexed to the Barber Aff. as Exh. "C," at 101; London excess policy 59/2209/5, annexed to the Barber Aff. as Exh. "D," at 130.

[*6] On January 6, 1993, London moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment. Specifically, London argued that it has no obligation to defend or indemnify Grace as the London excess policies expired in 1962, one year prior to Grace's acquisition of the corporate entities liable for the asbestos-related injuries and property damage. In opposition, Grace contended that, pursuant to the insuring and named insured provisions, London is obligated to provide coverage to Grace for liability arising out of injuries and property damage incurred by any entity subsequently acquired by Grace, so long as the injury or damage occurred during the policy period.

B. Magistrate Judge Bernikow's Report and Recommendation

On May 18, 1993, Judge Bernikow issued a Report and Recommendation recommending that London's motion for summary judgment be granted on the grounds that the insurance policies issued to Grace prior to Grace's acquisition of the asbestos-manufacturing entities do not obligate London to provide coverage to Grace (the "May 18 Report"). Magistrate Judge Bernikow rejected Grace's position as an unfair attempt "to transfer [the [*7] liabilities of the asbestos manufacturers] to its insurer under expired policies." May 18 Report, at 5-6.

Specifically, Magistrate Judge Bernikow determined that "extending coverage to after-acquired property would foist environmental defense costs onto the insurers, diminishing a company's motivation to restrict itself to environmentally sound acquisitions." *Id.*, at 8. Moreover, Magistrate Judge Bernikow found that "Grace's position could lead to abuse." *Id.* at 6. Thus, Magistrate Judge Bernikow determined that "[Grace's] construction would permit a company to acquire an unrelated, liability laden entity, secure in the knowledge that its insurer would bear the litigation costs." *Id.*

Additionally, Magistrate Judge Bernikow concluded that "policy concerns undermine Grace's argument." *Id.* "An insurer could not, with any confidence, tailor a premium to adequately cover post-expiration acquisitions, particularly if the insured chose to expand into fields with which it had no previous connection." *Id.*

Finally, Magistrate Judge Bernikow rejected Grace's argument that the policy language obligates London to cover the asbestos-related defense costs. Specifically,

---

[3] The fourth London excess policy contains slightly different language. It states:

> Underwriters hereby agree . . . to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability (a) imposed upon the Assured by law, or (b) assumed under contract or agreement by the Named Assured . . . for damages . . . on account of personal injuries . . . and property damage, caused by or arising out of each occurrence happening during the Policy Period. *See* London excess policy 59/2209/2, annexed to the Barber Aff. as Exh. "A," at 16.

Magistrate [*8] Judge Bernikow determined that Grace's interpretation of the insuring provision was in conflict with the "policy considerations" discussed above. *Id.* at 12. With respect to the named insured provision, Magistrate Judge Bernikow concluded that Grace's construction would "contravene the reasonable expectations of the insurer who bases its premium on the nature of the insured's business." *Id.* at 13.

C. Discussion

1. Standard of Law [4]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine [*9] issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970), and may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir. 1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir. 1985); [*10] *see also Adickes v. S.H. Kress & Co.,* 398 U.S. at 158-59; *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1223 (2d Cir. 1994). But the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249-50; *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12-15 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987); *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir. 1986), *cert. denied,* 479 U.S. 1088, 94 L. Ed. 2d 151, 107 S. Ct. 1295 (1987). [*11] The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

To determine whether the moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. at 248. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied [*12] unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett,* 477 U.S. at 330 & n.2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).

Rule 72(b) of the Federal Rules of Civil Procedure governs determinations by magistrate judges with respect to dispositive motions. Specifically, Rule 72(b) provides that, where a magistrate judge issues a Report and Recommendation that is dispositive of a claim or defense, the court must review *de novo* those portions to which the parties object. *See* Fed. R. Civ. P. 72(b).

2. Grace's Objections to the May 18 Report

On June 7, 1993 and June 21, [*13] 1993, respectively, the Court received Grace's objections to the May 18 Report and London's opposition thereto. After reviewing the May 18 Report, Grace's objections and London's opposition to Grace's objections, the Court agrees with Magistrate Judge Bernikow, for substantially the reasons set forth in the May 18 Report, that London's motion for summary judgment with respect to the London excess policies should be granted.

Grace objects to the May 18 Report solely on the grounds that Magistrate Judge Bernikow failed to give proper weight to the

[4] The standard of law set forth below also applies to the summary judgment motions of Hartford, First State and CNA. *See* § III.

language of the London excess policies. According to Grace, the express language of the London excess policies requires London to defend and indemnify Grace for the asbestos-related claims against it. The Court disagrees.

It is a basic tenet in constructing and interpreting contracts, such as insurance policies, that the intentions of the parties should control. *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135 (2d Cir. 1986). The meaning of particular language must be read "in light of the business purposes sought to be achieved by the parties." *Champion Int'l Corp. v. Continental Casualty Co.,* 546 F.2d 502, 505 (2d Cir. 1976), [*14] *cert. denied,* 434 U.S. 819, 54 L. Ed. 2d 75, 98 S. Ct. 59 (1977). Moreover, the court must evaluate individual provisions in light of the overall contract, reading the policy as a whole. *Board of Educ. v. CNA Ins. Co.,* 839 F.2d 14, 16 (2d Cir. 1988); *see also Alfin, Inc. v. Pacific Ins. Co.,* 735 F. Supp. 115, 119 (S.D.N.Y. 1990); *American Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 565 F. Supp. 1485, 1492-93 (S.D.N.Y. 1983).

In the present case, Magistrate Judge Bernikow found, and the Court agrees, that the parties did not intend to provide coverage to other entities acquired by Grace beyond the expiration of the London excess policies in 1962. When read in light of the entire insurance contract, it is evident that the provisions referred to by Grace were only intended to apply to companies acquired during the policy period. There is no provision in the insurance contract that purports to extend coverage specifically to after-acquired entities for previously incurred liability. An alternative reading would lead to an absurd scenario [*15] in which the insurance provider would be obligated to provide coverage to any company acquired by the insured for an indefinite period of time. Such an interpretation is without any support in the insurance agreement. *See Idaho v. Bunker Hill Co.,* 647 F. Supp. 1064, 1077 (D. Idaho 1986) (insurance coverage did not-extend to liabilities incurred by an entity acquired by the insured after the expiration of the insurance policy).

Moreover, as Magistrate Judge Bernikow correctly determined, Grace's position could lead to abuse. *See* the May 18 Report, at 6. Under Grace's theory, corporations could acquire unrelated companies with severe liability and rely upon insurance policies that had expired years earlier. As a result, an insurer would be unable to determine a pricing scheme that appropriately reflects the type of coverage sought by the insured. The Court agrees with Magistrate Judge Bernikow's determination that this result is contrary to public policy and without support in the insurance contract.

Grace's reliance upon *National Union Fire Ins. Co. v. Liberty Mut. Ins. Co.,* No. C-89-3973-DLJ, slip op. at 5-6 (N.D. Cal. Feb. 25, 1991) *("National* [*16] *Union"),* is misplaced. In *National Union,* the court held that, based on their precise language, the insurance policies provided coverage for all damage occurring prior to the insured's merger with the companies that had manufactured the asbestos products. The court reasoned that, if the insurance carriers intended to limit coverage to "only liabilities imposed during the policy period," it was "certainly within [the insurance carriers'] drafting capabilities." *Id.* at 9.

The Court agrees with Magistrate Judge Bernikow that the reasoning in *National Union* is unpersuasive. Specifically, the court's reasoning in *National Union* presumes that an insurer reasonably could foresee the need to draft an insurance agreement in such a way as to prevent the insured from acquiring entities with pre-merger liability and relying upon the insurance agreement for coverage. The Court finds this to be an unreasonable burden to place upon the insurance carrier in the present case. [5] Accordingly, London's motion for summary judgment is granted.

[*17] II. The Discovery Ruling

A. Background

In January 1986, Magistrate Judge Bernikow ruled, in the primary action, that Grace could not assert the attorney-client privilege or the work product doctrine to prevent Maryland from obtaining certain discoverable documents relevant to the asbestos claims against it. Accordingly, Grace produced to Maryland all documents related to the bodily injury claims against Grace (the "bodily injury documents"). Thereafter, Grace refused to produce the bodily injury documents to any other primary or excess insurance carrier involved in this litigation. Additionally, Grace refused to produce its asbestos-in-building claim documents to any insurer, including Maryland.

On November 4, 1991, Magistrate Judge Bernikow ordered Grace to produce all bodily injury documents and asbestos-in-building claim documents (collectively, the "asbestos documents") to both the primary and excess insurers under the "common interest" exception to the attorney-client privilege (the "November 4 Ruling"). Under the "common interest"

---

[5] Grace's reliance upon *In re Asbestos Ins. Coverage Cases,* Judicial Council Coordination Proceeding No. 1072, slip op. at 3 (Cal. Sup. Ct. Jan. 24, 1990) *("In re Asbestos"),* is also misplaced. In *In re Asbestos,* the court held that insurance policies issued to the insured prior to its merger with an asbestos manufacturer would cover the insured for the asbestos manufacturer's liability. *In re Asbestos,* however, is inapposite to the present case as, in that case, there was no suggestion that the relevant policies were not in existence at the time of the asbestos-related injuries.

exception, where an attorney acts for two parties sharing a common interest, communications by either party to the attorney are not privileged [*18] in a subsequent action between the parties. Magistrate Judge Bernikow determined that, as the common interest in "holding down the size of any award to an underlying claimant outweighed the areas or the areas of dispute between the insurers and Grace," Grace was obligated to produce the asbestos documents to the insurers. Tr. of Conference of 11/4/91, at 36-37.

Subsequently, Grace requested that Magistrate Judge Bernikow reconsider the November 4 Ruling. On July 14, 1993, Magistrate Judge Bernikow denied Grace's motion for reconsideration and ordered Grace to produce the asbestos documents (the "July 14 Ruling").

Grace now moves, pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and 28 U.S.C. 636(b)(1)(A), for an order reversing the November 4 and July 14 Rulings. Specifically, Grace argues that Magistrate Judge Bernikow erroneously interpreted New York law in applying the "common interest" exception and concluding that Grace must produce the asbestos documents. In opposition, Maryland argues that Magistrate Judge Bernikow properly interpreted New York law and, in any event, the "law of the case" doctrine required the denial of Grace's [*19] motion.

B. Discussion

Rule 72(a) of the Federal Rules of Civil Procedure provides, in pertinent part:

> A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter.

Fed. R. Civ. P. 72(a). Under Rule 72(a), if a party objects to a magistrate's order, the district court "shall consider such objections and modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Id.* A magistrate's ruling regarding discovery issues is afforded substantial deference by the district court. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 124 F.R.D. 75, 77 (1989); *Citicorp v. Interbank Card Ass'n,* 478 F. Supp. 756, 765 (S.D.N.Y. 1979).

According to Grace, a decision by the New York State Appellate Division, First Department, warrants a reversal of the Magistrate Judge Bernikow's November 4 and July 14 Rulings. Specifically, in *United States Fire Ins. Co. v. Phoenix Assurance Co.,* 193 A.D.2d 559, 598 N.Y.S.2d 938 [*20] (1st Dep't 1993) *("United States Fire"),* the court refused to apply the "common interest" exception to the attorney-client privilege on the grounds that the parties involved were not jointly represented by the same attorney.

Magistrate Judge Bernikow addressed the issue presented by *United States Fire* in considering Grace's motion for reconsideration. Specifically, Magistrate Judge Bernikow found that, although there was "a very compelling argument that *[United States Fire]* might very well indicate that the common interest doctrine has no applicability here, . . . the intervening law is not so overwhelming as to outweigh the need for certainty and finality." Tr. of Hr'g., at 34. The Court agrees with Magistrate Judge Bernikow's decision.

The court is free to modify its own pretrial rulings at any time prior to entering final judgment. *Wilder v. Bernstein,* 645 F. Supp. 1292, 1310 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988). The "law of the case" doctrine, however, counsels against re-opening issues previously decided absent compelling circumstances, such as an intervening change of controlling law, the availability [*21] of new evidence or the need to correct a clear error or prevent manifest injustice. *Id.* Thus, a judicial determination at one stage of a proceeding becomes the "law of the case" to be followed in successive stages of the same litigation, ensuring "the orderly progress of court proceedings." *Crown Zellerbach Corp. v. Goldsmith,* 609 F. Supp. 187, 189 (S.D.N.Y. 1985). As the Second Circuit stated in *Zdanok v. Glidden Co., Durkee Famous Foods Div.,* 327 F.2d 944, 953 (2d Cir.), *cert. denied,* 377 U.S. 934, 12 L. Ed. 2d 298, 84 S. Ct. 1338 (1964), "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Id.*

The Court recognizes that the decision in *United States Fire* raises a legitimate issue regarding the applicability of the "common interest" doctrine to the present circumstances. The Court finds further, however, that *United States Fire* does not represent a "compelling circumstance," *Wilder v. Bernstein,* 645 F. Supp. at 1310, [*22] warranting the disruption of the "orderly progress of court proceedings" below. *Crown Zellerbach Corp. v. Goldsmith,* 609 F. Supp. at 189. The New York State Court of Appeals has not yet confronted the circumstances addressed by the lower state court in *United States Fire.* Accordingly, the Court finds that *United States Fire* does not constitute an intervening change of controlling law such that a modification of its decision is warranted. Moreover, the parties in the instant case have adhered to the November 4 Ruling for many years and a sudden change this late in the action would serve only to upset the course of the current proceedings. *See id.*

The Court agrees further with Magistrate Judge Bernikow's

determination that the intervening law does not take precedence over the need for certainty and finality in the instant litigation. Magistrate Judge Bernikow's decision was properly based upon the need for consistency in the pending litigation and was not "clearly erroneous or contrary to law." *See* Fed. R. Civ. P. 72(a). Accordingly, Grace's motion for an order reversing the November 4 Ruling requiring Grace to disclose asbestos documents **[*23]** under the "common interest" exception to the attorney-client privilege is denied.

III. Hartford, First State and CNA

A. Background

1. Hartford and First State's Summary Judgment Motion

Defendants Hartford and First. State issued excess insurance policies to Grace between 1976 and 1985. Specifically, Hartford issued twenty excess policies to Grace between 1976 and 1985 (the "Hartford policies"). The first two Hartford policies covered the period between June 30, 1976 and June 30, 1977 (the "1976 Hartford policies"). First State issued four policies covering 1975 to 1977 and 1984 to 1985 (the "First State policies"). One First State policy covered the period between June 30, 1975 and June 30, 1976 (the "1975 First State policy"). Two other First State policies took effect on June 30, 1976 and expired on June 30, 1977 (the "1976 First State policies"). [6]

**[*24]** On September 20, 1993, Hartford and First State moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them partial summary judgment. Hartford and First State argued that, as the Second Circuit has adopted the "damage in fact" trigger for property damage claims, Grace lacks any legal claim to coverage. Specifically, Hartford and First State asserted that neither the Hartford policies nor the First State policies provide any coverage to Grace because the installation of Grace's asbestos-containing products predate any insurance coverage. [7]

Grace **[*25]** opposed the motion, arguing that there is a genuine issue of material fact as to whether the 1976 First State and Hartford policies are triggered. Specifically, Grace argued that asbestos-containing fireproofing was installed by it as late as 1976 at two sites in Canada (the "Canadian Projects"), thereby triggering the 1976 First State policies and the 1976 Hartford policies. In support of its position, Grace relied upon the affidavit of S. Allan Magnacca ("Magnacca"), a former senior manager at Grace's construction products operations at the Canadian Projects. In his affidavit, Magnacca stated that asbestos-containing fireproofing was manufactured and sold by Grace as late as December 1975. *See* Affidavit of S. Allan Magnacca, sworn to on July 7, 1994, at PP 12-16.

2. CNA's Summary Judgment Motion

Defendant CNA issued excess insurance policies to Grace between 1973 and 1985 (the "CNA excess policies"). On September 23, 1994, CNA moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment. Adopting the analysis of Hartford and First State, CNA argued that, under the "damage in fact" test adopted by the Second Circuit, it **[*26]** is not obligated to defend or indemnify Grace for any asbestos-related liability incurred by Grace and its affiliates. Specifically, CNA seeks an order declaring that only the installation of asbestos-containing materials in a building constitutes an "occurrence" or "accident." Thus, according to CNA, a policy is not triggered unless asbestos-containing materials were installed in a building during the effective period of the policy

B. Magistrate Judge Bernikow's Report and Recommendation

On September 13, 1994, Magistrate Judge Bernikow issued a Report and Recommendation with respect to the motions of Hartford, First State and CNA (the "September 13 Report"). Specifically, Magistrate Judge Bernikow recommended that the Court (1) grant Hartford and First State's motion for partial summary judgment except with respect to the 1975 First State policy; and (2) deny CNA's motion for partial summary judgment.

In making these recommendations, Judge Bernikow relied upon the Second Circuit's decision in *Maryland Casualty Co. v. W.R. Grace & Co.*, 23 F.3d 617 (2d Cir. 1994), in which the Court held that coverage under liability insurance policies is triggered **[*27]** with respect to asbestos damage claims only for those policy periods in which asbestos-containing products were installed in a building. With respect to the 1975 First State policy, Magistrate Judge Bernikow determined that the Magnacca testimony created an issue of fact as to whether the policy was triggered. With respect to those Hartford and First State policies effective June 30, 1976, the Magistrate Judge concluded that liability did not attach, as no asbestos products were installed after the policies' effective date.

---

[6] The other Hartford and First State policies are not relevant to the instant proceeding, as all parties agree-that they do not provide coverage to Grace for the environmental claims against it.

[7] Under the "damage in fact" trigger adopted by the Second Circuit in *Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 624 (2d Cir. 1993), the installation of asbestos triggers only the insurance coverage in effect at that time. Accordingly, insurance policies that become effective following the installation of asbestos do not obligate the insurance carrier to provide coverage to the insured party. *Id.*

Specifically, Magistrate Judge Bernikow rejected Grace's argument that the delivery of asbestos fireproofing to the Canadian Projects in late 1975 created an issue of fact as to whether installation occurred after June 30, 1976. Magistrate Judge Bernikow found that "Grace has presented no factual assertions that any of its products were installed in the two Canadian projects in 1976." September 13 Report, at 6. Magistrate Judge Bernikow determined further that, although "all inferences on a summary judgment motion must be drawn in favor of the non-movant," Grace's contention "amounts to nothing more than speculation." *Id.*

With respect to CNA's summary judgment **[*28]** motion, Magistrate Judge Bernikow concluded that CNA failed to present facts to which the "damage in fact" trigger could be applied. *Id.* at 7. Thus, Magistrate Judge Bernikow stated:

> Whereas Hartford and First State present facts demonstrating that their policies provided coverage from 1975 to 1985 and that no asbestos-containing materials were installed during that period, except [with respect to the 1975 First State policy], CNA merely seeks a declaration as to the appropriate trigger of coverage for property damage claims.

*Id.* Accordingly, Magistrate Judge Bernikow recommended that, as CNA's motion failed to present an actual case or controversy, CNA's summary judgment motion should be denied. *Id.*

C. Discussion

1. Hartford and First State's Objections to the September 13 Report

On September 30, 1994, the Court received Grace's objections to the September 13 Report. [8] In its objections, Grace argues that there is a material issue of fact as to whether the 1976 Hartford and First State policies are triggered. [9] Specifically, Grace argues that Magnacca's testimony, which is based on his capacity as a former senior manager at the Canadian Projects, provides **[*29]** sufficient evidence from which a reasonable jury could conclude that asbestos installations occurred after June 30, 1976, the effective date of the 1976 Hartford and First State policies. The Court disagrees.

Magnacca's testimony, standing alone, fails to support an inference that any installation occurred as late as June 30, 1976, the effective date of the 1976 Hartford and First State policies. At most, Magnacca's testimony indicates that Grace *sold* asbestos materials as late as 1975. Moreover, Grace has failed to produce any other evidence tending to prove that asbestos installation occurred **[*30]** after the effective dates of the 1976 Hartford and First State policies. Grace may not rely upon "mere speculation or conjecture" in opposition to Hartford and First State's summary judgment motion. *See Knight v. United States Fire Ins. Co.,* 804 F.2d at 12. Accordingly, Hartford and First State's motion for summary judgment is granted except with respect to the 1975 First State policy. [10]

2. CNA's Review of the September 13 Report

CNA has not filed objections to the September 13 Report. After reviewing the September 13 Report, the Court agrees with Magistrate Judge Bernikow's recommendation to deny CNA's motion for partial summary judgment. Specifically, the Court agrees that, as CNA's motion merely seeks a declaratory judgment with respect to the **[*31]** application of the "damage in fact" trigger to the CNA excess policies, there is no actual case or controversy subject to this Court's subject matter jurisdiction. *See BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 977 (Fed. Cir. 1993) (stating that a dispute is not justiciable unless it is "definite and concrete" rather than "hypothetical or of uncertain prospective occurrence"). Accordingly, CNA's motion for partial summary judgment is denied.

IV. Celotex's Motion

A. Background

On February 28, 1986, this Court entered a protective order to govern the discovery proceedings (the "Protective Order") which now covers both the primary action and the instant litigation. Under the terms of the Protective Order, the parties are permitted to protect confidential information by designating all or certain documents and depositions as confidential. The Protective Order provides further that confidential documents "may be used only in connection with this proceeding and not for any other litigation, or business or other purpose whatsoever." Protective Order, dated February 28, 1986, at P 3.

On May 5, 1994, the Celotex Corporation and Carey Canada

---

[8] On October 17, 1994, the Court received Hartford and First State's opposition to Grace's objections.

[9] Grace does not dispute Magistrate Judge Bernikow's determination that, based upon *Maryland Casualty Co. v. W.R. Grace & Co.,* 23 F.3d 617 (2d Cir. 1993), Hartford and First State are not obligated to provide coverage to Grace based upon those policies effective 1977 and thereafter.

[10] First State concedes that Magnacca's testimony creates an issue of fact as to whether the 1975 First State policy is triggered under *Maryland Casualty Co. v. W.R. Grace & Co.,* 23 F.3d 617 (2d Cir. 1994).

Inc. (collectively [*32] "Celotex"), two non-party corporations, moved to intervene and modify the Protective Order, pursuant to Rules 24(b) [11] [*33] and 26(c) [12] of the Federal Rules of Civil Procedure. Celotex argued that, as it is a plaintiff in another proceeding against several defendants in the present case, *see In re: The Celotex Corporation,* Adversary Proceeding No. 91-40, Consolidated Case Nos. 90-10016, 90-10017 (the "adversary proceeding"), [13] and both proceedings raise issues arising out of identical policy language, it should be permitted to intervene in the instant litigation in order to modify the Protective Order. Celotex seeks a modification of the Protective Order in order to obtain certain documents relevant to insurance policy interpretation in the adversary proceeding, including: (1) pleadings filed in this action by the insurers; (2) documents produced in this action by the insurers; (3) discovery requests and responses; and (4) depositions, deposition exhibits, trial transcripts and trial exhibits of witnesses affiliated with, employed by, or retained by the insurance company parties. Defendant Aetna opposes the motion.

B. Magistrate Judge Bernikow's Report and Recommendation

On August 10, 1994, Magistrate Judge Bernikow issued a Report and Recommendation recommending that the Court deny Celotex's motion (the "August 10 Report"). In the August 10 Report, Magistrate Judge Bernikow stated that:

> Rule 24(b) permits a non-party to intervene for the limited purpose of seeking relief from a protective order where an applicant has a claim or defense that presents a common question of law or facts at issue in the action in which [*34] the intervention is sought.

August 10 Report, at 4. Magistrate Judge Bernikow explained further, however, that a protective order, once entered, "can only be modified if an "'extraordinary circumstance' or 'compelling need' warrants the requested modification." *Id.* (quoting *Federal Deposit Ins. Corp. v. Ernst & Ernst,* 677 F.2d 230, 232 (2d Cir. 1982)).

