UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Haley Spears                                    No.3:11-cv-01807-KAD

    Plaintiff

v.

Liberty Life Assurance Company of Boston;
United Technologies Corporation;
The Group Life Insurance and Disability
Plan Of United Technologies Corporation
aka The UTC Choice Integrated Disability
Benefit Program;                                November 16, 2018

    Defendants

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### Table Of Contents

I)   Background ............................................................................................... 3

  a.  Procedural history ................................................................................. 3
  b.  Pertinent Plan Provisions ..................................................................... 5
  c.  This Court's 2015 Decision .................................................................. 5
  d.  Liberty's Actions On Remand ............................................................ 12
II)  Law & Argument ..................................................................................... 25

  a.  The Usual Standard for Summary Judgment Applies In An ERISA Case ..................... 25
  b.  Defendants Failed To Comply With The Order Of March 31, 2015, Which Required That ERISA Procedures Be Followed And That Liberty Support Its Determination ...... 26
  c.  Liberty's Failure To Comply With ERISA Regulations Entitles Spears To De Novo Review ........................................................................... 34
    i.   Failure To Have Procedures in Full Conformity with the Regulation ........................... 35
    ii.  Liberty Violated 29 C.F.R. §2560.503-1 (f)(3) When It Did Not Meet The ERISA Claim Review Deadlines On Remand ...................................................... 37
    iii. Liberty Violated 29 C.F.R. §2560.503-1 (i) When It Did Not Meet The ERISA Internal Appeal Deadlines On Remand Or Acknowledge That It Was Required To Offer An Appeal ................................................................ 43
    iv.  Liberty Violated 29 C.F.R. §2560.503-1 (h)(3)(ii) When It Did Not Establish A Reasonable Procedure On Remand When The Individual Who Made The Initial Adverse Benefit Determination Also Decided The Claim On Remand ..................... 44

    v.   Liberty Violated 29 C.F.R. §2560.503-1 (h)(3)(iii), (v) and (h)(4) When It Did Not Establish A Reasonable   Procedure On Remand When The Same Medical Consultants Were Used On Appeal .................................................................................. 46

    vi.  Liberty Violated 29 C.F.R. §2560.503-1(g) When It Did Not Include The ERISA Required Notice In Its June 2016 Denial of Spears' Right to Bring A Civil Action ..... 46

    vii. Liberty Violated 29 C.F.R. §2560.503-1(g)(iii) When It Did Not Provide An Adequate Description Of Any Additional Material Or Information Necessary For Spears To Perfect The Claim And An Explanation Of Why Such Material Or Information Was Necessary .................................................................................................................. 47

    viii. Liberty Violated §2560.503-1(h)(2)(iv) When It Did Not Take Into Account All Information Submitted By Spears, Including Vocational Information ......................... 48

    ix.  Liberty Violated 29 C.F.R. §2560.503-1(b)(5) When It Did Not Set Up Required Administrative Processes And Safeguards................................................................ 50

    x.   Even If The PPE Procedures Can Be Interpreted As Applying To Consideration Of A Claim On Remand, Liberty Did Not Follow Them ....................................................... 51

  d.  Even With An Arbitrary & Capricious Standard,  The Plan Must Be Interpreted Consistent With Its Plain Words, And Spears Must Be Found Disabled ...................... 52

    i.   A Discretionary Clause Cannot Be Used To Deny A Claim Which Is Otherwise Properly Payable Under The Policy Terms...................................................................... 52

    ii.  Liberty's Conflict Of Interest Affected Its Decision Making Resulting In De Novo Review..................................................................................................................... 53

  e.  Using Either The De Novo Or Arbitrary And Capricious Standard, Spears Was Disabled During The Elimination Period, Own Occupation And Any Occupation Period Until August  2014................................................................................................................ 55

    i.   Second Circuit Law Requires That Subjective Factors Such As Pain Be Taken Into Consideration ............................................................................................................ 55

    ii.  ..Under Either Standard Of Review, Spears Has Shown That She Met The Definition Of Disability Under The Plan................................................................................................ 56

    iii. Liberty's Denials Are Not Supported By Substantial Evidence Under An Arbitrary And Capricious Standard And Do Not Support Non-Disability Under A De Novo Standard ................................................................................................................................... 57

III)    CONCLUSION................................................................................................... 61

CERTIFICATION OF SERVICE ............................................................................. 62

Plaintiff, Haley Spears, brought this action against defendants Liberty Life Assurance Company of Boston ("Liberty"), United Technologies Corporation ("UTC")[1] and The Group Life Insurance and Disability Plan Of United Technologies Corporation aka The UTC Integrated Disability Program ("Plan") in 2011 when they terminated her from benefits under a disability

---

[1] UTC was dismissed as a defendant. This motion is brought against Liberty and the Plan. For the sake of simplicity, both defendants are referred to as "Liberty."

plan sponsored by her employer UTC. She alleges violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, et seq. ("ERISA").   Haley Spears ("Spears") is a participant in the Plan, an ERISA welfare benefit plan that is underwritten and insured by Liberty.   Spears  seeks disability benefits under her Long Term Disability ("LTD") plan.

## I)   Background

### a.  Procedural history

This case has a long and complex procedural history. Spears brought this civil action against defendants in 2011 ("Spears I").  After a debilitating and lengthy illness, Spears returned to work in August 2014, at a series of temporary jobs. R. 4862. She is not claiming that she is currently disabled.

On March 31, 2015, this court, after finding that Liberty acted arbitrarily and capriciously in denying Spears' LTD claim, granted partial summary judgment in favor of Spears against defendants. The court found that Liberty's reviews were deeply flawed and inadequate. Judgment was entered in favor of Spears. Dkt. 104. The court remanded the case and directed that defendants again consider the issue of Spears' disability.

On January 12, 2016, nine and half months after this court ordered the remand, Spears requested that Liberty decide her disability claim.  R. 2723, 2286. When Liberty did not decide the claim, Spears filed a Motion to Reinstate her Summary Judgment Motion to the Docket on February 27, 2016. The court denied that motion on April 1, 2016, stating that the case was closed, and the court did not retain jurisdiction. Spears then filed a new Complaint, ("Spears II") which was given docket number 3:16-cv-00572(VLB). That case was filed April 8, 2016. That

Complaint, and an Amended Complaint filed April 14, 2016[2], alleged that Liberty had exceeded the time allowed by ERISA to decide her remanded claim, and therefore it was deemed denied. The 2016 Complaint was filed to recover benefits due Spears under the plan. Liberty then denied the claim on June 16, 2016. R. 2379.  Spears filed an administrative appeal on July 13, 2016.  R. 2377. On December 16, 2016, Spears filed a Second Amended Complaint in the 2016 docket number, cv 3:16-cv-00572(VLB) which alleged that Spears filed an administrative appeal in July 2016 and that, as of the date of filing the December 2016 Complaint, Liberty still had not decided the appeal, and that because the appeal was not decided within the 45 days required by ERISA, the claim was deemed denied. The 2016 case was dismissed by this court on August 21, 2017 in a ruling where the court stated that plaintiff could file a Motion for Summary Judgment in the original 2011 case. The court stated that the 2016 case was filed as a result of a "poorly worded order entered by this court in the underlying case…." The court, on that same date, issued a Corrected Order in the 2011 case. On September 20, 2017, the court reopened the 2011 case.  This case, therefore, has pleadings filed under two docket numbers.

The operative Complaint is the  Amended Complaint filed August 30, 2017, dkt. 110. That Complaint alleged, inter alia,  that as of the April 2016 Complaint, Liberty had not decided the remanded case, and as of the December 16, 2016 Complaint, Liberty had not decided the administrative appeal, that the deadline had passed and that this meant that the claim was, again, deemed denied.  Liberty did not decide the administrative appeal until May 4, 2017. R. 4911. The Complaint requested that Liberty pay the unpaid disability benefits, pre-judgment interest, costs, attorney fees, and such other relief as the court deems just, reasonable or equitable.

---

[2] An Amended Complaint was filed due to intervening case law in *Halo v. Yale Health Plan*, 819 F3d 42 (2d Cir.2016). Halo was decided April 12,  2016.

### b. Pertinent Plan Provisions

Spears refers the court to the 2015 decision of Judge Bryant which summarizes the medical evidence and the details regarding each administrative appeal and denial. The reason for all of the LTD denials - both prior to the 2015 judgment and after remand - was Liberty's claim that Spears did not meet the 180 day Elimination Period.

Spears' disability plan provided short term disability ("STD") coverage for a 180 day period. This was the "Elimination Period" for the LTD coverage. The LTD Plan defined "Elimination Period" as "a period of consecutive days of Disability or Partial Disability for which no benefit is payable." The Elimination Period is the greater of (i) the end of Spears' STD benefits or (ii) 180 days. Dkt. 103, at 35.

The LTD claim was denied prior to the 2015 judgment because Liberty decided that Spears was not disabled throughout the Elimination Period. R. 2389. The Elimination Period was September 27, 2008 through March 27, 2009. Dkt. 103, at 31. Although Liberty disputed that Spears was disabled from February 8, 2009 through March 27, 2009, it nonetheless eventually paid her for the entire Elimination Period, stating that it did so based on "employer override" which was a request by UTC that benefits be paid. Dkt. 103, at 29 - 30. In spite of this undisputed payment, Liberty continued to deny benefits claiming that Spears was not disabled for the entire Elimination Period. R. 2389.

### c. This Court's 2015 Decision

In an 82 page ruling, dkt. 103, this court soundly criticized Liberty's claim practices. Even using the deferential arbitrary and capricious standard, the court found that Liberty violated the ERISA claim regulations and did not provide a full and fair review to Spears. The court was "deeply disturbed by the pervasive errors underlying Liberty's review of her [Spears] claim,

despite its many opportunities to perform a proper review…" Dkt. 103, at 78. Judge Bryant remanded the case, which, in effect, gave Liberty a second chance to get it right. The Court cited to *Solnin v. Sun Life Health Ins. Co.*, 766 F.Supp.2d 380, 393-94 (E.D.N.Y. 2011) and held that the ERISA claim regulations apply to post-remand benefits determinations. Dkt. 103, p. 79. Despite that statement by the court, Liberty took the position that the ERISA regulation's deadlines did not apply to the post-remand proceedings. R. 4893, "Although ERISA does not prescribe Liberty Life's deadline for review of the evidence in support of Plaintiff's claims, it will strive to follow the appeal review deadlines set forth in the Regulations." Letter from Attorney Baskin, July 24, 2015. Liberty's failure to comply with the ERISA requirements and deadlines on remand stems from its position that ERISA did not apply to it, in spite of the court's clear admonition in the March 31, 2015, remand order.

After detailing the history of Liberty's actions and inactions on Spears' claim, Judge Bryant discussed the pertinent plan provisions from UTC's disability plan. Dkt. 103, at 32 – 35. Both parties agreed that both the short term disability (STD) and long term disability (LTD) Plans were subject to the statutory and regulatory requirements of ERISA and that Liberty was an ERISA fiduciary. Dkt. 103, at 35. 29 C.F.R. §2560.503-1, the claim regulation, "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." Dkt. 103, p.36.

The court found that Liberty violated ERISA.  Liberty relied on fatally flawed physician review reports. Each and every peer review report upon which Liberty relied to deny STD and LTD benefits suffered from numerous and serious flaws, which rendered them insufficient to supply the substantial evidence necessary to support Liberty's denial decisions. Dkt. 103, at 52-53. The court found the following violations:

1. Dr. Taiwo's peer review report did not provide substantial evidence in support of Liberty's denial of Spears' initial claim to extend her STD benefits beyond February 8, 2009. Dkt. 103, p.53. The decision addresses Dr. Taiwo's analysis at 53 – 61. The errors in Liberty's use of Dr. Taiwo can be summarized as: Liberty never explained why it chose to consult a different doctor for its second peer review rather than to return to its own doctor, Dr. Potts, who provided an initial report favorable to Spears. None of the regulations cited by Liberty supported its claim that it was required to consult with a different doctor. Dkt. 103 at 54. The court noted that Liberty "appears to evade this question." Dkt. 103 at 54. "Liberty's abrupt change to a different peer reviewer for no good reason is alone suspect." Dkt. 103 at 55. Additionally, Liberty asked Dr. Taiwo an irrelevant question, whether the medical information supported ongoing restrictions and limitations, not whether Spears had restrictions and limitations during the Elimination Period. Nowhere did Dr. Taiwo consider Spears' condition prior to March 24, 2009, "let alone render any conclusions about whether Spears was disabled prior to this date." Dkt. 103 at 56. The court found that Liberty's conclusion was "baseless" and furthermore, Liberty's denial letter to Spears misleadingly quoted a portion of Dr. Taiwo's conclusion and left out the critical date restriction. Dkt. 103 at 56. Dr. Taiwo, moreover, failed to consider relevant evidence consisting of critical reports from Spears' treating physicians. This evidence included a report from UTC's own Medical Department that Spears could only work part time, and records from Dr. Zagar that Spears was receiving treatment via a PICC line. Dkt. 103 at 58.

