UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Haley Spears                                             No. 3: 3:11-cv-01807 -KAD

    Plaintiff

v.

Liberty Life Assurance Company of Boston;
United Technologies Corporation;
The Group Life Insurance and Disability
Plan Of United Technologies Corporation
aka The UTC Choice Integrated Disability
Benefit Program;                                         Nov. 16,  2018

    Defendants

PLAINTIFF'S LOCAL RULE 56(a)(1) STATEMENT

Preliminary statement

    Plaintiff incorporates by reference her Rule 56(a)(1) statement filed on April 28, 2014, in Civil No. 3:11-cv-01807 (VLB)("Spears 1"). Plaintiff does not repeat those statements here. This Rule 56(a)(1) statement describes the events subsequent to the court ruling granting summary judgment to Spears on March 31, 2015. It begins with #90, as #1 - 89 are included in the April 28, 2014 statement.

90.    Liberty did not make any change in its claim procedures after this court's March 2015 ruling granting summary judgment for Spears. See Liberty's March 16, 2017 answer to interrogatory #8, ex. A.

91.    Liberty took the position that the ERISA claim regulation did not apply to this claim on remand. R. 4893.

92.	Liberty requested that Spears fill out new claim forms on July 30, 2015. R. 4882.

93.	On October 21, 2015, Liberty notified plaintiff that it received "the claim documentation for this appeal review" on October 14, 2015. Liberty already had medical records from treating physicians and laboratory reports for Spears. See 2014 Rule 56(a)(1) statement and previous administrative record filed with the Court.

94.	Liberty's October 21, 2015 letter to Spears stated that day 45 of the "appeal review" was November 26, 2015. The letter cited to ERISA. R. 4708.

95.	Liberty assigned the remanded claim to its adjuster, Nancy Winterer, on October 14, 2015. R. 4854.

96.	The Liberty referral to Winterer stated that Spears was eligible for LTD. R. 4854.

97.	Liberty ordered a data base search of Spears on or about October 23, 2015. R. 2288, n. 32, 4702.

98.	The database search did not uncover any information which contradicted any of Spears' statements. R. 2278 – 4893.

99.	The database search did not uncover any information which showed that Spears was not disabled for the time period she claimed that she was disabled. R. 2278 – 4893.

100.	Liberty hired a private investigator to investigate Spears and her family on October 22, 2015. This included a social media search, including but not limited to Facebook, Twitter, Google plus, LinkedIn, Google, Bing, and Yahoo. R. 4564 – 4592.

101.	The investigator made a thorough search of the subject "and the subject's relatives." R. 4564. Searches were conducted in three states. R. 4564. A search of Google Maps produced a

satellite map of Spears' residence, and previous residence. R. 4565 - 4567. The investigator printed out Facebook pages of Spears' relatives. R. 4569 4570.

102. The investigator did not find any information which contradicted any of Spears' statements. R. 4564 – 4592.

103. The investigator did not find any information which showed that Spears was not disabled for the time period she claimed that she was disabled. R. 4564 - 4592.

104. Spears returned to work in August 2014, at a series of temporary jobs. R. 4862.

105. After Spears provided the requested claim forms to Liberty, Liberty then wanted another claim form on December 1, 2015, which Spears submitted on December 7, 2015. R. 2286 - 87, n. 40, 2878, 2875.

106. In addition to treatment discussed in Spears' 2014 summary judgment memorandum, John Tagliarini, D.C., treated Spears in 2012. She reported shoulder, cranial and cervical discomfort for the past three and a half years. R. 2731. Treatment continued until August 2014. R. 2792.

107. In addition to treatment discussed in Spears' 2014 summary judgment memorandum, Dr. Albritton saw Spears for evaluation for endocrine follow up for thyroid cancer and post-surgical hypothyroidism. History describe a total thyroidectomy in June 2013 due to cancer. R. 2716.

