# EXHIBIT A

# Part 1

**Claim Coversheet Report**

| Find | Clear | Print | Save | New | Help |
|------|-------|-------|------|-----|------|

Admin Notes   Claim   Class   Correspond   Doc List   Medical   SPELL Letters

Claim Number REDACTED    Claim Last Updated 10/16/2015    Printed On 1/10/2017

### Claimant Information

| | | | | | |
|---|---|---|---|---|---|
| Name | HALEY A SPEARS | SSN | REDACTED | Birth Date | REDACTED |
| Address | 9000 WEST WILDERNESS WAY | Salary Amount $ | 4421.92 | Mode | M |
| | #190 | Date of Hire | 12/19/2005 | | |
| | | Last Work Date | 09/26/2008 | | |
| | SHREVEPORT, LA 71106-0000 | Federal Tax | Employee Option | State Tax | No |
| Phone | (860) 930-0887 | Phys Demands | Sedentary | | |

JobDesc ADMIN ASST

| | | | | | |
|---|---|---|---|---|---|
| Claim Status | Denied | Status Reason | EP Not Met | Received Date | 01/22/2009 |
| Disability Date | 09/27/2008 | Close Date | 09/27/2008 | Reopen Date | |
| Sick Days Left | 182 | Max Ben Date | 10/10/2042 | RTW FT / PT | |
| Ben Begin Date | 03/28/2009 | Apprv Thru Date | | Gross Ben $ | |

Diagnosis 1 Code/Desc 784.0   Headache

Diagnosis 2 Code/Desc

### Policyholder Information

| | | |
|---|---|---|
| Customer ID | 01   REDACTED | UTC CHOICE |
| Subsidiary | 0106 | PRATT & WHITNEY |
| Location | 01430000 | MILITARY ENGINES |

Symb GF   Numeral 01   Product LTD   Funding CON   Bank Y   Calcs Y   Cntr Eff 10/01/2006

Class 02   ALL EMPLOYEES ENROLLED IN 60% PLAN

Waiting Period: New/Mode-Current/Mode 31   Day   31   Day   Days in WRKWK   Pre-X NC

Elimination Period: Days/Type 180   Sickness   COLA: Mode/Duration

Successive Period: Period/Mode 180   Day   SS Integration:Type/Value PSS

Partial Disability Type/Pct QRP   Survivor Ben Months/Wait Period 6   180

Non-Verifiable Symptoms Limit   Own Occupation Definition Limit 24   M/N Limit

Benefit %   Max Benefit $   Min Benefit $   Employer Contr % 100.00   Subro Ind Y

### Selected Benefits

| Symbol | Numeral | Product Type | Class | Eligibility Date | |
|--------|---------|--------------|-------|------------------|---|
| GF | 01 | LTD | 02 | 01/19/2006 | |
| PD | 02 | STD | 01 | 01/18/2006 | |

### Additional Information:

Liberty002278

**Note Report**

| Report | Clear | Print | Help |
|--------|-------|-------|------|

AS Accom | AS Event | Add Note | Appeal | Claim | Coord Claim Note | Correspond | Doc List | Employee | Leave | Life Claim | Lve Addtl Info

Lve Correspondence | Lve Program | Lve Work Sched | Medical | Medical History | Note | SPELL Letters | Scheduled Pmt | Task Print | Task Rpt

Tasks

**Claim**

\* **Claim/Event/Leave Number** REDACTED    **Accommodation Number** 

**Note type:**

**Primary Sort Order**
- Note Type
- Note Number
- ● Note Date/Time
- Accm. No.

Sec

---

**12/14/2016 3:03 PM - CLAIM Note 79**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject :
Text: [12/14/2016 - WINTERER, NANCY]LETTER FAXED TO ATTY TODAY: YOUR LETTER DATED JULY 13, 2016, STATED YOU WERE REQUESTING A REVIEW OF THE JUNE 16, 2016 REMAND REVIEW DETERMINATION TO UPHOLD THE LONG TERM DISABILITY DENIAL. YOU FURTHER STATED, ADDITIONAL DOCUMENTATION WILL BE SUBMITTED AT A LATER TIME. ON JULY 13, 2016, LIBERTY LIFE RECEIVED DR. SAUL S STATEMENT DATED JULY 13, 2016. ON AUGUST 9, 2016, LIBERTY LIFE RECEIVED DR. SAUL S CORRECTED JULY 13, 2016 STATEMENT. NEARLY THREE MONTHS LATER, LIBERTY LIFE RECEIVED DR. RAXLEN S 54 PAGE DOCUMENT ON SEPTEMBER 26, 2016. YOUR COVER LETTERS PROVIDED NO INFORMATION REGARDING THE STATUS OF THE APPEAL. THEREFORE, IT IS UNCLEAR WHETHER YOU PLAN TO SUBMIT ADDITIONAL DOCUMENTATION OR WHETHER THE APPEAL IS COMPLETE. PLEASE ADVISE WHETHER OR NOT THE APPEAL IS COMPLETE SO THAT LIBERTY LIFE CAN BEGIN THE APPEAL REVIEW.

**09/27/2016 2:12 PM - CLAIM Note 78**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FROM ATTY
Text: [09/27/2016 - WINTERER, NANCY]ON 9/26/16, RECEIVED FAX FROM ATTY THAT INCLUDED UNDATED REPORT BY DR. BERNARD RAXLEN REGARDING HIS RESPONSE TOE THE MULTI-DISCIPLINARY PEER REVIEW THAT WAS COMPLETED DURING THE REMAND REVIEW.

**08/10/2016 11:37 AM - CLAIM Note 77**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FROM ATTY
Text: [08/10/2016 - WINTERER, NANCY]ON 8/9/16, RECEIVED FAX FROM ATTY WITH CORRECTED 7-13-16 LETTER FROM DR SAUL.

**07/14/2016 6:56 AM - CLAIM Note 76**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : LETTERS FROM ATTY
Text: [07/14/2016 - WINTERER, NANCY]RECEIVED 2 LETTERS FROM ATTY ZIMBERLIN BY FAX- DATED 7-13-16. FIRST LETTER INDICATES, -WE ARE REQUESTING A REVIEW OF THE DENIAL. ADDITIONAL DOCUMENTATION WILL BE SUBMITTED AT A LATER TIME.- SECOND LETTER IS A COVER LETTER DATED 7-13-16, WITH 1 PAGE LETTER FROM AP DR SAUL DATED 7-13-16, IN WHICH HE DISAGREES WITH THE FINDINGS OF THE PANEL PEER REVIEW.

**06/27/2016 8:53 AM - CLAIM Note 75**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [06/27/2016 - WINTERER, NANCY]RECEIVED INVOICE DATED 5/24/16 FROM DR RISSENBERG, NEUROPSYCHOLOGIST. AT LIBERTY'S REQUEST, DR RISSENBERG SUBMITTED A RESPONSE TO NEUROPSYCH PEER REVIEW WHICH LARGELY COMMENTED ON HER TESTING. NO INVOICE NUMBER. INVOICE WAS DATED 5/24/16. AMOUNT WAS $1250.00. PAYMENT RELEASED TO DR RISSENBERG TODAY.

**06/16/2016 3:16 PM - CLAIM Note 74**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : CERTIFIED MAILING
Text: [06/16/2016 - PILAR, SARAH]LETTER SENT TO ATTY VIA USPS CERTIFIED 91 7199 9991 7036 3674 5597.

**06/16/2016 1:36 PM - CLAIM Note 73**
Claim/Event/Leave: REDACTED

Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REMAND OUT
Text: [06/16/2016 - WINTERER, NANCY]LTD DENIAL AND APPEAL UPHOLDS UPHELD BASED ON REMAND REVIEW. BASED ON REVIEW OF ALL INFORMATION ON FILE, PLUS DURING THIS REMAND REVIEW A MEDICAL PANEL REVIEW OF NEUROLOGY, INFECTIOUS DISEASE, NEUROPSYCHOLOGY, AND ENDOCRINOLOGY/INTERNAL MEDICINE, AND A PM&R IME, DENIAL UPHELD AS CLMNT DID NOT FULFILL THE POLICY'S ELIMINATION PERIOD, MEET THE POLICY'S DEFINITION OF TD OWN OCCUPATION, AND DEFINITION OF TD ANY OCCUPATION. DETERMINATION LETTER FAXED TODAY TO ATTY ZIMBERLIN TODAY. LETTER ALSO SENT VIA CERTIFIED MAIL.

**05/02/2016 2:23 PM - CLAIM Note 72**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [05/02/2016 - WINTERER, NANCY]RECEIVED NEUROPSYCHOLOGY AND NEUROLOGY PEER REVIEW ADDENDUM AND INVOICE FROM R3 CONTINUUM. INVOICE IS DATED 4/29/16. INVOICE # IS 577726=3. AMOUNT IS $846.98. PAYMENT RELEASED TODAY TO R3 CONTINUUM.

**04/27/2016 3:28 PM - CLAIM Note 71**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : CERTIFIED MAILING
Text: [04/27/2016 - BLANCHETTE, JACOB]CERTIFIED MAILING SENT 4/27/16 TRACKING NUMBER 91 7199 9991 7036 3664 5415

**04/27/2016 8:14 AM - CLAIM Note 70**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject : RESPONSE
Text: [04/27/2016 - WINTERER, NANCY]RECEIVED LETTER FROM ATTY ZIMBERLIN DATED 4/25/16, RE COPY OF THE FILE SENT 4/15/16. ATTY ALSO ASKED IS LIBERTY IS GOING TO PAY AP'S FOR THEIR -NEW REPORTS.- RESPONSE FAXED AND SENT BY CERTIFIED MAIL TODAY.[04/27/2016 - WINTERER, NANCY]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO W ZIMBERLIN AT 860-247-4194. -------------------------------------------- FROM: WINTERER, NANCY ------------------------------------------------------------------ TIME: 4/27/2016 8:26:39 AM SENT TO 860-247-4194 WITH REMOTE ID 8602474194 RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 4 ELAPSED TIME: 02:23 ON CHANNEL 9

**04/25/2016 1:33 PM - PHONE Note 33**
Claim/Event/Leave: REDACTED
NoteSubject : Called Other
Other Subject : MCN
Text: [04/25/2016 - WINTERER, NANCY]CHECKED O STATUS OF IME ADDENDUM- ATTY ZIMBERLIN'S LETTER OF COMPLAINTS PREVIOUSLY SENT TO MCN, AND REQUEST IME PHYSICIAN- DR COURTNEY, TO RESPOND.[04/25/2016 - WINTERER, NANCY] MCN INDICATED THEY DO NOT HAVE DR. COURTNEY'S RESPONSE AS YET, HE IS WORKING ON IT, AND IT IS A PRIORITY.

**04/19/2016 2:41 PM - LIFE Note 3**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY WORK
Text: [04/19/2016 - LANGHAMMER, HEATHER]DOC LIST COPIED (3/17/16 THROUGH 4/11/16) VIA A THUMB DRIVE AND SENT OVERNIGHT SAVER WITH SIGNATURE REQUIRED TO ATTORNEY WINONA ZIMBERLIN. TRACKING #: 1Z 248 96X 24 9665 4070. TRACKING LABEL SAVED TO THE DOC LIST.

**04/19/2016 9:57 AM - PHONE Note 32**
Claim/Event/Leave: REDACTED
NoteSubject : Other Called
Other Subject : ATTY RUSS ZIMBERLIN
Text: [04/19/2016 - WINTERER, NANCY]RECEIVED CALL FROM ATTY RUSS ZIMBERLIN AT 4:57PM ET MONDAY 4/18/16. ATTY ZIMBERLIN STATED THEY RECEIVED THUMB DRIVE WITH UPDATED RECORDS FROM MS SPEARS' CLM- PASSWORD DID NOT WORK, HE TRIED 5 TIMES, AND IS NOW LOCKED OUT. AFTER VERIFYING WITH HOADMIN- CALLED RUSS ZIMBERLIN. ADVISED WE ARE OVERNIGHTING NEW THUMB DRIVE TODAY, WITH PASSWORD INSTRUCTIONS. IF THIS DOES NOT WORK, WE WILL SEND IN PAPER FORM. HE ASKED IF HE COULD CALL ARC IF HE IS HAVING DIFFICULTY- STATED YES.

**04/18/2016 8:16 AM - CLAIM Note 69**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [04/18/2016 - WINTERER, NANCY]INVOICE RECEIVED FROM R3 CONTINUUM FOR 4 SPECIALTY PANEL PEER REVIEW. IM- ID- NEURO- NEUROPSYCH. INVOICE IS DATED 4/11/16. INVOICE NUMBER IS 577720-1. AMOUNT IS $37,701.75. SINCE AMOUNT IS OVER ARC'S AUTHORIZATION, EMAIL SENT TO ARU MANAGER TO RELEASE PAYMENT TO R3 CONTINUUM.

**04/18/2016 7:46 AM - CLAIM Note 68**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : DR GIANNINI- PCP
Text: [04/18/2016 - WINTERER, NANCY]RECEIVED A FAX TODAY VIA SCU. THIS FAX IS DATED 4/14/16 FROM ATTY ZIMBERLIN. THERE IS A COVER LETTER FROM ATTY WITH A STATEMENT FROM CLMNT'S PCP- DR GIANNINI. DR GIANNINI REPORTED MS SPEARS WAS TOTALLY DISABLED DURINGTHE PERIOD IN QUESTION.

Liberty002280

**04/15/2016 1:31 PM - LIFE Note 2**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY WORK
Text: [04/15/2016 - LANGHAMMER, HEATHER]COPIED DOC LIST FROM 3/17/16 THROUGH 4/11/16 PER CM'S REQUEST ONTO A THUMB DRIVE. SENT REQUEST WITH COPY OF THE COVER LETTER VIA CERTIFIED MAIL TO THE ATTORNEY WINONA ZIMBERLIN. TRACKING LABEL SAVED TO THE DOC LIST

**04/14/2016 12:11 PM - CLAIM Note 67**
Claim/Event/Leave: REDACTED
NoteSubject : IME/IPE
Other Subject : ADDENDUM RQST
Text: [04/14/2016 - WINTERER, NANCY]REQUEST SENT TODAY TO MCN FOR IME ADDENDUM. REQUESTED IME PHYSICIAN REVIEW AND COMMENT ON ATTY ZIMBERLIN'S 3/14/16 LETTER REGARDING CLMNT'S STATEMENTS ABOUT THE IME.

**04/14/2016 8:58 AM - CLAIM Note 66**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY OF FILE
Text: [04/14/2016 - WINTERER, NANCY]PER ATTY ZIMBERLIN'S 4/11/16 REQUEST FOR ALL DOCUMENTS IN FILE SINCE HER PREVIOUS 3/17/16 REQUEST, SENT COVER LETTER AND REQUEST FOR COPY OF DOCLIST THIS AM TO HO ADMIN FOR COPY OF DOCUMENTS SINCE 3/17/16- TO BE SENT CERTIFIED-RETURN RECEIPT TO ATTY ZIMBERLIN.

**04/12/2016 8:56 AM - CLAIM Note 65**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to AP
Other Subject : EMAIL
Text: [04/12/2016 - WINTERER, NANCY]AS RECOMMENDED BY HIS OFFICE STAFF, EMAILED DR RAXLEN 4:55PM 4/11/16 TO AGAIN REQUEST HIS RESPONSE TO THE PEER REVIEW AND/OR TO SET UP A DISCUSSION WITH DR CROSSLEY, ID PEER REVIEWER. REQUESTED RESPONSE FROM DR RAXLEN ON OR BEFORE 5/15/16.

**04/11/2016 4:21 PM - PHONE Note 31**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR RAXLEN
Text: [04/11/2016 - WINTERER, NANCY]FOLLOW-UP CALL TO NAYALIE AT DR RAXLEN'S OFFICE TODAY AT 1:50PM ET. SHE WAS TO CHECK WITH DR RAXLEN RE WHETHER HE PLANNED TO RESPOND TO LIBERTY'S 3/16/16 FAX AND/OR HIS AVAILABILITY TO SPEAK WITH REVIEWING ID PHYSICIAN-DR CROSSLEY. TODAY NAYALIE SUGGESTED ARC EMAIL DR RAXLEN DIRECTLY, AS HE IS VERY BUSY AND THE BEST WAY TO REACH HIM IS BY EMAIL.

**04/11/2016 11:00 AM - PHONE Note 30**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR SAUL- KAREN
Text: [04/11/2016 - WINTERER, NANCY]SPOKE TO KAREN AT DR SAU;'S OFFICE. KYTHA, PREVIOUS CONTACT IS AWAY FOR THE WEEK. EXPLAINED PURPOSE OF CALL TO KAREN. KAREN WILL SPEAK WITH DR SAUL TO FIND OUT IF HE PLANS TO RESPOND TO LIBERTY'S 3/16/16 REQUEST.[04/11/2016 - WINTERER, NANCY]KAREN TOOK ARC'S PHONE NUMBER TO CALL BACK WITH DR. SAUL'S ANSWER, AS DR SAUL WAS WITH PATIENTS AT THAT TIME.

**04/08/2016 7:50 AM - CLAIM Note 64**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : DR. ZAGAR
Text: [04/08/2016 - WINTERER, NANCY]RECEIVED NARRATIVE RESPONSE FROM DR ZAGAR (NEUROLOGY) TO PEER REVIEW REPORT.

**04/08/2016 7:26 AM - CLAIM Note 63**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [04/08/2016 - WINTERER, NANCY]RECEIVED INVOICE FROM MCN FOR 3/14/16 PM&R IME. INVOICE IS DATED 4/5/16. INVOICE NUMBER IS # N101453. AMOUNT IS $3850.00. SINCE AMOUNT IS OVER ARC'S AUTHORIZATION, EMAIL SENT TO ARU MANAGER TO RELEASE CHECK

**04/06/2016 8:29 AM - PHONE Note 29**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : RISSENBERG
Text: [04/06/2016 - WINTERER, NANCY]CALLED DR RISSENBERG TO FOLLOW UP REGARDING HER WRITTEN RESPONSE TO THE PEER REVIEW REPORT. WHEN WE SPOKE ON 3/22/16, DR RISSENBERG ADVISED SHE WOULD RESPOND IN WRITING BY APPROXIMATELY 3/30/16. AS OF THIS TIME, NO RESPONSE HAS BEEN RECEIVED. LEFT MESSAGE FOR DR RISSENBERG, FOR REMINDER TO SUBMIT HER RESPONSE + IF SHE DOES NOT PLAN TO RESPOND AT THIS POINT, TO PLEASE LEAVE ARC A MESSAGE. ARC PHONE NUMBER PROVIDED.

**04/05/2016 2:30 PM - PHONE Note 28**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called

NoteSubject : AP Called
Other Subject : DR ZAGAR
Text: [04/05/2016 - WINTERER, NANCY]RECEIVED CALL FROM DR ZAGAR. HE STATED HE WOULD WRITE SOMETHING UP, IT WOULD BE BRIEF AS IT HAS BEEN SOME TIME SINCE HE SAW MS SPEARS. HE WOULD STATE-WHERE HIS HEAD WAS AT-AT THE TIME. DR. ZAGAR INDICATED HE WOULD SEND TO ARC BY THE END OF THE WEEK.

**04/01/2016 2:44 PM - PHONE Note 27**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR RAXLEN
Text: [04/01/2016 - WINTERER, NANCY]FOLLOW UP CALL TO NAYALIE AT DR RAXLEN'S OFFICE. SPOKE TO NAYALIE WHO STATED DR RAXEL DOES NOT HAVE TIME TO REVIEW THE PAPERWORK SENT BY LIBERTY, BUT HE WOULD SPEAK WITH LIBERTY/ARC. ADVISED NAYALIA THE BEST OPTION WOULD BE FOR US TO SET UP A TIME IN WHICH HE COULD SPEAK WITH DR CROSSLEY- THE ID PHYSICIAN WHO REVIEWED MS SPEARS DISABILITY CLAIM FILE. NAYALIE TO DISCUSS W/ DR RAXLEN AND CALL ARC BACK WITH AN ANSWER.

**03/31/2016 11:57 AM - PHONE Note 26**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR BAEHRING
Text: [03/31/2016 - WINTERER, NANCY]FOLLOW UP CALL TO KAY AT DR BAEHRING'S OFFICE. DR BAEHRING WAS OUT OF THE OFFICE UNTIL 3/28/16. KAY INDICATED DR BAERHING DOES NOT THINK HE SHOULD COMMENT AND RESPOND TO LIBERTY'S REQUEST. DR BAEHRING HAS NOT SEEN PT SINCE 2013 AND SHE HAS MOVED AND IS BEING TREATED IN LA. ARC EXPLAINED WE ARE ASKING FOR INFORMATION FROM THE TIME PERIOD DR BAEHRING WAS TREATING MS SPEARS. KAY INDICATED AGAIN DR BAEHRING DOES NOT THINK HE SHOULD RESPOND TO LIBERTY'S REQUEST.

**03/30/2016 2:55 PM - PHONE Note 25**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR SAUL
Text: [03/30/2016 - WINTERER, NANCY]FOLLOW UP CALL TO KYTHA- DR SAUL'S OFFICE. HE WAS ON VACATION WHEN WE PREVIOUSLY SPOKE AND RETURNED 3/28/16. KYTHA STATED DR SAUL HAS FAX AND REPORT- HAS NOT GOTTEN TO REVIEW IT AS YET. IS PLANNING ON REVIEWING. KYTHA AGREED TO REMIND DR SAUL TO COMPLETE THE REVIEW OF THE REPORT AND MAKE COMMENTS. WE AGREED THAT HIS REVIEW WOULD BE COMPLETE BY WED 4/6/16.

**03/29/2016 1:34 PM - PHONE Note 24**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : RAXLEN
Text: [03/29/2016 - WINTERER, NANCY]FOLLOW UP CALL TO DR RAXLEN'S OFFICE. SPOKE TO NAYALIE. SHE CONFIRMED FAXED WAS RECEIVED, ALTHOUGH DR RAXLEN HAS NOT GOTTEN TO REVIEW AS YET. HE MIGHT GET TO IT SOON, AND NAYALIE WILL MENTION THE FAX/ARC CALL TO DR RAXLEN. ADVISED NAYALIE ARC WILL CALL BACK IN 2-3 DAYS TO FIND OUT IF DR RAXLEN PLANS TO RESPOND.

**03/29/2016 7:33 AM - CLAIM Note 62**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [03/29/2016 - WINTERER, NANCY]RECEIVED INVOICE FROM BMI FOR RECENT NEUROPSYCHOLOGICAL PEER REVIEW ADDENDUM. INVOICE IS DATED 3/23/16. INVOICE NUMBER IS 577726-2. AMOUNT IS $121.88. PAYMENT RELEASED TODAY TO BMI.

**03/22/2016 2:34 PM - PHONE Note 23**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR BAEHRING
Text: [03/22/2016 - WINTERER, NANCY]CALLED DR BAEHRING AT 203-785-7284. SPOKE WITH DR BAEHRING'S SECRETARY-KAY. KAY EXPLAINED SHE WAS IN ONE OFFICE AND WILL CHECK DR BAEHRING'S OTHER OFFICE TO CONFIRM 3/16 FAX WAS RECEIVED. KAY INDICATED DR. BAEHRING IS AWAY UNTIL 2/28/16.

**03/22/2016 2:23 PM - CLAIM Note 61**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to AP
Other Subject : RAXLEN
Text: [03/22/2016 - WINTERER, NANCY]PEER REVIEW REPORT AND REQUEST FOR DR RAXLEN TO REVIEW AND RESPOND, WAS REFAXED THIS PM. CONFIRMATION RECEIVED: YOUR FAX HAS BEEN SUCCESSFULLY SENT TO BERNARD RAXLEN, MD AT 516-336-8440. ------------------------------------------------- FROM: WINTERER, NANCY ------------------------------------------------
--------- TIME: 3/22/2016 2:05:03 PM SENT TO 516-336-8440 WITH REMOTE ID RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 2 ELAPSEDTIME: 00:57 ON CHANNEL 8

**03/22/2016 2:21 PM - PHONE Note 22**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : DR RISSENBERG
Text: [03/22/2016 - WINTERER, NANCY]DR RISSENBERG RETURNED ARC'S CALL. SHE CONFIRMED THAT SHE DID RECEIVE LETTER OVERNIGHTED TO HER LAST WEEK (DR RISSENBERG DOES NOT HAVE INCOMING FAX). DR. RISSENBERG INDICATED SHE WOULD RESPOND TO THE PEER REVIEW, BUT COULD NOT DO SO BY 3/25. SHE WILL BE ABLE TO SEND A

Liberty002282

RESPONSE ON OR BEFORE WED 3/30/16. SHE WILL CALL ARC WHEN SHE FAXES OUT HER RESPONSE.

**03/22/2016 1:59 PM - PHONE Note 21**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR SAUL
Text: [03/22/2016 - WINTERER, NANCY]CALLED DR SAUL'S OFFICE AT 203-383-4466. SPOKE TO KYTHA. CONFIRMED FAX RECEIVED. KYTHA INDICATED DR SAUL HAS BEEN ON VACATION AND WILL RETURN 3/23/16.

**03/22/2016 1:57 PM - PHONE Note 20**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR RISSENBERG
Text: [03/22/2016 - WINTERER, NANCY]CALLED DR RISSENBERG AT 914-232-6245. RECEIVED DR RISSENBERG'S VOICEMAIL IN HER VOICE. LEFT MESSAGE FOR PURPOSE OF THE CALL AND REQUESTED A CALL BACK. ARC PHONE AND FAX NUMBERS LEFT.

**03/22/2016 1:55 PM - PHONE Note 19**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR RAXLEN
Text: [03/22/2016 - WINTERER, NANCY]CALLED DR RAXLEN'S OFFICE AT 212-799-1121. SPOKE TO RECEPTIONIST. SHE STATED THEY DID NOT RECEIVE THE FAX FROM LIBERTY. ARC OBTAINED CORRECT FAX NUMBER- 516-336-8440. THIS IS THE FAX NUMBER USED FOR THE 3/16/165 FAX.WILL RE-FAX TODAY.

**03/22/2016 1:52 PM - PHONE Note 18**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR KAGE
Text: [03/22/2016 - WINTERER, NANCY]CALLED DR KAGE'S OFFICE AT 860-646-9929. RECEPTIONIST PLACED ARC ON HOLD AND SECOND PERSON PICKED UP. DID NOT PROVIDE HER NAME. CONFIRMED DR KAGE RECEIVED FAX. UPON ARC'S INQUIRY, SHE INDICATED DR KAGE WOULD PROBABLY REVIEW THE FAX/REPORT, BUT DOUBTED DR KAGE WOULD RESPOND, AS -THEY HAVE NO PART IN THAT NOW.-

**03/22/2016 1:48 PM - PHONE Note 17**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : GOUIN YOUNG, ND
Text: [03/22/2016 - WINTERER, NANCY]CALL TO DR GOUIN YOUNG AT 860-533-0179. SPOKE WITH DEBBIE. DEBBIE CONFIRMED 3/16/16 FAX WAS RECEIVED. SHE WILL PASS ON REMINDER FOR RESPONSE BY 3/25/16.

**03/22/2016 1:45 PM - PHONE Note 16**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : DR GIANNINI
Text: [03/22/2016 - WINTERER, NANCY]CALL PLACED TO DR GIANNINI AT 860-872-8321. RECEPTIONIST CONFIRMED 3/16/16 FAX WAS RECEIVED.

**03/18/2016 7:24 AM - PHONE Note 15**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : DR ZAGAR OFFICE
Text: [03/18/2016 - WINTERER, NANCY]LATE ENTRY. BRITTANY FROM DR ZAGAR'S OFFICE CALLED ARC AT APPROX 1:30PM ON THURS 3/17/16, IN RESPONSE TO THE 3/16/16 FAX. BRITTANY STATED DR ZAGAR HAS NOT SEEN MS SPEARS SINCE 2011 AND THEREFORE HE IS NOT ABLE TO COMMENT. ARC EXPLAINED WE ARE LOOKING BACK TO REVIEW HER MEDICAL CONDITIONS FROM 2009 AND FORWARD. BRITTANY INDICATED SHE WOULD SEND SOMETHING IN WRITING THAT DR ZAGAR WILL NOT BE COMMENTING.[03/18/2016 - WINTERER, NANCY]CONFIRMED BRITTANY HAD ARC'S FAX NUMBER.

**03/17/2016 7:11 AM - CLAIM Note 60**
Claim/Event/Leave: REDACTED
NoteSubject : Peer Review
Other Subject : NP ADDENDUM
Text: [03/17/2016 - WINTERER, NANCY]PER BMI, DUE DATE FOR NEUROPSYCH ADDENDUM IS 3/30/16.

**03/16/2016 2:23 PM - CLAIM Note 59**
Claim/Event/Leave: REDACTED
NoteSubject : Peer Review
Other Subject : ADDENDUM
Text: [03/16/2016 - WINTERER, NANCY]UPON FURTHER REVIEW OF THE NEUROPSYCHOLOGICAL PORTION TO THE PANEL PEER REVIEW REPORT, HAD ADDITIONAL QUESTIONS FOR NP REVIEWER. ADDENDUM QUESTIONS SEN TO BMI TODAY.

**03/16/2016 1:54 PM - CLAIM Note 58**
Claim/Event/Leave: REDACTED
NoteSubject : Peer Review
Other Subject : TO ATTENDING PHYSICI
Text: [03/16/2016 - WINTERER, NANCY]PANEL PEER REVIEW REPORT FAXED TODAY TO CLMNT'S ATTENDING PHYSICIANS INCLUDING DRS. RAXLEN; GOUIN YOUNG; SAUL; BAEHRING; ZAGAR; KAGE; GIANNINI. REQUESTED PHYSICIANS REVIEW

Liberty002283

INCLUDING DRS. KUGLER, COLIN, YOUNG, CASE, BALDERINO, LAGIA, RAGE, GIANNINI. REQUESTED PHYSICIANS REVIEW REPORT AND FAX BACK IN WRITING ANY DISAGREEMENTWITH ANY OF THE MEDICAL FINDINGS IN THE REPORT WITH THEIR MEDICAL OPINION AND THE MEDICAL BASIS FOR ANY DISAGREEMENT, BY 3/25/16. ALSO REQUESTED BY 3/25/16, AP-S CALL ARC TO SET UP MUTUALLY AGREEABLE TIME TO SPEAK WITH REVIEWING PHYSICIAN. FAX TO DR RISSENBERG WAS ABANDONED. THEREFORE, LETTER AND PEER REVIEW REPORT WAS OVERNIGHT TO DR RISSENBERG.

**03/14/2016 10:24 AM - CLAIM Note 57**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : IME QUESTIONS
Text: [03/14/2016 - WINTERER, NANCY]FINAL IME QUESTIONS FOR TODAY'S PM&R IME SENT TO MCN ON 3/11/16 PM.

**03/07/2016 3:06 PM - CLAIM Note 56**
Claim/Event/Leave: REDACTED
NoteSubject : Peer Review
Other Subject : REPORT
Text: [03/07/2016 - WINTERER, NANCY]RECEIVED COMPLETED PEER REVIEW REPORT TODAY FROM BMI. REPORT INCLUDES REVIEWS BY NEUROLOGY, INFECTIOUS DISEASE, ENDOCRINOLOGY/INTERNAL MEDICINE, AND NEUROPSYCHOLOGY.

**03/07/2016 7:56 AM - CLAIM Note 55**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [03/07/2016 - WINTERER, NANCY]RECEIVED INVOICE FROM MCN FOR NO SHOW FEE FOR IME SCHEDULED FOE 2/29/16. INVOICE DATED 2/29/16. INVOICE NUMBER IS N100271. AMOUNT IS $675.00. PAYMENT RELEASED TO MCN TODAY.

**03/01/2016 3:03 PM - CLAIM Note 54**
Claim/Event/Leave: REDACTED
NoteSubject : IME/IPE
Other Subject : 3/12/16
Text: [03/01/2016 - WINTERER, NANCY]PM&R IME RESCHEDULED FOR MONDAY 3/14/16 AT 12PM

**03/01/2016 1:22 PM - CLAIM Note 53**
Claim/Event/Leave: REDACTED
NoteSubject : IME/IPE
Other Subject : NO SHOW-LTTR TO ATTY
Text: [03/01/2016 - WINTERER, NANCY]CLMNT DID NOT ATTEND IME ON 2/29/16.[03/01/2016 - WINTERER, NANCY]ON 2/29/16, RECEIVED FAX FROM ATTY DATED SATURDAY 2/27/16 ARGUING LL'S 2/9/16 REFUSAL TO ALLOW ANOTHER PERSON IN THE EXAM ROOM WITH THE CLMNT OR TO VIDEOGRAPH THE EXAM IS NOT SUPPORTED BY THE POLICY. ALSO ATTY WANTED TO KNOW WHICH RECORDS WERE BEING SENT TO THE IME PHYSICIAN, AS SHE WOULD PROVIDE RECORDS TO THE PHYSICIAN IF LIBERTY DID NOT PROVIDE COMPLETE RECORDS. ALSO RECEIVED LETTER FROM ATTY DATED 2/29/16, STATING CLMNT HAD FAMILY EMERGENCY AND COULD NOT ATTEND IME, ATTY SPOKE TO MCN AND MCN STATED THEY COULD RE-SCHEDULE BUT LIBERTY HAD TO AUTHORIZE. ATTY REQUESTED NOTICE AS TO WHEN LL REAUTHORIZES RESCHEDULING APT FOR IME. LETTER TO ATTY TODAY: MS. SPEARS DISABILITY CLAIM FILE CURRENTLY CONTAINS OVER 4700 PAGES OF MEDICAL DOCUMENTATION. A COMPLETE COPY OF THE MEDICAL DOCUMENTATION ON FILE WAS SENT FOR THE IME PHYSICIAN S REVIEW. MS. SPEARS IS COVERED UNDER A GROUP DISABILITY INCOME POLICY SPONSORED BY HER EMPLOYER, AND WHICH IS GOVERNED BY THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA). WE RESPECTFULLY DISAGREE WITH YOUR POSITION THAT WE MUST ALLOW MS. SPEARS TO VIDEOTAPE THE IME. WE ARE UNABLE TO AGREE TO YOUR REQUEST TOHAVE THIRD PARTIES OR VIDEOGRAPHERS PRESENT DURING THE IME. IT WILL INTERFERE WITH THE INDEPENDENT NATURE OF THE EXAMINATION TO HAVE THIRD PARTIES PRESENT DURING THE EXAMINATION. IF MS. SPEARS AGREES TO ATTEND THE IME WE WILL AGREE TO PROVIDE HER WITH TRANSPORTATION AND IF SHE WISHES TO HAVE YOU OR A THIRD PARTY ACCOMPANY HER TO THE IME, WE WOULD REQUEST THAT YOU OR THE THIRD PARTY REMAIN IN THE WAITING ROOM WHILE THE IME IS CONDUCTED AND MS. SPEARS COULD CONSULT WITH YOU OR THE THIRD PARTY IN THE WAITING ROOM, IF NECESSARY. AT THIS TIME, WE ARE PROCEEDING TO RESCHEDULE THE IME. MCN WILL CONTACT YOU DIRECTLY REGARDING THAT APPOINTMENT.

**02/10/2016 3:12 PM - LIFE Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY WORK
Text: [02/10/2016 - BRETON, CINDY]EXPORTED DOC LIST, CORRESPONDENCE AND DOC FROM ARC NW ONTO THUMB DRIVE..MAILED O/N TO MCN

**02/10/2016 1:16 PM - CLAIM Note 52**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : TOLLING
Text: [02/10/2016 - WINTERER, NANCY]CLAIM RECEIVED IN ARU FOR REMAND/APPEAL REVIEW ON 10/16/15. REQUESTS SENT TO MS SPEARS' 27 PROVIDERS FOR THEIR TREATMENT RECORDS, WITH FOLLOW UP REQUESTS MADE BY ATTY ZIMBERLIN. AS OF 1/12/16, ALL MEDICAL WAS RECEIVEDTHAT ATTY WAS GOING TO PURSUE. DAYS WERE TOLLED FOR CLMNT TO SUBMIT MEDICAL TO BE CONSIDERED ON APPEAL- FROM 10/25/15 THROUGH 1/12/16- 85 DAYS. THEREFORE, DAY 45 AFTER TOLLING IS 3/25/16 AND DAY 90 AFTER TOLLING IS MAY 8, 2016.

**02/10/2016 12:44 PM - CLAIM Note 51**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal

Liberty002284

Other Subject : STATUS-LATE ENTRY
Text: [02/10/2016 - WINTERER, NANCY]ON 2/4/16, RECEIVED FAXED LETTER FROM ATTY THAT CLMNT WILL ATTEND IME. ON 2/9/16, REFERRED TO MCN FOR PM&R IME IN SHREVEPORT LA AREA. ALSO ON 2/9/16, SENT REVISED PEER REVIEW REFERRAL TO BMI- PEER REVIEW OF ALL RECORDSBY IM/ENDORCRINE, ID, NEURO, AND NP. ALSO LETTER FAXED TO ATTY ON 2/9/15 STATING: THANK YOU FOR YOUR LETTER OF FEBRUARY 4, 2016 INDICATING MS. SPEARS WILL ATTEND AN IME. AS WE DISCUSSED ON THE TELEPHONE LAST WEEK, THE IME WILL BE COMPLETED BY A PHYSICIAN SPECIALIZING IN PHYSICAL MEDICINE & REHABILITATION. AN INDEPENDENT MEDICAL VENDOR WILL BE DIRECTLY IN TOUCH WITH YOU REGARDING SPECIFIC ARRANGEMENTS FOR THE EXAMINATION, INCLUDING THE NAME OF THE EXAMINING PHYSICIAN. MS. SPEARS MAY BE ACCOMPANIED TO THE IME, HOWEVER, THAT PERSON WOULD NEED TO STAY IN WAITING ROOM AND NOT BE PRESENT DURING THE ACTUAL EXAMINATION.

**02/10/2016 2:34 AM - CLAIM Note 50**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 2/9/2016 - REFERRED TO MEDICAL CONSULTANT NETWORK FOR IME.

**02/02/2016 3:04 PM - CLAIM Note 49**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject :
Text: [02/02/2016 - WINTERER, NANCY]FAXED LETTER TO ATTY THIS PM. STATED: THIS LETTER IS IN FOLLOW UP TO OUR TELEPHONE CONVERSATION YESTERDAY, FEBRUARY 1, 2016. YOU CALLED REGARDING LIBERTY LIFE S PLAN TO HAVE MS. SPEARS ATTEND AN INDEPENDENT MEDICAL EXAMINATION (IME). WE DISCUSSED THE PURPOSE OF THE IME IS DUE TO THE COURT S RECOMMENDATION, AND TO HAVE MS. SPEARS MEDICAL CONDITION AS OF 2008 AND 2009 AS WELL AS HER CURRENT CONDITION, ASSESSED BY WAY OF THE EXAMINER S REVIEW OF ALL THE MEDICAL RECORDS AND PHYSICAL EXAMINATION. LIBERTY LIFE IS REQUESTING THAT YOU ADVISE US IN WRITING, WHETHER MS. SPEARS AGREES TO ATTEND AN IME. TIME IS OF THE ESSENCE IN THIS MATTER AND THE IME NEEDS TO BE ARRANGED AS SOON AS POSSIBLE. PLEASE ADVISE IN WRITING, ON OR BEFORE FRIDAY, FEBRUARY 5, 2016, AS TO WHETHER MS. SPEARS AGREES TO ATTEND AN IME.

**02/02/2016 2:32 AM - CLAIM Note 48**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 1/29/2016 - REFERRED TO BEHAVIORAL MANAGEMENT, INC. FOR PEER REVIEW.

**02/01/2016 2:56 PM - PHONE Note 14**
Claim/Event/Leave: REDACTED
NoteSubject : Other Called
Other Subject : ATTY ZIMBERLIN
Text: [02/01/2016 - WINTERER, NANCY]ATTY LEFT MESSAGE AT 11:59AM TODAY. ARC CALLED BACK AT 2:25PM AND SPOKE WITH ATTY ZIMBERLIN. SHE QUESTIONED IF IME WOULD BE TO ASSESS CLMNT AS OF 2008/2009, OR PRESENT- ARC REPLIED BOTH- WOULD REQUEST IME MD REVIEW ALLMEDICAL AS WELL AS EXAMINE CLMNT. ATTY ASKED WHAT SPECIALTY- INDICATED PM&R. ATTY ZIMBERLIN STATED SHE THOUGHT THAT PM&R IS AN APPROPRIATE SPECIALTY FOR THIS CASE. ATTY ALSO ASKED WHO WOULD DO EXAM- ARC ADVISED DO NOT KNOW- WILL GO THROUGH INDEPENDENT VENDOR. ARC ALSO ADVISED CLMNT MAY NEED TO TRAVEL FOR EXAM AND IF SO, TRANSPORTATION AND LODGING EXPENSES WILL BE COVERED. ATTY TO CALL CLMNT TO DISCUSS IME AND GET BACK TO ARC. ATTY REITERATED 2/3/16 DATE FOR RESPONSE REGARDING CLMNT'S ATTENDANCE TO IME. ATTY STATED -SHE WILL DO WHAT SHE CAN= TO GET BACK TO ARC BY 2/3/16.

**02/01/2016 2:46 PM - CLAIM Note 47**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject : LATE ENTRY
Text: [02/01/2016 - WINTERER, NANCY]FAXED LETTER TO ATTY ON 1/25/16 ASKING ATTY IF SHE AND CLMNT WOULD AGREE TO IME AS COURT HAS RECOMMENDED IME, WHILE ATTY STATES SHE DOES NOT WANT PRESENT DAY MEDICAL CONSIDERED. REQUESTED RESPONSE BY 2/3/16.

**01/25/2016 8:50 AM - CLAIM Note 46**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [01/25/2016 - WINTERER, NANCY]ON 1/12/16, CLMNT'S ATTY ADVISED SHE IS NOT SUBMITTING ANY FURTHER MEDICAL DOCUMENTATION. THUS APPEAL REVIEW BEGINS 1/13/16

**01/12/2016 3:46 PM - CLAIM Note 45**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject : OUTSTANDING MEDICAL
Text: [01/12/2016 - WINTERER, NANCY]THIS NOTE IS IN FOLLOW UP TO OUR TELEPHONE DISCUSSION THIS AFTERNOON. FOR YOUR INFORMATION, REGARDING THE REQUESTED TREATMENT RECORDS FROM ALL 27 PHYSICIANS MS. SPEARS LISTED ON THE SEPTEMBER 8, 2015 CLAIMANT INFORMATION FORM, AS OUTLINED IN OUR LETTER DATED DECEMBER 10, 2015, NO RESPONSE HAS BEEN RECEIVED FROM DR. DONALDSON (ALTHOUGH HIS JANUARY 20, 2009 CONSULTATION NOTE IS ON FILE), FROM LORI FITTS, MD, NOR FROM GAURAB BASU, MD. THE RECORDS FROM TALIARINI CHIROPRACTIC WERE RECEIVED FROM YOUR OFFICE ON DECEMBER 22, 2015. I APOLOGIZE THIS INFORMATION WAS NOT READILY AVAILABLE AT THE TIME OF OUR DISCUSSION.

Liberty002285

**01/12/2016 3:02 PM - PHONE Note 13**
Claim/Event/Leave: REDACTED
NoteSubject : Called Other
Other Subject : ATTY ZIMBERLIN
Text: [01/12/2016 - WINTERER, NANCY]CALL TO ATTY THIS PM. SHE RETURNED ARC'S 12/31/15 CALL ON 1/11/16 IN ARC'S ABSENCE. ATTY STATED THEY DO NOT WANT CURRENT MEDICAL CONSIDERED IN THIS APPEAL REVIEW, AS CLMNT IS SEEING NEW PHYSICIANS, HAVING NEW TESTS, RESULTING IN ENDLESS CYCLE. THEY WANT APPEAL FOR 2009 LTD DENIAL DECIDED ON MEDICAL IN FILE THROUGH 2015. ATTY ZIMBERLIN DID FAX THE OVN OF AN ENDOCRINOLOGY VISIT FROM DECEMBER 2015. WHEN ASKED ABOUT THE 3-4 PROVIDERS FROM THE CLMNT'S CIF COMPLETEDIN SEPT 2015 THAT HER OFFICE WAS STILL TRYING TO GET RECORDS FROM, ATTY ZIMBERLIN KEPT STATING SHE DOES NOT WANT CURRENT MEDICAL TO BE INCLUDED IN THE APPEAL REVIEW. ARC ATTEMPTED TO POINT OUT THAT THOSE RECORDS MIGHT BE FROM THE 2009 TIME PERIOD- WE DO NOT KNOW BECAUSE THE CLMNT PROVIDED NO TREATMENT DATES. AGAIN ATTY ZIMBERLIN REITERATED SHE WANTS NO CURRENT RECORDS CONSIDERED, WANTS THE APPEAL REVIEW TO PROCEED BASED ON MEDICAL IN FILE AS OF END OF DECEMBER 2015. ATTY STATED SHE WOULD FAXA STATEMENT TO MAKE HER POSITION CLEAR.

**12/31/2015 8:24 AM - PHONE Note 12**
Claim/Event/Leave: REDACTED
NoteSubject : Called Other
Other Subject : ATTY ZIMBERLIN
Text: [12/31/2015 - WINTERER, NANCY]RECEIVED CORRESPONDENCE THAT ATTY OFFICE MOVED ON 12/29/15. CALLED OFFICE AND SPOKE W/ RUSS. OFFICE IS OPEN AND ATTY ZIMBERLIN EXPECTED IN APPROX. 9AM. ADVISED CALLING RE CLMNT'S APT WITH NEW PHYSICIAN AND WHEN MEDICALIS TO BE EXPECTED. ALSO WANTED TO AGAIN DISCUSS DEADLINE FOR ALL MEDICAL TO BE SUBMITTED AND ESTABLISH DATE APPEAL TO MOVE FORWARD. ATTY ZIMBERLIN TO CALL BACK TODAY.

**12/17/2015 9:45 AM - CLAIM Note 44**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : TOLLING
Text: [12/17/2015 - WINTERER, NANCY]TOLLING SINCE 10/20/15 FOR ATTY TO SUBMIT MEDICAL FROM REMAINING PHYSICIANS, OUT OF THE 27 PHYSICIANS IDENTIFIED BY THE CLMNT ON THE CIF, THAT DID NOT YET RESPOND TO LL'S REQUEST.

**12/17/2015 9:39 AM - PHONE Note 11**
Claim/Event/Leave: REDACTED
NoteSubject : Called Other
Other Subject : ATTY ZIMBERLIN
Text: [12/17/2015 - WINTERER, NANCY]CALLED ATTY ZIMBERLIN THIS AM TO DISCUSS STATUS OF ADDITIONAL MEDICAL RECORDS SHE INTENDS TO SUBMIT FOR APPEAL REVIEW. ATTY ZIMBERLIN STATED HER OFFICE IS STILL WAITING ON MEDICAL FROM 3-4 ADDITIONAL PHYSICIANS. SHE ALSO STATED CLMNT HAS HAD TO WAIT A LONG TIME, BUT WILL BE SEEING A NEW PHYSICIAN SHORTLY- ATTY IS NOT CERTAIN OF THE DATE. ATTY ZIMBERLIN STATED SHE WOULD LIKE THE OVN FROM THIS UPCOMING TREATMENT VISIT TO BE CONSIDERED IN THE APPEAL REVIEW. STATED CLMNT IS AGAIN EXPERIENCING SIGNIFICANT FATIGUE. ARC ASKED ATTY IF SHE WOULD AGREE TO DATE FOR ALL MEDICAL TO BE SUBMITTED BY. ATTY ADVISED SHE WOULD LIKE TO SET SUCH A DATE, BUT WOULD LIKE TO SPEAK TO CLMNT FIRST, TO FIND OUT WHAT DATE SHE WILL BESEEING THE NEW PHYSICIAN, AND THEN DETERMINE LAST DATE FOR MEDICAL TO BE SUBMITTED. WE AGREED THAT ARC WILL CALL BACK ATTY NEXT WEEK TO DISCUSS.

**12/15/2015 3:14 PM - CLAIM Note 43**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : STOP PAID CHECK
Text: [12/15/2015 - COPP, JENNIFER]STOP PAID CHECK 30020188 AS IT WAS REISSUED ON 4/29/15.

**12/10/2015 10:46 AM - CLAIM Note 42**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject :
Text: [12/10/2015 - WINTERER, NANCY]ADVISED ATTY LL RCVD COMPLETED TEE. ADVISED RECVD RAXLEN RECORDS FORM HER OFFICE ON 11/25/15. REQUESTED CLMNT'S EARNINGS INFO FROM 6/1/15 THROUGH THE DATE SHE LEFT WORK- IN HER 12/7/15 LETTER ATTY STATED MS. SPEARS LAST WORKED IN AUGUST 2015 AND HAS HAD A RECENT DECLINE IN HEALTH. ASKED ATTY TO CONTACT ARC SHOULD SHE REQUIRE TIME BEYOND 12/16/15 FOR THE REMAINDER OF THE MEDICAL TO BE SUBMITTED. THIS IS FROM - DR. DONALDSON (ALTHOUGH HIS JANUARY 20, 2009 CONSULTATION NOTE IS ON FILE); LORI FITTS, MD; GAURAB BASU, MD; TALIARINI CHIROPRACTIC; AND ANY OTHER MEDICAL INFORMATION THAT YOU WISH TO SUBMIT IN SUPPORT OF MS. SPEARS CLAIM.

**12/10/2015 10:00 AM - CLAIM Note 41**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : RHEUM
Text: [12/10/2015 - WINTERER, NANCY]65 PAGES RHEUMATOLOGY- DR KAGE- RECORDS RECEIVED TODAY. INVOICE PREVIOUSLY PAID ON 11/12/15.

**12/01/2015 12:04 PM - CLAIM Note 40**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty

NoteSubject : LTR to Atty
Other Subject : TEE
Text: [12/01/2015 - WINTERER, NANCY]APPEARS NOT ALL THE USUAL LTD CLAIMANT FORMS WERE FORWARDED TO
CLMNT'S ATTY IN JULY 2015 BY OUTSIDE COUNSEL, FOR CLMNT'S COMPLETION. IN ORDER FOR LIBERTY LIFE TO FULLY
ASSESS MS. SPEARS ELIGIBILITY FOR LONG TERM DISABILITY BENEFITS IN ACCORDANCE WITH THE UNITED
TECHNOLOGIES CORPORATION GROUP DISABILITY INCOME POLICY, REQUESTED ATTY HAVE MS. SPEARS COMPLETE THE
ATTACHED TRAINING-EDUCATION-EXPERIENCE FORM, AND RETURN TO MY ATTENTION BY DECEMBER 18, 2015.

**11/25/2015 7:47 AM - CLAIM Note 39**
Claim/Event/Leave: REDACTED
NoteSubject :
Other Subject :
Text: [11/25/2015 - WINTERER, NANCY]LETTER AND CD RECEIVED FROM ATTY ZIMBERLIN. CD CONTAINS DR RAXLEN'S
TREATMENT RECORDS FROM 4/21/09 THROUGH 10/11/13. SENT TO HO ADMIN TO BE PLACED INTO DOCLIST.

**11/24/2015 11:31 AM - CLAIM Note 38**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY JOB
Text: [11/24/2015 - PILAR, SARAH]COPY OF CLAIM DOC LIST MEDICAL FILES FROM 10/22/2015-11/16/2015 ON THUMB DRIVE
SENT TO ATTY VIA UPS 2ND DAY 1Z24896X0298470010.

**11/24/2015 9:39 AM - CLAIM Note 37**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject :
Text: [11/24/2015 - WINTERER, NANCY]LETTER TO ATTY DATED 11/24/15. AS PER OUR 11/19/15 PHONE CONVERSATION,
LETTER TO BE SENT BY HO ADMIN WITH A COPY OF ALL MEDICAL RECEIVED FROM CLMNT'S PROVIDERS IN RESPONSE TO
OUR 10/23/15 REQUEST FOR TREATMENT RECORDS TO27 PROVIDERS IDENTIFIED BY MS. SPEARS. LETTER ALSO
IDENTIFIES THE 5 PHYSICIAN THAT HAVE NOT RESPONDED, AND WHAT IF ANY OF THEIR TREATMENT RECORDS ARE
ALREADY ON FILE. REQUEST ATTY SUBMIT REMAINDER OF MEDICAL TO LL ON OR BEFORE 12/16/15. TOLLING UNTIL
12/16/15- WILL MOVE FORWARD WITH APPEAL REVIEW AT THAT TIME.

**11/19/2015 11:05 AM - PHONE Note 10**
Claim/Event/Leave: REDACTED
NoteSubject : Other Called
Other Subject : ATTY ZIMBERLIN
Text: [11/19/2015 - WINTERER, NANCY]ATTY LEFT MESSAGE FOR ARC AT 3:50PM ET ON 11/18/15. CB TO ATTY AT 10:35AM
TODAY. SHE WAS CHECKING TO SEE IF ALL MEDICAL HAD BEEN RECEIVED, AND REQUESTED A COPY OF ALL MEDICAL LL
HAS RECEIVED IN RESPONSE TO REQUEST. ADVISED MS ZIMBERLIN THAT WE HAVE NOT RECEIVED A RESPONSE FROM
DR. REXLAN. SHE INDICATED THEY WOULD FOLLOW-UP WITH DR ZIMBERLIN. ALSO ARC TO MAKE LIST OF OTHER
PROVIDERS FROM WHOM MEDICAL HAS NOT BEEN RECEIVED.[11/19/2015 - WINTERER, NANCY]AND ATTY WILL FOLLOW-
UP. ATTY EMPHASIZED THEY WANT TO ASSIT IN GETTING ALL MEDICAL.

**11/12/2015 10:08 AM - CLAIM Note 36**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [11/12/2015 - WINTERER, NANCY]ON 11/11/15 RECEIVED INVOICE FROM RHEUM AND ALLERGY INSTITUTE - DR
BARBARA KAGE- FOR REQUESTED MEDICAL RECORDS. NO INVOICE NUMBER. AMOUNT IS $43.55. PAYMENT ISSUED TO
RHEUMATOLOGY AND ALLERGY INSTITUTE TODAY.

**11/06/2015 10:16 AM - PHONE Note 9**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : PCP MED RECORDS
Text: [11/06/2015 - WINTERER, NANCY]ON 11/2/15 RECEIVED PCP- DR GIIANNINI- ON DISC. AS PER GENNY DILLION-NOVITEX-
LIBERTY LIFE SOFTWARE WOULD NOT ALLOW MEDICAL RECORDS TO BE LOADED FROM THE PCP TRUECRYPT
SOFTWARE. CALLED RACHEL IN MEDICAL RECORDS AT DR GIANNINI'S OFFICE.- 860288-4104. RECORDS ARE 528 PAGES.
SHE WILL MAIL THE RECORDS TO ARU LONDON, KY ADDRESS TODAY.

**11/02/2015 8:23 AM - CLAIM Note 35**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [11/02/2015 - WINTERER, NANCY]RECEIVED INVOICE FROM CONNECTICUT NATURAL HEALTH SPECIALISTS FOR
TREATMENT RECORDS REQUESTED FOR PERIOD 9/1/08 TO PRESENT. NO INVOICE NUMBER. INVOICE DATED 10/26/15.
AMOUNT IS $177.20. PAYMENT RELEASED TODAY TO CT NATURAL HEALTH SPECIALISTS.

**10/28/2015 3:25 PM - CLAIM Note 34**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [10/28/2015 - WINTERER, NANCY]RECEIVED INVOICE FROM CT MULTISPECIALTY GROUP FOR REQUESTED
PULMONARY MEDICAL RECORDS. INVOICE DATED 10/27/15. NO INVOICE NUMBER. AMOUNT IS $7.15. PAYMENT RELEASED
TODAY TO CT MULTISPECIALTY GROUP FOR REQUESTED MEDICAL RECORDS.

Liberty002287

**10/26/2015 10:16 AM - CLAIM Note 33**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [10/26/2015 - WINTERER, NANCY]INVOICE RECEIVED 10/21/15 FOR REQUESTED MEDICAL RECORDS FROM
ASSOCIATED NEUROLOGISTS OF SOUTHERN CONNECTICUT PC. NO INVOICE NUMBER. AMOUNT IS $45.50. TAX ID NUMBER
IS 061009699. PAYMENT RELEASED TODAY FOR REQUESTED MEDICAL RECORDS- DR ZAGAR.

**10/23/2015 2:29 AM - CLAIM Note 32**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Special Invest
Other Subject : SCORE REFERRAL
Text: 10/22/2015 - REFERRED TO SIU FOR DATABASE SEARCH. TYPE OF SERVICE(S) REQUESTED: - ISO CLAIM SEARCH -
CHOICEPOINT - SSN TRACE - CHANGE OF ADDRESS - PROFESSIONAL LICENSING - SOCIAL MEDIA.

**10/22/2015 4:48 PM - CLAIM Note 31**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : SIU DATABASE INFO
Text: [10/22/2015 - LOTO, FRANK]DATABASE REQUEST RECEIVED. ISO REPORT LOADED TO EDM. REMAINDER OF REQUEST
SENT TO ICS MERRILL, THEIR REPORT WILL BE LOADED TO EDM WHEN COMPLETED.

**10/21/2015 3:24 PM - CLAIM Note 30**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY JOB
Text: [10/21/2015 - PILAR, SARAH]COMPLETE PAPER COPY OF REQUESTED FILES (TOTAL 27 DOCUMENTS: 25 LETTERS-
DOCUMENTS DATED 10/20/15 TYPE- REQUEST TITLE- PROVIDER 1 LETTER- DOCUMENT DATED 10/21/15 TYPE- MEDICAL
TITLE- CORRESPONDANCE 1 LETTER-DOCUMENT DATED 10/21/15 TYPE- REQUEST TITLE- PROVIDER) SENT VIA UPS NEXT
DAY 1Z24896X0191130446.

**10/21/2015 2:45 PM - PHONE Note 8**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : MARGARET-DR ZAGAR
Text: [10/21/2015 - WINTERER, NANCY]CALLED MARAGERT AT DR ZAGAR'S OFFICE. SHE WANTED TO CONFIRM THAT WE
WANTED THE RECORDS FROM 2009 THROUGH 2011, EVEN THOUGH CLMNT WAS NOT SEEN IN THAT OFFICE IN AFTER
2011. CONFIRM THAT IS THE MEDICAL WE NEED. MARGARETWILL CALL TOMORROW WITH NUMBER OF PAGES AND COST
FOR COPYING.

**10/21/2015 2:12 PM - CLAIM Note 29**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : MEDICAL RCRDS RQST
Text: [10/21/2015 - WINTERER, NANCY]BASED ON THE CIF COMPLETED BY MS. SPEARS ON SEPTEMBER 8, 2015, THE
PERIOD OF SEVEN YEARS FROM MS. SPEARS DATE OF DISABILITY THROUGH HER FULL TIME RETURN TO WORK, AND
ARC'S INITIAL REVIEW OF THIS CLAIM, IT IS DETERMINEDADDITIONAL MEDICAL INFORMATION IS NEEDED FOR THIS
APPEAL REVIEW. ON 10/20/15 + 10/21/15, REQUESTS SENT TO 27 PROVIDERS FOR TREATMENT REOCRDS DURING THE
PERIOD SEPTEMBER 1, 2008 THROUGH MARCH 31, 2015. 26 REQUESTS WERE SUCCESSFULLY FAXED AND ONE WASSENT
BY USPS. LETTER TO ATTY W ZIMBERLIN AND COPIES OF 27 MEDICAL REQUESTS TO BE OVERNIGHTED TO ATTY. LETTER
INDICATES LL EXPECTS ATTY TO CONTACT CLMNT'S PROVIDERS TO MAKE CERTAIN THEY RESPOND TO LL'S REQUEST.
ALL MEDICAL IS REQUESTED BY 11/9/15.

**10/20/2015 4:56 PM - PHONE Note 7**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : ZAGAR
Text: [10/20/2015 - MILLS, SUSAN]I RECEIVED A CALL FROM DR. ZAGAR S OFFICE REGARDING REQ FOR MEDICAL. I SPOKE
WITH MARGARET REGARDING RECORD REQ FOR PERIOD 9/1/2008- 3/31/15. SHE SAID PATIENT WAS FIRST SEEN 1/12/09
AND LAST SEEN 8/19/11. SHE WANTED TO BE SURE DCM WANTED ALL OF THOSE RECORDS AS THEY WILL HAVE TO
CHARGE AND SHE SAID IT IS 65 CENTS PER PAGE. I ADVISED I AM SURE DCM DOES AS THESE DATES ARE WITHIN THE
TIME PERIOD OUTLINED IN THE REQ LETTER. I ADVISED I WOULD PASS ON THIS MESSAGE SO DCM CAN CALL HER WITH
ANY QUESTIONS. SHE DID SAY SHE WILL SEND THE INFO TO DCM FOR THE TIME PERIOD PATIENT SEEN 2009-2011. HER
PHONE NUMBER IS 203-333-1133 X125.

**10/19/2015 1:24 PM - CLAIM Note 28**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject :
Text: [10/19/2015 - WINTERER, NANCY]CLAIM FILE UNDER REVIEW.

**10/16/2015 9:52 AM - CLAIM Note 27**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : IN
Text: [10/16/2015 - PATTON, LAURA]SECOND LEVEL APPEAL ASSIGNED TO NANCY WINTERER

Liberty002288

**10/16/2015 2:27 AM - CLAIM Note 26**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Appeals
Other Subject : SCORE REFERRAL
Text: 10/14/2015 - REFERRED TO APPEALS UNIT FOR CLAIM REVIEW AND DETERMINATION.

**04/20/2015 12:26 PM - CLAIM Note 25**
Claim/Event/Leave: REDACTED
NoteSubject : Legal
Other Subject : CK REISSUED
Text: [04/20/2015 - ODGAARD, EDITH]CK # 30020188 WAS NEVER CASHED AND IS NOW BEYOND 6 MONTHS AND
CONSIDERED STALE. REISSUING THE CHECK TODAY PER VENDOR REQUEST.

**06/19/2014 12:57 PM - CLAIM Note 24**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject :
Text: [06/19/2014 - DURLING, BARBARA]VENDOR PAYMENT RELEASED

**12/19/2011 12:59 PM - CLAIM Note 23**
Claim/Event/Leave: REDACTED
NoteSubject : Legal
Other Subject : LAWSUIT FILED
Text: [12/19/2011 - ODGAARD, EDITH]CLAIMANT HAS FILED A LAWSUIT. PLEASE DIRECT ANY FURTHER INQUIRY ON THIS
CLAIM TO THE LITIGATION MANAGER.

**06/15/2011 10:04 AM - CLAIM Note 22**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : OUT
Text: [06/15/2011 - CARIGNAN, HEATHER]MAINTAIN DENIAL EFF 9/27/2008 NOT DISABLED FROM HER OWN OCCUPATION
THROUGHOUT THE ELIM. PERIOD (9/27/08 -3/27/09). THE INFORMATION CONTAINED IN THE CLAIM FILE AND RECEIVED ON
APPEAL DOES NOT ALTER THE PREVIOUS CLAIM DECISION. TWO PAPER CLAIM FILES RETURNED TO RE-FILE AREA.
REMAINDER IS PAPERLESS. DETAILED LETTER SENT TO ATTY ZIMBERLIN TODAY VIA USPS. UTC NOTIFIED VIA GENERIC
LETTER.[06/15/2011 - CARIGNAN, HEATHER]COPY OF THE 9/27/10 PEER REVIEW REPORT WAS SENT TOATTY ZIMBERLIN
WITH THE APPEAL DECISION LETTER UPHOLDING THE DENIAL. ADVISED ATTY THAT WE WILL NOT AGREE TO HOLD THE
APPEAL REVIEW OPEN FOR HER REVIEW OF THIS REPORT AS THE CLMT WAS PROVIDED 180 DAYS TO APPEAL AND THE
RIGHT TO A COPY OF HER FILE IN THE 11/16/10 DENIAL LETTER, WITH THE APPEAL SUBMISSION AT NEAR THE
EXHAUSTION OF THE 180 DAYS.

**05/13/2011 12:28 PM - CLAIM Note 21**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : IN
Text: [05/13/2011 - COOK, MARILYN]ASSIGNED TO HEATHER CARIGNAN

**05/13/2011 3:05 AM - CLAIM Note 20**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Appeals
Other Subject : SCORE REFERRAL
Text: 5/12/2011 - REFERRED TO APPEALS UNIT FOR CLAIM REVIEW AND DETERMINATION.

**05/12/2011 4:07 PM - CLAIM Note 19**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : WLFD SHIPPED FILE
Text: [05/12/2011 - NIEVES, JANICE]FILE SHIPPED TODAY VIA UPS GROUND TO THE DOVER OFFICE FOR ARU

**05/12/2011 2:27 PM - CLAIM Note 18**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX CONFIRMATION
Text: [05/12/2011 - FURGALACK, MONIQUE]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO WINONA ZIMBERLIN AT
18602474194. RE: CLAIM: REDACTED SPEARS - FAX: (860) 247-4194 --------------------------------------------------------------
FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 -------------------------------------------------------------
TIME: 5/12/2011 2:16:41 PM SENT TO 18602474194 WITH REMOTE ID 8602474194 RESULT: (0/339;0/0) SUCCESSFUL SEND
PAGE RECORD: 1 - 2 ELAPSED TIME: 00:34 ONCHANNEL 38

**05/12/2011 2:16 PM - CLAIM Note 17**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to Atty
Other Subject :
Text: [05/12/2011 - FURGALACK, MONIQUE]FAXED APPEAL ACKNOWLEDGEMENT LETTER TO ATTY WINONA ZIMBERLIN

**05/12/2011 2:11 PM - CLAIM Note 16**
Claim/Event/Leave: REDACTED

Liberty002289

NoteSubject : Ref to Appeals
Other Subject : ARU
Text: [05/12/2011 - FURGALACK, MONIQUE]REFERRED TO ARU FOR APPEAL REVIEW

**05/12/2011 1:18 PM - CLAIM Note 15**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : REFERRAL REVIEW
Text: [05/12/2011 - MASSARO, TIFFANY]I AM IN AGREEMENT WITH THE RECOMMENDATION OF THIS CLAIM TO BE SENT TO APPEALS BY MONIQUE FURGALAK AS DOCUMENTED IN PRIOR CLAIM NOTE AND FOR THE RATIONALE SET FORTH THEREIN.

**05/12/2011 11:26 AM - CLAIM Note 14**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : REFERRED FOR MGR RVW
Text: [05/12/2011 - FURGALACK, MONIQUE]REFERRED FOR MGR REVIEW FOR REFERRAL TO ARU FOR LTD APPEAL REVIEW / APPEAL RECEIVED FROM ATTY WINONA ZIMBERLIN, APPEAL LETTER & ATTACHED ARTICLES/NEWSLETTER ON LYME DISEASE, SS FAVORABLE DECISION, RECORDS DATED 8/8/10- 4/29/11. LTD HAD BEEN DENIED FOR EP NOT MET & NOT MEETING DEFINITION OF DISABILITY AS PER APPEAL REVIEW ON STD, THE STD APPEAL DETERMINATION WAS AN UPHOLD BY THE APPEAL REVIEW UNIT FOR STD, STATING MEDICAL DID NOT SUPPORT IMPAIRMENT PRECLUDING RTWBEYOND 2/8/09 BASED ON TWO PEER MEDICAL REVIEWS CONDUCTED DURING THE APPEAL REVIEW PERIOD. THE ER REQUESTED STD BENEFITS ISSUED FOR 2/9/09 THROUGH REMAINDER OF STD PERIOD TO 3/27/09 FOR ASO ER ADMIN OVERRIDE.

**01/25/2011 3:55 PM - CLAIM Note 13**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : OTHER
Text: [01/25/2011 - JOHNSON, CHARLES]RECD AN EMAIL FROM DAVID DURGINS AT UTC ASKING IF THE CLMT HAS FILED AN APPEAL - RESPONDED TO HIM THAT THE CLAIM WAS CLOSED ON 11/16/2010 AND TO DATE NO ADDITIONAL INFORMATION OR APPEAL REQUEST HAS BEEN RECD - HOWEVER -SHE DOES HAVE 180 DAYS FROM 11/16/2010 TO FILE HER APPEAL

**11/16/2010 9:19 AM - CLAIM Note 12**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REFERRAL - DENIAL
Text: [11/16/2010 - RUPE, BRIAN]STD CLAIM HAS BEEN REOPENED AND PAID THROUGH THE MAX BEN DATE BASED ON A ER OVERRIDE. ARU UPHELD THE INITIAL DECISION TO DENY BENEFITS BEYOND 2/8/09 ON THE STD CLAIM. BASED ON THIS INFORMATION WE ARE REISSUING THE LTD DENIAL LETTER TO RESTATE THE REASONS FOR DENIAL OF THE LTD CLAIM AND THAT THE DECISION TO REOPEN AND EXT THE STD CLAIM DOES NOT CHANGE THE DECISION ON THE LTD CLAIM. DCM TO SEND OUT THE REVISED LETTER TO THE EE

**02/09/2009 1:30 PM - PHONE Note 6**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [02/09/2009 - FURGALACK, MONIQUE]CLMT RETURNED CALL - I ADVISED HER I HAVE REQUESTED HER PARTIAL PAY FROM ER-CARLOS DEL PORTAL FOR REVIEW OF HER PARTIAL STD THROUGH 2/8/09. CLMT STATED SHE LAST WORKED ON 2/2/09 AND ON 2/3/09 HAD A SPINAL TAP WITH ADR ZAGER, AND HAS BEEN HAVING ONGOING COMPLICATIONS, SO DR KAGE HER RHEUMATOLOGIST HAS TOLD HER SHE NEEDS TO REMAIN ON PART TIME STATUS LONGER THAN 2/8/09. SHE HAD SOME BLOODWORK/TESTING FOR HER SYMPTOMS. SHE HAS NOT WORKED SINCE 2/2/09 BUT HOPES TORTW AGAIN THIS WEEK, HER MOTHER IS DRIVING HER TO THE DR TODAY. CONFIRMED THAT THE STD WAS CLOSED AS OF 2/9/09 PER RELEASE FROM DR SILVER ON FILE, PART TIME AS OF 1/8/09 FOR ONE MONTH, THROUGH 2/8/09. ADVISED CLMT THAT TO REVIEW FOR STD/PARTIAL STDBEYOND 2/8/09, SHE WILL NEED TO SUBMIT ANY ADDTL MEDICAL RECORDS SHE WISHES TO SUPPORT HER STD CLAIM, AND WE WILL REFER FOR MEDICAL REVIEW WHEN REC'D.

**02/09/2009 11:47 AM - PHONE Note 5**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject :
Text: [02/09/2009 - FURGALACK, MONIQUE]CALLED CLMT PER PRIOR PHONE NOTE #4 - CLMT STATED SHE WAS ON THE PHONE WITH HER DR AND WOULD HAVE TO CALL BACK

**02/09/2009 11:41 AM - CLAIM Note 11**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REQUEST TO ER
Text: [02/09/2009 - FURGALACK, MONIQUE]PER PRIOR CLAIM NOTE, CLMT CALLED AND REQUESTED WE OBTAIN HER PART TIME PAY INFO FROM ER - SENT REQUEST TO ER-CARLOS DEL PORTAL REQUESTING PART TIME PAY INFO FOR STD CLAIM FOR PERIOD OF 1/8/09 - PRESENT, ALSO ASKED HIM TO CONFIRM LDW & 1ST DATE CLMT BACK OOW.

**02/09/2009 10:25 AM - PHONE Note 4**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : OOW AGAIN
Text: [02/09/2009 - SMITH, MARYELLEN]PER EE WK'D MOND 2/2/09, HAD SPINAL TAP AT DR. ZAGAR'S OFFICE 2/3/09 & HAS

TEXT: [02/03/2009 - SMITH, MARYELLEN]PER EE WK'D MOND 2/2/09--HAD SPINAL TAP AT DR. ZAGAR'S OFFICE 2/3/09 & HAS BEEN OFF WK SINCE DUE TO COMPLICATION OF EXCRUCIATING HA'S--IS FLAT ON HER BACK & MAY NEED ANOTHER PROCEDURE***EE STATES ALSO SAW RHEUM DR. KAGELAST WK & HAS RESTRICTIONS FOR PART TIME HOURS ONLY***EE STATES HER PAY HAS BEEN INCORRECT---PAYROLL IS OUTSOURCED TO JAMAICA & STUB DOESN'T INDICATE # OF HOURS WK'D---EE REQ'D ADCM CONTACT BENEFITS REP TO GET STRAIGHTENED OUT***ADVSD EE WILL NOTIFYADCM OF SITUATION & HAVE ADCM RTN CALL--EE STATED CALL AT HOME FIRST 860-308-2050 -- IF NO ANSWER COULD BE AT AP'S SO CALL CELL 860-930-0887

**01/30/2009 1:25 PM - CLAIM Note 10**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : & NOTICE TO ER
Text: [01/30/2009 - FURGALACK, MONIQUE]LTD EP NOT MET LETTER SENT TO CLMT / SENT EP NOT MET NOTICE TO ER-CARLOS DEL PORTAL.

**01/30/2009 12:51 PM - CLAIM Note 9**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REFERRAL - DENIAL
Text: [01/30/2009 - RUPE, BRIAN]MGR AGREES WITH THE CLOSURE OF THIS CLAIM FOR EP NOT MET AS THE EE HAS INDICATED THAT SHE IS RELEASED AND WILL BE RTW FULL TIME ON 2/9/08. THE DENIAL LETTER CAN BE SENT TO THE EE.

**01/29/2009 10:59 AM - CLAIM Note 8**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : MGR REVIEW
Text: [01/29/2009 - FURGALACK, MONIQUE]REFERRED TO MGR FOR REVIEW - FULL TIME RTW 2/9/09 PRIOR TO LTD BEGIN DATE, EP NOT MET

**01/29/2009 10:59 AM - PHONE Note 3**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : STATUS
Text: [01/29/2009 - FURGALACK, MONIQUE]CALLED CLMT WORK PH# 860-565-0242 - ADVISED MEDICAL REVIEW COMPLETED, PER MDS REVIEW ON THE STD CLAIM, MEDICAL SUPPORTS THE ONE MONTH OF PART TIME THROUGH 2/8/09, AND STD APPROVAL IS EXTENDED THROUGH 2/8/09 FOR PARTTIME, STD WILL CLOSE AS OF 2/9/09 FOR FULL TIME RTW. ADVISED CLMT THAT THE LTD CLAIM WILL BE DENIED FOR EP NOT MET AS HER FULL TIME RTW OCCURS PRIOR TO LTD BEGIN DATE, CLMT ASKED IF SHE NEEDS TO COMPLETE THE LTD FORMS AS SHE IS NOT SEEKING LTD, ADVISED CLMT SHE DOES NOT NEED TO COMPLETE THE LTD FORMS. CLMT STATED IN AGREEMENT AND THANKED FOR THE CALL.

**01/26/2009 8:44 AM - CLAIM Note 7**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : LTD COVERAGE
Text: [01/26/2009 - FURGALACK, MONIQUE]REC'D CONFIRMATION FROM ER/CARLOS DEL PORTAL THAT CLMT LTD COVERAGE IN EFFECT AT DOD WAS CLASS 2 60%. SYSTEM UPDATED.

**01/22/2009 1:04 PM - CLAIM Note 6**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : MDS
Text: [01/22/2009 - FURGALACK, MONIQUE]FILE IS REFERRED TO MDS FOR MEDICAL REVIEW UNDER COMPANION STD CLAIM

**01/22/2009 1:04 PM - CLAIM Note 5**
Claim/Event/Leave: REDACTED
NoteSubject : Notice/Proof Review
Other Subject : INITIAL LTD FORMS
Text: [01/22/2009 - FURGALACK, MONIQUE]INITIAL LTD/N&P FORMS LETTER SENT TO CLMT, FORMS DUE 4/28/09

**01/22/2009 12:59 PM - CLAIM Note 4**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : NO PRE-EXIST / SS
Text: [01/22/2009 - FURGALACK, MONIQUE]THIS LTD POLICY DOES NOT HAVE A PRE-EXIST PROVISION / THIS LTD POLICY DOES NOT OFFSET FOR SS DEPENDENTS

**01/22/2009 12:58 PM - CLAIM Note 3**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : LTD COVERAGE INQUIRY
Text: [01/22/2009 - FURGALACK, MONIQUE]*** 2 REQUESTS SENT TO ER/CARLOS DEL PORTAL, REQUESTING CONFIRMATION OF LTD COVERAGE IN EFFECT AT DOD, ELIGIBILITY SCREEN INDICATES CLASS 3, 66 2/3% AS OF 1/1/09, DOD OCCURRED IN 2008. (SEE NOTES ON COMPANION STD CLAIM# REDACTED) ***

**01/22/2009 12:57 PM - PHONE Note 2**
Claim/Event/Leave: REDACTED

Liberty002291

NoteSubject : EE Called
Other Subject :
Text: [01/22/2009 - FURGALACK, MONIQUE]REC'D RETURN CALL FROM CLMT - ADVISED HER OF MEDICAL REC'D ON STD, FOR RECENT N&P THAT WAS SENT BY STD DCM AND FILE WILL BE REFERRED FOR MEDICAL REVIEW FOR REVIEW OF STD BEYOND 1/7/08, ADVISED CLMT INITIALLY WE WEREINFORMEDSHE COULD RTW FULL TIME ON 1/8/09 AND THEN NOTE CAME FROM DR SILVER INDICATING PART TIME AND WORK UP TO FULL TIME APPROX A MONTH - CLMT STATED THAT MEANS APPROX 2/8/09 BUT SHE WAS NOT SURE WHEN WOULD BE RTW FULL TIME - ASKED CLMT WHAT CHANGED FROM BEING ABLE TO RTW FULL TIME TO THE PART TIME STATUS, AS ER INDICATED SHE HAD DRS APPTS SO WOULD BE PART TIME - ADVISED CLMT THAT HAVING DR APPTS IS NOT A SOLE REASON FOR DISABILITY - CLMT STATED IT WAS DUE TO HER SYMPTOMS AND MEDICAL CONDITION THAT SHE WAS ADVISED TO BE PART TIME FOR NOW. SHE STATED THAT DR SILVERS IS THE DR PROVIDING RESTRICTIONS REGARDING DISABILITY STATUS, AND DID NOT KNOW WHY STD DCM REQUSTED MEDICAL FROM ALL HER OTHER DRS, BUT THEN STATED THAT SHE HAS A NEW DR, DR OBERSTEIN, PH# 860-547-1278 THAT SHE SAW FOR FOV ON 1/21/09, COULD NOT PROVIDE SPECIALTY OVER PHONE AS SHE IS AT WORK, & SHE STATED THIS DR INFO SHOULD BE PART OF THE REVIEW OF HER CLAIM. ADVISED CLMT I WILL CONTACT DR OBERSTEIN'S OFFICE FOR THEIRFAX # AND SEND REQ FOR THE 1/21 OV NOTES TO ADD TO HER STD FILE REVIEW WHEN REC'D. CLMT ASKED HOW LONG SHE HAS ON N&P ON STD TO PROVIDE MEDICAL, ADVISED HER PER THE N&P LETTER SENT, UNTIL 3/1/09. ADVISED CLMT OF REVIEW FOR LTD ALSO AND LETTER TO BESENT TO HER WITH LTD FORMS. ALSO ADVISED CLMT THAT DR KAGE'S OFFICE HAS STATED THEY NEED AUTH FROM HER IN ORDER TO RESPOND TO THE MED REQUEST SENT ON STD CLAIM - CLMT STATED SHE WILL PROVIDE AUTH TO THEM. SHE ALSO STATED THAT ALTHOUGH DR BAEHRING RESPONDED THAT THEY HAVE NOT SEEN HER SINCE 1/1/09 AND ARE NOT TX HER FOR A DISABILITY, SHE HAS UPCOMING OV WITH THEM.

**01/22/2009 12:54 PM - PHONE Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject :
Text: [01/22/2009 - FURGALACK, MONIQUE]SEE NOTES ON COMPANION STD CLAIM : CALLED CLMT TODAY 1/22/09, WORK PH# 860-930-0887 - SHE STATED SHE WILL NEED TO CALL BACK, AND WILL PROVIDE INFO ON A NEW DR SHE NEEDS TO REPORT TO US *** WHEN CLMT RETURNS CALL, NEED TO CONFIRM ERTW FULL TIME, INFO REC'D FROM DR IS THAT SHE WAS RELEASED TO RTW PART TIME ON 1/8/09 WHICH ER CONFIRMED SHE DID, AND ERTW FULL TIME IN A MONTH FROM THAT DATE..NEED TO CONFIRM DATE OF FULL TIME RTW. ALSO REMIND FOR MED INFO STD DCM REQUESTED ON N&P FOR ONGOING REVIEW OF HER STD CLAIM.***

**01/22/2009 12:52 PM - CLAIM Note 2**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : RTW PART TIME
Text: [01/22/2009 - FURGALACK, MONIQUE]PER NOTICE ON FILE FROM ER, CLMT RTW PART TIME ON 1/8/09, WITH ERTW FULL TIME IN ONE MONTH

**01/22/2009 12:51 PM - CLAIM Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REQUEST TO ER
Text: [01/22/2009 - FURGALACK, MONIQUE]2 REQUESTS SENT TO ER/CARLOS DEL PORTAL, REQUESTING CONFIRMATION OF LTD COVERAGE IN EFFECT AT DOD, ELIGIBILITY SCREEN INDICATES CLASS 3, 66 2/3% AS OF 1/1/09, DOD OCCURRED IN 2008. (SEE NOTES ON COMPANION STD CLAIM# REDACTED)

Liberty002292

## Note Report

| Report | Clear | Print | Help |
|---|---|---|---|

AS Accom   AS Event   Add Note   Appeal   Claim   Coord Claim Note   Correspond   Doc List   Employee   Leave   Life Claim   Lve Addtl Info
Lve Correspondence   Lve Program   Lve Work Sched   Medical   Medical History   Note   SPELL Letters   Scheduled Pmt   Task Print   Task Rpt
Tasks

**Claim**

**\* Claim/Event/Leave Number** REDACTED    **Accommodation Number**

**Note type:**

**Primary Sort Order**
- Note Type
- Note Number
- ● Note Date/Time
- Accm. No.

**Sec**
- ●

---

**02/10/2016 3:12 PM - LIFE Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : COPY WORK
Text: [02/10/2016 - BRETON, CINDY]EXPORTED DOC LIST, CORRESPONDENCE AND DOC FROM ARC NW ONTO THUMB
DRIVE..MAILED O/N TO MCN

**03/10/2011 10:02 AM - CLAIM Note 112**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [03/10/2011 - KRUCZEK, KATHLEEN]RECEIVED INVOICE FROM CM. VENDOR PAYMENT ISSUED TODAY TO MCMC, PO
BOX 809302, CHICAGO, IL 60680-9302 FOR A PEER REVIEW-INVOICE # 65570-11/3/10 FOR $ 2,208.75. INVOICE IN DOC LIST.

**11/11/2010 2:22 PM - CLAIM Note 111**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FED TAX - ADDRESS
Text: [11/11/2010 - FURGALACK, MONIQUE]REC'D FAX FROM CLMT CONFIRMING CURRENT MAILING ADDRESS FOR STD
CHECK: 1008 TROUTBROOK DRIVE WEST HARTFORD CT 06119, & REQ $20.00 PER WEEK FED TAX.

**11/09/2010 2:10 PM - CLAIM Note 110**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX CONFIRMATION
Text: [11/09/2010 - FURGALACK, MONIQUE]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO HALEY SPEARS AT 18606465807.
RE: CLAIM: REDACTED - SPEARS - FAX: (860) 646-5807 --------------------------------------------------------------------
FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 -----------------------------------------------------
TIME: 11/9/2010 1:57:36 PM SENT TO 18606465807 WITH REMOTE ID 8606465807 RESULT: (0/339;0/0) SUCCESSFUL SEND
PAGE RECORD: 1 - 3 ELAPSED TIME: 00:52 ON CHANNEL 13

**11/09/2010 1:57 PM - CLAIM Note 109**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX TAX FORM
Text: [11/09/2010 - FURGALACK, MONIQUE]PER CLMT REQ, FAXED TAX FORM TO ATTN OF HER MOTHER CHRIS, FAX # 860-
646-5807. REQ THAT CLMT FWD ANY AMT OF FED /STATE TAX SHE WISHES WITH HELD AND WILL APPLY TO PROCESS THE
STD PAYMENT - REQ THAT CLMT ALSO PROVIDE CURRENT MAILING ADDRESS FOR HER STD PAYMENT

**11/08/2010 11:33 AM - CLAIM Note 108**
Claim/Event/Leave: REDACTED
NoteSubject : Reopen
Other Subject : MANAGER REVIEW
Text: [11/08/2010 - POURESHMENANTALEMY, RAMINE]AGREE WITH THE RECOMMENDATION PUT FORTH BY MONIQUE. RP

**11/04/2010 7:57 AM - CLAIM Note 107**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : MGR REVIEW
Text: [11/04/2010 - FURGALACK, MONIQUE]REFERRED TO MGR FOR REVIEW - CORRESPONDENCE IN DOC LIST FROM ARU -
ER SENT CONFIRMATION TO ARU STATING ER REQUESTS OVERRIDE OF THEIR STD APPEAL DETERMINATION AND REQ
THAT STD BE REOPENED AND ISSUE REMAINDER OF STD BENEFITS.

**11/03/2010 3:44 PM - PHONE Note 47**
Claim/Event/Leave: REDACTED

Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : QUESTS ON CLM
Text: [11/03/2010 - SMITH, MARYELLEN]EE CALLED RE: LTR RECVD ADVSING CLM BEING REOPENED***EE HAD QUESTIONS
AS TO DATES/PAY/TIMEFRAMES/TAXES***EE STATES WANTS TAXES TAKEN OUT OF ANY BENEFIT PAYMENTS---IF NEEDS
TO COMPLETE FORM TO HAVE TAXES W/H--IT CAN BE FAXED TO 860-646-5807 ATTN: CHRIS B(EE'S MOTHER)***ADVSD EE
WILL HAVE ADCM CALL HER TOMORROW--EE PROVIDED CONTACT # AS 860-308-2050--PER EE BEST TIME TO CALL IS IN
P.M.[11/03/2010 - SMITH, MARYELLEN]EMAIL TO ADCM

**10/18/2010 10:31 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15356022
Service Date: 10/18/2010
Activity: PHONE CONTACT, CLAIMS
Contact Information: NO CONTACT, ,
Note Type: ACTION PLAN DESCRIPTION
Text: NO FURTHER NCM ACTIVITY INDICATED. REMOVE FROM ASSIGNMENT.

**10/18/2010 10:31 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15356022
Service Date: 10/18/2010
Activity: PHONE CONTACT, CLAIMS
Contact Information: NO CONTACT, ,
Note Type: INFORMATION OBTAINED DESC
Text: DISCUSSED PEER REVIEW WITH ARC C. JOHNSON. DISCUSSED THAT PEER REVIEWER STATES NO R&LS FROM AN
INFECTIOUS DISEASE PERSPECTIVE. FURTHER DISCUSSED THAT THIS PROVIDER IS ALSO BOARD CERTIFIED IN IM AND
ALTHOUGH MENTIONED ADDITIONAL DIAGNOSES, HE DID NOT STATE THERE ARE ANY R&LS FOR THESE CONDITIONS.

**10/15/2010 4:06 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15355686
Service Date: 10/15/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, ,
Note Type: ACTION PLAN DESCRIPTION
Text: UPDATE ARC.

**10/15/2010 4:06 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15355686
Service Date: 10/15/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, ,
Note Type: INFORMATION OBTAINED DESC
Text: PEER REPORT RECD AND REVIEWED. PEER REVIEWER DR. JOHN BRUSCH [BOARD CERTIFIED INTERNAL MEDICINE,
GERIATRIC MEDICINE AND INFECTIOUS DISEASE) OPINED IN HIS REPORT OF 9/27/10 THAT MANY DISEASES HAVE BEEN
INVOLVED TO EXPLAIN THE CLMNTS CLINICAL PICTURE BUTTHERE ARE VERY FEW SUBSTANTIATED CLINICALLY. AMONG
THESE ARE PEPTIC ULCER DISEASE, HASHIMOTO S THYROIDITIS, AUTOIMMUNE DISORDERS, MIGRAINE HEADACHES,
ASTHMA AND IRRITABLE BOWEL SYNDROME. FROM AN INFECTIOUS DISEASE EVALUATION, THE CLAIMANT DOES NOT
HAVEANY RESTRICTIONS AND LIMITATIONS TO HER ACTIVITY FROM 02/08/2009 FORWARD. THE TREATMENT OF HER
PURPORTED INFECTIOUS DISEASES, INCLUDING LYME DISEASE, DOES NOT MEET STANDARDS OF CARE. REGARDING
QUALIFICATIONS OF DR. RAXLAN DR. BRUSCH OPINES THAT HE IS TRAINED PRIMARILY AS A PSYCHIATRIST. HE DOES NOT
HAVE ANY FORMAL INFECTIOUS DISEASE ID TRAINING AND IS NOT ID BOARD-CERTIFIED. BASED ON HIS SUBMITTED
DOCUMENTATION, HIS PRACTICE PATTERN OF THE DIAGNOSIS AND MANAGEMENT OF LYME DISEASE DOES NOT ADHERE
TOTHE GUIDELINES ESTABLISHED BY THE INFECTIOUS DISEASES SOCIETY OF AMERICA. THE BEST PHYSICIAN TO
MANAGE LYME DISEASE IS A BOARD-CERTIFIED INFECTIOUS DISEASE PHYSICIAN. HE FURTHER NOTES THE CLAIMANT
DOES HAVE A SUSTAINABLE FULL TIME CAPACITY AS OF 02/08/2009.

**10/14/2010 1:43 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15355028
Service Date: 10/14/2010
Activity: PHONE CONTACT, VENDOR
Contact Information: VENDOR, , MCMC
Note Type: ACTION PLAN DESCRIPTION
Text: WILL F/U FOR REPORT 10/15/10.

Liberty002294

**10/14/2010 1:43 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15355028
Service Date: 10/14/2010
Activity: PHONE CONTACT, VENDOR
Contact Information: VENDOR, , MCMC
Note Type: INFORMATION OBTAINED DESC
Text: VENDOR CONTACT PAULA CALLED AND ADVISED THE REVIEW HAS BEEN COMPLETED, HOWEVER DUE TO TECHNICALLY ISSUES THE COMPLETED WRITTEN REPORT WILL NOT BE AVAILABLE UNTIL TOMORROW.

**10/04/2010 10:31 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15349575
Service Date: 10/04/2010
Activity: COORD SERVICES, PEER REVIEW
Contact Information: VENDOR, , MCMC
Note Type: ACTION PLAN DESCRIPTION
Text: F/U FOR FINAL REPORT 10/18/10.

**10/04/2010 10:31 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15349575
Service Date: 10/04/2010
Activity: COORD SERVICES, PEER REVIEW
Contact Information: VENDOR, , MCMC
Note Type: INFORMATION OBTAINED DESC
Text: VENDOR CONFIRMATION RECD.

**09/28/2010 4:18 AM - CLAIM Note 106**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 9/27/2010 - REFERRED TO MCMC, LLC FOR PEER REVIEW.

**09/27/2010 12:39 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15346258
Service Date: 09/27/2010
Activity: COORD SERVICES, PEER REVIEW
Contact Information: VENDOR, , MCMC
Note Type: ACTION PLAN DESCRIPTION
Text: F/U FOR VENDOR CONFIRMATION.

**09/27/2010 12:39 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15346258
Service Date: 09/27/2010
Activity: COORD SERVICES, PEER REVIEW
Contact Information: VENDOR, , MCMC
Note Type: INFORMATION OBTAINED DESC
Text: FILE REFERRED TO VENDOR MCMC. SPOKE WITH CONTACT JODI REGARDING REFERRAL FOR INFECTIOUS DISEASE FOR THE DIAGNOSIS OF LYME DISEASE. FILE PREPARED AND GIVEN TO SUPPORT FOR COPY AND MAILING.

**09/24/2010 11:01 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15345557
Service Date: 09/24/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, MONIQUE, FURGALACK
Note Type: ACTION PLAN DESCRIPTION
Text: DISCUSS WITH ARC AND REFER FILE FOR PEER REVIEW.

**09/24/2010 11:01 AM - MDS Note**
Claim/Leave: REDACTED

Liberty002295

Claim/Leave: REDACTED
Episode #: 4
Nurse Name: SCARPONI, TAMMY
Service #: 15345557
Service Date: 09/24/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, MONIQUE, FURGALACK
Note Type: INFORMATION OBTAINED DESC
Text: THE CLMNT HAS BEEN TREATING SINCE 2008 FOR MULTIPLE COMPLAINTS, BUT A PRIMARY DIAGNOSIS OF LYME DISEASE. SHE HAS BEEN SEEN BY MULTIPLE SPECIALTY PROVIDERS THROUGHOUT TREATMENT INCLUDING GI, NEUROLOGY, RHEUMATOLOGY, NATUROPATH, CARDIOLOGY, AND DR. RAXLENWHO IS A PSYCHIATRIST, BUT NOTES INDICATE HE IS A LYME SPECIALIST. THE CLMNT AND PROVIDERS CONTINUE TO INDICATE THE CLMNT HAS THE INABILITY TO PERFORM IN AN OCCUPATIONAL SETTING. MULTIPLE PEER REVIEWS HAVE BEEN COMPLETED FROM NEUROLOGY, INTERNAL MEDICINE AND INTERNAL MEDICINE WITH INFECTIOUS DISEASE SPECIALTY. PEER REVIEWS HAVE CONTINUED TO INDICATE THE CLMNT DOES NOT HAVE A SUPPORTED DIAGNOSIS OF LYME DISEASE. PROVIDER CONTACT HAS BEEN MADE WITH MULTIPLE SPECIALISTS, HOWEVER DR. RAXLEN HAS NOT RETURNED PHONE CONTACT DESPITE MULTIPLE ATTEMPTS. IT HAS BEEN NOTED THAT TREATMENT HAS NOT BEEN CONSISTENT WITH THE STANDARD OF CARE. THE CLMNT HAS REPORTEDLY NOT IMPROVED DESPITE ONGOING TREATMENT WITH MULTIPLE SPECIALISTS. GIVEN THE COMPLEXITY OF THIS FILE, RECOMMEND FURTHER REVIEW.

**09/21/2010 2:51 PM - CLAIM Note 105**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [09/21/2010 - JOHNSON, CHARLES]REVIEWING THE INFORMATION THAT WAS RECD FROM THE ATTY - SENT FILE TO MDS FOR A MEDICAL REVIEW

**09/08/2010 2:41 PM - CLAIM Note 104**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [09/08/2010 - JOHNSON, CHARLES]WE RECD A LARGE PACKET OF INFORMATION FROM THE ATTY - CURRENTLY IN THE PROCESS OF REVIEWING THOSE RECORDS AND DETERMINING ACTION PLAN...

**05/13/2010 4:13 PM - CLAIM Note 103**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [05/13/2010 - JOHNSON, CHARLES]COMPLETED ADDITIONAL APPEAL REVIEW - THE INFORMATION IN THE FILE DOES NOT SUPPORT ONGOING IMPAIRMENTS - MAINTAIN DENIAL

**04/26/2010 8:28 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 3
Nurse Name: SULLIVAN, JENNIFER
Service #: 15274449
Service Date: 04/26/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: OTHER, CHUCK, JOHNSON
Note Type: ACTION PLAN DESCRIPTION
Text: REMOVE FILE FROM MDS QUEUE.

**04/26/2010 8:28 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 3
Nurse Name: SULLIVAN, JENNIFER
Service #: 15274449
Service Date: 04/26/2010
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: OTHER, CHUCK, JOHNSON
Note Type: INFORMATION OBTAINED DESC
Text: RECEIVED UPDATED REPORT FROM PEER REVIEWER SILVERMAN MD. ARC INDICATES NO FURTHER NCM ACTIVITY REQUIRED AT THIS TIME.

**04/01/2010 4:23 AM - CLAIM Note 102**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 3/31/2010 - REFERRED TO CONSULTING PHYSICIAN FOR CLAIM CONSULT - MEETING ATTENDANCE ONLY.

**03/31/2010 11:12 AM - MDS Note**
Claim/Leave: REDACTED
Episode #: 3
Nurse Name: SULLIVAN, JENNIFER
Service #: 15262090
Service Date: 03/31/2010
Activity: PHONE CONTACT, CLAIMS

Liberty002296

Contact Information: OTHER, CHUCK, JOHNSON
Note Type: INFORMATION OBTAINED DESC
Text: DISCUSSED NEWLY RECEIVED DOCUMENTS W/ ARC TO FORMULATE ACTION PLAN: DOCUMENTS WILL BE
FORWARDED TO PEER REVIEWER DR. SILVERMAN FOR COMMENT. ADDITIONALLY, WILL REQUEST HE SEND A LETTER TO
DR. RAXLEN LISTING THE DATES/TIMES CONTACT WAS ATTEMPTED AND INVITING DR. RAXLEN TO PROVIDE INPUT
REGARDING MEDICALLY SUPPORTED R/LS. WILL REQUEST DR. SILVERMAN ATTEMPT TO SPEAK WITH RHEUMATOLOGIST
DR. KAGE; IF THIS IS UNSUCCESSFUL WILL REQUEST THE SAME LETTER BE SENT TO HER. NCM SPOKE WITH ELAINE
CHATLIN AT VENDOR MLS TO DISCUSS. RECORDS FAXED TO HER AT 11:10 AM.

**03/31/2010 10:13 AM - CLAIM Note 101**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL TO EE
Text: [03/31/2010 - JOHNSON, CHARLES]PLACED A CALL TO THE EMPLOYEE - LEFT HER A MESSAGE - WE HAVE NOT RECD
THE ADDITIONAL PACKET OF INFORMATION SHE STATED WAS FORTHCOMING...WE WILL BE PROCEEDING WITH OUR NEXT
REVIEW STEPS

**03/09/2010 12:30 PM - CLAIM Note 100**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : SPOKE WITH ER
Text: [03/09/2010 - JOHNSON, CHARLES]SPOKE WITH DAVE DURGINS - 860-728-6523 - DISCUSSED THE CURRENT STATUS OF
THE APPEAL - DEADLINE FOR ADDITIONAL INFORMATION FROM THE CLMT IS 3/19/10...WE DID RECEIVE A RESPONSE FROM
THE CT ATTORNEY GENERAL - NO NEW MEDICAL INFORMATION WAS INCLUDED - I WILL TOUCH BASE WITH THE PERSON
WHO IS IN CHARGE OF RESPONDING TO THOSE COMPLAINTS AND WE WILL HAVE A STRATEGY FOR THE NEXT STEP WITH
THIS CLAIM - IF THERE IS ADDITIONAL INFORMATION RECD BY 3/19 AND IF THERE IS NOT...

**02/11/2010 3:33 PM - CLAIM Note 99**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : OTHER
Text: [02/11/2010 - JOHNSON, CHARLES]AS AGREED UPON WITH THE EMPLOYER - SENT CLMT A COPY OF HER FILE TODAY -
PER VOICEMAIL FROM DIANE SCHILLINGER - SHE IS STAYING WITH HER FATHER, PLEASE MAIL THE FILE THERE...SENT
FILE TO 635 RADCLIFF STREET FREEPORT LA 71104...CLMT'S CELL PHONE NUMBER IS 860-930-0887...FILE SENT 2ND DAY
AIR TO THIS ADDRESS - PROVIDED HER UNTIL MARCH 19, 2010 TO SUBMIT RECORDS...

**02/11/2010 3:31 PM - CLAIM Note 98**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : SPOKE WITH ER
Text: [02/11/2010 - JOHNSON, CHARLES]LATE ENTRY - CONVERSATION WITH DAVID DURGIN - 860-728-6523 - DISCUSSED
THE STATUS OF THE APPEAL - THAT THE DECISION TO MAINTAIN THE DENIAL WAS MADE...THE CLMT IS STATING THAT
SHE CONTINUES TO HAVE MULTIPLE PROBLEMS...WEAGREED THAT WE WOULD SEND THE CLMT ANOTHER COMPLETE
COPY OF HER FILE AND PROVIDE HER WITH AN ADDITIONAL 30 DAYS TO SUBMIT ANY AND ALL ADDITIONAL MEDICAL
RECORDS TO BE CONSIDERED WITH HER APPEAL...WE WILL CONDUCT ANOTHER REVIEW IF AND WHEN INFORMATION
COMES IN...IF NOTHING RECD - CLAIM TO REMAIN CLOSED

**01/29/2010 2:40 PM - CLAIM Note 97**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL WITH ER
Text: [01/29/2010 - JOHNSON, CHARLES]SPOKE WITH DIANE SCHILLINGER AT THE EMPLOYER - 860-565-8019...HAD
QUESTIONS ABOUT THE STATUS AND IF THE CLMT WISHED TO TAKE ADDITIONAL STEPS...THE CLAIM WAS REVIEWED BY A
PHYSICIAN PRIOR TO DENIAL AND ANOTHER MD ON APPEAL...THE APPEAL PHYSICIAN PEER REVIEWER MADE THE
STANDARD 3 CALLS TO THE PCP AND THEN 3 ADDITIONAL CALLS IN AN ATTEMPT TO SPEAK WITH HIM - HOWEVER - NO
RETURN CALLS WERE RECD...BASED ON THE RECORDS IN THE FILE - IMPAIRMENT WAS NOT SUPPORTED...INFORMED
HER WE TYPICALLY PROVIDE ONE LEVEL OF APPEAL REVIEW...ANYTHING AFTER THAT CAN BE LOOKED AT ON AN
INDIVIDUAL BASIS...

**01/29/2010 12:50 PM - CLAIM Note 96**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : OUT
Text: [01/29/2010 - JOHNSON, CHARLES]MAINTAIN DENIAL - FILE SENT TO CLOSED

**01/29/2010 12:50 PM - CLAIM Note 95**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [01/29/2010 - JOHNSON, CHARLES]COMPLETED APPEAL REVIEW - THE INFORMATION IN THE FILE DOES NOT SUPPORT
ONGOING IMPAIRMENTS...PROVIDED THE CLMT'S PCP ADDITIONAL TIME TO RETURN THE CALL TO THE PEER REVIEWER,
TO DATE - NO RETURN CALL HAS BEEN MADE...MAINTAIN DENIAL

**12/17/2009 2:40 PM - CLAIM Note 94**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL FROM EE

Other Subject : CALL FROM EE
Text: [12/17/2009 - JOHNSON, CHARLES]SPOKE WITH THE CLMT ABOUT THE CURRENT STATUS OF THE PEER REVIEWER AND HER PCP - BASED ON WHAT INFORMATION I HAVE - IT APPEARS THE PEER REVIEWER MADE ANOTHER ATTEMPT ON 12-14 AND DR. RAXLEN'S OFFICE STATED THEY WOULD CALL HIM BACK AT THE END OF THE DAY...APPEARS THE PEER REVIEWER IS DRAFTING AN ADDENDUM...CLMT IS BECOMING VERY FRUSTRATED WITH THE PROCESS AND THE LENGTH OF TIME IT HAS TAKEN...I ASSURED HER THAT WE ARE DOING EVERYTHING WE CAN TO GET A DECISION AS QUICK AS POSSIBLE...

**12/04/2009 1:49 PM - CLAIM Note 93**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL TO EE
Text: [12/04/2009 - JOHNSON, CHARLES]SPOKE WITH THE CLMT AND GAVE HER AN UPDATE ON THE PHYSICIAN REPORT - DR. RAXLEN ATTEMPTED TO CALL THE PEER REVIEWER AND WAS TOLD THAT HE WAS TOO BUSY AND HE WOULD HAVE TO CALL BACK...TOLD HER THAT WE WOULD REQUEST THE VENDOR TO STEP IN AND SET UP A TIME FOR THE TELECONFERENCE SO THEY CAN SPEAK ABOUT HER CLAIM...

**11/24/2009 3:34 PM - CLAIM Note 92**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL FROM EE
Text: [11/24/2009 - JOHNSON, CHARLES]RECD A VOICEMAIL FROM THE CLMT - RETURNED HER CALL - NO ANSWER - LEFT HER A MESSAGE - AS OF NOW WE DO NOT HAVE ANY INFORMATION ABOUT A CONVERSATION BETWEEN HER PCP AND THE PEER REVIEWER...ONCE THE CONVERSATION TAKES PLACE, IT STILL HAS TO GO THRU DICTATION AT THE VENDOR - SO IT CAN TAKE UP TO 3-5 DAYS FOLLOWING THE CONVERSATION TO GET TO ME...

**11/23/2009 3:45 PM - CLAIM Note 91**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL TO EE
Text: [11/23/2009 - JOHNSON, CHARLES]PLACED A CALL TO THE CLMT - THE PEER REVIEWER MADE 3 ATTEMPTS TO REACH DR. RAXLEN AND LEFT MESSAGES, BUT DID NOT RECEIVE A RETURN CALL...SHE SAID SHE WILL CONTACT THEM AND ASK HIM TO CALL DR. SILVERMAN...

**11/23/2009 3:32 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15208712
Service Date: 11/23/2009
Activity: INPERSON CONTCT, CLAIMS
Contact Information: CLAIMS, CHARLES, JOHNSON
Note Type: ACTION PLAN DESCRIPTION
Text: REMOVE FILE FROM MDS QUEUE.

**11/23/2009 3:32 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15208712
Service Date: 11/23/2009
Activity: INPERSON CONTCT, CLAIMS
Contact Information: CLAIMS, CHARLES, JOHNSON
Note Type: INFORMATION OBTAINED DESC
Text: DISCUSSED PEER REVIEW W/ ARC. NO FURTHER NCM ACTIVITY REQUIRED AT THIS TIME.

**11/23/2009 3:05 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15208676
Service Date: 11/23/2009
Activity: NURSE REVIEW, MEDICAL RECORDS REVIEW
Contact Information: NO CONTACT, ,
Note Type: ACTION PLAN DESCRIPTION
Text: DISCUSS W/ ARC.

**11/23/2009 3:05 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15208676
Service Date: 11/23/2009
Activity: NURSE REVIEW, MEDICAL RECORDS REVIEW
Contact Information: NO CONTACT, ,
Note Type: INFORMATION OBTAINED DESC
Text: RECEIVED AND REVIEWED PEER REVIEW BY ID DR. SILVERMAN. R/LS ARE NOT SUPPORTED. REPORT IN DOC LIST.

Liberty002298

**11/06/2009 3:15 PM - CLAIM Note 90**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : CALL FROM EE
Text: [11/06/2009 - JOHNSON, CHARLES]SPOKE WITH THE CLMT - PROVIDED HER AN UPDATE OF THE STATUS OF HER
APPEAL AND THE PROCESS WE ARE GOING THROUGH...SHE ASKED THAT IF WE HAVE A HARD TIME HAVING THE PEER
REVIEWER CONTACT HER PCP TO LET HER KNOW BEFORE MAKING A DECISION

**10/30/2009 4:07 AM - CLAIM Note 89**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 10/29/2009 - REFERRED TO MEDICOLEGAL SERVICES FOR PEER REVIEW.

**10/29/2009 1:10 PM - CLAIM Note 88**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : ID PEER REVIEW REF
Text: [10/29/2009 - SULLIVAN, JENNIFER]DOES THE RECORD SUPPORT THE PRESENCE OF LYME DISEASE OR ANY OTHER
INFECTIOUS PROCESS? IS THE TREATMENT WITHIN THE STANDARD OF CARE? IS THE DIAGNOSIS AND TREATMENT OF
LATE STAGE LYME DISEASE WITHIN THE AREA OF EXPERTISE OF A PHYSICIAN TRAINED IN PSYCHIATRY? IS THERE
EVIDENCE OF IMPAIRMENT FROM 2/8/09 TO THE PRESENT? IF SO, PLEASE INDICATE SUPPORTED RESTRICTIONS AND
LIMITATIONS AS WELL AS THEIR DURATION.

**10/29/2009 12:32 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15198208
Service Date: 10/29/2009
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, ,
Note Type: ACTION PLAN DESCRIPTION
Text: NCM TO REFER FILE FOR ID PEER REVIEW.

**10/29/2009 12:32 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 2
Nurse Name: SULLIVAN, JENNIFER
Service #: 15198208
Service Date: 10/29/2009
Activity: NURSE REVIEW, FILE REVIEW
Contact Information: NO CONTACT, ,
Note Type: INFORMATION OBTAINED DESC
Text: REVIEWED NOTES 2/9/09-10/6/09 AS WELL AS CP REVIEWS BY DR. POTTS [NEUROLOGY] AND DR. TAIWO
[OCCUPATIONAL MEDICINE]. ON APPEAL THE CLMT HAS SUBMITTED LETTER BY MULTIPLE PROVIDERS ATTESTING TO HER
INABILITY TO RTW DUE TO SYSTEMIC LYME DISEASE. THE PROVIDER WHO IS THE PRIMARY PHYSICIAN FOR THIS
DIAGNOSIS, DR. RAXLEN [PSYCHIATRY] INDICATES THAT THE CLMT HAS BEEN TREATED FOR THIS DIAGNOSIS SINCE 4/09
AND IS CURRENTLY RECEIVING IV ANTIBIOTICS FOR A MINIMUM OF THREE MONTHS. NOTES BY THE CLMTS
NEUROLOGIST, RHEUMATOLOGIST, AND NATUROPATH REITERATE THE CLMTS INABILITY TO RTW DUE TO HER MULTIPLE
SYMPTOMS. THERE IS NO NEW CLINICAL INFORMATION TO CONTRADICT THE OPINIONS OF DRS. POTTS AND TAIWO. THE
CLMTS TREATING PROVIDER FOR LYME DISEASE IS A PSYCHIATRIST WHICHWOULD APPEAR TO BE OUTSIDE THE AREA
OF EXPERTISE FOR THIS SPECIALTY. RECOMMEND AN INFECTIOUS DISEASE PEER REVIEW TO CLARIFY WHETHER THIS
DIAGNOSIS IS SUPPORTED AND WHETHER R/LS ARE WARRANTED.

**10/28/2009 9:08 AM - CLAIM Note 87**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : STATUS
Text: [10/28/2009 - JOHNSON, CHARLES]REVIEWING THE INFORMATION CONTAINED IN THE FILE - REFER FILE TO MDS FOR
A MEDICAL REVIEW

**10/16/2009 11:03 AM - CLAIM Note 86**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : IN
Text: [10/16/2009 - COOK, MARILYN]FILE ASSIGNED TO CHUCK JOHNSON.

**10/15/2009 4:12 PM - CLAIM Note 85**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Appeals
Other Subject : SCORE REFERRAL
Text: 10/14/2009 - REFERRED TO APPEALS UNIT FOR CLAIM REVIEW AND DETERMINATION.

**10/14/2009 12:22 PM - CLAIM Note 84**
Claim/Event/Leave: REDACTED

Liberty002299

NoteSubject : Appeal
Other Subject : FILE TO ARU
Text: [10/14/2009 - FURGALACK, MONIQUE]FILE GIVEN TO SUPPORT TO SEND TO ARU. APPEAL ACKNOWLEDGEMENT
LETTER SENT TO CLMT.

**10/14/2009 10:26 AM - CLAIM Note 83**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REFERRAL - ARU
Text: [10/14/2009 - RUPE, BRIAN]MGR AGREES WITH THE DECISION TO REFER THE CLAIM TO ARU.

**10/14/2009 8:35 AM - CLAIM Note 82**
Claim/Event/Leave: REDACTED
NoteSubject : Appeal
Other Subject : RECEIVED
Text: [10/14/2009 - FURGALACK, MONIQUE]APPEAL LETTER REC'D FROM CLMT, ATTACHED 2/9/09 PART TIME OOW SLIP
FROM DR KAGE, 4/21/09 LYME DISEASE PATIENT CHECKLIST, LETTERS FROM DR RAXLEN, DR KAGE, DR GOUIN, AND DR
ZAGAR STATING CLMT IS UNABLE TO WORK PART TIMEOR FULL TIME. REFERRED TO MGR FOR REVIEW FOR APPEAL
REFERRAL.

**05/19/2009 7:57 AM - CLAIM Note 81**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject :
Text: [05/19/2009 - FURGALACK, MONIQUE]SENT LETTER TO CLMT ASKING FOR CONFIRMATION BY 6/2/09 IF THE MEDICAL
RECORDS REC'D FROM DR RAXLEN ARE A REQUEST FOR APPEAL.

**05/18/2009 11:56 AM - CLAIM Note 80**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR RAXLEN
Text: [05/18/2009 - FURGALACK, MONIQUE]REC'D RECORDS DATED 4/21/09 FROM DR RAXLEN, EVAL FOR LYME DISEASE.

**05/13/2009 4:04 PM - CLAIM Note 79**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REFERRAL - CLOSURE
Text: [05/13/2009 - RUPE, BRIAN]MGR AGREES WITH THE DECISION TO REOPEN THE CLAIM AND DENY FOR NOT TD.
MEDICAL INFORMATION FOR THE TIME PERIOD IN QUESTION DOES NOT SUPPORT DISABILITY. THE EE INDICATED THAT
DR. KAGE WAS KEEPING HER OOW WORK DURING THE TIMEPERIOD IN QUESTION (2/9 - PRESENT). ALTHOUGH THERE
WAS A LETTER THAT WAS SENT TO DR. KAGE FROM THE BCP ON 5/12/09 TO CLARIFY THE CLAIMANT'S HEALTH STATUS
AND RTW PLAN, THIS WAS THE SECOND REQUEST FOR THIS INFORMATION (1ST REQUEST WAS ON 3/9/09). THE CLAIMANT
HAS INDICATED THAT SHE IS TREATING WITH A NEW DOCTOR (NEURO-PSYCH) AS OF THE END OF APRIL BUT THIS IS
OVER TWO MONTHS AFTER THE CLOSURE DATE OF 2/9/09. THE CLOSURE LETTER CAN BE SENT TO THE EE.

**05/13/2009 3:06 PM - CLAIM Note 78**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : MGR REVIEW
Text: [05/13/2009 - FURGALACK, MONIQUE]REFERRED TO MGR FOR REVIEW FOR NOT TD ONGOING: CP REVIEW REPORT
STATES MEDICAL RECORDS DO NOT SUPPORT ONGOING R&LS.

**05/13/2009 3:03 PM - CLAIM Note 77**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : CP REVIEW REPORT
Text: [05/13/2009 - FURGALACK, MONIQUE]CP REVIEW REPORT STATES: RECORDS DO NOT SUPPORT ANY SPECIFIC
LIMITATIONS OR RESTRICTIONS THAT WOULD PREVENT SITTING, STANDING OR WALKING AT A SEDENTARY PHYSICAL
DEMAND LEVEL. / 34-YEAR-OLD W/CHIEF COMPLAINT OF HEADACHE ASSOCIATED WITH VISUAL DISTORTION, NAUSEA AND
VOMITING AND AN EPISODE OF BLACKOUT SPELL. SHE HAD A PAST MEDICAL HISTORY OF MICROSCOPIC COLITIS,
MIGRAINE HEADACHE AND THYROID DISORDER. HER PHYSICAL EXAMINATION DID NOT REVEAL ANY FOCAL
NEUROLOGICAL DEFICIT. MRI OF HER BRAIN AND EEG SHOWED NON-SPECIFIC ABNORMALITIES. SHE WAS DIAGNOSED
WITH DAILY TENSION TYPE HEADACHE AND CLASSIC MIGRAINE AND SHE WAS TREATED WITH NEURONTIN WITH NO
LASTING RELIEF OF HER SYMPTOMS. SHE WAS ALSO EVALUATED BY A RHEUMATOLOGIST WHO CONCLUDED THAT HER
PRESENTATION OF GENERALIZED PAIN, RAYNAUDS, SICCA AND HIGHLY POSITIVE ANA WAS SUGGESTIVE OF AN IMMUNE
MEDIATED INFLAMMATORY DISORDER AND SHE WAS STARTED ON PLAQUENIL. THE UPDATED MEDICAL INFORMATION
INDICATES THAT SHE WAS SEEN BY ANOTHER PHYSICIAN WHO WAS CONVINCED THAT HER DIAGNOSIS WAS LYME
DISEASE. HOWEVER, SHE WAS SEEN BY ANOTHER RHEUMATOLOGIST WHO DOES NOT THINK SHE HAS LYME DISEASE.
SHE HAS ALSO REPORTED THAT SHE IS NOW RECEIVING CARE FROM A NEUROPSYCHOLOGISTWHO SPECIALIZES IN LYME
DISEASE AND A NATUROPATH. RECORDS FORM THESE PRACTITIONERS WERE NOT AVAILABLE FOR REVIEW. CP CALLED
INTERNIST/GASTROENTEROLOGIST WHO RECENTLY SAW HER. PREVIOUSLY CONTACTED HER RHEUMATOLOGIST DR.
KAGE, WHO STATED THAT SHE PREFERRED REQUEST IN WRITING. CP FAXED A LETTER TO DR. KAGE REQUESTING FOR
CLARIFICATION OF HEALTH STATUS AND PHYSICAL CAPACITY, HOWEVER, DR KAGE DID NOT RESPOND TO CP LETTER. CP
SPOKE WITH DR. O BRIEN ON 05-11-09 AND HE STATED THAT HE WAS TAKING CARE OF HER GASTROINTESTINAL
PROBLEMS. SHE HAS A HISTORY OF MICROSCOPIC COLITIS AND PEPTIC ULCER DISEASE CURRENTLY TREATED WITH ON
ACID SUPPRESSANT THERAPY. HER LAST ENDOSCOPY SHOWED THAT THE ULCER HAS HEALED. SHE CURRENTLY HAS

Liberty002300

NON-SPECIFIC UPPER AND LOWER GASTROINTESTINAL SYMPTOMS AND IT IS DIFFICULT TO DETERMINE HOW MUCH HER GI SYMPTOMS ARE CONTRIBUTING TO HER OTHER PROBLEMS. HE ALSO STATED THAT HE DID NOT RESTRICT HER ACTIVITIES.

**05/12/2009 5:11 PM - PHONE Note 46**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : RETURNED CALL
Text: [05/12/2009 - RUPE, BRIAN]MGR RECEIVED VMX FROM EE. MGR RETURNED CALL. MGR EXPLAINED THAT THE MEDICAL INFORMATION RECEIVED FOR THE TIME PERIOD IN QUESTION DOES NOT SUPPORT DISABILITY AND WE WILL BE CLOSING HER CLAIM FOR NOT TD AS OF 2/9/09. MGR REVIEWED MEDICAL INFORMATION RECIEVED. EE STATED THAT WE DIDN'T RECEIVE UPDATED INFORMATION FROM DR. ZAGAR AND QUESTIONED WHY THE BCP DID NOT CALL DR. ZAGAR. MGR STATED THAT THE BCP REVIEWED THE INFORMATION AND REACHED OUT TO THE TREATING PHYSICIANSDURING THE TIME PERIOD IN QUESTION BASED ON THE MEDICAL RECEIVED. MGR EXPLAINED THAT APPEAL PROCESS AND ADVISED THAT IF THERE IS ANY INFORMATION THAT WAS NOT RECEIVED, SHE CAN SUBMITT THAT ON APPEAL. MGR STATED THAT ALTHOUGH WE REQUESTED INFORMIAOCTN FROM THE NEUROPSYCHOLOGIST SHE HAS STARTED SEEING, IT WAS NOT UNTIL RECENTLY AND WE ARE REVIEWING THE CLAIM FOR BENEFITS BACK TO 2/9/09. MGR EXPLAINED THE APPEAL PROCESS. EE UNDERSTOOD AND HAD NO FURTHER QUESTIONS.

**05/12/2009 10:04 AM - PHONE Note 45**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : RETURNED CALL
Text: [05/12/2009 - RUPE, BRIAN]MGR RECEIVED VMX FROM EE WITH QUESTIONS AS TO THE STATUS OF HER CLAIM. BCP REPORT HAS BEEN RECEIVED AND MGR WOULD LIKE TO DISCUSS THE RESULTS OF THE REVIEW. MGR CALLED EE, T# (860) 308-2050 AND LEFT VMX FOR RETURN CALL.

**05/11/2009 3:06 PM - PHONE Note 44**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [05/11/2009 - BUDER, CHARLES]EE CALLED TO CHECK STATUS. DCM ADVISED ADDITIONAL FAX WAS SENT TO DR. GOUIN AND DR. RAXLEN. EE ADVISED SHE HAD PREVIOUSLY SPOKEN TO MGR AND WISHED TO DISCUSS FURTHER W/MGR. MGR WAS UNAVAILABLE AND EE WISHED TO BE PUT INTOMGR'S VMX. DCM TRANSFERRED EE. DCM EMAILED MGR AND CM

**05/06/2009 9:15 AM - CLAIM Note 76**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX CONFIRMATIONS
Text: [05/06/2009 - FURGALACK, MONIQUE]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO LAUREN GOUIN AT 18606775406.
RE: CLAIM: REDACTED- SPEARS - FAX: (860) 677-5406 ------------------------------------------------------------------
FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 --------------------------------------------------------------
TIME: 5/6/2009 9:02:23 AM SENT TO 18606775406 WITH REMOTE ID 8606775406 RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 3 ELAPSED TIME: 01:58 ON CHANNEL 6 YOUR FAX HAS BEEN SUCCESSFULLY SENT TO BERNARD RAXLEN AT 12127992377. RE: CLAIM: REDACTED- SPEARS - FAX: (212) 799-2377 ----------------------------------------------------------------
FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 --------------------------------------------------------------
TIME: 5/6/2009 9:03:30 AM SENT TO 12127992377 WITH REMOTE ID 2127992377 RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 3 ELAPSED TIME: 01:02 ON CHANNEL 19

**05/06/2009 9:15 AM - CLAIM Note 75**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : RVW W/MGR - MED REQ
Text: [05/06/2009 - FURGALACK, MONIQUE]PER REVIEW WITH MGR, FAXED REQ TO DR GOUIN & DR RAXLEN FOR MEDICAL RECORDS 1/2009 TO PRESENT, AND ASKED THEM TO RESPOND WITHIN 7 BUSINESS DAYS. SENT LETTER TO CLMT ADVISING FILE CURRENTLY UNDER MEDICAL REVIEW FOR PERIOD OF 2/9/09 TO PRESENT, AND OF FAXES SENT TO DR GOUIN & DR RAXLEN WITH REQ TO THEM TO RESPOND IN 7 BUSINESS DAYS, ALSO ADVISED IN LETTER TO CLMT IF ANY OTHER TX PROVIDERS DURING PERIOD OF 2/9/09 TO PRESENT, TO HAVE THEM FORWARD THEIR MEDICAL RECORDS.

**05/04/2009 12:41 PM - PHONE Note 43**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : WITH CONCERNS
Text: [05/04/2009 - RUPE, BRIAN]MGR RECEIVED CALL FROM EE WITH CONCERNS ABOUT THE TIMEFRAME FOR A DECISION TO BE MADE ON HER CLAIM. MGR STATED THAT WE RECEIVED MEDICAL INFORMATION ON 4/23 AND IT WAS SENT TO A BCP FOR REVIEW WITH AP CONTACT. MGR STATED THAT WE WILL BE ABLE TO GIVE HER AN UPDATE BY 5/8. EE UNDERSTOOD. EE ASKED WHY HER CLAIM WAS CLOSED WHEN SHE NEVER RTW FULL TIME. MGR STATED THAT WE WERE INFORMED THAT SHE WAS RTW FULL TIME AS OF 2/9/09 AND WE CLOSED THE CLAIM. MGR STATED THAT WE NEED MEDICAL INFORMATION PRIOR TO REOPENING THE CLAIM THAT EXPLAINS WHY SHE COULD NOT RTW FULL TIME ON 2/9/09. WE ARE NOW REVIEWING THE CLAIM TO DETERMINE IF IT WAS SUPPORTED FOR HER TO BE OUT OF WORK PT FROM 2/9/09 - 3/25/09 AND THEN TD THERE AFTER. EE STATED THAT SHE IS WORKING WITH TWO NEW DOCTORS. DR. DERNARD RAXLEN (NEURO PSYCH - SPECIALTY SYSTEMIC LYMES DISEASE) T# 212-799-1121 F# 212-799-2377 ADDRESS: 123 W 79TH ST, 1ST FLOOR, NEW YORK, NEW YORK 10024. SHE IS ALSO SEEING A NATUROPATHIC DOCTOR IN AVON, CT NAME DR. LAUREN GUIN T# 860-674-0111, F# 860-677-5406. MGR ASKED IF THE LYMES DISEASE IS HER PRIMARY DX AND SHE STATED YES. MGR ASKED IF DR. KAGE WAS THE DOCTOR KEEPING HER OUT OF WORK AND SHE STATED THAT THERE ARE MANY DOCTORSTHAT SHE IS SEEING BUT ALL FORMS AND MEDICAL RECORDS HAVE BEEN GOING THROUGH

Liberty002301

DR. KAGE TO SIMPLIFY THE PROCESS. MGR ASKED IF DR. KAGE REFERRED HER TO DR. RAXLEN, AND SHE STATED THAT SHE FOUND HIM ON HER OWN AS HER DOCTORS TOLD HER THAT SHE NEEDED TOSEE A LYMES SPECIALIST (SHE STATED THAT HER CONDITION IS CONTROVERSIAL). MGR ASKED THE EE WHAT SYMPTOMS ARE KEEPING HER FROM WORKING. SHE INDICATED THAT SHE WAS READING OFF A LIST B/C ONE OF HER SYMPTOMS IS MEMORY LOSS. SHE STATED HER SYMPTOMS WERE HEADACHES, MUSCLE PAIN, DYSLEXIA, BRAIN FOG, ABDOMINAL PAIN, NIGHT SWEATS, SHE CUT SHORT B/C SHE HAD TO GET TO A DOCTORS APPOINTMENT WITH DR. GOUIN. SHE ALSO INDICATED THAT SHE WAS PUT ON SEVERAL NEW MEDICATIONS BY DR. RAXLEN AND HER NEXT OV WITHHIM IS JUNE 2ND.

**04/24/2009 4:01 AM - CLAIM Note 74**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 4/23/2009 - REFERRED TO CONSULTING PHYSICIAN FOR COMPLETE REVIEW.

**04/23/2009 8:00 AM - CLAIM Note 73**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : CP REVIEW
Text: [04/23/2009 - FURGALACK, MONIQUE]FILE REFERRED FOR CP REVIEW OF ADDTL MEDICAL INFO REC'D FOR ASSESSMENT OF MEDICAL STATUS, R&LS/CAPACITY, PROVIDER CONTACT WITH ANY QUESTIONS.

**04/23/2009 7:46 AM - CLAIM Note 72**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR KAGE
Text: [04/23/2009 - FURGALACK, MONIQUE]REC'D FAX OF RECORDS FROM DR KAGE DATED 1/2009 - 3/31/09 DX: MIGRAINE HEADACHES, FATIGUE, DIFFICULTY CONCENTRATING, MEMORY LOSS, ACHY LEGS/ARMS/FACE/NECK/SPINE/FEET. AUTOIMMUNE INFLAMMATORY DISORDER SUSPECTED DUETOMULTIORGAN INVOLVEMENT-THYROID, GI TRACT, SICCA, RAYNAUDS PHENOMENON, ARTHRALGIA.[04/23/2009 - FURGALACK, MONIQUE]CONSULT INFECTIOUS DISEASE FOR LYME. HAD SUPRASCAPULAR NERVE BLOCK. 3/24/09 PATIENT CALL IN TO DR OFFICE, DR NOTE STATES PATIENTWOULD LIKE THEM TO COMMUNICATE TO DISABILITY CARRIER THAT AS OF THAT DATE SHE HAS FULL RESTRICTED HOURS MEANING THAT SHE WILL NOT BE ABLE TO WORK ANY HOURS, WILL BE COMPLETELY OUT OF WORK, 3/24/09 DR NOTE ALSO STATES THAT PER LAST OV NOTE PLAN WAS TO CONTINUE DECREASED SCHEDULE.

**04/15/2009 9:01 AM - PHONE Note 42**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : LEFT MESSG
Text: [04/15/2009 - FURGALACK, MONIQUE]LEFT MESSG ON VM FOR CLMT ADVISING WE HAVE NOT REC'D ANY ADDTL MED INFO TO DATE SINCE HER CALL TO US ON 3/25/09 STATING SHE WAS BACK OOW, AND AT THAT TIME SHE HAD INFORMED US SHE WAS HAVING DR KAGE SEND US ADDTL MEDICAL. ADVISED CLMT THAT A FAX WAS SENT TO DR KAGE PER HER REQUEST, AND WHEN ADDTL MEDICAL IS REC'D IT WILL BE REVIEWED.

**04/15/2009 7:33 AM - CLAIM Note 71**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : MED REQUEST
Text: [04/15/2009 - FURGALACK, MONIQUE]SEE PRIOR CLAIM NOTE FROM STD DCM, STD DCM FAXED A MED REQUEST TO DR KAGE PER CLMT'S REQUEST ON 4/14/09[04/15/2009 - FURGALACK, MONIQUE]REC'D FAX TRANSMISSION THAT 4/14/09 FAX DID NOT GO THROUGH TO DR KAGE, CONFIRMED FAX# WITH THEIR OFFICE THIS MORNING, FAX # WE HAVE IS CORRECT 860-646-7999. REFAXED AND REC'D CONFIRMATION THAT FAX WENT THROUGH.

**04/14/2009 4:15 PM - PHONE Note 41**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [04/14/2009 - LEIDINGER, CORLITA]EE CALLED TO CONFIRM IF MED INFO WAS REC'VD.... AVISED THAT CM WAS UNAVAIL TO CONFIRM.... EE REQUESTED CM TO SEND MED REQ TO DR. KAGE.... EE WOULD LIKE A C/B FROM CM.

**04/06/2009 8:28 AM - CLAIM Note 70**
Claim/Event/Leave: REDACTED
NoteSubject : Action Plan
Other Subject :
Text: [04/06/2009 - FURGALACK, MONIQUE]SEE PRIOR CLAIM NOTE, CLMT REPORTED SHE IS BACK OOW AND WILL SUBMIT ADDTL INFORMATION FOR REVIEW - FILE TO BE REFERRED BACK TO CP FOR REVIEW UPON RECEIPT OF ADDTL INFO

**03/25/2009 1:12 PM - PHONE Note 40**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject :
Text: [03/25/2009 - FURGALACK, MONIQUE]CLMT CALLED AND STATED WE WILL BE GETTING A FAX FROM DR KAGE OF UPDATED MEDICAL INFORMATION, SHE WAS WORKING PART TIME THROUGH YESTERDAY 3/24/09, AND AS OF TODAY 3/25/09 SHE IS OOW FULLY AGAIN PER HER DR, CLMT STATEDSHE DOES NOT WANT TO GET INTO IT RIGHT NOW AS TO WHAT OCCURED TO CAUSE THE CHANGE IN STATUS, BUT HER DR'S INFORMATION WILL INCLUDE THIS INFORMATION. ADVISED CLMT I HAVE NOT YET REC'D THIS FAX FROM DR KAGE THAT SHE IS MENTIONING, CLMT STATED SHE WILLCALL DR OFFICE TO MAKE SURE THIS IS SENT TO US. CLMT STATED SHE HAS A TEMPORARY CHANGE OF ADDRESS, WILL BE STAYING WITH HER MOTHER FOR NOW, AND SHE WILL HAVE HER MOTHER FAX US THE CHANGE OF ADDRESS LATER THIS

Liberty002302

STATING WITH HER MOTHER FOR NOW, AND SHE WILL HAVE HER MOTHER FAX US THE CHANGE OF ADDRESS LATER THIS WEEK. CLMT STATED SHE WILL ALSO SEND USREQUEST FOR FEDERAL AND STATE TAX WITH HOLDING FROM BENEFITS. ADVISED CLMT THAT ADDTL MEDICAL WILL BE REVIEWED WHEN REC'D FOR REVIEW OF STD BEYOND THE LAST APPROVED THROUGH DATE WHEN CLAIM HAD BEEN CLOSED FOR FULL TIME RTW.

**03/05/2009 9:46 AM - CLAIM Note 69**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : PARTIAL STD
Text: [03/05/2009 - FURGALACK, MONIQUE]PARTIAL STD BENEFITS FOR PERIOD OF 1/8/09 - 2/8/09 ISSUED TO CLMT - WORK INCENTIVE BENEFIT CALC SHEET COMPLETED FOR FILE. SICK ABSENCE TIME FOR PERIOD OF 1/8/09 - 2/8/09 WAS PROVIDED BY ER. HOURS WORKED DURING 1/8/09- 2/8/09 = 85.6 HOURS X HOURLY PAY RATE OF $25.51 = $2183.65 WHICH IS 48.63% OF PRE-DISB EARNINGS. OFFSET FOR PARTIAL DISABILITY = $387.66.[03/05/2009 - FURGALACK, MONIQUE]GROSS STD BENEFIT FOR 1/8/09 - 2/8/09 = $2693.94, LESS OFFSET FOR PARTIALOF $387.66 = $2306.28 PARTIAL STD BENEFIT.

**02/26/2009 3:09 PM - PHONE Note 39**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [02/26/2009 - FURGALACK, MONIQUE]REC'D CALL FROM CLMT - SHE STATED SHE HAS CONTINUED TO WORK PART TIME SINCE 2/8/09, DR KAGE IS THE DR KEEPING HER ON PART TIME RESTRICTIONS AT THIS TIME - ADVISED CLMT THAT FILE IS UNDER MEDICAL REVIEW INCLUDING PROVIDER CONTACT, FOR DETERMINATION OF PARTIAL DISABILITY BEYOND 2/8/09, AS HER CLAIM WAS CLOSED AS OF 2/9/09 FOR FULL TIME RTW PER PRIOR MEDICAL ON FILE FROM DR SILVERS. CLMT STATED THAT DR KAGE IS NOW THE DR THAT HAS THE PART TIME RESTRICTIONS IN PLACE. ADVISED CLMT THAT WILL REVIEW PARTIAL EARNINGS INFO FROM ER FOR PARTIAL STD BENEFITS THROUGH 2/8/09. ADVISED HER ONCE MEDICAL REVIEW IS COMPLETED, DETERMINATION WILL BE MADE ON ELIGIBLITY FOR PARTIAL STD BEYOND 2/8/09. CLMT GOT ANOTHER CALL ON HEROTHER LINE AND STATED SHE WAS WAITING FOR HER DR TO CALL HER BACK, AND SHE ASKED IF SHE DID NOT COME RIGHT BACK TO THE PHONE TO PLEASE HANG UP. WAS ON HOLD FOR SEVERAL MINUTES, DISCONNECTED THE CALL PER CLMT'S REQUEST.[02/26/2009 - FURGALACK, MONIQUE]CLMT CALLED BACK AND STATED SHE WAS TALKING TO HER DR ON THE OTHER LINE SO SHE WAS SORRY TO KEEP US HOLDING. REVIEWED WITH CLMT THAT STD WAS APPROVED THROUGH 2/8/09 FOR PARTIAL, CLOSED AS OF 2/9/09 FOR FULL TIME RTW. FILE UNDER MEDICAL REVIEW FOR ANY STD PARTIAL BEYOND 2/8/09 WITH INFO ON FILE. ADVISED CLMT OF MOST RECENT MED INFO REC'D FROM DR KAGE & DR ZAGAR. CLMT STATED THAT THE REASON SHE CANNOT RTW FULL TIME IS DUE TO HER MULTIPLE DX'S AND DRS DO NOT KNOW WHAT TO DO WITH HER, AND IT IS IMPORTANT THAT SHE ONLY WORK PART TIME AND THEN HAS TO REST, FATIGUE IS LIMITING HER PHYSICALLY AND COGNITIVELY. SHE STATED THAT SHE WAS RECENTLY DX WITH LYME DISEASE THAT HAS AFFECTED HER BRAIN AND WILL BEGIN TX FOR THAT, AND DRS ALSO THINK SHE MAY HAVE AN AUTOIMMUNE DISORDER BUT THEY CANNOT CONFIRM THIS. ADVISED CLMT THAT WE DO NOT SEND OUT MEDICAL REQUESTS ON CLOSED CLAIM AND IF THERE IS ANY ADDTL INFORMATION SHE WISHES CONSIDERED FOR HER CLAIM OTHER THAN THE INFORMATION WE REC'D, TO SUBMIT TO US. ADVISED WOULD REVIEW FOR PARTIAL STD BENEFITS THROUGH 2/8/09. CLMT THANKED FOR THE INFORMATION.

**02/26/2009 8:17 AM - CLAIM Note 68**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR OBERSTEIN
Text: [02/26/2009 - FURGALACK, MONIQUE]REC'D FAX OF RECORDS FROM DR OBERSTEIN DATED 1/21/09 - 2/17/09, THYROID FOLLOW UP[02/26/2009 - FURGALACK, MONIQUE]FORWARDED THIS FAX TO CP FOR MEDICAL FILE REVIEW IN PROCESS.

**02/24/2009 3:46 PM - PHONE Note 38**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : RE: FAX
Text: [02/24/2009 - FURGALACK, MONIQUE]REC'D CALL FROM WEDNESDAY AT DR OBERSTEIN'S OFFICE STATING THEY REC'D OUR MEDICAL RECORDS FEE CHECK AND SHE CANNOT LOCATE THE 1/22/09 MED REQUEST, SHE ASKED THAT THIS BE REFAXED - DID THIS TODAY. ADVISED HER OF SAME.SHE STATED SHE WILL FAX THE MEDICAL RECORDS AS SOON AS THE FAX IS REC'D.[02/25/2009 - FURGALACK, MONIQUE]***** REFAX CONFIRMATION: YOUR FAX HAS BEEN SUCCESSFULLY SENT TO DR. OBERSTEIN AT 18605471301. RE: CLAIM: REDACTED SPEARS - FAX: (860) 547-1301 ------------------------------------------------- FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 ------------------------------------------------- TIME: 2/24/2009 5:15:35 PM SENT TO 18605471301 WITH REMOTEID 860 5471301 RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 3 ELAPSED TIME: 01:06 ON CHANNEL 11 ***

**02/19/2009 2:50 PM - CLAIM Note 67**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : VENDOR PAYMENT
Text: [02/19/2009 - FURGALACK, MONIQUE]SENT REQUEST TO SYSTEM TO ADD VENDOR INFO - REC'D INVOICE FROM DR CT MULTISPECIALTY GROUP, P.C. DEPT. OF ENDOCRINOLOGY 100 RETREAT AVE SUITE 400 HARTFORD CT 06106. $45.00 MEDICAL RECORDS FEE FOR RECORDS FROM DR OBERSTEIN.[02/20/2009 - FURGALACK, MONIQUE]REC'D CONFIRMATION OF VENDOR INFO ADDED TO SYSTEM - ISSUED MEDICAL RECORDS FEE $45.00 TODAY TO ABOVE ADDRESS. CALLED WEDNESDAY IN MEDICAL RECORDS DEPT, PH# 860-547-1278 AND LEFT HER A VM MESSG CONFIRMING RECEIPT OF HER INVOICE AND THAT PAYMENT IS ISSUED, PROVIDED OUR FAX # FOR HER TO FAX RECORDS TO.[02/20/2009 - FURGALACK, MONIQUE]DATE AND INITIALS WRITTEN ON INVOICE AND PLACED IN FILE.

**02/18/2009 9:22 AM - PHONE Note 37**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : DR OBERSTEIN

Liberty002303

Text: [02/18/2009 - FURGALACK, MONIQUE]REC'D CALL FROM WEDNESDAY AT DR OBERSTEIN'S OFFICE STATING THEY HAVE ADDTL MEDICAL RECORDS TO SEND US THAT REQUIRES A PREPAY FEE, SHE IS REFERRING TO A FAX WE SENT THEM FOR RECORDS BACK ON 1/22/09, SHE WILL FAX AN INVOICE TODAY.

**02/17/2009 8:09 AM - CLAIM Note 66**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REQUEST TO ER
Text: [02/17/2009 - FURGALACK, MONIQUE]SENT AN ADDTL REQUEST TO ER-CARLOS DEL PORTAL, FOR COPY OF CLMT'S PAY STUBS FOR DATES OF 1/8/09 - PRESENT, THIS IS NEEDED TO REVIEW/CALCULATE PARTIAL STD FOR THE DATES OF 1/8/09 - 2/8/09. THIS INFORMATION HAS NOT BEENREC'D TO DATE.

**02/11/2009 3:59 AM - CLAIM Note 65**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 2/10/2009 - REFERRED TO CONSULTING PHYSICIAN FOR COMPLETE REVIEW.

**02/10/2009 12:52 PM - CLAIM Note 64**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : CP REVIEW
Text: [02/10/2009 - FURGALACK, MONIQUE]REFERRED FOR OCC MED CP FILE REVIEW: REFERRAL FOR FILE REVIEW WITH PROVIDER CONTACT. 1) REFERRAL QUESTIONS: DOES MEDICAL INFORMATION SUPPORT ONGOING IMPAIRMENT/PARTIAL IMPAIRMENT BEYOND 2/8/09? CLAIMANT WAS RELEASED TO PART TIME AS OF 1/8/09 FOR A MONTH BY DR. SILVERS, THEN TO BE FULL TIME. CLAIMANT HAD ADDITIONAL MEDICAL INFORMATION SUBMITTED FROM RHEUMATOLOGIST AND NEUROLOGIST FOR REVIEW. 2) CP TO CONDUCT PROVIDER CONTACT WITH DR. ZAGAR AND CONFIRM IF CLAIMANT HAS RELIEF FROM THE 2/9/09 EPIDURAL BLOOD PATCH, CURRENT MEDICAL STATUS/CAPACITY, AND IS HE KEEPING HER OUT OF WORK. 3) CP TO CONDUCT PROVIDER CONTACT WITH RHEUMATOLOGIST DR. KAGE TO CONFIRM CURRENT MEDICAL STATUS/CAPACITY AND DURATION OF PARTTIME RESTRICTIONS.

**02/10/2009 12:33 PM - CLAIM Note 63**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : 2 DRS
Text: [02/10/2009 - FURGALACK, MONIQUE]REC'D FAX OF MEDICAL RECORDS FROM ASSOC NEUROLOGISTS- DR ZAGAR, DATED THROUGH 2/9/09 - DX: MIGRAINE, LUMBAGO - 2/3/09 LUMBAR PUNCTURE, 2/9/09 EPIDURAL BLOOD PATCH. REC'D FAX OF MEDICAL RECORDS FROM RHEUMATOLOGY-DR KAGE DATED THROUGH 2/5/09, CHEIF COMPLAINT 2/5/09 FATIGUE, HEADACHE, DIFFICULTY CONCENTRATING, MEMORY LOSS, ACHY ARMS & LEGS

**02/10/2009 10:17 AM - CLAIM Note 62**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX CONFIRMATION
Text: [02/10/2009 - FURGALACK, MONIQUE]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO DR. DARIO ZAGAR AT 12033333937. RE: CLAIM: REDACTED- SPEARS - FAX: (203) 333-3937 ---------------------------------------------------------------- FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 ---------------------------------------------------------------- TIME: 2/10/2009 9:50:45 AM SENT TO 12033333937 WITH REMOTE ID RESULT: (0/316;0/0) ANSWER (PROBABLY HUMAN) DETECTED PAGE RECORD: NONE SENT ELAPSED TIME:01:04 ON CHANNEL 10 ---------------------------------------------------------------- TIME: 2/10/2009 10:10:17 AM SENT TO 12033333937 WITH REMOTE ID 1 203 333 3937 RESULT: (0/339;0/0) SUCCESSFUL SEND PAGE RECORD: 1 - 3 ELAPSED TIME: 01:16 ON CHANNEL 17

**02/10/2009 9:43 AM - CLAIM Note 61**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX TO DR ZAGAR
Text: [02/10/2009 - FURGALACK, MONIQUE]PER CLMT'S REQUEST IN PRIOR CLAIM NOTE - FAXED MED REQUEST TO DR ZAGAR, FAX# 203-333-3937, FOR RECORDS FROM JAN.2009 TO PRESENT, ALSO ASKED DR ZAGAR AS OF WHAT DATE CLMT WAS ADVISED TO CEASE WORK BY THIS DR AND DATE OF RTW FULL TIME.

**02/09/2009 4:18 PM - PHONE Note 36**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : MED INFO
Text: [02/09/2009 - VALENTIN, FRANCES]EE CALLED. AP ZAGAR (PHONE# 203-333-1133, FAX#203-333-3937) IS REQUESTING THAT WE SEND REQUEST FOR ADDTL MED INFO IN WRITING. PER EE, PLEASE FORWARD REQUEST TO AP. AP ALREADY HAS A RELEASE ON FILE TO SEND TO US. IF ANYQUESTIONS, MAY CONTACT EE AT ANYTIME. INFORMED EE WOULD NOTATE CALL ON CLAIM AND ADVISE ADCM. EMAIL TO ADCM.

**02/09/2009 1:33 PM - CLAIM Note 60**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : STATUS
Text: [02/09/2009 - FURGALACK, MONIQUE]SEE LTD CLAIM #REDACTEDFOR CLAIM NOTES RE: PHONE CALLS FROM/TO CLMT TODAY 2/9/09. ADVISED CLMT I HAVE REQUESTED HER PARTIAL PAY FROM ER-CARLOS DEL PORTAL FOR REVIEW OF HER PARTIAL STD THROUGH 2/8/09. CLMT STATED SHELAST WORKED ON 2/2/09 AND ON 2/3/09 HAD A SPINAL TAP WITH A DR ZAGAR, AND HAS BEEN HAVING ONGOING COMPLICATIONS, SO DR KAGE HER RHEUMATOLOGIST HAS TOLD HER SHE

Liberty002304

EASER, AND HAS BEEN HAVING ONGOING COMPLICATIONS, SO DR KASE HER RHEUMATOLOGIST HAS TOLD HER SHE NEEDS TO REMAIN ON PART TIME STATUS LONGER THAN 2/8/09. SHE HAD SOME BLOODWORK/TESTING FOR HER SYMPTOMS. SHE HAS NOT WORKED SINCE 2/2/09 BUT HOPES TO RTW AGAIN THIS WEEK, HER MOTHER IS DRIVING HER TO THE DR TODAY. CONFIRMED THAT THE STD WAS CLOSED AS OF 2/9/09 PER RELEASE FROM DR SILVER ON FILE, PART TIME AS OF 1/8/09 FOR ONE MONTH, THROUGH 2/8/09 THEN FULL TIME. ADVISED CLMT THAT TO REVIEW FOR STD/PARTIAL STD BEYOND 2/8/09, SHE WILL NEED TO SUBMIT ANY ADDTL MEDICAL RECORDS SHE WISHES TO SUPPORT HER STD CLAIM, AND WE WILL REFER FOR MEDICAL REVIEW WHEN REC'D.

**01/29/2009 10:56 AM - CLAIM Note 59**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject :
Text: STD APPROVED THRU 2/8/09 FOR PARTIAL, CLOSED 2/9/09 FOR FULL TIME RTW.

**01/29/2009 10:56 AM - PHONE Note 35**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : STATUS
Text: [01/29/2009 - FURGALACK, MONIQUE]CALLED CLMT WORK PH# 860-565-0242 - ADVISED MEDICAL REVIEW COMPLETED, PER MDS REVIEW, MEDICAL SUPPORTS THE ONE MONTH OF PART TIME THROUGH 2/8/09, AND STD APPROVAL IS EXTENDED THROUGH 2/8/09 FOR PART TIME, STD WILL CLOSE AS OF 2/9/09 FOR FULL TIME RTW. PROVIDED CLMT WITH FAX# TO FORWARD HER PART TIME PAY STUBS AS SHE RECV'S THEM, FOR REVIEW & CALCULATION OF PARTIAL STD BENEFITS THROUGH 2/8/09. CLMT ASKED THAT IF FOR SOME REASON IN FUTURE SHE HAS TO GO OOW AGAIN, WHAT IS THE SUCCESSIVE PERIOD FOR STD, ADVISED CLMT THAT STD SUCCESSIVE PERIOD IS 90 CONSECUTIVE CALENDAR DAYS, AND SHE WOULD NEED TO SUBMIT MEDICAL AND REPORT INFO RELATED TO BEING OOW AGAIN, FOR A CLAIM REVIEW TO DETERMINE IF A SUCCESSIVE OR NEWCLAIM. ADVISED CLMT THAT THIS STD CLAIM IS APPROVED THROUGH 2/8/09 FOR PART TIME, & CLOSED AS OF 2/9/09 FOR RTW FULL TIME & THE LTD WILL BE DENIED FOR EP NOT MET, ALSO SHE DOES NOT NEED TO COMPLETE THE LTD FORMS. CLMT STATED IN AGREEMENT AND THANKED FOR THE CALL.

**01/29/2009 10:43 AM - MDS Note**
Claim/Leave: REDACTED
Episode # : 1
Nurse Name: DAHLMEYER, MAUREEN
Service # : 15087714
Service Date: 01/29/2009
Activity: INPERSON CONTCT, CLAIMS
Contact Information: CLAIMS, MONIQUE, FURGALACK
Note Type: ACTION PLAN DESCRIPTION
Text: DCM INDICATED UNDERSTANDING. ALSO AGREED THAT, IF RECOVERY IS LENGTHIER, DCM WILL F/U FOR ADDL RECORDS AND, GIVEN COMPLEX HX AND NUMBER OF PROVIDERS INVOLVED IN TX , CONSIDER REFERRAL TO INT MED / OCC MED CP FOR OPINION RE: PRIMARY DISABLING CONDITION, LEVEL OF IMPAIRMENTS AND PROGNOSIS. NO FURTHER MDS ACTIVITY REQUIRED. CASE REMOVED FROM ASSIGNMENT.

**01/29/2009 10:43 AM - MDS Note**
Claim/Leave: REDACTED
Episode # : 1
Nurse Name: DAHLMEYER, MAUREEN
Service # : 15087714
Service Date: 01/29/2009
Activity: INPERSON CONTCT, CLAIMS
Contact Information: CLAIMS, MONIQUE, FURGALACK
Note Type: INFORMATION OBTAINED DESC
Text: MET WITH DCM TO DISCUSS OUTCOME OF REVIEW.

**01/29/2009 10:33 AM - CLAIM Note 58**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject :
Text: STD APPROVED THROUGH 2/8/09 FOR PART TIME CAPACITY CLOSED 2/9/09 FULL TIME RTW

**01/29/2009 10:33 AM - CLAIM Note 57**
Claim/Event/Leave: REDACTED
NoteSubject : Extended Benefits
Other Subject : PARTIAL STD TO 2/8
Text: [01/29/2009 - FURGALACK, MONIQUE]APPROVED THROUGH 2/8/09 FOR PARTIAL STD - PER MDS REVIEW, MEDICAL SUPPORTS PART TIME CAPACITY FOR THE ONE MONTH PERIOD OF 1/8/09 - 2/8/09, TO PROVIDE TIME FOR TRANSITION TO FULL TIME ACTIVITY.

**01/28/2009 3:40 PM - MDS Note**
Claim/Leave: REDACTED
Episode # : 1
Nurse Name: DAHLMEYER, MAUREEN
Service # : 15087340
Service Date: 01/28/2009
Activity: NURSE REVIEW, MEDICAL RECORDS REVIEW
Contact Information: NO CONTACT, ,
Note Type: ACTION PLAN DESCRIPTION

Liberty002305

Text: WILL DISCUSS WITH DCM.

**01/28/2009 3:40 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 1
Nurse Name: DAHLMEYER, MAUREEN
Service #: 15087340
Service Date: 01/28/2009
Activity: NURSE REVIEW, MEDICAL RECORDS REVIEW
Contact Information: NO CONTACT, ,
Note Type: ASSESSMENT DESCRIPTION
Text: CONT....COMORBIDS: SEE ABOVE. MEDS: NEURONTIN, PAMELOR, FROVA, VICODIN, ZOFRAN, NAPRALEN, SINGULAIR, AMITIZA, ASACOL, PREVACID, CITRUCEL AND TAPERING PREDNISONE { 12/08 }. STUDIES: BRAIN CT { 08/08 }: RIGHT TEMPORAL LOBE CHANGES; BRAIN MRI { 09/08 }: NON-SPECIFIC RIGHT TEMPORAL LOBE CHANGES; EEG { 09/08 }: NO DEFINITIVE FINDINGS; C-SPINE MRI { 10/08 }: NORMAL; BRAIN MRI { 10/08 }: NO CHANGES FROM PRIOR STUDY; 24 HOUR EEG { 10/08 }: NO ABNORMALITIES. R&LS/ ERTW : SEE ABOVE. ASSESSMENT: MED INFO SUPPORTS R&LS, RELATED TO EE'S NEURO STATUS, FOR REDUCED SCHEDULE PROGRESSING TO FULL TIME WITHIN ONE MONTH OF RTW. DURATION OF R&LS IS NOTED TO BE C/W THE RECOVERY PERIOD WHICH THE NEURO CP ORIGINALLY FELT IMPAIRMENTS SUPPORTED, AND GIVEN THE LENGTH OF ABSENCE ASWELL AS CLMT'S COMPLEX MEDICAL HX AND TX NEEDS, USE OF A PROGRESSIVE WORK SCHEDULE SEEMS A REASONABLE WAY TO PROVIDE A TYPE OF WORK CONDITIONING THAT SHOULD FACILITATE HER SUCCESSFUL TRANSITION TO A FULL RANGE OF ACTIVITIES.

**01/28/2009 3:39 PM - MDS Note**
Claim/Leave: REDACTED
Episode #: 1
Nurse Name: DAHLMEYER, MAUREEN
Service #: 15087340
Service Date: 01/28/2009
Activity: NURSE REVIEW, MEDICAL RECORDS REVIEW
Contact Information: NO CONTACT, ,
Note Type: INFORMATION OBTAINED DESC
Text: 31 YOF, ADMIN ASST, DOD 09-27-08 W/ MIGRAINE HEADACHES. RECORDS ARE ON FILE FROM MULTIPLE PROVIDERS INCLUDING PCP, DR. SCHIFF{ 10-18-08 }; NEUROLOGISTS: DR. GORDON{ DOD TO 11-13-08 }; DR. SILVERS { 11-14-08 TO 01-13-09 }; DR. ZAGAR { CONSULT 01-12-09 }; NEURO-ONCOLOGIST DR. BAEHRING { CONSULT 11-25-08 RE: MRI }; GI SPEC, DR. O'BRIEN { 04-08-08 TO 12-16-08 }; RHEUMATOLOGIST, DR. KAGE { 01-07-09 } AND NEUROLOGY CP, DR. POTTS { 12-18-08 AND 12-23-08 }. BASED ON HIS REVIEW OF EXAM AND DX FINDINGS ON FILE IN 12/08, DR. POTTS FELT IMPAIRMENTS AND MED MGMT TX NEEDS ASSOC WITH EE'S MIGRAINES SUPPORTED R&LS THRU 01/09. S/P CP CONTACTS WITH DR. SILVERS AND DR. GORDON, CP INDICATED THAT EE HAD ACTUALLY BEEN CLEARED TO RTW 01-07-09. CP ASSESSMENT DETAILS ARE OUTLINEDIN HIS 12-18-08 REPORT WHICH HAS BEEN RETAINED IN THE FILE. DR. SILVERS LATER SENT A F/U NOTE INDICATING RTW WOULD BE PART-TIME, WITH PROGRESSION TO FULL TIME OVER ONE MONTH. FILE HAS NOW BEEN REFERRED FOR NCM REVIEW. QUESTION: DOES MED INFO SUPPORT PART-TIME R&LS ? REVIEWED CP REPORT AND RECORDS RECD SINCE12-23-08. DR. O'BRIEN'S TX NOTES RELATE TO INTERMITTENT F/U AND MED MGMT FOR PEPTIC ULCER DISEASE AMD MICROSCOPIC COLITIS. LABS { 09/08 AND 01/09} SHOWED ELEVATED LFT'S. ABDOMINAL US { 11/08 } WAS C/WMILD FATTY LIVER. BY LOV 12-16-08, CLMT REPORTED CRAMPING AND BLOATING HAD IMPROVED WITH USE OF AMITIZA. AP NOTED 10 # WEIGHT GAIN BUT NO SIGNIFICANT EXAM ABNORMALITIES. CLMT WAS TO SEE DR. KAGE FOR W/U RE: ELEVATED ANA TITER { POSSIBLE INDICATOR OF AUTOIMMUNE DISEASE } AND, IF THAT WAS NEGATIVE, DR. O'BRIEN PLANNED TO OBTAIN A LIVER BX TO ASSESS FOR AUTOIMMUNE HEPATITIS. COPIOUS LAB TESTS { 01-07-09 } WHICH WERE ORDERED BY DR. KAGE ARE ON FILE BUT NO RHEUM CONSULT REPORT HAS BEEN RECD. EE ALSO CONSULTED W/ DR. ZAGAR 01-12-09 RE: MIGRAINES WHICH HAD IMPROVED W/ NEURONTIN BUT WHICH STILL OCCURRED 1-2 X / WEEK, LASTED APPROX 4 HR AND WERE ACCOMPANIED BY VISUAL AURA, NAUSEA AND OCC VOMITING. DR. ZAGAR'S REPORT IS INCOMPLETE. CONT BELOW...

**01/23/2009 8:32 AM - PHONE Note 34**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR OBERSTEIN
Text: [01/23/2009 - FURGALACK, MONIQUE]REC'D VM MESSG FROM WEDNESDAY AT DR OBERSTEIN'S OFFICE, SHE STATED SHE WAS CALLING ABOUT MED REQUEST WE SENT, PH# 860-547-1278, EXT. 250...RETURNED HER CALL, REACHED RECEIPTIONIST WHO STATED WILL PROVIDE MESG TO THE OFFICE TO CALL ME BACK. LEFT NAME/PH# & EXT.

**01/22/2009 12:45 PM - CLAIM Note 56**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX CONFIRMATION
Text: [01/22/2009 - FURGALACK, MONIQUE]YOUR FAX HAS BEEN SUCCESSFULLY SENT TO DR. OBERSTEIN AT 18605471301.
RE: CLAIM: REDACTED. SPEARS - FAX: (860) 547-1301 ------------------------------------------------------
------- FROM: /O=LIBERTYMUTUAL/OU=HOMEOFFICE/CN=RECIPIENTS/CN=N0045345 ---------------------------------------------------------
TIME: 1/22/2009 12:40:27 PM SENT TO 18605471301 WITH REMOTE ID 860 5471301 RESULT: (0/339)(0/0) SUCCESSFUL SEND
PAGE RECORD: 1 - 3 ELAPSED TIME: 00:40 ONCHANNEL 13

**01/22/2009 12:41 PM - CLAIM Note 55**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FAX TO DR OBERSTEIN
Text: [01/22/2009 - FURGALACK, MONIQUE]CALLED DR OBERSTEIN'S OFFICE (ENDOCRINOLOGY) PH# 860-547-1278, AND OBTAINED FAX # 860-547-1301. FAXED REQUEST TO DR OBERSTEIN TODAY FOR RECORDS FROM INITIAL OV 1/21/09 TO PRESENT

~~PRESENT~~

**01/22/2009 12:31 PM - CLAIM Note 54**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : REQUEST TO ER
Text: [01/22/2009 - FURGALACK, MONIQUE]SENT 2ND REQUEST TO ER/CARLOS DEL PORTAL, FOR CONFIRMATION OF LTD COVERAGE IN EFFECT AT DOD, IN ORDER TO CONVERT TO LTD

**01/22/2009 12:30 PM - CLAIM Note 53**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Managed Care
Other Subject : MDS FILE REVIEW
Text: [01/22/2009 - FURGALACK, MONIQUE]REFERRAL FOR MDS FILE REVIEW - DOES MEDICAL INFORMATION SUPPORT R&LS/IMPAIRMENT BEYOND 1/7/09 FOR PART TIME CAPACITY? AP INDICATES PART TIME APPROX ONE MONTH. PROVIDER CONTACT IF INDICATED.

**01/22/2009 12:05 PM - PHONE Note 33**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject :
Text: [01/22/2009 - FURGALACK, MONIQUE]REC'D RETURN CALL FROM CLMT - ADVISED HER OF MEDICAL REC'D ON RECENT N&P THAT WAS SENT BY STD DCM AND FILE WILL BE REFERRED FOR MEDICAL REVIEW FOR REVIEW OF STD BEYOND 1/7/08, ADVISED CLMT INITIALLY WE WERE INFORMEDSHE COULD RTW FULL TIME ON 1/8/09 AND THEN NOTE CAME FROM DR SILVER INDICATING PART TIME AND WORK UP TO FULL TIME APPROX A MONTH - CLMT STATED THAT MEANS APPROX 2/8/09 BUT SHE WAS NOT SURE WHEN WOULD BE RTW FULL TIME - ASKED CLMT WHAT CHANGED FROM BEING ABLE TO RTW FULL TIME TO THE PART TIME STATUS, AS ER INDICATED SHE HAD DRS APPTS SO WOULD BE PART TIME - ADVISED CLMT THAT HAVING DR APPTS IS NOT A SOLE REASON FOR DISABILITY - CLMT STATED IT WAS DUE TO HER SYMPTOMS AND MEDICAL CONDITION THAT SHE WAS ADVISED TO BE PART TIME FOR NOW. SHE STATED THAT DR SILVERS IS THE DR PROVIDING RESTRICTIONS REGARDING DISABILITY STATUS, AND DID NOT KNOW WHY STD DCM REQUSTED MEDICAL FROM ALL HER OTHER DRS, BUT THEN STATED THAT SHE HAS A NEW DR, DR OBERSTEIN,PH# 860-547-1278 THAT SHE SAW FOR FOV ON 1/21/09, COULD NOT PROVIDE SPECIALTY OVER PHONE AS SHE IS AT WORK, & SHE STATED THIS DR INFO SHOULD BE PART OF THE REVIEW OF HER CLAIM. ADVISED CLMT I WILL CONTACT DR OBERSTEIN'S OFFICE FOR THEIR FAX # ANDSEND REQ FOR THE 1/21 OV NOTES TO ADD TO HER FILE WHEN REC'D. CLMT ASKED HOW LONG SHE HAS ON N&P ON STD TO PROVIDE MEDICAL, ADVISED HER PER THE N&P LETTER SENT, UNTIL 3/1/09. ADVISED CLMT OF REVIEW FOR LTD ALSO.[01/22/2009 - FURGALACK, MONIQUE]ALSOADVISED CLMT THAT DR KAGE'S OFFICE HAS STATED THEY NEED AUTH FROM HER - CLMT STATED SHE WILL PROVIDE AUTH TO THEM. SHE ALSO STATED THAT ALTHOUGH DR BAEHRING RESPONDED THAT THEY HAVE NOT SEEN HER SINCE 1/1/09 AND ARE NOT TX HER FOR A DISABILITY, SHEHAS UPCOMING OV WITH THEM.

**01/22/2009 10:31 AM - PHONE Note 32**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject :
Text: [01/22/2009 - FURGALACK, MONIQUE]CALLED CLMT PH# 860-930-0887 - SHE STATED SHE WILL NEED TO CALL BACK, AND WILL PROVIDE INFO ON A NEW DR SHE NEEDS TO REPORT TO US *** WHEN CLMT RETURNS CALL, NEED TO CONFIRM ERTW FULL TIME, INFO REC'D FROM DR IS THATSHE WAS RELEASED TO RTW PART TIME ON 1/8/09 WHICH ER CONFIRMED SHE DID, AND ERTW FULL TIME IN A MONTH FROM THAT DATE..NEED TO CONFIRM DATE OF FULL TIME RTW. ALSO REMIND FOR MED INFO STD DCM REQUESTED ON N&P FOR ONGOING REVIEW OF HER STD CLAIM.***

**01/22/2009 9:59 AM - CLAIM Note 52**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. BAEHRING
Text: [01/22/2009 - HAYDEN, MARY]RECXD FAXED RETURNED REQUEST FROM DR. BAEHRING ADVISING EE NOT SEEN FROM 1/1/09 - PRESENT. NO TX PLAN AND NOT TREATING HER FOR DISABILITY ISSUES.

**01/22/2009 9:58 AM - PHONE Note 31**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject : DR. KAGE
Text: [01/22/2009 - HAYDEN, MARY]RECD CALL FROM DR. KAGE'S OFFICE. NO AUTH ON FILE TO RELEASE MED RECORDS. EE WILL NEED TO COME TO OFFICE TO SIGN AUTHORIZATION BEFORE ANY INFO IS RELEASED. DCM ADVISED THAT CLAIMANT HAS AUTH, WILL BE NOTIFIED. NO FURTHER QUESTIONS.

**01/20/2009 1:40 PM - CLAIM Note 51**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : RTW PART TIME
Text: [01/20/2009 - FURGALACK, MONIQUE]PER NOTICE REC'D FROM ER, CLMT RTW PART TIME ON 1/8/09, WITH ERTW FULL TIME IN ONE MONTH

**01/20/2009 10:30 AM - CLAIM Note 50**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. ZAGAR
Text: [01/20/2009 - HAYDEN, MARY]RECD FAXED MED RECORDS FROM DR. ZAGAR, NEUROLOGY. OV NOTE 1/12/09. EEG REPORT DATED 6/17/08, MRI REPORT DATED 10/8/08, MRI REPORT DATED 8/8/08 CT HEAD REPORT DATED 8/28/08. LAB

Liberty002307

REPORT DATED 9/17/08. MRI REPORT DATED 10/6/08. MRI REPORT DATED 9/2/08.CT HEAD REPORT DATED 8/28/08. LAB TEST RESULTS DATED 1/7/09, 9/24/08, 9/18/08,8/28/08.

**01/20/2009 10:23 AM - CLAIM Note 49**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [01/20/2009 - HAYDEN, MARY]RECD FAXED MED RECORDS FROM DR. SILVERS. OV NOTES 11/14/08, 9/8/08 INCLUDED. CT HEAD REPORT DATED 8/28/08, MRI BRAIN REPORT DATED 9/2/08, EEG STUDY 10/7/08-10/8/08, ABDOMINAL ULTRASOUND DATED 11/19/08.

**01/20/2009 10:21 AM - CLAIM Note 48**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. O'BRIEN
Text: [01/20/2009 - HAYDEN, MARY]RECD FAXED MED RECORDS FROM DR. O'BRIEN, DIGEST HEALTH SPEC. OV NOTES 4/8/08, 10/14/08, 12/16/08 INCLUDED.

**01/20/2009 8:48 AM - CLAIM Note 47**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : LTD COVERAGE
Text: [01/20/2009 - FURGALACK, MONIQUE]SENT INQUIRY TO ER - CARLOS DEL PORTAL, TO CONFIRM WHAT LTD COVERAGE CLMT HAD IN EFFECT AS OF HER DOD IN 2008. ELECTRONIC ELIGIBLITY FEED SHOWS LTD CLASS 3 66 2/3% AS OF 1/1/09, BUT NEED CONFIRMATION OF WHAT COVERAGE WAS IN EFFECT ON DOD IN ORDER TO CONVERT TO LTD.

**01/19/2009 10:35 AM - CLAIM Note 46**
Claim/Event/Leave: REDACTED
NoteSubject : Escalation
Other Subject : COMPLETED
Text: [01/19/2009 - HAMLIN, LORI]FILE ESCALATED TO LTD CASE MANAGER.

**01/19/2009 8:13 AM - CLAIM Note 45**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : ESCALATION
Text: [01/19/2009 - HAYDEN, MARY]SENT ESCALATION LTR TO EE. STATUS EMAIL TO ER.

**01/19/2009 8:05 AM - CLAIM Note 44**
Claim/Event/Leave: REDACTED
NoteSubject : Escalation
Other Subject : TO SEVERE
Text: [01/19/2009 - HAYDEN, MARY]STD MAX BEN DATE 3/27/09. APPROVED THRU 1/6/09. 31 YOF. JOB: ADMINSTRATIVE SUPPORT. PROVIDE SECRETARIAL AND ADMINISTRATIVE SUPPORT TO P&W/MILITARY ENGINES DIRECTOR, DOMESTIC BUSINESS DEVELOPMENT AND THE MANAGER, AFTERMARKETBUSINESS DEVELOPMENT. REQUIRES DECISION MAKING AND PROBLEM SOLVING WITH MINIMAL DIRECTION. ABLE TO WORK UNDER PRESSURE TO MEET PROJECT DEADLINES/SCHEDULES. INDIVIDUAL SHOULD PROJECT A HIGH LEVEL OF CONFIDENCE AND JUDGMENT IN A HIGHLY VISIBLE ADMINISTRATIVE POSITION. ABILITY TO BE FLEXIBLE & ABLE TO WORK IN A TEAM ENVIRONMENT AND INTERACT WITH ALL LEVELS OF ORGANIZATION. OVERTIME MAY BE REQUIRED - ON AN AS NEEDED BASIS. SIT 40%, LIFT 1%, WALK 5%, STAND 4%, TYPE 50%. SEDENTARY JOB DESC. EE RTW PART-TIME EFFECTIVE 1/8/09. ONGOING MEDICAL REQUESTED FOR POSS EXTENSION. MEDICAL HX: MIGRAINES, DAILY TENSION HEADACHES. MOST RECENT MDS RECOMMENDATIONS: CP REVIEW COMPLETED 12/23/08 - ADVISED ERTW DATE OF 1/7/09 APPEARS REASONABLE. FULL REPORT IN FILE. CURRENT R&LS: PER AP, DUE TO PATIENT'S MEDICAL CONDITION, RECOMMENDATION THAT EE RETURN TO WORK ON PART-TIME BASIS, AND WORK HER WAY UP TO FULL-TIME STATUS WITHIN NEXT MONTH. OUTSTANDING MED INFO: FAXED MED REQUEST TO DR. O'BRIEN, DR. DONALDSON,DR. KAGE, DR. BAEHRING, DR. ZAGAR, ANDR. SILVERS (OV NOTES & TEST RESULTS 1/1/09 - PRESENT, TX PLAN, ERTW DATE). N&P DUE 3/1/09. QUESTIONABLE ACTIVITY OR CIRCUMSTANCES: EE IS TREATING W/ SEVERAL DIFFERENT DOCTORS, CONTINUES TO BE REFERRED TO OTHERDOCTORS. MEDICAL INFORMATION FROM ALL CURRENT PHYSICIANS HAS BEEN REQUESTED. EE INDICATES THAT SHE IS UNABLE TO RETURN TO WORK FULL TIME DUE TO ONGOING DOCTOR APPOINTMENTS AND HER CURRENT HEALTH CONDITION. ACTION PLAN: REVIEW MED RECORDS ONCE RECD FOR ONGOING DETERMINATION. MISC NOTES: EE REQUESTED TO BE REACHED AT CELL PHONE # 860-930-0887.

**01/16/2009 3:40 PM - CLAIM Note 43**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : N&P DUE 3/1/09
Text: [01/16/2009 - HAYDEN, MARY]ADD'L MED INFO NEEDED TO EXTEND. FAXED MED REQUEST TO DR. O'BRIEN, DR. DONALDSON, DR. KAGE, DR. BAEHRING, DR. ZAGAR, ANDR. SILVERS (OV NOTES & TEST RESULTS 1/1/09 - PRESENT, TX PLAN, ERTW DATE). N&P DUE 3/1/09. LTR TO EE. EMAIL TO ER CONTACT.

**01/16/2009 3:38 PM - PHONE Note 30**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : UPDATE
Text: [01/16/2009 - HAYDEN, MARY]CALLED EE T# 860-930-0887 REGARDING STATUS. EE ADVISED THAT SHE RTW 1/8/08 PART-TIME. DR. SILVERS ADVISED HER TO WORK PART TIME DUE TO ONGOING APPOINTMENTS AND HEALTH. EE STATED THAT SHE IS NOT ABLE TO FUNCTION. DCM ASKED HOW MANY HOURS SHE HAS BEEN WORKING. EE REPLIED THAT SHE

WAS NOT PREPARED TO ANSWER QUESTIONS, BUT DIDN'T WORK MONDAY OR TUESDAY, THINKS SHE WORKED 5-6 HOURS NO WED - THURS. EE STATED THAT SHE HASN'T SEEN DR.SILVERS RECENTLY, BUT SPOKE WITH HIM ON THEPHONE. DR. SILVERS IS THE ONLY DOCTOR INVOLVED IN HER BEING OUT OF WORK AT THIS TIME, BUT SHE IS TREATING W/ SEVERAL OTHER DOCTORS. DCM CONFIRMED CURRENT TREATING PROVIDERS: DR. O'BRIEN, DR. DONALDSON, DR. KAGE, DR. BAEHRING, DR. SILVERS, AND DR. ZAGAR. DCM TO N&P ALL DOCTORS FOR FURTHER INFORMATION. NO FURTHER QUESTIONS.

**01/16/2009 9:50 AM - PHONE Note 29**
Claim/Event/Leave: REDACTED
NoteSubject : Called ER
Other Subject : RTW CLARIFICATION
Text: [01/16/2009 - HAYDEN, MARY]CALLED ER CONTACT CARLOS DELPORTAL, T# (860)565-4118 REGARDING RTW PT. LEFT VMX FOR RETURN CALL.[01/16/2009 - HAYDEN, MARY]RECD RETURN CALL FROM ER CONTACT CARLOS DELPORTAL. EE ADVISED CARLOS THAT SHE WOULD HAVE TO GO TO SEVERAL DOCTORS APPOINTMENTS IN THE UPCOMING WEEKS. EE WAS CONCERNED THAT SHE WOULDN'T GET PAID FOR TIME MISSED WHEN SHE COULD BE ON DISABILITY. CARLOS ADVISED THAT SHE WOULD NEED SUPPORTING DOCTOR INFORMATION. DCM ADVISED OF RELEASE FOR PT RTW RECD, CARLOS ADVISED THAT EE STATED SHE MIGHT BE RETURNING TO WORK FT B/C SHE COULDN'T GET RELEASE FROM DOCTOR. UNDERSTANDING IS THAT EE WILL WORK 4-8 HOURS PER DAY DEPENDING ON DOCTORS APPOINTMENT AND TREATMENTS. EE ADVISED CARLOS THAT 'TREATMENTS' COULD LAST ALL DAY. DCM ADVISED THAT SHE WOULD CONTACT EE TO DISCUSS, REQUEST UPDATED MEDICAL RECORDS. ER AGREED. NO FURTHER QUESTIONS.

**01/14/2009 12:44 PM - CLAIM Note 42**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [01/14/2009 - HAYDEN, MARY]RECD FAXED NOTE DATED 1/13/09 FROM DR. SILVERS. DUE TO PATIENT'S MEDICAL CONDITION, RECOMMENDATION THAT EE RETURN TO WORK ON PART-TIME BASIS, AND WORK HER WAY UP TO FULL-TIME STATUS WITHIN NEXT MONTH.

**01/14/2009 10:13 AM - CLAIM Note 41**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : 90 DAY REVIEW
Text: [01/14/2009 - BUDER, CHARLES]CLAIM REVIEWED BY SR DCM, PLAN AND DURATION APPROPRIATE. DX: MIGRAINE HEADACHES. MED INFO IN FILE SUPPORTS RESTRICTIONS THRU PARTIAL RTW DATE. CLAIM REVIEWED BY MDS. CM TO F/U AND CONFIRM EE WAS RELEASED FT BY AP AND CLOSE CLAIM, IF EE RTW PARTIALLY AND IS CLAIMING DISABILITY, CM TO REQ UPDATED MED INFO, SEND FOR LONG AUTH, AND FIND NEW ERTW FT. NO PAYMENT ERRORS. JOB DESC IN FILE. TASK TO ESCALATE IN S1.

**01/13/2009 8:57 AM - CLAIM Note 40**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : EMAIL TO ER
Text: [01/13/2009 - HAYDEN, MARY]EMAILED ER CONTACT CARLOS DELPORTAL TO CLARIFY IF EE WAS RELEASED PT OR FT. EE INDICATED ON 1/7/09 THAT AP RELEASED HER FT, BUT HR WANTED HER TO RTW PT DUE TO ONGOING AP APPTS. [01/14/2009 - HAYDEN, MARY]RECD REPLY FROM ER CONTACT. ADVISED INFORMATION IS CORRECT.

**01/13/2009 8:44 AM - CLAIM Note 39**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : RTW PT
Text: [01/13/2009 - HAYDEN, MARY]RECD REPLY FROM ER CONTACT CARLOS DELPORTAL. EE RTW PART-TIME ON 1/8/09. WILL BE ON PARTIAL DAYS FOR A COUPLE FO WEEKS, AS THE AP RECOMMENDS.

**01/09/2009 7:43 AM - CLAIM Note 38**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : RTW CONFIRMATION
Text: [01/09/2009 - HAYDEN, MARY]EMAILED ER CONTACT HALEY SPEARS TO CONFIRM RTW.[01/09/2009 - HAYDEN, MARY] CORRECTION: ER CONTACT CARLOS DELPORTAL

**01/07/2009 10:43 AM - PHONE Note 28**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : UPDATE
Text: [01/07/2009 - HAYDEN, MARY]CALLED EE C# 860-930-0887 FOR UPDATE. EE STATED THAT SHE PLANS TO RTW 1/8/09, BUT SPOKE W/ SUPERVISOR AND THEY SAID THEY WANT HER TO RTW PART-TIME. EE TOLD THEM SHE HAS EXTENSIVE DOCTOR APPTS TO ATTEND. DCM ASKED ABOUT RTWRELEASE FROM AP. AP RELEASED EE TO RTW FULL-TIME. EE AWAITING RETURN CALL FROM HR REGARDING STATUS. DCM ADVISED OF EXPECTED RTW FULL-TIME PER AP, WILL CONFIRM W/ HR. EE TO CONTACT ADCM W/ ANY FURTHER QUESTIONS.

**01/06/2009 4:15 PM - PHONE Note 27**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : UPDATE
Text: [01/06/2009 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 FOR UPDATE. RTW DATE? LEFT VMX FOR RETURN CALL.

Liberty002309

**01/05/2009 1:36 PM - CLAIM Note 37**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : WLFD REC'D FILE
Text: [01/05/2009 - GIAIMO, BONNIE]FILE REC'D VIA UPS FROM LM OFFICE DOVER PBMS DELIVERED FILE TO DCM

**12/31/2008 7:56 AM - CLAIM Note 36**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FILE SHIPPED
Text: [12/31/2008 - PLAISTED, SHELLEY]FILE SHIPPED TO THE WALLINGFORD OFFICE BY UPS GROUND SERVICE.

**12/29/2008 12:41 PM - CLAIM Note 35**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [12/29/2008 - HAYDEN, MARY]RECD PREVIOUSLY FAXED REST FORM DATED 11/11/08 FROM DR. SILVERS. ERTW 1/8/09. ALSO RECD RETURNED LTR FROM DR. SILVERS ADVISING ERTW 1/8/09.

**12/23/2008 11:09 AM - PHONE Note 26**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : EXTENSION
Text: [12/23/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 AND C# 860-930-0887 TO ADVISE OF EXTENSION. LEFT VMX FOR RETURN CALL.[12/23/2008 - HAYDEN, MARY]RECD RETURN CALL FROM EE. DCM ADVISED OF EXTENSION THRU 1/6/09. ERTW 1/7/09, BUT EE HAS SEVERAL DOCTORS APPTS. EE HOPES TO BE ABLE TO RTW THEN. DCM ADVISED THAT IF NO RTW, UPDATED MED INFO FROM ALL TREATING PROVIDERS WILL BE NECESSARY FOR FURTHER REVIEW. ADCM REVIEWED ALL PROVIDERS W/ EE: OV W/ RHEUMATOLOGIST DR. BARBARA CAGE ON 1/6/09; OV W/ NEUROLOGIST DR. DONALDSON AT UCONN ON 1/20/09; OV W/ NEUROLOGIST DR. BAEHRING AND MRI ON 12/27/08; ALSO TREATING W/ GI PHYSICIAN DR. O'BRIEN IN MANCHESTER, CT. NOV UNKNOWN. NOV W/ DR. SILVERS IS 1/21/09. EE BEGAN PHYSICAL THERAPY EFFECTIVE 12/22/08 AT PHYSICAL THERAPY OF ROCKY HILL, T# 860-513-1431. DCM ADVISED OF PAYMENT INFO AND PROCESS. NO FURTHER QUESTIONS.

**12/23/2008 11:04 AM - CLAIM Note 34**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject : EXTENDED BENEFITS
Text: EXTENDED BENE THRU 1/6/09. ADD'L MED INFO NEEDED TO EXTEND.

**12/23/2008 11:03 AM - CLAIM Note 33**
Claim/Event/Leave: REDACTED
NoteSubject : Extended Benefits
Other Subject : THRU 1/6/09
Text: [12/23/2008 - HAYDEN, MARY]EXTENDED APPROVAL THRU 1/6/09 (ERTW 1/7/09, R&LS SUPPORTED, CP REVIEW). DX: DAILY TENSION TYPE HEADACHE, CALLIC MIGRAINE HEADACHE, NONSPECIFIC MRI ABNORMAILITY, NONSPECIFIC EEG ABNORMAILITY. R&LS: EE OOW UNTIL 1/7/09. JOB:ADMIN ASSISTANT (SEDENTARY). ACTION PLAN: CALL EE FOR UPDATE.

**12/23/2008 11:02 AM - CLAIM Note 32**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : CP REVIEW COMPLETE
Text: [12/23/2008 - HAYDEN, MARY]RECD COMPLETED CP REVIEW. SUMMARY: A RETURN TO WORK DATE OF 1/7/09 APPEARS REASONABLE.

**12/17/2008 2:36 PM - CLAIM Note 31**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : FILE RECEIVED
Text: [12/17/2008 - PLAISTED, SHELLEY]FILE RECEIVED IN THE DOVER OFFICE AND PLACED IN THE CP CABINET FOR DR. POTTS

**12/15/2008 8:53 AM - CLAIM Note 30**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. BAEHRING
Text: [12/15/2008 - HAYDEN, MARY]RECD FAXED REST FORM DATED 12/11/08 FROM DR. BAERING. LOV 11/25/08. NOV 1/27/08. DX: 794.09. ABNORMAL BRAIN SCAN. R&LS NOT ASSESSED. ONLY SEEING PT FOR MRI SCAN ABNORMALITY. R&LS: N/A.

**12/12/2008 3:53 PM - CLAIM Note 29**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : SCORE REFERRAL
Text: 12/11/2008 - REFERRED TO CONSULTING PHYSICIAN FOR COMPLETE REVIEW.

**12/11/2008 1:01 PM - CLAIM Note 28**
Claim/Event/Leave: REDACTED

Liberty002310

NoteSubject : Ref to Managed Care
Other Subject : FULL FILE REVIEW
Text: [12/11/2008 - HAYDEN, MARY]REFERRED TO DOVER OFFICE FOR FULL FILE REVIEW.

**12/11/2008 1:00 PM - CLAIM Note 27**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to AP
Other Subject : DR. BAEHRING
Text: [12/11/2008 - HAYDEN, MARY]FAXED MED REQUEST TO DR. BAEHRING (OV NOTES & TEST RESULTS 11/1/08 -
PRESENT, REST FORM).

**12/11/2008 12:45 PM - PHONE Note 25**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : ADD'L PROVIDERS?
Text: [12/11/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 FOR UPDATE AND TO CONFIRM IF EE TREATING W/ ANY
OTHER PROVIDERS. EE STATED THAT SHE DID SEE DR. BAEHRING, OV DATE UNKNOWN. AP FOUND CYST ON BRAIN FROM
MRI FINDINGS. EE STATED THAT DR. GORDON ANDDR. SILVERS REVIEWED SAME RESULTS, BUT DID NOT FIND CYST. EE
REFERRED TO HEADACHE CLINIC. CONTACT INFO AND APPT INFO UNKNOWN. NOV W/ DR. BAEHRING IS JANUARY 2009. EE
ALSO HAS NODULES ON HER THYROID. REFERRED BY GI DR. JAMES O'BRIEN TO ENDOCRINOLOGYAND RHEUMATOLOGY.
EE NEEDS AN ULTRASOUND OF THYROID AND POSSIBLE BIOPSY OF LIVER. APPTS ARE IN JANUARY. DCM ASKED WHEN
LOV W/ DR. O'BRIEN WAS. EE STATED THAT SHE DOESN'T RECALL, S/W HIM OVER THE PHONE, ORDERED ULTRASOUND.
DCM ADVISED THAT CLAIM WILLBE REFERRED FOR CP REVIEW. NO FURTHER QUESTIONS.

**12/10/2008 9:29 AM - CLAIM Note 26**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [12/10/2008 - HAYDEN, MARY]RECD FAXED NOTE DATED 11/14/08 FROM DR. SILVERS. PROBLEM LIST: MIGRAINE W/
AURA, H/O 'BLACKOUTS', ASTHMA, COLITIS, PEPTIC ULCER DISEASE. HX: F/U: NOW ON NEURONTIN RECENTLY INCREASED
AND NOW ON 1200 MG TWICE DAILY. IN EARLYOCTOBER WENT ON PAMELOR 25 MG AT BEDTIME. HEADACHES HAVE
IMPROVED PARTIALLY. DESCRIBES HAVING SIGNIFICANT H/A ABOUT 4 TIMES PER WEEK. NAUSEOUSNESS BUT NO
VOMITING. SHE DOES GET SMELL BUT NO LIGHT OR SOUND SENSITIVITY. HEADACHE CAN LAST ANYWHERE FROM4-8 HRS
OR MORE. ALSO USES HYDROCODONE. ALSO GETS MINI BLACKOUT SPELLS. AGANI NOTES A SENSE OF SOMETIMES NOT
SEEMINGLY THERE OR STUTTERING. HAD A 24 HR EEG THAT WAS NEGATIVE. MRI SHOWED SOME THYROID NODULES
WHICH MAY NEED TO BE FOLLOWED UP ON. ALSOSUFFERS FROM INSOMNIA. NOW ALSO FINISHING A PREDNISONE TAPER
WHICH SHE FEELS IS HELPING A BIT. OTHER COMPLAINTS INCLUDE A SENSE OF BLOCKAGE IN EARS, PERSISTENT
ELEVATIONS OF LIVER FUNCTION TESTS, SOME TRANSIENT RT-SIDED FLANK PAIN. SHE CORRECTS ME AND TELLS ME
THAT SHE IS NO LONGER IRRITABLE AS WAS WRITTEN IN MY FIRST NOTE. MEDS: NEURONTIN 1200, PAMELOR 25,
SINGULAIR, PREVACID, ASACOL, CINTRACAL, NAPRELAN, FROVA, ZOFRAN, VICODIN. B-COMPLEX. IMPRESSION: TOLD HER
SHE CAN F/U EITHER W/ MYSELF OR DR. GORDON. FOR NOW WILL CONTINUE ON NEURONTIN 1200 MG, INCREASE AFTER
A COUPLE OF WEEKS IF HEADACHES ARE NOT IMPROVING. ALSO ADD ON RIBOFLAVIN AND MAGNESIUM FOR
PHOPHYLAXIS. SHOULD CHECK W/ GASTRONEUROLOGIST ABOUT LIVER FUNCTION AND OTHER GI SYMPTOMS,THOUGH
MAY BE MEDICATION RELATED. CAN MAKE A 3 MONTH F/U IF SHE WISHES. PREVIOUSLY RECD REST FORM DATED 11/11/08
ALSO FAXED.

**12/09/2008 4:06 PM - PHONE Note 24**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [12/09/2008 - DELPO, GAYLE]TCF EE FOR STATUS. S/W ADCM. CONFD THAT ADCM DID RECV MIN INFO FROM AP.
ADVISED THAT ADCM WILL DOC THE INFO AND WILL ALSO HAVE THE INFO REVD BY A CP. ADVISED EE OF GEN CP REVIEW
PROCESS. CONFD THAT ADCM WILL PROVIDE UPDATE, EITHER EXTENSION OR DENIAL. EE MAY CALL BACK TO FIND OUT
DATE OF CP REVIEW OR DUE DATE FOR CP REVIEW.

**11/24/2008 3:11 PM - PHONE Note 23**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [11/24/2008 - HAYDEN, MARY]RECD CALL FROM EE REGARDING STATUS OF NOTES FROM DR. SILVERS. DCM ADVISED
NO ADD'L INFO RECD FROM DR. SILVERS. ADCM READ THROUGH INFORMATION RECD FROM DR. SILVERS TO EE. EE
ASKED IF ADCM CONTACTED AP OFFICE TO OBTAIN MED INFO VIA TELEPHONE. DCM REITERATED THAT INFO MUST BE IN
WRITING, LM NEEDS OV NOTES FOR FURTHER DETERMINATION. EE WANTED TO CONFIRM THAT CELL NUMBER WAS
LISTED IN FILE. DCM CONFIRMED. EE TO CONTACT DR. SILVERS OFFICE. NO FURTHER QUESTIONS.

**11/20/2008 4:29 PM - PHONE Note 22**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : WITH CONCERNS
Text: [11/20/2008 - RUPE, BRIAN]MGR RECEIEVED CALL FROM EE WITH CONCERNS ABOUT THE STATUS OF HER CLAIM. EE
STATED THAT DR. SILVER'S NOTES WILL NOT BE DICTATED FOR TWO WEEKS AND WOULD LIKE US TO CALL THE AP'S
OFFICE TO DISCUSS THE CLAIM. MGR STATED THAT THE OFFICE VISIT NOTES FROM DR. SILVERS WOULD BE NECESSARY
IN ORDER TO DETERMINE ONGOING DISABILITY. MGR EXPLAINED DISABILITY PROCESS IN DETAIL. EE UNDESTOOD. EE
HAD QUESTIONS ABOUT HER JOB SECURITY. MGR DIRECTED HER TO HER HR. EE STATED THAT SHEIS ALSO GOING TO PT
FOR HER NECK PAIN. MGR ASKED ABOUT THE ETIOLOGY OF HER NECK PAIN OR IF SHE HAS EVER SEEN AN ORTHO. EE
STATED THAT SHE HASN'T AND IT WAS PRESCRIBED B/C DR. SILVERS FELT IT MAY HELP. EE ASKED THAT WE USE HER C#
860.930.9897 AS HER PRIMARY#. MGR AGREED AND EE HAD NO FURTHER QUESTIONS.

Liberty002311

860-930-0887 AS HER PRIMARY#. MGR AGREED AND EE HAD NO FURTHER QUESTIONS.

**11/20/2008 11:57 AM - PHONE Note 21**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : STATUS
Text: [11/20/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 TO ADVISE ADD'L INFO FROM DR. SILVERS NEEDED FOR
FURTHER DETERMINATION. LEFT VMX FOR RETURN CALL.

**11/18/2008 9:54 AM - PHONE Note 20**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : DR. SILVERS
Text: [11/18/2008 - HAYDEN, MARY]CALLED DR. SILVERS' OFFICE, T# 860-522-4429. S/W EMILY WHO ADVISED THAT OV
NOTES ARE SENT OUT FOR TRANSCRIPTION, TAKES 2 WEEKS FOR THEM TO COME BACK. DCM ASKED IF HANDWRITTEN
NOTES COULD BE FAXED TO ADCM. EMILY TO CHECK W/AP AND WILL FAX IF POSSIBLE. NO FURTHER QUESTIONS.

**11/18/2008 9:49 AM - CLAIM Note 25**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. GORDON
Text: [11/18/2008 - HAYDEN, MARY]RECD FAXED MED RECORDS FROM DR. GORDON. OV NOTE 11/3/08: 30 YOF LAST SEEN
ON 10/1/08. AT THAT TIME, HAD DAILY TENSION TYPE HEADACHE, CLASSIC MIGRANE, NONSPECIFIC MRI ABNORMALITY
AND NONSPECIFIC EEG ABNORMALITY. WAS TO REMAIN ON NEURONTIN 600 MG. SENT FOR 24 HR EEG RECORDING AND
F/U MRI. TODAY PT REPORTS SHE CONTINUES TO HAVE DAILY HEADACHE. THERE IS DISTORTION OF VISION, DIZZINESS.
TYPICALLY MEDICATE W/ FROVA THEN HYDROCODONE. REPORTS THAT SHE ZONES OUT, AWAKE BUT NOTRESPONSIVE.
REPORTS INSOMNIA, INCREASE IN STUTTERING. F/U MRI OF 10/6/08 REVEALS NO CHANGE IN RT TEMPORAL LOBE LESION.
HAS A NONSPECIFIC WHITE MATTER LESION IN RT TEMPORAL LOBE WHICH DOES NOT ENHANCE W/ CONTRAST.
UNCHANGED SINCE PREVIOUS EXAM. 24 HREEG IS NORMAL. ABNORMALITY ON PREVIOUS EEG WAS DEEMED NOT
SIGNIFICANT. LIVER ENZYMES SLIGHTLY ELEVATED. PLAN: WILL CONTINUE W/ NEURONTIN 600 MG. ADDED PAMELOR.
GIVEN SAMPLES OF TREXMEIT. F/U 2 WEEKS. TEST RESULTS INCLUDED.

**11/18/2008 9:43 AM - CLAIM Note 24**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [11/18/2008 - HAYDEN, MARY]RECD FAXED NOTE FROM DR. SILVERS ADVISING EE WAS SEEN ON 11/14/08. NO
MEDICAL INFORMATION RECD.

**11/17/2008 3:18 PM - PHONE Note 19**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [11/17/2008 - HAYDEN, MARY]RECD CALL FROM EE REGARDING STATUS OF MED RECORDS FROM DR. SILVERS. DCM
CHECKED MAIL, ADVISED NO INFO FROM DR. SILVERS RECD. EE TO CONTACT AP. NO FURTHER QUESTIONS.

**11/13/2008 3:16 PM - PHONE Note 18**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [11/13/2008 - BUDER, CHARLES]EE CALLED TO ADVISE DR. GORDON'S OFFICE WILL BE SENDING IN ADDITIONAL
MEDICAL INFO. EE WAS ABLE TO GET OV WITH DR. SILVER'S 11/14/08. DCM ADVISED FOR EE TO HAVE AP FAX MED AT
THAT TIME. EE HAD NO QUESTIONS ON THE CLAIM PROCESS.[11/13/2008 - BUDER, CHARLES]DCM EMAILED DCM

**11/13/2008 2:56 PM - PHONE Note 17**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : OTHER
Text: [11/13/2008 - FERREIRA, LISA]SPOKE TO EE ADVISED EE REST FORMS RECD FROM DR. GORDON AND DR. SILVERS.
DCM SENT 2ND REQUEST TO DR. GORDON FOR OV NOTES. FORM FROM DR. SILVERS ADVISES THAT EE HAS NOT BEEN
SEEN SINCE 9/8/08 (PRIOR TO DOD) AND NOV IS NOTUNTIL 1/28/09. EE ADVISED SHE SPEAKS TO DR. SILVERS SEVERAL
TIMES PER WEEK AND HE HAS JUST ADJUSTED HER MEDS LAST WEEK. EE WILL SEE HER PCP ON 11/17/08 DR. SCHIFF PH
860-561-7171 EE WILL DR. BAEHRING ( NEURO ) PH 203-785-7284 ON 11/25/08 EE WAS SUPPOSED TO SEE DR, DONALDSON
(NEURO) ON 860-679-4888 ON TUESDAY BUT APPOINTMENT WAS CANCELLED AP WAS OUT OF TOWN, EE ADVISED SHE IS
APPLYING FOR SPECIALTY CLINIC. ERTW: UNKNOWN POSSIBLY STARTING IN DEC PART TIME EMAIL TO DCM[11/13/2008 -
HAYDEN, MARY]RECD TRANSFERRED CALL FROM DCM. ADCM EXPLAINED INFO RECD FROM DR. GORDON AND DR.
SILVERS. INFO FROM DR. SILVERS ADVISED THAT EE WASN'T SEEN SINCE 9/8/08 AND NOV ISN'T UNTIL JANUARY. EE
STATED THAT SHE TREATS W/ DR. SILVER, WHO IS A NEUROLOGIST, OVER THE PHONE. FIRST OFFICE VISIT AVAILABLE IS
JANUARY. AP CHANGES HER MEDICATIONS REGULARLY. DCM ASKED ABOUT DOCUMENTATION, SUCH AS PHONE NOTES
OR PRESCRIPTIONS. AP SHOULD HAVE RECORD OF THE PHONE CALLS. EE TO CONTACT AP TO HAVE ALL INFO FAXED TO
ADCM. DCM ADVISED THAT INFO FROM DR. GORDON ADVISED OF A DX OF POST CONCUSSION SYNDROME. EE ASKED IF
THERE WAS A HEAD INJURY. EE STATED NO HEAD INJURY, FIRST TIME THAT EE HEARD OF THIS DX. EE FRUSTRATED W/
AP, STATED THAT HE WRITES THE OPPOSITE OF WHATSHE SAYS IN HIS NOTES. EE HAS COPY OF NOTES BUT DOES NOT
WANT TO SEND THEM TO ADCM B/C SHE DOESN'T AGREE W/ WHAT AP WROTE. DCM ADVISED THAT THEY WERE
REQUESTED FROM DR. GORDON'S OFFICE AND ARE NEEDED FOR FURTHER DETERMINATION. EE DOES NOT LIKE THE
PHYSICIANS SHE HAS BEEN SEEING, TRYING TO GET INTO THE MAYO CLINIC NOW. EE ALSO ASKED ABOUT PART-TIME
RTW FROM HOME. ADCM ADVISED THAT ER WILL NOT ALLOW EE TO RTW W/ ACCOMMODATIONS. EE STATED THAT SHE

Liberty002312

WAS TOLD SHE COULD WORK PART-TIME WHEN SHE WENT OUT OF WORK BY HR. DCM ADVISED EE TO CONTACT HR REGARDING ACCOMMODATIONS. EE ASKED ABOUT ADA AND FEDERAL REGULATIONS THAT REQUIRE EMPLOYERS TO BRING THEIR EMPLOYEES BACK W/ ACCOMMODATIONS. DCM ADVISED EE TO CONTACT HR. DCM SUMMARIZED THAT ADD'L MED INFO WAS NEEDED FOR FURTHER DETERMINATION OF CLAIM. EE TO CONTACT APS. NO FURTHER QUESTIONS.

**11/13/2008 12:09 PM - CLAIM Note 23**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to AP
Other Subject : DR. GORDON
Text: [11/13/2008 - HAYDEN, MARY] FAXED 2ND REQUEST FOR OV NOTES & TEST RESULTS TO DR. GORDON.

**11/13/2008 12:08 PM - PHONE Note 16**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : UPDATE
Text: [11/13/2008 - HAYDEN, MARY] CALLED EE T# (860) 308-2050 FOR UPDATE. REST FORMS RECD FROM DR. GORDON AND DR. SILVERS. 2ND REQUEST SENT TO DR. GORDON FOR OV NOTES. FORM FROM DR. SILVERS ADVISES THAT EE HAS NOT BEEN SEEN SINCE 9/8/08 (PRIOR TO DOD) AND NOV IS NOT UNTIL 1/28/09. ANY OTHER PROVIDERS? STATUS? LEFT VMX FOR RETURN CALL.

**11/13/2008 12:03 PM - CLAIM Note 22**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. GORDON
Text: [11/13/2008 - HAYDEN, MARY] RECD FAXED REST FORM FROM DR. GORDON DATED 11/13/08. LOV 11/4/08. NOV 1/7/09. DX: POST CONCUSSION SYNDROME (310.20). MEDIUM WORK RESTRICTION. DUE TO TREMOR. RESTRICTIONS IMPOSED 8/12/08 - 1/7/09. NO ADD'L INFO RECD.

**11/13/2008 12:01 PM - CLAIM Note 21**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SILVERS
Text: [11/13/2008 - HAYDEN, MARY] RECD FAXED RESTRICTIONS FORM DATED 11/11/08 FROM DR. SILVERS, NEUROLOGY. LOV 9/8/08. NOV 1/28/09. DX: MIGRAINE (346.10), ENCEPHALOPATHY (348.30). EE RESTRICTED FROM 9/29/08 - 12/8/08. MEDS: NEURONTIN, PREDNISONE, FROVA, ZOFRAN, NAPROLEN. OFFICE NOTES N/A.

**11/12/2008 10:05 AM - CLAIM Note 20**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : INVOICE
Text: [11/12/2008 - HAYDEN, MARY] RECD INVOICE FOR MED RECORDS FROM HEALY, MACINSKI, RAO, AND WADE, 1000 ASYLUM AVE, SUITE 4304, HARTFORD, CT 06105. STATEMENT DATE: 11/5/08. ACCOUNT # 2909. AMOUNT DUE: $5.85 FOR MED RECORDS. VENDOR IN SYSTEM. DCM ADDED VENDOR PAYMENT FOR $5.85. INITIALED INVOICE AND PLACED IN FILE.

**11/10/2008 8:37 AM - CLAIM Note 19**
Claim/Event/Leave: REDACTED
NoteSubject : No Mod Duty
Other Subject : 3 POINT
Text: [11/10/2008 - HAYDEN, MARY] RECD REPLY FROM ER CONTACT CARLOS DELPORTAL. EE NOT ABLE TO RTW FROM HOME OR PART-TIME. JOB IS OFFICE-FOCUSED AND PREFER FOR HER NOT TO RESUME WORK UNTIL SHE IS WELL, FULLY CAPABLE AND FUNCTIONA,L AND CAN RETURN TO THE OFFICE AND RESUME FULL-TIME EMPLOYMENT.

**11/07/2008 3:47 PM - PHONE Note 15**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : UPDATE
Text: [11/07/2008 - HAYDEN, MARY] RECD CALL FROM EE REGARDING STATUS. DCM ADVISED OF N&P AND PROCESS. EE STATED TAHT SHE IS NOT ABLE TO RTW AT THIS TIME. DCM ADVISED THAT UPDATED MED INFO WILL BE NEEDED TO EXTEND CLAMI. NO FURTHER QUESTIONS AT THIS TIME.

**11/06/2008 4:45 PM - CLAIM Note 18**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : N&P DUE 12/20/08
Text: [11/06/2008 - BUDER, CHARLES] ADDITIONAL INFO NEEDED FOR POSSIBLE EXT. FAXED MED REQ TO DR.SILVERS AND DR. GORDON (OV NOTES 10/1/08-PRESENT, CURRENT TX PLAN, LAB AND TEST RESULTS, AND COMPLETED RESTRICTIONS FORM). LTR TO EE, EMAIL TO HR, N&P DUE 12/20/08

**11/06/2008 4:41 PM - PHONE Note 14**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [11/06/2008 - BUDER, CHARLES] EE CALLED TO CHECK STATUS OF CLAIM. EE STATED SHE IS NOT RETURNING PARTIALLY AT THIS TIME. EE HAS FOV WITH DR. DAVIDSON 12/2/08. EE STATED THAT SHE SAW DR. GORDON 11/3/08. DCM ADVISED UPDATED MED WILL BE REQUESTED AND ADVISED N&P PROCESS. EE STATED SHE IS ONLY CURRENTLY TREATING WITH DR. SILVERS AND DR. GORDON AND TO SEND MED REQS TO THEM UNTIL SPECIALIST IS INVOLVED. EE ADVISED SHE TALKS TO DR. SILVERS OVER THE PHONE FOR CONSULTATIONS. DCM ADVISED N&P PROCESS AND FOR EE

Liberty002313

ADVISED SHE TALKS TO DR. SIEVERS OVER THE PHONE FOR CONSULTATIONS. DCM ADVISED RAP PROCESS AND FOR EE TO CALL IF ANYTHING CHANGES. EE WISHED FOR CALL FROM CM WHEN SHE RETURNS TO OFFICE. EE HAD NO QUESTIONS ON THE CLAIM PROCESS. DCM EMAILED DCM

**11/06/2008 12:51 PM - CLAIM Note 17**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : 3 POINT
Text: [11/06/2008 - HAYDEN, MARY]EMAILED ER CONTACT CARLOS DELPORTAL TO CONFIRM IF EE ABLE TO RTW FROM HOME.

**11/06/2008 12:49 PM - PHONE Note 13**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : UPDATE
Text: [11/06/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 FOR UPDATE. LEFT VMX FOR RETURN CALL.

**11/05/2008 4:22 PM - PHONE Note 12**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : STATUS
Text: [11/05/2008 - SMITH, KIMBERLY]REC'D CALL FROM EE REGARDING CLAIM STATUS. EXPLAINED CLAIM CURRENTLY APPROVED THRU 11/3/08. EE STATES SHE HAS NOV WITH DR. GORDON ON 11/10/08. EE STATES SHE HAS HAD SOME CHANGES MADE TO HER MEDICATIONS. MIGRAINE MEDS HAVE BEEN INCREASED AND SHE IS NOW ON ORAL STEROIDS AND ANTI- INFLAMMATORY MEDS. EE ASKED IF WORK FROM HOME WOULD BE AN OPTION. EXPLAINED ADCM CAN CONTACT ER PERTAINING TO THAT. EE STATES SHE IS VERY ANXIOUS TO RTW BUT UNABLE TO PREDICT WHEN A MIGRAINE WILL COME ON. EE STATES 9 OUT OF PAST 10 DAYS SHE HAS SUFFERED FROM A MIGRAINE. EE ASKED FOR RETURN CALL FROM ADCM TO FURTHER DISCUSS TX PLAN AND RTW OPTIONS. NO FURTHER QUESTIONS AT THIS TIME. EMAIL TO ADCM.

**10/29/2008 3:40 PM - CLAIM Note 16**
Claim/Event/Leave: REDACTED
NoteSubject : Job Description
Other Subject : IN FILE
Text: [10/29/2008 - HAYDEN, MARY]RECD JOB DESC FROM ER CONTACT. ADMINSTRATIVE SUPPORT. PROVIDE SECRETARIAL AND ADMINISTRATIVE SUPPORT TO P&W/MILITARY ENGINES DIRECTOR, DOMESTIC BUSINESS DEVELOPMENT AND THE MANAGER, AFTERMARKET BUSINESS DEVELOPMENT. REQUIRES DECISION MAKING AND PROBLEM SOLVING WITH MINIMAL DIRECTION. ABLE TO WORK UNDER PRESSURE TO MEET PROJECT DEADLINES/SCHEDULES. INDIVIDUAL SHOULD PROJECT A HIGH LEVEL OF CONFIDENCE AND JUDGMENT IN A HIGHLY VISIBLE ADMINISTRATIVE POSITION. TYPICAL DUTIES AND RESPONSIBILITIES INCLUDE THE FOLLOWING: 1) PROVIDE ROUTINE SECRETARIAL AND CLERICAL SUPPORT; 2) PLAN AND ARRANGE DOMESTIC & INTERNATIONAL TRAVEL; 3) SCHEDULE APPOINTMENTS AND MEETINGS, RESERVE FACILITIES, OBTAIN/ASSEMBLE SUPPORTING MATERIAL; 4) MAINTAIN FILES, REVIEW MAIL, HIGHLIGHT IMPORTANT ITEMS; 5) ASSIST IN PREPARING, GATHERING AND MAINTAINING EXPENSE REPORTS, VACATION SCHEDULES, DISTRIBUTION LISTS, ETC.; 6) ASSIST WITH MAIL DISTRIBUTION, MAINTAINING COPIERS/PRINTERS AND ORDERING OFFICE SUPPLIES. HIGH SCHOOL DIPLOMA OR BETTER. EXCELLENT COMPUTER SKILLS INCLUDING WORD, EXCEL, POWERPOINT AND OUTLOOK. DEMONSTRATED ADMINISTRATIVE & SECRETARIAL ABILITIES INCLUDING STRONG WRITTEN/VERBAL COMMUNICATION SKILLS; WORKING KNOWLEDGE OF MICROSOFT OFFICE PRODUCTS; ABILITY TO BE FLEXIBLE & ABLE TO WORK IN A TEAM ENVIRONMENT AND INTERACT WITH ALL LEVELS OF ORGANIZATION. OVERTIME MAY BE REQUIRED - ON AN AS NEEDED BASIS. SIT 40%, LIFT 1%, WALK 5%, STAND 4%, TYPE 50%. SEDENTARY JOB DESC.

**10/29/2008 3:06 PM - PHONE Note 11**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : EXTENSION
Text: [10/29/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 TO ADVISE OF EXTENSION. EE HAS NOV 11/3/08 AND WILL DISCUSS THE POSSIBILITY OF A PART-TIME RTW AT THAT VISIT. EE IS CONSIDERING SEEING A SPECIALIST OUT OF STATE. DCM EXPLAINED PARTIAL DISABIITY PROVISION AND PROCESS. ADCM TO CALL EE FOR UPDATE AFTER OV. NO FURTHER QUESTIONS.

**10/29/2008 2:46 PM - CLAIM Note 15**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject : EXTENDED BENEFITS
Text: EXTENDED BENE THRU 11/3/08. ADD'L MED INFO NEEDED TO EXTEND.

**10/29/2008 2:45 PM - CLAIM Note 14**
Claim/Event/Leave: REDACTED
NoteSubject : Extended Benefits
Other Subject : THRU 11/3/08
Text: [10/29/2008 - HAYDEN, MARY]EXTENDED APPROVAL THRU 11/3/08 (NOV, R&LS SUPPORTED). DX: DAILY TENSION TYPE HEADACHE, CALLIC MIGRAINE HEADACHE, NONSPECIFIC MRI ABNORMAILITY, NONSPECIFIC EEG ABNORMAILITY. R&LS: EE OOW UNTIL FURTHER NOTICE, REFERRED FOR 24 HOUR EEG AND MRIS. JOB: ADMIN ASSISTANT (REQUESTED). ACTION PLAN: CALL EE FOR UPDATE.

**10/29/2008 2:38 PM - PHONE Note 10**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP

Liberty002314

Other Subject : DR. GORDON
Text: [10/29/2008 - HAYDEN, MARY]CALLED DR. GORDON, T# (860) 522-3711. S/W MADELINE. CONFIRMED NOV POSTPONED UNTIL 11/3/08.

**10/27/2008 4:30 PM - PHONE Note 9**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : OV
Text: [10/27/2008 - SMITH, KIMBERLY]REC'D CALL FROM EE STATING NOV WITH DR. GORDON ON 11/3/08, DATE WAS CHANGED FROM 11/1/08. EE CURRENTLY TRYING TO GET OV WITH ADD'L NEUROLOGIST FOR SECOND OPINION. S1 UPDATED WITH CONTACT INFO. EXPLAINED DR. GORDON WILL NEED TO BE CONTACTED TO CONFIRM OV ON 11/3/08 FOR EXTENSION. EE UNDERSTOOD. EE STATES SHE WOULD LIKE TO RTW, ON PART TIME BASIS AFTER NOV IF POSSIBLE. EE ASKED FOR RETURN CALL FROM ADCM ONCE OV HAS BEEN CONFIRMED AND EXTENSION HAS BEEN MADE. NO FURTHER QUESTIONS. EMAIL TO ADCM.

**10/17/2008 3:39 PM - PHONE Note 8**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : RETURN CALL
Text: [10/17/2008 - HAYDEN, MARY]RECD RETURN CALL FROM EE. DCM ADVISED OF EXTENSION THRU 11/1/08. EE HAS NOV W/ DR. GORDON ON 11/24/08. DCM TO CALL EE FOR UPDATE. ADCM ADVISED EE TO DISCUSS RTW W/ AP AT OV. ADVISED OF POSSIBILITY OF PART-TIME RTW IF APPLICABLE. EE UNDERSTOOD, NO FURTHER QUESTIONS.

**10/16/2008 1:02 PM - PHONE Note 7**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : EXTENSION
Text: [10/16/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 TO ADVISE OF EXTENSION AND OBTAIN UPDATE. LEFT VMX FOR RETURN CALL.

**10/16/2008 12:42 PM - CLAIM Note 13**
Claim/Event/Leave: REDACTED
NoteSubject : Job Description
Other Subject : REQUESTED
Text: [10/16/2008 - HAYDEN, MARY]EMAILED ER CONTACT CARLOS DELPORTAL W/ JOB DESC REQUEST.

**10/16/2008 12:40 PM - CLAIM Note 12**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject : EXTENDED BENEFITS
Text: EXTENDED BENE THRU 11/1/08. ADD'L MED INFO NEEDED TO EXTEND.

**10/16/2008 12:40 PM - CLAIM Note 11**
Claim/Event/Leave: REDACTED
NoteSubject : Extended Benefits
Other Subject : THRU 11/1/08
Text: [10/16/2008 - HAYDEN, MARY]EXTENDED APPROVAL THRU 11/1/08 (1 MONTH FROM LOV, R&LS SUPPORTED DUE TO FURTHER TESTING). DX: DAILY TENSION TYPE HEADACHE, CALLIC MIGRAINE HEADACHE, NONSPECIFIC MRI ABNORMAILITY, NONSPECIFIC EEG ABNORMAILITY. R&LS: EE OOWUNTIL FURTHER NOTICE, REFERRED FOR 24 HOUR EEG AND MRIS. JOB: ADMIN ASSISTANT (REQUESTED). ACTION PLAN: CALL EE FOR UPDATE.

**10/16/2008 12:37 PM - CLAIM Note 10**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. GORDON
Text: [10/16/2008 - HAYDEN, MARY]RECD FAXED MED RECORDS FROM DR. GORDON, NEUROLOGY. MRI BRAIN DATED 10/6/08: STABLE NONENHACING WHITE MATTER LESION IN RT TEMPORAL LOBE. DIFFERENTIAL DX FAVORS DEMYELINATING PLAQUE OVER A LOW GRADE GLIOMA BUT CONTINUED SURVEILANCE IS RECOMMENDED W/ REPAET MRI IN 6 MONTHS. NO NEW LESION OR ABNORMAL AREAS OF ENHANCEMENT ARE IDENTIFIED. MRI C-SPINE DATED 10/6/08: NO EVIDENCE OF ABNORMAL CORD SIGNAL, BILATERAL THYROID NODULES THAT SHOULD BE FURTHER EVALUATED W/ ULTRASOUND.OV NOTE DATED 10/1/08: 30 YOF DX W/ HEADACHES ASSOCIATED W/ VISUAL DISTORTION, NAUSEA AND VOMITING. EPISODE OF BLACKOUT SPELLS. ROUTINE EEG WAS ABNORMAL. AGREE TO PROCEED W/ 24 HOUR EEG RECORDING PLANNED FOR NEXT WEEK. CONTINUE W/ NEURONTIN. F/U IN 1MONTH.

**10/16/2008 12:31 PM - CLAIM Note 9**
Claim/Event/Leave: REDACTED
NoteSubject : Med Records Rcvd
Other Subject : DR. SCHIFF
Text: [10/16/2008 - HAYDEN, MARY]RECD FAXED REST FORM DATED 10/15/08 FROM DR. SCHIFF. LOV 9/20/08. DX: HEADACHES, ABNORMAL MRI. SEVERE MIGRAINES. GOING THROUGH WORKUP WITH NEUROLOGIST. HIS DISCRETION AS TO RTW DATE.

**10/09/2008 4:06 PM - CLAIM Note 8**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : N&P DUE 11/22/08
Text: [10/09/2008 - HAYDEN, MARY]ADD'L MED INFO NEEDED TO EXTEND. FAXED MED REQUEST TO DR. SCHIFF AND DR.

Liberty002315

GORDON (OV NOTES & TEST RESULTS 9/27/08 - PRESENT, REST FORM). N&P DUE 11/22/08. LTR TO EE. EMAIL TO ER CONTACT.

**10/09/2008 4:03 PM - CLAIM Note 7**
Claim/Event/Leave: REDACTED
NoteSubject : LTR to EE
Other Subject : TAX WITHOLDING
Text: [10/09/2008 - HAYDEN, MARY]SENT TAX WITHOLDING FORM TO EE.

**10/09/2008 4:01 PM - PHONE Note 6**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : RETURN CALL
Text: [10/09/2008 - HAYDEN, MARY]RECD RETURN CALL FROM EE. EE WAS VERY FRUSTRATED, DID NOT UNDERSTAND WHY CLAIM WAS ONLY APPD THRU 10/8/08. DCM EXPLAINED DISABILITY PROCESS FROM BEGINNING TO END, ADVISING OF NEED FOR ONGOING MEDICAL INFORMATION. DCM CLARIFIED EE'S CURRENT TREATMENT. PCP IS DR. SCHIFF. EE DOES NOT HAVE SCHEDULED F/U VISIT AT THIS TIME. EE HAS BEEN AT THE HOSPITAL FOR PAST 3 DAYS FOR TESTING THROUGH DR. GORDON. EE DOES NOT KNOW IF SHE WILL CONTINUE TREATING W/ DR. GORDON. EE MAY CHOOSETO TRANSFER TO A NEUROLOGIST MORE SPECIALIZED. EE IS NOW WAITING FOR A RETURN CALL REGARDING TEST RESULTS. LESION WAS FOUND ON BRAIN, POSSIBLE BRAIN TUMOR. EE HAS BEEN IN A LOT OF PAIN, NO RELEASE TO RTW. ERTW UNKNOWN. EE NOT TREATING W/ ANY OTHER DOCTORS AT THIS TIME. DCM ADVISED OF THE NEED FOR MED INFO TO EXTEND CLAIM. DCM TO REQUEST RECORDS FORM DR. SCHIFF AND DR. GORDON. EE WAS VERY CONCERNED ABOUT MED RECORDS RELEASE, DID NOT UNDERSTAND WHY TEST RESULTS AND INFO WAS NEEDED. EE EXPLAINED CONFIDENTIALLY OF MED RECORDS, HIPPA, AND NEED FOR RECORDS TO ISSUE PAYMENTS AND APPROVE CLAIM. EE UNDERSTOOD AND WILL CALL ADCM W/ ANY CHANGE IN STATUS OR PROVIDERS. EE ASKED ABOUT TAXES AND PREMIUMS. DCM TO SEND FED TAX WITHHOLDING FORM TO EE. NO FURTHER QUESTIONS.

**10/09/2008 2:19 PM - PHONE Note 5**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : APPROVAL/UPDATE
Text: [10/09/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 TO ADVISE OF APPROVAL AND OBTAIN UPDATE. NEED ALL TREATING PROVIDER CONTACT INFO. LEFT VMX FOR RETURN CALL.

**10/08/2008 2:45 PM - PHONE Note 4**
Claim/Event/Leave: REDACTED
NoteSubject : Called EE
Other Subject : APPROVAL
Text: [10/08/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 TO ADVISE OF APPROVAL. LEFT VMX FOR RETURN CALL.

**10/08/2008 2:41 PM - CLAIM Note 6**
Claim/Event/Leave: REDACTED
NoteSubject : Status Report
Other Subject : APPROVAL
Text: DOD 9/27/08, BBD 10/4/08, APPD THRU 10/8/08, POSS EXTENSION.

**10/08/2008 2:40 PM - CLAIM Note 5**
Claim/Event/Leave: REDACTED
NoteSubject : Approved
Other Subject : THRU 10/8/08
Text: [10/08/2008 - HAYDEN, MARY]LDW 9/26/08, DOD 9/27/08, BBD 10/4/08 (7 DAY EP FOR SICKNESS). 5 DAY REIMBURSEMENT FOR CHOICE. DX: MIGRAINE HEADACHES. R&LS: EE REFERRED TO NEUROLOGIST FOR FURTHER WORKUP. JOB: ADMIN ASSISTANT (JOB DESC REQUESTED). APPROVED THRU 10/8/08 (OV W/ NEUROLOGIST, R&LS SUPPORTED). FINANCIAL INFO: NO SICK PAY. ACTION PLAN: CALL EE FOR UPDATE AFTER NEUROLOGIST VISIT.

**10/08/2008 2:28 PM - PHONE Note 3**
Claim/Event/Leave: REDACTED
NoteSubject : AP Called
Other Subject :
Text: [10/08/2008 - BURGESS, LYNDSEY]S/W LOUISE FROM DR. SCHIFF'S OFFICE, FOV 9/20/08, C/O SEVERE HEADACHES, REFERRED TO NEUROLOGIST, OOW 9/29-10/1/08. FOR ANY ADD'L INFO, MED REQUEST NEEDS TO BE FAXED TO #860-561-7272. WILL EMAIL DCM.

**10/07/2008 2:07 PM - MIR Note 2**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : N/A
Text: [10/07/2008 - HAYDEN, MARY]CALLED DR. SCHIFF, T# (860) 561-7171. LEFT VMX FOR NURSE TO CONFIRM DX, R&LS, OOW INFORMATION.

**10/07/2008 12:14 PM - PHONE Note 2**
Claim/Event/Leave: REDACTED
NoteSubject : EE Called
Other Subject : INITIAL INTERVIEW
Text: [10/07/2008 - LEIDINGER, CORLITA]EE RTN DCM'S CALL. CONFIRMED LDW 9/26/2008. EE OOW FOR PERSISTANT MIGRAINS & HEADACHES. EE WENT TO EMERG ROOM AT ST FRANCIS IN HARTFORD ON 8/28/2008 FOR SEVERE PAIN/

Liberty002316

HEADACHES. EE'S HAS HAD 2 MRI'S, 2 EEG'S, & A CATSCAN. HOSPITAL WAS CONCERNED THAT EE MAY HAVE A POSSIBLE TUMOR. PER EE, CAT SCAN SHOWED A MASS. EE STATED THAT DR. SCHIFF IS CURRENTLY TX'N EE & WOULD LIKE DCM TO FAX A REQ FOR MED INFO TO AP. EE CURRENTLY EXPERIENCING CHONIC PAIN IN NECK & HEAD, SEVERE NAUSEA, VOMITING. NOV 10/8/2008: EE GOING TO HARTFORD HOSP FOR ADDITIONAL TESTING & 10/24/2008 WITH NEUROLOGIST. CO-MORBIDS ARE ASTHMA, CHONIC BRONCH. EE HAS NO AVAIL SICKPAY. EE WAS CONCERNED ABOUT ACCRUING VACATION TIME & BEING ELIGIBLE FOREDUCATIONAL BENEFITS WHILE OUT ON STD. EE WAS ADVISED TO CONTACT HR FOR INFO. DCM EXPLAINED CLAIMS PROCESS TO EE. EE HAD NO ADDITIONAL QUESTIONS. EMAIL TO DCM.

**10/03/2008 3:14 PM - MIR Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Called AP
Other Subject : N/A
Text: [10/03/2008 - HAYDEN, MARY]CALLED DR. GORDON, T# (860) 522-3711 TO CONFIRM DX, R&LS, OOW INFORMATION. LINE RANG SEVERAL TIMES, NO ANSWER. UNABLE TO LEAVE MESSAGE.

**10/03/2008 3:12 PM - PHONE Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Initial EE Interview
Other Subject : 1ST ATTEMPT
Text: [10/03/2008 - HAYDEN, MARY]CALLED EE T# (860) 308-2050 FOR INTERVIEW. LEFT VMX FOR RETURN CALL.

**10/03/2008 8:43 AM - CLAIM Note 4**
Claim/Event/Leave: REDACTED
NoteSubject : Other
Other Subject : ACKNOWLEDGMENT RECD
Text: [10/03/2008 - HAYDEN, MARY]RECD ACKNOWLEDGMENT INFORMATION FROM ER CONTACT. LDW 9/26/08. SALARY: $53,063.04. NO SICK PAY. F/T NON EXEMPT. RTW TBD.

**10/02/2008 4:15 PM - CLAIM Note 3**
Claim/Event/Leave: REDACTED
NoteSubject : Ref to Other
Other Subject : TRIAGE TO COMPLEX
Text: [10/02/2008 - RODRIGUEZ, ELENI]** TRIAGED CLAIM FOR CASE MANAGEMENT. ***MISSING INFO: E-MAIL TO HR CARLOS DELPORTAL FOR EE'S INFO***

**10/02/2008 3:25 PM - CLAIM Note 1**
Claim/Event/Leave: REDACTED
NoteSubject : Telephonic Intake
Other Subject : REPORTED CLAIM NOTE
Text: VARENDT MISH 2ND SPVR TO CONTACT CLIFF STONE 860-557-2480 DEE DEE HADERT-PAYTON 860-557-0452 ALSO SPVR TO CONTACT VARENDT MISH 10-2-08

**10/02/2008 3:25 PM - CLAIM Note 2**
Claim/Event/Leave: REDACTED
NoteSubject : Telephonic Intake
Other Subject : MEDICAL CONDITION
Text: HEADACHES

Liberty002317

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213




WINONA ZIMBERLIN
ATTORNEY AT LAW
267 MAIN STREET
MANCHESTER CT 06042

Liberty002318



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

December 14, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:   Long Term Disability (LTD) Benefits
      UTC Choice
      Claim #: REDACTED
      Claimant: Haley Spears

Dear Winona Zimberlin:

This correspondence is regarding Haley Spears' Long Term Disability claim.

Your letter dated July 13, 2016, stated you were requesting a review of the June 16, 2016 remand review determination to uphold the Long Term Disability denial. You further stated, "Additional documentation will be submitted at a later time."

On July 13, 2016, Liberty Life received Dr. Saul's statement dated July 13, 2016. On August 9, 2016, Liberty Life received Dr. Saul's corrected July 13, 2016 statement.

Nearly three months later, Liberty Life received Dr. Raxlen's 54 page document on September 26, 2016.

Your cover letters provided no information regarding the status of the appeal. Therefore, it is unclear whether you plan to submit additional documentation or whether the appeal is complete.

Please advise whether or not the appeal is complete so that Liberty Life can begin the appeal review.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002319



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

September 22, 2016

Facsimile: 1-603-334-5708, 55 p.
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

    RE:   Haley Spears
    DOB: REDACTED
    Your claim#: 250039

Enclosed please find:

1. Report from Bernard Raxlen, M.D., and attachments, 54 p.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002320

*Dr. Bernard Raxlen, M.D., P.C.*
*566 7th Avenue, Suite 502*
*New York, NY 10018*
*E-mail: DrRaxlen@aol.com*
*Phone: (212) 799-1121*
*Fax: (516) 336-8440*

Attorney Winona Zimberlin has asked me to respond to a disability evaluation for Haley Spears she is representing her in her disability appeal against Liberty Mutual.

Her complete record was received by three physicians: Dr. Crossley (Infectious Disease and Internal Medicine) and Dr. Cooper (Endocrinology Internal Medicine) and Dr. Kitei -DO and/MA (Neurology) Dr. Raymond PhD Neuropsychology.

Dr. Cooper stated:

"A reasonable degree of clinical probability, that the evidence does not support global impairment. Claimant is able to work without restrictions for the time frame 9/27/08 through 3/29/09 - 3/28/09 - 3/31/15

Dr. Crossley stated:

"There is a reasonable degree of clinical probability that there is no evidence that claimant has had Lyme disease or other infection that would be functionally limiting."

Dr. Kitei Stated:

"Within a reasonable degree of clinical probability, evidence does not support impairment from a neurological standpoint".

Dr, Raymond Stated:

There is no valid evidence to support neurologic deficits associated with chronic headache or a plethora of other reported etiologies within the time frame of 9/27/08- 3/31/15.

Based on my observations of this patient over a four-year period, I would have to take exception to the findings of the reviewers. I would sharply disagree with their conclusions.

Since I am a psychiatrist, there were several places in the document that

Liberty002321

"tongue in cheek" comments such as "self-designated Lyme Disease
expert," were used to describe my qualifications to treat and diagnose Lyme
Disease. For this reason, I would like to highlight several aspects of my
biography to show that I am in fact eminently qualified to diagnose and treat
Lyme disease.

I have had 30 years experience in diagnosing and treating the different types
of TBD.

I Received a BA in philosophy and anthropology from Stanford University.
I received an MD in medicine from University of Toronto. Internship with
McGill hospital system in Montreal. One year in ER and house call medicine
in Toronto, Ontario. I studied approximately one year (9 months), in Brazil
in parasitology (Chaga's disease, schistosomiasis, entamoeba histolytica.)

Lived in the Amazon with the indigenous native population, where I studied
herbal medicine.

I completed a psychiatric residency at University of Chicago and post
residency fellowship for 2 years at the University of Pennsylvania in family
and child psychiatry.

I practiced in Connecticut from 1975- 2006 and now in NYC from 2007-
2016. My practice was in Greenwich Ct. a high Lyme endemic area. I
became interested in the connection between neuropsychiatric,
neurocognitive and neurologic symptomatology as it related to Lyme
Disease and to microbial inflammatory disease as represented by the CFIDS
(Chronic Fatigue) viral diseases (Epstein-Barr) and Neuroborreliosis (Lyme
disease and co-Infections.)

In addition I have a special interest in childhood fatigue, depression,
cognitive impairment and psychiatric illness as related to BB and TBD Tick
Borne Disease. Approximately 10- 12% of my practice are children who
have been affected and have undiagnosed TBD.

In addition I see adults of all ages from all sectors of the country.
I have concentrated my practice in the diagnosis and treatment of TBD
within a psychiatric specialty for 30 years. I have treated by conservative
estimate 20 new cases / month, roughly 1 per day or 220 new + per year or
6500 over a 30 year period. My patients are drawn from all parts of the

USA, especially throughout the northeast, where the TBD'S are now
reaching epidemic numbers. They present with a spectrum of persistent
symptoms from all systems.

As a result of major discrepancies both in diagnostic and treatment
philosophy between IDSA members and those of us who differed from their
orthodoxy we founded ILADS. I was one of the original 10 physicians who
founded ILADS (International Lyme and Associated Diseases Society) an
international organization devoted to the study, research, diagnosis and
treatment of TBD. The organization has grown to more than 500 member
physicians and other allied health professionals concerned with TBD.
I have presented my work at numerous scientific conferences over the last
15 years and recently have been elected chairman of the Ethics committee of
ILADS.

I and a number of my colleagues were responsible for writing and publishing
ILADS treatment guidelines in 2005. They have been upgraded and recently
updated and published again in 2016. (a copy enclosed for review)

TBD affects all systems of the human body. Particularly vulnerable are the
nervous system. (CNS and peripheral nerves) the musculoskeletal systems:
(Joint and muscles) The endocrine system: (thyroid, adrenals, male/female
hormones) The energy system: (mitochondrial deficiency)

The early case definition and description of what constitutes Lyme Disease
and by extension TBD, was for reporting purposes only in 1975. It was to be
used only for "statistical analysis" and for public health purposes.
Unfortunately, those physicians who have had minimal experience in
diagnosing and treating Lyme disease fall into the trap of defining all Lyme
cases by the narrow definition proposed 35 years ago by the CDC, in spite of
the agencies own admonition not to do so.

There is in my judgment, having reviewed again all my own records
including testing, treatment, response to treatment, persistence of symptom,
more than ample evidence to support a working diagnosis of chronic TBD.
This is the most likely reason for her painful, protracted multisystemic
symptoms. In particular her neurocognitive, neuropsychiatric symptoms and
her profound exhaustion.

So what are we to make of these persistent debilitating symptoms? What

Liberty002323

diagnosis fits her problem?

The reviewing physicians may question the diagnosis of TBD although it seems to me as disingenuous to state as Dr. Crossley does, that their is no evidence that the claimant has had Lyme disease or other infections that would be functionally limiting.
Certainly, in my opinion, there is sufficient evidence in her medical history, if one choses to acknowledge it, for TBD.
Notwithstanding the four years I worked with Miss Spears, other specialists also saw the patient after I did, and confirmed the diagnosis.
The following physicians all had personal contact with the patient and treated her for TBD.

Dr. Zane Saul (infectious disease), Dr. Zagar (neurology), Dr. Patterson Marshall (Neurology), Dr Sam Donta (infectious disease),  Dr Gianni ( PCP) and myself all had numerous contact with the patient and prescribed treatment protocols for Lyme Disease. (IM , IV and oral medication) These treatments were not spurious. They were based on the evidence obtained in the clinical assessment and laboratory findings. The reason for her multisystemic illness, all five specialists agreed was late stage Lyme and co-infections.

Miss Spears' medical history, reveals a young woman whose health has been plagued with a multiple of serious conditions. Some symptoms from her history include the following:
Age 16- Began with knee pain that extended to both knees, unable to walk without discomfort; no history of injury, persistent calf pain and cramping.
Age 20- 21 Serious foot pain- "Pain horrific"
Age 20- Diagnosed with exercise induced Asthma and SOB on minimal exercise. Chronic cough. Given steroids that did not help. Pulmonary function tests negative.
Age 18- TMJ diagnosis surgery suggested by oral surgeons
2001-2003- Spider bite or tick bite - Red erythematous rash
Contracted multiple infections over the years. But sports minded.
During High School, had chronic insomnia not being able to sleep until 2-3am.
2004- Hashimotos thyroiditis. Suspected thyroid cancer.
2005- Severe upper and lower GI inflammation; positive GI autoimmune
        GI inflammation; positive IBD specific AHCA
2006- severe exhaustion and crippling muscle pain.

Liberty002324

2007- severe migraine headaches, facial pain, visual disturbances.
2008- EEG abnormal, but non-focal.  MRI - Positive for white matter
.......lesions in the right temporal lobe other lobulated lesions scattered in
    the white matter. venous anomaly posterior right parietal lobe...
    Various abnormalities posterior right parietal lobe; pineal cyst;
    question low grade astrocytoma
2009- Hemobartonella or protozoa ...
2009- Igenex IGM pos39/Ind.41/Ind 83-931
              IGG — IND 31/41
              I/20 T... Babesiosis
2009- ANA Positive
      Cardiolipin antibody +ve...
      Anti DNA +ve.....
2009- CSF Borrelia Burgdorferi IgG 41/39/30/18 +ve
2009- Vit D 18.8 Low
2009- Increased Choline; Low creatinine; and NAA in temporal lobe lesions.
2010- Generalized systemic complaints particularly, muscles, joints, and
      severe cognitive decline.

In Haley Spears' case, the above named specialists were selected to conduct
a "thorough" chart review (doctors chosen by the insurance company) Based
on their findings, they were asked to determine the patient's disability status
currently and over the past 10 or so years.

The reviewers concluded that in spite of the medical conditions listed above,
"there is no evidence that the claimant has had Lyme disease or other
"infections" that would be "functionally limiting."

* The primary issue in question is, does Miss Spears have in her medical
record, a history of multi-systemic chronic persistent symptoms, that wax
and wane in intensity, duration, and frequency. It was not the reviewers task
to determine whether or not the claimant had an "infection" that would be
responsible for her symptoms. They were to determine if the patient was
disabled by her illness and if her recurring symptoms would constitute
"functional impairment".

The important question is not whether Miss Spears had "Lyme disease and
co-infections, (and there is indisputable evidence to show that in fact she did
have it validated by five different specialists over time, including myself)
but the question is did her illness or her combined illnesses leave her

Liberty002325

"disabled." Not in the physical sense that she can stand for however long, or sit for however long, or lift five pounds or 20 pounds, but could she mentally function?

Based on her personal testimony and the neuropsychological findings, and her health history, I think not!

The records show that her greatest difficulty appears to be a major neurocognitive deficit, found on neuropsychological testing, as well as positive antibody findings in CSF, (IgG+ve), lesions on CAT scan, and lesions on MRI, (positive findings), all consistent with Neuroborreliosis.

But, if Lyme disease is what the reviewers are disputing as a major contributor to Miss Spears disability, then their conclusions as they pertain to her "disability" and "Lyme disease" are seriously flawed. And the reason they are flawed is that they have based their conclusions on an obsolete clinical definition of Lyme disease and not the more complete updated ILADS description of a multi systemic microbial symptom complex.

This extremely narrow clinical definition has now been successfully expanded to include the subjective and non-specific symptoms of the Lyme patient. Especially when it concerns the severe and devastating neurocognitive symptoms (brain fog, distractibility, short and long term memory difficulties, word search, lack of concentration, severe migraine headaches, autoimmune lupus like syndromes), as well as profound neuropsychiatric symptoms (anxiety, depression, panic attacks, OCD, depersonalization, suicide thinking), physical symptoms (fatigue, SOB, irritable bowel, severe joint pain hemorrhagic colitis) and many more, all published in the scientific literature.

Because this definition has been found to be so narrow and restrictive over the past 30 years, a physician cannot accurately diagnose Lyme disease, if he uses the old CDC clinical criterion. In fact, if the reviewers followed IDSA guidelines in their analysis, they would have had to believe, that chronic relapsing Lyme disease does not exist, as well as completely ignoring the subjective world of the patient.

The conclusions of at least five other treating physician specialists, all who had treated Miss Spears, confirmed the Lyme diagnosis, and also confirmed the extent of her disability. They acknowledged her disability and her inability to work.

Liberty002326

Their conclusions are not based on the appearance of physical symptoms only, and instead subjective and nonspecific symptoms are weighed equally in their approach to her disability. Miss Spears does not exaggerate when describing her neurocognitive deficits because her scores on her neuropsychological testing showed that the patient was suffering from an alarming decline in mental functioning. Some of the scores are listed below.

Working memory 12th percentile. (Impairment of attention and concentration)
Arithmetic 2nd percentile
Auditory immediate memory 13th percentile
Auditory delayed memory (storage) 6th percentile
Delayed recall of material 2nd percentile.!
Scores consistent with frontal lobe encephalopathy.

These scores indicate unequivocally major deficiencies in cognitive functioning.

At one time or another Miss Spears has been diagnosed by a number of specialists with a series of serious illness, many with an autoimmune component. Those included Hashimotos disease, possible Lupus, demyelination in CNS, hemorrhagic colitis, fibromyalgia, chronic fatigue syndrome, severe intractable migraines, severe neurocognitve dysfunction, severe memory loss, limiting joint pain, and insomnia.
Either Miss Spears is one of those unfortunate chronically ill patients, struggling under a series of autoimmune, multi-systemic, recurring illnesses or like so many of my patients is suffering from "chronic relapsing Borreliosis with a high likelihood of co-infections".
These type of patients in my practice can improve significantly in the physical sense with proper treatment, but frequently can have intermittent return of these physical symptoms.
What tends not to improve is the severe neurocognitive deficits as shown by her disastrous scores on her neuropsychological evaluation. Short term memory, concentration and distractibility remain largely inconsistent and can change and rapidly fall even lower, depending on the work load and stress level. This, and her extreme exhaustion, can make Miss Spears unable to function consistently for any sustained period of time in a work environment.

Liberty002327

**ILADS Guidelines**

# ILADS Evidence-Based Guidelines for the Management of Lyme Disease

## Table of contents

### I Introduction to guidelines

1. International Lyme and Associated Diseases Society
2. Chronic Lyme disease: a growing epidemic
3. The need for new guidelines
4. A problem of definitions
5. Competency and training
6. Role of primary care
7. Highlights of guidelines

### II New presentations

8. Symptomatic presentation
9. Symptoms of Lyme disease
10. Increasing evidence of persistent infection
11. Disappointing results of symptomatic treatment
12. Severity of chronic Lyme disease

### III Diagnostic concerns

13. Atypical early presentations
14. Chronic Lyme disease presentations
15. The limitations of physical findings
16. Sensitivity limitations of testing
17. Seronegative Lyme disease
18. Importance of differential diagnosis
19. Clinical judgment
20. Testing for coinfection

### IV Treatment considerations

21. Prompt use of an antibiotic
22. Choosing an antibiotic
23. Oral antibiotic options
24. Intravenous option
25. Intramuscular option
26. Combination antibiotic treatment
27. Sequential treatment
28. Dosage
29. Duration of therapy
30. Empiric treatment

31. Persistent Lyme disease
32. Recurrent Lyme disease
33. Refractory Lyme disease
34. Treatment failure
35. Symptomatic treatment
36. Fibromyalgia
37. Decision to stop antibiotics
38. Alternative antibiotics
39. Therapy for coinfection

### V Research needs

40. Ongoing development of guidelines
41. Validation of guidelines
42. Comparative studies

### VI Periodic review of guidelines

43. Grading system for evidence-based guidelines
44. Table 1: Comparison of key IDSA and ILADS guidelines
45. Criteria for evidence-based guidelines

### Summary & disclaimer

These treatment guidelines are intended to assist physicians and other healthcare providers in clinical decision-making by describing a range of generally acceptable approaches for the diagnosis and treatment of Lyme borne diseases. Which approach to a particular situation should be determined through the exercise of sound clinical judgment by a physician and informed decision-making by a patient. Views of what constitutes appropriate care and treatment change rapidly and some approaches may be controversial. Healthcare professionals are encouraged to inform their patients of all reasonable treatment options that are appropriate for their care. These guidelines are not intended to provide medical advice to patients, who should consult with their individual physician for diagnosis or treatment.

These guidelines were published in February 2004. Since knowledge is constantly evolving, these guidelines may be considered current only as of the date published.

Reprinted from Expert Review of Anti-Infective Therapy 2(1), Supplement (2004) by the kind permission of Future Drugs, Ltd. Copyright, Future Drugs, Ltd. All rights reserved.

Liberty002328

## ILADS Guidelines

The ILADS Guidelines focus on which patients to evaluate, what tests to order, what antibiotics to use and what steps to take to ensure that concerns over antibiotic use are addressed.

The ILADS Working Group that formulated these guidelines included primary care clinicians, researchers, community healthcare providers and patient advocates. In developing these treatment guidelines, the group considered factors such as incidence of Lyme disease; severity of disease in terms of morbidity; comorbidities and determinants of when Lyme disease is most likely to become chronic; feasibility, efficacy and cost of antibiotic treatment; impact of antibiotic therapy on quality of life, including adverse drug events; and the potential for drug resistance to develop.

Because of the complexity and variability of Lyme disease symptoms, the guidelines are flexible. Treatment depends on the severity of each case, the patient's response to therapy and the physician's own clinical judgment.

### 4. A problem of definitions

Lyme disease was initially investigated by CDC epidemiologists focusing on erythema migrans, heart block, meningitis and arthritis. The ELISA test and later, the western blot, were introduced for seroepidemiologic studies. Chronic, persistent, recurrent and refractory Lyme disease were not included in these studies; consequently cases of chronic Lyme disease still go unrecognized.

For the purpose of the ILADS guidelines, 'chronic Lyme disease' is inclusive of persistent symptomatologies including fatigue, cognitive dysfunction, headaches, sleep disturbance and other neurologic features, such as demyelinating disease, peripheral neuropathy and sometimes motor neuron disease; neuropsychiatric presentations; cardiac presentations including electrical conduction delays and dilated cardiomyopathy; and musculoskeletal problems. Symptoms may continue despite 30 days of treatment (persistent Lyme disease). The patient may relapse in the absence of another tickbite or erythema migrans rash (recurrent Lyme disease), or be poorly responsive to antibiotic treatment (refractory Lyme disease).

36

By these definitions, almost two-thirds of 215 Lyme disease patients in a recent retrospective cohort from an endemic region had chronic Lyme disease [4]. Case definitions for Lyme disease have evolved and will continue to develop as a better understanding of chronic Lyme disease emerges to shape a common lexicon.

### 5. Competency and training

The appropriateness of treatment hinges on the clinician's experience in treating Lyme disease. Competence requires diagnostic and treatment skills heretofore not offered in medical school or postresidency training.

Clinicians more practiced in treating Lyme disease achieve better outcomes and encounter fewer complications because of an enhanced ability to interpret clinical data, the prompt prescription of antibiotics and the use of measures to reduce adverse events, e.g., employing acidophilus to replace normal intestinal flora that is depleted by antibiotics.

### 6. The increasing role of primary care

The primary-care physician has an important role as the first and at times, the principal medical contact for the person with Lyme disease.

Primary care physicians focus on the resolution of symptoms, monitoring for side effects, maintenance or improvement of functional status and prevention of recurrent symptoms.

These guidelines incorporate the evidence used by primary care physicians for the care of patients with Lyme disease.

### 7. Highlights of guidelines

- Since there is currently no definitive test for Lyme disease, laboratory results should not be used to exclude an individual from treatment
- Lyme disease is a clinical diagnosis and tests should be used to support rather than supersede the physician's judgment
- The early use of antibiotics can prevent persistent, recurrent and refractory Lyme disease

Liberty002329

ods [14]. In fact, there is no reliable, commercially available culture assay that can confirm the eradication of the organism. Using experimental techniques, however, *B. burgdorferi* has been detected in virtually every organ in the body, and the spirochete has a strong predilection for the central nervous system. Oral antibiotic levels in the central nervous system are low, and this fact may necessitate the addition of drugs with good penetration across the blood–brain barrier [15], such as intravenous ceftriaxone or cefotaxime.

Most studies demonstrate a beneficial effect of antibiotics in the management of chronic Lyme disease, but the extent of optimal treatment is still uncertain [4,12,13,16–22]. Recent clinical trials questioning the benefits of antibiotics have been criticized for enrolling patients with refractory Lyme disease who were sick for a mean of 4.7 years despite an average of three courses of antibiotics, and for relying only on one treatment protocol (1 month of i.v. ceftriaxone followed by 2 months of low-dose oral doxycycline) [23]. In view of these methodological problems, persistent infection remains a continuing concern for physicians.

## 11. Disappointing results of symptomatic treatment

A theoretical immune mechanism has been proposed to explain persistent symptoms in chronic Lyme disease, but no clinical or laboratory test can confirm this theory. The immune mechanism theory is based on physiological events (often in the form of cascades) that are not reversed by simply killing the infecting organism.

The presentation of chronic Lyme disease can be identical to that of other multisystem disorders, including systemic lupus erythematosus, rheumatoid arthritis and fibromyalgia. In the seminal article describing fibromyalgia in a Lyme disease population, antibiotic treatment failure and relapse of symptoms were considered to be proof of the absence of *B. burgdorferi* infection, and persistent symptoms were assumed to be due to postinfectious sequelae [24]. However, the failure of short-course (2–4 week) antibiotic treatment in 14 (94%) of 15

fibromyalgia patients is consistent with a persistent, inadequately treated infection with *B. burgdorferi* [24].

The increasing successes of repeated and prolonged antibiotic treatment in chronic Lyme disease are more consistent with a persistent infection mechanism.

## 12. Severity of chronic Lyme disease

For patients with chronic Lyme disease, the quality of life has been evaluated in a clinical trial sponsored by the National Institutes of Health (NIH) using a standardized questionnaire [23]. The quality of life of the 107 individuals with chronic Lyme disease was worse than that of patients with Type 2 diabetes or a recent heart attack, and equivalent to that of patients with congestive heart failure or osteoarthritis. Moreover, the average Lyme disease duration of 4.7 years in subjects enrolling in the study emphasized the chronic nature of the condition. Finally, the failure of 1 month of i.v. ceftriaxone followed by 2 months of oral doxycycline delineated the potential for a poor outcome in chronic Lyme disease [25].

# Section III: Diagnostic concerns.

The most important method for preventing chronic Lyme disease is recognition of the early manifestations of the disease.

## 13. Atypical early presentations

Early Lyme disease classically presents with a single erythema migrans (EM or 'bull's-eye') rash. The EM rash may be absent in over 50% of Lyme disease cases, however [25]. Patients should be made aware of the significance of a range of rashes beyond the classic EM, including multiple, flat, raised or blistering rashes. Central clearing was absent in over half of a series of EM rashes [26]. Rashes can also mimic other common presentations including a spider bite, ringworm, or cellulitis. One series of eleven EM rashes was misdiagnosed and treated as cellulitis, with all eleven patients showing clinical evidence of Lyme disease progression [27].

Physicians should be aware that fewer than 50% of

Liberty002330

ods [14]. In fact, there is no reliable, commercially available culture assay that can confirm the eradication of the organism. Using experimental techniques, however, *B. burgdorferi* has been detected in virtually every organ in the body, and the spirochete has a strong predilection for the central nervous system. Oral antibiotic levels in the central nervous system are low, and this fact may necessitate the addition of drugs with good penetration across the blood–brain barrier [15], such as intravenous ceftriaxone or cefotaxime.

Most studies demonstrate a beneficial effect of antibiotics in the management of chronic Lyme disease, but the extent of optimal treatment is still uncertain [4,12,13,16–22]. Recent clinical trials questioning the benefits of antibiotics have been criticized for enrolling patients with refractory Lyme disease who were sick for a mean of 4.7 years despite an average of three courses of antibiotics, and for relying only on one treatment protocol (1 month of i.v. ceftriaxone followed by 2 months of low-dose oral doxycycline) [23]. In view of these methodological problems, persistent infection remains a continuing concern for physicians.

## 11. Disappointing results of symptomatic treatment

A theoretical immune mechanism has been proposed to explain persistent symptoms in chronic Lyme disease, but no clinical or laboratory test can confirm this theory. The immune mechanism theory is based on physiological events (often in the form of cascades) that are not reversed by simply killing the infecting organism.

The presentation of chronic Lyme disease can be identical to that of other multisystem disorders, including systemic lupus erythematosus, rheumatoid arthritis and fibromyalgia. In the seminal article describing fibromyalgia in a Lyme disease population, antibiotic treatment failure and relapse of symptoms were considered to be proof of the absence of *B. burgdorferi* infection, and persistent symptoms were assumed to be due to postinfectious sequelae [24]. However, the failure of short-course (2–4 week) antibiotic treatment in 14 (94%) of 15

fibromyalgia patients is consistent with a persistent, inadequately treated infection with *B. burgdorferi* [24].

The increasing successes of repeated and prolonged antibiotic treatment in chronic Lyme disease are more consistent with a persistent infection mechanism.

## 12. Severity of chronic Lyme disease

For patients with chronic Lyme disease, the quality of life has been evaluated in a clinical trial sponsored by the National Institutes of Health (NIH) using a standardized questionnaire [23]. The quality of life of the 107 individuals with chronic Lyme disease was worse than that of patients with Type 2 diabetes or a recent heart attack, and equivalent to that of patients with congestive heart failure or osteoarthritis. Moreover, the average Lyme disease duration of 4.7 years in subjects enrolling in the study emphasized the chronic nature of the condition. Finally, the failure of 1 month of i.v. ceftriaxone followed by 2 months of oral doxycycline delineated the potential for a poor outcome in chronic Lyme disease [25].

# Section III: Diagnostic concerns.

The most important method for preventing chronic Lyme disease is recognition of the early manifestations of the disease.

## 13. Atypical early presentations

Early Lyme disease classically presents with a single erythema migrans (EM or 'bull's-eye') rash. The EM rash may be absent in over 50% of Lyme disease cases, however [25]. Patients should be made aware of the significance of a range of rashes beyond the classic EM, including multiple, flat, raised or blistering rashes. Central clearing was absent in over half of a series of EM rashes [26]. Rashes can also mimic other common presentations including a spider bite, ringworm, or cellulitis. One series of eleven EM rashes was misdiagnosed and treated as cellulitis, with all eleven patients showing clinical evidence of Lyme disease progression [27].

Physicians should be aware that fewer than 50% of

Liberty002331

all Lyme disease patients recall a tickbite [28]. Early Lyme disease should also be considered in an evaluation of 'off-season' onset when flu-like symptoms, fever and chills occur in the summer and fall. Early recognition of atypical early Lyme disease presentation is most likely to occur when the patient has been educated on this topic.

## 14. New chronic Lyme disease presentations

A detailed history may be helpful for suggesting a diagnosis of chronic Lyme disease. Headache, stiff neck, sleep disturbance and problems with memory and concentration are findings frequently associated with neurologic Lyme disease. Other clues to Lyme disease have been identified, although these have not been consistently present in each patient: numbness and tingling, muscle twitching, photosensitivity, hyperacusis, tinnitus, lightheadedness and depression.

Most patients diagnosed with chronic Lyme disease have an indolent onset and variable course. Neurologic and rheumatologic symptoms are characteristic, and increased severity of symptoms on wakening is common. Neuropsychiatric symptoms alone are more often seen in chronic than acute Lyme disease. Although many studies have found that such clinical features are often not unique to Lyme disease, the striking association of musculoskeletal and neuropsychiatric symptoms, the variability of these symptoms and their recurrent nature may support a diagnosis of the disease.

## 15. The limitations of physical findings

A comprehensive physical examination should be performed, with special attention to neurologic, rheumatologic and cardiac symptoms associated with Lyme disease.

Physical findings are nonspecific and often normal, but arthritis, meningitis and Bell's palsy may sometimes be noted. Available data suggest that objective evidence alone is inadequate to make treatment decisions, because a significant number of chronic Lyme disease cases may occur in symptomatic patients without objective features on examination

or confirmatory laboratory testing.

Factors other than physical findings, such as a history of potential exposure, known tickbites, rashes or symptoms consistent with the typical multisystem presentation of Lyme disease, must also be considered in determining whether an individual patient is a candidate for antibiotic therapy.

## 16. Sensitivity limitations of testing

Treatment decisions should not be based routinely or exclusively on laboratory findings [2;25]. The two-tier diagnostic criteria, requiring both a positive ELISA and western blot, lacks sensitivity and leaves a significant number of individuals with Lyme disease undiagnosed and untreated [29,30]. These diagnostic criteria were intended to improve the specificity of tests to aid in identifying well-defined Lyme disease cases for research studies [31]. Though arbitrarily chosen, these criteria have been used as rigid diagnostic benchmarks that have prevented individuals with Lyme disease from obtaining treatment. Diagnosis of Lyme disease by two-tier confirmation fails to detect up to 90% of cases and does not distinguish between acute, chronic, or resolved infection [21].

The CDC considers a western blot positive if at least 5 of 10 IgG bands or 2 of 3 IgM bands are positive [31]. However, other definitions for western blot confirmation have been proposed to improve the test sensitivity [30,32–36]. In fact, several studies showed that sensitivity and specificity for both the IgM and IgG western blot range from 92 to 96% when only two specific bands are positive [34–36].

Lumbar puncture has also been disappointing as a diagnostic test to rule out concomitant central nervous system infection. In Lyme disease, evaluation of cerebrospinal fluid is unreliable for a diagnosis of encephalopathy and neuropathy because of poor sensitivity (see Section II.8). For example, pleocytosis was present in only one of 27 patients (sensitivity 3%) and with only seven cells [12]. The antibody index was positive ($>1$) in only one of 27 patients (sensitivity 3%) [12]. An index is the ratio between Lyme ELISA antibodies in the spinal fluid

Liberty002332

and Lyme ELISA antibodies in the serum. The proposed index of 1.3 would be expected to have even worse sensitivity.

Several additional tests for Lyme disease have been evaluated. These include antigen capture, urine antigen and polymerase chain reaction. Each has advantages and disadvantages in terms of convenience, cost, assay standardization, availability and reliability. These tests remain an option to identify people at high risk for persistent, recurrent and refractory Lyme disease but have not been standardized.

## 17. Seronegative Lyme disease

A patient who has tested seronegative may have a clinical presentation consistent with Lyme disease, especially if there is no evidence to indicate another illness.

Although many individuals do not have confirmatory serologic tests, surveillance studies show that these patients may have a similar risk of developing persistent, recurrent and refractory Lyme disease compared with the seropositive population. A prospective observational study of 1094 patients [21] and the Klempner clinical trials [23] found no difference in measured outcomes (e.g., success of retreatment) among seropositive or seronegative Lyme disease patients.

## 18. Continued importance of differential diagnosis

The differential diagnosis of Lyme disease requires consideration of both infectious and noninfectious etiologies. Among noninfectious causes are thyroid disease, degenerative arthritis, metabolic disorders (vitamin B12 deficiency, diabetes), heavy metal toxicity, vasculitis and primary psychiatric disorders.

Infectious causes can mimic certain aspects of the typical multisystem illness seen in chronic Lyme disease. These include viral syndromes such as parvovirus B19 or West Nile virus infection, and bacterial mimics such as relapsing fever, syphilis, leptospirosis and mycoplasma.

The clinical features of chronic Lyme disease can be indistinguishable from fibromyalgia and chronic fatigue syndrome. These illnesses must be closely scrutinized for the possibility of etiological *B. burgdorferi* infection.

## 19. Clinical judgment

Clinical judgment remains necessary in the diagnosis of late Lyme disease. A problem in some studies that relied on objective evidence was that treatment occurred too late, leaving the patient at risk for persistent and refractory Lyme disease.

As noted, time-honored beliefs in objective findings and two-tier serologic testing have not withstood close scrutiny [21,30,34,37]. Lyme disease should be suspected in patients with newly acquired or chronic symptoms (headaches, memory and concentration problems and joint pain). Management of patients diagnosed on the basis of clinical judgment needs to be tested further in prospective trials, and diagnostic reproducibility must be verified.

## 20. Testing for coinfection

Polymicrobial infection is a new concern for individuals with Lyme disease, and coinfection is increasingly reported in critically ill individuals [25,38]. Although *B. burgdorferi* remains the most common pathogen in tickborne illnesses, coinfections including *Ehrlichia* and *Babesia* strains are increasingly noted in patients with Lyme disease, particularly in those with chronic illness. *Bartonella* is another organism that is carried by the same ticks that are infected with *B. burgdorferi*, and evidence suggests that it is a potential coinfecting agent in Lyme disease [25].

Recent animal and human studies suggest that Lyme disease may be more severe and resistant to therapy in coinfected patients [25,38]. Thus, concurrent testing and treatment for coinfection is mandatory in Lyme disease patients.

Liberty002333

# Section IV: Treatment considerations

Since Lyme disease can become persistent, recurrent and refractory even in the face of antibiotic therapy, evaluation and treatment must be prompt and aggressive.

## 21. Prompt use of antibiotics

Although no well designed studies have been carried out, the available data support the prompt use of antibiotics to prevent chronic Lyme disease. Antibiotic therapy may need to be initiated upon suspicion of the diagnosis, even without definitive proof. Neither the optimal antibiotic dose nor the duration of therapy has been standardized, but limited data suggest a benefit from increased dosages and longer treatment, comparable to the data on tuberculosis and leprosy which are caused by similarly slow-growing pathogens [25].

## 22. Choosing an antibiotic

In acute Lyme disease, the choice of antibiotics should be tailored to the individual and take into account the severity of the disease as well as the patient's age, ability to tolerate side effects, clinical features, allergy profile, comorbidities, prior exposure, epidemiologic setting and cost.

Conversely, persistent and refractory Lyme disease treatment is more likely to include intravenous and/or intramuscular antibiotics. The choices depend in part on the patient's response to antibiotic therapy and on the success of antibiotics in treating other Lyme disease patients (see below).

Therapy usually starts with oral antibiotics, and some experts recommend high dosages. The choice of antibiotic therapy is guided by weighing the greater activity of intravenous antibiotics in the central nervous system against the lower cost and easy administration of oral antibiotics for *B. burgdorferi*.

## 23. Oral antibiotic options

For many Lyme disease patients, there is no clear advantage of parenteral therapy. Along with cost considerations and pressure to treat patients with Lyme disease with the least intervention, there is growing interest in the use of oral therapy.

First-line drug therapies for Lyme disease may include (in alphabetical order): oral amoxicillin, azithromycin [39–41], cefuroxime [42], clarithromycin [43], doxycycline and tetracycline. These antibiotics have similar favorable results in comparative trials of early Lyme disease. In one study, azithromycin performed slightly less well when compared to amoxicillin and doxycycline. However, the efficacy of azithromycin was underestimated because the antibiotic was only given for 10 days [39].

One study has suggested that oral doxycycline (100 mg twice daily for 30 days) is as effective as intravenous ceftriaxone (2 g daily for 30 days) in early disseminated Lyme disease [40]. Two European studies have demonstrated similar efficacy of oral doxycycline and parenteral penicillin and ceftriaxone in early Lyme disease [44,45].

There are no studies comparing oral with intravenous antibiotics for persistent, recurrent and refractory Lyme disease.

## 24. Intravenous antibiotic options

It is common practice to consider intravenous antibiotics upon failure of oral medications in patients with persistent, recurrent or refractory Lyme disease, and as the first line of therapy for certain conditions, (i.e., encephalitis, meningitis, optic neuritis, joint effusions and heart block).

Ideally, the intravenous antibiotic should be selected on the basis of *in vitro* sensitivity testing or clinical experience [101]. Intravenous antibiotics are also justified by concern for penetration into the central nervous system [15].

Until recently, ceftriaxone, cefotaxime and penicillin were the only intravenous antibiotics routinely studied for use in Lyme disease. Intravenous imipenem, azithromycin and doxycycline have an adequate antispirochetal spectrum of activity and may represent suitable alternative therapies. How-

Liberty002334

**ILADS Guidelines**

ever, the latter two drugs are often considered for intravenous use only if they are not tolerated orally.

There is a paucity of data on alternative intravenous antibiotics, and their success is less predictable in chronic Lyme disease.

## 25. Intramuscular antibiotic options

Intramuscular benzathine penicillin (1.2 to 2.4 million units per week) is sometimes effective in patients who do not respond to oral and intravenous antibiotics. If intramuscular benzathine penicillin is used, long-term therapy may be necessary due to the low serum concentration of this form of penicillin [46]. Luft and colleagues report, "It was demonstrated that while *B. burgdorferi* may be sensitive to relatively small concentrations of penicillin and ceftriaxone, the organism is killed slowly. This implies that, as in syphilis, prolonged blood levels of these drugs may be necessary in order to ensure cure" [46].

One-third of a chronic Lyme disease population responded to intramuscular benzathine penicillin (1.2 to 2.4 million units per week) [16–18]. Benzathine penicillin has mainly been used in patients who have had multiple relapses while receiving oral or intravenous antibiotic therapy or who are intolerant of oral or intravenous antibiotics.

## 26. Combination antibiotic treatment

Combination therapy with two or more antibiotics is now increasingly used for refractory Lyme disease [11,41,45,46–49] and has also been given as initial therapy for some chronic presentations.

This approach is already used for another tickborne illness, babesiosis [50]. Oral amoxicillin, cefuroxime or (more recently) cefdinir combined with a macrolide (azithromycin or clarithromycin) are examples of combination regimens that have proven successful in clinical practice, although controlled clinical trials are lacking in persistent, recurrent and refractory Lyme disease.

Combination therapy in patients with Lyme disease raises the risk of adverse events. This risk must be weighed against the improved response to combination therapy in Lyme disease patients failing single agents [47–49].

## 27. Sequential treatment

Clinicians increasingly use the sequence of an intravenous antibiotic followed by an oral or intramuscular antibiotic [19,37,101,47,48]. In two recent case series that employed combination therapy and sequential therapy, most patients were successfully treated [19,47]. A logical and attractive sequence would be to use intravenous therapy first (e.g., intravenous ceftriaxone), at least until disease progression is arrested and then follow with oral therapy for persistent and recurrent Lyme disease.

## 28. Dosage

Increasingly, clinicians recommend that certain drugs used for Lyme disease be given at higher daily doses: for example, 3000–6000 mg of amoxicillin, 300–400 mg doxycycline and 500–600 mg of azithromycin. Some clinicians prescribe antibiotics using blood levels to guide higher doses. Close monitoring of complete blood counts and chemistries are also required with this approach.

With higher doses, there may be an increase in adverse events in general and gastrointestinal problems in particular. Acidophilus has reportedly reduced the incidence of *C. difficile* colitis and non-*C. difficile* antibiotic-related diarrhea.

Serious adverse effects of antibiotics, however, were less common than previous estimates. In a recent clinical trial of chronic Lyme disease, the overall serious adverse event rate was 3% after three months of antibiotics, including 1 month of intravenous antibiotics [23]. Clinicians who have experience with higher-dose antibiotic therapy must balance the benefit of higher drug levels achieved with this therapy against the modest risk of gastrointestinal and other side effects.

Research is needed to determine the added benefits of higher doses of antibiotics in chronic Lyme disease.



## 29. Duration of therapy

Because of the disappointing long-term outcome with shorter courses of antibiotics, the practice of stopping antibiotics to allow for a delayed recovery is no longer recommended for patients with persistent, recurrent and refractory Lyme disease. Reports show failure rates of 30–62% within 3 years of short-course treatment using antibiotics thought to be effective for Lyme disease [3,4,12]. Conversely for neurologic complications of Lyme disease, doubling the length of intravenous ceftriaxone treatment from 2 to 4 weeks improved the success rate from 66 to 80% [12,51].

The management of chronic Lyme disease must be individualized, since patients will vary according to severity of presentation and response to previous treatment.

Concurrent risk factors (i.e., coinfections, previous treatment failures, frequent relapses, neurologic involvement, or previous use of corticosteroids) or evidence of unusually severe Lyme disease should lead to the initiation of prolonged and/or intravenous antibiotic treatment. Physicians should always assess the patient's response to treatment before deciding on appropriate duration of therapy (i.e., weeks versus months).

## 30. Empiric treatment

The importance of establishing the diagnosis of Lyme disease is heightened in light of increasing concern about antibiotic over-use. After an appropriate history, physical examination and laboratory testing are completed, empiric antimicrobial therapy should be initiated on the basis of clinical clues, the severity of the patient's acute illness, underlying disease and the likelihood of *B. burgdorferi* infection. The ILADS working group recommends that empiric treatment be considered routine for patients with a likely diagnosis of Lyme disease.

## 31. Persistent Lyme disease

Persistent Lyme disease is more resistant to treatment and more likely to produce a relapse. Although persistent Lyme disease may resolve without

additional therapy, many experts believe that this condition should be treated with repeated and prolonged antibiotics. Physicians should extend the duration of antibiotics to prevent or delay recurrent and refractory Lyme disease.

## 32. Recurrent Lyme disease

Despite previous antibiotic treatment, Lyme disease has a propensity for relapse and requires careful follow-up for years. The data suggest that failure to eradicate the organism may be the reason for a recurrence of symptoms [12]. Early and aggressive treatment with antibiotics is indicated for recurrent Lyme disease. The ultimate impact from retreating each episode of recurrent Lyme disease is currently unclear.

## 33. Refractory Lyme disease

Refractory Lyme disease is a devastating condition that usually affects patients with persistent symptomatology and long-term disability. Prompt and aggressive institution of antibiotic therapy may be essential to prevent refractory disease. Increasing evidence shows that antibiotics have a beneficial effect on the course of refractory Lyme disease even in cases where the patient is intolerant of antibiotics or when a previous regimen has failed. Several months of therapy are often required to produce clear evidence of improvement. During this time, symptomatic treatment may be combined with antibiotic treatment.

## 34. Treatment failure

When patients fail to respond or their conditions deteriorate after initiation of empiric therapy, a number of possibilities should be considered other than Jarisch-Herxheimer reaction. These include adverse events that limit treatment, allergic history to medication, inappropriate or inadequate dosing regimen, compliance problems, incorrect medication, immune sequelae and sequestering of the organism (e.g., in the central nervous system). An alternative diagnosis or coinfection should also be considered.

*Continued on page 46*

Liberty002336

## 35. Symptomatic treatment

Although there may be a potential role for symptomatic treatment in chronic Lyme disease, this approach has little support due to the strong possibility of persistent infection. Owing to the potential hazard of immunosuppression and the poor outcome in one study, steroid therapy is not recommended [52]. Surgical synovectomy is associated with significant morbidity and does not address neurologic presentations; it should be reserved for knee pain failing antibiotic treatment [53]. Intra-articular steroid injection may be useful as a temporizing procedure in patients with persistent knee pain but this runs the risk of masking persistent infection.

Symptomatic therapy (particularly anti-inflammatory medications, tricyclic antidepressants, selective serotonin re-uptake inhibitors and hydroxychloroquine) may be useful in concert with antibiotics and in individuals failing antibiotics. Hyperbaric oxygen therapy (HBOT) is under study but is not recommended for routine therapeutic use [25,54]. Other treatments, including cholestyramine (CSM), antifungal therapy and antiviral agents require further study.

Since patients are becoming more interested in alternative therapies (e.g., traditional Chinese medicine, anti-oxidants, hyperthermia, bee venom, naturopathy and homeopathy), physicians should be prepared to address questions regarding these topics.

## 36. Fibromyalgia

The outcome of treating fibromyalgia secondary to Lyme disease with nonantibiotic regimens has been poor. The most encouraging clinical trial showed success in only one of 15 patients and only modest improvement in 6 of 15 individuals with fibromyalgia despite 2 years of treatment [24]. Antibiotic therapy has been much more effective than supportive therapy in symptomatic patients with fibromyalgia secondary to Lyme disease.

Fibromyalgia treatment alone without antibiotics raises the risk of conversion to refractory chronic Lyme disease and/or exacerbation of an undiagnosed persistent infection and is not recommended. Increasingly, clinicians do not feel comfortable treating fibromyalgia in Lyme disease without antibiotics.

## 37. Decision to stop antibiotics

Several studies of patients with Lyme disease have recommended that antibiotics be discontinued after 30 days of treatment. Complicating the decision to stop antibiotics is the fact that some patients present with disease recurrence after the resolution of their initial Lyme disease symptoms. This is consistent with incomplete antibiotic therapy. Although the optimal time to discontinue antibiotics is unknown, it appears to be dependent on the extent of symptomatology, the patient's previous response to antibiotics and the overall response to therapy (see below).

Rather than an arbitrary 30-day treatment course, the patient's clinical response should guide duration of therapy. Patients must therefore be carefully evaluated for persistent infection before a decision is made to withhold therapy.

The decision to discontinue antibiotics should be made in consultation with the patient and should take into account such factors as the frequency and duration of persistent infection, frequency of recurrence, probability of refractory Lyme disease, gains with antibiotics, the importance to the patient of discontinuing antibiotics and potential for careful followup.

The ideal approach would be to continue therapy for Lyme disease until the Lyme spirochete is eradicated. Unfortunately there is currently no test available to determine this point [25]. Therefore, the clinician must rely on the factors outlined above to decide on the length of antibiotic therapy for chronic Lyme disease.

## 38. Alternative antibiotics

There is compelling evidence that Lyme disease can result in serious and potentially refractory illness. Use of alternative antibiotics to treat early Lyme disease with erythema migrans is generally not

Liberty002337

indicated unless coinfection is suspected.

The ILADS Working Group believes that the risk of alternative antibiotics is acceptable in selected Lyme disease patients presenting with chronic Lyme disease. Alternative antibiotics include less commonly used oral antibiotics (cefixime, cefdinir, metronidazole) and intravenous antibiotics (imipenem, azithromycin). The role of alternative antibiotics in low-risk patients is less certain and there is less consensus within the Working Group as to whether the potential benefits outweigh the risks.

## 39. Therapy for coinfection

Therapy for polymicrobial infection in Lyme disease is a rapidly changing area of clinical practice [25]. Uncomplicated Lyme disease may be managed without addressing coinfection by means of standard oral or parenteral antibiotic therapy. Some, but not all, experts recommend therapy for subclinical or chronic coinfection with *Ehrlichia*, *Babesia* or *Bartonella* on the basis of their belief that responses are more prompt with this approach.

The dose, duration and type of treatment for coinfections have not been defined. Published reports of coinfection are limited to a small number of patients treated in open-label, non-randomized studies. Doxycycline has been indicated for *Ehrlichia*. A recently published randomized trial determined that treatment of severe *Babesia microti* with the combination of atovaquone and azithromycin was as effective as the use of standard oral therapy with clindamycin and quinine [55].

The decision to use alternative antibiotics should be based on the individual case, including a careful assessment of the patient's risk factors and personal preferences. Patients managed in this way must be carefully selected and considered reliable for followup. Further controlled studies are needed to address the optimal antimicrobial agents for coinfections and the optimal duration of therapy.

Additional research is needed to determine which antibiotics work best for *Bartonella*, but fluoroquinolones, azithromycin, doxycycline and rifampin have good *in vitro* activity.

# Section V: Research needs

The ILADS Working Group encourages centers that treat large numbers of Lyme disease patients symptomatically using IDSA treatment guidelines to perform a formal evaluation of their own programs. This will allow researchers to compare the results of treatment guidelines that use more antibiotics with those that do not.

## 40. Ongoing development of treatment guidelines

The IDSA guidelines recommending one-time short-term antibiotic therapy have not been successful. Physician demands for better outcomes have led to the development of the ILADS guidelines, and the continued evolution of an evidence-based approach is critical for the treatment of persistent, recurrent and refractory Lyme disease.

## 41. Validation of guidelines

Most studies of Lyme disease were retrospective, unblinded and uncontrolled. Furthermore, the antibiotic dose and duration of therapy were not standardized.

The first double-blind clinical trial found that weekly benzathine penicillin for 3 weeks was more effective than placebo for Lyme arthritis [56]. At the other end of the spectrum, a recently completed randomized clinical trial failed to demonstrate any efficacy of 90 days of antibiotic therapy in previously treated patients with neurologic Lyme disease [23].

Two additional randomized trials are examining the practice of retreating chronic Lyme disease patients with antibiotics, and these results should be available shortly [57,58]. The retreatment approach is being validated using a single-center, prospective surveillance database.

## 42. Comparative studies

The IDSA and ILADS Guidelines differ substantially, revealing the wide variation in diagnosis and treatment (TABLE 1) [59,60]. This variation suggests that physicians do not use a uniform strategy to diagnose and treat Lyme disease. Physicians often

Liberty002338

treat for Lyme disease longer than 4 weeks and also retreat [8,19,47,48,57–62]. These decisions are made despite warnings against overdiagnosis and overtreatment [63–65].

Community-based clinicians and academic centers often have different criteria for diagnosis and divergent goals of care [8]. The guidelines and standards of practice used for diagnosis of Lyme disease in academic research settings may not be applicable or appropriate for community-based settings. Moreover, the clinical manifestations of Lyme disease are often subtle or atypical in the community.

Because important data concerning the treatment of chronic Lyme disease was not considered by the IDSA expert panel, ILADS introduced an evidence-based review to determine which recommendations warranted revision. This evidence-based review gave rise to the current guidelines.

## Section VI: Periodic review of guidelines

New data on treatment of Lyme disease is emerging, and randomized controlled trials that address various unresolved issues in Lyme disease are ongoing. The ILADS Working Group has therefore developed a mechanism for routinely and periodically reviewing this information and for updating the guidelines on a regular basis. The most recent information will be available from the ILADS website at www.ILADS.org.

### 43. Grading system for evidence-based guidelines

The ILADS system for grading recommendations is similar to that used by the expert panel of the IDSA. However, the ILADS panel includes primary care clinicians, researchers and international leaders in the treatment of Lyme disease. Thus, the ILADS group is more inclusive and clinically oriented than the IDSA panel, and the ILADS guidelines reflect this diversity.

## 44. Table 1. Comparison of key IDSA and ILADS guidelines.

| Condition | IDSA | ILADS |
|---|---|---|
| Lyme arthritis | B - II | A - II |
| Encephalopathy | A - II | A - II |
| Retreatment | None | A - II |
| Prolonged antibiotics | None | A - II |
| Benzathine penicillin | D - III | B - III |
| Intra-articular steroid | B - III | D - III |
| Arthroscopic Synovectomy | B - II | D - II |
| Coinfection | B - III | B - III |
| Seronegative Lyme disease | None | A - III |
| Combination treatment | None | B - III |
| Empiric treatment | None | B - III |

## 45. Criteria for evidence-based guidelines

The ILADS recommendations are based on two criteria [10]:

- The strength of the evidence (denoted by categories A–E)

- The quality of the data (denoted by Roman numerals I–III)

Recommendations rated 'A' are considered good evidence to support the recommendation. Those rated 'B' have moderate evidence to support the recommendation. Those rated 'C' are considered optional. Measures designated 'D' generally should not be offered; those designated 'E' are contraindicated. A rating of I indicates that at least one randomized controlled trial supports the recommendation; II, evidence from at least one well-designed clinical trial without randomization supports the recommendation; and III, 'expert opinion'.

## Sources

Our data sources are English-language articles published from 1975 to 2003. The selection panel synthesized the recommendations from published and expert opinion. Human studies of Lyme disease were identified from MEDLINE (1975 to 2003) and from references in pertinent articles and reviews. Also included are abstracts and material presented at professional meetings and the collective experience of the ILADS Working Group treating tens of thousands of Lyme disease patients.

Liberty002339

## ILADS Guidelines

## References

1 Goldoft MJ, Schulze TL, Parkin WE, Gunn RA. Lyme disease in New Jersey. *NJ Med.* 87, 579–584 (1990).

2 CDC. Lyme disease-United States, 2000. *MMWR* 51, 29–31 (2002).

3 Shadick NA, Phillips CB, Logigian EL *et al.* The long-term clinical outcomes of Lyme disease. A population-based retrospective cohort study. *Ann. Intern. Med.* 121, 560–567 (1994).

4 Asch ES, Bujak DI, Weiss M, Peterson MGE, Weinstein A. Lyme disease: an infectious and postinfectious syndrome. *J. Rheumatol.* 21, 454–456 (1994).

5 Parola P, Raoult D. Ticks and tickborne bacterial diseases in humans: an emerging infectious threat. *Clin. Infect. Dis.* 32, 897–928 (2001).

6 Wormser GP, Nadelman RB, Dattwyler RJ *et al.* Practice guidelines for the treatment of Lyme disease. The Infectious Diseases Society of America. *Clin. Infect. Dis.* 31(Suppl. 1), 1–14 (2000).

7 Rahn DW, Malawista SE. Lyme disease: recommendations for diagnosis and treatment. *Ann. Intern. Med.* 114, 472–481 (1991).

8 Feder HM Jr. Differences are voiced by two Lyme camps at a Connecticut public hearing on insurance coverage of Lyme disease. *Pediatrics* 105(4 Pt 1), 855–857 (2000).

9 Burrascano JJ. Lyme disease. In: *Conn's Current Therapy.* WB Saunders Company, PA, USA 140–143 (1997).

10 Kish MA. Guide to development of practice guidelines. *Clin. Infect. Dis.* 32, 851–854 (2001).

11 Steere AC, Malawista SE, Snydman DR, Shope RE, Andiman WA, Ross MR, Steele FM. Lyme arthritis: an epidemic of oligoarticular arthritis in children and adults in three Connecticut communities. *Arthritis Rheum.* 20, 7–17 (1977).

12 Logigian EL, Kaplan RF, Steere AC. Chronic neurologic manifestations of Lyme disease. *N. Engl. J. Med.* 323, 1438–1444 (1990).

13 Fallon BA, Nields JA. Lyme disease: a neuropsychiatric illness. *Am. J. Psychiatry* 151, 1571–1583 (1994).

14 Tylewska-Wierzbunowska S, Chmielewski T. Limitation of serological testing for Lyme borreliosis: evaluation of ELISA and western blot in comparison with PCR and culture methods. *Wien Klin Wochenschr.* 114, 601–605 (2002).

15 Halperin JJ. Neuroborreliosis. *Am. J. Med.* 98(4A), 52S–59S (1995).

16 Battaglia HR, Alvarez G, Mercau A, Fay M, Campodónico M. Psychiatric symptomatology associated with presumptive Lyme disease: Clinical evidence. *J. Spiro Tick Dis.* 7, 22–25 (2000).

17 Corsaro L. Intramuscular Bicillin for persistent pediatric Lyme disease. Proceedings of the 9th International Conference on Lyme Borreliosis & Other Tick-borne Disorders (1999).

18 Cimmino MA, Accardo S. Long-term treatment of chronic Lyme arthritis with benzathine penicillin. *Ann. Rheum. Dis.* 51, 1007–1008 (1992).

19 Fallon BA, Tager F, Keilp J, Weiss N, Liebowitz MR, Fein L, Liegner K. Repeated antibiotic treatment in chronic Lyme disease. *J. Spiro Tick Dis.* 6, 94–102 (1999).

20 Lawrence C, Lipton RB, Lowy FD, Coyle PK. Seronegative chronic relapsing neuroborreliosis. *Eur. Neurol.* 35,113–117 (1995).

21 Cameron DJ. Monitoring Lyme disease in the community – First surveillance database sentinel health site. Proceedings of the 12th Annual International Scientific Conference on Lyme Disease and Other Spirochetal and Tick-Borne Disorders (1999).

22 Fallon BA, Kochevar JM, Gaito A, Nields JA. The underdiagnosis of neuropsychiatric Lyme disease in children and adults. *Psychiatr. Clin. North Am.* 21, 693–703 (1998).

23 Klempner MS, Hu LT, Evans J *et al.* Two controlled trials of antibiotic treatment in patients with persistent symptoms and a history of Lyme disease. *N. Engl. J. Med.* 345, 85–92 (2001).

24 Dinerman H, Steere AC. Lyme disease associated with fibromyalgia. *Ann. Intern. Med.* 117, 281–285 (1992).

25 Stricker RB, Lautin A. The Lyme wars: time to listen. *Expert Opin. Investig. Drugs* 12, 1609–1614 (2003).

26 Nadelman RB, Wormser GP. Erythema migrans and early Lyme disease. *Am. J. Med.* 98(4A), S15–S24 (1995).

27 Nowakowski J, McKenna D, Nadelman RB et al. Failure of treatment with cephalexin for Lyme disease. *Arch. Fam. Med.* 9, 563–567 (2000).

28 Steere AC, Broderick TF, Malawista SE. Erythema chronicum migrans and Lyme arthritis: epidemiologic evidence for a tick vector. *Am. J. Epidemia.* 108, 312–321 (1978).

29 Petrovic M, Vogelaers D, Van Renterghem L, Carton D, De Reuck J, Afschrift M. Lyme borreliosis – a review of

the late stages and treatment of four cases. *Acta Clin. Belg.* 53, 178–183 (1998).

30 Tilton RC, Sand MN, Manak M. The Western immunoblot for Lyme disease: determination of sensitivity, specificity and interpretive criteria with use of commercially available performance panels. *Clin. Infect. Dis.* 25(Suppl. 1), S31–S34 (1997).

31 CDC. Recommendations for test performance and interpretation from the second national conference on serologic diagnosis of Lyme disease. *MMWR* 44, 590–591 (1995).

32 Trevejo RT, Krause PJ, Sikand VK, Schriefer ME, Ryan R, Lepore T, Porter W, Dennis DT. Evaluation of two-test serodiagnostic method for early Lyme disease in clinical practice. *J. Infect. Dis.* 179, 931–938 (1999).

33 Aguero-Rosenfeld ME, Nowakowski J, McKenna DF, Carbonaro CA, Wormser GP. Serodiagnosis in early Lyme disease. *J. Clin. Microbiol.* 31, 3090–3095 (1993).

34 Harris N. An understanding of laboratory testing for Lyme disease. *J. Spiro Tick Dis.* 5, 16–26 (1998).

35 Ma B, Christen B, Leung D, Vigo-Pelfrey C. Serodiagnosis of Lyme borreliosis by Western immunoblot: reactivity of various significant antibodies against *Borrelia burgdorferi*. *J. Clin. Microbiol.* 30, 370–376 (1992).

36 Engstrom SM, Shoop E, Johnson RC. Immunoblot interpretation criteria for serodiagnosis of early Lyme disease. *J. Clin. Microbiol.* 33, 419–427 (1995).

37 Magnarelli LA. Laboratory analyses for Lyme disease. *Conn. Med.* 53, 331–334 (1989).

38 Krause PJ, Telford S, Spielman A, Sikand VJ, Ryan R, Christianson D, Burke G, Brassard P, Pollack R, Peck J, Persing DH. Concurrent Lyme disease and Babesiosis: Evidence for increased severity and duration of illness. *JAMA* 275, 1657–1660 (1996).

39 Luft BJ, Dattwyler RJ, Johnson RC *et al.* Azithromycin compared with amoxicillin in the treatment of erythema migrans: a double-blind, randomized, controlled trial. *Ann. Intern. Med.* 124, 785–791 (1996).

40 Dattwyler RJ, Luft BJ, Kunkel M *et al.* Ceftriaxone compared with doxycycline for the treatment of acute disseminated Lyme disease. *N. Engl. J. Med.* 337, 289–294 (1997).

41 Barsic B, Maretic T, Majerus L, Strugar J. Comparison of azithromycin and doxycycline in the treatment of erythema migrans. *Infection* 28, 153–156 (2000).

47

Liberty002340

## ILADS Guidelines

42 Scott LJ, Ormrod D, Goa KL. Cefuroxime axetil: an updated review of its use in the management of bacterial infections. *Drugs* 61, 1455–1500 (2001).

43 Dattwyler RJ, Grunwaldt E, Luft BJ. Clarithromycin in treatment of early Lyme disease: a pilot study. *Antimicrob. Agents Chemother.* 40, 468–469 (1996).

44 Karlsson M, Hammers-Berggren S, Lindquist L *et al.* Comparison of iv. penicillin G and oral doxycycline for treatment of Lyme neuroborreliosis. *Neurology* 44, 1203–1207 (1994).

45 Dotevall L, Hagberg L. Successful oral doxycycline treatment of Lyme disease-associated facial palsy and meningitis. *Clin. Infect. Dis.* 28, 569–574 (1999).

46 Luft BJ, Volkman DJ, Halperin JJ, Dattwyler RJ. New chemotherapeutic approaches in the treatment of Lyme borreliosis. *Ann. NY Acad. Sci.* 539, 352–361 (1988).

47 Battaglia HR, Alvarez G, Mercau A, Fay M, Campodónico M. Psychiatric symptomatology associated with presumptive Lyme disease: clinical evidence. *J. Spirol. Tick Dis.* 7, 22–25 (2000).

48 Ziska MH, Donta ST, Demarest FC. Physician preferences in the diagnosis and treatment of Lyme disease in the United States. *Infection* 24, 182–186 (1996).

49 Culp RW, Eichenfield AH, Davidson RS, Drummond DS, Christofersen MR, Goldsmith DP. Lyme arthritis in children. An orthopedic perspective. *J. Bone Joint Surg. Am.* 69, 96–99 (1987).

50 Weiss LM. Babesiosis in humans: a treatment review. *Expert Opin. Pharmacother.* 3, 1109–1115 (2002).

51 Logigian EL, Kaplan RF, Steere AC. Successful treatment of Lyme encephalopathy with iv. ceftriaxone. *J. Infect. Dis.* 180, 377–383 (1999).

52 Dattwyler RJ, Halperin JJ, Volkman DJ, Luft BJ. Treatment of late Lyme borreliosis – randomized comparison of ceftriaxone and penicillin. *Lancet* 1191–1194 (1988).

53 Schoen RT, Aversa JM, Rahn DW, Steere AC. Treatment of refractory chronic Lyme arthritis with arthroscopic synovectomy. *Arthritis Rheum.* 34, 1056–1060 (1991).

54 Pavia CS. Current and novel therapies for Lyme disease. *Expert Opin. Investig. Drugs* 12, 1003–1016 (2003).

55 Krause PJ, Lepore T, Sikand VK *et al.* Atovaquone and azithromycin for the treatment of babesiosis. *N. Engl. J. Med.* 343, 1454–1458 (2000).

56 Steere AC, Green J, Schoen RT *et al.* Successful parenteral penicillin therapy of established Lyme arthritis. *N. Engl. J. Med.* 312, 869–874 (1985).

57 Fallon BA. Chronic Lyme Disease Research Study. A double-blind placebo-controlled randomized clinical trial evaluating the efficacy of ten weeks of iv. ceftriaxone and effects on brain imaging. Enrollment since 2000.

58 Cameron DJ. Lyme Disease Retreatment Study. A double-blind placebo-controlled randomized clinical trial evaluating the efficacy of oral amoxicillin for seropositive and seronegative Lyme disease. Enrollment since 2001.

59 Eppes SC, Klein JD, Caputo G, Rose CD. Physician beliefs, attitudes and approaches toward Lyme disease in an endemic area. *Clin. Pediatr.* 33, 130–134 (1994).

60 Peña CA, Mathews AA, Siddiqi NH, Strickland GT. Antibiotic therapy for Lyme disease in a population-based cohort. *Clin. Infect. Dis.* 29, 694–695 (1999).

61 Wahlberg P, Granlund H, Nyman D, Panelius J, Seppala I. Treatment of late Lyme borreliosis. *J. Infect.* 29, 255–261 (1994).

62 Donta ST. Tetracycline therapy for chronic Lyme disease. *Clin. Infect. Dis.* 25(Suppl. 1), S52–S56 (1997).

63 Reid MC, Schoen RT, Evans J, Rosenberg JC, Horwitz RI. The consequences of overdiagnosis and overtreatment of Lyme disease: an observational study. *Ann. Intern. Med.* 128, 354–362 (1998).

64 Steere AC, Taylor E, McHugh GL, Logigian EL. The overdiagnosis of Lyme disease. *JAMA* 269, 1812–1816 (1993).

65 Sigal LH. Anxiety and persistence of Lyme disease. *Am. J. Med.* 98(4A), 74S–78S (1995).

Website 101 Burrascano JJ Jr. Managing Lyme disease: diagnostic hints and treatment guidelines for Lyme borreliosis, 2003. Accessed at www.ILADS.org on November 1, 2003.

### The ILADS Working Group

Daniel Cameron, MD MPH Internal Medicine and Epidemiology, Mt. Kisco, New York

Andrea Gaito, MD Rheumatology, Basking Ridge, New Jersey

Nick Harris, PhD Immunology, Palo Alto, California

Gregory Bach, DO Family and Integrative Medicine, Colmar, Pennsylvania

Sabra Bellovin, MD Family Practice, Portsmouth, Virginia

Kenneth Bock, MD Family Practice, Rhinebeck, New York

Steven Bock, MD Family Practice, Rhinebeck, New York

Joseph Burrascano, MD Internal Medicine East Hampton, New York

Constance Dickey, RN Registered Nurse Hampden, Maine

Richard Horowitz, MD Internal Medicine, Hyde Park, New York

Steven Phillips, MD Internal Medicine, Ridgefield, Connecticut

Lauhence Meer Scherrer, MD Internal Medicine, Flamatt, Switzerland

Bernard Raxlen, MD Psychiatry, Greenwich, Connecticut

Virginia Sherr, MD Psychiatry, Holland, Pennsylvania

Harold Smith, MD Emergency Medicine, Danville, Pennsylvania

Pat Smith, President Lyme Disease Association Inc. Jackson, New Jersey

Raphael Stricker, MD Hematology and Immunotherapy San Francisco, California

### Acknowledgement

ILADS would like to thank the Turn the Corner Foundation, New York, NY, for financial support of formulation of the guidelines; Medallion Media, Novato, CA, for editorial support of development of the guidelines; and the Lyme Disease Association, Inc., Jackson, NJ, for financial support of publication.

Liberty002341

Article Courtesy of
CALDA
&



Review

# Treatment of Lyme disease: a medicolegal assessment

*Lorraine Johnson and Raphael B Stricker†*

Lyme disease is the most common tick-borne disease in the world today. Despite extensive research into the complex nature of *Borrelia burgdorferi*, the spirochetal agent of Lyme disease, controversy continues over the diagnosis and treatment of this protean illness. This report will focus on two aspects of the treatment of Lyme disease. First, the medical basis for diagnostic and therapeutic uncertainty in Lyme disease, including variability in clinical presentation, shortcomings in laboratory testing procedures, and design defects in therapeutic trials. Second, the standard of care and legal issues that have resulted from the clinical uncertainty of Lyme disease diagnosis and treatment. Specifically, the divergent therapeutic standards for Lyme disease are addressed, and the difficult process of creating treatment guidelines for this complex infection is explored. Consideration by healthcare providers of the medicolegal issues outlined in this review will support a more rational approach to the diagnosis and treatment of Lyme disease and related tick-borne illnesses.

*Expert Rev. Anti-infect. Ther.* 2(4), 533–557 (2004)

## Lyme disease & diagnosis

### Characteristics of Lyme disease

Ticks have been called 'sewers of infectious disease'. Hard-shelled (*Ixodes*) ticks are capable of transmitting *Borrelia burgdorferi*, the agent of Lyme disease, and other pathogens such as *Babesia*, *Ehrlichia* and *Bartonella*. Thus, the term Lyme disease often signifies a poorly defined polymicrobial infection. Coinfections may alter the course of Lyme disease and may make the infected patient more difficult to treat [1,2]. Recent studies have shown that tick saliva carries immunosuppressive substances that enable tick-borne agents to invade tissues while paralyzing the local immune response [3,4]. This may allow the Lyme disease spirochete to disseminate rapidly and become entrenched and resistant early in the disease [5–7]. Although scientists believe that Lyme disease is transmitted primarily by ticks, some studies suggest gestational transmission and transmission by other insects, blood transfusion and intimate human contact [8–12].

In 2002, the number of Lyme disease cases reported to the US Centers for Disease Control and Prevention (CDC) increased by 40%, to 23,763 cases [13]. Since only 10 to 15% of Lyme disease cases are actually reported [12], it is estimated that the true number of cases throughout the USA may exceed 237,630 annually. The highest reported incidence of Lyme disease occurs in children under 15 years of age [12]. Morbidity associated with persistent Lyme disease is significant, with patients suffering a degree of physical health deterioration equal to that of patients with congestive heart failure [14]. Although it is commonly believed that Lyme disease does not result in death, at least 21 research studies have documented deaths associated with Lyme disease [15,16,201]. However, epidemiological studies are needed to document the fatality rates or proportionate mortality.

### Stages of disease

Lyme disease may have devastating effects if not promptly diagnosed and adequately treated. A multisystemic disorder, Lyme disease can manifest with:

- Neurological symptoms, such as Bell's palsy (causing paralysis of facial nerves)

- Meningitis (causing headache, fever and stiff neck)

© Future Drugs Ltd. All rights reserved. ISSN 1478-7210

Liberty002342

- Nerve inflammation (causing numbness and tingling in the arms and legs)
- Encephalitis (causing learning difficulties, confusion and dementia)
- Musculoskeletal symptoms such as myalgias and arthralgias, with or without arthritis
- Heart involvement (causing irregularities in heart rhythm and congestive heart failure)

Lyme disease mimics many other conditions, including psychiatric syndromes, progressive dementias, seizure disorders, strokes, extrapyramidal disorders, amyotrophic lateral sclerosis, Guillain–Barre syndrome and progressive demyelinating diseases such as multiple sclerosis [17]. *B. burgdorferi* genospecies are believed to exhibit strain-dependent organotropism, with the two European species *Borrelia afzelii* and *Borrelia garinii* observed to produce a predominance of skin and neurologic symptoms, respectively [18]. The potential strain-dependent organotropism of *B. burgdorferi* genospecies should be kept in mind when reviewing studies from other countries.

Like syphilis, Lyme disease has been described as having three stages: early localized, early disseminated and late stage or chronic Lyme disease. Early disease may involve an erythema migrans (EM) (bulls-eye or atypical) rash or a flu-like illness. While the EM rash alone is generally considered diagnostic of Lyme disease, only 68% of reported cases observed an EM rash [13].

Disseminated Lyme disease involves one or more organ systems (most commonly musculoskeletal, neurologic or cardiac) as spirochetes spread to distant sites. Late-stage or persistent Lyme disease occurs months to years after infection, and typically involves the musculoskeletal and neurologic systems (both central and peripheral). In late-stage or persistent Lyme disease, the infection is more entrenched and difficult to treat. In practice, infection forms a continuum along which early and late features overlap. For instance, the spirochete and its DNA have been isolated from the cerebrospinal fluid (CSF) early in the course of the disease when the EM rash is still present, and spirochetes have been cultured from the skin years after primary infection [202].

### Diagnostic difficulties

Failure to recognize and treat Lyme disease early on can allow the infection to progress, permitting a treatable acute infection to become a relapsing chronic disease that is ultimately less responsive to antibiotics [19]. There is a general consensus among the physicians who are most familiar with treating this disorder that the earlier that Lyme disease is treated, the greater the chance for a complete cure. Late disease presents the greatest treatment challenge and may be refractory to various treatment modalities.

Prompt diagnosis of Lyme disease is hampered by many factors. The spirochete can persist for years without causing symptoms [202], and some patients present initially with neurologic or rheumatologic complaints, since EM rash is either not present or is unrecognized or misdiagnosed [202]. Misdiagnosis is also made more likely by the fact that Lyme disease mimics many other syndromes. A central diagnostic difficulty in Lyme disease is the lack of a definitive and readily available laboratory test for the diagnosis of active infection [20].

### Lack of definitive laboratory tests for active infection

The most definitive diagnostic procedure for Lyme disease is biopsy and isolation of *B. burgdorferi* in culture [21]. However, *B. burgdorferi* spirochetes are scarce, tissue bound, and divide slowly [22], making it extremely difficult to culture the organism using routine methods [23,24]. Diagnosis of Lyme disease is most commonly supported by serological techniques that detect antibodies in the patient's blood [25]. Laboratory techniques that detect antibodies suffer from two primary drawbacks:

- A positive antibody response merely reflects past or present exposure to borrrelia infection and, hence, is not truly diagnostic of on-going infection
- These techniques rely on the immune response following exposure and will necessarily fail if the patient is not producing detectable antibodies

There are many reasons why Lyme seronegativity might occur:

- Serologic tests may be given too early (before antibodies are formed); *B. burgdorferi* may not be present in the blood (it may be in tissues) or may have eluded the immune system by adopting a cell wall-deficient L-form
- Antibodies in the patient's blood may be bound into immune complexes
- Antibodies may not be present in the patient's blood for other reasons (e.g., the use of antibiotics early in the course of the disease or systemic steroid therapy may abrogate the immune response to *B. burgdorferi*, and late in the disease, antibody levels may fall to very low levels) [22,26-28]

The two most commonly used methods for detecting antibodies against the spirocheral agent of Lyme disease are the enzyme-linked immunosorbent assay (ELISA) and the western blot. Recent studies by the group responsible for the Lyme disease proficiency testing for the College of American Pathologists (CAP) came to the conclusion that the currently available ELISA tests do not have adequate sensitivity to meet the two-tiered approach recommended by the CDC for surveillance [29]. Donta has observed that 52% of patients with chronic Lyme disease are found negative by ELISA but positive by western blot [30].

The western blot is recognized by the National Institute of Allergy and Infectious Diseases (NIAID), a division of the National Institutes of Health (NIH), as the most useful method for detecting borrelia antibodies currently available [203]. The western blot may be used to measure both immunoglobulin (Ig)M and G antibodies. Commonly, IgM antibodies appear first, wane after the first few weeks and do not recur. These are

Liberty002343

followed by IgG antibodies, which are regarded as the major enduring antibody response in chronic infectious diseases. However, in Lyme disease, IgM antibodies may persist for years, suggesting persistent infection or a reactivation of latent infection (as is seen, for example, in toxoplasmosis, leishmaniasis and cytomegalovirus infection) [31]. A number of studies point to the importance of the IgM response in recurrent or persistent Lyme disease [32-36].

Physicians treating Lyme disease should consider the particular bands that test positive for an individual patient and the specificity of the bands to the disease [32,37]. Western blot bands have been shown to be important in the endemic setting of the region. A study by Engstrom and colleagues found that two of five bands gave them a specificity of 93 to 96% and a sensitivity of 100% in the 70% of the patients who manufactured antibodies [38]. Another study that included 186 defined patients and 320 negative controls, showed excellent sensitivity and specificity for IgM and a good sensitivity and specificity for IgG using two of five bands [39].

The issue of seronegativity with antibody detection techniques is significant. One researcher found that only three of 14 patients who were culture positive for *B. burgdorferi* had positive antibody titers [40]. Another group of researchers showed that only 70% of documented Lyme disease patients in their study had a significant antibody response [41,42]. Another group found that approximately 20% of patients with Lyme disease were seronegative [32]. Ironically, seronegative patients may be the least able to mount an effective defense to the infection and, hence, may be the worst effected [204].

Other tests can help corroborate a diagnosis of Lyme disease. Polymerase chain reaction (PCR) that detects the presence of *B. burgdorferi* DNA in blood, CSF, urine, synovial fluid or tissues, is regarded as highly specific, but has a low yield, particularly in body fluids [43,44]. Signs of CNS involvement include elevated CSF protein or pleocytosis, abnormal brain single-photon emission computerized tomography (SPECT), magnetic resonance imaging (MRI) or electroencephalogram (EEG), intrathecal antibody production or a positive PCR for *B. burgdorferi*, or a positive culture.

### Lyme disease is a clinical diagnosis

Demonstration of active infection is not feasible as a matter of routine, given the insensitivity of the PCR test, the impracticality of culture tests, and the drawbacks of antibody detection methods. Conversely, the current state of diagnostic testing cannot demonstrate the eradication of *B. burgdorferi* (because negative test results do not mean an absence of infection). Due to weaknesses in laboratory tests, the diagnosis of Lyme disease remains primarily clinical, with the focus on vector exposure and symptoms that reflect the multisystemic nature of the disease, with laboratory tests playing a supporting role [205].

The CDC, US Food and Drug Administration (FDA), and NIAID have all expressed concern regarding the over-reliance on laboratory tests for diagnosing Lyme disease [21,47,205], with the FDA stating that tests 'should never be the primary basis for

making diagnostic or treatment decisions. Diagnosis should be based on a patient history, including symptoms and exposure to the tick vector and physical findings' [21]. In accordance with these recommendations, most practitioners use a clinical definition of Lyme disease that includes a combination of symptoms and clinical signs with or without positive serological support [45], although some clinicians maintain that diagnosis should be supported by positive serology [46].

### Misuse of the CDC surveillance criteria for diagnosis

Misdiagnosis also occurs because of misuse of the strict CDC surveillance case definition and testing standards for diagnosis. The CDC surveillance definition does not take into account neurological Lyme disease nor chronic Lyme disease, and therefore misses many confirmed Lyme cases. For surveillance purposes, the CDC requires five of ten IgG bands and two of three IgM bands for a positive result. Although a majority (89%) of patients with EM-confirmed Lyme disease develop an IgG response at some time during the disease, only 22% are positive by CDC criteria [41,42]. In addition, for its surveillance definition, the CDC recommends a two-tiered testing approach. However, this approach is problematic because the first tier test, the ELISA test, lacks sufficient sensitivity. The CDC has cautioned that this surveillance case definition was developed for national reporting of Lyme disease, and that it is not appropriate for clinical diagnosis [47].

As a CDC official explained, the distinction between diagnostic goals and surveillance goals is critical:

> *'Surveillance case definitions are created for the purpose of standardization, not patient care...whereas physicians appropriately err on the side of over-diagnosis, thereby assuring they don't miss a case, surveillance case definitions appropriately err on the side of specificity, thereby assuring that they do not inadvertently capture illnesses due to other conditions'* [206].

The CDC further notes that it is inappropriate to use surveillance case definitions 'for establishing clinical diagnoses, determining the standard of care necessary for a particular patient, setting guidelines for quality assurance, or providing standards for reimbursement' [47].

### Factors that may complicate treatment

*B. burgdorferi*, the spiral-shaped bacteria that causes Lyme disease, is an extremely complex organism. The genetic structure of *B. burgdorferi* is the most complex identified in a prokaryote [48]. Experimentally, *B. burgdorferi* has been shown to penetrate human fibroblasts and live intracellularly, even when the extracellular milieu contains bacteriocidal levels of ceftriaxone (Rocephin®, Roche) [202]. This mechanism may permit the spirochete to evade normal host defense mechanisms [202]. These findings are critically important, since chronic infections are highly dependent on intracellular asylum as a mode of persistence [49-51]. Intracellular pathogens are notoriously difficult to treat and cure [52].

Liberty002344

*B. burgdorferi* displays an altered morphology, referred to collectively as L-forms. L-forms of many bacteria have long been shown to be central in setting up chronic infection [53,54]; and the existence of cell wall-deficient L-forms of *B. burgdorferi* suggests that antibiotic treatment failures will arise. Some researchers hypothesize that the ability of *B. burgdorferi* to change to a cyst form and back to a helical form may be major factors in the relapsing and persistent nature of Lyme disease [55–58].

Other factors that may complicate treatment include the existence of untreated coinfections and the slow rate of *B. burgdorferi* reproduction (many antibiotics rely on actively dividing organisms), as well as its ability to either suppress or evade the immune system [59–62].

## Divergent treatment options
### Antibiotic treatment

The ideal antibiotics, route of administration, and duration of treatment for persistent Lyme disease are not established. No single antibiotic or combination of antibiotics appears to be capable of completely eradicating the infection [63], and treatment failures or relapses are reported with all current regimens, although they are less common with early aggressive treatment [22,63].

There are frequent discrepancies between *in vitro* and *in vivo* antibiotic results [22]. Preac-Mursic and colleagues found substantial variation in the kill rate of given antibiotics within different strains of *B. burgdorferi* and even within the same species. They described other factors that make antibiotic treatment more difficult, including the increased virulence of the infecting borreliae, the long generation time of the spirochete, infection in immunologically privileged sites, the inability of the antibiotic to penetrate those sites, and insufficient antibiotic dosage [64]. Given these variations, it is unlikely that a 'one size fits all' approach to treatment will be successful in Lyme disease.

Combinations of medications featuring different modes of action (e.g., cell wall acting vs. replication dependent) are common [65]. Among the factors to consider are tissue and CNS penetration, intracellular site of action, cell wall versus other mechanisms of action, patient tolerance and the existence of coinfections [66]. Route of administration plays a substantial role, with intravenous being the most effective, followed by intramuscular and then oral therapy [66]. Parenteral antibiotics are generally recommended when there is neurological involvement, carditis, or complicated Lyme arthritis [12].

### No fixed treatment end point creates divergent treatment options

There are no reliable microbiologic or immunologic criteria to document active infection in Lyme disease [22,67,68]. Without reliable biological markers, the task of determining who has the disease, the effectiveness of a course of treatment or the end point of treatment is problematic. The lack of definitive diagnostic tests for Lyme disease, not only means that diagnosis is a clinical determination, but also that the treatment end point must be determined by other means, becoming, by default an essentially clinical determination [30].

The NIAID notes the problem of false negatives and positives with the currently existing tests (the ELISA and western blot) and observes that:

> *'Neither the western blot nor the ELISA tests are sufficiently quantitative to enable one to monitor and evaluate the efficacy of antibiotic therapy during the course of treatment…the availability of a test that is both sensitive and indicative of active infection with* B. burgdorferi *would also enable one to identify those patients who would benefit from antibiotic therapy, as well as to judge the effectiveness of such therapy on the resolution of infection'* [205].

### Two Lyme camps

Given the current lack of a test that can demonstrate the eradication of *B. burgdorferi*, and the lack of studies determining the optimum length of antibiotic treatment or even the optimum choice of antibiotic [63], two different schools of practice have emerged. Some physicians treat for 30 days regardless of patient response unless relapse is shown by reliable objective measures [69]. Other physicians reason that if a diagnosis can only be made clinically because the current diagnostic tests are inadequate, then the determination of the treatment end point must also be made clinically [37]. The different approaches have crystallized into a polemic, and at times rancorous debate between the two Lyme camps [70].

A number of conflicting guidelines reflecting the views of the two Lyme camps have been promulgated over the years. Most recently, one set of guidelines was published under the auspices of the Infectious Disease Society of America (IDSA) [69], while another set was published by the International Lyme and Associated Diseases Society (ILADS) [37]. Both guidelines are evidence-based and peer reviewed, with the IDSA generally recommending standardized short-term treatment, and ILADS recommending individualized treatment based on the clinical course of the patient.

### Short-term treatment approach

The short-term treatment approach is reflected in the IDSA guidelines. Although the IDSA itself is a large specialty organization, the panel that drafted the guidelines was narrowly drawn and consisted almost exclusively of academic researchers with well-known ideological views, representing one of the two Lyme camps. The guidelines advise that response to treatment is usually slow and may be incomplete but retreatment, after a 30-day course of antibiotics, is not recommended in the absence of reliable objective measures. The guidelines also state that there are no convincing published data showing that repeated or prolonged courses of oral or intravenous antimicrobial therapy are effective for such patients.

Physicians advocating the short-term treatment approach note the overlap of symptoms of persistent Lyme disease and other autoimmune diseases and hypothesize that any persistent

Liberty002345

symptoms after treatment reflect an autoimmune process triggered by the infection. Basically, these physicians assume that the infection has been eradicated once the patient has received the presumptively adequate antibiotic treatment. They provide the patient with palliative treatment for the remaining symptoms. The assumption that the infection has been adequately treated is presumptive because:

* There have been no trials demonstrating the efficacy of the 30-day antibiotic treatment duration
* There is currently no diagnostic test that can establish the eradication of *B. burgdorferi*
* There is no evidence to support the hypothesis that the sole cause of the continuing symptoms is the presence of immune complexes

Terminating treatment despite persistent symptoms is a high-stakes risk for patients with progressive illness. In addition, steroids, which may be used to curb autoimmune conditions, increase the progression of active infection and are contraindicated for active Lyme disease [78]. Some physicians have characterized the termination of treatment despite persistent symptoms as medically sanctioned negligence [204], because termination of treatment may result in advanced neurological injury, debilitation and death [72].

The IDSA guidelines have drawn sharp criticism from treating physicians [204,207] and patients [208] because they make strong inflexible treatment recommendations based on weak evidence, place undue weight on flawed laboratory tests, discount the diagnostic value of patient symptoms, and fail to consider individual treatment response variability, coinfections, patient preferences, or treatment options. Moreover, they do not contain any data of note regarding the treatment of patients with late and chronic Lyme disease. The focus on reliable objective measures as a determinant for the continued treatment of symptomatic patients is particularly disturbing in light of the current state of diagnostic testing. Straubinger's animal studies proved persistent infection after antibiotic treatment only by harvesting 25 tissue samples from each dog at necropsy [44]. Animal studies indicate that considerable infection with *B. burgdorferi* in the CNS can be present without overt clinical signs [73]. As the CDC, NIAID and FDA have all acknowledged [21,47,205], the commercially available tests today simply cannot carry the weight of this load, which is why each of these agencies call for clinical diagnosis and discourage over reliance on laboratory tests.

### Long-term treatment

The longer-term treatment approach is reflected in the ILADS guidelines. ILADS is an interdisciplinary group of physicians and researchers dedicated to improving the diagnosis and treatment of tick-borne diseases. Members include neurologists, rheumatologists, internists, family practitioners, pediatricians, immunologists, ophthalmologists, dentists, and psychiatrists. The ILADS guidelines stipulate that laboratory tests should play a supportive role in the clinical diagnosis and treatment

determinations for Lyme disease. Similarly, the duration of therapy should be guided by clinical response to treatment, and treatment should continue until resolution of laboratory abnormalities and symptoms. The treatment guidelines discuss persistent, recurrent and refractory Lyme disease, treatment failure, and coinfection.

Physicians who advocate longer-term antibiotic treatment use an empirical approach based on the clinical evidence of active infection to determine treatment duration. Evidence of ongoing infection is determined by examining all clinical data, including persistence of symptoms, serologic testing, and other forms of corroborating tests such as MRI scans, SPECT imaging, neurocognitive testing, or other neurological indications. Ultimately, the determination of efficacy of therapy depends on the clinical response. One physician summarizes the treatment approach as follows:

*'Currently, no definitive tests are available for assessing the complete absence of spirochetes in patients. Only through a careful evaluation of individual clinical data can the optimum duration of treatment be established. Our observations indicate that if antibiotic therapy is terminated before the major active symptoms have cleared, a relapse is likely'* [74].

Physicians who advocate a long-term treatment approach point to:

* High rate of treatment failures using short-term antibiotics
* Studies showing persistent infection despite antibiotic treatment
* Clinical evidence that antibiotic treatment may suppress but not eradicate infection in some patients
* Clinical evidence of the benefit of longer treatment regimens
* Favorable clinical response of patients who are retreated

These physicians believe that it is too early for standardization of treatment regimens, and that these regimens should be individualized based upon the patient's symptoms and clinical course. From experience, they have seen that prolonged treatment regimens similar to those used in other chronic diseases such as tuberculosis and leprosy are more in keeping with the treatment needs of patients with persistent symptoms of Lyme disease. Although they acknowledge that immune reactivity may contribute to symptoms in chronic Lyme disease, they regard it as unlikely that this reactivity accounts for the majority of progressive symptoms in Lyme disease patients, particularly given that many of the symptoms characterized as inflammatory, improve in response to antibiotic treatment [19]. Moreover, some macrolide antibiotics have recently been shown to possess not only bacteriocidal effects, but also immunomodulatory effects [75].

### Validation of guidelines

The ILADS guidelines provide for validation using a single-center, prospective surveillance database and encourage additional treatment outcome studies, while no validation procedure is provided for the IDSA guidelines. ILADS notes that treatment following the IDSA guidelines has not been successful and recommends that centers employing the IDSA guidelines perform formal evaluations

Liberty002346

of the results of their own programs. Validation of the two treatment approaches through outcome studies could provide critical information regarding the treatment of Lyme disease. Two factors to bear in mind, however, are insuring sufficiently long-term follow-up to capture meaningful relapse rates and recording patient symptom data. Patients who report disability analogous to congestive heart failure should not be considered well by any measure.

### Failure rates of short-term antibiotic treatment

The IDSA guidelines recommend intravenous antibiotics for 2 to 4 weeks or oral antibiotics for 4 weeks for the treatment of persistent Lyme disease [69]. There have been no human trials proving the effectiveness of 30-day antibiotic regimens [32]. However, animal studies demonstrate that, while this duration of treatment may reduce the bacterial load, it does not eradicate the organism [71]. A number of studies have found treatment failures ranging from 24 to 50% using short-term protocols (TABLE 1). The IDSA conclusion, that their protocols result in 'eventual recovery in most patients', only serves to highlight the issue – namely what level of success is necessary to support an inflexible treatment protocol. The question with persistent Lyme disease has never been what to do with the 50 to 76% who find short-term treatment approaches successful. The issue is how to treat those 24 to 50% who fail under this treatment approach.

The period of follow-up appears to be critical in determining relapse rates given the late recurrence of symptoms in initially recovered patients (TABLE 1). Short-term studies that do not follow patients over a period of years are of questionable value, given that the longer patients are followed after receiving antibiotic treatment, the higher the relapse rates climb [79]. Recognizing that relapse may occur long after treatment is discontinued, Donta defined cure as an absence of symptoms for a year or more following therapy in his study of 277 patients treated with tetracycline [32].

### Persistence of infection despite antibiotic treatment

The persistence of *B. burgdorferi* despite presumptively adequate antibiotic treatment has been repeatedly demonstrated by post-treatment isolations of the bacteria [65]. In fact, *B. burgdorferi* has been cultured from patients who have been given intensive antibiotic therapy with intravenous third-generation cephalosporins for 21 days to 1 year [80–84]. Due to the known limitations of the currently available tests, it is not practical to routinely obtain laboratory evidence of continuing *B. burgdorferi* infection in humans. However, the Straubinger canine studies, examining 25 tissue samples per dog, support the concept of elusive yet persistent *B. burgdorferi* infection [44], and isolation of the spirochete has been repeatedly demonstrated in patients with persistent symptoms of Lyme disease (TABLE 2). Thus, the weight of evidence favors persistent infection in chronic Lyme disease.

Table 1. Treatment relapses and failures of short-term therapy for *Borrelia burgdorferi* infection.

| Study | Relapse or failure | Comments | Ref. |
|---|---|---|---|
| Shadick et al. | 37% (69 out of 184) | Overall, 69 case patients (37%) reported a previous relapse of Lyme disease | [90] |
| Treib et al. | >50% (44 total) | 4.2 ± 1.2 years after a 2-week course of intravenous ceftriaxone (2 g daily), more than half of the 44 patients with clinical signs of neuroborreliosis and specific intrathecal antibody production had nonspecific complaints resembling chronic fatigue syndrome and showed persisting positive immunoglobulin M serum titers for *Borrelia burgdorferi* on western blot analysis | [36] |
| Valesova et al. | 38% (10 out of 26) | 3 years after treatment of 26 patients, 19 showed complete response or marked improvement; relapse occurred in six and new manifestations in four of the cases | [162] |
| Shadick et al. | 26% (10 out of 38) | Within 1 year of treatment, ten out of 38 patients reported relapse and had repeated antibiotic treatment (five patients with intravenous ceftriaxone) | [79] |
| Asch et al. | 28% (60 out of 216) | A mean of 3.2 years after treatment, 28% had relapsed with major organ involvement; 18% reinfected. *Borrelia burgdorferi* antibodies remained positive in 32%, 82 (38%) patients were asymptomatic. Clinically active Lyme disease found in 19 (9%). Persistent symptoms in 114 (53%) | [163] |
| Pfister et al. | 37% (10 out of 27) | A mean of 8.1 months after a 2-week course of intravenous cefotaxime or ceftriaxone, ten out of 27 patients were symptomatic, and *Borrelia burgdorferi* was isolated from the cerebrospinal fluid of one patient | [84] |
| Logigian et al. | 37% (10 out of 27) | 6 months after a 2-week course of intravenous ceftriaxone (2 g daily), 17 patients (63%) showed improvement, six (22%) showed improvement but then relapsed, and four (15%) showed no change in their condition | [164] |

Liberty002347

## Table 2. Laboratory evidence of persistent *Borrelia burgdorferi* infection despite antibiotic treatment.

| Study | Comments | Ref. |
|---|---|---|
| Breier et al. | Following treatment with four courses of ceftriaxone with or without methylprednisolone for up to 20 days, *Borrelia burgdorferi* was isolated from cultures obtained from enlarging skin lesions | [165] |
| Horowitz | 80 patients treated with multiple courses of antibiotics for an average of 13 months who continued to have persistent symptoms were PCR-positive | [166] |
| Oksi et al. | 40% (13 out of 32 clinical relapses) were confirmed by PCR or culture | [102] |
| Bayer et al. | 97 patients with symptoms of chronic Lyme disease were PCR-positive despite having been treated with antibiotics for extended periods of time | [167] |
| Preac Mursic et al. | Isolation of *Borrelia burgdorferi* by culture in five patients, four of whom had tested antibody-negative on previous occasions | [64] |
| Burrascano | Patient treated with amoxicillin for 7 months, intravenous cefotaxime for 26 weeks, then cefuroxime for 5 months. Became pregnant at start of cefotaxime. At birth, the placenta tested positive for *Borrelia burgdorferi* | [168] |
| Battafarano et al. | A patient had chronic septic Lyme arthritis of the knee for 7 years, despite multiple antibiotic trials and multiple arthroscopic and open synovectomies. *Borrelia burgdorferi* was documented in synovium and synovial fluid | [169] |
| Haupl et al. | After repeated antibiotic treatment, *Borrelia burgdorferi* was cultured from a ligament sample | [82] |
| Preac-Mursic et al. | Patient with blurred vision treated with two separate month-long cycles of tetracycline had symptoms that persisted for several years. *Borrelia burgdorferi* was cultured from iris biopsy | [88] |
| Liegner et al. | After treatment with cefotaxime and minocycline, T-cell stimulation test with *Borrelia burgdorferi* antigens were strongly positive. A year later, paired serum and CSF samples were also strongly positive | [80] |
| Pfister et al. | *Borrelia burgdorferi* cultured from the CSF of a patient 7.5 months after treatment | [84] |
| Preac-Mursic et al. | *Borrelia burgdorferi* cultured from the CSF of three patients and from the skin of three others after treatment | [27] |

CSF: Cerebrospinal fluid; PCR: Polymerase chain reaction.

The reason for this persistence is not known. Researchers have proposed various different factors, including the virulence and organotropism of the bacterial strain, inoculum size, host immunity, coinfection with other tick-borne diseases, insufficient antibiotic therapy (tissue penetration, dose or duration), intracellular location of the bacteria, survival of *B. burgdorferi* in various human tissues (e.g., heart muscle, spleen, and brain) and certain types of cells, reinfection, and the ability of the bacteria to adopt different forms to ensure survival [86–88].

Long replication time, as well as genetic variability may also contribute to an organism's resistance to standard lengths of antibiotic treatment [19]. Antigen variation in Lyme disease and other diseases is believed to contribute to resistance to normal immunologic functions and evasion of routine laboratory detection [19,89]. Patients with persistent symptoms of Lyme disease report a longer duration of infection before receiving treatment than those without persistent symptoms [90]. In the chronic Lyme encephalopathy study currently being funded by the NIH, the mean number of years between symptom onset and treatment for over 3400 patients was 1.2 years [91].

Unfortunately, there is evidence that in some cases, antibiotic treatment of late Lyme disease, as in late syphilis and chronic tuberculosis [89], may merely suppress but not eradicate the infection. A number of researchers have compared Lyme disease to syphilis [17,22,92]. Chronic syphilitic infection may have periods of latency alternating with periods of active disease [48], and lack of syphilis eradication despite 'adequate' treatment is well known [93]. Similar observations have been made with respect to *B. burgdorferi* [85], and a number of studies support the view that, at least in some cases, antibiotics may suppress but not cure Lyme disease (TABLE 3).

### Theory behind longer treatment regimens

Given the high failure and relapse rates of short treatment regimens and evidence of persistence of *B. burgdorferi*, many, if not most, physicians practising in this area, believe that longer durations of treatment may be needed to achieve significant improvement or cure [45,94]. Long-term antibiotics are used for a number of conditions, including tuberculosis, leprosy, recurrent acute otitis media, endocarditis, salmonella infections, prophylaxis of at-risk populations (asplenic children, young children with sickle cell disease, and patients with prior rheumatic fever) and Reiter's syndrome, as well as Lyme disease [95,96,209]. While there are no specific studies that directly assess the safety of long-term antibiotic use, the FDA Center for Drug Evaluation and Research reports that a significant amount of data support the safety of long-term antibiotic therapy [209].

Liberty002348

Johnson & Stricker

The current World Health Organization (WHO) recommendation for treating infection with *Mycobacterium tuberculosis* is a combination of two antimicrobial agents administered for 18 months, while the WHO-sanctioned treatment for leprosy is a combination of three antimicrobial agents administered for 2 years [97-99]. Coyle and colleagues have observed the similarities between Lyme disease and other spirochetal infections such as syphilis and leptospirosis, both of which may also require long-term treatment regimens [22].

The immune-evasion strategy of *B. burgdorferi* is analogous to mycobacterial infections such as tuberculosis or leprosy [5-7], and many physicians find the treatment guidelines for these conditions in keeping with their clinical observations of what is needed for the eradication of chronic spirochetal infection in Lyme disease [30,32,37,100,210]. A number of researchers have also found that longer treatment periods provide a better treatment response (TABLE 4).

### Conflicting long-term treatment studies

Studies of long-term treatment outcomes have yielded conflicting results. One study by Wahlberg and colleagues of 100 patients with late Lyme disease in the Aland Islands compared the length of treatment with therapeutic efficacy and found that longer treatment periods were significantly more successful [101]. Successful treatment outcomes occurred in only four out of 13 patients (31%) treated with 14 days of ceftriaxone. In contrast, successful outcomes were seen in 50 out of 56 patients (89%) treated with ceftriaxone followed by 100 days of amoxicillin (Amoxil®, GlaxoSmithKline) plus probenecid, and in 19 out of 23 patients (83%) treated with ceftriaxone followed by 100 days of cefadroxil (Baxan®, Bristol-Myers Squibb). Oksi observed a 90% excellent or good response in his study of

30 European patients with disseminated Lyme disease treated for 100 days [173]. Donta's study of 277 patients is of particular interest because it showed that the longer the course of antibiotics, the more improvement was seen. Following 2 months of treatment, 33% of patients had significantly improved (degree of improvement: 75–100%). In contrast, after 3 months of treatment, 61% of patients had significantly improved [32].

The NIAID has funded three double-blind, placebo-controlled, treatment-outcome studies for persistent Lyme disease. One study is ongoing and is expected to be completed soon [91]. The findings of the other two studies, one by Klempner and colleagues [14], and the other by Krupp and colleagues [103], are contradictory. The Krupp study treated patients with persistent Lyme disease with 4 weeks of intravenous ceftriaxone. Following 6 months of treatment, 64% of patients showed an improvement in fatigue levels compared with 18.5% in the placebo group. The Klempner study that treated patients with 4 weeks of intravenous ceftriaxone followed by 2 months of oral doxycycline (Periostat®, CollaGenex), showed no improvement by those treated on the outcome measure, the SF-36 (a self-reported measure of ability to function).

The Klempner study has generated substantial controversy. ILADS has issued a detailed critique of the design flaws in the study [211]. Another commentator questioned the lead author's bias in the long-term treatment study, noting that halfway through the study Klempner commented to the press that it was irrational for any Lyme disease patient to take months of antibiotics for persisting symptoms of Lyme disease [212]. The problem of bias in scientific studies and guidelines is well-known and is an issue of particular concern in Lyme disease because of the degree of contention between the two Lyme camps [14].

Table 3. Evidence that antibiotics may suppress but not eradicate *Borrelia burgdorferi* infection.

| Study | Comments | Ref. |
|---|---|---|
| Breier *et al.* | Despite treatment with four courses of ceftriaxone with or without methylprednisolone for up to 20 days, a patient with lichen sclerosus et atrophicus had regression of skin lesions for up to 1 year. She repeatedly relapsed despite initially successful antibiotic treatment; these relapses were treated successfully with a course of the same antibiotics as previously used | [165] |
| Petrovic *et al.* | Despite repeated intravenous and oral treatment, symptoms improved only temporarily shortly after treatment, but re-emerged within weeks or months | [170] |
| Bayer *et al.* | 97 patients with symptoms of chronic Lyme disease, confirmed by polymerase chain reaction. Most of the patients had been treated with antibiotics for extended periods of time: 'It seems to be characteristic for most of the patients in our study that, after antibiotic-free periods of a few months, they had again become increasingly ill with neurological and arthritic symptoms, so that treatment had to be resumed' | [167] |
| Ferris *et al.* | Despite seven short-term antibiotic treatments received during a 2-year period, the patient's condition greatly deteriorated. 12 months of intravenous followed by 11 months of oral antibiotics improved the quality of life greatly. Antibiotics expected to be continued in the long-term, until cure or to delay progression of the disease | [171] |
| Lopez *et al.* | With long-term antibiotics (intravenous and oral), patient's general condition improved, but each antibiotic course was followed by a relapse | [172] |
| Haupl *et al.* | The patient had relapsing Lyme borreliosis with chorioiditis, arthritis, carditis, and tendonitis. Repeated antibiotic treatment stopped progression of disease but did not completely eliminate *Borrelia burgdorferi*. *Borrelia burgdorferi* cultured from ligament sample | [82] |

Liberty002349

Table 4. Benefit of longer treatment regimens for disseminated *Borrelia burgdorferi* infection.

| Study | Comment | Ref. |
|---|---|---|
| Oksi et al. | Of 165 patients with disseminated Lyme disease treated for a median duration of 16 weeks, 32 had treatment failure. 'We conclude that the treatment of Lyme borreliosis with appropriate antibiotics for more than 3 months may not always eradicate the spirochete' | [102] |
| Oksi et al. | 30 patients treated for 100 days. Conclusion: the general outcomes of infection in patients with disseminated Lyme borreliosis after 3 to 4 months of therapy indicate that prolonged courses of antibiotics may be beneficial in this setting, since 90% of the patients showed excellent or good treatment responses | [173] |
| Donta | Of 277 patients with chronic Lyme disease treated with tetracycline for 1 to 11 months (mean: 4 months), 20% were cured and 70% of the patients improved. 10% had treatment failures | [32] |
| Wahlberg et al. | Of 100 patients with late Lyme disease, the following success rates for treatment regimens were seen: four out of 13 patients (31%) treated with 14 days of ceftriaxone; 50 out of 56 patients (89%) treated with ceftriaxone followed by 100 days of amoxicillin plus probenecid; and 19 out of 23 patients (83%) treated with ceftriaxone followed by 100 days of cephadroxil | [101] |

*'Bias is ubiquitous, and medical research is no exception. From the very outset, investigator bias can influence the general attitude towards a research project. Research is at its best when it tests (or, more precisely, falsifies) hypotheses. The biased researcher, however, has preconceived ideas and is likely to approach a project to prove a point. For example, a researcher who is convinced of a particular treatment or, worse, has a vested interest in it, could misuse science to demonstrate the efficacy of his therapy. Equally, an investigator with a preconceived negative attitude towards a particular intervention can set out to disprove its efficacy'* [105].

Although the Klempner study appears to contradict the findings of Oksi and colleagues, Wahlberg and colleagues and Donta and colleagues, this may reflect design differences in the studies. Both the Klempner and Krupp studies were double-blind controlled studies, but they each used different outcome measures (SF-36 vs. the fatigue-severity scale). The Oksi, Walberg and Donta studies were not controlled. Despite the current focus on controlled studies, it is important to remember that noncontrolled studies often provide more clinically relevant treatment information [104,106]. In addition, variations in study samples, treatment types and durations, and outcome measures make it difficult to compare these studies.

In a recent commentary, Steiner noted that a central problem with Lyme disease studies in general, is that the patient group studied may be heterogeneous, as might be expected in the absence of accepted diagnostic criteria or biological markers. Positive therapeutic findings may therefore have been masked by biological noise [107]. The lack of a homogeneous population in persistent Lyme disease studies is also suggested in the treatment guidelines promulgated by the IDSA.

Animal studies do not suffer from the same flaws as those that plague human studies. Advantages of animal models generally include the ability to have a study population that is initially homogeneous and pathogen free, insure inoculation with *B. burgdorferi*, and quarantine against reinfection risk. In addition, after the treatment protocol, the animal may be sacrificed and extensive PCR testing of tissue samples may be performed to determine the effectiveness of the treatment. This is not feasible in humans. Straubinger's dog studies that examined 25 tissue samples per dog demonstrated that while 30 days of antibiotic therapy may reduce the bacterial load, it does not eradicate the organism [44]. Thus, despite blinding and randomization, outcomes in human studies suffer from more uncertainty than those in animal investigations.

Steiner reasons that all human studies focusing on Lyme disease face three threshold issues:

* Which patients should be included – what is the definition of the condition, and what are the diagnostic criteria?
* Which treatment should be tried – what is the pathogenesis of 'post-Lyme disease' – if it is caused by persistent infection, how long should antimicrobial treatment be continued?
* What end point should be established – how should the response of subjective complaints to treatment be assessed?

He concludes:

*'Without an objective surrogate (preferably biological) marker to enable recruitment of homogenous study groups, every attempt to address clinical questions in the realm of (persistent Lyme disease) is doomed, almost by definition, to leave these questions (whether treatment protocols are appropriate and whether there is ongoing infection) unanswered.'*

The existence of a heterogeneous patient group suggests that individualization rather than standardization of treatment approach may be more effective. Until reliable biological markers for the disease are developed, there may be no substitute for observing the patient's actual response to treatment to determine the appropriate duration of antibiotic therapy.

The other ongoing Lyme disease treatment study headed by Fallon at Columbia University is expected to be completed in 2005. However, if Steiner's conclusion that valid study results require a strong biological marker is correct, the debate regarding the appropriate length of treatment for persistent Lyme disease is not likely to be settled soon.

Liberty002350

### Favorable response to retreatment

As persistent Lyme disease symptoms respond to retreatment with antibiotics, investigators have argued that these symptoms can only be caused by ongoing infection. True post-infectious syndromes do not respond to repeated antibiotics [22]. When symptoms persist, antimicrobial treatment is generally followed by clinical improvement (TABLE 5). Relapsing disease is obvious to the treating physician and patient and generally responds to reinstitution of therapy [85]. The trial and error approach in medicine is a constant. For instance, physicians may titrate medication doses to find a level that works best for a patient and may try a variety of different treatment approaches before finding the one that is the most effective [109]. If a patient presents with an infection, responds favorably to antibiotic treatment, relapses when the treatment is withdrawn and responds favorably when the treatment is reinstituted, there is empirical evidence of an infectious process. This is not experimental treatment – it is the way infection has been treated for years [110].

### Standard of care for treating Lyme disease
#### Role of evidence & consensus in the standard of care

Historically, the physician's judgment has taken the laboring oar in medical decisions. This is reflected in the legal standard for determining standard of care that is determined by the consensus of professional judgment in the community. Since the 1950s, however, radical forces of change have swept the medical field, including the introduction and increased use of controlled studies in medical research and the increased influence of the managed care industry on the practice of medicine. In this context, it is important to understand the relative roles of evidence and consensus in medicine, the risks and benefits of treatment guidelines, and the effect that each of these has on the legal standard of care.

### Role of evidence & consensus in medicine

The amount of attention evidence-based medicine has garnered is disproportionate to the relatively small role that it plays in medical practice. Most medicine, even that which is widely accepted, is not based on rigorous scientific studies. The Institute of Medicine (IOM), which has prepared national standards for guideline development, considers the hypothetical data set forth in FIGURE 1 indicative of how scientific evidence and consensus might be distributed across the entire range of healthcare services [117]. Medical services, for which there is strong scientific evidence, constitute only 4% of total medical services provided, yet 51% of services have poor supportive scientific evidence, or even lack it entirely. Clearly, the bulk of medical practice is about managing uncertainty in the absence of definitive research [213].

A recent article indicates that only 20% of medical practice is confirmed by rigorous scientific research [118]. Although some argue that this percentage is unduly pessimistic, it is agreed that medical practice is often not based on controlled studies [214]. For example, many well-accepted practices, like cardiopulmonary resuscitation, close observation of suicide risk patients, blood transfusion, surgical treatment of low back pain, and the treatment of meningitis with antibiotics, have no rigorous and little nonrigorous science to support their use [119,214]. Similarly, most advances in surgery result from clinical innovations on the part of the treating physician, and the off-label use of prescription medications is well accepted [109]. These practices show how dangerous the leap is from 'without substantial evidence' to 'without substantial value' [214].

There is a tendency to overvalue the quantitative approach of randomized controlled studies (that may be flawed or inadequate for complex multivariate illnesses) and to discount less quantitative (but frequently more appropriate) approaches, such as observational or longitudinal studies [214]. Controlled

**Table 5. Favorable response to *Borrelia burgdorferi* retreatment.**

| Study | Comments | Ref. |
|---|---|---|
| Krupp | 28 patients with persistent Lyme disease in a double-blind placebo-controlled study treated with intravenous ceftriaxone for 4 weeks showed a 64% improvement rate on self-reported fatigue scale versus 18.5% of the placebo group | [103] |
| Fallon | 18 patients retreated with either intravenous, intramuscular or oral antibiotics scored better on overall and individual measures of cognition. Those retreated with intravenous antibiotics showed the greatest improvement | [174] |
| Oksi et al. | 13 patients with clinical relapse and *Borrelia burgdorferi* culture or polymerase chain reaction positivity were retreated for an additional 4 to 6 weeks with intravenous antibiotics, with a good response in nine of 13 (69%) | [173] |
| Donta | 98 patients retreated with either tetracycline, a combination of macrolide and hydroxychloroquine, or intravenous ceftriaxone showed a cure rate or significant improvement of 98, 74 or 85%, respectively | [32] |
| Lawrence et al. | Despite aggressive oral and intravenous antibiotic therapy, patient experienced repeated progressive neurologic relapses. Patient now on oral clarithromycin for 22 months with no new symptoms or deficits | [175] |
| Masters | Patient treated with high doses of penicillin for 6 months; he relapsed and spirochetes were subsequently cultured from his blood. The patient was placed back on antibiotics and responded to therapy | [176] |
| Cimmino et al. | Two patients with chronic Lyme arthritis resistant to the recommended antibiotic regimens were cured by long-term retreatment with benzathine penicillin | [177] |

Liberty002351

studies attempting to document the actual effects of ordinary clinical care are a relatively new phenomenon [106]. Moreover, the actual situations calling for controlled studies may be quite limited.

*Demands for equipoise make controlled trials appropriate only in the absence of any well-established standard treatment…(and) if researchers have substantial reason for confidence about the clinical utility of an investigational treatment, they may not corroborate it with [a randomized controlled study] that would deny the intervention to some subjects in the control arm of the study* [109].

There is also a tendency to devalue certain types of qualitative evidence as anecdotal, notwithstanding the fact that historically most medical research was of this nature [109]. The cumulative weight of anecdotal evidence can be substantial. Take, for instance, the information gleaned from aggregating isolated



**Figure 1. Percentage of medical practice based on evidence and concensus.**
Based on estimates provided by the Institute of Medicine.

adverse drug event reports or outcomes research, which assesses the effectiveness of particular medical practices in the real world by pooling large numbers of comparable patients [109]. Many believe this type of outcomes research may be more meaningful than controlled trials because the effectiveness of the medical practice is measured in actual practice settings [109]. The cumulative value of anecdotal evidence is also presumably the reason why physician proficiency in an area may be predicted based on the volume of similar cases treated [109].

Similarly, evidence immediately available from the patient's history, clinical examination, presentation of symptoms, course of disease, and response to treatment may also be discounted both by guidelines that do not take these factors into consideration and by insurance review processes that determine the necessary level of medical intervention without examination of the patient. Yet these are all vital pieces of evidence upon which the practice of medicine depends. Guidelines (and insurance companies that rely on guidelines to determine treatment or treatment reimbursement decisions) have the necessary effect of suppressing physician expertise, which is further compounded by state independent external review board decisions to the extent that the reviewers, in turn, rely on practice guidelines to frame their decisions [120].

The truth is that there is no bright line separating evidence-based medicine from other medicine. All medicine is based on evidence, but only a small portion of it is based on controlled studies. Even proponents of the evidence-based medicine movement embrace 'compelling nonexperimental evidence' when trying to bolster the percentage of medicine claimed to

be evidence-based [214]. When guidelines, like those from the IDSA, state that there is no compelling evidence, the question is, what type of evidence? If the answer is controlled studies, then this is hardly a surprise. Given the limited circumstances in which controlled studies are appropriate and the cost constraints of such studies, it is unlikely that a substantial portion of medicine will be supported by controlled studies in the foreseeable future.

In practice, evidence-based medicine is intended to enhance the practice of medicine by integrating the medical professional's expertise and the patient's right to choose between diagnostic and treatment options with the best available external clinical evidence from systematic research [121,122]. The best available evidence means simply that – the best evidence available. It may come from a wide range of sources as diverse as well-conducted randomized trials or expert opinion [123].

If a relevant, well-conducted randomized trial does not resolve the issue, the next best available evidence may be longitudinal or observational studies. If these do not provide the answer, expert opinion or clinical experience may provide the best available evidence. In the treatment of complex multivariate conditions, when treatment outcome studies are limited and conflicting, the most valuable evidence in fact may be the clinical course of an individual patient. For instance, patient response to levodopa is considered an important discriminative feature suggestive of Parkinson's disease. Similarly, in the context of the individual patient's clinical presentation, antibiotic responsiveness may be suggestive of Lyme disease.

Liberty002352

While the IDSA guidelines would leave patient symptoms — except as reflected in quantifiable tests — completely out of the equation, it is important to recall the phrase, 'all that can be measured may not have value, and all that has value may not be measured'. The recommendation in the IDSA guidelines that patients' symptoms of relapse be disregarded in the absence of 'objective measures' is tantamount to asking a surgeon to operate with one hand tied behind their back. Many conditions (such as Alzheimer's disease, Parkinson's disease, multiple sclerosis and psychological disorders) lack biological markers and therefore rely heavily on presenting symptoms for diagnosis. Evidence is sparse, and none of it should be ignored.

### Role of evidence-based guidelines

Unlike Lyme disease, which was not discovered until the late 1970s, the treatment protocols of many diseases, such as tuberculosis, were established long ago and have been better able to weather the onslaught of cost-containment measures ushered in by managed care. With newly discovered diseases like Lyme disease, burgeoning treatment approaches do not have the luxury of unfolding over time unfettered by outside economic influences. Physicians treating these newer maladies may have a hard time holding out for the goal of improving long-term health outcomes. Deeply entrenched viewpoints develop quickly in this environment, and economic battles may be fought by experts wearing white coats.

Certainly, the treatment controversy in Lyme disease has been framed by cost-containment issues, with some of the research appearing to be little more than dressed up actuarial tables [124]. Early on, guidelines for the treatment of Lyme disease were being written by actuarial firms, such as Milliman and Roberts, whom critics assert are hired to help insurers manage costs, not care [125]. It has been observed that if money were not an issue, there would be no treatment controversy in Lyme disease [126].

Recent reviews of practice guidelines have shown that most fail to meet quality standards [127], and that guidelines produced by specialist societies are generally of poor quality [128]. At their best, evidence-based guidelines represent an unbiased summary of the relevant research for the physician who is too busy to select and review the research personally. At their worst, such guidelines represent attempts of third parties to influence the medical decision-making process. Indeed, some critics contend that guidelines are used primarily to ration care and limit the doctor's autonomy and judgment in providing for his or her patients what the patients actually need [129]. As the foregoing suggests, the key issues in treatment guidelines are conflict of interests and bias on the part of the panel members.

Between 72 and 90% of physicians writing clinical practice guidelines have undisclosed conflicts of interest [130,131]. While most of the focus has been on conflicts that arise as a result of pharmaceutical ties, conflicts resulting from ties with the insurance industry also pose a serious risk because

of the insurance company's inherent conflict of interest, namely, making more money by denying further care. Because of this, payer guidelines, even those shrouded in the aura of science and objectivity as evidence-based medicine, are viewed as less authoritative [132].

The problem of bias can result from a number of other factors, including entrenched ideological beliefs and professional territorial considerations [135]. Guideline developers necessarily make choices: whose views are represented on the drafting committee, which studies are included and how the studies are interpreted [127]. When guidelines conclude that evidence is or is not convincing or compelling, the appropriate question is, to whom? When, as is more often than not the case, the science is narrow, limited and conflicting, 'there can be a major leap between what the evidence lays out and what the guidelines suggest' [215].

Evidence-based protocols reflect value judgments about the relative importance of health and economic outcomes in specific clinical situations. The question is whether these issues are being examined from the perspective of the insurer, the patient, the healthcare provider, or society at large — in other words, whose interests dominated the drafting panel? Not surprisingly, conflicting guidelines are common [134]. To overcome the tendency toward bias and to insure that a broad body of evidence is reviewed by the drafting panel, the IOM recommends that panels include a diverse group of stakeholders that may be affected by the guidelines — treating physicians, patients, and researchers [117].

The panel drafting the ILADS guidelines included primary care clinicians, researchers, community healthcare providers, and patients. In contrast, the IDSA did not solicit input from patient groups, nor from the physicians who treat the majority of patients with persistent Lyme disease — even those who are members of the IDSA [216]. When faced with divergent opinion regarding the treatment of persistent Lyme disease, the IDSA panel purged its sole dissenting member [208]. Moreover, 11 of the 12 authors of the guidelines were primarily research scientists with little or no experience treating patients with persistent Lyme disease [100]. Panel members who do not spend their days treating patients may fail to grasp either the complexity of the illness that is not reflected in controlled studies or the seriousness of failing to treat a patient with a progressive systemic illness.

Significantly, the goals of research and treatment are very different. Like surveillance, the goal of research is to err on the side of exclusion to insure a homogeneous study population. The emphasis on measuring results based on reliable objective criteria also makes sense in this context. The fact that these criteria may exclude a sizable portion of patients who have the illness is not an issue for research purposes. Treatment goals, on the other hand, err on the side of inclusion and overdiagnosis to insure that serious conditions are not left untreated. When research criteria such as reliable objective measures are applied to treatment protocols, treatment goals are not met and patients are left untreated.

Liberty002353

The IDSA guidelines recommend that symptomatic patients not be treated because 'there are no convincing published data' evidencing the efficacy of prolonged treatment or retreatment. In making this assertion, the IDSA fails to consider scores of studies evidencing persistent infection, including those listed in TABLES 4 & 5. Not surprisingly, failure to consider all relevant evidence is one of the pitfalls the IOM warns against when guidelines are drafted by narrowly drawn panels. Similarly, the narrowness of the panel predetermines the consensus that 'there is insufficient evidence to regard chronic Lyme disease as a separate diagnostic entity.'

Seen in this light, what the IDSA guidelines are really suggesting is that physicians refrain from treating patients until better science comes along – an idea that undoubtedly holds greater appeal to insurers and researchers than patients. Yet even the strongest proponents of evidence-based medicine would not require that patients go untreated pending stronger research [136,217]. This notion has been soundly rejected by the IOM because 'scientific evidence is not likely to exist for a great many of the combinations of clinical problems and characteristics that patients bring to clinicians in the real world' [117].

The appropriate role of guidelines is to 'ensure that patients and practitioners are well informed about the risks and benefits of alternative courses of care' [117]. Guidelines that attempt to supplant, rather than inform, overstep their role in the decision-making process. When guidelines become polemics for the viewpoints of those on the drafting committee, they no longer serve as information tools that assist physicians and patients in their decision-making process [137], and instead fall prey to the criticism that they 'constitute the exercise of power without responsibility', and only 'generate systematic and paternalistic pressure for the many to conform to the views of the few' [104].

## Legal standard of care

The legal standard of care is defined as 'the care and skill ordinarily exercised in like cases by reputable members of the profession practising in the same or similar locality under similar circumstances' [138]. It is defined by the actual practices of physician in the community, not by guidelines. The legal emphasis on consensus provides a suitable filter for the interest of stake-holders in guidelines. Consensus is, after all, not only a crude measure of the cumulative anecdotal evidence of practising physicians; it also reflects the extent to which varying types of evidence (including controlled studies) have been critically reviewed and have demonstrated efficacy in actual medical practice.

' As a legal matter, the relevance of evidence-based medicine protocols in determining the standard of care depends upon the extent to which the practice recommended has been adopted within the medical community [139]. In court, the standard of care is determined by expert testimony [140]. Although an expert may introduce evidence-based protocols in support of testimony, the protocols themselves do not establish a standard of care [141].

Notwithstanding the rise in evidence-based medicine, the emphasis on a community based standard of care is not likely to change. A survey of legal actions found that guidelines played a relevant or pivotal role in determining negligence in less than 7% of malpractice actions [141]. Guidelines also appear to be underused in clinical practice, suggesting that their role in shaping consensus may be limited [215]. In part, this reflects the realization that, like expert testimony, the seemingly objective quantitative approach of guidelines is vulnerable to a 'subjectivity of objectivity' [142], or thinly disguised (frequently even unintentional) bias cloaked in science, with 'hired guns' all around. Of course guidelines are not created on the eve of a trial to support one party over the other, but the risk of their misuse as instruments of cost control rather than as impartial guides for treatment decisions is widely recognized.

### Standard of care when different treatment options exist

The standard of care for treating a condition is determined by the manner in which clinically practising physicians actually treat patients. Most jurisdictions recognize that more than one standard of care may exist for treating a medical condition. For example, in California, a variation of the two schools of thought or respectable minority standard is codified in its jury instructions as follows:

> 'Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician is not negligent if, in exercising their best judgment, they select one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners [143].'

The establishment of a school of thought requires only that a group of respectable treating physicians adhere to a method of treatment. The size of the group following a particular approach need not be particularly large. One court in Arizona found 65 physicians sufficient [144]. The existence of different schools of practice is determined by expert testimony that, in addition to offering opinion on practices within the community, may also introduce guidelines evidencing a treatment approach, or consensus surveys suggesting the number of practitioners following that approach.

As was noted previously, both schools of thought about Lyme disease have introduced guidelines regarding their treatment approach. In addition, a number of consensus surveys illustrate the division within the medical community. One survey found that 57% of responding physicians treat persistent Lyme disease for 3 months or more [45]. Fallon notes that for over 3400 patients screened for the Columbia persistent Lyme disease study, the mean duration of intravenous treatment was 2.3 months and the mean duration of oral antibiotic therapy was 7.5 months [91]. In another survey, 50% of the responders considered using antibiotics for a time 'greater than 1 year in a symptomatic seropositive Lyme disease patient. Almost the same number would extend therapy to 18 months if needed' [94].

Liberty002354

The treatment issue seems to have created a split within the medical community in terms of practice, and all jurisdictions that have considered the matter have found that two standards of care exist in the treatment of persistent Lyme disease [145,218]. When more than one standard of care exists, practice in accordance with either of the acceptable standards of care is considered acceptable for malpractice purposes.

### Role of clinical judgment when different treatment options exist

There is a necessary interplay between scientific research and clinical judgment. 'Professional judgment must be applied to the science base, and science must inform professional judgment' [117]. The degree of individualization of treatment varies with the complexity of the illness and the amount of confounding variables involved, such as coinfections. The greater the need for individualization, the greater the role the clinical judgment of the treating physician plays.

In Lyme disease, treatment response is highly variable. The confounding variables affecting the course of treatment are extensive, and the amount of discretion required in treatment is considerable. Variables include:

- Length of time between tick bite, symptom onset, diagnosis and treatment
- Presence of untreated (identified or not yet identified) coinfections
- Whether the patient's immune system is compromised
- Severity of the patient's presenting symptoms
- Presence of neurological symptoms
- Whether the course of the illness is progressive
- Whether the illness significantly affects the patient's quality of life or functional level of achievement
- Patient's response to treatment
- Whether the patient is antibiotic responsive
- Which medications the patient can tolerate
- Whether prior treatment was sufficient in terms of antibiotic type, dose and duration
- Whether the patient relapses when treatment is withdrawn
- Whether diagnostic tests, symptoms or treatment response suggest ongoing infection
- Risks/benefits of the treatment approach under consideration
- Alternative treatment approaches available
- Risks associated with failing to treat

Needless to say, separate scientific studies do not exist isolating each of these variables.

Even those who follow the treatment approach advocated by the IDSA are not at liberty to ignore the clinical presentation of their patients. In the absence of a clear alternative cause, progressive neurological symptoms in patients with a prior diagnosis of Lyme disease should raise a high degree of suspicion that the infection is ongoing. Similarly, if a patient responds to treatment and then relapses when treatment is

discontinued, a physician who elects to withhold treatment of this patient's antibiotic responsive condition does so at substantial risk. The variability in patient response to treatment has critical implications in the treatment of Lyme disease.

When faced with uncertainty, physicians must make an election (and accept the accompanying risk) to over- or undertreat a condition. While insurers implement cost-containment measures to guard against wasteful defensive medicine, the goal of the medical malpractice system is 'to deter... healthcare providers from putting patients at excessive risk of bad outcomes' [149]. Medicine that improves outcomes contributes to the deterrence goal. The Office of Technology Assessment suggests weighing the following factors [146]:

- Whether the disease under consideration is life-threatening or disabling
- Whether timely detection changes therapy
- Whether the change in therapy can be expected to make a real difference to the patient's ultimate state of health
- Whether the treatment option is readily available and low risk

When the medical implications of being wrong are serious, as in the case of a life-threatening or debilitating condition such as Lyme disease for which early diagnosis or treatment may have substantial consequences for the patient while the risks of treatment are relatively low, electing to treat the patient may be the more prudent course.

Approximately 25 to 30% of medical malpractice lawsuits allege missed or delayed diagnosis (and treatment) [147]. When the medical consequences of being wrong are severe, so too are the consequences of malpractice. Failure to diagnose and treat Aaron Murray, a 14 year old boy who then suffered a significant decline in cognitive function, resulted in an original judgment of US$3.2 million (subsequently reduced to US$1.8 million) against his medical provider [160,219].

### Role of patient preference when different treatment options exist

Good medical care requires that decision-making be shared to varying degrees between practitioners and patients [117]. Respect for the basic autonomy of the patient is a fundamental principle of medical ethics [220]. Without adequate information about treatment options, their probable outcomes, and the risks and benefits associated with each, patients cannot act autonomously. The American Medical Association requires that the physician disclose and discuss with the patient, not only the risks and benefits of the proposed treatment, but also those of available treatment options (regardless of their cost or the extent to which the treatment options are covered by health insurance).

The physician's role in this process is to provide information to the patient along with any treatment recommendations that the physician may have based on previous clinical experience and a review of relevant research. Regardless of the physician's personal or professional views on the matter, the final decision among treatment options belongs to the patient [147].

The reason patient preference assumes such a large role in the decision-making process is clear – 'because patients ultimately reap the benefits and burdens of medical decisions, we must end by respecting patient autonomy unless there is a very compelling reason not to do so' [147]. When a patient has a serious illness, like Lyme disease, where different treatment options exist with different risk–benefit profiles, the stakes are high and there is no correct treatment. The treatment choice involves trade-offs between the risks and benefits of the different treatment options that only patients – who know the kinds of risks they are willing to take and the types of quality of life outcomes that matter to them – are uniquely suited to make [148].

Respect for autonomy is the primary moral justification underlying the legal obligation to obtain informed consent. Except in emergency situations, a healthcare provider must obtain consent from a patient for a course of treatment. The scope of this duty is measured by the amount of information necessary for a patient to exercise informed choice in the selection of treatments. California has adopted the patient's point of view on informed consent:

> *'The patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that is whatever information is material to the decision'* [149].

The physician must disclose to a patient material treatment options. In *Mathis v. Morrissey*, the California Court of Appeal discussed this issue:

> *'The (physician)...would have a duty...to disclose the two recognized schools of treatment so that the patient could be sufficiently informed to make the final, personal decision. As the Cobbs court explained, (a) medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone'* [151].

In the case of *Matthies v. Mastromonaco*, the New Jersey Supreme Court also upheld the patient's right to make an informed decision among medically reasonable treatment options, and did not deem informed consent to have been given when the physician discussed only the physician's treatment (or nontreatment) of choice. The court stated that 'physicians may neither impose their values on their patients nor substitute their level of risk aversion for that of their patients' [150].

Whether information of treatment options is material for the purposes of informed consent depends upon the circumstances of the case at hand. However, one commentator has noted that the duty of physician disclosure is often triggered by risks approximating a 1% probability if the severity of the risk is high [109]. Indeed, many physicians feel that the best safeguard against lawsuits is to give patients the full range of treatment options and withhold their personal recommendations [148]. In the case of Lyme disease, the magnitude of the risk of terminating treatment prematurely can be severe, permitting a serious systemic condition to progress with the risk of irreparable injury or even death [72]. Most, if not all, patients would consider these risks material and would want to be informed of the existence of another treatment option that reduced these risks.

Granted, the common law's bark is frequently worse than its bite when informed consent cases are adjudicated [182]. The law varies substantially between US states regarding whether the disclosure obligation is viewed from the patient's perspective or based on medical custom and on the extent and circumstances under which information must be disclosed. That said, it is clear that the willingness of courts to permit a certain degree of paternalism in the past has been rooted in the notion that physicians always act in the best interest of patients – a notion that no longer holds in the era of managed care.

Taking patient preferences into account not only increases patient satisfaction; it is also good healthcare policy. When Wennberg analyzed inefficiencies in the Medicare system by looking at small area variations in medical practice, he found that most variation in preference-sensitive care reflects physician opinion. Preference-sensitive care exists whenever different treatment approaches exist and may arise where treatment outcome studies supporting a treatment approach are weak (as in the choice between watchful waiting, radiation or surgery for prostate cancer) or where the quality of life implications of the alternate treatment approaches are significant (as in the choice between lumpectomy and mastectomy for breast cancer):

> *'Preference-sensitive decisions must sometimes be made in the face of scientific uncertainty about the effect of treatment on the main outcome. The choice of treatment for prostate cancer is a good example...because there have been few clinical trials to evaluate...treatments, the advantages of active treatments are not clear, and patients face a decision that can be characterized as a wager: those who choose active treatment make a bet that the treatment does in fact prolong life to a sufficient degree to be worth the known risks of the procedures'* [152].

Wennberg observes that patient and provider values are often in conflict in patient preference situations and recommends reducing the medical practice variations in these situations by 'reducing scientific uncertainty through outcomes research...and establish(ing) shared decision making for preference-based treatments' [119]. Implementing patient choice in preference-based treatments may also lower overall medical costs. Costs incurred in connection with preference-sensitive

Liberty002356

surgery, for instance, decline when shared decision-making is implemented [119,221]. Moreover, a significant portion of all healthcare costs are associated with end-of-life care, where giving a greater weight to patient preferences may reduce the amount and degree of medical intervention.

The patient preference issue clearly exists in the treatment of persistent Lyme disease. Patients should be provided with sufficient information to weigh and choose between the trade-offs implicit in the treatment choices available. Patients who suffer more serious forms of the illness or who have progressive illness could be expected to weigh the risk of side effects from antibiotics quite differently from those who suffer mild, nonprogressive symptoms. For some patients, the quality of life issues surrounding the wish to achieve sufficient functionality or symptom control to return to work may influence treatment decisions. Similarly, patients who have tried a number of antibiotic treatments without success may weigh their choices differently from relapsing patients who have been responsive to antibiotics in the past.

According to the IOM, respect for patient autonomy and patient preference should also be reflected in treatment guidelines [117]. The IDSA guidelines suggest that a failed conventional treatment is the only option, when in fact another viable treatment option, namely continued treatment, exists. By failing to acknowledge the treatment options that exist for persistent Lyme disease, the IDSA guidelines not only mislead treating physicians, they also usurp patient autonomy. Rigid guidelines that fail to consider patient preference or allow for the exercise of clinical discretion are inherently paternalistic [148].

While it is appropriate to consider treatment costs when drafting protocols, medicine is not an actuarial science. In this day of cost containment-driven healthcare, it is easy to lose sight of the fact that the ultimate goal of healthcare is the improvement of long-term healthcare outcomes. This issue can only be addressed by asking if the patient is well. The IDSA guidelines attempt to define wellness by excluding subjective symptoms, but such sleights of hand do not make patients well. Patients with persistent Lyme disease suffer disability comparable to those with congestive heart failure [14]. By any definition, they are not well. The cost-saving benefit to insurers under the IDSA guidelines from terminating treatment for symptomatic patients (at least over the short-term) is clear. Recently, commentators have noted that the 'single-minded pursuit of economic efficiency and emphasis on beneficent care' represents a resurgence of paternalism in the managed care environment that jeopardizes patient autonomy [153].

The view set forth in the IDSA guidelines, that treatment should be withheld from patients with ongoing symptoms who have been previously treated, results in a *de facto* naturalistic experiment reminiscent of the Tuskegee experiment for syphilis that has been so widely condemned for its essential failure to uphold medical ethics – namely the duty to help or cure, to protect the patient's health, to provide unbiased information to the patient and to respect the patient's autonomy. Not surprisingly, most patients with persistent Lyme disease opt out of this experiment.

### Role of insurance when different treatment options exist

When managed care tools began to be used in the healthcare marketplace, the economic incentives to deny payment or access to care began to impact the medical decisions made by practitioners. The extent to which the policies of insurance companies can interfere with Lyme disease treatment decisions is illustrated by a patient who died within 1 month of being denied further insurance coverage for intravenous antibiotic treatment [154].

To deal with the influence that insurance plans can have on medical decision making, courts began applying the state legal standard of care applicable to health professionals to other entities participating in managed care. Today, the same clinical standard of care applies to all parties involved in medical decision making, including physicians, insurers, and utilization reviewers [155–157].

The legal standard of care is community based and reflects the practices of treating physicians [155]. Unfortunately, there is evidence to suggest that many managed care organizations rely unduly on summary protocols to deny patients the treatment recommended by their physicians [120]. This, coupled with the fact that managed care organizations are incentivized to increase profits by reducing costs at the expense of expected treatment outcomes [120], creates a significant potential for abuse:

> *'Much, if not most, medical care, even that which is generally accepted in the medical community, would be denied under an evidence-based standard because so few healthcare services have been subject to rigorous research. At particular risk for denial of needed services are disabled people, because of the lack of treatment proven effective through clinical trials'* [213].

Even worse, some commentators suspect that the use of summary protocols as trip wires for treatment denials may be part of a larger strategy by insurers to enhance profitability by intentionally encouraging chronically ill patients to disenroll [120].

The Utilization Review Accreditation Commission (URAC) and the National Committee for Quality Assurance, both insurance accreditation organizations, provide that only licensed physicians can make medical necessity decisions or denials. In fact, Standards 32 and 33 of URAC's Health Utilization Management Standards require that organizations provide the patient or physician with the clinical rationale for the denial, which must relate specifically to this patient's condition or treatment plan. This is because a physician's clinical judgment, taking into account the patient's unique clinical presentation and course of treatment, is key to determining the standard of care. When an insurance company physician merely reads and communicates treatment guidelines to the treating physician, there is no exercise of independent clinical judgment. Such attempts to elevate form over substance fall short of the mark.

Beyond this, medical necessity is the legal standard of care that applies to all medical decisions. The standard of care is the case specific analytical process, which produces a clinical yardstick (reflecting both the art and science of medicine) and holds providers and managed care systems accountable in determining exposure to liability. It is based on national and

Liberty002357

clinical physician practices, as opposed to the medical practices or payor review practices of the managed care organization or insurer. Allowing each provider to define medical necessity individually would essentially allow insurers to define their own standard of care – a notion that has been soundly rejected by the courts [158].

Guidelines do not constitute the standard of care, which must be based on the clinical judgment of practising physicians taking into account the unique clinical presentation and course of treatment for the particular patient. Those relying on guidelines or other cost-containment mechanisms for any part of the medical decision-making process are not relieved of their obligation to follow the clinical standard of care:

*'However impressive the organization that sponsored the guidelines, or its process for developing them, the fact that a protocol exists for a particular condition does not mean that what it proposes is true. Nor does it guarantee that the protocol accurately represents customary practice...questioning may address the scope of the guideline, how it was developed and adopted...the existence of known exceptions to its application, and whether any school of medical thought rejects it and adopts a different approach to treatment...'* [141].

Courts have held that certain guideline developers can be held liable for faulty guidelines, and that doctors (and other medical decision makers, including insurers) cannot pass off their liability by claiming that adherence to guidelines has corrupted clinical judgment [156]. Third-party payors may be liable for injuries caused by negligent utilization review decisions [157]. The court in the case of *Wickline v. State of California* stated that third party payors can be held responsible 'when medically inappropriate decisions result from...implementation of cost containment mechanisms' [156]. Although the patient had not sued the treating physician, the case further noted that 'the physician who complies without protest...when his medical judgment dictates otherwise, cannot avoid his ultimate responsibility for his patients' care.' Significantly, cost containment measures were one of the key factors in *Murray v. Chesepeake*, where the clinic as well as the physician were found liable in the US$3.2 million verdict [160]. This principle is also recognized by the Department of Quality Assurance of the American Medical Association, the American College of Medical Quality, and the US Agency for Healthcare Policy and Research.

In cases focusing on whether a treatment provided is medically necessary, a treating physician's judgment, while not dispositive, is entitled to great deference by the courts. In *Sarchett v. Blue Shield of California*, the court stated that 'with doubts respecting coverage resolved in favor of the subscriber, there will be few cases in which the physician's judgment is so plainly unreasonable or contrary to good medical practice, that the coverage must be refused' [161]. Furthermore, all utilization review decisions must be consistent with community medical standards. In *Hughes v. Blue Cross of Northern California*, the court found that the insurer breached the covenant of good faith by

employing a standard of medical necessity that was significantly at variance with community standards. Consistent with the doctrine that policy language be construed liberally in favor of the insured, the court also made it clear that the term 'medical necessity' will be defined liberally [155].

The obligation of insurance companies is either to render services in conformity with the standard of care applicable to the medical community at large or to reimburse the insured for medical services provided within that standard of care, subject to any express exclusions of benefits contained in the insurance contract. Where two standards of care exist, the obligation is to provide treatment or reimburse for treatment conforming to either standard of care. Under the medical ethics doctrine of autonomy and the legal principle of informed consent, the choice between different treatment approaches must remain with the patient after consultation with the treating physician. The absence of malpractice does not imply the presence of informed consent [182].

**Employee Retirement Income Security Act**

In many instances, state law may be preempted by the federal Employee Retirement Income Security Act (ERISA) for insurance plans offered by employers to their employees. ERISA imposes on the insurer the same arbitrary and capricious standard that applies to fiduciaries generally and limits extracontractual and punitive damages. ERISA was initially enacted to protect against breaches of fiduciary duty by those administering pension plans, and its application to health insurance and malpractice situations has been a contorted exercise leaving injured plaintiffs without an adequate remedy when insurers favor reducing short-term costs over improving long-term patient outcomes. Due to the inequities that arise when ERISA is applied to malpractice situations, there has been a trend toward narrowing the ERISA pre-emption, through:

- Case law imposing state malpractice law standards in cases involving mixed benefit and treatment decisions
- State statutory law explicitly imposing state common law to cases that might otherwise have been pre-empted by ERISA.

Recently, the Supreme Court ruled that state statutory law could not survive an ERISA preemption claim and refused to permit a malpractice claim against insurers under a mixed benefit and treatment standard in the case of *Aetna Health Inc. v. Davila*, [US LEXIS 4571, (US 21 JUNE 2004)]. It is noteworthy, however, that the Supreme Court pointedly differentiated the present cases from previous mixed benefit and treatment cases involving the decisions of treating physicians or treating physicians' employers. In making the ruling, Justices Ginsburg and Breyer issued a concurring opinion, but joined the 'rising judicial chorus urging that Congress and the court revisit what is an unjust and increasingly tangled ERISA regime'. The decision resulted in renewed calls for Congress to either amend ERISA or pass patients' rights legislation. Due to the fact that this area of law is currently under significant flux, the impact of ERISA on the state law obligations applicable to insurers is beyond the scope of this article.

Liberty002358

Johnson & Stricker

## Expert opinion

Knowledgeable and respected professional groups can, and often do, come down on opposite sides of a particular treatment issue. When this occurs, the standard of care embraces the practices of each of the different schools of thought. Regardless of the standard of care preferred by a physician, the physician is required to exercise the best clinical judgment, and tailor treatment to the individual patient's unique clinical presentation. The existence of treatment options with different risks and benefits shifts the focus to patient preferences. Patients cannot make informed autonomous choices among options unless the physician discloses to the patient sufficient information about different treatment approaches to enable the patient to make a meaningful choice. Once this information has been disclosed to the patient, the decision about treatment shifts to the patient.

In the treatment of persistent Lyme disease, two schools of thought have emerged, and patients are faced with a choice of treatment options. The obligation of insurance companies is to render services in conformity with either community based standard of care, or to reimburse the insured for medical services provided within either standard of care, subject to any exclusion of benefits contained in the insurance contract. However, in the absence of a provision to the contrary in the insurance contract, the determination of treatment choice ultimately remains with the patient, not the insurer.

Allowing a serious multisystemic infection to progress unabated can result in irreversible physical damage, debilitation, and death [72]. Untreated Lyme disease may mimic other conditions such as vasculitis, demyelinating disorders, motor neurone disease and dementia [19]. While it can be expensive to treat persistent Lyme disease, this cost pales in comparison with the cost of untreated Lyme disease manifesting as progressive rheumatologic, neurologic and cardiac disorders.

The central difficulties in the diagnosis and treatment of Lyme disease stem from the lack of sufficiently sensitive and reliable biological markers of the disease. Without such markers, it is difficult to determine who has the disease, the effectiveness of a course of treatment, and the end point of treatment. Under these circumstances, the best evidence to guide treatment decisions may be the patient's unique clinical course. Medical decision-making in the grey zone exists on a continuum, framed by the competing goals of avoiding unnecessary costs on the one hand, and avoiding malpractice exposure on the other hand. Here, tort rules can serve a legal, medical and moral purpose by promoting medical accountability [159]. The treating physician should keep in mind that the fulcrum against which these frequently competing goals must be balanced is the patient's individual clinical presentation and preferences.

## Five-year view

A key concern with Lyme disease outcomes studies to date has been the suggestion that the conflicting results of these trials may reflect a heterogeneous patient population [107]. The need to provide more flexibility in standardized treatment regimens represents an important area of development. For instance, a recent study of chronic hepatitis C suggested a novel approach to treating heterogeneous patient groups. In that study, the length of treatment given was individualized, based on whether the patient was deemed to be a rapid responder, slow partial responder, flat partial responder, or a null responder [111]. Similar novel treatment strategies based on patient individualization may be required to solve the treatment issues in chronic Lyme disease. Those with persistent Lyme disease may be recognized as a heterogenous group, consisting of patients who respond rapidly, slowly, partially, completely or not at all to antibiotic treatment.

Another issue that may contribute to heterogeneity among persistent Lyme disease patients is the number of pathogens creating the illness. Since the identification of *B. burgdorferi* as the agent of Lyme disease in 1982, 15 tick-borne bacterial pathogens have been described throughout the world, including three species of *Ehrlichia*, and four species (possibly five) of *B. burgdorferi* [112]. Scientists have still not identified all of the pathogens that ticks may carry [113]. Until we are able to identify all of the infectious agents contributing to a patient's illness, difficulties may be expected in determining the appropriate course of treatment. Moreover, the diversity of species of bacteria among the tick-borne pathogens also complicates diagnosis because current antibody tests are species-specific [114,115]. Improvement in genotyping techniques holds promise for not only detecting and identifying other pathogenic bacteria carried by ticks in the future [113], but also improving the diagnostic tests used to determine who should be treated, whether a course of treatment is being effective, and when treatment has been successful.

The increasing understanding of human genetics may also influence the treatment of persistent Lyme disease. While it is known that host genes (human leukocyte antigen class II alleles) may be associated with chronic Lyme arthritis and lack of response to antibiotic treatment [116], other genes may eventually be associated with persistence of neurologic Lyme disease in the future. These advances, in turn, could affect the determination of the best course of treatment for an individual patient. Recently, the head of a large pharmaceutical company disclosed high failure rates of commonly prescribed medications due to the genetic variation of patients (more than 90% of medications work in only 30–50% of patients), and the executive proposed targeting drugs to genetically determined responsive patients [178]. Genetic testing that would enable a physician to target drug treatment to persistent Lyme disease patients would fundamentally alter the landscape of Lyme disease diagnosis and treatment.

The 5-year view in terms of the medicolegal assessment depends to a large degree on the extent to which the Lyme controversy can be depolarized. Scientific uncertainty is not settled by opinion – even the opinion of researchers. Moreover, when researchers start to hold entrenched viewpoints, science itself is in trouble. In the present polemical environment, even the ability to design appropriate research studies

Liberty002359

and interpret the results of studies in an unbiased manner has become compromised. There is a strong need for the two Lyme camps to begin a dialog, and it seems likely that a formal structured approach will be necessary.

Attempting to achieve an artificial consensus among contentious groups is not likely to be fruitful [179]. Although the NIH offers a consensus process using an independent panel that looks quite promising on paper, commentators point out that the reality falls short, suffering from a lack of impartiality, biased evidence selection, and exclusion of important stakeholders [180]. The concept of a science court, first advanced in the 1960s, addresses many of these issues by offering stakeholder input, impartial adjudication, managed selection of evidence, and a thorough airing of scientific 'facts' and viewpoints via cross-examination [181]. However, it may be premature and unrealistic to rush to resolution of a controversy where the science is still unfolding.

At this stage, meaningful progress can only be made by replacing the goal of conflict resolution with the more realistic goal of conflict delineation. This type of process would serve to identify and quantify the extent of consensus and controversy as well as highlight knowledge gaps, while establishing a research agenda. For instance, there may be a broader consensus than realized on the heterogeneity of patient or study populations. Identification of this consensus could lead to the discussion of how meaningful classes within the group might be identified. The first step would be to establish a process designed to insure that stakeholders all have an equal voice. Relevant issues here might include transparency, conflicts of interest, confidential voting (to eliminate pressure to conform and to reduce the dominance of forceful personalities or authority figures), proposition framing issues and other group process mechanisms to safeguard fairness and impartiality.

Unfortunately, researchers who adhere to short-term treatment protocols have rebuffed past proposals by members of ILADS for commencing a dialog between the two camps. When invited by legislative bodies to participate in an open forum, these same researchers, by and large, refuse to participate. This is clearly unacceptable conduct for those who receive public funding to conduct research. There can be no progress in bridging the gap between the two camps without dialog. The government, which holds the purse strings for the research grants, has the power and the obligation to ensure that researchers who receive grants engage in the type of open dialog and free exchange of ideas vital to the performance of research that addresses the needs of all stakeholders in this controversy.

In summary, although this 5-year medicolegal perspective is not particularly optimistic, more enlightened funding of Lyme disease research by government agencies and initiation of meaningful dialog between the Lyme camps should ultimately lead to resolution of the 'Lyme wars'.

### Acknowledgements
The authors thank Bransfield R, Dickson K, Dorward D, Fallon B, Gaito A, Gerberding J, Harris N, Harris S, Harvey W, Hoggard M, Johnson B, Kjemtrup A, Lane R, Liegner K, Lull R, Moore D, Morrow S, Phillips S, Prehn W, Sherr V, Smith H, Sugarman G and Winger E for helpful discussion. The authors are grateful to attorneys Greaves L, Maurer I, and Shepler L for medicolegal commentary, and to Hoggard M for technical assistance. The authors would also like to thank Smith P of the Lyme Disease Association, Mervine P, Lull L, Leonard P and Barsocchini B of the California Lyme Disease Association, and Forschner K of the Lyme Disease Foundation for continuing support. This article is dedicated to the memory of Paul Lavoie.

---

## Key issues

- The lack of sufficiently sensitive and reliable biological markers of Lyme disease makes it difficult to determine who has the disease, the effectiveness of a course of treatment and the end point of treatment.

- The bulk of medicine today is practiced in the grey zone, where evidence is unclear. Evidence-based medicine requires only that medicine be practiced in accordance with the evidence that currently exists, not that treatment be withheld pending research.

- Opinion is deeply divided regarding the best approach for treating persistent Lyme disease. This split has resulted in two standards of care, each of which is reflected in peer-reviewed, evidence-based guidelines.

- While each standard of care is supported by a strong underlying hypothesis, outcomes research is limited and conflicting.

- The legal standard of care is determined by the practices of physicians who actually treat patients, not by treatment guidelines.

- All healthcare providers and insurers are held to the same legal standard of care. Medical necessity is determined by the legal standard of care.

- Where two standards of care exist, treatment in accordance with either standard is acceptable for malpractice purposes.

- Where two standards of care exist, the treatment decision belongs to the patient under the medical ethical principle of autonomy and the legal doctrine of informed consent.

- Physicians must provide adequate information about treatment options, their probable outcomes, and the risks and benefits associated with each for patients to be able to act autonomously or give informed consent.

Liberty002360

Johnson & Stricker

## References

Papers of special note have been highlighted as:
* of interest
** of considerable interest

1  Marcus LC, Steere AC, Duray PH, Anderson AE, Mahoney EB. Fatal pancarditis in a patient with coexistent Lyme disease and babesiosis. Demonstration of spirochetes in the myocardium. *Ann. Intern. Med.* 103(3), 374–376 (1985).

2  Krause PJ, Telford SR 3rd, Spielman A *et al.* Concurrent Lyme disease and babesiosis. Evidence for increased severity and duration of illness. *J. Am. Med. Assoc.* 275(21), 1657–1660 (1996).
·  Evidence that coinfection increases the severity of Lyme disease.

3  Schoeler GB, Wikel SK. Modulation of host immunity by hematophagous arthropods. *Ann. Trop. Med. Parasitol.* 95(8), 755–771 (2001).

4  Hannier S, Liversidge J, Sternberg JM, Bowman AS. Ixodes ricinus tick salivary gland extract inhibits IL-10 secretion and CD69 expression by mitogen-stimulated murine splenocytes and induces hyporesponsiveness in B-lymphocytes. *Parasite Immunol.* 25(1), 27–37 (2003).

5  Guner ES. Complement evasion by the Lyme disease spirochete *Borrelia burgdorferi* grown in host-derived tissue cocultures: role of fibronectin in complement-resistance. *Experientia* 52(4), 364–372 (1996).

6  Liang FT, Jacobs MB, Bowers LC, Philipp MT. An immune evasion mechanism for spirochetal persistence in Lyme borreliosis. *J. Exp. Med.* 195(4), 415–422 (2002).

7  Rhen M, Eriksson S, Clements M, Bergstrom S, Normark SJ. The basis of persistent bacterial infections. *Trends Microbiol.* 11(2), 80–86 (2003).
·  Excellent review of the mechanisms of chronic infection.

8  Harvey WT, Salvato P. Lyme disease: ancient engine of an unrecognized borreliosis pandemic? *Med. Hypotheses* 60(5), 742–759 (2003).
··  Seminal analysis of the Lyme disease epidemic.

9  Stricker R, Moore D, Winger E. Clinical and immunologic evidence for the transmission of Lyme disease through intimate human contact. *J. Invest. Med.* 52(1), S151 (2004).

10  Nadelman RB, Sherer C, Mack L, Pavia CS, Wormser GP. Survival of *Borrelia burgdorferi* in human blood stored under blood banking conditions. *Transfusion* 30(4), 298–301 (1990).

11  MacDonald AB. Gestational Lyme borreliosis. Implications for the fetus. *Rheum. Dis. Clin. North Am.* 15(4), 657–677 (1989).

12  Centers for Disease Control and Prevention (CDC). Recommendations for the use of a Lyme disease vaccine. *Morb. Mortal. Wkly Rep.* 48(RR-7) (1999).

13  Centers for Disease Control and Prevention (CDC). Lyme Disease – USA, 2001–2002. *Morb. Mortal. Wkly Rep.* 53(17), 365–369 (2004).

14  Klempner MS, Hu LT, Evans J *et al.* Two controlled trials of antibiotic treatment in patients with persistent symptoms and a history of Lyme disease. *N. Engl. J. Med.* 345(2), 85–92 (2001).

15  Sigler S, Kershaw P, Scheuch R, Sklarek H, Halperin J. Respiratory failure due to Lyme meningoradiculitis. *Am. J. Med.* 103(6), 544–547 (1997).

16  Oksi J, Kalimo H, Marttila RJ *et al.* Inflammatory brain changes in Lyme borreliosis. A report on three patients and review of literature. *Brain* (1996) 119(Pt 6), 2143–2154 (2003).

17  Fallon BA, Nields JA. Lyme disease: a neuropsychiatric illness. *Am. J. Psychiatry* 151(11), 1571–1583 (1994).
·  Excellent review of neuropsychiatric symptoms in Lyme disease.

18  Lebech AM, Hansen K, Wilske B, Theisen M. Taxonomic classification of 29 *Borrelia burgdorferi* strains isolated from patients with Lyme borreliosis: a comparison of five different phenotypic and genotypic typing schemes. *Med. Microbiol. Immunol. (Berlin)* 183(6), 325–341 (1994).

19  Fallon BA, Schwartzberg M, Bransfield R *et al.* Late-stage neuropsychiatric Lyme borreliosis. Differential diagnosis and treatment. *Psychosomatics* 36(3), 295–300 (1995).

20  Coyle PK, Schutzer SE, Deng Z *et al.* Detection of *Borrelia burgdorferi*-specific antigen in antibody-negative cerebrospinal fluid in neurologic Lyme disease. *Neurology* 45(11), 2010–2015 (1995).

21  Food and Drug Administration. Lyme disease test kits: potential for misdiagnosis. *FDA Med. Bull.* (1999).

22  Coyle PK. Neurologic complications of Lyme disease. *Rheum. Dis. Clin. North Am.* 19(4), 993–1009 (1993).

23  Liveris D, Wang G, Girao G *et al.* Quantitative detection of *Borrelia burgdorferi* in 2 mm skin samples of erythema migrans lesions: correlation of results with clinical and laboratory findings. *J. Clin. Microbiol.* 40(4), 1249–1253 (2002).

24  Zore A, Ruzic-Sabljic E, Maraspin V *et al.* Sensitivity of culture and polymerase chain reaction for the etiologic diagnosis of erythema migrans. *Wien Klin. Wochenschr.* 114(13–14), 606–609 (2002).

25  Liegner KB. Lyme disease: the sensible pursuit of answers. *J. Clin. Microbiol.* 31(8), 1961–1963 (1993).

26  Schutzer SE, Coyle PK, Belman AL *et al.* Sequestration of antibody to *Borrelia burgdorferi* in immune complexes in seronegative Lyme disease. *Lancet* 335(8685), 312–315 (1990).

27  Preac-Mursic V, Weber K, Pfister HW *et al.* Survival of *Borrelia burgdorferi* in antibiotically treated patients with Lyme borreliosis. *Infection* 17(6), 355–359 (1989).

28  Mursic VP, Wanner G, Reinhardt S, Wilske B, Busch U, Marget W. Formation and cultivation of *Borrelia burgdorferi* spheroplast-L-form variants. *Infection* 24(3), 218–226 (1996).

29  Bakken LL, Callister SM, Wand PJ, Schell RF. Interlaboratory comparison of test results for detection of Lyme disease by 516 participants in the Wisconsin State Laboratory of Hygiene/College of American Pathologists Proficiency Testing Program. *J. Clin. Microbiol.* 35(3), 537–543 (1997).

30  Donta ST. Late and chronic Lyme disease. *Med. Clin. North Am.* 86(2), 341–349 (2002).

31  Donta ST. The existence of chronic Lyme disease. *Curr. Treat. Op. Infect. Dis.* 3, 261–262 (2001).

32  Donta ST. Tetracycline therapy for chronic Lyme disease. *Clin. Infect. Dis.* 25(Suppl. 1), S52–S56 (1997).

33  Craft JE, Fischer DK, Shimamoto GT *et al.* Antigens of *Borrelia burgdorferi* recognized during Lyme disease. Appearance of a new immunoglobulin M response and expansion of the immunoglobulin G response late in the illness. *J. Clin. Invest.* 78(4), 934–939 (1986).

34  Coyle PK, Schutzer SE, Belman AL, Krupp LB, Golightly MG. Cerebrospinal fluid immune complexes in patients exposed to *Borrelia burgdorferi*: detection of *Borrelia*-specific and -nonspecific complexes. *Ann. Neurol.* 28(6), 739–744 (1990).

35  Jain VK, Hilton E, Maytal J, Dorante G, Ilowite NT, Sood SK. Immunoglobulin M immunoblot for diagnosis of *Borrelia burgdorferi* infection in patients with acute facial palsy. *J. Clin. Microbiol.* 34(8), 2033–2035 (1996).

Liberty002361

36  Treib J, Fernandez A, Haass A, Grauer MT, Holzer G, Woessner R. Clinical and serologic follow-up in patients with neuroborreliosis. *Neurology* 51(5), 1489–1491 (1998).

37 • The International Lyme and Associated Diseases Society (ILADS). Evidence-based guidelines for the management of Lyme disease. *Expert Rev. Anti-infect. Ther.* 2(Suppl.), S1–S13 (2004).

•• First comprehensive guidelines for the diagnosis and treatment of Lyme disease.

38  Engstrom SM, Shoop E, Johnson RC. Immunoblot interpretation criteria for serodiagnosis of early Lyme disease. *J. Clin. Microbiol.* 33(2), 419–427 (1995).

39  Ma B, Christen B, Leung D, Vigo-Pelfrey C. Serodiagnosis of Lyme borreliosis by western immunoblot: reactivity of various significant antibodies against *Borrelia burgdorferi*. *J. Clin. Microbiol.* 30(2), 370–376 (1992).

•  Excellent review of Lyme disease serodiagnosis.

40  Rawlings JA, Fournier PV, Teltow GJ. Isolation of *Borrelia spirochetes* from patients in Texas. *J. Clin. Microbiol.* 25(7), 1148–1150 (1987).

41  Aguero-Rosenfeld ME, Nowakowski J, Bittker S, Cooper D, Nadelman RB, Wormser GP. Evolution of the serologic response to *Borrelia burgdorferi* in treated patients with culture-confirmed erythema migrans. *J. Clin. Microbiol.* 34(1), 1–9 (1996).

42  Aguero-Rosenfeld ME, Nowakowski J, McKenna DF, Carbonaro CA. Wormser GP. Serodiagnosis in early Lyme disease. *J. Clin. Microbiol.* 31(12), 3090–3095 (1993).

43  Goodman JL, Bradley JF, Ross AE *et al.* Bloodstream invasion in early Lyme disease: results from a prospective, controlled, blinded study using the polymerase chain reaction. *Am. J. Med.* 99(1), 6–12 (1995).

44  Straubinger RK. PCR-based quantification of *Borrelia burgdorferi* organisms in canine tissues over a 500-day postinfection period. *J. Clin. Microbiol.* 38(6), 2191–2199 (2000).

•  Evidence for persistent Lyme disease in dogs.

45  Ziska MH, Donta ST, Demarest FC. Physician preferences in the diagnosis and treatment of Lyme disease in the USA. *Infection* 24(2), 182–186 (1996).

46  Johnson BJ, Robbins KE, Bailey RE *et al.* Serodiagnosis of Lyme disease: accuracy of a two-step approach using a flagella-based ELISA and immunoblotting. *J. Infect. Dis.* 174(2), 346–353 (1996).

47  Centers for Disease Control and Prevention (CDC). Case definition for infectious conditions under public health surveillance (Lyme disease surveillance case definition). *Morb. Mortal. Wkly Rep.* 46(RR10, 1–3), 15–16 (1997).

48  Porcella SF, Schwan TG. *Borrelia burgdorferi* and *Treponema pallidum*: a comparison of functional genomics, environmental adaptations, and pathogenic mechanisms. *J. Clin. Invest.* 107(6), 651–656 (2004).

•  Good description of the complexity of *Borrelia burgdorferi*.

49  Georgilis K, Peacocke M, Klempner MS. Fibroblasts protect the Lyme disease spirochete, *Borrelia burgdorferi*, from ceftriaxone *in vitro. J. Infect. Dis.* 166(2), 440–444 (1992).

50  Coyle PK. *Borrelia burgdorferi* infection: clinical diagnostic techniques. *Immunol. Invest.* 26(1–2), 117–128 (1997).

51  Brouqui P, Badiaga S, Raoult D. Eucaryotic cells protect *Borrelia burgdorferi* from the action of penicillin and ceftriaxone but not from the action of doxycycline and erythromycin. *Antimicrob. Agents. Chemother.* 40(6), 1552–1554 (1996).

52  Mahmoud AA. The challenge of intracellular pathogens. *N. Engl. J. Med.* 326(11), 761–762 (1992).

53  Beaman BL, Scates SM. Role of L-forms of Nocardia caviae in the development of chronic mycetomas in normal and immunodeficient murine models. *Infect. Immun.* 33(3), 893–907 (1981).

54  Cook J, Fincham WJ, Lack CH. Chronic arthritis produced by streptococcal L-forms. *J. Pathol.* 99(4), 283–297 (1969).

55  Brorson O, Brorson SH. A rapid method for generating cystic forms of *Borrelia burgdorferi*, and their reversal to mobile spirochetes. *Apmis* 106(12), 1131–1141 (1998).

•  Evidence for cell wall-deficient forms of *Borrelia burgdorferi*.

56  Aberer E, Kaszik F, Silberer M. Why is chronic Lyme borreliosis chronic? *Clin. Infect. Dis.* 25(Suppl. 1), S64–S70 (1997).

57  Zajkowska JM, Hermanowska-Szpakowicz T, Kondrusik M, Pancewicz SA. Neurologic syndromes in Lyme disease. *Pol. Merkuriusz. Lek.* 9(50), 584–588 (2000).

58  Zajkowska JM, Hermanowska-Szpakowicz T, Pancewicz SA, Kondrusik M. Selected aspects of immunopathogenesis in Lyme disease. *Pol. Merkuriusz. Lek.* 9(50), 579–583 (2000).

59  Dorward DW, Fischer ER, Brooks DM. Invasion and cytopathic killing of human lymphocytes by spirochetes causing Lyme disease. *Clin. Infect. Dis.* 25(Suppl. 1) S2–S8 (1997).

60  Chiao JW, Pavia C, Riley M *et al.* Antigens of Lyme disease of spirochaete *Borrelia burgdorferi* inhibits antigen or mitogen-induced lymphocyte proliferation. *FEMS Immunol. Med. Microbiol.* 8(2), 151–155 (1994).

61  Seiler KP, Weis JJ. Immunity to Lyme disease: protection, pathology and persistence. *Curr. Opin. Immunol.* 8(4), 503–509 (1996).

62  Stricker RB, Burrascano J, Winger E. Longterm decrease in the CD57 lymphocyte subset in a patient with chronic Lyme disease. *Ann. Agric. Environ. Med.* 9(1), 111–113 (2002).

63  Hunfeld KP, Kraiczy P, Kekoukh E, Schafer V, Brade V. Standardised *in vitro* susceptibility testing of *Borrelia burgdorferi* against well-known and newly developed antimicrobial agents – possible implications for new therapeutic approaches to Lyme disease. *Int. J. Med. Microbiol.* 291(Suppl. 33), 125–137 (2002).

64  Preac Mursic V, Marget W, Busch U, Pleterski Rigler D, Hagl S. Kill kinetics of *Borrelia burgdorferi* and bacterial findings in relation to the treatment of Lyme borreliosis. *Infection* 24(1), 9–16 (1996).

65  Henneberg JP, Neubert U. *Borrelia burgdorferi* group: *in vitro* antibiotic sensitivity. *Orv. Hetil.* 143(21), 1195–1198 (2002).

66  Burrascano J. Lyme disease complexities. Kennett Friends Meeting, sponsored by the Lyme Disease Association of Southeastern Pennsylvania, Kennett Square, PA, USA. 3 May 2003.

67  Brown SL, Hansen SL, Langone JJ. Role of serology in the diagnosis of Lyme disease. *J. Am. Med. Assoc.* 282(1), 62–66 (1999).

•  US Food and Drug Administration view of Lyme disease testing.

68  Bakken LL, Case KL, Callister SM, Bourdeau NJ, Schell RF. Performance of 45 laboratories participating in a proficiency testing program for Lyme disease serology. *J. Am. Med. Assoc.* 268(7), 891–895 (1992).

•  Review of problems with Lyme disease testing.

69  Wormser GP, Nadelman RB, Dattwyler RJ *et al.* Practice guidelines for the treatment of Lyme disease. The Infectious Diseases Society of America. *Clin. Infect. Dis.* 31(Suppl. 1), 1–14 (2000).

Liberty002362

Johnson & Stricker

70  Feder HM Jr. Differences are voiced by two Lyme camps at a Connecticut public hearing on insurance coverage of Lyme disease. *Pediatrics* 105(4 Pt 1), 855–857 (2000).

71 · Straubinger RK, Summers BA, Chang YF, Appel MJ. Persistence of *Borrelia burgdorferi* in experimentally infected dogs after antibiotic treatment. *J. Clin. Microbiol.* 35(1), 111–116 (1997).

72  Liegner KB, Kochevar J. Guidelines for the clinical diagnosis of Lyme disease. *Ann. Intern. Med.* 129(5), 422 (1998).

73  Pachner AR, Delaney E, O'Neill T. Neuroborreliosis in the nonhuman primate: *Borrelia burgdorferi* persists in the central nervous system. *Ann. Neurol.* 38(4), 667–669 (1995).

74  Burrascano J. Lyme Disease. In: *Conn's Current Therapy.* Rakel R (Ed.), Saunders, PA, USA (1997).

•   Excellent review of Lyme disease diagnosis and treatment.

75  Labro MT, Abdelghaffar H. Immunomodulation by macrolide antibiotics. *J. Chemother.* 13(1), 3–8 (2001).

76  Freedman RM. The two Lyme camps. *Pediatrics* 107(6), 1495 (2001).

77  Magri JM, Johnson MT, Herring TA, Greenblatt JF. Lyme disease knowledge, beliefs, and practices of New Hampshire primary care physicians. *J. Am. Board Fam. Pract.* 15(4), 277–284 (2001).

78  Straubinger RK, Straubinger AF, Summers BA, Jacobson RH. Status of *Borrelia burgdorferi* infection after antibiotic treatment and the effects of corticosteroids: an experimental study. *J. Infect. Dis.* 181(3), 1069–1081 (2000).

79  Shadick NA, Phillips CB, Logigian EL *et al.* The long-term clinical outcomes of Lyme disease. A population-based retrospective cohort study. *Ann. Intern. Med.* 121(8), 560–567 (1994).

80  Liegner KB. Culture confirmed treatment failure of cefotaxime and minocycline in a case of Lyme meningoencephalomyelitis. In: *Program and abstracts of the Fifth International Conference on Lyme Borreliosis.* Arlington, VA, USA (1992).

81  Krupp LB, Masur D, Schwartz J *et al.* Cognitive functioning in late Lyme borreliosis. *Arch. Neurol.* 48(11), 1125–1129 (1991).

82  Haupl T, Hahn G, Rittig M *et al.* Persistence of *Borrelia burgdorferi* in ligamentous tissue from a patient with chronic Lyme borreliosis. *Arthritis Rheum.* 36(11), 1621–1626 (1993).

83  Hassler D, Riedel K, Zorn J, Preac-Mursic V. Pulsed high-dose cefotaxime therapy in refractory Lyme borreliosis. *Lancet* 338(8760), 193 (1991).

84  Pfister HW, Preac-Mursic V, Wilske B, Schielke E, Sorgel F, Einhaupl KM. Randomized comparison of ceftriaxone and cefotaxime in Lyme neuroborreliosis. *J. Infect. Dis.* 163(2), 311–318 (1991).

85  Liegner KB. Chronic persistent infection and chronic persistent denial of chronic persistent infection in Lyme disease. *Annual Lyme Disease Scientific Conference.* Atlantic City, NJ, USA. May 5–6 1993.

86  Halperin JJ. Neuroborreliosis: central nervous system involvement. *Semin. Neurol.* 17(1), 19–24 (1997).

87  Kersten A, Poitschek C, Rauch S, Aberer E. Effects of penicillin, ceftriaxone, and doxycycline on morphology of *Borrelia burgdorferi. Antimicrob. Agents. Chemother.* 39(5), 1127–1133 (1995).

88  Preac-Mursic V, Pfister HW, Spiegel H *et al.* First isolation of *Borrelia burgdorferi* from an iris biopsy. *J. Clin. Neuroophthalmol.* 13(3), 155–161 (1993).

89  Young D, Hussell T, Dougan G. Chronic bacterial infections: living with unwanted guests. *Nature Immunol.* 3(11), 1026–1032 (2002).

90  Shadick NA, Phillips CB, Sangha O *et al.* Musculoskeletal and neurologic outcomes in patients with previously treated Lyme disease. *Ann. Intern. Med.* 131(12), 919–926 (1999).

91  Fallon BA. *Testimony at public hearing in re Lyme disease, State of Connecticut.* Department of Public Health 29th January 2004.

92  Schmid GP. Epidemiology and clinical similarities of human spirochetal diseases. *Rev. Infect. Dis.* 11(Suppl. 6), S1460–S1469 (1989).

93  Jacobs RA. Syphilis. In: *Current Medical Diagnosis and Treatment, 42nd Edition.* Tierney LM, McPhee SJ, Papadakis MA (Eds), McGraw Hill, NY, USA (2003).

94  Katzel J. Is there a consensus in treatment of Lyme borreliosis? In: *Lyme Disease 1991 Patient/Physician Perspectives from the US and Canada.* Mermin L (Ed.), Madison, WI, USA (1991).

95  Cimmino MA, Moggiana GL, Parisi M, Accardo S. Treatment of Lyme arthritis. *Infection* 24(1), 91–93 (1996).

96  Raoult D, Houpikian P, Tissot Dupont H, Riss JM, Arditi-Djiane J, Brouqui P. Treatment of Q fever endocarditis: comparison of two regimens containing

doxycycline and ofloxacin or hydroxychloroquine. *Arch. Intern. Med.* 159(2), 167–173 (1999).

97  Goto M. Chemotherapy of leprosy: theoretical basis of new guideline in Japan. *Nihon Hansenbyo Gakkai Zasshi* 70(3), 151–155 (2001).

98  Shaw IN, Natrajan MM, Rao GS, Jesudasan K, Christian M, Kavitha M. Long-term follow-up of multibacillary leprosy patients with high BI treated with WHO/MDT regimen for a fixed duration of 2 years. *Int. J. Lepr. Mycobact. Dis.* 68(4), 405–409 (2000).

99  Small PM, Fujiwara PL. Management of tuberculosis in the USA. *N. Engl. J. Med.* 345(3), 189–200 (2001).

100  Stricker RB, Lautin A. The Lyme wars: time to listen. *Expert Opin. Investig. Drugs* 12(10), 1609–1614 (2003).

••  Excellent analysis of the Lyme disease controversy.

101  Wahlberg P, Granlund H, Nyman D, Panelius J, Seppala I. Treatment of late Lyme borreliosis. *J. Infect.* 29(3), 255–261 (1994).

102  Oksi J, Marjamaki M, Nikoskelainen J, Viljanen MK. *Borrelia burgdorferi* detected by culture and PCR in clinical relapse of disseminated Lyme borreliosis. *Ann. Med.* 31(3), 225–232 (1999).

103  Krupp LB, Hyman LG, Grimson R *et al.* Study and treatment of post Lyme disease (STOP-LD): a randomized double masked clinical trial. *Neurology* 60(12), 1923–1930 (2003).

104  Haycox A, Bagust A, Walley T. Clinical guidelines – the hidden costs. *Br. Med. J.* 318(7180), 391–393 (1999).

••  Short but cogent analysis of the interests of different stakeholders in the process of drafting guidelines.

105  Ernst E, Canter PH. Investigator bias and false positive findings in medical research. *Trends Pharmacol. Sci.* 24(5), 219–221 (2003).

106  Morriem E. From the clinics to the courts: the role evidence should play in litigating medical care. *J. Health Polit. Policy Law* 26(2), 409 (2001).

107  Steiner I. Treating post Lyme disease: trying to solve one equation with too many unknowns. *Neurology* 60(12), 1888–1889 (2003).

108  Halperin JJ, Heyes MP. Neuroactive kynurenines in Lyme borreliosis. *Neurology* 42(1), 43–50 (1992).

109  Noah L. Informed consent and the elusive dichotomy between standard and experimental therapy. *Am. J. Law Med.* 28(4), 361–408 (2002).

554                                                   *Expert Rev. Anti-infect. Ther.* 2(4), (2004)

Liberty002363

•• Excellent overview of the distinction between experimental and nonexperimental medicine, the weight that should be afforded to different types of evidence and the need for informed consent.

110 Britton C. Remarks before the NYS Assembly Committee on Health chaired by Richard Gottfried. *New York State Assembly, Standing Committee On Health, public hearing: chronic Lyme disease and long-term antibiotic treatment.* NY, USA, 27th November 2001.

111 Zeuzem S. A comparison of standard treatment versus dynamically individualized treatment in patients with chronic hepatitis C. *54th Annual Meeting of the American Association for the Study of Liver Diseases* MA USA. October 24–28, 2003.

112 Parola P, Raoult D. Ticks and tickborne bacterial diseases in humans: an emerging infectious threat. *Clin. Infect. Dis.* 32(6), 897–928 (2001).

113 Schabereiter-Gurtner C, Lubitz W, Rolleke S. Application of broad-range 16S rRNA PCR amplification and DGGE fingerprinting for detection of tick-infecting bacteria. *J. Microbiol. Methods* 52(2), 251–260 (2003).

114 Schouls LM, Van De Pol I, Rijpkema SG, Schot CS. Detection and identification of *Ehrlichia, Borrelia burgdorferi* sensu lato, and *Bartonella* spp. in Dutch *Ixodes ricinus* ticks. *J. Clin. Microbiol.* 37(7), 2215–2222 (1999).

115 Kaiser R. False-negative serology in patients with neuroborreliosis and the value of employing of different borrelial strains in serological assays. *J. Med. Microbiol.* 49(10), 911–915 (2000).

116 Steere AC, Dwyer E, Winchester R. Association of chronic Lyme arthritis with HLA-DR4 and HLA-DR2 alleles. *N. Engl. J. Med.* 323(4), 219–223 (1990).

117 Institute of Medicine. *Guidelines for clinical practice: from development to use.* Field M, Lohr K (Eds), National Academy Press, Washington, DC, USA (1992).

•• Excellent overview of the relative roles of evidence and consensus in medical practice and how to guard against bias in the drafting of treatment guidelines.

118 Hitt J. The year in ideas: A to Z evidence-based medicine. *New York Times* December 9 (2001).

119 Wennberg JE, Fisher JS, Skinner JS. Geography and the debate over Medicare reform. *Health, Aff. (Millwood)* (Suppl. Web Exclusives), W96–114 (2002).

•• Includes an excellent analysis of small-area variations caused by patient preference issues and the appropriate way to address this variation (outcomes research and informed patient consent).

120 Arlen J, MacLeod W. Malpractice liability for physicians and managed care organizations. *NY Uni. Law Rev.* (2003).

•• Excellent analysis of negligence liability for physicians and managed care organizations and the essential role that such sanctions play in regulating noncontractable postcontractual medical actions to establish optimal care.

121 Mulrow C, Lohr K. Proof and Policy from Medical Research Evidence Journal of Health Politics, Policy and Law, entitled Evidence: its meanings in health care and in law. (Summary of the 10 April 2000 IOM and AHRQ Workshop). *J. Health Polit. Policy Law* (2000).

•• Analysis of the subjective contribution of judgment, values, probability, and uncertainty in medical decision making.

122 Muir Gray J. *Evidence-Based Healthcare. How to Make Health Policy and Management Decisions.* Churchill Livingstone, London, UK (1997).

123 Hayward RS, Wilson MC, Tunis SR, Bass EB, Guyatt G. Users' guides to the medical literature. How to use clinical practice guidelines. Are the recommendations valid? The Evidence-Based Medicine Working Group. *J. Am. Med. Assoc.* 274(7), 570–574 (1995).

124 Nichol G, Dennis DT, Steere AC. Test-treatment strategies for patients suspected of having Lyme disease: a cost-effectiveness analysis. *Ann. Intern. Med.* 128(1), 37–48 (1998).

125 Martinez B. Care guidelines used by insurers face scrutiny. *Wall Street Journal,* September 14 (2000).

126 Beansfield R. *NYS Assembly Committee on Health chaired by Richard Gottfried.* Albany, NY, USA 27 November 2001.

127 Van de Weyden M. Clinical practice guidelines: time to move the debate from the how to the who. *Med. J. Aust.* 176(7), 304–305 (2002).

128 Grilli R, Magrini N, Penna A, Mura G, Liberati A. Practice guidelines developed by specialty societies: the need for critical appraisal. *Lancet* 355, 103–106 (2000).

129 Silver W. The Inadequacy of state legislative responses to ERISA preemption of managed care liability. *NY Uni. Law Rev.* 78(2), 845–873 (2003).

130 Stolberg S. Study says clinical guides often hide ties of doctors. *New York Times* 6 February (2003).

131 Choudhry N, Stelfox H, Detsky A. Relationships between authors of clinical practice guidelines and the pharmaceutical industry. *J. Am. Med. Assoc.* 287, 612–617 (2002).

132 Mello M. Of swords and shields: the use of clinical practice guidelines in medical malpractice litigation. *Uni. Penn. Law Rev.* 149(3), 645–710 (2000).

133 Woolf SH, Grol R, Hutchinson A, Eccles M, Grimshaw J. Clinical guidelines: potential benefits, limitations, and harms of clinical guidelines. *Br. Med. J.* 318(7182), 527–530 (1999).

134 Fletcher S, Fletcher R. Development of clinical guidelines. *Lancet* 352(9144), 1876 (1998)

135 Haycox A, Bagust A, Walley P. Clinical guidelines – the hidden costs. *Br. Med. J.* 318, 391–393 (1999).

136 Rosenbaum S, Kamoie B. Managed care and public health: conflict and collaboration. *J. Law Med. Ethics* 30(2), 191–200 (2002).

137 Woolf SH, Grol R, Hutchinson A, Eccles M, Grimshaw J. Potential benefits, limitations, and harms of clinical guidelines. *Br. Med. J.* 318, 527–530 (1999).

138 California Jury Instruction Civil Committee. Duty of Physicians. In: *California Jury Instructions, Civil : Book Of Approved Jury Instructions.* West Publishing Co., MN, USA (2002).

139 Mello M. Using statistical evidence to prove the malpractice standard of care: bridging legal, clinical, and statistical thinking. *Wake Forest Law Rev.* 37(3), 821–859 (2002).

140 California Jury Instruction Civil Committee. Medical negligence – standard of care determined by expert testimony. In: *California Jury Instructions, Civil: Book of Approved Jury Instructions.* West Publishing Co., MN, USA (2002).

141 Hurwitz B. Clinical guidelines and the law. *Br. Med. J.* 311, 1517–1518 (1995).

142 Mulrow C, Lohr K. Proof and policy from medical research evidence. *J. Health Politic Policy Law* 26(2) (2001).

143 California Jury Instruction Civil Committee. Alternative methods of diagnosis or treatment. In: *California Jury Instructions, Civil: Book of Approved Jury Instructions.* West Publishing Co., St. Paul, MN, USA (2002).

144 *Leech v. Bralliar* 275 F. Supp. 897 (D. Ariz 1967).

145 *Natale v. Michigan Board of Medicine,* (File no. 96–015560 AA-2) (1998) (2001).

146 Office of Technology Assessment (US Congress). Defensive Medicine: definition and causes. In: *Defensive Medicine and Medical Malpractice.* USA Government Printing Office, Washington, DC, USA (1994).

Liberty002364

Johnson & Stricker

• Interesting analysis of defensive versus nondefensive medicine and in what situations it is appropriate for a physician to employ defensive medicine to improve treatment outcomes.

147. Quill TE, Brody H. Physician recommendations and patient autonomy: finding a balance between physician power and patient choice. *Ann. Intern. Med.* 125(9), 763–769 (1996).

148 Amanda R, Marcia A, Richard WD *et al.* What is a good decision? *Effective Clin. Prac.* July/August (1999).

149 *Cobbs v. Grant,* 104 Cal. Rptr. 505 (Cal. 1972).

150 *Matthies v. Mastromonaco,* 733 A. 2d 456 (N.J. 1999).

151 *Mathis v. Morrissey,* 13 Cal. Rptr. 2d 819 (1992).

152 Wennburg JE, Peters GP. Unwarranted variations in the quality of healthcare: can the law help medicine provide a remedy/remedies? *Wake Forest Law Rev.* 37(3), 925–941 (2002).

153 Wang M. Resurgent Paternalism. Virtual Mentor-Ethics *J. Am. Med. Assoc.* 6(2) (1994).

154 Liegner KB, Lyme disease controversy: use and misuse of language. *Ann. Intern. Med.* 137(9), 775–777 (2002).

155 *Hughes v. Blue Cross of Northern California,* 263 Cal. Rptr. 850 (1989)

156 *Wickline v. State of California,* 239 Cal. Rptr. 810 (1986)

157 *Wilson v. Blue Cross of Southern California,* 271 Cal. Rptr. 876 (1990).

• The Wilson court points out that language in Wickline suggesting that liability rests solely within the treating physician's responsibility constitutes nonbinding dicta and holds that an insurance review company may be held responsible when its conduct is a substantial factor in the plaintiff's injury or death.

158 *Van Vactor v. Blue Cross Assoc.,* 365 N.E.2d 638,645 (Ill. App. Ct. 1977).

159 Furrow BR. The problem of medical misadventures: a review of E Haavi Morreim's Holding Healthcare Accountable. *J. Law Med. Ethics* 29(3–4), 381–393 (2001).

160 *Murray v. Chesapeake,* No. 07C99000129mm. (Cecil county, MD 2000).

161 *Sarchett v. Blue Shield of California,* 223 Cal. Rptr. 76 (1987).

162 Valesova H, Mailer J, Havlik J, Hulinska D, Hercogova J. Long-term results in patients with Lyme arthritis following treatment

with ceftriaxone. *Infection* 24(1), 98–102 (1996).

163 Asch ES, Bujak DI, Weiss M, Peterson MG, Weinstein A. Lyme disease: an infectious and postinfectious syndrome. *J. Rheumatol.* 21(3), 454–461 (1994).

164 Logigian EL, Kaplan RF, Steere AC. Chronic neurologic manifestations of Lyme disease. *N. Engl. J. Med.* 323(21), 1438–1444 (1990).

165 Breier F, Khanakah G, Stanek G *et al.* Isolation and polymerase chain reaction typing of *Borrelia afzelii* from a skin lesion in a seronegative patient with generalized ulcerating bullous lichen sclerosus et atrophicus. *Br. J. Dermatol.* 144(2), 387–392 (2001).

166 Horowitz R. Chronic persistent Lyme borreliosis: PCR evidence of chronic infection despite extended antibiotic therapy – a retrospective review. *13th International Scientific Conference on Lyme Disease and Other Tick-Borne Disorders.* CT, USA 24–26 March 2000.

167 Bayer ME, Zhang L, Bayer MH. *Borrelia burgdorferi* DNA in the urine of treated patients with chronic Lyme disease symptoms. A PCR study of 97 cases. *Infection* 24(5), 347–353 (1996).

168 Burrascano J. Failure of aggressive antibiotic therapy to protect the placenta from invasion by B burgdorferi in a pregnant patient with Lyme Borreliosis. *6th Annual International Science Conference on Lyme Disease and other Tick-Borne Diseases.* (1993) (Abstract).

169 Battafarano DF, Combs JA, Enzenauer RJ, Fitzpatrick JE. Chronic septic arthritis caused by *Borrelia burgdorferi. Clin. Orthop.* 297, 238–241 (1993).

170 Petrovic M, Vogelaers D, Van Renterghem L, Carton D, De Reuck J, Afschrift M. Lyme borreliosis – a review of the late stages and treatment of four cases. *Acta. Clin. Belg.* 53(3), 178–183 (1998).

171 Ferris Torrajada J, Lopez Andreu JA, Salcedo Vivo J, Sala Lizarraga JV. Lyme Borreliosis (Letter). *Lancet* 345(8962), 1436–1437 (1995).

172 Lopez-Andreu JA, Ferris J, Canosa GA, Sala-Lizarraga JV. Treatment of late Lyme disease: a challenge to accept. *J. Clin. Microbiol.* 32(5), 1415–1416 (1994).

173 Oksi J, Nikoskelainen J, Viljanen MK. Comparison of oral cefixime and intravenous ceftriaxone followed by oral amoxicillin in disseminated Lyme borreliosis. *Eur. J. Clin. Microbiol. Infect. Dis.* 17(10), 715–719 (1998).

174 Fallon BA. Repeated antibiotic treatment in chronic Lyme disease. *J Spirochet Tick Borne Dis.* 6, 94–101 (1999).

175 Lawrence C, Lipton RB, Lowy FD, Coyle PK. Seronegative chronic relapsing neuroborreliosis. *Eur. Neurol.* 35(2), 113–117 (1995).

176 Masters E. Spirochetemia after continuous high-dose oral amoxicillin therapy. *Infect. Dis. Clin. Prac.* 3(3), 207–208 (1994).

177 Cimmino MA, Accardo S. Long-term treatment of chronic Lyme arthritis with benzathine penicillin. *Ann. Rheum. Dis.* 51(8), 1007–1008 (1992).

178 Connor S. Glaxo chief: our drugs do not work on most patients. *The Independent* 8 December (2003).

179 Edmonds J, Day O, Bertouch J. In reply: The road to consensus: consideraton for the safe use and prescribing of COX-2 specific inhibitors. *Med. J. Aust.* 176(7), 332–334 (2002).

•• Excellent discussion of the hazards and pitfalls of guideline development within contentious groups.

180 Jacoby I. Consensus development at NIH: What went wrong? *Risk* 4, 133 (1993).

181 Jacoby I. Resolving medical controversies. *Risk* 6, 139 (1994).

182 Morris GH. Dissing disclosure: just what the doctor ordered. *Ariz. Law Rev.* 44, 313 (2002).

• Provides an extensive and well-reasoned analysis of the history, current status, and legal issues lurking in the doctrine of informed consent.

183 The American Urological Association. Prostate cancer clinical guidelines panel summary report on the management of clinically localized prostate cancer. *J. Urol.* 154(6):2144–2148 (1995).

**Websites**

201 Rubel J. Lyme disease symptoms and characteristics: a compilation of peer-reviewed literature reports (compilation of 19 Lyme related deaths). www.lymeinfo.net/LDSymptoms.pdf (Accessed July 2004)

202 Edlow J. Tick borne diseases, Lyme. eMedicine www.emedicine.com/emerg/topic588.htm (Accessed July 2004)

203 National Institute of Allergy and Infectious Diseases (National Institute of Health) profile, fiscal year 2001 www.niaid.nih.gov/publications/NIAIDP rofile/ (Accessed July 2004)

556

*Expert Rev. Anti-Infect. Ther.* 2(4), (2004)

Liberty002365

09/23/2016  15:59  8507835985  ZIMBERL INLAW  PAGE  47/53
Case 3:11-cv-01807-VLB  Document 142-3  Filed 11/16/18  Page 90 of 501

Treatment of Lyme disease

204  Liegner KB. *Remarks before the New York State Assembly Committee on Health, Public Hearing. Chronic Lyme Disease and Long-term Antibiotic Treatment*, NY, USA, 27 November 2001.
www.canlyme.com/leigner.html
(Accessed July 2004)

205  National Institute of Allergy and Infectious Diseases (National Institute of Health). Diagnosis of Lyme Disease.
www.niaid.nih.gov/dmid/lyme/diagnosis.htm
(Accessed July 2004)

206  Mead P. Statement by Paul Mead MD, M.P.H., Medical Epidemiologist, Division of Vector-Borne Infectious Diseases, National Center for Infectious Diseases, Center for Disease Control and Prevention, US Department of Health and Human Services on Hearing; CDC's Lyme Disease Prevention and Control Activities at public hearing in re Lyme disease, State of Connecticut, Department of Public Health, 29 January 2004.
www.hhs.gov/asl/testify/t040129.html
(Accessed July 2004)

207  Rawlings J Goldhagens H. Lyme Disease Controversies. Medscape coverage of the *14th International Scientific Conference on Lyme Disease and Other Tick-Borne Disorders*.
www.medscape.com/viewprogram/482_childindex
(Accessed July 2004)

208  Lyme Disease Foundation. The controversies surrounding Lyme disease diagnosis and treatment and why it is not uncommon for patients to experience persistent symptoms despite receiving conventional' (short-term) antibiotic therapy for Lyme disease.
www.lyme.org/lymelight/trtcontrov.html
(Accessed July 2004)

209  Cooper C. Safety of long-term therapy with penicillin and penicillin derivatives. Center for Drug Evaluation and Research.
www.fda.gov/cder/drugprepare/penlongsafety.htm
(Accessed July 2004)

210  Burrascano JJ. Diagnostic hints and treatment guidelines for Lyme and other tick-borne illnesses. (2002).
http://www.ilads.org/burrascano_1102.htm
(Accessed July 2004)

••  Comprehensive guide to Lyme disease diagnosis and treatment.

211  The International Lyme and Associated Diseases Society (ILADS). Evaluation of antibiotic treatment in patients with persistent symptoms of Lyme disease.
www.ilads.org/position2.htm
(Accessed July 2004)

••  Must-read rebuttal to the flawed study of 'long-term' antibiotic therapy published in the *N. Engl. J. Med.* [14].

212  Grier T. ELISA and western blot: lies that can kill you?
www.centurytel.net/tjs11/bug/blot1.htm
(Accessed July 2004)

213  Morgan M. Independent review of managed care decisions.
csha.calhealth.org/
(Accessed July 2004)

214  Booth A. What proportion of healthcare is evidence based?
www.shef.ac.uk/scharr/ir/percent.html
(Accessed July 2004)

•  Valuable compilation of discussion on evidence-based medicine from many studies and comments, including the distinction between randomized clinical-trial-based and compelling nonexperimental evidence.

215  Lewis D. National guideline clearinghouse: extensive resource underused, in managed care.
www.managedcaremag.com/archives/0106/0106.guidelines.htm
(Accessed July 2004)

216  Jemsek JG. Lyme disease in the Carolinas (1998)
www.jemsekclinic.com/lymedisease.php.
(Accessed July 2004)

217  Centre for Evidence Based Medicine. What are the limitations of EBM?
www.cebm.utoronto.ca/intro/limit.htm
(Accessed July 2004)

218  In the Matter of *Joseph Burrascano v. New York State Bd.* for Professional Medical Conduct, Determination and Order (No. 01–265) of the Hearing Committee dated November 6 2003
w3.health.state.ny.us/opmc/factions.nsf/58220x%20%20%20%20a7f9eeaafab8525 6b180058c032/7f57f08d61de929c85256a4a0047c6da/$FILE/ATTIDOPD/lc145623.pdf
(Accessed July 2004)

219  Hamilton, C. LymeNet Law Pages, Lyme Related Legal Matters. Jury awards $1.7 million to Cecil teen (December 20, 2000).
www2.lymenet.org/domino/law.nsf/0/2d03309dc8e1088d052569bd0061a28b?OpenDocument
(Accessed July 2004)

220  American Medical Association, Code of Medical Ethics. Current opinions with annotations 2002–2003.
www.ama-assn.org/apps/pf_new/pf_online?category=CEJA&assn=AMA&f_n=mSearch&s_t=&st_p=&cnth=1&
(Accessed July 2004)

221  Fowler F. The role of patient preferences in medical care.
www.fimdm.org/downloads/Patient_Preferences_Fowler.pdf
(Accessed July 2004)

### Affiliations

•  *Lorraine Johnson, JD, MBA*
California Lyme Disease Association,
P.O. Box 1423, Ukiah, CA 95482, USA
Tel.: +1 323 461 6184
Fax: +1 323 461 6143
lbj1@pacbell.net

•  *Raphael B Stricker, MD*
California Pacific Medical Center,
450 Sutter Street, Suite 1504, San Francisco,
CA 94108, USA
Tel.: +1 415 399 1035
Fax: +1 415 399 1057
rstricker@usmamed.com

Liberty002366

# LYME DISEASE SYMPTOMS

**The symptoms of Lyme disease are extraordinarily extensive. While you are highly unlikely to experience all, or even most, it is important to know what *might* be associated with this multi-symptom disease so that you can seek appropriate medical help promptly:**

**The Tick Bite**

If you get a rash it may be:

Raised, hot to touch, itchy, crusty, or oozy

Circular, spreading out, oval, triangular, or long-thin line

Disappear and return

At the site of the bite or on other parts of your body

Note: You may never see a tick or get a rash and still be infected with Lyme disease

**Head, Face, Neck**

Headache, mild or severe

Facial paralysis (Bell's palsy)

Tingling of nose, cheek, or face

Twitching of facial or other muscles (motor tics)

Jaw pain or stiffness (TMJ like problems)

Neck is stiff, painful, creaks or cracks

Sore Throat, swollen glands

Hoarseness or vocal cord problems

Sinusitis or increase in allergy symptoms

Difficulty chewing, swallowing, speaking

Change in smell, taste

Unexplained hair loss

**Eyes/Vision**

Double or blurry vision

Wandering or lazy eye

Drooping eyelid

Vision changes incl. blindness, retinal damage, optic atrophy

Red eyes

Conjunctivitis or "pinkeye"

Floaters or spots appearing in the line of sight

Pain or inflammation of eyes, or swelling around eyes

Oversensitivity to light

Decreased perception of light or color

Flashing lights

**Ears/Hearing**

Decreased hearing in one or both ears

Pain in ears

Ringing or buzzing in one or both ears

Sound sensitivity

**Digestive and Excretory Systems**

Diarrhea or constipation

Upset stomach (nausea, vomiting, pain)

Irritable bladder (trouble starting, stopping)

Unexplained weight gain or loss

Loss of appetite, anorexia

**Musculoskeletal System**

Joint pain, swelling, or stiffness

Stiff neck

Shifting joint pains

Muscle pain or cramps

Burning in feet

Shin splints

Drooping shoulders

Loss of reflexes

Poor muscle coordination

Loss of muscle tone, muscle weakness

**Respiratory and Circulatory Systems**

Shortness of breath, cough

Difficulty breathing or pneumonia

Chest pain or rib soreness

Night sweats or unexplained chills

Heart palpitations, extra beats or pulse skips

Heart blockage, heart murmur, valve prolapse

Heart attack

Swelling or enlargement of heart

Diminished exercise tolerance

**Neurologic System**

Burning or stabbing sensations in the body

Weakness or paralysis of limbs

Tremors or unexplained shaking

Seizures

White matter lesions

Pressure in head

Numbness in body, tingling, pinpricks

Poor balance, dizziness, difficulty walking

Increased motion sickness, wooziness

Lightheadedness, fainting

Stroke

Meningitis

Encephalopathy (dysfunction of the brain)

Encephalomyelitis (inflammation of the brain & spinal cord)

**Psychological Well-being**

Mood swings, irritability, or extreme agitation

Depression and anxiety

Personality changes

Depersonalization

Malaise

Suicidal thoughts (rare cases of suicide)

Anxiety/panic attacks

Aggressive behavior or impulse violence

Obsessive-compulsive behavior

Bipolar disorder/manic episodes

Schizophrenic-like states

Dementia

Eating disorders

Increased suspiciousness, paranoia/hallucinations

Disorientation (getting or feeling lost)

Feeling as if you are losing your mind

Overemotional reactions, crying easily

Disturbed sleep: difficulty falling or staying asleep, too much, too little or early awakening

**Mental Capability**

Forgetfulness, memory loss (short or long term)

Poor school or work performance

Attention deficit problems, distractibility

Confusion, difficulty in thinking

Difficulty with concentration, reading, or spelling

Disorientation: getting lost or going to the wrong place

Difficulty with speech (slowed, slurred or stammering)

Dyslexia-type reversals, Difficulty with writing

Word retrieval problems (can't remember words/stop mid-sentence)

Forgetting how to perform simple task

Problems with numbers

Liberty002367

# LYME DISEASE: THE PITFALLS OF
## LABORATORY TESTING
John Drulle, M.D.

Since Lyme disease is caused by a spirochete bacteria, Borrelia burgdorferi. the ideal diagnostic test would be one which could isolate the bacteria from the patient by culture or direct stain. This is unfortunately, rarely accomplished. The Lyme bacteria do not grow in standard laboratory culture media, and they are only present-in the body in small numbers, and may only be present in tissues which are not readily accessible. Other tests capable of direct detection of the Lyme bacteria are under development. These include antigen detection methods, which look for fragments of the Lyme bacteria in body tissues (urine, blood, spinal fluid, joint fluid, tears and breast milk) and PCR or DNA probes, which can find the genetic material of the Lyme bacteria in a tissue sample. A number of university and commercial research facilities are currently evaluating these tests, and they are available to practicing physicians as investigational tools. Although they are not currently FDA approved for use by commercial laboratories, we cannot ignore their presence and their benefit in helping

diagnose Lyme disease in certain diagnostic dilemmas. Similar tests are currently used in diagnosing certain cases of AIDS, and we hear no outcry from the same critics who would deny their application of Lyme disease.

Currently available commercial tests for Lyme disease provide indirect evidence of exposure to the Lyme bacteria. When someone is infected with the Lyme bacteria, the immune system responds by making specific proteins, called antibodies, whose role is to seek out eh Lyme bacteria, attach to them and initiate the process of destruction. In most patients, these antibodies are unable to destroy the Lyme bacteria, which by methods which are not completely understood, may remain alive in the human body for many years, in spite of high "titers" or concentrations of antibodies. Detectable levels of these antibodies may not be found until 3 to 8 weeks after exposure. Significant illness may be present before the test is positive. Most people who present with the characteristic EM (erythema migrans) rash of Lyme disease test negative at that time. A number of patients clearly

do not develop measurable antibodies. This is usually due to antibiotics given early in the infection for Lyme or non-Lyme infections. There is significant strain variability in Lyme bacteria isolated in different geographic areas, and since commercial tests have been developed from certain particular isolates, they may be incapable of detecting antibodies to a different strain of Lyme bacteria. It is also possible that some people's immune systems do not recognize the Lyme bacteria as an invader and do not produce specific bacteria and their fragments, they may combine with all the circulating Lyme specific antibodies. Current commercial antibody tests for Lyme can only detect free circulating antibodies, and are incapable of detecting those bound up in immune complexes. Investigational tests have been developed to free these sequestered antibodies and render them measurable by the standard tests. There is wide variability between tests of commercial laboratories, and it is not unusual to have a serum sample test positive in one lab and negative in another.

Liberty002368

The percentage of Lyme patients who test negative on the antibody tests is close to 100% if the test is performed early in the infection, to anywhere between 5% and 40% in late disease, depending on the particular published data we wish to cite. It is also known that false positive tests can occur. These may be due to other previous or current spirochetal infections such as syphilis, tick-borne relapsing fever, leptospirosis and gingivitis. Some patients who have rheumatoid arthritis, Lupus, or mononucleosis may test positive. Some people who appear to be in good health and have no Lyme related symptoms may test positive. This may indicate past exposure to the Lyme bacteria, with spontaneous recovery, or it may represent a dormant infection which may activate at some future date and cause clinical disease. This has been well documented in the European literature.

The Western Blot is now commercially available for Lyme disease. Here various sized Lyme antibodies are allowed to migrate on a strip of filter paper. They separate into distinct bands, and serve as a "fingerprint" for Lyme disease. This technique is wrongly thought to be a "confirmatory test" for Lyme, which it is in

AIDS. It may be useful to sort out false positive tests and in cases where the antibody titer is "borderline". Since its results depend on the presence of Lyme specific antibodies, the same factors which can cause a negative serologic test may cause a negative Western Blot.

The most common errors made by physicians in interpreting these previously mentioned tests are:
1) A negative test excludes the diagnosis of Lyme.
2) A negative test in someone who previously tested positive and received antibiotic treatment implies "cure".

It must be stressed that these tests do not correlate with symptoms and activity of the Lyme bacteria once antibiotics are initiated. There is no currently available test for cure. Physicians who monitor Lyme titers (concentration of antibodies) during and after antibiotic therapy, and pronounce patients "cured" when their test becomes negative, do not understand what they are measuring and are wasting the patients' money and doing them a disservice.

The major message I would like to impart is that in 1991 the diagnosis of Lyme disease is

primarily clinical, based on the patient's history, symptoms, and physical findings. The laboratory tests may be a useful adjunct in making the diagnosis, but negative results do not rule out the possibility of the disease.

[ In 1997 - 6 years after the original publication - Dr. Drulle's article and major message are still remarkably accurate: we still have few direct detection methods, the "gold standard" tests for diagnosis and cure have not yet been developed, and the diagnosis of Lyme disease is primarily clinical. The main advances have been in PCR testing, which has been the subject of numerous research articles (e.g. "Borrelia burgdorferi DNA in the Urine of Treated Patients with Chronic Lyme Disease Symptoms", Bayer, *Infection* 24, 1996. - study supported largely by the Lyme Disease Association of New Jersey). PCR testing is now offered by several commercial laboratories. Given the apparent paucity of organisms and the poorly-understood pathogenesis of Lyme disease, this situation may exist for years more. - Ken Fordyce, former Chairman, 1992-1995, Governor's Lyme Disease Advisory Council, NJ]

Liberty002369



November 13, 2008

Dear Friends:

Please accept my warmest greetings to each of you attending Turn the Corner Foundation's Third Annual Gala, *Unmask A Cure*.

I join you in recognizing tonight's honorees for their support and contributions to Turn the Corner: Bernard Raxlen, M.D., recipient of the Humanitarian Award, and Andy Abrahams Wilson, recipient of the 2008 Vision of Hope Award. I am also delighted to send my congratulations to the recipients of the Courage Award: Alicia Brown, Cydney Chase, Kathy Fowler, Michele Matthews, Jordan Fisher Smith, Sheila Statlender, Ph.D., and Lindsay Zweibel.

Since its inception in 2002, Turn the Corner Foundation dedicated its efforts to the support of research, education, awareness and innovative treatments for Lyme disease and other tick-borne diseases. I commend your commitment to provide hope, encouragement and essential services for the individuals and families who are affected this disease.

You have my best wishes for a memorable and successful event.

Sincerely yours,

Hillary Rodham Clinton

Hillary Rodham Clinton
United States Senator



CHARLES E. SCHUMER
NEW YORK

**United States Senate**
WASHINGTON, DC 20510

COMMITTEES

JOINT ECONOMIC
BANKING
JUDICIARY
RULES
FINANCE

November 13, 2008

Dear Friends:

Please accept my warmest greetings as you gather for the Turn the Corner Foundation's Third Annual Fundraising Gala, "Unmask A Cure." I am grateful for the opportunity to recognize the fine work of Turn the Corner and tonight's honorees.

Since its inception, Turn the Corner's mission has always been to educate and help those individuals that have been affected by Lyme disease. By helping to fund hospitals, colleges, medical association and other research organization, Turn the Corner has help make strides in how Lyme disease and other tick-borne diseases are diagnosed, treated and prevented. I would like to thank all the supporters for their efforts and the services they provide to countless New Yorkers.

Further, I would like to extend my congratulations to tonight's honorees, Bernard D Raxlen, MD, recipient of the 2008 Humanitarian Award and Andy Abrahams Wilson, recipient of the 2008 Vision of Hope Award. The commitment and support for the community throughout these years serves as inspiration to us all. Their support of Turn the Corner has aided its ability to grow and prosper. I am honored to join in this show of support for their hard work.

Again, congratulations and thank you for your hard work and dedication on behalf of many young New Yorkers. I know that the Turn the Corner Foundation will continue these efforts for many more years to come. Best wishes for a wonderful evening.

Sincerely,

Charles E. Schumer
United States Senator





# Bernard D. Raxlen, MD

## 2008 *Humanitarian Award* Recipient

Bernard D. Raxlen, MD became interested in Tick Borne Disease (including Lyme disease) in 1988 because of the chronic undiagnosed symptoms of his patients. Previously, he had spent a decade in private practice pioneering nutritional and integrative psychiatry and medicine.

Dr. Raxlen's practice was situated in the highly Lyme-endemic areas of Westchester and Fairfield counties before moving to New York City. Over the past 20 years, he has successfully treated over 4,000 case of Tick-Borne Disease, specializing in neuropsychiatric and neurocognitive complications. Dr. Raxlen is unique amongst psychiatrists because he initiates a total comprehensive treatment program which utilizes both oral and intravenous antibiotics, as well as other treatment strategies such as neuropharmacology and stress management.

He was one of the founding members and former secretary of the board of governors of ILADS (the International Lyme and Associated Disease Society) and, along with an immunologist, he was clinically responsible for a new Lyme peptide antigen test.

Dr. Raxlen has been a featured speaker in more than 60 workshops and on television networks like ABC, NBC and FOX over the years on topics including psychiatry, psychoneuroimmunology and Tick-Borne Disease. He has been featured on the Discovery Channel show *Mystery Diagnosis* and, more recently, in the documentary *Under Our Skin*.

Liberty002372



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

August 9, 2016

Facsimile:  1-603-334-5708, 2 p.
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

      RE:   Haley Spears
      DOB: REDACTED
      Your claim#: 250039

Enclosed please find a report from Dr. Saul. This corrects a typo in the previous report.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002373

## INTERNAL MEDICINE & INFECTIOUS DISEASE ASSOCIATES,PC

### ZANE K. SAUL M.D.   GORAN MILJKOVIC M.D.   DAVID J. LOBO M.D.

July 13, 2016
Re: Haley Spears
DOB REDACTED

I treated Haley Spears from August 2010 until June 2014. She underwent two courses of antibiotic therapy. This is the standard of care for long term Lyme disease. I observed her on and off antibiotic therapy. She was under my care for advanced, debilitating Lyme disease. She had chronic fatigue, difficulty concentrating, headaches and joint pain. Despite fatigue, she had difficulty sleeping at night. She was not medically able to work in any capacity. She was not capable of a sedentary work position due to cognitive difficulties. She couldn't maintain focus to assigned tasks. Her Fatigue prevented any durable or sustained physical work effort. She was unable to maintain standing, lifting, pulling, reaching or grasping at a job on a sustained 40 hour a week basis. She was clearly motivated to get better and begin working again. As of 2014 she remained fatigued at times. Long term chronic Lyme disease can take many years to resolve.

I have reviewed the report of Behavioral Medical Interventions. I disagree with their conclusions. None of those doctors examined Ms. Spears. None of them are experts in Lyme disease. Ms. Spears' diagnosis was confirmed by cerebrospinal fluid testing on February 3, 2009. Dr. Crossley is incorrect when he states that the positive igG western blot test on February 3, 2009 meant nothing without a positive western blot on serum.

Dr. Crossley stated that "the evidence shows self-reported symptoms" and uses that to opine that Ms. Spears did not have any functional impairment for the timeframe in question. Fatigue cannot be verified by x-ray or other objective testing. Neither can headaches nor joint pain. He offered no evidence to refute the patient's credible report of fatigue, headaches or pain.

I have reviewed the October 14, 2010 report of Dr. Brusch. He did not contact me prior to his report. He opined that the positive igG western blot in the CSF was a false positive. He is incorrect. Ms. Spears' diagnoses were confirmed by clinical exam and history.

I have reviewed the IME exam of Dr. Courtney. By his own admission, he is not a specialist in Lyme disease and is not a specialist in infectious disease. He examined Ms. Spears after she returned to work. His exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her. He is incorrect when he concludes that Ms. Spears did not have any incapacitating diagnosis. She did have numerous diagnoses, as shown in her medical records. She had chronic multi-system illness.

Zane Saul, M.D

3241 Main Street, Suite B Stratford, CT 06614 · Phone: 203-383-4466 · Fax: 203-383-4499
2600 Post Road, Suite 2 Southport, CT 06890 · Phone: 203-259-8087 · Fax: 203-256-5974

Liberty002374

 Zimberlin Law LLC
267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin                                                    By appointment only:
Russell D. Zimberlin                                                  Hartford Office
                                                                     2 Congress Street
                                                                     Hartford, CT 06114

July 13, 2016

Facsimile: 1-603-334-5708 , 2p.
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

        RE:    Haley Spears
        DOB: REDACTED
        Your claim #: 250039

        Attached please find:

        1.  Report of Dr. Saul, 7/13/16, 1 p.

    Dr. Saul states that he has reviewed the report of Behavioral Medical Interventions, and
disagrees with their conclusions. His reasoning is set forth in his letter.

        Additional documentation will be provided. Thank you.

                                                      Very truly yours,

                                                      Winona W. Zimberlin

WWZ:

Liberty002375

# INTERNAL MEDICINE & INFECTIOUS DISEASE ASSOCIATES,PC

## ZANE K. SAUL M.D.   GORAN MILJKOVIC M.D.   DAVID J. LOBO M.D.

July 13, 2016
Re: Haley Spears
REDACTED

I treated Haley Spears from August 2010 until June 2014. She underwent two courses of antibiotic therapy. This is the standard of care for long term Lyme disease. I observed her on and off antibiotic therapy. She was under my care for advanced, debilitating Lyme disease. She had chronic fatigue, difficulty concentrating, headaches and joint pain. Despite fatigue, she had difficulty sleeping at night. She was not medically able to work in any capacity. She was not capable of a sedentary work position due to cognitive difficulties. She could maintain focus to assigned tasks. Her Fatigue prevented any durable or sustained physical work effort. She was unable to maintain standing, lifting, pulling, reaching or grasping at a job on a sustained 40 hour a week basis. She was clearly motivated to get better and begin working again. As of 2014 she remained fatigued at times. Long term chronic Lyme disease can take many years to resolve.

I have reviewed the report of Behavioral Medical Interventions. I disagree with their conclusions. None of those doctors examined Ms. Spears. None of them are experts in Lyme disease. Ms. Spears' diagnosis was confirmed by cerebrospinal fluid testing on February 3, 2009. Dr. Crossley is incorrect when he states that the positive IgG western blot test on February 3, 2009 meant nothing without a positive western blot on serum.

Dr. Crossley stated that "the evidence shows self-reported symptoms" and uses that to opine that Ms. Spears did not have any functional impairment for the timeframe in question. Fatigue cannot be verified by x-ray or other objective testing. Neither can headaches nor joint pain. He offered no evidence to refute the patient's credible report of fatigue, headaches or pain.

I have reviewed the October 14, 2010 report of Dr. Brusch. He did not contact me prior to his report. He opined that the positive IgG western blot in the CSF was a false positive. He is incorrect. Ms. Spears' diagnoses were confirmed by clinical exam and history.

I have reviewed the IME exam of Dr. Courtney. By his own admission, he is not a specialist in Lyme disease and is not a specialist in infectious disease. He examined Ms. Spears after she returned to work. His exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her. He is incorrect when he concludes that Ms. Spears did not have any incapacitating diagnosis. She did have numerous diagnoses, as shown in her medical records. She had chronic multi-system illness.

Zane Saul, M.D

3241 Main Street, Suite B Stratford, CT 06614 · Phone: 203-383-4466 · Fax: 203-383-4499
2600 Post Road, Suite 2 Southport, CT 06890 · Phone: 203-259-8087 · Fax: 203-256-5974

Liberty002376



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

July 13, 2016

Facsimile:  1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

      RE:    Haley Spears
      DOB: REDACTED
      Your claim #: 250039

      Pursuant to your June 16, 2016 letter, we are requesting a review of the denial.
Additional documentation will be submitted at a later time. Thank you.

                    Very truly yours,

                    Winona W. Zimberlin

WWZ:

Liberty002377



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| **Date:** June 16, 2016 | |
| **To:** | WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 |
| **Attn:** | |
| **Fax:** | (860) 247-4194 |
| **From:** | Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 |
| **Total Pages**<br>**(Including Cover):** | 28 |
| **RE:** | |
| **Claim #:** REDACTED<br>**Claimant:** Haley Spears | |
| UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

Liberty002378



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

June 16, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

We have completed the remand review of Haley Spears' Long Term Disability (LTD) claim and have maintained the decision to deny benefits.

This remand review and analysis considered all the medical and claim documentation contained in Ms. Spears' Short Term Disability (STD) and Long Term Disability administrative record, whether or not specifically referenced in this document.

Haley Spears submitted a disability claim for her absence from work beginning on September 27, 2008, as a result of headaches. At that time, Ms. Spears was covered under the United Technologies Corporation (UTC) Short Term Disability Plan, a self-insured plan administered by Liberty Life Assurance Company of Boston (Liberty), and for LTD benefits, the UTC Group Disability Income Policy, a fully insured policy administered by Liberty.

Under Ms. Spears' disability income coverage, STD benefits began on 10/4/08 and had a maximum benefit date of 3/27/09. For disability from her own occupation, the LTD benefit begin date is 3/28/09 with a maximum benefit date of 3/27/11. As of 3/28/11 and forward, to be eligible for continued benefits, the Policy requires Ms. Spears to be disabled from any occupation.

At the time Ms. Spears' absence from work began on 9/27/08, her job was titled Administrative Support with the physical demands of sitting 40% of the time in an eight hour day, lifting 1 %, walking 5%, and standing 4%, and typing 50% of an eight hour day. Ms. Spears was required to lift up to 10 pounds, and her job allowed her to change positions frequently. Typical duties included routine secretarial and clerical support, scheduling appointments and meetings, maintaining files, reviewing mail and assisting with mail distribution, and assist in preparation of reports.

**Claim Summary**

Liberty002379

During this period, Ms. Spears was being treated by Primary Care Physician (PCP) Evan Schiff, MD, for asthma, was evaluated by Endocrinologist Robert Oberstein, MD, for a multi nodular thyroid goiter, and was being treated by Gastroenterologist James O'Brien, MD, for a history of abdominal pain, diarrhea, gastritis and colitis.

On 5/16/08, Ms. Spears was examined by Dr. Schiff. The results of the physical exam are documented to be within normal limits. On 8/29/08, Ms. Spears reported to Dr. Schiff's office that she had gone to the emergency room the night before with a migraine headache. After an MRI and CT of the brain, Ms. Spears was referred to Neurologist David Silvers, MD.

A 9/23/08 telephone note from Dr. Schiff's office indicates Ms. Spears' mother called the office expressing concern that Ms. Spears was in need of medication for anxiety/depression. Ms. Spears' mother wanted the office to know Ms. Spears had "suffered from Anxiety & BiPolar Disorder following" an assault at the age of 13. Dr. Schiff's office records indicate Ms. Spears called the office on the night of 9/25/08 reporting she did not "feel right about Dr. Silvers, therefore she is not going back to him. She will find another neurologist."

After submitting her STD claim, on 10/7/08, Ms. Spears spoke with the STD Disability Case Manager (DCM). The record of that conversation indicates Ms. Spears reported she was experiencing chronic head and neck pain, severe nausea and vomiting. Upcoming testing was scheduled for 10/8/08 and a neurology appointment was scheduled for 10/24/08.  Ms. Spears reported she also has asthma and chronic bronchitis. Ms. Spears reported that she had no more sick pay, and expressed her concern about accruing vacation time while on STD.  Ms. Spears also questioned if she was eligible for education benefits while on STD. The DCM referred Ms. Spears to Human Resources at UTC for the answer to these questions.

On 11/3/08, Neurologist Barry Gordon, DO, provided the diagnoses of common migraine, frequent tension headaches, nonspecific white matter lesion, and reported that the episodes of "zoning out" as reported by Ms. Spears, were due to fatigue.

Dr. Silvers completed a <u>Restrictions Form</u> on 11/11/08.  Dr. Silvers reported he first saw Ms. Spears on 9/8/08. Dr. Silvers reported the diagnoses of migraine and encephalopathy, and indicated Ms. Spears had the capacity to perform sedentary work. Dr. Silvers' 11/14/08 office visit note reports, "She has frequent migraine, blackout of unclear etiology but doubt epilepsy. Additional complaints including insomnia, stuttering, question of a role of stress may be playing here. I told her that she can follow-up either with myself or Dr. Gordon."

On 11/25/08, Ms. Spears consulted with Joachim Baehring, MD, Neuro-Oncology. Although Ms. Spears reported her speech was "off," "memory gaps," word finding difficulties, and stuttering, on exam, Dr. Baehring reported, "Language is fluent. There are no cognitive deficits."  Dr. Baehring did report he noticed Ms. Spear's stuttering, "on a couple of occasions during her visit." No abnormalities were reported on physical exam. Dr. Baehring provided the diagnoses of right temporal lobe signal abnormality of unknown etiology; benign pineal region cyst; headache of unknown etiology, likely multifactorial.

A 12/10/08 Phone Note from Dr. Baehring's office reports Ms. Spears called that date regarding her headache treatment regimen. Since Dr. Baehring was primarily monitoring the MRI abnormalities, Ms. Spears was advised to return to Dr. Silvers or alternatively, contact the Fairfield Neurology

Liberty002380

headache clinic.

All the medical documentation contained in Ms. Spears disability claim file at that time, was reviewed by Liberty's Consulting Neurologist Frisso Potts, MD. Dr. Potts'12/18/08 report of that review concluded Ms. Spears, "appears to have nearly daily headaches, the severity of which is likely to preclude her from working," and "Concurrently, the claimant's medications are being adjusted and improvement is expected as treatment of the reported headaches progresses." Dr. Potts also indicated, "It appears reasonable to extend the no work recommendation until the end of January, at which time effective treatment from the reported headaches is likely to have occurred." Dr. Potts spoke with Dr. Gordon and Dr. Silvers for this review. Dr. Gordon reported he had placed no restrictions on Ms. Spears' work activity, and Dr. Silvers indicated Ms. Spears was able to return to work on a part-time basis on 1/8/09, and progress to full time work by 2/9/09. Dr. Potts then endorsed Dr. Silvers' plan for Ms. Spears' return to work date of 1/8/09.

At the request of Dr. O'Brien, Ms. Spears was evaluated by Rheumatologist Barbara Kage, MD, on 1/6/09. Dr. Kage documented Ms. Spears report of fatigue, night sweats, weight loss/gain; hands changing color in the cold, dry eyes and dry mouth, stiffness in the morning, jaw pain, headache; eye pain, blurred double vision, floaters, flashes; asthmatic shortness of breath; chest tightness; heartburn, abdominal pain, diarrhea, nausea; recurrent sinus and ear infections; muscle weakness, tingling and numbness; anxiety; bruising easily; ringing in ears. On exam, Dr. Kage reported, "Pt in no acute distress," and she was well developed, had no obvious deformities, had excellent grooming, and was oriented to person, place and time. Dr. Kage reported Ms. Spears' history and current medical conditions suggested an immune-mediated inflammatory disorder, and she would work up Ms. Spears for a connective tissue disease.

Ms. Spears did return to part-time work on 1/8/09.

Ms. Spears was first evaluated by Dario Zagar, MD, Neurologist in Fairfield, CT, on 1/12/09, for management of her migraine headaches. On exam, Dr. Zagar noted Ms. Spears was well appearing, alert, oriented to time place and person, well nourished, and "Patient did not appear uncomfortable." Dr. Zagar reported no disorientation, remote memory was not impaired, short term memory was normal, an adequate fund of knowledge was demonstrated, no language abnormalities were demonstrated, and no abnormalities in attention were demonstrated. Dr. Zagar's assessment included common migraine inadequately controlled; lumbago; possible systemic lupus erythematosus (SLE). Ms. Spears was to maintain a headache diary, continue her medications, and add Migranal nasal spray as an abortive treatment.

The follow up rheumatology office visit was on 1/19/09. Dr. Kage reported that the test results and Ms. Spears' medical history suggested an autoimmune inflammatory disorder. Plaquenil was prescribed.

On 1/20/09, Ms. Spears was seen by Neurologist James Donaldson, MD, of the UConn Medical Group. Dr. Donaldson reported he observed Ms. Spears to appear depressed, and she reported poor sleep. Dr. Donaldson indicated the patch seen on MRI in Ms. Spears right temporal lobe was likely a low-grade glioma, and her headaches were likely muscle contraction headaches. He recommended Nortriptyline as Dr. Gordon had ordered, amitriptyline, or other antidepressant.

On 1/22/09, all the claim forms required for an LTD application were sent to Ms. Spears for her

Liberty002381

completion, and return to Liberty.  It was requested that Ms. Spears complete and return the forms as soon as possible as the additional information was required for the LTD eligibility decision.  It was noted that the forms were to be returned to Liberty no later than 4/28/09.

After Ms. Spears' 1/24/09 request to see another neurologist, in February 2009 Dr. Schiff documented, "Nurse called to inform that I was uncomfortable with her shopping for neurologists + therefore was uncomfortable with managing her care- She should find a new doctor as an internist."

Ms. Spears followed up with Dr. Beahring on 1/27/09. The MRI of the brain that date was unchanged from the October 2008 MRI.  On exam, Dr. Baerhing reported Ms. Spears was fully awake, alert and oriented, with clear and fluent speech. Impression was reported as right temporal lobe signal of unknown etiology, benign pineal region cyst, and likely multifactorial headaches.

At the 2/5/09 office visit, Dr. Kage prescribed Zoloft. Dr. Kage's 2/9/09 Patient Call In note states, "pt states she agrees to working 4 hours daily per your discussion with her at last appt… pt states her papers should state she needs to work morning hours so she can go home and rest in the afternoons."  The claim file contains a note dated 2/9/09 from Dr. Kage that states, "Due to her medical condition, Ms. Spears should reduce her work schedule to 4 hours per day. I recommend that she be allowed to work mornings only."

Dr. Zagar performed a lumbar puncture on 2/9/09, and reevaluated Ms. Spears on 2/17/09.  Ms. Spears reported increased headaches after the lumbar puncture, no vision problems, no memory lapses, no depression or anxiety. Assessment that date included common migraine, well controlled; probable SLE; probable Lyme disease.  Ms. Spears was to continue Topamax 100 mg daily, and was later started on IV antibiotics under the direction of Dr. Zagar.

On 3/5/09, Ms. Spears saw Dr. O'Brien in follow up for her GI issues. She presented as oriented to time, place, and person, and in no acute distress, with normal affect. Dr. O'Brien reported that Ms. Spears upper and lower GI symptoms "seem to be side effects of medicines on several occasions. As the meds change, so do her side effects." The plan was for Ms. Spears to follow up as needed.

All the medical documentation on file was reviewed by Liberty's Consulting Physician Board Certified in Internal Medicine and Board Certified in Occupational Medicine, Oyebode Taiwo, MD. Dr. Taiwo's reports are dated 2/25/09 and 3/9/09. After his phone contact with Dr. O'Brien, and attempted phone contact and attempted written contact (as Dr. Kage specifically requested) with Dr. Kage, Dr. Taiwo reported Ms. Spears currently had "non-specific upper and lower gastrointestinal symptoms. Dr. O'Brien had placed no restrictions on Ms. Spears' activities." [Ms. Spears had no Primary Care Provider at this time for Dr. Taiwo to contact].

Ms. Spears was first evaluated by Family Medicine physician Kristin Giannini, MD, on 3/10/09. Headaches are the only complaint documented. On exam, Dr. Giannini reported Ms. Spears to be alert, cooperative and well groomed, "Not in acute distress or Sickly," well nourished, and well developed with normal posture, with a normal voice. No abnormalities were recorded on physical exam. On the Neuropsychiatric portion of the exam, Dr. Giannini reported, "Mental status exam performed with findings of –Oriented X3 with appropriate mood and affect and demonstrates appropriate judgment and insight."  Assessment that visit included asthma and Lyme disease.

At her 3/16/09 appointment with Dr. Zagar, Ms. Spears was accompanied by her mother.  Ms.

Liberty002382

Spears reported her headaches had improved on the Topamax. Dr. Zagar documented upon review of systems that Ms. Spears reported fatigue, stuttering, "Increase in cognitive problems, spelling, vocabulary, math, etc. Dizziness and memory lapses or loss. No tremor. No difficulty walking. Numbness." On exam, no neurologic, psychiatric or mental status exam findings are documented.

Dr. Kage's 3/9/09 office visit note reports Dr. Kage advised Ms. Spears to consult with an Infectious Disease specialist. There are 3/17/09 and 3/18/09 phone notes from Dr. Kage's office which indicate Dr. Kage advised Ms. Spears that it was okay for Ms. Spears to see the Lyme Clinic at Yale run by Rheumatologists, as they would provide an assessment of all her medical problems.

Ms. Spears' returned to work on a part-time basis on 1/8/09. Although Dr. Silvers indicated Ms. Spears should progress to full time work by 2/9/09, Ms. Spears continued working part-time through 3/24/09, at which time she stopped all work.

On 3/26/09 Ms. Spears was evaluated by Robert Schoen, MD, of New Haven Rheumatology. Dr. Schoen reported Ms. Spears' medical history, current medications as Topamax, Plaquenil, Prevacid, Asacol, folic acid, Singular, and vitamins. Physical exam was documented as within normal limits. Diagnoses provided were headache, fatigue, arthralgias; abnormal MRI scan of the brain; positive Lyme disease Western blot bands on CSF with negative peripheral blood serology. Dr. Schoen reported, "My best estimation is that she does not have and has not had Lyme disease as the cause for her symptoms." Dr. Schoen recommended the antibiotics be stopped, and that Ms. Spears pursue further workup with Dr. Zagar, Dr. Kage, and endocrinology.

On 3/30/09, Dr. Schoen documented:

I spoke to Dr. Zagar on March 30, 2009. I indicated that, in my opinion, the patient does not have central nervous system Lyme disease and she has been treated adequately for this possibility. He indicated that the patient and her mother were dissatisfied with my opinion. I indicated that I would support their decision to get an additional opinion, if they wish.

As requested by Dr. Giannini, on 3/30/09, Saqib Naseer, MD, evaluated Ms. Spears from a Cardiology perspective due to her reported palpitations, racing heartbeat, occasional dyspnea on exertion, and chest discomfort. Although there were no acute concerns at that time, Dr. Naseer reported he would have Ms. Spears return for an echocardiogram and treadmill test, and Holter monitor. Results of the 4/1/09 pulmonary test reported, "mild reversible airway obstruction," consistent with asthma. Ms. Spears saw Dr. Giannini again on 4/8/09 for ear pain. Dr. Giannini reported Ms. Spears was alert and oriented and in no acute distress.

The benefit begin date for Ms. Spears' LTD claim is 3/28/09. As of 3/28/09, Ms. Spears needed to have fulfilled the Policy's Elimination Period, meet the Policy's definition of disability and all other terms of the UTC Group Disability Income Policy. The Policy states:

*"Disability" or "Disabled" means:*

i.   *"Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

ii.  *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"**Elimination Period**" means a period of consecutive days of Disability or Partial Disability*

Liberty002383

*for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.*

*If the Covered Person returns to work for any thirty or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.*

**Elimination Period:**
*The greater of:*
   *a. the end of the Covered Person's sick pay, Short Term Disability Benefits; or*
   *b. 180 days.*

*"**Own Occupation**" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.*

Ms. Spears was first evaluated by Lauren Gouin Young, Naturopathic Doctor, on 4/20/09. Ms. Spears reported symptoms including neck, knee and foot pain, fatigue, migraines, severe brain fog, swollen hands, and night sweats, Dr. Gouin Young recommended dietary changes and dietary supplements. Treatment later included acupuncture.

On 4/21/09, Ms. Spears was first evaluated by Bernard Raxlen, MD, board certified in Psychiatry and specializes in the treatment of Lyme disease.  Ms. Spears reported her symptoms included "Horrible migraines (no medicine worked)," seizures, inability to walk up stairs, non-restorative sleep and insomnia, pain everywhere including joint pain and eye pain with blurred vision, difficulty speaking and slurred speech, night sweats, and palpitations.  IV antibiotics were prescribed.

On 4/27/09, Dr. Zagar indicated Ms. Spears was accompanied by her parents. Ms. Spears reported she had seen Dr. Raxlen and Dr. Raxlen thinks "Lyme disease was the diagnosis and that longer term treatment was required." Dr. Zagar reported, "Headaches are well controlled, physical and cognitive complaints remained unchanged," and the physical findings included "Patient did not appear uncomfortable."  Dr. Zagar advised, "I am skeptical about the utility of further antibiotic treatment, given the paucity of evidence to show that prolonged antibiotics provide additional benefit.  They would like to proceed with treatment as recommended by Dr. Raxlen." On 5/1/09, ConnectiCare issued its denial for services provided by Dr. Raxlen, an out-of-network provider.

Internal Medicine, Occupational Medicine physician, Dr. Taiwo, completed an updated review of the medical documentation in Ms. Spears' claim file. His 5/13/09 report concluded, "Ms. Spears' records do not support any specific limitations or restrictions that would prevent her from sitting, standing or walking at a sedentary physical demand level from 3/24/09 through the present."

The denial for STD benefits was issued on 5/13/09.  Ms. Spears had returned to work part-time on 1/8/09, although she did not progress to full time work on 2/8/09 as had been outlined by Dr. Silvers. Instead Ms. Spears continued working part time until she left work completely beginning 3/25/09. Based on the medical documentation on file and Dr. Taiwo's medical review, STD benefits were denied after 2/8/09, since the medical records on file did not support Ms. Spears' inability to perform the material and substantial duties of her job on a full time basis.

Liberty002384

Dr. Gianinni saw Ms. Spears for an asthma recheck on 6/18/09. Ms. Spears reported improvement with her headaches with an increase in Topamax, and reported her Asthma was "doing fine." On exam, Dr. Giannini reported Ms. Spears was alert, cooperative, well groomed, and "Not in acute distress or Sickly." Dr. Giannini also reported, "Mental status exam performed with findings of- Oriented X 3 with appropriate mood and affect and demonstrates appropriate judgment and insight." There was no tenderness or abnormalities noted on physical exam.

On 7/18/09, Ms. Spears was evaluated by Sam Donta, MD, Infectious Disease. Dr. Donta indicated his impression was, "she has chronic multi-symptom illness consistent with a chronic fatigue and fibromyalgia of long standing duration that may well be due to Lyme Disease in part or in whole." Dr. Donta recommended a different course of treatment over the next two years for Chronic Lyme Disease.

Ms. Spears was evaluated by Dr. Kage on 7/20/09, at which time Dr. Kage reported, "pt feels disabled d/t memory lapses, off/on fatigue… Neck pain & Rt parietal HA pain wakes the patient up at night; Few years ago- "bulls eye" rash '05."  Dr. Kage also reported, "I will reevaluate her regarding any Connective Tissue Disease once she completes her antibiotic regimen."

On 7/31/09, Ms. Spears had a follow up visit with Dr. Baehring. Ms. Spears reported her headache had not worsened in frequency or intensity, and denied nausea and vomiting. Dr. Baehring reported, "Apparently she had been diagnosed with babesiosis, Bartonella infections and borreliosis. I am not certain what these diagnoses are based on." On neurologic exam, Dr. Baehring found Ms. Spears to be "fully awake and alert and oriented. Language is fluent. There are no cognitive deficits." There was no change in the MRI of the brain from the previous studies and intervals between scans was increased to one year.

A Patient Call In note from Dr. Kage's office dated 8/3/09, states, "pt wrote letter for you to sign, please review…  Inform her that per Dr. B. Kage, Labs July '09- autoimmune rheumatic screen is ok."  Liberty received a letter from Dr. Kage dated 8/4/09 reporting Ms. Spears is unable to work "part time or full time, and it is medically necessary for her to be on full time disability."

After her appointment with Dr. Zagar in late June 2009, Ms. Spears saw Dr. Zagar next on 10/26/09. She was accompanied by her mother. Ms. Spears reported she thought she was improving overall-speech and conversation was better, back and neck pain and migraines had improved. Fatigue was still an issue, sleeping 8 to 13 hours per day, trouble sleeping at times, and "She is "shot" for a few days if she is particularly busy." On neurological exam, Dr. Zagar reported no cognitive or speech difficulties or deficits. As for the treatment plan, Dr. Zagar documented his concern regarding treatment with ongoing IV antibiotics. Additionally, Dr. Zagar recommended Ms. Spears' consult with a Psychologist, a Clinical Social Worker for relaxation training and sleep hygiene, and Provigil or Ritalin for fatigue.  Ms. Spears was to consider the options.

During the STD appeal review, all the medical documentation in Ms. Spears' disability claim file was reviewed by Michael Silverman, MD, Board Certified in Infectious Disease and in Internal Medicine, and a certified Medical Examiner. Dr. Silverman's 11/23/09 report of that review indicated the medical documentation on file did not support evidence of any infectious disease process, nor did it, despite Ms. Spears' symptoms of headaches, leg and upper back pain, support restrictions and/or limitations for Ms. Spears' work activity, as of 2/8/09 and forward.

Liberty002385

In a letter dated 1/29/10, Ms. Spears was notified that the denial for continued STD benefits beyond 2/8/09 was upheld. At the request of the Plan fiduciary, United Technologies Corporation, Ms. Spears was then provided a second opportunity to appeal the STD denial.

On 1/20/10, Ms. Spears presented to Dr. Giannini's office to have State assistance forms completed. Ms. Spears reported, "Has definitely improved overall. Has been off antibiotics… Memory still not very good. Symptoms not as frequent, often, severe. Has been severely fatigued. Sleep still not good." Dr. Giannini reported on exam, Ms. Spears was alert, in no acute distress, and did not appear sickly.   Mental status exam findings indicated Ms. Spears was oriented in all spheres, had appropriate mood and affect with appropriate judgment and insight.

After her first office visit with Dr. Raxlen on 4/21/09, Ms. Spears saw Dr. Raxlen almost monthly for the remainder of 2009. In 2010, Ms. Spears had four office visits with Dr. Raxlen.   From February 2011 through June 2013, office visits were every other month. From Ms. Spears' Trout Brook Drive residence in West Hartford, CT to Dr. Raxlen's West 79th Street office in New York City, Ms. Spears traveled 117 miles each way. MapQuest indicates with moderate traffic, this is a two hour drive. Dr. Raxlen's 2/16/10 office visit note starts with, "-Pt rode in Mardi Gras parade x 4 hrs on 2/13! –Sleep better but still erratic. –Feels okay if able to sleep 13 hours+ -not depressed or anxiety –off antibiotics x2 months." Ms. Spears also reported continued vision problems, stuttering, night sweats, tingling in right temporal lobe, right foot, and left forearm.   She advised she had a slight improvement in energy, and headaches were controlled with Migranal.

On 3/19/10, in the history of present illness, Dr. Zagar reported, "Stopped all antibiotics in December 2009 as per Dr. Raxlen. She felt that she "hit a plateau" prior to that. Was doing fairly well for some time. "Nowhere near normal. But slight energy increase." "Totally crashed after about 5 weeks… Considering restarting meds. Total of 7 months of antibiotics over the last year." Despite Ms. Spear's self-reported cognitive complaints, Dr. Zagar documented no cognitive issues on exam. Dr. Zagar reported, "Since it has been a year at this point, I am no longer comfortable facilitating their IV antibiotic treatments as prescribed by Dr. Raxlen…. I will prescribe one more month."

In Dr. Kage's Patient Call In note dated 5/6/10, Dr. Kage reported, "I am not going to prescribe treatments for Lyme."

The claim file contains correspondence from ConnectiCare dated 4/9/10 in response to Dr. Raxlen's request for IV hydration three days per week. The letter to Ms. Spears states, "Based upon the medical information submitted for review, there is no physician documentation (office progress notes or laboratory studies) of a disease or condition that requires intravenous hydration several times per week. Additionally, there is no documentation that you cannot maintain hydration by drinking adequate amounts of oral fluids."

During the second STD appeal review, Dr. Silverman was asked to review all the additional documentation received in support of Ms. Spears' claim. As in Dr. Silverman's first review, multiple attempts to reach Dr. Raxlen were unsuccessful.   On 4/8/10, Dr. Silverman did speak with Dr. Kage. Dr. Silverman's summary of that conversation reports, "She stated that there was no clearcut evidence of rheumatological disorder which would explain the claimant's current symptomatology from her perspective," and she would defer to Dr. Raxlen regarding Ms. Spears' tick-borne illness. As a result of this second review, Dr. Silverman continued to report the medical documentation on

Liberty002386

file did not support evidence of an infectious disease process, and despite Ms. Spears' self-reported symptoms, the medical documentation did not support restrictions and/or limitations for Ms. Spears' work activity to preclude her from performing her job as of 2/8/09 and forward.

On the Physical Residual Functional Capacity Questionnaire completed by Dr. Zagar on 6/21/10, Dr. Zagar reported Ms. Spears' diagnoses are CNS Lyme disease and migraine. Symptoms were reported as neck/shoulder pain, migraine, fatigue, cognitive impairment, and joint pains. On this form, Dr. Zagar indicated Ms. Spears has anxiety affecting her physical condition. Dr. Zagar reported Ms. Spears is able to sit one hour at a time before changing position; would need 15 minute breaks every two hours; can lift up to 10 pounds occasionally. Dr Zagar reported, "Main issues are cognitive- trouble with memory, word finding, concentration, and fatigue requiring frequent naps. On the Medical Source Assessment (Mental) form, in the categories of Understanding and Memory, Sustained Concentration and Persistence, and Adaptation, Dr. Zagar indicated Ms. Spears was able to perform the task or function with noticeable difficulty or unable to perform the task or function on a regular, reliable schedule. Under Social Interaction, Dr. Zagar mostly indicated Ms. Spears was able to perform the tasks with no observable limits, other than, "accept instructions and respond appropriately to criticism," that would be performed with noticeable difficulty.

Ms. Spears was seen in the office by Dr. Giannini on 7/9/10. The office note states:
> Patient words: She is here to fill out disability papers. She has been treated for chronic Lyme and because of this is not able to work. She has had neuroLyme and has serious enough symptoms related to this that she is unable to hold down a job. Cannot focus, poor concentration, cannot perform simple tasks. Can be fine 1 minute and then extreme fatigue and has to go lay down. Also has dizziness, nausea, vomiting, and chronic headaches.

On 7/9/10, Dr. Giannini reported Ms. Spears was alert, cooperative and well groomed, not in acute distress, not sickly, well nourished, well developed, and well hydrated with normal posture and normal voice. Dr. Giannini documented on exam for Neuropsychiatric, "Thought Process/Cognitive Function- attention deficit, reading comprehension impaired, word comprehension impaired and concentration impaired (during conversation in office had trouble staying on task and following conversation. Could not remember dates)." Assessment and Plan stated, "Lyme disease." It is noted that this 7/7/10 treatment record, after Ms. Spears' explicit, self-reported symptoms that date, is the only record on file in which Dr. Giannini reported anything on Neuropsychiatric exam, other than a normal mental status exam.

On 7/9/10 Dr. Giannini then completed the same forms as completed by Dr. Zagar on 6/21/10, and provided a similar assessment to Dr. Zagar's. Dr. Giannini indicated Ms. Spears has depression affecting her physical condition. Dr. Giannini reported:
> Due to all of Haley's symptoms she is unable to complete a workday due to extreme cognitive dysfunction and fatigue. She can be fine one minute and severely fatigued and needing to go to bed the next. She has minimal to no ability to concentrate, stay on task, focus or remember even simple things at this point. She is unable to work at this time and for likely the next several years and probably beyond.

In 2010, Ms. Spears was treated by Dr. Cynthia Grosso, Chiropractor, for neck and upper back pain. Treatment was recommended two to three times per week and began on 6/2/10. Ms. Spears attended treatment approximately weekly, through 9/9/10. On 9/9/10, Dr. Grosso reported, "The patient's prognosis is guarded because has not received enough treatments to determine a prognosis." It is

Liberty002387

noted that Dr. Grasso's office in West Springfield, Massachusetts is 32 miles from Ms. Spears' West Hartford, Connecticut residence, and according to Google Maps, a 56 minute drive.

On July 12, July 16, and July 20, 2010, Ms. Spears participated in a neuropsychological evaluation performed by Marian Rissenberg, PhD, as referred by Dr. Raxlen, to determine the nature and extent of Ms. Spears' cognitive impairment. Ms. Spears reported she paid a neighbor to drive her the 90 minutes to Dr. Rissenberg's office, as she is only able to drive short distances due to "fatigue and confusion." Dr. Rissenberg reported:

> At the time of testing, Ms. Spears' symptoms included forgetfulness and poor concentration, difficulty with word-retrieval, new learning, following directions, organizing and completing tasks and keeping track of what she was doing or saying, in addition to fatigue, malaise, chills and sweats, dizziness, neck and back pain, sleep disturbance, increased anxiety and irritability, and sensitivity to noise.

Dr. Rissenberg concluded Ms. Spears demonstrated a "dramatic decline in mental status," with impairment of working memory, and auditory verbal memory. Dr. Rissenberg reported, "The nature and severity of these cognitive deficits, particularly coupled with Ms. Spears' physical symptoms, would preclude gainful employment of any kind at this time." Continued aggressive medical treatment and supportive psychotherapy were recommended.

Dr. Raxlen's 7/18/10 office note reports, "still has cognitive issues, but turns off and on. –short term & long term memory –friends recall events-she does not remember them… can get overloaded easily-overwhelmed   -became confused at brother's wedding-again confused-couldn't follow wedding ceremony."

Ms. Spears returned to see Dr. Zagar on 7/23/10, for her chief complaint of Lyme disease. She reported she had neuropsychological testing due to her issues with memory and thinking.  Although Ms. Spears reported dizziness and memory loss/lapses, difficulty walking and numbness, anxiety, and sleep disturbances, on exam, Dr. Zagar reported Ms. Spears was alert, oriented to time, place and person, well nourished, and "patient did not appear uncomfortable." Dr. Zagar documented a normal neurological exam, and, "Attention demonstrated no abnormalities." Topamax was to be decreased to see if the decrease would improve Ms. Spears' cognitive complaints.

Ms. Spears was first seen in the Infectious Disease office of Zane Saul, MD, on 8/8/10. Ms. Spears' extensive history of symptoms and treatment was documented.  The Assessment indicates, "Multiple somatic symptoms since 2008 -HA, ? cognition… sleep abnormalities, stuttering, fatigue –multiple specialists… ? lyme vs Psych issues."  The plan at that time was to obtain previous records, review, then make an assessment.  Dr. Saul then sees Ms. Spears on 9/3/10. Although he circled multiple symptoms in the review of systems including brain fog, there are no cognitive or psychiatric findings documented on exam. Ms. Spears continues to see Dr. Saul for monthly visits throughout May 2011 and then every 2 to 3 month thereafter.

In a letter dated 9/9/10, Dr. Raxlen reported he had last seen Ms. Spears on 7/8/10 and that Ms. Spears had only had "partial improvement in response to extensive treatment" of the co-infections, and she continued to suffer from "debilitating physical and neurocognitive symptoms."

All the medical documentation in Ms. Spears' claim file was reviewed by John Brusch, MD, Board Certified in Internal Medicine and Infectious Disease. The 10/14/10 report of that review indicated,

Liberty002388

"Although many diseases have been involved to explain the claimant's clinical picture, there are very few that are substantiated clinically." Among the substantiated diseases Dr. Brusch listed were peptic ulcer disease, Hashimoto's thyroiditis, migraine headaches, asthma and irritable bowel syndrome. Dr. Brusch reported Ms. Spears "does not have any significant infectious disease that would impair the claimant's sustainable full time capacity as of 02/08/2009," and "There is no evidentiary documentation that her listed medications impair her full-time sustainable capacity; Plaquenil, azithromycin, Mepron, Rifamin, Topamax, Prevacid, Asacol, Singulair, Zoloft, Oracit vitamins, Advair and Proventil."

On 10/19/10, Ms. Spears reported to Dr. Gouin Young that she had increased clarity, decreased brain fog, improved speech and better retention with the antibiotic treatment for Lyme. Ms. Spears also reported that her insomnia was erratic, and she continued to have fevers and night sweats.

After Liberty upheld the STD denial on 1/29/10 and again on 5/13/10, on 10/27/10 the STD fiduciary, UTC, instructed Liberty to release all remaining STD benefits to Ms. Spears. At this time, there was no change in Liberty's determination that the medical evidence on file did not support impairment preventing Ms. Spears from performing her job, rather it was the fiduciary's decision to pay STD benefits to Ms. Spears through the 3/27/09 maximum STD benefit date.

On 11/16/10, Liberty issued the LTD denial letter. LTD benefits were denied since Ms. Spears had not fulfilled the Policy's Elimination Period. As noted previously, the UTC Group Disability Income Policy requires, in order to be eligible for LTD benefits, the claimant must fulfill the 180 day Elimination Period of continuous disability.

The most recent office visit note on file from Dr. Kage is dated 12/23/10. Ms. Spears' chief complaint that date was feeling achy in both shoulders, her neck and joints throughout the day and daytime somnolence. Ms. Spears rated her fatigue as varying from 6/10 to 10/10. Ms. Spears reported she is able to do light housekeeping such as emptying the dishwasher. Dr. Kage explained, "Pronounced migraine headaches triggered an extensive work-up which showed possible astrocytoma, possible tick-borne disease, and perhaps rheumatic autoimmune disease." Dr. Kage noted the possible astrocytoma is being monitored by Yale, she is monitoring the autoimmune inflammatory disorder (with normal repeat rheumatic lab tests and Plaquenil discontinued in December 2009), and Infectious Disease, Dr. Raxlen, is treating the Lyme. Dr. Kage further reported, "The diagnosis of Lyme disease based on CSF Lyme test is not irrefutable since her Lyme serology 1.09 was normal,  Lyme c6 test- negative."

At Dr. Saul's request, Ms. Spears had a Sleep Study on 1/19/11. The results of the Sleep Study included periodic limb movement disorder, sleep onset and sleep maintenance insomnia, no "snoring or obstructive sleep apnea observed by Medicare guidelines." On 2/17/11, Ms. Spears met in consultation with Richard Shoup, MD, Sleep Medicine specialist. Ms. Spears reported difficulty falling asleep and staying asleep. In Dr. Shoup's evaluation for the review of systems, Ms. Spears reported she had no palpitations, no abdominal pain, and "No decrease in ability to concentrate, no headaches, no loss of consciousness, no memory loss, no complaints of muscle weakness, no seizures. Seizures before treated for CNS Lyme." On exam, Ms. Spears was found to be alert, well developed, well nourished, "affect is normal and positive. In no acute distress."  No cognitive deficits were noted on exam. Dr. Shoup reported Ms. Spears' "internal clock has no regularity," and he recommended Ms. Spear designate a regular wake-up time, get 30 minutes of bright light each morning, and keep a sleep diary.  On 3/24/11 and 4/29/11, Dr. Shoup documented no progress with

Liberty002389

regulating Ms. Spears' sleep despite multiple additional recommendations.

Dr. Zagar followed up with Ms. Spears and her mother on 2/18/11. Difficulties with cognition and sleep were reported. Ms. Spears indicated at that time she started on vitamin D and B12, was in acupuncture, chiropractic treatment, and on adrenal support as recommended by the naturopath. On exam, Dr. Zagar reported Ms. Spears "did not appear uncomfortable," and "No disorientation was observed, Remote memory was not impaired, Short term memory not impaired, An adequate fund of knowledge was demonstrated… No language abnormalities were demonstrated… Attention demonstrated no abnormalities."

On 3/28/11, the LTD Policy definition of disability would change from Ms. Spears' disability from her own occupation, to disability from *any occupation.* The United Technologies Corporation Group Disability Income Policy states:

> *"Disability" or "Disabled" means:*
> i.   *"Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
> ii.  *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*
>
> *"Any Occupation" means any occupation, for which the Covered Person is reasonably fitted considering his training, education, experience, age, physical qnd mental capacity, and the salary of which is at least 80% of the Covered Person's Basic Monthly Earnings.*

On June 15, 2011, the appeal review of the LTD denial was completed. The determination was to uphold the LTD denial since the Policy required Elimination Period had not been fulfilled.  It was recognized that Ms. Spears sought medical treatment and she reported various and differing symptoms, Liberty had determined that the medical evidence did not substantiate that Ms. Spears was disabled throughout the entire Elimination Period and beyond.

Ms. Spears followed up with Dr. Zagar regarding Lyme disease on 8/19/11.  On exam, Dr. Zagar reported Ms. Spears "did not appear uncomfortable," and "No disorientation was observed, Remote memory was not impaired, Short term memory not impaired, An adequate fund of knowledge was demonstrated… No language abnormalities were demonstrated… Attention demonstrated no abnormalities." This is the last office visit on file that Ms. Spears had with Dr. Zagar.

On 9/7/11, Ms. Spears reported to Dr. Saul that "seems like her cognition is worse," she had new stuttering, and her pain was worse. Dr. Saul provided the diagnosis of CNS Lyme and the plan was to continue current treatment.

Dr. Baehring's 9/23/11 office visit record indicates on that follow up visit Ms. Spears had no neurologic symptoms to report and her headaches were mostly resolved. Again, Dr. Baehring documented Ms. Spears had no cognitive deficits.

Regarding a telephone call to Dr. Gouin Young's office received from Ms. Spears on 11/10/11, the note indicates, "w/be traveling for 3 weeks. Should she up the Ester-C-what strength-Anything else she should increase?"

Liberty002390

On 1/30/12. Ms. Spears was evaluated by John Tagliarini, DC, for head, neck and shoulder pain. Ms. Spears reported on a scale of 0 to 10, her discomfort ranged from 5 to 10.  Ms. Spears reported upper back pain, mid back pain, lower back pain, shoulder pain, wrist pain, hand pain, knee pain. Ankle pain, foot pain, joint swelling/stiffness, fatigue, ringing in the ears, visual disturbances, nausea, loss of appetite, asthma, seasonal allergies, absence seizures, and hypothyroid.  Dr. Tagliarini's assessment on 1/30/12 indicated, "Haley's prognosis is good at this time." Treatment continued with Dr. Talagrini through 8/11/14.

Dr. Raxlen's office visit notes from March and June 2012 report improvement in Ms. Spears' cognition and communication. As of 8/3/12. Ms. Spears reported to Dr. Raxlen that her energy was better, she could do more in a day, and she took 2 walks per day. Dr. Raxlen's 11/9/12 office note indicates Ms. Spears had "infrequent headaches relieved with hydration," was more active with church bible study and other groups, sleep was improved, exercise included elliptical, pilates, and yoga, and she was walking her dogs every day.  Ms. Spears reported that date that she hoped to go back to work in the next few months.

Ms. Spears 11/18/12 Supplemental List as prescribed by Dr. Gouin Young, included 14 supplements for Ms. Spears to take in the morning, and 6 supplements to take at bedtime.

Ms. Spears began treatment with Robert Lang, MD, Endocrinologist in February 2013. The 2/21/13 exam documented Ms. Spears' mental status as normal. A thyroid ultrasound and biopsy were recommended.  On 2/22/13, Ms. Spears had a follow up appointment with Dr. Oberstein, at which time he "strongly recommended excision, now."  At Ms. Spears' office visit with Dr. Lang on 3/22/13, based on her history of Hashimoto's and the biopsy report, Dr. Lang recommended a thyroidectomy.

Ms. Spears had her regular follow up visit with Dr. Baehring on 4/22/13. She reported no neurologic symptoms, no cognitive deficits, and no problems with language. Dr. Baehring reported, "The two brain MRI abnormalities have remained entirely stable," and surveillance scans were increased to every 2 years.   This is the last update with Dr. Baehring on file.

Dr. Raxlen's 6/4/13 office note reports Ms. Spears had "clarity in cognition," and she was exercising most days. Ms. Spears was "off shots" and weaning off the Tramadol.  Ms. Spears reported her asthma was better, and she was scheduled for the thyroid surgery. Dr. Raxlen reported Ms. Spears had driven to his office from Boston that day. This is the last office note from Dr. Raxlen on file.

After a negative cardiac work-up by Dr. Naseer, the thyroidectomy was performed on 6/27/13 by Robert Udelsman, MD. In the July 1, 2013 follow up office note Dr. Udelsman reported Ms. Spears recovered well postoperatively, and she was to return to the care of Dr. Oberstein. Ms. Spears followed up post-operatively with Dr. Oberstein on 8/30/13, and with Dr. Lang post-operatively on 9/3/13. Ms. Spears reported to Dr. Lang she was "feeling ok but not 100%. Decreased energy. Also sees Endocrinologist in Hartford." At her office visit with Dr. Oberstein on 11/6/13, Ms. Spears reported she was "feeling ok in general."  On 11/27/13, Dr. Lang's office note reported Ms. Spears felt better but that she had a sinus infection.  The treatment plan was to obtain lab results from Dr. Oberstein and to get an ultrasound one year from surgery. The diagnoses included hypothyroid after surgery and history of papillary cancer.

The most recent office visit note on file from Dr. Saul is dated 6/9/14. Ms. Spears reported doing

Liberty002391

well off antibiotics, with better energy, and, "Thinking about trying to find work." Dr. Saul's assessment that date was Lyme, now stable off antibiotics and Hypothyroidism. Ms. Spears was to follow up with Dr. Saul as needed.

On 11/17/14, Ms. Spears had an appointment with Zhiheng He, MD, Endocrinologist, in Cambridge, Massachusetts. Dr. He reported Ms. Spears had referred herself to the office for follow up of her thyroid cancer and thyroidectomy. Dr. He reported Ms. Spears had just moved to Boston from Connecticut. Ms. Spears denied any complaints on review of systems and the physical exam was within normal limits. Lab work was recommended in six weeks and a follow up ultrasound was recommended for February 2015.

The medical documentation on file indicates Ms. Spears was treated during the period 12/8/14 through 8/26/15 at Maddalo Chiropractic for back pain. Increased pain was attributed to a fall on ice in January 2014 and an automobile accident on 7/9/15. From 9/16/15 through 12/9/15, Ms. Spears received chiropractic treatment for cervical, thoracic, and lumbar pain and muscle spasm with Robert Rougeau, DC, of Greenacres Clinic in Louisiana.

On 12/17/15, Ms. Spears was evaluated by Melissa Albritton, MD, Endocrinologist, in Bossier City, LA. Regarding Ms. Spears extensive complaints and symptoms, Dr. Albritton reported, "Her complaints tend to fluctuate. It is hard for me to get a good grasp on what complaints she has right now as her complaints tend to vary from day to day." Physical exam was documented as within normal limits. Dr. Albritton provided the diagnoses of Thyroid cancer, Post-surgical hypothyroidism, and Vitamin D deficiency. Dr. Albritton reported, "I did tell her I am not a holistic therapist nor am I a specialist in infectious diseases so if she does want follow up for that issue she will need to speak with her primary care about referrals… I have encouraged her to make sure she establishes with primary care."

We learned from the LTD forms Ms. Spears completed on 9/8/15, that **Ms. Spears returned to work full time in August 2014**. Ms. Spears also reported as of September 2015, she resided in Shreveport, Louisiana. On the Activities Questionnaire completed 9/8/15, Ms. Spears reported:

> My condition has varied from 2009-2015: In 2009 I was debilitated + generally could stand/walk for a few minutes at a time. I could walk from the car to the store, often this was a challenge. I had bad days + some not quite as bad. Sitting varied from a few minutes to over an hour. There were times I felt better for a period, then would go down hill again. In Aug 2014 I felt I could go back to work. I was able to sit most of the day at work, at times I would nap in my car during lunch.
>
> Regarding the use of an assistive device, Ms. Spears indicated, "There were times I had to hold onto someone when walking." Regarding sitting in a car Ms. Spears stated she could sit long enough to get to doctors' appointments in 2009 and "short distances generally," and then in "2013ish I was able to drive further but this could vary."

Regarding her ability to perform personal and household activities of daily living, Ms. Spears reported:

> I was always able to go to the bathroom myself. Sometimes people would bring me meals, often weekly. I did limited grocery shopping when able, I had help with my finances and mail for a long time. My ability to clean up after myself/after meals varied. I had a cleaner for a significant period of time. Sometimes I needed help drying my hair + getting dressed as well as going up +

Liberty002392

down stairs. Generally I bathed myself but there were periods when I needed help. I had gradual improvement in time, as of Aug. 2014 I did not need assistance in most of these tasks.

Regarding participating in an exercise program, Ms. Spears stated she exercised at times as part of her treatment plan and eventually was able to increase her exercise. She volunteered for the homeless ministry in 2015.   Travel included flying to Florida in 2013; flying to California in December 2014; flying to Louisiana to visit "family/caregivers" (dates not provided); "drove to MA 2013, 2014."

Ms. Spears reported she did experience memory and concentration problems, "I have trouble remembering dates. There were times I could not remember my age or year I was born, how to get home from a nearby intersection, when I had Dr appointments, tasks to complete. While I am much improved, I still struggle at times."

On the Claimant Information Form completed 9/8/15, Ms. Spears provided the names and addresses of 27 providers involved with her medical care. Thus, during this remand review, on Ms. Spears behalf Liberty requested the treatment records (from date of first treatment to the present) of all 27 providers.  Five providers did not respond to Liberty's request, however, Attorney Zimberlin did eventually provide records from two of the five; Drs. Raxlen and Tagliarini.  Additionally, Attorney Zimberlin forwarded records from many of the 22 physicians who did respond to Liberty's request, as well as treatment records from the newest providers, Greenacres Chiropractic and Dr. Alberton.

Based on the information regarding Ms. Spear's recent work activity and wages provided by Attorney Zimberlin, in mid-August 2014, Ms. Spears began working full time for Kforce, Inc. at a location in Boston, MA. Ms. Spears reported her position was Professional Administrator. Ms. Spears worked for Kforce through mid-March 2015. Beginning 3/18/15, Ms. Spears took a full time Recruiter position with WinterWyman. The position was located in Cambridge, MA, and the "expected duration of the assignment" was "four months." In a letter to Liberty dated 12/7/15, Attorney Zimberlin explained, "Please be advised that Ms. Spears is no longer working. She last worked in August 2015. She is seeking additional medical treatment."

**Remand Review**
To understand and thoroughly evaluate Ms. Spears' symptoms and medical conditions from September 27, 2008 to the present, all the medical documentation on file was referred for a physician panel medical review comprised of specialists in Neurology, Neuropsychology, Infectious Disease, and Internal Medicine/ Endocrinology. Additionally, Ms. Spears was asked to attend an Independent Medical Examination (IME) with a Physical Medicine & Rehabilitation (PM&R) specialist.

The 3/4/16 panel review report was completed by Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine; Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine; Daniel Kitei, DO, MA, Neurology; Michael Raymond, PhD, ABN, Neuropsychology.  It was requested for this review, the physicians consider the periods 9/27/08 through 3/27/09, and from 3/28/09 forward. The four review physicians all noted the medical records provided for review and documented Ms. Spears' broad spectrum of medical complaints.

Dr. Cooper reported that he was asked to look at the medical documentation from several perspectives, including endocrinology, rheumatology, GI, cardiology, and internal medicine. From

Liberty002393

an endocrinology perspective, Dr. Cooper reported there is no evidence in the available records to support impairment. Ms. Spears has a history of thyroid issues, including multinodular thyroid and hypothyroidism. In 2009, a biopsy of the thyroid was done by Dr. Oberstein, which was found to be benign. She had her thyroid removed in June 2013, and subsequent thyroid ultrasounds showed no recurrence of cancer. From a rheumatology/musculoskeletal perspective, Dr. Cooper said that the records indicated Dr. Kage performed exams of synovitis and musculoskeletal systems which were unremarkable.

Dr. Cooper further reported that Dr. Giannini opined restrictions and limitations in 2010 due to Ms. Spears' "plethora of symptoms, but provided no clinical evidence to back up her opinion within the medical records provided for review." From a gastroenterology perspective, Dr. Cooper noted that there were no abnormal findings. Finally, Dr. Cooper stated that from a cardiology perspective, all exams were also normal. Additionally, the sleep studies that were conducted were normal. In summary, Dr. Cooper reported there is insufficient evidence within the records to support functional impairment and no restrictions for Ms. Spears' functional capacity including work capacity, during the periods 9/27/08 through 3/27/09, and from 3/28/09 forward.

From an Infectious Disease perspective, Dr. Crossley was looking at whether Ms. Spears has had any infection that would be "responsible for her non-specific symptoms and if these would be functionally impairing." Dr. Crossley reported there is no evidence that Ms. Spears has had Lyme disease or other infections that would be functionally limiting:

> This conclusion is based on the absence of any objective findings of late-stage Lyme disease (typically manifest by arthritis, neurologic findings, or a cardiac conduction defect) and the totally nonspecific self-reported symptoms noted by the claimant. Importantly, except for a single CSF test that is impossible to interpret, all of the claimant's testing for tick-borne illnesses was negative.

Dr. Crossley concluded there are no documented impairments for the periods 9/27/08 through 3/27/09, and from 3/28/09 forward, that would be associated with the presence of any infection. "Her symptoms are non-specific and not related to any infection… The claimant's functional capacity would not have been limited by any infection during the periods noted."

Dr. Kitei reported from a neurology standpoint:

> Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support impairment from a neurologic standpoint. The claimant has complained intermittently of headaches but the most recent note including notes from 2009 and 2010 detail that she had significant improvement. When she was seen at Yale Neurology on 7/30/10, she had not had migraines for months, and when she saw Associated Neurologists of Southern Connecticut on 3/29/10, her migraines were well controlled. When she saw Yale Neurology on 4/22/13, she did not have any neurologic symptoms and headaches had largely resolved.

Dr. Kitei emphasized Ms. Spears has had consistently normal neurologic examinations throughout the records, and no neurologic examinations that were abnormal.

Dr. Raymond, Neuropsychologist, noted Ms. Spears' primary complaint in 2008 was vascular headaches, and, "Multiple neurological examinations were negative and nondiagnostic with regard to neurocognitive functioning, sensorimotor abilities, and formal cranial nerve testing." Dr. Raymond

Liberty002394

further reported:

> Despite the claimant's subjective neurocognitive complaints, she was only evaluated neuro-psychologically on one occasion. This occurred per Dr. Rissenberg in July 2010. As noted, Dr. Rissenberg's conclusion that the neuropsychological test results "are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness" is certainly not confirmed or a viable clinical explanation based on the neuropsychological test results. In fact, the evaluation itself was cursory, non-standardized, and was limited by the exclusion of formal effort testing, as noted above. Premorbid levels of intellectual functioning appeared to be miscalculated based on the method and rationale documented in that prior report. Overall, based on those assessment factors, it is highly unusual that a neuropsychologist would be able to render a clinical opinion with any degree of neuropsychological certainty.

Dr. Raymond concluded, "the preponderance of clinical evidence contained within this file does not support neurocognitive impairment," for the periods 9/27/08 through 3/27/09, and from 3/28/09 forward.

In response to Liberty's request for further clarification, Dr. Raymond reported on 3/22/16 that:

> Dr. Rissenberg's neuropsychological evaluation, dated July, 2010, albeit nonstandardized and somewhat cursory, would certainly preclude any conclusions regarding the claimant's current impairments, cause of impairments, severity of impairments, or limitations in functional capacity… the neuropsychological evaluation completed in July, 2010, is obsolete as it is 6 years old. Furthermore, the evaluation was nonstandardized, somewhat cursory, and without formal effort testing. Thus, given the dearth of updated neuropsychological data, the aforementioned information, in and of itself, does not reflect the claimant's impairments, cause of any impairments, severity of impairments, or limits on functional capacity.

On 3/2/16, Dr. Cooper spoke with Dr. Lang. Dr. Cooper's summary of that conversation was sent to Dr. Lang.  Dr. Lang signed his agreement to Dr. Cooper's summary on 3/3/16, which stated, "Dr. Lang stated there should be no impact on her functionality from an endocrine perspective."

Since Dr. Lang was the only attending physician that responded to the review physicians' multiple attempts to speak to attending physicians, on 3/16/16, the physician panel review report was faxed to Drs. Zagar, Saul, Rissenberg, Kage, Gouin Young, Giannini, Baehring, and Dr. Raxlen (Dr. Donta had retired). The cover letter requested the providers review the panel report and comment, and should he/she disagree with the medical findings, to please provide his/her medical opinion and the medical basis for his/her disagreement. Additionally, it was offered that if an attending physician would like to speak with a review physician to discuss his/her medical opinion, a telephone consultation would be scheduled at a mutually agreeable time. Follow up calls were made to the physicians' offices to confirm their receipt of the faxed report.

Despite numerous additional calls by Liberty to request the providers' responses, ultimately responses were received from Dr. Zagar, and Dr. Rissenberg. On 4/18/16, Attorney Zimberlin submitted a statement from Dr. Giannini. Dr. Zagar's 4/6/16 response addressed January 2009 through October 2011, the period of time Ms. Spears was under his care. Dr. Zagar reviewed Ms. Spears' symptoms and treatment, indicating:

> She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis. At the time I was seeing her, she seemed to do little outside of seeing her doctors because of her various symptoms. She was unable to drive or handle some other basic daily activities. Neuropsychological testing done in

Liberty002395

2010 showed cognitive impairment, which was consistent with her subjective symptoms. While I would agree that the diagnosis of CNS Lyme was not certain, she clearly has had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily function.

In regard to Dr. Raymond's neuropsychological report and conclusions, Dr. Rissenberg's 4/6/16 response defended her testing methodology and conclusions indicating that her "assessment of Ms. Spears was appropriate and comprehensive, reflecting the highest standards and best practices of my field…"

On 4/13/16, Dr. Giannini reported [the dates of the period Dr. Giannini references are unknown]:
> I was treating Haley during the period in question for headaches and fatigue. Headaches and fatigue have no specific objective evidence to indicate quality and severity. They are measured based on the patient subjective report. During this period Haley's headaches and fatigue were severe enough that she would have spent significant amounts of time away from a job. She would have been an unreliable employee and missed many days of work. She was most definitely disabled during this period.

Dr. Rissenberg's comments were sent to Dr. Raymond, and Dr. Zagar's comments were sent to Dr. Kitei, to determine if the attending providers' responses changed their previous conclusions, and to provide the medical rationale to support their conclusions. On 4/29/16, Dr. Kitei reported:
> The current records do not offer any additional information from a neurologic standpoint… From a neurologic standpoint there is no additional information that would alter my previous opinion that the evidence does not support impairment from a neurologic standpoint. As noted previously, the claimant complained intermittently of headaches but notes including 2009 and 2010 detailed that she had significant improvement and she has had consistently normal neurological examinations as detailed previously.

Dr. Raymond discussed methodology and standards for neuropsychological testing in the field. Dr. Raymond concluded:
> Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of neuropsychological certainty that neurocognitive impairment is not supported within the time frame in question (9/27/08 – 3/31/15). While Dr. Rissenberg raised concerns regarding the undersigned's clinical opinions and conclusions, the concerns were addressed by the undersigned as previously referenced. With all due respect, the concerns raised by Dr. Rissenberg did not change or alter the undersigned's opinions as previously stated in the initial and addendum reports dated 2/13/16 and 3/16/16, respectively.

The PM&R Independent Medical Examination took place on 3/14/16, as performed by Jenness Courtney, MD, in Shreveport, LA.  Dr. Courtney also reviewed all the medical documentation in Ms. Spears' disability claim file. The IME report indicated, "The claimant is a former administrative assistant who was 31 years old at her date of disability, September 27, 2008, initially due to headaches. This evaluation is to determine the claimant's functional capacity for the periods of September 27, 2008, through March 27, 2009," and from 3/38/09 forward. Regarding the history of Ms. Spears' illness, Dr. Courtney reported:
> A comprehensive medical history was attempted; however, this claimant refused to give any substantial history. Upon questioning concerning her initial migraine headaches, this claimant

Liberty002396

stated that this was only the symptom of her real problems. She stated that she no longer has any problems related to this event. She attributes all of the problems as related to bacterial/parasitic infections. She states that treatment for these infections remedied her symptoms. When asked specific questions about the history and course of events during the time periods stated above, the patient states that she was instructed by her lawyer not to answer these questions.

Regarding Ms. Spears' activity level, Dr. Courtney reported:
She was questioned concerning her ability to perform activities of daily living. When she was at her worst during the time frame after September 27, 2008, she reports that she had problems with fatigue, pain, and decreased energy. She also reports neurocognitive deficits, where she had difficulties with memory and confusion. She states that her mother and the home health nurse would aid her with activities of daily living such as dressing and bathing. She reports no problems at this time.

Dr. Courtney concluded:
In summary, my overall impression regarding the insured's current verifiable physical impairments and limitations, as well as her maximum full-time work capacity, again, the patient specifically states that she does not have these problems at this point, that she was fully healed with the treatments that were provided to her. Her only complaints have to do with reduced energy, which she attributes to hypothyroid disease and her history of thyroidectomy.

As far as to the extent of which the results of this Independent Medical Examination provide any information concerning the periods of September 27, 2008, through March 27, 2009, apparently the patient was placed on work restrictions, from my review, at least from November of 2008 through January of 2009, in which she was to return to work. Again, there was a reviewer that noted that from March 24, 2009, through May 11, 2009, she had no verifiable evidence of why the patient could not work.

Dr. Courtney reported, regarding the period from March 2009 forward:
it does not appear that the patient had any incapacitating diagnosis. She had apparently been previously taken off work. The chiropractic notations of lumbalgia and cervical segment dysfunction and cervicalgia would not be a reason for the patient to not be able to perform at least sedentary work during that period of time. There are no current restrictions/limitations.

On 3/14/16, Liberty received a letter from Attorney Zimberlin indicating Dr. Courtney was rude and argumentative, unprepared, accused Ms. Spears of failing to cooperate, and did not do his job because he asked Ms. Spears' her diagnoses rather than determining the diagnoses himself. In his letter of reply to Attorney Zimberlin's 3/14/16 letter, Dr. Courtney stated, "It is a patient's job to comply with requests to provide detailed history of the illnesses including diagnosis and prior treatment at doctor's appointments. When asked to do the above, Ms. Spears responded with irritability and refusal to cooperate." Dr. Courtney did review the complete medical records that were provided to him.

In summary, based on a thorough review of all the medical documentation in Ms. Spears' disability claim file, the four specialty medical review and the PM&R IME completed during this remand review, it is determined that the medical evidence does not provide sufficient proof that Ms. Spears was unable to perform her own occupation continuously throughout the Policy's Elimination Period, 24 months Own Occupation period, and the Any Occupation period beginning on 3/28/11.

Liberty002397

**Remand Assessment**

To meet the definition of disability throughout the three phases of this claim, the Elimination Period, the Own Occupation period, and the Any Occupation period, Ms. Spears must provide proof of continued impairment which prevented her from performing her own Administrative Support occupation through 3/27/11, and prevented her from performing any occupation for which she is fitted, from 3/28/11 forward.

The UTC Group Disability Income Policy states:

*Disability Benefit*

*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

Proof is defined by the Policy as:

*"Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*
*Proof must be submitted in a form or format satisfactory to Liberty.*

**Elimination Period**

At the onset of the LTD Policy's Elimination Period from 9/27/08 through 3/27/09, Ms. Spears' chief complaint was severe headaches. In the months from September 2008 through January 2009, Ms. Spears was evaluated by five Neurologists, two Rheumatologists, Endocrinology, Gastroenterology, and Cardiology.  Physical examinations were normal.

Ms. Spears' self-reported symptoms increased during the Elimination Period. Reported symptoms progressed from headaches with nausea and vomiting to include blackouts/seizures, insomnia, stuttering, and in November 2008 included memory gaps and stuttering.  By January, Ms. Spears complained of fatigue, night sweats, weight loss/gain; dry eyes and dry mouth, stiffness in the morning, jaw pain, headache; eye pain, blurred double vision, floaters, flashes; asthmatic shortness

Liberty002398

of breath; chest tightness; heartburn, abdominal pain, diarrhea, nausea; recurrent sinus and ear infections; muscle weakness, tingling and numbness; anxiety; bruising easily; ringing in her ears.

Despite the increase in self-reported symptoms, Ms. Spears' cognitive and physical exams remained normal, and she was able to return to work on a part time basis beginning on 1/8/09, remained working part time through 3/24/09.

There are multiple inconsistencies noted in Ms. Spears' medical records. There are no findings on exam including the neurological or musculoskeletal exams by Dr. Giannini on 3/10/09. On 4/21/09, Ms. Spears reported to Dr. Raxlen that she experiences "Horrible migraines (no medicine worked)," while on 4/27/09, Dr. Zagar reported, "Headaches are well controlled, only 2 migraines in the last couple of months."

Since Ms. Spears' self-reported symptoms were not consistent with the medical evidence and her actual functional abilities continuously throughout the Elimination Period, Ms. Spears' STD and LTD claims were denied. As noted previously, STD benefits were paid through the 3/27/09 maximum benefit date based on the fiduciary's decision, not based on Liberty's assessment of Ms. Spears' level of impairment.

**Own Occupation Period**
During the Own Occupation period from 3/28/09 through 3/27/11, as Drs. Raxlen, Zagar, Giannini, and Saul endorsed the diagnosis of Lyme disease, Ms. Spears' physical examinations remained normal. Although fatigue became a prominently reported symptom, there is no evidence Ms. Spears tried the medications for fatigue that Dr. Zagar recommended in October 2009. Additionally, Ms. Spears appeared to have little, if any, improvement in her sleep, despite Dr. Shoup's February through April 2011 recommendations regarding sleep hygiene.

Ongoing inconsistencies continued, as evidenced in the medical records. On 2/16/10, Ms. Spears reported to Dr. Raxlen that she was able to travel to Louisiana and rode in the Mardi Gras parade for four hours on 2/13/10. On 3/19/10, one month later, Ms. Spears reported to Dr. Zagar that once her antibiotics were stopped in December 2009, and after 5 weeks of feeling "fairly well," she "totally crashed." At this appointment, despite Ms. Spears' cognitive complaints, Dr. Zagar documented no cognitive issues on exam.

On the Physical Residual Functional Capacity Questionnaire and Medical Source Assessment (Mental) forms dated 6/21/10, Dr. Zagar reported Ms. Spears experiences symptoms of neck and shoulder pain, migraines, fatigue, joint pains, and cognitive impairment including trouble with memory, word finding, concentration, although he had never documented abnormal findings on exam. Similarly on 7/9/10, Ms. Spears' description of her symptoms were documented in a letter from Dr. Giannini and on the Physical Residual Functional Capacity Questionnaire and Medical Source Assessment (Mental) forms completed by Dr. Giannini. Dr. Giannini's 7/9/10 office visit note is the only of Dr. Giannini's office visit notes (before and after 7/9/10) in which Dr. Giannini documents on exam, any concern regarding cognitive difficulties.

In July 2010, Ms. Spears reported to Dr. Raxlen her cognitive impairment "turns off and on." In August and September 2010, Ms. Spears reported to Dr. Saul she has "brain fog." On 10/19/10, Ms. Spears reports to Dr. Gouin Young that she had increased cognitive clarity, better retention and improved speech.

Liberty002399

**Any Occupation Period**

There have been measurably fewer medical records submitted in support of Ms. Spears' impairing conditions for the Any Occupation phase, beginning 3/28/11. The review physicians, Drs. Cooper, Crossley, Kitei, and Raymond, all reported there is insufficient evidence within the medical records to support functional impairment, and therefore no restrictions for Ms. Spears' functional activity, including work activity, from 3/28/11 forward.

Discrepancies in Ms. Spears' reported symptoms continue to be evident. On 8/19/11, Dr. Zagar documented normal findings on the cognitive and physical portions of his exam; on 9/7/11, Ms. Spears reported to Dr. Saul that her cognition was worse; Dr. Beahring documented a normal neurologic and cognitive exam on 9/23/11. In November 2011 Ms. Spears reported to Dr. Gouin Young's office she would be traveling for three weeks.

In March through August 2012, Dr. Raxlen reported improvement in Ms. Spears' cognition and speech, and as of November 2012, Ms. Spears reported being active with church groups, having improved sleep, and engaging in regular exercise (elliptical, Pilates, yoga), and walking her dogs.

In June 2013, Ms. Spears had the thyroidectomy with no postoperative complications. Ms. Spears reported traveling to Florida in 2013. She continued to have the capacity to travel to her medical appointments in New York City. In June 2014, Ms. Spears reported to Dr. Saul that she had increased energy and was looking for work.  Ms. Spears returned to work full time in August 2014.

Based on the claim and medical documentation on file, not only does the medical evidence fail to support impairment precluding Ms. Spears from performing her own Administrative Support occupation, and then any occupation, the documentation on file fails to support Ms. Spears' symptoms were of a frequency, severity, and duration, to have precluded her ability to perform her occupation throughout the 9/27/08 through 3/27/09 Elimination Period, throughout the 3/28/09 through 3/27/11 Own Occupation Period, and at the 3/28/11 beginning of the Any Occupation period, and forward.

**Additional Remand Analysis**

Of note, there have been references to Ms. Spears' mental health and recommendations for mental health treatment throughout the claim file, however, there are no mental health evaluations or treatment records on file. Dr. Silvers questioned the role of stress in Ms. Spears' symptoms. Ms. Spears' mother reported her concern regarding Ms. Spears' mental health. Dr. Donaldson reported Ms. Spears' appeared depressed. Dr. Kage prescribed Zoloft. On forms, Dr. Zagar indicated Ms. Spears has anxiety affecting her physical condition, and Dr. Giannini reported depression was affecting Ms. Spears' physical condition. Dr. Zagar and Rissenberg recommended psychotherapy. Dr. Saul's office also questioned the role of mental health in Ms. Spears' multiple somatic complaints.

As noted previously, Dr. Kage had succinctly explained Ms. Spears medical work-up was set in motion by her complaints of increased, severe headaches; "Pronounced migraine headaches triggered an extensive work-up which showed possible astrocytoma, possible tick-borne disease, and perhaps rheumatic autoimmune disease." Ms. Spears pursued multiple opinions and treatment from numerous specialists for these possible conditions.

Liberty002400

There was no brain tumor although careful surveillance was required to establish that fact. The rheumatology work-up indicated no rheumatic autoimmune disease. The presence of tick-borne disease has been disputed, although Ms. Spears was extensively treated for that condition. Whether or not a specific medical condition or diagnosis existed does not determine whether Ms. Spears met the Policy's definition of disability; it is Ms. Spears' functional capacity that determines whether she had the ability to perform her own occupation through 3/27/11, and any occupation thereafter. Ms. Spears' self-reported symptoms were not consistent with the overwhelmingly normal medical and cognitive exams, and did not coincide with her actual functional abilities.

This remand review has taken into consideration the opinions and assessments of all Ms. Spears' treating physicians. Ms. Spears' attending physicians have had the opportunity to directly observe, listen to, and examine Ms. Spears. The documentation of each attending physician has been fully considered; Ms. Spears' reported symptoms and functional activity, as well as each physician's reported objective physical exam findings, imaging and laboratory test results, and their medical expertise. Alternatively, the expert reviewing physicians who have examined the medical records over the course of Ms. Spears' claim, have their specialized medical expertise, and a comprehensive perspective based on all the medical information from the numerous physicians who have evaluated Ms. Spears. These peer review physicians have had the opportunity to review, compare and contrast all medical evaluator's findings, as well as the frequency, duration, consistency and severity of Ms. Spears' self-reported symptoms.

The review physicians are all board certified in their specialties and are qualified to review and interpret medical records and opine on medical functionality. Additionally, Drs. Taiwo, Silverman, Crossley, and Raymond are certified Medical Examiners. All the attending physicians' documentation and opinions have been fully considered.  The reviewing physicians' conclusions are based on the totality of medical documentation on file, including consistencies and inconsistencies in Ms. Spears' self-reported symptoms and functional activity, as well as all the documented medical data.

The UTC Group Disability Income Policy states:
   ***Discontinuation of the Long Term Disability Benefit***
   *The Monthly Benefit will cease on the earliest of:*
   1. *the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;*
   2. *the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.*
   3. *the date the Covered Person refuses to be examined or evaluated at reasonable intervals;*
   4. *the date the Covered Person refuses to receive Appropriate Available Treatment;*
   5. *the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;*
   6. *the date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;*
   7. ***the date the Covered Person's current Partial Disability earnings exceed 80.00% of his Basic Monthly Earnings;***
   ***Because the Covered Person's current earnings may fluctuate, Liberty will average***

*earnings over three consecutive months rather than immediately terminating his benefit once 80.00% of Basic Monthly Earnings has been exceeded.*

8. *the date the Covered Person is no longer Disabled according to this policy;*
9. *the end of the Maximum Benefit Period; or*
10. *the date the Covered Person dies.*

According to the earnings records submitted by Attorney Zimberlin, Ms. Spears returned to work, full time, in August 2014. At Kforce, Ms. Spears' averaged earnings of approximately $2749.00 per month. In March 2015, Ms. Spears combined monthly earnings from Kforce and WinterWyman was $1119.00. In April 2015 Ms. Spears earned $4658.00, and in May 2015 she earned $5151.00 with WinterWyman. Ms. Spears' average monthly earnings over the three months March, April, and May 2015, was $3642.00, greater than 80% of Ms. Spears' $4422.00 Basic Monthly Earnings prior to her absence from work in September 2008.

The Policy states:

> **"Basic Monthly Earnings"** *means the Covered Employee's monthly rate of earnings from the Sponsor in effect for the calendar year immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include bonuses, commissions, overtime pay and extra compensation.*

Although Ms. Spears' earnings' did not exceed 80% of her Basic Monthly Earnings until the Spring of 2015, Ms. Spears did return to work full time in August 2014.

Attorney Zimberlin's 12/7/15 letter states, "Please be advised that Ms. Spears is no longer working. She last worked in August 2015. She is seeking additional medical treatment… Based on Spears' recent decline in health, Liberty should not limit its consideration of this claim to a seven year period." However, it is noted that the WinterWyman Job Order on file, indicates Ms. Spears' position was a four month period only, beginning 3/18/15.

Additionally, Dr. He's 11/17/14 office note reports Ms. Spears had no complaints in the reviews of systems, and the physical exam was within normal limits.  Dr. Albritton's 12/17/15 office note indicates Ms. Spears reported extensive complaints and symptoms, although again, the physical exam was reported to be within normal limits.  Furthermore, at the March 2016 IME, Ms. Spears reported to Dr. Courtney that she no longer had symptoms from her previous tick-borne infections, and Dr. Courtney reported Ms. Spears currently has no restrictions or limitations for work activities.

The UTC Group Disability Income Policy further states:

> **"Active Employment"** *means the Employee must be actively at work for the Sponsor:*
> 1. *on a full-time basis and paid regular earnings;*
> 2. *for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:*
>    *a. at the Sponsor's usual place of business; or*
>    *b. at a location authorized by the Sponsor.*
>
> *An Employee will be considered actively at work if he was actually at work on the day immediately preceding:*
> 1. *a weekend (except where one or both of these days are scheduled work days);*
> 2. *holidays (except when the holiday is a scheduled work day);*

Liberty002402

3. *paid vacations;*
4. *any non-scheduled work day;*
5. *an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and*
6. *an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).*

The Policy also indicates:
  **"Employee"** *means a person in Active Employment with the Sponsor.*
  **"Sponsor"** *means the entity to whom this policy is issued."*

Based on this Active Employment provision, Ms. Spears would not have been in Active Employment since her termination from UTC, and thus not eligible for LTD benefits under the UTC Group Disability Income Policy, for any new period of disability.

Ms. Spears is also not eligible for LTD benefits under the Successive Periods of Disability policy provision. That provision states:
  ***Successive Periods of Disability***
  *With respect to this policy,* **"Successive Periods of Disability"** *means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.*

  *A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:*
  1. *returns to his Own Occupation on an Active Employment basis for less than six continuous months; and*
  2. *performs all the Material and Substantial Duties of his Own Occupation.*

  *To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.*

  *Benefit payments will be subject to the terms of this policy for the prior Disability.*

  *If a Covered Person returns to his Own Occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.*

  *If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.*

In our review of Haley Spears' claim, Liberty did fully consider the ruling by the Social Security Administration (SSA) to approve Social Security Disability Income (SSDI) benefits. Ms. Spears' SSDI benefits were approved at the Administrative Law Judge level on 2/25/11. It should be noted that while we fully considered the SSA's ruling, the decision by the SSA does not determine entitlement to benefits under the terms and conditions of the UTC Group Disability Income Policy. The Administrative Law Judge's <u>Decision</u> reports Ms. Spears' self-reported symptoms and the intensity and persistence of her symptoms, were considered at "face value." Additionally the

Liberty002403

opinions of Dr. Raxlen, Zagar, and Giannini were afforded significant weight compared to other examining physicians, and/or medical review physicians.

Prior to the 2/25/11 SSA Decision, Liberty obtained the medical reviews of Dr. Potts, Neurology; Dr. Taiwo, Internal Medicine and Occupational Medicine; Dr. Silverman, Infectious Disease; Dr. Brusch, Infectious Disease. Since the 2/25/11 SSA Decision, Liberty has obtained updated treatment records, and has considered the medical reviews by Dr. Cooper, Internal Medicine and Endocrinology; Dr. Crossley Infectious Disease; Dr. Kitei, Neurology; Dr. Raymond, Neuropsychology; IME performed by Dr. Courtney, PM&R; that were not considered by the SSA in its determination process. Dr. Potts reported it was reasonable for Ms. Spears to remain out of work while medications were being regulated for her headaches; through 1/8/09. All other reviewing physicians reported the medical evidence was insufficient to support impairment precluding Ms. Spears from full time work.

## Conclusion

We conducted a thorough and independent review of Haley Spears' entire claim.  In summary, we acknowledge that Ms. Spears has had multiple symptoms associated with her condition.  However, the information does not contain physical exam findings, diagnostic test results, valid neuropsychological test results, or other forms of medical documentation supporting her symptoms remained of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the duties of her occupation continuously throughout and beyond the Policy's Elimination Period.

Having carefully considered all of the information submitted in support of Haley Spears' claim, our position remains that proof of Ms. Spears' continued disability in accordance with the Policy provisions has not been provided.  Therefore, no Long Term Disability benefits will be paid.

This claim decision reflects an evaluation of the claim facts and United Technologies Corporation Group Disability Income Policy provisions.

Liberty Life Assurance Company of Boston will allow Ms. Spears the opportunity to submit a second, optional request for review. Since this optional review is not required by the Policy or the Court's remand order, it is requested that you notify Liberty within 45 days from your receipt of this letter, of your request for the optional review. At that time, we will determine a schedule for the submission of documents for that review. Your request for the optional review should be submitted to:

> **Liberty Life Assurance Company of Boston**
> **Liberty Mutual Benefits**
> **Attention: Nancy Winterer**
> **P.O. Box 7213**
> **London, KY 40742-7213**
> **Secure Fax No.: (603) 334-5708**

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Liberty002404

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002405

# Fax

**To :** Nancy Winterer Liberty Mutual     **Date :** 2016-05-24

**Fax :** +16033345708     **Subject :** H.Spears Neuropsy Review

**From :** Dr. Marian Rissenberg     **Email :** dr.marian@rissenberg.com

**Phone :** 9142326245     **Pages :** 2

☐ Urgent   ☑ Please Reply   ☐ For Review   ☐ Please Recycle   ☐ Please Comment

**Comments :**

Claim# REDACTED)

POWERED BY

iFAX
crowdedroad.com/ifax

# M. Rissenberg, Ph.D., Neuropsychologist

125 Katonah Avenue
Katonah, N.Y. 10536
(914) 232-6245

Invoice

Tax ID # 13-3589354
NPI # 1457634354

Bill To:
    Nancy Winterer
Client: Liberty Mutual Insurance - Disability
    Long Term Disability Benefits

Page:  1

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 4/6/16 | Neuropsychological Consultation - Haley Spears Claim# REDACTED | $1,250.00 |

| | Sales Tax: | $0.00 |
|---|---|---|
| | Total Amount: | $1,250.00 |
| | Amt Applied: | $0.00 |
| | Balance Due: | $1,250.00 |

Liberty002407

# FAX COVER SHEET

**To:** Nancy Winterer

**Company:**

**Fax Number:** 603-334-5708

**Re:** Final Report Attached

**From:** David Dalby <ddalby@mcn.com>

**Date:** 05/04/16 09:23:16 AM

**Pages (Including cover):** 2

## Notes:

Hello Nancy,

Please find the response regarding claim #: 2500391 attached. If you have any questions or concerns please don't hesitate to let me know.

Thank you!

**David Dalby**
Client Services Coordinator

**Medical Consultants Network LLC**
Medical Judgment Nationwide

Seattle, WA
P: (206) 621-9097 x 2282
F: (206) 812-6420
Mailto: ddalby@mcn.com
http://www.mcn.com

**Confidentiality Notice:** This facsimile and its attachments are intended only for the addressee(s) and it may contain confidential or legally privileged information. Use, disclosure, dissemination, or distribution of this facsimile by an unauthorized recipient is strictly prohibited. Please notify the sender immediately and contact **Medical Consultants Network LLC** at **800-636-3926** if you are not the intended recipient and arrange for the return of these documents without reading or saving it in any manner.

Liberty002408

## Northwest Louisiana Physical Medicine
### Jenness D. Courtney, III, M.D.

1801 Fairfield Ave., Suite # 411
Shreveport, Louisiana 71101-4443

Phone (318) 424-4224
Fax (318) 424-4044

Re: Haley Spears

Attn: David Dalby

It is a patient's job to comply with requests to provide detailed history of the illnesses
including diagnosis and prior treatment at doctor's appointment. When asked to do the
above, Mrs. Spears responded with irritability and refusal to cooperate. The claimant's
records were reviewed and commented on in the report.

Jenness Courtney III, M.D.

Liberty002409

# Northwest Louisiana Physical Medicine
## Jenness D. Courtney, III, M.D.

====================================================================

1801 Fairfield Ave., Suite # 411
Shreveport, Louisiana 71101-4443

Phone (318) 424-4224
Fax (318) 424-4044

Re: Haley Spears
Claim #: REDACTED
Attn: David Dalby

It is a patient's job to comply with requests to provide detailed history of the illnesses including diagnosis and prior treatment at doctor's appointment. When asked to do the above, Mrs. Spears responded with irritability and refusal to cooperate. The claimant's records were reviewed and commented on in the report.

Jenness Courtney III, M.D.

Liberty002410



952-927-7147 FAX
OFFICE@R3CONTINUUM.COM

April 29, 2016

**CONFIDENTIAL**

Nancy Winterer
Liberty Mutual
London, KY

Re: Haley Spears
Claim No: REDACTED
Web ID: 577726

Dear Ms. Winterer:

This report will serve as an addendum to my original report dated 3/4/16 and Neuropsychology addendum report dated 3/22/16 related to Haley Spears, after reviewing the additional information received.  Services have been completed on this file, and specific questions you have asked are addressed at the end of this report.

## Conclusion

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support impairment from a neurologic standpoint in regards to the complaints of headache.

**Michael Raymond, PhD, ABN, Neuropsychology:**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of neuropsychological certainty that:  there is no valid objective evidence to support neurocognitive deficits associated with chronic headache or a plethora of other reported possible etiologies within the time frame of 9/27/08 – 3/31/15.

### Referral Information:
Age (DOB): REDACTED
Gender: FEMALE
DOD: 09/27/2008
Diagnoses listed on referral: headache

## Medical Issue

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
The primary medical issue in question in this review is noted as in addition to the original question on whether there is any neurologic impairment, additional records were provided including Dr. Zagar's response and whether that response changes my previous conclusions.

**Michael Raymond, PhD, ABN, Neuropsychology:**
The primary medical issue in question in this review, from a neuropsychological perspective, is noted as: whether there is evidence to support neurocognitive deficits that would be functionally impairing within the time frame in question from 9/27/08 – 3/31/15.  While the claimant has been evaluated and treated by multiple medical specialists for a host of various etiologies (e.g., thyroid disease, dyspnea, pineal cysts, Lyme disease, systemic lupus erythematosus, fibromyalgia, etc), prior neurological examinations were negative with regard to neurocognitive functioning.  Serial cerebral MRI's identified a nonspecific and stable right temporal lesion of idiopathic etiology.  Despite Dr. Rissenberg's rebuttal of the undersigned's conclusions (2/13/16, 3/16/16), her statements and concerns, do not change or alter the undersigned's initial impressions and conclusions as clearly stated within the aforementioned reports.  Specifically, the preponderance of clinical evidence contained within the file does not support neurocognitive impairment within a designated time frame.

**Additional Information Reviewed**

1. **Attending Physician Statements completed by Dario Zagar, MD, Neurology, dated 4/6/16**
2. **Peer Review and Related Correspondence completed by Marian Rissenberg, PhD, Neuropsychology**
3. **Miscellaneous Documents**

**Summary of Records**

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
All provided records were reviewed.

A letter from Dr. Zagar dated 4/2/16 was reviewed in which he noted that he cared for Haley Spears from January 2009 until October 2011. She had complained of symptoms including headaches, fatigue, joint pain, digestive problems, and cognitive complaints, and had the possibility of CNS Lyme disease. He noted that he felt that her fatigue and cognitive issues limited her daily functioning so that in his opinion she was unable to work even on a part time basis. He felt that her neuropsychological testing done in 2010 showed cognitive impairment.

There is also a letter from Dr. Rissenberg which essentially defends the neuropsychological testing that was performed and argues against the points made by Dr. Raymond.

**Michael Raymond, PhD, ABN, Neuropsychology:**
Some previous records already reviewed in addition to Dr. Rissenberg's clinical review and rebuttal of the undersigned's previous conclusions was reviewed.  Specifically, Dr. Rissenberg indicated that her interpretation of the neuropsychological test results (July, 2010) "supports the high probability that my assessment of Ms. Spears was thorough and appropriate and my opinion is well founded".

Dr. Rissenberg, in her response (4/6/16) listed 5 areas of concern with regard to the undersigned's peer review regarding her neuropsychological assessment of the claimant dated July, 2010.

The undersigned, with all due respect, indicated that Dr. Rissenberg's neuropsychological evaluation was considered cursory or abbreviated.  It must be noted that the vast majority of neuropsychological reports have a section titled "tests administered"; Dr. Rissenberg's report did not include such a section nor was there an attached data sheet with the exception of WAIS-III and WMS-III test scores.  In addition, the undersigned did not have access to raw neuropsychological test data.  Respectfully, the

Liberty002412

evaluation completed by Dr. Rissenberg, is "cursory", and not a comprehensive neuropsychological evaluation.  According to Dr. Rissenberg, the assessment only included the WAIS-III, WMS-III, and a measure of constructional praxis and motor programming.  A depression and anxiety inventory was also administered.  No additional comprehensive personality assessment was included.  Furthermore, no formal effort testing was completed.  From a neuropsychological test battery perspective, a comprehensive neuropsychological evaluation, such as the Halstead Reitan Neuropsychological Battery, was not administered.  Dr. Rissenberg's evaluation must be considered flexible or known as a "casually-composed" battery.  While this is often utilized by neuropsychologists, there is no research completed about a particular combination of tests used and there is no consensus regarding the interpretation with individuals with suspected brain damage.  Thus, clinical inferences are difficult and when made, are often inaccurate.  This evaluation would not withstand the Daubert or Frye challenge regarding the standards of admissibility.

The undersigned utilized the term "nonstandardized" depicting Dr. Rissenberg's evaluation.  Once again, as previously noted, the term nonstandardized was utilized based on a flexible rather than a fixed approach to neuropsychological assessment.  Once again, a flexible or casually composed battery of tests is not research based such as the HRB which evaluates a full range of neuropsychological functions dependent upon the integrity of the brain.  This evaluation is well defined within the research regarding clinical patterns of test performance, and thus, when administered and interpreted correctly, can result in rendering clinical conclusions with sensitivity and specificity.

The undersigned questioned Dr. Rissenberg's statement regarding the claimant's premorbid level of cognitive abilities.  Specifically, Dr. Rissenberg indicated that the claimant was estimated to have an IQ in the high average range. In her rebuttal, Dr. Rissenberg indicated "I used the standard practice in the field of clinical neuropsychology considering multiple factors to obtain the best estimate of Ms. Spears' premorbid cognitive capacity at around the 75th percentile (IQ of 110).  Respectfully, the best practice in clinical neuropsychology to estimate premorbid intellectual abilities is by utilizing the Barona, regression equation utilizing demographic variables.  This was not completed.  Furthermore, an excellent marker of premorbid intellectual functioning would be formal academic achievement in areas of reading and spelling.  The National Adult Reading Test (NART) or reading section of the Wide Range Achievement Test (WRAT) was not utilized.  Dr. Rissenberg indicated that she utilized "hold" scores (e.g., tests that hold up well following any form of brain damage).  However, within the evaluation completed by Dr. Rissenberg, the most noteworthy "hold" test scores were on the WAIS-III information and vocabulary subtests with standard scores of 8 and 9, respectively.  These scores are clearly within the average and not high average range.

Dr. Rissenberg indicated "there is clear and objective evidence, as well as clinical evidence, of significant impairment in multiple areas of function".  Once again, the undersigned disagrees with this statement based on a dearth of comprehensive objective and valid neuropsychological test results.  Dr. Rissenberg's conclusion that the neuropsychological test results were "consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness" certainly cannot be ascertained by the neuropsychological test results, or lack thereof, reported.  While there is some performance variability, this, in and of itself, does not reflect organically induced cognitive impairment.  In fact, personality variables, adjustment difficulties, or other behavioral concomitants, might have contributed to the clinical picture.  Unfortunately, formal personality assessment was not administered by Dr. Rissenberg.  More importantly, and as previously noted, formal effort testing was not completed.  One cannot simply dismiss formal effort testing based on a few subtest scores or perceived test taking behaviors.  It is imperative that a neuropsychological assessment is completed in a valid fashion in order for the neuropsychologist to render an opinion with any degree of neuropsychological certainty.

Liberty002413

Nancy Winterer                                                    Re: Haley Spears
April 29, 2016                                                       Page 4 of 5

This coincides with a position paper of the National Academy of Neuropsychology which was approved in November, 2004.  While Dr. Rissenberg completed the claimant's evaluation as a clinical as opposed to a forensic evaluation, according to the above noted position paper, "assessment of response validity, as a component of a medically necessary evaluation, is medically necessary.  When the potential for secondary gain increases the incentive for symptom exaggeration or fabrication and/or when neuropsychologists become suspicious of insufficient effort or inaccurate or incomplete reporting, neuropsychologists can, and must, utilize symptom validity tests and procedures to assist in the determination of the validity of the information and test data obtained".  While Dr. Rissenberg may not have perceived the need for formal freestanding or embedded validity tests to be administered, it is the current practice in both clinical and forensic settings, that validity tests be administered in order to accurately identify the potential for invalid test results which clearly would result in invalid clinical interpretation.

<u>Analysis</u>

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
Please see my original analysis for details of past records. The current records do not offer any additional information from a neurologic standpoint. Dr. Rissenberg, a neuropsychologist, wrote a detailed letter regarding his opinion that Dr. Raymond's assessment was not accurate. As noted in my original report, I was asked to not opine on neuropsychological or cognitive issues so this is not relevant to my report. Dr. Zagar's note also details that he felt that the claimant was limited in functioning due to fatigue and cognitive issues so was unable to work, but as previously noted, opining on the cognitive issues and any impaired functioning in that regard will be yielded to Dr. Raymond for this report as per my instructions. From a neurologic standpoint there is no additional information that would alter my previous opinion that the evidence does not support impairment from a neurologic standpoint. As noted previously, the claimant complained intermittently of headaches but notes including 2009 and 2010 detailed that she had significant improvement and she has had consistently normal neurological examinations as detailed previously.

**Michael Raymond, PhD, ABN, Neuropsychology:**
Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of neuropsychological certainty that neurocognitive impairment is not supported within the time frame in question (9/27/08 – 3/31/15).  While Dr. Rissenberg raised concerns regarding the undersigned's clinical opinions and conclusions, the concerns were addressed by the undersigned as previously referenced.  With all due respect, the concerns raised by Dr. Rissenberg did not change or alter the undersigned's opinions as previously stated in the initial and addendum reports dated 2/13/16 and 3/16/16, respectively.  Furthermore, the neuropsychological test results (2010) are clearly obsolete and thus, they would not coincide with the claimant's current level of adaptive abilities (e.g., including the time frame through 3/31/15).

<u>Questions</u>
The below questions are answered for the timeframe of 9/27/2008 through 3/27/2009 and 3/28/2009 through 3/31/2015.  Please refer to the Analysis section above for additional details and rationale supporting this reviewer's opinions.

Liberty002414

Nancy Winterer                                                          Re: Haley Spears
April 29, 2016                                                          Page 5 of 5

**Dr. Kitei**

1.  **Please review Dr. Zagar's 4/6/16 response to the 3/4/16 multi-disciplinary peer review. Please indicate if Dr. Zagar's response changes your previous conclusions, and provide the medical/neurologic rationale to support your conclusions.**

    No, Dr. Zagar's response did not change my previous conclusions because there are no additional details offered regarding neurologic impairment. The previously listed diagnoses, including headaches, fatigue, joint pain, digestive problems, and cognitive complaints were discussed in my previous report and while Dr. Zagar's opinion is that the claimant was unable to work due to fatigue and cognitive issues, I was specifically asked to not opine on neuropsychological and cognitive issues because there is another reviewer opining on those issues and discussing the neuropsychological testing. My previous report discussed in detail why the evidence does not support impairment from a neurologic standpoint.

**Dr. Raymond**

1.  **Please review Dr. Rissenberg's 4/6/16 response to the neuropsychological portion of the 3/4/16 multidisciplinary per review. Please indicate if Dr. Rissenberg's response changes your previous conclusions, and provide the medical/neuropsychological rationale that support your conclusions.**

    As previously discussed within the body of this addendum, the review of previous and additional records do not change or alter the undersigned's previous clinical conclusions.  The rationale for this is noted above.

Sincerely,

Michael Raymond, PhD, ABN
Board Certified Neuropsychologist
New Jersey License # SIO2529

Daniel Kitei, DO, MA
Board Certified Neurologist
Board Certified Neuromuscular Medicine
Colorado License #47342

*All opinions in this report are solely the opinions of the author. There is no conflict of interest. There is no doctor/provider-patient treatment relationship, and the author did not personally examine the claimant. All opinions are advisory only, independent, and are based upon a reasonable degree of medical certainty and evidence-based medical concepts, considering all the data available at the time of preparation of this report.  This report is not intended as a recommendation regarding any decisions on a claim or administrative functions to be made or enforced. R3 does not make claim decisions.*

Liberty002415

# Curriculum Vitae

# Daniel J. Kitei D.O., M.A.
## Board Certified Neurologist and Neuromuscular Specialist

| MEDICAL TRAINING | |
|---|---|
| *2008* | *American Board of Psychiatry and Neurology*<br>Board Certified in Neurology |
| *2009* | *American Board of Psychiatry and Neurology*<br>Board Certified in Neuromuscular Medicine |
| *2008-2009* | *Harvard Medical School Neuromuscular Program*<br>Neuromuscular/EMG Fellowship<br>Massachusetts General Hospital<br>Brigham and Women's Hospital |
| *2005-2008* | *University of Connecticut Health Center*<br>Neurology Residency<br>Chief Resident 2007-2008<br>   Visiting Rotation at the University of California at San Francisco-Exposure to<br>MDA/ALS clinic, EMG/NCS, Single fiber EMG, Spine and nerve injury clinics<br>   Visiting Rotation at Stanford University-Exposure to MDA/ALS clinic,<br>EMG/NCS, intra-operative monitoring, Epilepsy Monitoring Unit, Grid Placement |
| *2004-2005* | *Tucson Hospitals Medical Education Program, Tucson, Arizona*<br>Transitional Internship |

| EDUCATION | |
|---|---|
| *2000-2004* | *Arizona College of Osteopathic Medicine, Glendale, Arizona*<br>Medical School<br>Neurology Rotations at Barrow Neurologic Institute, Mayo Clinic Scottsdale, AZ |
| *1999-2000* | *University of California at Santa Barbara*<br>Master's Degree<br>Religious Studies and Global Medicine |
| *1995-1999* | *University of California at Santa Barbara*<br>Bachelor of Arts<br>Pre-Med and Religious Studies |
| *1991-1995* | *Brophy College Preparatory, Phoenix, Arizona*<br>High School |

Liberty002416

| ACTIVITIES AND AWARDS | |
|---|---|
| *2008* | *University of Connecticut Resident Teacher Award*<br>Awarded each year to the resident who displayed the highest level of teaching excellence |
| *2006-2007* | *University of Connecticut Award for Excellence in Stroke Treatment*<br>Awarded to the Resident who showed the highest efficiency and quality in Acute Stroke Treatment |
| *2005-2007* | *American Council of Graduate Medical Education*<br>University of Connecticut Board Member<br>Creation and improvement of policy for the Capital Area Health Consortium |
| *2005-2007* | *University of Connecticut Resident Forum*<br>Neurology Residency Representative<br>Creation and improvement of policy for the University of Connecticut and associated hospitals |
| *2007* | *Internal Review Committee*<br>Reviewed individual UCONN residency programs with faculty members for quality of education and presented a resident perspective on particular program's strengths and weaknesses |
| *2003-2004* | *Arizona College Of Osteopathic Medicine Admissions Committee*<br>Student representative to admissions committee |
| *2002* | *Health Education Learning Programs*<br>Student of the Year 2002 |
| *1996-2000* | *University of California at Santa Barbara Academic Honors*<br>Graduated Cum Laude, Golden Key National Honor Society, Who's Who National Dean's List |
| *1993-1995* | *AZA Youth Organization*<br>Chapter President, Southwestern Regional Chairman |

| PUBLICATIONS AND RESEARCH | |
|---|---|
| *2010* | Eugene M, Kitei D, Silvers D. Clinical Reasoning: A 75-year-old woman with visual disturbances and unilateral ataxia. *Neurology* 2010; 75; e29 |
| *2008* | Kitei D, DiMario F. Childhood Orbital Pseudotumor: Case Report and Literature Review. *Journal of Child Neurology* 2008; 23(4) 425-430 |
| *2008* | Kitei, D, Lee N, MERCI Clot Retrieval in Acute Stroke-Comparing IVTPA, IATPA, MERCI Retrieval and Combination therapy (in progress) |
| *2005-2008* | *Hartford Hospital Stroke Center*<br>Participated in enrollment, examinations & data collection for multiple studies including the Multi-Merci Trial (Evaluating the efficacy of the MERCI clot retrieval device for acute ischemic stroke), The FAST trial (Evaluating Factor 7 for acute hemorrhagic stroke treatment), The PRoFESS Trial (comparing aggrenox and plavix for stroke prevention) |
| *2005* | *University of Arizona Diabetes Research Lab*<br>Research Assistant for basic science laboratory, genetic testing |

2

Liberty002417

| LECTURES AND PRESENTATIONS | |
|---|---|
| *2009* | *Swedish Medical Center Grand Rounds*<br>Neuromuscular Emergencies |
| *2009* | *Harvard Medical School Neuromuscular Program*<br>Brain-Computer Interface in neuromuscular disease |
| *2006-2007* | *University of Connecticut Medical School*<br>Guest lectures on Parkinson's Disease, Multiple Sclerosis, Physical Exam |
| *2007* | *University of Connecticut Department of Neurology Grand Rounds*<br>Acute Stroke Treatment-Review of current therapies and Presentation of Data<br>from Hartford Hospital-A Regional Stroke Center |
| *2005-2007* | *Neuromuscular Conferences, University of Connecticut Dept of Neurology*<br>Limb Girdle Muscular Dystrophy 2A-Clinical, pathological aspects<br>Myotonia-Disease states and electrolyte abnormalities<br>Muscle Cramps-Clinical causes and pathology |
| *2005-2007* | *Grand Rounds Case Presentations, University of Connecticut Dept of Neurology*<br>Creutzfeldt-Jacob Disease-Clinical, MRI, EEG, CSF findings<br>Microhemorrhages-The use of MRI for diagnosis and treatment<br>Carotid Dissection-Pathology and clinical presentation<br>Multiple Sclerosis-A rare spinal cord lesion presenting with painful feet<br>Venous Sinus Thrombosis-Evaluation and treatment |

| VOLUNTEER AND TEACHING HISTORY | |
|---|---|
| *2010-2011* | *Rocky Vista Medical School*<br>Clinical Assistant Professor |
| *2008-2009* | *Harvard Medical School*<br>Preceptor for Medical Student Neurology Education |
| *2002-2004* | *Maemonides Social Action Club of Midwestern University*<br>Vice President |
| *2001-2003* | *"Head Start" Health Care For Underprivileged Children*<br>Volunteer for medical exams and patient education, Phoenix, Arizona |
| *2001-2003* | *TOPS High School Sports Physicals*<br>Performed hundreds of physicals for underprivileged athletes, Phoenix, AZ |
| *1996-2003* | *Health Education Learning Programs*<br>Assistant for Medical Education, Phoenix, Arizona |
| *1998-2001* | *Union Hills Family Physicians*<br>Assistant to physicians, office managerial duties, Glendale, Arizona |
| *1996-1999* | *Campus Learning Assistance Programs*<br>Conducted math and physics tutorials for undergraduate students<br>University of California, Santa Barbara |
| *1994-1995* | *Arizona Recreation Center for the Handicapped*<br>Activity creation and supervision for physically and mentally disabled, Glendale,AZ |

3

Liberty002418

| WORK HISTORY | |
|---|---|
| *2011* | Rocky Mountain Neurology<br>Neurologist, Managing Partner |
| *2009-2010* | Blue Sky Neurosciences<br>Neurologist<br>Englewood, CO |
| *2006-2007* | Jefferson Radiology<br>Physician On Site<br>Hartford, Connecticut |

| MEMBERSHIPS AND LICENSURE | |
|---|---|
| *2009-2011* | *State of Colorado Medical License #47342* |
| *2006-2009* | *State of Connecticut Medical License #044585* |
| *2008-2009* | *State of Massachusetts Medical License #235826* |
| *2005-2008* | *American Council of Graduate Education Board Member* |
| *2005-2011* | *American Academy Of Neurology Member* |
| *2004-2011* | *American Medical Association Member* |
| *2004-2011* | *American Osteopathic Association Member* |

| HOBBIES | |
|---|---|
| *Tennis* | Ranked 19 in Southwestern United States Junior Tennis<br>Arizona Representative to Hermosillo, Mexico International Tennis Exchange |
| *Exercise* | Certified Personal Trainer and active in multiple sports |
| *Theater/TV* | Principal and featured roles in over 15 productions |
| *Poker* | Future World Poker Tour Winner (Hopefully) |
| *Travel* | Traveled extensively and always interested in a new place |

4

Liberty002419

<u>**CURRICULUM VITAE**</u>

**Michael J. Raymond**
**866-927-0184**


**EDUCATION:**

1981                      Ph.D.   Rehabilitation (Psychology), Florida
                          State University, Tallahassee, Florida

1978                      M.S.    Rehabilitation Counseling, University of
                          Scranton, Scranton, Pennsylvania

1974                      B.A.   History/Education, St. Francis College, Loretto,
                          Pennsylvania

**PROFESSIONAL EXPERIENCE:**

2010 – Present      **<u>Clinical Associate Professor</u>**
                        Department of Clinical Sciences, The Commonwealth
                        Medical College, Scranton, Pennsylvania.
                            Provide clinical practicum teaching and supervision of
                            medical students with primary emphasis in
                            clinical/forensic neuropsychology and rehabilitation.


2010 – Present      **<u>Consulting Neuropsychologist</u>**
                        Neuropsychological Rehabilitation Services
                        Neptune, New Jersey.

                            Provide comprehensive clinical and forensic
                            neuropsychological assessment and consultation.

2005 – Present      **<u>Neuropsychological Consultant</u>**
                        Behavioral Medical Interventions
                        Minneapolis, Minnesota.

Updated 5.5.14

Liberty002420

Provided clinical and forensic neuropsychological consultation.

2004 – 2010   **Director, Adult Neuropsychology Services**
Comprehensive Neuropsychological Specialties, Monmouth Beach, New Jersey.
Provide comprehensive clinical and forensic neuropsychological assessment and consultation.

2002 – Present   **Clinical Professor,**
Department of Psychology, Philadelphia College of Osteopathic Medicine, Philadelphia, Pennsylvania.
Provide clinical practicum teaching and supervision for doctoral psychology students with primary emphasis on clinical neuropsychology and rehabilitation.

1998 - 2000   **Visiting Professor,**
Trnava University, Graduate School of Public Health and Nursing, Trnava, Slovak Republic.
Taught graduate courses with primary emphasis on neuropathology, rehabilitation and neuropsychology.

1994 - 1997   **Adjunct Professor,**
Marywood University, Graduate School of Arts and Sciences (Psychology), Scranton, Pennsylvania.
Taught graduate level courses with primary emphasis on neuroanatomy, neuropsychological assessment and neurological disorders.

1992 - 2006   **Surveyor, Brain Injury Programs,**
Commission on Accreditation of Rehabilitation Facilities, Tucson, Arizona.

1990 - 2006   **Neuropsychologist,**
Monmouth Neuropsychology Associates, Red Bank, New Jersey.
Provided comprehensive clinical and forensic neuropsychological assessment and consultation.

Liberty002421

| | |
|---|---|
| 1988 - Present | **Director, Clinical/Forensic Neuropsychology,**<br>**Clinical Director, Brain Injury/Sports Concussion Program,**<br>The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |

Provide comprehensive inpatient/outpatient neuropsychological consultation to physicians, and multidisciplinary rehabilitation team, provide consultation to the Veteran's Administration Medical Center (VAMC), inservice training/education and research.  Provide expert forensic neuropsychological testimony.  Provide all managerial, administrative and supervisory duties to a five (5) person department, including cognitive rehabilitation and psychometry and sports concussion program affiliated with professional, college, and high school teams.

| | |
|---|---|
| 1986 – 1998 | **Neuropsychologist,** (part-time), Wyoming Valley Health Care System, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |

Provided comprehensive inpatient neuropsychological consultation to the psychiatry service, including adult, adolescent, children and addictive treatment programs.  Participated in biweekly staff meetings and inservice training.

| | |
|---|---|
| 1986 - 1988 | **Neuropsychologist, Director, Psychological Services,**<br>The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |

Provided comprehensive inpatient/outpatient neuropsychological consultations to the medical service and multidisciplinary rehabilitation team, pain/stress management, cognitive rehabilitation, psychotherapy, inservice training and research.  Provided all managerial, administrative and supervisory duties to seven (7) person Department of Psychological Services.  Developed a neuropsychological laboratory and contributed toward the development of a cognitive rehabilitation service and brain injury rehabilitation program.

Liberty002422

1985 - 1986     **Neuropsychologist,** Neurorehab Associates, Inc., Rochester New York.
> Provided comprehensive neuropsychological consultation including assessment and evaluation for day rehabilitation patients and outpatients and individual, family and group psychotherapy.  Responsible for the supervision of the neuropsychology service including a staff psychologist and three (3) psychometrists.  Contributed to the development of a comprehensive day rehabilitation service for neurologically impaired individuals. Provided consultation to the interdisciplinary rehabilitation team. Participated in weekly neurology grand rounds, The University of Rochester School of Medicine.

1982 - 1985     **Clinical Psychologist,** (part-time), Family Counseling Clinic, Mansfield, Pennsylvania.
> Provided intake/brief psychological evaluations and individual family psychotherapy.

1981 - 1985     **Clinical Psychologist,** Department of Rehabilitation Medicine, Clinical Psychology  Section, The Williamsport Hospital and Medical Center, Williamsport, Pennsylvania.
> Provided consultations to the medical service and multidisciplinary rehabilitation team, neuropsychological assessment and evaluation, pain/stress management, psychotherapy and inservice training.  Consultant and contributing editor to the Department of Sports Medicine.

1979 - 1981     **Graduate Assistant,** Department of Human Services and Studies, Florida State University, Tallahassee, Florida.
> Instructor:   Medical and Psychological Aspects of Disability, 5 hour undergraduate course.
>
> Supervisor:   Undergraduate intern and field experience, 7 quarters.
> Researcher:   Curriculum Development, Task Force of Independent Living.1979 – 1980

1979 - 1980     **Directed Individual Study**, Department of Psychology,

Liberty002423

Tallahassee Pain and Stress Management Institute, Tallahassee, Florida.
> Training and practice in pain/stress management utilizing a variety of biofeedback modalities and relaxation techniques.

1978 - 1979 **Psychological Associate**, Divine Providence Hospital, Community Mental Health Center, Williamsport, Pennsylvania.
> Provided individual, marital and family psychotherapy, psychological and neuropsychological assessment and evaluation, and consultation with the Lycoming County Prison.

1/78 - 6/78 **Clinical Psychology Intern**, Department of Rehabilitation Medicine, Neuropsychology Section, Geisinger Medical Center, Danville, Pennsylvania.
> Training and practice in medical consultations (i.e., neurology, pediatrics, rehabilitation medicine, psychiatry, etc.), provided neuropsychological assessment and evaluation involved with neurologyurology/neurosurgery conferences and rehabilitation medicine grand rounds.

9/77 - 12/77 **Graduate Practicum**, Department of Psychiatry, Clinical Psychology Section, VA Medical Center, Wilkes-Barre, Pennsylvania.
> Training and practice in psychiatric consultations, Individual/group therapy, and neuropsychological assessment.

9/77 - 12/77 **Graduate Practicum**, Department of Career Development, Williamsport Area Community College, Williamsport, Pennsylvania.
> Training and practice in individual and group vocational counseling, and psychological/vocational assessment and evaluation of college students and community residents.

1974 - 1976 **Supervisor**, Division of Distribution, Grand Union Company,

Liberty002424

Elmwood Park, New Jersey.
Supervised union personnel and clerical staff; majority of responsibilities included: productivity, cost analysis and inventory control.

**PRESENTATIONS:**

| | |
|---|---|
| November 2011 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Marco Island, Florida. |
| October 2011 | Behavioral Manifestations in Brain Injury.  Brain Injury Team Inservice.  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 2011 | Neurocognitive Deficits in Epilepsy.  Epilepsy Support Group, Wilkes-Barre, Pennsylvania. |
| May 2011 | Clinical and Forensic Neuropsychological Aspects of MTBI.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| May 2011 | Roundtable Discussion:  Future Trends in Sports Concussion Management.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| March 2011 | Neuropsychological Performance in a Patient Following Resection of a Vestibular Schwannoma. American College of Professional Neuropsychology 3rd Annual Conference, Las Vegas, Nevada. |
| March 2011 | Concussions. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 2010 | Schools Treat Concussions Seriously, Newspaper Interview/Article, The Citizen's Voice, Wilkes-Barre, Pennsylvania. |

Liberty002425

| | |
|---|---|
| November 2010 | Concussions Drawing More Attention, Newspaper Interview /Article, The Times Tribune, Scranton, Pennsylvania. |
| November 2010 | Use Your Head When Making Decisions About Sports Concussion, Wilkes-Barre Junior Penguins, Wilkes-Barre, Pennsylvania. |
| October 2010 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| October 2010 | Neuropsychological Consequences of Moyamoya Disease:  A Clinical Case Study.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| May 2010 | Speed that Hurts:  MVA & TBI:  WILK Radio, Wilkes-Barre, Pennsylvania. |
| February 2010 | Anoxic Encephalopathy Following Cardiac Arrest.  American College of Professional Neuropsychology Conference, Las Vegas, Nevada. |
| November 2009 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| October 2009 | Work-Related Mild Traumatic Brain Injury:  Forensic Neuropsychological Assessment 2009.  Northeast Regional Occupational Health and Safety Conference, Wilkes-Barre, Pennsylvania. |
| October 2009 | Clinical and Forensic Neuropsychology:  An Overview.  Brain Injury Rehabilitation Team, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |

Updated 5.5.2014                                7

Liberty002426

| | |
|---|---|
| April 2009 | Visual Perceptual Symptoms Associated with Right Hemispheric Pathology do not Affect Performance on the TOMM.  American College of Professional Neuropsychology Conference, San Diego, California. |
| March 2009 | Clinical Consideration in Sports Concussion Management.  Southeast Georgia Healthcare System, Brunswick, Georgia. |
| October 2008 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Neuropsychological Consequences of Autosomal Dominant Cerebellar Atrophy:  A Clinical Study.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Concussion Among High School Athletes.  Sports Fever, 1340 FOX Sports Radio, Wilkes-Barre, Pennsylvania. |
| September 2008 | Traumatic Brain Injury:  Healing the Body and Mind. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 2008 | Expect the Unexpected:  Signs and Symptoms of TBI. Pastoral Care Conference, Wilkes-Barre, Pennsylvania |
| August 2008 | Clinical and Legal Implications of Sports Concussion. John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2008 | Consequences of Sports Concussion.  Sports Fever, WSWB TV, Wilkes-Barre, Pennsylvania. |
| June 2008 | Signs, Symptoms, and Treatment of Sports Concussion in High School Athletes.  Toyota High School Sports Show, FOX 56 TV, Wilkes-Barre, Pennsylvania. |

Liberty002427

February 2008          Sports Concussion:  Tackling the Common Myths.  You
                       Be The Judge, FOX 56 TV, Wilkes-Barre, Pennsylvania.

February 2008          Traumatic Brain Injury Overview.  You Be The Judge,
                       FOX 56 TV, Wilkes-Barre, Pennsylvania.

February 2008          Mild Traumatic Brain Injury in the Workplace:  Clinical
                       and Forensic Neuropsychological Considerations.  PES1:
                       Worker's Compensation Conference, Las Vegas, Nevada.

November 2007          Cumulative Effects of Multiple Concussion:  A
                       Neuropsychological Case Study.  The National Academy
                       of Neuropsychology Annual Meeting, Scottsdale,
                       Arizona.

November 2007          The American Board of Professional Neuropsychology
                       Preparation for Application, Work Sample Submission
                       and Examination.  Special Topic Workshop.  The
                       National Academy of Neuropsychology Annual Meeting,
                       Scottsdale, Arizona.

October 2007           Management of Sports Concussion; Sue Henry Show,
                       WILK Radio, Wilkes-Barre, Pennsylvania.

September 2007         Current Trends in Sports Concussion Management,
                       Sports Talk Saturday, WILK Radio, Wilkes-Barre,
                       Pennsylvania.

March 2007             Work-Related Mild Traumatic Brain Injury:  Forensic
                       Neuropsychological Assessment.  Workers Injury Law
                       and Advocacy Group, 12th Annual Conference, San
                       Antonio, Texas.

March 2007             Ethical Representation of Brain Injured Workers.
                       Workers Injury Law and Advocacy Group, 12th Annual
                       Conference, San Antonio, Texas.

November 2006          Sports Concussion:  An Overview for the High School

Updated 5.5.2014                          9

Liberty002428

|  | Athlete.  Wilkes-Barre Area School District, Wilkes-Barre, Pennsylvania. |
|---|---|
| October 2006 | Sacred Stories of Sudden Disability, Moderator, Panel Discussion,  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 2006 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas. |
| October 2006 | Neuropsychological Sequela in a Patient with a Tumefactive Demyelinating Lesion.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas. |
| September 2006 | Sports Concussion Management, Sports Talk, WILK Radio, Wilkes-Barre, Pennsylvania. |
| May 2006 | Sports Concussion, Advance (2006, 16, 18), Interview, King of Prussia, Pennsylvania. |
| May 2006 | Survivor/Family Panel Discussion; Moderator, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| May 2006 | Neuropsychological Assessment:  Clinical/Forensic Implications, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| May 2006 | Sports Concussion, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| April 2006 | Sports Concussion Management, WNEP-TV Health Watch. |
| April 2006 | Program Aims to Assess Concussions.  Times Leader |

Liberty002429

|  | Newspaper Interview (April 25, 2006), Wilkes-Barre, Pennsylvania. |
|---|---|
| March 2006 | Traumatic Brain Injury and Concussion Management, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2005 | Medical Overview: Traumatic Brain Injuries. The Critical Medical, Legal and Funding Issues for Children and Adults with Spinal Cord and Traumatic Brain Injuries, Wilkes-Barre, Pennsylvania. |
| October 2005 | Test of Memory Malingering (TOMM) Performance in Persons with Right Hemisphere Lesions. The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| October 2005 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination. Special Topic Workshop. The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| August 2005 | Sports Concussion Management, Sports Medicine Conference, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2004 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission, and Examination. Special Topic Workshop. The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |
| November 2004 | Neuropsychological Findings in a Patient with HELLP Syndrome. The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |

Updated 5.5.2014                                    11

Liberty002430

| | |
|---|---|
| June 2004 | Strategies & Techniques to Improve Adjustment Difficulties following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| June 2004 | Neuropsychological Assessment of Mild Brain Injury in Patients with Spinal Injuries, Brain Injury Association of Pennsylvania Annual Meeting, Harrisburg, Pennsylvania. |
| February 2004 | Community Awareness of Traumatic Brain Injury, Catholic Television Network, Scranton, Pennsylvania. |
| October 2003 | Left Temporal Parietal Infarct Secondary to Idiopathic Thrombocytopenia Purpura:  A Neuropsychological Case Study.  The National Academy of Neuropsychology Annual Meeting, Dallas, Texas. |
| March 2003 | Neurocognitive and Behavioral Concomitants of Traumatic Brain and Spinal Injuries, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |
| November 2002 | Neuropsychological Manifestations of Multiple Sclerosis, National Multiple Sclerosis Society Meeting, Matamoras, Pennsylvania. |
| October 2002 | Neuropsychological Performance in a Patient with Von Hippel-Lindau Disease, The National Academy of Neuropsychology Annual Meeting, Miami, Florida. |
| August 2002 | Family Intervention Strategies Following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2002 | Cognitive and Behavioral Symptoms of Sjogren Syndrome, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| November 2001 | Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, Allied Services John Heinz Institute of Rehabilitation |

Liberty002431

Medicine, Wilkes-Barre, Pennsylvania.

| | |
|---|---|
| November 2001 | Neuropsychological Manifestations in a Case of Sjogren Syndrome , The National Academy of Neuropsychology Annual Meeting, San Francisco, California. |
| May 2001 | Neuropsychological Aspects of Mild Brain Injury, Association of Rehabilitation Nurses, Wilkes-Barre, Pennsylvania. |
| November 2000 | Central Neurocytoma:  Serial Neuropsychological Findings, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida. |
| November 2000 | Neuropsychological Assessment and Treatment of Multiple Sclerosis, National Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania. |
| October 2000 | Post Concussion:  An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 2000 | An Expert Opinion on Concussion, Times Leader Newspaper (interview), Wilkes-Barre, Pennsylvania. |
| May 2000 | Neuropsychological Assessment of Acquired Brain Injuries, Luzerne/Lackawanna County Critical Care Association, Moosic, Pennsylvania. |
| November 1999 | Neurobehavioral Sequelae of Immunotherapy Anaphylaxis, The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas. |
| October 1999 | Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1999 | Signs, Symptoms, and Suggestions of Everyday |

Liberty002432

|  | Concussion, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
|---|---|
| August 1999 | Concussion in Sports, WWDL 105 FM Radio, Scranton, Pennsylvania. |
| May 1999 | Symptom Exaggeration and Mild Traumatic Brain Injury: An Unbelievable Case, Advanced Workshop in Applied Clinical Neuropsychology, The Reitan Society Annual Meeting, San Diego, California. |
| April 1999 | Neurobehavioral Consequences of Acquired Brain Injury, Outpatient Services, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1998 | Repeal of the Helmet Law; Clinical Considerations, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| November 1998 | Brainwave-R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation, The Reitan Society Meeting, 18th Annual Conference of the National Academy of Neuropsychology, Washington, D.C. |
| September 1998 | Multidisciplinary Approach to Rehabilitation, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 1998 | Viral Encephalitis: A Case Study Based on Serial HRNB Performances, The Reitan Society Annual Meeting, Tuscon, Arizona. |
| August 1998 | International Teleconference on Rehabilitation, University of Scranton, Scranton, Pennsylvania. |
| June 1998 | Post Concussion: An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |

Liberty002433

| | |
|---|---|
| May 1998 | Neurological Rehabilitation in the United States; Panel Discussion, Trnava University, Slovak Republic. |
| May 1998 | Model Brain Injury Program; Panel Discussion, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| May 1998 | Major Consequences of Mild Brain Injury, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| April 1998 | Common Misconceptions about Brain Injury Among Survivors and Family Members, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| January 1998 | Mild Brain Injury; Multispecialty Perspectives, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 1997 | Photostimulation and Seizures: The Japanese Cartoon Dilemma.  WARM Radio (590 AM), Pittston, Pennsylvania. |
| November 1997 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Neuropsychological Dysfunction in a Mixed Dominant Patient Following a Left Temporoparietal Abscess, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Recovery from Traumatic Brain Injury: A Cognitive Rehabilitation Case Study, The Brain Injury Association Annual National Symposium, Philadelphia, Pennsylvania. |
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The |

Liberty002434

|  | John Heinz Institute of Rehabilitation Medicine, Tunkhannock Clinic, Tunkhannock, Pennsylvania. |
|---|---|
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The John Heinz Institute of Rehabilitation Medicine, Hazleton Clinic, Hazleton, Pennsylvania. |
| February 1997 | The Effects of Traumatic Brain Injury on the Survivor and Family, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1996 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| November 1996 | Neuropsychological Dysfunction in a Patient with Multiple Meningiomas, Reitan Society Meeting, New Orleans, Louisiana. |
| April 1996 | Neurobehavioral Consequences of Brain Injury, Valley Crest Nursing Facility, Wilkes-Barre, Pennsylvania. |
| November 1995 | Traumatic Brain Injuries, Panel Discussion, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| November 1995 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, San Francisco, California. |
| November 1995 | Neuropsychological Aspects of Posthallucinogen Perception Disorder, Reitan Society Meeting, San Francisco, California. |
| October 1995 | Neurosurgical/Neuropsychological Collaboration in the |

Updated 5.5.2014                                        16

Liberty002435

Diagnosis and Treatment of Meningioma, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania.

| | |
|---|---|
| August 1995 | Current Perspectives of Brain Injury Rehabilitation, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 1995 | Forensic Neuropsychological Considerations in Traumatic Brain Injury Cases, Litigation Department, Hourigan, Kluger, Spohrer, Quinn, Wilkes-Barre, Pennsylvania. |
| March 1995 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1995 | Brainwave-R: A Comprehensive Cognitive Rehabilitation Program, Applied Cognitive Rehabilitation Training Seminar, Albuquerque, New Mexico. |
| December 1994 | Assessment of Malingering (part 2), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Assessment of Malingering (part 1), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Rehabilitation Overview, Medical Staff, Headley Court, Surrey, England. |
| November 1994 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida. |
| November 1994 | The Effects of Unilateral Vascular Lesions and Gender on Visual-Spatial and Verbal Auditory Attention, The National Academy of Neuropsychology Annual |

Liberty002436

Meeting, Orlando, Florida.

November 1994          Predictive Validity of Neuropsychological Deficit Scale
                      and Halstead Impairment Index in Mild Traumatic Brain

                      Injury:  A Two Center Study, The Reitan Society
                      Meeting, Orlando, Florida.

April 1994            Neurobehavioral Consequences of Acquired Brain Injury,
                      Meadows Nursing and Rehabilitation Center,  Dallas,
                      Pennsylvania.

February 1994         Summary Challenge Moderator:  The National Forum
                      Conference on Federal Healthcare Legislation,
                      Washington, D.C.

December 1993         Neuropsychological Overview, Wilkes University
                      Nursing Students, The John Heinz Institute of
                      Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

December 1993         Traumatic Brain Injury:  The Transition from
                      Rehabilitation to College, Luzerne County Community
                      College, Nanticoke, Pennsylvania.

November 1993         Grand Rounds:  Penetrating Head Injury Without
                      Neuropsychological Deficits, The Susquehanna
                      Neuropsychology Group, Wilkes-Barre, Pennsylvania.

November 1993         Medicolegal Aspects of Epilepsy, The John Heinz
                      Institute of Rehabilitation Medicine, Wilkes-Barre,
                      Pennsylvania.

October 1993          Moderator: Reitan Society Meeting, The National
                      Academy of Neuropsychology Annual Meeting,
                      Phoenix, Arizona.

October 1993          The Neuropsychologist as Consultant in Rehabilitation,
                      The National Academy of Neuropsychology Annual
                      Meeting, Phoenix, Arizona.

Liberty002437

| | |
|---|---|
| May 1993 | Neuropsychological Assessment of Traumatic Brain Injury, Head Trauma Awareness Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1993 | Head Injuries, Call The Doctor, WVIA TV, Avoca, Pennsylvania |
| February 1993 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1993 | The Transition from Rehabilitation to School, Luzerne Intermediate Unit, Wilkes-Barre, Pennsylvania. |
| November 1992 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Neuropsychology  Overview:  College Misericordia Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Behavioral  Problems Following Traumatic Brain Injury, Head Injury Support Group, Wilkes-Barre, Pennsylvania. |
| May 1992 | Minor Head Injury:  Neuropsychological Perspectives, The Second Annual Educational Conference of the JMA Foundation, Baltimore, Maryland. |
| April 1992 | Neuropsychological Consequences of Traumatic Brain Injury, Head Trauma Symposium, Marywood University, Scranton, Pennsylvania. |
| April 1992 | Neuropsychological Aspects of Minor Head Injury, Mild Traumatic Brain Injury Conference, Reading, Pennsylvania. |
| March 1992 | Neuropsychological Rehabilitation:  A Clinical Overview, |

Liberty002438

American Rehabilitation Nursing Association, Wilkes-Barre, Pennsylvania.

| | |
|---|---|
| March 1992 | Neuropsychology Overview, Lycoming College Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| February 1992 | Halstead - Reitan Neuropsychological Battery (2 Part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| February 1992 | The Use of the Knox's Cube Test and Digit Span in Assessing Memory and Attention, International Neuropsychological Society Annual Meeting, San Diego California. |
| February 1992 | Neuropsychological Assessment:  An Adjunct to Neurological Diagnosis, The Seventh Annual University of Scranton Psychology Conference, Scranton, Pennsylvania. |
| January 1992 | Management of the Aggressive Patient, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1991 | Medicolegal Aspects of Symptom Exaggeration and Malingering:  A Clinical Update, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1991 | Antiseizure Medication and Cognitive Performance, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 1991 | Minor Head Injury Rehabilitation, PARF Conference, Harrisburg, Pennsylvania. |

Liberty002439

| | |
|---|---|
| August 1991 | Head Trauma Rehabilitation Overview, St. Francis Medical Center, Poughkeepsie, New York. |
| June 1991 | Helmet Law and Head Injury, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| May 1991 | Neuropsychology Overview, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1991 | Neuropsychological Aspects of Minor Head Injury, The First Annual Educational Conference of The National Brain Injury Research Foundation, Washington, D.C. |
| March 1991 | Neuropsychological Sequelae in Acute Carbon Monoxide Encephalopathy, The Sixth National Traumatic Brain Injury Symposium, Baltimore, Maryland. |
| February 1991 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The Sixth Annual University of Scranton Psychology Conference, Scranton, Pennsylvania. |
| January 1991 | Depression vs. Dementia, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| November 1990 | Medicological Aspects of Competency in Dementia, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1990 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The National Academy of Neuropsychology Annual Meeting, Reno, Nevada. |
| October 1990 | Head Trauma Rehabilitation, Southern Tier Independence Center Head Injury Conference, Binghamton, New York. |

Liberty002440

| | |
|---|---|
| August 1990 | Overview of Neuropsychological/Cognitive Services, Veterans Administration Medical Center, Wilkes-Barre, Pennsylvania. |
| June 1990 | Neuropsychological Assessment Tutorial, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| March 1990 | Neuropsychological Consideration of Minor Head Injury, Crawford Rehabilitation Services, Denver, Colorado. |
| February 1990 | Medicolegal Aspects of Malingering:  A Neuropsychological Perspective, Central Rehabilitation Associates, Inc., Camp Hill, Pennsylvania. |
| January 1990 | Minor Head Injury, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| December 1989 | Head Trauma Rehabilitation:  Behavioral Management Strategies, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1989 | Medicolegal Aspects of Symptom Exaggeration and Malingering, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1989 | Halstead-Reitan Neuropsychological Battery (3 part series), Psychology Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| June 1989 | Interpersonal Communication Training, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| May 1989 | Neuropsychology Update:  Post-Concussive Syndrome, Department of Neurology/Neurosurgery, Community Medical Center, Scranton, Pennsylvania. |

Updated 5.5.2014                              22

Liberty002441

| | |
|---|---|
| March 1989 | Current Trends in Head Trauma Rehabilitation, WARM Radio, Avoca, Pennsylvania. |
| March 1989 | Personal Injury Litigation, A Neuropsychological Perspective, Luzerne County Bar and Library Association, Wilkes-Barre, Pennsylvania. |
| December 1988 | Neuropsychological Deficit Scale:  A Clinical Case Review, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| December 1988 | WAIS-R Implications in Neuropsychological Assessment, (3 part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1988 | Neuropsychological Aspects of Diffuse Histiocytic Lymphoma, The National Academy of Neuropsychologists Annual Meeting, Orlando, Florida. |
| November 1988 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1988 | Halstead-Reitan Neuropsychological Battery, Graduate Psychology Class, Marywood College, Scranton, Pennsylvania. |
| November 1988 | Wechsler Memory Scale-Revised, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| September 1988 | Head Trauma Rehabilitation, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| September 1988 | Neuropsychological Investigation in Traumatic Brain Injury:  A Cognitive Rehabilitation Case Study, Cognitive Rehabilitation: Community Reintegration Through |

Liberty002442

Scientifically Based Practice, Richmond, Virginia.

| | |
|---|---|
| June 1988 | Neuropsychology Overview, United Rehabilitation Services, Wilkes-Barre, Pennsylvania. |
| June 1988 | Behavioral Sequelae of Stroke, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| February 1988 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The Fourth Annual Psychology Conference, University of Scranton, Scranton, Pennsylvania. |
| November 1987 | Neuropsychological Assessment (3 part series), Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 1987 | Worker's Compensation Developments - 1987; Neuropsychological Testimony, The Dickinson School of Law, Carlisle, Pennsylvania. |
| October 1987 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The National Academy of Neuropsychologists Annual Meeting, Chicago, Illinois. |
| May 1987 | Psychological Considerations in Multiple Sclerosis, Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania. |
| March 1987 | Neuropsychological Assessment:  Halstead-Reitan Battery, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| March 1987 | Psychological Considerations in Stroke Rehabilitation, Meadows Nursing Facility, Dallas, Pennsylvania. |
| February 1987 | Similar Neuropsychological Findings from |

Liberty002443

Cardiovascular Abnormalities:  A Comparison Case Study, The Third Annual Psychology  Conference, University of Scranton, Scranton, Pennsylvania.

February 1987 — Neuropsychological Assessment:  Halstead-Reitan Battery, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania.

February 1987 — Behavioral Sequelae of Head Trauma, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre,  Pennsylvania.

February 1987 — WAIS-R Implications in Neuropsychological Assessment, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

January 1987 — Pain Management for the Elderly, Senior Citizen Group, Salvation Army, Wilkes-Barre, Pennsylvania.

January 1987 — Introduction to Neuropsychological Assessment, Department of  Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

October 1986 — Similar Neuropsychological Findings from Cardiovascular Abnormalities:  A Comparison Case Study, The National Academy of Neuropsychologists Annual Meeting, Las Vegas, Nevada.

August 1986 — WAIS-R Implications in Neuropsychological Assessment, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

May 1986 — Bedside Neuropsychological Examination, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

Liberty002444

| | |
|---|---|
| December 1985 | Differential Diagnosis of Dementia, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| August 1985 | Halstead-Reitan Neuropsychological Battery, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| October 1984 | Differential Intellectual Sequelae of Right Hemisphere CVA in Left vs. Right-Handed Patients.  The National Academy of Neuropsychologists Annual Meeting, San Diego, California. |
| March 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part II, Sunbury, Pennsylvania. |
| January 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part I, Sunbury, Pennsylvania. |
| June 1983 | Neuropsychology Inservice, Department of Nursing, Williamsport Hospital, Williamsport, Pennsylvania. |
| May 1983 | Learning Disabilities and Neuropsychological Assessment, Office of Vocational Rehabilitation, Williamsport, Pennsylvania. |
| November 1982 | Sports Psychology Winter Workshop, The Department of Sports Medicine, Williamsport Hospital, Williamsport, Pennsylvania. |
| March 1982 | Psychological Aspects of Asthma, The Central Pennsylvania Lung and Health Service Association, Williamsport, Pennsylvania. |
| February 1982 | Coping with the Cancer Patient, Department of Hematology/Oncology, Williamsport Hospital, Williamsport, Pennsylvania. |

Liberty002445

**BOARDS AND COMMITTEES:**

| | |
|---|---|
| 2007 – Present | National Alumni Board of Directors, Florida State University Alumni Association, Tallahassee, Florida. |
| 2003 – Present | Medical Advisor, National Brain and Spinal Cord Injury Prevention Program, Think First Program, Wilkes-Barre, Pennsylvania. |
| 2001 – 2002 | Examiner and Site Coordinator for Standardization Sample of the Reynolds Intellectual Assessment Scales (RIAS), Psychological Assessment Resources (PAR), Lutz, Florida. |
| 2001 – 2005 | Manuscript Reviewer, Rehabilitation Psychology, Washington, D.C. |
| 2000 – 2005 | Member, Clinical Practitioner Task Force:  National Academy of Neuropsychology, Denver, Colorado. |
| 1999 – 2002 | Board Member, Coalition of Clinical Practitioners in Neuropsychology, Tucson, Arizona. |
| 1999 – 2000 | President, Reitan Society, Tucson, Arizona. |
| 1998 - Present | Editorial Board, Journal of Cognitive Rehabilitation, Indianapolis, Indiana. |
| 1997 - 2006 | Editorial Board, Journal of Forensic Neuropsychology, Dallas, Texas. |
| 1996 - Present | New Jersey Board of Psychological Examiners (Examiner; Neuropsychology) Newark, New Jersey. |
| 1996 - Present | Editorial Board, The Professional Neuropsychologist. Bethesda, Maryland. |
| 1996 – 1997 | APA Continuing Education Committee, Marywood |

Liberty002446

University, Scranton, Pennsylvania.

| | |
|---|---|
| 1996 - 1998 | Professional Affairs Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1995 - 1998 | Vice-President, Reitan Society, Danville, Pennsylvania. |
| 1995 – 2007 | President, American College of Professional Neuropsychology, White River Junction, Vermont. |
| 1994 - 1997 | Chairperson, Public Relations Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1994 - Present | Executive Director, American Board of Professional Neuropsychology, White River Junction, Vermont. |
| 1993 - 2006 | Consulting Editor, Archives of Clinical Neuropsychology College Station, Texas. |
| 1993 - 1995 | Co-Chairperson, Reitan Society, Danville, Pennsylvania. |
| 1993 - 1997 | Program Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1993 - 1994 | Coordinator, Professional Lecture Series, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1992 – 2000 | Editorial Board, Allied Services, Scranton, Pennsylvania. |
| 1992 - 1993 | Reitan Society Steering Committee, Danville, Pennsylvania. |
| 1992 - 1998 | Physicians Health Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1992 - 2006 | Commission on Accreditation of Rehabilitation Facilities (CARF), Surveyor, Tucson, Arizona. |

Liberty002447

| | |
|---|---|
| 1991 - Present | American Board of Professional Neuropsychology (Examiner) White River Junction, Vermont. |
| 1989 - 1994 | Medical Advisory Council, The National Brain Injury Research Foundation, Washington, D.C. |
| 1989 - 1994 | Editorial Board, (Associate Editor), The Journal of Head Injury, Washington, D.C. |
| 1989 - 2007 | Research Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - Present | Medical Records Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - Present | Brain Injury Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2007 | Quality Assurance Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2008 | Medical Staff Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - 1988 | Advisory Board Member, NHIF Northeast Region, Wilkes-Barre, Pennsylvania. |
| 1986 - 1987 | Patient/Family Education Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1985 - 1986 | Board Member, Neurorehab Associates, Inc., Rochester, New York. |
| 1985 - 1986 | Board Member, NHIF Eastern Region, Rochester, New York. |
| 1984 - 1986 | Board Member, NHIF Eastern Region, Williamsport, Pennsylvania. |

Liberty002448

| 1983 - 1985 | Employee Health, Fitness and Recreation Program, Williamsport Hospital, Williamsport, Pennsylvania. |
| 1982 - 1985 | Board Member, Counseling Clinic, United Methodist Home for Children, Mansfield, Pennsylvania. |
| 1981 - 1985 | Behavioral Science Committee, Williamsport Hospital, Williamsport, Pennsylvania. |

**CERTIFICATION AND LICENSURE:**

American Board of Forensic Examiners,
Diplomate (1303) (Neuropsychology)
American Board of Professional Disability Consultants,
Diplomate (P-132)
American Board of Professional Neuropsychology,
Diplomate (232)
American Board of  Professional Neuropsychology,
Added Qualifications in Rehabilitation (112) and
Forensics (127)
ImPACT Consultant, Sports Concussion Management
New Jersey State Board of Psychological Examiners
(SI02529)

**AWARDS AND HONORS:**

Healthcare Hero Award, Times Leader, 2010
Distinguished Neuropsychologist Award, American Board of
Professional Neuropsychology, 2003
Ad-Hoc Member on Rehabilitation, Hospital Association of
Pennsylvania, 1999.
Charter Member, Coalition of Clinical Practitioners in
Neuropsychology, 1999.
President, Reitan Society, 1998 – 2000.
Honorary Professorship, Trnava University, 1998.

Liberty002449

Charter Member, Reitan Society, 1997.
Diplomate, American Board of Forensic Examiners, 1995.
Distinguished Alumnus Award in Medicine, St. Francis College, 1995.
Fellow, American College of Professional Neuropsychology, 1995.
Fellow, National Academy of Neuropsychology, 1994.
Diplomate, American Board of Professional Disability Consultants,
    1993.
Diplomate, American Board of Professional Neuropsychology, 1991.
Fellow, Pennsylvania Psychological Association, 1990.
Graduate Assistantship, Florida State University, 1979 - 1981.
Rho Chi  Sigma, Rehabilitation Counseling Services Honor Society,
    1979.
Rehabilitation Services Administration Traineeship Award,
    1976 - 1978.


**PROFESSIONAL MEMBERSHIPS:**

American Board of Forensic Examiners (Diplomate)
American Board of Professional Neuropsychology (Diplomate)
American College of Forensic Examiners
American College of Professional Neuropsychology (Fellow)
American Psychological Association; (1, 22, 40)
Brain Injury Association
Coalition of Neuropsychology (Charter Member)
International Neuropsychological Society
National Academy of Neuropsychology (Fellow)
National Brain Injury Research Foundation
New Jersey Neuropsychological Society
Reitan Society (President, Vice President)
Society for Cognitive Rehabilitation
Susquehanna Neuropsychology Group (Past President)
National Brain and Spinal Cord Injury Prevention Program; Think
First Program (Medical Advisor)

**RESEARCH/PUBLICATIONS:**

Raymond, M.J. (in press).  Neuropsychological performance in a
    Patient following resection of a vestibular schwannoma.

Liberty002450

**Applied Neuropsychology** (abstract).

Raymond, M.J. (2010).  Neuropsychological consequences of
     Moyamoya Disease:  A clinical case study.  **Archives of
     Clinical Neuropsychology, 25,** 6 (abstract).


Raymond, M.J. (2010).  Anoxic encephalopathy following
     cardiac arrest.  **Applied Neuropsychology, 17,** 3 (abstract).

Bennett, T.L. & Raymond, M.J. (2010).  Neuropsychological
     assessment in disability determination, fitness for duty and
     rehabilitation planning.  In A.M. Horton & L.C. Hartlage (Eds).
     **Handbook of Forensic Neuropsychology**, 2nd edition, New
     York, Springer.

Sewick, B. & Raymond, M.J. (2009).  Visual perceptual
     symptoms associated with right hemisphere pathology do not
     affect performance on the Test of Memory Malingering
     (TOMM).  **Applied Neuropsychology, 16,** 4 (abstract).

Raymond, M.J. (2008).  Neuropsychological consequences of
     autosomal dominant cerebellar atrophy:  a clinical study.
     **Archives of Clinical Neuropsychology, 23,** 6 (abstract).

Bennett, T.L. & Raymond, M.J. (2008).  The neuropsychology
     of traumatic brain injury.  In A.M. Horton, D. Wedding & J.
     Webster (Eds.).  **The Neuropsychology Handbook**, Volume 3,
     New York, Springer.


Raymond, M.J. (2007).  Work-related mild traumatic brain injury:
     forensic neuropsychological assessment.  **Worker's First
     Watch, Fall**.

Raymond, M.J. (2007).  Cumulative effects of multiple concussions:  a
     neuropsychological case study.  **Archives of Clinical
     Neuropsychology, 22,** 7 (abstract).


Raymond, M.J. (2007).  Playball:  not so fast my friend; a sports
     concussion case study.  **ImPACT Newsletter, Spring**.

Liberty002451

Raymond, M.J. (2006).  Neuropsychological sequela in a patient with a tumefactive demyelinating lesion.  **Archives of Clinical Neuropsychology, 21,** 6 (abstract).

Raymond, M.J. & Sewick, B.G. (2005).  Test of Memory Malingering (TOMM) performance in persons with right hemispheric lesions.  **Archives of Clinical Neuropsychology, 20,** 7 (abstract).

Raymond, M.J. (2005).  Neuropsychological profile of a patient with a CSF assay suggestive of Alzheimer's Disease.  **Applied Neuropsychology**, **12,** 4 (abstract).

Raymond, M.J. (2004).  Neuropsychological findings in a patient with HELLP syndrome.  **Archives of Clinical Neuropsychology, 19**, 7 (abstract).

Raymond, M.J. (2003).  Forensic neuropsychological assessment in cases of mild traumatic brain injury.  **Workers First Watch, 3,** 3.

Raymond, M. J. (2003).  Left temporal parietal infarct secondary to Idiopathic Thrombocytopenia Purpura:  A neuropsychological case study.  **Archives of Clinical Neuropsychology, 18,** 8 (abstract).

Bennett, T.L. & Raymond, M.J. (2003).  Utilizing neuropsychological testing in disability determination and rehabilitation planning. In  A. M. Horton & L.C. Hartlage (Eds.), **Handbook of Forensic Neuropsychology**, New York, Springer.

Raymond, M. J. (2003). Neuropsychological features of Von Hippel-Lindau disease.  **New Jersey Neuropsychological Society Newsletter, Winter/Spring.**

Raymond, M. J. (2002).  Cognitive and behavioral symptoms in a case of Sjogren syndrome. **Journal of Cognitive**

Liberty002452

**Rehabilitation, Fall.**

Raymond, M. J. (2002).  Neuropsychological performance in a case of Von Hippel-Lindau disease.  **Archives of Clinical Neuropsychology,  17,** 8 (abstract).

Raymond, M.J. (2001).  Neuropsychological manifestations in a case of Sjogren syndrome. **Archives of Clinical Neuropsychology, 16**, 8 (abstract).

Raymond, M.J. (2000).  Central Neurocytoma:  serial neuropsychological findings.  **Archives of Clinical Neuropsychology, 15,** 8 (abstract).

Raymond, M. J. (1999).  Symptom exaggeration and mild traumatic brain injury:  An unbelievable case.  **Reitan Society Bulletin, 5** (abstract).

Raymond, M. J. (1999).  Neurobehavioral sequelae of immunotherapy anaphylaxis.  **Archives of Clinical Neuropsychology, 14,** 8 (abstract).

Raymond, M.J., Bewick, K.C., Bennett, T.L., Malia, K.B. (1999).  A comprehensive functional approach to brain injury rehabilitation.  **Brain Injury Source, Fall.**

Raymond, M.J., Castellino, R.M. (1999).  The role of the clinical neuropsychologist in the assessment and treatment of rehabilitation patients.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3.

Raymond, M.J., Bewick, K.C., Kennedy, A. & Duffy, T.F. (1999).  A model program for brain injury rehabilitation.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3.

Raymond, M.J. & Bennett, T.L. (1999).  Introduction and overview.  In M.J. Raymond, T.L. Bennett, L.C. Hartlage & C.M. Cullum (Eds.), **Mild Traumatic Brain Injury: A Clinician's**

Liberty002453

**Guide**, Austin, Texas: Pro-Ed.

Bennett, T.L. & Raymond, M.J. (1999). Psychotherapeutic
    interventions for individuals with mild traumatic brain injury.
    In  M.J. Raymond, T.L. Bennett, L.C. Hartlage &

    C.M. Cullum (Eds.), **Mild Traumatic Brian Injury: A
    Clinician's Guide**, Austin, Texas: Pro-Ed.

Raymond, M.J., Bennett, T.L., Hartlage, L.C., & Cullum, C.M.
    (1999)**. Mild Traumatic Brain Injury: A Clinician's
    Guide,** Austin, Texas: Pro-Ed.

Raymond, M.J. (1998).  Viral encephalitis; A case study based on
    serial HRNB performance.  **Reitan Society Bulletin, 4**
    (abstract).

Malia, K.B., Raymond, M.J., Bewick, K.C., & Bennett, T.L.
    (1998). Information processing deficits and brain
    injury: Preliminary results, **Neuro Rehabilitation**, **11**, 3.

Raymond, M.J. (1998).  Post concussion: An often neglected
    syndrome.  **Northeast Rehab.  September/October**.

Bennett, T.L., Raymond, M.J., Malia, K.B., Bewick, K.C., Linton,
    B.S. (1998).  Rehabilitation of attention and concentration
    deficits following brain injury.  **Journal of Cognitive
    Rehabilitation,  March/April.**

Raymond, M.J. (1998).  Neuropsychological dysfunction in a mixed
    dominant patient following a left temporoparietal abscess.
    **Archives of Clinical Neuropsychology, 13**, 1 (abstract).

Raymond, M.J. (1997). Neuropsychological dysfunction in a
    patient with multiple meningiomas.  **Reitan Society Bulletin, 3**
    (abstract).

Bennett, T.L. & Raymond, M.J. (1997). Mild brain injury: An
    overview. **Applied Neuropsychology, 4,** 1.

Liberty002454

Bennett, T.L. & Raymond, M.J. (1997). Emotional consequences of and psychotherapy for individuals with mild brain injury. **Applied Neuropsychology, 4,** 1.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1997). **Brainwave R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation**, Austin, Texas: Pro-Ed.

Raymond, M.J. (1996).  Neuropsychological aspects of posthallucinogen perception disorder.  **Reitan Society Bulletin, 2,** 1 (abstract).

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1996).  The effects of unilateral vascular lesions and gender on visual-spatial and verbal-auditory attention span.  **Applied Neuropsychology, 3,** 4.

Raymond, M.J., Bewick, K.C., Malia, K.B., & Bennett, T.L. (1996). A comprehensive approach to memory rehabilitation following brain injury. **Journal of Cognitive Rehabilitation. November/December**.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1996). Memory: A comprehensive approach.  **Society for Cognitive Rehabilitation Newsletter, 4,** 3.

Raymond, M.J., Bennett, T.L., Malia, K.B., & Bewick, K.C. (1996). Rehabilitation of visual processing deficits following brain injury. **Neuro Rehabilitation, 6**, 3.

Rojas, D.C.,  Raymond, M.J., & Bennett, T.L. (1995).  Predictive validity of the neuropsychological deficit scale and halstead impairment index in mild brain injury: A two center study. **Reitan Society Bulletin, 1**, 1 (abstract).

Bewick, K.C., Raymond, M.J., Malia, K.B., & Bennett, T.L. (1995). Metacognition as the ultimate executive:  Techniques and tasks

Liberty002455

to facilitate executive functions. **Neuro Rehabilitation**, **5**, 4.

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1995).  The effects of unilateral vascular lesions and gender on visual-spatial and verbal-auditory attention.   **Archives of Clinical Neuropsychology, 10**, 4 (abstract).

Raymond, M.J. (1994). Neuropsychological consultation in rehabilitation.  **New Jersey Rehab, 3**.

Raymond, M.J. (1994).  Aging and neuropsychological assessment. **Archives of Clinical Neuropsychology, 9**, 6.  (book review).

Raymond, M.J. (1992).  Neuropsychiatric sequelae in acoustic neuroma.  **Bulletin of the National Academy of Neuropsychology, 8**, 4.

Raymond, M.J. (1992).  Opening doors: The significance of neuropsychological assessment in neurorehabilitation.  **Rehab Management**, **June/July.**

Franzen, M.D.,  McCracken, L.M., Raymond, M.J., Haut, M.W., & Haut, J.S. (1992).  The use of the knox's cube test and digit span in assessing memory and attention.  **Journal of Clinical and Experimental Neuropsychology, 14**, 1 (abstract).

Naugle, R.I. & Raymond, M.J. (1991).  Neuropsychological sequelae of stroke as a function of handedness.  **Perceptual and Motor Skills, 73**.

Raymond, M.J. & Naugle, R.I. (1991).  Handedness and gender effects on the relative preservation of  visuospatial versus verbal function following  right hemisphere stroke.  **Archives of Clinical Neuropsychology, 6,** 3 (abstract).

Raymond, M.J. (1991).  Neuropsychological assessment:  An adjunct to neurological diagnosis.  **Hospital News, June.**

Raymond, M.J. (1990). Neuropsychological aspects of minor head

Liberty002456

injury.  **The Journal of Head Injury, 4**.

Raymond, M.J. (1989).  Major consequences of minor head injury.
**JMA Bulletin, 2**.

Raymond, M.J. (1989).  Neuropsychological aspects of  diffuse
histiocytic lymphoma:  A case report.  **Archives of Clinical
Neuropsychology, 4,** 2 (abstract).

Raymond, M.J. (1988).  Neuropsychological investigation in right
hemisphere stroke:  A rehabilitation case study.  **Bulletin:
The National Academy of  Neuropsychologists, 5** (abstract).

Raymond, M.J. (1986).  Similar neuropsychologic findings from
cardiovascular abnormalities:  A comparison case study.
**Archives of Clinical Neuropsychology, 1**, 3 (abstract).

Raymond, M.J. & Hartlage, L.C. (1985).  Differential intellectual
sequelae of  right hemisphere CVA in left vs. right-handed
patients.  **The International Journal of Clinical
Neuropsychology, 7** (abstract).

Raymond, M.J. (1985). Headache among athletes.
**The Williamsport News**, **Winter.**

Raymond, M.J. (1984). Psychological effects of running.
**The Williamsport News, Spring.**

Raymond, M.J. (1984).  Chronic pain:  The pain that really hurts.
**The Williamsport News, Summer/Fall.**

Raymond, M.J. (1983).  Drug abuse among student athletes.
**The Williamsport News**, **Spring.**

Raymond, M.J. (1983).  Control of pre-competition anxiety.
**The Williamsport News**, **Winter.**

Raymond, M.J. (1982).  The choking phenomenon.

Liberty002457

**The Williamsport News, Fall.**

Raymond, M.J. (1982).  The psychological importance of sporting activities for disabled individuals.  **The Williamsport News, Summer.**

Raymond, M.J. (1982). Depression:  The effects on athletic performance.  **The Williamsport News, Spring.**

Raymond, M.J. (1981).  A comparison of WAIS performances between right and left-handed left hemiplegic persons. Doctoral Dissertation, Florida State University.

Raymond, M.J. (1980).  (contributing ed.) **Independent Living Curriculum for Master's Degree Rehabilitation Programs.** Tallahassee, Florida: The National Commission of Rehabilitation Education Task Force on Independent Living, Florida State University.

Raymond, M.J. (1978).  The significance university upperclassmen have on influencing drug and alcohol usage by freshman females.  Unpublished Master's Scholarly Paper, University of Scranton.

**PROFESSIONAL GOALS AND INTERESTS:**

Clinical:   Brain injury rehabilitation, neuropsychological assessment and evaluation, forensic neuropsychology, sports concussion management and cognitive remediation.

Teaching:   Neuropsychology, rehabilitation psychology, neuropsychological assessment, forensic neuropsychology, and supervision and training of students in research and clinical activities.

Research:   Diagnosis and treatment of central nervous system disorders and neuropsychological correlates of behavior.

Administrative:   Program evaluation and development, quality

Liberty002458

assurance, peer review and neurorehabilitation consultation.

**REFERENCES:**

References furnished upon request.

Liberty002459



# R3 CONTINUUM

d/b/a Crisis Care Network, Behavioral Medical Interventions, Crisis Management Int'l
4115 Ayrshire Dr SW
Wyoming, MI 49418

# INVOICE

| Invoice Date: | 04/29/2016 |
|---|---|
| Invoice #: | 577726-3 |
| Invoice Due Date: | 05/29/2016 |
| Payment Terms: | Net 30 days |

| Bill To: |
|---|
| London, KY |
| PO Box 7207 |
| London, KY 40742 |

| Referred By | Claim # | Claimant Name |
|---|---|---|
| Nancy Winterer | REDACTED) | Haley Spears |

| Delivery Method | Invoice Currency | Customer Reference # |
|---|---|---|
| Other | USD | n/a |

| Qty/Hrs | Service Provided | Description | Specialty | Rate | Amount |
|---|---|---|---|---|---|
| 2.00 | File Review | Report by Michael Raymond | Neuropsychology | $178.00 | $356.00 |
| 0.90 | | Report by Dr. Daniel Kitei | Neurology | $301.75 | $271.58 |
| 1.00 | | Admin Fees - Flat | | $50.00 | $50.00 |
| 1.00 | | Surcharge | | $169.40 | $169.40 |

| | |
|---|---|
| Subtotal | $846.98 |
| Sales Tax | $0.00 |
| Total Invoice Amount | $846.98 |
| Payment/Credit Applied | $0.00 |
| TOTAL | $846.98 |

**Thank you for your business.**

**Please remit to:**

**R3 Continuum**
**4115 Ayrshire DR SW**
**Wyoming, MI 49418**

If you have any questions, please contact Accounting at:
Phone: **(616) 965-2411**
Email: **accounting@r3continuum.com**
Federal ID #: **46-4003573**

Liberty002460

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213




WINONA ZIMBERLIN
ATTORNEY AT LAW
267 MAIN STREET
MANCHESTER CT 06042

Liberty002461



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

April 27, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:   Long Term Disability (LTD) Benefits
      UTC Choice
      Claim #: REDACTED
      Claimant: Haley Spears

Dear Winona Zimberlin:

This letter responds to your correspondence dated April 25, 2016.

In the April 25, 2016 letter you wrote, "Your most recent letter states you were including all the
Liberty file subsequent to the remand.  The file you sent did not contain any of the medical
information we provided, the numerous forms we provided and the internal Liberty notes."

On April 11, 2016, you requested a copy of the IME report, "and any other documents you have
regarding this claim, subsequent to my last request."   Therefore, on April 15, 2016, the IME report
and all other documents generated after March 17, 2016 were forwarded to your attention.
Previously, per your March 17, 2016 request, on March 22, 2016, a copy of the entire claim file
including all the medical information and forms you provided, was forwarded to your office.

Your April 13, 2016 and April 25, 2016 letters both state, "I previously made a request that Liberty
pay the physicians from whom you are requesting new reports. I did not receive a response from
you."

Your March 17, 2016 letter ended with, "In regard to your request to the eight doctors identified in
your March 16, 2016 letter, is Liberty willing to pay these doctors for their time in responding to
your request?"  I apologize.  I did not understand this question was a request that Liberty reimburse
Ms. Spears' attending physicians for their time to respond to the multi-disciplinary peer review
report.

Your April 25, 2016 letter states, "I believe Liberty agreed to pay Dr. Rissenberg for her time.
Please advise whether Liberty will pay for the other requested reports, and if so, the amount Liberty
will pay."

Liberty002462

On March 16, 2016, a request was sent to eight of Ms. Spears' attending physicians, to review and respond to the March 4, 2016 multi-disciplinary peer review. A response was requested by March 25, 2016.  Follow-up telephone calls were made to each of the physicians' offices. Several weeks have passed since the requested response date and no further follow-up requests will be pursued.  No payment has been issued by Liberty to any of these providers.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002463



# Zimberlin Law LLC
267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

April 25, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

> RE:   Haley Spears
> DOB: REDACTED
> Your claim #: 250039

Your most recent letter states that you were including all the Liberty file subsequent to the remand. The file you sent did not contain any of the medical information we provided, the numerous forms we provided and the internal Liberty notes.

I previously made a request that Liberty pay the physicians from whom you are requesting new reports. I did not receive a response from you. I believe Liberty agreed to pay Dr. Rissenberg for her time.

Please advise whether Liberty will pay for the other requested reports, and if so, the amount Liberty will pay. Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002464



# R3 CONTINUUM

# I N V O I C E

| Invoice Date: | 04/11/2016 |
|---|---|
| Invoice #: | 577726-1 |
| Invoice Due Date: | 05/11/2016 |
| Payment Terms: | Net 30 days |

**R3 Continuum, LLC**

d/b/a Crisis Care Network, Behavioral Medical Interventions,

Crisis Management International

4115 Ayrshire Dr SW

Wyoming, MI 49418

| Bill To: |
|---|
| London, KY |
| PO Box 7207 |
| London, KY 40742 |

| Referred By | Claim # | Claimant Name |
|---|---|---|
| Nancy Winterer | REDACTED) | Haley Spears |

| Delivery Method | Invoice Currency | Customer Reference # |
|---|---|---|
| Other | USD | n/a |

| Qty/Hrs | Service Provided | Description | Specialty | Rate | Amount |
|---|---|---|---|---|---|
| 49.00 | File Review | Report by Michael Raymond | Neuropsychology | $178.00 | $8,722.00 |
| 33.30 | | Report by Dr. Daniel Kitei | Neurology | $301.75 | $10,048.28 |
| 51.30 | | Report by Robert Cooper | Endocrinology | $335.75 | $17,223.98 |
| 6.50 | | Report by Dr. Kent Crossley | Infectious Disease | $255.00 | $1,657.50 |
| 1.00 | | Admin Fees - Flat | | $50.00 | $50.00 |

| | |
|---|---|
| Subtotal | $37,701.75 |
| Sales Tax | $0.00 |
| Total Invoice Amount | $37,701.75 |
| Payment/Credit Applied | $0.00 |
| **TOTAL** | **$37,701.75** |

**Thank you for your business.**

**Please remit to:**

**R3 Continuum**

**4115 Ayrshire DR SW**

**Wyoming, MI 49418**

If you have any questions, please contact Accounting at:

Federal ID #: **46-4003573**

Phone: **(866) 927-0184**

Email: **accounting@r3continuum.com**

Liberty002465

https://www.campusship.ups.com/cship/create?ActionOriginPair=default___PrintWindow...   4/19/2016

UPS CampusShip: Shipment Label



NANCY WINTERER
603-750-7550
LIBERTY MUTUAL-DOVER-0096
100 LIBERTY WAY
DOVER  NH 03820

0.0 LBS    LTR    1 OF 1

**SHIP TO:**
  ATTORNEY AT LAW
  WINONA ZIMBERLIN
  267 MAIN STREET
  **MANCHESTER  CT 06042-3538**

**CT 061 9-01**

**UPS NEXT DAY AIR**        **1**
TRACKING #: 1Z 248 96X 24 9665 4070

BILLING: P/P
SIGNATURE REQUIRED

Office/Dept Number: 009603304

CS 18.1.11.    WNTINV50 72.0A 01/2016

009603304

Page 1 of 1

Liberty002466

Addendum Questions for Dr. Raymond:

1. Please review Dr. Rissenberg's 4/6/16 response to the neuropsychological portion of the 3/4/16 multi-disciplinary per review.  Please indicate if Dr. Rissenberg's response changes your previous conclusions, and provide the medical/neuropsychological rationale that support your conclusions.

Liberty002467

Addendum Questions for Dr. Kitei:

1.  Please review Dr. Zagar's  4/6/16 response to the 3/4/16 multi-disciplinary peer review. Please indicate if Dr. Zagar's response changes your previous conclusions, and provide the medical/neurologic rationale to support your conclusions.

Liberty002468

# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

April 14, 2016

*Facsimile: 1-603-422-7909, 2 pages.*

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH 03820

Dear Ms. Winterer:

RE: Haley Spears
DOB: REDACTED

Please find enclosed a medical report from Dr. Kristin Giannini dated April 13, 2016.
Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:rlc
Enclosure

Liberty002469

**Healthwise Medical Associates, LLP**
**Rockville Family Physicians**
**520 Hartford Tpke, Ste M**
**Vernon, CT 06066**
**Phone:**(860) 872-8321 **Fax:** (860) 979-0056

HALEY SPEARS
74 HEATH STREET
SOMERVILLE, CT 62145

DOB: REDACTED

04/13/2016

To whom it may concern:

I was treating Haley during the period in question for headaches and fatigue. Headaches and fatigue have no specific objective evidence to indicate quality and severity. They are measured based on patient subjective report. During this period Haley's headaches and fatigue were severe enough that she would have spent significant amounts of time away from a job. She would have been an unreliable employee and missed many days of work. She was most definitely disabled during this period.

KRISTIN A GIANNINI MD

Liberty002470





91 7199 9991 7033 6439 4326

N. Winter
2500391

Winona Zimberlin
Attorney At Law
267 Main Street
Manchester, CT 06042

Liberty002471

**n0062751**

**From:** Winterer, Nancy
**Sent:** Thursday, April 14, 2016 9:37:53 AM
**To:** Clara Easter (ceaster@mcn.com)
**Subject:** PM&R IME Addendum
**Attachments:** RE IME.pdf

Good Morning Clara,


I need to request an addendum from Dr. Courtney regarding the IME he completed on Haley S.

Claim #REDACTEDMCN Number: 1-C193333S2


For the addendum:

Liberty Life requests Dr. Courtney review the attached 3/14/16 letter and comment.


Please let me know if you need me to send this addendum request through the system, or if this email is sufficient.


Thank you Clara,

Nancy


Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way   Mail Stop 02G   Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.  If you are not the

Liberty002472

intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.

Liberty002473



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

April 13, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

     RE:   Haley Spears
     DOB: REDACTED
     Your claim #: 250039

     I previously made a request that Liberty pay the physicians from whom you are requesting new reports. I did not receive a response from you. I believe Liberty agreed to pay Dr. Rissenberg for her time.

     Please advise whether Liberty will pay for the other requested reports, and if so, the amount Liberty will pay. Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002474

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213


WINONA ZIMBERLIN
ATTORNEY AT LAW
267 MAIN STREET
MANCHESTER CT 06042

Liberty002475



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

April 14, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:   Long Term Disability (LTD) Benefits
      UTC Choice
      Claim #: REDACTED
      Claimant: Haley Spears

Dear Winona Zimberlin:

Per your April 11, 2016 request, enclosed is a copy of the documents in Ms. Spears' disability claim file since your previous request.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002476



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

April 13, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

 RE:  Haley Spears
 DOB: REDACTED
 Your claim #: 250039

        I previously made a request that Liberty pay the physicians from whom you are
requesting new reports. I did not receive a response from you. I believe Liberty agreed to pay Dr.
Rissenberg for her time.

        Please advise whether Liberty will pay for the other requested reports, and if so, the
amount Liberty will pay. Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002477



# R3 CONTINUUM

# INVOICE

**R3 Continuum, LLC**

d/b/a Crisis Care Network, Behavioral Medical Interventions,

Crisis Management International

4115 Ayrshire Dr SW

Wyoming, MI 49418

| Invoice Date: | 04/11/2016 |
|---|---|
| Invoice #: | 577726-1 |
| Invoice Due Date: | 05/11/2016 |
| Payment Terms: | Net 30 days |

| Bill To: |
|---|
| London, KY |
| PO Box 7207 |
| London, KY 40742 |

| Referred By | Claim # | Claimant Name |
|---|---|---|
| Nancy Winterer | REDACTED) | Haley Spears |

| Delivery Method | Invoice Currency | Customer Reference # |
|---|---|---|
| Other | USD | n/a |

| Qty/Hrs | Service Provided | Description | Specialty | Rate | Amount |
|---|---|---|---|---|---|
| 49.00 | File Review | Report by Michael Raymond | Neuropsychology | $178.00 | $8,722.00 |
| 33.30 | | Report by Dr. Daniel Kitei | Neurology | $301.75 | $10,048.28 |
| 51.30 | | Report by Robert Cooper | Endocrinology | $335.75 | $17,223.98 |
| 6.50 | | Report by Dr. Kent Crossley | Infectious Disease | $255.00 | $1,657.50 |
| 1.00 | | Admin Fees - Flat | | $50.00 | $50.00 |

| | |
|---|---|
| Subtotal | $37,701.75 |
| Sales Tax | $0.00 |
| Total Invoice Amount | $37,701.75 |
| Payment/Credit Applied | $0.00 |
| **TOTAL** | **$37,701.75** |

**Thank you for your business.**

**Please remit to:**

**R3 Continuum**
**4115 Ayrshire DR SW**
**Wyoming, MI 49418**

If you have any questions, please contact Accounting at:
Federal ID #: **46-4003573**
Phone: **(866) 927-0184**
Email: **accounting@r3continuum.com**

Liberty002478

**n0062751**

| | |
|---|---|
| **From:** | Winterer, Nancy |
| **Sent:** | Monday, April 11, 2016 4:53:42 PM |
| **To:** | 'drraxlen@aol.com';   'bernardraxlenmd@aol.com' |
| **Subject:** | Request for your Response |
| **Attachments:** | Dr. Raxlen cover letter.pdf; PEER REVIEW-03.07.2016.pdf |

Hello Dr. Raxlen,

Nayalie in your office suggested I contact you directly by email.

On March 16, 2016 Liberty Life faxed a multi-disciplinary medical review report to you, regarding your patient Haley Spears, DOB REDACTED We are the Disability insurer for Ms. Spears and we are currently evaluating her claim for disability from 9/27/08 through the present.   We asked that you read the attached report and provide your medical opinion and the

medical basis for any disagreement in writing via return fax. (fax number: **603-334-5708**).

Additionally, it was indicated we would like to schedule a phone consultation between you and Dr. Crossley, Infectious Disease review physician, to discuss your medical opinion.  You were asked to contact me at 1-888-437-7611 Ext. 16401 to schedule the phone consultation at a mutually agreeable time.

We would greatly appreciate your input, although we are working within time constraints.  Please respond on or before Friday **April 15, 2016** with your medical opinion, and/or to have a phone consultation with Dr. Crossley to discuss you medical opinion.

Thank you for your time and consideration.

Nancy Winterer

Liberty002479

Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way    Mail Stop 02G    Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.   If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.   If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.

Liberty002480

**n0062751**

---

**From:**        Microsoft Outlook
**Sent:**        Monday, April 11, 2016 4:53:49 PM
**To:**          drraxlen@aol.com;   bernardraxlenmd@aol.com
**Subject:**     Relayed: Request for your Response
**Attachments:** Request for your Response.msg

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

drraxlen@aol.com (drraxlen@aol.com)

bernardraxlenmd@aol.com (bernardraxlenmd@aol.com)

Subject: Request for your Response



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

April 11, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

> RE:    Haley Spears
> DOB: REDACTED
> Your claim #: 250039

Please send me the report of your IME doctor and any other documents you have regarding this claim, subsequent to my last request.

Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002482

# Associated Neurologists of Southern Connecticut, P.C.

Kenneth Siegel, M.D.                        Jeffery Gross, M.D.
Peter McAllister, M.D.                      Anthony Quan Hong, M.D.
Srinath Kadimi, M.D., F.R.C.S              Dario Zager, M.D.
Thomas B. Toothaker, M.D.                  Bozena Czapka, PA-C
Karen Brown, PA-C                           Shilpa Desai, PA-C
Amy Palmer, Ph.D                            Christine McCarthy, Ph.D
Deb Del Vecchio-Scully, MS, LPC, NCC

Main Office:

75 Kings Highway Cutoff
Phone: (203) 333-1133
Fairfield, CT 06824

## *Liberty Mutual* FACSIMILE COVER SHEET

To: *Long Term Disability*     From: *Virginia Esser (Ginger) Collections Legal Specialist*

Fax: *1 (203) 422-7909*

Fax: (203) ~~333-0242~~ *336-9212*

Phone: *1 (888) 437-7611 X 16401*   Phone: (203) 333-1133 EXT. *111*

Date: *4-7-16*                      Page 1 of *2*

Message: *NANCY WINTER ER*
*RE: HALEY SPEARS   Claim #0250239*
*enclosed PLEASE Find DR ZAGAR Report From*
*REVIEWING THE Medical Records that were FAXED*
*to Him on 3-16-16 - Any ?? Call me @ # above*

ATTENTION: This message is intended only for the individual to whom it is addressed. It contains information that may be confidential under law. If you are not the intended recipient or agent responsible for delivering this message do not read, copy, or distribute this information. If you have received this message in error, please notify the sender immediately, by phone call, and return the message by mail to the address above. Thank You.

Additional office location:
570 Boston Post Rd Milford, CT 06460 Phone: (203) 877-1414 Fax (203) 877-4144

Liberty002483



# Associated Neurologists
## *of* Southern Connecticut, P.C.

4/6/2016

Re: SPEARS, HALEY

To Whom it May Concern:

I cared for Haley Spears from January of 2009 through October of 2011, and can only comment on her situation at that time since I have not been in contact with her in the interim. Ms. Spears was dealing with symptoms including frequent headaches, severe fatigue, joint pains, digestive problems, and cognitive complaints. Testing was notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease. She was also under the care of a rheumatologist and infectious disease specialist for her issues, and received long term antibiotic therapy and a variety of symptomatic treatments with only minimal improvement in her symptoms. She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis. At the time I was seeing her, she seemed to do little outside of seeing her doctors because of her various symptoms. She was unable to drive or handle some other basic daily activities. Neuropsychological testing done in 2010 showed cognitive impairment, which was consistent with her subjective symptoms.

While I would agree that a diagnosis of CNS Lyme was not certain, she clearly has had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily functioning.

To be frank, on review of your physicians' assessments of her prior medical records, it is clear that each took as skeptical and unsympathetic a viewpoint as possible when assessing her case, which is unfair to this unfortunate young woman. I am certain that if any of them had been her treating physician rather than an insurance reviewer they would not have taken the same approach.

Please feel free to contact me with any questions.

Sincerely,

Dario M. Zagar, MD

75 Kings Highway Cutoff  |  Fairfield, Connecticut 06824  |  tel:203-333-1133  |  fax:203.333.3937
670 Boston Post Road  |  Milford, Connecticut 06460  |  tel.:203.877.1414  |  fax:203.877.3144
www.anscneuro.com

Liberty002484

# Fax

**To :** Nancy Winterer, Liberty Mutual     **Date :** 2016-04-06

**Fax :** 16033345708          **Subject :** H.Spears Response

**From :** Dr. Marian Rissenberg     **Email :** dr.marian@rissenberg.com

**Phone :** 9142326245          **Pages :** 6

☐ Urgent  ☐ Please Reply  ☐ For Review  ☐ Please Recycle  ☐ Please Comment

**Comments :**



POWERED BY iFAX
crowdedroad.com/ifax

Liberty002485



MARIAN RISSENBERG, PH.D.

*Neuropsychologist*

Liberty Mutual Insurance, Long Term Disability Benefits
Attention Nancy Winterer, Appeal Review Consultant
By Fax to (603) 334-5708
April 6, 2016

Review and Response Re: Haley Spears; (DOB REDACTEDClaim# REDACTED)

I have reviewed the report dated 3/4/16 prepared by Robert Cooper, M.D., Kent
Crossley, M.D., Daniel Kitei, D.O. and Michael Raymond, Ph.D. of Behavioral
Medical Interventions, and will address the comments concerning my
neuropsychological assessment in July 2010 of Haley Spears.

I have attached a copy of my Curriculum Vitae, which attests to my training,
experience and expertise in the field of clinical neuropsychology, in general, the
assessment of neuropsychological impairment due to injury and illness, and the
neuropsychological impact of Lyme disease and other infectious/inflammatory
conditions, in particular. I believe it supports the high probability that my
assessment of Ms. Spears was thorough and appropriate and my opinions well
founded.

1.) Dr. Raymond characterizes my neuropsychological assessment as "cursory"
or "abbreviated." It was not.

The assessment was comprehensive, involving 9 hours direct patient contact, and
8 hours review and analysis, and comprising:

Review of medical records
Review of independent input from both parents, via email, regarding Ms. Spear's
past and present academic, vocational, and social emotional functioning
Phone interview with a colleague and close friend of four years regarding above
Completion of a self-report history and symptom inventory by Ms. Spears
Clinical Interview (60 minutes)
Formal, individual, standardized testing of cognitive, executive, motor and
affective (emotional and psychological) functioning, specifically:
Wechsler Adult Intelligence Scale - III (complete battery - 12 subtests)
Wechsler Memory Scale - III (complete batter - 11 subtests)
The Beck Depression Inventory
The Beck Anxiety Inventory
Draw-a-Person Test
Luria Motor Programs Test

125 Katonah Avenue
Katonah, NY 10536
(914) 232-6245
dr.marian@rissenberg.com

Liberty002486



2.) Dr. Raymond characterizes my assessment as "nonstandardized." It was not.

The tests and methods are widely used and carefully and extensively normed and standardized to the highest standards in the field. See above.

3.) Dr. Raymond suggests that my estimate of Ms. Spears' premorbid cognitive capacity is "miscalculated," or overestimated. It is not.

I used the standard best practice in the field of clinical neuropsychology - considering multiple factors - to obtain the best estimate of Ms. Spears' premorbid cognitive capacity at around the 75th percentile (IQ of 110). This estimate is necessary to determine the degree of deficit, if any, demonstrated on testing. These factors are education, work history, "hold" scores (scores on tests relatively insensitive to the effects of brain injury or disease), and "best performance" (the highest scores or difficulty level obtained).

Ms. Spears is a high school graduate who completed two years of college. The average IQ for a high school graduate is 110 (75th percentile). "Educational attainment is the best single demographic predictor of IQ." (Doerr & Carlin, 1991) Ms. Spears had been working three-and-a-half years at her job as an executive administrative assistant at Pratt and Whitney (manufacturers of turbine engines) when she had to take medical leave due to illness in March 2009. "An occupational history is another important step in evaluating premorbid functioning." (Doerr & Carlin, 1991) Ms. Spears' highest cognitive score was at the 75th percentile, and scores at the 50th percentile were obtained on several tests of abstract reasoning. On each of these, "intratest variability" (more difficult items are correctly solved while some easier are missed) was evident. In this case, it is the difficulty level of the test items solved that best estimates premorbid ability. "For intellectually impaired persons, the least depressed abilities are the best remaining behavioral representatives of the original intellectual potential." (Lezak, 2012).

4.) Dr. Raymond argues that the results of my assessment provide no evidence of impairment. This is not correct.

There is clear and objective evidence, as well as clinical evidence, of significant impairment in multiple areas of function. Ms. Spears obtained a Working Memory Index at the 12th percentile. This represents *statistically significant* (p < .05) Ms. Spears' Auditory Delayed Memory Index was at the 6th percentile, in the Borderline Defective range, impaired by any standard.

Liberty002487



*RISSENBERG RESPONSE RE: H. SPEARS*

*PAGE 3*

5.) Dr. Raymond notes, in support of his wholesale dismissal of my neuropsychological assessment of Ms. Spears, the lack of "formal effort testing (e.g., embedded or freestanding)." However, such testing was not necessary or appropriate to the circumstances.

While "effort testing" can be important to rule out a lack of effort or malingering when scores are consistently low, it is not indicated when there are relatively higher scores obtained, as was the case with Ms. Spears, which alone demonstrate good effort, particularly when they are obtained on measures of a variety of cognitive functions. Furthermore, abundant clinical evidence of good effort was provided by Ms. Spears' test-taking behavior, including her continued attempt to solve increasingly difficult items on a subtest, after failing easier ones (see intratest variability, as noted above), and after the time limit had been exceeded.

In sum, having reviewed the Physician Review of 3/4/16, I maintain that my neuropsychological assessment of Ms. Spears was appropriate and comprehensive, reflecting the highest standards and best practices of my field, that my analysis and interpretation of the results was fully informed and valid, and that the results, using widely used, extensively normed and standardized, objective neuropsychological tests, demonstrate statistically significant impairment of cognitive function.

Marian Rissenberg, Ph.D.
Neuropsychologist
New York State Lic# 009016

*Doerr, Hans O., and Carlin, Albert S. (1991) Forensic Neuropsychology: Legal and Scientific Bases. The Guilford Press. New York, London.*

*Lezak, Muriel Deutsch, Howleson, Diane B., Bigler, Erin D., and Tranel, Daniel (2012) Neuropsychological Assessment, 5th Edition, Oxford University Press. New York, Oxford.*

Liberty002488

# MARIAN RISSENBERG, PH.D.

## *Curriculum Vita*

### *Education*

- ○ Doctorate, Experimental Psychology/Cognitive Neuroscience, New York University, Graduate School of Arts and Science, Department of Psychology, New York, NY

- ○ Post Doctoral Fellowship, Neuropsychology, Cornell University Medical College, Department of Neurology, Division of Neuroscience, New York, NY

***Certification***       New York State Certified Psychologist, License # 009016

### *Professional Experience*

| | |
|---|---|
| 1989 - Present | Neuropsychologist, Private Practice, Katonah, NY |
| 1991 - Present | Neuropsychologist, Consulting Medical Staff, Department of Psychiatry, Northern Westchester Hospital, Mt. Kisco, NY |
| 1994 - Present | Director, Center for Neuropsychology, Katonah, NY |
| 2003 - Present | Clinical & Research Supervisor, Doctoral and Post-Doctoral Neuropsychology, Center for Neuropsychology |
| 2008 - 2012 | Consulting Psychologist, Stony Lodge Hospital, Ossining, NY |
| 2006 - 2007 | Adjunct Professor, Department of Psychology, Manhattanville College, Purchase, NY |
| 1998 - 2003 | Assistant Clinical Professor of Medical Psychology, Department of Psychiatry, Columbia University College of Physicians and Surgeons, New York, NY |
| 1988 - 1991 | Psychologist, Adjunct Medical Staff, Four Winds Hospital, Cross River, NY |
| 1986 - 1988 | Assistant Professor of Psychology, Department of Neurology, Cornell University Medical College, New York, NY |
| 1981-1984 | Teaching Assistant, New York University, Graduate School of Arts and Science, New York, NY |
| 1979-1981 | Assistant Psychologist, Alzheimer's Research Center, Department of Psychiatry, New York University Medical Center, New York, NY |

***Professional Memberships:*** American Psychological Association; International Dyslexia Association; International Foundation for Autism Research; International Neuropsychological Society

***Teaching Experience:*** Introductory Psychology, Abnormal Psychology, Memory & Cognition, Biological Bases of Behavior (Physiological Psychology), Neuropsychology

*125 KATONAH AVE, KATONAH, N.Y., 10536 | d r . m a r i a n @ r i s s e n b e r g . c o m | (914) 232-6245*

Liberty002489

MARIAN RISSENBERG, PH.D.

### Publications

Rissenberg, M. (1985) Word finding ability in normal aging and senile dementia of the Alzheimer's type.  Journal of Clinical and Experimental Neuropsychology, 7(2), 156.

Rissenberg, M. (1985) Identification of incomplete pictures in normal aging and senile dementia of the Alzheimer's type. The Gerontologist, 25, 78.

Rissenberg, M. & Glanzer, M. (1986) Picture superiority in free recall: The effects of normal aging and primary degenerative dementia. Journal of Gerontology, 41(1), 64-71.

Rissenberg, M. & Glanzer, M. (1987) Free recall and word finding ability in normal aging and senile dementia of the Alzheimer's type: The effect of item concreteness. Journal of Gerontology, 42(3), 318-322.

Selman, J., Rissenberg, M., Melius, J. (1991) Eosinophilia-myalgia syndrome: Follow-up survey of patients. New York. Morbidity & Mortality Weekly Report.

Tager, F. A., Fallon, B. A., Keilp, J., Rissenberg, M., et al. (2001) A controlled study of cognitive deficits in children with chronic Lyme disease. The Journal of Neuropsychiatry and Clinical Neurosciences, 13, 500-507.

### Presentations

Fallon, B.A., Tager, F.A., Rissenberg, M. (1998) Neuropsychiatric aspects of Lyme disease in children and adolescents. Lyme disease and other spirochetal & tick-borne disorders, International Scientific Conference.

Greico, J. & Rissenberg, M. (2013) Attention and Learning in Children with Lyme Disease and ADHD. American Academy of Clinical Neuropsychology, Annual Scientific Meeting.

Greico, J. & Rissenberg, M. (2013) Working Memory in Children with Lyme Disease versus ADHD. International Neuropsychological Society, Annual Scientific Meeting.

Rissenberg, M. (2010) Pitocin and Autism Spectrum Disorder. International Foundation for Autism Research, Annual Scientific Meeting.

Rissenberg, M. (2005) Neuropsychological Presentation of Chronic Lyme Disease. International Lyme and Associated Disease Society, Annual Scientific Meeting.

Rissenberg, M. (1994) Characteristics of cognitive deficit in Lyme borreliosis. Lyme Disease Foundation, Annual Scientific Meeting.

Rissenberg, M. (1986) The Stroop effect in normal aging and Alzheimer's disease. American Psychological Association, Annual Scientific Meeting.

Rissenberg, M. & Chambers, S. (1996) Neuropsychological deficits in chronic Lyme disease. American Psychiatric Association, Annual Scientific Meeting.

Rissenberg, M. & Leonardi, D. (2000) Neuropsychological evaluation of children with Lyme disease: Implications for education and treatment. Lyme disease and other spirochetal & tick-borne disorders, International Scientific Conference.

Liberty002490



Medical Consultants Network, LLC
1301 5th Ave, Suite 2900
Seattle, WA 98101
**Tax ID: 27-1944238**

# Invoice #: N101453
### Invoice Date: 04/05/2016

**ATTN:** **Nancy Winterer**
**Liberty Mutual Insurance**
**P.O. Box 7210**
**London, KY 40742**

| | | | |
|---|---|---|---|
| **MCN #:** | **1-C193333** | **Coverage:** | **Disability-Long Term** |
| **Claim #(s):** | REDACTED | | |
| **Claimant:** | **Haley Spears** | | |
| **DOL/DOI:** | **09/27/2008** | | |

| DATE OF SERVICE | PROVIDER | SPECIALTY | SERVICE | AMOUNT |
|---|---|---|---|---|
| 03/14/2016 | Jenness Courtney | Physical Medicine & Rehabilitation | Independent Medical Evaluation | $3,850.00 |
| | | | **INVOICE TOTAL** | **$3,850.00** |

**For proper credit, please indicate invoice # N101453 on your payment to:**

**Tax ID#: 27-1944238**
**Medical Consultants Network, LLC**
**1301 5th Ave, Suite 2900**
**Seattle, WA 98101**

**Thank you for choosing MCN for your medical judgment needs!**

**A finance charge of 1% per month (12% per annum) will be assessed on all charges outstanding more than 60 days after the date of this invoice.**

**Please notify MCN accounting of any discrepancies within 30 days of the invoice date.**
**(206) 219-4910 Phone**
**(206) 812-6410 Fax**
**accounting@mcn.com**

Liberty002491



901 Boren Avenue, Suite 1400
Seattle, WA 98104-3529
T: 206.621.9097
F: 206.812.6420
www.mcn.com

March 14, 2016


Nancy Winterer
**LIBERTY MUTUAL INSURANCE**
P.O. Box 7210
London, KY 40742-7210


**Re:  Haley Spears**
**Claim Number:**  REDACTED
**Date of Injury:  September 27, 2008**
**MCN Number:  1-C193333S2**

Dear Ms. Winterer:

Thank you for allowing Medical Consultants Network, LLC, to schedule an independent medical examination on **Haley Spears**.  The following is a report of the examination performed on March 14, 2016.  Jenness Courtney, MD, prepared and dictated this report.

The opinions expressed in this report are those of the physician, and do not reflect the opinions of **Medical Consultants Network, LLC.**  The examinee was informed that this examination was at the request of **Liberty Mutual Insurance**, that a written report would be sent to that agency, and that the examination was for evaluative purposes only.  Furthermore, the examinee was informed that the purpose of the examination was to address specific injuries or conditions, as outlined by the requesting party, was not meant to constitute a general medical examination, and is not a substitute for her personal physician(s) or health care.  The examinee was informed at the time of the examination not to engage in any physical maneuvers beyond what she could tolerate, or which she felt were beyond her limits, or could cause physical harm or injury.

The dictated report is as follows:

**The patient was instructed that this was a one-time evaluation and that no physician and patient relationship would be established.**

**The claimant is a former administrative assistant who was 31 years old at her date of disability, September 27, 2008, initially due to headaches.  This evaluation is to determine the claimant's functional capacity for the periods of September 27, 2008, through March 27, 2009, and March 28, 2009, through March 31, 2015.**

Liberty002492

**Medical Consultants Network, LLC**          Claim Number: <sup>REDACTED</sup>
**March 14, 2016**                                     Re:  Haley Spears
                                                              **Page 2**

---

## HISTORY OF PRESENT ILLNESS:

A comprehensive medical history was attempted; however, this claimant refused to give any substantial history.  Upon questioning concerning her initial migraine headaches, this claimant stated that this was only the symptom of her real problems.  She stated that she no longer has any problems related to this event.  She attributes all of the problems as related to bacterial/parasitic infections.  She states that treatment for these infections remedied her symptoms.  When asked specific questions about the history and course of events during the time periods stated above, the patient states that she was instructed by her lawyer not to answer these questions.

## PAST MEDICAL HISTORY:

As far as a past medical history and surgical history, she reports that her past medical history was negative prior to 2008.

**Illnesses:**  She reports a history of asthma, ulcers, goiter, and Hashimoto's thyroiditis.

**Operations:**  She reports having a thyroidectomy in June of 2013.

**Allergies:**  She reports no drug allergies, only seasonal allergies.

**Medications:**  She reports Singulair for asthma type allergies, levothyroxine replacement, and Xopenex inhaler.

## REVIEW OF SYSTEMS:

As far as HEENT, she reports Singulair for her allergy symptoms, no cough, hemoptysis, or shortness of breath.

**Cardiovascular:**  She reports a history of palpitations related to the infections, but takes no medications, and these are intermittent.

**Gastrointestinal Symptoms:**  Constipation, diarrhea, bloating, and cramping that she attributes all to thyroid disease.

**Endocrine:**  See Past Medical History for thyroid findings.

**Genitourinary:**  No dysuria, hematuria, frequency, or urgency.

**Musculoskeletal:**  She reports that she had a car accident recently; however, those symptoms, which are being treated by a chiropractor, have no bearing on this report.

**Medical Consultants Network, LLC**                    Claim Number: REDACTED
**March 14, 2016**                                      **Re:  Haley Spears**
                                                                   **Page 3**

---

## SOCIOECONOMIC HISTORY:

**Physical Activity Level:**  She was questioned concerning her ability to perform activities of daily living.  When she was at her worst during the time frame after September 27, 2008, she reports that she had problems with fatigue, pain, and decreased energy.  She also reports neurocognitive deficits, where she had difficulties with memory and confusion.  She states that her mother and the home health nurse would aid her with activities of daily living such as dressing and bathing.  She reports no problems at this time.

As far as her exercise regimens, she reports exercising now one time a week, but only when she feels good.  She does some walking and jogging, also some aerobics and light weights.

She reports that she worked for approximately one year following this event.  She worked in recruitment and hiring in a staffing firm.  This was a full-time job that she discontinued in August of 2015.

## PHYSICAL EXAMINATION:

On physical examination, overall, this claimant was very restricted in any answers. She basically refused, again, to give any history.   She did allow a physical examination.

Her gait was non-antalgic and reciprocal.  She was able to perform tandem, toe, and heel walking.

Cervical range of motion was normal with flexion, extension, lateral bending, and rotation.  Lumbar range of motion was normal with flexion and extension.

Strength testing of the upper extremities and lower extremities showed her to be 5/5 with shoulder abduction, elbow flexion, elbow extension, wrist extension, grip, thumb abduction, fifth digit adduction, hip flexion, hip extension, knee flexion, knee extension, dorsiflexion, plantar flexion, and extensor hallucis longus extension of the great toe.

Circumferences of the biceps were taken; right 37 cm, left 35 cm.

Straight leg raise was negative in sitting and supine.

Sensation was tested with pinprick and Semmes-Weinstein monofilament and noted to be normal for sharp, dull, and soft touch throughout the upper extremity and lower extremity dermatomes C5, C6, C7, C8, T1, L2, L3, L4, L5, and S1.

Deep Tendon Reflexes:  Biceps 2+ and symmetrical, triceps 2+ and symmetrical, brachioradialis 2+ and symmetrical, patella and ankle also 2+ and symmetrical. Negative Hoffmann's, negative Babinski's, negative clonus.

Gastroc circumference; right 36.5 cm, left 37.5 cm.  Leg lengths were also measured from the anterior superior iliac spine to the superior edge of the medial malleolus, noted to be 87.5 cm on the right, 88 cm on the left.

Ankle range of motion actively was normal with dorsiflexion and plantar flexion.  Hip range of motion was normal bilaterally with flexion, extension, internal and external rotation.  FABERE's examination was negative.

Shoulder range of motion was normal in all planes, flexion, abduction, internal and external rotation.  She showed no impingement signs, negative Hawkins, negative Neer's.  Wrist range of motion was normal with extension and flexion.

Knee range of motion actively was also normal with flexion and extension.

She displayed no tender points or myofascial trigger points.  Palpation was performed on the cervical paraspinals, thoracic paraspinals, lumbar paraspinals, shoulder areas, around the scapulae, including the levator scapulae and rhomboids.  There was no muscle atrophy and no palpable spasms.  There were also no visual spasms.


**REVIEW OF MEDICAL RECORDS:**

An extensive review of medical records that were provided for this case was performed.  These will be summarized.

There is a triage from Hartford Hospital Emergency Room.  The doctor is Dushyant Parikh, MD.  Employer is Filene's.  The diagnosis was laceration of the left index finger.  Laboratory reports were also noted.

There is an Allergy Associates of Hartford report, Dr. Srinivasan, April of 2002.  It reports symptomatic rhinitis and seasonal exacerbations.  It mentions skin testing, with a reaction to dust mites, molds, cat dander, grasses, trees, and ragweed.  She deferred oral steroids and Benadryl.  He stated he would be discussing various options, including immunotherapy.

There is documentation of her FVC and FEV1.

There is a note also from Dr. Srinivasan dated September 22, 2003, which reports she has long-standing severe asthma.  She uses a nebulizer two to three times a day to control the severity.  It states anxiety and symptoms of claustrophobia might cause her asthma symptoms to flare.  This was a note To Whom It May Concern.

There are follow-up visits with this same physician, as well as lab work, that are presented, and these extend from the initial date until 2004.

Then in 2007, there is a Dr. Schiff, Hartford Medical Group, who performed labs.

Liberty002495

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                        **Re:  Haley Spears**
                                                              **Page 5**

---

On June 14, 2007, there is Connecticut GI, and there is a note from Amy Coates, APRN, also signed by Donna Cipolla, MD.  The chief complaint was diarrhea.  It started approximately two years ago.  She describes having diarrhea ten times a day and significant weight loss.  The impression states that she has diarrhea, worse under stress and with certain foods; intermittent GERD (gastroesophageal reflux disease) symptoms and epigastric discomfort, which have been responsive to a proton pump inhibitor in the past.  She also reports bright red rectal bleeding and anal burning, likely hemorrhoidal.   Given the constellation of her symptoms, irritable bowel syndrome is most likely.  Will need to rule out inflammatory bowel disease.  She has been given Protonix, Anusol, and Imodium.  She is being scheduled for endoscopy and colonoscopy.

There are several lab reports, which are basically comprehensive metabolic profiles, CBCs, and urinalysis.

June 29, 2007, Donna Cipolla, MD.   There was a gastrointestinal endoscopy.  Impression:  Normal esophagus, clean-based gastric ulcer.  The patient was started on Prilosec and told to hold aspirin and NSAIDs.

There are also biopsies that were taken.   They report inflammatory changes characteristic of microscopic colitis, no evidence of inflammatory bowel disease.  Duodenum:  No evidence of inflammatory disease.  Stomach Biopsy:  No evidence of gastritis.  A discrete ulcer is not identified.  This was both in the antral and fundic mucosa.  Also in the gastric body, no discrete ulcer is identified.  The impression basically states the colon is normal on biopsy.  Internal hemorrhoids were found.

September 14, 2007, the impression again for the upper gastrointestinal endoscopy, non-bleeding, erythematous gastropathy, healed ulcer.

There is a note from the Division of Endocrinology, Connecticut Multispecialty Group, appointment January 21, 2008.  The patient is seen in consultation for thyroid nodules.  The active problems are listed as ulcerative colitis, a fatty liver, thyroid cyst, systemic lupus erythematosus, plantar fasciitis, and migraine headaches.   It states that the patient was noted to have a goiter in 2004.  Apparently, nodules were sampled, two cytologies for cysts.  They were normal.  Her review of systems noted very poor energy, poor memory and concentration, gastrointestinal issues, vision blurred on and off with migraines, and ringing in the ears.  Her medications were listed at this time.  Those included Amitiza, Asacol, Prevacid, gabapentin, Zofran, B12, Pepcid, Frova, Maxalt, Zomig, Imitrex, folic acid, and Singulair.   Thyroid examination showed abnormalities, cobblestone texture, without distinct dominant nodule.  Assessment:  Hashimoto's thyroiditis, non-toxic multinodular goiter.  It states she does have Hashimoto's, based on the antibody testing, and should have periodic testing of TSH going forward.

There is a Patient Encounter, April 8, 2008, Provider James O'Brien, MD.  This is a followup for microscopic colitis.  There is a differential diagnosis given of recurrent peptic ulcer disease, exacerbation of lymphocytic colitis, new inflammatory bowel disease or irritable bowel syndrome.

Liberty002496

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                          **Re:  Haley Spears**
                                                                    **Page 6**

There is a Spirometry Report from Hartford Medical, April 29, 2008.

There are notes from the Hartford Medical Group for vaccines.  These included hepatitis B and Gardasil.

There is a laboratory report, collected June 3, 2008, a skin tag of the vulva.

There was a GYN examination.  There was a tiny condyloma, HurriCaine applied, multiple healing areas.  Patient to see dermatology in two weeks.

There is cytology from a cervical smear.  HPV DNA was detected.  Negative for intraepithelial lesion or malignancy.

There are lab reports in which chlamydia and gonorrhea were not detected.

August 28, 2008, Saint Francis Hospital, Harford, Connecticut, Emergency Department, Thomas Turbiak, MD.  Diagnosis:  Migraine headaches.  The patient was prescribed Benadryl.

There is a CT of the head performed on August 28, 2008.  No intra-axial or extra-axial fluid collections.  Low attenuation changes are present in the white matter of the right temporal lobe, which may represent gliosis or edema.  A follow-up brain MRI is recommended.

There is a lab report which has a circle around HEP panel cytomegalovirus antibody iron profile, August 28, 2008.

August 29, 2008, Emergency Department Discharge Instructions.

MRI of the brain performed on September 2, 2008.  Within the white matter of the right temporal lobe, there is a 1.7 x 0.8 cm lobulated lesion demonstrating increased signal on T2-weighted images.   It does not enhance following contrast administration.  It may represent an inactive demyelinating plaque.  A low-grade glioma is less likely.

October 6, 2008, MRI of the brain, with and without contrast.  Again, basically it states a stable, non-enhancing white matter lesion in the right temporal lobe.  Surveillance is recommended, with a repeat MRI in six months.

Patient Encounter, James W. O'Brien, MD.  Assessment:  Nausea, abdominal pain, lymphocytic colitis, and constipation.

November 3, 2008, Dr. Barry Gordon.  Impression:  Migraine headaches, frequent tension type headaches.  Recommendations:  Continue with Neurontin, added Pamelor, samples of Treximet to stop migraines, and hydrocodone as needed.

Neurologic followup with David S. Silvers, MD.   Diagnosis:  Migraine and encephalopathy.

Liberty002497

**Medical Consultants Network, LLC**                **Claim Number:** REDACTED
**March 14, 2016**                                      **Re:  Haley Spears**
                                                              **Page 7**

There are restrictions from Dr. Silvers on November 11, 2008, that indicated the claimant had sedentary work capacity and could not return to work because of migraines and encephalopathy.  This restriction was to stay in place until January 1, 2009.

Evergreen Imaging Center, ultrasound of the thyroid.  Impression:  Multinodular goiter. Ultrasound of the abdomen.  Impression:  Probable mild fatty infiltration of the liver; otherwise normal.

Lab reports from Manchester Memorial Hospital, November 19, 2008.  ANA was positive, ferritin and iron low, ALT high.

Yale Brain Tumor Center.  Impression:  Right temporal lobe signal abnormality of unknown etiology, pineal region cyst, which appears benign, and headache of unknown etiology.

James O'Brien, MD, December 16, 2008.  Discussed rheumatologic workup for a high titer positive ANA.

A note from Dr. Potts.  These recommendations state, "Provide a description of the claimant's impairments."  The claimant appears to have nearly daily headaches, the severity of which is likely to preclude her from working.  Currently, the claimant's medications are being adjusted and improvement is expected.  It appears reasonable to extend the no-work recommendation until the end of January, at which time effective treatment for the headaches should occur.

Physical Therapy Initial Evaluation, December 22, 2008.  The diagnosis was headaches.  Treatments would include cervical range of motion, improved posture, manual therapy, therapeutic exercise, and modalities.

Frisso A. Potts, MD, December 23, 2008, states that, "Dr. Silvers called me and indicated that the claimant would return to work on January 7, 2009."

Lab reports from January 7, 2009, show anti-DNA double-stranded 7.5, which was high.  ANA was positive, protein C antigen negative, antinuclear antibody (ANA) 75, noted to be high, and HLA-B27 detected.  There was a lupus anticoagulant not detected, anti-Sjögren less than 5, Lyme antibody screen negative.

Dr. Zagar, Monday, January 12, 2009, visit was headache related.  Assessment: Common migraine, lumbago.

Rheumatology and Allergy Institute of Connecticut, Barbara Kage, MD.  Her report describes the abnormal lab findings, and states that she does not meet ACR criteria for a diagnosis of systemic lupus erythematosus.  She states that in view of the high complexity of her presentation, "I have advised her to start Plaquenil."

There is a Bone Density Report.

Liberty002498

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                       **Re: Haley Spears**
                                                               **Page 8**

There is UConn Medical Group Neurology Associates from January 20, 2009.  It basically states that, "Her headaches, I believe, are muscle contraction tension headaches."  James Donaldson III, MD.

Connecticut Multispecialty Group, from Dr. Robert Oberstein.  Assessment: Endocrine labs revealed non-specific abnormal findings; Hashimoto's thyroiditis; non-toxic, multinodular goiter.  Follow-up visit in one month.

Lab report, Dr. Zagar.  It mentions Borrelia burgdorferi IgG antibody detected, IgM not detected.

Followup with a physician's assistant on February 3, 2009.  The chief complaint was headaches.

There is a cerebrospinal fluid study, negative for malignant cells and white blood cells.  Color was clear.

February of 2009, Barbara Kage, MD.  Treatment plan basically the same.

Recurring notes from Rheumatology and Allergy Institute.

Associated Neurologists of Southern Connecticut, handwritten note.

Dr. Zagar, February 17, 2009.  He reports the rheumatological evaluation was felt to be most consistent with systemic lupus erythematosus and ulcerative colitis, although repeat studies are being performed, and mentioned the probability of Lyme disease.  He states, "It is unclear to me how this latest finding fits in with her complicated picture.  Given her subjective cognitive issues and headaches, it is possible that Lyme disease is playing a role, though no evidence of primary infection was seen."  He will discuss with Dr. Kage and Dr. Baehring regarding next course of action, which will likely be intravenous ceftriaxone for four weeks.  Serum Lyme titers, including WB, are negative, no bands.

There is a review, apparently by a Dr. Taiwo, MD, and it is in review of her medical records up to that point.  No recommendations.

Rheumatology and Allergy Institute of CT states that there are excerpts from Up-To-Date that state that the diagnosis of neurologic Lyme disease should not be made in patients who are seronegative.  There are more reports that state, however, that a negative test for Lyme antibodies in the cerebrospinal fluid does not exclude neurologic Lyme disease.  It is difficult to determine the sensitivity or specificity of cerebrospinal fluid Lyme antibody testing.  The plan was to consult infectious disease.

There is a report of confirmation of Lyme disease by Dr. Zagar.

There is a followup by Dr. Giannini, March 10, 2009, Family Practice, basically stating what the above notations concerning Lyme disease were.

Liberty002499

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                        **Re:  Haley Spears**
                                                              **Page 9**

Dr. Zagar states at followup on March 16, 2009, that she is on ceftriaxone 2 grams intravenous via PICC line for her Lyme IgG WB positivity on cerebrospinal fluid.  He states she is having more fatigue and cognitive issues over the last couple of weeks.  Work is noted to be a problem, even though she is only working four hours a day.  She sleeps most of the day when not at work.  He states she is seeing a specialist at Yale for her Lyme positivity.

There is New Haven Rheumatology, March 16, 2009, Robert Schoen, MD.  He reports, "I had a lengthy discussion with the patient and her mother.  My best estimation is that she does not have and has not had Lyme disease as the cause for her symptoms."  It states that although she had several bands on IgG western blot cerebrospinal fluid testing, her peripheral serology was negative, which is also against the diagnosis of Lyme disease.  She has now received treatment for the possibility of central nervous system Lyme disease, including four weeks of ceftriaxone therapy.  "My opinion would be that this is sufficient treatment, and I recommended to the patient and her mother that she go off this treatment now.  They may get another opinion, but I would stop the antibiotic therapy at present.  I think that she needs to pursue other diagnostic avenues."

She did see a Dr. Naseer, MD, regarding palpitations.  He recommended a Holter.

She also had a multistage stress test.  These were non-ischemic.  Although she was not able to achieve a target heart rate, she did do reasonably well.

There is a pulmonary report also, April 1, 2009.  The impression showed it was spirometry showing mild reversible airway obstruction, with air trapping and normal diffusion capacity, which can be seen in asthma.

Rockville Family Physicians, Dr. Giannini.  Otalgia.

There was testing for B. burgdorferi.  Both were noted to be negative.  Babesia FISH was negative, human ehrlichiosis.

Evaluation by Bernard Raxlen, MD.  There was a Lyme Disease Symptom Checklist, April 21, 2009.

There were several CT scans that were performed of the abdomen and also again involving her goiter.

There were continued followups with Rheumatology and Allergy Institute of Connecticut.

There is an evaluation from Dr. Taiwo.  The date is May 11, 2009.  The assessment states that Ms. Spears has recently been evaluated by multiple practitioners, including three neurologists, an internist, two rheumatologists, a neuropsychologist who specializes in Lyme disease, and a naturopathic clinician.  Her diagnosis and treatment plan remains unclear.  Her records do not support any specific limitations or restrictions that would prevent her from sitting, standing, or walking

Liberty002500

at a sedentary physical demand level from March 24, 2009, through the present time.

There is Advanced Orthopaedics & Sports Medicine, Dr. Pedro Romero.  A 31-year-old female who sustained an injury to the left index finger.  Diagnosis:  Crush injury of the left index finger.

Followups with Dr. Giannini.  Chronic daily headaches.

There is a note from Dr. Bernard Raxlen from June 22, 2009.  The notes states To Whom It May Concern.  It basically states that it is not possible for Ms. Spears to work full time or part time, and disability leave is medically necessary.  Treatment is likely to last a minimum of twelve months.  He is noted to be Neuropsychiatry Nutritional Medicine, Systemic Lyme Disease, and Tick-borne Illnesses.  He also started her on Zithromax, rifampin, and Mepron for a minimum of three months.

Dr. Zagar, followup dated June 29, 2009, states initially feeling better.  "I thought I was going to end up in a wheelchair," then improved.  Headaches have improved.  Migraines are responding.  The assessment again, Lyme disease, common migraine, and possible systemic lupus erythematosus.  Continue Topamax, Lexapro.

There is a note from Sam Donta, MD, Infectious Disease.  He reports in her history that antibodies for co-infections Babesia, Bartonella, and Ehrlichia are negative.  She apparently had a blood test that showed Babesia organisms.  She continues to have a PICC line in place.  The impression is chronic multi-symptom illness consistent with chronic fatigue and fibromyalgia syndrome of long-standing duration that may well be due to Lyme disease in part or in whole.  She has had no obvious overall improvement, which may be due to her not having as effective of a treatment for chronic Lyme disease as is possible.  He recommended changing from azithromycin to clarithromycin, discontinue Mepron and rifampin, as there is no evidence that she has chronic Babesiosis or Bartonellosis, and discontinue all supplemental C and B vitamins.  He stated, "We will plan to alternate courses of Plaquenil and Biaxin with tetracycline over the next two years."

There is a Dr. Lauren Gouin of Connecticut Natural Health Specialists, who states that Haley is unable to perform the duties of her job.

There is a followup with Yale Neurosurgery.  It states that Haley remains asymptomatic from MRI abnormalities.

Barbara Kage, MD, notes on August 4, 2009, to Liberty Life Assurance Company, that Haley is not able to work part time or full time, and that her treatment is to last for at least twelve months.

There is a letter from Haley Spears, October 1, 2009, due to a denial of claim for disability benefits.  It mentions, "When I returned to work on January 8, 2009, my intention was to work part time for one month while building up to full time hours.  Dr. Kage stated that moving to full time hours on February 9, 2009, was not an

Liberty002501

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                      **Re:  Haley Spears**
                                                                  **Page 11**

option because I struggled working four hours a day due to exhaustion, my continued medical complications, pain, and neurocognitive difficulties."

Patient Encounter, James O'Brien, MD.  The assessment was for gastrointestinal symptoms.  Continue those medications.  Follow up in one year.

Unremarkable CT of the abdomen and pelvis, which was also performed during this time.

There is an MLS Peer Review Services note, November 23, 2009.  Medical documentation was summarized.  Several questions were noted, including, "Is the diagnosis and treatment of late stage Lyme disease within the area of expertise of a physician trained in psychiatry?"  Also, "Do the records support the presence of Lyme disease or any other infectious process?"  This reviewer noted that the significance of the testing was not consistent with the diagnosis of neuroborreliosis, and there were no other diagnostic tests supporting evidence of co-infections, of which treatment was based by Dr. Raxlen.  Basically, the patient had no substantiation to support the diagnoses.  This is Michael Silverman, MD.

Continued lab reports are noted.

Continued rheumatology reports from Barbara Kage, MD, are noted.

There is a note from Bridget Patterson-Marshall, MD.

Followup with Rockville Family Physicians.

Endocrine followup, March 12, 2010.

Followup, March 19, 2010, Dr. Zagar.

Dr. Zagar noted on March 26, 2010, that the history mentioned difficulties with speech, memory issues, coming and going.  Doing well at some point.  He stated that he informed them that since it has been one year, he no longer feels comfortable facilitating their antibiotic treatments as prescribed by Dr. Raxlen.  He recommended continuing Topamax.

There is an initial visit by Juliana Hoyle, RN, April 13, 2010, Home Health Aide Supervision.

There is a note from Digestive Health Specialists, Dr. O'Brien.

There is another note from MLS Peer Review Services, Dr. Michael Lee Silverman, April 22, 2010.  It states that numerous attempts were sent to Dr. Raxlen for return phone consultation, but no contact was made.  He went on to state in his conclusion, he says, "It is my opinion, within a reasonable degree of medical certainty, that the diagnoses are not appropriate with respect to Lyme disease, and specifically neuroborreliosis.  There has not been any documentation revealing any evidence of other tick-borne illness supporting these diagnoses."

**Medical Consultants Network, LLC**                    **Claim Number:** REDACTED
**March 14, 2016**                                          **Re:  Haley Spears**
                                                                    **Page 12**

Continued reports from rheumatology, Dr. Kage, with basically the same recommendations.

There is Grosso Chiropractic.  Apparently, the patient was seen.  She is currently unemployed.  She has had neck problems, aching, stiffness, throbbing, stabbing pain, upper back problems, appear to be getting worse.

There are multiple notes regarding her treatments.

Dr. Giannini, dated July 9, 2010, Functional Capacity Assessment.  Due to Haley's symptoms, unable to complete a normal workday due to extreme cognitive dysfunction and fatigue.

There is a neuropsychologist's report, July of 2010, which is rather extensive.  Apparently, she noted a dramatic decline in mental status.  It states that these findings are consistent with frontal or diffuse cerebral dysfunction, as seen in chronic infectious or inflammatory illness.

Dr. Raxlen wrote a report on September 9, 2010, basically noting the neuropsychological testing, and states that this evaluation strongly supports Ms. Spears' eligibility for full time disability benefits.

There is a Liberty Life Assurance Company Case Report.  In this, there is a Clinical Summary.  At the end, the recommendations state, "Although many diseases have been involved to explain the claimant's clinical picture, there are very few that are substantiated clinically."  It says, "From an infectious disease evaluation, the claimant does not have any restrictions or limitations to her activity from February 8, 2009, forward."  It goes on to state that, "Dr. Raxlen trained primarily as a psychiatrist.  He does not have any formal infectious disease training, and is not ID board certified.  Based on his submitted documentation, his practice pattern of the diagnosis and management of Lyme disease does not adhere to the guidelines established by the Infectious Disease Society of America."  This is by John Brusch, MD.

Followup, Dr. Robert Oberstein, for Hashimoto's thyroiditis.  No further workup at this point.  It does mention that the thyroid function tests are fluctuating.

Followups are noted with Dr. Zagar once again, and Dr. Giannini of Family Practice.  She was seen for an upper respiratory infection.

Dr. Cynthia Grosso, Chiropractic Care, December 30, 2010.

January 19, 2011, a sleep study.  Impression:  Periodic limb movement disorder, sleep onset and sleep maintenance insomnia, no obstructive sleep apnea.

Sleep Medicine Consultation, February 17, 2011, Dr. Shoup.

Again there is an Internal Medicine & Infectious Disease, Zane Saul, MD, on March 7, 2011.  He reports that, basically, she is unable to work in any capacity at this time.

Liberty002503

**Medical Consultants Network, LLC**        Claim Number: REDACTED
**March 14, 2016**                          Re:  Haley Spears
                                            Page 13

There are follow-up notes from Dr. Shoup with Sleep Medicine Associates.

There are followups with Dr. Baehring, basically stating that her benign pineal cyst is unchanged.  The right temporal lobe abnormalities are likewise unchanged.

There is a dermatology report, Jennifer Pennoyer, MD.  The patient is being seen for a congenital nevus of the left dorsal hand.

Followup with Dr. Naseer, Cardiology.

Followup with Dr. Oberstein for her goiter, February 28, 2012.

Dr. Romero, June 12, 2012.  Tendinitis of the foot.

Followup, Kristin Giannini, MD.

Followup, Dr. Robert Oberstein.  Assessment:  Non-toxic, multinodular goiter.  Euthyroid, no new medication needed.

Followup, Kristin Giannini, MD, November 19, 2012, for allergic rhinitis and otalgia.

There is a Women's Health note for Preventive Medicine, Carla Desantis, MD, February 1, 2013.

There is a followup with Dr. Oberstein.  Apparently, she had multiple nodules at this point which were growing.  He recommended excision.

There is a Thyroid Ultrasound With Consult For Biopsy.  Apparently, there was a cytology report which showed a left thyroid fine needle aspiration, Hürthle cell neoplasm.  It appears that they recommended that she have a thyroidectomy.

James O'Brien, MD, followup, April 11, 2013.  Discussed gastroesophageal reflux disease.

She had followup with Dr. Naseer on April 19, 2013, and they did an echocardiogram.

Dr. Robert Udelsman.  Plan was total thyroidectomy.

There is a note from Dr. Baehring.  It states that on neurologic examination, she is fully awake, alert, and oriented.  Language is fluent.  No cognitive deficits.  No cranial neuropathies.

Dr. Naseer noted myocardial perfusion imaging revealed no evidence of ischemia, and her ventricular ejection fraction was normal.  Apparently, Dr. Naseer cleared her for surgery.

There is a surgical date of June 27, 2013, for a total thyroidectomy, Dr. Robert Udelsman.  Final diagnosis noted incidental papillary thyroid microcarcinoma.

Liberty002504

**Medical Consultants Network, LLC**
March 14, 2016

Claim Number:  REDACTED
Re:  Haley Spears
Page 14

There is a followup, Yale University School of Medicine, Department of Surgery, Dr. Robert Udelsman.  She came in for a follow-up appointment on that day.  She was begun on Synthroid.

There is an appointment, August 2, 2013.  It states that Haley Spears is here for a mind/body consultation.  There is a wellness plan basically noted.

Followup with her endocrinologist, Dr. Oberstein.

Continued followups with endocrinology and pulmonology physician's assistants.

Followups with Dr. Cappelluti for asthma and allergic rhinitis.

A neck ultrasound was performed, which showed no definitive metastatic disease.

Cambridge Medical Specialties, Dr. He mentions that she had thyroid papillary carcinoma Stage I, T1N0.  In the past, this was 9.  No further treatment noted.

December 17, 2015, Willis-Knighton Health System.  There is an office visit discussing her diagnoses in an endocrine followup.

There is an attorney's note.

In addition to the medical records, also noted there is a section denoted Chart Notes.

The first is from January 30, 2012, Dr. Tagliarini, Chiropractic, and it reports all of her previous problems noted above and that she was also in auto accidents.  Her diagnosis was cervicalgia.

There are 63 pages of those notes.

There are rheumatology notes then noted.  These are handwritten notes, difficult to read.  They are, however, reviewed in their entirety.

There is also a report from a Maddalo Chiropractic practice, December 8, 2014.  It said she has been under chiropractic for a long time for her neck, lower back, and scoliosis pain.  Several motor vehicle accidents, it reports.

There are 42 pages of those notes.

There is a Confidential Investigative Report.

There appears to be a United States District Court in Connecticut document.

There are ophthalmology reports that are reviewed.

There is a Liberty Mutual report from May 13, 2009, in which it appears that they denied short-term disability benefits beyond February 8, 2009.

**Medical Consultants Network, LLC**          **Claim Number:** REDACTED
**March 14, 2016**                               **Re:  Haley Spears**
                                                          **Page 15**

There is an Office of the Attorney General, State of Connecticut letter, where the Assistant Attorney General is writing in support of the claim of Haley Spears for short-term disability benefits.  Basically, it states that he is asking Liberty Life to reconsider its earlier denial and grant full disability coverage to Haley Spears.

There are several court-related documents disputing short-term and long-term disability claims.  These are briefly reviewed however.

**DISCUSSION:**

I will now address the following questions that have been specifically asked of me.

1)   *Comprehensive medical history, including chief complaint, present illness, past medical/surgical history, medications/allergies, and review of systems.*

I was asked, for the periods of September 27, 2008, through March 27, 2009, and then March 28, 2009, through the present, to obtain a comprehensive medical history, including the chief complaint, present illness, past medical/surgical history, medications/allergies, and review of systems, and to consider chiropractic treatment records on file.  As noted earlier, this claimant was apprehensive in providing any medical history.  When asked why she could not do so, she stated she was basically informed by her attorney not to answer those questions.  She went on to state that she had neurocognitive deficits and a poor memory, and, therefore, she refused to give adequate history.

As far as chiropractic treatments, she basically was being treated for what appears to be myofascial pain.  She, as a result, had several chiropractic manipulations.  She underwent traction and chiropractic manipulation a multitude of times.  Her basic complaints were tightness, throbbing, aching, and discomfort in the upper back.  These symptoms are related to myofascial pain syndrome.  It was alluded to in her medical record that she was possibly dealing with fibromyalgia, although that would not be the definitive diagnosis.  Myofascial pain syndrome would be the likely description of what she was dealing with at that time.

2)   *Comprehensive functional history.  Include past and current reported daily activities; how the insured's spine pain, whole body pain, and decreased energy limits her functionality; maximum reported sitting, standing, and walking capacity per session and per eight-hour workday, and the insured's reported participation in work, activities of daily living, and recreation/hobbies.*

As far as a functional history, she was asked specifically concerning her activities of daily living.  The patient would not give any history regarding whether or not she needed aid.  Finally, when asked in a yes/no fashion, she did state that she needed aid.  Review of her records noted that, at times, her mother did aid her with her activities of daily living.  When asked specifically

Liberty002506

about length of time that she could sit, stand, or walk, she did not report any clear answer.

3)   *Comprehensive neuromuscular examination.  Include complete spine exam [including spine range of motion, the presence/absence of spasm, postural deviations, signs of neural irritation]; neurological exam [motor/sensory/reflexes/Babinski reflexes]; tender point exam; and gait assessment.  Include a detailed neck and upper extremity exam, to include joint range of motion, circumferential arm/forearm measurements, and motor/sensory exam.*

A comprehensive neuromuscular examination was performed, and that is noted in the Physical Examination section.

4)   *Assessment of objective physical deconditioning:  Any evidence of generalized muscle atrophy, resting tachycardia, and/or poor muscle tone?  Please discuss.*

No objective physical deconditioning noted. No muscle atrophy. No muscle atrophy. No abnormal muscle tone. Heart rate not assessed.

5)   *Opinion regarding verifiable physical impairment:  Based on the review of functional evidence, clinical exam findings, and diagnostic test evidence, does the insured have any verifiable functional impairment?  For any impairment confirmed, please provide the clinical, diagnostic, and/or functional evidence supporting your opinion.*

I have been asked my opinion regarding verifiable physical impairment. Based on the review of functional evidence, clinical examination findings, and diagnostic test evidence, was the insured noted to have any verifiable functional impairment?  As far as from March 28, 2009, and to the present, the patient had multiple complaints that were basically non-verifiable.  Her complaints were gastrointestinal related, migraine headache related, and what she would attribute to her Hashimoto's thyroiditis and the eventual diagnosis of thyroid cancer.  She also would attribute her symptoms to Lyme disease, which I am not an expert in its diagnosis; however, there are conflicting opinions as to whether or not this truly existed as a diagnosis. The patient reports no impairment as of now, and per my examination, she shows no functional impairment.  As far as the periods from September 27, 2008, through March 27, 2009, apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective.

6)   *Opinion regarding medically-supported physical restrictions/limitations:  For any physical impairment confirmed, please provide specific physical restrictions/limitations.  Please define by type of task [sitting, standing, lifting, etc.], as well as frequency of task [never, occasional, frequent, constant]. Include duration of physical restrictions/limitations.  Is there any medical or functional evidence supporting your opinion?*

Liberty002507

**Medical Consultants Network, LLC**           **Claim Number:** REDACTED
**March 14, 2016**                               **Re:  Haley Spears**
                                                         **Page 17**

As far as medically-supported physical restrictions and limitations, I have been asked to define the frequency of tasks, including sitting, standing, and lifting, and the duration of these limitations.  It would be virtually impossible, based on the review of these records, to determine what this patient could have done from September 27, 2008, through March 27, 2009, without examination of the patient; however, her limitations, again, seem to be more subjective than objective regarding her headaches, headache frequency, and her myofascial complaints.  Apparently, the patient was able to work at least part time during that period, but seemed to be plagued by fatigue.  Again, her limitations would be subjective at best.

7)    *Assessment of excessive or atypical pain behaviors:  Note any excessive or atypical pain behaviors observed during the Independent Medical Examination.  Does the insured's reported pain severity and functional limitations correlate with your clinical exam findings, the diagnostic test evidence, and treatment requirements?*

    As far as assessment of her atypical pain behaviors, the patient reports that she has no problems at this time, as she basically got better with the treatments that were provided.  From a review of the records, it would be determined that she attributes her problems specifically to the Lyme disease diagnosis.

8)    *Assessment of functional inconsistencies:  Compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted.*

    Patient reports no functional limitations at this time. Patient reported debilitating fatigue, headaches, and cognitive dysfunction which are difficult to objectively document.

9)    *Conclusions:  Summary of your overall impression regarding the insured's current verifiable physical impairments, medically-supported physical restrictions/limitations, and maximum full-time work capacity.*

    In summary, my overall impression regarding the insured's current verifiable physical impairments and limitations, as well as her maximum full-time work capacity, again, the patient specifically states that she does not have these problems at this point, that she was fully healed with the treatments that were provided to her.  Her only complaints have to do with reduced energy, which she attributes to hypothyroid disease and her history of thyroidectomy.

    As far as to the extent of which the results of this Independent Medical Examination provide any information concerning the periods of September 27, 2008, through March 27, 2009, apparently the patient was placed on work restrictions, from my review, at least from November of 2008 through January of 2009, in which she was to return to work.  Again, there was a reviewer that noted that from March 24, 2009, through May 11, 2009, she had no verifiable evidence of why the patient could not work.  As far as that

Liberty002508

**Medical Consultants Network, LLC**                    Claim Number:  REDACTED
**March 14, 2016**                                      Re:  Haley Spears
                                                              **Page 18**

extension from that period of time through March 31, 2015, it does not appear that the patient had any incapacitating diagnosis.  She had apparently been previously taken off work.  The chiropractic notations of lumbalgia and cervical segment dysfunction and cervicalgia would not be a reason for the patient to not be able to perform at least sedentary work during that period of time.

There are no current restrictions/limitations.

Jenness Courtney, MD
Physical Medicine & Rehabilitation, Board Certified

nsa:T 0316 Hal Spe Courtney
Client Services RN: Amy Berroyer; Please call if questions (206)-621-9097
You may comment on your examination experience online at http://www.mcn.com/contact-us/surveys

# Behavioral Medical Interventions

# INVOICE

6600 France Ave S
Suite 245
Edina, MN 55435

Voice: (952) 927-0184
Fax:

| Invoice Date: | 03/23/2016 |
|---|---|
| Invoice #: | 577726-2 |
| Invoice Due Date: | 04/22/2016 |
| Payment Terms: | Net 30 days |

| Bill To: |
|---|
| London, KY |
| PO Box 7207 |
| London, KY 40742 |

| Referred By | Claim # | Claimant Name |
|---|---|---|
| Nancy Winterer | REDACTED) | Haley Spears |

| Delivery Method | Invoice Currency | Customer Reference # |
|---|---|---|
| Other | USD | n/a |

| Qty/Hrs | Service Provided | Description | Specialty | Rate | Amount |
|---|---|---|---|---|---|
| 0.50 | File Review | Report by Michael Raymond | Neuropsychology | $178.00 | $89.00 |
| 0.10 | | Admin Fees - Hourly | | $85.00 | $8.50 |
| 1.00 | | Surcharge | | $24.38 | $24.38 |

| | |
|---|---|
| Subtotal | $121.88 |
| Sales Tax | $0.00 |
| Total Invoice Amount | $121.88 |
| Payment/Credit Applied | $0.00 |
| **TOTAL** | **$121.88** |

**Thank you for your business.**

**Please remit to:**

**4115 Ayrshire DR SW**
**Wyoming, MI 49418**

If you have any questions, please contact Accounting at:
Federal ID #: **46-4003573**
Phone: **(866) 927-0184**
Email: **accounting@behavioralmedical.com**

1 of 1

Liberty002510

6600 France Ave S. Suite 245
Edina, MN 55435
1-866-927-0184 phone
952-927-7147 fax
office@behavioralmedical.com

**Behavioral·Medical
Interventions**

March 22, 2016                               **CONFIDENTIAL**

Nancy Winterer
Liberty Mutual
London, KY

Re: Haley Spears
Claim No: REDACTED
Web ID: 577726

Dear Ms. Winterer:

This report will serve as an addendum to my original report dated 3/4/16, related to Haley Spears, after reviewing the additional information received.  Services have been completed on this file, and specific questions you have asked are addressed at the end of this report.

**Conclusion**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of clinical probability that my opinion from my original report has not changed.

**Referral Information**:
Age (DOB): REDACTED
Gender: FEMALE
DOD: 09/27/2008
Diagnoses listed on referral: headache

**Medical Issue**
The primary medical issue in question in this review is noted as further clarification regarding my opinion on the neuropsychological testing that was done.

**Analysis**
Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of clinical probability that . . . As previously stated in initial report dated 2/13/2016, analysis of the case has not changed, and thus reflects the responses to the following questions.

**Questions**
The below questions are answered for the timeframe of 9/27/08 through 3/27/09 and 3/28/09 through 3/31/15.  Please refer to the Analysis section above for additional details and rationale supporting this reviewer's opinions.

Nancy Winterer                                                    Re: Haley Spears
March 22, 2016                                                    Page 2 of 2

1. **Please explain the reason you conclude the data provided for this review was "mostly obsolete."**

   From a neuropsychological perspective, the undersigned concluded that the data was "mostly obsolete" based on updated neuropsychological information.  As previously noted, the claimant had only undergone one neuropsychological evaluation in July, 2010 which was deemed abbreviated, nonstandardized, and did not include formal effort testing.  Within the time frame through 3/31/15, this information is clearly obsolete (e.g., 6 years old).

2. **Please explain how the data you described as "mostly obsolete" reflects on the claimant's impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015.**

   Once again, and from a neuropsychological perspective, the neuropsychological evaluation completed in July, 2010, is obsolete as it is 6 years old.  Furthermore, the evaluation was nonstandardized, somewhat cursory, and without formal effort testing.  Thus, given the dearth of updated neuropsychological data, the aforementioned information, in and of itself, does not reflect the claimant's impairments, cause of any impairments, severity of impairments, or limits on functional capacity.

3. **Please explain how the "obsolete (6 years old)" results of Dr. Rissenberg's July 2010 neuropsychological evaluation reflect on the claimant's impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015.**

   As noted above, Dr. Rissenberg's neuropsychological evaluation, dated July, 2010, albeit nonstandardized and somewhat cursory, would certainly preclude any conclusions regarding the claimant's current impairments, cause of impairments, severity of impairments, or limitations in functional capacity.  In essence, without having comprehensive and updated neuropsychological data, the undersigned was unable to render a clinical opinion regarding limitations, restrictions, or functional capability, with any degree of neuropsychological certainty.

Sincerely,

Michael Raymond, PhD, ABN
Board Certified Neuropsychologist
New Jersey License # SIO2529

*All opinions in this report are solely the opinions of the author. There is no conflict of interest. There is no doctor/provider-patient treatment relationship, and the author did not personally examine the claimant. All opinions are advisory only, independent, and are based upon a reasonable degree of medical certainty and evidence-based medical concepts, considering all the data available at the time of preparation of this report.  This report is not intended as a recommendation regarding any decisions on a claim or administrative functions to be made or enforced. BMI does not make claim decisions.*

Liberty002512

<u>**CURRICULUM VITAE**</u>

**Michael J. Raymond**
**866-927-0184**

**EDUCATION:**

1981                    Ph.D.   Rehabilitation (Psychology), Florida
                        State University, Tallahassee, Florida

1978                    M.S.   Rehabilitation Counseling, University of
                        Scranton, Scranton, Pennsylvania

1974                    B.A.   History/Education, St. Francis College, Loretto,
                        Pennsylvania

**PROFESSIONAL EXPERIENCE:**

2010 – Present    **<u>Clinical Associate Professor</u>**
                        Department of Clinical Sciences, The Commonwealth
                        Medical College, Scranton, Pennsylvania.
                           Provide clinical practicum teaching and supervision of
                           medical students with primary emphasis in
                           clinical/forensic neuropsychology and rehabilitation.

2010 – Present    **<u>Consulting Neuropsychologist</u>**
                        Neuropsychological Rehabilitation Services
                        Neptune, New Jersey.

                           Provide comprehensive clinical and forensic
                           neuropsychological assessment and consultation.

2005 – Present    **<u>Neuropsychological Consultant</u>**
                        Behavioral Medical Interventions
                        Minneapolis, Minnesota.

Updated 5.5.14

Liberty002513

Provided clinical and forensic neuropsychological consultation.

2004 – 2010     **Director, Adult Neuropsychology Services**
Comprehensive Neuropsychological Specialties, Monmouth Beach, New Jersey.
Provide comprehensive clinical and forensic neuropsychological assessment and consultation.

2002 – Present     **Clinical Professor,**
Department of Psychology, Philadelphia College of Osteopathic Medicine, Philadelphia, Pennsylvania.
Provide clinical practicum teaching and supervision for doctoral psychology students with primary emphasis on clinical neuropsychology and rehabilitation.

1998 - 2000     **Visiting Professor,**
Trnava University, Graduate School of Public Health and Nursing, Trnava, Slovak Republic.
Taught graduate courses with primary emphasis on neuropathology, rehabilitation and neuropsychology.

1994 - 1997     **Adjunct Professor,**
Marywood University, Graduate School of Arts and Sciences (Psychology), Scranton, Pennsylvania.
Taught graduate level courses with primary emphasis on neuroanatomy, neuropsychological assessment and neurological disorders.

1992 - 2006     **Surveyor, Brain Injury Programs,**
Commission on Accreditation of Rehabilitation Facilities, Tucson, Arizona.

1990 - 2006     **Neuropsychologist,**
Monmouth Neuropsychology Associates, Red Bank, New Jersey.
Provided comprehensive clinical and forensic neuropsychological assessment and consultation.

Liberty002514

1988 - Present      **Director, Clinical/Forensic Neuropsychology,**
                    **Clinical Director, Brain Injury/Sports Concussion Program,**
                    The John Heinz Institute of Rehabilitation Medicine, Wilkes-
                    Barre, Pennsylvania.
                            Provide comprehensive inpatient/outpatient
                            neuropsychological consultation to physicians,
                            and multidisciplinary rehabilitation team, provide
                            consultation to the Veteran's Administration Medical
                            Center (VAMC), inservice training/education and
                            research.  Provide expert forensic neuropsychological
                            testimony.  Provide all managerial, administrative and
                            supervisory duties to a five (5) person department,
                            including cognitive rehabilitation and psychometry and
                            sports concussion program affiliated with professional,
                            college, and high school teams.

1986 – 1998         **Neuropsychologist,** (part-time), Wyoming Valley Health Care
                    System, First Hospital Wyoming Valley, Wilkes-Barre,
                    Pennsylvania.
                            Provided comprehensive inpatient neuropsychological
                            consultation to the psychiatry service, including adult,
                            adolescent, children and addictive treatment programs.
                            Participated in biweekly staff meetings and inservice
                            training.

1986 - 1988         **Neuropsychologist, Director, Psychological Services,**
                    The John Heinz Institute of Rehabilitation Medicine, Wilkes-
                    Barre, Pennsylvania.
                            Provided comprehensive inpatient/outpatient
                            neuropsychological consultations to the medical service
                            and multidisciplinary rehabilitation team, pain/stress
                            management, cognitive rehabilitation, psychotherapy,
                            inservice training and research.  Provided all managerial,
                            administrative and supervisory duties to seven (7) person
                            Department of Psychological Services.  Developed a
                            neuropsychological laboratory and contributed toward the
                            development of a cognitive rehabilitation service and
                            brain injury rehabilitation program.

Liberty002515

| 1985 - 1986 | **Neuropsychologist,** Neurorehab Associates, Inc., Rochester New York. |

Provided comprehensive neuropsychological consultation including assessment and evaluation for day rehabilitation patients and outpatients and individual, family and group psychotherapy.  Responsible for the supervision of the neuropsychology service including a staff psychologist and three (3) psychometrists.  Contributed to the development of a comprehensive day rehabilitation service for neurologically impaired individuals. Provided consultation to the interdisciplinary rehabilitation team. Participated in weekly neurology grand rounds, The University of Rochester School of Medicine.

| 1982 - 1985 | **Clinical Psychologist,** (part-time), Family Counseling Clinic, Mansfield, Pennsylvania. |

Provided intake/brief psychological evaluations and individual family psychotherapy.

| 1981 - 1985 | **Clinical Psychologist,** Department of Rehabilitation Medicine, Clinical Psychology  Section, The Williamsport Hospital and Medical Center, Williamsport, Pennsylvania. |

Provided consultations to the medical service and multidisciplinary rehabilitation team, neuropsychological assessment and evaluation, pain/stress management, psychotherapy and inservice training.  Consultant and contributing editor to the Department of Sports Medicine.

| 1979 - 1981 | **Graduate Assistant,** Department of Human Services and Studies, Florida State University, Tallahassee, Florida. |

Instructor:   Medical and Psychological Aspects of Disability, 5 hour undergraduate course.

Supervisor:   Undergraduate intern and field experience, 7 quarters.

Researcher:   Curriculum Development, Task Force of Independent Living.1979 – 1980

| 1979 - 1980 | **Directed Individual Study**, Department of Psychology, |

Liberty002516

Tallahassee Pain and Stress Management Institute, Tallahassee, Florida.
> Training and practice in pain/stress management utilizing a variety of biofeedback modalities and relaxation techniques.

1978 - 1979    **Psychological Associate**, Divine Providence Hospital, Community Mental Health Center, Williamsport, Pennsylvania.
> Provided individual, marital and family psychotherapy, psychological and neuropsychological assessment and evaluation, and consultation with the Lycoming County Prison.

1/78 - 6/78    **Clinical Psychology Intern**, Department of Rehabilitation Medicine, Neuropsychology Section, Geisinger Medical Center, Danville, Pennsylvania.
> Training and practice in medical consultations (i.e., neurology, pediatrics, rehabilitation medicine, psychiatry, etc.), provided neuropsychological assessment and evaluation involved with neurologyurology/neurosurgery conferences and rehabilitation medicine grand rounds.

9/77 - 12/77    **Graduate Practicum**, Department of Psychiatry, Clinical Psychology Section, VA Medical Center, Wilkes-Barre, Pennsylvania.
> Training and practice in psychiatric consultations, Individual/group therapy, and neuropsychological assessment.

9/77 - 12/77    **Graduate Practicum**, Department of  Career Development, Williamsport Area Community College, Williamsport, Pennsylvania.
> Training and practice in individual and group vocational counseling, and psychological/vocational assessment and evaluation of college students and community residents.

1974 - 1976    **Supervisor**, Division of Distribution, Grand Union Company,

Liberty002517

Elmwood Park, New Jersey.
Supervised union personnel and clerical staff; majority of responsibilities included: productivity, cost analysis and inventory control.


**PRESENTATIONS:**

| | |
|---|---|
| November 2011 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Marco Island, Florida. |
| October 2011 | Behavioral Manifestations in Brain Injury.  Brain Injury Team Inservice.  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 2011 | Neurocognitive Deficits in Epilepsy.  Epilepsy Support Group, Wilkes-Barre, Pennsylvania. |
| May 2011 | Clinical and Forensic Neuropsychological Aspects of MTBI.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| May 2011 | Roundtable Discussion:  Future Trends in Sports Concussion Management.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| March 2011 | Neuropsychological Performance in a Patient Following Resection of a Vestibular Schwannoma. American College of Professional Neuropsychology 3rd Annual Conference, Las Vegas, Nevada. |
| March 2011 | Concussions. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 2010 | Schools Treat Concussions Seriously, Newspaper Interview/Article, The Citizen's Voice, Wilkes-Barre, Pennsylvania. |

Liberty002518

| | |
|---|---|
| November 2010 | Concussions Drawing More Attention, Newspaper Interview /Article, The Times Tribune, Scranton, Pennsylvania. |
| November 2010 | Use Your Head When Making Decisions About Sports Concussion, Wilkes-Barre Junior Penguins, Wilkes-Barre, Pennsylvania. |
| October 2010 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| October 2010 | Neuropsychological Consequences of Moyamoya Disease:  A Clinical Case Study.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| May 2010 | Speed that Hurts:  MVA & TBI:  WILK Radio, Wilkes-Barre, Pennsylvania. |
| February 2010 | Anoxic Encephalopathy Following Cardiac Arrest.  American College of Professional Neuropsychology Conference, Las Vegas, Nevada. |
| November 2009 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| October 2009 | Work-Related Mild Traumatic Brain Injury:  Forensic Neuropsychological Assessment 2009.  Northeast Regional Occupational Health and Safety Conference, Wilkes-Barre, Pennsylvania. |
| October 2009 | Clinical and Forensic Neuropsychology:  An Overview.  Brain Injury Rehabilitation Team, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |

Liberty002519

| | |
|---|---|
| April 2009 | Visual Perceptual Symptoms Associated with Right Hemispheric Pathology do not Affect Performance on the TOMM.  American College of Professional Neuropsychology Conference, San Diego, California. |
| March 2009 | Clinical Consideration in Sports Concussion Management.  Southeast Georgia Healthcare System, Brunswick, Georgia. |
| October 2008 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Neuropsychological Consequences of Autosomal Dominant Cerebellar Atrophy:  A Clinical Study.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Concussion Among High School Athletes.  Sports Fever, 1340 FOX Sports Radio, Wilkes-Barre, Pennsylvania. |
| September 2008 | Traumatic Brain Injury:  Healing the Body and Mind. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 2008 | Expect the Unexpected:  Signs and Symptoms of TBI. Pastoral Care Conference, Wilkes-Barre, Pennsylvania |
| August 2008 | Clinical and Legal Implications of Sports Concussion. John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2008 | Consequences of Sports Concussion.  Sports Fever, WSWB TV, Wilkes-Barre, Pennsylvania. |
| June 2008 | Signs, Symptoms, and Treatment of Sports Concussion in High School Athletes.  Toyota High School Sports Show, FOX 56 TV, Wilkes-Barre, Pennsylvania. |

Updated 5.5.2014                                              8

Liberty002520

| | |
|---|---|
| February 2008 | Sports Concussion:  Tackling the Common Myths.  You Be The Judge, FOX 56 TV, Wilkes-Barre, Pennsylvania. |
| February 2008 | Traumatic Brain Injury Overview.  You Be The Judge, FOX 56 TV, Wilkes-Barre, Pennsylvania. |
| February 2008 | Mild Traumatic Brain Injury in the Workplace:  Clinical and Forensic Neuropsychological Considerations.  PES1: Worker's Compensation Conference, Las Vegas, Nevada. |
| November 2007 | Cumulative Effects of Multiple Concussion:  A Neuropsychological Case Study.  The National Academy of Neuropsychology Annual Meeting, Scottsdale, Arizona. |
| November 2007 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Scottsdale, Arizona. |
| October 2007 | Management of Sports Concussion; Sue Henry Show, WILK Radio, Wilkes-Barre, Pennsylvania. |
| September 2007 | Current Trends in Sports Concussion Management, Sports Talk Saturday, WILK Radio, Wilkes-Barre, Pennsylvania. |
| March 2007 | Work-Related Mild Traumatic Brain Injury:  Forensic Neuropsychological Assessment.  Workers Injury Law and Advocacy Group, 12th Annual Conference, San Antonio, Texas. |
| March 2007 | Ethical Representation of Brain Injured Workers. Workers Injury Law and Advocacy Group, 12th Annual Conference, San Antonio, Texas. |
| November 2006 | Sports Concussion:  An Overview for the High School |

Liberty002521

Athlete.  Wilkes-Barre Area School District, Wilkes-Barre, Pennsylvania.

October 2006        Sacred Stories of Sudden Disability, Moderator, Panel Discussion,  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

October 2006        The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas.

October 2006        Neuropsychological Sequela in a Patient with a Tumefactive Demyelinating Lesion.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas.

September 2006      Sports Concussion Management, Sports Talk, WILK Radio, Wilkes-Barre, Pennsylvania.

May 2006            Sports Concussion, Advance (2006, 16, 18), Interview, King of Prussia, Pennsylvania.

May 2006            Survivor/Family Panel Discussion; Moderator, 2006 Statewide TBI Conference, Anchorage, Alaska.

May 2006            Neuropsychological Assessment:  Clinical/Forensic Implications, 2006 Statewide TBI Conference, Anchorage, Alaska.

May 2006            Sports Concussion, 2006 Statewide TBI Conference, Anchorage, Alaska.

April 2006          Sports Concussion Management, WNEP-TV Health Watch.

April 2006          Program Aims to Assess Concussions.  Times Leader

Updated 5.5.2014                    10

Liberty002522

|  | Newspaper Interview (April 25, 2006), Wilkes-Barre, Pennsylvania. |
|---|---|
| March 2006 | Traumatic Brain Injury and Concussion Management, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2005 | Medical Overview:  Traumatic Brain Injuries.  The Critical Medical, Legal and Funding Issues for Children and Adults with Spinal Cord and Traumatic Brain Injuries, Wilkes-Barre, Pennsylvania. |
| October 2005 | Test of Memory Malingering (TOMM) Performance in Persons with Right Hemisphere Lesions.  The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| October 2005 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| August 2005 | Sports Concussion Management, Sports Medicine Conference, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2004 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission, and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |
| November 2004 | Neuropsychological Findings in a Patient with HELLP Syndrome.  The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |

Liberty002523

| | |
|---|---|
| June 2004 | Strategies & Techniques to Improve Adjustment Difficulties following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| June 2004 | Neuropsychological Assessment of Mild Brain Injury in Patients with Spinal Injuries, Brain Injury Association of Pennsylvania Annual Meeting, Harrisburg, Pennsylvania. |
| February 2004 | Community Awareness of Traumatic Brain Injury, Catholic Television Network, Scranton, Pennsylvania. |
| October 2003 | Left Temporal Parietal Infarct Secondary to Idiopathic Thrombocytopenia Purpura:  A Neuropsychological Case Study.  The National Academy of Neuropsychology Annual Meeting, Dallas, Texas. |
| March 2003 | Neurocognitive and Behavioral Concomitants of Traumatic Brain and Spinal Injuries, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |
| November 2002 | Neuropsychological Manifestations of Multiple Sclerosis, National Multiple Sclerosis Society Meeting, Matamoras, Pennsylvania. |
| October 2002 | Neuropsychological Performance in a Patient with Von Hippel-Lindau Disease, The National Academy of Neuropsychology Annual Meeting, Miami, Florida. |
| August 2002 | Family Intervention Strategies Following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2002 | Cognitive and Behavioral Symptoms of Sjogren Syndrome, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| November 2001 | Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, Allied Services John Heinz Institute of Rehabilitation |

Liberty002524

Medicine, Wilkes-Barre, Pennsylvania.

November 2001       Neuropsychological Manifestations in a Case of Sjogren Syndrome , The National Academy of Neuropsychology Annual Meeting, San Francisco, California.

May 2001       Neuropsychological Aspects of Mild Brain Injury, Association of Rehabilitation Nurses, Wilkes-Barre, Pennsylvania.

November 2000       Central Neurocytoma:  Serial Neuropsychological Findings, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida.

November 2000       Neuropsychological Assessment and Treatment of Multiple Sclerosis, National Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania.

October 2000       Post Concussion:  An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

September 2000       An Expert Opinion on Concussion, Times Leader Newspaper (interview), Wilkes-Barre, Pennsylvania.

May 2000       Neuropsychological Assessment of Acquired Brain Injuries, Luzerne/Lackawanna County Critical Care Association, Moosic, Pennsylvania.

November 1999       Neurobehavioral Sequelae of Immunotherapy Anaphylaxis, The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas.

October 1999       Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

September 1999       Signs, Symptoms, and Suggestions of Everyday

Liberty002525

|  | Concussion, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
|---|---|
| August 1999 | Concussion in Sports, WWDL 105 FM Radio, Scranton, Pennsylvania. |
| May 1999 | Symptom Exaggeration and Mild Traumatic Brain Injury: An Unbelievable Case, Advanced Workshop in Applied Clinical Neuropsychology, The Reitan Society Annual Meeting, San Diego, California. |
| April 1999 | Neurobehavioral Consequences of Acquired Brain Injury, Outpatient Services, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1998 | Repeal of the Helmet Law; Clinical Considerations, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| November 1998 | Brainwave-R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation, The Reitan Society Meeting, 18th Annual Conference of the National Academy of Neuropsychology, Washington, D.C. |
| September 1998 | Multidisciplinary Approach to Rehabilitation, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 1998 | Viral Encephalitis: A Case Study Based on Serial HRNB Performances, The Reitan Society Annual Meeting, Tuscon, Arizona. |
| August 1998 | International Teleconference on Rehabilitation, University of Scranton, Scranton, Pennsylvania. |
| June 1998 | Post Concussion: An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |

Liberty002526

| | |
|---|---|
| May 1998 | Neurological Rehabilitation in the United States; Panel Discussion, Trnava University, Slovak Republic. |
| May 1998 | Model Brain Injury Program; Panel Discussion, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| May 1998 | Major Consequences of Mild Brain Injury, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| April 1998 | Common Misconceptions about Brain Injury Among Survivors and Family Members, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| January 1998 | Mild Brain Injury; Multispecialty Perspectives, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 1997 | Photostimulation and Seizures: The Japanese Cartoon Dilemma.  WARM Radio (590 AM), Pittston, Pennsylvania. |
| November 1997 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Neuropsychological Dysfunction in a Mixed Dominant Patient Following a Left Temporoparietal Abscess, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Recovery from Traumatic Brain Injury: A Cognitive Rehabilitation Case Study, The Brain Injury Association Annual National Symposium, Philadelphia, Pennsylvania. |
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The |

Liberty002527

|  | John Heinz Institute of Rehabilitation Medicine, Tunkhannock Clinic, Tunkhannock, Pennsylvania. |
|---|---|
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The John Heinz Institute of Rehabilitation Medicine, Hazleton Clinic, Hazleton, Pennsylvania. |
| February 1997 | The Effects of Traumatic Brain Injury on the Survivor and Family, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1996 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| November 1996 | Neuropsychological Dysfunction in a Patient with Multiple Meningiomas, Reitan Society Meeting, New Orleans, Louisiana. |
| April 1996 | Neurobehavioral Consequences of Brain Injury, Valley Crest Nursing Facility, Wilkes-Barre, Pennsylvania. |
| November 1995 | Traumatic Brain Injuries, Panel Discussion, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| November 1995 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, San Francisco, California. |
| November 1995 | Neuropsychological Aspects of Posthallucinogen Perception Disorder, Reitan Society Meeting, San Francisco, California. |
| October 1995 | Neurosurgical/Neuropsychological Collaboration in the |

Liberty002528

Diagnosis and Treatment of Meningioma, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania.

| | |
|---|---|
| August 1995 | Current Perspectives of Brain Injury Rehabilitation, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 1995 | Forensic Neuropsychological Considerations in Traumatic Brain Injury Cases, Litigation Department, Hourigan, Kluger, Spohrer, Quinn, Wilkes-Barre, Pennsylvania. |
| March 1995 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1995 | Brainwave-R: A Comprehensive Cognitive Rehabilitation Program, Applied Cognitive Rehabilitation Training Seminar, Albuquerque, New Mexico. |
| December 1994 | Assessment of Malingering (part 2), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Assessment of Malingering (part 1), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Rehabilitation Overview, Medical Staff, Headley Court, Surrey, England. |
| November 1994 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida. |
| November 1994 | The Effects of Unilateral Vascular Lesions and Gender on Visual-Spatial and Verbal Auditory Attention, The National Academy of Neuropsychology Annual |

Liberty002529

|  | Meeting, Orlando, Florida. |
|---|---|
| November 1994 | Predictive Validity of Neuropsychological Deficit Scale and Halstead Impairment Index in Mild Traumatic Brain |
|  | Injury:  A Two Center Study, The Reitan Society Meeting, Orlando, Florida. |
| April 1994 | Neurobehavioral Consequences of Acquired Brain Injury, Meadows Nursing and Rehabilitation Center,  Dallas, Pennsylvania. |
| February 1994 | Summary Challenge Moderator:  The National Forum Conference on Federal Healthcare Legislation, Washington, D.C. |
| December 1993 | Neuropsychological Overview, Wilkes University Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| December 1993 | Traumatic Brain Injury:  The Transition from Rehabilitation to College, Luzerne County Community College, Nanticoke, Pennsylvania. |
| November 1993 | Grand Rounds:  Penetrating Head Injury Without Neuropsychological Deficits, The Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| November 1993 | Medicolegal Aspects of Epilepsy, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 1993 | Moderator: Reitan Society Meeting, The National Academy of Neuropsychology Annual Meeting, Phoenix, Arizona. |
| October 1993 | The Neuropsychologist as Consultant in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Phoenix, Arizona. |

Liberty002530

| | |
|---|---|
| May 1993 | Neuropsychological Assessment of Traumatic Brain Injury, Head Trauma Awareness Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1993 | Head Injuries, Call The Doctor, WVIA TV, Avoca, Pennsylvania |
| February 1993 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1993 | The Transition from Rehabilitation to School, Luzerne Intermediate Unit, Wilkes-Barre, Pennsylvania. |
| November 1992 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Neuropsychology  Overview:  College Misericordia Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Behavioral  Problems Following Traumatic Brain Injury, Head Injury Support Group, Wilkes-Barre, Pennsylvania. |
| May 1992 | Minor Head Injury:  Neuropsychological Perspectives, The Second Annual Educational Conference of the JMA Foundation, Baltimore, Maryland. |
| April 1992 | Neuropsychological Consequences of Traumatic Brain Injury, Head Trauma Symposium, Marywood University, Scranton, Pennsylvania. |
| April 1992 | Neuropsychological Aspects of Minor Head Injury, Mild Traumatic Brain Injury Conference, Reading, Pennsylvania. |
| March 1992 | Neuropsychological Rehabilitation:  A Clinical Overview, |

Liberty002531

American Rehabilitation Nursing Association, Wilkes-Barre, Pennsylvania.

March 1992                 Neuropsychology Overview, Lycoming College Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

February 1992              Halstead - Reitan Neuropsychological Battery (2 Part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania.

February 1992              The Use of the Knox's Cube Test and Digit Span in Assessing Memory and Attention, International Neuropsychological Society Annual Meeting, San Diego California.

February 1992              Neuropsychological Assessment:  An Adjunct to Neurological Diagnosis, The Seventh Annual University of Scranton Psychology Conference, Scranton, Pennsylvania.

January 1992               Management of the Aggressive Patient, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

November 1991              Medicolegal Aspects of Symptom Exaggeration and Malingering:  A Clinical Update, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

November 1991              Antiseizure Medication and Cognitive Performance, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

August 1991                Minor Head Injury Rehabilitation, PARF Conference, Harrisburg, Pennsylvania.

Liberty002532

| | |
|---|---|
| August 1991 | Head Trauma Rehabilitation Overview, St. Francis Medical Center, Poughkeepsie, New York. |
| June 1991 | Helmet Law and Head Injury, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| May 1991 | Neuropsychology Overview, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1991 | Neuropsychological Aspects of Minor Head Injury, The First Annual Educational Conference of The National Brain Injury Research Foundation, Washington, D.C. |
| March 1991 | Neuropsychological Sequelae in Acute Carbon Monoxide Encephalopathy, The Sixth National Traumatic Brain Injury Symposium, Baltimore, Maryland. |
| February 1991 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The Sixth Annual University of Scranton Psychology Conference, Scranton, Pennsylvania. |
| January  1991 | Depression vs. Dementia, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| November 1990 | Medicological Aspects of Competency in Dementia, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1990 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The National Academy of Neuropsychology Annual Meeting, Reno, Nevada. |
| October 1990 | Head Trauma Rehabilitation, Southern Tier Independence Center Head Injury Conference, Binghamton, New York. |

Liberty002533

August 1990                  Overview of Neuropsychological/Cognitive
                             Services, Veterans Administration Medical Center,
                             Wilkes-Barre, Pennsylvania.

June 1990                    Neuropsychological Assessment Tutorial, Psychology
                             Department, First Hospital Wyoming Valley,
                             Wilkes-Barre, Pennsylvania.

March 1990                   Neuropsychological Consideration of Minor Head Injury,
                             Crawford Rehabilitation Services, Denver, Colorado.

February 1990                Medicolegal Aspects of Malingering:  A
                             Neuropsychological Perspective, Central Rehabilitation
                             Associates, Inc., Camp Hill, Pennsylvania.

January 1990                 Minor Head Injury, Apple A Day, WVIA TV, Avoca,
                             Pennsylvania.

December 1989                Head Trauma Rehabilitation:  Behavioral Management
                             Strategies, Nursing Department, The John Heinz Institute
                             of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

November 1989                Medicolegal Aspects of Symptom Exaggeration and
                             Malingering, The John Heinz Institute of Rehabilitation
                             Medicine, Wilkes-Barre, Pennsylvania.

September 1989               Halstead-Reitan Neuropsychological Battery (3 part
                             series), Psychology Department, The John Heinz
                             Institute of Rehabilitation Medicine, Wilkes-Barre,
                             Pennsylvania.

June 1989                    Interpersonal Communication Training, Nursing
                             Department, The John Heinz Institute of Rehabilitation
                             Medicine, Wilkes-Barre, Pennsylvania.

May 1989                     Neuropsychology Update:  Post-Concussive Syndrome,
                             Department of Neurology/Neurosurgery, Community
                             Medical Center, Scranton, Pennsylvania.

Liberty002534

| March 1989 | Current Trends in Head Trauma Rehabilitation, WARM Radio, Avoca, Pennsylvania. |
|---|---|
| March 1989 | Personal Injury Litigation, A Neuropsychological Perspective, Luzerne County Bar and Library Association, Wilkes-Barre, Pennsylvania. |
| December 1988 | Neuropsychological Deficit Scale:  A Clinical Case Review, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| December 1988 | WAIS-R Implications in Neuropsychological Assessment, (3 part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1988 | Neuropsychological Aspects of Diffuse Histiocytic Lymphoma, The National Academy of Neuropsychologists Annual Meeting, Orlando, Florida. |
| November 1988 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1988 | Halstead-Reitan Neuropsychological Battery, Graduate Psychology Class, Marywood College, Scranton, Pennsylvania. |
| November 1988 | Wechsler Memory Scale-Revised, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| September 1988 | Head Trauma Rehabilitation, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| September 1988 | Neuropsychological Investigation in Traumatic Brain Injury:  A Cognitive Rehabilitation Case Study, Cognitive Rehabilitation: Community Reintegration Through |

Liberty002535

Scientifically Based Practice, Richmond, Virginia.

| | |
|---|---|
| June 1988 | Neuropsychology Overview, United Rehabilitation Services, Wilkes-Barre, Pennsylvania. |
| June 1988 | Behavioral Sequelae of Stroke, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| February 1988 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The Fourth Annual Psychology Conference, University of Scranton, Scranton, Pennsylvania. |
| November 1987 | Neuropsychological Assessment (3 part series), Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 1987 | Worker's Compensation Developments - 1987; Neuropsychological Testimony, The Dickinson School of Law, Carlisle, Pennsylvania. |
| October 1987 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The National Academy of Neuropsychologists Annual Meeting, Chicago, Illinois. |
| May 1987 | Psychological Considerations in Multiple Sclerosis, Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania. |
| March 1987 | Neuropsychological Assessment:  Halstead-Reitan Battery, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| March 1987 | Psychological Considerations in Stroke Rehabilitation, Meadows Nursing Facility, Dallas, Pennsylvania. |
| February 1987 | Similar Neuropsychological Findings from |

Liberty002536

Cardiovascular Abnormalities:  A Comparison Case
Study, The Third Annual Psychology  Conference,
University of Scranton, Scranton, Pennsylvania.

February 1987          Neuropsychological Assessment:  Halstead-Reitan
Battery, Psychology Department, First Hospital
Wyoming Valley, Wilkes-Barre, Pennsylvania.

February 1987          Behavioral Sequelae of Head Trauma, Nursing
Department, The John Heinz Institute of Rehabilitation
Medicine, Wilkes-Barre,  Pennsylvania.

February 1987          WAIS-R Implications in Neuropsychological
Assessment, Department of Psychological Services, The
John Heinz Institute of Rehabilitation Medicine,
Wilkes-Barre, Pennsylvania.

January 1987          Pain Management for the Elderly, Senior Citizen Group,
Salvation Army, Wilkes-Barre, Pennsylvania.

January 1987          Introduction to Neuropsychological Assessment,
Department of  Psychological Services, The John Heinz
Institute of Rehabilitation Medicine, Wilkes-Barre,
Pennsylvania.

October 1986          Similar Neuropsychological Findings from
Cardiovascular Abnormalities:  A Comparison Case
Study, The National Academy of Neuropsychologists
Annual Meeting, Las Vegas, Nevada.

August 1986          WAIS-R Implications in Neuropsychological
Assessment, Department of Psychological Services,
The John Heinz Institute of Rehabilitation Medicine,
Wilkes-Barre, Pennsylvania.

May 1986          Bedside Neuropsychological Examination, Department of
Psychological Services, The John Heinz Institute of
Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

Liberty002537

| | |
|---|---|
| December 1985 | Differential Diagnosis of Dementia, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| August 1985 | Halstead-Reitan Neuropsychological Battery, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| October 1984 | Differential Intellectual Sequelae of Right Hemisphere CVA in Left vs. Right-Handed Patients.  The National Academy of Neuropsychologists Annual Meeting, San Diego, California. |
| March 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part II, Sunbury, Pennsylvania. |
| January 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part I, Sunbury, Pennsylvania. |
| June 1983 | Neuropsychology Inservice, Department of Nursing, Williamsport Hospital, Williamsport, Pennsylvania. |
| May 1983 | Learning Disabilities and Neuropsychological Assessment, Office of Vocational Rehabilitation, Williamsport, Pennsylvania. |
| November 1982 | Sports Psychology Winter Workshop, The Department of Sports Medicine, Williamsport Hospital, Williamsport, Pennsylvania. |
| March 1982 | Psychological Aspects of Asthma, The Central Pennsylvania Lung and Health Service Association, Williamsport, Pennsylvania. |
| February 1982 | Coping with the Cancer Patient, Department of Hematology/Oncology, Williamsport Hospital, Williamsport, Pennsylvania. |

Liberty002538

**BOARDS AND COMMITTEES:**

| | |
|---|---|
| 2007 – Present | National Alumni Board of Directors, Florida State University Alumni Association, Tallahassee, Florida. |
| 2003 – Present | Medical Advisor, National Brain and Spinal Cord Injury Prevention Program, Think First Program, Wilkes-Barre, Pennsylvania. |
| 2001 – 2002 | Examiner and Site Coordinator for Standardization Sample of the Reynolds Intellectual Assessment Scales (RIAS), Psychological Assessment Resources (PAR), Lutz, Florida. |
| 2001 – 2005 | Manuscript Reviewer, Rehabilitation Psychology, Washington, D.C. |
| 2000 – 2005 | Member, Clinical Practitioner Task Force:  National Academy of Neuropsychology, Denver, Colorado. |
| 1999 – 2002 | Board Member, Coalition of Clinical Practitioners in Neuropsychology, Tucson, Arizona. |
| 1999 – 2000 | President, Reitan Society, Tucson, Arizona. |
| 1998 - Present | Editorial Board, Journal of Cognitive Rehabilitation, Indianapolis, Indiana. |
| 1997 - 2006 | Editorial Board, Journal of Forensic Neuropsychology, Dallas, Texas. |
| 1996 - Present | New Jersey Board of Psychological Examiners (Examiner; Neuropsychology) Newark, New Jersey. |
| 1996 - Present | Editorial Board, The Professional Neuropsychologist. Bethesda, Maryland. |
| 1996 – 1997 | APA Continuing Education Committee, Marywood |

Liberty002539

University, Scranton, Pennsylvania.

| | |
|---|---|
| 1996 - 1998 | Professional Affairs Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1995 - 1998 | Vice-President, Reitan Society, Danville, Pennsylvania. |
| 1995 – 2007 | President, American College of Professional Neuropsychology, White River Junction, Vermont. |
| 1994 - 1997 | Chairperson, Public Relations Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1994 - Present | Executive Director, American Board of Professional Neuropsychology, White River Junction, Vermont. |
| 1993 - 2006 | Consulting Editor, Archives of Clinical Neuropsychology College Station, Texas. |
| 1993 - 1995 | Co-Chairperson, Reitan Society, Danville, Pennsylvania. |
| 1993 - 1997 | Program Committee, National Academy of Neuropsychology, Aurora, Colorado. |
| 1993 - 1994 | Coordinator, Professional Lecture Series, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1992 – 2000 | Editorial Board, Allied Services, Scranton, Pennsylvania. |
| 1992 - 1993 | Reitan Society Steering Committee, Danville, Pennsylvania. |
| 1992 - 1998 | Physicians Health Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1992 - 2006 | Commission on Accreditation of Rehabilitation Facilities (CARF), Surveyor, Tucson, Arizona. |

Liberty002540

| | |
|---|---|
| 1991 - Present | American Board of Professional Neuropsychology (Examiner) White River Junction, Vermont. |
| 1989 - 1994 | Medical Advisory Council, The National Brain Injury Research Foundation, Washington, D.C. |
| 1989 - 1994 | Editorial Board, (Associate Editor), The Journal of Head Injury, Washington, D.C. |
| 1989 - 2007 | Research Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - Present | Medical Records Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - Present | Brain Injury Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2007 | Quality Assurance Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2008 | Medical Staff Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - 1988 | Advisory Board Member, NHIF Northeast Region, Wilkes-Barre, Pennsylvania. |
| 1986 - 1987 | Patient/Family Education Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1985 - 1986 | Board Member, Neurorehab Associates, Inc., Rochester, New York. |
| 1985 - 1986 | Board Member, NHIF Eastern Region, Rochester, New York. |
| 1984 - 1986 | Board Member, NHIF Eastern Region, Williamsport, Pennsylvania. |

Liberty002541

| 1983 - 1985 | Employee Health, Fitness and Recreation Program, Williamsport Hospital, Williamsport, Pennsylvania. |
|---|---|
| 1982 - 1985 | Board Member, Counseling Clinic, United Methodist Home for Children, Mansfield, Pennsylvania. |
| 1981 - 1985 | Behavioral Science Committee, Williamsport Hospital, Williamsport, Pennsylvania. |

**CERTIFICATION AND LICENSURE:**

American Board of Forensic Examiners,
    Diplomate (1303) (Neuropsychology)
American Board of Professional Disability Consultants,
    Diplomate (P-132)
American Board of Professional Neuropsychology,
    Diplomate (232)
American Board of  Professional Neuropsychology,
    Added Qualifications in Rehabilitation (112) and
    Forensics (127)
ImPACT Consultant, Sports Concussion Management
New Jersey State Board of Psychological Examiners
    (SI02529)

**AWARDS AND HONORS:**

Healthcare Hero Award, Times Leader, 2010
Distinguished Neuropsychologist Award, American Board of
    Professional Neuropsychology, 2003
Ad-Hoc Member on Rehabilitation, Hospital Association of
    Pennsylvania, 1999.
Charter Member, Coalition of Clinical Practitioners in
    Neuropsychology, 1999.
President, Reitan Society, 1998 – 2000.
Honorary Professorship, Trnava University, 1998.

Liberty002542

Charter Member, Reitan Society, 1997.
Diplomate, American Board of Forensic Examiners, 1995.
Distinguished Alumnus Award in Medicine, St. Francis College, 1995.
Fellow, American College of Professional Neuropsychology, 1995.
Fellow, National Academy of Neuropsychology, 1994.
Diplomate, American Board of Professional Disability Consultants, 1993.
Diplomate, American Board of Professional Neuropsychology, 1991.
Fellow, Pennsylvania Psychological Association, 1990.
Graduate Assistantship, Florida State University, 1979 - 1981.
Rho Chi  Sigma, Rehabilitation Counseling Services Honor Society, 1979.
Rehabilitation Services Administration Traineeship Award, 1976 - 1978.


**PROFESSIONAL MEMBERSHIPS:**

American Board of Forensic Examiners (Diplomate)
American Board of Professional Neuropsychology (Diplomate)
American College of Forensic Examiners
American College of Professional Neuropsychology (Fellow)
American Psychological Association; (1, 22, 40)
Brain Injury Association
Coalition of Neuropsychology (Charter Member)
International Neuropsychological Society
National Academy of Neuropsychology (Fellow)
National Brain Injury Research Foundation
New Jersey Neuropsychological Society
Reitan Society (President, Vice President)
Society for Cognitive Rehabilitation
Susquehanna Neuropsychology Group (Past President)
National Brain and Spinal Cord Injury Prevention Program; Think First Program (Medical Advisor)

**RESEARCH/PUBLICATIONS:**

Raymond, M.J. (in press).  Neuropsychological performance in a Patient following resection of a vestibular schwannoma.

Liberty002543

**Applied Neuropsychology** (abstract).

Raymond, M.J. (2010).  Neuropsychological consequences of
       Moyamoya Disease:  A clinical case study.  **Archives of
       Clinical Neuropsychology, 25,** 6 (abstract).


Raymond, M.J. (2010).  Anoxic encephalopathy following
       cardiac arrest.  **Applied Neuropsychology, 17,** 3 (abstract).

Bennett, T.L. & Raymond, M.J. (2010).  Neuropsychological
       assessment in disability determination, fitness for duty and
       rehabilitation planning.  In A.M. Horton & L.C. Hartlage (Eds).
       **Handbook of Forensic Neuropsychology**, 2nd edition, New
       York, Springer.

Sewick, B. & Raymond, M.J. (2009).  Visual perceptual
       symptoms associated with right hemisphere pathology do not
       affect performance on the Test of Memory Malingering
       (TOMM).  **Applied Neuropsychology, 16,** 4 (abstract).

Raymond, M.J. (2008).  Neuropsychological consequences of
       autosomal dominant cerebellar atrophy:  a clinical study.
       **Archives of Clinical Neuropsychology, 23,** 6 (abstract).

Bennett, T.L. & Raymond, M.J. (2008).  The neuropsychology
       of traumatic brain injury.  In A.M. Horton, D. Wedding & J.
       Webster (Eds.).  **The Neuropsychology Handbook**, Volume 3,
       New York, Springer.

Raymond, M.J. (2007).  Work-related mild traumatic brain injury:
       forensic neuropsychological assessment.  **Worker's First
       Watch, Fall**.

Raymond, M.J. (2007).  Cumulative effects of multiple concussions:  a
       neuropsychological case study.  **Archives of Clinical
       Neuropsychology, 22,** 7 (abstract).

Raymond, M.J. (2007).  Playball:  not so fast my friend; a sports
       concussion case study.  **ImPACT Newsletter, Spring**.

Liberty002544

Raymond, M.J. (2006).  Neuropsychological sequela in a patient with a tumefactive demyelinating lesion.  **Archives of Clinical Neuropsychology, 21,** 6 (abstract).

Raymond, M.J. & Sewick, B.G. (2005).  Test of Memory Malingering (TOMM) performance in persons with right hemispheric lesions.  **Archives of Clinical Neuropsychology, 20,** 7 (abstract).

Raymond, M.J. (2005).  Neuropsychological profile of a patient with a CSF assay suggestive of Alzheimer's Disease.  **Applied Neuropsychology**, **12,** 4 (abstract).

Raymond, M.J. (2004).  Neuropsychological findings in a patient with HELLP syndrome.  **Archives of Clinical Neuropsychology, 19**, 7 (abstract).

Raymond, M.J. (2003).  Forensic neuropsychological assessment in cases of mild traumatic brain injury.  **Workers First Watch, 3,** 3.

Raymond, M. J. (2003).  Left temporal parietal infarct secondary to Idiopathic Thrombocytopenia Purpura:  A neuropsychological case study.  **Archives of Clinical Neuropsychology, 18,** 8 (abstract).

Bennett, T.L. & Raymond, M.J. (2003).  Utilizing neuropsychological testing in disability determination and rehabilitation planning. In  A. M. Horton & L.C. Hartlage (Eds.), **Handbook of Forensic Neuropsychology**, New York, Springer.

Raymond, M. J. (2003). Neuropsychological features of Von Hippel-Lindau disease.  **New Jersey Neuropsychological Society Newsletter, Winter/Spring.**

Raymond, M. J. (2002).  Cognitive and behavioral symptoms in a case of Sjogren syndrome. **Journal of Cognitive**

Liberty002545

Rehabilitation, Fall.

Raymond, M. J. (2002).  Neuropsychological performance in a case of Von Hippel-Lindau disease.  **Archives of Clinical Neuropsychology,  17,** 8 (abstract).

Raymond, M.J. (2001).  Neuropsychological manifestations in a case of Sjogren syndrome. **Archives of Clinical Neuropsychology, 16**, 8 (abstract).

Raymond, M.J. (2000).  Central Neurocytoma:  serial neuropsychological findings.  **Archives of Clinical Neuropsychology, 15,** 8 (abstract).

Raymond, M. J. (1999).  Symptom exaggeration and mild traumatic brain injury:  An unbelievable case.  **Reitan Society Bulletin, 5** (abstract).

Raymond, M. J. (1999).  Neurobehavioral sequelae of immunotherapy anaphylaxis.  **Archives of Clinical Neuropsychology, 14,** 8 (abstract).

Raymond, M.J., Bewick, K.C., Bennett, T.L., Malia, K.B. (1999).  A comprehensive functional approach to brain injury rehabilitation.  **Brain Injury Source, Fall.**

Raymond, M.J., Castellino, R.M. (1999).  The role of the clinical neuropsychologist in the assessment and treatment of rehabilitation patients.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3**.**

Raymond, M.J., Bewick, K.C., Kennedy, A. & Duffy, T.F. (1999).  A model program for brain injury rehabilitation.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3**.**

Raymond, M.J. & Bennett, T.L. (1999).  Introduction and overview.  In M.J. Raymond, T.L. Bennett, L.C. Hartlage & C.M. Cullum (Eds.), **Mild Traumatic Brain Injury: A Clinician's**

Liberty002546

**Guide**, Austin, Texas: Pro-Ed.

Bennett, T.L. & Raymond, M.J. (1999). Psychotherapeutic interventions for individuals with mild traumatic brain injury. In  M.J. Raymond, T.L. Bennett, L.C. Hartlage &

C.M. Cullum (Eds.), **Mild Traumatic Brian Injury: A Clinician's Guide**, Austin, Texas: Pro-Ed.

Raymond, M.J., Bennett, T.L., Hartlage, L.C., & Cullum, C.M. (1999)**.  Mild Traumatic Brain Injury: A Clinician's Guide,** Austin, Texas: Pro-Ed.

Raymond, M.J. (1998).  Viral encephalitis; A case study based on serial HRNB performance.  **Reitan Society Bulletin, 4** (abstract).

Malia, K.B., Raymond, M.J., Bewick, K.C., & Bennett, T.L. (1998). Information processing deficits and brain injury: Preliminary results, **Neuro Rehabilitation**, **11**, 3.

Raymond, M.J. (1998).  Post concussion: An often neglected syndrome.  **Northeast Rehab.  September/October**.

Bennett, T.L., Raymond, M.J., Malia, K.B., Bewick, K.C., Linton, B.S. (1998).  Rehabilitation of attention and concentration deficits following brain injury.  **Journal of Cognitive Rehabilitation,  March/April.**

Raymond, M.J. (1998).  Neuropsychological dysfunction in a mixed dominant patient following a left temporoparietal abscess.  **Archives of Clinical Neuropsychology, 13**, 1 (abstract).

Raymond, M.J. (1997). Neuropsychological dysfunction in a patient with multiple meningiomas.  **Reitan Society Bulletin, 3** (abstract).

Bennett, T.L. & Raymond, M.J. (1997). Mild brain injury: An overview. **Applied Neuropsychology, 4,** 1.

Liberty002547

Bennett, T.L. & Raymond, M.J. (1997). Emotional consequences of and psychotherapy for individuals with mild brain injury. **Applied Neuropsychology, 4,** 1.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1997). **Brainwave R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation**, Austin, Texas: Pro-Ed.

Raymond, M.J. (1996).  Neuropsychological aspects of posthallucinogen perception disorder.  **Reitan Society Bulletin, 2,** 1 (abstract).

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1996).  The effects of unilateral vascular lesions and gender on visual-spatial and verbal-auditory attention span.  **Applied Neuropsychology, 3,** 4.

Raymond, M.J., Bewick, K.C., Malia, K.B., & Bennett, T.L. (1996). A comprehensive approach to memory rehabilitation following brain injury. **Journal of Cognitive Rehabilitation. November/December**.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1996). Memory: A comprehensive approach.  **Society for Cognitive Rehabilitation Newsletter, 4,** 3.

Raymond, M.J., Bennett, T.L., Malia, K.B., & Bewick, K.C. (1996). Rehabilitation of visual processing deficits following brain injury. **Neuro Rehabilitation, 6**, 3.

Rojas, D.C.,  Raymond, M.J., & Bennett, T.L. (1995).  Predictive validity of the neuropsychological deficit scale and halstead impairment index in mild brain injury: A two center study. **Reitan Society Bulletin, 1**, 1 (abstract).

Bewick, K.C., Raymond, M.J., Malia, K.B., & Bennett, T.L. (1995). Metacognition as the ultimate executive:  Techniques and tasks

Liberty002548

to facilitate executive functions. **Neuro Rehabilitation**, **5**, 4.

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1995).  The effects
   of unilateral vascular lesions and gender on visual-spatial and
   verbal-auditory attention.   **Archives of Clinical
   Neuropsychology, 10**, 4 (abstract).

Raymond, M.J. (1994). Neuropsychological consultation in
   rehabilitation.  **New Jersey Rehab, 3**.

Raymond, M.J. (1994).  Aging and neuropsychological assessment.
   **Archives of Clinical Neuropsychology, 9**, 6.  (book review).

Raymond, M.J. (1992).  Neuropsychiatric sequelae in acoustic
   neuroma.  **Bulletin of the National Academy of
   Neuropsychology, 8**, 4.

Raymond, M.J. (1992).  Opening doors: The significance of
   neuropsychological assessment in neurorehabilitation.  **Rehab
   Management**, **June/July.**

Franzen, M.D.,  McCracken, L.M., Raymond, M.J., Haut, M.W., &
   Haut, J.S. (1992).  The use of the knox's cube test and digit
   span in assessing memory and attention.  **Journal of Clinical
   and Experimental Neuropsychology, 14**, 1 (abstract).

Naugle, R.I. & Raymond, M.J. (1991).  Neuropsychological
   sequelae of stroke as a function of handedness.  **Perceptual
   and Motor Skills, 73**.

Raymond, M.J. & Naugle, R.I. (1991).  Handedness and gender
   effects on the relative preservation of  visuospatial versus
   verbal function following  right hemisphere stroke.  **Archives
   of Clinical Neuropsychology, 6,** 3 (abstract).

Raymond, M.J. (1991).  Neuropsychological assessment:  An adjunct
   to neurological diagnosis.  **Hospital News, June.**

Raymond, M.J. (1990). Neuropsychological aspects of minor head

Liberty002549

injury.  **The Journal of Head Injury, 4**.

Raymond, M.J. (1989).  Major consequences of minor head injury.
        **JMA Bulletin, 2**.

Raymond, M.J. (1989).  Neuropsychological aspects of  diffuse
        histiocytic lymphoma:  A case report.  **Archives of Clinical
        Neuropsychology, 4,** 2 (abstract).

Raymond, M.J. (1988).  Neuropsychological investigation in right
        hemisphere stroke:  A rehabilitation case study.  **Bulletin:
        The National Academy of  Neuropsychologists, 5** (abstract).

Raymond, M.J. (1986).  Similar neuropsychologic findings from
        cardiovascular abnormalities:  A comparison case study.
        **Archives of Clinical Neuropsychology, 1**, 3 (abstract).

Raymond, M.J. & Hartlage, L.C. (1985).  Differential intellectual
        sequelae of  right hemisphere CVA in left vs. right-handed
        patients.  **The International Journal of Clinical
        Neuropsychology, 7** (abstract).

Raymond, M.J. (1985). Headache among athletes.
        **The Williamsport News**, **Winter**.

Raymond, M.J. (1984). Psychological effects of running.
        **The Williamsport News, Spring.**

Raymond, M.J. (1984).  Chronic pain:  The pain that really hurts.
        **The Williamsport News, Summer/Fall.**

Raymond, M.J. (1983).  Drug abuse among student athletes.
        **The Williamsport News, Spring.**

Raymond, M.J. (1983).  Control of pre-competition anxiety.
        **The Williamsport News**, **Winter.**

Raymond, M.J. (1982).  The choking phenomenon.

Liberty002550

**The Williamsport News,  Fall.**

Raymond, M.J. (1982).  The psychological importance of sporting activities for disabled individuals.  **The Williamsport News, Summer.**

Raymond, M.J. (1982). Depression:  The effects on athletic performance.  **The Williamsport News, Spring.**

Raymond, M.J. (1981).  A comparison of WAIS performances between right and left-handed left hemiplegic persons.  Doctoral Dissertation, Florida State University.

Raymond, M.J. (1980).  (contributing ed.) **Independent Living Curriculum for Master's Degree Rehabilitation Programs.**  Tallahassee, Florida: The National Commission of Rehabilitation Education Task Force on Independent Living, Florida State University.

Raymond, M.J. (1978).  The significance university upperclassmen have on influencing drug and alcohol usage by freshman females.  Unpublished Master's Scholarly Paper, University of Scranton.


**PROFESSIONAL GOALS AND INTERESTS:**

Clinical:   Brain injury rehabilitation, neuropsychological assessment and evaluation, forensic neuropsychology, sports concussion management and cognitive remediation.

Teaching:   Neuropsychology, rehabilitation psychology, neuropsychological assessment, forensic neuropsychology, and supervision and training of students in research and clinical activities.

Research:   Diagnosis and treatment of central nervous system disorders and neuropsychological correlates of behavior.

Administrative:   Program evaluation and development, quality

Liberty002551

assurance, peer review and neurorehabilitation consultation.

**REFERENCES:**

References furnished upon request.

Liberty002552

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213




WINONA ZIMBERLIN
ATTORNEY AT LAW
267 MAIN STREET
MANCHESTER CT 06042

Liberty002553



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

March 22, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

As per your March 17, 2016 request, enclosed please find a complete copy of Ms. Spears disability claim file since remanded by the court for this appeal review.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002554



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

March 17, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

    RE:    Haley Spears
    DOB: REDACTED
    Your claim#: 250039

I am requesting a complete copy of the Liberty Mutual claim file on this claimant, including, but
not limited to, peer reviews from the "four independent peer reviewers" referred to in your letter
of March 16, 2016. Documents which have already been provided to me in the administrative
record filed with the court need not be provided again.

In regard to your request to the eight doctors identified in your March 16, 2016 letter, is Liberty
willing to pay these doctors for their time in responding to your request?

Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002555

**n0062751**

---

| | |
|---|---|
| **From:** | Sheila Bearden |
| **Sent:** | Wednesday, March 16, 2016 4:03:13 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | RE: Peer Addendum Request   Claim No: REDACTED Web ID: 577726 |

Hi Nancy,


My week's been going well so far, thanks for asking! Hope the same for you?


This email will do. We'll get the addendum opened and sent to Dr Raymond; due date will be 3/30.


Please let me know should you require any further assistance at all, thank you.


**Sheila O. Bearden**

**Client Services Coordinator III**


**Behavioral Medical Interventions (BMI)**

6600 France Ave. S., Suite 245

Edina, MN 55435

**Direct: 952-641-0635**

**Fax: 952-927-7147**

**Sheila.bearden@behavioralmedical.com**

**www.behavioralmedical.com**

Follow us on: **LinkedIn** and **Twitter**

**CONFIDENTIALITY NOTICE:** This message is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is private, privileged, confidential, and exempt from disclosure under applicable law.

Any unauthorized review, use, disclosure, or distribution of this e-mail message, including any attachment, is prohibited.   If you are not the intended recipient, please advise the sender by reply email, or forward to Office@BehavioralMedical.com, and destroy all copies of the original message.

**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Wednesday, March 16, 2016 12:25 PM
**To:** Sheila Bearden <sheila.bearden@behavioralmedical.com>
**Subject:** Peer Addendum Request Claim No: REDACTED Web ID: 577726

Hello Shelia,

I need to get an addendum from Dr. Raymond to his part of the review on H.S.

The questions are:

(1)   Please explain the reason you conclude the data provided for this review was "mostly obsolete."

(2)   Please explain how the data you described as "mostly obsolete" reflects on the clmnt's impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015.

(3)   Please explain how the "obsolete (6 years old)" results of Dr. Rissenberg's July 2010 neuropsychological evaluation reflect on the clmnt's impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015.

Please let me know if I need to send this request through the system.   Also, please let me know what the due date will be.

Thank you, Shelia!   Hope you are having a good week.


Nancy


Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way    Mail Stop 02G    Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.

Liberty002558

**n0062751**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway |
| **Sent:** | Wednesday, March 16, 2016 1:00:16 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Your fax has been successfully sent to Bernard Raxlen, MD at 516-336-8440. |

Your fax has been successfully sent to Bernard Raxlen, MD at 516-336-8440.
------------------------------------------------------------
From: Winterer, Nancy
------------------------------------------------------------
Time: 3/16/2016 12:46:54 PM
Sent to 516-336-8440 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 12:50 on channel 20

Liberty002559

**n0062751**

---

**From:**      RightFax E-mail Gateway
**Sent:**      Wednesday, March 16, 2016 1:03:49 PM
**To:**        Winterer, Nancy
**Subject:**   Your fax has been successfully sent to Kristin Giannini, MD   at 860-979-0056.

Your fax has been successfully sent to Kristin Giannini, MD   at 860-979-0056.
-----------------------------------------------------------
From: Winterer, Nancy
-----------------------------------------------------------
Time: 3/16/2016 12:50:07 PM
Sent to 860-979-0056 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 12:53 on channel 32

Liberty002560

**n0062751**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway |
| **Sent:** | Wednesday, March 16, 2016 1:05:28 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Your fax has been successfully sent to Joachim Baehring, MD   at 203-737-2591. |

Your fax has been successfully sent to Joachim Baehring, MD   at 203-737-2591.

------------------------------------------------------------

From: Winterer, Nancy

------------------------------------------------------------

Time: 3/16/2016 12:48:30 PM
Sent to 203-737-2591 with remote ID "203 737 2591"
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 14:43 on channel 28

Liberty002561

**n0062751**

---

**From:**       RightFax E-mail Gateway
**Sent:**       Wednesday, March 16, 2016 1:05:32 PM
**To:**         Winterer, Nancy
**Subject:**    Your fax has been successfully sent to Barbara Kage, MD at 860-646-7999.

Your fax has been successfully sent to Barbara Kage, MD at 860-646-7999.
------------------------------------------------------------
From: Winterer, Nancy
------------------------------------------------------------
Time: 3/16/2016 12:51:52 PM
Sent to 860-646-7999 with remote ID "FAX                    "
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 12:50 on channel 29

Liberty002562

**n0062751**

---

**From:** RightFax E-mail Gateway
**Sent:** Wednesday, March 16, 2016 1:23:36 PM
**To:** Winterer, Nancy
**Subject:** Your fax has been successfully sent to Lauren Gouin Young, ND at 860-812-2025.

Your fax has been successfully sent to Lauren Gouin Young, ND at 860-812-2025.
------------------------------------------------------------
From: Winterer, Nancy
------------------------------------------------------------
Time: 3/16/2016 12:54:45 PM
Sent to 860-812-2025 with remote ID ""
Result: (0/339;4/11) Remote end was ringing but did not answer
Page record: NONE SENT
Elapsed time: 00:41 on channel 0
------------------------------------------------------------
Time: 3/16/2016 1:09:24 PM
Sent to 860-812-2025 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 13:23 on channel 19

Liberty002563

**n0062751**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway |
| **Sent:** | Wednesday, March 16, 2016 1:32:25 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Your fax has been successfully sent to Dario Zagar, MD at 203-333-3937. |

Your fax has been successfully sent to Dario Zagar, MD at 203-333-3937.

------------------------------------------------------------

From: Winterer, Nancy

------------------------------------------------------------

Time: 3/16/2016 12:55:46 PM
Sent to 203-333-3937 with remote ID ""
Result: (3/301;0/0) Busy signal detected
Page record: NONE SENT
Elapsed time: 00:25 on channel 13

------------------------------------------------------------

Time: 3/16/2016 1:14:39 PM
Sent to 203-333-3937 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 17:13 on channel 18

Liberty002564

**n0062751**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway |
| **Sent:** | Wednesday, March 16, 2016 1:32:30 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Your fax has been successfully sent to Zane Saul, MD at 203-383-4499. |

Your fax has been successfully sent to Zane Saul, MD at 203-383-4499.

------------------------------------------------------------

From: Winterer, Nancy

------------------------------------------------------------

Time: 3/16/2016 12:53:09 PM
Sent to 203-383-4499 with remote ID ""
Result: (3/301;0/0) Busy signal detected
Page record: NONE SENT
Elapsed time: 00:17 on channel 19

------------------------------------------------------------

Time: 3/16/2016 1:08:13 PM
Sent to 203-383-4499 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 23
Elapsed time: 23:33 on channel 4

Liberty002565

## n0062751

**From:**      RightFax E-mail Gateway
**Sent:**      Wednesday, March 16, 2016 1:50:39 PM
**To:**        Winterer, Nancy
**Subject:**   Fax to Marian Rissenberg, PhD abandoned after 5 attempts.

Fax to Marian Rissenberg, PhD abandoned after 5 attempts.
------------------------------------------------------------
From: Winterer, Nancy
------------------------------------------------------------
Time: 3/16/2016 12:57:39 PM
Sent to 914-232-6245 with remote ID ""
Result: (0/316;0/0) Answer (probably human) detected
Page record: NONE SENT
Elapsed time: 00:39 on channel 8
------------------------------------------------------------
Time: 3/16/2016 1:15:48 PM
Sent to 914-232-6245 with remote ID ""
Result: (0/316;0/0) Answer (probably human) detected
Page record: NONE SENT
Elapsed time: 00:39 on channel 15
------------------------------------------------------------
Time: 3/16/2016 1:26:08 PM
Sent to 914-232-6245 with remote ID ""
Result: (0/316;0/0) Answer (probably human) detected
Page record: NONE SENT
Elapsed time: 00:39 on channel 14
------------------------------------------------------------
Time: 3/16/2016 1:36:49 PM
Sent to 914-232-6245 with remote ID ""
Result: (0/316;0/0) Answer (probably human) detected
Page record: NONE SENT
Elapsed time: 00:39 on channel 11
------------------------------------------------------------
Time: 3/16/2016 1:46:29 PM
Sent to 914-232-6245 with remote ID ""
Result: (0/316;0/0) Answer (probably human) detected
Page record: NONE SENT
Elapsed time: 00:02 on channel 15

Liberty002566



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Dario Zagar, MD
Associated Neurologists of Southern CT

**Fax:  203-333-3937**

**RE:     Long Term Disability Benefits**
**Patient Name: Haley Spears**
**Date of Birth:** REDACTED
**Claim Number:**  REDACTED

Dear Dr. Zagar:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Kitei to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Zane Saul, MD

**Fax:  203-383-4499**

**RE:    Long Term Disability Benefits**
         **Patient Name: Haley Spears**
         **Date of Birth:** REDACTED
         **Claim Number:**  REDACTED

Dear Dr. Saul:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim. During this review, Kent Crossley, MD, Infectious Disease, contacted your office but was unable to speak with you.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Crossley to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

Liberty002568



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Marian Rissenberg, PhD
Center for Neuropsychology
125 Katonah Ave
Katonah, NY  10536

**Fax: 914-232-6245**

**RE:    Long Term Disability Benefits**
        **Patient Name: Haley Spears**
        **Date of Birth:** REDACTED
        **Claim Number:** REDACTED

Dear Dr. Rissenberg:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Raymond to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

Liberty002569



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Bernard Raxlen, MD
Lyme Resource Medical

**Fax: 516-336-8440**

**RE:    Long Term Disability Benefits**
**Patient Name: Haley Spears**
**Date of Birth:** REDACTED
**Claim Number:** REDACTED

Dear Dr. Raxlen:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Crossley to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Barbara Kage, MD
Rheumatology and Allergy Institute of CT

**Fax: 860-646-7999**

**RE:    Long Term Disability Benefits**
**       Patient Name: Haley Spears**
**       Date of Birth:** REDACTED
**       Claim Number:** REDACTED

Dear Dr. Kage:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Cooper to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

*Nancy Winterer*

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

Liberty002571



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: **603-334-5708**

March 16, 2016

Lauren Gouin Young, ND
CT Natural Health Specialists

**Fax: 860-812-2025**

**RE:     Long Term Disability Benefits
         Patient Name: Haley Spears
         Date of Birth:** REDACTED
         **Claim Number:** <sup>REDACTED</sup>

Dear Dr. Young:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Cooper to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

Liberty002572



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611

Secure Fax No.: **603-334-5708**

March 16, 2016

Kristin Giannini, MD
Rockville Family Physicians

**Fax:  860-979-0056**

**RE:     Long Term Disability Benefits**
**Patient Name: Haley Spears**
**Date of Birth: REDACTED**
**Claim Number:**  REDACTED

Dear Dr. Giannini:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim. During this review, Robert Cooper, MD, Internal Medicine, contacted your office but was unable to speak with you.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Cooper to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

Liberty002573



Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611

Secure Fax No.: **603-334-5708**

March 16, 2016

Joachim Baehring, MD
Yale Cancer Center
**Fax: 203-737-2591**

**RE:    Long Term Disability Benefits
        Patient Name: Haley Spears
        Date of Birth:** REDACTED
        **Claim Number:**     REDACTED

Dear Dr. Baehring:

Liberty Life Assurance Company of Boston is currently reviewing a long term disability claim related to your patient, Haley Spears.  A comprehensive multi-disciplinary independent medical record review was recently conducted to assist in assessing Ms. Spears' disability claim. During this review, Daniel Kitei, MD, Neurology, contacted your office but was unable to speak with you.

As a medical provider for Ms. Spears, we are providing you with a copy of the medical report for your review and comment.  In the event that you disagree with any of the medical findings in the report, we would greatly appreciate it if you would provide your medical opinion and the medical basis for your disagreement in writing via return fax.  (fax number: **603-334-5708**)

Please provide your comments to us by or before **March 25, 2016**.  If you should require additional time to provide comment, please let us know and we will afford you additional time to respond.

Also, we would like to schedule a phone consultation between you and Dr. Kitei to discuss your medical opinion. Please contact Nancy Winterer at 1-888-437-7611 Ext. 16401 by or before **March 25, 2016** and we will schedule the phone consultation at a mutually agreeable time.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 422-7909

*Claim 2500391*

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.
   UPS Access Point™
   THE UPS STORE
   1931 WOODBURY AVE
   PORTSMOUTH ,NH 03801

   FOLD HERE

---

0.0 LBS   LTR   1 OF 1

NANCY WINTHER
LIBERTY MUTUAL-DOVER-0096
1090 LIBERTY WAY
DOVER, NH 03820

SHIP TO:
CENTER FOR NEUROPSYCHOLOGY
MARJAN RISSENBERG, PHD
125 KATONAH AVE
KATONAH NY 10536-2136

NY 105 0-03

UPS NEXT DAY AIR SAVER 1P
TRACKING #: 1Z 248 96X 13 9045 0919

BILLING: P/P

Office/Dept Number: 009600200

Liberty002575



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| Date: March 16, 2016 | |
| To: | WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 |
| Attn: | |
| Fax: | (860) 247-4194 |
| From: | Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 |
| Total Pages<br>(Including Cover):   3 | |
| RE: | |
| Claim #:  REDACTED<br>Claimant:  Haley Spears | |
| UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

Liberty002576



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

March 16, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

As we have discussed in our previous correspondence, Liberty's deadline for making a
determination has been tolled by its need to obtain medical records from the 27 medical providers
Ms. Spears identified on remand. We received medical records from 24 of those 27 medical
providers. At your request, we provided the claim file without the 3 remaining sets of medical
records to an independent third party to schedule peer reviews with physicians board certified in
appropriate specialties. We have received the independent peer review report from the four
independent peer reviewers and have sent that report to the medical providers who rendered
opinions regarding Ms. Spears' work capacity for their review and comment. Please ask Ms. Spears
to encourage the following physicians to respond to Liberty's requests for contact:

    (1) Bernard Raxlen, MD
    (2) Lauren Gouin Young, ND
    (3) Zane Saul, MD
    (4) Joachim Baehring, MD
    (5) Dario Zagar, MD
    (6) Barbara Kage, MD
    (7) Kristin Giannini, MD
    (8) Marian Rissenberg, PhD, Neuropsychology

Liberty's deadline has been further tolled by the need to conduct an IME. You advised Liberty Life
on February 4, 2016 that Ms. Spears agreed to attend an IME. The IME was originally scheduled for
February 29, 2016, but Ms. Spears did not attend the IME. At your request, the IME was
rescheduled for March 14, 2016. We have received confirmation that the IME took place on March
14, 2016.  We generally receive the results of an IME within 2-3 weeks. We therefore anticipate
receiving the IME results by the end of March.

Liberty002577

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002578

Clmnt is former Administrative Assistant who was 31yo at her DOD 9/27/2008, initially due to Headaches. We are assessing clmnt's functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present. In addition to this IME, the medical documentation is being reviewed by Infectious Disease; Neurology; Neuropsychology; Internal Medicine.

Please address:

1.  For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, please provide a Comprehensive medical history, including chief complaint, present illness, past medical/surgical history, medications/allergies, and review of systems.  (Please be certain to consider the Chiropractic treatment records on file from May 2010 through December 2015 in responding to this question).

2.  For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, please provide a Comprehensive functional history.  Include past and current reported daily activities; how the insured's spine pain, whole body pain, and decreased energy has limited her functionally; maximum reported sitting, standing, and walking capacity per session and per 8 hour workday, and the insured's reported participation in work, ADLs, and recreation/hobbies.

3.  Comprehensive neuromuscular examination.  Include complete spine exam [including spine ROM, the presence/absence of spasm, postural deviations, signs of neural irritation]; neurological exam [motor/sensory/reflexes/Babinski reflexes]; tender point exam; and gait assessment.  Include a detailed neck and upper extremity exam to include joint ROM, circumferential arm/forearm measurements, and motor/sensory exam.

4.  Assessment of objective physical deconditioning: Any evidence of generalized muscle atrophy, resting tachycardia, and/or poor muscle tone?  Please discuss.

5.  Please provide your opinion regarding verifiable physical impairment: Based on the review functional evidence, clinical exam findings, and diagnostic test evidence, does the insured have any verifiable functional impairment? For any impairment confirmed, please provide the clinical, diagnostic, and/or functional evidence supporting your opinion.

6.  Opinion regarding medically-supported physical restrictions/limitations: For any physical impairment confirmed, please provide specific physical restrictions/limitations. Please define by type of task [sitting, standing, lifting, etc.], as well as frequency of task [never, occasional, frequent, constant]. Include duration of physical restrictions/limitations. Is there any medical or functional evidence supporting.

7.  Assessment of excessive or atypical pain behaviors: Note any excessive or atypical pain behaviors observed during the IME. Does the insured's reported pain severity and functional limitations correlate with your clinical exam findings, the diagnostic test evidence, and treatment requirements?  Please

8.  Assessment of functional inconsistencies: Compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted.

9. Conclusions: Summary of your overall impression regarding the insured's <u>current</u> verifiable physical impairments, medically-supported physical restrictions/limitations, and maximum full-time work capacity.

10. Please comment on the extent to which the results of this IME provide any information that can be used to evaluate Ms. Spears' diagnoses and restrictions and limitations during the following two time periods:
    1. 9/27/2008 through 3/27/2009
    2. 3/28/2009 through 3/31/2015

Liberty002580

**n0062751**

| | |
|---|---|
| **From:** | National Scheduling |
| **Sent:** | Monday, March 14, 2016 4:22:45 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Claimant Attended Exam, Claim # REDACTEDClaimant: Hal Spe |

Dear Nancy Winterer,

We have confirmed with Dr. Courtney that claimant Hal Spe attended the scheduled IME on 3/14/2016 at 12:00 PM.

We will keep you updated should we encounter any unexpected delays in obtaining this report.

Thank you for choosing MCN!

Sincerely,

The MCN Team



PLEASE NOTE: This message was sent using Transport Layer Security.

Liberty002581

# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

March 14, 2016

Facsimile: 1-603-334-5708
Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

      RE:    Haley Spears
      DOB: REDACTED
      Your claim#: 250039

Ms. Spears had her appointment with your medical consultant. In addition to being rude and argumentative, your consultant was unprepared. He mentioned several times that this was a 1400 page medical record which he only "scanned." He expressed confusion as to why he had been asked to conduct this exam, after Ms. Spears had already returned to work. He repeatedly asked Ms. Spears what her various diagnoses were, which evidences his lack of knowledge as to what was in her medical record. Incredibly, when Ms. Spears was unable to articulate her various diagnoses, he accused her of failing to cooperate.

It is a doctor's job, not Ms. Spears', to arrive at a diagnosis. If your consultant wanted to know what diagnoses have been given to Ms. Spears by her doctors, all he had to do was to read the file.

Very truly yours,

Winona W. Zimberlin

WWZ:

Liberty002582

**n0062751**

| | |
|---|---|
| **From:** | Delano Stark |
| **Sent:** | Friday, March 11, 2016 3:40:13 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | RE: For Spears IME 3/14/16 |

Hi Nancy,


It's no big deal.   I've just faxed over these updated questions to Dr. Courtney's office and left a voicemail with his assistant to use these questions in place of the previous questions.   You have a good weekend yourself! Thanks!


-Del


**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Friday, March 11, 2016 11:28 AM
**To:** Delano Stark
**Subject:** For Spears IME 3/14/16
**Importance:** High


I apologize on this Friday afternoon, but I have tweaked some of the IME questions again, added one more question (question #10) to the list for Dr. Courtney on Monday 3/14.


Please confirm you have received this request and that it will be used for the IME on 3/14/16.


Thank you, Del.

Have a good weekend.

Nancy

Liberty002583

Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way   Mail Stop 02G   Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| [nancy.winterer@libertymutual.com](mailto:nancy.winterer@libertymutual.com)

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.

PLEASE NOTE: This message was sent using Transport Layer Security.

Liberty002584

Clmnt is former Administrative Assistant who was 31yo at her DOD 9/27/2008, initially due to Headaches. We are assessing clmnt's functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present. In addition to this IME, the medical documentation is being reviewed by Infectious Disease; Neurology; Neuropsychology; Internal Medicine.

Please address:

1. For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, please provide a Comprehensive medical history, including chief complaint, present illness, past medical/surgical history, medications/allergies, and review of systems. (Please be certain to review the Chiropractic treatment records on file from May 2010 through December 2015 in response to this question).

2. For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, please provide a Comprehensive functional history. Include past and current reported daily activities; how the insured's spine pain, whole body pain, and decreased energy has limited her functionally; maximum reported sitting, standing, and walking capacity per session and per 8 hour workday, and the insured's reported participation in work, ADLs, and recreation/hobbies.

3. Comprehensive neuromuscular examination. Include complete spine exam [including spine ROM, the presence/absence of spasm, postural deviations, signs of neural irritation]; neurological exam [motor/sensory/reflexes/Babinski reflexes]; tender point exam; and gait assessment. Include a detailed neck and upper extremity exam to include joint ROM, circumferential arm/forearm measurements, and motor/sensory exam.

4. Assessment of objective physical deconditioning: Any evidence of generalized muscle atrophy, resting tachycardia, and/or poor muscle tone? Please discuss.

5. For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, please provide your opinion regarding verifiable physical impairment: Based on the review functional evidence, clinical exam findings, and diagnostic test evidence, does the insured have any verifiable functional impairment? For any impairment confirmed, please provide the clinical, diagnostic, and/or functional evidence supporting your opinion.

6. Opinion regarding medically-supported physical restrictions/limitations: For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, for any physical impairment confirmed, please provide specific physical restrictions/limitations. Please define by type of task [sitting, standing, lifting, etc.], as well as frequency of task [never, occasional, frequent, constant]. Include duration of physical restrictions/limitations. Is there any medical or functional evidence supporting.

7. Assessment of excessive or atypical pain behaviors: Note any excessive or atypical pain behaviors observed during the IME. Does the insured's reported pain severity and functional limitations correlate with your clinical exam findings, the diagnostic test evidence, and treatment requirements? Please

Liberty002585

8.  Assessment of functional inconsistencies: For the periods 9/27/2008 through 3/27/2009, and 3/28/09 through the present, compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted.

9.  Conclusions: Summary of your overall impression regarding the insured's current verifiable physical impairments, medically-supported physical restrictions/limitations, and maximum full-time work capacity.

Liberty002586

**n0062751**

| | |
|---|---|
| **From:** | Winterer, Nancy |
| **Sent:** | Thursday, March 10, 2016 2:39:18 PM |
| **To:** | 'Delano Stark' |
| **Subject:** | RE: Appointment Confirmed, Adjusted cover letter questions |

Thanks!  I will send the questions over shortly.

**From:** Delano Stark [mailto:dstark@mcn.com]
**Sent:** Thursday, March 10, 2016 1:38 PM
**To:** Winterer, Nancy
**Subject:** Appointment Confirmed, Adjusted cover letter questions

Hi Nancy,

I am confirming that we have this IME scheduled for  12pm on Monday 3/14/16 with Dr. Courtney.   If you would like for us to adjust the cover letter questions we've sent out to the doctor you can send the questions into me right now, and I can get that taken care of for you.

Thanks!

-Del

**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Thursday, March 10, 2016 10:22 AM
**To:** Delano Stark
**Subject:** RE: IME appointment later in the day

Hi Del,

Liberty002587

I just wanted to confirm that from your end, the IME for Ms. Spears is still on for 12pm on Monday 3/14/16.

Also, I need to tweak the questions for the IME.   How is the best way to get the final questions to you for the IME MD- should I email the questions to you, or send them through the referral system.

Thanks, Del.

Nancy

**From:** Delano Stark [mailto:dstark@mcn.com]
**Sent:** Tuesday, March 01, 2016 2:05 PM
**To:** Winterer, Nancy
**Subject:** RE: IME appointment later in the day

Hi Nancy,

I was able to get this rescheduled for Monday March 14th at 12:00PM.   I will send out a full cost details message here in a little bit, and I will also make sure to send out an appointment letter to the attorney's office.   Thank you!

-Del

**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Tuesday, March 01, 2016 10:38 AM
**To:** Delano Stark
**Subject:** RE: IME appointment later in the day
**Importance:** High

Liberty002588

Good Afternoon Del,


Please go ahead and reschedule Ms. Spears' IME with Dr. Courtney.   Please reschedule with their earliest appointment, and notify Atty Zimberlin in writing.


Thank you very much, and let me know if you need any further information.


Nancy


Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way    Mail Stop 02G    Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.   If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.   If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.


**From:** Delano Stark [mailto:dstark@mcn.com]
**Sent:** Monday, February 29, 2016 3:34 PM
**To:** Winterer, Nancy
**Subject:** RE: IME appointment later in the day


Hi Nancy,

That's okay Nancy.   I spoke with the claimant's attorney and she confirmed the claimant would not attend the appointment.   I also spoke the office of Dr. Courtney just now, and they had confirmed the claimant did not show up to this appointment.

I have also heard from Dr. Courtney's office that they do have availability to reschedule this IME on either 3/14 or 3/21 should you wish to reschedule this IME.   I will hold off until I hear back from you before making any scheduling arrangements, but please let me know if Liberty Mutual would like get this rescheduled, and I would certainly be able to get that done for you.   Thank you!

-Del

**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Monday, February 29, 2016 12:14 PM
**To:** Delano Stark
**Subject:** RE: IME appointment later in the day

Hi Del,

I apologize I am not getting back to you until now.   Most likely the clmnt will not present for the IME today.

Please let me know when you find out definitively.

Thank you.

Nancy

Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

Liberty002590

100 Liberty Way    Mail Stop 02G    Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.

**From:** Delano Stark [mailto:dstark@mcn.com]
**Sent:** Friday, February 26, 2016 3:46 PM
**To:** Winterer, Nancy
**Subject:** RE: IME appointment later in the day

Hi Nancy,

I just wanted to give you a heads up that the claimant called in again inquiring about whether or not we would be able to reschedule this appointment.  She has let me know that she has a family member on death bed, and there's a possibility that she won't be able to make this appointment.  I did not directly contact the claimant as there is an attorney, on the case, but I just wanted to give you a heads up about this.

I told her that as far as I know Liberty Mutual wants to proceed with this appointment, and that I was not allowed to directly contact her.  Since she has an attorney for this case, she was informing me that the attorney's office was difficult to get in touch with, and wanted to have us contact Liberty Mutual about rescheduling this examination.  I know this is late, and most likely within the 24 hour time frame for late cancellations, but I just thought I should let you know.

Liberty002591

Thank you,

-Del


**From:** Winterer, Nancy [mailto:NANCY.WINTERER@LibertyMutual.com]
**Sent:** Thursday, February 25, 2016 4:10 AM
**To:** Delano Stark
**Subject:** RE: IME appointment later in the day


Thank you Del !!  If you have not already, please send a revised appointment letter to the atty, Liberty, etc.   Thank you.

Nancy


Nancy Winterer

Appeal Review Consultant

Group Benefits/Liberty Life Assurance Company of Boston

100 Liberty Way    Mail Stop 02G    Dover, NH 03820| Phone: 1-888-437-7611 Ext. 16401 SDN: 8-731-6401|Secure Fax: 603-422-7909| nancy.winterer@libertymutual.com

This e-mail, and any attachments thereto, is intended for the use of the addressees and may contain personal, confidential and/or privileged information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via e-mail and via telephone at 603-750-7550, ext. 16401 and permanently delete the original and any copy of any e-mail and any printout thereof or attachments thereto.


**From:** Delano Stark [mailto:dstark@mcn.com]
**Sent:** Wednesday, February 24, 2016 6:45 PM
**To:** Winterer, Nancy
**Subject:** IME appointment later in the day

Liberty002592

Hi Nancy,


**Claimant: Hal. Spe.**

**Claim#** REDACTED


The original IME appointment we had set up with Dr. Courtney for the above claimant was for Monday, February 29th at 11:00AM.   I received a call from the claimant about an hour ago informing me that she had another doctor's appointment the very same day earlier in the morning, and would be preferring an afternoon appointment.   I told her that we would need approval from Liberty Mutual in order to confirm a rescheduling, but I told her that I would get in contact with the provider's office to see what they had available.


Luckily for us, Dr. Courtney's office had availability at 2:00PM on the very same day to reschedule this appointment.   I told the office that we would like to push the appointment back to that time slot at 2PM.   I did not call the claimant back to notify them because there was an attorney listed on the case.   However,  the claimant did end up calling back just now, asking me if I was able to get a later appointment date to which I told her "Yes, we now have this scheduled for 2:00PM on February 29th instead of 11:00AM."


I just wanted to let you know that the appointment date, location, and physician are all still the same, but now the appointment time has been bumped back to 2PM instead of 11:00AM.


Thank you,


**Del Stark**
Customer Service Representative

Liberty002593

**Medical Consultants Network ®**

Medical Judgment Nationwide

National Scheduling, Seattle WA

P: 206.621.9097   Ext 2212

F: 206.623.4956

dstark@mcn.com
www.mcn.com


PLEASE NOTE: This message was sent using Transport Layer Security.


PLEASE NOTE: This message was sent using Transport Layer Security.


PLEASE NOTE: This message was sent using Transport Layer Security.


PLEASE NOTE: This message was sent using Transport Layer Security.


PLEASE NOTE: This message was sent using Transport Layer Security.

Liberty002594



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| **Date:** March 10, 2016 | |
| **To:** | WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 |
| **Attn:** | |
| **Fax:** | (860) 247-4194 |
| **From:** | Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 |
| **Total Pages**<br>**(Including Cover):** | 2 |
| **RE:** | |
| **Claim #:** REDACTED<br>**Claimant:** Haley Spears | |
| UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

Liberty002595



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

March 10, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

This letter is to confirm Ms. Spears' IME appointment on:

Monday March 14, 2016 at 12:00PM

With:

Jenness D. Courtney, III, MD
Physical Medicine & Rehabiltation
9045 Ellerbe Road   Suite 107
Shreveport, LA  71106

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002596

6600 France Ave. S., Suite 245
Edina, MN 55435
1-866-927-0184 phone
952-927-7147 fax
office@behavioralmedical.com

**Behavioral·Medical
Interventions**

March 4, 2016                              **CONFIDENTIAL**

Nancy Winterer
Liberty Mutual
London, KY

Re: Haley Spears
Claim No: REDACTED
Web ID: 577726

Dear Ms. Winterer:

We have received and processed the referral of the file on Haley Spears for the purpose of file review
and provider contact.  All records provided by Liberty Mutual were reviewed. Services have been
completed on this file, and below is a summary of findings and conclusions.

<u>Conclusion</u>

**Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion
within a reasonable degree of clinical probability that the evidence does not support global impairment
and that the claimant is able to work without restriction for the timeframe of 9/27/2008 through
3/27/2009 and 3/28/2009 through 3/31/2015.

**Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion
within a reasonable degree of clinical probability that there is no evidence the claimant has had Lyme
disease or other infections that would be functionally limiting.

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion
within a reasonable degree of clinical probability that the evidence does not support impairment from a
neurological standpoint.

**Michael Raymond, PhD, ABN, Neuropsychology:**
Based on a review of the provided data as summarized and analyzed below (e.g., voluminous,
redundant, and mostly obsolete), it is this reviewer's opinion within a reasonable degree of
neuropsychological certainty that:  there is no valid objective evidence to support neurocognitive deficits
associated with chronic headache or a plethora of other reported possible etiologies, within the
timeframe of 9/27/08 – 3/31/15.

Liberty002597

**Referral Information**
Age (DOB): REDACTED
Gender: FEMALE
DOD: 09/27/2008
Listed attending physician (s): Robert Lang, MD, Endocrinology, Zane Saul, MD, Infectious Disease,
Joachim Baehring, MD, Neurology, Neuro-Oncology, and Kristin Giannini, MD, Family Practice
Diagnoses listed on referral: headache

**Medical Issue**

**Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
According to a medical report dated 1/20/10, Kristin Giannini, MD, stated that due to joint pains from
Lyme Disease, need for daily antibiotics and fatigue and memory loss, the claimant is not able to work
at the current time: able to sit for 2 hours but no standing or walking, occasionally lifting/carrying up to
5 lbs., capable of simple grasping and fine manipulation, pushing and pulling with left hand but not right
hand, capable of using feet for repetitive pushing and pulling as in operating foot controls, occasionally
bending, squatting, crawling but no climbing or reaching. No unprotected heights, being around moving
machinery, exposure to marked changes in temperature and humidity, driving automotive equipment or
exposure to dust and fumes. In a functional capacity assessment dated 7/9/10, Dr. Giannini stated the
claimant was unable to work for the next several years and beyond, due to extreme cognitive function
and fatigue. In an attending physician letter dated 2/9/09, Barbara Kage, MD, rheumatology stated the
claimant is able to work 4 hours in the morning. In an attending physician letter dated 8/4/09, Dr. Kage
stated the claimant is not able to work part-time or full–time for a minimum of 12 months.  At issue is
whether the evidence in the chart supports that the claimant is impaired with restrictions and limitations,
and whether or not the evidence supports that the claimant is unable to work during the periods
9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

**Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**
The primary medical issue in question in this review is to determine if the claimant has had any infection
that would be responsible for her non-specific symptoms and if these would be functionally impairing.
Her "Lyme literate" specialists have stated she was unable to work because of these symptoms caused
by Lyme disease.  For example, Dr. Raxlen on 6/22/09 wrote that she would not be able to work for "at
least twelve months."

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
The primary medical issue in question in this review is unclear from a neurologic standpoint, but the
Attending Physician Statement notes the claimant had cognitive problems and migraine according to
Barbara Kage in 2009. In 2010, Dr. Raxlen felt that the claimant had Lyme disease and "can't work."
There is a note of fatigue and cognitive changes from Dario Zagar and an Attending Physician Statement
from Dr. Giannini that the claimant had some lifting and cognitive limitations.

**Michael Raymond, PhD, ABN, Neuropsychology:**
The primary medical issue in question in this review, from a neuropsychological perspective, is noted
as:  whether there is evidence to support neurocognitive deficits that would be functionally impairing
within the time frame in question from 9/27/08 – 3/31/15.  A plethora of possible etiologies, the vast

Liberty002598

majority of which were nonspecific, were laced within the voluminous medical record review. The claimant was evaluated by well over 15 medical specialists including, but not limited to internal medicine, neurology, rheumatology, endocrinology, immunology, oncology, infectious disease, psychiatry, sleep medicine, general surgery, orthopedic surgery, and neuropsychology, to name a few. The claimant's primary complaint was vascular headache in 2008. However, she has been evaluated and treated for a host of other etiologies including, but not limited to gastrointestinal disease, thyroid disease, dyspnea, pineal cyst, Lyme disease, systemic lupus erythematosus, fibromyalgia, etc. The claimant was evaluated by numerous neurologists as part of her subjective complaints of reduced cognitive efficiency. Multiple neurological examinations were negative and nondiagnostic with regard to neurocognitive functioning, sensorimotor abilities, and formal cranial nerve testing. Prior serial cerebral MRI's identified a nonspecific and stable right temporal lobe lesion of idiopathic etiology. A pineal cyst was also noted. Despite these multiple problems and subjective neurocognitive complaints, the claimant had only undergone one neuropsychological evaluation in July 2010. The evaluation was an abbreviated and nonstandardized assessment which did not include formal effort testing (e.g., embedded or freestanding). A number of specific subtest scores were noted within the body of the report and the WAIS-III and WMS-III summary report was attached. The undersigned did not have access to neuropsychological raw test data. While Dr. Rissenberg, neuropsychologist, indicated "on formal testing, Ms. Spears was highly motivated and gave her best effort on all tasks", there is no objective evidence to support this, and thus, this can be easily scrutinized. This is especially borne out with numerous subjective complaints of the claimant which were highlighted throughout the report as well as within the behavioral observations section. For some reason, Dr. Rissenberg indicated "based on her education and work history and aspects of her current test performance, Ms. Spears premorbid intellectual capacity is estimated to be in at least the high end of the average range or the 75th percentile (a full-scale IQ of 115). Once again, this statement appears somewhat erroneous and in all likelihood an overestimate of the claimants premorbid level of intellectual functioning at the time of the evaluation. For the most part, the claimants general intellectual and memory abilities were relatively consistent and within the average to low average range. In summary, Dr. Rissenberg opined that "these findings are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious or inflammatory illness." Once again, and based on a rather cursory neuropsychological assessment, this statement can certainly be easily scrutinized and one which does not appear to be justified based on the neuropsychological test results, or lack thereof. Furthermore, these results must be considered obsolete (6 years old).

**Records List**
**What follows is an outline of the records reviewed to prepare for this report:**

1. **Attending Physician Statements completed by:**
   a. **Prasad Srinivasan, MD, Allergy and Immunology, dated 9/22/03**
   b. **David Silvers, MD, Neurology, dated 1/6/08 through 11/11/08**
   c. **Provider Whose Signature is Illegible, dated 4/29/08**
   d. **Evan Schiff, MD, Internal Medicine, dated 9/11/08 and 10/10/08**
   e. **Barry Gordon, DO, Neurology, dated 10/13/08 and 11/13/08**
   f. **Joachim Baehring, MD, Neurology, Neuro-Oncology, dated 12/11/08 and undated**
   g. **Barbara Kage, MD, FACR, Rheumatology, dated 2/9/09 and 8/4/09**
   h. **Dario Zagar, MD, Neurology, dated 5/26/09 through 6/21/10 and undated**

Liberty002599

  i. K. Dondlinger, RN on behalf of Dr. Zagar, dated 6/12/09

  j. Bernard Raxlen, MD, Psychiatry and Lyme Disease and Carolyn Welcome, PA-C, dated 6/22/09 through 9/9/10

  k. Lauren Gouin, ND, dated 7/21/09

  l. Kristin Giannini, MD, Family Practice, dated 1/20/10 and 7/9/10

  m. Dr. Raxlen, dated 5/27/10

  n. Zane Saul, MD, Infectious Disease, dated 3/7/11

  o. Unsigned Provider, undated

2. **Medical Records, Correspondence and/or Consultations completed by:**

  a. Hartford Hospital and Medical Group, dated 11/22/99 through 6/17/14 and undated

  b. Dr. Srinivasan, dated 4/9/02 through 11/10/04 and undated

  c. Manchester Ophthalmology, dated 1/27/04 through 4/28/13

  d. Vanishing Veins, dated 5/25/04 through 1/20/09 and undated

  e. Dr. Gouin, dated 8/27/04 through 1/16/13 and undated

  f. Connecticut GI, dated 6/14/07 and 10/4/07

  g. Unknown Facility, dated 11/13/07 through 4/1/15

  h. Digestive Health Specialists, dated 4/8/08 through 4/17/14

  i. Women's Health Connecticut, dated 7/10/08 through 9/11/13

  j. Thomas Turbiak, MD, Emergency Medicine, dated 8/28/08 and 8/29/08

  k. Dr. Silvers, dated 9/8/08 through 11/17/08

  l. Dr. Gordon, dated 10/1/08 and 11/3/08

  m. Yale Neurology/Medical Oncology, dated 11/25/08 through 4/22/13

  n. Physical Therapy Center of Rocky Hill, dated 12/22/08

  o. Dr. Kage, dated 1/6/09 through 2/18/11 and undated

  p. Unknown Facility, dated 1/6/09 through 5/6/10

  q. Associated Neurologists of Southern Connecticut, dated 1/12/09 through 8/19/11 and illegibly dated

  r. James Donaldson III, MD, Neurology and Internal Medicine, dated 1/20/09

  s. Connecticut Multispecialty Group, dated 1/21/09 through 4/10/14

  t. Professional Home Care Services, dated 2/27/09 through 5/7/10

  u. St. Vincent's Medical Center, dated 2/27/09 and 3/2/09

  v. Critical Home Care Services, dated 3/3/09 and 9/13/09

  w. Rockville Family Physicians, dated 3/10/09 through 11/25/13

  x. Unknown Facility, dated 3/25/09

  y. Robert Schoen, MD, Rheumatology, dated 3/26/09 and 3/30/09

  z. Saqib Naseer, MD, FACC, FASNC, Nuclear and Noninvasive Cardiology, dated 3/30/09 through 1/27/14

  aa. Lyme Resource Medical, dated 4/21/09 through 6/4/13 and undated

  bb. Pedro Romero, MD, Orthopedic Surgery, dated 6/9/09 and 6/12/12

  cc. Sam Donta, MD, Infectious Disease, dated 7/18/09

  dd. Bridget Patterson-Marshall, MD, Neurology, dated 1/13/10 through 4/8/10

  ee. Visiting Nurse Association of Central Connecticut, dated 3/30/10 through 5/10/10 and undated

  ff. Cynthia Grosso, DC, dated 5/26/10 through 9/9/10

  gg. Provider Whose Signature is Illegible, dated 8/5/10

Liberty002600

      hh. Dr. Saul, dated 9/3/10 through 6/9/14
      ii.  Richard Shoup, MD, Sleep Medicine, dated 2/17/11 through 4/29/11
      jj.  Lynn Fairchild, PA-C, dated 1/23/12
      kk. Tagliarni Chiropractic, dated 1/30/12 through 8/11/14
      ll.  Office of Robert Lang, MD, PC, dated 2/21/13 through 7/10/14
      mm.      Robert Udelsman, MD, MBA, General Surgery, dated 4/22/13 through 7/1/13
      nn. Zhiheng He, MD, Endocrinology, dated 11/17/14
      oo. Candace Maddalo, DC, dated 12/7/14 through 8/26/15
      pp. Robert Rougeau, DC, dated 9/16/15 through 12/2/15
      qq. Mary Albritton, MD, Endocrinology, dated 12/17/15
      rr.  Provider Whose Signature is Illegible, illegibly dated

3.  Diagnostics
4.  Labs
5.  Medications
6.  Independent Evaluation completed by Marian Rissenberg, PhD, Neuropsychology, dated 7/2010
7.  Client Internal Claim Review Notes/Interviews
8.  Occupational Information/Job Description
9.  Peer Reviews and Related Correspondence completed by:
    a.  Frisso Potts, MD, Neurology, dated 12/18/08 and 12/23/08
    b.  Oyebode Taiwo, MD, MPH, Internal Medicine, dated 2/25/09 through 5/11/09
    c.  Michael Silverman, MD, Internal Medicine and Infectious Disease, dated 11/23/09 through 4/22/10
    d.  John Brusch, MD, Internal Medicine and Infectious Disease, dated 10/14/10
10. Confirmatory Letters completed by:
    a.  Dawn Garcia, NP, dated 5/14/09
    b.  James O'Brien, MD, Gastroenterology, dated 5/11/09
11. Surveillance/Investigative Reports
12. Employee Statements
13. Collateral Statements
14. Employer Statements
15. Attorney Correspondence and/or Legal Documents
16. Social Security Claim Forms/Documents
17. Client Documents
18. Miscellaneous Documents
19. Duplicate Documents
20. Authorizations

**<u>Summary of Records</u>**

**Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
All records noted above were reviewed in their entirety. I will summarize those portions of the records received that have relevance to the questions and timeframe identified for this review, and within the scope of my areas of endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care.

Nancy Winterer                                                    Re: Haley Spears
March 4, 2016                                                     Page 6 of 19

The claimant is a 38-year-old female with a medical history pertinent for headache.

The claimant saw Kristin Giannini, MD for primary care. On 3/10/09, Dr. Giannini noted the claimant complained of headaches. There was also a history of multi-nodular thyroid and possible hypothyroidism. A biopsy of thyroid nodule was benign. There was a questionable history of ulcerative colitis and possible autoimmune liver disease. Physical exam showed blood pressure of 138/74 and pulse of 80. Rest of exam including thyroid, cardiac, pulmonary and musculoskeletal exam was noted to be normal. On 6/18/09, the claimant complained of headaches. Physical exam was again noted to be normal. On 11/19/12, Dr. Giannini noted a normal physical exam.

The claimant sees Barbara Kage, MD, for management of joint pain, lower back pain, and positive ANA. On 1/19/09, Dr. Kage noted a blood pressure of 105/63. Rest of exam was normal was no synovitis or inflammation on joint exam with normal range of motion. A workup for connective tissue disease was ordered. On 7/20/09, Dr. Kage noted the claimant has a history of Raynaud's phenomenon. There was also a history of GERD, ulcer, and microscopic colitis. Repeat ANA was negative casting doubt on diagnosis of Connective tissue disease. Glucosamine and chondroitin were prescribed, and Plaquenil was continued. Follow-up with ID was recommended.

The claimant saw James O' Brien, MD, GI for management of ulcer. On 10/14/08, Dr. O' Brien noted Prevacid was helping. "Overall she has improved." Physical exam showed "mild suprapubic tenderness". Rest of exam was normal was abdomen soft and no rebound tenderness. Liver size was normal. Cardiac, pulmonary and neurologic exam was normal. On 10/8/09, abdominal exam was noted to be normal. Dr. O'Brien noted gastrointestinal symptoms are in remission except for rare gassiness. On 6/10/11, physical exam including abdominal exam was normal. IBS/ bacterial overgrowth were questioned as cause of symptoms. On 4/11/2013, Dr. O'Brien noted Dexilant was controlling symptoms of heartburn. Diet/lifestyle changes were recommended.

The claimant saw Robert Oberstein, MD, endocrinology for management of a multi-nodular goiter. On 1/21/09, Dr. Obsterstein noted the claimant underwent three biopsies of a left thyroid nodule which were benign. Physical exam did not reveal a dominant thyroid nodule. On 11/6/13, the claimant was being treated for hypothyroidism with Synthroid. TSH was 1.28.

The claimant saw Melissa Albritton, MD, endocrinology for management of postsurgical hypothyroidism and thyroid cancer. On 12/17/15, Dr. Albritton noted the claimant had a history of thyroidectomy in 6/2013 with presence of 0.4 cm micropapillary cancer. Repeat thyroid ultrasounds showed no recurrence of cancer. Physical exam including neck, respiratory, cardiac and musculoskeletal exam was noted to be normal.

The claimant saw Erika Cappelluti, MD, pulmonary for management of asthma. On 4/10/14, Dr. Cappelluti noted the claimant has a history of asthma. She was using her rescue inhaler. Physical exam including cardiac, pulmonary and musculoskeletal exam was noted to be normal.

The claimant saw Saqib Najeer, MD, cardiology, MD for management of palpitations and chest pain. On 3/30/09, Dr. Najeer noted the claimant had palpitations and atypical chest pain. On physical exam, blood pressure was 120/80. Cardiac exam was noted to be normal. An echo, Holter, and stress test was

Liberty002602

ordered.  On 2/14/12, Dr. Najeer noted the claimant had no cardiac symptoms. Physical exam was noted
to be normal. On 6/12/13, Dr. Najeer noted the claimant had a normal stress test without any ischemic
changes. An echocardiogram was normal with ejection fraction of 55-60 %.

The claimant saw Richard Sharp, MD, sleep medicine for evaluation of sleep apnea. On 2/17/11, Dr.
Sharp noted the claimant had infrequent snoring. Physical exam was noted to be normal. A sleep study
revealed the absence of sleep apnea. Better sleep hygiene was discussed. On 4/29/11, Dr. Sharp noted a
normal physical exam. Sleep hygiene was again discussed. Dr. Sharp felt there was no need for further
follow-up.

**Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**
The records provided for review document that the claimant has had a broad spectrum of medical
complaints.  These were noted in a letter by Dr. Raxlen (a self-designated "Lyme disease expert") on
6/22/09 to include fatigue, sensitivity to smells, slurred speech, sensitivity to sound, neck pain, night
sweats, fever, heart palpitations, gastrointestinal problems, joint pain, muscle weakness, fasciculations,
neuropathy, sleep disturbances, depression, anxiety, and neurocognitive deficits.

The claimant told some providers that she had had a tick bite and a "target" lesion at age 16.  Dr. Raxlen
concluded, based on this history – and the symptoms noted in his letter – that she had Lyme disease. He
also decided that Ms. Spears was infected with Borrelia and Bartonella (two other infections potentially
carried by ticks).  He initiated therapy with intravenous antibiotics (azithromycin) and also ordered oral
rifampin and Mepron.  In October 2009, she was being treated with ceftriaxone and oral doxycycline
and noted to have 'only partial relief of symptoms.' She was also seen by a naturopath (Dr. Gouin) in
2009-13.  He noted that she reported fatigue and brain fog and a period of three days during which she
was unable to walk.

Dr. Schoen, a rheumatologist, who saw here on 3/26/2009 wrote that "she does not and has not had
Lyme disease as the cause for her symptoms."  One provider noted that by January 2010, she had
received intravenous Rocephin via a PICC line for a period of some seven months.

By late 2010, she was being treated by an infectious diseases specialist (Dr. Saul). He saw her initially
on 9/3/10 and wrote that she felt worse and had complaints of brain fog, fatigue, headache, and
arthralgias.  He treated her with azithromycin and Mepron initially for "Lyme disease and co-
infections".  By February 2011, she was being treated with a regimen of Mepron, Levaquin, Omnicef
and azithromycin.  On 3/7/11, he wrote that she had "advanced debilitating Lyme disease."  He
continued to treat her with other antibiotics until June 2012 when these drugs were discontinued.  He
wrote that she gradually got worse from June until December 2012 and for this reason, he ordered
intramuscular Bicillin.  By 7/1/13, she was noted to be doing well off all antibiotics.  On 3/7/14, he
reported that she had had a tick bite in December 2013 which "tested positive for Lyme" and she was
treated with Omnicef.  He discontinued the antibiotics and noted by 6/9/14 that she was doing well off
antibiotics.

Extensive testing for Lyme disease was entirely negative in 2008 - 2010.  She also had tests for other
tick-borne infections (Anaplasma, Ehrlichiosis, Babesia, Bartonella and Babesia) in April 2009.  All of
these were negative.  A single specimen of cerebrospinal fluid was tested on 2/3/09 and reported to

Liberty002603

have a positive IgG Western Blot for *Borrelia burgdorferi*.  The IgM was negative.  CSF glucose and protein were normal.  As noted on the test report, there were no interpretive criteria for this test on CSF. In the context of an individual who has never had a single positive Western Blot on serum, this result is not meaningful.

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
The claimant is a 38-year-old woman with a long medical history. She was seen at The Hartford Hospital Medical Group and most of the notes are illegible but on 9/11/09 it is noted she had PICC line infection while be treated for presumed chronic Lyme disease. She saw Dr. Turbiak in the emergency department on 8/28/08 with migraines, and CT scan of her head revealed low attenuation in the right temporal lobe.

She saw Dr. Silvers from neurology on 9/8/08 complaining of blacking out and headache and physical examination was normal. On 11/14/08, she was on Neurontin and Pamelor and was complaining of headaches four days out of the week at a 10 out of 10, and she had a 24 hour EEG that was unremarkable. She saw Dr. Gordon from neurology on 10/1/08, and it was noted that her MRI had shown a right internal capsule white matter lesion. EEG revealed a nonspecific abnormality. On 11/3/08, she complained of daily headaches and zoning out, and physical examination revealed a normal neurologic examination.

She was seen at Yale Neurology on 11/25/08, and physical examination was normal. On 1/27/09, she complained of persistent headaches, but they were better and that her speech had improved, but she complained of fatigue. Physical examination was again normal. On 7/31/09, she had a normal neurologic examination. On 7/30/10, she had not had migraines for months, and physical examination was normal. On 9/23/11, she had no neurologic symptoms and headaches had largely resolved. She had a normal neurologic examination, and MRI revealed no change. On 4/22/13, she had no neurologic symptoms. She saw Dr. Kage on 7/20/09, and it was noted that her Lyme serology was normal, and Lyme IGM was negative, and Lyme IGG revealed four bands. She was seen at Associated Neurologists of Southern Connecticut on 1/12/09 complaining of headache. On 2/17/09, she was given Topamax. On 2/26/09, Lyme disease was mentioned without any clear evidence of that diagnosis. On 3/16/09, it was noted that she was getting ceftriaxone. On 4/27/09, she had some cognitive complaints and complained of one migraine a month. Her physician was "skeptical about further IV treatment for Lyme disease." On 6/29/09, it was noted that headache improved overall. On 10/26/09, she complained of migraines two times a month and complained of fatigue. On 3/29/10, it was noted that migraines were well controlled, and she complained of some cognitive difficulty. Physical examination revealed a normal neurological examination. On 7/23/10, she complained of cognitive difficulty. On 10/29/10, her Topamax was tapered, and she had no migraines but still complained of cognitive difficulty. On 8/23/11, she complained of cognitive difficulty and had a normal neurological examination.

She saw Dr. Schoen on 3/26/09 who did not think her symptoms were from Lyme disease and noted that her serology was negative.

She saw Dr. Saul on 7/1/13 and had no recurrence of Lyme symptoms. On 3/7/13, she was reportedly doing well. On 6/9/14, her energy level was reportedly better. She saw Al Britton from endocrinology on 12/17/15 and had a history of thyroid cancer with fluctuating symptoms.

Liberty002604

Her lab on 8/21/09 revealed negative Borrelia burgdorferi testing, negative western blot, and negative Lyme antibody. She had neuropsychological testing by Dr. Rissenberg in July 2010 which reportedly revealed a significant decline.

**Michael Raymond, PhD, ABN, Neuropsychology:**
All records were reviewed in their entirety.  Below please find a summary of those records deemed most relevant to the questions and time frame identified for this review and with the scope of my practice and area of expertise as a board certified neuropsychologist.

As previously referenced, the medical record review contained voluminous, redundant, and obsolete records to the clinical issue and timeframe currently under review.  Records were provided by multiple specialists as previously discussed.  Furthermore, only one neuropsychological assessment was completed, albeit in a cursory and nonstandardized fashion, in July 2010.

By way of history, the claimant is a 37-year-old, right-handed female with a high school education and some additional college courses.  She had been employed as an administrative assistant until her date of disability (9/27/08) initially the result of headaches.  Numerous other symptoms and possible etiologies were reported.  The undersigned will only discuss the most salient information regarding the claimant's neuropsychological status in accordance with her subjective neurocognitive complaints.  Medical colleagues, in internal medicine, infectious disease, and neurology, have also reviewed these records and will comment accordingly within their area of expertise.

Attending physician statements (APS) were completed by multiple medical specialists.

On 1/13/08, Dr. Silvers, neurologist, indicated "it is my recommendation that Haley Spears return to work on a part-time basis, and work her way up to full-time status within the next month".  Primary diagnosis was migraine.  In contrast, a second form was completed on 11/11/08 indicating that the claimant was restricted from 9/29/08 – 12/8/08 as a result of migraine and encephalopathy.  On 10/1/08, Dr. Gordon, neurologist, completed a restrictions form indicating that there were "none" restrictions from a physical, mental, or cognitive perspective.  Another neurological APS was completed by Dr. Zagar from 5/26/09 – 6/21/10.  In a letter, Dr. Zagar indicated, "Unfortunately, while she has had improvement in headaches, she continues to have fatigue and cognitive issues which limit her daily functioning, and, in my opinion, have made her unable to work at this time.  I expect that she will be able to return to work in the next few months, probably initially part time and later hopefully full time, but that it is detrimental to her to expect that at this time."  A similar letter was completed on 10/6/09 once again indicating that she was limited by "fatigue and cognitive issues".  On 6/22/09, Dr. Raxlen, neuropsychiatrist with specialties in nutritional medicine and systemic Lyme disease, indicated that the claimant has been diagnosed with Lyme disease.  Dr. Raxlen indicated "at this time it is not possible for Ms. Spears to work full time or part time, and disability leave is medically necessary for her.  Due to the duration of her illness and the extensive, multisystemic nature of her symptoms, particularly the neurological involvement, her treatment is very likely to last for a minimum of 12 months".  On 1/20/10, Dr. Raxlen completed a mental residual functional capacity assessment indicating that the claimant was "markedly limited" in essentially all aspects of memory and cognitive functioning, including "remember locations, understanding very short simple instructions, carrying out detailed instructions, performing

Liberty002605

activities within a schedule, and set realistic goals and make plans independently." It appears that this form was completed without any formal neurocognitive or mental status assessment; this was merely completed based on the claimant's subjective report/complaints.

From a historical perspective, the claimant's initial complaints/symptoms involved vascular headaches (migraines). Over the course of a few months, she had been evaluated by numerous neurologists. An initial cerebral MRI (9/2/08) identified a nonspecific right temporal lesion. She was evaluated neurologically by Dr. Silvers whose neurological examination was unremarkable which included mental status examination, sensorimotor evaluation, gait and coordination, and cranial nerve testing. An EEG (9/18/08) identified "rare" polymorphic delta slowing in both temporal regions. A repeat MRI (10/6/08) identified a stable and non-enhancing white matter lesion involving the right temporal lobe. This was considered to be a possible chronic demyelinating plaque.

On 11/3/08, the claimant was seen for another neurological evaluation, per Dr. Gordon. Neurological evaluation was unremarkable. Impression included common migraine and nonspecific white matter lesion that represented a "scar".

Based on questionable neuroimaging findings, the claimant was evaluated per Dr. Baehring, neuro-oncologist, at Yale University School of Medicine (11/25/08). It was noted that "Ms. Spears presents to the Yale Neurology Clinic seeking another opinion". Physical examination, including an extensive neurological examination was unremarkable. She was deemed alert and oriented with fluent language and "no cognitive deficits". Dr. Baehring also noted a small pineal cyst of insignificance. His impression included a right temporal lobe signal abnormality of unknown etiology, pineal cyst, and headache of unknown etiology. The claimant was re-evaluated per Dr. Baehring on 4/22/13. This was based on the recommendation for interval surveillance of the right temporal lesion and pineal cyst. Within the clinic note, it was noted: "since her last office visit, she has no neurologic symptoms to report." Neurological evaluation was unremarkable. In conclusion, Dr. Baehring indicated "I am very pleased with Haley's status. The two brain MRI abnormalities have remained entirely stable, and I think we can now increase the intervals between surveillance scans to 2 years."

A neurology peer review was completed by Dr. Potts, on 12/18/08 and 12/23/08, respectively. Dr. Potts commented on the claimant's headaches indicating that "she appears to have nearly daily headaches, the severity of which is likely to preclude her from working. Currently, the claimant's medications are being adjusted. It appears reasonable to extend the no work recommendation until the end of January." On 12/23/08, Dr. Potts indicated that a "return to work date of 1/7/09 appears reasonable". Furthermore, it was noted that Dr. Potts had spoken with Dr. Gordon, neurologist "who indicated he had not placed any restrictions or limitations on the claimant's work capacity and had not recommended she stay out of work."

On 10/6/09, a letter was forwarded per Dr. Zagar, neurologist, addressing the claimant's overall status. Specifically, Dr. Zagar indicated "I have been following Haley Spears for her neurological issues caused by CNS Lyme disease since January 2009. These symptoms include frequent headaches, severe fatigue, joint pain, digestive problems, and cognitive complaints. She remains unable to work even on a part-time basis."

Liberty002606

Nancy Winterer                                                    Re: Haley Spears
March 4, 2016                                                     Page 11 of 19

An independent peer review was completed by Dr. Silverman, internist, on 11/23/09 and 4/22/10. As is customary in peer reviews, the report included a summary of medical documentation, peer to peer consultation, conclusion, and responses to referral questions. With regard to Lyme disease, Dr. Silverman indicated "the claimant does not have any history or evidence of Lyme disease. A lumbar puncture was completed on 2/3/09 which was positive by IgG for Borrelia antibodies, but negative for IgM. The significance of this testing is not consistent with a diagnosis of neuroborreliosis. Regarding impairment, Dr. Silverman indicated "there is no clear-cut evidence of impairment from 2/8/09 to the present. Physical exams do not support evidence of restrictions and/or limitations". In a follow-up peer review (4/22/10), Dr. Silverman indicated "it is my opinion, with a reasonable degree of medical certainty, that the diagnoses are not appropriate with respect to Lyme disease, and specifically neuroborreliosis. In addition, to date, there has not been any documentation revealing any evidence of other tick-borne illness supporting these other diagnoses. The claimant has been receiving multiple courses of other intravenous therapies, all of which are not standard of care in treatment for these diagnoses which indeed had not been confirmed or further elucidated through requests for information by Dr. Raxlen". As previously noted, the claimant had only undergone one neuropsychological assessment since 2008. This was completed per Dr. Rissenberg in July 2010. The evaluation was marginal from a neuropsychological perspective, non-comprehensive, and nonstandardized. Furthermore, no effort testing was administered (e.g., embedded, freestanding). A number of subtest scores were noted within the body of the report, and WAIS-III and WMS-III summary report information was attached to the report. The undersigned did not have access to raw neuropsychological test data. Furthermore, at this juncture, the test results must be considered obsolete (6 years old). In any event, the test results and opinion, of Dr. Rissenberg, can respectfully be challenged. In particular, it was noted that the claimant was "highly motivated and gave her best effort on all tasks." Once again, this can be easily scrutinized based on the fact that no formal effort testing was administered. In addition, Dr. Rissenberg, for some unknown reason, appeared to have overestimated the claimant's premorbid level of intellectual functioning (1/15). Based on review of specific subtest scores, level of education, and work history, it is more likely that the claimant has been functioning within the average range of general intelligence. As a result of a rather cursory neuropsychological assessment without formal effort testing, the interpretation of neuropsychological test data is limited, and thus, a neuropsychologist would not be able to render an opinion with any degree of neuropsychological certainty. Despite this, Dr. Rissenberg opined that "these findings are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious or inflammatory illness."

On 9/9/10, Dr. Raxlen, in letter form, highlighted a number of subjective complaints of the claimant, including "brain fog, confusion, and memory problems." Furthermore, he commented on the aforementioned neuropsychological evaluation indicating that Dr. Rissenberg had opined that a "marked decline in overall intellectual functioning was among the findings. Dr. Rissenberg's evaluation strongly supports Ms. Spears' eligibility for full-time disability benefits."

**Provider Interview with Robert Lang, MD, Endocrinology completed by Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
Please refer to attached appendix

Liberty002607

Nancy Winterer                                                    Re: Haley Spears
March 4, 2016                                                     Page 12 of 19


**Provider Interview with Zane Saul, MD, Infectious Disease completed by Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**
I called Dr. Saul's office on February 29th at 11:00 am, March 1st at 1:00 pm, and March 2nd at 10:00 am and 3:00 pm. I had been told he would call me back on the afternoon of 3/2/16. He did not.


**Provider Interview with Joachim Baehring, MD, Neurology, Neuro-Oncology completed by Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
Multiple attempts were made to reach Dr. Baehring: on 2/25/16 at 11:00 am when a message was left with Kay; on 2/26/16 at 9:30 am when a message was left with June; and on 2/29/16 at 1:00 pm when a message was left with Kay. No return calls were placed. If a return call is placed, an addendum will be dictated.


**Provider Interview with Kristin Giannini, MD, Family Practice completed by Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
I attempted to reach Dr. Giannini on 2/18/16 at 315PM EST, and a message was left on the office voicemail. A second attempt was made on 2/19/16 at 1215PM EST, and a message was left on the office voicemail. A third attempt was made on 2/24/16 at 1135AM EST, and a message was left on the office voicemail.


**Panel Call facilitated by Erin Truesdale**
A panel call was facilitated between Dr. Kent Crossley, Infectious Disease; Dr. Michael Raymond, Neuropsychology; Dr. Daniel Kitei, Neurology; and Dr. Robert Cooper, Endocrinology on 3/2/16 at 5:30 PM CST.


Dr. Cooper stated that he was asked to look at the case from several perspectives, including endocrinology, rheumatology, GI, and cardiology. From an endocrinology perspective, Dr. Cooper opines that there is no evidence in the available records to support impairment. The claimant has a history of thyroid issues, including multinodular thyroid and hypothyroidism. In 2009, a biopsy of the thyroid was done by Dr. Oberstein, which was found to be benign. She had her thyroid removed in June 2013, and subsequent thyroid ultrasounds showed no recurrence of cancer. From a rheumatology/musculoskeletal perspective, Dr. Cooper said that the records indicated Dr. Kage performed exams of synovitis and musculoskeletal systems on 1/19/09 and 7/20/09 which were unremarkable. Dr. Cooper added that the claimant's PCP, Dr. Giannini, opined restrictions and limitations in 2010 due to her plethora of symptoms, but provided no clinical evidence to back up her opinion within the medical records provided for review. From a gastroenterological perspective, Dr. Cooper noted that there were no abnormal findings. Finally, Dr. Cooper stated that from a cardiology perspective, all exams within the available evidence were also normal. Additionally, sleep studies were conducted that were normal. In summary, Dr. Cooper opines that, overall, there is no evidence within the available records to support functional impairment for the timeframe in question.


Per Dr. Crossley, he found nothing in the available records to support impairment, and he agrees with Dr. Cooper's assessment. The claimant's symptoms were first reported in 2007, and her broad spectrum of medical complaints included fatigue, sensitivity to smells, slurred speech, sensitivity to sound, neck pain, night sweats, fever, heart palpitations, gastrointestinal problems, joint pain, muscle weakness, fasciculations, neuropathy, sleep disturbances, depression, anxiety, and neurocognitive deficits. Dr.

Liberty002608

Nancy Winterer                                                      Re: Haley Spears
March 4, 2016                                                       Page 13 of 19

Crossley noted that the claimant seemed to bounce from one doctor to the next for several years until she found Dr. Raxlen, who opined that she had Lyme disease, as well as Borrelia and Bartonella infections. He began the claimant on an antibiotic regimen, including azithromycin, rifampin, and Mepron. In October 2009, the claimant was being treated with ceftriaxone and oral doxycycline. She also saw a naturopath, who gave her more antibiotics. By 2010, the claimant told Dr. Saul that she felt worse. Dr. Crossley added that there is a very telling note within the available records, however, by Dr. Schoen, which stated that the claimant has never had Lyme disease as the cause of her symptoms. Dr. Saul continued to give the claimant more antibiotics until 2012. Interestingly, the claimant reported in 2013 that her symptoms became worse when she was off the antibiotics, but by June 2014, her symptoms had drastically improved off of antibiotics. Dr. Crossley went on to say that there had been numerous tests done over the years, and all of them were negative, with the exception of one. This was cerebrospinal fluid tested on 2/3/09, which was reported to have a positive IgG Western Blot for Borrelia burgdorferi. Dr. Crossley stated that, for a person who has never had a single positive Western Blot on serum, this result means nothing. Overall, the evidence shows self-reported symptoms and a lack of objective data. Thus, Dr. Crossley opines that functional impairment is not supported for the timeframe in question.

Dr. Kitei stated that he agrees with both Dr. Cooper and Dr. Crossley in that there is nothing within the available records to support impairment. He stated that Lyme disease can cause neurological symptoms, but while he was looking over the records, he was questioning that diagnosis. Starting in 2008, the claimant had more than ten neurological tests done, which were all normal. She was seen at Yale Neurology, where a physical examination was found to be normal. The claimant has also complained of headaches. In 2013, Dr. Kitei noted that the claimant no longer reported headaches and that they had resolved. On 3/7/13, the claimant saw Dr. Saul and reported at that time to be doing well, and by 6/9/14, her energy level was better. At that time, her subjective complaints had improved, as well. Dr. Kitei deferred opining on cognitive impairment to the neuropsychologist reviewing the case. In conclusion, Dr. Kitei opined that there was no evidence in the records to support functional impairment.

Dr. Raymond commented that he agrees with the above reviewers' assessments. He stated that the claimant had seen 15 different specialists and eight different neurologists over the course of her treatment. Dr. Raymond said that there is no evidence in the available documentation that the claimant is suffering from neurocognitive abnormalities. There was a neuropsychological evaluation done on one occasion, by Dr. Rissenberg in July 2010. This evaluation rendered only marginal results, and no validity testing or formal effort testing was administered. Regardless, Dr. Rissenberg concluded that the results were "consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness." Dr. Raymond disagrees with this assessment. The only abnormal finding was in Dr. Raxlen's mental residual functional capacity assessment on 1/20/10, which indicated that the claimant was "markedly limited" in memory and cognitive functioning, including "remember locations, understanding very short simple instructions, carrying out detailed instructions, performing activities within a schedule, and set realistic goals and make plans independently." However, Dr. Raymond notes that this assessment does not coincide with the claimant's actual functional abilities at the time. Dr. Raymond opines that there is no evidence in the records to support functional impairment, and no etiology to support any neuropsychological diagnoses.

The reviewers agreed with each other's findings and had no additional questions. With nothing further to add, they were thanked for their time, and the panel call concluded.

Liberty002609

## Analysis

**Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**
Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support global impairment and that the claimant is able to work without restrictions during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

Although the claimant has a history of micropapillary thyroid cancer, she underwent total thyroidectomy in 6/2013 and has not had any recurrence of the cancer. She appears to be clinically and biochemically euthyroid as was noted by Dr. Oberstein on 11/6/13 and Dr. Albritton on 12/17/15. There are no findings on exams of synovitis or musculoskeletal finds by Dr. Kage on exams on 1/19/09 or 7/20/09 to support the degree of impairment opined in her attending physician letters on 2/9/09 and 8/4/09. There are no findings on exams including neurological or musculoskeletal exams by Dr. Giannini 3/10/09 or 11/19/12 support effect on functionality or supporting ongoing restrictions or limitations opined on 1/20/10 or 7/9/10. There was no evidence of a GI disorder leading to ongoing restrictions or limitations. There are no focal abdominal findings on exams by Dr. O'Brien to support impairment from a gastrointestinal perspective. Dr. Najeer noted that the claimant had no cardiac symptoms. Stress test, echo, and Holter were noted to be normal. The claimant had a sleep study which failed to reveal the presence of sleep apnea.

**Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**
There is no evidence the claimant has had Lyme disease or other infections that would be functionally limiting.  This conclusion is based on the absence of any objective findings of late-stage Lyme disease (typically manifest by arthritis, neurologic findings, or a cardiac conduction defect) and the totally non-specific self-reported symptoms noted by the claimant.  Importantly, except for a single CSF test that is impossible to interpret, all of the claimant's testing for tick-borne illnesses was negative.  Several writers have noted that neurological Lyme disease does not occur in individuals with a negative serum Western Blot studies.  As noted by one recent reviewer (Halperin JJ. Nervous system Lyme disease. Infect Dis Clin North Am 2015; 29:241-53), neurological Lyme disease is part of disseminated infection, and it is not seen in the absence of positive serum tests for Borrelia antibody.  I agree with Dr. Brusch (infectious diseases) who wrote in his peer review report of 9/27/10 that Ms. Spears "does not have Lyme disease of any type."  Moreover, as Halperin notes, this infection is easily treated with oral antibiotics and the first course of doxycycline the claimant received would have been effective therapy.

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**
Based on the information available for review, as described above, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support impairment from a neurologic standpoint. The claimant has complained intermittently of headaches but the most recent note including notes from 2009 and 2010 detail that she had significant improvement. When she was seen at Yale Neurology on 7/30/10, she had not had migraines for months, and when she saw Associated Neurologists of Southern Connecticut on 3/29/10, her migraines were well controlled. When she saw Yale Neurology on 4/22/13, she did not have any neurologic symptoms and headaches had largely resolved. The claimant has had consistently normal neurologic examinations, most recently on 4/22/13 at Yale Neurology but there are over ten normal neurologic examinations throughout the records and no

neurologic examinations that were abnormal. The claimant has complained of Lyme disease, and that diagnosis is in question, but I will yield to the infectious disease reviewer in regards to Lyme disease. The claimant has also had cognitive complaints, but there is a reviewer from neuropsychology reviewing the case in that regard, so I will also not opine on that.

**Michael Raymond, PhD, ABN, Neuropsychology:**
Based on the information available for review, as described above, it is the reviewer's opinion with a reasonable degree of neuropsychological certainty that neurocognitive impairment is not supported within the time frame in question (9/27/08 – 3/31/15). While the claimant had been evaluated by 5 or 6 different neurologists, all neurological examinations, as previously discussed, were well within the normal range.  There was no suggestion, whatsoever, of reduced cognitive efficiency.  The only suggestion for "inattention, brain fog, memory loss" were reported as part of an interview and based solely on the claimant's subjective report.  Initial problems began that were primarily related to vascular headaches.  Additional problems began when the claimant underwent an initial cerebral CT scan and multiple cerebral MRI's identifying a nonspecific right temporal lesion and eventual pineal cyst. Fortunately, serial evaluations had remained stable and without evidence of an acute process.  A plethora of other subjective complaints and medical issues were noted and addressed over time.

Despite the claimant's subjective neurocognitive complaints, she was only evaluated neuropsychologically on one occasion.  This occurred per Dr. Rissenberg in July 2010.  As noted, Dr. Rissenberg's conclusion that the neuropsychological test results "are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness" is certainly not confirmed or a viable clinical explanation based on the neuropsychological test results.  In fact, the evaluation itself was cursory, non-standardized, and was limited by the exclusion of formal effort testing, as noted above. Premorbid levels of intellectual functioning appeared to be miscalculated based on the method and rationale documented in that prior report.  Overall, based on those assessment factors, it is highly unusual that a neuropsychologist would be able to render a clinical opinion with any degree of neuropsychological certainty.

In summary, the preponderance of clinical evidence contained within this file does not support neurocognitive impairment within the designated time frame.

**<u>Questions</u>**
The below questions are answered for the timeframe of 9/27/2008 through 3/27/2009 and 3/28/2009 through 3/31/2015.  Please refer to the Analysis section above for additional details and rationale supporting this reviewer's opinions.

**Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine:**

1. **Please contact PCP Kristin Giannini, MD, who treated claimant 3/10/09 through 11/25/13, regarding Ms. Spear's condition, treatment, and functional capacity.**

   See provider interview section

Nancy Winterer                                                      Re: Haley Spears
March 4, 2016                                                       Page 16 of 19

2.   **Please contact Endocrinologist Robert Lang, MD, who treated claimant from 2/21/13 through 7/10/14, regarding Ms. Spear's condition, treatment, and functional capacity.**

   See provider interview section

3.   **From an Internal Medicine and Endocrinology perspective, based on the available medical evidence, please describe the claimant's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

   From an Internal Medicine and Endocrinology perspective, based on the available medical evidence, the claimant should have no impairments during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015

4.   **Based on the medical evidence, from an Endocrinology and Internal Medicine perspective, please provide your best assessment of the claimant's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

   Based on the medical evidence, from an Endocrinology and Internal Medicine perspective, there should be no effect on the claimant's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) should not be during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

**Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine:**

1.   **Please contact Zane Saul, MD, who treated claimant from 8/8/10 through 6/9/14, regarding Ms. Spear's condition, treatment, and functional capacity.**

   Please see the above notes.  Dr. Saul did not return my calls.

2.   **From an Infectious Disease perspective, based on the available medical evidence, please describe the claimant's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

   I see no documented impairments for the periods of time noted that would be associated with the presence of any infection.  Her symptoms are non-specific and not related to any infection.

3.   **Based on the medical evidence, from an Infectious Disease perspective, please provide your best assessment of the claimant's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

Liberty002612

The claimant's functional capacity would not have been limited by any infection during the periods noted. Her non-specific symptoms are not the consequence of any infection.

**Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine:**

1. **Please also contact Joachim Baehring, MD, who treated claimant from 11/25/08 through 4/22/13, regarding Ms. Spear's condition, treatment, and functional capacity.**

   Multiple attempts were made to reach Dr. Baehring as noted above and no return calls were placed.

2. **From a Neurology perspective, based on the available medical evidence, please describe the claimant's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

   Please see the Analysis section above.

3. **Based on the medical evidence, from a Neurology perspective, please provide your best assessment of the claimant's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

   Please see the Analysis section above.

**Michael Raymond, PhD, ABN, Neuropsychology:**

1. **Please explain the results and conclusions of the July 2010 Neuropsychological Evaluation by Marian Rissenberg, PhD including areas of cognitive strength and weakness, psychological findings, results of validity testing.**

   Respectfully, the results and conclusions rendered by Dr. Rissenberg following her July 2010 neuropsychological evaluation, are of concern and easily refuted. Specifically, the conclusion included "findings that are consistent with frontal and diffuse cerebral dysfunction as is seen in chronic infectious and inflammatory illness". That evaluation was cursory, non-standardized, and without formal effort testing. Premorbid level of intellectual functioning appeared to be miscalculated as it is highly unlikely that the claimant functioned within the high average range of general intelligence. The evaluation, despite being obsolete, did not objectively support neurocognitive strengths or weaknesses at the time of the evaluation.

2. **Based on the medical evidence, from a Neuropsychology perspective, please provide your best assessment of the claimant's functional capacity (including activities of daily living, capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.**

Liberty002613

Nancy Winterer                                                              Re: Haley Spears
March 4, 2016                                                                Page 18 of 19

Unfortunately, based on a dearth of neuropsychological evidence, the undersigned is unable to render a conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested timeframe.  However, the available neuropsychological evidence offered in the medical record does not support presence of neurocognitive impairments or restrictions, including activities of daily living (ADL) for the noted timeframe.

If you need any further assistance, please do not hesitate to call.

Sincerely,

Daniel Kitei, DO, MA
Board Certified Neurologist
Board Certified Neuromuscular Medicine
Colorado License #47342

Robert Cooper, M.D., F.A.C.E., F.A.C.P
Board Certified Endocrinologist
Board Certified Internal Medicine
Massachusetts License #204180
New Jersey License #25MA07589200
New York License #198082
Pennsylvania License # MD057608L

Kent Crossley, MD, FACP
Board Certified Internal Medicine
Board Certified Infectious Disease
Minnesota License #18766

Michael Raymond, PhD, ABN
Board Certified Neuropsychologist
New Jersey License # SIO2529

Liberty002614

Nancy Winterer                                                      Re: Haley Spears
March 4, 2016                                                       Page 19 of 19

*All opinions in this report are solely the opinions of the author. There is no conflict of interest. There is no doctor/provider-patient treatment relationship, and the author did not personally examine the claimant. All opinions are advisory only, independent, and are based upon a reasonable degree of medical certainty and evidence-based medical concepts, considering all the data available at the time of preparation of this report.  This report is not intended as a recommendation regarding any decisions on a claim or administrative functions to be made or enforced. BMI does not make claim decisions.*

Liberty002615



6600 France Ave. S., Suite 245
Edina, MN 55435
1-866-927-0184 phone
952-927-7147 fax
office@behavioralmedical.com

March 2, 2016

**\*\*CONFIDENTIAL\*\***

Robert Lang, MD                              Re: Haley Spears
Fax: (203) 248-6933                          Claim No: REDACTED
                                             DOB: REDACTED

Dear Dr. Lang:

Thank you for taking the time to discuss your patient, Haley Spears, with me.  The following is a summary of our conversation on 2/19/16 at 12:00 pm ET.  Please review it, make any comments or corrections you might have, and sign and fax this letter back to me.  **A response is respectfully requested within <u>five</u> business days from the date of this letter.  If you do not respond, I will conclude that this letter is an accurate representation of our conversation.**

Dr. Lang stated Ms. Spears was found to have an incidental thyroid cancer. She was being treated with levothyroxine. Dr. Lang stated there should be no impact on her functionality from an endocrine perspective.

Again, I appreciate the opportunity to discuss Haley Spears with you.

Sincerely,

Robert Cooper, M.D., F.A.C.E., F.A.C.P
Board Certified Endocrinologist
Board Certified Internal Medicine
Massachusetts License #204180
New Jersey License #25MA07589200
New York License #198082
Pennsylvania License # MD057608L

Robert Lang, MD

Re: Haley Spears

March 2, 2016

Page 3 of 3

---

*Please Complete and Fax to Confidential Fax:  952-927-7147*

I have read the above and agree that it is an accurate representation of our conversation and my assessment of my patient, Haley Spears.

Additional comments:

Robert Lang, MD

Date  3/3/16

Liberty002617

<u>**CURRICULUM VITAE**</u>

**Michael J. Raymond**
**866-927-0184**

**EDUCATION:**

1981                    Ph.D.   Rehabilitation (Psychology), Florida
                        State University, Tallahassee, Florida

1978                    M.S.    Rehabilitation Counseling, University of
                        Scranton, Scranton, Pennsylvania

1974                    B.A.   History/Education, St. Francis College, Loretto,
                        Pennsylvania

**PROFESSIONAL EXPERIENCE:**

2010 – Present    **<u>Clinical Associate Professor</u>**
                        Department of Clinical Sciences, The Commonwealth
                        Medical College, Scranton, Pennsylvania.
                            Provide clinical practicum teaching and supervision of
                            medical students with primary emphasis in
                            clinical/forensic neuropsychology and rehabilitation.

2010 – Present    **<u>Consulting Neuropsychologist</u>**
                        Neuropsychological Rehabilitation Services
                        Neptune, New Jersey.

                            Provide comprehensive clinical and forensic
                            neuropsychological assessment and consultation.

2005 – Present    **<u>Neuropsychological Consultant</u>**
                        Behavioral Medical Interventions
                        Minneapolis, Minnesota.

Updated 5.5.14

Liberty002618

Provided clinical and forensic neuropsychological consultation.

2004 – 2010 **Director, Adult Neuropsychology Services**
Comprehensive Neuropsychological Specialties, Monmouth Beach, New Jersey.
Provide comprehensive clinical and forensic neuropsychological assessment and consultation.

2002 – Present **Clinical Professor,**
Department of Psychology, Philadelphia College of Osteopathic Medicine, Philadelphia, Pennsylvania.
Provide clinical practicum teaching and supervision for doctoral psychology students with primary emphasis on clinical neuropsychology and rehabilitation.

1998 - 2000 **Visiting Professor,**
Trnava University, Graduate School of Public Health and Nursing, Trnava, Slovak Republic.
Taught graduate courses with primary emphasis on neuropathology, rehabilitation and neuropsychology.

1994 - 1997 **Adjunct Professor,**
Marywood University, Graduate School of Arts and Sciences (Psychology), Scranton, Pennsylvania.
Taught graduate level courses with primary emphasis on neuroanatomy, neuropsychological assessment and neurological disorders.

1992 - 2006 **Surveyor, Brain Injury Programs,**
Commission on Accreditation of Rehabilitation Facilities, Tucson, Arizona.

1990 - 2006 **Neuropsychologist,**
Monmouth Neuropsychology Associates, Red Bank, New Jersey.
Provided comprehensive clinical and forensic neuropsychological assessment and consultation.

Liberty002619

1988 - Present        **Director, Clinical/Forensic Neuropsychology,**
                      **Clinical Director, Brain Injury/Sports Concussion Program,**
                      The John Heinz Institute of Rehabilitation Medicine, Wilkes-
                      Barre, Pennsylvania.
                      Provide comprehensive inpatient/outpatient
                      neuropsychological consultation to physicians,
                      and multidisciplinary rehabilitation team, provide
                      consultation to the Veteran's Administration Medical
                      Center (VAMC), inservice training/education and
                      research.  Provide expert forensic neuropsychological
                      testimony.  Provide all managerial, administrative and
                      supervisory duties to a five (5) person department,
                      including cognitive rehabilitation and psychometry and
                      sports concussion program affiliated with professional,
                      college, and high school teams.

1986 – 1998          **Neuropsychologist,** (part-time), Wyoming Valley Health Care
                      System, First Hospital Wyoming Valley, Wilkes-Barre,
                      Pennsylvania.
                      Provided comprehensive inpatient neuropsychological
                      consultation to the psychiatry service, including adult,
                      adolescent, children and addictive treatment programs.
                      Participated in biweekly staff meetings and inservice
                      training.

1986 - 1988          **Neuropsychologist, Director, Psychological Services,**
                      The John Heinz Institute of Rehabilitation Medicine, Wilkes-
                      Barre, Pennsylvania.
                      Provided comprehensive inpatient/outpatient
                      neuropsychological consultations to the medical service
                      and multidisciplinary rehabilitation team, pain/stress
                      management, cognitive rehabilitation, psychotherapy,
                      inservice training and research.  Provided all managerial,
                      administrative and supervisory duties to seven (7) person
                      Department of Psychological Services.  Developed a
                      neuropsychological laboratory and contributed toward the
                      development of a cognitive rehabilitation service and
                      brain injury rehabilitation program.

Liberty002620

| | |
|---|---|
| 1985 - 1986 | **Neuropsychologist,** Neurorehab Associates, Inc., Rochester New York. |

Provided comprehensive neuropsychological consultation including assessment and evaluation for day rehabilitation patients and outpatients and individual, family and group psychotherapy.  Responsible for the supervision of the neuropsychology service including a staff psychologist and three (3) psychometrists.  Contributed to the development of a comprehensive day rehabilitation service for neurologically impaired individuals. Provided consultation to the interdisciplinary rehabilitation team. Participated in weekly neurology grand rounds, The University of Rochester School of Medicine.

1982 - 1985   **Clinical Psychologist,** (part-time), Family Counseling Clinic, Mansfield, Pennsylvania.

Provided intake/brief psychological evaluations and individual family psychotherapy.

1981 - 1985   **Clinical Psychologist,** Department of Rehabilitation Medicine, Clinical Psychology  Section, The Williamsport Hospital and Medical Center, Williamsport, Pennsylvania.

Provided consultations to the medical service and multidisciplinary rehabilitation team, neuropsychological assessment and evaluation, pain/stress management, psychotherapy and inservice training.  Consultant and contributing editor to the Department of Sports Medicine.

1979 - 1981   **Graduate Assistant**, Department of Human Services and Studies, Florida State University, Tallahassee, Florida.
Instructor:   Medical and Psychological Aspects of Disability, 5 hour undergraduate course.

Supervisor:   Undergraduate intern and field experience, 7 quarters.
Researcher:   Curriculum Development, Task Force of Independent Living.1979 – 1980

1979 - 1980   **Directed Individual Study**, Department of Psychology,

Liberty002621

Tallahassee Pain and Stress Management Institute, Tallahassee, Florida.
> Training and practice in pain/stress management utilizing a variety of biofeedback modalities and relaxation techniques.

1978 - 1979 **Psychological Associate**, Divine Providence Hospital, Community Mental Health Center, Williamsport, Pennsylvania.
> Provided individual, marital and family psychotherapy, psychological and neuropsychological assessment and evaluation, and consultation with the Lycoming County Prison.

1/78 - 6/78 **Clinical Psychology Intern**, Department of Rehabilitation Medicine, Neuropsychology Section, Geisinger Medical Center, Danville, Pennsylvania.
> Training and practice in medical consultations (i.e., neurology, pediatrics, rehabilitation medicine, psychiatry, etc.), provided neuropsychological assessment and evaluation involved with neurologyurology/neurosurgery conferences and rehabilitation medicine grand rounds.

9/77 - 12/77 **Graduate Practicum**, Department of Psychiatry, Clinical Psychology Section, VA Medical Center, Wilkes-Barre, Pennsylvania.
> Training and practice in psychiatric consultations, Individual/group therapy, and neuropsychological assessment.

9/77 - 12/77 **Graduate Practicum**, Department of Career Development, Williamsport Area Community College, Williamsport, Pennsylvania.
> Training and practice in individual and group vocational counseling, and psychological/vocational assessment and evaluation of college students and community residents.

1974 - 1976 **Supervisor**, Division of Distribution, Grand Union Company,

Liberty002622

Elmwood Park, New Jersey.
Supervised union personnel and clerical staff; majority of responsibilities included: productivity, cost analysis and inventory control.

**PRESENTATIONS:**

| | |
|---|---|
| November 2011 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Marco Island, Florida. |
| October 2011 | Behavioral Manifestations in Brain Injury.  Brain Injury Team Inservice.  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 2011 | Neurocognitive Deficits in Epilepsy.  Epilepsy Support Group, Wilkes-Barre, Pennsylvania. |
| May 2011 | Clinical and Forensic Neuropsychological Aspects of MTBI.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| May 2011 | Roundtable Discussion:  Future Trends in Sports Concussion Management.  The DiSepio Symposium Series, Saint Francis University, Loretto, Pennsylvania. |
| March 2011 | Neuropsychological Performance in a Patient Following Resection of a Vestibular Schwannoma. American College of Professional Neuropsychology 3rd Annual Conference, Las Vegas, Nevada. |
| March 2011 | Concussions. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 2010 | Schools Treat Concussions Seriously, Newspaper Interview/Article, The Citizen's Voice, Wilkes-Barre, Pennsylvania. |

Updated 5.5.2014                              6

Liberty002623

| | |
|---|---|
| November 2010 | Concussions Drawing More Attention, Newspaper Interview /Article, The Times Tribune, Scranton, Pennsylvania. |
| November 2010 | Use Your Head When Making Decisions About Sports Concussion, Wilkes-Barre Junior Penguins, Wilkes-Barre, Pennsylvania. |
| October 2010 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| October 2010 | Neuropsychological Consequences of Moyamoya Disease:  A Clinical Case Study.  The National Academy of Neuropsychology Annual Meeting, Vancouver, Canada. |
| May 2010 | Speed that Hurts:  MVA & TBI:  WILK Radio, Wilkes-Barre, Pennsylvania. |
| February 2010 | Anoxic Encephalopathy Following Cardiac Arrest.  American College of Professional Neuropsychology Conference, Las Vegas, Nevada. |
| November 2009 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| October 2009 | Work-Related Mild Traumatic Brain Injury:  Forensic Neuropsychological Assessment 2009.  Northeast Regional Occupational Health and Safety Conference, Wilkes-Barre, Pennsylvania. |
| October 2009 | Clinical and Forensic Neuropsychology:  An Overview.  Brain Injury Rehabilitation Team, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |

Liberty002624

| | |
|---|---|
| April 2009 | Visual Perceptual Symptoms Associated with Right Hemispheric Pathology do not Affect Performance on the TOMM.  American College of Professional Neuropsychology Conference, San Diego, California. |
| March 2009 | Clinical Consideration in Sports Concussion Management.  Southeast Georgia Healthcare System, Brunswick, Georgia. |
| October 2008 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Neuropsychological Consequences of Autosomal Dominant Cerebellar Atrophy:  A Clinical Study.  The National Academy of Neuropsychology Annual Meeting, New York, New York. |
| October 2008 | Concussion Among High School Athletes.  Sports Fever, 1340 FOX Sports Radio, Wilkes-Barre, Pennsylvania. |
| September 2008 | Traumatic Brain Injury:  Healing the Body and Mind. Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 2008 | Expect the Unexpected:  Signs and Symptoms of TBI. Pastoral Care Conference, Wilkes-Barre, Pennsylvania |
| August 2008 | Clinical and Legal Implications of Sports Concussion. John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2008 | Consequences of Sports Concussion.  Sports Fever, WSWB TV, Wilkes-Barre, Pennsylvania. |
| June 2008 | Signs, Symptoms, and Treatment of Sports Concussion in High School Athletes.  Toyota High School Sports Show, FOX 56 TV, Wilkes-Barre, Pennsylvania. |

Liberty002625

| February 2008 | Sports Concussion:  Tackling the Common Myths.  You Be The Judge, FOX 56 TV, Wilkes-Barre, Pennsylvania. |
|---|---|
| February 2008 | Traumatic Brain Injury Overview.  You Be The Judge, FOX 56 TV, Wilkes-Barre, Pennsylvania. |
| February 2008 | Mild Traumatic Brain Injury in the Workplace:  Clinical and Forensic Neuropsychological Considerations.  PES1: Worker's Compensation Conference, Las Vegas, Nevada. |
| November 2007 | Cumulative Effects of Multiple Concussion:  A Neuropsychological Case Study.  The National Academy of Neuropsychology Annual Meeting, Scottsdale, Arizona. |
| November 2007 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Scottsdale, Arizona. |
| October 2007 | Management of Sports Concussion; Sue Henry Show, WILK Radio, Wilkes-Barre, Pennsylvania. |
| September 2007 | Current Trends in Sports Concussion Management, Sports Talk Saturday, WILK Radio, Wilkes-Barre, Pennsylvania. |
| March 2007 | Work-Related Mild Traumatic Brain Injury:  Forensic Neuropsychological Assessment.  Workers Injury Law and Advocacy Group, 12th Annual Conference, San Antonio, Texas. |
| March 2007 | Ethical Representation of Brain Injured Workers.  Workers Injury Law and Advocacy Group, 12th Annual Conference, San Antonio, Texas. |
| November 2006 | Sports Concussion:  An Overview for the High School |

Liberty002626

|  | Athlete.  Wilkes-Barre Area School District, Wilkes-Barre, Pennsylvania. |
|---|---|
| October 2006 | Sacred Stories of Sudden Disability, Moderator, Panel Discussion,  John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 2006 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas. |
| October 2006 | Neuropsychological Sequela in a Patient with a Tumefactive Demyelinating Lesion.  The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas. |
| September 2006 | Sports Concussion Management, Sports Talk, WILK Radio, Wilkes-Barre, Pennsylvania. |
| May 2006 | Sports Concussion, Advance (2006, 16, 18), Interview, King of Prussia, Pennsylvania. |
| May 2006 | Survivor/Family Panel Discussion; Moderator, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| May 2006 | Neuropsychological Assessment:  Clinical/Forensic Implications, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| May 2006 | Sports Concussion, 2006 Statewide TBI Conference, Anchorage, Alaska. |
| April 2006 | Sports Concussion Management, WNEP-TV Health Watch. |
| April 2006 | Program Aims to Assess Concussions.  Times Leader |

Liberty002627

|   | Newspaper Interview (April 25, 2006), Wilkes-Barre, Pennsylvania. |
|---|---|
| March 2006 | Traumatic Brain Injury and Concussion Management, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2005 | Medical Overview:  Traumatic Brain Injuries.  The Critical Medical, Legal and Funding Issues for Children and Adults with Spinal Cord and Traumatic Brain Injuries, Wilkes-Barre, Pennsylvania. |
| October 2005 | Test of Memory Malingering (TOMM) Performance in Persons with Right Hemisphere Lesions.  The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| October 2005 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Tampa, Florida. |
| August 2005 | Sports Concussion Management, Sports Medicine Conference, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 2004 | The American Board of Professional Neuropsychology Preparation for Application, Work Sample Submission, and Examination.  Special Topic Workshop.  The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |
| November 2004 | Neuropsychological Findings in a Patient with HELLP Syndrome.  The National Academy of Neuropsychology Annual Meeting, Seattle, Washington. |

Liberty002628

| | |
|---|---|
| June 2004 | Strategies & Techniques to Improve Adjustment Difficulties following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| June 2004 | Neuropsychological Assessment of Mild Brain Injury in Patients with Spinal Injuries, Brain Injury Association of Pennsylvania Annual Meeting, Harrisburg, Pennsylvania. |
| February 2004 | Community Awareness of Traumatic Brain Injury, Catholic Television Network, Scranton, Pennsylvania. |
| October 2003 | Left Temporal Parietal Infarct Secondary to Idiopathic Thrombocytopenia Purpura:  A Neuropsychological Case Study.  The National Academy of Neuropsychology Annual Meeting, Dallas, Texas. |
| March 2003 | Neurocognitive and Behavioral Concomitants of Traumatic Brain and Spinal Injuries, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |
| November 2002 | Neuropsychological Manifestations of Multiple Sclerosis, National Multiple Sclerosis Society Meeting, Matamoras, Pennsylvania. |
| October 2002 | Neuropsychological Performance in a Patient with Von Hippel-Lindau Disease, The National Academy of Neuropsychology Annual Meeting, Miami, Florida. |
| August 2002 | Family Intervention Strategies Following Brain Injury, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 2002 | Cognitive and Behavioral Symptoms of Sjogren Syndrome, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| November 2001 | Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, Allied Services John Heinz Institute of Rehabilitation |

Liberty002629

Medicine, Wilkes-Barre, Pennsylvania.

November 2001    Neuropsychological Manifestations in a Case of Sjogren Syndrome , The National Academy of Neuropsychology Annual Meeting, San Francisco, California.

May 2001    Neuropsychological Aspects of Mild Brain Injury, Association of Rehabilitation Nurses, Wilkes-Barre, Pennsylvania.

November 2000    Central Neurocytoma:  Serial Neuropsychological Findings, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida.

November 2000    Neuropsychological Assessment and Treatment of Multiple Sclerosis, National Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania.

October 2000    Post Concussion:  An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

September 2000    An Expert Opinion on Concussion, Times Leader Newspaper (interview), Wilkes-Barre, Pennsylvania.

May 2000    Neuropsychological Assessment of Acquired Brain Injuries, Luzerne/Lackawanna County Critical Care Association, Moosic, Pennsylvania.

November 1999    Neurobehavioral Sequelae of Immunotherapy Anaphylaxis, The National Academy of Neuropsychology Annual Meeting, San Antonio, Texas.

October 1999    Neuropsychological Assessment:  A Clinical Overview. Interdisciplinary Approach to Brain Injury Rehabilitation, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

September 1999    Signs, Symptoms, and Suggestions of Everyday

Liberty002630

|  | Concussion, Brain Injury Support Group, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
|---|---|
| August 1999 | Concussion in Sports, WWDL 105 FM Radio, Scranton, Pennsylvania. |
| May 1999 | Symptom Exaggeration and Mild Traumatic Brain Injury: An Unbelievable Case, Advanced Workshop in Applied Clinical Neuropsychology, The Reitan Society Annual Meeting, San Diego, California. |
| April 1999 | Neurobehavioral Consequences of Acquired Brain Injury, Outpatient Services, John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1998 | Repeal of the Helmet Law; Clinical Considerations, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| November 1998 | Brainwave-R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation, The Reitan Society Meeting, 18th Annual Conference of the National Academy of Neuropsychology, Washington, D.C. |
| September 1998 | Multidisciplinary Approach to Rehabilitation, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| September 1998 | Viral Encephalitis: A Case Study Based on Serial HRNB Performances, The Reitan Society Annual Meeting, Tuscon, Arizona. |
| August 1998 | International Teleconference on Rehabilitation, University of Scranton, Scranton, Pennsylvania. |
| June 1998 | Post Concussion: An Oft Neglected Syndrome, Medical Staff Meeting, Allied Services Rehabilitation Hospital, Scranton, Pennsylvania. |

Liberty002631

| | |
|---|---|
| May 1998 | Neurological Rehabilitation in the United States; Panel Discussion, Trnava University, Slovak Republic. |
| May 1998 | Model Brain Injury Program; Panel Discussion, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| May 1998 | Major Consequences of Mild Brain Injury, International Brain Injury Association Educational Lecture Series, Prague, Czech Republic. |
| April 1998 | Common Misconceptions about Brain Injury Among Survivors and Family Members, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| January 1998 | Mild Brain Injury; Multispecialty Perspectives, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| December 1997 | Photostimulation and Seizures: The Japanese Cartoon Dilemma.  WARM Radio (590 AM), Pittston, Pennsylvania. |
| November 1997 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Neuropsychological Dysfunction in a Mixed Dominant Patient Following a Left Temporoparietal Abscess, The National Academy of Neuropsychology Annual Meeting, Las Vegas, Nevada. |
| November 1997 | Recovery from Traumatic Brain Injury: A Cognitive Rehabilitation Case Study, The Brain Injury Association Annual National Symposium, Philadelphia, Pennsylvania. |
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The |

Liberty002632

|  | John Heinz Institute of Rehabilitation Medicine, Tunkhannock Clinic, Tunkhannock, Pennsylvania. |
|---|---|
| May 1997 | Overview of Neuropsychological/Cognitive Services: Diagnosis and Treatment of Neurological Disorders, The John Heinz Institute of Rehabilitation Medicine, Hazleton Clinic, Hazleton, Pennsylvania. |
| February 1997 | The Effects of Traumatic Brain Injury on the Survivor and Family, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1996 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, New Orleans, Louisiana. |
| November 1996 | Neuropsychological Dysfunction in a Patient with Multiple Meningiomas, Reitan Society Meeting, New Orleans, Louisiana. |
| April 1996 | Neurobehavioral Consequences of Brain Injury, Valley Crest Nursing Facility, Wilkes-Barre, Pennsylvania. |
| November 1995 | Traumatic Brain Injuries, Panel Discussion, Call The Doctor, WVIA TV, Avoca, Pennsylvania. |
| November 1995 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, San Francisco, California. |
| November 1995 | Neuropsychological Aspects of Posthallucinogen Perception Disorder, Reitan Society Meeting, San Francisco, California. |
| October 1995 | Neurosurgical/Neuropsychological Collaboration in the |

Liberty002633

Diagnosis and Treatment of Meningioma, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania.

| | |
|---|---|
| August 1995 | Current Perspectives of Brain Injury Rehabilitation, Brain Injury Support Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| August 1995 | Forensic Neuropsychological Considerations in Traumatic Brain Injury Cases, Litigation Department, Hourigan, Kluger, Spohrer, Quinn, Wilkes-Barre, Pennsylvania. |
| March 1995 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1995 | Brainwave-R: A Comprehensive Cognitive Rehabilitation Program, Applied Cognitive Rehabilitation Training Seminar, Albuquerque, New Mexico. |
| December 1994 | Assessment of Malingering (part 2), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Assessment of Malingering (part 1), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1994 | Rehabilitation Overview, Medical Staff, Headley Court, Surrey, England. |
| November 1994 | Neuropsychological Consultation in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Orlando, Florida. |
| November 1994 | The Effects of Unilateral Vascular Lesions and Gender on Visual-Spatial and Verbal Auditory Attention, The National Academy of Neuropsychology Annual |

Liberty002634

|  | Meeting, Orlando, Florida. |
|---|---|
| November 1994 | Predictive Validity of Neuropsychological Deficit Scale and Halstead Impairment Index in Mild Traumatic Brain |
|  | Injury:  A Two Center Study, The Reitan Society Meeting, Orlando, Florida. |
| April 1994 | Neurobehavioral Consequences of Acquired Brain Injury, Meadows Nursing and Rehabilitation Center,  Dallas, Pennsylvania. |
| February 1994 | Summary Challenge Moderator:  The National Forum Conference on Federal Healthcare Legislation, Washington, D.C. |
| December 1993 | Neuropsychological Overview, Wilkes University Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| December 1993 | Traumatic Brain Injury:  The Transition from Rehabilitation to College, Luzerne County Community College, Nanticoke, Pennsylvania. |
| November 1993 | Grand Rounds:  Penetrating Head Injury Without Neuropsychological Deficits, The Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| November 1993 | Medicolegal Aspects of Epilepsy, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 1993 | Moderator: Reitan Society Meeting, The National Academy of Neuropsychology Annual Meeting, Phoenix, Arizona. |
| October 1993 | The Neuropsychologist as Consultant in Rehabilitation, The National Academy of Neuropsychology Annual Meeting, Phoenix, Arizona. |

Liberty002635

| | |
|---|---|
| May 1993 | Neuropsychological Assessment of Traumatic Brain Injury, Head Trauma Awareness Group, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1993 | Head Injuries, Call The Doctor, WVIA TV, Avoca, Pennsylvania |
| February 1993 | Careers in Psychology, Kings College, Wilkes-Barre, Pennsylvania. |
| January 1993 | The Transition from Rehabilitation to School, Luzerne Intermediate Unit, Wilkes-Barre, Pennsylvania. |
| November 1992 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Neuropsychology  Overview:  College Misericordia Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1992 | Behavioral  Problems Following Traumatic Brain Injury, Head Injury Support Group, Wilkes-Barre, Pennsylvania. |
| May 1992 | Minor Head Injury:  Neuropsychological Perspectives, The Second Annual Educational Conference of the JMA Foundation, Baltimore, Maryland. |
| April 1992 | Neuropsychological Consequences of Traumatic Brain Injury, Head Trauma Symposium, Marywood University, Scranton, Pennsylvania. |
| April 1992 | Neuropsychological Aspects of Minor Head Injury, Mild Traumatic Brain Injury Conference, Reading, Pennsylvania. |
| March 1992 | Neuropsychological Rehabilitation:  A Clinical Overview, |

Updated 5.5.2014                                    19

Liberty002636

American Rehabilitation Nursing Association, Wilkes-Barre, Pennsylvania.

March 1992      Neuropsychology Overview, Lycoming College Nursing Students, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

February 1992      Halstead - Reitan Neuropsychological Battery (2 Part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania.

February 1992      The Use of the Knox's Cube Test and Digit Span in Assessing Memory and Attention, International Neuropsychological Society Annual Meeting, San Diego California.

February 1992      Neuropsychological Assessment: An Adjunct to Neurological Diagnosis, The Seventh Annual University of Scranton Psychology Conference, Scranton, Pennsylvania.

January 1992      Management of the Aggressive Patient, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

November 1991      Medicolegal Aspects of Symptom Exaggeration and Malingering: A Clinical Update, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

November 1991      Antiseizure Medication and Cognitive Performance, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

August 1991      Minor Head Injury Rehabilitation, PARF Conference, Harrisburg, Pennsylvania.

Liberty002637

| | |
|---|---|
| August 1991 | Head Trauma Rehabilitation Overview, St. Francis Medical Center, Poughkeepsie, New York. |
| June 1991 | Helmet Law and Head Injury, WBRE (NBC) TV, Wilkes-Barre, Pennsylvania. |
| May 1991 | Neuropsychology Overview, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| April 1991 | Neuropsychological Aspects of Minor Head Injury, The First Annual Educational Conference of The National Brain Injury Research Foundation, Washington, D.C. |
| March 1991 | Neuropsychological Sequelae in Acute Carbon Monoxide Encephalopathy, The Sixth National Traumatic Brain Injury Symposium, Baltimore, Maryland. |
| February 1991 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The Sixth Annual University of Scranton Psychology Conference, Scranton, Pennsylvania. |
| January  1991 | Depression vs. Dementia, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| November 1990 | Medicological Aspects of Competency in Dementia, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1990 | Handedness and Gender Effects on the Relative Preservation of Visuospatial Versus Verbal Function Following Right Hemisphere Stroke, The National Academy of Neuropsychology Annual Meeting, Reno, Nevada. |
| October 1990 | Head Trauma Rehabilitation, Southern Tier Independence Center Head Injury Conference, Binghamton, New York. |

Liberty002638

| | |
|---|---|
| August 1990 | Overview of Neuropsychological/Cognitive Services, Veterans Administration Medical Center, Wilkes-Barre, Pennsylvania. |
| June 1990 | Neuropsychological Assessment Tutorial, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| March 1990 | Neuropsychological Consideration of Minor Head Injury, Crawford Rehabilitation Services, Denver, Colorado. |
| February 1990 | Medicolegal Aspects of Malingering:  A Neuropsychological Perspective, Central Rehabilitation Associates, Inc., Camp Hill, Pennsylvania. |
| January 1990 | Minor Head Injury, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| December 1989 | Head Trauma Rehabilitation:  Behavioral Management Strategies, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1989 | Medicolegal Aspects of Symptom Exaggeration and Malingering, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| September 1989 | Halstead-Reitan Neuropsychological Battery (3 part series), Psychology Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| June 1989 | Interpersonal Communication Training, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| May 1989 | Neuropsychology Update:  Post-Concussive Syndrome, Department of Neurology/Neurosurgery, Community Medical Center, Scranton, Pennsylvania. |

Liberty002639

| | |
|---|---|
| March 1989 | Current Trends in Head Trauma Rehabilitation, WARM Radio, Avoca, Pennsylvania. |
| March 1989 | Personal Injury Litigation, A Neuropsychological Perspective, Luzerne County Bar and Library Association, Wilkes-Barre, Pennsylvania. |
| December 1988 | Neuropsychological Deficit Scale:  A Clinical Case Review, Susquehanna Neuropsychology Group, Wilkes-Barre, Pennsylvania. |
| December 1988 | WAIS-R Implications in Neuropsychological Assessment, (3 part series), Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| November 1988 | Neuropsychological Aspects of Diffuse Histiocytic Lymphoma, The National Academy of Neuropsychologists Annual Meeting, Orlando, Florida. |
| November 1988 | Medicolegal Aspects of Minor Head Injury, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| November 1988 | Halstead-Reitan Neuropsychological Battery, Graduate Psychology Class, Marywood College, Scranton, Pennsylvania. |
| November 1988 | Wechsler Memory Scale-Revised, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| September 1988 | Head Trauma Rehabilitation, Apple A Day, WVIA TV, Avoca, Pennsylvania. |
| September 1988 | Neuropsychological Investigation in Traumatic Brain Injury:  A Cognitive Rehabilitation Case Study, Cognitive Rehabilitation: Community Reintegration Through |

Liberty002640

|  | Scientifically Based Practice, Richmond, Virginia. |
|---|---|
| June 1988 | Neuropsychology Overview, United Rehabilitation Services, Wilkes-Barre, Pennsylvania. |
| June 1988 | Behavioral Sequelae of Stroke, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| February 1988 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The Fourth Annual Psychology Conference, University of Scranton, Scranton, Pennsylvania. |
| November 1987 | Neuropsychological Assessment (3 part series), Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| October 1987 | Worker's Compensation Developments - 1987; Neuropsychological Testimony, The Dickinson School of Law, Carlisle, Pennsylvania. |
| October 1987 | Neuropsychological Investigation in Right Hemisphere Stroke:  A Rehabilitation Case Study, The National Academy of Neuropsychologists Annual Meeting, Chicago, Illinois. |
| May 1987 | Psychological Considerations in Multiple Sclerosis, Multiple Sclerosis Society, Wilkes-Barre, Pennsylvania. |
| March 1987 | Neuropsychological Assessment:  Halstead-Reitan Battery, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania. |
| March 1987 | Psychological Considerations in Stroke Rehabilitation, Meadows Nursing Facility, Dallas, Pennsylvania. |
| February 1987 | Similar Neuropsychological Findings from |

Liberty002641

Cardiovascular Abnormalities:  A Comparison Case Study, The Third Annual Psychology  Conference, University of Scranton, Scranton, Pennsylvania.

February 1987          Neuropsychological Assessment:  Halstead-Reitan Battery, Psychology Department, First Hospital Wyoming Valley, Wilkes-Barre, Pennsylvania.

February 1987          Behavioral Sequelae of Head Trauma, Nursing Department, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre,  Pennsylvania.

February 1987          WAIS-R Implications in Neuropsychological Assessment, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

January 1987           Pain Management for the Elderly, Senior Citizen Group, Salvation Army, Wilkes-Barre, Pennsylvania.

January 1987           Introduction to Neuropsychological Assessment, Department of  Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

October 1986           Similar Neuropsychological Findings from Cardiovascular Abnormalities:  A Comparison Case Study, The National Academy of Neuropsychologists Annual Meeting, Las Vegas, Nevada.

August 1986            WAIS-R Implications in Neuropsychological Assessment, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

May 1986               Bedside Neuropsychological Examination, Department of Psychological Services, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

Liberty002642

| | |
|---|---|
| December 1985 | Differential Diagnosis of Dementia, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| August 1985 | Halstead-Reitan Neuropsychological Battery, Neuropsychology Service, Neurorehab Associates, Rochester, New York. |
| October 1984 | Differential Intellectual Sequelae of Right Hemisphere CVA in Left vs. Right-Handed Patients.  The National Academy of Neuropsychologists Annual Meeting, San Diego, California. |
| March 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part II, Sunbury, Pennsylvania. |
| January 1984 | Neuropsychological Aspects of Head Trauma, SUN Home Health Agency, Part I, Sunbury, Pennsylvania. |
| June 1983 | Neuropsychology Inservice, Department of Nursing, Williamsport Hospital, Williamsport, Pennsylvania. |
| May 1983 | Learning Disabilities and Neuropsychological Assessment, Office of Vocational Rehabilitation, Williamsport, Pennsylvania. |
| November 1982 | Sports Psychology Winter Workshop, The Department of Sports Medicine, Williamsport Hospital, Williamsport, Pennsylvania. |
| March 1982 | Psychological Aspects of Asthma, The Central Pennsylvania Lung and Health Service Association, Williamsport, Pennsylvania. |
| February 1982 | Coping with the Cancer Patient, Department of Hematology/Oncology, Williamsport Hospital, Williamsport, Pennsylvania. |

Liberty002643

**BOARDS AND COMMITTEES:**

| | |
|---|---|
| 2007 – Present | National Alumni Board of Directors, Florida State University Alumni Association, Tallahassee, Florida. |
| 2003 – Present | Medical Advisor, National Brain and Spinal Cord Injury Prevention Program, Think First Program, Wilkes-Barre, Pennsylvania. |
| 2001 – 2002 | Examiner and Site Coordinator for Standardization Sample of the Reynolds Intellectual Assessment Scales (RIAS), Psychological Assessment Resources (PAR), Lutz, Florida. |
| 2001 – 2005 | Manuscript Reviewer, Rehabilitation Psychology, Washington, D.C. |
| 2000 – 2005 | Member, Clinical Practitioner Task Force:  National Academy of Neuropsychology, Denver, Colorado. |
| 1999 – 2002 | Board Member, Coalition of Clinical Practitioners in Neuropsychology, Tucson, Arizona. |
| 1999 – 2000 | President, Reitan Society, Tucson, Arizona. |
| 1998 - Present | Editorial Board, Journal of Cognitive Rehabilitation, Indianapolis, Indiana. |
| 1997 - 2006 | Editorial Board, Journal of Forensic Neuropsychology, Dallas, Texas. |
| 1996 - Present | New Jersey Board of Psychological Examiners (Examiner; Neuropsychology) Newark, New Jersey. |
| 1996 - Present | Editorial Board, The Professional Neuropsychologist. Bethesda, Maryland. |
| 1996 – 1997 | APA Continuing Education Committee, Marywood |

Liberty002644

University, Scranton, Pennsylvania.

1996 - 1998        Professional Affairs Committee, National Academy of Neuropsychology, Aurora, Colorado.

1995 - 1998        Vice-President, Reitan Society, Danville, Pennsylvania.

1995 – 2007        President, American College of Professional Neuropsychology, White River Junction, Vermont.

1994 - 1997        Chairperson, Public Relations Committee, National Academy of Neuropsychology, Aurora, Colorado.

1994 - Present        Executive Director, American Board of Professional Neuropsychology, White River Junction, Vermont.

1993 - 2006        Consulting Editor, Archives of Clinical Neuropsychology College Station, Texas.

1993 - 1995        Co-Chairperson, Reitan Society, Danville, Pennsylvania.

1993 - 1997        Program Committee, National Academy of Neuropsychology, Aurora, Colorado.

1993 - 1994        Coordinator, Professional Lecture Series, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

1992 – 2000        Editorial Board, Allied Services, Scranton, Pennsylvania.

1992 - 1993        Reitan Society Steering Committee, Danville, Pennsylvania.

1992 - 1998        Physicians Health Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania.

1992 - 2006        Commission on Accreditation of Rehabilitation Facilities (CARF), Surveyor, Tucson, Arizona.

Liberty002645

| | |
|---|---|
| 1991 - Present | American Board of Professional Neuropsychology (Examiner) White River Junction, Vermont. |
| 1989 - 1994 | Medical Advisory Council, The National Brain Injury Research Foundation, Washington, D.C. |
| 1989 - 1994 | Editorial Board, (Associate Editor), The Journal of Head Injury, Washington, D.C. |
| 1989 - 2007 | Research Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - Present | Medical Records Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - Present | Brain Injury Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2007 | Quality Assurance Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1986 - 2008 | Medical Staff Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1987 - 1988 | Advisory Board Member, NHIF Northeast Region, Wilkes-Barre, Pennsylvania. |
| 1986 - 1987 | Patient/Family Education Committee, The John Heinz Institute of Rehabilitation Medicine, Wilkes-Barre, Pennsylvania. |
| 1985 - 1986 | Board Member, Neurorehab Associates, Inc., Rochester, New York. |
| 1985 - 1986 | Board Member, NHIF Eastern Region, Rochester, New York. |
| 1984 - 1986 | Board Member, NHIF Eastern Region, Williamsport, Pennsylvania. |

Liberty002646

1983 - 1985          Employee Health, Fitness and Recreation Program,
                     Williamsport Hospital, Williamsport, Pennsylvania.

1982 - 1985          Board Member, Counseling Clinic, United Methodist
                     Home for Children, Mansfield, Pennsylvania.

1981 - 1985          Behavioral Science Committee, Williamsport Hospital,
                     Williamsport, Pennsylvania.


**CERTIFICATION AND LICENSURE:**

> American Board of Forensic Examiners,
>     Diplomate (1303) (Neuropsychology)
> American Board of Professional Disability Consultants,
>     Diplomate (P-132)
> American Board of Professional Neuropsychology,
>     Diplomate (232)
> American Board of  Professional Neuropsychology,
>     Added Qualifications in Rehabilitation (112) and
>     Forensics (127)
> ImPACT Consultant, Sports Concussion Management
> New Jersey State Board of Psychological Examiners
>     (SI02529)


**AWARDS AND HONORS:**

> Healthcare Hero Award, Times Leader, 2010
> Distinguished Neuropsychologist Award, American Board of
>     Professional Neuropsychology, 2003
> Ad-Hoc Member on Rehabilitation, Hospital Association of
>     Pennsylvania, 1999.
> Charter Member, Coalition of Clinical Practitioners in
>     Neuropsychology, 1999.
> President, Reitan Society, 1998 – 2000.
> Honorary Professorship, Trnava University, 1998.

Liberty002647

Charter Member, Reitan Society, 1997.
Diplomate, American Board of Forensic Examiners, 1995.
Distinguished Alumnus Award in Medicine, St. Francis College, 1995.
Fellow, American College of Professional Neuropsychology, 1995.
Fellow, National Academy of Neuropsychology, 1994.
Diplomate, American Board of Professional Disability Consultants,
    1993.
Diplomate, American Board of Professional Neuropsychology, 1991.
Fellow, Pennsylvania Psychological Association, 1990.
Graduate Assistantship, Florida State University, 1979 - 1981.
Rho Chi  Sigma, Rehabilitation Counseling Services Honor Society,
    1979.
Rehabilitation Services Administration Traineeship Award,
    1976 - 1978.


**PROFESSIONAL MEMBERSHIPS:**

American Board of Forensic Examiners (Diplomate)
American Board of Professional Neuropsychology (Diplomate)
American College of Forensic Examiners
American College of Professional Neuropsychology (Fellow)
American Psychological Association; (1, 22, 40)
Brain Injury Association
Coalition of Neuropsychology (Charter Member)
International Neuropsychological Society
National Academy of Neuropsychology (Fellow)
National Brain Injury Research Foundation
New Jersey Neuropsychological Society
Reitan Society (President, Vice President)
Society for Cognitive Rehabilitation
Susquehanna Neuropsychology Group (Past President)
National Brain and Spinal Cord Injury Prevention Program; Think
First Program (Medical Advisor)

**RESEARCH/PUBLICATIONS:**

Raymond, M.J. (in press).  Neuropsychological performance in a
    Patient following resection of a vestibular schwannoma.

Liberty002648

**Applied Neuropsychology** (abstract).

Raymond, M.J. (2010).  Neuropsychological consequences of
   Moyamoya Disease:  A clinical case study.  **Archives of
   Clinical Neuropsychology, 25,** 6 (abstract).


Raymond, M.J. (2010).  Anoxic encephalopathy following
   cardiac arrest.  **Applied Neuropsychology, 17,** 3 (abstract).

Bennett, T.L. & Raymond, M.J. (2010).  Neuropsychological
   assessment in disability determination, fitness for duty and
   rehabilitation planning.  In A.M. Horton & L.C. Hartlage (Eds).
   **Handbook of Forensic Neuropsychology**, 2nd edition, New
   York, Springer.

Sewick, B. & Raymond, M.J. (2009).  Visual perceptual
   symptoms associated with right hemisphere pathology do not
   affect performance on the Test of Memory Malingering
   (TOMM).  **Applied Neuropsychology, 16,** 4 (abstract).

Raymond, M.J. (2008).  Neuropsychological consequences of
   autosomal dominant cerebellar atrophy:  a clinical study.
   **Archives of Clinical Neuropsychology, 23,** 6 (abstract).

Bennett, T.L. & Raymond, M.J. (2008).  The neuropsychology
   of traumatic brain injury.  In A.M. Horton, D. Wedding & J.
   Webster (Eds.).  **The Neuropsychology Handbook**, Volume 3,
   New York, Springer.

Raymond, M.J. (2007).  Work-related mild traumatic brain injury:
   forensic neuropsychological assessment.  **Worker's First
   Watch, Fall**.

Raymond, M.J. (2007).  Cumulative effects of multiple concussions:  a
   neuropsychological case study.  **Archives of Clinical
   Neuropsychology, 22,** 7 (abstract).

Raymond, M.J. (2007).  Playball:  not so fast my friend; a sports
   concussion case study.  **ImPACT Newsletter, Spring**.

Liberty002649

Raymond, M.J. (2006).  Neuropsychological sequela in a patient with a tumefactive demyelinating lesion.  **Archives of Clinical Neuropsychology, 21,** 6 (abstract).

Raymond, M.J. & Sewick, B.G. (2005).  Test of Memory Malingering (TOMM) performance in persons with right hemispheric lesions.  **Archives of Clinical Neuropsychology, 20,** 7 (abstract**).**

Raymond, M.J. (2005).  Neuropsychological profile of a patient with a CSF assay suggestive of Alzheimer's Disease.  **Applied Neuropsychology**, **12,** 4 (abstract).

Raymond, M.J. (2004).  Neuropsychological findings in a patient with HELLP syndrome.  **Archives of Clinical Neuropsychology, 19**, 7 (abstract).

Raymond, M.J. (2003).  Forensic neuropsychological assessment in cases of mild traumatic brain injury.  **Workers First Watch, 3,** 3.

Raymond, M. J. (2003).  Left temporal parietal infarct secondary to Idiopathic Thrombocytopenia Purpura:  A neuropsychological case study.  **Archives of Clinical Neuropsychology, 18,** 8 (abstract).

Bennett, T.L. & Raymond, M.J. (2003).  Utilizing neuropsychological testing in disability determination and rehabilitation planning. In  A. M. Horton & L.C. Hartlage (Eds.), **Handbook of Forensic Neuropsychology**, New York, Springer.

Raymond, M. J. (2003). Neuropsychological features of Von Hippel-Lindau disease.  **New Jersey Neuropsychological Society Newsletter, Winter/Spring.**

Raymond, M. J. (2002).  Cognitive and behavioral symptoms in a case of Sjogren syndrome. **Journal of Cognitive**

Liberty002650

**Rehabilitation, Fall.**

Raymond, M. J. (2002).  Neuropsychological performance in a case of Von Hippel-Lindau disease.  **Archives of Clinical Neuropsychology,  17,** 8 (abstract).

Raymond, M.J. (2001).  Neuropsychological manifestations in a case of Sjogren syndrome. **Archives of Clinical Neuropsychology, 16**, 8 (abstract).

Raymond, M.J. (2000).  Central Neurocytoma:  serial neuropsychological findings.  **Archives of Clinical Neuropsychology, 15,** 8 (abstract).

Raymond, M. J. (1999).  Symptom exaggeration and mild traumatic brain injury:  An unbelievable case.  **Reitan Society Bulletin, 5** (abstract).

Raymond, M. J. (1999).  Neurobehavioral sequelae of immunotherapy anaphylaxis.  **Archives of Clinical Neuropsychology, 14,** 8 (abstract).

Raymond, M.J., Bewick, K.C., Bennett, T.L., Malia, K.B. (1999).  A comprehensive functional approach to brain injury rehabilitation.  **Brain Injury Source, Fall.**

Raymond, M.J., Castellino, R.M. (1999).  The role of the clinical neuropsychologist in the assessment and treatment of rehabilitation patients.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3**.**

Raymond, M.J., Bewick, K.C., Kennedy, A. & Duffy, T.F. (1999).  A model program for brain injury rehabilitation.  Special issue: Rehabilitation.  **Journal of Health Management and Public Health, 4,** 3**.**

Raymond, M.J. & Bennett, T.L. (1999).  Introduction and overview.  In M.J. Raymond, T.L. Bennett, L.C. Hartlage & C.M. Cullum (Eds.), **Mild Traumatic Brain Injury: A Clinician's**

Liberty002651

**Guide**, Austin, Texas: Pro-Ed.

Bennett, T.L. & Raymond, M.J. (1999). Psychotherapeutic interventions for individuals with mild traumatic brain injury. In  M.J. Raymond, T.L. Bennett, L.C. Hartlage &

C.M. Cullum (Eds.), **Mild Traumatic Brian Injury: A Clinician's Guide**, Austin, Texas: Pro-Ed.

Raymond, M.J., Bennett, T.L., Hartlage, L.C., & Cullum, C.M. (1999)**. Mild Traumatic Brain Injury: A Clinician's Guide,** Austin, Texas: Pro-Ed.

Raymond, M.J. (1998).  Viral encephalitis; A case study based on serial HRNB performance. **Reitan Society Bulletin, 4** (abstract).

Malia, K.B., Raymond, M.J., Bewick, K.C., & Bennett, T.L. (1998). Information processing deficits and brain injury: Preliminary results, **Neuro Rehabilitation**, **11**, 3.

Raymond, M.J. (1998).  Post concussion: An often neglected syndrome.  **Northeast Rehab.  September/October**.

Bennett, T.L., Raymond, M.J., Malia, K.B., Bewick, K.C., Linton, B.S. (1998).  Rehabilitation of attention and concentration deficits following brain injury.  **Journal of Cognitive Rehabilitation,  March/April.**

Raymond, M.J. (1998).  Neuropsychological dysfunction in a mixed dominant patient following a left temporoparietal abscess. **Archives of Clinical Neuropsychology, 13**, 1 (abstract).

Raymond, M.J. (1997). Neuropsychological dysfunction in a patient with multiple meningiomas.  **Reitan Society Bulletin, 3** (abstract).

Bennett, T.L. & Raymond, M.J. (1997). Mild brain injury: An overview. **Applied Neuropsychology, 4,** 1.

Liberty002652

Bennett, T.L. & Raymond, M.J. (1997). Emotional consequences of and psychotherapy for individuals with mild brain injury. **Applied Neuropsychology, 4,** 1.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1997). **Brainwave R: Cognitive Strategies and Techniques for Brain Injury Rehabilitation**, Austin, Texas: Pro-Ed.

Raymond, M.J. (1996).  Neuropsychological aspects of posthallucinogen perception disorder.  **Reitan Society Bulletin, 2,** 1 (abstract).

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1996).  The effects of unilateral vascular lesions and gender on visual-spatial and verbal-auditory attention span.  **Applied Neuropsychology, 3,** 4.

Raymond, M.J., Bewick, K.C., Malia, K.B., & Bennett, T.L. (1996). A comprehensive approach to memory rehabilitation following brain injury. **Journal of Cognitive Rehabilitation. November/December**.

Malia, K.B., Bewick, K.C., Raymond, M.J., & Bennett, T.L. (1996). Memory: A comprehensive approach.  **Society for Cognitive Rehabilitation Newsletter, 4,** 3.

Raymond, M.J., Bennett, T.L., Malia, K.B., & Bewick, K.C. (1996). Rehabilitation of visual processing deficits following brain injury. **Neuro Rehabilitation, 6**, 3.

Rojas, D.C.,  Raymond, M.J., & Bennett, T.L. (1995).  Predictive validity of the neuropsychological deficit scale and halstead impairment index in mild brain injury: A two center study. **Reitan Society Bulletin, 1**, 1 (abstract).

Bewick, K.C., Raymond, M.J., Malia, K.B., & Bennett, T.L. (1995). Metacognition as the ultimate executive:  Techniques and tasks

Liberty002653

to facilitate executive functions. **Neuro Rehabilitation**, **5**, 4.

Martin, R.C., Franzen, M.D., & Raymond, M.J. (1995).  The effects of unilateral vascular lesions and gender on visual-spatial and verbal-auditory attention.   **Archives of Clinical Neuropsychology, 10**, 4 (abstract).

Raymond, M.J. (1994). Neuropsychological consultation in rehabilitation.  **New Jersey Rehab, 3**.

Raymond, M.J. (1994).  Aging and neuropsychological assessment.  **Archives of Clinical Neuropsychology, 9**, 6.  (book review).

Raymond, M.J. (1992).  Neuropsychiatric sequelae in acoustic neuroma.  **Bulletin of the National Academy of Neuropsychology, 8**, 4.

Raymond, M.J. (1992).  Opening doors: The significance of neuropsychological assessment in neurorehabilitation.  **Rehab Management**, **June/July.**

Franzen, M.D.,  McCracken, L.M., Raymond, M.J., Haut, M.W., & Haut, J.S. (1992).  The use of the knox's cube test and digit span in assessing memory and attention.  **Journal of Clinical and Experimental Neuropsychology, 14**, 1 (abstract).

Naugle, R.I. & Raymond, M.J. (1991).  Neuropsychological sequelae of stroke as a function of handedness.  **Perceptual and Motor Skills, 73**.

Raymond, M.J. & Naugle, R.I. (1991).  Handedness and gender effects on the relative preservation of  visuospatial versus verbal function following  right hemisphere stroke.  **Archives of Clinical Neuropsychology, 6,** 3 (abstract).

Raymond, M.J. (1991).  Neuropsychological assessment:  An adjunct to neurological diagnosis.  **Hospital News, June.**

Raymond, M.J. (1990). Neuropsychological aspects of minor head

Liberty002654

injury.  **The Journal of Head Injury, 4**.

Raymond, M.J. (1989).  Major consequences of minor head injury.
    **JMA Bulletin, 2**.


Raymond, M.J. (1989).  Neuropsychological aspects of  diffuse
    histiocytic lymphoma:  A case report.  **Archives of Clinical
    Neuropsychology, 4,** 2 (abstract).

Raymond, M.J. (1988).  Neuropsychological investigation in right
    hemisphere stroke:  A rehabilitation case study.  **Bulletin:
    The National Academy of  Neuropsychologists, 5** (abstract).

Raymond, M.J. (1986).  Similar neuropsychologic findings from
    cardiovascular abnormalities:  A comparison case study.
    **Archives of Clinical Neuropsychology, 1**, 3 (abstract).

Raymond, M.J. & Hartlage, L.C. (1985).  Differential intellectual
    sequelae of  right hemisphere CVA in left vs. right-handed
    patients.  **The International Journal of Clinical
    Neuropsychology, 7** (abstract).

Raymond, M.J. (1985). Headache among athletes.
    **The Williamsport News**, **Winter.**

Raymond, M.J. (1984). Psychological effects of running.
    **The Williamsport News, Spring.**

Raymond, M.J. (1984).  Chronic pain:  The pain that really hurts.
    **The Williamsport News, Summer/Fall.**

Raymond, M.J. (1983).  Drug abuse among student athletes.
    **The Williamsport News, Spring.**

Raymond, M.J. (1983).  Control of pre-competition anxiety.
    **The Williamsport News**, **Winter.**

Raymond, M.J. (1982).  The choking phenomenon.

Liberty002655

**The Williamsport News,  Fall.**

Raymond, M.J. (1982).  The psychological importance of sporting activities for disabled individuals.  **The Williamsport News, Summer.**

Raymond, M.J. (1982). Depression:  The effects on athletic performance.  **The Williamsport News, Spring.**

Raymond, M.J. (1981).  A comparison of WAIS performances between right and left-handed left hemiplegic persons. Doctoral Dissertation, Florida State University.

Raymond, M.J. (1980).  (contributing ed.)  **Independent Living Curriculum for Master's Degree Rehabilitation Programs.** Tallahassee, Florida: The National Commission of Rehabilitation Education Task Force on Independent Living, Florida State University.

Raymond, M.J. (1978).  The significance university upperclassmen have on influencing drug and alcohol usage by freshman females.  Unpublished Master's Scholarly Paper, University of Scranton.

**PROFESSIONAL GOALS AND INTERESTS:**

Clinical:   Brain injury rehabilitation, neuropsychological assessment and evaluation, forensic neuropsychology, sports concussion management and cognitive remediation.

Teaching:   Neuropsychology, rehabilitation psychology, neuropsychological assessment, forensic neuropsychology, and supervision and training of students in research and clinical activities.

Research:  Diagnosis and treatment of central nervous system disorders and neuropsychological correlates of behavior.

Administrative:   Program evaluation and development, quality

Liberty002656

assurance, peer review and neurorehabilitation consultation.

**REFERENCES:**

References furnished upon request.

Liberty002657

# Robert J. Cooper, M.D., F.A.C.E., F.A.C.P.

***PROFESSIONAL EXPERIENCE***:

**New England Endocrine & Thyroid Center, PC**                    04/01/2013 - Present
Springfield, MA

Owner of single specialty solo medical practice; Clinical Endocrinologist.  Established newly formed endocrine practice. Manage personnel including medical assistant and front desk personnel.  Clinical practice treating thyroid disorders, adrenal disorders, pituitary disorders, lipid disorders, calcium and bone disorders, diabetes and general endocrine disorders. Perform ultrasound guided thyroid biopsies, fine needle aspirations, and radioactive iodine treatments. Work directly with and educate cytopathology fellows and pathology residents.

**Baystate Medical Center**                    03/26/2012 – 03/29/2013
Springfield, MA

Attending Physician, Department of Endocrinology; Work directly with and educate Fellows, Medical Residents and Medical Students.  Perform ultrasound guided thyroid biopsies, fine needle aspirations, and radioactive iodine treatments.  Teaching practice treating diabetes, thyroid disorders, adrenal disorders, pituitary disorders, lipid disorders, calcium and bone disorders, and general endocrine disorders.

**Holyoke Medical Center**                    12/2003 - 03/2012
Holyoke, MA

Chief of Medicine (05/2005 – 03/2009);  Director of Endocrine Center for Excellence; Director of Ultrasound Thyroid Biopsy/Fine Needle Aspiration Clinic; Attending Physician, Department of Endocrinology.  Manage personnel including registered nurse, office manager and front desk personnel.  Perform ultrasound guided thyroid biopsies, fine needle aspirations, and radioactive iodine treatments.  Clinical practice treating thyroid disorders, adrenal disorders, pituitary disorders, lipid disorders, calcium and bone disorders, and general endocrine disorders.

**Baystate Medical Center**                    03/2000 – 11/2003
Springfield, MA

Attending Physician, Department of Endocrinology; Director of Ultrasound Thyroid Biopsy/Fine Needle Aspiration Clinic; Coordinator of Endocrine Resident elective; Assistant Fellowship Director (05/2002 – 01/2003); Worked directly with and educated Fellows, Medical Residents and Medical Students.  Performed ultrasound guided thyroid biopsies, fine needle aspirations, and radioactive iodine treatments.  Teaching practice treating diabetes, thyroid disorders, adrenal disorders, pituitary disorders, lipid disorders, calcium and bone disorders, and general endocrine disorders.

**East End Endocrine Associates, P.C.**                    11/1998 – 02/2000
Westhampton Beach, NY

Co-partner of single specialty group; Clinical Endocrinologist.  Established newly formed endocrine practice.  Managed personnel including medical assistant, office manager and front desk personnel.  Initiated glucose monitoring protocol at Southampton Hospital, Southampton, NY. Clinical practice treating diabetes, thyroid disorders, adrenal disorders, pituitary disorders, lipid disorders, calcium and bone disorders, and general endocrine disorders.

Liberty002658

Robert J. Cooper, MD, FACE
Page - 2 -

| | |
|---|---|
| **Fellowships (See Education Section)** | 07/1996 – 10/1998 |

**Queens-Long Island Medical Group**          07/1995 – 06/1996
Flushing, NY

Internal Medicine Physician, HMO affiliated multispecialty group.  Clinical practice treating general medical care of adults 18 years of age and older.

### _EDUCATION_:

**University of Pennsylvania**          09/1982 – 06/1983
Philadelphia, PA

**State University of New York at StonyBrook**          09/1983 – 06/1988
StonyBrook, NY
_Degree:_ B.S. in Biology and Psychology

**Albert Einstein College of Medicine**          08/1988 - 06/1992
Bronx, NY
_Degree_**:** M.D.

**Long Island Jewish Hospital**          07/1992 – 06/1993
New Hyde Park, NY
_Position:_  First Year Medical Intern (PGY1)

**Long Island Jewish Hospital**          07/1993 – 06/1994
New Hyde Park, NY
_Position:_  Second Year Medical Resident (PGY2)

**Long Island Jewish Hospital**          07/1994 – 06/1995
New Hyde Park, NY
_Position:_  Third Year Medical Resident (PGY3)

**See Employment Section**          07/1995 – 06/1996

**Medical College of Pennsylvania**          07/1996 – 10/1996
Philadelphia, PA
_Position:_  First Year Fellow in Cardiology

**Long Island Jewish Hospital**          11/1996 – 06/1997
New Hyde Park, NY
_Position_**:** First year Fellow in Endocrinology (PGY4)

**Winthrop University Hospital**          07/1997 – 10/1998
Mineola, NY
_Position:_ Second year Fellow in Endocrinology  (PGY5)

Liberty002659

Robert J. Cooper, MD, FACE
Page - 3 -

## *LICENSURE AND BOARD CERTIFICATIONS:*

MA License #204180 - Current
NY License #198082 - Current
PA License #MD-057608-L - Current
NJ License #25MA07589200 - Current

1996 - Certified Diplomate, American Board of Internal Medicine
1998 - Certified Diplomate, American Board of Internal Medicine –
      Subspecialty Boards on Endocrinology, Diabetes and Metabolism
2000 - Certified Thyroid Ultrasound and Ultrasound Guided FNA Biopsy
2004 - Certified Bone Densitometry
2006 - Recertified ABIM – Internal Medicine
2008 - Recertified ABIM - Endocrinology

## *HONORS AND AWARDS:*

2004 - Fellow - American College of Endocrinology (F.A.C.E.)
2015 – Fellow – American College of Physicians (F.A.C.P.)

## *TEACHING APPOINTMENTS:*

Tufts University School of Medicine                                    2000 – Present
136 Harrison Avenue
Boston, MA
*Position:*  Assistant Professor of Medicine

## *OTHER PROFESSIONAL EXPERIENCE:*
Behavioral Medical Interventions                                      2015 – Present
Edina, MN
*Position:*  Consultant Services – Reviewing medical content and accuracy

VeriMed HealthCare Network                                           2008 – Present
West Palm Beach, FL
*Position:*  Consultant Services – Reviewing medical content and accuracy

## *PROFESSIONAL MEMBERSHIPS:*

American College of Physicians
American Association of Clinical Endocrinologists
American Thyroid Association
American Diabetes Association
American College of
Thyroidology The Endocrine
Society

Liberty002660

Robert J. Cooper, MD, FACE
Page - 4 -

### *OFFICE AND COMMITTEE ASSIGNMENTS IN PROFESSIONAL SOCIETIES:*

| | |
|---|---|
| Editor MedStudy Internal Medicine Board Review | 2013 – Present |
| Advisory Board for the Connecticut American Diabetes Association Annual Meeting | 2003 - Present |
| Cardiometabolic Health Congress<br>  – Panelist for Symposium on Oral Anti-Hyperglycemic Therapy and Cardiovascular Risk Reduction<br>  – Advisory Board | 2009<br>2005 - Present |
| American Association of Clinical Endocrinologists –<br>Legislative and Regulatory Committee<br>Endocrine Board Review Committee | <br>2002 - Present<br>2013 - Present |
| Radiation Safety Committee Member<br>  – Baystate Heath Systems and Holyoke Medical Center | 2003 - 2012 |
| Contracts Committee Member<br>  – Holyoke Medical Center | 2003 - 2012 |
| Pharmacy and Therapeutics Committee<br>  – Holyoke Medical Center | 2003 - 2012 |
| Faculty Member of Testosterone Update | 2009 |
| Quality Assurance and Quality Improvement Committee<br>  – Holyoke Medical Center | 2005 - 2009 |
| Practice Care Assessment Committee<br>  – Holyoke Medical Center | 2005 - 2009 |
| The Endocrine Society – Clinical Endocrinology Update<br>  – Lecture and demonstration on Use of Thyroid Ultrasound in Evaluating Thyroid Nodules | 2004 and 2001 |
| The Endocrine Society –National Meeting<br>  – Preceptor for Thyroid Ultrasound Course | 2003 |
| American Board of Internal Medicine<br>– Subspecialty Board of Endocrinology, Diabetes and Metabolism – Committee<br>to review ABIM Subspecialty Board Examination Questions | 2002 |
| American Association of Clinical Endocrinologists – National Meeting<br>– Lecture and Preceptor for Thyroid Ultrasound Certification Course | 2001 |

Liberty002661

Robert J. Cooper, MD, FACE
Page - 5 -

## *PUBLICATIONS:*

Pantanowitz L, Panetti C, Goulart R, Cooper RJ.  Cholesterol Crystals in the Thyroid Gland.  ACTA Cytologica: The Journal of Clinical Cytology and Cytopathology 51(2): 249-251, March-April 2007.

Tollin SR, Resta C, Cooper RJ, Westra WH, Udelsman R.  Familial Cushing's Syndrome with Idiopathic ACTH-Independent Bilateral Macronodular Adrenocortical Hyperplasia Successfully Treated by Laparoscopic Adrenalectomy.  The Endocrinologist 10(5): 341-346, 2000.

Cooper RJ, Belilos E, Drexler S, et al.  Idiopathic Giant-Cell Granulomatous Hypophysitis Mimicking Acute Meningitis.  Am J Med Sci 318(5): 339-342 (November),1999.

## *RESEARCH EXPERIENCE:*

FutureCare Studies, Inc.                                                                            2004 - Present
354 Birnie Avenue, 4th Floor
Springfield, MA 01107

**Position:**  Sub-Investigator

"A multi-center, double-blind, randomized, parallel-group study to compare the effect of 24 weeks treatment with LAF 237 (50mg qd or bid) to placebo as add-on therapy to pioglitazone 45 mg qd in patients with type 2 diabetes inadequately controlled with thiazolidinedione monotherapy"

"A double-blind, randomized, placebo-controlled, parallel study to evaluate the efficacy and safety of AndroGel, as an adjunct to oral hypoglycemic therapy, in the treatment of hypogonadal men with type 2 diabetes"

"Efficacy and safety of inhaled human insulin (Exubera) compared with subcutaneous human insulin in the therapy of adult subjects with type 1 or type 2 diabetes mellitus and chronic asthma:  A one year, multi-center, randomized, outpatient, open-label, parallel-group comparative trial"

"Efficacy and safety of inhaled human insulin (Exubera) compared with subcutaneous human insulin in the therapy of adult subjects with type 1 or type 2 diabetes mellitus and chronic obstructive pulmonary disease:  A one year, multi-center, randomized, outpatient, open-label, parallel-group comparative trial"

"A one-year, open, randomized, parallel, three-arm study comparing Exubera (insulin dry powder pulmonary inhaler) vs. Avandia (rosiglitazone maleate) as add-on therapy vs. Exubera substitution of sulfonylurea in patients with type 2 diabetes, poorly controlled on combination sulfonylurea and metformin treatment"

**Position:**  Principal Investigator                                                               October 2006

"Acrostudy – A multicenter, post marketing surveillance study of Somavert therapy in patients with Acromegaly in the US and Europe"

Liberty002662

Robert J. Cooper, MD, FACE
Page - 6 -

### SPEAKER/LECTURE BUREAU:

Takeda Pharmaceuticals
Abbott Pharmaceuticals
Salix Pharmaceuticals
Otsuka Pharmaceuticals
Eisai Pharmaceuticals
Jansen Pharmaceuticals

Liberty002663

CURRICULUM VITAE

Kent Bertram Crossley

Citizenship:                   U.S.A.

Education:

  1964  B.A.              Carleton College, Northfield, Minnesota

  1968  B.S., M.D.        University of Minnesota Medical School
                          Minneapolis, Minnesota

  1997  M. Div.           Luther Seminary, St. Paul, Minnesota

  2000  M.H.A.            Carlson School of Management,
                          University of Minnesota.

                          Thesis: Professional Satisfaction of U.S.
                          Healthcare Chaplains

Postdoctoral Training:

  1968-69                 Intern in Internal Medicine, University of Minnesota
                          Hospitals, Minneapolis, Minnesota

  1969-71                 Resident in Internal Medicine, University of Minnesota
                          Hospitals, Minneapolis, Minnesota

  1971-73                 Research Fellow in Medicine (Infectious Diseases), Harvard
                          Medical School and Thorndike Memorial Laboratory;
                          Clinical Fellow, II and IV (Harvard) Medical Services,
                          Boston City Hospital, Boston, Massachusetts

Professional Experience:

  1973-75                 Chief, Infectious Diseases Section, Department of Medicine
                          and Preventive Medicine Officer, Fitzsimons Army
                          Medical Center, Denver, Colorado (Major, US Army Medical
                          Corps)

Liberty002664

| | |
|---|---|
| 1975-96 | Chief, Infectious Disease Section, Department of Internal Medicine, St. Paul-Ramsey Medical Center, St. Paul, Minnesota |
| 1975-79 | Assistant Professor of Medicine, University of Minnesota Medical School, Minneapolis, Minnesota |
| 1979-87 | Associate Professor of Medicine, University of Minnesota Medical School, Minneapolis, Minnesota |
| 1985-87 | Clinical Associate Professor, College of Pharmacy, University of Minnesota, Minneapolis, Minnesota |
| 1987- | Professor of Medicine, University of Minnesota Medical School, Minneapolis, Minnesota |
| 1987- | Professor, College of Pharmacy, University of Minnesota, Minneapolis, Minnesota |
| 1988-90 | Acting Chief, Department of Internal Medicine, St. Paul-Ramsey Medical Center, St. Paul, Minnesota |
| 1990-96 | Chief, Department of Internal Medicine, St. Paul-Ramsey Medical Center, St. Paul, Minnesota |
| 1995 | Visiting Scholar in Medicine, Cambridge University School of Clinical Medicine, Cambridge, England |
| 1996- | Associate Chief of Staff for Education, Minneapolis Veterans Affairs Medical Center (MVAMC), Minneapolis, Minnesota. |
| 1998- | Director, Education Product Line, Minneapolis VAMC; Designated Educational Official and Designated Learning Officer, MVAMC; VISN 13 [later VISN 23] Academic Affiliations Officer |
| 2011 | Acting Chief of Staff, Minneapolis VA Healthcare System |
| 2011 - Present | Chief of Staff, Minneapolis VA Healthcare System |

Certification and Licensure:

Diplomate of the National Board of Medical Examiners (1969)

Diplomate of the American Board of Internal Medicine (1973)

Liberty002665

Diplomate of the American Board of Internal Medicine in the Subspecialty of Infectious Diseases (1974)

Licensed to practice medicine in Minnesota

Memberships:

Fellow, American College of Physicians
Fellow, Infectious Diseases Society of America
American Society for Microbiology
British Society for the Study of Infection
Fellow, Society for Healthcare Epidemiology of America
Hospital Infection Society
American College of Physician Executives

Offices Held:

| | |
|---|---|
| 1985-86 | Councilor, Society of Hospital Epidemiologists of America |
| 1986-88 | Director, Minnesota Chapter, National Foundation for Infectious Diseases |
| 1985-88 | Chairman, Minnesota Medical Association Task Force on AIDS |
| 1988-94 | Director (and member of the Executive Committee), Minnesota Association of Public Teaching Hospitals |
| 1999-2001 | Chairman, Community Council on Graduate Medical Education, University of Minnesota Medical School |
| 2010- | Vice-chair, Metropolitan Minnesota Council on Graduate Medical Education. |

Consultant Positions:

| | |
|---|---|
| 1973-75 | Consultant in Infectious Diseases to the Fifth United States Army |
| 1976-78 | Consultant, Center for Disease Control, Atlanta, Georgia - Study to Evaluate the Efficacy of Nosocomial Infection Control (SENIC) |
| 1976-79 | Editorial Advisor, Minnesota Communicable Disease Newsletter |

3

Liberty002666

| | |
|---|---|
| 1977-78 | Medical Consultant to the Epidemiology Unit, Communicable Diseases Section, Minnesota Department of Health |
| 1977-79 | Originator and Co-director, Minnesota Department of Health Communicable Diseases Seminar |
| 1978-81 | Consultant and Chairman, Task Force on Utilization of Prophylactic Antibiotics in Surgery; Foundation for Health Care Evaluation, Minneapolis, Minnesota |
| 1988-1990 | IDSA/FDA Reviewer for Guidelines for New Anti-infective Drugs (urinary tract infections) |
| 1995-1996 | Member, Prophylactic Antibiotic Project Advisory Group, Foundation for Health Care Evaluation, Minneapolis |
| 1997- | Member, Medical Education and Research Cost (MERC) Advisory Committee, Minnesota Department of Health |
| 2010 - | Consultant, Behavioral Medical Interventions, Minneapolis, Minnesota |

1993-    Journal reviewer for:

> Annals of Internal Medicine
> Clinical Infectious Diseases
> Journal of Infectious Diseases
> Journal of the American Geriatric Society
> Journal of the American Medical Association
> New England Journal of Medicine
> Infection Control and Hospital Epidemiology
> Anaerobe

Editorial Board Member:

| | |
|---|---|
| 1988-2006 | Infectious Disease News |
| 1996-2002 | Surgical Infections Forum |

Hospital Activities:

| | |
|---|---|
| 1976-96 | Chairman, Infection Control Committee, St. Paul-Ramsey Medical Center |

Liberty002667

| | |
|---|---|
| 1978-96 | Member, Continuing Medical Education Committee, Ramsey Foundation |
| 1979-96 | Chairman, St. Paul-Ramsey Medical Center/Ramsey Foundation Research Committee |
| 1985-86 | Member, Finance Committee; Program Development Committee, Ramsey Clinic |
| 1985-87 | Member, Administrative Committee, Medical Education and Research Foundation |
| 1987-88 | Interim President, Ramsey Foundation |
| 1987-96 | Director, Ramsey Clinic Board |
| 1988-91 | Chairman of the Board of Directors, Ramsey Foundation |
| 1988-96 | Member, Pension Board of Trustees, Ramsey Clinic/Ramsey Foundation |
| 1990-96 | Member, Medical Education Committee, St. Paul Ramsey Medical Center |
| 1994-96 | Member, Operation Improvement Steering Committee, St. Paul Ramsey Medical Center |
| 1993-96 | Co-chair, Department of Medicine Outpatient Operations Committee, St. Paul Ramsey Medical Center |
| 1993-95 | Co-chair, Department of Medicine Quality Improvement Committee, St. Paul Ramsey Medical Center |
| 1996-8 | Member, Continuous Quality Improvement Task Force, Minneapolis VA Medical Center |
| 1997- | Chairman, Infection Control Committee, Minneapolis VA Medical Center |
| 1997-9 | Chairman, Educational Council, VISN 13 (Veterans Integrated Service Network); |
| 2004- | Chair, VISN 23 Pandemic Influenza Planning Committee |

Liberty002668

Medical School Activities:

| | |
|---|---|
| 1989-96 | Member, Intern Selection Committee, Department of Medicine |
| 1994-95 | Member, Search Committee for Chairman, Department of Internal Medicine |
| 1995-6 | Member, Promotions and Tenure Committee, Department of Medicine |
| 1995-6 | Member, Faculty Development Committee; Managed Care Initiative, University of Minnesota Medical School |
| 1996- | Member, Graduate Education Council, University of Minnesota Medical School |
| 2004-9 | Member, Admissions Committee, University of Minnesota Medical School |
| 2006-9 | Co-chair, Admissions Committee, University of Minnesota Medical School |
| 2007-9 | Member, Admission Oversight Committee, University of Minnesota Medical School |
| 2010- | Member, Admissions Executive Committee, University of Minnesota Medical School |

PUBLICATIONS

1.      CROSSLEY KB, KJELLSTRAND CM:  Intraperitoneal insulin for control of blood sugar in diabetic patients during peritoneal dialysis.  Br Med J 1:269-270, 1971.

2.      CROSSLEY KB, SPINK WW:  Recurrent meningitis:  meningeal defect found after 12th attack.  JAMA 216:331, 1971.

3.      CROSSLEY KB:  Management of intravenous infusions.  N Engl J Med 284:1037, 1971.

4.      CROSSLEY KB, MATSEN JM:  The scalp-vein needle:  a prospective study of the associated complications.  JAMA 220:985-987, 1972.

5.      CROSSLEY KB, BIGOS ST, JOFFE CD:  *Hemophilus influenzae* pericarditis:  a report of two cases in adults with a summary of the literature.  Am Heart J 85:246-251, 1973.

6

6.      CROSSLEY KB, MATSEN JM:  Intravenous catheter-associated bacteremia: the role of the diagnostic laboratory.  Appl Microbiol 26:1006-1007, 1973.

7.      CROSSLEY KB:  The bacterial pneumonias. pp 114-137 in Twenty-seventh Annual Symposium on Pulmonary Diseases, Washington:  US Government Printing Office, 1974.

8.      WILLIAMS DN, CROSSLEY KB, HOFFMAN C et al.:  Parenteral clindamycin phosphate:  pharmacology with normal and abnormal liver function and effect on nasal staphylococci.  Antimicrob Agents Chemother 7:153-158, 1975.

9.      IANNINI PB, CROSSLEY KB:  Therapy of *Staphylococcus aureus* bacteremia associated with a removable focus of infection.  Ann Intern Med 84:558-560, 1976.

10.     CROSSLEY KB:  The complications of parenteral hyperalimentation. pp 469-479 in Najarian JS, Delaney JP (eds.)  Critical Surgical Care,  New York:  Stratton Intercontinental Medical Book Corp., 1977.

11.     LAVERDIERE M, CROSSLEY K, SABATH LD:  Clinical evaluation of a combination of pirbenicillin-tobramycin in the treatment of severe *Pseudomonas aeruginosa* infections.  Curr Ther Res 21:464-467, 1977.

12.     LANDESMAN B, CROSSLEY KB:  Methicillin-resistant *Staphylococcus aureus* infection.  APIC 5:52, 1977.

13.     ZASKE D, CROSSLEY K:  Amikacin:  a new aminoglycoside antibiotic.  Minn Med 61:123-126, 1978.

14.     FAVILLE RJ, ZASKE DE, KAPLAN EL, CROSSLEY KB, SABATH LD, QUIE PG:  *Staphylococcus aureus* endocarditis:  combined therapy with vancomycin and rifampin.  JAMA 240:1963-1965, 1978.

15.     LEE BK, CROSSLEY KB, GERDING DN:  The association between *Staphylococcus aureus* bacteremia and bacteriuria.  Am J Med 65:303-306, 1978.

16.     DEMUTH PJ, GERDING DN, CROSSLEY KB:  *Staphylococcus aureus* bacteriuria.  Arch Intern Med 139:78-80, 1979.

17.     CROSSLEY K, LOESCH D, LANDESMAN B, MEAD K, CHERN M, STRATE R:  An outbreak of infections caused by strains of *Staphylococcus aureus* resistant to methicillin and aminoglycosides.  I.  Clinical Studies.  J Infect Dis 139:273-279, 1979.

Liberty002670

18.     CROSSLEY K, LANDESMAN B, ZASKE D:  An outbreak of infections caused by strains of *Staphylococcus aureus* resistant to methicillin and aminoglycosides.  II. Epidemiologic Studies.  J Infect Dis 139:280-287, 1979.

19.     CROSSLEY K, MEAD K:  A modified device for replica plating.  J Clin Path 32:409-411, 1979.

20.     ROTSCHAFER J, CROSSLEY K, ZASKE D, VISTE R:  Comparative study of cefaclor and amoxicillin in treatment of urinary tract infection.  Urology  14:233-236, 1979.

21.     CROSSLEY K, IRVINE P, WARREN JB, LEE BK, MEAD K:  Tetanus and diphtheria immunity in urban Minnesota adults.  JAMA 242:2298-2300, 1979.

22.     HOLTAN N, CROSSLEY K, PRIES C:  Prevalence of intestinal parasites in a Laotian immigrant population.  Minn Med 62:749-752, 1979.

23.     CROSSLEY K, ROTSCHAFER JC, CHERN MM, MEAD K, ZASKE D: Comparison of a radioimmunoassay and a microbiologic assay for measurement of serum vancomycin concentrations.  Antimicrob Agents Chemother 17:654, 1980.

24.     ROTSCHAFER J, MEAD K, CHERN M, CROSSLEY K:  Evaluation of a radioimmunoassay for measurements of serum vancomycin concentration.  pp. 521-523 in Nelson JD and Grassi C (eds.)  Current Chemotherapy and Infectious Disease. Proceedings of the 11th Congress of Chemotherapy and the 19th Interscience Conference on Antimicrobial Agents and Chemotherapy, Washington, DC:  The American Society for Microbiology, 1980.

25.     CROSSLEY K, SOLLIDAY J:  Comparison of rectal swabs and stool cultures for the detection of gastrointestinal carriage of *Staphylococcus aureus*.  J Clin Microbiol 11:433-434, 1980.

26.     HALEY RW, SCHABERG DR, MC CLISH DK, QUADE D, CROSSLEY KB, CULVER DH, MORGAN WM, MC GOWAN JE, JR, SHACHTMAN RH:  The accuracy of retrospective chart review in measuring nosocomial infection rates.  Results of validation studies in pilot hospitals.  Am J Epidemiol 111:516-533, 1980.

27.     HALEY RW, HOOTON TM, SCHOENFELDER JR, CROSSLEY KB, QUADE D, STANLEY RC, CULVER DH:  Effect of an infection surveillance and control program on the accuracy of retrospective chart review.  Am J Epidemiol 111:543-555, 1980.

28.     CROSSLEY K, WARREN JB:  Acute ethanol intoxication and serum bactericidal activity against *Hemophilus influenzae*.  J Stud Alcohol 41:749-752, 1980.

29.     IRVINE P, CROSSLEY K:  Tetanus and the institutionalized elderly.  JAMA 244:2159-2160, 1980.

30.     BAKER D, ROTSCHAFER JC, SAWCHUK R, CROSSLEY KB, SOLEM LD:  Vancomycin pharmacokinetics.  J Pediatr 97:502-503, 1980.

31.     TOFTE RW, SOLLIDAY J, CROSSLEY KB:  Antimicrobial susceptibility of *Acinetobacter calcoaceticus, Serratia marcescens, Pseudomonas fluorescens* and *Pseudomonas maltophilia* to three novel cephalosporin-like antibiotics.  J Antimicrob Chemother 6:799-801, 1980.

32.     ZASKE DE, CROSSLEY KB, STRATE RJ:  Aminoglycoside toxicity (letter).  N Engl J Med 303:1002, 1980.

33.     TOFTE RW, CROSSLEY K:  Clinical experience with toxic-shock syndrome.  N Engl J Med 303:1417, 1980.

34.     CROSSLEY K, JOHNSON J, MUDGE R:  A comparative study of nosocomial infections caused by strains of *S. aureus* of differing antimicrobial susceptibilities.  pp 937-941 in  Proceedings of the IV International Symposium on Staphylococci and Staphylococcal Infections,  Stuttgart:  Gustav Fischer Verlag, 1981.

35.     ROTSCHAFER J, MEAD K, CROSSLEY K:  Recent studies of the pharmacokinetics of vancomycin.  pp 773-776 in  Proceedings of the IV International Symposium on Staphylococci and Staphylococcal Infections,  Stuttgart:  Gustav Fischer Verlag, 1981.

36.     HALEY RW, SCHABERG DR, CROSSLEY KB, VON ALLMEN SD, MC GOWAN JE, JR.:  Extra charges and prolongation of stay attributable to nosocomial infections:  a prospective interhospital comparison.  Am J Med 70:51-58, 1981.

37.     TOFTE RW, SOLLIDAY J, ROTSCHAFER J, CROSSLEY KB:  *Staphylococcus aureus* infection of dialysis shunt:  absence of synergy with vancomycin and rifampin.  South Med J 74:612-615, 1981.

38.     CIPOLLE RJ, ZASKE DE, CROSSLEY K:  Gentamicin and tobramycin.  in Taylor W,  Finn A ( eds.)  Therapeutic Drug Monitoring - A Practical Approach,  New York:  Gross, Townsend and Frank, Inc., 1981.

39.     LOFGREN RP, NELSON AE, CROSSLEY KB:  Prosthetic valve endocarditis caused by *Achromobacter xylosoxidans*.  Am Heart J 101:502, 1981.

40.     CROSSLEY KB, COUCH L and the Task Force on Prophylactic Antibiotics in Surgery:  Antimicrobial prophylaxis in surgical patients.  JAMA 245:722-726, 1981.

Liberty002672

41.     CROSSLEY K:  Immunization in adults (editorial).  Clinical Microbiology Newsletter 3:26-27, 1981.

42.     TOFTE RW, ROTSCHAFER J, SOLLIDAY J, CROSSLEY K:  Moxalactam therapy for a wide spectrum of bacterial infections in adults.  Antimicrob Agents Chemother 19:740-744, 1981.

43.     CROSSLEY K:  Changing patterns of antibiotic resistance.  IM--Internal Medicine for the Specialist, August 1981.

44.     WILLIAMS DN, CROSSLEY KB:  Fever of unknown origin:  review and clinical approach.  The Bulletin (St. Louis Park Medical Center, St. Louis Park, MN) 25:6-13, 1981.

45.     WILLIAMS R, CROSSLEY KB:  Acute and chronic hepatic involvement of brucellosis.  Gastroenterology 83:455-458, 1982.

46.     CROSSLEY KB, SOLLIDAY J:  Antimicrobial susceptibility of Shigellae isolated in Minnesota.  Minn Med 65:679-680, 1982.

47.     ROTSCHAFER JC, CROSSLEY K, ZASKE DE, MEAD K, SAWCHUK RJ, SOLEM LD:  Pharmacokinetics of vancomycin:  observations in 28 patients and dosage recommendations.  Antimicrob Agents Chemother 22:391-394, 1982.

48.     LACKNER TE, ROTSCHAFER JC, CROSSLEY K, LA BROSSE K:  Assay specificity for biologically active gentamicin in serum.  Am J Hosp Pharm 39:647, 1982.

49.     ROTSCHAFER JC, CROSSLEY KB, LESAR TS, ZASKE D, MILLER K:  Cefaclor pharmacokinetic parameters:  serum concentrations determined by a new high-performance liquid chromatographic technique.  Antimicrob Agents Chemother 21:170-172, 1982.

50.     CROSSLEY K:  The practical use of antibiotics in respiratory infections:  when to use, what to use, potential complications. in Drage CW (ed.)  Respiratory Medicine for Primary Care Physicians,  New York:  Academic Press, 1982.

51.     ROTSCHAFER JC, MORLOCK C, STRAND L, CROSSLEY K:  Comparison of radioimmunoassay and enzyme immunoassay methods in determining gentamicin pharmacokinetic parameters and dosages.  Antimicrob Agents Chemother 22:648-651, 1982.

52.     CROSSLEY KB, JOHNSON J, CROSSLEY L, MUDGE R:  Autopsy review:  a procedure of questionable value.  Infection Control 4:29-30, 1983.

Liberty002673

53.     BITTNER MJ, DWORZACK DL, PREHEIM LC, TOFTE RW, CROSSLEY KB: Ceftriaxone therapy of serious bacterial infections in adults. Antimicrob Agents Chemother 23:261-266, 1983.

54.     CROSSLEY K, IRVINE P:  Infectious diseases and immunizations. in Cassel C and Walsh JR (eds.)  Geriatric Medicine:  Principles and Practice,  New York:  Springer-Verlag, 1984.

55.     ADAMS J, CAPISTRANT T, CROSSLEY K, JOHANNSEN R, LISTON S: *Fusobacterium necrophorum* septicemia.  JAMA 250:35, 1983.

56.     ROTSCHAFER JC, CROSSLEY KB, ZASKE DE, RUSSILLO NJ, STRATE RG, TOFTE RW, SOLEM LD:  Clinical use of one-compartment model for determining netilmicin pharmacokinetic parameters and dosage recommendations.  Ther Drug Monitor 5:263-267, 1983.

57.     IRVINE PW, VAN BUREN N, CROSSLEY K:  Causes for hospitalization of nursing home residents.  The role of infection.  J Am Geriatr Soc 32:103-107, 1984.

58.     TOFTE RW, SOLLIDAY J, CROSSLEY KB:  Susceptibilities of enterococci to twelve antibiotics.  Antimicrob Agents Chemother 25:532-533, 1984.

59.     CROSSLEY KB and the Task Force on Prophylactic Antibiotics in Surgery: Antibiotic prophylaxis in surgery:  improvement following a multihospital educational program.  South Med J 77:864-867, 1984.

60.     CROSSLEY KB, GERDING DN, PETZEL RA:  Acceptance of hepatitis B vaccine by hospital personnel.  Infect Control 6:147-149, 1985.

61.     CROSSLEY KB, ROSS J:  Colonization of hospitalized patients by *Staphylococcus aureus, Staphylococcus epidermidis* and enterococci.   J Hosp Infect 6:179-186, 1985.

62.     BAILIE GR, CROSSLEY KB, ROTSCHAFER JC:  Imipenem/cilastatin efficacy evaluated.  Drug Intell Clin Pharm 19:840-841, 1985.

63.     CROSSLEY KB:  Vancomycin. in Peterson PK, Verhoef J (eds.)   The Antimicrobial Agents Annual 1,   Amsterdam:  Elsevier Science Publishers, 1985.

64.     CROSSLEY KB, IRVINE P, KASZAR DJ, LOEWENSON RB:  Infection control practices in Minnesota nursing homes.  JAMA 254:2918-2921, 1985.

65.     HENRY K, CROSSLEY KB:  An objection to a classified advertisement  (letter). New Engl J Med 315:326, 1986.

Liberty002674

66.     CROSSLEY KB and the Minnesota Medical Association Task Force on AIDS:
Acquired immunodeficiency syndrome:  a contemporary overview.  Minnesota Medicine
69:29-30, 1986.

67.     CROSSLEY KB and the Minnesota Medical Association Task Force on AIDS:
Acquired immunodeficiency syndrome:  serological testing for HTLV-III antibody.
Minnesota Medicine 69:140-142, 1986.

68.     CROSSLEY KB and the Minnesota Medical Association Task Force on AIDS:
Acquired immunodeficiency syndrome:  recommendations to prevent transmission for
hospitals and health care workers.  Minn Med 69:211-213, 1986.

69.     CROSSLEY KB:  Vancomycin and Teicoplanin. in Peterson PK, Verhoef J (eds.)
The Antimicrobial Agents Annual 2, Amsterdam:  Elsevier Science Publishers, 1986.

70.     HENRY K, STEINBERG I, CROSSLEY K:  Vancomycin-induced neutropenia
during treatment of osteomyelitis in an outpatient.  Drug Intell Clin Pharm 20:783-785,
1986.

71.     HENRY K, CROSSLEY KB:  Meningitis.  Principles of diagnosis, advances in
treatment.  Postgrad Med 80:59-71, 1986.

72.     HENRY K, CROSSLEY KB:  Wild pigeon-related psittacosis in a family.  Chest
90:708-710, 1986.

73.     CROSSLEY KB, HENRY K, IRVINE P, WILLENBRING K:  Antimicrobial use
in nursing homes:  prevalence, cost and utilization review.   Bull NY Acad Med 63:510-
518, 1987.

74.     HENRY K, CROSSLEY K:  Concerns about the use of condoms to prevent
AIDS (letter). JAMA 256:1442, 1986.

75.     HENRY K, MAKI M, CROSSLEY K:  Analysis of the use of HIV antibody
testing in a Minnesota hospital.  JAMA 259:229-232, 1988.

76.     HENRY K, TORO C, CROSSLEY K:  Perforation of the esophagus by chicken
bones - a report of two cases and a review of the literature.   Minn Med 70:459-460,
1987.

77.     CROSSLEY K, HENRY K:  AIDS:  Implications for long-term care.  Clinical
Report on Aging (Am Geriatr Soc) 1:1,3,5,6,9, 1987.

78.     HENRY K, SULLIVAN C, CROSSLEY K:  Nasal septal abscess due to
*Staphylococcus aureus* in an AIDS patient.  Rev Infect Dis 10:428-430, 1988.

Liberty002675

79.     BRUMMITT CF, CROSSLEY KB, FALKEN M, STICKLE DW, LALLY RT, WOOLFREY BT: Penicillin-resistant *Streptococcus pneumoniae*.  Report of a case and results of a clinical laboratory proficiency survey in Minnesota.  Am J Clin Pathol 89:238-242, 1988.

80.     HENRY K, WILLENBRING K, CROSSLEY KB:  Human immunodeficiency virus antibody testing.  A description of practices and policies at U.S. infectious disease-teaching hospitals and Minnesota hospitals.  JAMA 259:1819-1822, 1988.

81.     AIDS (Special Issue).  Crossley K (editor).  Minn Med 71:241-326, 1988.

82.     CROSSLEY K:  The omnipresence of AIDS.  Minn Med 71:245, 1988.

83.     CROSSLEY K: Vancomycin and Teicoplanin. in  Peterson PK, Verhoef J (eds) Antimicrobial Agents Annual 3,  Amsterdam:  Elsevier Science Publishers, 1988.

84.     RODVOLD KA, BLUM RA, FISCHER JH, ZOKUFA HZ, ROTSCHAFER JC, CROSSLEY KB, RIFF LJ:  Vancomycin pharmacokinetics in patients with various degrees of renal function.  Antimicrob Agents Chemother 32:848-852, 1988.

85.     ZOKUFA H, RODVOLD KA, BLUM RA, RIFF LJ, FISHER JH, CROSSLEY K, ROTSCHAFER J:  Simulation of vancomycin peak and trough concentrations using five dosing methods in 37 patients.  Pharmacotherapy 9:10-16, 1989.

86.     GILLUM J, GARRISON M, CROSSLEY K, ROTSCHAFER J:  Current immunization practices for adults and children.  Part I.  Postgrad Med 85:183-186,188-190, 195, 198, 1989.

87.     GILLUM J, GARRISON M, CROSSLEY K, ROTSCHAFER J:  Current immunization practices for adults and children.  Part II.  Postgrad Med 85:199-202, 207-210, 1989.

88.     THURN J, WILLENBRING K, CROSSLEY K:  Needlestick injuries and needle disposal in Minnesota physicians' offices.  Am J Med 86:575-579, 1989.

89.     ZOKUFA HZ, SOLEM LD, RODVOLD KA, CROSSLEY KB, FISCHER JH, ROTSCHAFER JC:  The influence of serum albumin and alpha-1-acid glycoprotein on vancomycin protein binding in patients with burn injuries.  J Burn Care Rehabil 10:425-428, 1989.

90.     GARRISON MW, ROTSCHAFER JC, CROSSLEY KB:  Suboptimal effect of daptomycin in the treatment of bacteremias.  South Med J 82:1414-1415, 1989.

91.     THURN JR, CROSSLEY K, WILLENBRING K:  Educating patients about HIV (letter). JAMA 262:1948-1949, 1989.

Liberty002676

92.     CROSSLEY KB, THURN JR.  Nursing home-acquired pneumonia.  Semin Respir Infect 4:64-72,1989.

93.     CROSSLEY KB, THURN JR, HENRY K:  <u>Meningitis and Encephalitis</u>.  in Taylor W (ed.)  Difficult Medical Management,  Philadelphia:  WB Saunders and Co., 1990.

94.     THURN J, CROSSLEY K, GERDTS A, MAKI M, JOHNSON J:  Enteral hyperalimentation as a source of nosocomial infection.  J Hosp Infect 15:203-17, 1990.

95.     CROSSLEY KB, THURN JR, WILLENBRING K:  Needlestick injuries and needle disposal in Minnesota nursing homes.  J Am Geriatr Soc 38:793-796, 1990.

96.     EYER S, BRUMMITT C, CROSSLEY K, SIEGEL R, CERRA F:  Catheter-related sepsis:  prospective, randomized study of three methods of long-term catheter maintenance.  Crit Care Med 18:1073-9, 1990.

97.     THURN JR, BELONGIA EA, CROSSLEY K:  Methicillin-resistant *Staphylococcus aureus* in Minnesota nursing homes.  JAGS 39:1105-9, 1991.

98.     MCGOWAN JE JR, CHESNEY PJ, CROSSLEY KB, LA FORCE FM:  From the Infectious Diseases Society of America:  Guidelines for the use of systemic glucocorticosteroids in the management of selected infections.  J Infect Dis 165:1-13, 1992.

99.     DEGELAU J, SOMANI SK, COOPER SL, GUAY DRP, CROSSLEY KB:  Amantadine resistant *influenza A* in a nursing facility.  Arch Intern Med 152:390-392, 1992.

100.    CROSSLEY KB, THURN JR:  <u>Control measures for MRSA:  Can the cost be reduced</u>? pp. 187-196 in Cafferkey MT (ed.)  Methicillin-resistant *Staphylococcus aureus* - Clinical management and laboratory aspects,  New York: Marcel Dekker, Inc., 1992.

101.    THURN JR, CROSSLEY K, GERDTS, A, BAKEN L:  Dynamics of coagulase-negative staphylococcal colonization in patients and employees in a surgical intensive care unit.  Hosp Infect 20:247-255, 1992.

102.    CROSSLEY KB, NELSON L, IRVINE P:  State regulations governing infection control issues in long term care.  JAGS 40:251-254, 1992.

103.    CROSSLEY KB:  <u>Approach to the seriously ill, febrile nursing home patient</u>.  in R. J. Duma (ed.)  Recognition and Management of Nursing Home Infections. New York: Intramed Communications (for the National Foundation of Infectious Diseases), 1992.

104.    CROSSLEY KB:  Book review of "Control of disease vectors in the community" by C. F. Curtis.  Saudi Med J 14:371, 1993.

Liberty002677

105.     CROSSLEY KB:  Infection control aspects of the employee health program. pp 193-200  in Smith PW (ed.)  Infection Control in Long Term Care Facilities  (2nd Edition),  Northampton, MA: Delmar Publishers, 1994.

106.     CHAO CC, ALA TA, HU S, CROSSLEY KB, SHERMAN RE, PETERSON PK, FREY WH II:  Serum cytokine levels in patients with Alzheimer's disease.  Clin Diagn Lab Immunol 1:433-436, 1994.

107.     CROSSLEY KB:  Streptococci.  pp. 326-334 in Mayhall CG (ed) Hospital Epidemiology and Infection Control, Baltimore: Williams & Wilkins, 1995.

108.     CROSSLEY KB, PETERSON PK:  Infections in the elderly. pp. 2737-2742 in Mandell GL, Bennett JE, Dolin R (eds)  Principles and Practice of Infectious Diseases (4th edition.),  New York:  Churchill Livingstone Inc., 1995

109.     CROSSLEY K, PETERSON P:  Infections in the elderly.  Clin Infect Dis 22:209-15, 1996.

110.     THURN JR, CROSSLEY K, GERDTS A:  Colonization of nursing home residents on admission to an acute care hospital.   J. Hosp Infect 32:127-133, 1996

111.     STRAUSBAUGH LJ, CROSSLEY KB, NURSE BA, THRUPP LD: Antimicrobial resistance in long-term care facilities.  A SHEA position paper.  Infect Control  Hosp Epidemiol 17:129-140, 1996

112.     CROSSLEY KB, ARCHER G (eds.):  The staphylococci in human disease.   New York:  Churchill Livingstone, 1997.

113.     GATERMANN SG, CROSSLEY KB:  Urinary tract infections. pp. 493-508 in CROSSLEY KB, ARCHER G (eds.)   The staphylococci in human disease.   New York: Churchill Livingstone, 1997.

114.     CROSSLEY K and the long-term-care committee of the society for healthcare epidemiology of america:  Vancomycin resistant enterococci in long term care facilities. Infect Control Hosp Epidemiol 19:521-525, 1998.

115.     CROSSLEY KB, PETERSON P:  Infections in the elderly -new developments. pp. 75-100 in REMINGTON JS, SWARTZ M (eds.)  Current clinical topics in infectious diseases - 18., 1998.

116.     CROSSLEY KB:  Streptococci. pp. 385-393 in Mayhall CG (ed) hospital epidemiology and infection control, Second Edition,  Baltimore: Williams & Wilkins, 1999.

117.    CROSSLEY KB, PETERSON PK:  <u>Infections in the elderly</u>. in  Mandell GL, Bennett JE, Dolin R (eds)  principles and practice of infectious diseases (5th edition.), New York:  Churchill Livingstone Inc., 1999

118.   CROSSLEY KB:   <u>Infection in the elderly</u>.  in Schlossberg D (ed) Current therapy of infectious diseases.   Philadelphia: WB Saunders Co., 1999.

119.   CROSSLEY KB: Nursing Homes as a reservoir of antibiotic resistance.   (Invited review)   Curr Opin Infect Dis 2001;14:455-460.

120.   CROSSLEY KB: Infections in long-term care institutions in Norway.  J Hosp Infect 2001;49:84-5.

121.   LOEB M, BENTLEY DW, BRADLEY S, CROSSLEY KB et. al:  Development of minimum criteria for the initiation of antibiotics in residents of long-term-care facilities: results of a consensus conference.   Infect Control Hosp Epidemiol 2001;22:120-4.

122.   CROSSLEY KB:  Professional satisfaction among U.S. healthcare chaplains. J Pastoral Care. 2002; 56:21-7.

123.   SIMOR AE, BRADLEY S, STRAUSBAUGH LJ, CROSSLEY KB, NICOLLE LE:   Clostridium difficile in long-term care facilities for the elderly.   Infect Control Hosp Epidemiol 2002;23:696-703.

124. WAINWRIGHT M, CROSSLEY KB:   Methylene Blue – a therapeutic dye for all seasons.  J. Chemother 2002;14:431-43.

125.   THRUPP L, BRADLEY S, SMITH P, SIMOR A, GANTZ N, CROSSLEY K, LOEB M, STRAUSBAUGH L, NICOLLE L;   Tuberculosis prevention and control in long-term-care facilities for older adults.   Infect Control Hosp Epidemiol. 2004;25(12):1097-108.

126.   CROSSLEY KB:  <u>Streptococci</u>.  pp. 517-527 in Mayhall CG (editor) Hospital Epidemiology and Infection Control, (3rd edition) Baltimore: Williams & Wilkins, 2004.

127.   CROSSLEY KB, PETERSON PK:  <u>Infections in the elderly</u>. pp 3517-3524 in Mandell GL, Bennett JE, Dolin R (editors)  Principles and Practice of Infectious Diseases (6th edition),  New York:  Churchill Livingstone Inc., 2005.

128.   CROSSLEY K: <u>Overview of *Staphylococcus aureus* in Medicine</u> in Weigelt JA [editor]: MRSA-Diagnosis and Management.   New York: Informa, 2007.

129.   CROSSLEY KB: <u>Infections in the Elderly</u> in Schlossberg D (editor) Clinical Infectious Diseases.   New York: Cambridge University Press, 2007.

Liberty002679

130. DREKONJA DM, TRAYNOR LM, DECAROLIS DD, CROSSLEY KB, JOHNSON JR:  Treatment of non-life threatening methicillin-resistant Staphylococcus aureus infections with alternative antimicrobial agents: a 2 year retrospective review.  Diagn Microbiol Infect Dis. 2009;63:201-7.

131.  CROSSLEY KB, JEFFERSON K, FOWLER V AND ARCHER G [editors]: The Staphylococci in Human Disease.  Oxford: Wiley-Blackwell, 2009.

132.  GATTERMAN S, CROSSLEY KB:  Urinary Tract Infection in CROSSLEY KB, JEFFERSON K, FOWLER V AND ARCHER G [editors]: The Staphylococci in Human Disease.  Oxford: Wiley-Blackwell, 2009.

133. CROSSLEY KB, JOHN J:  Treatment of Staphylococcal Infection in CROSSLEY KB, JEFFERSON K, FOWLER V AND ARCHER G [editors]: The Staphylococci in Human Disease.  Oxford: Wiley-Blackwell, 2009.

134.  CROSSLEY KB, PETERSON PK:  Infections in the elderly in MANDELL GL, BENNETT JE, DOLIN R (editors)  Principles and Practice of Infectious Diseases (7th edition),  New York:  Elsevier, 2009.

135.  CROSSLEY K: Review: intranasal mupirocin ointment reduces Staphylococcus aureus infections in nasal carriers.  Evid Based Med 2009;14:110.

136.  CROSSLEY KB:  Streptococci. in Mayhall CG (editor) Hospital Epidemiology and Infection Control, (4rd edition) Baltimore: Williams & Wilkins, 2010.

137.  STONE ND, ASHRAF MS, CALDER J, CRNICH CJ, CROSSLEY KB et al. Surveillance definitions of infections in long-term care facilities: revising the McGeer criteria.  (Accepted for publication in Infect Control Hosp Epidemiol.)


GRADUATE STUDENT MENTORSHIPS [M.P.H. or M.H.A. Committees]

Joseph Thurn, M.D. [M.P.H.]  Needlestick Injuries and Needle Disposal in Minnesota Physicians' Offices.  1992

Aaron DeVries, M.D. [M.P.H.]  Toxic Shock Syndrome.  2005.

Megan Alavi [M.H.A]   Applying Emergency Response Lessons Learned from Hurricane Katrina to Pandemic Influenza:  An Analysis of the Minnesota Department of Health Pandemic Influenza Plan.   2007.

Nelay Kothari, M.D. [M.H.A.]  Antibiotic Prescribing in Minnesota Long-term Care Facilities.  2007.

Liberty002680

Katherine Waters, D.V.M. [M.P.H.]   Prevalence of methicillin-resistance *Staphylococcus aureus* (MRSA) infection in pets living in households where a child has been diagnosed with MRSA.   2007.

Pamela Adams, D.V.M. [M.P.H.]  Consultative Report: Minnesota County Foreign Animal Disease Response Support Guide.  2010.

Nicole Khoury, Ph.D. [M.P.H.]   Consultative Report: The Role Electronic Surveillance Systems Play in Improving Infection Control Investigation.   2010.

U.S. PATENTS

CROSSLEY KB.  Oligodynamic Catheter.  US Patent 4054139 issued 10/18/1977

CROSSLEY KB.   Method and Apparatus to Prevent Infections.   US Patent 6551346 issued 4/22/2003

# Curriculum Vitae

# Daniel J. Kitei D.O., M.A.
# Board Certified Neurologist and Neuromuscular Specialist

| MEDICAL TRAINING | |
|---|---|
| *2008* | *American Board of Psychiatry and Neurology*<br>Board Certified in Neurology |
| *2009* | *American Board of Psychiatry and Neurology*<br>Board Certified in Neuromuscular Medicine |
| *2008-2009* | *Harvard Medical School Neuromuscular Program*<br>Neuromuscular/EMG Fellowship<br>Massachusetts General Hospital<br>Brigham and Women's Hospital |
| *2005-2008* | *University of Connecticut Health Center*<br>Neurology Residency<br>Chief Resident 2007-2008<br>  Visiting Rotation at the University of California at San Francisco-Exposure to MDA/ALS clinic, EMG/NCS, Single fiber EMG, Spine and nerve injury clinics<br>  Visiting Rotation at Stanford University-Exposure to MDA/ALS clinic, EMG/NCS, intra-operative monitoring, Epilepsy Monitoring Unit, Grid Placement |
| *2004-2005* | *Tucson Hospitals Medical Education Program, Tucson, Arizona*<br>Transitional Internship |

| EDUCATION | |
|---|---|
| *2000-2004* | *Arizona College of Osteopathic Medicine, Glendale, Arizona*<br>Medical School<br>Neurology Rotations at Barrow Neurologic Institute, Mayo Clinic Scottsdale, AZ |
| *1999-2000* | *University of California at Santa Barbara*<br>Master's Degree<br>Religious Studies and Global Medicine |
| *1995-1999* | *University of California at Santa Barbara*<br>Bachelor of Arts<br>Pre-Med and Religious Studies |
| *1991-1995* | *Brophy College Preparatory, Phoenix, Arizona*<br>High School |

Liberty002682

| ACTIVITIES AND AWARDS | |
|---|---|
| *2008* | *University of Connecticut Resident Teacher Award*<br>Awarded each year to the resident who displayed the highest level of teaching excellence |
| *2006-2007* | *University of Connecticut Award for Excellence in Stroke Treatment*<br>Awarded to the Resident who showed the highest efficiency and quality in Acute Stroke Treatment |
| *2005-2007* | *American Council of Graduate Medical Education*<br>University of Connecticut Board Member<br>Creation and improvement of policy for the Capital Area Health Consortium |
| *2005-2007* | *University of Connecticut Resident Forum*<br>Neurology Residency Representative<br>Creation and improvement of policy for the University of Connecticut and associated hospitals |
| *2007* | *Internal Review Committee*<br>Reviewed individual UCONN residency programs with faculty members for quality of education and presented a resident perspective on particular program's strengths and weaknesses |
| *2003-2004* | *Arizona College Of Osteopathic Medicine Admissions Committee*<br>Student representative to admissions committee |
| *2002* | *Health Education Learning Programs*<br>Student of the Year 2002 |
| *1996-2000* | *University of California at Santa Barbara Academic Honors*<br>Graduated Cum Laude, Golden Key National Honor Society, Who's Who National Dean's List |
| *1993-1995* | *AZA Youth Organization*<br>Chapter President, Southwestern Regional Chairman |

| PUBLICATIONS AND RESEARCH | |
|---|---|
| *2010* | Eugene M, Kitei D, Silvers D. Clinical Reasoning: A 75-year-old woman with visual disturbances and unilateral ataxia. *Neurology* 2010; 75; e29 |
| *2008* | Kitei D, DiMario F. Childhood Orbital Pseudotumor: Case Report and Literature Review. *Journal of Child Neurology* 2008; 23(4) 425-430 |
| *2008* | Kitei, D, Lee N, MERCI Clot Retrieval in Acute Stroke-Comparing IVTPA, IATPA, MERCI Retrieval and Combination therapy (in progress) |
| *2005-2008* | *Hartford Hospital Stroke Center*<br>Participated in enrollment, examinations & data collection for multiple studies including the Multi-Merci Trial (Evaluating the efficacy of the MERCI clot retrieval device for acute ischemic stroke), The FAST trial (Evaluating Factor 7 for acute hemorrhagic stroke treatment), The PRoFESS Trial (comparing aggrenox and plavix for stroke prevention) |
| *2005* | *University of Arizona Diabetes Research Lab*<br>Research Assistant for basic science laboratory, genetic testing |

Liberty002683

| LECTURES AND PRESENTATIONS | |
|---|---|
| *2009* | *Swedish Medical Center Grand Rounds*<br>Neuromuscular Emergencies |
| *2009* | *Harvard Medical School Neuromuscular Program*<br>Brain-Computer Interface in neuromuscular disease |
| *2006-2007* | *University of Connecticut Medical School*<br>Guest lectures on Parkinson's Disease, Multiple Sclerosis, Physical Exam |
| *2007* | *University of Connecticut Department of Neurology Grand Rounds*<br>Acute Stroke Treatment-Review of current therapies and Presentation of Data<br>from Hartford Hospital-A Regional Stroke Center |
| *2005-2007* | *Neuromuscular Conferences, University of Connecticut Dept of Neurology*<br>Limb Girdle Muscular Dystrophy 2A-Clinical, pathological aspects<br>Myotonia-Disease states and electrolyte abnormalities<br>Muscle Cramps-Clinical causes and pathology |
| *2005-2007* | *Grand Rounds Case Presentations, University of Connecticut Dept of Neurology*<br>Creutzfeldt-Jacob Disease-Clinical, MRI, EEG, CSF findings<br>Microhemorrhages-The use of MRI for diagnosis and treatment<br>Carotid Dissection-Pathology and clinical presentation<br>Multiple Sclerosis-A rare spinal cord lesion presenting with painful feet<br>Venous Sinus Thrombosis-Evaluation and treatment |

| VOLUNTEER AND TEACHING HISTORY | |
|---|---|
| *2010-2011* | *Rocky Vista Medical School*<br>Clinical Assistant Professor |
| *2008-2009* | *Harvard Medical School*<br>Preceptor for Medical Student Neurology Education |
| *2002-2004* | *Maemonides Social Action Club of Midwestern University*<br>Vice President |
| *2001-2003* | *"Head Start" Health Care For Underprivileged Children*<br>Volunteer for medical exams and patient education, Phoenix, Arizona |
| *2001-2003* | *TOPS High School Sports Physicals*<br>Performed hundreds of physicals for underprivileged athletes, Phoenix, AZ |
| *1996-2003* | *Health Education Learning Programs*<br>Assistant for Medical Education, Phoenix, Arizona |
| *1998-2001* | *Union Hills Family Physicians*<br>Assistant to physicians, office managerial duties, Glendale, Arizona |
| *1996-1999* | *Campus Learning Assistance Programs*<br>Conducted math and physics tutorials for undergraduate students<br>University of California, Santa Barbara |
| *1994-1995* | *Arizona Recreation Center for the Handicapped*<br>Activity creation and supervision for physically and mentally disabled, Glendale,AZ |

3

Liberty002684

| WORK HISTORY | |
|---|---|
| *2011* | Rocky Mountain Neurology<br>Neurologist, Managing Partner |
| *2009-2010* | Blue Sky Neurosciences<br>Neurologist<br>Englewood, CO |
| *2006-2007* | Jefferson Radiology<br>Physician On Site<br>Hartford, Connecticut |

| MEMBERSHIPS AND LICENSURE | |
|---|---|
| *2009-2011* | *State of Colorado Medical License #47342* |
| *2006-2009* | *State of Connecticut Medical License #044585* |
| *2008-2009* | *State of Massachusetts Medical License #235826* |
| *2005-2008* | *American Council of Graduate Education Board Member* |
| *2005-2011* | *American Academy Of Neurology Member* |
| *2004-2011* | *American Medical Association Member* |
| *2004-2011* | *American Osteopathic Association Member* |

| HOBBIES | |
|---|---|
| *Tennis* | Ranked 19 in Southwestern United States Junior Tennis<br>Arizona Representative to Hermosillo, Mexico International Tennis Exchange |
| *Exercise* | Certified Personal Trainer and active in multiple sports |
| *Theater/TV* | Principal and featured roles in over 15 productions |
| *Poker* | Future World Poker Tour Winner (Hopefully) |
| *Travel* | Traveled extensively and always interested in a new place |

4

Liberty002685



Medical Consultants Network, LLC
1301 5th Ave, Suite 2900
Seattle, WA 98101
**Tax ID: 27-1944238**

# Invoice #: N100271
### Invoice Date: 02/29/2016

**ATTN:**    **Nancy Winterer**
**Liberty Mutual Insurance**
**P.O. Box 7210**
**London, KY 40742**

| | | | |
|---|---|---|---|
| **MCN #:** | **1-C193333** | **Coverage:** | **Disability-Long Term** |
| **Claim #(s):** | REDACTED | | |
| **Claimant:** | **Haley Spears** | | |
| **DOL/DOI:** | **09/27/2008** | | |

| DATE OF SERVICE | PROVIDER | SPECIALTY | SERVICE | AMOUNT |
|---|---|---|---|---|
| 02/29/2016 | Jenness Courtney | Physical Medicine & Rehabilitation | No Show | $675.00 |
| | | | **INVOICE TOTAL** | **$675.00** |

**For proper credit, please indicate invoice # N100271 on your payment to:**

**Tax ID#: 27-1944238**
**Medical Consultants Network, LLC**
**1301 5th Ave, Suite 2900**
**Seattle, WA 98101**

**Thank you for choosing MCN for your medical judgment needs!**

**A finance charge of 1% per month (12% per annum) will be assessed on all charges outstanding more than 60 days after the date of this invoice.**

**Please notify MCN accounting of any discrepancies within 30 days of the invoice date.**
**(206) 219-4910 Phone**
**(206) 812-6410 Fax**
**accounting@mcn.com**

Liberty002686



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| **Date:** March 1, 2016 | |
| **To:** WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 | |
| **Attn:** | |
| **Fax:** (860) 247-4194 | |
| **From:** Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 | |
| **Total Pages**<br>**(Including Cover):**   3 | |
| **RE:**<br><br>**Claim #:** REDACTED<br>**Claimant:** Haley Spears<br><br>UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

March 1, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:     Long Term Disability (LTD) Benefits
        UTC Choice
        Claim #: REDACTED
        Claimant: Haley Spears

Dear Winona Zimberlin:

This letter responds to your correspondence dated February 27, 2016 and February 29, 2016.

Ms. Spears disability claim file currently contains over 4700 pages of medical documentation. A complete copy of the medical documentation on file was sent for the IME physician's review.

Ms. Spears is covered under a group disability income policy sponsored by her employer, and which is governed by the Employee Retirement Income Security Act (ERISA). We respectfully disagree with your position that we must allow Ms. Spears to videotape the IME. The United Technologies Corporation Group Disability Income Policy contains the following provision related to Examinations:

**Examination**

Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

We are unable to agree to your request to have third parties or videographers present during the IME. It will interfere with the independent nature of the examination to have third parties present during the examination. If Ms. Spears agrees to attend the IME we will agree to provide her with transportation and if she wishes to have you or a third party accompany her to the IME, we would request that you or the third party remain in the waiting room while the IME is conducted and Ms. Spears could consult with you or the third party in the waiting room, if necessary.

At this time, we are proceeding to reschedule the IME. MCN will contact you directly regarding that appointment.

Liberty002688

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002689



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:
Hartford Office
2 Congress Street
Hartford, CT 06114

February 29, 2016

Facsimile: 1-603-334-5708

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

  RE: Haley Spears
  DOB: REDACTED
  Your claim#: 250039

Ms. Spears was unable to attend the scheduled IME for today due to a family emergency. Our office did speak to Del at Medical Consultants Network about rescheduling this appointment. He did confirm with Dr. Courtney's office that they do have March 14 or March 21 available at this time. Del has informed our office that Liberty Mutual must approve the rescheduling of this appointment. Please let me know when Liberty approves the rescheduling of this appointment. Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:rlc

Liberty002690



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

February 27, 2016

Facsimile: 1-603-334-5708

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

RE:    Haley Spears
DOB: REDACTED
Your claim#: 250039

There is no provision in the LTD plan which bars Ms. Spears from having another person present in the exam room or videotaping the exam. Your letter does not cite to such a provision. Liberty Life cannot impose conditions on this exam if the plan does not authorize it to do so.

Please advise which records Liberty provided to the IME doctor. If complete records were not provided, we will provide them to the doctor.

Very truly yours,

Winona W. Zimberlin

WWZ:dz

Liberty002691

**n0062751**

---

**From:** Delano Stark
**Sent:** Wednesday, February 24, 2016 6:45:08 PM
**To:** Winterer, Nancy
**Subject:** IME appointment later in the day

Hi Nancy,

**Claimant: Hal. Spe.**

**Claim#** REDACTED

The original IME appointment we had set up with Dr. Courtney for the above claimant was for Monday, February 29th at 11:00AM.  I received a call from the claimant about an hour ago informing me that she had another doctor's appointment the very same day earlier in the morning, and would be preferring an afternoon appointment.  I told her that we would need approval from Liberty Mutual in order to confirm a rescheduling, but I told her that I would get in contact with the provider's office to see what they had available.

Luckily for us, Dr. Courtney's office had availability at 2:00PM on the very same day to reschedule this appointment.  I told the office that we would like to push the appointment back to that time slot at 2PM.  I did not call the claimant back to notify them because there was an attorney listed on the case.  However,  the claimant did end up calling back just now, asking me if I was able to get a later appointment date to which I told her "Yes, we now have this scheduled for 2:00PM on February 29th instead of 11:00AM."

I just wanted to let you know that the appointment date, location, and physician are all still the same, but now the appointment time has been bumped back to 2PM instead of 11:00AM.

Thank you,

**Del Stark**
Customer Service Representative

**Medical Consultants Network ®**

Medical Judgment Nationwide

National Scheduling, Seattle WA

P: 206.621.9097   Ext 2212

F: 206.623.4956

dstark@mcn.com
www.mcn.com

PLEASE NOTE: This message was sent using Transport Layer Security.

Liberty002693

**n0062751**

| | |
|---|---|
| **From:** | Clara Easter |
| **Sent:** | Tuesday, February 09, 2016 3:37:46 PM |
| **To:** | Winterer, Nancy |
| **Subject:** | Appointment Scheduled for Claim #: REDACTED; Claimant: Hal Spe |

Dear Nancy Winterer:

We would like to thank you for your referral and to inform you that the following exam has been scheduled for the above-referenced claimant:

Date & Time: 02/29/2016 11:00 AM

Consultant: Dr. Jenness Courtney

Specialty: Physical Medicine & Rehabilitation

Location: Office of Exams/Mailing/Billing --9045 Ellerbe Rd, Suite 107, Shreveport, LA 71106

Address: 9045 Ellerbe Rd, Suite 107, Shreveport, LA 71106

This provider is outside MCN In-Network Pricing. The fee for this service is $2,850.00 (Flat Rate).

If the claimant fails to show for this exam, the No-Show fee will be $700.00.

Please notify MCN of a cancellation no later than 2/24/2016 at 11 AM to avoid a Late Cancel Fee of $700.00.

An appointment letter will be mailed to the attorney and copied to you for your records.

Please feel free to call us at 206.621.9097 if you have any questions or if we may be of further assistance.

Thank you for choosing MCN!

Sincerely,

Brianna Bean

PLEASE NOTE: This message was sent using Transport Layer Security.

Liberty002694

CINDY BRETON
LIBERTY MUTUAL-DOVER-0096
100 LIBERTY WAY
DOVER NH 03820

**0.0 LBS    LTR**

**1 OF 1**

**SHIP TO:**
BRIANNA BEAN
MCN
SUITE 1400
901 BOREN AVENUE
**SEATTLE   WA 98104-3543**



# WA 981 9-05



# UPS NEXT DAY AIR SAVER **1P**

TRACKING #: 1Z 248 96X 29 9003 3680

BILLING: P/P
SIGNATURE REQUIRED

Office/Dept Number: 009603304

CS 18.0.22.     WNTNV50 72.0A 01/2016



Liberty002695

CINDY BRETON
LIBERTY MUTUAL-DOVER-0096
100 LIBERTY WAY
DOVER NH 03820

0.0 LBS    LTR

**SHIP TO:**
BRIANNA BEAN
MCN
SUITE 1400
901 BOREN AVENUE
**SEATTLE  WA 98104-3543**



# WA 981 9-05

# UPS NEXT DAY AIR SAVER 1P

TRACKING #: 1Z 248 96X 29 9003 3680



BILLING: P/P
SIGNATURE REQUIRED

Office/Dept Number: 009603304

CS 18.0.22.    WNTNV50 72.0A 01/2016



Liberty002696

# Liberty Mutual - Independent Evaluation

## IME

Requested By:   Nancy Winterer
                Disability Claims
                P.O. Box 7206
                London, KY 40742-7206
                (888) 437-7611 x16401
        Fax:    (603) 334-5708

┌─ Document Locations ─────────┐
│ ☑ Document List              │
│ ☐ Correspondence             │
│ ☐ Paper File                 │
└──────────────────────────────┘

**Return Report to: GBLibertyVendorReferrals@libertymutual.com**

| | | | |
|---|---|---|---|
| Customer Name: | UTC CHOICE | Date Sent: | 2/9/2016 |
| Funding type: | CON | Coverage Type: | LTD |
| Claimant Name: | HALEY  A  SPEARS | Claim #: | REDACTED |
| Claimant Address: | 9000 WEST WILDERNESS WAY#190 | Claimant SSN: | REDACTED |
| | | Claimant DOB: | REDACTED |
| City: | SHREVEPORT | Claimant Tel. #: | (860) 930-0887 |
| State: | LA | Claimant DOD: | 9/27/2008 |
| Zip: | 71106-0000 | | |
| | | Primary Diagnosis: | Headache |
| Gender: | FEMALE | Att. Physician: | |
| Specialist Type Requested : | Physical Medicine and Rehabilitation (PM&R) | Physician: Phone/Fax | n/a |

Referral Questions:                          Vendor Chosen:      Medical Consultant Network

Claimant Name:    HALEY  A  SPEARS

# Liberty Mutual - Independent Evaluation

## IME

Clmnt is former Administrative Assistant who was 31yo at her DOD 9/27/2008, initially due to Headaches. We are assessing clmnt's functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015. In addition to this IME, the medical documentation is being reviewed by Infectious Disease; Neurology; Neuropsychology; Internal Medicine.

Please address:

1. Comprehensive medical history, including chief complaint, present illness, past medical/surgical history, medications/allergies, and review of systems.

2. Comprehensive functional history.  Include past and current reported daily activities; how the insured's spine pain, whole body pain, and decreased energy limits her functionally; maximum reported sitting, standing, and walking capacity per session and per 8 hour workday, and the insured's reported participation in work, ADLs, and recreation/hobbies.

3. Comprehensive neuromuscular examination.  Include complete spine exam [including spine ROM, the presence/absence of spasm, postural deviations, signs of neural irritation]; neurological exam [motor/sensory/reflexes/Babinski reflexes]; tender point exam; and gait assessment. Include a detailed neck and upper extremity exam to include joint ROM, circumferential arm/forearm measurements, and motor/sensory exam.

4. Assessment of objective physical deconditioning: Any evidence of generalized muscle atrophy, resting tachycardia, and/or poor muscle tone? Please discuss.

5. Opinion regarding verifiable physical impairment: Based on the review functional evidence, clinical exam findings, and diagnostic test evidence, does the insured have any verifiable functional impairment? For any impairment confirmed, please provide the clinical, diagnostic, and/or functional evidence supporting your opinion.

6. Opinion regarding medically-supported physical restrictions/limitations: For any physical impairment confirmed, please provide specific physical restrictions/limitations. Please define by type of task [sitting, standing, lifting, etc.], as well as frequency of task [never, occasional, frequent, constant]. Include duration of physical restrictions/limitations. Is there any medical or functional evidence supporting.

7. Assessment of excessive or atypical pain behaviors: Note any excessive or atypical pain behaviors observed during the IME. Does the insured's reported pain severity and functional limitations correlate with your clinical exam findings, the diagnostic test evidence, and treatment requirements?

8. Assessment of functional inconsistencies: Compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted.

9. Conclusions: Summary of your overall impression regarding the insured's current verifiable physical impairments, medically-supported physical restrictions/limitations, and maximum full-time work capacity.

Instructions For Vendor:

Claimant Name:    HALEY  A  SPEARS

## Liberty Mutual - Independent Evaluation
### IME

Attorney Information (if applicable):

All correspondence MUST go through clmnt's attorney:
Winona Zimberlin
Zimberlin Law LLC
267 Main Street
Manchester, CT  06042
(p) 860.783.5999  (f) 860.783. 5996

Claimant Name:     HALEY  A  SPEARS

Liberty002699

PANEL REVIEW:  Clmnt is former Administrative Assistant who was 31yo at her DOD 9/27/2008, initially due to Headaches.  We are assessing clmnt's functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015. In addition to this panel review, clmnt will be examined and records will be reviewed by PM&R.

Referral for PANEL review by:
Infectious Disease
Neurology
Neuropsychology
Endocrinology/Internal Medicine (please include review of Rheumatology, Gastroenterology, Cardiology, Pulmonology, Sleep Medicine, and Primary Care records)

INFECTIOUS DISEASE:
Please contact Zane Saul, MD (P-203-259-8087 F-203-383-4499), who treated clmnt from 8/8/10 through 6/9/14, regarding Ms. Spear's condition, treatment and functional capacity.

From an Infectious Disease perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

Based on the medical evidence, from an Infectious Disease perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

NEUROLOGY:
Please also contact Joachim Baehring, MD (P-203-785-7284 F-203-737-2591), who treated clmnt from 11/25/08 through 4/22/13, regarding Ms. Spear's condition, treatment and functional capacity.

From a Neurology perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

Based on the medical evidence, from a Neurology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

NEUROPSYCHOLOGY:

Please explain the results and conclusions of the July 2010 Neuropsychological Evaluation by Marian Rissenberg, PhD, including areas of cognitive strength and weakness, psychological findings, results of validity testing.

Based on the medical evidence, from a Neuropsychology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

ENDOCRINOLOGY/INTERNAL MEDICINE (please include review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, and Primary Care records):

Please contact PCP Kristin Giannini, MD (P-860-872-8321 F-860-875-6271), who treated clmnt 3/10/09 through 11/25/13, regarding Ms. Spear's condition, treatment and functional capacity.

Please contact Endocrinologist Robert Lang, MD (P-203-248-4362 F-203-248-6933), who treated clmnt from 2/21/13 through 7/10/14, regarding Ms. Spear's condition, treatment and functional capacity.

From an Internal Medicine and Endocrinology perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

Based on the medical evidence, from an Endocrinology and Internal Medicine perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.

Liberty002701

**n0062751**

---

**From:**       Clara Easter
**Sent:**        Tuesday, February 09, 2016 3:37:46 PM
**To:**          Winterer, Nancy
**Subject:**     Appointment Scheduled for Claim #: REDACTED; Claimant: Hal Spe

Dear Nancy Winterer:

We would like to thank you for your referral and to inform you that the following exam has been scheduled for the above-referenced claimant:

Date & Time: 02/29/2016 11:00 AM

Consultant: Dr. Jenness Courtney

Specialty: Physical Medicine & Rehabilitation

Location: Office of Exams/Mailing/Billing --9045 Ellerbe Rd, Suite 107, Shreveport, LA 71106

Address: 9045 Ellerbe Rd, Suite 107, Shreveport, LA 71106

This provider is outside MCN In-Network Pricing. The fee for this service is $2,850.00 (Flat Rate).

If the claimant fails to show for this exam, the No-Show fee will be $700.00.

Please notify MCN of a cancellation no later than 2/24/2016 at 11 AM to avoid a Late Cancel Fee of $700.00.

An appointment letter will be mailed to the attorney and copied to you for your records.

Please feel free to call us at 206.621.9097 if you have any questions or if we may be of further assistance.

Thank you for choosing MCN!

Sincerely,

Brianna Bean

PLEASE NOTE: This message was sent using Transport Layer Security.



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

---

Date:  February 9, 2016

To:    WINONA ZIMBERLIN
       ATTORNEY AT LAW
       267 MAIN STREET
       MANCHESTER CT 06042

Attn:

Fax:   (860) 247-4194

From:  Nancy Winterer
       Appeal Review Consultant
       Phone No.: (888) 437-7611
       Secure Fax No.: (603) 334-5708

Total Pages
(Including Cover):    2

RE:

Claim #:   REDACTED
Claimant:  Haley Spears

UTC Choice

---

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

Liberty002703



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

February 9, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

Thank you for your letter of February 4, 2016 indicating Ms. Spears will attend an IME.

As we discussed on the telephone last week, the IME will be completed by a physician specializing in Physical Medicine & Rehabilitation.  An independent medical vendor will be directly in touch with you regarding specific arrangements for the examination, including the name of the examining physician.

Ms. Spears may be accompanied to the IME, however, that person would need to stay in waiting room and not be present during the actual examination.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002704



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

February 4, 2016

Facsimile: 1-603-334-5708

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
PO Box 7213
London, KY 40742-7611

Dear Ms. Winterer:

      RE:    Haley Spears
      DOB: REDACTED
      Your claim#: REDACTED

      Ms. Spears will attend an IME. Please advise as to the name of this evaluator. Is there any objection if Ms. Spears brings another person with her to the exam?

Very truly yours,

Winona W. Zimberlin

WWZ:dz
Enclosure

Liberty002705

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.**  Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.**  Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™
THE UPS STORE
1931 WOODBURY AVE
PORTSMOUTH ,NH 03801

FOLD HERE

MARILYN COOK
LIBERTY MUTUAL-DOVER-0096
100 LIBERTY WAY
DOVER ,NH 03820

0.0 LBS    LTR    1 OF 1

SHIP TO:
BEHAVIORAL MANAGEMENT INC
SUITE 245
6600 FRANCE AVE S.
EDINA MN 55435-1820

MN 551 9-01

UPS NEXT DAY AIR SAVER    1P

TRACKING #: 1Z 248 96X 13 9568 0233

BILLING: P/P

Office/Dept Number: 009603304

W9IZN9V50 72.0A 61/2016

Liberty002706



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| **Date:** February 2, 2016 | |
| **To:** | WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 |
| **Attn:** | |
| **Fax:** | (860) 247-4194 |
| **From:** | Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 |
| **Total Pages**<br>**(Including Cover):** | 2 |
| **RE:**<br>**Claim #:** REDACTED<br>**Claimant:** Haley Spears<br><br>UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

Liberty002707



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

February 2, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:    Long Term Disability (LTD) Benefits
       UTC Choice
       Claim #: REDACTED
       Claimant: Haley Spears

Dear Winona Zimberlin:

This letter is in follow up to our telephone conversation yesterday, February 1, 2016.

You called regarding Liberty Life's plan to have Ms. Spears attend an Independent Medical Examination (IME). We discussed the purpose of the IME is due to the Court's recommendation, and to have Ms. Spears' medical condition as of 2008 and 2009 as well as her current condition, assessed by way of the examiner's review of all the medical records and physical examination.

Liberty Life is requesting that you advise us in writing, whether Ms. Spears agrees to attend an IME. Time is of the essence in this matter and the IME needs to be arranged as soon as possible.

**Please advise in writing**, **on or before Friday, February 5, 2016**, as to whether Ms. Spears agrees to attend an IME.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002708

# Liberty Mutual - Independent Evaluation

## Peer Review

Requested By:   Nancy Winterer
Disability Claims
P.O. Box 7206
London, KY 40742-7206
(888) 437-7611 x16401
Fax:   (603) 334-5708

┌─ Document Locations ─┐
☑ Document List
☐ Correspondence
☐ Paper File

**Return Report to: GBLibertyVendorReferrals@libertymutual.com**

| | |
|---|---|
| Customer Name: | UTC CHOICE |
| Funding type: | CON |
| Claimant Name: | HALEY A SPEARS |
| Claimant Address: | 9000 WEST WILDERNESS WAY#190 |
| City: | SHREVEPORT |
| State: | LA |
| Zip: | 71106-0000 |
| Gender: | FEMALE |
| Specialist Type Requested : | Other |

| | |
|---|---|
| Date Sent: | 1/29/2016 |
| Coverage Type: | LTD |
| Claim #: | REDACTED |
| Claimant SSN: | REDACTED |
| Claimant DOB: | REDACTED |
| Claimant Tel. #: | (860) 930-0887 |
| Claimant DOD: | 9/27/2008 |
| Primary Diagnosis: | Headache |
| Att. Physician: | |
| Physician: Phone/Fax | see below |

Referral Questions:                    Vendor Chosen:      Behavioral Management, Inc.

Claimant Name:    HALEY A SPEARS

# Liberty Mutual - Independent Evaluation

## Peer Review

PANEL REVIEW:  Clmnt is former Administrative Assistant who was 31yo at her DOD 9/27/2008, initially due to Headaches.  We are assessing clmnt's functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Referral for PANEL review by:
Endocrinology
Gastroenterology
Infectious Disease
Neurology
Neuropsychology
Internal Medicine (please include review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, Ophthalmology, Dermatology, and Primary Care records)

ENDOCRINOLOGY:
Please contact Robert Lang, MD (P-203-248-4362 F-203-248-6933), who treated clmnt from 2/21/13 through 7/10/14, regarding Ms. Spear's condition, treatment and functional capacity.

From an Endocrinology perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from an Endocrinology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

GASTROENTEROLOGY:
Please contact James O'Brien, MD (P-860-649-3477 F-860-649-0011), who treated clmnt from 4/8/08 through 4/17/14, regarding Ms. Spear's condition, treatment and functional capacity.

From a Gastroenterology perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from a Gastroenterology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

INFECTIOUS DISEASE:
Please contact Zane Saul, MD (P-203-259-8087 F-203-383-4499), who treated clmnt from 8/8/10 through 6/9/14, regarding Ms. Spear's condition, treatment and functional capacity.

From an Infectious Disease perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from an Infectious Disease perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

NEUROLOGY:
Please contact Dario Zagar, MD (P-203-333-1133 F-203-333-3937), who treated clmnt from 2/26/09 through 8/19/11, regarding Ms. Spear's condition, treatment and functional capacity.  Please also contact Joachim Baehring, MD (P-203-785-7284 F-203-737-2591), who treated clmnt from 11/25/08 through 4/22/13, regarding Ms. Spear's condition, treatment and functional capacity.

From a Neurology perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from a Neurology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

NEUROPSYCHOLOGY:
Please explain the results and conclusions of the July 2010 Neuropsychological Evaluation by Marian Rissenberg, PhD, including areas of cognitive strength and weakness, and psychological findings.   Please discuss how the strengths and weaknesses obtained on testing represent the following:
•Valid effort on the part of the claimant to perform at her highest level.

Claimant Name:    HALEY A SPEARS

# Liberty Mutual - Independent Evaluation

## Peer Review

☐ Appear consistent or inconsistent with Ms. Spears' subjective complaints.
☐ Compared with estimated levels of previous function.
☐ Whether results of testing were influenced by factors such as secondary gain- financial or emotional, lack of job to return to, lack of motivation, etc.

From a Neuropsychology perspective, based on the available medical evidence, please describe any cognitive and psychological impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from a Neuropsychology perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

INTERNAL MEDICINE (please include review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, Ophthalmology, Dermatology, and Primary Care records):

Please contact Kristin Giannini, MD (P-860-872-8321 F-860-875-6271), who treated clmnt 3/10/09 through 11/25/13, regarding Ms. Spear's condition, treatment and functional capacity.

From an Internal Medicine perspective, based on the available medical evidence, please describe the clmnt's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Based on the medical evidence, from an Internal Medicine perspective, please provide your best assessment of the clmnt's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015.

Instructions For Vendor:

Claimant Name:     HALEY  A  SPEARS

Liberty002711

# Liberty Mutual - Independent Evaluation

## Peer Review

Attorney Information (if applicable):

Claimant Name:    HALEY  A  SPEARS

Liberty002712



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

| | |
|---|---|
| **Date:** January 25, 2016 | |
| **To:** | WINONA ZIMBERLIN<br>ATTORNEY AT LAW<br>267 MAIN STREET<br>MANCHESTER CT 06042 |
| **Attn:** | |
| **Fax:** | (860) 247-4194 |
| **From:** | Nancy Winterer<br>Appeal Review Consultant<br>Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5708 |
| **Total Pages**<br>**(Including Cover):** 2 | |
| **RE:**<br><br>Claim #: REDACTED<br>Claimant: Haley Spears<br><br>UTC Choice | |

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

January 25, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:     Long Term Disability (LTD) Benefits
        UTC Choice
        Claim #: REDACTED
        Claimant: Haley Spears

Dear Winona Zimberlin:

I am in receipt of your January 12, 2016 fax regarding our telephone conversation that date.

My recollection from this conversation is that you advised you are not going to submit any further medical documentation in support of Ms. Spears' appeal.  I also recall that you stated that you did not want current medical documentation considered in this appeal review, only documentation submitted through December 31, 2015.

Taking into account the Court's recommendation that Liberty "would be well advised, upon reconsideration, rather than simply conducting a paper review of [Spears'] claim, to have an independent medical examination performed on [Spears]…", Liberty is planning to have Ms. Spears attend an Independent Medical Examination (IME).

In light of your comments however, prior to scheduling the IME, we want to confirm that Ms. Spears agrees to attend an IME. In the interest of time, please advise me by **Wednesday February 3, 2016**, as to whether Ms. Spears is willing to attend an IME.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002714



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

January 11, 2016

Facsimile: 1-603-422-7909, 8 pages.

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH 03820

Dear Ms. Winterer:

> RE:     Haley Spears
> DOB: REDACTED

Enclosed please find:

> 1. Melissa Albritton, M.D., 12/17/15, 7p.

Very truly yours,

Winona Zimberlin

WWZ



**Laura Kimball-Ravari, M.D. FACE**
**Melissa Albritton, M.D.**
Sammi Smith, APRN, MSN, ACNP-C
Vickey Burnett APRN, FNP-C
Jennifer Angelo, PA-C

Endocrinology
Endocrine Specialists
2449 Hospital Dr, Suite 400
Bossier City, LA 71111
Phone: (318) 212-7902
Fax: (318) 212-7905

| | |
|---|---|
| **PATIENT:** | Haley Spears |
| **DATE OF BIRTH:** | REDACTED**AGE:** 38 |
| **DATE:** | December 17, 2015 |
| **VISIT TYPE:** | Office Visit |

Ms. Spears is a 38-year-old female who presents for initial evaluation in this clinic for endocrine follow up of thyroid cancer and post-surgical hypothyroidism.    She has a past medical history of:

1.    **Hashimoto's thyroid disease.**
2.    **Post-surgical hypothyroidism.**
3.    **Thyroid cancer.**
4.    **GERD.**
5.    **Colitis.**
6.    **Cardiac arrhythmia.**
7.    **Chronic pain.**
8.    **Chronic tick borne disease.**

She was previously followed by a Dr. Zhiheng He. He is an endocrinologist with the Kingbridge Health Alliance. She had a total thyroidectomy in June 2013 and was found to have a 0.4 cm micropapillary carcinoma. It is my understanding that radioiodine was not given due to the very small size of the tumor.    It looks like the plan was to keep her TSH between 0.1 and 0.5.  She has had thyroid ultrasounds and the most recent one was March 2015 which showed no evidence of recurrence. The last lab was have on her is from May 2015. She did not get lab prior to this appointment. She says she has had lab recently but it has not been sent to us.  She is currently taking Synthroid. She uses brand name only. She takes 50 mcg pills, but she takes two of them on Monday through Friday and then 1-1/2 on Saturday and Sunday. She says this dose was changed three weeks ago.

She says that at one point prior to her thyroid surgery she was on Armour Thyroid.  She says she has been on as high a dose of Synthroid as 125 mcg.  She has recently moved here and is changing care to here. She does not know how long she will be in this area but will be trying to get her records sent to us in the near future.

She says she had chronic tick borne disease which required IV antibiotic therapy for a very long time. It sounds like she had PICC lines for over a year.    She was followed by an infectious disease specialist and a psychiatrist who also specialized in infectious disease. She said she saw a neuro-oncologist. She says that she ultimately was asymptomatic from that disease a few years ago but was quite sick for quite some time prior to that.

Her complaints tend to fluctuate. It is hard for me to get a good grasp on what complaints she has right now as her complaints tend to vary from day to day. She does state that she has occasional palpitations. She also reports some problems with energy and weight fluctuations. She has trouble sleeping sometimes. She does have some occasional irritability and anxious feeling.  She notes dry hair, dry skin, and some breakout on the skin on her face but she attributes that to having a dairy on a recent trip. She says she is very sensitive to dairy.  She has seen a holistic provider who worked her up for triggers for asthma.  She says she was told dairy was a big trigger. She says she was not determined to be sensitive to gluten.    She denies any blood pressure fluctuations. She says she does sometimes have fluctuations in her blood sugar but that is only if she goes a long period of time without eating. She reports some chronic pain.  She says that she was diagnosed with Raynaud's syndrome. She also has some heat intolerance and will occasionally get cold in her hands and feet, but for the most part she feels that she is sensitive to heat. She does occasionally have night sweats. She has intermittent hoarseness.  She also has intermittent diarrhea, which seems to be worse if she has any type of dairy. She denies any dysphagia. She says she does have ridges on her nails.  She says she is supposed to be taking Vitamin D once a week but she has forgotten that over the last few weeks and just remembered this past week.  She says her cycles are fairly regular. She has never tried to become pregnant and has never had a miscarriage. She does think that she has been told she has cysts on her ovaries in the past.   She says she has palpitations and at one point was told she had an arrhythmia but that might have been associated with the tick borne disease.    She says she did have cardiology evaluation at that time.

Liberty002716

**Thyroid:**
**History:** Thyroid Cancer
**Type:**
**Date of Diagnosis:**
**Other Comments:**
6/2013: total thyroidectomy
**History of Thyroid Cancer:Yes**
**Stage:** I    **Date of Diagnosis:** {Date of DX}
**Pathology:** 0.4 cm papillary carcinoma. isthmus. no invasion.
Head or neck radiation: No
Family history of Thyroid Cancer: No
**Family history of Thyroid Disease: Yes**

### Past Medical/Surgical History

| Disease/disorder | Onset Date | Management | Date | Comments |
|---|---|---|---|---|
|  |  | birthmark biopsy |  | TCM 12/17/2015 - |
|  |  | Thyroidectomy | 2013 |  |
| Asthma |  |  |  | TCM 12/17/2015 - |
| Cancer, thyroid |  |  |  | TCM 12/17/2015 - |
| Cardiac dysrhythmias |  |  |  | TCM 12/17/2015 - |
| Chronic pain |  |  |  | TCM 12/17/2015 - |
| Chronic Tick Borne |  |  |  | TCM 12/17/2015 - |
| Disease |  |  |  |  |
| Colitis |  |  |  | TCM 12/17/2015 - |
| GERD |  |  |  |  |
| Headache, migraine |  |  |  |  |
| Thyroid disease |  |  |  |  |

Currently pregnant: no.

### Social History
Preferred language is English. Born in Shreveport, LA.
**Education / Employment / Occupation / Military Experience**
The patient has a(n) some college education.

| Employment | History | Status | Retired | Restrictions |
|---|---|---|---|---|
|  |  | unemployed |  |  |

Patient has no military experience.

**Marital Status / Family / Social Support**

Currently single.

Does not have children.

The patient lives with 1 brother(s).

**Tobacco**

Patient is a non-smoker.

**Alcohol**

There is a history of alcohol use.

Type: variety.Alcohol is consumed socially.  1 drink

**Caffeine**

The patient uses caffeine: coffee and chocolate.. - 0-1 cup a day

Haley Spears DOB: REDACTEDEncounter Date: 12/17/15                2

Liberty002717

**Lifestyle**

Moderate activity level. Exercises occasionally.
Diet includes: regular diet.

## Allergies:

| Ingredient | Reaction | Medication Name | Comment |
|---|---|---|---|
| ERYTHROMYCIN BASE | Nausea/Vomiti ng | | |

## Active Medications (Started Before Visit):

| Medication Name | Qty | Description |
|---|---|---|
| Xopenex HFA 45 mcg/actuation aerosol inhaler | 0 | inhale 2 puff by inhalation route  every 6 hours as needed |
| Vitamin D2 50,000 unit capsule | 0 | take 1 capsule by Oral route  every week |
| Synthroid 50 mcg tablet | 0 | take by oral route  2 tablets Monday through Friday and 1.5 tablets Saturday and Sunday |

## REVIEW OF SYSTEMS

| System | Neg/Pos | Details |
|---|---|---|
| Neuro | Positive | Headache. |
| GI | Positive | Decreased appetite, Diarrhea, Heartburn. |
| Hema/Lymph | Positive | Easy bruising. |
| GU | Positive | Hot flashes. |
| MS | Positive | Back pain, Joint pain. |
| Integumentary | Positive | Brittle nails, + dry skin.  + dry hair. |
| Cardio | Positive | Irregular heartbeat/palpitations. |
| Eyes | Positive | Dry eyes. |
| Constitutional | Positive | Change in appetite, Fatigue, Increased appetite, Irritability, Night sweats, Weight gain. |
| Allergic/Immuno | Positive | Seasonal allergies. |
| Psych | Positive | Insomnia. |
| Endocrine | Positive | Heat intolerance. |
| Integumentary | Negative | Brittle hair and hair loss. |
| Endocrine | Negative | Cold intolerance, polydipsia and polyphagia. |
| Eyes | Negative | Eye redness, itchy eyes and vision loss. |
| Hema/Lymph | Negative | Easy bleeding and lymphadenopathy. |
| Neuro | Negative | Dizziness, extremity weakness, gait disturbance, numbness in extremity, seizures and tremors. |
| Psych | Negative | Anxiety. |
| GI | Negative | Abdominal pain, constipation, nausea and vomiting. |
| ENMT | Negative | Dysphagia, hoarseness, lump in throat and nasal congestion. |
| Respiratory | Negative | Chronic cough, cough and dyspnea. |
| GU | Negative | Dysuria, hematuria and polyuria. |
| Constitutional | Negative | Decreased activity, generalized weakness, lethargy, malaise and pallor. |
| Cardio | Negative | Chest pain and edema. |

## VITAL SIGNS

Haley  Spears DOB: REDACTED Encounter Date: 12/17/15                3

Liberty002718

Last menses was 11/19/2015.

| Time | BP | Position | Temp F | Pulse | Resp | Ht In | Wt lb | BMI | BSA | Pain |
|------|-----|----------|--------|-------|------|-------|-------|------|-----|------|
| 9:29 AM | 120/77 | sitting | | 75 | 16 | 66 | 121 | 19.53 | | 0/10 |

#### PULSE OXIMETRY RESULTS

| Time | Pulse Ox Rest | Pulse | Pulse Ox Amb% |
|------|---------------|-------|---------------|
| 9:29 AM | | 75 | |

MEASURED BY

| Time | Measured by |
|------|-------------|
| 9:29 AM | Tina C. McHugh, LPN |

#### Physical Exam:

| Exam | Findings | Details |
|------|----------|---------|
| Constitutional | Normal | Well developed. |
| Eyes | Normal | Conjunctiva - Right: Normal, Left: Normal. Pupil - Right: Normal, Left: Normal. |
| Neck Exam | Comments | no palpable thyroid tissue noted. no abnormal neck masses noted. |
| Neck Exam | Normal | Submandibular lymph nodes - Normal. Cervical lymph nodes - Normal. |
| Respiratory | Normal | Auscultation - Normal. Effort - Normal. |
| Cardiovascular | Normal | Regular rhythm. No murmurs, gallops, or rubs. |
| Abdomen | Normal | Inspection - Normal. Auscultation - Normal. No abdominal tenderness. No hepatic enlargement. |
| Skin | Normal | Inspection - Normal. |
| Musculoskeletal | Normal | Visual overview of all four extremities is normal. |
| Extremity | Normal | No edema. |
| Neurological | Normal | Cranial nerves - Cranial nerves II through XII grossly intact. DTRs - Normal. |
| Psychiatric | Normal | Orientation - Oriented to time, place, person & situation. Appropriate mood and affect. |

#### Assessment/Plan:

1.    **Thyroid cancer.**
2.    **Post-surgical hypothyroidism.**
3.    **Vitamin D deficiency.**

Ms. Spears is a 38-year-old female who was referred here for endocrine follow up of thyroid cancer.    I have reviewed the information that I have available to me. I have told her that we will be happy to check thyroid levels and a thyroglobulin today. I would like her goal TSH to be between about 0.1 and 0.5.    We will be happy to work with her to get her levels to a spot where she feels the best. If her T3 is low we may consider putting her on a low dose of Cytomel. I did tell her that I am not a holistic therapist nor am I a specialist in any type of infectious disease so if she does want follow up for that issue she will need to speak with her primary care about referrals. I will also check a Vitamin D level today because she does report a history of having a low Vitamin D. We will get a thyroglobulin panel as I don't see where she has had one recently. She will be due for a thyroid ultrasound in the Spring of 2016. This can be ordered for her follow up appointment. I have encouraged her to make sure she establishes with primary care as it seems that there may be some other medical issues going on and we'll mainly be focused on thyroid.

Order thyroid ultrasound
Obtain previous medical records
Check thyroid levels today

The total time spent with the patient was 70+ minutes. More than 50% of this time was spent counseling and coordinating the care for the patient.

Follow-Up Visit:
4 months

Haley Spears DOB: REDACTED Encounter Date: 12/17/15                    4

Liberty002719

**Functional Assessment:**

Learning Instructions: Written: No, Verbal: No;

Barrier: N/A

Comprehension Level: Written: Yes, Verbal: Yes;

Funtional Assessment: N/A

Nutritional Assessment: N/A

Evidence of Abuse: No

Patient feels safe in his/her environment.

Diet: Diet: regular diet.

Document Generated by: Lisa Wisby 12/18/2015

I, Lisa Wisby, am transcribing for Mary Melissa Albritton MD on 12/18/2015 at 2:18 PM

I, Mary Melissa Albritton MD, personally performed the services described in this documentation, as transcribed by Lisa Wisby, and it is both accurate and complete.

Electronically signed by Mary Melissa Albritton MD on 12/21/2015 12:41 PM

Liberty002720

**Endocrine Specialists**
2449 Hospital Drive
Bossier City, LA, 711111914

**Spears, Haley**
9000 West Wilderness Way #190
Shreveport, LA, 71106
Person #: 1049779
Sex: F
DOB: REDACTED

**Ordering:** Albritton MD, Mary Melissa    **Performing #:** Meditech          **Location:** WK Endocrine Specialists
**Tests Ordered :** Thyroid Stimulating Hormone (TSH), Thyroglobulin Panel Tumor Mrk (THYROGLOBPNL), T3 Free (T3FREE), T4 Fre
e (T4FREE), Vitamin D Total (25-OH) (VITAMIND)

**Thyro Tumor Mrk (Collection Date: 12/17/2015 11:01, Status: Final)**

```
                                                          interpreted in the context
                                                          ents and radioiodine
                       ablation status.  Tg levels of 0.1-2.0 ng/mL in athyrotic
                       individuals on suppressive therapy indicate a low risk of
                                       detectable recurrent papillary/follicular thyroid


                       -----------------ADDITIONAL INFORMATION------------------
                       PLEASE NOTE: Thyroglobulin flagging is based on athyrotic
                       reference values.

                       The thyroglobulin and thyroglobulin antibody testing
                       methods are immunoenzymatic assays manufactured by Beckman
                       Coulter Inc. and performed on the Unicel DXI 800.

                       Values obtained from different assay methods or kits
                       may be different and cannot be used interchangeably.

                       The results cannot be interpreted as absolute evidence
                       for the presence or absence of malignant disease.

                       Test Performed by:
                       Mayo Clinic Laboratories - Rochester Superior Drive
                       200 First Street SW, Rochester, MN 55905
                       Laboratory Director: William G. Morice, II, M.D., Ph.D.
Thyro Tumor  1.1   ng/mLH   ()
Mrk                    ------------------REFERENCE VALUE-------------------------
                       Athyrotic <0.1
                       Intact Thyroid <=33
```

Thyroglob. Ab <1.8    IU/mL    <4.0

**Vitamin D 25-OH (Collection Date: 12/17/2015 11:01, Status: Final)**

| Component | Result | Units | Flag | Range | Comment | | |
|-----------|--------|-------|------|-------|---------|---|---|
| Vitamin D 25-OH | 41.2 | ng/mL | | 30.0-100.0 | Adult Vitamin D Status | Range | |
| | | | | | | | <20 ng/mL |

Patient: Spears, Haley , DOB: REDACTED

| | |
|---|---|
| * Insufficiency | 20-30 ng/mL |
| * Sufficiency | 30-100 ng/mL |

As of 10/16/14, the Vitamin D Total assay has been
standardized to be in alignment with the ID-LC/MS/MS 25(OH)
Vitamin D reference measurement procedure.

### T4 Free (Collection Date: 12/17/2015 11:01, Status: Final)

| Component | Result | Units | Flag | Range | Comment |
|---|---|---|---|---|---|
| T4 Free | 1.20 | ng/dL | | 0.8-1.5 | |

### T3 Free (Collection Date: 12/17/2015 11:01, Status: Final)

| Component | Result | Units | Flag | Range | Comment |
|---|---|---|---|---|---|
| T3 Free | 2.60 | pg/mL | | 2.00-3.60 | |

### TSH (Collection Date: 12/17/2015 11:01, Status: Final)

| Component | Result | Units | Flag | Range | Comment |
|---|---|---|---|---|---|
| TSH | 3.950 | uIU/mL | | 0.370-4.550 | |

Patient: Spears, Haley , DOB: REDACTED

Liberty002722



# Zimberlin Law LLC

267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996
www.zimberlinlaw.com

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

January 12, 2016

Facsimile: 1-603-422-7909, 1 page

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH 03820

Dear Ms. Winterer:

      RE:   Haley Spears
      DOB: REDACTED

This will confirm our discussion today that we would like Liberty to make a decision regarding Ms. Spears' disability claim. In the event that Liberty reinstates her benefits, we reserve the right to add additional documents to the record. As we indicated, Ms. Spears is currently pursuing medical treatment.

Thank you.

Very truly yours,

Winona Zimberlin

WWZ

Liberty002723



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
(888) 437-7611
Secure Fax No.: (603) 334-5708

---

Date:  January 12, 2016

---

To:    WINONA ZIMBERLIN
       ATTORNEY AT LAW
       267 MAIN STREET
       MANCHESTER CT 06042

---

Attn:

---

Fax:   (860) 247-4194

---

From:  Nancy Winterer
       Appeal Review Consultant
       Phone No.: (888) 437-7611
       Secure Fax No.: (603) 334-5708

---

Total Pages
(Including Cover):    2

---

RE:

Claim #:   REDACTED
Claimant:  Haley Spears

UTC Choice

---

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5708

January 12, 2016

Winona W. Zimberlin
Attorney At Law
267 MAIN STREET
MANCHESTER, CT 06042

RE:   Long Term Disability (LTD) Benefits
      UTC Choice
      Claim #: REDACTED
      Claimant: Haley Spears

Dear Winona Zimberlin:

This note is in follow up to our telephone discussion this afternoon.

For your information, regarding the requested treatment records from all 27 physicians Ms. Spears listed on the September 8, 2015 <u>Claimant Information Form</u>, as outlined in our letter dated December 10, 2015, no response has been received from Dr. Donaldson (although his January 20, 2009 consultation note is on file), from Lori Fitts, MD, nor from Gaurab Basu, MD.  The records from Taliarini Chiropractic were received from your office on December 22, 2015.

I apologize this information was not readily available at the time of our discussion.

If you have any questions regarding this matter, please contact me.

Sincerely,

Nancy Winterer
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16401
Secure Fax No.: (603) 334-5708

Liberty002725

# Winona W. Zimberlin

Attorney At Law
2 Congress Street
Hartford, CT 06114-1024

Telephone (860) 249-5291
Facsimile (860) 247-4194

December 28, 2015

*Facsimile: Facsimile: 1-603-422-7909, 2 pages.*

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH  03820

Dear Ms. Winterer:

RE:   Haley Spears
DOB: REDACTED

Please be advised that our office is moving to Manchester, CT.  Please see the attached for our new address and telephone numbers.  Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:rlc
Enclosure

Liberty002726

We have moved to:



Zimberlin Law LLC
267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.783.5996

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:
Hartford Office
2 Congress Street
Hartford, CT 06114

Liberty002727

# Winona W. Zimberlin

Attorney At Law
2 Congress Street
Hartford, CT 06114-1024

---

Telephone (860) 249-5291
Facsimile (860) 247-4194

December 28, 2015

*Facsimile: Facsimile: 1-603-422-7909, 2 pages.*

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH 03820

Dear Ms. Winterer:

     RE:  Haley Spears
           DOB: REDACTED

     Please be advised that our office is moving to Manchester, CT. Please see the attached for our new address and telephone numbers. Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:rlc
Enclosure

Liberty002728

# We are moving 12/29/15 to:

 **Zimberlin Law LLC**
267 Main Street | Manchester, CT 06042
(p) 860.783.5999 | (f) 860.247.4194

Winona W. Zimberlin
Russell D. Zimberlin

By appointment only:

Hartford Office
2 Congress Street
Hartford, CT 06114

Liberty002729

# Winona W. Zimberlin

Attorney At Law
2 Congress Street
Hartford, CT 06114-1024

---

Telephone (860) 249-5291
Facsimile (860) 247-4194

December 17, 2015

Claim
2 5 0 0 3 9 1

Nancy Winterer
Appeals Review Consultant
Liberty Life Assurance Company of Boston
100 Liberty Way
Mail Stop 02G
Dover, NH  03820

Dear Ms. Winterer:

RE:   Haley Spears
        DOB: REDACTED

Please find enclosed medical records from Tagliarini Chiropractic, PC.  Please be advised that I will forward any additional records received to your attention.  Thank you.

Very truly yours,

Winona W. Zimberlin

WWZ:rlc
Enclosure

Liberty002730

| **Chart Notes** | | | Tagliarini Chiropractic,PC |
|---|---|---|---|
| **Haley Spears** | | | 836 Farmington Ave. #229 |
| | | | West Hartford, CT 06119 |
| | | | Phone: 860-236-2225 |
| | | | Fax: 860-231-0077 |

| **Patient:** | **Spears, Haley** | **DOB:** REDACTED | | |
|---|---|---|---|---|
| **Ins Co** | **Medicare CT** | **Pol #** **NONE** | **Insured** | REDACTED |

**Date** **01/30/2012**

**Provider Dr. John Tagliarini, D.C.**

### Subjective:

Haley presented today for a consulation and examination. Haley complained of shoulder, cranial and cervical discomfort that is localized. Haley's discomfort has been present for the past three and a half years and is most noticeable during the day and in the afternoon. The symptoms become aggravated by: holding phone, movement of shoulders, hands typing on computer, postions with head tilted, and motion of neck. The symptoms are reduced by: medication, accupuncture, natural pain patches, TENS machine, applying heat to the involved area, resting and massage. The discomfort was described as sharp, shooting and burning and has been frequent (comes and goes). Haley has seen another chiropractor, a medical doctor and a physical therapist so far for her current symptoms and has had X-rays, an MRI (neck and brain, 9/08, 10/08, 1/08, 6/08, 6/09, 6/10, and 8/11), spinal tap, blood test, ultra sound and a CT scan previously done. On a scale of 0 to 10 with 10 being the worst, she described the intensity of the discomfort as being a range 5 to 10. She has tried pain medication, muscle relaxers, heat, Injections and physical therapy to alleviate the pain so far. She reported the origin of her discomfort to be tick borne diseases. She noted that the following activities are affected by her symptoms: social life, church, work, walking, sleeping, running, driving/riding in a car, house work and exercising.

Haley reported that she also has the following current conditions: upper back pain, mid back pain, lower back pain, shoulder pain, wrist pain, hand pain, knee pain , ankle pain, foot pain, joint swelling/stiffness, fatigue, ringing in the ears (tinnitus), visual disturbances, nausea, loss of appetite, asthma, seasonal allergies, absent seizures and hypothyroid.

Haley reported that she has had the following conditions in the past: headaches, lower back pain, elbow pain, wrist pain, hand pain, knee pain , ankle pain, foot pain, jaw pain/TMJ, joint swelling/stiffness, dizziness, reflux, abnormal weight gain, abnormal weight loss, constipation, ulcers, chronic sinusitis, excessive thirst, excessive urination, anxiety, frequent illness, epilepsy, hot flashes, birth control pills and painful periods/cramps.

Haley reported that she was sepsis in 2008 and has had a colonoscopy and endoscopy.

Haley also reported that she was in an auto accident.

### Objective:

Haley is a 34 year old female who today would be described as; alert and oriented in person, place and time. Haley's vital signs were taken. Her blood pressure was; 113/ 78 mmHg. Her pulse measured 73. She is 5'5.5" tall. She weighs 129.2 pounds.

Manual, subjectively rated strength tests were performed on some of the major muscle groups of the upper extremities, based on the AMA Guides to the Evaluation of Permanent Impairment, 4th Ed., 1993/5th ed., 2001. A rating scale of five to zero is used, five being

| **Chart Notes** | | Tagliarini Chiropractic,PC |
| --- | --- | --- |
| **Haley Spears** | | 836 Farmington Ave. #229 |
| | | West Hartford, CT 06119 |
| | | Phone: 860-236-2225 |
| | | Fax: 860-231-0077 |

| **Patient:** | **Spears, Haley** | **DOB:** REDACTED | | |
| --- | --- | --- | --- | --- |
| **Ins Co** | **Medicare CT** | **Pol #** | **NONE** | **Insured** REDACTED |

**Date    01/30/2012**

**Provider    Dr. John Tagliarini, D.C.**                          *** *continued from previous page* ***

normal. Muscle strength losses of the upper extremities indicate new logical facilitation resulting from, to the cervical spine. Less than 5/5 reveals a decrease in normal bilateral muscle strength indicative of subluxation based neurological dysfunction. The areas that tested weak during the examination include: shoulder abductors (C5), elbow flexors (C5,6) and elbow extensors (C7). These muscles were rated at a grade 3 out of 5 on the right.

Active cervical ranges of motion were within normal limits.

Stiffness was noted by the patient in the following active ranges of spinal motion: cervical flexion, cervical extension, cervical left rotation, cervical right rotation and cervical right lateral flexion.

Haley tested negative for Dejerine's Triad. A positive test is when the patient's pain increases when she coughs, sneezes or bears down and indicates a space occupying lesion, most commonly a herniated or protruding interevrtebral disc.

The Cervical Distraction Test was negative. This test is performed seated with the patient's head in a neutral position. The doctor then lifts the patient's head. A decrease in pain upon distraction is a positive test and indicates nerve root compression and/or facet capsulitis.

Foraminal Compression Test was positive bilaterally. A Foraminal Compression test was performed on this patient in order to localize the cervical pain. Downward pressure was applied to the top of the head while the patient's head was rotated towards the side of complaint. The test is then performed on the opposite side. A positive test indicates foraminal encroachment or nerve root compression.

Palpation revealed tenderness in the following areas; bilateral upper cervical area, bilateral upper thoracic area, bilateral mid thoracic area and bilateral lumbar area.

Palpation of the muscles revealed spasm in the following areas; bilateral cervical area, bilateral upper thoracic area and bilateral mid thoracic area.

 Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C5, T3 and T7.

### Assessment:
Haley's prognosis is good at this time.

### Plan:
I've advised Haley that it is necessary to see her 2x per week for 6 weeks. The objective during this time will be to correct subluxation, correct postural distortions, decrease muscle

# Chart Notes

## Haley Spears

**Tagliarini Chiropractic,PC**
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | **Insured** | |

**Date** 01/30/2012

**Provider** Dr. John Tagliarini, D.C.                    *** *continued from previous page* ***

spasm, increase flexibility, reduce adhesions, increase joint mobility, restore biomechanical integrity, improve range of motion and to improve the patients daily functional capacity. To accomplish this, we will be performing low-force manipulation to correct subluxation and increase joint mobility. After this 6 week time frame, a re-examination will be performed to monitor the patient's progress and determine the need for further care.

Haley was given the following applicable patient education handouts at today's visit: Icing Instructions. Cold packs were prescribed to Haley for use 12-15 minutes at a time to reduce inflammation, swelling and discomfort in the affected area.

**Diagnosis**   739.1: Cervical Interseg. Somatic Dysfunction, 739.1
               723.1: Cervicalgia, 723.1
               739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002733

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date** 02/23/2012

**Provider Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of constant tightness and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest, medication and heat.

Haley also complained of constant tightness and throbbing discomfort in the back of the neck. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest, medication and heat.

Haley also complained of constant sharp, tightness and throbbing discomfort in the right trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest, medication and heat.

Haley also complained of constant sharp, tightness and throbbing discomfort in the left trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest, medication and heat.

Haley also complained of frequent aching and tightness discomfort in the mid back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest and medication.

Haley also complained of frequent aching and tightness discomfort in the low back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement and prolonged sitting. The discomfort was reported to decrease with rest and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C5, T3 and T7.

### Assessment:

Haley's prognosis is good at this time.

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | |
|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** NONE | **Insured** | REDACTED |

**Date** 02/23/2012

Provider Dr. John Tagliarini, D.C.     *** *continued from previous page* ***

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return twice a week.

**Diagnosis**    739.1: Cervical Interseg. Somatic Dysfunction, 739.1
739.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

| **Chart Notes**<br>**Haley Spears** | | **Tagliarini Chiropractic, PC**<br>836 Farmington Ave. #229<br>West Hartford, CT 06119<br>Phone: 860-236-2225<br>Fax: 860-231-0077 |
|---|---|---|
| **Patient:** Spears, Haley | **DOB:** REDACTED | **Insured** REDACTED |
| **Ins Co** Medicare CT | **Pol #** NONE | |

**Date** 02/28/2012

**Provider Dr. Jessica Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of constant tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant aching and tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant tightness discomfort in the mid back. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant dull and throbbing discomfort in the buttocks. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley noted immediate relief after her last treatment followed by a short period of soreness.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: right C1, C2, C5, C6, T3, T7, T12 and right pelvis.

Joint dysfunction was found bilaterally at the T1 sternocostal junction. This was accompained by fixation, point tenderness at the site as well as the belly of the anterior scalene musculature. By adjusting the ribs anterior to posterior, pressure and tension is relieved at the anterior scalenes decreasing muscle spasm, and increasing ROM of the joint.

### Assessment:
Haley's prognosis is good at this time. Haley reported feeling better after the treatment.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return twice a week.

Liberty002736

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | Insured | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | | |

**Date    02/28/2012**

**Provider    Dr. Jessica Tagliarini, D.C.**                    *** *continued from previous page* ***

**Diagnosis**    739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002737

| **Chart Notes** | | Tagliarini Chiropractic,PC |
| Haley Spears | | 836 Farmington Ave. #229 |
| | | West Hartford, CT 06119 |
| | | Phone: 860-236-2225 |
| | | Fax: 860-231-0077 |

| **Patient:** Spears, Haley | **DOB:** REDACTED | |
| Ins Co Medicare CT | Pol # NONE | **Insured** REDACTED |

**Date** 03/01/2012

**Provider** Dr. John Tagliarini, D.C.

### Subjective:

Haley sought treatment today complaining of constant dull and aching discomfort in the buttocks. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care.

Haley also complained of frequent dull and aching discomfort in the back of the right hip. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care.

Haley also complained of constant sharp, aching, tightness and throbbing discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of constant sharp, aching and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of constant dull and aching discomfort in the upper back. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of constant aching, tightness and throbbing discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of frequent dull, aching and throbbing discomfort in the mid back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Liberty002738

| Chart Notes | Tagliarini Chiropractic,PC |
|---|---|
| Haley Spears | 836 Farmington Ave. #229 |
| | West Hartford, CT 06119 |
| | Phone: 860-236-2225 |
| | Fax: 860-231-0077 |

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date** 03/01/2012

Provider Dr. John Tagliarini, D.C.        *** continued from previous page ***

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: right C1, C2, C5, C6, T3, T7, T12 and right pelvis.

Joint dysfunction was found bilaterally at the T1 sternocostal junction. This was accompanied by fixation, point tenderness at the site as well as the belly of the anterior scalene musculature. By adjusting the ribs anterior to posterior, pressure and tension is relieved at the anterior scalenes decreasing muscle spasm, and increasing ROM of the joint.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return twice a week.

**Diagnosis**    739.1: Cervical Interseg. Somatic Dysfunction, 739.1
               723.1: Cervicalgia, 723.1
               739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date** 03/06/2012

**Provider** Dr. Jessica Tagliarini, D.C.

### Subjective:

Haley sought treatment today complaining of constant dull and tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of constant dull and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of constant dull and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

Haley also complained of constant dull and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication, ice and heat.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: right C1, C5, C6, T3 and T6.

Joint dysfunction was found bilaterally at the T1 sternocostal junction. This was accompained by fixation, point tenderness at the site as well as the belly of the anterior scalene musculature. By adjusting the ribs anterior to posterior, pressure and tension is relieved at the anterior scalenes decreasing muscle spasm, and increasing ROM of the joint.

### Assessment:

Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

Liberty002740

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date    03/06/2012**

Provider   Dr. Jessica Tagliarini, D.C.                    *** *continued from previous page* ***

**Plan:**

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return twice a week.

**Diagnosis**     739.1: Cervical Interseg. Somatic Dysfunction, 739.1
                  723.1: Cervicalgia, 723.1
                  739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002741

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | |

**Date** 03/15/2012

**Provider** Dr. John Tagliarini, D.C.

### Subjective:

Haley sought treatment today complaining of constant aching and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant aching and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of intermittent dull and aching discomfort in the buttocks. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care.

Haley also complained of constant aching and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints. Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  right C1, left C5, T3, T8 and right pelvis.

### Assessment:

Haley's condition is showing improvement as anticipated.

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return once a week.

| Diagnosis | 739.1: Cervical Interseg. Somatic  Dysfunction, 739.1 |
|---|---|
| | 723.1: Cervicalgia, 723.1 |
| | 739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2 |

Liberty002742

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date** 03/15/2012

**Provider** Dr. John Tagliarini, D.C. *** continued from previous page ***

Liberty002743

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured    REDACTED |

**Date** 03/22/2012

**Provider Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of constant tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe.

Haley also complained of constant tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

Haley also complained of frequent dull and aching discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant dull, aching and tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

Haley also complained of constant dull, aching and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent throbbing discomfort in the buttocks. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent dull, aching and tightness discomfort in the low back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.  Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  right C1, left C5, T3, T8 and right pelvis.

### Assessment:

Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

Liberty002744

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | **Insured** | REDACTED |

**Date    03/22/2012**

Provider   Dr. John Tagliarini, D.C.                                     *** *continued from previous page* ***

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return once a week.

**Diagnosis**      739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
                              723.1: Cervicalgia, 723.1
                              739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

---

Liberty002745

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date**   03/26/2012

**Provider   Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of constant sharp, tightness and throbbing discomfort in the right trapezius. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant dull, tightness and throbbing discomfort in the back of the neck. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant dull, aching and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of constant aching, tightness and throbbing discomfort in the mid back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant aching and tightness discomfort in the low back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of constant dull, aching and tightness discomfort in the buttocks. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal  joints.  Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  right C1, left C5, T3, T8 and right pelvis.

### Assessment:

Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | Insured | REDACTED |
|---|---|---|---|
| Ins Co  Medicare CT | Pol #  NONE | | |

**Date**   03/26/2012

| Provider   Dr. John Tagliarini, D.C. | *** continued from previous page *** |
|---|---|

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return once a week.

**Diagnosis**   739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002747

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | REDACTED |
|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** NONE | **Insured** | |

**Date** 04/18/2012

**Provider Dr. John Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of constant aching, tightness and throbbing discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

Haley also complained of constant aching and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

Haley also complained of frequent aching and tightness discomfort in the mid back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints. Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: right C1, left C5, T3, T8 and right pelvis.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return once a week.

**Diagnosis**   739.1: Cervical Interseg. Somatic Dysfunction, 739.1
               723.1: Cervicalgia, 723.1
               739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002748

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic, PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | REDACTED |
|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** NONE | **Insured** | |

**Date** 04/26/2012

**Provider  Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of frequent tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication and movement.

Haley also complained of frequent tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 3 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent dull, aching and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent dull, aching and tightness discomfort in the mid back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

Haley also complained of frequent dull, aching and tightness discomfort in the low back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal  joints.  Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  right C1, left C5, T3, T8 and right pelvis.

### Assessment:

Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:

Liberty002749

# Chart Notes
**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | **Insured** | |

**Date**   04/26/2012

**Provider**   Dr. John Tagliarini, D.C.                                         *** *continued from previous page* ***

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return once a week.

**Diagnosis**   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date** 12/20/2012

**Provider** Dr. Jessica Tagliarini, D.C.

## Subjective:

Haley presented today for a consultation and examination. Haley complained of cervical discomfort that radiates to both shoulders. Haley's discomfort has been present for several years but increased recently and is most noticeable during the day, afternoon and evening. The symptoms become aggravated by: activity, sitting and standing. The symptoms are reduced by: resting, stretching and yoga. The discomfort was described as sharp, shooting, dull and aching and has been frequent (comes and goes). Haley has seen a medical doctor so far for her current symptoms and has had no new testing previously done. On a scale of 0 to 10 with 10 being the worst, she described the intensity of the discomfort as being a 10. She has tried pain medication, muscle relaxers, Tylenol, physical therapy and yoga to alleviate the pain so far. She reported the origin of her discomfort to be a tic born disease. She noted that the following activities are affected by her symptoms: walking, driving/riding in a car, house work, exercising and computer use. She also just started having headaches.

Past history has not changed from her original new appointment on 1/30/12.

## Objective:

Evaluation of the upper extremity deep tendon reflexes was found to be within normal limits.

Active cervical ranges of motion were within normal limits.

Stiffness and pain was noted by the patient in the following active ranges of spinal motion: cervical left rotation and cervical left lateral flexion.

Palpation revealed tenderness, spasm and hypertonicity in the following areas; cervical region and bilateral cervical dorsal area.

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: right C2, C5, left C6, T3, T8 and left L5.

## Assessment:

Haley has had an exacerbation. These are episodic marked deterioration of the patient's condition due to acute flareups of the presenting conditions.

## Plan:

It is recommended that Haley return in one week.

Liberty002751

**Chart Notes**

Haley Spears

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | **Insured** | REDACTED |

**Date** 12/20/2012

Provider Dr. Jessica Tagliarini, D.C. *** *continued from previous page* ***

Cold packs were prescribed to Haley for use 12-15 minutes at a time to reduce inflammation, swelling and discomfort in the affected area.

Diagnosis 739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002752

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date**   01/02/2013

**Provider**   Dr. John Tagliarini, D.C.

## Subjective:

Haley sought treatment today complaining of constant tightness and throbbing discomfort in the left trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and movement.

Haley also complained of frequent throbbing and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with medication, chiropractic care, rest and movement.

Haley also complained of frequent throbbing and tightness discomfort in the upper back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

Haley also complained of frequent tightness and aching discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and movement.

## Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

## Assessment:

Haley's prognosis is good at this time.

## Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in one week.

**Diagnosis**   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

# Chart Notes

**Haley Spears**

**Tagliarini Chiropractic,PC**
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** | NONE | **Insured** | REDACTED |

**Date**    01/02/2013

**Provider**   Dr. John Tagliarini, D.C.                    *** continued from previous page ***

---

Liberty002754

| **Chart Notes** | | Tagliarini Chiropractic,PC |
|---|---|---|
| **Haley Spears** | | 836 Farmington Ave. #229 |
| | | West Hartford, CT 06119 |
| | | Phone: 860-236-2225 |
| | | Fax: 860-231-0077 |

| **Patient:** | **Spears, Haley** | **DOB:** | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| **Ins Co** | **Medicare CT** | **Pol #** | **NONE** | **Insured** | |

**Date**    01/14/2013

**Provider    Dr. John Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of constant tightness, throbbing and shooting discomfort in the right trapezius. She rated the intensity of discomfort as a level 10 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of constant tightness and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with medication, chiropractic care, rest and ice.

Haley also complained of constant tightness, shooting and throbbing discomfort in the left trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with medication, ice, chiropractic care and rest.

Haley also complained of constant tightness and aching discomfort in the back of the neck. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest, medication and ice.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
 We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in 2 weeks.

**Diagnosis**    739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
                       723.1: Cervicalgia, 723.1
                       739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

Liberty002755

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** | **NONE** | **Insured** | |

**Date**    **01/14/2013**

Provider    Dr. John Tagliarini, D.C.                              *** *continued from previous page* ***

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date    02/08/2013**

**Provider   Dr. John Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of constant throbbing, tightness and aching discomfort in the upper back. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with medication and chiropractic care.

Haley also complained of frequent dull and tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and rest.

Haley also complained of frequent tightness and throbbing discomfort in the mid back. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in 2 weeks.

**Diagnosis**   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

| Chart Notes | | Tagliarini Chiropractic,PC |
|---|---|---|
| Haley Spears | | 836 Farmington Ave. #229 |
| | | West Hartford, CT 06119 |
| | | Phone: 860-236-2225 |
| | | Fax: 860-231-0077 |

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date 02/12/2013**

**Provider Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of frequent aching, throbbing and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with chiropractic care and medication.

Haley also complained of frequent tightness, aching and dull discomfort in the upper back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and rest.

Haley also complained of frequent dull and tightness discomfort in the mid back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest and medication.

Haley also complained of frequent aching discomfort in the bottom of the left foot. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe.

Haley also complained of frequent aching and tightness discomfort in the bottom of the right foot. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and medication.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:

Haley has had an exacerbation. These are episodic marked deterioration of the patient's condition due to acute flareups of the presenting conditions.
Haley reported feeling better after the treatment.

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return in one week.
Cold packs were prescribed to Haley for use 12-15 minutes at a time to reduce inflammation, swelling and discomfort in the affected area.

Liberty002758

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date**    02/12/2013

**Provider**    Dr. John Tagliarini, D.C.                    *** continued from previous page ***

**Diagnosis**    739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

Liberty002759

# Chart Notes
### Haley Spears

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured REDACTED |

**Date** 03/04/2013

**Provider Dr. John Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of frequent dull, aching and tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of frequent dull, aching, throbbing and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, rest, medication and ice.

Haley also complained of frequent dull, aching, tightness and throbbing discomfort in the left trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of intermittent dull, aching, tightness and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, rest, medication and ice.

Haley also complained of frequent tightness, aching, throbbing and sharp discomfort in the bottom of the right foot. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with medication, movement and rest.

Haley also complained of frequent aching, throbbing, tightness and sharp discomfort in the bottom of the left foot. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, medication, ice and movement.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | |
|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** NONE | **Insured** | REDACTED |

**Date**   03/04/2013

Provider   Dr. John Tagliarini, D.C.                               *** *continued from previous page* ***

experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

## Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in 2 weeks.

**Diagnosis**   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

Liberty002761

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | |
|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # **NONE** | **Insured** | REDACTED |

**Date**    03/25/2013

**Provider**   Dr. John Tagliarini, D.C.

### Subjective:
Haley sought treatment today complaining of frequent dull, tightness and throbbing discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of frequent throbbing, tightness and dull discomfort in the right trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of frequent aching, throbbing and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and ice.

Haley also complained of frequent tightness, aching and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with medication, chiropractic care, rest, movement and ice.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
 We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in 2 weeks.

Liberty002762

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic, PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** | **NONE** | **Insured** | REDACTED |

**Date**   03/25/2013

| Provider | Dr. John Tagliarini, D.C. | *** continued from previous page *** |
|---|---|---|

**Diagnosis**      739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic, PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | | |
|---|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured | REDACTED |

**Date** 04/08/2013

**Provider Dr. John Tagliarini, D.C.**

### Subjective:
Haley sought treatment today complaining of intermittent tightness and dull discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and movement.

Haley also complained of intermittent tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and movement.

Haley also complained of intermittent dull and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, movement and medication.

Haley also complained of intermittent tightness, aching and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return in 2 weeks.

**Diagnosis** 739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002764

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | |

**Date**  04/08/2013

**Provider**  Dr. John Tagliarini, D.C.
*** continued from previous page ***

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | |

Date    04/18/2013

Provider   Dr. John Tagliarini, D.C.

### Subjective:

Haley sought treatment today complaining of frequent tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with rest, chiropractic care, medication and movement.

Haley also complained of frequent tightness, aching and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

Haley also complained of frequent tightness and dull discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

Haley also complained of frequent tightness, dull and aching discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

Haley also complained of frequent shooting, sharp and tightness discomfort in the bottom of the right foot. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent dull, aching and tightness discomfort in the bottom of the left foot. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest, medication and movement.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

### Assessment:

Haley's prognosis is good at this time.  Haley felt better after the adjustment and has

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** | NONE | **Insured** | |

**Date**   04/18/2013

**Provider**   Dr. John Tagliarini, D.C.                                    *** *continued from previous page* ***

experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

## Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan.  It is recommended that she return in 3 weeks.

**Diagnosis**   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

Liberty002767

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** REDACTED | | |
|----------|---------------|-------------------|---|---|
| Ins Co | Medicare CT | **Pol #** NONE | **Insured** | REDACTED |

**Date**   05/16/2013

**Provider**   Dr. John Tagliarini, D.C.

### Subjective:

Haley sought treatment today complaining of frequent tightness and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent tightness and aching discomfort in the back of the neck. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent dull, tightness and aching discomfort in the left trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent tightness discomfort in the mid back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, medication and movement.

Haley also complained of frequent dull and tightness discomfort in the low back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with chiropractic care, medication and movement.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels:  C1, C5, T3, T8 and left L5.

### Assessment:

Haley's prognosis is good at this time.  Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

Liberty002768

# Chart Notes
## Haley Spears

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| **Patient:** Spears, Haley | **DOB:** REDACTED | **Insured** REDACTED |
|---|---|---|
| **Ins Co** Medicare CT | **Pol #** NONE | |

**Date** 05/16/2013

**Provider** Dr. John Tagliarini, D.C.      *** *continued from previous page* ***

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return once a month.

**Diagnosis**    739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002769

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic, PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date** 06/18/2013

**Provider** Dr. John Tagliarini, D.C.

### Subjective:
Haley sought treatment today complaining of frequent tightness and dull discomfort in the right trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and movement.

Haley also complained of frequent tightness discomfort in the back of the neck. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, movement and rest.

Haley also complained of frequent tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest, chiropractic care and movement.

Haley also complained of frequent tightness discomfort in the upper back. She rated the intensity of discomfort as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, movement and rest.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return in 4 weeks.

**Diagnosis**    739.1: Cervical Interseg. Somatic Dysfunction, 739.1
                723.1: Cervicalgia, 723.1
                739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | |

**Date**  06/18/2013

**Provider**  Dr. John Tagliarini, D.C.

*** continued from previous page ***

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: Spears, Haley | DOB: REDACTED | | |
|---|---|---|---|
| Ins Co Medicare CT | Pol # NONE | Insured | REDACTED |

Date   07/18/2013

Provider   Dr. John Tagliarini, D.C.

### Subjective:
Haley sought treatment today complaining of frequent tightness and dull discomfort in the back of the neck. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of frequent dull and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and rest.

Haley also complained of frequent dull, aching and tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of frequent tightness, dull and throbbing discomfort in the mid back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care, rest and medication.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:
Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return in 5 weeks.

Diagnosis   739.1: Cervical Interseg. Somatic  Dysfunction, 739.1
739.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic  Dysfunction, 739.2

Liberty002772

# Chart Notes

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | **DOB:** | REDACTED | | REDACTED |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | **Pol #** | NONE | **Insured** | |

**Date** 07/18/2013

**Provider** Dr. John Tagliarini, D.C. *** continued from previous page ***

Liberty002773

**Chart Notes**

**Haley Spears**

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| **Patient:** Spears, Haley | **DOB:** REDACTED | |
|---|---|---|
| Ins Co Medicare CT | Pol # NONE | **Insured** REDACTED |

**Date** 09/30/2013

**Provider Dr. John Tagliarini, D.C.**

### Subjective:

Haley sought treatment today complaining of constant tightness and throbbing discomfort in the mid back. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of constant tightness and throbbing discomfort in the upper back. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of frequent tightness discomfort in the left trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and rest.

Haley also complained of frequent tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with rest and chiropractic care.

Haley also complained of intermittent shooting discomfort in the back of the right hip. She rated the intensity of discomfort as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to decrease with chiropractic care and rest.

### Objective:

Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:

Haley's prognosis is good at this time. Haley felt better after the adjustment and has experienced an increase in range of motion and muscle strength and a decrease in pain since treatment began.

### Plan:

We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return once a month.

Liberty002774

# Chart Notes

## Haley Spears

Tagliarini Chiropractic,PC
836 Farmington Ave. #229
West Hartford, CT 06119
Phone: 860-236-2225
Fax: 860-231-0077

| Patient: | Spears, Haley | DOB: | REDACTED | | |
|---|---|---|---|---|---|
| Ins Co | Medicare CT | Pol # | NONE | Insured | REDACTED |

**Date** 09/30/2013

**Provider** Dr. John Tagliarini, D.C. *** *continued from previous page* ***

**Diagnosis** 739.1: Cervical Interseg. Somatic Dysfunction, 739.1
723.1: Cervicalgia, 723.1
739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002775

| **Chart Notes**<br>**Haley Spears** | | | Tagliarini Chiropractic,PC<br>836 Farmington Ave. #229<br>West Hartford, CT 06119<br>Phone: 860-236-2225<br>Fax: 860-231-0077 |
|---|---|---|---|
| **Patient:** Spears, Haley | **DOB:** REDACTED | | **REDACTED** |
| **Ins Co** Medicare CT | **Pol #** NONE | **Insured** | |

**Date** 11/08/2013

**Provider** Dr. John Tagliarini, D.C.

### Subjective:
Haley sought treatment today complaining of frequent tightness and aching discomfort in the upper back. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting and movement. The discomfort was reported to decrease with chiropractic care.

Haley also complained of frequent aching and tightness discomfort in the right trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with chiropractic care.

Haley also complained of frequent tightness and aching discomfort in the left trapezius. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with chiropractic care.

Haley also complained of intermittent tightness, aching and burning discomfort in the buttocks. She rated the intensity of discomfort as a level 7 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with chiropractic care.

### Objective:
Intersegmental traction was used to traction open the individual vertebral segments, improve intervertebral disc hydration, decrease spasm and increase mobility, circulation and nutrition to the involved spinal joints.

Multiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted at the following levels: C1, C5, T3, T8 and left L5.

### Assessment:
Haley has had an exacerbation. These are episodic marked deterioration of the patient's condition due to acute flareups of the presenting conditions.
Haley reported feeling better after the treatment.

### Plan:
We will continue to treat Haley as per the examination findings and continue the existing treatment plan. It is recommended that she return in one week.
Cold packs were prescribed to Haley for use 12-15 minutes at a time to reduce inflammation, swelling and discomfort in the affected area.

| **Chart Notes** | | Tagliarini Chiropractic,PC |
|---|---|---|
| **Haley Spears** | | 836 Farmington Ave. #229 |
| | | West Hartford, CT 06119 |
| | | Phone: 860-236-2225 |
| | | Fax: 860-231-0077 |

| **Patient:** Spears, Haley | **DOB:** REDACTED | |
|---|---|---|
| **Ins Co Medicare CT** | **Pol # NONE** | **Insured** REDACTED |

**Date   11/08/2013**

**Provider   Dr. John Tagliarini, D.C.**                                    *** *continued from previous page* ***

**Diagnosis**   739.1: Cervical Interseg. Somatic Dysfunction, 739.1
                723.1: Cervicalgia, 723.1
                739.2: Thoracic Interseg. Somatic Dysfunction, 739.2

Liberty002777