**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF CONNECTICUT**

_____
                                              :
**HALEY SPEARS**                              :
    **Plaintiff,**           :
                                              :         **Civil No. 3:11-cv-01807 (KAD )**
**v.**                                        :
                                              :
**LIBERTY LIFE ASSURANCE**                    :
**COMPANY OF BOSTON**                         :
**AND THE GROUP LIFE INSURANCE**              :
**AND DISABILITY PLAN OF UNITED**             :
**TECHNOLOGIES CORPORATION a/k/a**
**THE UTC CHOICE INTEGRATED**                 :
**DISABILITY BENEFIT PROGRAM**                :         **November 16, 2018**
    **Defendants.**          :
_____ :

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Defendants Liberty Life Assurance Company Of Boston ("Liberty") and The Group Life Insurance and Disability Plan Of United Technologies Corporation a/k/a The UTC Choice Integrated Disability Benefit Program ("the Plan") (collectively, "Defendants") respectfully submit this Memorandum Of Law In Support Of Defendants' Motion For Summary Judgment on Plaintiff's Amended Complaint dated August 30, 2017. Plaintiff Haley Spears ("Plaintiff") alleges that, on remand, Liberty wrongfully denied her claim and appeal on remand for long-term disability ("LTD") benefits under the Plan in violation of § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001,

**et seq.**[1] **The Administrative Record reflects that Liberty's initial denial of Plaintiff's claim followed almost three years of review, which included a total of four physician peer reviews, conducted by physicians board certified in appropriate specialties. Liberty denied Plaintiff's claim on the ground that the medical evidence was insufficient to support her purported inability to perform the material and substantial duties of her Own Occupation as of February 9, 2009, and, accordingly, that she did not meet the definition of disability throughout the Elimination Period. Thereafter, Plaintiff was effectively accorded four appeals to establish her disability and entitlement to disability benefits prior to filing her lawsuit.**

**In its Decision dated March 31, 2015, on the parties' cross-motions for judgment on the stipulated administrative record ("Ruling"), this Court determined that it was unclear whether Plaintiff was entitled to benefits and remanded this matter back to Liberty for further review. On remand, Liberty requested medical records from the twenty-seven medical providers identified by Plaintiff, obtained a peer review of Plaintiff's 4,500-page disability claim file from a team of four independent physicians with appropriate board specialties, none of whom were involved in any of the initial pre-remand benefit determinations, and obtained an independent medical examination ("IME") of Plaintiff, as was strongly recommended by the Ruling. Plaintiff, on the other hand, demanded – long after**

---

[1] **Plaintiff's claims for breach of fiduciary duty and her claims against Defendant United Technologies Corporation were previously dismissed by the Court. (Docket No. 127.)**

the review process on remand began and long after she returned to work[2] – that Liberty foreshorten its review of her claims, even though (1) she had not then produced medical records from three physicians she identified on remand, (2) she had just requested that Liberty expand its review to include yet another physician and additional medical records and give her extra time to provide those records, and (3) she had not yet undergone the IME that the Court plainly deemed appropriate in the Ruling. After Plaintiff finally underwent the IME, which was delayed by Plaintiff, and after receipt of opinion letters from Plaintiff's treating physicians responding to the four-physician peer review report, Liberty issued a 27-page determination addressing the issues raised by the Ruling and denying Plaintiff's claim on remand.

Although Liberty was not required by the Ruling or by law to grant Plaintiff an additional appeal of its remand determination, Liberty offered Plaintiff an opportunity to submit a second, optional request for review within 45 days. Plaintiff's counsel sent Liberty a letter accepting the offer of an additional review within that 45-day deadline, but she did not provide any substantive information in support of her appeal with that letter. Over the course of the next three months, Plaintiff's counsel submitted two opinion letters from Plaintiff's treating physicians, along with numerous articles regarding Lyme disease. She did not, however, notify Liberty that her appeal was complete in any communications transmitting these documents. Accordingly, Liberty sent Plaintiff's counsel a letter dated December 14, 2016, requesting that she advise Liberty as to whether

---

[2] Plaintiff has now been back at work for four years. (Am. Compl. ¶ 15.)

or not Ms. Spears' appeal was complete so that Liberty could proceed with the second/optional remand review. Plaintiff's counsel, however, did not respond to Liberty's December 14, 2016, letter. Instead, she filed a second lawsuit, again trying to circumvent the administrative review process, despite Liberty's repeated efforts to ensure it had everything Plaintiff wished to be considered on remand.

On March 20, 2017, all the documentation submitted for the second remand review was forwarded for review and assessment by the panel of specialists who previously reviewed Plaintiff's claim file during the first remand review. The panel concluded that the additional material submitted for review did not change their conclusion that the medical evidence did not support impairment preventing Plaintiff from performing the material and substantial duties of her own occupation during the Elimination Period, the 24-month Own Occupation period or the Any Occupation period thereafter. Based on this extensive medical review and in light of the extensive administrative record as a whole, Liberty concluded that although Plaintiff had reported multiple subjective symptoms allegedly preventing her from working, the information provided for review did not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Plaintiff's symptoms were of such severity, frequency and duration as to support restrictions and/or limitations rendering Plaintiff unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period or during the Own Occupation period or any occupation thereafter.

Viewing the extensive Administrative Record as a whole, Defendants are entitled to judgment as a matter of law on all claims asserted by Plaintiff, because Liberty's remand determinations are reasonable and supported by substantial evidence.

I.   FACTS

Plaintiff was a participant in the Plan by virtue of her employment by a division of the Plan Sponsor, United Technologies Corporation ("UTC"). LTD benefits provided by the Plan are fully insured by Group Disability Income Policy GF3-810-258966-016 ("the Policy"). The Policy states in relevant part as follows:

> When Liberty receives Proof that a Covered Person is Disabled due to … Sickness …, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period …. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:
>
> 1. Disability;
> 2. Regular Attendance of a Physician; and
> 3. Appropriate Available Treatment.

(AR20[3].) The Policy defines "Elimination Period" as "a period of consecutive days of Disability or Partial Disability for which no benefit is payable." (AR8.) The Elimination Period in the Policy is the "greater of" the end of the Covered Person's sick pay, Short term Disability Benefits or 180 days. (AR4.) The Policy defines "Disability," in relevant part, as follows: "during the Elimination Period

---

[3] Citations to Bates numbered documents in this memorandum designated AR# are citations to the Policy that controls Plaintiff's claim and appeals filed at Docket No. 085-4 and the Administrative Record for Plaintiff's claim and appeal on remand, attached as Exhibit B to the Affidavit of Paula McGee dated March 23, 2012, filed under seal on March 1, 2013, Docket No. 56-4, Bates stamped Liberty000041-002239, and as Exhibit A to the Affidavit of Paula McGee filed herewith as Exhibit 2, Bates stamped Liberty002278-Liberty005005.

and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." (AR7.) "Sickness" is defined as "illness, disease, pregnancy or complications of pregnancy." (AR10.) "Material and Substantial Duties" are defined as the "responsibilities that are normally required to perform the Covered Person's Own Occupation ... and cannot be reasonably eliminated or modified." "Own Occupation" is defined as "the Covered Person's occupation that he was performing when his Disability ... began." (AR9.). Significantly, however, the Policy provides, "For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." (Id.) The Policy defines "Proof," in relevant part, as follows:

> "Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:
> ...
> 3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty. (AR10.) Finally, the Policy gives Liberty the discretionary authority to construe the terms of the policy and to determine benefit eligibility thereunder. (AR34.)