Applying this standard to the present case, Magistrate Judge Bernikow concluded that Celotex "has not made the required showing" for an order modifying the Protective Order. August 10 Report, at 6. Specifically, Magistrate Judge Bernikow stated that "although fostering judicial economy and avoiding duplicative discovery are laudable goals . . . they hardly amount to extraordinary circumstances or compelling need." *Id.*

C. Discussion

The Court has not received any objections to the August 10 Report. Upon review of the August 10 Report, the Court agrees with Magistrate Judge Bernikow's recommendation to deny Celotex's motion on the grounds that Celotex has failed to make the required showing of "extraordinary circumstances" or "compelling need." Accordingly, Celotex's motion to intervene and [*35] for a modification of the Protection Order is denied.

CONCLUSION

For the reasons set forth above, the Report and Recommendations issued by Magistrate Judge Bernikow on May 18, 1993, September 13, 1994 and August 10, 1994 are accepted in accordance with 28 U.S.C. § 636(b).

Accordingly, London's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment is granted. Hartford and First State's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them summary judgment, is granted except with respect to the 1975 First State policy. CNA's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order declaring that an insurance policy is not triggered unless asbestos-containing materials were installed in a building during the effective period of the policy, is denied. Celotex's motion, pursuant to Rules 24(b) and 26(c) of the Federal Rules of Civil Procedure, to intervene in this action and to modify the Protective Order is also denied.

Grace's motion, pursuant to Rule 72(a) and 28 U.S.C. 636 [*36] (b)(1)(A), for an order reversing the November 4 Ruling is denied.

---

[11] Rule 24(b) provides, in pertinent part:

> Upon timely application anyone may be permitted to intervene in an action: (2) when an applicant's claim or defense and the main action have a question of law or fact in common . . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of rights of the original parties.

Fed. R. Civ. P. 24(b).

[12] Rule 26(c) states, in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought . . . on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

Fed. R. Civ. P. 26(c).

[13] In the adversary proceeding, Celotex is seeking a declaratory judgment with respect to insurance coverage for asbestos-related personal injuries, property damage and environmental damage claims.

Page 9 of 9

1994 U.S. Dist. LEXIS 15322, *36

SO ORDERED.

SHIRLEY WOHL KRAM

UNITED STATES DISTRICT JUDGE

DATED: New York, New York

October 26, 1994

---

**End of Document**

# Exhibit 17h.

# Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.

United States District Court for the Northern District of New York

May 23, 1992, Decided ; May 23, 1992, Filed

88-CV-819

**Reporter**
1992 U.S. Dist. LEXIS 7721 *; 1992 WL 121726

NIAGARA MOHAWK POWER CORPORATION; LONG ISLAND LIGHTING COMPANY; NEW YORK STATE ELECTRIC & GAS CORPORATION; ROCHESTER GAS AND ELECTRIC CORPORATION; and CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Plaintiffs, v. STONE & WEBSTER ENGINEERING CORPORATION, ITT FLUID PRODUCTS CORPORATION, and ITT FLUID TECHNOLOGY CORPORATION, Defendants.

**Counsel:** [*1] HISCOCK & BARCLAY, P. O. Box 4878, Syracuse, NY 13221-4878, SWIDLER & BERLIN, 3000 K Street, NW, Washington, D.C. 20007, OF COUNSEL: RICHARD K. HUGHES, ESQ., JOHN R. FERGUSON, ESQ.

ATTORNEYS FOR PLAINTIFF, NIAGARA MOHAWK POWER, KIRKLAND & ELLIS, 200 East Randolph Drive, Chicago, Illinois 60601, HANCOCK & ESTABROOK, MONY Tower I, P. O. Box 4976, Syracuse, NY 13221, OF COUNSEL: JAMES C. MUNSON, ESQ., WILLIAM ALLEN, ESQ.

ATTORNEYS FOR PLAINTIFFS, LONG ISLAND LIGHTING, NEW YORK STATE ELECTRIC & GAS, ROCHESTER GAS & ELECTRIC and CENTRAL HUDSON GAS & ELECTRIC, McNAMEE LOCHNER TITUS & WILLIAMS, OF COUNSEL: SCOTT A. BARBOUR, ESQ.

Attorneys for Defendants, ITT Fluid Products & ITT, Fluid Technology, 75 State Street, P. O. Box 459, Albany, NY 12201-4059, HALE & DORR, 1455 Pennsylvania Ave NW, Washington, D.C. 20004, NEAL P. McCURN, C.J., OF COUNSEL: JAMES QUARLES III, ESQ.

**Judges:** McCurn

**Opinion by:** NEAL P. McCURN

# Opinion

**MEMORANDUM-DECISION AND ORDER**

On April 30, 1991, the court heard oral argument with respect to the summary judgment motion by defendants, ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("ITT" or "the ITT defendants"), and the cross-motion for summary judgment by plaintiffs. [*2] Due to the lengthy memoranda of law, volumes of exhibits and appendices, as well as the numerous legal issues (some quite complex) raised by those motions, the court reserved decision. Then, on January 3, 1992, the court heard oral argument on a second set of summary judgment motions by ITT. [1] As it did on April 30, 1991, and for the same reasons, the court reserved decision. The first set of motions focuses entirely on liability, whereas the second set of motions is framed both in terms of liability and damages. This memorandum-decision and order will address all of the outstanding motions.

[*3] *INTRODUCTION*

This lawsuit arises out of the construction of the Nine Mile Point 2 nuclear power plant ("NMP2" or "the project"). In 1988, plaintiffs, five New York utilities that own and operate NMP2, [2] [*4] commenced the present lawsuit against

---

[1] The various memoranda of law submitted in connection with these two sets of motions total over 300 pages in length, excluding exhibits thereto and Statements of Material Facts pursuant to Local Rule 10(J). The combined exhibits total approximately 3,818 pages. In addition, in response to ITT's second set of summary judgment motions, plaintiffs submitted six volumes of appendices which are not numbered sequentially, but which measure nearly nine inches in height. Some of the exhibits are duplicative, but not many.

[2] The plaintiffs are Niagara Mohawk Power Corporation ("NiMo"), Long Island Lighting Company, New York Gas and Electric Corporation, Rochester Gas and Electric Corporation, and Central Hudson Gas & Electric Corporation. Because NiMo is the owner of the largest share of NMP2 and because it is the first named plaintiff, NiMo and plaintiffs will be used interchangeably throughout this decision.

defendant Stone and Webster Engineering Corporation ("SWEC"), the company which designed and engineered NMP2 and served as the project construction manager. Also named as defendants are ITT Fluid Corporation and ITT Fluid Technology, as successors to ITT Grinnell Industrial Piping, Inc., the company which actually had the contract with plaintiffs for the piping work on NMP2. In the spring of 1991, NiMo and SWEC entered into an undisclosed settlement agreement, leaving the ITT defendants as the only remaining defendants in this action. [3]

The amended complaint contains three causes of action against ITT: breach of contract; negligence; and gross negligence. [4] By NiMo's calculations, the alleged resulting damages total approximately $ 88 million. [5] Over the past three and one-half years, the parties have conducted exhaustive discovery; and it is the fruits of that discovery which, in large part, form the basis for these motions.

**[*5]** ***BACKGROUND***

Basically, this controversy centers around the interpretation of four documents - the contract between NiMo and ITT for "Field Fabrication and Erection of Piping for Nine Mile Point Nuclear Station - Unit 2" ("contract P301C") and three Contract Changes thereto, Contract Changes 26, 32 and 34. In their various memoranda of law, the parties have detailed a great many facts, including extrinsic evidence, which they deem relevant to these motions. To simplify matters, in this section the court will limit its recitation of the facts to the provisions of those four documents which the parties maintain govern the outcome of the motions. Other relevant facts will be referred to subsequently as necessary to resolve the legal issues raised herein.

*A. Contract P301C*

The long and contentious relationship between NiMo and ITT began almost twenty years ago in August, 1974, when NiMo and ITT entered into contract P301C. [6] As originally negotiated, contract P301C was a "Cost Plus Fixed Fee Contract." Put simply, instead of being paid one "lump sum" for its work on the project, ITT was to be paid a fixed fee. ITT was also entitled to reimbursement for all costs it **[*6]** incurred in connection with the piping work. The ostensible reason for structuring the contract in that way was that as of 1974, a nuclear power plant of this size had not previously been designed, making it impossible to know with certainty at the time of contracting how much the piping would eventually cost.

Not surprisingly, contract P301C is lengthy and extremely detailed. The court need not be concerned at this point, however, with the many nuances of that contract. In response to ITT's second motion for summary judgment on liability, two provisions of contract P301C **[*7]** are particularly relevant, at least in NiMo's view. The first such provision is the "Alterations and Amendments" clause, which states in relevant part:

> No waiver of any provision of the Contract, and no consent to departure therefrom, by either party, shall be effective *unless in writing and signed by the waiving or consenting party, and no such waiver or consent shall extend beyond the particular case and purpose involved.*

Contract P301C, "Supplementary Conditions of Contract" at P16 (Plaintiffs' Exhs., Vol. I at 18 (emphasis added)). Although numerous contract changes were entered into between NiMo and ITT, as NiMo is quick to point out, that clause was never changed in any way or deleted from the original contract.

NiMo also relies upon article four of the contract's "Supplementary Conditions", the "Release of Claims" provision. That provision also was not altered in any way or deleted from contract P301C by any of the subsequent contract changes. Article four states in its entirety:

> The Engineers, in its sole discretion, may withhold final approval of the work until the Contractor shall furnish to it an affidavit setting forth the extent to which final payment **[*8]** or settlement has been made of all bids and

[3] When ITT filed its original summary judgment motion in December, 1990, it included a motion for summary judgment on SWEC's cross-claim for contribution and indemnification. However, based upon the SWEC settlement agreement, SWEC has agreed to drop this cross-claim against ITT; thus rendering moot that portion of ITT's first summary judgment motion.

[4] Amended Complaint at PP150-157.

[5] The damage figures cited herein are all taken from NiMo's damage reports - part of the record on these motions. The court is cognizant of the fact that due to additional recent calculations by NiMo's experts (some as recent as early this month), these figures may not correspond exactly to the damages NiMo will be seeking to prove at trial. The court will use the figures contained in those damage reports simply as a point of reference. Those figures are not binding on the parties in any way.

[6] In addition to P301C, ITT and NiMo entered into two other contracts for the project. One was a contract to fabricate the pipe ("the piping contract" or "301B" contract) and the other was a contract to fabricate the pipe supports. Contract P301C is at the heart of this litigation, but there is one allegation pertaining to the 301B piping contract and that is the so-called radiograph enhancement claim, which will be briefly addressed later.

> claims of whatever kind or nature in any manner arising out of the Contract, including full details as to any such bills and claims remaining unpaid or unsettled; and the Purchaser shall have the right to retain from any payment then due to the Contractor, so long as any of said bills or claims remain unpaid or unsettled and outstanding, a sum sufficient (or if insufficient, then all of any such payment due to the Contractor) in the opinion of the Engineers to provide for the payment of the same and the Purchaser may pay any such bills or claims pro tanto in full satisfaction and discharge of any like amount due to the Contractor. Prior to final payment and as a condition thereto the Contractor shall furnish a release, in form and substance satisfactory to the Engineers, of all claims of Contractor against the Purchaser and the Engineers arising under and by virtue of the Contract.
>
> If any breach or breaches by the Contractor of any provision of the Contract shall occur at any time prior to the completion of the Contract and the acceptance of the work by the Purchaser, and any part of the amounts due or to become due to the Contractor hereunder **[*9]** (including payments for additional work) shall be unpaid to the Contractor, the Purchaser may retain therefrom a sum sufficient, in the opinion of the Engineers to indemnify the Purchaser against all damages which have resulted or may result from such breach or breaches, but, if no such amount shall be retained, or if the amount of such damages shall exceed the amount so retained, the Contractor shall pay to the Purchaser on demand the amount of such damages or such excess as the case may be.

Contract P301C, "Supplementary Conditions of Contract" at P4 (Plaintiffs' Exhs., Vol. I at 13).

*B. Contract Change 26*

In 1976, ITT began to work on the project. As a result of numerous delays, the original Commercial Operation Date was extended four years from 1981 to 1986, thus requiring ITT to work on the project for five years longer than it had planned originally. Naturally, the delays also resulted in cost escalation. Based upon the increased amount of time it would be expected to work on the project, and the estimated cost increases, ITT requested a fee adjustment in June, 1980.

Following over a year of negotiations, on December 21, 1981, NiMo and ITT executed Contract **[*10]** Change 26. ITT vigorously contends that that Contract Change settled all claims existing as of December 21, 1981. One change included therein was the method by which ITT was to be paid, which, at least in part, was a response to the New York Public Service Commission's suggestion that reimbursable contracts (such as contract P301C) be converted to a type of contract containing greater incentives and penalties. Contract Change 26 converted the original "Cost Plus Fixed Fee" contract to a "Cost Reimbursable Incentive Fee Contract." ITT's fee was ultimately increased to $ 10,390,000.00. As part of the incentive compensation, ITT agreed to put $ 2,000,000.00 of that fee into a pool which NiMo would then unilaterally award based upon certain performance criteria. NiMo contributed $ 1,000,000.00 to that fund. The remainder of ITT's $ 10,390,000.00 fee (or $ 8,390,000.00) was the "base" fee.

With respect to this base fee, Contract Change 26 specifically provided:

> It is agreed that the total fee compensation to which Contractor [ITT] is entitled for all work performed and any and all things done pursuant to performance of this Contract through 7:59 am EST, December 21, 1981, is **[*11]** *Two Million, Four Hundred Forty Nine Thousand, Seven Hundred Forty Five Dollars ($ 2,449,745).*

Contract Change 26, Article VI at P2 (Plaintiffs' Exhs., Vol. I at 56) (emphasis in original)). Other changes incorporated in Contract Change 26 were a change in the completion date of the piping work to October 1, 1986, and an increase in the estimated cost of ITT's work from $ 49 million to $ 206 million.

Relevant also is the provision of Contract Change 26 requiring ITT to pay $ 135,000.00 to NiMo "in consideration of full and final settlement of charges levied against Contractor [ITT] for tool loss and alleged defective or deficient work occurring through 7:59 a.m. EST December 21, 1981. . . ." Contract Change 26, Article VI at P5 ("the settlement clause") (Plaintiffs' Exhs., Vol. I at 56). Insofar as future disputes over liability for defective work were concerned, Contract Change 26 provided that ITT would be reimbursed for all costs of rework:

> If at any time before final completion and acceptance of the work, the Engineers shall certify to the Purchaser that any part of the work is found to be deficient or in any way fails to conform to the specifications, plans **[*12]** and drawings, then the Engineer is hereby expressly authorized and empowered to reject such defective or deficient work and to require the Contractor to redo and make good all such defective or deficient work at no cost to the Purchaser; *provided, however, that such defective work occurs as a result of gross negligence, willful misconduct or willful failure of Contractor's [ITT] supervisory employees to follow the directions of the Purchaser and/or Engineer*. If, however, the Contractor

> [ITT] is required to redo or make good deficient or defective work *for any other reason*, the Contractor [ITT] shall re-perform this work and will be reimbursed for costs incurred therefor, without additional fee.

Contract Change 26, Article XVI at P3(10) (emphasis added) (Plaintiffs' Exhs., Vol. I at 76-77)). ITT's second summary judgment motion on liability is premised upon this apparent limitation of liability.

Finally, in conjunction with Contract Change 26, ITT executed an "Intermediate Corporation Release," which provided in relevant part:

> ITT . . ., for good and valuable consideration, as determined through negotiations stipulated in Change Order No 26 to Contract No. PC-NMP2-P301C [*13] and all amendments thereto, agrees that, except for amounts retained under Contract No. PC-NMP2-P301C through 7:59 EST A.M., December 21, 1981, in the total amount of $ 190,432, *said Change represents full and final settlement of any and all costs, claims, and outstanding changes and charges whether or not recognized, claimed and purported, incurred from contract inception through 7:59 EST, A.M., December 21, 1981.*

ITT's Appendix, Vol. II at 268 (emphasis added). No reciprocal release was ever executed by NiMo. Indeed, ITT's efforts to obtain a mutual release in connection with this Contract Change were rebuffed by NiMo. According to NiMo's Manager of Contract Administration at the time, NiMo informed ITT that it would not execute a mutual release because it had a policy of not granting such releases to contractors. Affidavit of James T. Niezabytowski (February 21, 1991) at P5 (Plaintiffs' Exhs., Vol. II thereto at 248). Furthermore, NiMo's Manager of Contract Administration did not think a mutual release was justified because the only claim being settled was ITT's fee claim against NiMo and not any outstanding claims which NiMo might have had against ITT. *Id.*

[*14] *C. Contract Change 32*

Out of a growing concern over the "major change in scope in terms of size and speed" on the project, in approximately March, 1984, ITT began asserting that it was entitled to an increase in compensation. ITT's Appendix, Vol. III at 614. At the same time, ITT also expressed concern over various "backcharges" NiMo apparently unilaterally deducted from ITT invoices. More than one year later, on May 28, 1985, NiMo and ITT executed Contract Change 32.

From ITT's standpoint, by acquiescing in that Contract Change, it relinquished a claim for $ 9.6 million - the fee to which ITT believed it was entitled as of March, 1985. In exchange for relinquishing that fee, according to ITT, it received the following. First, contract P301C was changed from a "base fee" contract to a $ 14.6 million dollar "fixed fee," representing ITT's total entitlement on a base cost of $ 309,450,000.00. *See* Contract Change 32 at PIV(1) (ITT's Appendix, Vol. III at 783). Notably, that fee was "not subject to adjustment for any reason," except as specifically provided by Contract Change 32. *Id.* at PIII (ITT's Appendix, Vol. III at 782). Second, Contract Change 32 provided, [*15] that "the total value of all fees earned . . . through April 12, 1985, which amount reflects consideration for the value of the work accomplished . . . is agreed and established at . . . $ 12,207,704.36." *Id.* at PIV(2)(a) (ITT's Appendix, Vol. III at 783). With respect to ITT's fee, that Change also explicitly stated that the "remaining amount of fixed fee payable to the Contractor [ITT] is . . . agreed and established at . . . $ 2,392,295.64." *Id.* at PIV(2)(b) (ITT's Appendix, Vol. III at 783). The penultimate paragraph of Contract Change 32 clearly stated:

> The compensation stipulated for performance of this change represents *total and complete compensation for such performance including costs associated with the impact, if any, on the unchanged work.*

*Id.* at 7 (emphasis added) (ITT's Appendix, Vol. III at 788).

As it did with Contract Change 26, as part of Contract Change 32, ITT executed an "Intermediate Corporation Release" which stated:

> ITT . . ., for good and valuable consideration, as determined through negotiations stipulated in Change Order No. 32 to Contract No. NMP2-PC-P301C and all amendments thereto, agrees that *said Change Order represents* [*16] *full and final settlement of any and all extra costs, claims, and outstanding changes and charges whether or not recognized, claimed or purported, incurred from contract inception through May 8, 1985.* In consideration of Change Order No. 32, this release hereby remises, releases and forever discharges Niagara Mohawk Power Corporation and Stone & Webster Engineering Corporation, Agent, from all claims, demands and rights thereto arising in connection with work performed or any contractual, statutory or common law basis pursuant to said Contract for Nine Mile Point Nuclear Power Station -. . . through said date.

ITT's Appendix, Vol. III at 789 (emphasis added). Once again, no reciprocal release was executed by NiMo. From ITT's standpoint, the effect of this Contract Change was to settle all other claims (those not settled by Contract Change

26), including those set forth in the amended complaint.

*D. Contract Change 34*

Contract Change 34 was the final contract change to contract P301C. It established a final cost of $ 296,785,801.24 for all work performed by ITT under the contract; and it set the total fee at $ 14,600,000.00. Contract Change 34 at 1 (ITT's Appendix, [*17] Vol. III at 852). In comparison to contract P301C and Contract Changes 26 and 32, Contract Change 34 is a short document (only two pages), over which there was evidently little negotiation or dispute.

As with the prior contract changes, ITT executed a release to accompany Contract Change 34. That release, while varying some from those executed in connection with Contract Changes 26 and 32, still had the common feature of, at least by its terms, releasing only NiMo, and not ITT, from claims arising out of contract P310C. *See* "For Corporate Release" (ITT's Appendix, Vol. III at 854). Again, NiMo did not execute a reciprocal release.

ITT contends that summary judgment should be granted on its first motion based upon any one of four affirmative defenses: (1) accord and satisfaction; (2) estoppel; (3) release; and (4) waiver. [7] NiMo takes the position that summary judgment is appropriate, but in favor of plaintiffs, dismissing each of those affirmative defenses as a matter of law. Alternatively, NiMo declares that the record is replete with genuine issues of material fact, rendering entirely improper ITT's motion for summary judgment on the affirmative defenses.

**[*18]** ***DISCUSSION***

There is little upon which these parties agree. There is one small but important undisputed point, however, and that is the applicable law. In this diversity action New York law applies, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *PSI Metals, Inc. v. Firemen's Ins. Co.*, 839 F.2d 42, 43-44 (2d Cir. 1988); and the parties realize that. *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 725 F.Supp. 656, 659 (N.D.N.Y. 1989) ("*NiMo*"); *see also* Transcript of December 31, 1988 Hearing ("Tr. I") at 5. Moreover, any doubt here as to the applicability of New York law is removed by the parties' choice of law clause, unequivocally stating that contract P301C should "take effect and . . . be construed in accordance with the laws of the State of New York." Contract P301C, Supplementary Conditions at 10, P22 (Plaintiffs' Exhs., Vol. I at 20). *See Bank of America Nat. Trust & Sav. Assn. v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 264-65 (S.D.N.Y.), *aff'd sub nom. without pub. opinion*, *First Nat'l Bank of Maryland v. Envases Venezolanos*, 923 F.2d 843 (2d Cir. 1990). **[*19]**

There is one other minor point upon which the parties are now in agreement. In light of NiMo's concession that it is not seeking damages from ITT on account of "costs associated with investigative and corrective action taken in response to falsification of weld radiographic film committed by two ITT employees," [8] NiMo does not appear to be contesting that part of ITT's motion seeking summary judgment on the enhanced radiograph claim. Thus, insofar as the amended complaint can be read as seeking damages based upon the radiograph falsification incident, summary judgment is granted in favor of ITT on such claim.

By now the legal standards for granting summary judgment in this Circuit are well settled and familiar to all. Some of those principles are worth repeating though, **[*20]** particularly as they relate to contract actions. Such a review is also useful where, as here, those principles have a tendency to become somewhat obscured by the necessarily zealous legal representation by counsel.

Summary judgment is an extraordinary remedy available only when it is clear that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The initial burden of demonstrating the absence of a genuine issue of material fact is on the moving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). That burden may be discharged if the movant demonstrates to the court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In deciding whether the moving party has met

[7] *See* Answer to Amended Complaint, Counterclaim and Jury Demand of ITT Fluid Products Corporation and ITT Fluid Technology Corporation at 16-17.

In its answer, ITT specifically asserts an affirmative defense based upon the "settlement agreements" (i.e. the pertinent Contract Changes). *Id.* at 17. That is not truly a discrete aspect of ITT's first summary judgment motion, however. Therefore, even though ITT separately asserted in its answer a defense based upon the "settlement agreements," the court will not consider that as a possible independent basis for ITT's first summary judgment motion. The settlement agreement defense will only be considered insofar as the same is encompassed in the other affirmative defenses which form the basis for ITT's motions herein.

[8] Plaintiffs' Memorandum in Support of their Cross-Motion for Summary Judgment and in Opposition to Motion for Summary Judgment of Defendants ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("Plaintiffs' Memorandum") at 4, n. 4.

this burden, all ambiguities must be resolved against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987) **[*21]** (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That burden is not met where the non-movant simply shows that there is some "metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). To avoid summary judgment then, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

In *Seiden Associates, Inc. v. ANC Holdings, Inc.*, No. 91-7770 (2d Cir. March 23, 1992), the Second Circuit just recently reiterated several well known rules of contract construction, and the effect of such rules upon a summary judgment motion:

> In reviewing a written **[*22]** contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. . . . When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. . . . Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, . . ., since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. . . .