The court also criticized Dr. Taiwo's "wholly unsubstantiated conclusion" that Spears' medical records did not support any specific limitations or restrictions; moreover, he did not reconcile the fact that Liberty concluded that Spears was disabled for a considerable portion of the Elimination Period with his conclusion that she was not disabled. Dr. Taiwo and Liberty were both aware that the symptoms which formed the basis for Spears' STD claim were

7

debilitating migraines and related symptoms, not gastrointestinal problems, yet Dr. Taiwo relied on the GI doctor (Dr. O'Brien) who allegedly told Dr. Taiwo that he did not restrict Spears' activities. Dkt. 103 at 60.

2. Dr. Silverman's November 2009 report did not provide substantial evidence to support Liberty's denial of Spears' appeal of the STD denial. After Spears had been denied for continued STD benefits, she appealed to Liberty. Dkt. 103 at 62.  She submitted letters from four different treating doctors, each of whom stated their opinion that she was unable to work. The court found that Liberty's conclusion that there was "no new clinical information to contradict the opinions of Drs. Potts and Taiwo" was baseless, both because Dr. Potts agreed with Spears' treating physicians that the severity of her near daily headaches was likely to preclude her from working and because Dr. Taiwo offered no explanation or support for his bare opinion. The court found that Dr. Silverman's November 23, 2009, report suffered from two fatal defects.  First, the bulk of his reports concerns whether or not Spears suffers from Lyme disease. Dkt. 103 at 63. He concentrated on Lyme disease because Liberty asked him to opine on four questions and three of the questions exclusively pertained to Spears' diagnosis. The court found that this was not the relevant question. The relevant question was whether or not Spears' condition rendered her disabled within the meaning of the STD plan. Dkt. 103 at 64.

Secondly, Dr. Silverman appeared to have determined that Spears was ineligible for benefits based on a higher standard of evidence than that called for under the STD plan. Dkt. 103 at 65. The court cited to *O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995), which held that even when a plan vests the plan administrator with discretionary authority, "where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words . . . their actions may well be found to be arbitrary and capricious."  Dr. Silverman wrote that Spears' medical records revealed

8

"no clear cut evidence of impairment from February 8, 2009 to the present." Neither the STD nor the LTD policies require proof of disability by "clear cut" evidence. Dkt. 103 at 65. The standard is whether a claimant can perform the material and substantial duties of her own occupation. Dr. Silverman's conclusion that Spears did not have any physical restrictions was based on his determination that Spears failed to provide "clear[-]cut findings" of impairment. "This conclusion neither follows logically from its premise nor does it comport with the requirements of the Plan. Second, nothing in this paragraph (nor elsewhere in his report) provides any indication that Dr. Silverman considered whether the evidence of Spears' pain and fatigue and the frequency, severity and duration of Spears' migraines impacted Spears' ability to perform her material and substantial duties independently from his conclusion that she failed to provide clear-cut evidence of impairment." Dkt. 103 at 68. The court concluded by reiterating the finding regarding the Dr. Taiwo report; that the Dr. Silverman report does not reconcile Liberty's finding that Spears was disabled at the beginning of the Elimination Period with its conclusion that she was no longer disabled. "This is an incongruity which permeated all of Liberty's findings and those of its peer reviewers." Dkt. 103 at 69.

3. Dr. Silverman's second report of May 13, 2010 violated the ERISA claims regulations and did not provide substantial evidence in support of Liberty's decision to deny Spears' second appeal of her STD claim. The court held that, when Liberty referred new medical information it received for a second appeal review back to Dr. Silverman, that "directly violated the ERISA claims regulations, *see* 29 C.F.R. §2560.503-1(h)(3)(v)[which requires a new medical consultant to review an adverse determination], and virtually assured that Spears would not receive a full and fair review." Dkt. 103 at 70. Among the new records submitted was a letter written by an Assistant Attorney General of the State of Connecticut which was highly critical of Dr. Silverman's initial report. The court wrote, "It is nearly inconceivable that a consultant whose

9

analysis and conclusion has been called into question by a state prosecutorial office would do anything other than defend that conclusion, particularly when Liberty asked him to "comment on the assertion by Assistant Attorney General Huhn" and whether "this information alter[ed] [the] prior assessment." Dkt. 103 at 71. The court also found that, in addition to being hopelessly compromised, the Dr. Silverman report did not provide Liberty with substantial evidence to support its denial, since it did not even address whether Spears was disabled within the meaning of the STD plan. Dkt. 103 at 71.

4. Dr. Brusch's report did not provide substantial evidence in support of Liberty's denial of STD or LTD benefits. After receiving a significant number of additional medical records, Liberty referred Spears' file to Dr. John Brusch. He prepared a report dated September 27, 2010. The court stated, "[a]s was the case with Dr. Silverman's first report, nearly all of the questions Dr. Brusch was asked to consider concerned the accuracy of Spears' Lyme disease diagnosis and the quality of the treatment she was receiving for this disease." The questions Liberty asked Dr. Brusch were either irrelevant – regarding the accuracy of the Lyme disease diagnosis and the quality of the treatment she was receiving for that disease; or otherwise troublesome. Liberty's restriction to "clinically supported" restrictions and limitations was troublesome, as the question precluded Dr. Brusch from considering the extent to which Spears suffered from impairments which did not or could not be demonstrated clinically. *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013)(stating that "the plan administrator must give sufficient attention to subjective complaints" and that "it is error to reject subjective evidence simply because it is subjective"). The court found Dr. Brusch's response even more troubling. He wrote: "[f]rom an infectious disease evaluation, the claimant does not have any restrictions and limitations to her activity from [February 8, 2009] forward." The qualifier Dr. Brusch employed, "[f]rom an infectious disease evaluation," was both extremely vague and rendered the remainder of his

answer non-responsive to the question he was asked. The court found this to be particularly problematic because Dr. Brusch elsewhere acknowledged that Spears' migraine headaches were among the conditions that *were* "substantiated clinically." Dkt. 103 at 73.

5. In addition to Liberty's error in relying on medical reports which did not support their conclusions, the court found error in Liberty's claim handling procedures. First, Liberty acted arbitrarily and capriciously when it considered some of Spears' post-Elimination period records, but not others, without explanation. Dkt. 103 at 74. In its final denial letter of June 15, 2011, Liberty denied the LTD claim without considering new medical records submitted by Spears. The new records ranged in date from August 8, 2010 through April 29, 2011. Liberty decided that those records were "not relevant" to the "period under consideration," which was the Elimination Period. The court held that this determination was plainly inconsistent with its earlier treatment of such records. Liberty had provided Dr. Brusch with a host of records from June, July and August 2010. "At no point up until Liberty's final letter did Liberty indicate that such records were 'not relevant,' nor would such indication have made any sense given that Liberty provided them to its independent consultant for his consideration." Dkt. 103 at 75. The court cited favorably to *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 552 F.3d 863, 871 (9th Cir. 2008) ("When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.").

In light of the "deeply flawed and inadequate series of reviews" the Court remanded the case back to Liberty with several instructions, Dkt. 103 at 78 – 80:

1. Liberty was instructed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period.

2. Take greater care in posing relevant questions to its peer reviewers. Consider whether to have an IME or to have its medical consultants communicate with Spears' treating physicians.

3. Perform a full and fair review that complies with the ERISA claims regulations.

4. Liberty may not categorically dismiss Spears' post-Elimination Period medical record as "not relevant" without a reasonable explanation.

### d. Liberty's Actions On Remand

Liberty admitted that it did not make any change in its claim procedures after this Court's March 2015 ruling granting summary judgment for Spears. Ex. A, response to interrogatory #8.

Liberty did not begin the court-required review of Spears' claim until July 24, 2015, almost four months after this Court's remand order. R. 4890 – 4893. Spears provided additional medical records to defendants and filled out additional claim forms at their request. R. 4890 – 4893, 4882, 4859. It took an additional three months for Liberty to assign the remanded claim to its adjuster, Nancy Winterer. This took place on October 14, 2015. R. 4854.

One of the first actions taken by the adjuster was to order a data base search of Spears on or about October 23, 2015. R. 2288, n. 32, 4702. The database search did not uncover any information which contradicted any of Spears' statements. R. 2278 – 4893. It did not uncover any information which showed that Spears was not disabled for the time period she claimed that she was disabled. R. 2278 – 4893.

Liberty also hired a private investigator to investigate Spears and her family in 2015. R. 4564 – 4592. This included a social media search, including but not limited to Facebook, Twitter, Google plus, LinkedIn, Google, Bing and Yahoo. R. 4564 – 4592. The investigator made a thorough search of the subject "and the subject's relatives." R. 4564. Searches were conducted in three states. R. 4564. A search of Google Maps produced a satellite map of Spears'

residence, and previous residence. R. 4565 - 4567. The investigator printed out Facebook pages of Spears' relatives. R. 4569 4570.

The investigator did not find any information which contradicted any of Spears' statements. R. 4564 – 4592. The investigator did not find any information which showed that Spears was not disabled for the time period she claimed that she was disabled. R. 4564 - 4592.

Liberty then wanted an additional claim form on December 1, 2015, which Spears provided.  R. 4859, 2286 - 87, n. 40, 2878. On or about February 2, 2016, ten months after the court remand, Liberty requested a peer review report from Behavioral Medical Interventions, Inc.  ["BMI"]. R. 2285, n. 48.  BMI provides claims processing and adjustment services. https://www.bloomberg.com  /research/stocks/private/snapshot.asp?privcapId=139905025  (Last visited 11/13/18).  BMI, now called "R3 Continuum" advertises its services on the internet to help  make  "defensible  decisions  relative  to  complex  claims."  https://r3c.com/our-services/evaluations/ (last visited 11/13/18).

 Eleven months after the court remand without a new decision, on February 27, 2016, Spears filed her Motion to Reinstate in court.

BMI provided a  peer review report to on March 4, 2016. R. 2597. It lists records which had  been reviewed. This list does not include: Connecticut Department of Social Services, finding that Ms. Spears is unemployable, 4/22/10, 4 p., Raymond Edward Cestar, Vocational Expert, resume, and report, Liberty Mutual / Application and Denial of life insurance, 8/2/10, 3 p., affidavit of Christine P. Baumann, 3 p., affidavit of Haley Spears, 3 p. affidavit of Israel Moreno-Lozano, 2 p. affidavit of Chatura Weliwitigoda, 2 p., Manchester Memorial Hospital, St. Francis Hospital, Connecticut assistant attorney general report, Attorney General Blumenthal's antitrust investigation,   medical journal articles supplied by Spears,   R. 2599 - 2601. Four individuals contributed to the BMI report. R. 2597.  They did not examine Spears. R. 2597.

13

BMI charged Liberty $38,670.61 for the peer review report and addendums. R. 2280, 2510. The $38,670.61 did not include the charge for an IME. R. 2281. Michael Raymond, Ph.D., ABN, Neuropsychology, contributed to the BMI report. R. 2607. Dr. Raymond wrote that "Unfortunately, based on a dearth of neuropsychological evidence, the undersigned is unable to render a conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested timeframe." R. 2614. On March 16, 2016, Liberty responded to the Dr. Raymond report by requesting another report from him. R. 2557. Dr. Raymond did not change his conclusions. R. 2511. He wrote another report on March 22, 2016 which reiterated that the data was "mostly obsolete" because the data was six years old. R. 2512. In its request for another report, Liberty requested that Dr. Raymond explain how the results of Dr. Rissenberg's July 2010 evaluation reflected on Spears' impairments and functional capacity for the periods 9/27/08 through 3/27/09 and 3/28/09 through 3/31/15. R. 2512. Dr. Raymond wrote, "…without having comprehensive and updated neuropsychological data, the undersigned was unable to render a clinical opinion regarding limitations, restrictions or functional capability, with any degree of neuropsychological certainty." R. 2512.

Robert Cooper, M.D., FACE, FACP, Endocrinology, Internal Medicine contributed to the BMI report. R. 2597. Dr. Cooper summarized "those portions of the records received that have relevance to the questions and timeframe identified for this review, and within the scope of my areas of endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care." R. 2601. Dr. Cooper did not summarize the records of  Dr. Raxlen, Dr. Saul, Dr. Rissenberg, the Social Security Administration, Dr. Silvers, Dr. Donaldson, Dr. Gouin, Dr. Zagar, Dr. Schoen, Dr. Schiff, Dr. Gordon, Professional Home Care Services, Visiting Nurse Association, Liberty denial of life insurance for Spears, State Department of Social Services finding of unemployability, Raymond Cestar's vocational report, affidavits, Manchester Memorial Hospital, St. Francis

14

Hospital,  Dr. Patterson-Marshall, Dr. Baehring, Connecticut assistant attorney general report, Attorney General Blumenthal's antitrust investigation, or  medical journal articles supplied by Spears. R. 2602 – 03. Dr. Cooper, based on his records review as described above, did not find evidence of "global impairment" and found that Spears could work without restriction during the periods 9/27/08 through 3/27/09 and 3/28/09 through 3/31/15. R. 2610.