108. In addition to treatment discussed in Spears' 2014 summary judgment memorandum, Spears was treated by Dr. Cynthia Grosso from May 26, 2010 to December 30, 2010 for complaints of pain. R. 4483 – 4499.

109. In addition to treatment discussed in Spears' 2014 summary judgment memorandum, Spears was treated by John Paholski, PT, MS, OCS in December 2008 for a chief complaint of constant headaches. R.4529.

110. On January 12, 2016, Spears requested that Liberty decide on her claim. R. 2723, 2286.

111. On or about February 2, 2016 Liberty requested a peer review report from Behavioral Medical Interventions, Inc. ["BMI"]. R. 2285, n. 48.

112. BMI provides claims processing and adjustment services. www.bloomberg.com.

113. BMI, now called "R3 Continuum" advertises its services on the internet to help make "defensible claims decisions." https://r3continuum.com/clin.(last viewed 11/8/18).

114. BMI provided a peer review report to Liberty on March 4, 2016. R. 2597.

The peer review report lists records which have been reviewed to prepare the report. This list does not include:   State of Connecticut Department of Social Services, finding that Ms. Spears is unemployable, 4/22/10, 4 p., Raymond Edward Cestar, Vocational Expert, resume, and report, Liberty Mutual / Application and Denial of life insurance, 8/2/10, 3 p., affidavit of Christine P. Baumann, 3 p., affidavit of Haley Spears, 3 p. affidavit of Israel Moreno-Lozano, 2 p. affidavit of Chatura Weliwitigoda, 2 p., Manchester Memorial Hospital, St. Francis Hospital, Connecticut assistant attorney general report, Attorney General Blumenthal's antitrust investigation,  medical journal articles supplied by Spears,  R. 2599 - 2601.

115. Four individuals contributed to the BMI report. R. 2597.  They did not examine Spears. R. 2597.

116. BMI charged Liberty $38,670.61 for the peer review reports. Ex. A, interrogatory response to #13.

117. The $ 38,670.61    did not include the charge for an IME by a different doctor. R. 2281. Ex. A, interrogatory response to #13.

118. Michael Raymond, Ph.D., ABN, Neuropsychology, contributed to the BMI report. R. 2607.

119. Dr. Raymond did not have access to the raw test data. R. 2607.

120. Dr. Raymond concluded that, because he felt that Dr. Rissenberg's assessment was "cursory" and "without formal effort testing," a "neuropsychologist would not be able to render an opinion with any degree of neuropsychological certainty." R. 2607.

121. Dr. Raymond is not a medical doctor. R. 2597.

122. Dr. Raymond noted that Dr. Raxlen assessed an abnormal finding in his mental residual functional capacity assessment on January 20, 2010, which indicated that Spears was markedly limited in memory and cognitive functioning, including remembering locations, understanding very short simple instructions, carrying out detailed instructions, performing activities within a schedule, and setting realistic goals and making plans independently. R. 2609.

123. Although he noted Dr. Raxlen's findings, Dr. Raymond concluded that "there is no evidence in the records to support functional impairment…." R. 2609.

124. Although he noted Dr. Raxlen's findings, Dr. Raymond found that neurocognitive impairment was not supported within the time frame in question, 9/27/08 – 3/31/15. R. 2611.

125. Although he noted Dr. Raxlen's findings, Dr. Raymond found that "[t]here was no suggestion, whatsoever, of reduced cognitive efficiency." R. 2611.

126. Although he noted Dr. Raxlen's findings, Dr. Raymond found that the "only suggestion for 'inattention, brain fog, memory loss' were reported as part of an interview and based solely on the claimant's subjective report." R. 2611.

127. Dr. Raymond's report found that initial problems began that were primarily related to vascular headaches. R. 2611.

128. Dr. Raymond wrote that "[a]dditional problems began when the claimant underwent an initial cerebral CT scan and multiple cerebral MRI's identifying a nonspecific right temporal lesion and eventual pineal cyst." R. 2611.