### Plaintiff's Claim for Benefits

Plaintiff worked as an administrative assistant at Pratt & Whitney, a division of UTC. (AR2174.) Plaintiff's job duties were sedentary in nature and involved mostly sitting, as well as some standing and walking. (AR2169.) Plaintiff filed a claim for short-term ("STD") benefits in October 2008. (AR69.) Liberty

initially approved Plaintiff's claim for STD benefits, but terminated those benefits effective February 8, 2009, when it determined that she no longer met the definition of disability under the terms of the Plan. (AR62, AR372.) The Administrative Record reflects that Liberty's initial denial of Plaintiff's claim followed almost three years of review, which included a total of four physician peer reviews, conducted by physicians board certified in appropriate specialties. Liberty also denied Plaintiff's claim for LTD benefits on the ground that the medical evidence was insufficient to support her inability to perform the material and substantial duties of her own occupation as of February 9, 2009, and, accordingly, she did not meet the definition of disability throughout the Elimination Period. Thereafter, Plaintiff was effectively accorded four appeals to establish her disability and entitlement to disability benefits prior to filing her lawsuit. (AR79-80, AR195-98, AR213, AR263-64, AR268-73, AR287-89, 296, AR312-13, AR319, AR350, AR373, AR453-57, AR1769-70.)

    In October 2010, UTC asked Liberty to override its STD decision and pay Plaintiff's STD benefits. (AR42, AR223.) Liberty paid Plaintiff benefits through March 27, 2009, the end of the STD period, only on the basis of UTC's override and notwithstanding her failure to prove she was disabled. (AR211-14.) It also notified Plaintiff that "[t]his employer override for payment of short term disability benefits did not alter the Appeal Review Unit's determination to uphold denial of benefits beyond February 8, 2009." (AR212.)

<u>Plaintiff's Return To Work</u>

    Plaintiff returned to work in August 2014. (AR4862.)

## Review On Remand

The Administrative Record reflects that on remand, Liberty requested medical records from each of the 27 medical providers identified by Plaintiff, obtained a peer review of Plaintiff's 4,500-page disability claim file from a team of four independent physicians with appropriate board specialties, none of whom were involved in any of the underlying pre-remand benefit determinations, and obtained an IME of Plaintiff as was strongly recommended by the Ruling. (AR2492-AR2509, AR2579-AR2580, AR2597-AR2685, AR2710-AR2712.) Plaintiff, on the other hand, demanded – long after the review process began and long after she returned to work – that Liberty foreshorten its review of her claims, even though (1) she had not then produced medical records from three physicians she identified on remand, (2) she had just requested that Liberty expand its review to include yet another physician and additional medical records and give her extra time to provide those records, and (3) she had not yet undergone the IME that the Court plainly deemed appropriate in the Ruling. (AR2286 (Phone Notes 11, 13), AR2723, AR2725.) Based on the independent medical review and IME, which eventually occurred on March 14, 2016, Liberty issued a 27-page determination letter addressing the issues raised by this Court's Ruling and denying Plaintiff's claim on remand. (AR2378-AR2405.) Even though Liberty was not required by the Ruling or by law to grant Plaintiff an additional appeal of its remand determination, Liberty offered Plaintiff an opportunity to submit a second, optional request for review within 45 days. (AR2404.)

### Second, Optional Remand Review

Plaintiff sent Liberty a letter within that 45-day deadline accepting the offer of an additional appeal, but she did not then provide any substantive information in support of her appeal. (AR2377.) Over the course of the next three months, Plaintiff provided reports from her treating physicians, Zane Saul, MD and Bernard Raxlen, MD, along with numerous articles regarding Lyme disease. (AR2375-AR2376, AR2373-74, AR2320-72.) Liberty forwarded all of the documentation submitted for the second remand review for assessment by the panel of independent specialists who previously reviewed Plaintiff's claim file during the first remand review. (AR4896, AR4998-AR4999.) The panel concluded that the medical evidence did not support impairment preventing Plaintiff from performing the material and substantial duties of her Own Occupation or Any Occupation during any of the relevant time periods. (AR4992-AR4997.) Based on this medical review, Liberty concluded that although Plaintiff had reported multiple subjective symptoms allegedly preventing her from working, the information provided for review did not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Plaintiff's symptoms were of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Plaintiff unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any occupation after March 27, 2011. (AR4910-AR4915.)

## II.   PROCEDURAL HISTORY

### A.   Plaintiff's First Lawsuit

On November 18, 2011, Plaintiff filed this lawsuit asserting that Defendants improperly terminated her disability benefits under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), and in breach of their fiduciary duties under Section 502(a)(3), 29 U.S.C. § 1132(a)(3) ("Spears I"). (Compl., Docket No. 1 (hereinafter "Plaintiff's Original Complaint").) On August 3, 2012, this Court dismissed Plaintiff's breach of fiduciary duty claim under Section 502(a)(3) and Plaintiff's claims against Defendant UTC (hereinafter "August 3, 2012 Decision"). (Docket No. 22.) Plaintiff did not request reconsideration of the Court's August 3, 2012 Decision or seek to amend her complaint to address the deficiencies in her complaint.

The parties subsequently filed cross-motions for judgment on a stipulated administrative record. On March 31, 2015, this Court issued a ruling remanding Plaintiff's LTD claim back to Liberty for further review with the following instructions:

> First, Liberty is instructed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period. The question is not whether Spears' medical records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis. Second, while Liberty's reliance on independent paper reviews is not itself improper, the deficiencies present in each of the reviews undertaken so far indicate that Liberty must take much greater care in posing relevant questions to its peer reviewers and ensuring that the responses that they receive are both consistent with the terms of the Plan and are responsive to the question asked.

In fact, given the multiple deficiencies in each of these reviews, Liberty "would be well-advised, upon reconsideration, rather than simply conducting a paper review of [Spears'] claim, to have an independent medical examination performed on [Spears], or at a minimum, to have its medical consultants communicate with [Spears'] treating physicians in order to fully understand the basis for their [opinions]." *Viglietta, 2005 WL 52533336, at \*12.*

Third, Liberty is instructed to perform a full and fair review that complies with the ERISA claims regulations. *See Solnin v. Sun Life & Health Ins. Co.*, 766 F. Supp. 2d 380,393-94 (E.D.N.Y. 2011) (holding that the ERISA claims regulations apply to post-remand benefits determinations) (citing cases). This includes (but is not limited to) having Spears' file reviewed by individuals who were neither "consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual," 29 C.F.R. § 2560.503-1(h)(2)(v), permitting Spears "to submit written comments, documents, records, and other information relating to the claim for benefits," 29 C.F.R. § 2560.503-1(h)(2)(ii), "tak[ing] into account all comments, documents, records, and other information submitted by [Spears] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination," 29 C.F.R. § 2560.503-1(h)(2)(iv), and "not afford[ing] deference to the initial adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(ii).

Finally, there is the question of how some or all of Spears' post-Elimination Period medical records (which comprise a substantial amount of the medical records in this case) bear on the question of Spears' eligibility for LTD benefits. As an initial matter, they are certainly relevant to the question of whether Spears was unable to perform the "Material and Substantial Duties of her Own Occupation" "during the Elimination Period and the next 24 months," [AR 7 (emphasis added)], and if "thereafter" she was "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." [Id.]. In addition, such post-Elimination Period evidence may be relevant to Spears' condition during the Elimination Period, insofar as it "speaks to the credibility and accurateness of [] earlier evaluations and opinions." *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 605 (6th Cir. 2014) (citing and quoting *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LB Emps.*, 741 F.3d 686, 690 n. 1 (6th Cir. 2014)). This is particularly true here, where Spears received multiple letters from her treating physicians during the Elimination Period stating that she was unable to work full or even part-time, and where Liberty appears to have given these letters

> minimal weight in the absence of sufficient amounts of corroborating medical records.
>
> Thus, on remand Liberty may not categorically dismiss some or all of Spears' post-Elimination Period medical records as "not relevant" without a reasonable explanation.