*Id.*, slip op. at 2452-53 (citations omitted). [9] Stated more succinctly, the Second Circuit has held that where the issue to be decided concerns the parties' interpretation of a contract, "'summary judgment is perforce improper unless the terms of the agreement are '*wholly unambiguous*,' and no material facts are in dispute." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) (emphasis added) (citing **[*23]** *Wards Co. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir. 1985) (quoting in turn *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). [10] Therefore, "where one party opposes summary judgment by propounding a reasonable interpretation of a disputed matter, it may be sufficient to defeat the motion." *Schering*, 712 F.2d at 10. Finally, if there is conflicting evidence regarding the parties' intent, the court may only identify the issues at the summary judgment stage, not resolve them. *Id.* at 9-10.

**[*24]**

To prevail on a motion for summary judgment on a breach of contract cause of action, a movant faces difficult although not insurmountable hurdles. Nonetheless, the summary judgment mechanism is a valuable litigation tool, and not a "disfavored procedural shortcut,. . . ." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555. As the Supreme Court reminded lower courts in *Celotex*:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that **[*25]** are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

---

[9] *See also Ginett v. Computer Task Group, Inc.*, No. 91-7768, 91-7792, slip op. 3169, 3195-3196 (2d Cir. April 21, 1992) ("If an ambiguity in the contract exists, then summary judgment is generally improper, because the principles governing summary judgment 'require that where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contract.'" (quoting *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983)); *see also Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1025-1026 (2d Cir. 1991) ("Where contract language is ambiguous, interpretation of the language's meaning, and hence determination of the parties' intent, is a question of fact for the jury.") (citations omitted); *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 546 (2d Cir. 1989) ("Where parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement at issue, a factual question arises that must be resolved by a jury.")

[10] And that is so even where, as here, both parties move for summary judgment. *Long Island Airports Limousine Service Corp. v. Playboy-Elsinore Associates*, 739 F.2d 101, 103 (2d Cir. 1984) (citations omitted); *see also Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976) (citing *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967)) (fact that both sides move for summary judgment does not make it more readily available).

*Id.* Consistent with that view of Rule 56, in a case decided prior to *Celotex*, the Second Circuit cautioned district courts that "justice requires careful consideration of the entire posture of the case so the 'drastic device' of summary judgment, . . . is not precipitously imposed." *Schering*, 712 F.2d at 6 (quoting *Heyman*, 524 F.2d at 1320). To avoid "precipitously" granting summary judgment, the court has reviewed the seemingly endless record on these motions, and has carefully considered the parties' extensive memoranda of law, all the while keeping in mind the foregoing standards governing summary judgment.

*I. BREACH of CONTRACT*

*A. Accord and Satisfaction*

The first affirmative defense offered by ITT as a possible basis for summary judgment is that of accord and satisfaction. The Second Circuit has defined that defense as follows:

> Accord and satisfaction **[*26]** is a legal rule of repose. Available as a defense in appropriate circumstances, its policy is to bar further litigation if the parties agreed to satisfy all existing claims by means of a substituted performance.

*Geisco, Inc. v. Honeywell, Inc.*, 682 F.2d 54, 57 (2nd Cir. 1982). The Court in *Geisco* then outlined and discussed the elements of accord and satisfaction:

> To establish the defense, 'the Court must find (i) the parties agreed that the transactions in question were to constitute an accord and satisfaction, and (ii) the performance rendered by defendant was sufficient consideration for a discharge.' . . . The requisite agreement is not foreclosed by the plaintiff's unexpressed, subjective understanding; agreement *in law* arises if 'what was done by the defendant . .; made it unreasonable for plaintiff not to understand" that defendant's performance 'was offered to him as full satisfaction of any claim he might have' against defendant . . . As to the sufficiency of the consideration, an accord and satisfaction is supported if 'the payments tendered by the (defendant) were in excess of any amount *then owing* to plaintiff,' . . . Where these **[*27]** factors appear, plaintiff may not accept the defendant's substituted performance and then sue on his original claims.

*Id.* at 57 (citations omitted) (emphasis in original). In other words, "in appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by the proffered agreement." *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.*, 494 F.Supp. 487, 496-97 (S.D.N.Y. 1979) (citation omitted). Determining whether there was a meeting of the minds necessary to create an accord "requires the court to examine the circumstances surrounding the putative contract, including the parties' expressions of intent." *Id.* at 497 (citations omitted). It thus stands to reason that, as ITT admits, [11] "whether there is an accord and satisfaction ordinarily involves a pure question of intention, which is, as a rule, a question of fact." *Moers v. Moers*, 229 N.Y. 294, 300 (1920) (citation omitted). Of course, "if the evidence directly or through reasonable inference creates no conflict concerning **[*28]** the intention it is a question of law." *Id.*

ITT claims that the evidence is not in conflict here, and so the court can find as a matter of law that the parties intended Contract Changes 26 and 32 to be "settlements;" and as such, those Contract Changes constitute an accord and satisfaction which operates to bar NiMo's pending claims against ITT. Even though the conventional wisdom is that summary judgment is seldom appropriate on an intent issue, ITT strongly urges that summary judgment be granted in its favor on this defense. Regardless of the inherently factual nature of an intent inquiry, ITT argues that it had reason to believe that Contract Changes 26 and 32 worked an accord and satisfaction of NiMo's pending claims because "the language of the Contract Changes and the undisputed facts concerning the circumstances of their negotiation would **[*29]** have led any reasonable person to understand that a settlement of *both* parties' claims had been reached." ITT's Memorandum at 48 (emphasis in original). NiMo responds that those contract changes were merely "modifications" of the parties' ongoing contractual relationship,. . . ." Plaintiffs' Memorandum at 59. According to NiMo, the purpose of those Contract Changes was to "change payment terms for future performance, *not* to discharge ITT from liability for all past substandard performance." *Id.* (emphasis added).

Whether, as ITT contends, there was a complete accord and satisfaction by Contract Changes 26 and 32, or, whether, as NiMo contends, those Contract Changes were simply modifications cannot be decided as a matter of law on these motions. Obviously, to ascertain whether the parties reached an accord necessitates an inquiry into the parties' intent. To discern the parties' intent, the court must first look to Contract Changes 26 and 32.

At first glance it appears, as NiMo maintains, that those documents are unambiguous. Closer examination reveals,

---

[11] Memorandum in Support of Motion for Summary Judgment of Defendants ITT Fluid Products Corporation and ITT Fluid Technology Corporation ("ITT's Memorandum") at 46.

however, that when read as a whole, Contract Changes 26 and 32 are susceptible of at least two fairly reasonable [*30] meanings, insofar as whether the parties intended to effect an accord and satisfaction by executing those documents and accompanying releases. In particular, when the settlement clause of Contract Change 26 is read in conjunction with the release accompanying that Change, and with the provision setting ITT's fee at $ 2,449,745.00, it is reasonable to infer that ITT thought it had at least settled some, if not all, of the claims which are the subject of this litigation. That is the meaning which ITT attributes to Contract Change 26. It is equally plausible, however, to read Contract Changes 26 and 32, as does NiMo, as a very limited release, having little, if any, bearing on the claims herein. That interpretation is supported by the settlement clause of Contract Change 26. [12] Therefore, the court cannot say that the relevant documents are **wholly unambiguous** on the issue of accord and satisfaction. Consequently, because the parties' intent as to accord and satisfaction cannot readily be ascertained from the documentary evidence, extrinsic evidence should be considered.

[*31] Even a cursory examination of the extrinsic evidence offered on these motions readily shows that there is a conflict as to what the parties intended when they entered into Contract Changes 26 and 32. To illustrate, with respect to Contract Change 26, relying in large part upon the deposition testimony of two key players in the negotiations of that Contract Change (Louis Stoltenberg, SWEC's contract administrator, chief negotiator and draftsperson for Contract Change 26, and Lee Foster Henry, ITT's chief negotiator on Contract Change 26), ITT argues that Contract Change 26 settled all claims existing as of December, 1981. Messrs. Stoltenberg and Henry essentially so testified. *See* Deposition of Louis H. Stoltenberg (September 27, 1990) (ITT's Appendix, Vol. IV at 1158); Deposition of Lee Henry Foster (July 17, 1990) at 81-82 (ITT's Appendix, Vol. IV at 1016-17).

Not only does NiMo offer a widely varying interpretation of Contract Change 26 based on the language thereof, but it relies upon the deposition of James Niezabytowski, Manager of Contract Administration during the relevant time frame and one of the chief negotiators of Contract Change 26, whose testimony directly controverts [*32] that of Messrs. Stoltenberg and Henry. Mr. Niezabytowski testified that the settlement clause was limited; it was meant to confine the settlement to identified tool losses and formally processed back charges for defective or deficient work. Deposition Testimony of James T. Niezabytowski (July 12, 1990) at 228-32 (Plaintiffs' Exhs., Vol. III at 523-27). That testimony is corroborated by the affidavit of Dominick T. Scafidi, a Senior Contract Administrator for NiMo, who avers:

> The only performance deficiencies addressed in Contract Change 26 were those performance deficiencies previously identified by SWEC and formally processed as 'back charges.' Niagara Mohawk and ITT did reach an agreement on the total amount ITT was to pay with respect to these specific back charges.

Affidavit of Dominick T. Scafidi (February 20, 1991) at P10 (Plaintiffs' Exhs., Vol. II at 238).

The parties also offer divergent views as to what was intended by Contract Change 32. According to ITT, that claim settled all claims currently pending in this action, other than those already settled by Contract Change 26. ITT maintains that because in Contract Change 32 it agreed to a $ 14.6 million fixed [*33] fee "not subject to adjustment for any reason," [13] "permitting Niagara Mohawk to pursue this claim would permit it to attempt to take back from Grinnell [ITT] the very consideration for which Grinnell [ITT] agreed to settle its fee claim." ITT's Memorandum at 53.

ITT portrays the events leading up to Contract Change 32 as a series of negotiations extending over nearly a year, due to the mutual dissatisfaction of both parties over their respective obligations under contract P301C. Calling ITT's view "grossly inaccurate," NiMo implies that ITT is conveniently overlooking the fact that during that same time, ITT was asserting "ever-escalating claims against the project." Plaintiffs' Memorandum at 41. Against that background, NiMo contends that any claims which it had against ITT were simply not part of the negotiations for Contract Change 32, explaining that "the project decided *not* to perform an assessment of ITT's performance deficiencies at [*34] the time of Contract Change 32, because it would drain too many resources from the project and disrupt the work." Deposition of Gary C. Hoyt at 194-96, 210-11, and 367-69 (August 28 and 29, 1990) (Plaintiffs' Exhs., Vol. III at 575-77, 579-80, and 666-68).

That conflicting evidence as to what was meant by Contract Changes 26 and 32 makes summary judgment "perforce improper". [14] At this stage of the litigation, the court cannot hold as a matter of law that those Contract Changes constitute an accord and satisfaction. Nor can the court hold (as NiMo urges) that as a matter of law Contract Changes 26 and 32 do not constitute an accord and satisfaction. Moreover, even assuming *arguendo* that the court could somehow determine

[12] *See supra*, p. 9.

[13] Contract Change 32 at 1, PIII (ITT's Appendix, Vol. III at 782).

[14] *See Leberman*, *supra*, 880 F.2d at 1559.

at this juncture that an accord and satisfaction had been reached, the scope of such an accord cannot be resolved as a matter of law. Thus, due to the existence of genuine issues of material fact as to whether the parties intended Contract Changes 26 and 32 to operate as an accord and satisfaction; and, if so, the scope of such accord, summary judgment must be denied on that defense - both as to ITT and as to NiMo.

**[*35]** *B. Release*

Another affirmative defense advanced by ITT is that of release, or, more appropriately, implied release. Specifically, ITT asserts that NiMo's "acceptance of a release [from ITT] without an express reservation of rights bars all claims inconsistent with the claims released by" ITT. [15] Based upon the express language of the alterations and amendments clause in P301C, [16] it is NiMo's position that any releases or waivers thereunder must be in writing and narrowly construed. Thus, NiMo asserts that because the only releases here were unilateral releases executed by ITT discharging NiMo, and not the other way around (that is, NiMo did not execute any reciprocal releases discharging ITT), those releases cannot operate as a bar to this action.

ITT's implied release argument is derived solely from law outside this jurisdiction. *See* ITT's Memorandum at 62-66. In reliance upon that case law, ITT asks this court to apply a legal presumption **[*36]** that because it executed a unilateral release in favor of NiMo, the court should find, as a matter of law, a reciprocal release in favor of ITT. The court will not invoke such a presumption. Indeed, to do so would be in direct contravention of New York law which requires "an 'explicit, unequivocal statement of a present promise to release defendant from liability.'" *Bank of America Nat. Trust & Sav. Asso. v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir. 1985) (quoting *Carpenter v. Machold*, 86 A.D.2d 727, 727, 447 N.Y.S.2d 46, 47 (3rd Dep't 1982)). [17] The court will not disregard that settled law and will adhere to the traditional rules governing releases, as articulated by New York courts.

**[*37]**

Contract principles apply to the interpretation of releases. *Id.* at 715 (citations omitted). "The scope and meaning of a release will be determined by the manifested intent of the parties - in Corbin's words, 'by the process of interpretation, just as in the case of determining the meaning of an executory contract.'" *In re Thomson McKinnon Secur. Inc.*, 132 Bankr. 9, 13 (Bankr. S.D.N.Y. 1991) (quoting *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) (quoting in turn 5A Corbin on Contracts § 1238 at 560 (1964)). [18] An additional rule which is of particular significance here is that "if ambiguities in the document prevent a firm conclusion that it is a release, additional evidence may be considered to resolve the issue." *Marvel Entertainment Group, Inc. v. Young Astronaut Council*, 747 F.Supp. 945, 948 (S.D.N.Y. 1990) (citing *Gillaizeau*, 766 F.2d at 714). Thus, under those circumstances, "whether a document is a release is a factual question and therefore extrinsic evidence and oral testimony may be considered." *Id.*

**[*38]** Application of those rules to the present case mandates the conclusion that, as with the accord and satisfaction defense, there is a factual issue as to intent, rendering summary judgment wholly improper. Admittedly, when read in isolation, Contract Changes 26 and 32 appear to be clear and unambiguous. To effectuate a release thereunder, a writing is required and NiMo did not do that. When read together to give effect to each part, however, it is plausible to construe those documents as meaning that NiMo intended to release ITT from any liability for the claims which are the subject of this suit, even in the absence of a document executed by NiMo expressly designated as a release.

For instance, the release ITT executed in connection with Contract Change 32 contains arguably broad language; it is not limited to particular claims or claims by only certain parties. *See supra*, p. 12 (particularly the highlighted language thereon). In addition, Contract Change 32 itself describes the release thereto as having been given "in consideration of the agreements and understandings between the parties which form the complete basis of this Contract Change 32. . . ." ITT's Appendix, Vol. **[*39]** III at 788. This apparent ambiguity prohibits the court from reaching a "firm conclusion" [19] that the parties intended Contract Changes 26 and 32 to operate as a release barring this lawsuit. Extrinsic evidence on this issue will thus be permitted. Moreover, the court cannot find as a matter of law (as would be necessary to grant ITT's motion) the requisite "explicit unequivocal

---

[15] ITT's Memorandum at 62.

[16] *See supra*, p. 6.

[17] ITT endeavors to distinguish this case, among others, on the ground that it involved a gratuitous, as opposed to a bargained for release. That is a distinction without a difference, at least for purposes of analyzing the issues raised by ITT's motions. ITT has not pointed to any case authority, and the court is aware of none, in which a New York court has employed different standards governing releases based upon whether they are gratuitous or not.

[18] *Accord Gillaizeau* 766 F.2d at 713 (citing *Gordon*, 358 F.2d at 263) ("The parties' intent will determine the scope of a release.")

[19] *See Marvel Entertain.*, 747 F. Supp. at 948.

statement of a present promise to release" [20] by NiMo. Thus, ITT's summary judgment motion on this defense must be denied. Likewise, the existence of a factual dispute as to intent also precludes summary judgment on NiMo's cross-motion.

*C. Waiver*

ITT makes two waiver arguments. The first is a general waiver argument that by agreeing to an "equitable fee arrangement" [21] in Contract Changes 26 and 32, NiMo waived any rights it may have had to pursue the pending claims against ITT in this action. ITT's **[*40]** second waiver argument is commonly referred to as waiver-by-acceptance and usually arises in the area of construction contracts. In particular, according to ITT, when NiMo executed Contract Change 34 - the final Contract Change; accepted ITT's work without reservation or qualification; released all the retainage; paid all monies due ITT and requested and received ITT's release, NiMo accepted ITT's work. By that purported acceptance, ITT contends that NiMo waived the right to recover for patent, as opposed to latent, defects. [22]

ITT's perfunctory treatment of the general waiver argument **[*41]** makes it practically impossible for the court to respond in any meaningful way. *See* ITT's Memorandum at 68. So the court is forced to resort to the settled rule that because "it is often not clear that a party has waived its legal rights, the waiver issue frequently involves questions of fact, and cannot be decided on a summary judgment motion." *Topps Chewing Gum, Inc. v. Imperial Toy Corp.*, 686 F.Supp. 402, 408 (E.D.N.Y. 1988) (citing *Alsens A.P.C. Works v. Degnon Cont. Co.*, 222 N.Y. 34, 37 (1917)), *aff'd without pub. opinion*, 895 F.2d 1410 (2d Cir. 1989). Contrary to what ITT thinks, this is not a situation such as that presented in *Topps* where the court found a waiver as a matter of law. Unlike *Topps*, in the present case there is an "opportunity for a reasonable inference" [23] to be drawn that NiMo did not waive its right to sue. Thus, the court must return to a by now familiar refrain: the existence of a material issue of fact precludes granting summary judgment in favor of either party on a general waiver theory.

**[*42]** ITT fares no better with its waiver-by-acceptance argument. Application of the waiver-by-acceptance doctrine to the present case is problematic for several reasons. The first is that courts have not applied that doctrine in the broad manner ITT implies. In *Philip Zweig & Sons, Inc. v. Tuscarora Constr. Co.*, 50 A.D.2d 1069, 376 N.Y.S.2d 761 (1975), for example, the court differentiated between waiver of the right to terminate a contract for breach, which may result due to acceptance of later performance, and the waiver of the right to recover damages caused by that breach. In so doing the court repeated the general proposition that, "'Failure to enforce the right to terminate the contract promptly constitutes to that extent a waiver of the default, but we have repeatedly held that it constituted no waiver of the claim for damages.'" *Id.* at 1069, 376 N.Y.S.2d at 762-63 (quoting *General Supply & Constr. Co. v. Goelet*, 241 N.Y. 28, 36 (1925) and citing *Deeves & Son v. Manhattan Life Ins. Co.*, 195 N.Y. 324, 330 (1909)). *See also Parke v. Franco-American Trading Co.*, 120 N.Y. 51, 56-57 (1890) **[*43]** (holding, *inter alia*, that "defective performance [may] be waived, subject to the right of the party damnified to recover or recoup damages for the loss he has sustained by reason of it"). As a result, even if waiver-by-acceptance is appropriate here, such waiver is potentially more limited than ITT would have this court believe.

Application of the waiver-by-acceptance rule is also questionable because of an obvious factual distinction between the cases in which it has been discussed and this case. In those cases, the plaintiffs were seeking to recover for physically defective work, [24] not, as NiMo, for excessive costs incurred as a result of ITT's alleged failure to properly and efficiently manage the piping work at NMP2, and for its alleged failure to develop and monitor adequate quality assurance programs. *See* plaintiffs' Memorandum at 67. Third, even assuming for the sake of argument that the waiver-by-acceptance doctrine should be invoked in the present case, it would be premature for the court to do so today because the court cannot find as a matter of law an intent to waive by NiMo.

**[*44]** Competing inferences may be drawn from the present record on the waiver issue. NiMo reasons that the inference of waiver-by acceptance which ITT urges this court to find as a matter of law is impermissible in light of the "Release of Retainage" provision contained in Contract Change 26. That provision specifies, "Final payment, . . ., shall not relieve the

[20] *See Gillaizeau*, 766 F.2d at 713.

[21] ITT's Memorandum at 68.

[22] Patent defects are those defects "known or discernible by reasonable inspection." *Yeshiva Univ. v. Fidelity & Deposit Co.*, 116 A.D.2d 49, , 500 N.Y.S.2d 241, 244 (1st Dep't 1986) (citing *Town of Tonawanda v. Stapell, Mumm & Beals Corp.*, 240 A.D. 472, 270 N.Y.S. 377 (4th Dep't), *aff'd*, 265 N.Y. 630 (1934)).

[23] *See id.* at 408 (citation omitted).

[24] *See, e.g., Cawley v. Weiner*, 236 N.Y. 357 (1923); *John W. Cowper Co. v. Buffalo Hotel Dev. Venture*, 115 A.D.2d 346, 496 N.Y.S.2d 127 (1985), *appeal of third-party plaintiff dismissed*, 68 N.Y.2d 660, 505 N.Y.S.2d 75 (1986), *aff'd*, 72 N.Y.2d 890, 532 N.Y.S.2d 742 (1988).

Contractor [ITT] from responsibility under the Contract and guarantee." Contract Change 26, Article XI(3) (Plaintiffs' Exhs., Vol. I at 67). ITT responds that that "language merely memorializes the rule that liability for latent defects survives final payment . . ." ITT's Memorandum at 73, n. 30. Any other interpretation of the release of retainage provision would, in the opinion of ITT, "lead to absurd results." *Id.* As NiMo mentions, however, that restrictive reading of the release of retainage provision "is at odds with the plain meaning of . . . [that] provision." Plaintiffs' Memorandum at 68. Hence, another ambiguity.

Moreover, the release of retainage provision does not, as NiMo states, "dispose once and for all of any contention that final payment by NMPC could be construed to bar any claims that it might have against **[*45]** ITT for breach of the contract." Plaintiffs' Memorandum at 47-48. But, the existance of that provision is highly relevant to the parties' intent with respect to waiver - a factual issue, resolution of which must await trial. *Accord In re Family Showtime Theatres, Inc.*, 67 Bankr. 542, 550 (Bankr. E.D.N.Y. 1986) *aff'd*, 72 Bankr. 38 (Bankr. E.D.N.Y.), *aff'd without pub. opinion*, 819 F.2d 1130 (2d Cir. 1987)(citing *In re Delta Hotel of Syracuse*, 10 Bankr. 585, 597 (Bankr. N.D.N.Y. 1981)) ("Waiver is matter of intent which depends on the factual circumstances of each particular case."). In light of the foregoing, neither ITT nor NiMo is entitled to summary judgment insofar as waiver-by-acceptance is concerned.

*D. Estoppel*

Resorting to vague notions of fairness, ITT contends that NiMo should be equitably estopped from pursuing its claims in this lawsuit against ITT. More specifically ITT states, "Niagara Mohawk's settlement of Grinnell's [ITT's] fee claim and the 'taking of a release may be regarded as an express or implied admission' that any problems with Grinnell's [ITT's] performance were, as Grinnell **[*46]** [ITT] claimed, either the plaintiffs' [NiMo's] fault or caused by events beyond Grinnell's [ITT's] control." ITT's Memorandum at 67 (quoting *Lugena v. Hanna*, 420 S.W.2d 335, 341 (Mo. 1967)). ITT argues, although not wholeheartedly, that "such an admission now estops the plaintiffs from claiming it was Grinnell's [ITT's] wrongful conduct which was responsible for its allegedly inefficient performance." *Id.* at 67-68. This estoppel argument, while somewhat novel, is not persuasive. At this point, the court will not find such a purported admission.

More important is that ITT has not met its burden of proof with respect to this defense. The New York Court of Appeals has explained that "the doctrine of equitable estoppel 'is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct has been misled into acting upon the belief that such enforcement would not be sought.'" *Walther v. Bank of New York*, 772 F.Supp. 754, 768 (S.D.N.Y. 1991) (quoting *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667 (1982)). **[*47]** ITT has pointed to no evidence of "misleading" words or conduct by NiMo. Thus, because ITT has not met its burden of proof as to the estoppel defense, summary judgment will not be granted in its favor on this issue. However, because NiMo did not expressly address estoppel in its cross-motion, summary judgment striking that defense will not be granted in NiMo's favor either. The parties should be aware, though, that the court has serious reservations, at least on the current state of the record, as to the viability of the estoppel defense.