Kent Crossley, MD., FACP, infectious disease, internal medicine, contributed to the BMI report. R 2597. He wrote that Spears' test results of her cerebrospinal fluid on February 2, 2009 with a positive IgG Western Blot for Borrelia burgdorferi was not meaningful. R. 2604. Dr. Crossley found that this CSF test was "impossible to interpret." R. 2610. Dr. Crossley concluded that there was no evidence that Spears had Lyme disease or other infections that would be functionally limiting based on "the absence of any objective findings of late-stage Lyme disease (typically manifest by arthritis, neurologic findings or a cardiac conduction defect) and the totally non-specific self-reported symptoms noted by the claimant." R. 2610.  Dr. Crossley is a member of the Infectious Diseases Society of America. R. 2666. He wrote that Spears' symptoms were "non-specific and not related to any infection." R. 2612.

Daniel Kitei, D.O., MA., neurology, neuromuscular medicine, contributed to the BMI report. R. 2597. Dr. Kitei wrote that the primary medical issue in question was unclear from a neurologic standpoint, but that the Attending Physician Statement notes the claimant had cognitive problems and migraine in 2009. He wrote that, "[i]n 2010, Dr. Raxlen felt that the claimant had Lyme disease and 'can't work.'  There is a note of fatigue and cognitive changes from Dario Zagar and an Attending Physician Statement from Dr. Giannini that the claimant had some lifting and cognitive limitations." R. 2598. Dr. Kitei noted that Spears had a "long medical history." R. 2604.  He described her treatment with a PICC line for chronic Lyme Disease, treatment for migraines, blackouts, numerous medications, and CT scan of her head which

revealed low attenuation in the right temporal lobe. R. 2604. Dr. Kitei noted that Spears' EEG revealed a nonspecific abnormality. R. 2604. Dr. Kitei noted that neuropsychological testing by Dr. Rissenberg reportedly revealed a significant decline. R. 2605. He questioned the diagnosis of Lyme disease. R. 2609. Dr. Kitei deferred opining on cognitive impairment to the neuropsychologist reviewing the case. R. 2609. He deferred any opinion on Lyme disease to the infectious disease reviewer. R. 2611.

Liberty requested an IME from the company "MCN" in February 2016, after it was aware that Spears had returned to work in August 2014. R. 2284, n.1, R. 4892. MCN advertises on the internet that it helps reduce the economic losses of injury and disability. It provides claims management services for employers, insurers, self- insured organizations, state funds, workers' compensation programs and attorneys. https://mcn.com/services (last visited 11/13/18).

The MCN doctor, Dr. Courtney, stated to Spears that he had a 1,400 page record, which he had only scanned. R. 2582. Dr. Courtney stated to Spears that he did not know why he had been asked to conduct this exam, after Spears had already returned to work. R. 2582. Spears requested that another person accompany her into the exam room with Dr. Courtney. R. 2469. Liberty refused to allow another person into the exam room with Spears and Dr. Courtney. R. 2691. Liberty did not identify any LTD policy provision preventing a plan beneficiary from having a third party accompany her into an exam room with Liberty's IME physician. R. 2691.

Dr. Courtney's report of March 14, 2016, summarized Spears' medical records, which included the following diagnoses by several different physicians: heart palpitations, asthma, ulcers, goiter, Hashimoto's thyroiditis, constipation, diarrhea, bloating, cramping, allergies, intermittent GERD, irritable bowel syndrome, r/o inflammatory bowel disease, microscopic colitis, healed ulcer, fatty liver, thyroid cyst, systemic lupus erythematosus, plantar fasciitis, migraine headaches, poor energy, poor memory and concentration, blurred vision, ringing in the

ears, recurrent peptic ulcer disease, exacerbation of lymphocytic colitis, low attenuation changes in the white matter of the right temporal lobe of the brain, lobulated lesion in the white matter of the right temporal lobe of the brain, nausea, abdominal pain, lymphocytic colitis, frequent tension type headaches, encephalopathy, positive ANA, ferritin and iron low, ALT high, pineal region cyst of brain, lumbago, abnormal lab findings, "high complexity" presentation, Borrelia burgdorferi IgG antibody detected, probability of Lyme disease, confirmation of Lyme disease, Lyme IgG WB positive on cerebrospinal fluid, fatigue and cognitive issues, sleeping during the day, spirometry showing mild reversible airway obstruction, otalgia, crush injury to left index finger, blood test showing Babesia organisms, PICC line in place, chronic multi-symptom illness consistent with chronic fatigue and fibromyalgia syndrome of long-standing duration that may well be due to Lyme disease in part or in whole, neck problems, aching, stiffness, throbbing, stabbing pain, upper back problems, extensive neuropsychologist's report of July 2010, which notes a dramatic decline in mental status, consistent with frontal or diffuse cerebral dysfunction as seen in chronic infections or inflammatory illness, "no obvious overall improvement, which may be due to her not having as effective of a treatment for chronic Lyme disease as is possible," fluctuating thyroid function test results, periodic limb movement disorder, sleep onset and sleep maintenance insomnia, tendinitis of the foot, papillary thyroid microcarcinoma, cervicalgia, several reports concluding inability to work by Dr. Kage, Dr. Gouin, Dr. Raxlen, Dr. Saul and Dr. Giannini. R. 2493 -2506.

Dr. Courtney did not state that he reviewed the Social Security grant of disability benefits, witness affidavits, the vocational expert report or Liberty's denial of life insurance benefits to Spears. R. 2492 - 2509. Spears reported to Dr. Courtney that she had no current medical problems, but got better with the treatments that were provided. R. 2508. Dr. Courtney wrote that he was not an expert in the diagnosis of Lyme disease. R. 2507. Dr. Courtney wrote, "[a]s far as

the periods from September 27, 2008 through March 27, 2009, apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective." R. 2507. Dr. Courtney wrote that it would be virtually impossible, based on a review of these records, to determine what this patient could have done from September 27, 2008, through March 27, 2009, without examination of the patient.  He wrote that the patient was able to work at least part time during that period, but seemed to be plagued by fatigue. R. 2508.

Dr. Giannini, Spears' former treating physician, wrote Liberty a letter on April 13, 2016, in response to the BMI report. She treated Spears during the period in question for headaches and fatigue.  She explained that headaches and fatigue have no specific objective evidence to indicate quality and severity. They are measured based on patient subjective report. She wrote: "During this period Haley's headaches and fatigue were severe enough that she would have spent significant amounts of time away from a job.  She would have been an unreliable employee and missed many days of work.  She was most definitely disabled during this period." R. 2470.

Dr. Zagar, Spears' former treating physician, wrote Liberty a letter on April 6, 2016 after reviewing the BMI report.  He stated that he cared for Spears from January 2009 to October 2011. He wrote that Spears' symptoms included frequent headaches, severe fatigue, joint pains, digestive problems and cognitive complaints. Testing was notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease. She received long term antibiotic therapy and a variety of treatments with only minimal improvement in her symptoms.   "She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis." R. 2484.  Dr. Zagar wrote that, while a diagnosis of CNS Lyme was not certain, "she clearly had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple

18

somatic and cognitive symptoms, and which affected her enough to impair her daily functioning." R. 2484. Dr. Zagar commented, "t[o] be frank, on review of your physicians' assessments of her prior medical records, it is clear that each took as skeptical and unsympathetic a viewpoint as possible when assessing her case, which is unfair to this unfortunate young woman. I am certain that if any of them had been her treating physician rather than an insurance reviewer they would not have taken the same approach." R. 2484. The diagnosis of multisystem disorder was consistent with the opinion of treating physician Sam Donta, M.D. R. 1365.

Dr. Rissenberg, Spears' neuropsychologist, wrote a letter on April 6, 2016 to respond to the BMI report. R. 2486. The letter attaches a copy of her CV, which attests to her training, experience and expertise in the field of clinical neuropsychology, in general, the assessment of neuropsychological impairment due to injury and illness, and the neuropsychological impact of Lyme disease and other infectious/inflammatory conditions. R. 2486.

Dr. Rissenberg's CV indicates that she has published on the topic of cognitive defects with chronic Lyme disease and has presented on the neuropsychiatric aspects of Lyme disease including on cognitive deficits in patients suffering from Lyme disease. R. 2490. Dr. Rissenberg's report refutes Dr. Raymond's characterization of her assessment as "cursory" or "abbreviated." She wrote that the assessment was comprehensive, involving nine hours of direct patient contact and eight hours of review and analysis. This included review of records, independent input, phone interview with a colleague, self- report, clinical interview and six standardized tests. She wrote that the tests and methods are widely used and carefully and extensively normed and standardized to the highest standards in the field. R. 2487.

Dr. Rissenberg wrote that she used the standard best practice in the field of clinical neuropsychology to obtain the best estimate of Spears' premorbid cognitive capacity as at around the 75th percentile. She noted that Spears was a high school graduate who completed two years of

college. She noted that the average IQ of a high school graduate is 110, (75th percentile) and that educational attainment is the best single demographic predictor of IQ. Her highest cognitive score on testing was at the 75th percentile and scores at the 50th percentile were obtained on several tests of abstract reasoning. "On each of these, 'intratest variability' (more difficult items are correctly solved while some easier are missed) was evident. In this case, it is the difficulty level of the test items solved that best estimates premorbid ability. 'For intellectually impaired persons, the least depressed abilities are the best remaining behavioral representatives of the original intellectual potential.'" R. 2487.

Dr. Rissenberg refuted Dr. Raymond's statement that her assessment provided no evidence of impairment. She wrote that there was clear and objective evidence, as well as clinical evidence, of significant impairment in multiple areas of function. Spears obtained a Working Memory Index at the 12th percentile and Auditory Delayed Memory Index was at the 6th percentile, in the Borderline Defective range, "impaired by any standard." R. 2487. Her report explained that formal effort testing was not necessary or appropriate because it is not indicated when there are relatively higher scores obtained, as was the case with Spears. R. 2488.

Dr. Rissenberg explained that effort testing can be important to rule out a lack of effort or malingering when scores are consistently low. She explained that, for Spears, there was abundant clinical evidence of good effort provided by her test taking behavior, including her continued attempt to solve increasingly difficult items on a subtest, after failing easier ones and after the time limit had been exceeded. R. 2488.

Liberty requested another report from BMI (now called R3 Continuum). R. 2411. The April 29, 2016, R3 Continuum response from Dr. Kitei stated that he reviewed the letter from Dr. Zagar dated April 2, 2016. R. 2412. He wrote that the evidence did not support impairment from a neurologic standpoint in regard to the complaints of headache.  R. 2411. He did not offer an

opinion as to neuropsychological or cognitive issues. R. 2414. The April 29, 2016, R3 Continuum response from Dr. Raymond stated that he reviewed the letter from Dr. Rissenberg and it did not change his conclusions. R. 2412.

At the time Spears filed her Motion to Reinstate, Liberty had not decided her remanded claim. See Complaint, April 14, 2016, p. 2. Liberty denied Spears' claim on June 16, 2016, after a second civil action was brought. R. 2379. The denial stated that Spears did not meet the Elimination Period. R. 2398. Liberty's internal notes stated that the claim was denied because the Elimination Period was not met. R. 2378. The Elimination Period was September 27, 2008 to March 27, 2009. R. 2398. This is the same reason that the claim was denied prior to the remand. The 2016 Liberty denial did not discuss the vocational report by Raymond Cestar or Liberty's rejection of Spears' application for life insurance. R. 2379 – 2405. Although the denial also considered disability during the "own occupation" and "any occupation" periods of the LTD plan, it is the denial of disability throughout the Elimination Period which is the foundation of the denial. R. 2399. Liberty's denial decision consisted of twenty pages summarizing medical evidence and only a few sentences explaining why it believed Spears did not meet the Elimination Period. Those reasons can be described as: Spears' symptoms were "self-reported," there were "inconsistencies" in the medical evidence and "the self-reported symptoms were not consistent with the medical evidence and her actual functional abilities continuously throughout the Elimination Period…," R. 2399.

Spears submitted an internal appeal on July 13, 2016. R. 2377.  She submitted reports from her treating doctors which discussed the conclusions made by Liberty in its denial. R. 2320, R. 2376. Spears provided a report from Dr. Raxlen to Liberty on September 23, 2016. R. 2320. His report discusses the BMI report. R. 2321. Dr. Raxlen wrote, based on his observations of his patient over a four year period, he disagreed with the BMI conclusions. R. 2321. Dr. Raxlen

described his qualifications to treat and diagnose Lyme disease. R. 2322. He wrote that he had 30 years' experience in diagnosing and treating the different types of tick borne disease. R. 2322. He had treated approximately 6,500 patients over a 30 year period for tick borne disease. R. 2322. He wrote that, as a result of major discrepancies both in diagnostic and treatment philosophy between IDSA members and others, he was one of the original ten physicians who founded ILADS (International Lyme and Associated Diseases Society), an international organization devoted to the study, research, diagnosis and treatment of tick borne disease. R. 2323. He wrote that he presented his work at numerous scientific conferences over the last 15 years and recently has been elected chairman of the Ethics committee of ILADS. R. 2323.  He wrote that he, and a number of his colleagues, were responsible for writing and publishing ILADS treatment guidelines in 2005, which were recently updated. R. 2323.