129.    In Dr. Raymond's opinion, Dr. Rissenberg "appeared to have overestimated the claimant's premorbid level of intellectual functioning." R. 2607.

130.    In Dr. Raymond's opinion, Spears' was more likely functioning within the average range of general intelligence. R. 2607.

131.    He based this on "review of specific subtest scores, level of education and work history." R. 2607.

132.    Dr. Raymond did not indicate which sub-test scores he relied upon. R. 2607.

133.    Dr. Raymond did not offer his own opinion as to Spears' residual functional capacity for the time period 9/27/08 – 3/31/15. R. 2611.

134.    Dr. Raymond wrote that "Unfortunately, based on a dearth of neuropsychological evidence, the undersigned is unable to render a conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested timeframe." R. 2614.

135.    On March 16, 2016, Liberty responded to the Dr. Raymond report by requesting another report from him. R. 2557.

136.    Dr. Raymond did not change his conclusions. R. 2511. He wrote another report on March 22, 2016 which reiterated that the data was "mostly obsolete" because the data was six years old. R. 2512.

137.    In its request for another report, Liberty requested that Dr. Raymond explain how the results of Dr. Rissenberg's July 2010 evaluation reflected on Spears' impairments and functional capacity for the periods 9/27/08 through 3/27/09 and 3/28/09 through 3/31/15. R. 2512.

138. Dr. Raymond wrote, "…without having comprehensive and updated neuropsychological data, the undersigned was unable to render a clinical opinion regarding limitations, restrictions or functional capability, with any degree of neuropsychological certainty." R. 2512.

139. On March 23, 2016, BMI charged Liberty $121.88 for the additional report of Dr. Raymond. R. 2510.

140. Robert Cooper, M.D. FACE, FACP, Endocrinology, Internal Medicine contributed to the BMI report. R. 2597.

141. Dr. Cooper summarized "those portions of the records received that have relevance to the questions and timeframe identified for this review, and within the scope of my areas of endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care." R. 2601.

142. Dr. Cooper did not summarize the records/reports of Dr. Raxlen, Dr. Saul, Dr. Rissenberg, the Social Security Administration, Dr. Silvers, Dr. Donaldson, Dr. Gouin, Dr. Zagar, Dr. Schoen, Dr. Schiff, Dr. Gordon, Professional Home Care Services, Visiting Nurse Association, Liberty denial of life insurance for Spears, State of Connecticut, Department of Social Services finding of unemployability, Raymond Cestar's vocational report, affidavits, Manchester Memorial Hospital, St. Francis Hospital, Dr. Patterson-Marshall, Dr. Baehring, Connecticut assistant attorney general report, Attorney General Blumenthal's antitrust investigation, or medical journal articles supplied by Spears. R. 2602 – 03.

143. Dr. Cooper, based on his records review as described above, did not find evidence of "global impairment" and found that Spears could work without restriction during the periods 9/27/08 through 3/27/09 and 3/28/09 through 3/31/15. R. 2610.

144. Kent Crossley, MD., FACP, infectious disease, internal medicine, contributed to the BMI report. R. 2597. He wrote that Spears' test results of her cerebrospinal fluid on February 2, 2009

with a positive IgG Western Blot for Borrelia burgdorferi was not meaningful. R. 2604. Dr. Crossley found that this CSF test was "impossible to interpret." R. 2610. Despite the positive test, Dr. Crossley concluded that there was no evidence that Spears had Lyme disease or other infections that would be functionally limiting based on "the absence of any objective findings of late-state Lyme disease (typically manifest by arthritis, neurologic findings or a cardiac conduction defect) and the totally non-specific self-reported symptoms noted by the claimant." R. 2610.