**(Docket No. 103, pp. 78-81.)**

Approximately one year later, on April 11, 2016, Plaintiff filed a second lawsuit, again alleging both an ERISA claim for benefits and a claim for breach of fiduciary duty (hereinafter referred to as "Spears II"). (Civil No. 3:16-cv-00572 (VLB).) In a transparent attempt to avoid dismissal of her breach of fiduciary duty claim, which this Court had dismissed in 2012, Plaintiff re-alleged the same allegations that supported her initial breach of fiduciary duty claim, but omitted reference to the specific provision of Section 502 under which she asserted that claim. Instead of alleging a standalone breach of fiduciary duty claim, Plaintiff opted simply to seek a declaration in her claims for relief that Defendants breached their fiduciary duty to her. (Id., Am. Compl., Docket No. 8, Exhibit 2 hereto, p. 12.) She also elected to omit any reference to her claims for restitution, reformation, estoppel and injunction that were specifically alleged in her original complaint in this action. (Compare id. with Civil Action No. 3:11-cv-01807 (VLB), Docket No. 1, Count Two & pp. 12-13.) As she did with her breach of fiduciary duty claim, Plaintiff also attempted to re-allege her claims against Defendant UTC.

Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint in Spears II on October 28, 2016, on the grounds that this Court's August 3, 2012 Decision dismissing Plaintiff's 502(a)(3) claim in Spears I, a prior action between the same parties alleging the same operative facts, was res judicata with respect

to Plaintiff's breach of fiduciary duty claim and with respect to her claims against UTC. (Civil Action No. 3:16-cv-00572 (VLB), Docket No. 24.) Defendants also moved to dismiss these claims for failure to state a claim. (Id.) On December 16, 2016, Plaintiff filed a Second Amended Complaint in Spears II, primarily alleging conduct that occurred before her original November 18, 2011 Spears I Complaint and trying to tie UTC to Liberty's benefit determinations. (Id., Second Am. Compl., Docket No. 33, Exhibit 16 hereto, ¶¶ 10-31.) Plaintiff identified no reason whatsoever for her inordinate delay in seeking to amend her complaint in an effort to revive claims that were dismissed by this Court four years earlier in her first lawsuit or to explain her tactical behavior in initially omitting, and then seeking to reinstate, (a) citations from her original complaint in this lawsuit to the specific ERISA provisions under which she asserted her claims in her second lawsuit and (b) claims for relief from this lawsuit that might support a breach of fiduciary duty claim in her second lawsuit.

On August 21, 2017, the Court *sua sponte* dismissed Spears II and allowed Plaintiff to re-open Spears I by filing a Motion for Summary Judgment demonstrating why she is entitled to summary judgment notwithstanding Defendants' decision on remand. (Id., Docket No. 75.) On August 30, 2017, Plaintiff filed an Amended Complaint in Spears I, primarily alleging conduct that occurred before her original November 18, 2011 Complaint and attempting to re-allege once again her breach of fiduciary duty claims and her claims against UTC that had been dismissed back in 2012. (Docket No. 110-02.) Defendants filed a motion to dismiss those claims on September 13, 2017, which was granted by the

Court on May 31, 2018. The Court held that Plaintiff's claims for breach of fiduciary duty and her claims against UTC were barred by the law of the case doctrine. (Docket No. 127.) Plaintiff did not seek reconsideration of the Court's May 31, 2018, decision.

III.   **ARGUMENT**

A.   **Bench Trial On The Papers**

"[T]here is no right to a jury trial in a suit brought to recover ERISA benefits, and thus the district court would [be] the factfinder at trial ..." **O'Hara v. Nat'l Union Fire Ins. Co**., 642 F.3d 110, 116 (2d Cir. 2011). It is Defendants' position that this ERISA claim for benefits matter would be most appropriately resolved by cross-motions for judgment on a stipulated administrative record, and that there is no need for a trial in this matter. Instead, the Court should treat this motion as requesting "essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." "In that scenario, the district court … must "make explicit findings of fact and conclusions of law" pursuant to Federal Rule of Civil Procedure 52(a)." **O'Hara**, 642 F.3d at 116 (citing **Burke v. PriceWaterHouseCoopers LLP, Long Term Disability Plan**, 537 F. Supp. 2d 546, 548 (S.D.N.Y. 2008), **aff'd**, 572 F.3d 76, 78 (2d Cir. 2009); **Muller v. First Unum Life Ins. Co.**, 341 F.3d 119, 124 (2d Cir. 2003)).

B.   **Standard of Review**

1.   **Because the applicable plan documents controlling Plaintiff's claim for benefits contain an effective reservation of discretionary authority, Liberty's determination is subject to the abuse of discretion standard of review.**

"Where the written plan documents confer upon a plan administrator the

discretionary authority to determine eligibility, [the court] will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" Fuller v. J.P. Morgan Chase & Co., 423 F.3d 104, 106-07 (2d Cir. 2005). Here, the Policy stated:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(AR34.) Thus, the Policy unequivocally confers discretionary authority on Liberty and, therefore, the arbitrary and capricious standard applies to the Court's review of the claim determination in this case. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989); Fuller, 423 F.3d at 105, 106-07; Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

### 2. A structural conflict of interest must be considered in the Court's analysis, but it does not change the standard of review in denial-of-benefit cases.

The Supreme Court has held that a structural conflict of interest does not change the standard of review in denial-of-benefit cases. Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008); see also Roganti v. Metropolitan Life Ins. Co., 786 F.3d 201, 217-18 (2d Cir. 2015); McCauley v. First Unum, 551 F.3d 126, 133 (2d Cir. 2008). Instead, conflicts are "but one factor among many that a reviewing judge must take into account." Glenn, 128 S. Ct. at 2351. In Glenn, the Court held that the conflict of interest should be given greater weight where the circumstances indicate it affected the benefits decision and given less weight where the administrator has made attempts to shield the decision from bias. Id. In order to afford any weight to a conflict of interest, a

plaintiff must show that the conflict of interest actually *influenced* the administrator's decision. <u>Hobson v. Metropolitan Life Ins. Co</u>., 574 F.3d 75, 83 (2d Cir. 2009). In her Amended Complaint, Plaintiff alleges that "Defendants have an inherent conflict of interest in that Liberty both evaluates claims for LTD benefits and pays LTD benefits claims. Defendants showed bias in administering the Plan as they failed to provide fair process to Spears, in that they failed to timely provide the peer review report on which it relied, and refused to allow Spears a reasonable time to respond to the report." (Docket No. 110-02, ¶ 31.) She also alleges that "Defendants were influenced by their financial conflict of interest when they made the decision to terminate Spears's benefits." (Id. ¶ 36.) None of these allegations addresses Liberty's handling of the administrative review on remand. Instead, they deal with Liberty's handling of the underlying, pre-remand claim and appeals. Consequently, they are irrelevant to this Court's evaluation of the remand review. To the extent the Court finds them to be relevant, however, Defendant refers the Court to the arguments Defendants made in their Memorandum of Law in Support of Defendants' Motion for Judgment dated April 28, 2014, (Docket No. 085-1, pp. 39-46).

        3.    <u>Under the highly deferential arbitrary and capricious standard of review, the Court will not overturn a decision to deny or terminate benefits unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law.</u>

"Under [the] highly deferential [arbitrary and capricious] standard of review, [the] Court cannot substitute its judgment for that of the Plan Administrator and will not overturn a decision to deny or terminate benefits unless 'it was 'without reason, unsupported by substantial evidence or erroneous

as a matter of law.'" <u>Fuller</u>, 423 F.3d at 106 (citation omitted). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." <u>Celardo v. GNY Auto. Dealers Health & Welfare Trust</u>, 318 F.3d 142, 146 (2d Cir. 2003). An administrator's decision must be upheld "as long as it was based on 'substantial evidence,' even if the evidence presently in the record could also reasonably support a contrary determination." <u>Piscottano v. Metropolitan Life Ins. Co</u>., 118 F.Supp.2d 200, 210-11 (D. Conn. 2000) (citation omitted). "Finally, plaintiff has the burden of demonstrating that [the administrator's] denial of benefits was arbitrary and capricious." <u>Short v. Unum Life Ins. Co</u>., 2003 U.S. Dist. LEXIS 22327 at *19-20 (D. Conn. Dec. 3, 2003)[4] (citing <u>Sharkey v. Ultramar Energy</u>, 70 F.3d 226, 230 (2d Cir. 1995)). She also "bears the burden of proving that [s]he continues to be eligible for disability benefits." <u>Wedge v. Shawmut Design & Constr. Group Long Term Disability Ins. Plan</u>, 23 F. Supp. 3d 320, 334 (N.D.N.Y. 2014) (citing <u>Critchlow v. First UNUM Life Ins. Co. of Am</u>., 378 F.3d 246, 256 (2d Cir. 2004)).