*E. Contractual Limitation for Gross Negligence*

ITT's second motion for summary judgment on liability, is grounded on § 10 of Contract Change 26. ITT claims that that provision limits its potential liability to acts of gross negligence or willful misconduct. [25] ITT further claims that the work for which NiMo is seeking recovery was not done in a grossly negligent manner, and thus summary judgment is warranted. NiMo counters that irrespective of the exclusion in § 10, article four of contract P301C's supplementary conditions gave NiMo the right to seek damages in the event of a breach, and nothing has happened subsequent to the execution **[*48]** of that contract altering or constraining that right in any way. Moreover, even if the gross negligence standard of article 10 applies here, NiMo argues that there are genuine issues of material fact precluding summary judgment.

Here again the issue is one of contract construction - what is meant by § 10 of Contract Change 26. Section 10 is susceptible of more than one fairly reasonable interpretation, neither of which "'strains the contract language beyond its reasonable and ordinary meaning." *Seiden Associates, supra*, slip op. at 2453 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)). The first possible meaning is that ascribed to § 10 by ITT; that is that the parties intended that ITT "not be responsible for the cost of redoing or repairing defective or deficient work unless that work was caused by gross negligence or willful misconduct. . . ." Memorandum (Liability Issues) in Support of the ITT Defendants' Second Motion for Summary **[*49]** Judgment ("ITT's Damages Memorandum") at 18. According to NiMo, such an interpretation would impermissibly render other contract provisions unreasonable or of no effect. *See*

---

[25] *See supra*, p. 9.

Plaintiffs' Memorandum Opposing ITT's Second Motion for Summary Judgment (Liability Issues) ("Plaintiffs' Liability Memorandum") at 31 (and discussion therein).

It is a close call, but after careful consideration of the memoranda of law, the applicable case law, the relevant portions of the record and the Transcript of the January 3, 1992 hearing ("Tr. II"), the court is left with the distinct impression that there is an ambiguity. Section 10 is sufficiently unclear to warrant consideration of parole evidence. And, at the risk of sounding repetitive, when the parole evidence is surveyed here, there is no doubt that genuine issues of material fact remain. There is a serious factual dispute as to what the parties intended by § 10 of Contract Change 26. NiMo's president during the relevant time frame testified as follows at his deposition:

> Q. And the resolution [of the parties' dispute over Grinnell's liability for defective or deficient work] was that unless it was gross negligence, willful misconduct **[*50]** or failure to follow the engineer's specific instructions by a management person at ITT, then ITT couldn't be backcharged?
> A. That is as you -- what you just described is in this document that I just reviewed?
> Q. And your understanding?
> A. Yes.

Deposition Testimony of William J. Donlon at 82 (June 19, 1991) (ITT's Appendix, Vol. VII at 1896). Mr. Donlon's testimony is compatible with that of Ronald Wagner, SWEC's construction manager who attended the negotiating sessions for Contract Change. Mr. Wagner emphatically testified: "Let me say for the record one more time, for errors in work of a normal event, human fallibility, without any semblance of any evidence that there was fraud or malintent, I thought those types of backcharges were frivolous." Deposition Testimony of Ronald Wagner at 677 (June 24, 1991) (ITT's Appendix, Vol. VII at 2129). Conversely, NiMo has come forth with documentary evidence, and deposition testimony tending to show that the purpose of article 10 was not to limit NiMo's right to seek damages from ITT in an action such as the present one. *See* Plaintiffs' Liability Memorandum at 8-14, and 33 (outlining relevant proof). On the basis **[*51]** of that contradictory evidence, the court must deny ITT's second motion for summary judgment to the extent that it is seeking dismissal premised on the theory that § 10 of Contract Change 26 is a bar to this action.

The parties are forewarned that even if it is ultimately decided that the gross negligence standard of § 10 applies, then, in all probability, there will be an additional factual determination for the jury -- whether ITT's conduct was grossly negligent. *Food Pageant, Inc. v. Consolidated Edison Co.*, 54 N.Y.2d 167, 173, 445 N.Y.S.2d 60, 62 (1981) ("Where the inquiry is to the existence or nonexistence of gross negligence, . . ., . . . the question . . . remains a matter for jury determination."). A critical part of that determination will be whether, as ITT has labeled it, NiMo's "aggregate" theory of gross negligence will suffice to establish gross negligence in the minds of the jury. Apparently NiMo is not claiming that any specific items or categories of work by ITT were grossly negligent, but rather that ITT's work on the project as a whole was grossly negligent. ITT strongly argues that NiMo should not be allowed to proceed on that **[*52]** theory because inherent in such theory is that ITT's conduct did not rise to the level of gross negligence. While the aggregate theory of gross negligence propounded by NiMo undoubtedly makes NiMo's burden of proof more difficult, that does not necessarily mean, as a matter of law, that NiMo cannot succeed on such theory. Providing the issue of gross negligence gets that far, it will be up to the jury to give such weight to NiMo's evidence on the issue of gross negligence as it deems appropriate.

What should be abundantly clear by now is that summary judgment is not proper insofar as liability is concerned (with the one inconsequential exception of the enhanced radiograph claim), because at the heart of each of ITT's defenses is the issue of intent -- a factual issue in all but the most unusual of cases. That is not to say, however, that the court does not find quite convincing ITT's version of events on these motions (as well might a jury). The court's task at this stage of the proceedings is not to resolve factual disputes, however, but only to identify them. [26] As set forth above, a number of triable issues exist as to the interpretation of Contract P301C and the relevant **[*53]** supplemental documents. Consequently, insofar as the first set of motions is concerned, ITT's motion for summary judgment on the enhanced radiograph claim is granted. ITT's motion is in all other respects denied. NiMo's cross-motion is denied in all respects as well.

*II. Negligence Claim*

In addition to the contract based cause of action, NiMo is seeking to recover on negligence and gross negligence theories. ITT is also moving for summary judgment on both of those claims. NiMo's tort claims are not completely unfamiliar to this court. In *NiMoI*, *supra*, 725 F.Supp. 656, this court considered those claims in the context of ITT's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). At that time, NiMo proffered two separate theories of tort

---

[26] *See Schering*, *supra*, 712 F.2d at 9-10.

liability. NiMo first maintained that it should be able to recover against ITT on a claim of negligent performance of a contract. Secondly, NiMo asserted that ITT could be liable in tort because [*54] of a special relationship of trust and confidence which arose out of, among other things, NiMo's long standing contractual relationship with ITT.

For a number of reasons, the court did not agree with NiMo that New York **always** recognizes a cause of action for negligent performance of services under a contract. *Id.* at 661-66. The court therefore dismissed NiMo's tort claims to the extent that they were based upon such legal theory, concluding "the mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice as special additional allegations of wrongdoing which amount to 'a breach of a duty distinct from, or in addition to, the breach of a contract.'" *Id.* at 666 (quoting *North Shore Bottling Co., Inc. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 92 (1968)).

NiMo's tort claims were allowed to stand, however, insofar as they were premised upon the second theory of liability -- the existence of a special relationship of trust and confidence. *Id.* at 668-69. Specifically, the court found that the allegations pertaining to the long-standing [*55] contractual relationship between NiMo and ITT, as well as other allegations, could, if ultimately proven, perhaps support an independent tort duty of care. *Id.* The court reminded the NiMo, though, that to establish an independent duty of care based on tort law, they would have a "heavy burden." *Id.* at 669.

Before considering NiMo's second theory of tort liability, which is before the court again on these (ITT's second motion for summary judgment) motions, the court is obliged to discuss a Second Circuit case, decided just four days after *NiMoI*. In *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594 (2d Cir. 1989), the Second Circuit reaffirmed its view that "it is well settled under New York law that negligent performance of a contract *may* give rise to a claim sounding in tort as well as one for breach of contract,. . . ." *Id.* at 602 (citations omitted) (emphasis added). Although at first glance that statement appears to be at odds with *NiMoI* (rejecting NiMo's negligent performance of a contract claim), closer scrutiny of *Wrigley* demonstrates that it and *NiMoI* are factually distinguishable in two significant respects. [*56] As will be more fully explained herein, *NiMo* and *Wrigley* differ in terms of the basis asserted for the independent tort duty of care, and with respect to the nature of the damages sought.

The uncontradicted proof at trial in *Wrigley* demonstrated that defendants held themselves out as experts in trademark law; and in that capacity, they undertook to protect approximately 3,500 trademarks held worldwide by Wrigley, the well-known vendor of candy and chewing gum. For a number of years, defendants were responsible for renewing Wrigley's numerous trademark registrations. Then, for economic reasons, Wrigley decided to discontinue hiring outside trademark agents, and instead decided to manage its trademarks inhouse. The inhouse trademark agent hired by Wrigley to replace defendants soon discovered that defendants had been extremely derelict in to renewing Wrigley's trademarks. Many trademarks had lapsed, for example, and others, which were about to lapse, were only salvaged because of the frantic and costly last minute efforts of Wrigley's then newly hired inhouse trademark agent. As a result, Wrigley incurred substantial damages, which it characterized as "clean-up" costs. [*57] Essentially those damages were the expenses Wrigley incurred in getting the trademark aspect of its business back in order.

Following a non-jury trial, the district court found that defendants were liable to Wrigley for both negligent performance of a contract and for breach of contract. The damages awarded included a sum for clean-up costs. On appeal, although a portion of the judgment was reversed, those particular aspects of the judgment were undisturbed. *See id.* at 604.

Emphasizing, as did the district court, that defendants had held themselves out as experts in trademark law, the Second Circuit agreed that defendants were liable for negligent performance of a contract because they breached a duty of care which arose out of their expertise. *Id.* at 602; *see also William Wrigley Jr. Co. v. Waters*, 1987 U.S. Dist. LEXIS 13663 at *10-*11 (S.D.N.Y. December 16, 1987). As experts, the Second Circuit held defendants to a duty of care and "caution proper to [their] calling.'" *Id.* (quoting *Ultrameres Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 179, (1931) (other citations omitted)). Referring to [*58] the defendants as "specialized service personnel," the *Wrigley* Court found persuasive "the uncontradicted testimony establishing that the trademark registration renewal business necessitates precision, careful attention and strict adherence to the legal requirements of numerous foreign jurisdictions." *Id.* The Court further explained:

> Running afoul of such standards means risking a defective or untimely registration which translates into potentially disastrous consequences. Thus, there is an obligation on behalf of experts such as defendants to maintain files that are scrupulously accurate, up to date and complete.

*Id.* at 602-03.

In contrast, in the present case, NiMo did not expressly allege that ITT owed an independent duty of care to it based upon

some expertise held by ITT. NiMo's tort claims now, as they were at the time of *NiMoI*, are couched strictly in terms of ordinary negligence and gross negligence, with no specific mention in the amended complaint as to a duty of care arising out of ITT's expertise. NiMo seeks only to hold ITT liable for falling "below the standard of care exercised by piping contractors" generally. *See* Amended Complaint **[*59]** at PP154 and 157. Now, well into this litigation and nearly two years after the filing of the amended complaint, NiMo seems to be implying that ITT should be considered an expert in the area of nuclear power plant construction (specifically with respect to the piping therein), based primarily upon ITT's status as a holder of the "N stamp." [27] Initially that was not the stated basis for the negligent performance of a contract claim, and thus not expressly considered by the court in *NiMoI*. Furthermore, NiMo did not, and has not, explicitly asserted that an extra-contractual duty of care arose based upon the purported expertise of ITT.

The other notable **[*60]** factual distinction between *NiMoI* and *Wrigley* is that in the latter, the damages awarded, particularly those for clean-up costs, were not contemplated under the contract. To illustrate, Wrigely was allowed to recover as part of its damages, under a negligence theory, costs incurred in connection with organizing all of the case files for which defendants were responsible. *Wrigley*, 890 F.2d at 604, n. 4. Whereas in this case, NiMo is seeking damages in its negligence causes of action which were contemplated under the contract, as is evidenced by the fact that those damages are identical to the damages sought in the breach of contract action. Indeed, in the amended complaint at P135; and then incorporates that paragraph by reference in all three causes of action relating to ITT. *See id.* at PP150, 153 and 156.

Interestingly, none of the parties moved for reconsideration of *NiMoI* based upon *Wrigley* or, for that matter, upon any other ground. However, because *Wrigley* was decided after *NiMoI*, and because arguably *Wrigley* mandates a different result than that reached in *NiMoI*, the court is compelled to examine the law of the case **[*61]** doctrine and its possible bearing on the present litigation. [28] **[*62]** The Second Circuit in *In Re PCH Associates*, 949 F.2d 585 (2d Cir. 1991), explained that "under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *Id.* at 592 (citing 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* P0.404(1), at 117 (1991)). This doctrine is discretionary, however, and generally "does not limit a court's power to reconsider its own decisions prior to final judgment." [29] *Virgin Atlantic Airways, Ltd. v. Nat'l.*

[27] The "N" stamp refers to the "NA/NPT" stamp held by ITT. According to ITT, "an N stamp represents authorization by the American Society of Mechanical Engineers . . . to install safety related piping on a nuclear power plant. Memorandum (Liability Issues) in Support of the ITT Defendants Second Motion for Summary Judgment ("ITT's Liability Memorandum") at 42.

[28] A court may, *sua sponte*, deviate from the law of the case doctrine for, among other reasons, the purpose of avoiding the perpetration of error. When that is done, certain notice requirements must be met. For example, in *United States v. Uccio*, 940 F.2d 753 (2d Cir. 1991), the Second Circuit held that the district court properly exercised its discretion to revisit one of its prior rulings where the district court believed such ruling was "incorrect." *Id.* at 758-59. The Second Circuit explicitly held that "having given Uccio [the defendant] sufficient notice and an opportunity to be heard, it was well within the court's discretion to decline to deem itself bound by a ruling that it had come to view as wrong." *Id.* at 759. *See also United States v. Lorusso*, 695 F.2d 45, 53 (2d Cir. 1982) ("'whether the case *sub judice* be civil or criminal[,] so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so'") (quoting *United States v. Jerry*, 487 F.2d 600, 605 (2d Cir. 19730), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983)). Thus, in the present case, even though none of the parties moved for reconsideration after *NiMoI*, if the court were, in its discretion, to revisit the issues decided therein, the law of the case doctrine would not be violated, assuming the existence of a valid legal basis justifying such reconsideration.

[29] Although part of NiMo's tort claims were dismissed in *NiMoI*, the parties did not seek and the court did not enter a partial or final judgment with respect to those claims, as provided for in Fed. R. Civ. P. 54(b). That rule allows a court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed. R. Civ. P. 54(b). That was not done here. Rule 54(b) further states, in straightforward language:

> In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision *is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

*Id.* (emphasis added); *see also In Re United States*, 733 F.2d 10, 13 (2d Cir. 1984) ("It is well established that the interlocutory orders and rulings made pretrial by a district judge are subject to modification by the district judge at any time prior to final judgment,. . . .") (citations omitted). Therefore, because a partial final judgment under Rule 54(b) was not issued in connection with *NiMoI*, the court could conceivably reconsider its prior decision therein, providing no other obstacles to reconsideration are present.

*Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citations omitted).

**[*63]**

There are three well recognized circumstances which may justify a court in departing from the law of the case. Those circumstances are "[1] an intervening change in controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or to prevent manifest injustice." *Id.* (citing 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790). With respect to the first circumstance, it is not enough that the party seeking reconsideration could now make a "more persuasive" argument based upon intervening law. *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981), *cert. denied*, 459 U U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). Rather, "The law of the case will be disregarded only when the court has 'a clear conviction of error' with respect to a point of law on which its previous decision was predicated,. . . ." *Id.* (quoting *Zdanok v. Glidden*, 327 F.2d 944, 953 (2d Cir. 1964) (citing in turn *Johnson v. Cadillac Motor Car Co.*, 241 F.2d 878, 886 (2d Cir. 1919)). This court has held that to warrant a change in a prior decision based **[*64]** upon a change in the law, the change "'must truly be significant and controlling." *Wilson v. Great American Industries, Inc.*, 770 F.Supp. 85, 89 (N.D.N.Y. 1991) (McCurn, C.J.) (quoting *Sango v. City of New York*, 1989 WESTLAW 86995 (E.D.N.Y. 1989) (citing in turn *Fogel*, 668 F.2d at 109)). The Second Circuit has stressed that "mere doubt" on the part of the court is insufficient to open the point for full reconsideration. *Fogel*, 668 F.2d at 109 (quoting *White v. Higgins*, 116 F.2d 312, 317 (1st Cir. 1940)).

Courts ordinarily have not defined precisely what constitutes clearly erroneous or manifest injustice for reconsideration purposes. At least one court has held though that reconsideration is not warranted unless the prior decision is "dead wrong." *Parts & Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir. 1988), *cert. denied*, 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). [30]

**[*65]** Finally, regardless of what the basis for reconsideration is, while acknowledging a court's power to revisit its own decision, the Supreme Court has cautioned that "as a rule courts should be loathe to do so in the absence of *extraordinary circumstances*. . . ." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (emphasis added).

With those principles firmly in mind, the court sees no reason to revisit the issue of whether New York always recognizes a cause of action for negligent performance under a contract. Assuming *arguendo* that *Wrigley* represents a "change" in the law, the court still is not left with the clear conviction that it erred in dismissing NiMo's negligent performance of a contract claim. Given the previously discussed factual distinctions between *NiMoI* and *Wrigley*, the court does not believe that *Wrigley* is controlling here. And while, based upon *Wrigley*, perhaps NiMo could make a more persuasive argument as to the viability of a negligent performance of a contract claim, that simply is not enough. Nor, even after *Wrigley*, does **[*66]** the court believe that its *NiMoI* decision is "dead wrong." [31] Thus, the court will stand by its prior holding that, under the particular facts of this case, to the extent that NiMo's tort claims are based upon negligent performance of a contract, such claims cannot be allowed to stand.

**[*67]** The court is now free to consider the various arguments on these motions as to NiMo's remaining tort claims. After having the benefit of extensive discovery, ITT advances two reasons as to why summary judgment should be granted on these claims. First, ITT contends that NiMo cannot meet its burden of proving an independent tort duty of care, because no special relationship existed between ITT and NiMo. Second, ITT asserts that the economic loss doctrine bars NiMo's tort claims (both for negligence and for gross negligence). Basically that doctrine provides that recovery for purely economic loss is limited to a contract action, and therefore such losses are not recoverable in a negligence cause of action.

Insofar as the first argument is concerned, NiMo vigorously responds that the facts **do** establish that it and ITT had the requisite "special relationship." Alternatively, NiMo argues that, at the very least, there are genuine issues of material fact regarding the existence of a special relationship and so summary judgment on these claims is not appropriate. With respect to the economic loss doctrine, NiMo simply asserts that that doctrine does not bar their tort claims, which **[*68]**

---

[30] In a more picturesque statement, the Court in *Sterling* stated, "to be clearly erroneous, a decision must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." 886 F.2d at 233.

[31] Indeed, the court observes that after both *NiMoI* and *Wrigley* were decided, at least one New York state court plainly held, albeit with no analysis, that a cause of action for negligent performance of a contract "simply does *not* exist. . . ." *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, ,568 N.Y.S.2d 581, 583 (1st Dep't 1991) (emphasis added) (citing *Hamilton v. Hertz Corp.*, 130 Misc.2d 1034, 1037, 498 N.Y.S.2d 706). *Cf. Westminster Const. Co. v. Sherman*, 160 A.D.2d 867, , 554 N.Y.S.2d 300, 301 (2d Dep't 1990) (citations omitted) (allegations that work was performed under a contract in a "less than skillful and workmanlike manner" stated a cause of action for breach of contract, and **not** for negligence).

are indisputably for economic damages only. [32]

*A. Independent Legal Duty of Care*

*1. Special Relationship*

The court will first consider ITT's contention that, as a matter of law, no special relationship existed between it and NiMo. NiMo contends, as it did previously, [33] that a special relationship of trust and confidence, such as that described in *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dep't 1988), existed between it and ITT. NiMo believes that ITT can be held liable for negligence and gross negligence **[*69]** based upon such a relationship. NiMo also suggests a somewhat related but arguably distinct basis for the finding of a special relationship; that is ITT's alleged status as project manager. NiMo specifically contends that ITT "functioned as the project manager for piping erection, . . . [;]" and in that capacity ITT owed an independent duty of care to NiMo. Plaintiffs' Liability Memorandum at 44.

The parties did not separately analyze the existence of a special relationship based upon trust and confidence, and one arising out of ITT's purported status as project manager. To clarify, the court will differentiate between the two. First, the court will consider the existence of a special relationship based upon the trust and confidence which NiMo allegedly reposed in ITT. Secondly, the court will consider the related issue of whether a special relationship existed arising out of ITT's alleged status as project manager for piping.

*a. Trust and Confidence*

**[*70]** At the outset the court observes that it finds somewhat surprising, given the voluminous record on these motions, that the proof relied upon by the parties in connection with this issue is quite scant. For example, in asserting that no special relationship existed between it and NiMo, ITT relies exclusively upon the deposition testimony of NMP2 project manager and NiMo vice president, Gerald K. Rhode. Mr. Rhode flatly responded "No," to the question "Were you aware of any relationship between ITT Grinnell and Niagara Mohawk Power Company other than that of owner and contractor?" Deposition of Gerald K. Rhode (July 16, 1991) at 19 (ITT's Appendix, Vol. VII at 2014.) ITT interprets that emphatic denial as meaning that no special relationship of trust and confidence existed between it and NiMo.

NiMo counters by relying primarily upon the affidavits of Mr. Rhode and Mr. Stanley Seiken. Mr. Seiken is one of several prospective expert witnesses retained by NiMo. In seeming contrast to his just quoted testimony, Mr. Rhode avers in his affidavit that "ITT was in effect a fiduciary for NMPC,. . . ." Affidavit of Gerald K. Rhode (Nov. 27, 1991) at P13 (Plaintiffs' Exhs., Vol. IV thereto **[*71]** at 746). Both Messrs. Rhode and Seiken assert, but for different reasons, that NiMo placed trust and confidence in ITT, and hence in ITT's abilities. Mr. Rhode explains that "because the precise scope of ITT's piping work could not be known at the time that ITT was hired to do the piping work, NMPC [NiMo] had no choice but to enter into a 'cost-plus' contract." *Id.* He further explains, "This forced NMP [NiMo] to repose great trust and confidence in ITT's integrity, technical ability, organizational and management ability, and ability to select qualified personnel." *Id.* Along a similar vein, Mr. Seiken avers that NiMo's trust and confidence in ITT was based upon "the delegation of portions of the NMP2 quality assurance program associated with piping construction/erection to ITT through the NMP2 Preliminary Safety Analysis Report,. . . ." Affidavit of Stanley J. Seiken (Dec. 14, 1991) at P17 (Plaintiffs' Exh., Vol IV Ex. 2 thereto at 790).

New York state courts, as well as others, [34] **[*73]** have recognized that whether a fiduciary relationship [35] exists is a

---

[32] NiMo does not attempt to characterize its damages as anything other than economic in nature. *See* Tr.II at 57 (plaintiffs' counsel admitting that all damages sought here under negligence theories are economic loss damages). In fact, as early as December 13, 1988, when ITT's motion to dismiss the tort claims was argued, ITT described NiMo's damages as solely for economic loss. *See* Tr. I at 5. NiMo did not challenge that.

[33] *NiMoI*, 725 F.Supp. at 667-68.

[34] *See Richardson Greenshields Securities v. Mui-Hin Lau*, 693 F.Supp. 1445, 1456 (S.D.N.Y. 1988) (applying New York law, court denied summary judgment on breach of fiduciary duty claim because of conflicting evidence regarding whether brokerage firm employee had a fiduciary relationship with customer); *see also Carter Equipment Co. v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 390 (5th Cir. 1982) ("The existence or nonexistence of a fiduciary relationship between parties is a question of fact for the jury."); *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 983 (7th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978), (To establish the existence of a confidential relationship in the context of a fraud claim, the Court stated, "The trier of fact must examine all of the circumstances surrounding the relationship between the parties and determine whether 'one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first.'") (quoting *Kester v. Crilly*, 405 Ill. 425, 91 N.E.2d 419, 423 (1950)).