In Dr. Raxlen's judgment, Spears' diagnosis was chronic tick borne disease, which was the most likely reason for her painful, protracted multisystemic symptoms, in particular her neurocognitive, neuropsychiatric symptoms and profound exhaustion. R. 2323. Dr. Raxlen wrote that the following doctors all treated Spears for tick borne disease: Dr. Zane Saul (infectious disease), Dr. Zagar (neurology), Dr. Patterson Marshall (Neurology) Dr. Sam Donta (infectious disease), and Dr. Giannini (pcp). R. 2324.

Dr. Raxlen wrote that the important question was not whether Spears had Lyme disease, but did her illness or her combined illnesses leave her disabled? "Not in the physical sense that she can stand for however long, or sit for however long, or lift five pounds or 20 pounds, but could she mentally function?" R. 2326. Dr. Raxlen wrote, "[t]he records show that her greatest difficulty appears to be a major neurocognitive deficit, found on neuropsychological testing, as well as positive antibody findings in CSF, (IgG+ve), lesions on CAT scan, and lesions on MRI, (positive findings), all consistent with Neuroborreliosis." R. 2326. Dr. Raxlen wrote that, if the

Lyme disease is what the BMI reviewers are disputing as a major contributor to Spears' disability, their opinions are seriously flawed, because they have based their conclusions on an obsolete clinical definition of Lyme disease. R. 2326. Dr. Raxlen wrote that the definition has been expanded to include the subjective and non-specific symptoms of the Lyme patient, as well as profound neuropsychiatric symptoms and physical symptoms. R. 2326.

Dr. Raxlen provided medical literature supporting his opinion and qualifications, consisting of the ILADS Evidence Based Guidelines for the Management of Lyme Disease, R. 2328, Johnson and Stricker article, Treatment of Lyme Disease, R. 2342, Lyme Disease Symptoms, R. 2367, Drulle article, Lyme Disease: The Pitfalls of Laboratory Testing, R. 2368; commendations for being the recipient of the Turn the Corner Foundation's Humanitarian Award. R. 2370 – 2372.

Spears provided a report from Dr. Saul in support of her appeal. R. 2373 – 76. The report of Dr. Saul stated that Spears underwent two courses of antibiotic therapy, which was the standard of care for long term Lyme disease. He observed her on and off antibiotic therapy. Her Lyme disease was advanced and debilitating. She had chronic fatigue, difficulty concentrating, headaches and joint pain. Despite fatigue, she had difficulty sleeping at night. "She was not medically able to work in any capacity. She was not capable of a sedentary work position due to cognitive difficulties. She couldn't maintain focus to assigned tasks. Her fatigue prevented any durable or sustained physical work effort. She was unable to maintain standing, lifting, pulling, reaching or grasping at a job on a sustained 40 hour a week basis. She was clearly motivated to get better and begin working again. As of 2014 she remained fatigued at times. Long term chronic Lyme disease can take many years to resolve." R. 2374.

The Dr. Saul report stated that he reviewed the report of BMI. He disagreed with their conclusions. He noted that none of the BMI doctors examined Spears, and none of them were

experts in Lyme disease. He wrote that Spears' diagnosis was confirmed by cerebrospinal fluid testing on February 3, 2009. He wrote, "Dr. Crossley is incorrect when he states that the positive igG western blot test on February 3, 2009 meant nothing without a positive western blot on serum." R. 2374. Dr. Saul commented on Dr. Crossley's statement that "the evidence shows self-reported symptoms" because Dr. Crossley uses that to opine that Spears did not have any functional impairment for the time frame in question.  Dr. Saul noted that fatigue cannot be verified by x-ray or other objective testing; and neither can headaches nor joint pain. Dr. Saul noted that Dr. Crossley offered no evidence to refute the patient's credible report of fatigue, headaches or pain. R. 2374.

Dr. Saul reviewed the October 14, 2010 report of Dr. Brusch. Dr. Saul wrote that Dr. Brusch did not contact him prior to his report. Dr. Saul wrote that Dr. Brusch was incorrect when he opined that the positive igG western blot in the CSF was a false positive.  The diagnosis was confirmed by clinical exam and history. R. 2374.

Dr. Saul reviewed the IME of Dr. Courtney. Dr. Saul noted that, by his own admission, Dr. Courtney is not a specialist in Lyme disease and is not a specialist in infectious disease. He examined Spears after she returned to work. "His exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her. He is incorrect when he concludes that Ms. Spears did not have any incapacitating diagnosis.  She did have numerous diagnoses, as shown in her medical records.  She had chronic multi-system illness." R. 2374.

Ten months after Spears submitted her internal appeal, Liberty denied it, on May 4, 2017. R. 4911. Liberty called this an "optional request for review." R. 4911.  It is apparent that Liberty called this an  "optional request for review" rather than an "appeal" because Liberty did  not comply with ERISA requirements for appeal.  Liberty stated that it forwarded the new medical records provided by Spears for review to the same panel of consultants who previously reviewed

the claim during the first remand review. R. 4913. Not surprisingly, none of the Liberty doctors changed their opinions. Liberty again denied the claim, for the same reasons it previously stated. In spite of the hundreds of pages of medical records, neuropsychological testing, positive lab result for Lyme, detailed functional capacity reports, vocational opinion, and Social Security grant of disability benefits, Liberty concluded, "the information provided for review does not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Ms. Spears' symptoms were of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any occupation after March 27, 2011." R. 4915. Liberty focused on what it called "Ms. Spears' self-reported symptoms." R. 4915. The May 2017 denial did not reconcile Liberty's finding that Spears was disabled at the beginning of the Elimination Period with its new conclusion that she was never disabled. The May 2017 denial makes no mention of Liberty's previous determination that Spears was disabled for at least part of the STD period and its eventual payment of all of the STD benefits to Spears.

## II) Law & Argument

### a.    The Usual Standard for Summary Judgment Applies In An ERISA Case

A party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317(1986). The court's task on a summary judgment motion— even in a nonjury case under ERISA— is to determine whether genuine issues of material fact exist for trial, not to make findings of fact. *O'Hara v. National Union Fir. Ins. Co. of Pittsburgh,*

*PA.*, 642 F.3d 110 (2d Cir. 2011). Regardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact. The critical question for the district court is whether there was a genuine dispute of material fact, not whether the administrator's decision was supported by sufficient evidence on the merits. *See Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 (2d Cir. 2010). That is, a conclusion that an administrator's decision was based on "sufficient evidence" does not entitle a plan to summary judgment if there are issues of material fact in dispute. *O'Hara v. National Union, supra.*

**b.   Defendants Failed To Comply With The  Order Of March 31, 2015, Which Required That ERISA Procedures Be Followed And That Liberty Support Its Determination**

This court issued a lengthy memorandum of decision March 31, 2015, dkt. 103. The court remanded the case so that Liberty could consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period;  ask the proper questions of its medical consultants and ensure that the responses are consistent with Plan terms and are responsive to the questions; and perform a full and fair review that complies with the ERISA claims regulations; and may not categorically dismiss Spears' post-Elimination Period medical records as "not relevant " without a reasonable explanation.

Neither the June 2016 denial nor the May 2017 denial comply with the court's order. First, Liberty was directed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period. The court noted the obvious inconsistency in Dr. Taiwo's and Dr. Silverman's conclusions that Spears never had any limitations and restrictions

with Liberty's conclusion that Spears was disabled for at least a considerable portion of the Elimination Period. Dkt. 103 at 59, 69.

The June 2016 denial does not make any attempt to reconcile Dr. Taiwo's and Dr. Silverman's conclusions with Liberty's finding of disability. The June 2016 denial is based upon a new report by BMI. R. 2378 – 2405. Opinions from Dr. Cooper, Dr. Crossley, Dr. Kitei and Dr. Raymond were solicited for the report. According to the denial letter, Dr. Cooper concluded that there were no restrictions on work capacity for any time from September 27, 2008 onward; Dr. Crossley concluded that there were no functional capacity limitations from an infection from September 27, 2008 onward; Dr. Kitei concluded that, from a neurology standpoint, the evidence did not support impairment, and   Dr. Raymond concluded that there was no neurocognitive impairment for any time after September 27, 2008. There is no discussion, in the 27 page denial, as to why Liberty concluded that Spears was disabled during the Elimination Period, and then was not disabled. There is a statement that UTC instructed Liberty to release all remaining STD benefits to Spears, but no explanation as to why UTC instructed Liberty to do so.  The logical inference is that UTC, the plan administrator,   believed that Spears was disabled under the plan.

There is no indication in the denial that Liberty informed the BMI consultants that it had ever determined that Spears was disabled under the Plan. There was no attempt at all by Liberty to comply with the 2015 remand order that it reconcile its determination that she was disabled during a portion of the Elimination Period.  This inconsistency in Liberty's analysis was a central reason for the remand, yet Liberty chose to ignore this portion of the Court order. As held by *Fairbaugh v. Life Ins. Of North America*, 737 F. Supp.2d 68 (D.Conn. 2010), it is arbitrary and capricious for a Plan to revoke benefits which had previously been granted if a claimant's medical condition was essentially unchanged. That is exactly what happened here. This court, in the 2015 remand order, recognized that this was arbitrary and capricious; it ordered that Liberty

address this problem; and Liberty did not do so. *See also, Connors v. CT General Life Ins.*, 272 F.3d 127 (2d Cir. 2001)(termination of benefits preceded by no significant change in plaintiff's condition); *see Hall v. Hewlett, 6:12-cv-330-Orl-28KRS,* 2013 US Dist. Lexis 79171(MD Fla 6/5/13)(plaintiff was granted, and then denied with essentially the same medical records); *Johnson v. Guardian,* 3:16 cv 01141 J. Shea (D. Conn. 10/27/17)(decisions to terminate benefits in the absence of a change in condition have been held to have been arbitrary and capricious).

There is also no indication that Liberty ever informed any of its consultants that the Plan requires them to consider subjective symptoms. *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (stating that "the plan administrator must give sufficient attention to subjective complaints" and that "it is error to reject subjective evidence simply because it is subjective"). It is crucial for a Plan to inform its evaluators that subjective symptoms count when evaluating disability; otherwise the evaluators will review the records looking for buzz-words such as "restrictions and limitations" rather than "symptoms." Providing this information to its consultants is part of Liberty's duty to ask the proper questions of its medical consultants.

The May 4, 2017, denial also made no mention of the remand order's requirement that Liberty reconcile its determination that Spears was disabled with its consultants' opinions that she was never disabled. R. 4911. Liberty had two opportunities to comply with this Court's order; each time it declined to do so.

The remand order required Liberty to ask the proper question of its medical consultants and ensure that the responses were consistent with Plan terms and are responsive to the questions. The court held that it was error to ask questions of Dr. Brusch regarding the accuracy of the Lyme disease diagnosis, or to only list restrictions which were "clinically supported." Dkt. 103, at72-73. It was error for Dr. Brusch to limit his answer "[f]rom an infection disease evaluation." The relevant question was, whether Spears' symptoms rendered her disabled under

28

the STD or LTD Plans. Dkt. 103 at 74.  A review of the BMI report shows that none of the evaluators were asked the correct questions; their responses were not consistent with Plan terms, and did not reconcile Liberty's finding of disability with their opinions. None of them offered any medical explanation as to why Spears could be found disabled from September 2008 to February or March 2009, but not thereafter.

Dr. Cooper was asked a total of four questions. R. 2611 – 2612. Questions one and two simply asked him to contact two of Spears' doctors. Questions three and four asked "from an Internal Medicine and Endocrinology perspective." This is the same language the Court criticized in its 2015 order regarding Dr. Brusch. None of the four questions asked Dr. Cooper if Spears' symptoms rendered her disabled under the STD or LTD Plans. None of the questions informed Dr. Cooper – or any of the other BMI evaluators – that Spears' had already been found disabled by Liberty, or that UTC's own Medical Department did not approve Spears' return to full time, regular duty during the Elimination Period. Dr. Cooper's analysis never mentioned the positive cerebrospinal fluid test in 2009. R. 2608. Liberty did not ensure that his responses were relevant to Plan requirements and did not ensure that he was given all relevant evidence. He did not discuss the impact of the white matter lesion in the right temporal lobe of the brain. R. 2608. Perhaps this is because he was only asked to review the file from an "internal medicine and Endocrinology perspective" and was not asked to consider any brain impairment. R. 2612

Dr. Crossley was asked three questions. This first question asked him to contact Dr. Saul. The second and third questions requested an opinion, "from an Infectious Disease perspective" – the exact language condemned by the Court when used by Dr. Brusch. Dr. Crossley, moreover, carefully qualified his responses. His response to question two was, "I see no documented impairments for the periods of time noted that would be associated with the presence of any infection.  Her symptoms are non-specific and not related to any infection." The

response to question three was similar, "The claimant's functional capacity would not have been limited by any infection during the periods noted. Her non-specific symptoms are not the consequence of any infection." R. 2612-2613. Not only is the cause of Spears' disability irrelevant, her symptoms need not be "specific" in order to result in a covered disability. The medical term "non-specific" is defined as "1. Not due to any single known cause; 2. Not directed against a particular agent, but rather having a general effect." https://medical-dictionary.thefreedictionary.com/nonspecific (last visited 11/13/18). This is entirely consistent with the opinion of treating physician Dr. Saul, whose opinion was that Spears had chronic multi-system illness. R. 2374. The term "non-specific" does not mean non-existent; it does not mean non-disabling; and it does not mean non-severe. It simply means a symptom which can have a general effect throughout the body, rather than in one location in the body. Dr. Crossley was not asked any relevant questions and he did not give any relevant answers. Liberty, in violation of the court's order, did not ensure that the responses were consistent with Plan terms. His conclusion – that the positive IgG Borrelia burgdorferi result of the 2009 test of cerebrospinal fluid was not meaningful – is unsubstantiated and cannot be substantial evidence supporting the denial. R. 2604.