145. Dr. Crossley is a member of the Infectious Diseases Society of America. R. 2666.

146. Dr. Crossley wrote that Spears' symptoms were "non-specific and not related to any infection." R. 2612.

147. Daniel Kitei, D.O., MA., neurology, neuromuscular medicine, contributed to the BMI report. R. 2597.

148. Dr. Kitei wrote that the primary medical issue in question was unclear from a neurologic standpoint, but that the Attending Physician Statement notes the claimant had cognitive problems and migraine in 2009. He wrote that, "[i]n 2010, Dr. Raxlen felt that the claimant had Lyme disease and 'can't work.' There is a note of fatigue and cognitive changes from Dario Zagar and an Attending Physician Statement from Dr. Giannini that the claimant had some lifting and cognitive limitations." R. 2598.

149. Dr. Kitei noted that Spears had a "long medical history." R. 2604. He described her treatment with a PICC line for chronic Lyme Disease, treatment for migraines, blackouts, numerous medications, and CT scan of her head which revealed low attenuation in the right temporal lobe. R. 2604.

150. Dr. Kitei noted that Spears' EEG revealed a nonspecific abnormality. R. 2604. Dr. Kitei noted that neuropsychological testing by Dr. Rissenberg reportedly revealed a significant decline. R. 2605.

151. The BMI report states that a cerebral MRI of September 2, 2008 identified a nonspecific right temporal lesion. An EEG of September 18, 2008 identified rate polymorphic delta slowing in both temporal regions. A repeat MRI of October 6, 2008 identified a stable and non-enhancing white matter lesion involving the right temporal lobe. This was considered to be a possible chronic demyelinating plaque. R. 2606.

152. Dr. Kitei questioned the diagnosis of Lyme disease. R. 2609. Dr. Kitei stated that Spears complained of headaches, and by 2013 no longer reported headaches. By June 9, 2014, her energy level was better. "At that time her subjective complaints had improved, as well." Dr. Kitei deferred opining on cognitive impairment to the neuropsychologist reviewing the case. R. 2609. He deferred any opinion on Lyme disease to the infectious disease reviewer. R. 2611.

153. Liberty requested an IME on or about February 2016. R. 2284, n.1, after it was aware that Spears had returned to work in August 2014. R. 4892.

154. The IME doctor, Dr. Courtney, stated to Spears that he had a 1400-page record, which he had only scanned. R. 2582.

155. The IME doctor, Dr. Courtney, stated to Spears that he did not know why he had been asked to conduct this exam, after Spears had already returned to work. R. 2582.

156. Spears requested that another person accompany her into the exam room with Dr. Courtney. R. 2705, 2688.

157. Liberty refused to allow another person into the exam room with Spears and Dr. Courtney. R. 2691.

158. Liberty did not identify any LTD policy provision preventing a plan beneficiary from having a third party accompany her into an exam room with Liberty's IME physician. R. 2691.

159. Dr. Courtney's report of March 14, 2016, summarized Spears' medical records, which included the following diagnoses by several different physicians: heart palpitations, asthma, ulcers, goiter, Hashimoto's thyroiditis, constipation, diarrhea, bloating, cramping, allergies, intermittent GERD, irritable bowel syndrome, r/o inflammatory bowel disease, microscopic colitis, healed ulcer, fatty liver, thyroid cyst, systemic lupus erythematosus, plantar fasciitis, migraine headaches, poor energy, poor memory and concentration, blurred vision, ringing in the ears, recurrent peptic ulcer disease, exacerbation of lymphocytic colitis, low attenuation changes in the white matter of the right temporal lobe of the brain, lobulated lesion in the white matter of the right temporal lobe of the brain, nausea, abdominal pain, lymphocytic colitis, frequent tension type headaches, encephalopathy, positive ANA, ferritin and iron low, ALT high, pineal region cyst of brain, lumbago, abnormal lab findings, "high complexity" presentation, Borrelia burgdorferi IgG antibody detected, probability of Lyme disease, confirmation of Lyme disease, Lyme IgG WB positive on cerebrospinal fluid, fatigue and cognitive issues, sleeping during the day, spirometry showing mild reversible airway obstruction, otalgia, crush injury to left index finger, blood test showing Babesia organisms, PICC line in place, chronic multi-symptom illness consistent with chronic fatigue and fibromyalgia syndrome of long-standing duration that may well be due to Lyme disease in part or in whole, neck problems, aching, stiffness, throbbing, stabbing pain, upper back problems, extensive neuropsychologist's report of July 2010, which notes a dramatic decline in mental status, consistent with frontal or diffuse cerebral dysfunction as seen in chronic infections or inflammatory illness, "no obvious overall improvement, which may be due to her not having as effective of a treatment for chronic Lyme disease as is possible,"