> **4.** <u>**The Court's review of the reasonableness of Liberty's remand determinations must be based solely upon the administrative record and applicable plan documents.**</u>

Under the abuse of discretion standard, this Court's review of the reasonableness of the determination on remand is limited to the information available to and considered by Liberty at the time of its determinations. <u>Miller v. Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir. 1995); <u>Short</u>, 2003 U.S. Dist. LEXIS 22327 at *19. The documents that Plaintiff submitted in support of her remand and

---

[4] Copies of all unpublished opinions cited herein are provided at Exhibit 3.

second optional remand appeal are attached as Exhibit B to the Affidavit of Paula McGee dated March 23, 2012, filed under seal on March 1, 2013, Docket No. 56-4 and as Exhibit A to the Affidavit of Paula McGee filed herewith as Exhibit 2, along with a copy of the applicable Policy governing Plaintiff's claim. As this case is indisputably subject to the abuse of discretion standard of review, any purported evidence outside of the Administrative Record should not be considered by the Court in reviewing the reasonableness of Liberty's determination. Id.

**B.      Liberty's Determinations On Remand Were Reasonable, Supported by Substantial Evidence And Not Contrary to Law.**

**1.      Liberty's remand determinations were supported by substantial evidence in the Administrative Record.**

Liberty's remand determinations were supported by substantial evidence in the Administrative Record. To meet the definition of disability throughout the three phases of this claim, the Elimination Period, the Own Occupation period, and the Any Occupation period, Plaintiff was required to provide proof of continued impairment which prevented her from performing her own Administrative Support occupation through 3/27/11, and prevented her from performing any occupation for which she is fitted from 3/28/11 forward. (AR7, AR9.) "Proof," in turn, means the evidence in support of a claim for benefits and includes, but is not limited to, a claim form completed and signed by the claimant, an attending physician's statement completed and signed by the claimant's attending physician, and the provision by the attending physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence. According to the Policy, proof must be submitted in a form or format satisfactory to Liberty. (AR10.)

On remand, Liberty requested medical records from the 27 medical providers identified by Plaintiff, obtained a peer review of Plaintiff's 4,500-page disability claim file provided by a team of four independent physicians with appropriate board specialties that were not involved in any of the initial pre-remand benefit determinations, and obtained an IME. (AR2492-AR2509, AR2579-AR2580, AR2597-AR2685, AR2710-AR2712.) After Plaintiff's IME, which eventually occurred on March 14, 2016, and receipt of opinion letters dated April 6 and 13, 2016, from Plaintiff's treating physicians responding to the peer review report, Liberty issued a 27-page determination letter, denying Plaintiff's claim on remand. (AR2378-AR2405.) Based on a thorough review of all the medical documentation in Plaintiff's disability claim file, the specialty medical review conducted by a four-physician panel, and the IME completed during the remand review, Liberty determined that although Plaintiff had had multiple symptoms associated with her condition, the medical evidence did not provide sufficient proof that she was unable to perform her own occupation continuously throughout the Policy's Elimination Period, the 24-month Own Occupation period, or the Any Occupation period under the terms of the Policy. (AR2378-AR2405.) Although Liberty was not required by the Ruling or by law to grant Plaintiff an additional appeal of its remand determination, Liberty offered Plaintiff an opportunity to submit a second, optional request for review within 45 days. (AR2404.)

On the optional appeal, Plaintiff submitted two opinion letters from her treating physicians, along with numerous articles regarding Lyme disease. (AR2375-76, AR2373-74, AR2320-72.) After attempting to confirm that Plaintiff's

appeal was complete, Liberty forwarded the two opinion letters and articles for review and assessment by the independent panel of specialists who previously reviewed Plaintiff's claim file during the first remand review. (AR2319, AR4896, AR4998-99.) The panel concluded that the additional material submitted for review did not change their conclusion that the medical evidence did not support impairment preventing Plaintiff from performing the material and substantial duties of (1) her own job from September 27, 2008, when her absence from work began through March 27, 2009, the end of the Elimination Period; (2) her own Administrative Support occupation from March 28, 2009, through March 27, 2011, the end of the Own Occupation period; and (3) any occupation for which she is fitted from March 28, 2011, the beginning of the Any Occupation period, forward. (AR4992-AR4997.) In support of this conclusion, the peer reviewers explained that: (1) Plaintiff's medical records contained multiple inconsistencies in her self-reported symptoms; (2) her self-reported symptoms were inconsistent with her actual functional capacity; and (3) the medical records contained physical exam and cognitive exam findings that were consistently within normal limits. (AR2597-AR2616, AR4992-97.) Based on this extensive and thorough independent peer review, Liberty concluded that although Plaintiff had reported multiple subjective symptoms allegedly preventing her from working, the information provided for review did not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Plaintiff's symptoms were of such severity, frequency and duration that would require restrictions and/or limitations

rendering Plaintiff unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any occupation after March 27, 2011. (AR4910-AR4915.) Defendants are entitled to judgment as a matter of law on all claims asserted by Plaintiff, because Liberty's remand determinations were supported by substantial evidence in the Administrative Record. See e.g., Wedge v. Shawmut Design & Constr. Group Long Term Disability Ins. Plan, 23 F. Supp. 3d 320, 344 (S.D.N.Y. 2014) (granting summary judgment for defendant, holding that denial of benefits was not arbitrary and capricious because the plan administrator applied the appropriate standard, did not ignore opinions of any treating doctors, did not ignore the claimant's subjective complaints, and properly explained why its decision differed from that of the Social Security Administration).

2.    **Liberty's remand determinations addressed the concerns raised by the Court's Ruling.**

On remand, Liberty asked Plaintiff to provide all additional evidence she wished to be considered by Liberty on remand consistent with the Court's decision. Liberty also asked Plaintiff to complete an Activities Questionnaire, Claimant Information Form, Family Information Questionnaire, Claimant Supplementary Statement and Medical Records Release. (AR4892-93.) Plaintiff initially resisted this request, asking why Liberty was requesting new forms and a blank authorization which did not identify names of specific medical providers, when Liberty had been given access to medical information multiple times. (AR4874.) Plaintiff submitted completed forms after Liberty explained that the last medical records Plaintiff submitted were dated April 2011, whereas Plaintiff was

claiming total disability through July 2014 and partial disability from August 2014 through April 2015. (AR4859-69, AR4871-72.)

Liberty requested medical records from all 27 physicians Plaintiff identified on her Claimant Information Form and subsequent correspondence from her attorney. (AR4856, AR4867-4869.) Although Liberty had not received records from all 27 physicians, Plaintiff's counsel asked Liberty to foreshorten the process and review Plaintiff's claim based on the records received to date. (AR2286 (Phone Note 13), AR2723, AR2725.) Accordingly, Liberty submitted all of Plaintiff's medical records, including those submitted with Plaintiff's initial claim and appeals and on remand, to a third-party vendor and requested an independent peer review from a panel of physicians specializing in endocrinology, gastroenterology, infectious disease, neurology, neuropsychology, and internal medicine, including a review of rheumatology, cardiology, pulmonology, sleep medicine, ophthalmology, dermatology, and primary care records. (AR2709-AR2712.) None of the specialists assigned to complete the independent peer review, Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology and Internal Medicine, Kent Crossley, MD, FACP, Infectious Disease and Internal Medicine, Daniel Kitei, DO, MA, Neurology and Neuromuscular Medicine, and Michael Raymond, PhD, ABN, Neuropsychology, were consulted in connection with Plaintiff's underlying, pre-remand claim and appeals.