[35] The court is cognizant of the fact that, for the most part, the cases referenced herein included separate and distinct claims for breach of a fiduciary duty. *NiMoI*, 725 F.Supp. at 666. NiMo is making no such claim. The court is of the view, though, that the rules

question of fact. *Pavone v. Aetna Cas. & Sur. Co.*, 91 Misc.2d 658, , 398 N.Y.S.2d 630, 636 (N.Y. Sup. Ct. 1977); [***72**] *Levine v. Chussid*, 221 N.Y.S.2d 311, 314 (N.Y. Sup. Ct. 1961) (question of fact presented regarding existence of "confidential relationship" for purposes of imposing a constructive trust, thus precluding summary judgment); *cf. Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1232-33 (S.D.N.Y. 1991) (applying New York law, summary judgment denied where a general question of fact existed regarding whether an investment banker owed a fiduciary duty to a tender offeror based upon the latter's disclosure of confidential information). Thus, given the conflicting evidence set forth above, the issue of whether there was a special relationship of trust and confidence between ITT and NiMo, which could form the basis for an independent tort duty of care, is, in all likelihood, a factual issue for the jury. [36]

[***74**] *b. Project Manager*

ITT's argument (albeit not explicit) that summary judgment is proper because, as a matter of law, it was not the project manager for NMP2 is equally unavailing, although for a different reason. Specifically ITT, as the party seeking summary judgment on these tort claims, did not satisfy its "initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (quoting Fed. R. Civ. P. 56(c)). The only proof referenced by ITT in the massive record [37] is the previously mentioned deposition of Gerald Rhode, wherein he testified that he was not aware of any relationship between ITT and NiMo other than that of owner-contractor. Rhode Deposition at 19 (ITT's Appendix, Vol. VII at 2014). That proof is not directly responsive to the issue of whether ITT was the project manager on the NMP2 project, and is an insufficient basis for [***75**] the granting of summary judgment on that issue.

The court notes in passing that even if ITT had met its initial burden of proof here, NiMo was also remiss in satisfying its burden as the nonmoving party. More particularly, NiMo did not designate "specific facts showing that there is a genuine issue for trial[,]" as required by Fed. R. Civ. P. 56(e). Instead of refuting with specific references to the record ITT's contention that it was not the project manager, in apparent reliance upon the affidavit of Mr. Rhode, [38] NiMo simply [***76**] asserts that "the record shows that ITT functioned as the project manager for piping erection, a task that exceeded the scope of many entire construction projects." Plaintiffs' Liability Memorandum at 44. Providing that ITT had met its initial burden of proof on the project manager issue, on the basis of the meager proof just recounted, the court assumes, without deciding, that NiMo would not have been able to survive ITT's motion for summary judgment on this issue. That is so because serving as a project manager for piping erection alone is nearly identical to the situation presented in *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 859 F.2d 242 (2d Cir. 1988), wherein the Second Circuit held that a steel contractor and erector could not assert direct negligence claims against subcontractors with "discrete, circumscribed roles in [an] overall construction project," and who had no general supervisory duties concerning such project. *Id.* at 248. Thus, even though the court is extremely doubtful as to whether NiMo can proceed under a theory that an independent tort duty of care arose because of ITT's status as a project manager, it will not [***77**] grant summary judgment against ITT on that narrow issue. Consequently, ITT's motion for summary judgment on NiMo's tort claims is denied insofar as that motion is premised upon the nonexistence of a special relationship, regardless of the basis for such relationship (trust and confidence and/or project manager status).

---

governing whether a fiduciary relationship exists, be it formal or informal, apply with equal force even where no claim for breach of a fiduciary duty is alleged.

[36] Judge Sweet's decision in *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741 (S.D.N.Y. 1990), does not require a different conclusion. Although the court in *Don King* held, as a matter of law, that there was no special relationship of trust and confidence arising out of a promotional contract between a boxer and a promoter, there was persuasive evidence in that case that the boxer, as well as his manager, believed that the promoter had not been doing a satisfactory job, thus destroying any alleged trust relationship. *See id.* at 766-67.

There is a marked contrast between the evidence presently before this court and the evidence in *Don King*. Unlike *Don King*, ITT has not pointed to any evidence showing that the alleged relationship of trust between it and NiMo was destroyed. Perhaps more importantly, however, at least at this stage in the court's analysis, is the fact that NiMo has highlighted evidence which, if found credible by a jury, could support a finding of a special relationship of trust and confidence.

[37] The court readily admits that, in an effort to find evidence which would support ITT's position, it did not scrupulously review the entire record submitted in connection with motions presently before it. That is not the court's obligation; it is the obligation of the parties.

[38] Without any evident foundation, Mr. Rhode averred that ITT was "functioning as the project manager for piping erection [at NMP2]. . . ." Rhode Affidavit at P13 (Plaintiffs' Exhs., Vol. IV thereto at 746).

*B. Economic Loss Doctrine*

At oral argument on January 3, 1992, the court expressed some concern as to the viability of NiMo's tort causes of action in light of the economic loss doctrine. NiMo immediately sought and was granted permission to file a supplemental memorandum of law more fully detailing its position on this issue. In that memorandum of law NiMo narrowed the focus of its argument, asserting that the economic loss doctrine is inapplicable where a special relationship of trust and confidence has been shown. After much reflection, the court disagrees.

The general rule in New York, previously alluded to, is that "[a] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. *Macmillan, Inc. v. Federal Ins. Co.*, 764 F.Supp. 38, 41 (S.D.N.Y. 1991) (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Rd. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987)). **[*78]** As one court astutely observed, however, "the *Clark-Fitzpatrick* rule, . . ., is only *one* of the dikes that New York courts have erected in their inevitable attempt to keep contract law 'fron drowning in a sea of tort.'" *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 (S.D.N.Y. 1988) (emphasis added) (*quoting East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 2300 (1986)). The second dike which New York courts have erected is that "if the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." [39] *Id.* (and cases cited therein). Or, as the Second Circuit has more narrowly stated, "New York law holds that a *negligence* action seeking recovery for economic loss will not lie." *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984) (emphasis added) (citing *Price Brothers Co. v. Olin Construction Co.*, 528 F.Supp. 716, 721 (W.D.N.Y. 1981); *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185 (1978)); *see also Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F.Supp. 713, 722 (W.D.N.Y. 1991) **[*79]** (plaintiff not allowed to recover under negligence and strict liability where only economic loss damages sought).

There are a few recognized exceptions to that rule. The first exception, broadly stated, is that a party may recover purely economic **[*80]** loss damages in a tort malpractice action when the underlying contract is for the rendering of professional services. [40] For example, the New York of Appeals has allowed causes of action to stand against architects sued by clients for negligence in design, construction, or choice of materials, even where the only injury claimed is economic. **[*81]** [41] The second exception is where a party is seeking to recover economic loss damages on a theory of negligent performance of a contract for services. This exception is illustrated by the often cited case of *Consol. Edison Co. v. Westinghouse Elec. Corp.*, 567 F.Supp. 358 (S.D.N.Y. 1983). The *Westinghouse* court plainly held that "a suit for negligent performance of contractual duties is clearly available where only economic injury is alleged." *Id.* at 364. Obviously, after *NiMoI*, which dismissed NiMo's tort claims insofar as they were based upon negligent performance of a contract, NiMo cannot avail itself of this exception to the economic loss doctrine. *See NiMoI*, 725 F.Supp. at 666.

The foregoing makes clear that in New York, unless a party falls within one of the exceptions, there are two significant limitations to recovery in tort where the allegations essentially mirror those of the breach of contract cause of action. The first limitation is that the plaintiff "must establish that the

[39] Such a rule is necessary because of the divergent goals of tort and contract law, which the court in *Carmania* thoughtfully explained as follows:

> The law of contracts is meant to facilitate voluntary economic exchange. Plaintiffs who sue successfully for breach of contract are entitled to damages providing them with the benefit of the bargains they and the defendants chose to strike -- i.e., to be placed in the positions they would have enjoyed had the parties' expectations panned out. The law of torts, in contrast, has different goals: to deter people from inflicting harm when they behave unreasonably, and to compensate those injured by restoring them to the state they occupied before they suffered harm.

*Carmania*, 705 F.Supp. at 938.

[40] Insofar as NiMo's liability memorandum can be read as intimating that the economic loss doctrine is not a bar to the tort claims because ITT rendered professional services, the court declines to so find. Even assuming that the erection of large bore piping and pipe supports by ITT amounted to the rendering of professional services, the court is not prepared to expand the professional services exception to include construction project subcontractors such as ITT. Including subcontractors within the limited professional services exception to the economic loss doctrine would significantly undermine that doctrine; because then any subcontractor on a construction project, even those in contractual privity, could be held liable for strictly economic loss damages. The court is not prepared to take so expansive a view of the professional services exception to the economic loss doctrine.

[41] *See, e.g., Sears, Roebuck & Co. v. Enco Assocs., Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767 (1977); *Paver & Wildfoerster v. Catholic High School Association*, 38 N.Y.2d 669, 382 N.Y.S.2d 22 (1976); *but see Robinson Redevelopment Co. v. Anderson*, 155 A.D.2d 755, 547 N.Y.S.2d 458 (3rd Dep't 1989) (developer not entitled to bring professional malpractice claim for economic loss against architectural firm).

defendant violated a legal duty separate from its contractual obligations,. . . ." *Robehr Films, Inc. v. American Airlines, Inc.*, No. 85 Civ. 1072, 1989 U.S. Dist. LEXIS 10998, at *5 (S.D.N.Y. September 19, 1989) (citing *Carmania*, 705 F.Supp. 936), **[*82]** *aff'd without pub. opinion*, 902 F.2d 1556 (2d Cir. 1990). The second limitation is that the plaintiff "[]must demonstrate that the damages it suffered do not constitute mere 'economic loss.'" *Id.* Assuming for the moment that NiMo can overcome that first limitation, the court is not convinced that it can overcome the second, at least insofar as the negligence claim is concerned.

The economic loss doctrine was the subject of some discussion in *NiMoI*. [42] NiMo implies from that discussion that the court has taken the position that economic loss damages **are** recoverable in tort where there is a finding of a special relationship of trust and confidence. The court did not so hold in *NiMoI*; and it declines to do so now. Discussion of the economic loss doctrine in *NiMoI* was limited to the negligent performance of a contract claim. [43] The possible applicability of the economic loss doctrine in the context of a tort claim, based upon the existence of a special relationship, was not expressly considered by the court in *NiMoI*. Therefore, even though the economic loss doctrine was discussed in *NiMoI*, because that doctrine was not considered in **[*83]** the context of the special relationship issue, that earlier decision does not preclude the court from now finding, as it must, that the economic loss doctrine bars NiMo's negligence claim.

Published decisions on the narrow issue of whether economic loss damages are recoverable in a tort action where only simple negligence is alleged are seemingly non-existent. *Robehr*, a case heavily relied upon by ITT is instructive though. The court in *Robehr* denied plaintiff's motion to amend its complaint to] include a cause of action for negligence, finding that such an amendment would be futile because the plaintiff alleged only economic loss in its proposed negligence claims. *Robehr*, 1989 U.S. Dist. LEXIS 10998, at *13. In so holding, the *Robehr* court relied upon Judge Silverman's dissent in *Schiavone Constr. Co. v. Elgood May Corp.*, 81 A.D.2d 221, 439 N.Y.S.2d 933 (1st Dep't 1981), **[*84]** which the New York Court of Appeals subsequently adopted with approval. [44] In particular, the *Robehr* court reasoned:

> where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule . . . that purely economic interests are not entitled to protection against *mere negligence*, and so have denied the recovery.

*Robehr*, 1989 U.S. Dist. LEXIS 10998, at * 14 (emphasis added) (quoting *Schiavone*, 439 N.Y.S.2d at 939 (quoting in turn *Jones & Laughlin Steel Corp. v Johns-Manville Sales Corp.*, 626 F.2d 280, 287-89 (3rd Cir. 1980)). Importantly, neither the fact that a contract is for services, rather than goods, nor the fact that the parties are in contractual privity diminishes the force of the economic loss rule. *Id.* at * 13, n. 7 (citations omitted).

**[*85]** In their amended complaint, with respect to damages incurred as a result of ITT's allegedly tortious conduct, NiMo asserts the following:

> As a result of the foregoing, the Owners [plaintiffs] have incurred and continue to incur damages including, but not limited to, the following:
>
> a. the cost of redesign and reconstruction of systems and component of the NMP2 project;
>
> b. the cost of excess manhours;
>
> c. additional overhead expense resulting from redesign, reconstruction an excess manhours;
>
> d. the cost of financing these Owner expenditures;
>
> e. the cost of delay in the NMP2 project.

Amended Complaint at 38, P135(a)-(e). [45] Clearly then the amended complaint does not allege that NiMo ever sustained personal or property injury, as is required to recover in tort. Indeed, consistent with the voluminous damage reports NiMo *Id.* submitted in opposition to ITT's second summary judgment motion, [46] at oral argument, as mentioned earlier, NiMo conceded that it is only seeking economic loss damages in this action. Tr. II at 57. Furthermore, that has been NiMo's position since the early stages of this litigation. Therefore, as in *Robehr*, because NiMo is **[*86]** not seeking to recover for any injury apart from economic loss, summary judgment dismissing NiMo's negligence claim is mandated.

---

[42] *See NiMoI*, 725 F.Supp. at 665.

[43] *See id.*

[44] *See Schiavone*, 56 N.Y.2d 667, 451 N.Y.S.2d 720 (1981).

[45] Although this paragraph is designated as a separate subsection of the amended complaint entitled, "damages," it is incorporated by reference in the tort causes of action alleged against ITT. *See* Amended Complaint at 41-42, PP153 and 156. And no other damages are referred to in the tort claims. Thus, it is clear that NiMo is seeking to recover for these damages based upon a tort theory.

[46] *See* Plaintiffs' Appendices Vols. II, III, IV, and V, Tabs I-P thereto.

NiMo tries to circumvent the general rule prohibiting negligence actions for purely economic loss by arguing that once a special relationship is shown, such damages are recoverable in tort. Thus, in essence, NiMo is urging this court to adopt yet another exception to the general prohibition against the recovery of strictly economic losses in negligence actions. The court is reluctant to do that for several reasons. [*87] First, NiMo has not pointed to any cases, and the court is aware of none, allowing recovery for strictly economic loss damages where mere negligence is the only tort claim. Second, NiMo's assertion, while somewhat forceful at first glance, does not withstand closer analysis because, without exception, the cases NiMo relies upon are readily distinguishable. Some of the cases, such as *Paver* and *Sears*, involved professional malpractice claims. NiMo has already conceded, however, that it is not seeking to recover against ITT on a professional malpractice theory. *NiMoI*, 725 F.Supp. at 666. Therefore, the fact that economic loss damages are generally recoverable in malpractice cases is of no consequence here.

In addition to the malpractice line of cases, NiMo places much credence in *Apple Records*. The plaintiffs in *Apple Records* were the world renowned recording group, the Beatles. They sued Capitol Records alleging fraud, breach of fiduciary duties, tortious conduct, and conversion. The Supreme Court, among other things, dismissed the fraud and conversion causes of action, as well as a catch-all cause of action designated as a claim for "tortious [*88] conduct." *See Apple Records*, 137 A.D.2d at , 529 N.Y.S.2d at 284. On appeal, the Appellate Division reversed and reinstated the fraud and conversion causes of action. *Id.* Significantly, the Appellate Division's affirmance included that part of the lower court's decision dismissing the tortious conduct cause of action. *Id.* Although the Appellate Division did not give any reason for affirming dismissal of the tortious conduct cause of action, it can be inferred that the court did so because if allowed to stand, that claim would have violated the economic loss doctrine.

It is true, however, as NiMo has repeatedly reminded the court, that in *Apple Records* the Beatles were allowed to proceed with their tort claims, in part under a special relationship theory, even though the only damages sought were economic. NiMo is ignoring two critical distinctions between *Apple Records* and the present case, though. The first is that the remaining viable tort claims in *Apple Records* were intentional torts -- claims which NiMo has already freely admitted are absent from this case. *NiMoI*, 725 F.Supp. at 666. Any arguably negligence based theory [*89] of recovery was dismissed in *Apple Records* when the court dismissed the "tortious conduct" cause of action. Thus, because in *Apple Records* the tort claims arose from a duty wholly independent of the contract, there was no danger of tort law encroaching upon contract law. The Beatles were seeking redress for separate harms -- breach of contract and the commission of intentional torts. Thus, it stands to reason that the economic loss doctrine was not an issue, and indeed was not even mentioned in *Apple Records*. The second vital distinction between *Apple Records* and the instant case is that in the former the special relationship theory was used to sustain the claim for breach of fiduciary duties, another claim which NiMo is not alleging in this litigation. Because of those important distinctions, the court is unwilling to apply the rationale of *Apple Records* to the present case.

Additionally, NiMo's assertion that, "Breach of such a societally imposed duty [an independent duty based on a special relationship] permits the recovery of economic damages even if a contract between the plaintiff and defendant exists," is not persuasive. Plaintiffs' Liability Memorandum [*90] at 42. In the court's view, that assertion is not supported by the case law set forth above; and neither of the cases relied upon by NiMo persuades the court otherwise. In neither *Int'l Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 743 F.Supp. 250, 258-60 (S.D.N.Y. 1990), nor *Apple Records*, did the courts suggest that recovery for economic damages would be permitted based upon a theory that an independent duty of care arose because of a special relationship between the parties. Moreover, the tort claims alleged in those two cases were not mere negligence claims; but in the case of *Int'l Ore*, a claim for negligent misrepresentation, and, in the case of *Apple Records*, claims for intentional torts and breach of a fiduciary duty. Thus, because the plaintiffs in those two cases sought recovery for breach of a duty extraneous to the contract, the intentional tort and negligent misrepresentation claims therein could stand regardless of the vitality of the contract claims. [47]

[*91] Finally it is true, as NiMo contends, that a contract action can be grounded in negligence or gross negligence standards, or both. [48] The availability of alternative theories of recovery in a contract action does not mean, as NiMo insinuates, [49] that courts should, or must, allow separate independent tort claims for negligence where only economic damages are alleged. Indeed, as previously discussed, such a

[47] Although there was a plain negligence claim asserted in *Int'l Ore*, the district court refused to allow that claim to stand because it found no independent tort liability in that the claimed failure to perform arose only by virtue of the contract. *Int'l Ore*, 743 F.Supp. at 258.

[48] *See, e.g., Kalisch-Jarcho, Inc. v. New York*, 58 N.Y.2d 377, 381-85, 461 N.Y.S.2d 746, 747-50 (1983).

[49] *See* Plaintiffs' Liability Memorandum at 42, n. 12.

holding would be contrary to well settled New York case law. Consequently, ITT is entitled to summary judgment on NiMo's tort based negligence claim because NiMo has not shown any injury apart from economic loss, which clearly is not recoverable under a negligence theory.

*III. Gross Negligence*

Up to this point, the court has purposely omitted from its discussion NiMo's separate cause of action **[*92]** for gross negligence in tort. That omission is deliberate. By definition, [50] gross negligence is more closely analogous to an intentional tort than it is to negligence. Thus, the court believes that, notwithstanding the economic loss doctrine, NiMo's cause of action for gross negligence in tort is still viable, provided, of course, that NiMo can establish the requisite independent duty of care, which would arise here, if at all, out of the alleged special relationship (based upon trust and confidence and/or project manager status) between NiMo and ITT.

To summarize, as to liability, NiMo is entitled **[*93]** to proceed for the time being on its breach of contract cause of action under theories of both negligence and gross negligence. NiMo's negligence cause of action sounding in tort cannot, however, survive ITT's motion for summary judgment because that cause of action is barred by the economic loss doctrine. NiMo is permitted to go forth, however, on its gross negligence tort cause of action. To ultimately prevail on such cause of action, however, NiMo must establish, *inter alia*, a special relationship between it and ITT. Otherwise there would be no independent duty of care -- a necessary prerequisite to any finding of tort liability. Allowing NiMo to proceed on a gross negligence theory under both contractual and tort theories might at first appear redundant in that the damages sought thereunder are identical. The scope of recovery under those two theories is potentially different though. Due to the qualifying language of § 10 of Contract Change 26 (i.e., recovery for grossly negligent defective or deficient work), any recovery for gross negligence under the contract is arguably more restrictive than the scope of recovery for gross negligence in tort. Thus, for now, NiMo **[*94]** is entitled to proceed on a theory of gross negligence predicated upon both contractual and tort theories.

*IV. DAMAGES* [51]

**[*95]** In a nutshell, ITT contends that plaintiffs' damages claims, totaling approximately $ 88,000,000.00, are ripe for summary judgment because the damages are either consequential and therefore barred under the contract, or speculative, or both. NiMo responds: (1) the damages are direct, and thus not barred by the contract; (2) if there is a dispute as to whether any of the damages are direct or consequential, that dispute must be resolved by a jury; and (3) New York law does not permit a contractual limitation on liability for gross negligence. NiMo further responds that their damages are not speculative because the damage analyses furnished by its experts are all acceptable under New York law.

To facilitate analysis of the damage claims, the court has divided the damages into twelve separate categories, [52] each

[50] The accepted definition of gross negligence actually combines two definitions. *See Federal Ins. Co. v. Honeywell, Inc.*, 631 F. Supp. 1560, 1563 (S.D.N.Y. 1986). "'Gross negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others.'" *Id.* (quoting *N.Y. Pattern Jury Instructions* 2:10A (Supp. 1986)).

[51] On April 27, 1992, the court received, via facsimile, a copy of Plaintiffs' Supplemental Memorandum in Opposition to ITT's Second Motion for Summary Judgment ("supplemental memorandum"). Accompanying that memorandum was a letter from plaintiffs' counsel, John Ferguson, indicating that the memorandum would be filed with the court on April 28, 1992. The court did not consider that memorandum in connection with the present motions, and denied ITT's telephone request for permission to file a reply to the supplemental memorandum.

Plaintiffs did not seek permission from the court for the filing of such memorandum, as required by Local Rule 10(E). Furthermore, of at least equal significance is the fact that when the court received that supplemental memorandum, it was in the throes of drafting this decision. The court understands all too well that this is a technically complex case, and that at least one expert was not deposed until April 15, 1992. (Plaintiffs' supplemental memorandum did focus primarily on that testimony.) Those factors do not justify plaintiffs' unsolicited submission. As previously mentioned, the record on these motions is voluminous, and the combined memoranda of law extremely lengthy. This case is scheduled to be tried in less than three weeks - at some point submissions to the court must stop. The court has reached that point.

[52] Those categories are:

(1) financing costs;

(2) erection, repair, and rework of large bore piping and pipe supports ("large bore piping");

(3) costs allegedly incurred by NiMo as a result of inspections conducted as part of the Nuclear Regulatory Commission's ("NRC") "Construction Appraisal Team" ("CAT") and three "Systematic Assessment of Licensee Performance" ("SALP") inspections - generally referred to by the parties (and hence the court) as the CAT/SALP claim;

(4) increased quality assurance/quality control ("QA/QC");

(5) retaining Management Analysis Company ("MAC") to assess NMP2's quality programs and assist with corrective

of which will be addressed herein. Before turning to the arguments particular to each separate category of damages, there are two issues common to several categories of damages which must be considered: (1) whether certain damages are direct or consequential and (2) whether certain damages are speculative as a matter of law.

**[*96]** *A. Direct versus Consequential Damages*

ITT contends that four of the damage categories are barred because those damages are, as a matter of law, consequential, and the contract expressly bars the recovery of consequential damages. [53] **[*97]** In particular, ITT contends that the costs for financing, CAT/SALP (generally), engineering oversight and overhead [54] are all consequential. NiMo does not dispute that the contract bars the recovery of consequential damages. [55] NiMo strongly contests ITT's characterization of the damages as consequential, however. Rather, NiMo contends that the contractual limitation does not apply here because the damages plaintiffs are seeking to recover are direct -- not consequential. [56]

In *American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590 (1989), the New York Court of Appeals explained the difference between general (or direct) and consequential (or special) damages:

> General damages are those which are the natural and probable consequences of the breach . . ., while special damages are extraordinary in that they do not so directly flow from the breach.

*Id.* at 42-43, 550 N.Y.S.2d at 593 (citations omitted).