Dr. Kitei was asked three questions. The first asked him to contact Dr. Baehring. The second and third both asked him to respond, "from a Neurology perspective." R. 2613. Again, this type of narrow and irrelevant question was disapproved of in the 2015 Court order. Dr. Kitei's response was guarded: He wrote that the evidence did not support impairment "from a neurological standpoint." R. 2597. Dr. Kitei summarized the records he reviewed. R. 2604 -2605. He made no mention of the positive cerebrospinal fluid test of February 2009. Not only did he cherry pick the medical records he summarized in his report, he "deferred opinion on cognitive

impairment...." R. 2609. Liberty did not ensure that his responses were consistent with Plan terms. His opinion cannot be substantial evidence supporting the denial.

Dr. Raymond was asked two questions. The first question asked him to explain the results and conclusions of the July 2010 Neuropsychological evaluation by Marian Rissenberg, Ph.D. Although the conclusions of Dr. Rissenberg were clear, R. 491, 2487, Dr. Raymond instead offered his own conclusions which disagreed with Dr. Rissenberg. R. 2613. The second question was limited to his opinion "from a Neuropsychology perspective" - again, the same narrow and irrelevant question Liberty had been asking its consultants since prior to the remand. Here, however, Dr. Raymond conceded that he was "unable to render a conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested timeframe." R. 2614. This statement is directly inconsistent with his very next statement: "the available neuropsychological evidence offered in the medical record does not support presence of neurocognitive impairments...." R. 2614. No explanation is offered for this contradiction. Liberty did not ensure that his responses were consistent with Plan terms. His opinion cannot be substantial evidence supporting the denial.

The IME of Spears by Dr. Courtney does not support its conclusion of non-disability. The 2015 court order suggested an IME or to have Liberty's consultants communicate with Spears' treating physicians. Dkt. 103 at 79. By the time of this court ruling, Spears had returned to work. The IME took place on March 14, 2016. R. 2492. Dr. Courtney did not support Liberty's initial denial of short term benefits. He wrote, "As far as the periods from September 27, 2008 through March 27, 2009, apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective." R. 2507. Dr. Courtney stated that he was not an expert in the diagnosis of Lyme disease. R. 2507. He found it virtually impossible,

31

based on the records review, to determine what this patient could have done from September 27, 2008 through March 27, 2009, without examination of the patient. R. 2508. He wrote, "Apparently, the patient was able to work at least part time during that period, but seemed to be plagued by fatigue." R. 2508. This opinion, which supports the inability to work during the Elimination Period, cannot be substantial evidence supporting the denial. This opinion contradicts the findings of the BMI reviewers and is supportive of Spears' claim for benefits. The BMI reviewers provided opinions in 2016 after a medical record review. If it was impossible for Dr. Courtney to express an opinion in 2016 regarding Spears' condition in 2008 and 2009 with an examination in 2016, then it was similarly impossible for the BMI reviewer to express an opinion as to what Spears could have done from September 27, 2008 through March 27, 2009, without examination of the patient. The Liberty denial letters do not explain this inconsistency in the opinions of its consultants.

The 2015 remand order required that Liberty perform a full and fair review that complies with the ERISA claims regulations. 29 C.F.R. §2560.503; *Merrill v. Hartford Life & Accident Insurance Co.,* 503 F.Supp.2d 531 (D.Conn. 2007) (claim remanded so that insurer can provide a full and fair review).   A full and fair review requires that an administrator consider all of the pertinent information "reasonably available, " *Crocco v. Xerox Corp.,* , 956 F.Supp.129 at 139, *aff'd in part and rev'd in part on other grounds,* 137 F.3d 105 (2d Cir. 1998); *Johnson v. Guardian, supra.* Liberty did not do this. In addition to not reconciling its grant of STD benefits with its consultants who did not find any impairments, it did not explain why it did not continue to use its consultant Dr. Potts, after he gave an opinion which was favorable to Spears. Dr. Potts agreed with Spears' treating physicians that "the severity" of her "near[] daily headaches" was "likely to preclude her from working." Dkt. 103 at 62.

32

A full and fair review also requires consideration of the vocational opinion of Raymond Cestar. Neither the June 16, 2016 denial nor the May 4, 2017 denial made any mention of Mr. Cestar's evaluation.

Those denials also made no mention of UTC's own Medical Department's work restrictions for Spears. The UTC Medical Department sent an email to Liberty that Spears had been examined by UTC and was cleared to return to work with the following restrictions: (i) four-hour work days, beginning on February 13, 2009 until a later date to be determined by a doctor, and (ii) light duty, which excluded bending, twisting, and lifting until February 20, 2009. Dkt. 103 at 12. A full and fair review would also require consideration of Liberty's denial of life insurance to Spears because of her numerous health problems. R. 477. Liberty has never addressed the inconsistency in its position that Spears was healthy enough to work, but not healthy enough for it to insure her life.

A full and fair review means that Liberty would comply with the 2015 remand order which found that all of Spears' impairments must be considered, even if they could not be demonstrated clinically. Dkt. 103 at 73. *Miles, supra.* Rather than heeding the admonition of this court to consider subjective symptoms, Liberty  simply re-named them as "self - reported symptoms." The denial letter of June 16, 2016 refers to "self-reported symptoms" at least five times.  R. 2379 -2405. (p. 20 one time) (p. 21 twice) (p.  23 twice). The May 4, 2017, denial also referred to Spears' "self-reported symptoms"  twice. R. 4915. The phrase "self-reported" symptoms is not defined in the Liberty plan. R.1-40, 2196-2239. That phrase is not part of the plan at all. There are some disability plans which exclude or limit payments for illnesses due to "self-reported symptoms," however, this is not one of those plans. See *Chronister v. Baptist Health,* 442 F.3d 648 (8th Cir. 2006)(definition of self-reported symptoms; limited to 24 months of payments). Here, subjective symptoms were supported by objective evidence to support them,

such as the positive spinal tap, the neuropsychological testing and brain lesions on CT scan and MRI. "Where the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Quigley v. Unum Life Ins. Co. of Am.*, 340 F. Supp. 2d 215, 224 (D. Conn. 2004); *Lanoue v. Prudential,* 3:07cv1756 (JBA), recommended ruling March 20, 2009, *aff'd* 2009 U.S. Dist. Lexis 91698 (D. Conn. Sept. 25, 2009). Pain must be considered. *Miles v. Principal Life Ins. Co.,* 720 F.3d 472 (2d Cir. 2013).

### c. Liberty's Failure To Comply With ERISA Regulations Entitles Spears To De Novo Review

Liberty took the position that ERISA's deadlines did not apply to its review of the evidence on remand. R. 4893. This position is directly contrary to case law and to this court's 2015 ruling on the summary judgment motions, where this Court held that "Liberty is instructed to perform a full and fair review that complies with the ERISA claims regulations." Dkt. 103, at 79. This erroneous position taken by Liberty perhaps explains its delays in processing this claim on remand, and its non-compliance with mandated ERISA procedures. To claim that ERISA procedures do not apply on a remanded claim misses the entire point of the 2015 remand; this case was remanded because Liberty did not comply with the regulations; the purpose of the remand was to give Liberty another chance to fix its mistakes. The remand serves the same purpose as in an appeal from a governmental agency such as Social Security; if an ALJ decision is wrong in its analysis of the governing regulations, the case is remanded back to the ALJ for another hearing, with instructions to comply with the correct legal standards.

In a Second Circuit case decided after this court's 2015 summary judgment ruling for plaintiff, *Halo v. Yale Health Plan,* 819 F.3d 42 (2d Cir. 2016), the court addressed some of the consequences that follow from an ERISA plan's failure to comply with the Department's claims-

34

procedure regulation, 29 C.F.R. § 2560.503–1.  The court held, *inter alia*,  that when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, will result in that claim being reviewed de novo in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent and harmless. In making this ruling, the court noted that the Department of Labor's regulation imposes minimum requirements for benefit claims procedures, and the Department's preamble clarifies that, when a plan fails to comply with those minimum requirements, the plan's decision denying a claim should not be entitled to deference in court. See 65 Fed.Reg. at 70,255. The court rejected the substantial compliance doctrine.  Minor deviations from an established procedure – such as a plan responding in 73 hours when the regulation requires that it do so in 72 hours, which do not harm the claimant, might be tolerated.

The court emphasized that, to prevent the exception from swallowing the rule, however, such deviations should not be tolerated lightly. Moreover, the plan "bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it." *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995); see also *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108(2d Cir. 2005) (noting the "administrator had the burden of proving discretion").

Liberty violated the regulations in the following respects:

### i.  Failure To Have Procedures in Full Conformity with the Regulation

The Department of Labor promulgated regulations interpreting "full and fair" review to require that claimants be given access to all "relevant" documents. 29 C.F.R. §2560.503-1(h)(2)(iii).   29 C.F.R. §2560.503-1(m)(8)(iv) defines "relevant" documents to include

"statement[s] of policy or guidance with respect to the plan concerning the denied . . .

benefit…without regard to whether such …statement was relied upon in making the benefit

determination." The Department indicated that these regulations were intended to make clear that

"the claimant should receive any information demonstrating that, in making the adverse benefit

determination, the plan complied with its own processes for ensuring appropriate decision

making and consistency." 65 Fed.Reg. 70,246, 70,252 (Nov. 21, 2000).

Despite the request by Spears for these documents during the administrative appeal

process in *Spears I,* Liberty refused to provide internal guidelines, rules and protocols for the

plan. R. 265.  Liberty did not provide any of its internal guidelines until after suit was brought in

*Spears I.* Once suit was brought, and a request for production was filed for these documents,

Liberty finally admitted that, although it did have written Policies, Procedures and Exceptions

("PPE") which pertain to claims matters, it did not use any of these guidelines to help decide

Spears' claim. The PPE are R. 2254 – 2277.   Liberty's answer to Spears' discovery request in

*Spears I* states, "Plaintiff's Claim File does not have any reference to any specific PPE.  Had a

particular guideline been used as part of the claim determination, it would have been noted in the

claim File." Ex. B.  There was no such statement in the June 16, 2016 denial notice. R. 2379.

Similarly, in *Spears II*, Liberty denied that any rules, guidelines, protocols, standards or criteria

were used in rendering its decision after court remand. Ex. A, response to interrogatory # 3.

Liberty did not reference any of its PPE procedures in its June 2016 denial. The

regulation, 29 C.F.R. §2560.503-1 (g)(1)(A), provides that, "if an internal rule, guideline,

protocol or other similar criterion was relied upon in making the adverse determination, either

the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule,

guideline, protocol, or other similar criterion was relied upon in making the adverse

determination and that a copy of such rule, guideline, protocol, or other criterion will be provided

free of charge to the claimant upon request;…." This means that Liberty did not use any written guidelines or processes as part of the claim determination on remand.  The Department of Labor recognizes that the use of guidelines ensures a standard process for "ensuring appropriate decision making and consistency." Without using its own guidelines (the PPE), decision making will be arbitrary and capricious.  Similar claims will not be handled consistently. One claimant might be provided benefits while another claimant, in the same situation, will not. This is the harm that the Department of Labor sought to prevent in this regulation. The harmful effect on a claimant such as Spears is obvious; her claim for STD was granted, then denied, then paid, and then none of the LTD benefit was paid because the elimination period was allegedly not met, even though it was fully paid.

### ii.   Liberty Violated 29 C.F.R. §2560.503-1 (f)(3) When It Did Not Meet The ERISA Claim Review Deadlines On Remand

Liberty has admitted, in *Spears II,* that it did not modify any of its claim procedures after the court granted judgment in *Spears I.* Ex. A, Liberty's Responses to Interrogatory # 8. Therefore, the same PPE were in effect in this case as they were in Spears I. Those procedures are not in "full conformity with the regulation." They do not address a key issue in this case – whether – and how - ERISA deadlines apply to a case on court remand.  This failure leads to confusion and uncertainty by claims adjusters who do not know whether to apply ERISA deadlines to claims on remand. Here, this court ordered that Liberty provide a full and fair review on March 31, 2015. Liberty's counsel did not begin this review until July 24, 2015, almost four months later.  That is far greater than the 45 days allowed by 29 C.F.R. §2560.503-1 (f)(3). ERISA deadlines apply to a claim on remand. *Solnin v. Sun Life Health Ins. Co*., *supra.* 29 C.F.R. §2560.503-1 (f)(3) allows a plan 45 days in which to make a decision on a disability claim. *Rappa v. Conn. Gen. Life Ins. Co.,* 2007 WL 4373949, at *2 (E.D.N.Y. Dec. 11, 2007).