fluctuating thyroid function test results, periodic limb movement disorder, sleep onset and sleep maintenance insomnia, tendinitis of the foot, papillary thyroid microcarcinoma, cervicalgia, several reports concluding inability to work by Dr. Kage, Dr. Gouin, Dr. Raxlen, Dr. Saul and Dr. Giannini. R. 2493 -2506.

160. Dr. Courtney did not state that he reviewed the Social Security grant of disability benefits, witness affidavits, the vocational expert report or Liberty's denial of life insurance benefits to Spears. R. 2492 -2509.

161. Spears reported to Dr. Courtney that she had no current medical problems, but got better with the treatments that were provided. R. 2508.

162. Dr. Courtney wrote that he was not an expert in the diagnosis of Lyme disease. R. 2507. Dr. Courtney wrote, "[a]s far as the periods from September 27, 2008 through March 27, 2009, apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective." R. 2507.

163. Dr. Courtney wrote that it would be virtually impossible, based on a review of these records, to determine what this patient could have done from September 27, 2008, through March 27, 2009, without examination of the patient. He wrote that the patient was able to work at least part time during that period, but seemed to be plagued by fatigue. R. 2508.

164. Liberty paid $3,850.00 to Medical Consultants Network ("MCN") for the IME by Dr. Courtney. R. 2491. MCN advertises on the internet that it helps reduce the economic losses of injury and disability. It provides claims management services for employers, insurers, self-insured organizations, state funds, workers' compensation programs and attorneys. https://mcn.com/services,( last viewed 11/8/18).

11

165. Dr. Giannini, Spears' former treating physician, wrote Liberty a letter on April 13, 2016, stating that she treated Spears during the period in question for headaches and fatigue. She explained that headaches and fatigue have no specific objective evidence to indicate quality and severity. They are measured based on patient subjective report. She wrote: "During this period Haley's headaches and fatigue were severe enough that she would have spent significant amounts of time away from a job. She would have been an unreliable employee and missed many days of work. She was most definitely disabled during this period." R. 2470.

166. Dr. Zagar, Spears' former treating physician, wrote Liberty a letter on April 6, 2016 after reviewing the BMI report. He stated that he cared for Spears from January 2009 to October 2011. He wrote that Spears' symptoms included frequent headaches, severe fatigue, joint pains, digestive problems and cognitive complaints. Testing was notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease. She received long term antibiotic therapy and a variety of treatments with only minimal improvement in her symptoms. "She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis." R. 2484.

167. Dr. Zagar wrote that, while a diagnosis of CNS Lyme was not certain, "she clearly had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily functioning." R. 2484.

168. Dr. Zagar commented, "t[o] be frank, on review of your physicians' assessments of her prior medical records, it is clear that each took as skeptical and unsympathetic a viewpoint as possible when assessing her case, which is unfair to this unfortunate young woman. I am certain

that if any of them had been her treating physician rather than an insurance reviewer they would not have taken the same approach." R. 2484.

169. Dr. Rissenberg, Spears' neuropsychologist, wrote Liberty a letter on April 6, 2016 to respond to the BMI report. R. 2486. The letter attaches a copy of her Curriculum Vitae, which attests to her training, experience and expertise in the field of clinical neuropsychology, in general, the assessment of neuropsychological impairment due to injury and illness, and the neuropsychological impact of Lyme disease and other infectious/inflammatory conditions. R. 2486.