Liberty asked the independent peer reviewers to assess both whether there was medical evidence in the file to support the various diagnoses relied on by Plaintiff's treating physicians and whether Plaintiff's symptoms, regardless of

22

diagnosis, were sufficiently limiting to support Plaintiff's disability under the terms of the Policy. Specifically, Liberty asked that each of the specialists, based on the available medical evidence, (1) describe the claimant's impairments, cause of any impairments, severity of impairments, and the duration of any impairments, for the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015 and (2) provide their best assessment of the claimant's functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during each of the same time periods. Liberty also asked the specialists to contact Plaintiff's treating physicians regarding Plaintiff's condition, treatment and functional capacity. (AR2710-AR2712.)

Robert Cooper, M.D., F.A.C.E., F.A.C.P, Endocrinology, Internal Medicine, reviewed all of the records provided in their entirety. (AR2601.) Dr. Cooper concluded in relevant part as follows:

> Based on the information available for review, … it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support global impairment and that the claimant is able to work without restrictions during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015.
>
> Although the claimant has a history of micropapillary thyroid cancer, she underwent total thyroidectomy in 6/2013 and has not had any recurrence of the cancer. She appears to be clinically and biochemically euthyroid as was noted by Dr. Oberstein on 11/6/13 and Dr. Albritton on 12/17/15. There are no findings on exams of synovitis or musculoskeletal finds by Dr. Kage on exams on 1/19/09 or 7/20/09 to support the degree of impairment opined in her attending physician letters on 2/9/09 and 8/4/09. There are no findings on exams including neurological or musculoskeletal exams by Dr. Giannini 3/10/09 or 11/19/12 support effect on functionality or supporting ongoing restrictions or limitations opined on 1/20/10 or 7/9/10. …

(AR2610.) The summary of a panel call of the four independent peer reviewers,

reports that Dr. Cooper explained his conclusion in relevant part as follows:

> From an endocrinology perspective, Dr. Cooper opines that there is
> no evidence in the available records to support impairment. The
> claimant has a history of thyroid issues, including multinodular
> thyroid and hypothyroidism. In 2009, a biopsy of the thyroid was
> done by Dr. Oberstein, which was found to be benign. She had her
> thyroid removed in June 2013, and subsequent thyroid ultrasounds
> showed       no       recurrence       of       cancer.       From       a
> rheumatology/musculoskeletal perspective, Dr. Cooper said that the
> records indicated Dr. Kage performed exams of synovitis and
> musculoskeletal systems on 1/19/09 and 7/20/09 which were
> unremarkable. Dr. Cooper added that the claimant's PCP, Dr.
> Giannini, opined restrictions and limitations in 2010 due to her
> plethora of symptoms, but provided no clinical evidence to back up
> her opinion within the medical records provided for review. … In
> summary, Dr. Cooper opines that, overall, there is no evidence within
> the available records to support functional impairment for the
> timeframe in question.

(AR2608.) With respect to the specific questions presented to Dr. Cooper, he

concluded, "From an Internal Medicine and Endocrinology perspective, based on

the available medical evidence, the claimant should have no impairments during

the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015." He also

concluded, "Based on the medical evidence, from an Endocrinology and Internal

Medicine perspective, there should be no effect on the claimant's functional

capacity (including activities of daily living, physical capacity for work, capacity

to travel) … during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through

3/31/2015." (AR2612.) Dr. Cooper distinguished his findings from those of Dr.

Giannini, one of Plaintiff's treating physicians, by stating that there were no

findings on exams, including neurological or musculoskeletal exams by Dr.

Giannini, to support her conclusions regarding Plaintiff's functional capacity and

restrictions and limitations. (AR2610.) As requested by Liberty, Dr. Cooper tried three times to reach Dr. Giannini about her assessment of Plaintiff's condition, treatment and functional capacity, but was unsuccessful. (AR2608.) Dr. Cooper was able to reach Plaintiff's endocrinologist, Dr. Lang, however, who stated that Plaintiff's thyroid cancer should have no impact on her functionality from an endocrinology perspective. (AR2616.)

Kent Crossley, MD, FACP, Infectious Disease, Internal Medicine, identified the primary medical issue in question in his review as determining if Plaintiff has had any infection that would be responsible for her non-specific symptoms and if these would be functionally impairing. (AR2598.) Dr. Crossley discussed the medical records provided by treating physicians Dr. Raxlen, Dr. Gouin (Plaintiff's naturopath), and Dr. Saul (an infectious diseases specialist), each of whom opined that Plaintiff was disabled by Lyme disease. (AR100, AR1780, AR2598, AR2603-04.) He also discussed the medical records of Dr. Schoen, Plaintiff's rheumatologist, who concluded that Plaintiff did not have Lyme disease. (AR2603-04.) Based on his review of the Administrative Record, Dr. Crossley concluded, contrary to Dr. Raxlen, Dr. Gouin, and Dr. Saul, but consistent with Dr. Schoen, that there was no evidence that Plaintiff had Lyme disease or other infections that would be functionally limiting. (AR2610.) He explained his conclusion as follows:

> … This conclusion is based on the absence of any objective findings of late-stage Lyme disease (typically manifest by arthritis, neurologic findings, or a cardiac conduction defect) and the totally non-specific self-reported symptoms noted by the claimant. Importantly, except for a single CSF test that is impossible to interpret, all of the claimant's testing for tick-borne illnesses was negative. Several

> writers have noted that neurological Lyme disease does not occur in
> individuals with a negative serum Western Blot studies. As noted by
> one recent reviewer (Halperin JJ. Nervous system Lyme disease.
> Infect Dis Clin North Am 2015; 29:241-53), neurological Lyme disease
> is part of disseminated infection, and it is not seen in the absence of
> positive serum tests for Borrelia antibody. I agree with Dr. Brusch
> (infectious diseases) who wrote in his peer review report of 9/27/10
> that Ms. Spears "does not have Lyme disease of any type."
> Moreover, as Halperin notes, this infection is easily treated with oral
> antibiotics and the first course of doxycycline the claimant received
> would have been effective therapy.

(Id.) The summary of a panel call held among the four independent peer reviewers
reports that Dr. Crossley stated that "he found nothing in the available records to
support impairment." "Overall, the evidence shows self-reported symptoms and a
lack of objective data. Thus, Dr. Crossley opines that functional impairment is not
supported for the timeframe in question." (AR2608-09.) As requested by Liberty,
Dr. Crossley tried to contact Dr. Saul three times to discuss his assessment of
Plaintiff's condition, treatment and functional capacity, but was unsuccessful in
reaching him. (AR2608.)

Daniel Kitei, DO, MA, Neurology, Neuromuscular Medicine, in his section of
the peer review report, concluded, "Based on the information available for review,
as described above, it is the reviewer's opinion within a reasonable degree of
clinical probability that the evidence does not support impairment from a
neurologic standpoint." (AR2610.) Dr. Kitei explained his conclusion as follows:

> … The claimant has complained intermittently of headaches but the
> most recent note including notes from 2009 and 2010 detail that she
> had significant improvement. When she was seen at Yale Neurology
> on 7/30/10, she had not had migraines for months, and when she saw
> Associated Neurologists of Southern Connecticut on 3/29/10, her
> migraines were well controlled. When she saw Yale Neurology on
> 4/22/13, she did not have any neurologic symptoms and headaches
> had largely resolved. The claimant has had consistently normal

> neurologic examinations, most recently on 4/22/13 at Yale Neurology but there are over ten normal neurologic examinations throughout the records and no neurologic examinations that were abnormal. …

(AR2610-AR2611.) As requested by Liberty, Dr. Kitei attempted to reach Dr. Baehring three times, but was unsuccessful. (AR2608.)