**[*98]**

Consequential damages are recoverable only when they were both foreseeable and within the contemplation of the parties at the time the contract was made.[57] *Id.* at 43, 550 N.Y.S.2d at 593 (citations omitted). Generally, whether damages are direct or consequential is an issue of fact which must be reserved for trial. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1459 n. 30

---

actions supposedly necessitated by ITT's alleged mismanagement of quality programs;

(6) the quality performance management program ("QPMP") instituted at the behest of the NRC;

(7) civil penalty;

(8) engineering oversight;

(9) overhead;

(10) liquid penetrant inspection;

(11) planner preparation; and

(12) a final category designated by ITT only as "other damages". ITT's Damages Memorandum at 52.

The costs for QA/QC, MAC review, civil penalty and QPMP are part and parcel of the so-called CAT/SALP claim; but for the sake of clarity, the court, as did ITT, will separately address each of those elements of the CAT/SALP claim. Additionally, overhead costs and financing costs are not actually separate and distinct categories of damages, but have been added to various other categories of damages. They too will be separately addressed, because there are some legal arguments pertaining only to them.

[53] The contract specifically provides, "In no event shall the Contractor [ITT] be liable for consequential damages arising out of the performance of erection work to the project." Contract P301C, Supplementary Conditions, at 6, P8 (Plaintiffs' Exhs., Vol. I at 16). Interestingly, despite a total of 34 contract changes, that particular provision remained unchanged throughout the duration of contract P301C.

[54] In its analysis, NiMo combines the last two categories of damages, but to avoid possible confusion, the court will separately address the engineering oversight costs and the overhead costs.

[55] Tr. II at 52.

[56] *Id.*

[57] This rule has its origins in the often cited case of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), wherein it states:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaching the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract.

9 Exch. at , 156 Eng. Rep. at 151.

(S.D.N.Y. 1986) ("We reserve for trial the question of whether the plaintiff's claimed damages should be characterized as direct, incidental, or consequential.") *American Electric Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 459 (S.D.N.Y. 1976) ("the precise demarcation between direct and consequential damages is a question of fact,. . . ."); but *see Starmakers Pub. Corp. v. Acme Fast Freight, Inc.*, 646 F.Supp. 780, 782 (S.D.N.Y. 1986) (Special damages for three-week delay in delivery not recoverable as a matter of law where shipper could not eatablish that defendant freight forwarders had notice that shipped matter was time-sensitive); and *Sweazey v. merchants Mutual Insurance Co.*, 169 A.D.2d 43, 571 N.Y.S.2d 131, 132 **[*99]** (3rd Dep't 1991) reversing denial of motion to dismiss consequential damages claim based upon the absence of a showing that such damages were foreseeable and within the contemplation of the parties at the time the contract was made or prior thereto).

**[*100]** Disregarding that general rule, ITT and NiMo cite a number of cases which they contend stand for the proposition that the four categories of damages listed above are, as a matter of law, either consequential or direct. [58] **[*101]** Significantly, in none of those cases did the court hold, as a matter of law on a summary judgment motion, that certain types of damages were either direct or consequential. Without exception, all of the cited cases were tried (although most were non-jury), and the determination as to whether the damages therein were direct or consequential was made by the court **after** it had an opportunity to review the fully developed trial record. [59] Stated somewhat differently, it was the insufficiency of the proof which led to the conclusion that the sought damages in those cases were consequential and thus not recoverable.

**[*102]** Turning to the present case, ITT cannot prevail on its motion for summary judgment on the damage claims insofar as that motion is premised on the argument that certain of NiMo's damages are consequential, and thus barred by the contract. The issue of whether those particular damages (financing, [60] **[*103]** engineering oversight, engineering overhead costs and CAT/SALP damages (generally) are consequential is, most likely, one of fact and thus cannot be decided until trial. [61] *See Charles E. S. McLeod, Inc. v. R.B. Hamilton Moving & Storage*, 89 A.D.2d 863, 453 N.Y.S.2d 251 (2d Dep't 1982) (summary judgment thwarted where fact issue as to whether lessee knew that lessor was in the business

---

[58] Such a contention by NiMo is slightly curious given the fact that it did not cross-move for summary judgment in response to ITT's summary judgment motion on the damage issues. Perhaps NiMo intends for the court, on its own volition, to grant summary judgment to plaintiffs on this narrow issue. *See Coach Leatherware Co. v. Anntaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (citations omitted) (recognizing that although not expressly authorized by Rule 56, the practice of a district court independently granting summary judgment in favor of a nonmoving party has become "an accepted method of expediting litigation"). The court will not grant summary judgment in favor of NiMo, declaring that some or all of their damages are direct damages as a matter of law because, as will be seen, summary judgment on the issue of whether certain damages are direct or consequential is not appropriate.

[59] *See Record Club of America, Inc. v. United Artists Records, Inc.*, 696 F.Supp. 940, 947 (S.D.N.Y. 1988) (following non-jury trial, court dismissed claims for lost customer-list rental fees and advertising-insert income as consequential where there was no evidence submitted that such damages were within the contemplation of the parties when they entered into the agreement); *Havens Steel Co. v. Randolph Engineering Co.*, 613 F.Supp. 514, 541 (W.D. Mo. 1985), *aff'd*, 813 F.2d 186 (8th Cir. 1987) (documentary evidence supported finding under Missouri law that "costs of capital" were recoverable as "direct" damages); *Burgess Constr. Co. v. M. Morrin & Son Co.*, 526 F.2d 108, 117 (10th Cir. 1975), *cert denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (citation omitted) ("Overhead is a proper element of cost of completion damages,. . . ."); and *437 Madison Ave. Associates v. A.T. Kearney, Inc.*, 127 Misc.2d 37, 488 N.Y.S.2d 950 (Sup. Ct., 1st Dep't 1985) (losses due to non-breaching party's dealings with third party were consequential); *Certain-Teed Products Corp. v. Goslee Roofing & Sheet Metal, Inc.*, 26 Md. App. 452, 339 A.2d 302 (1975) (jury award of interest upheld on appeal because, among other reasons, "the interest paid was in fact a normal and thus foreseeable incident to [defendant's] breach of warranty"); and *Roanoke Hospital Ass'n v. Doyle & Russell, Inc.*, 215 Va. 796, 214 S.E.2d 155 (1975) (consequential damages denied where jury made factual determination that such damages were not within contemplation of the parties).

[60] With respect to financing costs, ITT emphasizes that one scholar has written, albeit within the framework of the Uniform Commercial Code ("U.C.C."), "because recovery of such interest or finance charges is a recovery of consequential damage, such recovery must be denied where consequential damages have been properly disclaimed or excluded by the buyer's contract of sale." Roy R. Anderson, *Incidental and Consequential Damages*, 7 Journal of Law and Commerce 327, 435 (1987). The court cannot accept that view, however, in light of the relevant case law set forth above. Moreover, the author's view is not especially persuasive because in that same article, as NiMo notes, the author references cases holding to the contrary. *See id.* at 435-36, 439. Thus, the court is unwilling, based upon the Anderson article, to hold as a matter of law that financing costs are consequential damages.

[61] The court does not intend by this statement to foreclose the possibility of granting a directed verdict on this issue in the event NiMo does not come forth with sufficient proof at trial that the enumerated categories of damages were foreseeable and within the contemplation of the parties at the time they contracted.

of renting heavy equipment, and therefore should have foreseen that if it breached the lease, lessor might sustain loss by reason of inability to relet the equipment until it was repaired). [62]

*1. Financing Costs*

As part of its damages, NiMo is seeking approximately $ 27 million in financing costs. That figure was derived from an accounting concept commonly used in the public utilities industry, known as "Allowance for Funds Used During Construction" ("AFUDC"). The regulations governing public utilities subject to the provisions of the Federal **[*104]** Power Act, such as NiMo, defines AFUDC, in relevant part, as:

> "Allowance of funds used during construction" (Major and Non-major utilities) includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used, not to exceed, without prior approval of the Commission, allowances computed in accordance with the formula prescribed in paragraph (a) of this subparagraph.

18 C.F.R. part 101, Electric Plant Instructions § 3(17) (1990). *See generally, Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 200-202 (2d Cir. 1980).

ITT offers three reasons as to why it is entitled to summary judgment with respect to financing cost damages. First, according to ITT, such damages are prohibited under New York law unless it is shown that the plaintiff is seeking to recover for a loan obtained *solely* to finance the underlying damages. In other words, ITT maintains that because NiMo cannot trace any actual financing expenditures to ITT's wrongdoing, it should not be allowed to recover any such costs. Second, ITT contends that by seeking a damage award for financing costs NiMo is seeking, **[*105]** in effect, a "double recovery" [63] because they are seeking to be compensated for an award of financing costs using AFUDC calculations, as well as seeking an award of statutory interest on the base damages. [64] Third, ITT contends that the financing costs are consequential, and thus barred under the contract.

Simply stated, NiMo counters that ITT is attempting to impose an impermissible tracing requirement on the recovery of financing costs under New York law. NiMo further counter that CPLR § 5001 is not a bar to the recovery of financing costs. In light of the previous discussion regarding consequential damages, the court will assume, for purposes of these motions only, that financing costs are not consequential damages, and therefore the contractual limitation on the same is inapplicable. Operating from that basic assumption, the court will consider ITT's remaining arguments regarding tracing and § 5001.

**[*106]** *a. CPLR § 5001 - Prejudgment Interest*

ITT contends that NiMo should not be allowed to recover its financing costs because such costs are, in reality, a claim for prejudgment interest, governed exclusively by § 5001 of the CPLR. ITT further maintains that NiMo "seeks to be compensated not once but twice for the lost time-value of money, first in the award of 'financing costs' based on the AFUDC data and then with the award of statutory interest on both the base damages and the 'financing costs.'" ITT's Damages Memorandum at 14. This argument need not detain the court for long. ITT's position is not well taken after *Long Island Lighting Co. v. IMO Industries, Inc.*, No. 85 Civ. 6892, 1990 U.S. Dist. LEXIS 5,351 (S.D.N.Y. May 3, 1990) ("*LILCO*"), wherein Judge Owen plainly stated, "[a] party to a contract may recover financing costs as incidental damages, *apart* from prejudgment interest allowable under New York State law." *Id.* at *16 (emphasis added) (citing *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481 (2d Cir. 1983) and *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017 (2d Cir. 1978)); **[*107]** *see also Minpeco, S.A. v. Hunt*, 686 F.Supp. 420, 425-27 (S.D.N.Y. 1988) (denying motion to preclude claim for cost of borrowing money necessitated by defendants' alleged manipulation of the silver market). [65] There are obvious factual and legal distinctions between the cited cases and the present case: the cited cases deal predominately with the issue of the recovery of incidental damages under the U.C.C. and, for the most part, pertain to contracts for goods, as opposed to services. Nonetheless, the

---

[62] *Accord Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352, 358 (E.D. Mich. 1983) (under Michigan law, applying *Hadley* rule, court stated, "the issue of whether plaintiff can recover the alleged consequential damages is a question of fact that will be determined by evidence showing whether these damages were within the contemplation of the parties at the time the contract was made.")

[63] ITT's Damages Memorandum at 14.

[64] New York Civil Practice Law and Rules ("CPLR") § 5001 provides, in relevant part:

> Interest *shall* be recovered upon a *sum awarded* because of a breach of performance of a contract, . . ., . . . and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y. Civ. Prac. L. & R. § 5001 (McKinney 1963) (emphasis added).

[65] *Accord Havens, supra*, 613 F.Supp. 514 (W.D. Mo. 1985), *aff'd*, 813 F.2d 186, 188 (8th Cir. 1987) ("In Missouri, a claim for the cost of money used to pay expenses necessitated by a breach of contract is a claim for damages, not for prejudgment interest.")

court finds the cited authority applicable here given the Second Circuit's express determination in *Bulk Oil* that the plaintiff there was entitled to be made whole for its interest payments. *See Bulk Oil*, 697 F.2d at 485.

**[*108]** Of equal if not more import is the fact that NiMo is not, as ITT implies, trying to seek a double recovery for financing cost damages. Instead, NiMo is merely seeking to prove its actual financing costs, which have been computed only through NMP2's commercial operation ("C.O.") date of April, 1988. Cotenants' Memorandum in Opposition to ITT's Motion for Summary Judgment on Damages Issues ("Plaintiff's Damages Memorandum") at 50; *see also* Tr. II at 76. NiMo is then seeking statutory prejudgment interest from that date to the present. *Id.* at 50. Indeed, NiMo states with candor:

> If the [plaintiffs] recover all of their pre-commercial operation financing costs at trial, they will *not* seek an award of prejudgment interest for the time period *prior* to C.O. On the other hand, if the [plaintiffs] do not recover some or all of their pre-commercial operation financing cost damages at trial, the Court can then determine, in light of the jury's damage award, whether or to what extent an award of statutory prejudgment interest is appropriate for that period.

*Id.* (emphasis in original). Given those candid statements by NiMo, there is absolutely no basis for ITT's **[*109]** assertion that NiMo is seeking a double recovery here. Moreover, the case law set forth above provides ample support for NiMo's financing cost claim as part of the damages arising from ITT's alleged breach of contract and alleged tortious conduct. Consequently, § 5001 of the CPLR does not prevent NiMo from attempting to prove at trial so much of its damages as relates to financing costs.

*b. Traceability*

ITT vigorously contends that *LILCO*, 1990 U.S. Dist. LEXIS 5351, is dispositive of NiMo's damage claim for financing costs. In *LILCO*, Judge Owen held that a financing cost award was not proper because the plaintiff was "*unable to point to a particular loan* necessitated by [defendant's] conduct,. . . ." [66] *Id.* at *16 (emphasis added) (citation omitted). The *LILCO* court also noted that "an award of interest would be appropriate if LILCO had rightfully and properly rejected the diesels as non-conforming goods, *and had secured a loan in order to purchase replacement diesels from Colt.*" *Id.* (emphasis added).

**[*110]** NiMo, on the other hand, heavily relies on two cases outside this jurisdiction: *The Cincinnati Gas & Electric Co v. General Electric Co.*, No. C-1-84-988, (S.D. Ohio 19 ) [67] **[*112]** ("*Zimmer*") (applying Ohio law); and *Washington Public Power Supply System v. General Electric Co.*, No. 85-098- AA, 1989 U.S. Dist. LEXIS 18,279 (E.D. Wash. Nov. 8, 1989) ("*WPPSS*") (applying Washington law). The courts in both of those cases allowed the plaintiff utilities to submit financing cost proof to the jury. The issue arose in *Zimmer* against the backdrop of defendants' motion to exclude evidence relevant to plaintiffs' financing costs claim. The *Zimmer* court held that the plaintiffs were entitled to present such evidence for purposes of a summary jury trial. [68] *Zimmer*, slip op. at 12-13. [69] The *Zimmer* court warned plaintiffs, however, "that they must be prepared to make the requisite showing of casuation [sic] and, to the extent that the injury was foreseeable, a showing of a nexus between the damages alleged and the alleged wrongdoing of defendant, i.e., that the costs are attributable to the wrongdoing." *Id.*. at 11-12. In other words, the **[*111]** *Zimmer* court equated causation with traceability: "to require plaintiffs to establish this nexus [attributing the costs of the loan to the breach] serves the same purposes as the concept of traceability." *Id.* at 12. The court in *Zimmer* further explained:

> that the requirements of causation and certainty of damages [sic] provide an adequate means for defendants to present their argument to the jury on such matters as whether some or all of plaintiffs' alleged 'financing costs' were due to plaintiffs' alleged mismanagement of its affairs or whether costs incurred (e.g. costs of dividends) were the result of business decisions. . . . Similarly, while we are not barring plaintiffs from offering testimony on the general methods of accounting in the utilities industry or presenting a formula for assessing the amount of damages, we note that the jury will be

---

[66] In denying plaintiff's claim for financing costs, the *LILCO* court plainly relied upon the traceability factor as defined therein, **as well** as upon the fact that the plaintiff did not meet "'its burden of proof that its claim for financing costs was attributable to [Imo's] [defendant's] breach,'. . . ." *LILCO* 1990 U.S. Dist. LEXIS 5351, at * 17 (quoting *Ernst Steel Corp. v. Horn Const. Div.*, 104 A.D.2d 55, 481 N.Y.S.2d 833, 839, n. 16 (4th Dep't 1984), *mod'd*, 486 N.Y.S.2d 1022 (4th Dep't 1985)). Therefore, the just quoted statement is not, as NiMo suggests, mere *dicta* (and thus implicitly not worthy of serious consideration).

[67] The date of this decision is illegible on the copy provided to the court.

[68] A summary jury trial is a proceeding used to facilitate settlement by allowing parties to try a case before a jury, which will then render an advisory verdict. *See* Fed. R. Civ. P. 39(c).

[69] Because the decision itself did not contain page numbers, the court took the liberty of inserting page numbers so as to avoid confusion.

instructed on plaintiffs' burden of establishing causation, . . ., and certainty of the amount of damages.

*Id.* at 12 (citation omitted). It is critical to note that the *Zimmer* court did not place an additional burden on plaintiffs of demonstrating traceability to a specific loan.

In an analogous situation, the court in *WPPSS* denied defendant's summary judgment motion on plaintiff's claim for interest, basically finding that the defendant had failed to satisfy its burden of presenting evidence negating either causation or accountability. *WPPSS*, 1989 U.S. Dist. LEXIS 18279, at *16. The relevance of *WPPSS* to the present case is arguably limited somewhat by the fact that traceability, although offered as a possible basis for summary judgment, was not actually an issue therein. In *WPPSS* the defendant, as does ITT, asserted that the plaintiff should not be allowed to recover "cost of capital" "where it cannot trace specific interest expense to the claimed injury." *Id.* at 20 (citations omitted). However, **[*113]** because in *WPPSS* the bonds issued to finance the subject construction were spent only on that particular project, it was not critical that the court define the parameters of the asserted traceability requirement. *See id.* at * 21. Nevertheless, the court implicitly rejected defendant's tracing argument, observing that in another case (upon which defendants had relied), "the plaintiff's claim for actual interest was denied because 'its books were not set up to show the amount of interest paid on a particular job,' . . ., *not* because the plaintiff could not trace a particular expense within one job to the proceeds of a specific loan.") *Id.* (emphasis added) (quoting *Wyoming v. Brasel & Sims Constr. Co.*, 688 P.2d 871, 881 (Wyo. 1984)). The court concurs with NiMo's reading of *WPPSS*; that is *WPPSS* does not impose a stringent tracing requirement on the recovery of financing costs. Instead, *WPPSS* only confirms the view that there be a "legally sufficient casual link" between a plaintiff's direct damage and the loan in question. *Id.* at *19.

Ordinarily the court would be reluctant to follow *Zimmer* and *WPPSS* because they construe **[*114]** case law outside this jurisdiction. However, because the definition of causation (in the context of a financing cost claim) in those cases is remarkably similar, indeed, virtually identical to the definition under New York law, [70] **[*116]** *Zimmer* and *WPPSS* are certainly instructive on the tracing argument. In addition, a careful reading of *Zimmer* and *WPPSS*, as well as *LILCO* and the cases cited therein, convinces the court that NiMo should, at a minimum, be permitted to proffer evidence at trial relating to its purported financing cost damages. [71] Not only is that the more sound practice given the current posture of this case, [72] **[*117]** but, importantly, such a practice is also in accordance with New York law. In *Ernst Steel*, a case referred to in *LILCO*, the Appellate Division started with the generally accepted proposition that "in an appropriate case a seller is entitled to recover commercially reasonable finance and interest charges incurred as a result of a buyer's breach as a proper item of incidental damages. . . ." 104 A.D.2d at , 481 N.Y.S.2d at 839 (citations omitted). [73] Then, even though the Appellate Division reversed the trial court's award of **[*115]** interest damages, it reasoned:

> *while there is no requirement in the code [U.C.C.] that interest expenses must be identified to indebtedness specifically covering the contact [sic] goods, where a seller cannot link the claimed damages to the contract it clearly has a more difficult burden of proof.* In our view, [plaintiff] has not substantiated its claim that the entire amount of increased costs due to the delay was paid for

[70] *Compare Zimmer*, slip op. at 7 ("Causation requires a showing that the damages claimed were reasonably foreseeable and in the contemplation of the parties."); and *WPPSS*, 1989 U.S. Dist. LEXIS 18279 at * 19, n. 11 (citations omitted) ("In a contract action, the need to borrow the funds must be shown to have been 'a normal and foreseeable incident arising from' the breach of contract.") *with LILCO*, 1990 U.S. Dist. LEXIS 5351 at *16 (citation omitted) ("Courts award such relief [financing costs] where the injured party can point to costs associated with a particular loan that was 'commercially reasonable and foreseeable' under the circumstances.")

[71] As with other issues in this litigation, whether that proof will be legally sufficient to withstand the inevitable motion for a directed verdict by ITT remains to be seen.

[72] In response to ITT's summary judgment motion on damages, NiMo has identified Ronald Ungerer, NiMo's Chief Financial Officer as someone who will testify regarding NiMo's capital raising efforts purportedly necessitated by ITT's alleged breach of contract. Specifically, NiMo states that Mr. Ungerer "will testify at trial that NMPC raised money to pay for the costs attributable to ITT's wrongdoing from various sources -- including selling preferred stock and common stock, issuing long-term and short-term securities and making substantial borrowings -- and incurred a finance cost on each source." Plaintiffs' Damages Memorandum at 42 (citing Ungerer Affidavit at PP4-5; and NMPC's Response to ITT Interrogatories on Damages). The other plaintiffs will also present similar testimony. *Id.* (citing Cotentant Responses to ITT Interrogatories on Damages). That contemplated testimony, in conjunction with the fact that, at least at this juncture, ITT is not disputing that plaintiffs borrowed money and hence incurred financing costs due to ITT's alleged wrongdoing, renders summary judgment inappropriate.

[73] As are many of the cases cited in this subsection, *Ernst Steel* involved a breach of a contract for goods under the U.C.C. Clearly the present case does not involve a contract for goods under the U.C.C.; but, in the absence of case authority directly on point, these U.C.C. cases at least provide some guidance.

with borrowed funds . . . and it has failed to link any portion of its indebtedness to the delay in payment resulting from [defendant's] breach. [Plaintiff] has not met its burden of proof that its claim for financing costs was attributable to [defendant's] breach and the award of interest expenses must be reversed *due to a failure of proof.*

*Id.* (citation omitted) (emphasis added). The basis for the reversal in *Ernst Steel* was thus not due to a failure to trace to a specific loan, but rather due to a failure of proof on causation. [74]

Based upon the foregoing (particularly the highlighted language), unlike the *LILCO* court, this court does not construe *Ernst Steel* as mandating traceability to prevail on a claim for financing costs damages. All that is required is that a plaintiff's proof of financing cost damages be "commercially reasonable and foreseeable under the circumstances." *See LILCO*, 1990 U.S. Dist. LEXIS 5351 at * 16 (citation omitted). [75] NiMo thus **[*118]** is entitled to offer evidence that its claimed financing costs are attributable to ITT's alleged breach. NiMo should, of course, be mindful of its burden of proof on this issue, especially with respect to causation. As did the plaintiff in *Ernst Steel*, in the absence of proof relating a specific loan to ITT's alleged breach, NiMo will undoubtedly have a more difficult burden of proof. That does not mean, however, that NiMo should be prohibited from offering at trial proof of its supposed financing cost damages.

*B. Claimed Speculative Nature of Damages*

ITT's other argument, **[*119]** common to several different categories of damages, is that those damages are speculative as a matter of law. ITT makes that argument as to the following categories of damages: large bore piping; QA/QC; MAC review; QPMP; civil penalty; engineering oversight; and overhead. Naturally NiMo disagrees, asserting that the damages calculations by its own experts are "manifestly reasonable" and an "accurate assessment" of the damages sustained by plaintiffs. [76] Thus, from NiMo's perspective, there is absolutely no reason that the jury should not hear its proof on the categories of damages just listed.

"It is well-settled that a plaintiff in a contract action must demonstrate *both* that his damages were caused by the alleged breach and that the alleged loss is capable of proof with reasonable certainty." *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F.Supp. 1003, 1008 (S.D.N.Y. 1991) (emphasis added) (citing *Lexington Products, Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982); **[*120]** *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986)). On this aspect of its motion, ITT centered almost exclusively on whether the amount of NiMo's asserted damages can be proven with reasonable certainty; it did not focus on causation. [77] So at this point, the court will limit its discussion to whether the amount of NiMo's damage estimates, as calculated by its experts, is based upon speculation or conjecture, and as such should not be allowed to be presented to a jury.