Liberty missed its deadline to decide Spears' claim on remand and also missed the deadline to decide the claim on appeal. The court in *Robertson v. Standard Ins. Co.,* 218 F. Supp.3d 1165 (D. Or. 2016), addressed the ERISA timelines to be followed on remand.  The court first held that the claim regulation applies to claims considered by the plan after a court remand. The court was persuaded to adopt this approach by the DOL's interpretation of its own regulation. The DOL argued, in an amicus brief submitted at the Second Circuit in the appeal of *Solnin v. Sun Life & Health Ins*. Co., 766 F. Supp. 2d 380, 382 (E.D.N.Y. 2011), ex. C,  that a claim that has been remanded by a court generally should be treated as an appeal of a denied claim under the ERISA claims regulation. The court found the claim regulation to be ambiguous as it related to court remands, and so it deferred to the DOL's interpretation of its regulation. *Chase Bank USA, N.A. v. McCoy,* 562 U.S. 195, 207–08 (2011) ("Under *Auer v. Robbins*, we defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is "plainly erroneous or inconsistent with the regulation.") (internal citation and quotation marks omitted). In addition, the DOL clearly opined that the deadlines begin to run from the date the court files its order requiring the claims administrator to reconsider its claim. The *Robertson* court agreed with the DOL that allowing defendant to take as long as it wants to decide a remanded claim would be fundamentally unfair, especially given that it had already deemed that defendant did not fulfill its fiduciary duty to plaintiff.

In the present case, the March 31, 2015 date should be used as the start date for ERISA deadlines. Regardless of whether that date is considered to be the filing date of an initial claim or the filing date of an appeal as argued by the DOL, Liberty missed the deadline.

If March 31, 2015 (the date of this court's order) is used as the start date of the 45 day period, the 45 days expired on April 17, 2015. If  July 24, 2015 (the date of the letter from Attorney Baskin,) is used as the start date, then Liberty also did not meet the deadline. If the start

date is September 10, 2015, when Spears provided  requested claim forms to Liberty, Liberty still did not meet the deadline.  If October 14, 2015 is used (the date Liberty gave the file to Nancy Winterer, Liberty did not meet the deadline. If the start date is the date Spears returned the claim form first requested on December 1, 2015, (December 7, 2015), Liberty still did not meet the deadline. R. 2875.  If January 12, 2016 is used (the date that Spears requested that Liberty issue a new decision in compliance with the court's remand order and with ERISA), day 45 is February 26, 2016. There was no decision by February 26, 2016 and one day later Spears filed her Motion to Reinstate Summary Judgment to the Docket. Liberty's delay on remand was egregious. While Liberty acted quickly in requesting a data base search and a private investigator to investigate Spears and her family,  Liberty did not request its peer review report from BMI until February 2, 2016. R. 2288, n.32, 4702, 4564-4592, 2285, n.48. Liberty did not request an IME until February 2016. R. 2284, n.1. Liberty did not make a decision on the claim until June 16, 2016. R. 2404.

ERISA requires that a plan make a decision on a disability claim within 45 days. 29 C.F.R. § 2560.503-1(f )(3). This is a maximum.  *Aitken v. Aetna Life, 16 Civ. 4606(PGG)* (S.D.N.Y. September 25, 2018)(in some cases, delaying a decision until the end of the applicable maximum period may be unreasonable and thus a violation of the procedural standards). If a plan is unable to make a decision within 45 days, it may request an extension of time of up to 30 days. Notice of any such extension must be given in writing before the commencement of the extension.  29 C.F.R. § 2560.503-1(f)(3). This request can only be made if the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 45 day period, of the circumstances requiring the extension and time and the date by which the plan expects to render a decision. The notice shall specifically explain the standards on which entitlement to a benefit is based, the

unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues.  No such extension of time was taken by Liberty within 45 days of  March 31, 2015.   If no decision is rendered by the deadline, the claim for benefits is deemed denied. Thus, if Liberty failed to meet the deadline, Spears' claim is deemed denied, and her administrative remedies are therefore exhausted. 29 C.F.R. § 2560.503-1(f)(3), *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98 (2d Cir. 2005).

Deadlines play a crucial role and empower claimants to call a halt to the evidence-gathering process and insist on an up or down decision on the record as it stands. *Nichols v. Prudential, supra*. The plain language of 29 C.F.R. §2560.503-1(f)(3) precludes the judicial creation of a "substantial compliance doctrine," *Halo v. Yale*, *supra*. If an administrator does not make a timely decision, and a plan participant brings a civil action to contest the lack of a decision, then the court will apply a de novo standard. The rationale for this rule is that, there is no decision to which to defer because of the plan's inaction. A court may give deferential review only to actual exercises of discretion. A "deemed denied" claim is not denied by any exercise of discretion, but by operation of law. *Nichols v. Prudential, supra*, 108.

In the present case, the facts demonstrate that Liberty acted in a dilatory and bad faith manner. Although Liberty was aware that the March 2015 ruling mandated that it comply with ERISA on remand, it took no action at all within the 45 day period. The only explanation for this inaction was its claim that ERISA did not apply to deadlines on remand. R. 4893. Liberty – while denying that ERISA required it to comply with its deadlines – has asserted that the ERISA deadline extension and tolling procedures apply to it. In the same way that Liberty cherry- picked from Spears' medical records to support a denial, it has cherry- picked from the ERISA regulations, claiming that some apply to this case and others do not. . *Johnson v. Guardian Life Ins. Co.* No. 3:16-cv-01141 (D. Conn. Oct. 27, 2017) (MPS)(administrator may weigh competing

evidence, but it may not cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.")  In a letter dated October 21, 2015 – some seven months after this court's ruling – it sent plaintiff a letter stating, "[t]he claim documentation for this appeal review was received in this office on October 14, 2015.  Thus day 45 of this appeal review is November 26, 2015."  R. 4708.  The letter was written by Nancy Winterer, a Liberty adjuster with a London, Kentucky address.  The letter goes on to state that ERISA gives Liberty 45 days to render a decision after "receipt of appeal" and that the "days allowed for receipt of the additional medical documentation are days tolled and are not counted in the 90 day appeal review period." R. 4708. Since Liberty did not request medical records until October 20, 2015, Liberty concluded that the days from October 20, 2015 through the date "all the necessary documentation is received" are days tolled and not counted in the 90 day appeal time frame. R. 4708. Another letter from Liberty of November 24, 2015, claimed that it was not going to count the days from October 20, 2015 through December 16, 2015 as part of the 45 days. R. 2999. Liberty gave itself this extra time to collect records which were largely duplicate. It gave itself this extra time prospectively, claiming on November 24 that it somehow knew that it would not receive records until December 16, 2015.

Liberty's position – that it can delay starting to work on a claim for months, and then claim that the clock starts ticking  when it finally gets around to looking at the file – has no basis in law. If this was the law, then an insurer, in effect, has no deadline at all.  It was Liberty's choice not to send this claim to its adjuster until October 14, 2015. It cannot use its own delay to justify lack of compliance with the ERISA regulation. Its asserted rationale – that it needed medical records from Spears' providers - is similarly baseless. It already had the records it needed. The reason for the remand was not so that Liberty could collect more records, but so it could issue a new decision using correct procedures. There was no need for it to collect duplicate

records. If it felt that it needed additional records, then surely it could have requested them in April 2015, after the Court's ruling. It did not need to wait until October 2015. Rather than work on this claim, Liberty conducted a social media investigation of Spears and her family.  R. 4564 – 4592.  The tolling provision, moreover, only applies if an extension is needed "due to matters beyond the control of the plan." §2560.503-1(f)(3). Waiting seven months to look at the medical records is not beyond the control of the plan. Tolling, additionally, only applies when a claimant fails to "submit information necessary to decide a claim…"  Duplicate records, duplicate claim forms, and records from after the date Spears returned to work, were not necessary to decide the claim. The ending date of tolling is when "the claimant responds to the request for additional information."  §2560.503-1(f)(4). Tolling does not run from the time a plan writes a letter to a doctor requesting records. If that were true, than a plan could write to doctors over and over and never have a deadline to make a decision. As noted by the court in *Salisbury v. Prudential Ins. Co. of Am.*, 238 F.Supp.3d 444 (S.D.N.Y. 2017), the time periods for decision making are generally maximum periods, not automatic entitlements.  *Salisbury* relied on Department of Labor guidelines which state that an extension may be imposed only for reasons beyond the control of the plan, and that simply having too much work does not constitute an acceptable justification. *Salisbury* held that a plan's failure to provide a sufficient "special circumstance" would constitute violation of the claims procedure regulation. The drafters of this regulation did not intend "special circumstances" to be the plan administrator's own delay in working on the claim. An inadequate extension notice triggers de novo review. *Salisbury, id.*

Looking at the chronology of events in the administrative records, it is not plausible that Liberty's delay in deciding the claim on remand was related to its lack of pertinent medical records for Spears. It had them. It is more likely that its delay was a result of its decision – which it did  not make until February 2016 - to request a report from BMI to refute the opinions of

Spears' treating doctors. R. 2285, n. 48. Liberty did not need to wait until February 2016 to request this report; it already had Spears' medical records. Liberty could easily have requested this report in April 2015.  The ERISA regulation deadlines were designed just for this situation; to prevent delays by an insurer when a claimant is seeking disability benefits. This is especially true since Liberty was aware that Spears had filed her Motion to Reinstate back in February 2016 claiming that Liberty missed its deadline to decide her claim. Liberty's lackadaisical approach to ERISA's deadlines is surprising, in light of this Court's remand order. One would think that the Court order would have encouraged Liberty to be more conscious of its ERISA obligations, however, that did not happen.

### iii.   Liberty Violated 29 C.F.R. §2560.503-1 (i) When It Did Not Meet The ERISA Internal Appeal Deadlines On Remand Or Acknowledge That It Was Required To Offer An Appeal

After the June 16, 2016 denial, Spears' filed an administrative appeal on July 13, 2016. R. 2377. 29 C.F.R. §2560.503-1(i) provides that a claimant has a right to one internal appeal. This is a mandate. It is not optional. Liberty has no procedures which inform its adjusters as to whether an appeal from a denial on remand is allowed, and if so, what are the applicable deadlines. Ex. A, Liberty's response to interrogatory # 3. Liberty's June 16, 2016 denial letter states that it will allow Spears to submit a request for review, however, it goes on to claim, "[s]ince this optional review is not required by the Policy or the Court's remand order, it is requested that you notify Liberty within 45 days from your receipt of this letter, of your request for the optional review.  At that time, we will determine a schedule for the submission of documents for that review." R. 2404. Under the ERISA regulation, a claimant's right to pursue an appeal is not optional.  The Plan must allow at least one administrative appeal.  29 C.F.R. §2560.503-1(i).  Even after several years of litigation in *Spears I*, and this Court's order that

Liberty provide a full and fair review under ERISA, Liberty still took the position that it was not required to comply with ERISA. Such disregard of this court's 2015 order is alarming.

As pointed out in the DOL's brief in *Solnin,* if a remand is ordered on one narrow point, the remand review can be considered an appeal. In *Solnin,* the district court issued an order concluding that Sun Life's denial of Solnin's claim was arbitrary and capricious because Sun Life had considered only Solnin's medical limitations, and not whether she was vocationally qualified to obtain any employment. The court remanded the matter to Sun Life, instructing it to consider both Solnin's physical capability and her vocational qualifications. In this circumstance, the DOL argued that a remanded claim should normally be considered a request for review of a denied claim received by the claims fiduciary on the date of the court order. In *Solnin*, the court did not ask the claimant to start over, but asked for a "limited scope review of a particular issue or issues – here Solnin's vocational qualifications." DOL brief at 15. Here, Judge Bryant did not limit the remand review to one narrow issue. The 2015 order was a remand of the entire case and ERISA was to apply on remand. This entitled Spears to a new initial decision under ERISA and one mandatory administrative ERISA appeal. Liberty's lack of awareness that its remand procedures must be in compliance with the ERISA regulation explains its delay in providing a decision on appeal. Liberty did not decide the appeal until May 2017, 11 months after the appeal was filed. R. 4910. Liberty acknowledged that an administrative appeal was pending. Ex A., Liberty's answer to interrogatory #6, refers to Spears' "2016 appeal of Liberty's denial of her claim on remand." Even if Spears' claim is considered to be re-filed at the appeal level (as argued by the DOL in *Solnin*), rather than the initial level, Liberty still did not comply with ERISA timelines and procedures.