170. Dr. Rissenberg's CV indicates that she has published on the topic of cognitive defects with chronic Lyme disease and has presented on the neuropsychiatric aspects of Lyme disease including on cognitive deficits in patients suffering from Lyme disease. R. 2490.

171. Dr. Rissenberg's report refuted Dr. Raymond's characterization of her assessment as "cursory" or "abbreviated." She wrote that the assessment was comprehensive, involving nine hours of direct patient contact and eight hours of review and analysis. This included review of records, independent input, phone interview with a colleague, self-report, clinical interview and six standardized tests. She wrote that the tests and methods are widely used and carefully and extensively normed and standardized to the highest standards in the field. R. 2487.

172. Dr. Rissenberg wrote that she used the standard best practice in the field of clinical neuropsychology to obtain the best estimate of Spears' premorbid cognitive capacity as at around the 75th percentile. She noted that Spears is a high school graduate who completed two years of college. She noted that the average IQ of a high school graduate is 110, (75th percentile) and that educational attainment is the best single demographic predictor of IQ. Her highest cognitive score on testing was at the 75th percentile and scores at the 50th percentile were obtained on

several tests of abstract reasoning. "On each of these, 'intratest variability' (more difficult items are correctly solved while some easier are missed) was evident. In this case, it is the difficulty level of the test items solved that best estimates premorbid ability. 'For intellectually impaired persons, the least depressed abilities are the best remaining behavioral representatives of the original intellectual potential.'" R. 2487.

173. Dr. Rissenberg refuted Dr. Raymond's statement that her assessment provided no evidence of impairment. Dr. Rissenberg wrote that there was clear and objective evidence, as well as clinical evidence, of significant impairment in multiple areas of function. Spears obtained a Working Memory Index at the 12th percentile and Auditory Delayed Memory Index was at the 6th percentile, in the Borderline Defective range, "impaired by any standard." R. 2487.

174. Dr. Rissenberg's report explained that formal effort testing was not necessary or appropriate because it is not indicated when there are relatively higher scores obtained, as was the case with Spears. R. 2488.

175. Dr. Rissenberg explained that effort testing can be important to rule out a lack of effort or malingering when scores are consistently low. She explained that, for Spears, there was abundant clinical evidence of good effort provided by her test taking behavior, including her continued attempt to solve increasingly difficult items on a subtest, after failing easier ones and after the time limit had been exceeded. R. 2488.

176. On April 14, 2016, Spears filed a Complaint in this court, alleging that she "previously filed Civil No. 3-cv-01807(VLB) in order to recover benefits due to her under the Plan. After briefs were filed, the Court ruled that Liberty's actions were arbitrary and capricious. The court found that Liberty's reviews were deeply flawed and inadequate. Judgment was entered in favor of Spears. On March 31, 2015 the court ordered that the case be remanded to the Plan

14

Administrator for a new decision. Liberty was instructed to perform a full and fair review that complies with the ERISA claims regulations. On remand, Liberty did not exercise discretion and make a timely decision on her claim. On January 12, 2016, Spears requested that Liberty make a decision on her claim. Despite this request, as of the date of the filing of the Complaint, Liberty still has not made a decision on Spears' claim. As defendants have exceeded the time limit allowed by ERISA in which to make a decision, Spears' claim is deemed denied." Ex. B.

177. The BMI (now called R3 Continuum) response from Dr. Kitei stated that he reviewed the letter from Dr. Zagar dated April 2, 2016. R. 2412. He did not offer an opinion as to neuropsychological or cognitive issues. R. 2414.

178. At the time Spears filed her 2016 Complaint in this Court, Liberty had not decided her remanded claim. Complaint, April 14, 2016, p. 2.

179. Liberty denied Spears' claim on June 16, 2016. R. 2379. The denial states that Spears did not meet the elimination period. R. 2398. The elimination period was September 27, 2008 to March 27, 2009. R. 2398.