Finally, Michael Raymond, PhD, ABN, Neuropsychology, reviewed all of Plaintiff's medical records in their entirety. (AR2605.) In his section of the peer review report, he wrote, "Based on a review of the provided data as summarized and analyzed below (e.g., voluminous, redundant, and mostly obsolete), [Dr. Raymond concluded that] it is this reviewer's opinion within a reasonable degree of neuropsychological certainty that: there is no valid objective evidence to support neurocognitive deficits associated with chronic headache or a plethora of other reported possible etiologies, within the timeframe of 9/27/08 – 3/31/15." (AR2597.) He explained his conclusion as follows:

> While the claimant had been evaluated by 5 or 6 different neurologists, all neurological examinations, as previously discussed, were well within the normal range. There was no suggestion, whatsoever, of reduced cognitive efficiency. The only suggestion for "inattention, brain fog, memory loss" were reported as part of an interview and based solely on the claimant's subjective report. Initial problems began that were primarily related to vascular headaches. Additional problems began when the claimant underwent an initial cerebral CT scan and multiple cerebral MRI's [sic] identifying a nonspecific right temporal lesion and eventual pineal cyst. Fortunately, serial evaluations had remained stable and without evidence of an acute process. A plethora of other subjective complaints and medical issues were noted and addressed over time.

> Despite the claimant's subjective neurocognitive complaints, she was only evaluated neuropsychologically on one occasion. This occurred per Dr. Rissenberg in July 2010. As noted, Dr. Rissenberg's conclusion that the neuropsychological test results 'are consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness' is certainly not confirmed or a

**viable clinical explanation based on the neuropsychological test results. In fact, the evaluation itself was cursory, non-standardized, and was limited by the exclusion of formal effort testing, as noted above. Premorbid levels of intellectual functioning appeared to be miscalculated based on the method and rationale documented in that prior report. Overall, based on those assessment factors, it is highly unusual that a neuropsychologist would be able to render a clinical opinion with any degree of neuropsychological certainty.**

(AR2611.) When asked to evaluate the July 2010 neuropsychological evaluation of Dr. Rissenberg, Dr. Raymond refuted the evaluation, stating that it "was cursory, non-standardized, and without formal effort testing. Premorbid level of intellectual functioning appeared to be miscalculated as it is highly unlikely that the claimant functioned within the high average range of general intelligence. The evaluation, despite being obsolete, did not objectively support neurocognitive strengths or weaknesses at the time of the evaluation." (AR2613.)

Liberty sought clarification from Dr. Raymond regarding why he concluded that the data provided for his review was "mostly obsolete" and how that data affected his conclusions regarding Plaintiff's impairments and functional capacity. (AR2557.) In Dr. Raymond's addendum, he explained that he could not rely on neuropsychological testing from July 2010 in reaching a conclusion about Plaintiff's impairments and functional capacity six years later, in March of 2015. (AR2511-AR2552.)

Liberty sent the independent peer reviewers' report to Plaintiff's physicians Dario Zagar, MD, Zane Saul, MD, Marian Rissenberg, PhD, Bernard Raxlen, MD, Barbara Kage, MD, Lauren Gouin Young, ND, Kristin Giannini, MD, and Joachim Baehring, MD, and asked for their feedback.

Liberty also asked them to schedule a call with the peer review physicians. (AR2567-AR2574.) Liberty made repeated attempts to follow up with Plaintiff's treating physicians. (AR2281-AR2283, AR2479.)

Marian Rissenberg, MD, sent Liberty a letter dated April 6, 2016, addressing the comments in the March 4, 2016, peer review report concerning her July 2010 neuropsychological assessment. (AR2486-AR2490.) Liberty sent Dr. Rissenberg's April 6, 2016, letter to Dr. Raymond and asked him whether Dr. Rissenberg's response changed his previous conclusions. (AR2467.) Dr. Raymond concluded that Dr. Rissenberg's statements and concerns did not change his conclusions. "Specifically, the preponderance of clinical evidence contained within the file does not support neurocognitive impairment within a designated time frame." (AR2412.)

By letter dated April 6, 2016, Dario M. Zagar, MD, sent Liberty the following comments regarding the March 4, 2016, peer review report:

> I cared for Haley Spears from January of 2009 through October of 2011, and can only comment on her situation at that time since I have not been in contact with her in the interim.
>
> Ms. Spears was dealing with symptoms including frequent headaches, severe fatigue, joint pains, digestive problems, and cognitive complaints. Testing was notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease. She was also under the care of a rheumatologist and infectious disease specialist for her issues, and received long term antibiotic therapy and a variety of symptomatic treatments with only minimal improvement in her symptoms. She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis. At the time I was seeing her, she seemed to do little outside of seeing her doctors because of her various symptoms. She was unable to drive or handle some other basic daily activities. Neuropsychological

testing done in 2010 showed cognitive impairment, which was consistent with her subjective symptoms.

While I would agree that a diagnosis of CNS Lyme was not certain, she clearly has had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily functioning.

To be frank, on review of your physicians' assessments of her prior medical records, it is clear that each took as skeptical and unsympathetic a viewpoint as possible when assessing her case, which is unfair to this unfortunate young woman. I am certain that if any of them had been her treating physician rather than an insurance reviewer they would not have taken the same approach.

(AR2483-84.)

Liberty sent Dr. Zagar's April 6, 2016, letter to Kr. Kitei to determine whether Dr. Zagar's response changed Dr. Kitei's previous conclusions. (AR2468.) In his addendum, Dr. Kitei concluded, "From a neurologic standpoint there is no additional information that would alter my previous opinion that the evidence does not support impairment from a neurologic standpoint." (AR2414.)

At the Court's recommendation, Liberty also requested an IME through a third-party vendor. Liberty asked that the IME physician address Plaintiff's comprehensive medical and functional history, conduct a comprehensive neuromuscular examination, make an assessment of objective physical deconditioning, give an opinion, based on the review of the functional evidence, clinical exam findings, and diagnostic test evidence, whether Plaintiff had any verifiable functional impairment, give an opinion regarding whether there were any medically supported physical restrictions/limitations, note any excessive or atypical pain behaviors observed during the IME, compare Plaintiff's functional statements and clinical observations, and discuss any inconsistencies noted, and

summarize the reviewer's overall impression regarding Plaintiff's current verifiable physical impairments, medically supported physical restrictions/limitations, and maximum full-time work capacity, and comment on the extent to which the results of this IME provided any information that could be used to evaluate Plaintiff's diagnoses and restrictions and limitations during the following two time periods: (1) 9/27/2008 through 3/27/2009 and (2) 3/28/2009 through 3/31/2015. (AR2698, AR2579-AR2580.) Consistent with Liberty's request, the IME provider attempted to obtain a comprehensive medical and functional history from Plaintiff, conducted a comprehensive neuromuscular examination, and conducted a thorough review of Plaintiff's medical records. With respect to Plaintiff's physical impairment, the IME provider stated as follows:

> I have been asked my opinion regarding verifiable physical impairment. Based on the review of functional evidence, clinical examination findings, and diagnostic test evidence, was the insured noted to have any verifiable functional impairment? As far as from March 28, 2009, and to the present, the patient had multiple complaints that were basically non-verifiable. Her complaints were gastrointestinal related, migraine headache related, and what she would attribute to her Hashimoto's thyroiditis and the eventual diagnosis of thyroid cancer. She also would attribute her symptoms to Lyme disease, which I am not an expert in its diagnosis; however, there are conflicting opinions as to whether or not this truly existed as a diagnosis. The patient reports no impairment as of now, and per my examination, she shows no functional impairment. As far as the periods from September 27, 2008, through March 27, 2009, apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective.