**[*121]** In appraising the sufficiency of damage evidence, several well established principles have evolved. In *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003 (2d Cir.1991), the Second Circuit reiterated a couple of those principles. First, "although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law.'" *Id.* at 1009 (quoting *United States ex rel. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985)). Second, "[a] party is not to be denied damages when they are necessarily uncertain, . . ., New York law does not countenance damage awards based on 'speculation or conjecture.'" *Id.* at 1010 (quoting *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591 (1978)). "In other words, 'the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.'" *Care Travel Co. v. Pan American World Airways, Inc.*, 944

[74] The court does not read the selective language quoted by ITT from *Ernst Steel, see* ITT's Damages Memorandum at 12, as establishing a traceability requirement. When read in context, that language simply refers to causation. The plaintiff therein did not show that it borrowed funds to perform the subject contract.

[75] *See also Zimmer*, slip op. at 8-9 ("'Randolph's [plaintiff] ability to recover its 'cost of capital' expense is [not] limited by its ability to 'trace' its actual 'borrowing' costs. . . . The only thing necessary is that the court have some reasonable way of determining Randolph's [plaintiff] borrowing cost *or* the cost associated with a use of its own capital. . . .'") (quoting *Havens, supra*, 613 F.Supp. at 542).

[76] Plaintiffs' Damages Memorandum at 26.

[77] ITT did mention (almost as an afterthought) that summary judgment could be granted dismissing the CAT/SALP claim on causation grounds. *See* ITT's Damages Memorandum at 45, n. 28. ITT also made that argument by inference with respect to the large bore piping claim. *See* Defendants' Reply Memorandum in Support of their Second Motion for Summary Judgment ("ITT's Reply Memorandum") at 10-11. However, because the parties did not undertake a thorough legal analysis of the fact of injury issue, but only briefly touched upon that issue, the court will not address it at this time. For the same reason (lack of briefing), the court will not hypothesize as to whether lack of causation is a viable alternate basis for granting summary judgment on any of the other damage claims.

F.2d 983 (2d Cir. 1991) [*122] (quoting *Kenford Co.*, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132 (citing in turn *Wakeman v. Wheeler & Wilson Manuf'g Co.*, 101 N.Y. 205 (1886)). "The burden of uncertainty as to the amount of damages is upon the wrongdoer,. . . . [78] [*123] *Lamborn v. Dittmer*, 873 F.2d 522, 532-33 (2d Cir. 1989) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)) (citations omitted). Lastly, the principle having perhaps the most impact upon ITT's motion pertaining to damages is that "the test for admissibility of evidence concerning prospective damages is whether the evidence has *any tendency* to show their probable amount. [79] *Id.* (emphasis added).

Those same principles were expounded upon by the New York Court of Appeals in *Berley Industries*:

> Particularly in actions *ex contractu*, . . ., when it is clear that some injury has been occasioned, recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damages is unavoidably uncertain, beset by complexity or difficult to ascertain. . . . The law is realistic enough to bend to necessity in such cases. A jury then may draw reasonable inferences from the other, though lesser, proofs actually presented in order to arrive at an estimate of the amount of extra costs which are the natural and probable result of the delay. [*124] . . . Even then there must be a definite and logical connection between what is proved and the damages a jury is asked to find. . . .

*Id.* at , 412 N.Y.S.2d at 591; *see also Borne Chemical Co. v. Dictrow*, 85 A.D.2d 646, , 445 N.Y.S.2d 406, 413-14 (2d Dep't 1981). It cannot be overlooked, however, that "the amount of damages need not be calculated with absolute certainty or mathematical precision." *Trans World Airlines, Inc. v. 47th Street Photo, Inc.*, 751 F.Supp. 439, 440 (S.D.N.Y. 1990) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250-251, 75 L.Ed. 544 (1931), and other cases). Similarly, "evidence that, as a matter of just and reasonable inference, shows the existence of damages and the extent thereof will suffice, even though the result is only an approximation." *Id.* at 441 (citing *Story Parchment*, 282 U.S. at 563, 51 S.Ct. at 250 and other cases). The court will now examine the evidence submitted in connection with ITT's summary judgment motion on damages in light [*125] of the standards just recited.

*2. Large Bore Piping*

ITT claims that the damages NiMo seeks to recover for erection, repair and rework of large bore piping and pipe supports are speculative because the sampling methodology employed by NiMo's experts is "inherently speculative," and the determination of a "reasonable" [80] amount of rework is also speculative. The court will separately address those two contentions.

*a. Sampling*

Preliminarily, it should be noted that according to ITT there would be no need for statistical sampling if one of two events had occurred at Contract Change 34 - the final contract change. Either NiMo should have kept the contemporaneous time records, which it had a right to do under Contract Change 26; [81] or, NiMo should not have agreed to final acceptance of ITT's [*126] work by signing Contract Change 34. As discussed in section one, ITT adheres to the view that when NiMo approved final payment to ITT under Contract Change 34, [82] ITT had settled **all** claims (past and future) with NiMo. In reliance upon NiMo's final acceptance of ITT's work (in Contract Change 34), ITT also did not retain the contemporaneous time records.

ITT makes much of the fact that NiMo did not exercise its

---

[78] In support of this statement, the Second Circuit here cited to *Perma Research & Dev. Co. v. Singer Co.*, 542 F.2d 111 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). After *Kenford Co.*, *supra*, the continuing validity of *Perma Research* is "seriously in doubt," but not insofar as it stands for the particular rule quoted above. *See Penthouse International, Ltd. v. Dominion Federal Sav. & Loan Asso.*, 855 F.2d 963, 983 (2d Cir. 1988), *cert, denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989) (acknowledging that Court of Appeals in *Kenford* specifically rejected the "rational basis" test enunciated in *Perma Research* as a basis by which to assess future lost profits damages).

[79] In a number of the cited cases, including *Lamborn*, the courts discussed the standard for assessing damages proof as it relates to future damages, such as future lost profits. Even though NiMo is not seeking recovery of lost future profits, or any other type of prospective damages, that difference in the type of damages sought does not, in the court's view, render the cited cases involving prospective relief inapplicable here.

[80] "Reasonable" is the characterization of NiMo's expert, Mr. Nance. Thus, any further references to a reasonable rework rate shall mean in the opinion of Alan Nance - not necessarily in the opinion of the court.

[81] *See* Contract Change 26 at P27 (ITT's Appendix, Vol. VI at 1530).

[82] *See* Contract Change 34, ITT's Appendix, Vol. III at 852-54.

right to retain the contemporaneous time records. While in hindsight it obviously would have been preferable to have those documents; the fact remains that they are not available. [83] Nothing in the record suggests that the unavailability of those documents is due to wrongdoing by any party to this litigation. [84] Thus, the court will not prevent NiMo from relying upon statistical sampling evidence just because at one point there were contemporaneous time records, **[*127]** which purportedly would have established what NiMo is endeavoring to show by way of sampling.

To fully understand ITT's objections to the sampling methodology devised and applied by NiMo's experts, an overview of that methodology is helpful. The starting point for NiMo's sampling methodology is the document packages ("planners"), which were retrieved from NMP2 plant records. The information contained in those planners, while incomplete, contains such **[*128]** items as isometric drawings for a certain section of piping; weld data reports; and sign-off forms from the superintendent, foreperson or field engineer. ITT's Appendix, Vol. V at 1411. Out of 17,735 pipe support planners, the sampling population consisted of 401 planners selected by NiMo's statistical expert. *Id.* at 1259 and 1411; ITT's Appendix, Vol. VII at 1945-48. The sampling population was smaller for piping sections; 41 out of 421 planners were reviewed. *Id.* at 1251; *id.* at 1972.

Using the sample planners, one of NiMo's experts, Alan D. Nance, tried to ascertain whether repair and rework was done, and the cause for such repair or rework, i.e. craft error or other causes, such as SWEC mandated design changes. *Id.* at 1409, 1412. When he determined that the rework or repair was due to craft error, Mr. Nance then estimated the hours spent on such repair or rework. *Id.* at 1213, 1242, 1409, 1412. Those figures were totaled and extrapolated to the entire number of pipe supports and pipes. A reasonable amount of rework was then credited by the expert, and the hours were translated into a dollar amount by using average wage costs for the years in question. **[*129]** *Id.* at 1251, 1256.

The methodology just described, albeit in far less detail than that contained in the damage reports of NiMo's experts, is objectionable to ITT. According to ITT, "because of the small number of documentation packages actually reviewed and the multiplier effect of overhead and interest, the smallest error in Mr. Nance's judgment as to whether a piece of rework occurred, was [ITT's] fault, or the time necessary to accomplish it is enormously magnified in the final damages calculation." ITT's Damages Memorandum at 20. To illustrate, ITT states that "in the pipe support claim, . . ., an incorrect assumption that a single incident of rework required scaffolding in 1983 would add approximately $ 51,000 to the damages sought by the plaintiffs." *Id.* (citing ITT's Appendix Vol. V, at 1255-1268).

Due to the time and expense allegedly involved in reviewing every planner, [85] NiMo hired several experts, including a statistician, Dr. Charles Mann, and Alan Nance, a mechanical engineer specializing in piping. In conducting his review of the sample planners, Nance's job was to apply the sampling method devised by Dr. Mann. Mr. Nance avers that his review exposed **[*130]** that "there were systemic, recurring, ongoing and serious failures on the part of ITT in the pipe support and piping erection process," including improper installation sequence, incorrect installation, lost documentation, carelessly performed work, welding defects, loose hardware, delayed inspections, lost material and incorrect repairs. Nance Affidavit at P33 (Plaintiffs' Appendix Vol. I, Ex. C thereto). Based on Nance's results, Dr. Mann then determined the cost of excessive work in the total population of pipe and pipe supports. Affidavit of Charles Mann (December 3, 1991) ("Mann Affidavit") at P6 (Plaintiffs' Appendix Vol. I, Ex. E thereto).

**[*131]** Not unexpectedly, Dr. Mann avers that "the statistical methodology used to make the calculations and inferences . . . is widely accepted and used in the statistical community." *Id.* at P8 (Plaintiffs' Appendix, Vol. I, Ex. E thereto). NiMo has provided the court with additional information regarding the methods used and conclusions drawn by its damages experts. Although the court did review that information, it need not concern itself with those details to resolve this motion.

The threshold issue here is the propriety of statistical sampling in the context of this rather unique litigation (the construction of a nuclear power plant). After reviewing

[83] ITT now regrets its failure to return those records because they would be helpful in showing "the grossly excessive nature of the plaintiffs' time estimates" regarding large bore piping. ITT's Reply Memorandum at 11.

[84] NiMo insinuates that there was something improper about ITT destroying those records, whereas it appears that those records were simply destroyed "in the normal course of [ITT's] business many years ago." Affidavit of Charles L. Huston (December 4, 1991) ("Huston Affidavit"), Ex. 8 thereto at 2 (Plaintiffs' Appendix, Vol. I, Exh. H thereto).

[85] Without deciding whether NiMo will ultimately be allowed to present their statistical sampling evidence at trial, the court notes that if, as NiMo suggests, it would take one person working 2,000 hours per year 54 years to perform a comprehensive review of each of the nearly 16,000 planners, the use of statistical sampling seems justifiable. *See* Plaintiffs' Damages Memorandum at 7 (citing Affidavit of Alan D. Nance (December 3, 1991) ("Nance Affidavit") at P23).

NiMo's proof as to damages, which is part of the record on this motion, the court cannot accept ITT's assertion that NiMo's sampling evidence is inherently speculative. It is true, as ITT points out, that sampling has generally been allowed in factual settings vastly different than the present one. *See, e.g., Royal Business School, Inc. v. New York State Dept. of Education*, 141 A.D.2d 170, 534 N.Y.S.2d 489 (3rd Dep't 1988) (allowing statistical sampling to determine the accuracy of a business **[*132]** school's certification of students for state tuition assistance awards, and to compute the total amount disallowed for improper certification); and *People v. Chesler*, 91 Misc.2d 551, 398 N.Y.S.2d 320 (N.Y. Sup. Ct. 1977) (expert testimony permissible based upon sampling in a case challenging the representation of minorities in a jury pool). It is equally true, however, that the evidence before the court, primarily in the form of damage reports and experts' affidavits, undeniably has a "tendency" to show the amount of damages allegedly sustained by NiMo. Estimates based on "sound sampling techniques" will, in some circumstances, suffice as the best evidence of proving damages. *Martin Motor Sales, Inc. v. Saab-Scania of America, Inc.*, 452 F.Supp. 1047, 1053 (S.D.N.Y. 1978), *aff'd without pub. opinion*, 595 F.2d 1209 (2d Cir. 1979) (citation omitted). [86] Thus, even though the present case might not fall into the group of cases where statistical sampling evidence has typically been permitted, without a more fully developed record, there can be no determination as to whether NiMo's sampling techniques are sound. **[*133]**

NiMo's experts need to be cross-examined and defense experts also need to render their opinion - both as to the propriety of the sampling methodology employed, and as to the conclusions which can be drawn from that methodology. Presumably, cross-examination of experts on both sides of this litigation will allow the respective opposing counsel to show, for example, the fallacy, if any, in the reasoning of a given expert; whether that expert's calculations are based upon faulty underlying assumptions, and whether the methodology used is a reasonable basis for ascertaining damages. [87] Only then will the court be in a position to determine whether certain damage claims are truly speculative. **[*134]** [88]

This is not a situation, as ITT contends, where it can be safely said at this point that NiMo's damages calculations as to large bore piping are so "grossly inflated and exaggerated **[*135]** as to render them meaningless." *D.S. Magazines, Inc. v. Warner Publisher Services*, 640 F.Supp. 1194, 1209 (S.D.N.Y. 1986) (damages claims "derived from unwarranted bases and speculative assumptions . . . [were] so conjectural that they could not serve as a proper basis for calculating plaintiff's alleged damages"). Nor is this a situation such as that presented in *Herman Schwabe* where the testimony of plaintiff's economist was properly excluded because it was based on assumptions that ranged from "demonstrably false to unreasonable and contrary to common sense." *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970) (citing *Herman Schwabe*, 297 F.2d at 910-12). Looking at NiMo's damage proof in a vacuum (that is without the advantage of experts offering contrary opinions), as the court necessarily must on this motion, it cannot say that the assumptions of NiMo's experts are demonstrably false and/or contrary to common sense. Such a finding would be premature given the current state of the record. The present case is more akin to *Trans World Airlines, supra*, 251 F.Supp. 439, where the court, quoting **[*136]** from a Ninth Circuit decision, observed that when evidence tends to support a theory of damages, a party has the right to put that evidence before a jury and ask them to believe it. 751 F.Supp. at 441 (quoting *Transworld Airlines Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 692-693 (9th Cir. 1990). To conclude, the court denies ITT's summary judgment motion insofar as that motion is seeking a determination that NiMo's large bore piping claims are speculative as a matter of law because they are based upon statistical sampling.

*b. Rework Determination*

The second aspect of ITT's motion as to the large bore piping

---

[86] *Accord Tenants' Union of West Side, Inc. v. Beame*, 40 N.Y.2d 133, 138, 386 N.Y.S.2d 83, 85 (1976) ("for the statistical methods . . . to be acceptable, they need[] to be sound, fair, representative and, in general designed to produce an accurate result,. . . .") (citations omitted).

[87] *See William H. Rankin Co. v. Assoc. Bill Posters of U.S.*, 42 F.2d 152, 155 (2d Cir. 1930) (citing *Eastman Kodak Co. v. Southern Photo Material Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1926)).

[88] Without prejudging any of the evidence which may be proffered at trial, the court reminds counsel, and defense counsel in particular, that:

> There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high.

*Brink's Inc. v. City of New York*, 717 F.2d 70, 711 (2d Cir. 1983) (quoting *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962)). Heeding that admonition in the present case may mean that when all is said and done, it will be a matter of weight and credibility as opposed to admissibility.

damage claim is that the attempt by NiMo's expert to ascertain a reasonable amount of rework is wholly speculative. As ITT describes it, there are essentially three steps in the methodology used by NiMo's expert to make that determination. First, the expert used a 73.4 manhour rate derived from the negotiation of unit rates in 1981. Deposition of Alan D. Nance (May 8, 1991) at 298 (ITT's Appendix, Vol. VII at 1954). Those rates supposedly reported a projection as to how long it would take to erect a given commodity. **[*137]** Mr. Nance (NiMo's engineering expert) then rounded up the unit rate to 100 manhours to justify "things we could not quantify." *Id.* at 309. (ITT's Appendix, Vol. VII at 1963). The resulting calculation represents the time Mr. Nance posits that ITT *should have* spent on each large bore pipe support. *Id.* at 293 (ITT's Appendix, Vol. VII at 1949). (emphasis added). Lastly, to arrive at a final reasonable rework figure, Mr. Nance relied upon a 1981 report suggesting that rework for all crafts on a nuclear power plant, not just large bore piping and pipe supports, could "represent 15 to 20 percent of total manhours in certain areas." ITT's Appendix Vol., VI at 1490. He also relied upon a 1981 estimate by SWEC that rework due to design changes might equal 12%. Mr. Nance thus computed that rework due to craft error (put more bluntly, ITT's "fault") should have been no more than ten percent. ITT's Appendix, Vol. VII at 1950. The end result of those calculations is an allocation of ten manhours (that is, ten percent of 100 manhours) as a reasonable rework rate for each large bore pipe support. ITT's Appendix, Vol. V at 1256.

These calculations result in "no more than a **[*138]** guess" in ITT's opinion. ITT's Damages Memorandum at 31. ITT disputes these calculations claiming that "plaintiffs are attempting to unilaterally impose a contractual obligation on Grinnell [ITT] that was never discussed in negotiations." *Id.* More particularly, according to ITT, "the final result of the plaintiffs' methodology is an attempt to hold Grinnell [ITT] liable for hours devoted to rework in excess of ten percent of the time Grinnell [ITT] 'should' have taken to erect the pipe supports and piping." *Id.*

NiMo does not challenge ITT's description of the methodology used by Mr. Nance to determine a reasonable rework amount. Instead, as it did with most of the damage claims, NiMo responds by reiterating the general rules of law as to proof of damages, and by outlining the extensive work done by its experts to quantify the damages. Basically for the same reasons set forth in section III(B)(2)(a), the court is unable to hold that the reasonable amount of rework calculated by NiMo's experts in connection with large bore piping is speculative as a matter of law. NiMo is apprised, however, that on the record as it is presently constituted, on a spectrum, the rework element **[*139]** of the large bore piping claims seems to fall far closer to impermissible, speculative evidence than it does to admissible evidence.

*3. CAT/SALP*

The only ground asserted by ITT for granting summary judgment on NiMo's claim regarding CAT/SALP costs generally is that those damages are consequential. In ITT's view, these damages are consequential and thus excluded under the contract because they are not a "direct" or "natural" result of ITT's alleged breach of contract. ITT's Damages Memorandum at 34. As previously discussed, whether damages are consequential or not is usually a fact issue. [89] Therefore, ITT's assertion that these damages are consequential does not form an adequate basis for the granting of summary judgment.

*4. Increased QA/QC Costs*

As part of their CAT/SALP claim, NiMo is seeking to recover $ 10,522,576.00 (excluding overhead and financing costs) of the total project QA/QC costs. ITT's Appendix, Vol. V at 1310. This calculation is based on the assumption **[*140]** that as a result of failures (at least some, if not all, of which NiMo is attributing to ITT) revealed by the CAT and SALP audits conducted by the NRC, there were "substantial increases in *project* QA/QC manpower" which otherwise would not have been needed. *Id.* (emphasis added). ITT presents the court with compelling reasons as to why this particular claim is speculative as a matter of law. *See* ITT's Damages Memorandum at 36-40. NiMo does not refute that reasoning; instead, as before, it simply makes generalizations regarding the merits of its proof. NiMo cannot survive ITT's motion for summary judgment on this claim on the basis of those generalizations.

The court agrees with ITT - the mathematical formula used by NiMo to quantify this claim is fraught with uncertainty. The most glaring and perhaps most significant uncertainty is that one of NiMo's experts "estimated," with no readily apparent foundation, that 25% of the QA/QC costs which he deemed as "excessive" are attributable to ITT. ITT's Appendix, Vol. V at 1384. Plainly then this claim is far too speculative and as such does not meet the standards established in the case law discussed herein. Thus, for **[*141]** substantially the reasons set forth in ITT's Damages Memorandum, the court grants summary judgment to ITT as to the damage claim for increased QA/QC costs.

*5. MAC Review Costs*

Another part of the CAT/SALP claim is the $ 3,690,604.00,

---

[89] *See supra*, § IV(A).

which supposedly represents ITT's share of the MAC review. The MAC review refers to the consulting work done by an outside firm (MAC) assessing NMP2 quality programs. NiMo divides the MAC review cost into two parts: the amount charged by MAC and the estimated costs of all personnel on the NMP2 project, including ITT employees, who assisted or otherwise interacted with MAC. ITT's Appendix, Vol. V at 1230-32; 1304-05. Once again, NiMo did not respond in any specific or meaningful way to ITT's cogent argument that this element of damages is speculative because it is based upon no more than a series of estimates connected by unfounded assumptions. So, for the reasons set forth in ITT's Damages Memorandum, ITT is also entitled to summary judgment on that portion of the CAT/SALP claim pertaining to the cost of the MAC review.

*6. OPMP Costs*

Supposedly as a result of mismanagement by ITT, the NRC ordered the NMP2 project to establish a program [***142**] to monitor construction quality activities. ITT's Appendix, Vol. V at 1232-33. NiMo is seeking to recover $ 113,682.00 of the estimated cost of that program. This claim too cannot withstand ITT's summary judgment motion. NiMo has come forth with absolutely nothing to convince the court that these calculations are based upon anything other than educated guesswork. The court agrees with ITT, given the guesswork and unsupported assumptions which form the basis for this damage estimate, summary judgment on the QPMP claim is mandated. *See* ITT's Damages Memorandum at 42-44; and ITT's Reply Memorandum at 13.

*7. Civil Penalty*

In a letter dated March 20, 1984, the NRC included a Notice of Violation imposing a $ 100,000.00 civil penalty on NMP2. ITT's Appendix, Vol. V at 1309; *see also id.* at 1373-82. One of NiMo's experts determined that 19% of that penalty or $ 19,000.00 was attributable to ITT. NiMo is seeking to recover that sum. The $ 19,000.00 figure was arrived at through a relatively simple computation. The total number of NRC violations cited was divided by the violations (or portions of violations) which NiMo contends were the "fault" of ITT. *Id.* at [***143**] 1309, 1373-83. The court concurs with ITT that because "the plaintiffs did not consider the severity of the violations, nor take into consideration the NRC's overwhelming concern with Niagara Mohawk's management deficiencies," this particular damage calculation "does not bear the 'definite and logical connection' between Grinnell's alleged deficiencies and the claimed damages required by *Berley Industries*,. . . ." ITT's Damages Memorandum at 44-45. That, combined with the fact that NiMo offered nothing to convince the court otherwise, requires that summary judgment be granted in favor of ITT on this claim.

*8. Engineering Oversight*

As previously mentioned, engineering oversight costs are not a separate category of damages, but are a portion of the damage claims for planner preparation, large bore pipe support and large bore piping. [90] ITT contends that these oversight damages are both consequential and speculative. The court can find no reason in this instance to deviate from its initial conclusion that generally whether damages are consequential is a fact issue. (ITT itself seems to place little credence in the argument that oversight damages are consequential, as it [***144**] devotes only one sentence of its lengthy damages memorandum to that argument. *See* ITT Damages Memorandum at 48.) Thus, summary judgment is denied on the engineering oversight portion of NiMo's damages insofar as said motion is based upon the assumption that those damages are consequential.