### iv.  Liberty Violated 29 C.F.R.  §2560.503-1 (h)(3)(ii) When It Did Not Establish A Reasonable   Procedure On Remand When The

### Individual Who Made The Initial Adverse Benefit  Determination Also Decided The Claim On Remand

Liberty had the same person who denied the claim on remand also review the claim on appeal. Subsection (a) of the claims regulation states that this section sets forth minimum requirements for claims for benefits. It provides for an overriding obligation of an employee benefit plan to establish and maintain reasonable procedures. Subsection (h) requires that a plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination. Subsection (3)(ii) requires that a review not afford deference to the initial adverse benefit determination and that it is "conducted by an appropriate named fiduciary of the plan who is **neither the individual who made the adverse benefit determination** that is the subject of the appeal, nor the subordinate of such individual." (emphasis added).   The reason for such a rule is obvious: a review of a claim should be decided by fresh eyes, by someone who is not personally invested in the first denial. The individual who made the first denial will likely be very reluctant to reverse his or her own decision; such a reversal can imply that the first denial was in error. Some claims adjusters may not be willing to admit they were wrong. The solution to this problem is to have a different person decide the appeal.

Here, the initial denial decision was made by Nancy Winterer in June 2016. R. 2404. Ex. A, response to interrogatory #2.  In spite of the above regulation, on administrative appeal Liberty again assigned this claim to Nancy Winterer. Again, she denied the claim. R. 4910.  This is a violation of both the letter and spirit of the requirement for a full and fair review. Liberty, no doubt, has many claims adjusters who could have considered this claim on remand. Yet, Liberty chose to assign this claim to the same person who had already denied it.  Liberty did not have

any rules addressing remands. Ex. A, interrogatory #3.  Liberty did not change or revise any of its policies and procedures regarding claim reviews after receiving the  remand order. Ex. A, interrogatory #8.  Surely, this is not the first time Liberty has been ordered to reconsider a claim on remand. The failure to have specific procedures to address these circumstances can, as it did here, mean that a claimant is denied a full and fair review. Spears submits that, after this court found that Liberty's claim process was deficient, Liberty should have put some guidelines into place and required its adjusters to rely on them in processing claims.

Even if the remand is considered to have been filed on appeal, as argued by the DOL, procedures adopted by Liberty must still comply with the requirement of a full and fair review. Plaintiff submits that review by the same adjuster who just denied the claim cannot be a full and fair review, regardless of whether the appeal is mandatory under ERISA or optional.

### v.  Liberty Violated 29 C.F.R.  §2560.503-1 (h)(3)(iii), (v) and (h)(4) When It Did Not Establish A Reasonable    Procedure On Remand When The Same Medical Consultants Were Used On Appeal

Not only did Liberty use the same adjuster on appeal, it used the same medical consultants. R. 4911. This is specifically prohibited by 29 C.F.R. §2560.503-1 (h)(3)(iii),(v) and (h)(4). Subsection (v) requires a plan, if the adverse benefit determination was based in whole or in part on a medical judgment, to "consult with a health care professional …who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal…." The same BMI consultants were used on appeal.

### vi.  Liberty Violated 29 C.F.R. §2560.503-1(g) When It Did Not Include The ERISA Required Notice In Its June 2016 Denial of Spears' Right to Bring A Civil Action

Liberty has no procedures which ensure that, when a claim is denied, either for the first time, or on remand, ERISA-specific appeal rights are included. The  PPE which Liberty has

᠄ ⸻ ' R. 2263. This procedure does not provide the appropriate language for an ERISA denial, leaving the adjuster to guess as to what language is required. A written procedure which included the required ERISA notifications was needed in this case. The lack of any reference to ERISA in the denial letter also leads to the inference that Liberty did not believe that the ERISA claim regulation applied on remand. Even if this court finds that the remand order started the clock for an appeal determination (as argued by the DOL in *Solnin*), Liberty still violated this provision by not provided the required ERISA notification.

The Regulation, 29 C.F.R. §2560.503-1(g), contains specific requirements for content of notifications of adverse benefit determinations. It provides,

"The notification shall set forth, in a manner calculated to be understood by the claimant-

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

There is no notice in the June 16, 2016 denial of Spears' right to bring a civil action under §502(a). R. 2404. There is also no such notice in the May 4, 2017 denial. R. 4915.

### vii. Liberty Violated 29 C.F.R. §2560.503-1(g)(iii) When It Did Not Provide An Adequate Description Of Any Additional Material Or Information Necessary For Spears To Perfect The Claim And An Explanation Of Why Such Material Or Information Was Necessary

There is also no  description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary. R. 2404. The regulation requires that this notice must be "set forth in a manner calculated to be understood by the claimant." 29 C.F.R.  §2560.503-1(g)(1). There is nothing in Liberty's  notice which informs a reasonable claimant that she should submit additional information, and if so, what kind of information. It was incumbent upon Liberty to provide the required notice as it actually related to the facts of this case. It did not do so and violated the claim regulation. Despite the finding by this court that Liberty must make a determination as to how Spears' post-Elimination Period medical records bear on the question of Spears' eligibility for LTD benefits, Liberty did not comply with that order and did not inform Spears of its decision regarding which dates it believed to be relevant.

### viii.  Liberty Violated §2560.503-1(h)(2)(iv) When It Did Not Take Into Account All Information Submitted By Spears, Including Vocational Information

Liberty chose to ignore evidence which showed that Spears was disabled. 20 C.F.R. §2560.503-1(h)(2)(iv) provides that the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim unless the claims procedures provide for a review that takes into account all comments, documents, records and other information submitted by the claimant. Here, Liberty's appeal determination did not consider the report of the vocational expert, Raymond Cestar. Mr. Cestar concluded that the vocational base of employability of Spears had greatly eroded. R. 473. Her need to frequently alternate positions of sitting and standing at will and to take frequent naps cannot be accommodated by regularly scheduled rest and lunch periods in a normal workplace.  The activities of competitive employment require that a worker remain on task for extended periods

to consistently meet required quality standards and productivity norms. The cognitive deficiencies of Spears further exacerbate her capability to be gainfully employed. He concluded that Spears was disabled from performing all of the material and substantial duties of her past employment as an administrative assistant as it is normally performed in the national economy. Her impairment and its harmful residuals militate against ability to make a transition to any other occupations which she may reasonably pursue – whether transferring her skills or making a vocational adjustment to unskilled work. Therefore, she was unemployable at any job. R. 463-475. Raymond Cestar had almost 40 years of experience in evaluating the work capacity of people with disabilities. R. 462. There is no other vocational report in the record. Liberty never obtained a vocational opinion supporting its termination of benefits.

The Second Circuit has emphasized the need for a vocational assessment of a disability claimant. See *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 215 (2d Cir. 2006); *Durakovic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 113, 136 (2d Cir. 2010); *Smith v. Champion Int'l Corp.,* 573 F. Supp.2d 599, 618-55 (D. Conn. 2008); *Dwinnell v. Federal Express Corporation Long Term Disability Plan,* 3:14-cv-01439 (D.Conn. April 14, 2017(JAM). *Demirovic* involved an ERISA plan which provided benefits for total and permanent disability, which was defined as the inability to work in any capacity, as determined in the discretion of the Trustees. Despite the broad grant of discretion to the Trustees, the denial of disability benefits was arbitrary and capricious because "a proper inquiry would require not only a medical assessment of Demirovic's physical capacity to perform both physical and sedentary work, but also a non-medical assessment as to whether she has the vocational capacity to perform any type of work …."

At issue in this case is Spears' entitlement to "own occupation" benefits and also "any occupation" benefits after the initial 24 month period of disability. The Cestar report provides

an opinion on both periods. There is no vocational evidence in the record to the contrary. The denials did not take the Cestar report into account and therefore Liberty violated the regulation.

Liberty also made no mention of the lay statements which were furnished by Spears. Affidavits from co-workers and others were submitted. R. 453. The regulation requires that the plan take into account all information submitted by a claimant. An affidavit from Spears' mother describes the dramatic change in Spears' condition at the end of 2008, and described her limitations in her daily activities. R. 482.   Israel Moreno-Lozano, a co-worker of Spears at UTC, prepared an affidavit. R.488.  Chatura Weliwitigota, another co-worker from UTC, also supplied an affidavit. R. 489. In a related disability context, the Federal Circuit has emphasized the importance of lay statements. *Jandreau v. Nicholson*, 492 F.3d 1372 (Fed. Cir. 2007).

Liberty also did not take into account its own denial of Spears' application for life insurance from Liberty.  Liberty denied Spears' application for life insurance because of her medical history.  R.477. Liberty never explained this inconsistency.

### ix.   Liberty Violated 29 C.F.R.  §2560.503-1(b)(5) When It Did Not Set Up Required Administrative Processes And Safeguards

This regulation requires that the claims procedures for a plan will be deemed to be reasonable only if those procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

The importance of an insurer having procedures which are in conformance with the Regulation was recognized by courts prior to the *Halo* decision. As stated by the court in *Glista v. UNUM Life Ins. Co. of Am.,* 378 F.3d 113 (1ˢᵗ Cir. 2004), "[w]here a Plan administrator has chosen consistently to interpret Plan terms in a given way, that interpretation is relevant in

assessing the reasonableness of the administrator's decision. The Department of Labor regulations state that claims procedures "will be deemed reasonable only if" they ensure that "Plan provisions [are] applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). Liberty's lack of any consistent procedures which it applied to Spears' claim on remand militates in favor of a de novo standard of review. Courts have stressed the importance of "uniformity of construction" when evaluating whether an action was arbitrary and capricious. *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032 , 1037 (7th Cir. 1990) (quoting *Reilly v. Blue Cross & Blue Shield United of Wisc.,* 846 F.2d 416, 420 (7th Cir.1988), which cites *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 318 (5th Cir.1982)).

As per *Halo, supra,* Liberty's violation of the ERISA regulations results in de novo review.

### x. Even If The PPE Procedures Can Be Interpreted As Applying To Consideration Of A Claim On Remand, Liberty Did Not Follow Them

Liberty's PPE, R. 2260, states that,

This standard was not met on remand. Liberty did not even assign this claim to its adjuster until October 14, 2015. R. 4854. It cannot be said that this deviation was inadvertent and harmless. After the remand order of this court in 2015, Liberty was, or should have been, well aware that it must comply with all ERISA deadlines. The lack of any timely decision on administrative appeal is also not harmless, as Spears had to pursue her claim, again, in this court, in order to obtain a decision from Liberty.

The PPE provide that, ˌ                                                                                           ˌ

                                                                                    R. 2266. This was not done. An IME was performed on remand by Dr. Jeness Courtney, on March 14, 2016. R. 2492 – 2509. Liberty did not provide that report to Spears' treating doctors, in

s.

This recognizes the importance of the opinion of the treating physician in the medical evaluation. Liberty did not give appropriate consideration to the opinions of Spears' doctors, as discussed more fully below.

The PPE, moreover

### d. Even With An Arbitrary & Capricious Standard, The Plan Must Be Interpreted Consistent With Its Plain Words, And Spears Must Be Found Disabled

#### i. A Discretionary Clause Cannot Be Used To Deny A Claim Which Is Otherwise Properly Payable Under The Policy Terms

If this court does not adopt a de novo standard of review, judgment must still enter for Spears. "Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious." *McCauley v. First Unum Life Insurance Co.*, 551 F.3d 126, 132 (2d Cir. 2008); *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008). Decisions are arbitrary and capricious when they are rendered without reason, unsupported by substantial evidence or erroneous as a matter of law. See *id.*; *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir. 1995). "Nevertheless, where the administrator . . . interprets the Plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." McCauley at 133 quoting from *Pulvers v. First UNUM Life*

*Insurance Co.,* 210 F.3d 89, 92 (2d Cir.2000).  After *Glenn,* a plan where the administrator both evaluates and pays benefits claims creates a conflict of interest that the court must consider and weigh as a factor in determining whether there was an abuse of discretion. *Glenn,* 554 U.S. at 111-12.[3]  The March 2015 decision found that Liberty's denial was arbitrary and capricious.

A discretionary clause cannot be used to deny a claim which is otherwise properly payable under the policy terms. Policy provisions allowing an insurer discretion to determine eligibility for benefits cannot be used to improperly deny claims or to restrict any rights an insured has under the policy. Ex.  D, Connecticut Insurance Department Bulletin HC-67, March 19, 2008.  This Bulletin applies to disability insurers. Conn. Gen. Stat. §38a-469. The Liberty policy affirmatively states that the, "Governing Jurisdiction is Connecticut and subject to the laws of that State," R. 1.

### ii.  Liberty's Conflict Of Interest Affected Its Decision Making Resulting In De Novo Review

The court ruling of March 2015 held that, given the procedural deficiencies that hampered Liberty's review process, the court gave some weight to Liberty's inherent conflict of interest. Dkt. 103 at 47. Judge Bryant relied on *Durakovic v. Building Serv.,* 609 F.3d 133 (2d Cir. 2010). On remand, Liberty has not complied with this court's order, has not complied with ERISA mandates, and has committed more procedural violations. This should lead this court to accord additional weight to the structural conflict of interest.

---

[3] *See generally,*  Langbein, John H., *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA* (January 15, 2013), Northwestern University L. Rev., Vol. 101, p. 1315, 2007 (judicial review in ERISA cases is an essential safeguard against self-serving conduct); DeBofsky, Mark, The *Paradox of the Misuse of Administrative Law in ERISA Benefit Claims* (2003), 37 J. Marshall L.Rev. 727 (2003) (substantial evidence test should not be used to decide claims).