180. The 2016 Liberty denial reviewed the claim history. Short term disability benefits ["STD"] were payable from October 4, 2008 until March 27, 2009. R. 2379. STD benefits were initially paid until February 8, 2009. R. 2384.

181. United Technologies Corporation ["UTC"] instructed Liberty to release all remaining STD benefits to Spears. Liberty did so. Spears received STD payments for the entire elimination period. R. 2389.

182. The 2016 Liberty denial does not discuss the vocational report by Raymond Cestar or Liberty's rejection of Spears' application for life insurance. R. 2379 – 2405.

183. Liberty did not provide written notice of Spears' ERISA appeal rights in its June 16, 2016 denial. R. 2404.

184. Spears submitted an internal appeal on July 13, 2016. R. 2377.

185. Spears submitted reports from her treating doctors which discuss the conclusions made by Liberty in its denial. R. 2320, R. 2376.

186. Spears provided a report from Dr. Raxlen to Liberty on September 23, 2016. R. 2320. His report discusses the BMI report. R. 2321. Dr. Raxlen wrote that, based on his observations of his patient over a four-year period, he disagreed with the BMI conclusions. R. 2321.

187. Dr. Raxlen described his qualifications to treat and diagnose Lyme disease. R. 2322. He wrote that he has had 30 years experience in diagnosing and treating the different types of tick-borne disease. R. 2322. He has treated approximately 6500 patients over a 30-year period for tick borne disease. R. 2322. He wrote that, as a result of major discrepancies both in diagnostic and treatment philosophy between IDSA members and others, he was one of the original ten physicians who founded ILADS (International Lyme and Associated Diseases Society), an international organization devoted to the study, research, diagnosis and treatment of tick-borne disease. R. 2323. He wrote that he presented his work at numerous scientific conferences over the last 15 years and recently has been elected chairman of the Ethics committee of ILADS. R. 2323. He wrote that he, and a number of his colleagues, were responsible for writing and publishing ILADS treatment guidelines in 2005, which were recently updated. R. 2323.

188. In Dr. Raxlen's judgment Spears' diagnosis was chronic tick-borne disease, which is the most likely reason for her painful, protracted multisystemic symptoms, in particular her neurocognitive, neuropsychiatric symptoms and profound exhaustion. R. 2323. Dr. Raxlen wrote that the following doctors all treated Spears for tick borne disease: Dr. Zane Saul (infectious

16

disease), Dr. Zagar (neurology), Dr. Patterson Marshall (Neurology) Dr. Sam Donta (infectious disease), Dr. Giannini (pcp). R. 2324.

189. Dr. Raxlen wrote that the important question was not whether Spears had Lyme disease, but did her illness or her combined illnesses leave her disabled? "Not in the physical sense that she can stand for however long, or sit for however long, or lift five pounds or 20 pounds, but could she mentally function?" R. 2326. Dr. Raxlen wrote, "[t]he records show that her greatest difficulty appears to be a major neurocognitive deficit, found on neuropsychological testing, as well as positive antibody findings in CSF, (IgG+ve), lesions on CAT scan, and lesions on MRI, (positive findings), all consistent with Neuroborreliosis." R. 2326. Dr. Raxlen wrote that, if the Lyme disease is what the BMI reviewers are disputing as a major contributor to Spears' disability, then their conclusions are seriously flawed, because they have based their conclusions on an obsolete clinical definition of Lyme disease. R. 2326. Dr. Raxlen wrote that the definition has been expanded to include the subjective and non-specific symptoms of the Lyme patient, as well as profound neuropsychiatric symptoms and physical symptoms. R. 2326.

190. Dr. Raxlen provided medical literature supporting his opinion and qualifications, consisting of the ILADS Evidence Based Guidelines for the Management of Lyme Disease, R. 2328, Johnson and Stricker article, Treatment of Lyme Disease, R. 2342, Lyme Disease Symptoms, R. 2367, Drulle article, Lyme Disease: The Pitfalls of Laboratory Testing, R. 2368; commendations for being the recipient of the Turn the Corner Foundation's Humanitarian Award. R. 2370 – 2372.