(AR2507.) With respect to Plaintiff's physical restrictions and limitations, the IME provider stated as follows:

> As far as medically-supported physical restrictions and limitations, I have been asked to define the frequency of tasks, including sitting,

> standing, and lifting, and the duration of these limitations. It would
> be virtually impossible, based on the review of these records, to
> determine what this patient could have done from September 27,
> 2008, through March 27, 2009, without examination of the patient;
> however, her limitations, again, seem to be more subjective than
> objective regarding her headaches, headache frequency, and her
> myofascial complaints. Apparently, the patient was able to work at
> least part time during that period, but seemed to be plagued by
> fatigue. Again, her limitations would be subjective at best.

With respect to her current functioning, the IME provider concluded that Plaintiff

did not have any current restrictions or limitations. (AR2508.)

Liberty subsequently asked the IME provider to respond to a letter Liberty

received from Plaintiff's counsel, which raised concerns about the IME provider's

questions about Plaintiff's diagnoses and his apparent lack of knowledge about

her medical records. (AR2472.) The IME provider responded as follows:

> It is a patient's job to comply with requests to provide detailed
> history of the illnesses including diagnosis and prior treatment at
> doctor's appointment. When asked to do the above, Mrs. Spears
> responded with irritability and refusal to cooperate. The claimant's
> records were reviewed and commented on in the report.

(AR2409.)

Based on its review of the Administrative Record, including the four-

physician independent peer review and IME report, Liberty issued a remand

determination letter dated June 16, 2016, that concluded as follows:

> <u>Conclusion</u>
>
> We conducted a thorough and independent review of Haley Spears'
> entire claim. In summary, we acknowledge that Ms. Spears has had
> multiple symptoms associated with her condition. However, the
> information does not contain physical exam findings, diagnostic test
> results, valid neuropsychological test results, or other forms of
> medical documentation supporting her symptoms remained of such
> severity, frequency and duration, that the symptoms resulted in
> restrictions and/or limitations rendering Ms. Spears unable to

> perform the duties of her occupation continuously throughout and beyond the Policy's Elimination Period.
>
> Having carefully considered all of the information submitted in support of Haley Spears' claim, our position remains that proof of Ms. Spears' continued disability in accordance with the Policy provisions has not been provided. Therefore, no Long Term Disability benefits will be paid.

(AR2404.) In reaching this conclusion, Liberty specifically stated, consistent with this Court's Ruling, "Whether or not a specific medical condition or diagnosis existed does not determine whether Ms. Spears met the Policy's definition of disability; it is Ms. Spears' functional capacity that determines whether she had the ability to perform her own occupation through 3/27/11, and any occupation thereafter. Ms. Spears' self-reported symptoms were not consistent with the overwhelmingly normal medical and cognitive exams, and did not coincide with her actual functional abilities." (AR2401.) In addition to the distinctions made in the individual peer reviews, Liberty distinguished Plaintiff's treating physician opinions regarding her ability to work as follows:

> This remand review has taken into consideration the opinions and assessments of all Ms. Spears' treating physicians. Ms. Spears' attending physicians have had the opportunity to directly observe, listen to, and examine Ms. Spears. The documentation of each attending physician has been fully considered; Ms. Spears' reported symptoms and functional activity, as well as each physician's reported objective physical exam findings, imaging and laboratory test results, and their medical expertise. Alternatively, the expert reviewing physicians who have examined the medical records over the course of Ms. Spears' claim, have their specialized medical expertise, and a comprehensive perspective based on all the medical information from the numerous physicians who have evaluated Ms. Spears. These peer review physicians have had the opportunity to review, compare and contrast all medical evaluator's findings, as well as the frequency, duration, consistency and severity of Ms. Spears' self-reported symptoms.

> The review physicians are all board certified in their specialties and are qualified to review and interpret medical records and opine on medical functionality. Additionally, Drs. Taiwo, Silverman, Crossley, and Raymond are certified Medical Examiners. All the attending physicians' documentation and opinions have been fully considered. The reviewing physicians' conclusions are based on the totality of medical documentation on file, including consistencies and inconsistencies in Ms. Spears' self-reported symptoms and functional activity, as well as all the documented medical data.

(AR2401.) Liberty's remand determination also addressed the conclusions

reached by the Social Security Administration as follows:

> In our review of Haley Spears' claim, Liberty did fully consider the ruling by the Social Security Administration (SSA) to approve Social Security Disability Income (SSDI) benefits. Ms. Spears' SSDI benefits were approved at the Administrative Law Judge level on 2/25/11. It should be noted that while we fully considered the SSA's ruling, the decision by the SSA does not determine entitlement to benefits under the terms and conditions of the UTC Group Disability Income Policy. The Administrative Law Judge's Decision reports Ms. Spears' self-reported symptoms and the intensity and persistence of her symptoms, were considered at "face value." Additionally the opinions of Dr. Raxlen, Zagar, and Giannini were afforded significant weight compared to other examining physicians, and/or medical review physicians.

> Prior to the 2/25/11 SSA Decision, Liberty obtained the medical reviews of Dr. Potts, Neurology; Dr. Taiwo, Internal Medicine and Occupational Medicine; Dr. Silverman, Infectious Disease; Dr. Brusch, Infectious Disease. Since the 2/25/11 SSA Decision, Liberty has obtained updated treatment records, and has considered the medical reviews by Dr. Cooper, Internal Medicine and Endocrinology; Dr. Crossley Infectious Disease; Dr. Kitei, Neurology; Dr. Raymond, Neuropsychology; IME performed by Dr. Courtney, PM&R; that were not considered by the SSA in its determination process. Dr. Potts reported it was reasonable for Ms. Spears to remain out of work while medications were being regulated for her headaches; through 1/8/09. All other reviewing physicians reported the medical evidence was insufficient to support impairment precluding Ms. Spears from full time work.

(AR2403-AR2404.)

Although Liberty was not required by this Court's Ruling or by law to grant Plaintiff an additional appeal of its remand determination, Liberty offered Plaintiff an opportunity to submit a second, optional request for review within 45 days. (AR2404.) Plaintiff's counsel sent Liberty a letter accepting the proffered additional appeal within that 45-day deadline, but did not then provide any substantive information in support of her appeal. (AR2377.) Subsequently, by letter dated July 13, 2016, Plaintiff sent Liberty a report from Zane Saul, MD, dated July 13, 2016. (AR2375-AR2376.) By letter dated August 9, 2016, Plaintiff sent Liberty a second copy Dr. Saul's report dated July 13, 2016, correcting an error in the previous copy. (AR2375-AR2376.) Dr. Saul reported that Plaintiff was under his care for "advanced, debilitating Lyme disease," from August 2010 through June 2014. (AR2374.) He reported that Plaintiff's symptoms included chronic fatigue, difficulty concentrating and other cognitive difficulties, headaches, joint pain, difficulty sleeping, and that Ms. Spears was unable to sustain any work in any capacity. (Id.) Dr. Saul further reported, "I have reviewed the October 14, 2010 report of Dr. Brusch. He did not contact me prior to his report. He opined that the positive igG western blot in the CSF was a false positive. He is incorrect. Ms. Spears' diagnoses were confirmed by clinical exam and history." (Id.) Additionally, regarding the March 2016 panel medical review, Dr. Saul indicated he disagreed with the panel's conclusion and that, "None of those doctors examined Ms. Spears. None of them are experts in Lyme disease." (Id.) Regarding the conclusions of panel contributor Kent Crossley, MD, Infectious Disease and Internal Medicine, Dr. Saul reported, "Ms. Spears' diagnosis was confirmed by

cerebrospinal fluid testing on February 3, 2009. Dr. Crossley is incorrect when he states that the positive igG western blot test on February 3, 2009 meant nothing without a positive western blot on serum." (Id.) Dr. Saul said of Dr. Crossley's report, "He offered no evidence to refute the patient's credible report of fatigue, headaches or pain." (Id.) Regarding the March 14, 2016 IME, Dr. Saul reported, "his exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her." (Id.) Finally, Dr. Saul asserted Ms. Spears had "chronic multi-system illness." (Id.)