Nor does the court agree with ITT that these damages are speculative as a matter of law. ITT insists (mistakenly) that NiMo's formula is based on two **unsupported** assumptions. Specifically, according to ITT the assumptions that NiMo's engineering costs increased and that they did so on a proportional basis are both unsupported. Those assumptions are not completely unsupported, however. In fact, the contrary is true: both assumptions are amply supported by proof in the record. For example, two NiMo employees unequivocally averred that NiMo incurred [***145**] increased oversight costs due to ITT failures. Affidavit of Yatish C. Goyal (Dec. 3, 1991) at P9 (Plaintiffs' Exhs. Vol. V, Tab T thereto); Affidavit of Gerald K. Rhode (Nov. 27, 1991) at P12 (Plaintiffs' Exhs. Vol. VI, Tab U thereto); *see also* Huston Affidavit at P17 (Plaintiffs' Exhs., Vol. IV at 770). Insofar as the assumption that increases were on a proportional basis is concerned, based upon the averments and deposition testimony of Charles Huston, one of NiMo's experts, the court is also satisfied that that is not a completely unsupported assumption. *See* Huston Affidavit at P17 (and citations therein) (Plaintiffs' Exhs., Vol. IV at 770).

ITT tries to depict the oversight formula as being the same or worse than the mathematical formula rejected by the Court of Appeals in *Berley Industries*, where there was no attempt "to prove that the formula was logically calculated to produce a fair estimate of actual damages." *Berley Industries*, 45 N.Y.2d at 688, 412 N.Y.S.2d at 591. In the present case, NiMo made such an attempt. Therefore, the court will allow NiMo's

---

[90] In its damages memorandum, ITT states that this claim is in the amount of $ 120,561. ITT's Damages Memorandum at 45. That number is transposed; it should be $ 120,651.00.

damage claim for oversight to remain in the case - at least for now.

[*146] *9. Overhead*

NiMo's claim for overhead costs, totaling $ 3,573,744.00, (also a portion of other damage claims rather than an actual category of damages unto itself), is in almost the exact same position as the oversight claim. ITT contends that summary judgment on this claim is also mandated because such costs are speculative, and barred as consequential damages. Again, the court will not retreat from its determination that the issue of whether damages are consequential is ordinarily one of fact. Therefore, the resolution of that issue will have to await another day. Further, because there is no discernable difference between the method used to calculate oversight costs and that used to calculate overhead costs, there is also no basis for granting summary judgment in ITT's favor on the overhead claim.

*10. Liquid Penetrant Inspection*

During the course of the CAT inspection, the NRC found that five welds that had been liquid penetrant inspected [91] and accepted by ITT had, in fact, unacceptable "linear indications." As part of the damages, NiMo is seeking $ 9,633,506.00, [92] which it attributes to the fact that for a period of time, ITT's union pipefitters accompanied [*147] liquid penetrant inspectors. ITT's Appendix Vol. V, at 1286.

ITT vigorously argues that it is "inconceivable" that NiMo is entitled to recover any amount for these alleged damages because the arrangement to have ITT union pipefitters accompany inspectors was approved with the piping union management by SWEC's resident manager, Ronald Wagner. And relying upon contract P301C, ITT states that it was obligated to abide by SWEC's directions, and, by the same token, was entitled to reimbursement for such resulting labor costs.

NiMo alleges that ITT misapprehends the nature of this claim. NiMo, through the affidavit of Charles Huston, contends that it is not an issue of who supplied or requested the union pipefitters who accompanied the [*148] liquid penetrant inspectors. Huston Affidavit at 15 P29 (Plaintiffs' Exhs., Vol. IV at 777). Rather, in NiMo's view, the reason the pipefitters had to accompany the inspectors was essentially due to ITT's alleged breach of contract. That is, "if ITT had planned and scheduled its work so that the welds were tested within a reasonable time, before dirt and rust had a chance to build up," then presumably there would have bee no need for the accompanying pipefitters. *Id.* (citation omitted). Because the outcome here appears to depend upon whether ITT properly performed under the contract, and because that is one of the definitive issues for trial, ITT's summary judgment motion on this claim is denied.

This category of damages is also consequential according to ITT. The basis for ITT's argument this time is slightly different than it was for the other categories of damages. This time around, ITT is asserting that the use of additional ITT union pipefitters constitutes a "special" or "unusual" circumstance; and thus any damages arising therefrom are consequential. Even though the argument is different, the result is the same. Whether these damages are consequential and thus [*149] excluded under the contract cannot be decided on this summary judgment motion.

*11. Planner Preparation*

The last specified category of damages is for costs incurred due to SWEC's preparation of planner packages. Following an NRC inspection in April, 1982, SWEC personnel began to prepare some of the planners. ITT's Appendix, Vol. V at 1292, 1299. They did that because the NRC resident inspector found that the welding procedure for a certain category of welds had not specified that the welds be qualified for impact testing. *Id.* at 1292. According to ITT, those planners would have had to have been prepared by someone in any event, so the cost of SWEC personnel who eventually performed that task is not recoverable. ITT bluntly states, "there is no legal theory or contractual obligation to support such a recovery." ITT's Damages Memorandum at 51.

NiMo argues, on the other hand, that the damages it is seeking under this claim are for costs incurred as a result of "the fact that SWEC personnel had to take over work that ITT personnel had performed improperly." Huston Affidavit at 16, P31 (Plaintiffs' Exhs., Vol. IV at 778) (citation omitted). Thus, as with the liquid penetrant [*150] inspection claim, this claim too seems to turn on NiMo's success in proving a breach of the underlying contract; and that issue cannot and has not been decided by these motions. NiMo's claim for planner preparation will thus remain in the case for now.

*12. Other Damages*

Finally, ITT is arguing that a catch-all category of damages, which it simply refers to as "other," are consequential damages and thus barred under the contract. *See* ITT's Damages Memorandum at 52 and chart attached thereto. It

---

[91] A liquid penetrant inspection is a type of nondestructible test used to measure the acceptability of a given weld.

[92] Plaintiffs' Appendix Vol. IV, Tab M at 1. This figure is inclusive of the $ 846,609.00 in overhead costs and the $ 2,401,874.00 in associated financing costs.

should come as no surprise that the court is hesitant to conclude that these damages are consequential, and therefore prohibited by the contract, when ITT has not even specified what those damages are, except in a cursory manner. Moreover, such a finding would be wholly inconsistent with the court's prior determination that whether damages (of any kind) are consequential is a fact issue.

To summarize, with the exception of the damage claims for QA/QC costs; MAC review; QPMP costs; and the civil penalty, [93] the court is not prepared to hold at this point in the litigation that any of NiMo's other damage claims are speculative (or otherwise barred) as a matter of law. Furthermore, **[*151]** the court on these motions will not, and cannot, determine that any of NiMo's purported damages are consequential and thus barred under contract P301C. The possibility always remains, however, that the court will be in a position to make such determinations (both as to the speculative nature of given damage claims and/or whether any damages are consequential as a matter of law) after hearing the proof at trial. [94]

**[*152]** Accordingly, for the reasons set forth herein, it is hereby

ORDERED:

(1) that the first motion for summary judgment by the ITT defendants is GRANTED with respect to the enhanced radiograph claims; and in all other respects it is DENIED;

(2) that plaintiffs' cross-motion for summary judgment is in all respects DENIED;

(3) that the motion for summary judgment by the ITT defendants seeking to dismiss Count V (Breach of Contract) of the Amended Complaint on the grounds that that cause of action is contractually barred is DENIED;

(4) that the motion for summary judgment by the ITT defendants seeking to dismiss Count VI (Negligence) of the Amended Complaint on the grounds that that cause of action is barred by the economic loss doctrine is GRANTED;

(5) that the motion for summary judgment by the ITT defendants seeking to dismiss Count VII (Gross Negligence) of the Amended Complaint on the grounds that the ITT defendants did not owe the plaintiffs any independent tort duty and/or that such cause of action is barred by the economic loss doctrine is DENIED;

(6) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for financing costs on the **[*153]** grounds that those damages are barred by law and are consequential damages barred by the parties' contract is DENIED;

(7) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for increased QA/QC costs, MAC review costs, QPMP costs and a portion of the civil penalty on the grounds that they are speculative is GRANTED;

(8) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for CAT/SALP damages on the grounds that those damages are consequential damages barred by the parties' contract is DENIED;

(9) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claims for engineering oversight costs on the grounds that those damages are speculative and are consequential damages barred by the parties' contract is DENIED;

(10) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for overhead on the grounds that those costs are speculative is DENIED;

(11) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for the costs of pipefitters accompanying liquid penetrant inspectors is DENIED;

**[*154]** (12) that the motion for summary judgment by the ITT defendants seeking to dismiss plaintiffs' claim for the costs of SWEC's preparation of planners is DENIED; and

(13) that the motion for summary judgment by the ITT defendants to dismiss all claims for consequential damages identified on the chart attached to ITT's Damages Memorandum on the grounds that they are barred by the parties' contract is DENIED.

IT IS SO ORDERED.

DATED: May 23, 1992,

Syracuse, New York

---

[93] These four categories of damages total roughly $ 14.3 million.

[94] The standard for granting a motion for summary judgment and the standard for granting a motion for a directed verdict under Fed. R. Civ. P. 50(a) are essentially the same. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Given the highly technical and complex nature of this litigation, combined with the fact that at trial there will undoubtedly be widely divergent opinions offered by the parties' respective experts, the advantage to the court (and to the parties) of a fully developed record is obvious.

Page 35 of 35

1992 U.S. Dist. LEXIS 7721, *154

Neal P. McCurn

Chief, U.S. District Judge

---

**End of Document**

# Exhibit 17i.

# Prestige Jewelry Int'l, Inc. v. BK Jewellery HK

United States District Court for the Southern District of New York

October 14, 2015, Decided; October 15, 2015, Filed

11-CV-2930 (LAP)

**Reporter**
2015 U.S. Dist. LEXIS 165245 *; 2015 WL 8481873

PRESTIGE JEWELRY INTERNATIONAL, INC., Plaintiff, v. BK JEWELLERY HK, BK JEWELRY (N.Y) INC., WING YEE GEMS & JEWELLERY LIMITED, AND A.V. JEWELRY EXPORT-IMPORT, LTD., Defendants.

**Prior History:** Prestige Jewelry Int'l, Inc. v. BK Jewellery HK, 2012 U.S. Dist. LEXIS 63850 (S.D.N.Y., Mar. 27, 2012)

**Counsel:** [*1] For Prestige Jewelry International, Inc., Plaintiff: Andrew Sol Langsam, Pryor Cashman LLP, New York, NY; Barry Kramer, Edwards & Angell, LLP (NJ), Short Hills, NJ; Christine S Baxter, Darth M. Newman, Joseph A Martin, PRO HAC VICE, Archer & Greiner, One Centennial Square, Haddonfield, NJ; Leo James Hurley, Jr, Patrick Papalia Archer & Greiner, P.C., New York, NY.

For Wing Yee Gems & Jewelery Limited, A.V. Jewelry Export-Import, Ltd., BK Jewellery HK, BK Jewelry (N.Y.) Inc., Defendant: Max Moskowitz, LEAD ATTORNEY, Ostrolenk, Faber, LLP, New York, NY.

For BK Jewellery, BK Jewellery, Inc., BK Jewelry (N.Y.) Inc., Counter Claimant: Max Moskowitz, Ostrolenk, Faber, LLP, New York, NY.

For Wing Yee Gems & Jewelery Limited, A.V. Jewelry Export-Import, Ltd., Counter Claimant: Max Moskowitz, LEAD ATTORNEY, Ostrolenk, Faber, LLP, New York, NY.

For Prestige Jewelry International, Inc., Counter Defendant: Andrew Sol Langsam, Pryor Cashman LLP, New York, NY; Barry Kramer, Edwards & Angell, LLP (NJ), Short Hills, NJ; Darth M. Newman, PRO HAC VICE, Archer & Greiner, One Centennial Square, Haddonfield, NJ; Leo James Hurley, Jr, Patrick Papalia, Archer & Greiner, P.C., New York, NY.

**Judges:** LORETTA A. PRESKA, Chief [*2] United States District Judge.

**Opinion by:** LORETTA A. PRESKA

## Opinion

MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief United States District Judge:

Following this Court's September 15, 2014 Order [dkt. no. 106] denying Plaintiff's motion for summary judgment [dkt. no. 69] and granting Defendants' motion for partial summary judgment [dkt. no. 91], Prestige brings a motion for reconsideration pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and Rule 6.3 of the Local Civil Rules. Plaintiff argues that the discovery of additional prior art renders obvious the patent that is the subject of these proceedings, U.S. Design Patent D618,132 (the "'132 Patent"). According to Plaintiff, this obviousness undercuts the earlier finding that the patent was not invalid and, accordingly, it would be manifestly unjust for the Court to move forward without reconsidering that finding in light of the new prior art. Accordingly, Plaintiff urges the Court either to find the '132 Patent invalid or to allow the issue of validity to be decided by the jury. For the following reasons, Plaintiff's motion [dkt. no. 119] is DENIED.

I. Legal Standard

"[M]otions for reconsideration are intended to bring to the Court's attention matters that it overlooked, not to 'examin[e] a decision and then plug[ ] the gaps of a lost motion with [*3] additional matters.' Indeed, as Chief Judge Mukasey . . . wrote, a party seeking reconsideration 'is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.'" Questrom v. Federated Dep't Stores, Inc., 192 F.R.D. 128, 130-31 (S.D.N.Y. 2000) (footnotes omitted) (quoting Polsby v. St Martin's Press, Inc., No. 97 Civ. 690(MBM), 2000 U.S. Dist. LEXIS 596, 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000)) aff'd, 2 F. App'x 81 (2d Cir. 2001). The Court of Appeals has made clear that reconsideration of prior decisions should be the exception rather than the rule:

> We have limited district courts' reconsideration of earlier decisions under Rule 54(b) by treating those decisions as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964). Thus, those decisions may not usually be changed unless there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted). We review for abuse of discretion [*4] a district court's denial of the Rule 54(b) motion and its denial of leave to amend a complaint. Local 802, Associated Musicians v. Parker Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998) (leave to amend); Virgin Atl. Airways, 956 F.2d at 1254-55 (Rule 54(b) motion).

Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003).

When a party asserts that new evidence requires reconsideration of a prior decision,

> "the proponent must demonstrate that the newly discovered evidence was neither in his possession nor available upon the exercise of reasonable diligence at the time the interlocutory decision was rendered." The party moving for reconsideration based on the newly discovered evidence must show that (1) the proffered evidence was unavailable despite the exercise of due diligence by the movant in procuring evidentiary support, and (2) manifest injustice will result if the court opts not to reconsider its earlier decision.

In re Rezulin Products Liab. Litig., 224 F.R.D. 346, 350 (S.D.N.Y. 2004) (quoting Tri-Star Pictures v. Leisure Time Prods., B.V., No. 88 CIV. 9127 (DNE), 1992 U.S. Dist. LEXIS 15232, 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992)).

ii. Analysis

Plaintiff argues primarily that the newly found prior art was "not available through reasonable diligence" because "a reasonably diligent search of the prior art was conducted but did not yield the particular items" sought; indeed, Plaintiff claims that "a significantly higher level of diligence, and great expense, was required to find, document, and obtain the catalogs containing the relevant jewelry pieces." (Prestige's Mem. in Supp. Mot. Recons. [*5] [dkt. no. 119], at 9.) However, that prior counsel's search did not yield the specific prior art now brought forth does not mean that the evidence was not available through reasonable diligence. Indeed, the art in question comes in the form of catalogs that were circulated prior to August 2008, (id. at 6), so the evidence would appear to have been available dating to the time of publication. In attempting to show that the materials were nonetheless unavailable, Plaintiff details the searches that were conducted by prior counsel, asserting that they were reasonably diligent. While the Court takes no position as to the prior search, what is clear is that there is nothing extraordinary about the methods Plaintiff used eventually to track down the prior art where the entire litigation hinges upon the validity of the '132 Patent. While "deploy[ing] multiple associates on a multi-day investigation," "enlist[ing] the help of another, unrelated client" and dedicating "weeks of effort" of one kind or another to tracking down the images represents a significant investment of resources to the search, under these circumstances, the Court cannot find that this is somehow beyond reasonable diligence. Plaintiff's attempts to distinguish [*6] between "abundant reasonable diligence" and "extraordinary diligence" are not convincing. (Id. at 9-10.) To put it simply, when new counsel performed a reasonably diligent search, the materials were uncovered, and there is no indication that prior counsel could not have done the same thing and obtained the same result.

As Plaintiff can demonstrate only that the prior art was not found and not that it was actually unavailable, the newly presented evidence is untimely and will not be considered. Accordingly, the Court need not address what that evidence might show or opine on Plaintiff's remaining arguments as to obviousness.

As the Court appropriately considered only that evidence properly before it in rendering its summary judgment decision, that decision was neither unjust nor in error — the prejudice to Plaintiff that arises, if any can be said to arise, is entirely the result of Plaintiff's failure to meet its burden in a timely fashion. That the Court has discretion to reconsider its prior decisions does not make it appropriate to grant one party a mulligan after it had a fair opportunity to argue its point and lost.

iii. Conclusion

For the above reasons, Plaintiff's motion [dkt. no. 119] is [*7] DENIED. The parties are scheduled to appear for a conference in courtroom 12A, United States Courthouse, 500 Pearl Street, New York, New York 10007 on October 28, 2015, at 3:00 p.m. and shall confer and attempt to stipulate to a schedule that will move this case forward.

SO ORDERED.

Page 3 of 3

2015 U.S. Dist. LEXIS 165245, *7

Dated: New York, New York

October 14, 2015

/s/ Loretta A. Preska

LORETTA A. PRESKA

Chief U.S. District Judge

---

**End of Document**

# Exhibit 17j.

# StreetEasy, Inc. v. Chertok

United States Court of Appeals for the Second Circuit

June 7, 2016, Decided

15-2003

**Reporter**

651 Fed. Appx. 37 *; 2016 U.S. App. LEXIS 10235 **

StreetEasy, Inc.,[1] Plaintiff-Appellee, v. Douglas Chertok, Defendant-Appellant.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** **[**1]** Appeal from an order of the United States District Court for the Southern District of New York (Sullivan, J.).

NMD Interactive, Inc. v. Chertok, 2013 U.S. Dist. LEXIS 49809 (S.D.N.Y., Mar. 18, 2013)

**Counsel:** FOR PLAINTIFF-APPELLEE: ISAAC ZAUR, Emily S. Reisbaum, Clarick Gueron Reisbaum LLP, New York, NY.

FOR DEFENDANT-APPELLANT: DOUGLAS CHERTOK, Pro se, Pearl River, NY.

**Judges:** PRESENT: DEBRA ANN LIVINGSTON, DENNY CHIN, SUSAN L. CARNEY, Circuit Judges.

## Opinion

**[*38]** **SUMMARY ORDER**

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order of the district court is **AFFIRMED**.

Appellant Douglas Chertok, an attorney proceeding *pro se*, appeals the district court's order awarding $19,192.33 in attorney's fees to StreetEasy, Inc. ("StreetEasy"), representing a sanction against Chertok under Federal Rule of Civil Procedure 11. Previously, we vacated two out of the three violations of Rule 11 on which the district court based its original sanctions award against Chertok, and remanded for reconsideration of the appropriate amount of sanctions. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

* * *

We review a district court's imposition of Rule 11 sanctions for abuse of discretion. *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999). This deferential standard applies because the district court is "[f]amiliar with the issues and **[**2]** litigants" and thus "better situated than the court of appeals to marshal the pertinent facts and apply [a] fact-dependent legal standard." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). When reviewing Rule 11 sanctions, however, we "nevertheless need to ensure that any [sanctions] decision is made with restraint." *Schlaifer Nance & Co.*, 194 F.3d at 334. "[D]iscretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand." *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir. 1987).

The district court's sanctions award was not an abuse of discretion. The district court based its award on a variety of factors: it cited the need for deterrence, and recognized that "the willful and pervasive nature of [Chertok]'s misrepresentations, and the time and effort they added to this litigation," called for a "considerable sanction." Joint App'x 290-91. It balanced those considerations against the fact that we vacated two out of the three Rule 11 violations it originally relied on, and the fact **[*39]** that StreetEasy devoted less than one third of its submissions to the affirmed Rule 11 violation. Under these circumstances, it cannot be said that the district court's decision to award one-third of the original amount was not within the range of permissible decisions. *See Eastway Constr. Corp.*, 821 F.2d at 123 (recognizing district court's **[**3]** wide range of discretion in setting amount of Rule 11 sanctions); *see also Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp,*

[1] Accordingly, we DENY Chertok's motion, and AFFIRM the order of the district court.

*Inc.*, 28 F.3d 259, 266 (2d Cir. 1994) (recognizing court discretion in determining reasonable fee under Rule 11).

Chertok argues, in essence, that the sanctions award must be less than one-third of the original amount because less than one-third of the effort resulted directly from the violation. He cites Rule 11(c)(4), which provides as follows:

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction *may include* nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses *directly resulting from the violation.*

Fed. R. Civ. P. 11(c)(4) (emphases added). We disagree. A sanction must simply be "limited to what suffices to deter repetition of the conduct." *Id.* But it "*may include* . . . an order directing payment . . . of part or all of the reasonable attorney's fees . . . directly resulting from the violation." *Id.* (emphasis added); *see, e.g., S.E.C. v. Smith*, 710 F.3d 87, 98 (2d Cir. 2013) ("District courts are given broad discretion in tailoring appropriate and reasonable **[**4]** sanctions." (alteration omitted) (quoting *O'Malley v. N.Y.C. Trans. Auth.*, 896 F.2d 704, 709 (2d Cir. 1990))); *cf., e.g., Catton v. Def. Tech. Sys. Inc.*, 541 F. App'x 25, 30 (2d Cir. 2013) (summary order) (finding no abuse of discretion where a district court tailored the amount of attorney's fees—awarded in connection with moving for Rule 11 sanctions—to be in line with the "direct result" of the Rule 11 violation). We identify no abuse of discretion in either the decision to award fees in this case, or in the district court's conclusion that the fees awarded resulted directly from the violation. The district court was not obliged to award fees based precisely on the number of pages in the briefing devoted to the sanctionable conduct. As the district court observed, deterrence is the purpose of Rule 11 sanctions, and it had the discretion to set the amount based on all the circumstances. And there is no abuse of discretion in ordering sanctions, as the district court did, in the amount that it awarded.

* * *

Chertok next challenges our determination in the prior appeal that the district court did not abuse its discretion in imposing a Rule 11 sanction in connection with Chertok's misrepresentations as to which particular documents related to shareholder and board consents he agreed to sign pursuant to a settlement agreement. He argues, for **[**5]** the first time in this appeal, that we should entirely vacate the sanctions award because the consents were not valid under Delaware law, and so he cannot have made any misrepresentation regarding them. In so arguing, Chertok requests that this Court reverse itself and depart from the law of the case in order to avoid manifest injustice. We decline to do either.

Generally, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, **[*40]** 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976). But "because that rule is prudential, not jurisdictional, we have discretion to consider waived arguments." *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004). We are more likely to exercise discretion "(1) where consideration of 1 the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir. 1996).

The law of the case doctrine requires that "'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case,' unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (first quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991); then quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). Such reasons include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent **[**6]** manifest injustice." *Id.* at 1230 (quoting *Tenzer*, 213 F.3d at 39).

No manifest injustice would result from declining to consider Chertok's new argument or depart from the law of the case. Chertok already petitioned for rehearing of our prior decision; that petition was denied. Chertok offers no convincing explanation as to why he, or his counsel in the proceedings below, did not raise the present argument at an earlier stage, such as in opposition to sanctions. Indeed, the argument appears based on a thirteen-year-old state law case. *See H-M Wexford LLC v. Encorp., Inc.*, 832 A.2d 129, 151 (Del. Ch. 2003). Under these circumstances, we will not exercise our discretion to consider this waived argument or depart from the law of the case.

* * *

On April 27, 2016, Chertok also filed a motion to vacate the judgment for purported fraud on this Court. This motion was opposed, and Chertok then filed his reply. Chertok, however, has not presented clear and convincing evidence to meet the high bar for finding fraud on the Court. *See King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002).

Accordingly, we **DENY** Chertok's motion, and **AFFIRM** the order of the district court.

Page 3 of 3

651 Fed. Appx. 37, *40; 2016 U.S. App. LEXIS 10235, **6

**End of Document**