As noted by *Glenn, supra*, "seemingly inconsistent" actions are evidence that a conflict affected an administrator's decision where the actions are financially advantageous. Here, the action of Liberty in paying the STD claim, while at the same time denying that Spears was disabled, is inconsistent and documents the influence the conflict had in this claim. Liberty did not have the authority to modify the terms of the Plan, and therefore had no authority to pay a claimant who was not disabled under the terms of the Plan, even if it calls such a payment "employer override."   R. 33, 2222. The Summary Plan Description provides, "[n]o UTC representative is authorized to waive requirements of this plan, to interpret the terms or plan provisions or to grant exceptions or to contract with employees to provide benefits beyond those described in this SPD." R. 2222. The assertion of "employer override" is in direct contradiction to this provision. Liberty has never taken responsibility for its own payment to Spears for the entire Elimination Period. Plaintiff submits that the reason UTC told Liberty to pay the STD benefits was because UTC believed that Spears was disabled under the plan. For Liberty to continue to claim that Spears was not disabled during this time period is evidence of bad faith and a failure by Liberty to comply with its fiduciary obligation to Spears.

Liberty's abrupt change in position – paying the STD claim and then claiming that Spears was not disabled– highlights the conflict of interest and calls into question its motive in denying benefits. Liberty did not point to any actual change in Spears' medical condition on February 8, 2009. Liberty's consultants at BMI on remand were apparently not aware that Liberty had already made a decision that Spears was disabled, at least for a period of time. See *Houston v. Unum Life Ins. Of Am.* 246 F. App'x 293, 301 (6th Cir. 2007)(Unum's decision did not show a deliberate principled reasoning process as required by *Glenn;* additionally Unum did not give full consideration to claimant's objective vocational evidence of disability; plan administrator may not disregard opinions of treating physicians*);Brown v. Blue Cross,* 898 F.2d 1556, 1569

54

(11th Cir. 1990)(*Overruled on other grounds, Doyle v. Liberty Life Assurance*, 542 F.3d 1352

(11th Cir. 2008)(factor in evaluating abuse of discretion is existence and definiteness of external

standard by which reasonableness of fiduciary's conduct may be measured). There is an extra

Ex. A. to Motion for Summary Judgment, 4/28/14.  R. 2241. C

't.  This

fact, and Liberty's violation of the remand order, procedural violations, and lack of any written

guidelines to decide Spears' appeal on remand leads to an inference that the conflict of interest

influenced its denial decisions. A smoking gun is not required for a court to find that a conflict of

interest affected the administrator's decision.

### e. Using Either The De Novo Or Arbitrary And Capricious Standard, Spears Was   Disabled During The Elimination Period, Own Occupation And Any Occupation Period   Until August  2014

#### i. Second Circuit Law Requires That Subjective Factors Such As Pain Be Taken Into Consideration

Pain must be considered by a plan. If an administrator does not credit subjective reports

of pain, ERISA mandates that the plan administrator provide the claimant with "adequate notice

in writing…setting forth the specific reasons for such denial…." 29 U.S.C. §1133; *Miles v.*

*Principal Life Ins. Co.,* 720 F.3d 472 (2d Cir. 2013). In *Miles*, the Second Circuit held that an

insurer erred by selectively considering evidence in the record, by requesting objective evidence

for a condition which could not be objectively verified, and by giving inadequate weight to the

Social Security determination of plaintiff's credibility.  Spears' records demonstrated continued

pain. Liberty never directed its consultants to consider pain, and they did not do so. Liberty's

denials did not evaluate Spears' pain. As in *Mikrut v. Unum Life Ins. Co.*, 3:03cv1714(SRU) (D. Conn. December 20, 2006), complete disregard of complaints of pain suggest that a plan administrator was influenced by a conflict of interest.

### ii.  Under Either Standard Of Review, Spears Has Shown That She Met The Definition Of Disability Under The Plan

Plaintiff refers the court to the documentation of her disability as set forth in her Summary Judgment motion and Rule 56a(1) statement in *Spears* I, dkt. 82. As recognized by the court in dkt. 103 at 3, "Spears asserts and the Defendants do not dispute, that, prior to the onset of her symptoms, Spears was a dedicated and bright employee who worked hard and was able to handle a range of job responsibilities."  Spears underwent a spinal tap on February 2, 2009, which yielded a positive result for IgG, an antibody associated with Lyme disease. The court found that the spinal tap caused complications which required her to remain on part-time status beyond February 8, 2009, and that her employer UTC cleared her to work only on a part-time, light duty basis. Dkt. 103 at 11-12. The court found that Spears received a peripherally inserted central catheter (PICC) line in March 2009, upon the order of Dr. Zagar. Dkt. 103, at 13.

Spears refuted the conclusions of Liberty's non-examining, non- treating consultants who reviewed the claim on remand. Dr. Zane Saul provided a report stating that he treated Spears from 2010 until 2014. R. 2374. Dr. Kristin Giannini provided a report in April 2016. R. 2470. Dr. Dario Zagar provided a report in April 2016. He cared for Spears from 2009 until 2011. R. 2484. See discussion of these reports, *infra*. Marian Rissenberg Ph.D., provided another report, as did Dr. Raxlen. R. 2488

Spears has demonstrated, with hundreds of pages of medical records and the vocational report, that she could not do her job, or any other job, from September 2008 until the time she went back to work in August 2014.

### iii. Liberty's Denials Are Not Supported By Substantial Evidence Under An Arbitrary And Capricious Standard And Do Not Support Non-Disability Under A De Novo Standard

Liberty's reasons for the June 2016 denial are unconvincing. Its reasons in its 27 page denial letter can be summarized as follows. As for the Elimination Period:

1. Spears had self-reported symptoms. R. 2399.

2. There are multiple inconsistencies in Spears' medical records. R. 2399.

3. Self-reported symptoms were not consistent with the medical evidence. R. 2399.

These reasons can be easily dismissed. First, there is no exclusion or limitation in this Plan that self-reported symptoms cannot be used to support disability. *Miles v. Principal Life, supra,* conclusively held that subjective symptoms must be considered by an ERISA plan. As regards the alleged "multiple inconsistencies" in the medical records; symptoms wax and wane. They are not the exact same every day. Liberty wrote that Dr. Giannini did not include findings on an exam of March 10, 2009. This is not correct. This exam is R. 1257. Dr. Giannini, in her review of symptoms listed headaches as a positive neurological finding. The visit of April 21, 2009 to Dr. Raxlen was the first visit to Dr. Raxlen; the history given related to the entire time Spears was sick, not just the previous month. The visit to Dr. Zagar is R. 992, which reflected the most recent time period. Liberty's conclusion that her self-reported symptoms were not consistent with her "actual functional abilities continuously throughout the Elimination Period" is not explained in the denial letter and is inconsistent with its own payment of benefits for the full Elimination Period.

As for the "own occupation period:" Liberty denied benefits during this period because:

1. Physical examinations were normal.

2. There was no evidence that Spears tried the medications Dr. Zagar had recommended for fatigue.

3. Ongoing inconsistences in the medical records continued.

As for the allegedly normal physical examinations, Liberty has not identified which examinations it claims were normal. As for the medication for fatigue, again Liberty has not identified which medication it claims will cure fatigue. Liberty conceded that Spears had little improvement in her sleep during this period, although, oddly, Liberty uses that as a reason to deny her claim. R. 2399. Liberty also concedes that Dr. Giannini's July 10, 2010 office visit note documents cognitive difficulties on exam. As for the alleged "inconsistencies" in her records, there was no inconsistency. She had efforts at activity and then "totally crashed." R. 2399. An exacerbation of symptoms following a period of activity is not surprising.  Liberty's denial claims that Dr. Zagar never documented abnormal findings on exam. That is not correct. For example, on October 26, 2009, and March 26, 2010, Dr. Zagar diagnosed Lyme disease, migraine, current well-controlled and insomnia.  In October 2009, Dr. Zagar noted that she had been on IV antibiotics for 6-8 month with minimal improvement.

As for the "any occupation" period, Liberty denied benefits because:

1. The BMI consultants found insufficient evidence of functional impairment.

2. Discrepancies in reported symptoms continue to be evident.

3. In June 2014 Spears reported increased energy and was looking for work.

As for the BMI report, see discussion above. As for the alleged "discrepancies" they simply reflect the reality of a person with a chronic multi - system illness, when some days are better than other days. None of the reported activities – going to church, improvements in sleep, exercise, by themselves show an ability to work full time. Having the capacity to travel to medical appointments does not show the ability to work full time.  If it did, then no person could ever be found disabled under this Liberty policy.  Spears did look for work in the summer of 2014 and returned to work in August 2014 in temporary jobs.

58

When evaluating a claim under an "any occupation" standard the opinion of a vocational expert is essential. Spears submitted the report of Raymond Cestar, who thoroughly discussed the requirements of work as related to Haley Spears. Liberty offered no vocational analysis at all.

Liberty included a section in its denial called "additional remand analysis." R. 2400. In it, Liberty raised the question of Spears' mental health, stating that some of her doctors have referenced depression and anxiety. A finding of a mental impairment is not a defense. This policy does not have an exclusion or limitation for mental health disabilities. If Liberty concluded that there was a mental health impairment, that is simply more evidence of disability.

**f. This Court Can Fashion An Appropriate Remedy**

This court has already given defendants an opportunity, on remand, to fix their mistakes and make a legally sufficient decision. They have not done so. Liberty has delayed, ignored relevant evidence provided by Spears, and cherry-picked conclusions from its own consultants. If this court finds that Liberty did not comply with this court's remand order, did not provide a full and fair review, or if Spears is disabled, then this court should reverse the denial of benefits, and issue judgment for Spears. Although the Federal courts do not wish to sit as plan administrators in the first instance, in this case, the Court has already remanded the case, and again, defendants have failed in their fiduciary duty towards Spears. Liberty has already had two bites at the apple. Spears has already waited over nine years for her benefits. The computation of benefits is as follows:

Benefits from March 2009 through the period of partial disability:

| | |
|---|---|
| March 2009, 4 days ($88.43 per diem) | $353.75 |
| April 2009 through July 2014 | |
| $2,653.15, per month @ 64 months = | $169,801.60 |
| Plus partial disability benefit[4], | $ 12,458.31 |
| Aug. 2014 through March 2015 | |

_____

[4] Partial benefits are payable from August 2014 through March 2015 based on R. 9, R. 21.

| | |
|---|---|
| Total disability benefit | $182,613.66 |
| 10% prejudgment interest is: $157,248.80 | <u>$157,248.80</u> |
| TOTAL, with interest | $339,862.46 |

See ex. E, spreadsheet.

Prejudgment interest at 10% was allowed in *Fairbaugh v. Life Ins. Co. of North America,* 872 F. Supp.2d 174 (D.Conn.2012) (award also considered a sanction), an ERISA case in the District of Connecticut. This is the Connecticut statutory rate for prejudgment interest. Conn. Gen. Stat. §37-3a. "In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court." *Jones v. UNUM Life Ins. Co. of America*, 223 F.3d 130, 139 (2d Cir. 2000). "In exercising such discretion, the court is to take into consideration '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" *Jones*, 223 F.3d at 139 (quoting *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)). The purpose of prejudgment interest is "to fully compensate the wronged party for the actual damages suffered, *i.e.*, to make him whole." *Slupinski v. First Unum Life Ins. Co.*, 554F.3d 48, 54 (2d Cir. 2009). *See also Augustin v. Jablonski*, 819 F.Supp.2d 153, 178 (E.D.N.Y.2011). Spears requests a rate of 10%. This reflects the remedial purpose of the statute and reflects the relative equities of the parties. Defendants here repeatedly failed to abide by the ERISA claim regulation. Spears has waited nine years since she was terminated from benefits.

**III)   CONCLUSION**

There is no evidence in the record suggesting that Spears' reports of headaches, pain and fatigue were not credible. There is no surveillance documenting any activities inconsistent with Spears' claims. Liberty's investigation of Spears and her family turned up nothing. Liberty made no legitimate attempt to comply with this court's order on remand. Whether a de novo or arbitrary and capricious standard of review is used, Liberty has acted in bad faith in failing to comply with the court order, failing to comply with ERISA or even acknowledge that it applied on remand, and  relying on highly paid defense consulting companies  to support its termination of benefits. No possible credible evidence could support a denial of benefits. Remand would be a useless formality. *Miller v United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir. 1995);  *Miles v. Principal Life, supra.* This justifies an award of benefits and interest at the full statutory rate.

In the alternative, Spears requests a judgment of remand to the plan administrator. Plaintiff reserves the right to file for attorney fees for this motion if warranted.  If the court finds a material issue of fact, partial summary judgment should be granted, and this matter should be set for trial on any remaining issue of fact.

Respectfully submitted,

By:   /s/      Winona W. Zimberlin
Winona W. Zimberlin
Zimberlin Law LLC
267 Main St.
Manchester, CT. 06042
Ct 05501
(860) 783-5999

## CERTIFICATION OF SERVICE

I hereby certify that on November 16, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ _Winona W. Zimberlin_____
Winona W. Zimberlin