191. Spears provided a report from Dr. Saul in support of her appeal. R. 2373 – 76. The report of Dr. Saul stated that Spears underwent two courses of antibiotic therapy, which was the standard of care for long term Lyme disease. He observed her on and off antibiotic therapy. Her

Lyme disease was advanced and debilitating. She had chronic fatigue, difficulty concentrating, headaches and joint pain. Despite fatigue, she had difficulty sleeping at night. "She was not medically able to work in any capacity. She was not capable of a sedentary work position due to cognitive difficulties. She couldn't maintain focus to assigned tasks. Her fatigue prevented any durable or sustained physical work effort. She was unable to maintain standing, lifting, pulling, reaching or grasping at a job on a sustained 40 hour a week basis. She was clearly motivated to get better and begin working again. As of 2014 she remained fatigued at times. Long term chronic Lyme disease can take many years to resolve." R. 2374.

192. The Dr. Saul report stated that he reviewed the report of BMI. He disagreed with their conclusions. He noted that none of the BMI doctors examined Spears, and none of them were experts in Lyme disease. He wrote that Spears' diagnosis was confirmed by cerebrospinal fluid testing on February 3, 2009. He wrote, "Dr. Crossley is incorrect when he states that the positive igG western blot test on February 3, 2009 meant nothing without a positive western blot on serum." R. 2374.

193. Dr. Saul commented on Dr. Crossley's statement that "the evidence shows self-reported symptoms" because Dr. Crossley uses that to opine that Spears did not have any functional impairment for the time frame in question. Dr. Saul noted that fatigue cannot be verified by x-ray or other objective testing; and neither can headaches nor joint pain. Dr. Saul noted that Dr. Crossley offered no evidence to refute the patient's credible report of fatigue, headaches or pain. R. 2374.

194. Dr. Saul reviewed the October 14, 2010 report of Dr. Brusch. On July 13, 2016, Dr. Saul wrote that Dr. Brusch did not contact him prior to his report. Dr. Saul wrote that Dr. Brusch was

18

incorrect when he opined that the positive igG western blot in the CSF was a false positive. The diagnoses were confirmed by clinical exam and history. R. 2374.

195. Dr. Saul reviewed the IME of Dr. Courtney. Dr. Saul noted that, by his own admission, Dr. Courtney is not a specialist in Lyme disease and is not a specialist in infectious disease. He examined Spears after she returned to work. "His exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her. He is incorrect when he concludes that Ms. Spears did not have any incapacitating diagnosis. She did have numerous diagnoses, as shown in her medical records. She had chronic multi-system illness." R. 2374.

196. Liberty did not send the Dr. Courtney IME to Spears' treating doctors. (No record cite; no such letters are in the record).

197. Liberty denied the internal appeal May 4, 2017. R. 4910.

198. When this claim was considered on remand, Liberty did not have any rules, guidelines, protocols, standards and criteria, whether published or internal, which were utilized in whole or in part in rendering any decision, after the court remand, relating to plaintiff's claims for benefits, or in the administrative appeal. Ex. A, Liberty's response to interrogatory #3.

199. When this claim was considered on remand, Liberty did not have any rules, guidelines, protocols, standards and criteria, whether published or internal, relating specifically to an ERISA claim on remand. Ex. A, Liberty's response to interrogatory #3.

The Plaintiff

By
____/s/ Winona Zimberlin_____
Winona W. Zimberlin
Zimberlin Law, LLC
267 Main St.
Manchester, CT. 06042
Ct 05501
(860) 783-5999


CERTIFICATE OF SERVICE

      I hereby certify that on November 16, 2018 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated o the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


/s/      Winona W. Zimberlin
Winona W. Zimberlin