Nearly three months later, on September 26, 2016, Liberty received an undated, 52-page report from Dr. Raxlen. (AR2320.) Dr. Raxlen provided biographical information to support his credentials, discussed the medical community's changing understanding of Lyme and associated diseases, and noted he was one of five of Plaintiff's specialists who diagnosed her with Lyme disease. (AR2323-AR2324.) Dr. Raxlen cited Plaintiff's scores of neuropsychological testing to illustrate "an alarming decline in mental functioning" that Plaintiff's providers took into account in diagnosing and treating her illness. (AR2325-AR2327.) Dr. Raxlen also indicated that Plaintiff's medical history and previous diagnoses supported that she "is suffering from "chronic relapsing Borreliosis with a high likelihood of co-infections." (AR2325-AR2327.)

Because Plaintiff's counsel's cover letters transmitting these documents provided no information regarding the status of her request for a second, optional remand review, it was unclear whether she planned to submit additional

documentation or whether the appeal was complete. Consequently, on December 14, 2016, Liberty sent a letter to Plaintiff's counsel asking whether the appeal was complete so that Liberty could begin the appeal review. Plaintiff's counsel never responded to Liberty's December 14, 2016, letter. (AR2319.) Nevertheless, Liberty proceeded with its second, optional remand review based on the documents it had received up to that point.

On March 20, 2017, Liberty forwarded all the documentation submitted for this second remand review to the panel of specialists who previously reviewed Plaintiff's claim file during the first remand review and asked them to review the letters from Plaintiff's counsel and the reports from Drs. Saul and Raxlen to determine if this additional documentation changed their prior medical opinions in any way, and if their medical opinions had changed, to advise how their opinions changed. (AR4896, AR4998-AR4999, AR5001-AR5002.)

By a report dated April 4, 2017, the four independent peer reviewers concluded that the additional records submitted on appeal did not change their determinations. Specifically, Dr. Crossley concluded, "Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of clinical probability that, as noted in my prior review, there is no evidence the claimant has had Lyme disease or other infections that would be associated with any functional limitation." (AR4992.) Dr. Crossley analyzed the materials provided on appeal as follows:

> The material submitted for review consists of a letter from Dr. Zane Saul (infectious diseases) that notes he treated her from August 2010 to June 2014. Since the prior review covered all of the documentation from this period, his current letter does not add to what we already

know regarding the claimant. His letter reiterates his prior opinion that the claimant would not be able to work even at a sedentary position because of her cognitive difficulties. He again noted her symptoms were primarily those of chronic fatigue, difficulty with concentration, headache, and joint pain. He stated that my interpretation of the CSF Lyme disease testing (that the information was uninterpretable) was incorrect but did not explain how he came to that conclusion.

An undated detailed letter from Dr. Raxlen (psychiatry) was provided. This letter contains no new information about the claimant. Additional information from the International Lyme and Associated Disease Society. [sic]

(AR4994.)

Dr. Cooper, in turn, concluded, "Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support global impairment and that the claimant is able to work without restriction for the timeframe of 9/27/2008 through 3/27/2009 and 3/28/2009 through 3/31/2015." (AR4992.) In support of his conclusion, Dr. Cooper stated, "The additional records do not contain any additional information relating to endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care aspects of the file but only to infectious disease (Lyme disease) and neuropsychiatric manifestations." (AR4995.)

Dr. Kitei similarly concluded, "Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion within a reasonable degree of clinical probability that my conclusion from the previous reports is unchanged, that the evidence does not support impairment from a neurologic standpoint. (AR4992.) He reasoned, "Response letters were reviewed, including a

letter from Zane Saul, MD from infectious disease from 7/13/16 noting that the claimant had 'debilitating Lyme disease' and was not able to work in any capacity. He spends time speaking about his qualifications and notes that the claimant is unable to function, but there are no specifics in regards to neurologic clinical findings to support impairment." (AR4994.)

Finally, Dr. Raymond concluded, "Based on a review of the provided data as summarized and analyzed below, it is the reviewer's opinion with a reasonable degree of neuropsychological certainty that: there is no valid objective neuropsychological evidence to support neurocognitive deficits associated with chronic headache or plethora of other reported possible etiologies within the timeframe of 9/27/08 – present." (AR4992.) No additional records were "provided by a neuropsychologist or records addressing the potential neuropsychological consequences of Lyme disease or other multiple etiologies." (AR4994.)

On May 4, 2017, Liberty issued its final determination letter, upholding its prior determination. (AR4910-AR4915.) Liberty's determination letter analyzed the information provided on appeal, as follows:

<u>Second/Optional Remand Analysis</u>
As noted by the Infectious Disease, Endocrine/Internal Medicine, Neurology, and Neuro-psychology panel review specialists, the documentation received for this second remand review does not provide new medical information regarding the period Ms. Spears was claiming disability from work.

Additionally, all the reviewing physicians indicated Dr. Saul's and Dr. Raxlen's reports do not change their previous conclusions. The panel indicates the medical evidence does not support impairment preventing Ms. Spears from performing the material and substantial duties of (1) her own job from September 27, 2008 when her absence from work began through March 27, 2009; (2) her own Administrative Support occupation from March 28, 2009 through March 27, 2011;

and (3) any occupation for which she is fitted from March 28, 2011 forward.

Moreover, the additional reports from Drs. Saul and Raxlen do not alter our Remand Assessment and Additional Remand Analysis as set forth in the June 16, 2016 remand review letter upholding the denial of Ms. Spears' disability claim. The medical records contain multiple inconsistencies in Ms. Spears' self-reported symptoms; Ms. Spears' self-reported symptoms were inconsistent with her actual functional capacity, as outlined in detail in the June 16, 2016 letter; the medical records contain physical exam and cognitive exam findings that are consistently within normal limits.

We conducted this second thorough review of Haley Spears' entire claim. In summary, we acknowledge that Ms. Spears has reported multiple subjective symptoms allegedly preventing her from working. However, the information provided for review does not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Ms. Spears' symptoms were of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any occupation after March 27, 2011.

(AR4914-AR4915.)

As demonstrated above, Liberty's determination was based on substantial evidence provided by the panel peer review addendum, in which all four independent peer reviewers indicated there was no new additional medical information that would change their original conclusions that the medical evidence did not support impairment preventing Plaintiff from performing her occupation continuously throughout and beyond the Policy's Elimination Period, the Own Occupation period, and the Any Occupation period.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment on all claims asserted by

Plaintiff and enter judgment in Defendants' favor. Defendants further request that the Court award Defendants their costs and attorneys' fees in this matter and such other relief as the Court deems warranted.

> **DEFENDANTS, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON AND THE GROUP LIFE INSURANCE AND DISABILITY PLAN OF UNITED TECHNOLOGIES CORPORATION a/k/a THE UTC CHOICE INTEGRATED DISABILITY BENEFIT PROGRAM**
>
> By:   **/s/ Sarah C. Baskin**
> **Beverly W. Garofalo (ct11439)**
> **Sarah C. Baskin (ct 13570)**
> **Jackson Lewis P.C.**
> **90 State House Square, 8th Floor**
> **Hartford, CT 06103**
> **Tel. (860) 522-0404**
> **Fax (860) 247-1330**
> **Email: garofalob@jacksonlewis.com**
> **Email: baskins@jacksonlewis.com**

## CERTIFICATION OF SERVICE

I hereby certify that on November 16, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Sarah C. Baskin
Sarah C. Baskin