**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| HALEY SPEARS, | : | |
| PLAINTIFF, | : | |
| | : | **CIVIL ACTION NO.:** |
| | : | **3:11-cv-1807 (VLB)** |
| v. | : | |
| | : | |
| LIBERTY LIFE ASSURANCE COMPANY | : | |
| OF BOSTON; | : | |
| THE GROUP LIFE | : | |
| INSURANCE AND DISABILITY PLAN | : | |
| OF UNITED TECHNOLOGIES | : | **September 30, 2019** |
| CORPORATION, aka THE UTC CHOICE | : | |
| INTEGRATED DISABILITY BENEFIT | : | |
| PROGRAM, | : | |
| DEFENDANTS. | : | |

**MEMORANDUM OF DECISION GRANTING [ECF NO. 138]**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING [ECF NO. 144] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This action is an appeal of a denial of long-term disability benefits brought

by the Plaintiff, Haley Spears ("Spears"), against the United Technologies Choice

Integrated Disability Benefit Program (the "Plan"), sponsored by her former

employer, United Technologies Corporation (UTC), and the plan administrator,

Liberty Life Assurance Company of Boston ("Liberty"), acting pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA").[1]

Spears alleges that the Defendants improperly denied her claim for Long

Term Disability ("LTD") benefits under the Plan, in violation of the provisions of 29

---

[1] Spears also named her former employer, UTC, as a defendant in this action, but
all claims against UTC were dismissed on August 3, 2012. *See* [ECF No. 22, Order,
at 14-17].

1

C.F.R. § 2560.503-1, which governs processing and handling of claims for ERISA plan benefits.

On April 28, 2014, Spears and the Defendants, respectively, filed motions for summary judgment and for judgment on the administrative record. [ECF No. 82, 85].

In a Memorandum of Decision dated March 31, 2015, [ECF No. 103] (the "Remand Order"), the Court granted, in part, Spears' Motion for Summary Judgment, denied Defendants' Motion for Judgment on the Administrative Record, and remanded the case to the plan administrator for further proceedings in accordance with the Court's Order. The Court entered Judgment for Spears the same day. [ECF No. 104].

I.    The Court's March 31, 2015 Remand Order

The Court's Remand Order first recounted relevant background facts, with which familiarity is presumed; a brief summary is presented here. Spears worked as an executive administrative assistant at Pratt & Whitney, ("P&W") a division of United Technologies Corporation ("UTC"); her job responsibilities included making travel arrangements, filing documents, and assisting in preparing, gathering and maintaining expense reports. [ECF No. 103 at 3]. Spears was a good worker before adverse medical symptoms appeared, but beginning in the spring of 2008, she began to experience symptoms of ill health. *Id.* at 3-4. The symptoms started as nausea and abdominal pain, but later Spears began to suffer from migraine headaches, including blurred vision and an inability to focus. *Id.* at 4. On August 28, 2008, Spears went to the emergency room at St. Francis Hospital for a migraine

headache. While there, Spears underwent a CT scan, followed by an MRI on September 2, 2008, both of which were abnormal. *Id.* at 4-5.

Spears' migraines and related symptoms persisted, and shortly after this MRI, in September 2008, Spears stopped working and applied for Short Term Disability ("STD") benefits. *Id.* at 5. Liberty determined Spears was eligible for STD, and paid Spears STD benefits based on her persistent symptoms. *Id.*

Spears underwent another MRI on October 6, 2008, which was abnormal. She was treated by a number of physicians in the fall of 2008, some of whom submitted letters to Liberty restricting Spears' work activities. *Id.* at 5-7.

Liberty referred Spears' STD claim for peer review by Dr. Potts, a neurologist. After consulting with Spears' treating physicians whose treatment notes indicated Spears suffered from "severe and persistent headaches," Dr. Potts' December 18, 2008 report concluded Spears suffered from "nearly daily headaches, the severity of which is likely to preclude her from working." *Id.* at 7. Liberty extended Spears' STD benefits through January 6, 2009. *Id.* at 8.

Spears returned to work part-time on January 8, 2009, and eventually Liberty extended Spears' STD benefits through February 8, 2019, but refused to extend them further. On January 29, 2009, Liberty also denied Spears Long Term Disability ("LTD") benefits because Spears' expected full-time return to work on February 9 would result in her failure to satisfy the Plan's Elimination Period requirement. The Elimination Period requirement mandated that Spears had to be disabled for the entire Elimination Period, which ran from September 27, 2008 until March 27, 2009.

*Id.* at 10.  Spears never did return to work full-time and worked part-time through March 24, 2009, when she quit working altogether.  *Id.* at 11.

The Remand Order Chronicled Spears' numerous appeals and the processes Liberty employed to resolve them.  During the appeals process, Spears continued to submit medical information to Liberty, as well as other relevant information, such as:

- A letter from Connecticut Assistant Attorney General Hulin stating that a medical peer review report by Dr. Silverman, which Liberty relied on in denying benefits to Spears, was not "supported by the evidence."  *Id.* at 21.

- A notice from the Connecticut Department of Social Services stating that Spears was "unemployable" for a period of at least six months due to being disabled.  *Id.* at 25 n.16.

- A Social Security Administration ("SSA") determination, in which  an administrative law judge concluded that Spears was disabled as of August 31, 2008, that her part-time return to work in January 2009 was an unsuccessful work attempt, and that she was properly diagnosed as suffering from Lyme disease in February 2009.  *Id.* at 30.

- An August 2010 notice from Liberty denying Spears life insurance coverage. *Id.* at 25.

Shortly after Liberty had completed its third review denying Spears' disability claim, on October 27, 2010, Spears' employer, UTC, contacted Liberty and requested that Liberty override its STD determination and issue Spears additional STD benefits, through the remainder of the eligibility period (March 27, 2009).  *Id.* at 29.  Accordingly, Spears received the maximum level of STD benefits for the period during which she was eligible.  UTC also requested Liberty re-open its LTD evaluation, which Liberty did.  However, this review, like all the others, resulted in a denial of disability benefits.  *Id.* at 29-31.

The Remand Order next discussed the details of Spears' disability "Plan," with which familiarity is once again presumed. Of particular relevance to this decision, the Remand Order stated the Plan provided for STD benefits, which were paid for by UTC, and LTD benefits, which were paid by a group insurance policy underwritten by Liberty. *Id.* at 32-35.

Next, the Remand Order noted the administration of both disability plans was governed by ERISA and discussed the applicable claim administration requirements. Principally the Order stated the ERISA claim administration processing "procedures must provide for 'a full and fair review of the claim and the adverse benefit determination.'" *Id.* at 36 (quoting 29 C.F.R. § 2560.503-1(h)(1)). To do this, a Plan must:

> (1) provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits. 29 C.F.R. §2560.503-1(h)(2)(ii); (2) provide a claimant, upon request and free of charge, reasonable access to, and copies of all documents and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8)[2] of this section. 29 C.F.R. §2560.503-1(h)(2)(iii); (3) provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. 29 C.F.R. §2560.503-1(h)(2)(iv); (4) provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual. 29 C.F.R. §2560.503-1(h)(3)(ii); (5) provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in

---

[2] 29 C.F.R. §2560.503-1(m)(8)(iv) defines "relevant" documents to include "a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination."

connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination. 29 C.F.R. §2560.503- 1(h)(3)(iv); and (6) provide that the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual. 29 C.F.R. §2560.503-1(h)(3)(v).

[ECF No. 103 at 36-37].

In its final section before analyzing Liberty's conduct in denying Spears' disability claims, the Court, in the Remand Order, set forth the proper legal standards, and found that because "Liberty was vested with 'the authority, in its sole discretion, to construe the terms of th[e] policy and to determine benefit eligibility [t]hereunder,' and its determinations of benefit eligibility were deemed 'conclusive and binding,'" the Court was mandated to employ an arbitrary and capricious standard of review in assessing Liberty's performance. *Id.* at 40-41. The Court noted that the "Second Circuit has held that, in certain circumstances, a plan administrator's failure to comply with the ERISA claims regulations requires courts to eschew the more deferential arbitrary and capricious review in favor of a more searching *de novo* review," but explained that the question of whether a plan administrator had to fully or only "substantially" comply with ERISA claims regulations "remain[ed an] open [question]," and that most courts leaned toward a substantial compliance standard, and only shifted to *de novo* review "if the plan administrator acted in a dilatory or bad faith manner." *Id.* at 41-42. Although Spears argued numerous grounds for finding Liberty violated ERISA claims procedures, which Spears argued compelled the Court to review Liberty's actions *de novo*, the Court declined to do so because it found no "dilatory conduct" nor evidence that

Liberty "failed to reach a decision" or "provide some explanation for it." *Id.* at 43-44.

In commencing its analysis of Liberty's performance in denying Spears' disability claims, the Court noted Liberty had a conflict of interest because it decides whether to pay claims it underwrites and is obligated to pay. Consequently, it has an incentive to deny claims because the denial of claims would positively impact its profitability. *Id.* at 49. The Court cited *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 108 (2008), for the idea that an ERISA fiduciary's conflict of interest is more important when the "circumstances suggest a higher likelihood that it affected the benefits decision," and found that because of a "number of serious 'decisionmaking deficiencies' in the course of Liberty's review of Spears' claim," the Court was obliged to afford "some weight to Liberty's conflict of interest." *Id.* at 50 (quoting *Durakovic v. Bldg. Serv.*, 609 F.3d 133, 140 (2d Cir. 2010)).

In the Remand Order, the Court found that Liberty's handling of Spears' claim for Short Term Disability ("STD") and LTD benefits was arbitrary and capricious. The Court so found because it was "deeply disturbed by the pervasive errors underlying Liberty's review of her claim, despite its many opportunities to perform a proper review." *Id.* at 77-78. Specifically, the Court found that "each and every peer review report upon which Liberty relied to deny STD and LTD benefits suffered from numerous and serious flaws, which render[ed] them insufficient to supply the substantial evidence necessary to support Liberty's denial decisions." *Id.* at 53. The peer review report errors included the following:

- Liberty changed initial peer reviewers midstream from Dr. Potts, who had issued a finding favorable to Spears, to Dr. Taiwo, who did not, without explanation, which the Court found "suspect." *Id.* at 54. Moreover, Liberty "asked Dr. Taiwo to answer an irrelevant question," namely, whether Spears' medical information supported "*ongoing* restrictions and limitations" from April 23, 2009 onward, when the key question was whether Spears' medical information supported Liberty's denial of benefits during Spears' "Elimination Period," which ran from September 27, 2008 to March 27, 2009.[3] *Id.* at 55 (emphasis in original). As a result, "*nowhere* in [Dr. Taiwo's] four-page report d[id] he consider Spears' condition prior to March 24, 2009, . . . "[n]or, based on the question he was asked, should he have." *Id.* at 56 (emphasis in original). In addition, Dr. Taiwo failed to review numerous relevant medical records from Spears' treating physicians, and "offered the wholly unsubstantiated conclusion that "[Spears'] medical records . . . do not support any specific limitations or restrictions," despite Dr. Taiwo being "well aware" that Spears had received STD benefits for four months after Liberty had found her disabled during a portion of the Elimination Period. *Id.* at 57-59. Finally, Liberty misled Spears in its benefits denial letter by stating that Dr, Taiwo's review "d[id] not support any restrictions and limitations . . . during the period of February 9, 2009[4] though the present date," despite Dr. Taiwo not addressing any period before April 23, 2009. *Id.* at 56-57.

- After Spears appealed Liberty's initial denial, Liberty referred Spears' case to Dr. Silverman, whose November 23, 2009 report "suffer[ed] from two fatal defects." *Id.* at 63. First, the bulk of Dr. Silverman's report was devoted to whether Spears suffered from Lyme disease, which made sense given the questions Liberty had asked Dr. Silverman, which pertained almost exclusively to whether Spears had Lyme disease or not. *Id.* at 63-64. But this was "not the relevant question," because what was relevant was "whether or not Spears' condition rendered her disabled within the meaning of the STD Plan," regardless of what caused her disability. *Id.* at 64. Second, Dr. Silverman used an improperly high standard for determining whether Spears was disabled, namely, whether there was "clear-cut evidence of impairment," which undisputedly was not required by either Spears' STD or LTD policies. *Id.* at 65. Additionally, Dr. Silverman's report, like Dr. Taiwo's, failed to "reconcile Liberty's finding that Spears was disabled at the beginning of the Elimination Period with its conclusion that she was no longer disabled," which was "an incongruity which permeated all of Liberty's findings and those of its peer reviewers. *Id.* at 68-69.

---

[3] This was the key question because one of the requirements for providing LTD benefits was Spears being disabled for the entire Elimination Period. *Id.* at 55-57.
[4] February 9, 2009 was the date that Liberty stopped paying Spears STD benefits.

- After granting Spears a second appeal, Liberty referred Spears' file, which now included the letter from Charles Hulin, Assistant Attorney General of the State of Connecticut, criticizing Dr. Silverman's report and stating that Liberty's denial "d[id] not appear to be supported by the evidence," back to Dr. Silverman. *Id.* at 70. The referral back to Dr. Silverman "directly violated the ERISA regulations, 29 CFR § 2560.503-1(h)(3)(v),[5] and virtually assured that Spears would not receive a full and fair review," because it was "nearly inconceivable that a consultant whose analysis and conclusion has been called into question by a state prosecutorial office would do anything other than defend that conclusion, particularly when Liberty asked him to 'comment on the assertion by Assistant Attorney General Hulin' and whether 'this information alter[ed] [the] prior assessment.'" *Id.* at 70-71. Finally, Dr. Silverman's second report "d[id] not even address whether Spears was disabled within the meaning of the STD Plan" because "Dr. Silverman addressed Spears' diagnosis, *not* whether her symptoms rendered her disabled under the Plan." *Id.* at 71 (emphasis in original).

- After Liberty agreed to give Spears a third appeal, it referred Spears' file to Dr. Brusch, an infectious disease expert, but his report has significant flaws. First, "[a]s was the case with Dr. Silverman's first report, nearly all of the questions Dr. Brusch was asked to consider concerned the accuracy of Spears' Lyme disease diagnosis and the quality of the treatment she was receiving for this disease," not "whether her symptoms rendered her disabled under the Plan." *Id.* at 71-72. Second, Dr. Brusch was asked to "list all clinically supported restrictions and limitations" from February 8, 2009 forward. The Court found the term "clinically supported" "troublesome, insofar as the question preclude[d] Dr. Brusch from considering the extent to which Spears suffered from impairments which did not or could not be demonstrated clinically." *Id.* at 72-73 (citing *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013), which held that a "the plan administrator must give sufficient attention to subjective complaints" and that "it is error to reject subjective evidence simply because it is subjective"). Even "more troubling" to the Court, however was Dr. Brusch's response, that "[f]rom an infectious disease evaluation, the claimant does not have any restrictions and limitations to her activity from [February 8, 2009] forward." The Court found that the qualifier "from an infectious disease evaluation . . . [was] both extremely vague and render[ed] the remainder of his answer non-responsive to the question he was asked." *Id.* at 73. Finally, Dr. Brusch concluded that Spears had "no significant chronic ongoing infectious disease(s) that could explain any degree of impairment," but that conclusion "d[id] not respond to

---

[5] On appeal, the claims procedures must "[p]rovide that the health care professional engaged for purposes of a consultation . . . shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." 29 CFR § 2560.503-1(h)(3)(v).

the relevant issue of whether Spears' symptoms rendered her disabled under the STD or LTD Plans." *Id.* at 73-74.

The Court also found fault with Liberty's final denial letter, dated June 15, 2011, which stated that Liberty declined to review certain medical information from August 8, 2010 through April 29, 2011 on the basis that the records were not relevant. The Court was troubled because Liberty had provided some of these same records to peer reviewers and had never before indicated that Liberty considered records irrelevant. *Id.* at 75-76 (citing *Saffon v. Wells Fargo Long term Disability Plan*, 552 F.3d 863, 871 (9th Cir. 2008), which held that "[w]hen an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.").

The Court remanded the case back to the Plan Administrator, i.e. Liberty, with four specific Orders for Liberty to follow:

- "First, Liberty is instructed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period. The question is *not* whether Spears' medical records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis." *Id.* at 78.

- "Second, while Liberty's reliance on independent paper reviews is not itself improper, the deficiencies present in each of the reviews undertaken so far indicate that Liberty must take much greater care in posing relevant questions to its peer reviewers and ensuring that the responses that they receive are both consistent with the terms of the Plan and are responsive to the question asked. In fact, given the multiple deficiencies in each of these reviews, Liberty 'would be well-advised, upon reconsideration, rather than simply conducting a paper review of [Spears'] claim, to have an independent medical examination performed on [Spears], or at a minimum, to have its medical consultants communicate with [Spears'] treating physicians in

order to fully understand the basis for their [opinions].'"[6]   *Id.* at 78-79 (quoting *Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ. 3874 LAK, 2005 WL 5253336, at *12 (S.D.N.Y. Sept. 2, 2005)).

- "Third, Liberty is instructed to perform a full and fair review that complies with the ERISA claims regulations.  *See Solnin v. Sun Life & Health Ins. Co.*, 766 F. Supp. 2d 380,393-94 (E.D.N.Y. 2011) (holding that the ERISA claims regulations apply to post-remand benefits determinations) (citing cases).  This includes (but is not limited to) having Spears' file reviewed by individuals who were neither 'consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual,' 29 C.F.R. § 2560.503-1(h)(2)(v), permitting Spears 'to submit written comments, documents, records, and other information relating to the claim for benefits," 29 C.F.R. § 2560.503-1(h)(2)(ii), 'tak[ing] into account all comments, documents, records, and other information submitted by [Spears] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination,' 29 C.F.R. § 2560.503-1(h)(2)(iv), and 'not afford[ing] deference to the initial adverse benefit determination.'  29 C.F.R. § 2560.503-1(h)(3)(ii)."  *Id.* at 79-80.

- "Finally, there is the question of how some or all of Spears' post-Elimination Period medical records (which comprise a substantial amount of the medical records in this case) bear on the question of Spears' eligibility for LTD benefits.  As an initial matter, they are certainly relevant to the question of whether Spears was unable to perform the 'Material and Substantial Duties of her Own Occupation' 'during the Elimination Period *and the next 24 months*,' and if 'thereafter' she was 'unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.'  In addition, such post-Elimination Period evidence may be relevant to Spears' condition during the Elimination Period, insofar as it 'speaks to the credibility and accurateness of [] earlier evaluations and opinions.'  This is particularly true here, where Spears received multiple letters from her treating physicians during the Elimination Period stating that she was unable to work full or even part-time, and where Liberty appears to have given these letters minimal weight in the absence of sufficient amounts of corroborating medical records.  Thus, on remand Liberty may not categorically dismiss some or all of Spears' post-Elimination Period medical records as 'not relevant' without a reasonable explanation."  *Id.* at 80-81 (emphasis in original) (citations omitted).

---

[6] The Court also noted that Liberty's peer reviewers' efforts to speak with Spears' treating physicians was "limited" in that contact with them was sporadic and ineffective.  *Id.* at 79 n.33.

Judgment was then entered for Spears the same day that the Court's Remand Order issued, March 31, 2015, [ECF No. 104], and the case was remanded to Liberty for action in accordance with the Court's Remand Order.

## II. Liberty's Actions on Remand

### A. The Initial Remand Review

The first action Liberty took occurred on July 24, 2015, almost four months after the Court's Remand order issued, when Liberty's counsel sent Spears' counsel a letter "writ[ten] on behalf of Liberty," stating that Liberty had reviewed the Court's March 31, 2015 Memorandum of Decision, inviting Spears to submit whatever additional documentation she wished for Liberty to consider on remand, and asking her to complete various attached forms and to submit detailed information about any employment she had obtained, "including self-employment," between February 9, 2009 and July 24, 2015. [AR 4892-93]. In the last paragraph, Liberty's counsel stated that "[a]lthough ERISA does not prescribe Liberty Life's deadline for review of the evidence in support of Plaintiff's claims, it will strive to follow the appeal review deadlines set forth in the Regulations." [AR 4893; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 91; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 91].[7] Although Liberty's letter referenced

---

[7] In her Local Rule 56(a)(1) Statement, Spears said "Liberty took the position that the ERISA claim regulation did not apply to this claim on remand. *Id.* ¶ 91. In Liberty's Local Rule 56(a)(2) Statement, in response, Liberty stated "[b]ased on the Administrative Record of Plaintiff's claim and second, optional request for review on remand in the instant action, Defendants deny the statements made in Paragraph 91, as stated. Responding further, Defendants admit only that the Administrative Record contains a letter dated July 24, 2015, referenced by Plaintiff that stated the following with respect to ERISA's administrative procedure regulations." Liberty then quoted the entire last paragraph of Liberty's counsel's

attached forms and asked Spears to complete and return them, no forms were enclosed with the letter. Liberty mailed Spears a separate letter nearly a week later dated July 30, 2015 with which forms were enclosed and asked Spears to return those forms to Liberty by August 31, 2015. [AR4890; AR 4882-990; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 92; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 92].

On August 26, 2015, Spears provided the wage information requested, and requested to know why new medical authorization forms were required. [AR4873-81]. Liberty responded on September 1, 2015, stating that its last correspondence

---

July 24, 2015 letter. [D's Local Rule 56(a)(2) Statement at ¶ 91]. Liberty's Local Rule 56(a)(2) Statement violates Local Rule 56 in at least three ways. First, Liberty did not "include a reproduction of each numbered paragraph in the moving party's Local Rule 56 (a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." D. Conn. L. R. Civ. P. 56(a)(2)(i). Second, this Local Rule requires "a separate section entitled 'Additional Material Facts' setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party." D. Conn. L. R. Civ. P. 56(a)(2)(ii). No such section appears in Liberty's Statement. Finally, and most importantly, Local Rule 56(a)(3) requires that "each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Further, the 'specific citation' obligation of this Local Rule requires parties to cite to specific paragraphs when citing to affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." D. Conn. L. R. Civ. P. 56(a)(3). Liberty's statement that it based its denial in paragraph 91 on "the Administrative Record of Plaintiff's claim and second, optional request for review on remand in the instant action," [ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 91], does not meet the "specific citation" requirement of Local Rule 56(a)(3). As a result, the Court is free to deem admitted certain facts that are supported by the evidence or grant Spears' Motion for Summary Judgment if warranted as a matter of law. D. Conn. L. R. Civ. P. 56(a)(3).

with Spears had occurred on June 15, 2011, and that the last medical records Spears submitted to Liberty were received in April 2011, but the wage information Spears provided showed she went back to work in August 2014 and she was now claiming that she was fully disabled through July 2014 and partially disabled from August 2014 through April 2015. Thus, Liberty needed medical records from April 2011 through April 2015. Liberty also asked Spears to provide the forms previously sent and the required medical authorization by September 15, 2015. [AR4871-72]. The same day, Spears asked for more time to submit the requested forms. [AR4870]. Spears sent the requested forms to Liberty on September 10, 2015. [AR4859-4869]. On September 16, 2015, Spears supplemented her list of medical providers with three additional providers. [AR4855].

On October 14, 2015, Liberty assigned Nancy Winterer to oversee the remand determination. [AR4854; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 95; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 95]. On October 20, 2015, Winterer sent medical record release forms signed by Spears on September 8, 2015 via fax to Dr. Richard Shoup, one of Spears' medical providers, and requested that he provide Spears' medical records by November 9, 2015. [AR4849-53]. Identical letters were faxed to 24 other medical providers the same day, also requesting responses by November 9, 2015. [AR4753-4848].[8]

On October 21, 2015, Winterer overnighted Spears' counsel an unsigned letter stating that "[t]he claim documentation for this appeal was received in this

---

[8] The record shows the letter to James O'Brien was mailed rather than faxed. [AR4805-08].

office on October 14, 2015. Thus, day 45 of this appeal review is November 26, 2015." [AR4751-52; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 93, 94; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 93, 94]. The letter said it was attaching copies of the letters sent to 27 of Spears medical providers on October 20 and 21, 2015, which were required because information Spears filled out on September 8, 2015 indicated she was claiming disability for "seven years."[9] *Id.* Finally, the letter stated that under ERISA:

> "an appeal determination should be rendered within 45 days of receipt of appeal, unless there are special circumstances beyond Liberty's control which require a delay in making a determination. If additional time is needed, ERISA allows for a 45 day extension to evaluate and render an appeal decision. The days allowed for receipt of the additional medical documentation are days tolled and are not counted in the 90 day appeal review period. Therefore, the days from October 20, 2015 through the date all the necessary documentation is received, are days tolled and not counted in the 90 day Appeal timeframe."

[AR4751].[10]

On October 22, 2015, Winterer ordered a database search of Spears, consisting of a search of an "ISO Claim search," "Accurint/Lexis Nexis" search for drivers license information for Connecticut and Louisiana, "SSN Searches," "Change of Address," "Occupation and Professional Licensing," and "Social

---

[9] The letters attached to Winterer's October 21, 2015 letter include 25 total medical providers, not 27.

[10] An almost identical letter, but containing Winterer's signature, is found at AR4708-09. It is unclear from the record if this letter was sent to Spears. The letter adds a footnote 1 that says "[p]ursuant to ERISA Regulations, additional time for a final decision may exceed 90 days to the extent that the timeframe is tolled while Liberty is awaiting receipt of requested documentation needed to fully evaluate your claim. (Tolled: accumulation of time is suspended.)." [AR4708]. The letter attaches letters sent to two more of Spears' medical providers and one employer, asking for employment records for 2014 and 2015. [AR4710-20].

Media Searches (Facebook, Twitter, etc.)."  [AR2288 note 32; AR4702; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 97; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 97].  The "ISO Claim search" was completed immediately and the data was loaded into Liberty's database.  [AR2288 note 31].

Liberty also hired ICS Merrill EMSI Investigative Services ("ICS Merrill") to investigate Spears.  [AR2288 note 31; AR 4564; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 100; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 100].[11]  ICS Merrill completed their search on October 27, 2015, and it reported finding no social media records for Spears, nor any professional licenses.  ICS Merrill did, however, include in its report the Facebook pages of Spears' relatives Tommy Baumann, Charlie Baumann, and David Shane Spears, Google map views and photographs of Spears' residences in West Hartford, Connecticut, Somerville, Massachusetts, and Shreveport, Louisiana, and this Court's Memorandum of Decision Granting in Part and Denying in Part Defendants' Motion to Dismiss, [ECF No. 13], dated August 3, 2012.  [AR4564-92; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 100, 101; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 100, 101].

Liberty realized that it inadvertently failed to send Spears its "Training-Education-Experience" form when it sent its other forms to Spears in July 2015,

---

[11] Spears' Rule 56(a)(1) Statement in the cited paragraph says Liberty hired a private investigator to investigate Spears.  Liberty denies this and says there is no evidence in the record that Liberty hired a private investigator.  This appears to be a question of semantics because the record reflects Liberty hired ICS Merrill Investigative Services which investigated Spears and gathered information about her relatives.

and although Spears had completed all of Liberty's requested forms to date, on December 1, 2015 Liberty asked Spears to complete the Training-Education-Experience form, which Spears submitted to Liberty on December 7, 2015. [AR2286-87 note 40; AR2878; AR2875; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 105; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 105].

On January 12, 2016, Spears requested that Liberty adjudicate Spears' disability claim. [AR2723; AR2286 Note 13; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 110; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 110].

On January 29, 2016, Liberty referred Spears' case for peer review to Behavioral Management, Inc. ("BMI").[12] [AR2285 Note 48; AR2709-12; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 111; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 111]. Liberty listed "Headache" as the "Primary Diagnosis," stated that Spears' disability started on "9/27/2008, initially due to Headaches," and requested peer review by a panel to assess Spears' "functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." [AR2709-10]. The peer review request also asked for a panel review by Endocrinology, Gastroenterology, Infectious Disease, Neurology, Neuropsychology, and Internal Medicine, [AR2710], with Internal Medicine to include a review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, Ophthalmology, Dermatology, and Primary Care records. *Id.*

---

[12] Liberty's referral records indicate the entity contracted to perform the peer review was "Behavioral Management, Inc." [AR2285 Note 49; 2709]. BMI's report, however, indicates the name of the entity is Behavioral Medical Interventions." [AR2597]. In any case, the Court refers to this entity as BMI.

The peer review was split into six medical specialties. Each specialist was tasked to review part of Spears' medical record, speak to certain of her treating physicians and answer specific questions relating to Spears' medical condition during specified timeframes:

- **Endocrinology: This section asked BMI to "contact Robert Lang, MD, . . . who treated [Spears] from 2/21/13 through 7/10/14, regarding Ms. Spears' condition, treatment and functional capacity." It also asked the following two questions: (1) "From an Endocrinology perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from an Endocrinology perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." *Id.*

- **Gastroenterology: This section asked BMI to "contact James O'Brien, MD, . . . who treated [Spears] from 4/8/08 through 4/17/14, regarding Ms. Spears' condition, treatment and functional capacity." It also asked the following two questions: (1) "From a Gastroenterology perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from a Gastroenterology perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." *Id.*

- **Infectious Disease: This section asked BMI to "contact Zane Saul, MD, . . . who treated [Spears] from 8/8/10 through 6/9/14, regarding Ms. Spears' condition, treatment and functional capacity." It also asked the following two questions: (1) "From an Infectious Disease perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from an Infectious Disease perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." *Id.*

- **Neurology:** This section asked BMI to "contact Dario Zagar, MD, . . . who treated [Spears] from 2/26/09 through 8/19/11, regarding Ms. Spears' condition, treatment and functional capacity." It also asked BMI to "contact Joachim Baehring, MD, . . . who treated [Spears] from 11/25/08 through 4/22/13, regarding Ms. Spears' condition, treatment and functional capacity." It also asked the following two questions: (1) "From a Neurology perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from a Neurology perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." *Id.*

- **Neuropsychology:** This section asked BMI to "explain the results and conclusions of the July 2010 Neuropsychological Evaluation of Marian Rissenberg, PhD, including areas of cognitive strength and weakness, and psychological findings. Please discuss how the strengths and weaknesses obtained on testing represent the following: · Valid effort on the part of [Spears] to perform at her highest level. · Appear consistent or inconsistent with Ms. Spears' subjective complaints. · Compared with estimated levels of previous function. · Whether results of testing were influenced by factors such as secondary gain− financial or emotional, lack of job to return to, lack of motivation, etc." It also asked the following two questions: (1) "From a Neuropsychology perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from a Neuropsychology perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." [AR2710-11].

- **Internal Medicine** (including review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, Ophthalmology, Dermatology, and Primary Care records): This section asked BMI to "contact Kristin Giannini, MD, . . . who treated [Spears] from 3/10/09 through 11/25/13, regarding Ms. Spears' condition, treatment and functional capacity." It also asked the following two questions: (1) "From an Internal Medicine perspective, based on the available medical evidence, please describe [Spears'] impairments, causes of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." (2) Based on the medical evidence, from an Internal

Medicine perspective, please provide your best assessment of [Spears'] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015."  [AR2711].

BMI employed four medical professionals to perform its peer review: Robert Cooper, M.D., who is listed as analyzing "Endocrinology" and "Internal Medicine"; Kent Crossley, M.D., who is listed as analyzing "Infectious Disease" and "Internal Medicine"; Daniel Kitei, D.O.[13], who is listed as analyzing "Neurology" and "Neuromuscular Medicine" and; Michael Raymond, PhD, who is listed as analyzing "Neuropsychology."  [AR2597; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 115, 119, 140, 144; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 115, 119, 140, 144].  These medical professionals reviewed Spears' medical records, which were delineated in their report, participated in one group conference call, and attempted to contact several of Spears' medical providers, but did not examine Spears.  BMI provided its report to Liberty on March 4, 2016.  [AR2597-2685; P's Local Rule 56(a)(1) Statement at ¶¶ 114, 115; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 114, 115].

Dr. Cooper first stated that "[a]t issue is whether the evidence in the chart supports that the claimant is impaired with restrictions and limitations, and whether or not the evidence supports that the claimant is unable to work during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015."  [AR2598].  He then noted that he reviewed all of the listed medical records "in their entirety," and would "summarize those portions of the records received that have relevance

_____

[13] D.O. apparently stands for Doctor of Osteopathy, or a doctor specializing in the joints, muscles and spine.

to the questions and timeframe identified for this review, and within the scope of my areas of endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care." [AR2601; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 141; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 141]. He then summarized the records from eight of Spears' medical providers, including Dr. Giannini, who noted on March 10, 2009 and June 18, 2009 that Spears complained of headaches. [AR2602]. During the conference call, Dr. Cooper stated that he was "asked to look at the case from several perspectives, including endocrinology, rheumatology, GI, and cardiology." [AR2608]. Dr. Cooper then summarized his findings "[f]rom an endocrinology perspective," "[f]rom a rheumatology/musculoskeletal perspective," and "[f]rom a gastronenterological perspective." He also discussed Spears' sleep studies. *Id.* In discussing his findings from an endocrinology perspective, Dr. Cooper stated that "there is no evidence in the available records to support impairment." *Id.* In discussing his findings from a rheumatology/musculoskeletal perspective, Dr. Cooper cited to Dr. Giannini's findings as follows: "[Spears'] PCP, Dr. Giannini, opined restrictions and limitations in 2010 due to her plethora of symptoms, but provided no clinical evidence to back up her opinion within the medical records provided for review." *Id.* In discussing his findings from a gastroenterology perspective, Dr. Cooper "noted that there were no abnormal findings." *Id.* Dr. Cooper summarized that "there is no evidence within the available records to support functional impairment for the timeframe in question." *Id.* Dr. Cooper's summary of his findings in BMI's report states that "the evidence does not support global impairment and that [Spears] is able to work

without restrictions during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015." [AR2610; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 143; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 143].

Dr. Crossley first stated that "[t]he primary medical issue in question in this review is to determine if the claimant has had any infection that would be responsible for her non-specific symptoms and if these would be functionally impairing." [AR2598]. He then summarized the findings of four of Spears' medical providers, first noting that Spears "has had a broad spectrum of medical complaints," including fatigue, sensitivity to smells, slurred speech, sensitivity to sound, neck pain, night sweats, fever, heart palpitations, gastrointestinal problems, joint pain, muscle weakness, fasciculations, neuropathy, sleep disturbances, depression, anxiety, and neurocognitive deficits." [AR2603]. He then summarized Spears' treatment and diagnoses for various diseases. [AR2603-04]. During the conference call, Dr. Crossley first stated that there was "nothing in the available records to support impairment," and then noted the above symptoms "reported" by Spears, and that she "seemed to bounce from one doctor to the next for several years until she found Dr. Raxlen, who opined that she had Lyme disease." [AR2608-09]. He noted that Spears had been tested positive for the IgG antibody on February 3, 2009, which could indicate the presence of Lyme disease, but then opined that because her other testing was negative, "this result means nothing." [AR2609; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 144; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 144]. Dr. Crossley agreed with Dr. Cooper and found that "the evidence shows self-reported symptoms and a lack of objective

data [and therefore] . . . functional impairment is not supported for the timeframe in question." *Id.* In his summary, Dr. Crossley stated that he "agree[d] with Dr. Brusch (infectious disease) who wrote in his peer review report of 9/27/10 that Spears 'does not have Lyme disease of any type.'" [AR2610]. Dr. Crossley's summary states further that "[t]here is no evidence the claimant has had Lyme disease or other infections that would be functionally limiting." *Id*.

Dr. Kitei's section of the report first stated that "[t]he primary medical issue in question in this review is unclear from a neurologic standpoint," but then noted that several of her medical providers had found that she had "cognitive problems and migraine," "Lyme disease" which made her unable to work, "fatigue and cognitive changes," and "lifting and cognitive limitations." [AR2598; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 148; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 148]. In his analysis Dr. Kitei noted that Spears went to the emergency room with migraines on August 28, 2008, and that a "CT scan of her head revealed low attenuation in the right temporal lobe." [AR2604; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 149; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 149]. He then noted that Spears saw a medical provider on September 8, 2008 "complaining of blacking out and headache." *Id.* Dr. Kitei noted that Spears complained of headaches in 2008 and 2009 but found that those complaints were resolved by 2013 and "the evidence does not support impairment from a neurologic standpoint." [AR2610]. In the conference call, Dr. Kitei stated that he agreed with Dr. Cooper and Dr. Crossly that "there is nothing within the available records to support impairment." *Id.* He did not reconcile that conclusion

with his notation of the low attenuation in Spears right temporal lobe. *Id.;* [AR2604; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 149; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 149].

Dr. Raymond first stated that "[t]he primary medical issue in question in this review, from a neuropsychological perspective, is noted as: whether there is evidence to support neurocognitive deficits that would be functionally impairing within the time frame in question from 9/27/08 – 3/31/15." [AR2598]. He then stated that he had reviewed all the medical records provided "in their entirety," and that his analysis was "a summary of those records deemed most relevant to the questions and time frame identified for this review and with the scope of my practice and area of expertise as a board certified neuropsychologist." [AR2605]. Dr. Raymond stated that "the medical record review contained voluminous, redundant, and obsolete records to the clinical issue and timeframe currently under review," *id.*, but failed to explain why medical records from 2008 and 2009 were obsolete to Spears' medical condition during that time. Dr. Raymond noted that "[a] plethora of possible etiologies [i.e. causes], the vast majority of which were non-specific, were laced within the voluminous medical records review." [AR2598-99]. He noted that Spears was found disabled on September 27, 2008 due to headaches and discussed the letters sent by several of her doctors in late 2008 and early 2009 discussing how these headaches made per unable to work. [AR2605-06; P's Local Rule 56(a)(1) Statement at ¶ 127; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 127]. Dr. Raymond then discussed various clinicians' attempts to determine the cause of Spears' headaches and cited the two peer

review studies conducted by Dr. Silverman in detail, including Dr. Silverman's findings that there was "no clear-cut evidence of impairment from 2/8/09 to the present." [AR2606-07].

Dr. Raymond noted that Dr. Raxlen had conducted a "mental residual functional capacity assessment" on January 20, 2010, which found Spears "'markedly limited' in memory and cognitive functioning, including 'remember locations, understanding very short simple instructions, carrying out detailed instructions, performing activities within a schedule, and set realistic goals and make plans independently,' but Dr. Raymond noted that this assessment did not "coincide with [Spears'] actual functional abilities at the time." [AR2609; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 122, 123; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 122, 123]. Dr. Raymond did not, however, cite to any of Spears' "actual functional capabilities" in his report nor did he provide his own assessment of Spears' functional capacity concluding only that "there is no valid objective evidence to support neurocognitive deficits associated with chronic headache or a plethora of other reported possible etiologies, within the timeframe of 9/27/08 – 3/31/15." [AR2597; P's Local Rule 56(a)(1) Statement at ¶ 133; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 133].

Dr. Raymond did not examine Spears and he provided no opinion of the credibility of Spears' subjective complaints. Nor did he challenge the credibility assessments and weight given to her subjective complaints by her treating physicians who observed, examined and treated Spears over a lengthy period of time.

Finally, Dr. Raymond criticized the neuropsychological assessment conducted by Dr. Rissenberg, finding it "marginal from a neuropsychological perspective, non-comprehensive, and nonstandardized," apparently because certain tests Dr. Raymond thought were important, in addition to the ones Dr. Rissenberg administered, were not conducted, and because Dr. Raymond considered the assessment, conducted in July 2010, obsolete because it was "6 years old." [AR2607]. Dr. Raymond made particular note of the fact that Dr. Rissenberg did not test Spears' effort to rule out malingering, a routine test administered to subjects whose complaints are subjective. [AR2607, 2609, 2611]. During the call Dr. Raymond stated that he agreed with the other doctor's assessments and that "there is no evidence in the available documentation that the claimant is suffering from neurocognitive abnormalities." [AR2609].

Dr. Raymond also disagreed with Dr. Rissenberg's July 2010 assessment that found Spears' test results "consistent with frontal or diffuse cerebral dysfunction as seen in chronic infectious and inflammatory illness," and summarized that "there is no evidence in the records to support functional impairment, and no etiology to support any neuropsychological diagnoses." [*Id.*; P's Local Rule 56(a)(1) Statement at ¶ 128; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 128]. In his summary Dr. Raymond stated that "neurocognitive impairment is not supported within the time frame in question (9/27/08 – 3/31/15)" because "all neurological examinations, as previously discussed, were well within the normal range." [AR2611]. He also noted that "[u]nfortunately, based on a dearth of neuropsychological evidence, the undersigned is unable to render a

conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested timeframe. However, the available neuropsychological evidence offered in the medical record does not support presence of neurocognitive impairments or restrictions, including activities of daily living (ADL) for the noted timeframe." [AR2614; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 114, 115; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 114, 115]. .

Raymond acknowledged, but did not analyze, Spears' CT scan and MRIs showing brain abnormalities, but found those "stable." While commenting on the stability of the objective diagnostic findings, he did not comment on the severity or debilitating effect of these abnormalities. Finally, he referenced the "plethora of other subjective complaints and medical issues" that had been "noted and addressed over time," but did not comment on them, suggesting he did not consider her subjective complaints and medical issues. [AR2611].

Only one of Spears' treaters was contacted by a reviewer. That treater was her endocrinologist Dr. Lang, who reported on February 19, 2016 that Spears had "incidental thyroid cancer," which was being treated and that there "should be no impact on her functionality from an endocrine perspective." [AR2616].

On March 16, 2016, Winterer followed up, asking BMI to ask Dr. Raymond three questions: "(1) Please explain the reason you conclude the data provided for this review was 'mostly obsolete.' (2) Please explain how the data you described as 'mostly obsolete' reflects on [Spears'] impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity

during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015. (3) Please explain how the 'obsolete (6 years old)' results of Dr. Rissenberg's July 2010 neuropsychological evaluation reflect on [Spears'] impairments, cause of any impairments, severity of any impairments, duration of any impairments, and functional capacity during the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 3/31/2015."  [AR2557-58; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 135; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 135].

In response, Dr. Raymond provided an addendum that stated "my opinion from my original report has not changed.  [AR2511; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 136; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 136].  He also stated that he considered Dr. Rissenberg's report obsolete because "[f]rom a neuropsychological perspective" it was six years old and "abbreviated, nonstandardized," and not including formal testing, and Dr. Raymond had "updated neuropsychological information."  [AR2512; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 136; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 136].  He also stated that "[f]rom a neuropsychological perspective . . . given the dearth of updated neuropsychological data, the aforementioned information, in and of itself, does not reflect the claimant's impairments, cause of any impairments, severity of impairments, or limits on functional capacity."  Finally, he stated that "in essence, without having comprehensive and updated neuropsychological data, the undersigned was unable to render a clinical opinion regarding limitations, restrictions, or functional capability, with any degree of neuropsychological

certainty." [AR2512; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 138; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 138].

On February 10, 2016, 13 days after it had referred Spears' case to BMI, Liberty requested an independent medical examination ("IME") of Spears by an entity called Medical Consultants Network, LLC ("MCN"). [AR2284 Note 1; AR2492; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 153; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 153]. Dr. Courtney conducted the IME for MCN on March 14, 2016 and his report was forwarded to Liberty the same day. [AR2492]. In his report, Dr. Courtney documented his physical examination of Spears, and the review of Spears' medical records, writing short summaries of some of them. [AR2494-2506; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 159; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 159].[14]

Dr. Courtney was asked a number of questions. The fifth asked for an "[o]pinion regarding verifiable physical impairment: Based on the review of functional evidence, clinical exam findings, and diagnostic test evidence, does the insured have any verifiable functional impairment? For any impairment confirmed, please provide the clinical, diagnostic, and/or functional evidence supporting your opinion." [AR2507]. Dr. Courtney responded: "As far as from March 28, 2009, and to the present, the patient had multiple complaints that were basically non-verifiable. . . . As far as the periods from September 27, 2008, through March 27, 2009, apparently the patient had multiple physicians who supported her inability to

---

[14] It is undisputed that Dr. Courtney's IME was not sent to Spears' treating physicians. [ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 196; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 196].

even do sedentary activities.  Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective."  *Id.*

The sixth question asked for an "[o]pinion regarding medically-supported physical restrictions/limitations: For any physical impairment confirmed, please provide specific physical restrictions/limitations.  Please define by type of task [sitting, standing, lifting, etc.], as well as frequency of task [never, occasional, frequent, constant].  Include duration of physical restrictions/limitations.  Is there any medical or functional evidence supporting your opinion?"  *Id.*  In response, Dr. Courtney said "[i]t would be virtually impossible, based on the review of these records, to determine what this patient could have done from September 27, 2008, through March 27, 2009, without examination of the patient; however, her limitations, again, seem to be more subjective than objective regarding her headaches, headache frequency, and her myofascial complaints.  Apparently, the patient was able to work at least part time during that period, but seemed to be plagued by fatigue.  Again, her limitations would be subjective at best."  [AR2508].

The eighth question asked for an "[a]ssessment of functional inconsistencies: Compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted."  *Id.*  In response, Dr. Courtney stated "[p]atient debilitating fatigue, headaches, and cognitive dysfunction which are difficult to objectively document."  *Id.*

Question nine asked for a "[s]ummary of your overall impression regarding the insured's current verifiable physical impairments, medically-supported

physical restrictions/limitations, and maximum full-time work capacity." *Id.* In response, Dr. Courtney summarized:

> As far as to the extent of which the results of this Independent Medical Examination provide any information concerning the periods of September 27, 2008, through March 27, 2009, apparently the patient was placed on work restrictions, from my review, at least from November of 2008 through January of 2009, in which she was to return to work. Again, there was a reviewer that noted that from March 24, 2009, through May 11, 2009, she had no verifiable evidence of why the patient could not work. As far as that extension from that period of time through March 31, 2015, it does not appear that the patient had any incapacitating diagnosis. She had apparently been previously taken off work. The chiropractic notations of lumbalgia and cervical segment dysfunction and cervicalgia would not be a reason for the patient to not be able to perform at least sedentary work during that period of time.

[AR2508-09].

On April 6, 2016, Dr. Zagar, Spears' former treating physician, wrote Liberty a letter after reviewing the BMI peer review report, commenting on it and disagreeing with its conclusions:

> I cared for Haley Spears from January of 2009 through October 2011. . . . Ms. Spears was dealing with symptoms including frequent headaches, severe fatigue, joint pains, digestive problems, and cognitive complaints. Testing was notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease. She was also under the care of a rheumatologist and infectious disease specialist for her issues, and received long term antibiotic therapy and a variety of symptomatic treatments with only minimal improvement in her symptoms. She continued to have fatigue and cognitive issues which limited her daily functioning, and in my opinion she was unable to work, even on a part-time basis. At the time I was seeing her, she seemed to do little outside of seeing her doctors because of her various symptoms. She was unable to drive or handle some other basic daily activities. Neuropsychological testing done in 2010 showed cognitive impairment, which was consistent with her subjective symptoms. While I would agree that a diagnosis of CNS Lyme was not certain, she clearly has had some multisystem disorder (e.g., an unspecified autoimmune disorder or fibromyalgia) that

produced her constellation of multiple somatic and cognitive symptoms, and which affected her enough to impair her daily functioning. To be frank, on review of your physicians' assessments of her prior medical records, it is clear that each took as skeptical and unsympathetic a viewpoint as possible when assessing her case, which is unfair to this unfortunate young woman. I am certain that if any of them had been her treating physician rather than an insurance reviewer they would not have taken the same approach.

[AR2484; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 166-68; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 166-68].

Also, on April 6, 2016, Dr. Rissenberg sent Liberty a response to Dr. Raymond's critique of her July 2010 neuropsychological assessment of Spears. [AR2486-88; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 169; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 169]. Dr. Rissenberg explained that Dr. Raymond's characterization of her assessment as "cursory" or "abbreviated" was incorrect. [AR2486, 2489-90; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 169-71; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 169-71]. Rather, Dr. Rissenberg explained, her July 2010 assessment of Spears was thorough, appropriate and well founded because she spent nine hours with Spears, administered six different psychological tests to Spears, and then spent eight hours analyzing the results. [AR2486; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 171; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 171]. She explained that her assessment provided "clear and objective evidence, as well as clinical evidence, of significant impairment in multiple areas of function," including "Spears obtain[ing] a Working Memory Index at the 12th percentile," which was "*statistically significant*," and an "Auditory Delayed Memory Index" at the 6th percentile, which was "in the Borderline Defective range, impaired by any

standard." [AR2487 (emphasis in original); ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 173; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 173].

Next, Dr. Rissenberg noted that the tests that Dr. Raymond criticized her for not giving were unnecessary because the things they tested for, such as whether a patient was malingering or not making an effort to properly take the tests, were already obvious from Spears' responses to the tests Dr. Rissenberg *did* administer. [AR2488; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 175; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 175]. Finally, Dr. Rissenberg stated that her July 2010 assessment of Spears was appropriate and comprehensive, and it "demonstrate[d] statistically significant impairment of cognitive function." [AR2488].

On April 11, 2016, Spears filed a Complaint against Liberty in this Court, *Spears v. Liberty Life Assurance Co. of Boston*, 3:16-cv-572 (VLB) (D. Conn.), which stated that "[a]s defendants have exceeded the time limit allowed by ERISA in which to make a decision, Spears' claim is deemed denied." [ECF No. 138-2, P's Local Rule 56(a)(1) Statement Exhibit B at 2, ¶ 176; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 176].[15]

On April 13, 2016, Dr. Giannini wrote a letter "To whom it may concern," which was forwarded to Liberty on April 14, 2016, in which she stated:

---

[15] That case was dismissed by the Court *sua sponte* on August 21, 2017, [3:16-cv-572 ECF No. 75], as the Court had retained jurisdiction over the remand proceedings in the above-captioned case, 3:11-cv-01807 (VLB). The operative complaint is therefore Plaintiff's Amended Complaint, [ECF No. 110], filed August 30, 2017, which does include allegations that Liberty violated ERISA on remand by not meeting ERISA's claim processing deadlines. [ECF No. 110 at 2-3, ¶ 33].

> I was treating Haley [Spears] during the period in question for
> headaches and fatigue. Headaches and fatigue have no specific
> objective evidence to indicate quality and severity. They are measured
> based on patient subjective report. During this period Haley's
> headaches and fatigue were severe enough that she would have spent
> significant amounts of time away from a job. She would have been an
> unreliable employee and missed many days of work. She was most
> definitely disabled during this period.

[AR2469-70; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 165; ECF No. 159,

D's Local Rule 56(a)(2) Statement at ¶ 165].

On April 29, 2016, BMI, now called R3 Continuum, sent Liberty an addendum

to BMI's previously submitted peer review report. [AR2411-15; ECF No. 138-2, P's

Local Rule 56(a)(1) Statement at ¶ 177; ECF No. 159, D's Local Rule 56(a)(2)

Statement at ¶ 177]. In the addendum, Dr. Kitei responded to the letter Dr. Zagar

had submitted and Dr. Raymond responded to the letter Dr. Rissenberg had

submitted. *Id.*

Dr. Kitei concluded that "the evidence does not support impairment from a

neurologic standpoint in regards to the complaints of headache" because Dr.

Zagar's letter "d[id] not offer any additional information from a neurological

standpoint." [AR2411; AR2414]. He continued:

> Dr. Zagar's note also details that he felt that the claimant was limited
> in functioning due to fatigue and cognitive issues so was unable to
> work, but as previously noted, opining on the cognitive issues and any
> impaired functioning in that regard will be yielded to Dr. Raymond for
> this report as per my instructions. From a neurologic standpoint there
> is no additional information that would alter my previous opinion that
> the evidence does not support impairment from a neurologic
> standpoint. As noted previously, the claimant complained
> intermittently of headaches but notes including 2009 and 2010 detailed
> that she had significant improvement and she has had consistently
> normal neurological examinations as detailed previously. . . . My
> previous report discussed in detail why the evidence does not support
> impairment from a neurological standpoint.

[AR2414-15].  Dr. Kitei neither acknowledged nor assessed abnormalities reflected in Spears' diagnostic test results.

Dr. Raymond concluded that "it is the reviewer's opinion within a reasonable degree of neuropsychological certainty that: there is no valid objective evidence to support neurocognitive deficits associated with chronic headache or a plethora of other reported possible etiologies [i.e. causes] within the time frame of 9/27/08 – 3/31/15" because "the preponderance of the clinical evidence contained within the file does not support neurocognitive impairment within [the] designated time frame."  [AR2411-12].  Dr. Raymond continued that while Dr. Rissenberg administered six tests to Spears, she did not administer a comprehensive battery of tests, such as the Halstead Reitan Neuropsychological Battery, and thus her tests should be considered a "casually-composed" battery of tests that made clinical inferences difficult and "often inaccurate."  [AR2413].  Dr. Raymond stated that "[t]his evaluation would not withstand [a] Daubert or Frye challenge regarding the standards of admissibility."  *Id.*

Dr. Raymond disagreed with Dr. Rissenberg's conclusion that the results of the tests administered showed Spears was impaired, saying that the test results did not support that, because "personality variables, adjustment difficulties, or other behavioral concomitants, might have contributed to the clinical picture."  *Id.*  Again Dr. Raymond faulted Dr. Rissenberg for not conducting validity testing, especially given Spears' potential for secondary gain, i.e. disability benefits.  [AR2414].

On June 16, 2016 Liberty denied Spears LTD benefits in a 27-page letter (the "June 16, 2016 Denial Letter"). [AR2379-2405; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 179; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 179].

The June 16, 2016 Denial Letter recounted the findings and opinions of the physicians retained to evaluate Spears' claim. [AR2380-93; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 180; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 180]. These summaries included summaries of peer reviews conducted by Dr. Taiwo, Sr. Silverman (twice), and Dr. Brusch. [AR2384-89]. The June 16, 2016 Denial Letter next summarized the findings of the peer review conducted by BMI, summarizing the findings of Drs. Cooper, Crossley, Kitei, and Raymond. [AR2393-95]. Next the June 16, 2016 Denial Letter summarized the responses of Drs. Zagar, Rissenberg, and Giannini to the BMI peer review report, and summarized Drs. Raymond and Kitei's response to Dr. Rissenberg and Dr. Zagar's responses, respectively. [AR2395-96]. Finally, the June 16, 2016 Denial Letter summarized Dr. Courtney's IME findings. [AR2396-97].

In analyzing Spears' condition during the Elimination Period, Liberty noted that

> Spears' self-reported symptoms increased during the Elimination Period. Reported symptoms progressed from headaches with nausea and vomiting to include blackouts/seizures, insomnia, stuttering, and in November 2008 included memory gaps and stuttering. By January, Ms. Spears complained of fatigue, night sweats, weight loss/gain; dry eyes and dry mouth, stiffness in the morning, jaw pain, headache; eye pain, blurred double vision, floaters, flashes; asthmatic shortness of breath; chest tightness; heartburn, abdominal pain, diarrhea, nausea; recurrent sinus and ear infections; muscle weakness, tingling and numbness; anxiety; bruising easily; ringing in her ears.

[AR2398-99]. The June 16, 2016 Denial Letter continued: "Despite the increase in self-reported symptoms, Ms. Spears' cognitive and physical exams remained normal, and she was able to return to work on a part time basis beginning on 1/8/09, remained working part time through 3/24/09." [AR2399]. Liberty then noted that there were "multiple inconsistencies" in Spears' medical records, such as there being "no findings on exam" by Dr. Giannini March 10, 2009, and that on April 21, 2009 "Spears reported to Dr. Raxlen that experience[d] horrible migraines" which no medicine helped, but six days later Dr. Zagar reported that Spears' headaches were "well controlled," with "only two in the last couple of months." *Id.* The June 16, 2016 Denial Letter completed its discussion of the Elimination Period by stating:

> Since Ms. Spears' self-reported symptoms were not consistent with the medical evidence and her actual functional abilities continuously throughout the Elimination Period, Ms. Spears' STD and LTD claims were denied. As noted previously, STD benefits were paid through the 3/27/09 maximum benefit date based on the fiduciary's decision, not based on Liberty's assessment of Ms. Spears' level of impairment.

*Id.*

The June 16, 2016 Denial Letter then addressed the "Own Occupation" period of March 28, 2009 to March 27, 2011. First, Liberty noted that Drs. Raxlen, Zagar, Giannini and Saul had "endorsed the diagnosis of Lyme disease," but "Spears' physical examinations remained normal." [AR2399]. The June 16, 2016 Denial Letter noted continued inconsistencies in Spears' medical records, such as Dr. Raxlen noting that Spears reported marching for four hours in the Mardi Gras parade in Louisiana on February 13, 2010, while one month later on March 19, 2010,

Spears told Dr. Zagar that her antibiotics were stopped in December 2009, causing her to "totally crash" after five weeks. *Id.* The June 16, 2016 Denial Letter stated that Dr. Zagar also noted Spears' "symptoms of neck and shoulder pain, migraines, fatigue, joint pains, and cognitive impairment including trouble with memory, word finding, concentration" on Spears' "Physical Residual Functional Capacity Questionnaire" and her "Medical Source Assessment (Mental)," but Dr. Zagar "never documented abnormal findings on exam." *Id.* The June 16, 2016 Denial Letter stated that Dr. Giannini did document Spears' symptoms on these two same forms and on exam on July 9, 2010, but this was the only time she did so. *Id.* Finally, the June 16, 2016 Denial Letter noted that in July 2010, "Spears reported to Dr. Raxlen that her cognitive impairment 'turns off and on,'" and in August and September 2010 Spears reported to Dr. Saul that she had 'brain fog,'" but on October 19, 2010 Spears reported to Dr. Young "that she had increased cognitive clarity, better retentions and improved speech." *Id.*

The June 16, 2016 Denial Letter next addressed the "Any Occupation" phase, which began March 28, 2011 and ran forward. [AR2400]. Once again finding discrepancies in her records, the June 16, 2016 Denial Letter noted that on August 19, 2011 "Dr. Zagar documented normal findings on the cognitive and physical portions" of his examination of Spears, and Dr. Baehring "documented a normal neurologic and cognitive exam on September 23, 2011, but on September 7, 2011 Spears reported to Dr. Saul that her condition was worse. *Id.* The June 16, 2016 Denial Letter then noted a gradual improvement in Spears' condition, as reported by Dr. Raxlen in "March through August 2012, and as reported by Dr. Saul in June

2014. *Id.* Spears returned to work full-time, the June 16, 2016 Denial Letter noted, in August 2014. *Id.*

In a section entitled "Additional Remand Analysis," Liberty first discussed issues regarding mental health, stress, and depression that occurred in Spears medical records, despite "no mental health evaluations or treatment records on file." *Id.* Then Liberty noted that "Spears' medical work-up was set in motion by her complaints of increased, severe headaches," noted that Spears did not have a brain tumor and her Lyme disease diagnosis was disputed, and summarized that "Ms. Spears' self-reported symptoms were not consistent with the overwhelmingly normal medical and cognitive exams, and did not coincide with her actual functional abilities." [AR2400-01].

The June 16, 2016 Denial Letter then noted that all of Spears' treatment records were considered, and that Spears' "peer review physicians have had the opportunity to review, compare and contrast all medical evaluator's findings, as well as the frequency, duration, consistency and severity of Ms. Spears' self-reported symptoms. The review physicians are all board certified in their specialties and are qualified to review and interpret medical records and opine on medical functionality. Additionally, Drs. Taiwo, Silverman, Crossley, and Raymond are certified Medical Examiners." [AR2401].?

The June 16, 2016 Denial Letter next discussed a portion of the applicable insurance policy entitled "Discontinuation of the Long Term Disability Benefit" and whether Spears' earnings in 2014 and 2015 made her ineligible for LTD benefits. [AR2401-03].

The June 16, 2016 Denial Letter then discussed Spears' award of Social Security Disability Income benefits, distinguishing the administrative law judge's ("ALJ") credibility assessment. The Denial Letter noted inconsistencies in Spears' reports to her doctors stated above as bases to discredit Spears' credibility, and the Denial Letter notes the ALJ took "Spears' self-reported symptoms and the intensity and persistence of those symptoms . . . at 'face value.'" [AR2403].

In a paragraph immediately before the "Conclusion" section, the June 16, 2016 Denial Letter stated:

> Prior to the 2/25/11 SSA Decision, Liberty obtained the medical reviews of Dr. Potts, Neurology; Dr. Taiwo, Internal Medicine and Occupational Medicine; Dr. Silverman, Infectious Disease; Dr. Brusch, Infectious Disease. Since the 2/25/11 SSA Decision, Liberty has obtained updated treatment records, and has considered the medical reviews by Dr. Cooper, Internal Medicine and Endocrinology; Dr. Crossley Infectious Disease; Dr. Kitei, Neurology; Dr. Raymond, Neuropsychology; IME performed by Dr. Courtney, PM&R; that were not considered by the SSA in its determination process. Dr. Potts reported it was reasonable for Ms. Spears to remain out of work while medications were being regulated for her headaches; through 1/8/09. All other reviewing physicians reported the medical evidence was insufficient to support impairment precluding Ms. Spears from full time work."

[AR2404].

In its "Conclusion," the June 2016 Denial Letter "acknowledge[d] that Ms. Spears has had multiple symptoms associated with her condition.

> However, the information does not contain physical exam findings, diagnostic test results, valid neuropsychological test results, or other forms of medical documentation supporting her symptoms remained of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the duties of her occupation continuously throughout and beyond the Policy's Elimination Period.
> Having carefully considered all of the information submitted in support of Haley Spears' claim, our position remains that proof of Ms.

> **Spears' continued disability in accordance with the Policy provisions has not been provided. Therefore, no Long Term Disability benefits will be paid.**

*Id.* No reference was made to Spears' CT scan and MRIs showing brain abnormalities, her testing notable for a positive CSF Lyme IgG antibody, suggestive of the possibility of CNS Lyme disease, the antibiotic therapy or the variety of symptomatic treatments which failed to alleviate her symptoms. The June 2016 Denial Letter ended by offering Spears a "second, optional request for review." *Id.*

### B. The Remand Appeal

On July 13, 2016, Spears sent Liberty a letter stating "[p]ursuant to your June 16, 2016 letter, we are requesting a review of the denial. Additional documentation will be submitted at a later time." [AR2377; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 184; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 184].

The same day, July 13, 2016, Spears sent Liberty a one-page report of Dr. Saul, and then updated it on August 9, 2016 to correct an error in Dr. Saul's report in support of her appeal of Liberty's denial of benefits following this court's remand. [AR2373-76; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 185; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 185]. Dr. Saul's report notes that he treated Spears from August 2010 until June 2014, and that she underwent two courses of antibiotic therapy, which is "standard" care for "long term Lyme disease." [AR2374 ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 191; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 191]. He noted that "[s]he had chronic fatigue, difficulty concentrating, headaches and joint pain," and therefore

was "not medically able to work in any capacity" and "was not capable of a sedentary work position due to cognitive difficulties." *Id.* He also noted that she was "clearly motivated to get better and begin work again," and that "[a]s of 2014 she remained fatigued at times," which was not unexpected because "[l]ong term chronic Lyme disease can take many years to resolve." *Id.*

Dr. Saul disagreed with BMI's peer review, noting that none of the reviewers were experts in Lyme disease, and specifically disagreeing with Dr. Crossley when he stated that "the positive igG western blot test on February 3, 2009 meant nothing without a positive western blot on serum." [AR2374; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 192; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 192]. He also found fault with Dr. Crossley minimizing Spears' "self-reported symptoms" because fatigue, headaches, and joint pain "cannot be verified by x-ray or other objective testing." [AR2374; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 193; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 193].

Finally, Dr. Saul disagreed with Dr. Brusch's position that "the positive igG western blot in the CSF was a false positive," and took issue with Dr. Courtney's IME because Dr. Courtney "[b]y his own admission . . . is not a specialist in Lyme disease" and "[h]e examined her after she returned to work"; therefore "[h]is exam in 2016 has no relevance to Ms. Spears' condition at the time I treated her." [AR2374; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 194-95; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 194-95].

On September 22, 2016 Spears sent Liberty a report of Dr. Raxlen, who had treated Spears and who "sharply disagree[d]" with the BMI peer reviewers'

conclusions." [AR2320-21; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 186; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 186]. First, Dr. Raxlen pointed out that even though he is a psychiatrist, he has been heavily involved in understanding Lyme disease, co-founded a group that broke off from an earlier group studying Lyme disease due to a desire to expand the definition of Lyme disease, and undisputedly has treated over 1,000 patients for Lyme disease. [AR2321-23; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 187; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 187].

Dr. Raxlen stated that Dr. Crossley's statement that there was no evidence that Spears had Lyme disease or other diseases that might be functionally limiting was "disingenuous" because "there is sufficient evidence in her medical history, if one chooses to acknowledge it, for TBD [tick borne diseases]." [AR2324]. Dr. Raxlen pointed out"

> Dr. Zane Saul (infectious disease), Dr. Zagar (neurology), Dr. Patterson Marshall (Neurology), Dr Sam Donta (infectious disease), Dr Gianni [sic] (PCP) and myself all had numerous contact with the patient and prescribed treatment protocols for Lyme disease. (IM, IV and oral medication). These treatments were not spurious. They were based on the evidence obtained in the clinical assessment and laboratory findings. The reason for her multisystematic illness, all five specialists agreed was late stage Lyme and co-infections.

[AR2324; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 188; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 188].

Dr. Raxlen then noted that the "important question is not whether Miss Spears had Lyme disease and co-infections, . . . but the question is did her illness or her combined illnesses leave her 'disabled.' Not in the physical sense . . . , but could she mentally function. . . . It was not the [BMI's peer] reviewers task to

determine whether or not the claimant had an 'infection' that would be responsible for her symptoms.  They were to determine if the patient was disabled by her illness and if her recurring symptoms would constitute 'functional impairment.'"  [AR2325-26].  He then concluded that she could not mentally function and was disabled. [AR2326 ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 189; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 189].

As evidence, Dr. Raxlen cited to Spears' "neuropsychological testing" that showed she "was suffering from an alarming decline in mental function," including (1) "Working memory 12th percentile (Impairment of attention and concentration)," (2) "Arithmetic 2nd percentile," (3) "Auditory immediate memory 13th percentile," (4) Auditory delayed memory (storage) 6th percentile, (5) Delayed recall of material 2nd percentile," which were "[s]cores consistent with frontal lobe encephalopathy [brain disease]."  [AR2327].  Dr. Raxlen concluded that her "disastrous scores on her neuropsychological evaluation," which revealed "severe neurocognitive deficits," combined with "her extreme exhaustion," made "Spears unable to function consistently for any sustained period of time in a work environment."  *Id.*

On December 14, 2016, Liberty faxed a letter to Spears' counsel asking her if Spears planned to submit any other documents.  [AR2279 Note 79].  On March 17, 2017, three months after asking if Spears would submit additional material, Liberty's legal department ordered proceeding with the appeal review, despite Spears' counsel not responding to Liberty's letter.  [AR4896 Note 80].  That same day Liberty reassigned the remand appeal back to Ms. Winterer.  [AR5004].

On March 20, 2017, Winterer submitted Spears' appeal including Drs. Saul and Raxlen's rebuttals to BMI/R3 Continuum which in turn sent the appeal back to Drs. Crossley, Cooper, Kitei, and Raymond, asking them to "review this additional documentation in light of your prior medical opinion and please advise us if this documentation changes your prior medical opinion in any way." [AR4998-99].[16]

In the "Analysis" section of the review report, Dr. Crossley stated that "there is no evidence the claimant has had Lyme disease or other infections that would be associated with any functional limitation." [AR4994-95]. Dr. Cooper stated that "[t]he additional records do not contain any additional information relating to endo/IM/rheum/gastro/cardio/pulmonary and sleep medicine/primary care aspects of the file but only to infectious disease (Lyme disease) and neuropsychiatric manifestations." [AR4995]. Dr. Kitei stated that "the evidence does not support impairment from a neurologic standpoint." *Id.* Dr. Raymond stated that "neurocognitive impairment is not supported within the timeframe in question. No additional information regarding the possible neuropsychological sequela of multiple etiologies (e.g., Lyme disease) was submitted by a neuropsychologist." *Id.* All reviewers agreed that the information provided was not new and did not change their prior opinions in any way. [AR4995-96].

---

[16] The same day, March 20, 2017, Liberty sent the input from Drs. Saul and Raxlen back to Dr. Courtney at MCN, asking him to "review the letters and additional documents submitted by Ms. Zimberlin, including the submission from Dr. Saul and Dr. Raxlen. Please review this additional documentation in light of your prior medical opinion and please advise us if this documentation changes your prior medical opinion in any way." [AR5002]. On March 31, 2017 MCN advised that their "MD" is away until April 3, 2017, which would cause a delay in obtaining the IME addendum as requested." [AR4895 Note 86]. No response from Dr. Courtney appears in the record.

On May 4, 2017, in a five-page letter (the "May 2017 denial letter"), Liberty denied Spears' appeal of Liberty's June 16, 2016 denial of LTD benefits.  AR4911-15; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 197; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 197].  The May 2017 denial letter first discussed various aspects of Spears' insurance policy, then summarized the input from Drs. Saul and Raxlen, noted that Liberty referred Spears' file back to BMI, and summarized the BMI peer reviewers' findings.  [AR4911-14].

Liberty first stated that the peer review panel noted that the information submitted by Spears on appeal was not new.  [AR4914].

> Additionally, all the reviewing physicians indicated Dr. Saul's and Dr. Raxlen's reports do not change their previous conclusions.  The panel indicates the medical evidence does not support impairment preventing Ms. Spears from performing the material and substantial duties of (1) her own job from September 27, 2008 when her absence from work began through March 27, 2009; (2) her own Administrative Support occupation from March 28, 2009 through March 27, 2011; and (3) any occupation for which she is fitted from March 28, 2011 forward.  Moreover, the additional reports from Drs. Saul and Raxlen do not alter our Remand Assessment and Additional Remand Analysis as set forth in the June 16, 2016 remand review letter upholding the denial of Ms. Spears' disability claim.   The medical records contain multiple inconsistencies in Ms. Spears' self-reported symptoms; Ms. Spears' self-reported symptoms were inconsistent with her actual functional capacity, as outlined in detail in the June 16, 2016 letter; the medical records contain physical exam and cognitive exam findings that are consistently within normal limits.   We conducted this second thorough review of Haley Spears' entire claim.   In summary, we acknowledge that Ms. Spears has reported multiple subjective symptoms allegedly preventing her from working.   However, the information provided for review does not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation indicating Ms. Spears' symptoms were of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any

**occupation after March 27, 2011. Having carefully considered all of the information submitted in support of Haley Spears' claim, our position remains that proof of Ms. Spears' disability in accordance with the UTC Group Disability Income Policy provisions has not been provided. Therefore, no Long Term Disability benefits will be paid.**

[AR4915].[17]

III.    <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

---

[17] It is undisputed that "[w]hen this claim was considered on remand, Liberty did not have rules, guidelines, protocols, standards and criteria, whether published or internal, which were utilized in whole or in part in rendering any decision, after the court remand, relating to plaintiff's claims for benefits, or in the administrative appeal, [or] relating specifically to an ERISA claim on remand. Ex. A, Liberty's response to interrogatory #3." [ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 198-99; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 198-99].

**A.**     <u>Standard of Review</u>

    **1.**   <u>The Plan Granted Liberty Discretionary Authority to Determine</u>
        <u>Benefits Eligibility Under the Plan</u>

ERISA jurisprudence determines the standard and scope of review in connection with a challenge to a plan's denial of benefits. *Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869 at *6 (S.D.N.Y. 2007). "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996).

After analyzing the legislative history of ERISA, the Supreme Court held that a denial of benefits challenge is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 111-12 (2d. Cir. 1995); *Murphy v. IBM Corp.*, 23 F.3d 719, 721 (2d Cir. 1994) (per curiam), *cert. denied*, 513 U.S. 876 (1994). Generally, federal courts should avoid excessive judicial interference with pension plan administration vested with discretionary authority, by applying a deferential "arbitrary and capricious" standard reviewing a challenge its decisions. *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 829 (1983). Under an arbitrary and capricious standard, a court may overturn an ERISA plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law. *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133 (2d Cir 2010).

As mentioned, *supra* at 6, in its Remand Order, the Court found that because "Liberty was vested with 'the authority, in its sole discretion, to construe the terms of th[e] policy and to determine benefit eligibility [t]hereunder,' and its determinations of benefit eligibility were deemed 'conclusive and binding,'" the Court was mandated to employ an arbitrary and capricious standard of review in assessing Liberty's performance. *Id.* at 40-41.

## 2. The *De Novo* Standard of Review Applies in This Case

Previously, the Court considered whether alleged errors in Liberty's handling of Spears' claim were enough under binding precedent to shift the standard of review from arbitrary and capricious to a more searching *de novo* review, but found that because then-existing precedent largely supported a "substantial compliance" analysis and because it found no "dilatory conduct" nor evidence that Liberty "failed to reach a decision" or "provide some explanation for it," *de novo* review was inappropriate. *Id.* at 43-44.

Just over a year after the March 31, 2015 Remand Order issued, the Second Circuit decided *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), on April 12, 2016. The *Halo* court rejected the substantial compliance doctrine, finding it "flatly inconsistent with" ERISA, and held that *de novo* review would be triggered by a plan administrator not following the ERISA claim review procedures. *Id.* at 56. The Court did note that the Department of Labor had issued guidance that "inadvertent and harmless deviations" from ERISA requirements would not trigger *de novo* review. *Id.* at 57. The Court established a *de minimis* order of magnitude for determining whether a deviation was inadvertent and harmless, holding that such

deviations might take the form of "human error causing, for example, a plan to respond in 73 hours when the regulation requires that it do so in 72 . . . or in 16 days when the regulation specifies 15," as long as "such slight delays [do] not harm the claimant." *Id*. The Court then stated, however, that in order to ensure the "inadvertent and harmless deviations" exception doesn't swallow the rule, "such deviations should not be tolerated lightly," and held that

> when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless. Moreover, the plan 'bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it.'

*Halo*, 819 F.3d at 57-58 (emphasis in original) (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995)).[18]

---

[18] On September 17, 2019, Liberty filed a Notice of Supplemental Authority with the court, [ECF No. 190], and argued that *Halo* is no longer good law following the United States Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), because the preamble that *Halo* relied on was merely an *ad hoc* justification that did not warrant the application of *Auer* deference, from *Auer v. Robbins*, 519 U.S. 452 (1997), that *Halo* employed. The Court disagrees. As explained in *SEC v. Alpine Sec. Corp.*, No. 17cv4179, 2019 U.S. Dist. LEXIS 147492, at *2-3 (S.D.N.Y. Aug. 29, 2019), the "only question presented" by *Kisor* was whether *Auer* deference was good law, which the Court answered in the affirmative. As *Kisor* did not change anything about *Auer*, but merely explained its application, it cannot have overruled *Halo sub silentio*, and did not do so expressly, as *Kisor* does not mention *Halo*. Moreover, the examples in *Kisor* of *ad hoc*, insufficient agency explanation that would not warrant *Auer* deference included a "speech of a mid-level officer," an "informal memorandum," and an agency disclaimer of the use of regulatory guides. *Kisor*, 139 S. Ct. at 2416-17. Nowhere did *Kisor* state that agency regulation preambles, which are published contemporaneously with the regulations themselves and are required to be "a concise general statement of their basis and purpose," *Halo*, 819 F.3d at 52 (quoting 5 U.S.C. § 553(c)), are improper for a court to defer to under *Auer*, nor did *Kisor* anywhere overrule the cases and other

The Labor Department has imposed deadlines for processing benefit claims. 29 C.F.R. § 2560.503-1. As discussed further below, the time limit to process a disability benefit claim is 45 days unless special circumstances warrant a forty-five-day extension and timely notice of the special circumstances is given to the claimant. 29 C.F.R. § 2560.503-1(i)(1)(i); (i)(3). Liberty makes no rational argument why the Court should distinguish between a review of a claim or a review of a denial of a claim. Both are reviews of a claim and the deadline applies to both.

Liberty admits it had a deadline to review the denial of Spears' claim upon remand. On October 21, 2015, Winterer overnighted Spears' counsel an unsigned letter stating that "[t]he claim documentation for this appeal was received in this office on October 14, 2015. Thus, day 45 of this appeal review is November 26, 2015." [AR4751-52; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 93, 94;

_____

authorities cited by *Halo* holding the exact opposite. *See generally Kisor*, 139 S. Ct. 2400; *see also Halo*, 819 F.3d 52-53 ("'[I]t it does not make sense to interpret the text of a regulation independently from its' preamble" (quoting Kevin M. Stack, *Interpreting Regulations*, 111 Mich. L. Rev. 355 (2012)); "[W]e look to the preamble . . . for the administrative construction of the regulation, to which deference is . . . clearly in order." (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 158 n.3 (1982)); "While language in the preamble of a regulation is not controlling over the regulation itself, we have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules." (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999))). The Court also notes that Liberty argues that the Department of Labor ("DOL") amicus brief filed in *Solnin v. Sun Life & Health Ins. Co.*, 672 F. App'x 121 (2d Cir. 2017) is insufficient under *Kisor*. The Court disagrees, as *Kisor* itself noted that the *Auer* deference argument was brought to the Court's attention first in a DOL amicus brief. *See Kisor*, 139 S. Ct. at 2417 n.6 ("[I]n the circumstances . . . [t]here [was] simply no reason to suspect that the interpretation [did] not reflect the agency's fair and considered judgment on the matter in question.") (quoting *Auer*, 519 U.S at 462). At bottom, Liberty's Notice of Supplemental Authority asks the Court to ignore *Halo* based on *Kisor*. This the Court declines to do.

ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 93, 94]. Liberty even gave notice of special circumstances warranting a 45-day extension. *Id.* Despite its admission that there was a deadline, Liberty inexplicably takes the position now that the ERISA claims-procedure regulation, at least as far as deadlines contained therein goes, did not apply on remand and there was no deadline. *See* Liberty's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment at 14 ("ERISA's procedural time limitations do not apply to a court-ordered remand."). [ECF No. 160].

Liberty initially made no argument in its summary judgment briefing that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless. *Id.* On September 26, 2019 Liberty filed a recitation of facts which the Court construes to be its effort to meet this standard. [ECF No. 193]. In it, Liberty asserts that in the four-month period between the Court's March 31, 2015 Remand Order and Liberty's July 24, 2015 letter to Spears' counsel, the parties engaged in brief settlement discussions. Liberty also claimed it was in a quandary because the Court's Remand Order was confusing because it conflicted with the Liberty policy in several ways. Liberty claims it ordered Liberty "to consider on remand only the question of whether Plaintiff was disabled by her symptoms, without regard to any diagnosis." [ECF No. 193 at 2]. In support, Liberty cited the Remand Order at 78. Liberty claims the order conflicted with the policy's definitions of "disabled," "sickness," "proof" and the policy's requirement that Liberty provide benefits only upon proof that a covered person is disabled due to injury or sickness. Liberty is mistaken. The

word "symptoms" appears nowhere on cited page 78 of the Remand Order. On the contrary, the Remand order states "Liberty is instructed to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period. The question is *not* whether Spears' medical records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis." Remand Order at 78 (emphasis in original). The Remand Order was clear, did not conflict with the Liberty policy, and did not tell Liberty to consider only Spears' symptoms, rather it instructed Liberty to review medical evidence of all types submitted by Spears, which under ERISA includes the claimant's subjective complaints.

Even if the Remand Order was confusing, Liberty did not file a Motion for Clarification or Reconsideration which is required to be filed within seven days of the Court's order. D. Conn. L. Civ. R. 7(c)(1). Liberty had and did not avail itself of the timely procedural mechanisms to clarify any confusion.

Liberty also says there was delay because Liberty considered filing a motion for reconsideration or an interlocutory appeal but decided against either. Liberty could have done one or both and withdrawn either of both.

Liberty also argues the parties engaged in "significant settlement discussions." The parties did not seek a stay or extension, nor did Spears stipulate to a delay.

Finally, Liberty also claims Spears' physicians were not responsive. Liberty did not render a decision until approximately 16 months after the Remand Order.

Liberty does not identify exactly how much delay was attributable to Spears' physicians or compare it to its own delay, including the several months between the date of the Remand Order and its initiation of the review.

### 3. Given The Procedural Deficiencies That Hampered Liberty's Review Process The Court Gives Substantial Weight to Liberty's Inherent Conflict

As discussed, *supra* at 7, in its Remand Order, the Court noted that Liberty had a structural conflict of interest because it both pays LTD claims and decides whether to pay them, and the denial of claims would positively impact business unit profit and growth, and corporate return on equity. The Court cited *Glenn*, 554 U.S. 105, 108, for the idea that an ERISA fiduciary's conflict of interest is more important when the "circumstances suggest a higher likelihood that it affected the benefits decision," and found that because of a "number of serious 'decisionmaking deficiencies' in the course of Liberty's review of Spears' claim," the Court was obliged to afford "some weight to Liberty's conflict of interest." [ECF No. 103 at 50 (quoting *Durakovic v. Bldg. Serv.*, 609 F.3d 133, 140 (2d Cir. 2010)).]

Here, as will be discussed in more detail below, Liberty not only continued to violate the ERISA claims procedure regulation on remand, some of the errors it committed were identical to the ones Liberty committed pre-remand and which the Court identified in its March 2015 Remand Order remanding the case to Liberty. Even worse, Liberty violated portions of the Remand Order that expressly required it to take certain actions. For these reasons, the Court gives substantial weight to Liberty's inherent conflict of interest because the "circumstances suggest a higher likelihood that it affected [Liberty's] benefits decision." *Glenn*, 554 U.S. at 108.

### 4. *De Novo* Standard of Review

"[U]pon de novo review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence." *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004). Even under de novo review, however, Plaintiff bears the burden to prove, by a preponderance of the evidence, that she meets the relevant definition of disability. *Baumer v. Ingram Long Term Disability Plan*, 803 F. Supp. 2d 263, 269 n.6 (W.D.N.Y. Mar. 26, 2011) (citing *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006)). "In applying the *de novo* standard, a court reviews all aspects of the termination of benefits, including fact issues, 'to determine for itself whether the claimant should be granted or denied the requested relief.'" *Id.* at 268 (quoting *Lijoi v. Continental Cas. Co.*, 414 F. Supp. 2d 228, 238 (E.D.N.Y. 2006)).

### IV. Analysis

#### A. ERISA Guidelines, Including Claim Processing Deadlines, Applied on Remand

As a threshold matter that Court must decide whether the ERISA claim processing deadlines found in 29 C.F.R. § 2560.503-1 applied on remand in this case. For the reasons set forth below, the Court finds that they did.

Liberty first argues that "the Court did not hold that ERISA claim regulations apply to a court-ordered remand." Liberty's Opp. At 13. This is so, according to Liberty, because "[n]owhere in its Ruling did the Court state that the time limitations set forth in ERISA's procedural regulations applied on remand or establish specific deadlines for the remand review. Had it wanted to establish such deadlines, it could easily have done so." *Id.* at 13-14 (citing cases). Liberty also

cites the Court's "casual reference" to *Solnin* as not providing support for the idea that ERISA deadlines applied on remand. *Id.* at 13. In short, according to Liberty, "the Court never ruled on that issue." *Id.* at 14.

Liberty then argues that "ERISA's procedural time limitations do not apply to a court-ordered remand." Liberty's Opp. at 14. Liberty reasons that this is so because ERISA's regulations expressly apply only to initial claims, and subsequent appeals, but they are silent as to remands by district courts. *Id.* (noting also that "remands are not even required by ERISA" but rather are a "judicial construct."). Liberty then argues that if the Department of Labor, who is responsible for this CFR section, meant to include remands they would have added that after appropriate rulemaking. *Id.*

Finally, Liberty argues that *Solnin*, 766 F. Supp. 2d at 393-94, which held that ERISA claim procedure timelines *do apply* to remands, is distinguishable because there the plan administrator agreed that ERISA claim procedure deadlines applied, whereas here Liberty stated in their first post-remand communication that ERISA's claim procedure deadlines did not apply. Liberty's Opp. at 15 n.3. Liberty also distinguishes *Robertson v. Standard Ins. Co.*, 218 F. Supp. 3d 1165, 1170 (D. Or. 2016), by arguing that the defendant there "never issued a remand determination." *Id.*

Spears argues that Liberty's "position is directly contrary to case law and to this court's 2015 ruling on the summary judgment motions, where this Court held that "Liberty is instructed to perform a full and fair review that complies with the ERISA claims regulations." [ECF No. 138-1, Spears MSJ at 34 (citing the Court's

Remand Order, [ECF No. 103] at 79.)]. Spears argues that "[t]o claim that ERISA procedures do not apply on a remanded claim misses the entire point of 2015 remand; this case was remanded because Liberty did not comply with the regulations; the purpose of the remand was to give Liberty another chance to fix its mistakes." *Id.*

Spears also argues that *Solnin* and another in-circuit case, *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *2 (E.D.N.Y. Dec. 11, 2007) both held that "ERISA deadlines apply to a claim on remand." Spears' MSJ at 37. *Spears* argues that *Robertson* held the same and did so after analyzing an amicus brief submitted by the Department of Labor ("DOL") in *Solnin v. Sun Life & Health Ins. Co.*, 672 F. App'x 121 (2d Cir. 2017). *Id.* at 38 (citing *Robertson*). In that brief, Spears notes, the DOL argued that the ERISA claims procedure applied to a remanded claim and such claim should normally be treated as an appeal of a denied claim. *Id.* In addition

> [t]he [Robertson] court found the [ERISA] claim regulation to be ambiguous as it related to claim remands, and so it deferred to the DOL's interpretation of its regulation. . . . The *Robertson* court agreed with the DOL that allowing defendant to take as long as it wants to decide a remanded claim would be fundamentally unfair, especially given that it had already deemed that defendant did not fulfill its fiduciary duty to plaintiff.

*Id.* Finally, Spears notes that Liberty has taken contradictory positions on this issue, because in its Rule 56(a)(2) Statement Liberty denied Spears' statement that "Liberty took the position that the ERISA claim regulation did not apply to this claim on remand," yet argued in its Opposition Brief that ERISA's procedural time limits do not apply on remand. [ECF No. 169, Spears Reply Brief at 5]. Spears also notes

that "Liberty does not cite to a single case, regulation or statute which states that the ERISA timelines do not apply on remand." *Id.*

Liberty filed a sur-reply brief with the Court's leave, but the brief does not address this issue, only damages. [ECF No. 177].

The Court agrees with Spears that in this case, at least, all ERISA claim procedures, including claim processing deadlines, applied to the Court's March 31, 2015 remand. First, the Court's Remand Order, as Spears correctly notes, ordered Liberty "to perform a full and fair review that complies with the ERISA claims regulations." [ECF No. 103 at 79]. The Court in no way carved out an exception for claim processing deadlines. It Ordered Liberty's review to "compl[y] with the ERISA claim regulations." Full stop. Even if Liberty believed that there was no caselaw supporting the Court's Remand Order, it was not free to ignore the Order.

Moreover, this Order was supported by a citation to *Solnin*, which *did hold* that ERISA claim regulations, including ERISA claim processing deadlines, "apply to post-remand benefit determinations." *Id.* Accordingly, the Court did inform Liberty of the deadlines and the fact that they applied. Finally, to cement this understanding, the Court Ordered that Liberty "perform a full and fair review that . . . "includes (<u>but is not limited to</u>)" four enumerated points that the Court was especially concerned about. *Id.* (emphasis added). The "includes but is not limited to" language indicates that not just those four areas, but <u>all</u> of the applicable ERISA claim processing regulations applied on remand. The Court is at a loss to explain how Liberty interpreted the Court's language to arrive at its conclusion that ERISA claim procedure deadlines did not apply on remand.

Further, the Court agrees with Spears that Liberty cites no cases, no regulation, nor any authority whatsoever holding that post-remand benefit determinations need not comply with ERISA claim processing deadlines. In fact, the case law addressing this issue has uniformly found that post-remand benefit determinations must be conducted in accordance with ERISA claim procedure guidelines. *Solnin v. Sun Life & Health Ins. Co.*, 766 F. Supp. 2d 380, 393-94 (E.D.N.Y.) ((holding that the ERISA claims regulations apply to post-remand benefits determinations and noting that, as here, "Defendants have not cited any legal authority to the contrary"); *Rappa*, 2007 WL 4373949, at *7-8 (analyzing plan administrator's actions on remand pursuant to 29 C.F.R. § 2560.503-1); *Grant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 1:09-cv 1848-RWS, 2010 WL 3749197, at *6 (N.D. Ga. Sept. 21, 2010) (citing 29 C.F.R. § 2560.503-1 to guide defendant in considering plaintiff's benefit claim on remand); *Stiers v. AK Steel Benefits Plans Admin. Comm.*, No. 07-145, 2008 WL 1924252, at *6 (S.D. Ohio Apr. 29, 2008) ("This case is hereby **REMANDED** to the Defendant's plan administrator, who shall provide Plaintiff with a full and fair hearing on appeal, in accordance with 29 C.F.R. § 2560.503-1(h)(4) and the terms of this opinion) (emphasis in original); Brief of the Secretary of Labor, Thomas E. Perez, as Amicus Curiae Supporting Plaintiff-Appellee and Requesting Affirmance, *Solnin v. Sun Life & Health Ins. Co.*, 672 F. App'x 121 (2d Cir. 2017) ("[Defendant]'s argument that [29 C.F.R. § 2560.503-1] and its time limits cease to apply if a court reverses a denial of benefits and remands a claim for further consideration is an inappropriately narrow reading of the regulatory language"); *Robertson v. Standard Ins. Co.*, 218 F. Supp. 3d 1165, 1170-

71 (D. Or. 2017) (agreeing with the DOL that "the deadlines set forth in the ERISA claims regulations apply to a court-ordered remand of a claim. In addition, the DOL clearly opines that the deadlines begin to run from the date the court files its order requiring the claims administrator to reconsider its claim."); *Thomas v. Cigna Grp. Ins.*, No. 09-CV-5029 (SLT) (RML), 2013 WL 635929, at *2 (E.D.N.Y. Feb. 20, 2013) ("[T]his Court finds ample support for [Defendnat]'s assertion that the time limitations set forth in 29 C.F.R. § 2560.503–1 apply to [Defendant]'s post-remand review of Plaintiff's claim. Plaintiff has not cited any legal authority to the contrary.") (citing *Solnin*, 766 F. Supp. 2d at 393 and *Rappa*, 2007 WL 4373949, at *7); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2007) ("[W]e believe that a remand to the district court with instructions to remand to MetLife for a full and fair inquiry is the proper remedy here. This course is contemplated both by our precedent and by ERISA law.") citing *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006).

The cases cited by Liberty are not to the contrary. In *Gorbacheva v. Abbott Labs. Extended Disability Plan*, the court held that the plan administrator's failure to give Plaintiff a chance to respond to new evidence developed on remand was error but was not so grave as to amount to a "wholesale and flagrant violation of the procedural requirements of ERISA," making clear that the court found ERISA applied on remand. 309 F. Supp. 3d 756, 768 (N.D. Cal. 2018) (citation omitted). And in *DeMoss v. Matrix Absence Management Inc.* the court quoted the district court's remand order approvingly, which stated, in pertinent part, "[u]pon remand to the administrator, Defendant must provide Plaintiff with a full and fair review. . . . After

Defendant has provided its rationale and Plaintiff has submitted additional evidence, if any, Defendant should evaluate Plaintiff's claim as it would on appeal from an initial denial of benefits." 438 F. App'x 650, 651 (10th Cir. 2011). This statement too makes clear that the district court ordered remand in accordance with ERISA claim procedures, as an appeal following an initial denial of benefits certainly would be reviewed under those procedures. It is true that the *DeMoss* court ordered a review time period, namely, 120 days, different than that required by ERISA on either initial review or appeal, namely 45 days. *See* 29 C.F.R. §§ 2560.503-1(f)(3) (initial review of disability claims); 2560.503-1(i)(3)(i) (appeal of disability claims). But that was unremarkable and well within the court's discretion to manage its docket as the court saw fit. It did not, as the court's remand order makes clear, mean that the ERISA claim review procedures did not apply.

The Court finds Liberty's treatment of *Solnin* and *Robertson* unpersuasive. Liberty first claims that *Solnin* held that ERISA claim procedures applied in that case "in large part because the claim representative handling the plaintiff's claim 'actually reference[d] the time periods for a benefit determination as they are set forth in the current version of 29 C.F.R. § 2560.503-1(f)(3).'" Liberty's Opp. at 15 n.3 (quoting *Solnin*, 766 F. Supp. 2d at 394). But the fact that the claim representative believed that ERISA deadlines applied was not the main reason *Solnin* so held. Rather, the *Solnin* court first analyzed three district court cases, one in circuit, *Rappa*, and two out of circuit, *Grant* and *Stiers*, and found their reasoning persuasive. It was only after this that the *Solnin* court noted that "[m]oreover, [Defendant]'s letter to Plaintiff's counsel actually references the [ERISA] time

periods . . . [which] tends to undercut Defendants' current assertion that the provisions of [ERISA] do not apply post-remand." 766 F. Supp. at 394. Thus, it is clear the *Solnin* Defendant's belief that ERISA applied while reviewing the Plaintiff's claim later undercut its argument that ERISA did not apply post-remand, but that was not the main reason for *Solnin's* holding, as Liberty suggests.

Liberty distinguishes *Robertson* because there, unlike here, "the defendant never issued a remand determination." Liberty's Opp. at 15 n.3. That fact, however, is a distinction without a difference. In *Robertson*, the court had remanded the case, and because defendant delayed adjudicating plaintiff's claim, plaintiff wished to short-circuit that review by having the court find that plaintiff had exhausted her administrative remedies, enabling her to seek redress from the court instead. The court agreed that defendant's actions in delaying review exhausted plaintiff's administrative remedies because the delay on remand violated ERISA's 45-day limit for review. 218 F. Supp. 3d at 1171. As here, the parties argued over whether ERISA applied post-remand, with defendant, similar to Liberty, arguing that it did not. The court found that it did, finding cases the parties cited supported the court's finding that the ERISA regulations were ambiguous. Because of this the court deferred to the Secretary of Labor's amicus brief in *Solnin*, finding it very persuasive. The court found that the amicus brief was not inconsistent with the ERISA regulatory text, and that under *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 207-08 (2011), deferring to the DOL's brief was appropriate. *Id.* at 1170-71. The brief had argued that "allowing Defendant to take as long as it wants to decide a remanded claim would be fundamentally unfair, especially given that this Court has already deemed

62

that Defendant 'fell far short of fulfilling its fiduciary duty to Plaintiff' in denying Plaintiff's claim the first time." *Id.* at 1771 (quoting the court's earlier remand order). The court agreed, as does this Court.

Like the *Robertson* court, this Court finds the DOL amicus brief very persuasive. First, the DOL notes that "[t]here is nothing in the [ERISA] regulations . . . that so limits their applicability or otherwise excludes remanded claims from their purview. The regulations define a claim broadly: for purposes of the regulations, a claim 'is a request for a plan benefit by a participant or beneficiary.' 29 C.F.R. § 2560.503-1(d) (1999)." DOL Amicus Brief at 16. The DOL also bases its opinion on a plan administrator's duties as a fiduciary:

> [I]t is significant that claims administrators are fiduciaries, and that the benefit determination is a fiduciary act. *Glenn*, 554 U.S. at 111 (citing Firestone, 489 U.S. at 111-13). Accordingly, the administrator is required to act loyally and prudently in deciding claims, and must do so in a manner that is solely and exclusively for the benefit of the participants and beneficiaries and for the exclusive purpose of providing plan benefits and defraying reasonable plan expenses. 29 U.S.C. § 1104(a). *See also Firestone*, 489 U.S. at 109. This does not mean, of course, that every claim must be granted; but it does require administrators to have and adhere to a reasonable claims process that can accommodate all claims, including remanded claims. A reasonable claims process must provide claimants an answer in a reasonable amount of time, within the limits set forth in ERISA's claims regulations.

DOL Amicus Brief at 19. Finally, as the *Robertson* court recognized, "it is untenable and inconsistent with both ERISA section 503 and the implementing claims regulations, as well as with ERISA's stringent fiduciary duties of prudence and loyalty set forth in section 404, 29 U.S.C. § 1104, to allow a plan fiduciary who has acted arbitrarily and capriciously in denying a claim the first time to then take as

long as it wants to decide a remanded claim simply because the court did not set time limits." DOL Amicus Brief at 13; *Robertson*, 218 F. Supp. 3d at 1171.

In sum, although the Court does not find the ERISA claim review regulation or cases citing it ambiguous, as *Robertson* did, the Court finds its own Remand Order clear, the DOL's position and case law addressing this issue persuasive, and the Court therefore agrees with Spears that ERISA claim review procedures, 29 C.F.R. § 2560.503-1, including all ERISA deadlines, applied on remand.

> B.  Liberty Violated ERISA Claim Procedure Deadlines on Remand

Spears argues that on remand, her claim should have been treated as an initial claim for benefits under ERISA, citing the Department of Labor's amicus brief in *Solnin*. [Spears' Memorandum at 43-44]. Spears argues that the DOL stated in its amicus brief that remanded cases should ordinarily be treated as appeals from initial claims, but so stated because most cases, as in *Solnin*, are remanded to decide narrow, discrete issues,[19] whereas here, according to Spears, the Court remanded for a full and fair review of Spears' entire claim. Liberty argues that no timelines should apply, but if they do the timelines on remand should be those of an appeal, as the DOL held. Liberty's Opp. at 14-15.

The Court holds that the deadlines on remand *in this case* are those of an ERISA appeal, not only because that is what the DOL suggests in their *Solnin* amicus brief, but principally because the Court in its Remand Order specified that the full and fair review Liberty was to conduct included, but was not limited to,

> having Spears' file reviewed by individuals who were neither "consulted in connection with the adverse benefit determination that

---

[19] *See* DOL amicus brief at 14-15 n.7.

is the subject of the appeal, nor the subordinate of any such individual," 29 C.F.R. § 2560.503-1(h)(2)(v), permitting Spears "to submit written comments, documents, records, and other information relating to the claim for benefits," 29 C.F.R. § 2560.503-1(h)(2)(ii), "tak[ing] into account all comments, documents, records, and other information submitted by [Spears] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination," 29 C.F.R. § 2560.503-1(h)(2)(iv), and "not afford[ing] deference to the initial adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(ii).

[ECF No. 103 at 79-80]. 29 C.F.R. § 2560.503-1(h), which these four quoted sections are a part of, is entitled "Appeal of Adverse Benefit Determinations," indicating that on remand the Court intended Liberty to consider the claim an ERISA appeal.[20]

Considering the remand an appeal of an adverse benefit determination, ERISA specifies that the appeal must be decided within 45 days, unless the plan administrator determines that special circumstances apply, in which case the times may be extended for 45 days, provided the plan administrator notifies the claimant of the special circumstances and the expected date by which the appeal will be decided. 29 C.F.R. §§ 2560.503-1(i)(1)(i), (i)(3)(i). But, "[i]n no event shall such extension exceed a period of [45] days from the end of the initial period." 29 C.F.R. §§ 2560.503-1(i)(1)(i), (i)(3)(i). The appeal period begins at the time an appeal is

---

[20] Whether the deadlines governing Liberty's appeal are governed by the ERISA initial claim or appeal procedures is of little moment, as the time limits and procedures specified for both are quite similar. *Compare* 29 C.F.R. § 2560.503-1(f)(3) (time limit for initial claim is 45 days, with a possible extension of up to 30 days, for "matters beyond the control of the plan," provided written notice is provided, and allowing another 30-day extension, for a total of 105 days maximum) with 29 C.F.R. § 2560.503-1(i)(3)(i) (time limit for appeal is 45 days, with a possible extension of up to 45 days, for "special circumstances," provided written notice is provided, for a total of 90 days maximum).

filed, "without regard to whether all the information necessary to make a benefit determination on review accompanies the filing." 29 C.F.R. §§ 2560.503-1(i)(4).

On remand, the appeal period begins on the date of the remand order. DOL amicus brief at 20-21 ("Starting the timeline from the date of the order requiring remand ensures that all parties have sufficient notice and that there is a clear, bright-line date from which to measure compliance, should it be questioned in the future"); *Thomas*, 2013 WL 635929, at *2 (finding plan administrator "receive[d] notification of the need to review Plaintiff's claim" when the remand order "was entered onto this Court's Electronic Case Filing ("ECF") system."); *Robertson*, 218 F. Supp. 3d at 1171 ("The deadlines in the claim regulations begin to run from the date of this Court's order remanding the claim."); *Schadler v. Anthem Life Ins. Co.*, No. CIV.A. 3:95-CV1044-D, 1999 WL 202568, at *2 (N.D. Tex. Apr. 1, 1999) (time begins to run from the date the opinion was filed); *Hardt v. Relaince Standard Life Ins. Co.*, 540 F. Supp. 2d 656, 664 (E.D. Va. 2008) (review begins on "date of issuance" of remand order).

### 1. Liberty's Initial Remand Claim Denial

Here, since the remand review period began March 31, 2015, Liberty was required to decide Spears' claim within 45 days of that date, or May 15, 2015, or notify Spears, prior to May 15, 2015, of an extension of up to 45 days if warranted by special circumstances. Liberty did not so notify Spears. That violated 29 C.F.R. §§ 2560.503-1(i)(1)(i), (i)(3)(i).[21] Even if Liberty had notified Spears of an extension

---

[21] The ERISA regulations in effect on March 31, 2015 were promulgated on July 9, 2001. *See* 66 Fed. Reg. 35886, 35887 (July 9, 2001). These regulations were

due to "special circumstances," which could not exceed 45 days, *id.*, Liberty was required to decide Spears' claim by June 29, 2015. But, as Liberty admits, it did not even notify Spears that it would begin its review until July 24, 2015, 115 days after issuance of the Court's Remand Order. That violated ERISA. This is especially so since the "time periods for decisionmaking [under ERISA] are generally maximum periods, not automatic entitlements." *Salisbury v. Prudential Ins. Co. of Am.*, 238 F. Supp. 3d 444, 450 (S.D.N.Y. 2017) (quoting ERISA Rules and Regulations for Administration and Enforcement: Claims Procedures, 65 Fed. Reg. 70,246, 65,250 (Nov. 21, 2000)).

As noted, after long exceeding any conceivable deadline, Liberty stated in its July 24, 2015 letter to Spears that its review of Spears' claim on remand was not governed by ERISA's review deadlines. [AR4890-93]. Liberty maintains this position in its opposition to Spears' Motion for Summary Judgement. Liberty's Opposition. at 12-15. Liberty offers no law or persuasive rationale supporting its position. The Department of Labor's position is the exact opposite, DOL Amicus Brief at 16-20, and this Court's Remand Order that made plain that Liberty's review on remand was to include, <u>but was not limited to</u>, four provisions of the ERISA appeal procedure. [ECF No. 103 at 79-80 (emphasis added)]. It is irrational to read the claim processing regulations not to impose a deadline when deadlines are imposed for each type of review and appeals are specifically noted. 29 C.F.R. § 2560.503-1. In fact, the review periods imposed by the regulations are based on

---

amended on December 19, 2016, but the changes did not affect this case. 82 Fed. Reg. 56560, 56566 (Dec. 19, 2016).

the exigency of the circumstance the benefit is intended to cover. While the regulations expressly mention appeals it makes no distinction based on the type or level of review at issue. The overall regulatory scheme makes clear a deadline is imposed for all reviews. Liberty's position is contrary to case law, a fair reading of the regulation and the clear regulatory scheme as well as the Court's Remand Order.

In the alternative, Liberty argues that its timeline for review of Spears' claim was tolled because of the delay in obtaining Spears medical records. This argument is unavailing. ERISA does allow tolling, but even if tolling is allowed, Liberty exceeded ERISA's claim procedure deadlines on appeal. ERISA's tolling procedures are precisely defined: "In the event that a period of time is extended as permitted pursuant to paragraph (i)(1), (i)(2)(iii)(B), or (i)(3) of this section due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination on review shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." 29 C.F.R. §§ 2560.503-1(i)(1)(4). Tolling, therefore, occurs from the date a claimant is notified of an extension due to the "claimant's failure to submit information" until the claimant provides the information. *Id.*

The only extension in the record that occurred due to Spears' failure to submit information necessary to decide her claim occurred on November 24, 2015.

[AR2999-3000].[22]   Prior to that, in response to Liberty's July 30, 2015 letter providing forms for Spears to fill out, one of which was a form asking for a list of Spears' medical providers, Spears submitted the necessary forms to Liberty on September 10, 2015.  [AR4859-69].   On October 14, 2015, Liberty assigned the appeal to Nancy Winterer, one of its claims appeal handlers.  [AR4854].  She sent information requests to Spears' 27 medical providers on October 20, 2015, [AR4753-4853, 4710-17, 4706-07], and sent Spears a letter, as discussed, *supra*, on October 21, 2015, informing Spears of this fact, which stated that Liberty had 45 days from the date Winterer's office received Spears' information, October 14, 2015, to complete its review, which was November 26, 2015.[23]  On November 24, 2015, Liberty had received medical records for all but five of Spears' medical providers, and it had partial records for one of those, so it sent the extension notification to Spears on that date.  [AR2999-3000].  The letter noted that because Liberty was extending the date due to not having complete information from Spears' medical providers, the 90-day review period was tolled until the records were received.  *Id.*  Liberty requested the records by December 16, 2015, at which time it stated it would continue its review of Spears' claim.  *Id.*[24]  On January 12,

<hr>

[22] The information not provided was not actually from Spears but was rather medical records from her medical providers.  The Court assumes without deciding that the failure to provide this information can be imputed to Spears.  If it cannot, Liberty's tolling argument disappears, as the prerequisites for ERISA tolling are not met due to the missing information not being Spears'.

[23] Apparently as a practical matter Liberty, or at least Winterer, thought the ERISA deadlines *did* apply, but that they began running once Winterer's office received Spears information from Liberty on October 14, 2015.

[24] On December 1, 2015, Liberty sent Spears a letter informing her that Liberty had forgotten to send Spears a required "Training-Education-Experience" form, which Spears returned on December 7, 2015.  [AR2878, 74].

2016, Liberty was still waiting for records from three of Spears' medical providers when Spears indicated to Liberty that she wanted Liberty to conduct the remand review using her medical records that had been provided as of December 31, 2015. [AR2286 Note 13, AR2723].

Liberty set about deciding Spears' claim, informing Spears on January 25, 2016, that it desired to perform an IME [AR2714], and referring Spears' file to BMI on January 29, 2016. [AR2709-12]. On February 4, 2016, Spears indicated that she would attend the IME. [AR2705]. Liberty engaged MCN to conduct the IME on February 10, 2016, [AR2285, AR2695-99], which MCN initially scheduled for February 29, 2016. [AR2694]. The peer review report was provided on March 4, 2016, [AR2597-2685]. Because Spears was unable to attend the February 29, 2016 it was completed on March 14, 2016. [AR2492-2509]. On March 16, 2016, Liberty sent Spears a letter stating that its deadline for review was still tolled because it only received records from 24 of 27 of Spears' medical providers. [AR2577-78]. The letter also stated that the review deadline was "further tolled by the need to conduct an IME." *Id.* The same day, March 16, 2016, Liberty sent letters to eight of Spears' medical providers enclosing the March 4, 2016 peer review report and inviting their feedback. [AR2567-74]. Liberty also, on March 16, 2016, sent Dr. Raymond, one of its peer reviewers, an email asking him for clarification of his portion of the peer review report, [AR2557], and he responded on March 22, 2016. [AR2511-52]. Two of Spears' medical providers, Drs. Rissenberg and Zagar, responded to the March 4, 2016 peer review report on April 6, 2016, [AR2486-90, AR2483], and a third, Dr. Giannini, responded on April 14, 2016. [AR2469-70]. BMI

provided an addendum to their peer review report on April 29, 2016, responding to Spears' three medical providers. [AR2411-59].

Liberty issued its first denial of Spears' appeal on June 16, 2016. [AR2378-2405].

Liberty's remand claim review lasted 14 and ½ months, or 412 days, after the Court's Remand Order, from March 31, 2015 when the Order issued to the date Liberty denied Spears' claim, June 16, 2016. That is almost ten times as long as the standard appeal review of 45 days, and almost five times as long as the maximum extended appeal review period of 90 days.

Liberty's tolling argument is unpersuasive because it had already violated the ERISA claim appeal initial deadline of 45 days and the extended deadline of 90 days before it initiated its review. Liberty did not initiate the review directed by the March Remand Order until the deadline had already past. Liberty did not assign the appeal to Nancy Winterer until October, approximately six months after the remand order. [AR4854].

In an analogous case involving an argument for equitable tolling, the Second Circuit held that when the applicable ERISA deadline expired on day 60 and the plan administrator first requested an IME on day 81, tolling did not apply. *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005) ("A tolling period cannot delay the expiration of a deadline when that deadline has already expired."), *superseded by statute in part on other gnds. as stated in Wedge v. Shawmut Design & Constr. Grp. Long term Disability Ins. Plan*, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at *5-10 (S.D.N.Y. Sept. 10, 2013).

More recently the Second Circuit made clear that it rejected the "substantial compliance" doctrine, which it concluded was "flatly inconsistent" with ERISA and held that ERISA "plans should be held to the articulated standards" of 29 C.F.R. § 2560.503-1. *Halo*, 819 F.3d at 50, 56. Here, under 29 C.F.R. § 2560.503-1(i)(4), Liberty's claimed tolling of Spears' claim deadline could not have started until November 24, 2015, when Winterer sent her one and only ERISA deadline extension notification to Spears. Even assuming without deciding that because Spears failed to provide three of the 27 medical records Liberty requested Liberty's deadline was tolled indefinitely from November 24, 2015 onward, the deadline had already passed on either May 15, 2015 or June 29, 2015, either 193 or 148 days before the tolling even started. Therefore, tolling does not apply. *Nichols*, 406 F.3d at 108 ("A tolling period cannot delay the expiration of a deadline when that deadline has already expired."). In addition, Liberty's statement to Spears that the IME tolled Liberty's review was incorrect, as it is not supported by the ERISA statute. 29 C.F.R. § 2560.503-1(i)(4) (providing for tolling of plan administrator's review deadline only if an extension is required upon "a claimant's failure to submit information necessary to decide a claim.").

Even if the Court were to consider July 24, 2015, when Liberty told Spears it was going to review her claim on remand, to be the start of the ERISA review period, the initial review period would have run 45 days later on September 7, 2015, or on October 22, 2015 if the Court were to use the extended 90-day time limit. In either case, the ERISA claim review deadline passed well before Liberty decided to extend its review period on November 24, 2015. Most troubling is Ms. Winterer's statement

that because her "office," i.e. Liberty's appeal review office, received Spears' information on October 14, 2015, the appeal review deadline started from that date. ERISA does not allow a plan administrator to delay review of a claimant's file by waiting to send the file to its appeal review department on some future date.

The delay entailed in Liberty's review was not inadvertent or harmless, as the *Halo* exception for *de minimis* ERISA departures requires. 819 F.3d at 57. Liberty, after reviewing the Court's Remand Order, intentionally decided not to govern itself by the ERISA deadlines; this decision was hardly inadvertent. And, by the time Liberty's initial denial letter issued on June 16, 2016, Spears had been living with the denial of her LTD benefits for seven and a half *years*. That length of time has now ballooned to over a decade. That is not harmless.

The Court is aware that Spears was the cause of some of the delay of Liberty's initial remand denial. For example, Spears failed to attend the IME scheduled on February 29, 2016, which delayed the IME for two weeks until March 14, 2016. And it was at least three of Spears' medical providers, out of 27, who caused Liberty to notify Spears of an extension on November 24, 2015 and eventually led Spears to ask Liberty on January 12, 2016 to decide the claim using records up to December 31, 2015. But these delays pale in comparison to delays caused by Liberty.

In sum, Liberty should have realized that the ERISA claims review deadlines applied to it on remand. Its claims handler Nancy Winterer certainly acted like they did. In any event, those deadlines did apply for the reasons set forth above, Liberty did not meet them, and they were not tolled under 29 C.F.R. § 2560.503-1(i)(4). For

this reason, among the other reasons explained below, the Court must review Liberty's remand review decision denying Spears' appeal *de novo.* *Halo*, 819 F.3d 42.

### 2. Liberty's Remand Appeal Denial

In its Initial Appeal Denial Letter of June 16, 2016, Liberty invited Spears to "submit a second, optional request for review. Since this optional review is not required by the Policy or the Court's remand order, it is requested that you notify Liberty within 45 days from your receipt of this letter, of your request for the optional review. At that time, we will determine a schedule for the submission of documents for that review." [AR2404]. On July 13, 2016, Spears requested review of Liberty's remand claim denial. [AR2377]. The same day, Spears sent Liberty a one-page report by Dr. Saul, [AR2375-76], and later updated the report to correct an error on August 9, 2016. [AR2373-74]. On September 22, 2016, Spears sent liberty a seven-page report by Dr. Raxlen, which attached some articles and other information about Lyme disease. [AR2320-72].

Liberty faxed Spears' counsel a letter on December 14, 2016, asking if Spears intended to submit any other information, [AR2319], but Spears' counsel did not respond. On March 16, 2017, Liberty's legal department ordered Winterer to proceed with the remand appeal. [AR4896]. On March 20, 2017, Liberty referred the two reports Spears had submitted back for peer review to Drs. Cooper, Crossley, Kitei, and Raymond, [AR4896, AR4998-99], and sent them Dr. Saul and Dr. Raxlen's reports on March 22, 2017. [AR4913]. The peer reviewers sent their report

to Liberty on April 4, 2017. [AR4992-97]. Liberty denied Spears' claim on remand a second time on May 4, 2017. [AR4910-15].

Liberty argues that even if ERISA claim review deadlines applied to its initial remand review, they do not apply to its review of its remand claim denial decision because its review of its remand claim denial decision was "optional." Liberty's argument lacks merit. As the Department of Labor stated in its *Solnin* amicus brief,

> it is significant that claims administrators are fiduciaries, and that the benefit determination is a fiduciary act. Accordingly, the administrator is required to act loyally and prudently in deciding claims, and must do so in a manner that is solely and exclusively for the benefit of the participants and beneficiaries and for the exclusive purpose of providing plan benefits and defraying reasonable plan expenses. This does not mean, of course, that every claim must be granted; but it does require administrators to have and adhere to a reasonable claims process that can accommodate all claims, . . . . A reasonable claims process must provide claimants an answer in a reasonable amount of time, within the limits set forth in ERISA's claims regulations.

DOL Amicus Brief at 19 (citations omitted). The adjudication of any claim for benefits under an ERISA plan, as the DOL stated, is a fiduciary act, and when benefits decisions are being made, ERISA applies.

The Court made this clear in its Remand Order when it found fault with Liberty on Liberty's several optional appeals for not following ERISA's requirements. For example, the Court noted that while Liberty "typically provides claimants with one level of appeal review, . . . after a conversation with Spears' employer, Liberty agreed" to provide another appeal. [ECF No. 103 at 21]. Yet the court found fault under ERISA with that "optional" second appeal, finding that the referral back to Dr. Silverman a second time "directly violated the ERISA regulations, 29 CFR § 2560.503-1(h)(3)(v)" because that regulation requires that

"the health care professional engaged for purposes of a consultation . . . shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual." *Id.* at 21 n.23. The Court also found fault with Liberty's use of Dr. Silverman on this optional appeal because Dr. Silverman's second report "d[id] not even address whether Spears was disabled within the meaning of the STD Plan" because "Dr. Silverman addressed Spears' diagnosis, *not* whether her symptoms rendered her disabled under the Plan." *Id.* at 71 (emphasis in original).

After Spears requested another appeal, through newly engaged counsel, Liberty agreed, and provided another "optional" appeal. Once again, the Court found fault with Liberty's handling of this optional appeal under ERISA. In specific, the Court found fault under ERISA with Liberty's review medical professional, Dr. Brusch, an infectious disease expert, because his report was flawed. For one, "[a]s was the case with Dr. Silverman's first report, nearly all of the questions Dr. Brusch was asked to consider concerned the accuracy of Spears' Lyme disease diagnosis and the quality of the treatment she was receiving for this disease," not "whether her symptoms rendered her disabled under the Plan." *Id.* at 71-72 (emphasis added). For another, the Court found fault with Dr. Brusch because he found "no significant chronic ongoing infectious disease(s) that could explain any degree of impairment," but that conclusion "d[id] not respond to the relevant issue of whether Spears' symptoms rendered her disabled under the STD or LTD Plans." *Id.* at 73-74.

In sum, the Court made clear, prior to remand, that ERISA applies to "optional" appeals just as it applies to initial appeals of negative benefit decisions. Therefore, ERISA applied to the "optional" appeal on remand.

Liberty did not, however, follow ERISA in deciding Spears' "optional" remand appeal. First, the remand appeal lasted 295 days, from July 13, 2016, when Spears requested the appeal, until May 4, 2017, when the appeal was decided. This is far outside the 45 or 90-day appeal review deadlines. Second, Liberty never notified Spears of an extension to its review deadline, so no tolling ever occurred. Finally, and most egregiously, Liberty long delayed adjudicating Spears' claim. Liberty argues that after it received Spears' second medical input on September 22, 2016, from Dr. Raxlen, it waited but Spears never told them if she was going to submit more medical information. After faxing Spears' counsel a letter requesting to know if she was going to submit more information in December 2016, Liberty waited again until its legal department ordered Ms. Winterer to adjudicate the appeal on March 17, 2017. Even then, it took Liberty 48 days, until May 4, 2017, to adjudicate the appeal. And the length of time from the time that Liberty received Spears' last medical information, on September 22, 2016, until it decided the appeal on May 4, 2017, was 224 days, grossly in excess of ERISA's requirements. During that time the only action Liberty took to expedite the review was to fax a letter to Spears' counsel. ERISA clearly requires more.

In sum, Liberty should have realized that the ERISA claims review deadlines applied to it on remand and on an appeal from a remand determination. Those deadlines applied for the reasons set forth above, Liberty did not meet them, and

they were not tolled under 29 C.F.R. § 2560.503-1(i)(4). For this reason, among the other reasons explained below, the Court must review Liberty's remand review decision denying Spears' appeal *de novo*. *Halo*, 819 F.3d 42.

C. **Liberty's Peer Review Report on Remand was Fatally Flawed and Does Not Provide Substantial Evidence in Support of Liberty's Decision on Remand**

As noted, On January 29, 2016, Liberty referred Spears' case for peer review to BMI. [AR2285 Note 48; AR2709-12; ECF. No. 138-2, P's Local Rule 56(a)(1) Statement at ¶¶ 111; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶¶ 111].

The peer review request listed "Headache" as the "Primary Diagnosis," stated that Spears' disability started on "9/27/2008, initially due to Headaches," and requested review by a panel to assess Spears' "functional capacity for the periods 9/27/2008 through 3/27/2009, and 3/28/2009 through 1/31/2015." [AR2709-10]. The peer review request also asked for a panel review by Endocrinology, Gastroenterology, Infectious Disease, Neurology, Neuropsychology, and Internal Medicine, [AR2710], with Internal Medicine to include a review of Rheumatology, Cardiology, Pulmonology, Sleep Medicine, Ophthalmology, Dermatology, and Primary Care records. *Id.* The document then broke the review down into these six areas, asking in each case for the panel to contact one or two of Spears' medical providers, with direction for the panel to contact each "regarding Ms. Spear's [sic] condition, treatment and functional capacity." *Id.* The lone exception to this direction was under the "neuropsychology" section, where the peer review document asked the panel to "explain the results and conclusions of the July 2010 Neuropsychological Evaluation of Marian Rissenberg, PhD, including areas of

cognitive strength and weakness, and psychological findings.  Please discuss how the strengths and weaknesses obtained on testing represent the following: · Valid effort on the part of [Spears] to perform at her highest level. · Appear consistent or inconsistent with Ms. Spears' subjective complaints. · Compared with estimated levels of previous function. · Whether results of testing were influenced by factors such as secondary gain− financial or emotional, lack of job to return to, lack of motivation, etc."  [AR2710-11].  Finally, in each section, the panel was asked two questions: (1) "From an [insert name of section] perspective, based on the available medical evidence, please describe the clmnt's [sic] impairments, cause of any impairments, severity of impairments, and the duration of any impairments, during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015"; (2) "Based on the medical evidence, from an [insert name of section] perspective, please provide your best assessment of the clmnt's [sic] functional capacity (including activities of daily living, physical capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 1/31/2015."  *Id.*

This peer review referral document itself was the first source of trouble with Liberty's peer review.  First, by stating that Spears primary diagnosis was simple headaches, Liberty downplayed the severity of Spears' migraine headaches, which were persistent and had caused her to go to the emergency room on August 28, 2008.  [ECF No. 103 at 4-5].  Liberty disclosed its predisposition against Spears' claim to what was supposed to be a neutral panel of physicians, tainting the process from the onset.

Second, it is not clear why Liberty even designated an endocrinology or gastroenterology section. As the Court noted in its Remand Order, Spears' treating physician Dr. O'Brien's finding that Spears was not restricted was irrelevant because "Dr. O'Brien was taking care of Ms. Spears for her gastrointestinal symptoms. . . . the symptoms which formed the basis for Spears' [disability] claim were debilitating migraines and related symptoms." [ECF No. 103 at 60]. Third, in splitting up the review into separate medical sections, and asking about Spears' "impairments" from, e.g., "an endocrinology perspective," or Spears' "functional capacity," from, again, e.g., an "endocrinology perspective," Liberty's referral letter simply asked the panel the wrong questions. Liberty should have asked the correct question, which was "whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period." [ECF No. 103 at 78]. This is especially troublesome because it does not appear, from the peer review referral document or the records listed in the March 4, 2016 peer review, that the panel even had a copy of the LTD Plan to refer to in making their disability determination. [AR2709-11; AR2597-2615]. Nor is it apparent that Liberty provided BMI with a copy of the Court's Remand Order, which contained the proper question the peer reviewers should have been asked. [ECF No. 103 at 78]. And Liberty clearly did not ask the panel to reconcile its findings with Liberty's "determination that she was disabled during a portion of the Elimination Period." [ECF No. 103 at 78; AR2709-11]. In fact, none of the four peer reviewers even *mentioned* that Liberty had determined that Spears "was disabled during a portion of the Elimination

Period" in their peer review report. [AR2597-2615]. This was an expected result of Liberty not asking the proper, Court-ordered question, and is especially troubling because the Court ordered Liberty to "take much greater care in posing relevant questions to its peer reviewers." [ECF No. 103 at 78]. Another problem with the questions was the use of the phrase from an, e.g. "endocrinology perspective," the use of which the court in its Remand Order found to be "extremely vague" and rendered the answer non-responsive to the question asked. Finally, the peer review referral requested that the reviewers comment on Spears' "functional capacity (including activities of daily living, physical capacity for work, [and] capacity to travel)." [AR2710-11]. It is unclear to the Court how having the reviewers opine on Spears' capacity to travel is relevant to finding her disabled within the meaning of the LTD Plan. In sum, the remand peer review was doomed from the start because of Liberty's poorly worded questions.

Another disturbing aspect of the review process was the absence of a global assessment of Spears' physical and mental condition. Liberty cabined each reviewer asking each a discrete question. Liberty's review methodology was not designed to elicit the critical assessment of Spears' overall health necessary to demonstrate that its review was capable of discerning whether the combination of her symptoms and/or conditions rendered her disabled.

One other troubling aspect of the peer review referral document has to do with its treatment of Dr. Rissenberg's July 2010 neuropsychological evaluation. The peer review referral document asked BMI to "explain the results and conclusions" of the evaluation, "including areas of cognitive strength and

weakness, and psychological findings." Then it asked the panel to discuss how the testing results (1) reflected Spears' "[v]alid effort . . . to perform at her highest level," (2) "[a]ppear consistent or inconsistent with Ms. Spears' subjective complaints," (3) "[c]ompared with estimated levels of previous function," and (4) "were influenced by factors such as secondary gain [i.e.] financial or emotional, lack of job to return to, lack of motivation, etc." These questions put BMI on notice that Liberty was skeptical of Dr. Rissenberg's evaluation and loaded the dice against Dr. Rissenberg and Spears. That was also problematic.

As mentioned, BMI assigned four medical professionals to cover the six medical areas set out in the peer review referral, Drs. Cooper (endocrinology, internal medicine), Crossley (infectious disease, internal medicine), Kitei (neurology, neuromuscular medicine), and Raymond (neuropsychology). Each had their problems in conducting the peer review.

Dr. Cooper noted that on both March 10, 2009 and June 18, 2009, during examinations by her primary care provider, Dr. Giannini, Spears complained of headaches, but on both days physical examinations were "normal." [AR2602]. Dr. Cooper fails to point out that in the June 18, 2009 examination record, Dr. Giannini notes that Spears told Dr. Giannini that her headaches "got really bad," causing Dr. Giannini to increase the prescription medication she was taking for them, and that in Spears' "Problem List/Past Medical" list Dr. Giannini had listed "Chronic Daily Headache," [AR1292], which she repeated at the end of the examination under "Assessment & Plan." [AR1294]. Dr. Cooper also noted Spears' January 19, 2009 examination by Dr. Kage, which was "normal." [AR2602]. But Dr. Cooper failed to

note a January 6, 2009 examination by Dr. Kage noting "bad migraine . . . blurred/double vision . . . fatigue," and "abnormal MRI Brain." [AR1945-49].

During a conference call with all four peer reviewers, Dr. Cooper stated that Dr. Kage's examinations were "unremarkable" and Spears' primary care provider, Dr. Giannini, "opined restrictions and limitations" in 2010 due to her plethora of symptoms, but provided no clinical evidence to back up her opinion within the medical records provided for review." [AR2608].

Dr. Cooper's reference to a lack of "clinical evidence" is very troubling because requiring this type of evidence before finding that Spears was disabled was expressly criticized in the Court's Remand Order because it violates Second Circuit precedent requiring consideration of subjective evidence. [ECF No. 103 at 72-73, citing *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (stating that "the plan administrator must give sufficient attention to subjective complaints" and that "it is error to reject subjective evidence simply because it is subjective").].

Dr. Cooper's conclusion was that "it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support global impairment and that the claimant is able to work without restriction for the timeframe of 9/27/2008 through 3/27/2009 and 3/28/2009 through 3/31/2015." [AR2597] is problematic for several reasons. First, Dr. Cooper's reference to "clinical" probability indicates that he improperly rejected any evidence that might indicate that Spears was disabled within the meaning of the LTD Plan unless it was supported by objective medical test results or the like. Second, he does not define

what "global impairment" means, but assuming without deciding that global impairment means Spears was incapable of working at all due to being completely impaired, that assessment is irrelevant as it is disconnected from the LTD Plan and the relevant question, which was "whether the medical evidence submitted by Spears rendered by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period." [ECF No. 103 at 78]. More importantly, Dr. Cooper' assessment is impossible to square with Liberty's finding Spears disabled for over four months during the Elimination Period. Not only did Dr. Cooper not reconcile his finding of no global impairment with Liberty's finding of disability, he does not even *mention* Spears' disability finding by Liberty and it does not appear that he was even aware that she was disabled at any point.

In sum, Dr. Cooper does not provide substantial evidence for Liberty's denial of Spears' LTD Plan benefits.

Dr. Crossley fares no better. First, his conclusion, that "it is the reviewer's opinion within a reasonable degree of clinical probability that there is no evidence the claimant has had Lyme disease or other infections that would be functionally limiting," [AR2597], was already deemed irrelevant by the Court's Remand Order, which stated that "[t]he question is *not* whether Spears' medical records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis." [ECF NO. 103 at 78 (emphasis in original)]. Dr. Crossley's conclusion did not address the proper question, which is "whether the medical evidence submitted by Spears rendered by Spears rendered

her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period." *Id.* In addition, his reference to "clinical probability" indicates that he, like Dr. Cooper, improperly rejected any evidence that might indicate that Spears was disabled within the meaning of the LTD Plan unless it was supported by objective medical test results or the like.

Dr. Crossley's analysis acknowledged Spears' treating physician Dr. Raxlen noted on June 22, 2009 that Spears had "fatigue, sensitivity to smells, slurred speech, sensitivity to sound, neck pain, night sweats, fever, heart palpitations, gastrointestinal problems, joint pain, muscle weakness, fasciculations [i.e. nerve problems], neuropathy, sleep disturbances, depression, anxiety, and neurocognitive deficits." [AR2603]. He noted that Dr. Gouin, a naturopath who treated Spears from 2009 to 2013 reported fatigue, brain fog, "and a period of three days during which she was unable to walk." *Id.* On September 3, 2010, Dr. Saul documented that Spears had "brain fog, fatigue, headache, and arthralgias [joint pains]." *Id.* But Dr. Crossley concentrated on Spears' various providers' assessment of whether she had Lyme disease or not, and concluded that she did not because she never clearly tested positive for it, and the one test on February 3, 2009 where she tested positive for one Lyme disease antibody was "not meaningful" in the absence of other positive test results. [AR2603-04]. He also noted that he agreed with Dr. Brusch that "Ms. Spears 'does not have Lyme disease of any type.'" [AR2610].

During the conference call, Dr. Crossley "agree[d] with Dr. Cooper's assessment" and "found nothing in the available records to support impairment." [AR2608]. Dr. Crossley did note that Spears' "broad spectrum" of symptoms consisted of "fatigue, sensitivity to smells, slurred speech, sensitivity to sound, neck pain, night sweats, fever, heart palpitations, gastrointestinal problems, joint pain, muscle weakness, fasciculations, neuropathy, sleep disturbances, depression, anxiety, and neurocognitive deficits." *Id.* But he concluded that "the evidence shows self-reported symptoms and a lack of objective data," even though some of the reported symptoms were observable and the physicians who treated Spears were able to observe and assess her and credited her complaints. Thus, Dr. Crossley opined that "functional impairment is not supported for the timeframe in question." [AR2609].

Here, as with Dr. Cooper, Dr. Crossley completely discounts Spears' subjective symptoms, simply because they are "self-reported." As discussed, *supra*, under binding Second Circuit precedent, that was error. *Miles*, 720 F.3d at 486. Moreover, he "agreed" with Dr. Brusch. Including Dr. Brusch's opinion undermined the independence of the review, converting what was supposed to be an independent review by an impartial reviewer into a justification exercise to validate the original denial and Winterer's expression of her dim view of Spears' claim in her referral letter. Finally, Dr. Crossley concentration on Spears' *symptoms* was misplaced; what mattered was whether she was disabled within the meaning of the LTD Plan.

In sum, Dr. Crossley does not provide substantial evidence for Liberty's denial of Spears' LTD Plan benefits.

Dr. Kitei first noted that "[t]he primary medical issue in question in this review is unclear from a neurological standpoint," [AR2598], but then concludes with clarity that "it is the reviewer's opinion within a reasonable degree of clinical probability that the evidence does not support impairment from a neurological standpoint." [AR2597]. How Dr. Kitei could have reached such a definitive conclusion when he was unclear about what the issue was is a mystery to the Court. And, as should be obvious by now, Dr. Kitei failed to answer the proper question. He also, like Drs. Cooper and Crossley, improperly rejected any evidence that might indicate that Spears was disabled within the meaning of the LTD Plan unless it was supported by objective medical test results or the like and used the excessively vague phrase "from a neurological standpoint."

Dr. Kitei did note that Dr. Kage, in 2009, found that Spears had cognitive problems and migraine headaches. He also noted that in 2010 Dr. Raxlen found that Spears had Lyme disease and could not work. He also noted that Dr. Zagar found Spears had fatigue and "cognitive changes," and Dr. Giannini found Spears had "some lifting and cognitive limitations." [AR2598]. Later in his analysis Dr. Kitei noted that Spears went to the emergency room on August 28, 2008 with migraine headaches, and that the CT scan that day was abnormal. [AR2604] He also noted that she reported blacking out and headache to Dr. Silvers, a neurologist, on September 8, 2008, *id.*, although her physical examination was normal, and on November 14, 2008, despite being on two medications for them her

headaches were occurring four days a week "at a 10 out of 10," *id.*, and earlier that month, on November 3, 2008, Spears daily headaches and "zoning out." *Id.* On October 1, 2008, neurologist Dr. Gordon had noted an abnormal MRI that showed a "right internal capsule white matter lesion" and an "EEG [that] revealed a nonspecific abnormality." He also noted that on January 27, 2009, Spears reported fatigue and persistent headaches, although they had improved. *Id.* Dr. Kitei also reported a gradual improvement in her condition during 2010 and 2011. *Id.*

During the conference call Dr. Kitei agreed with Drs. Cooper and Crossley "that there is nothing within the available records to support impairment." [AR2609]. He noted that Spears had complained of headaches, but that by 2013 they had resolved. *Id.* "In conclusion, Dr. Kitei opined that there was no evidence in the records to support functional impairment."

It appears to the Court that the only way Dr. Kitei arrived at this definitive conclusion is if he completely and improperly rejected information that could not be verified through the use of medical testing. More importantly, as with Drs. Cooper and Crossley, Dr. Kitei did not even attempt, as was required, to reconcile his findings of no impairment with the fact that Liberty had found Spears disabled for over four months during the Elimination Period, nor did he answer the correct question.

In sum, Dr. Kitei does not provide substantial evidence for Liberty's denial of Spears' LTD Plan benefits.

Dr. Raymond first noted that "[t]he primary medical issue in question in this review, from a neuropsychological perspective, is noted as: whether there is

evidence to support neurocognitive deficits that would be functionally impairing within the time frame in question from 9/27/08 – 3/31/15." [AR2598]. This, as was true with the other three peer reviewers, was the wrong question, especially since it deemed "evidence to support neurocognitive deficits" of primary importance, but the Court had already ruled that "[t]he question is *not* whether Spears' medical records . . . are sufficient to support any particular diagnosis." [ECF No. 103 at 78]. Even if Spears had no "neurocognitive deficits," she may still have been found disabled within the meaning of the LTD Plan, which nowhere requires a finding of "neurocognitive deficits" as a prerequisite to a finding of disability within the meaning of the Plan.[25]

In his analysis, Dr. Raymond concentrated on possible diagnoses of what caused Spears' health issues:

> A plethora of possible etiologies [i.e. causes], the vast majority of which were nonspecific, were laced within the voluminous medical record review. The claimant was evaluated by well over 15 medical specialists including, but not limited to internal medicine, neurology, rheumatology, endocrinology, immunology, oncology, infectious disease, psychiatry, sleep medicine, general surgery, orthopedic surgery, and neuropsychology, to name a few. The claimant's primary complaint was vascular headache in 2008. However, she has been evaluated and treated for a host of other etiologies including, but not limited to gastrointestinal disease, thyroid disease, dyspnea, pineal cyst, Lyme disease, systemic lupus erythematosus, fibromyalgia, etc. The claimant was evaluated by numerous neurologists as part of her subjective complaints of reduced cognitive efficiency. Multiple neurological examinations were negative and nondiagnostic with regard to neurocognitive functioning, sensorimotor abilities, and formal cranial nerve testing. Prior serial cerebral MRI's [sic] identified

---

[25] "'Disability' or 'Disabled' means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." [Liberty LTD Plan, AR7].

a nonspecific and stable right temporal lobe lesion of idiopathic etiology [i.e. unknown cause]. A pineal cyst was also noted.

[AR2598-99]. Dr. Raymond then criticized neuropsychological testing conducted by Dr. Rissenberg, which he called "abbreviated and nonstandardized" and "easily scrutinized." *Id.* Finally, he called Dr. Rissenberg's evaluation "obsolete" because it was six years old. *Id.*

Later, Dr. Raymond did address that Spears was work restricted from September 29, 2008 until December 8, 2008 because of "headache and encephalopathy [i.e. brain disease]." [AR2605]. He also quoted a peer review conducted by Dr. Potts on December 18 and 23, 2008, which found that Spears "appears to have nearly daily headaches, the severity of which is likely to preclude her from working." *Id.* He noted that Dr. Zagar had treated Spears between May 2009 and June 2010 and wrote on October 6, 2009 that that Spears' "symptoms include frequent headaches, severe fatigue, joint pain, digestive problems, and cognitive complaints. She remains unable to work even on a part-time basis." [AR2606].

Dr. Raymond approvingly cited the two peer reviews conducted by Dr. Silverman and quoted Dr. Silverman's finding that "there is no clear-cut evidence of impairment from 2/8/09 to the present. Physical exams do not support evidence of restrictions and/or limitations." [AR2607].

During the conference call Dr. Raymond "commented that he agreed with [Drs. Cooper, Crossley, and Kitei's] assessments." [AR2609]. He stated that "there is no evidence in the available documentation that the claimant is suffering from neurocognitive abnormalities." *Id.* He disagreed with Dr. Rissenberg's evaluation,

which he called "marginal." *Id.* Dr. Raymond did note that there was an "abnormal finding" on "Dr. Raxlen's mental residual functional capacity assessment on 1/20/10, which indicated that the claimant was 'markedly limited' in memory and cognitive functioning, including 'remember locations, understanding very short simple instructions, carrying out detailed instructions, performing activities within a schedule, and set realistic goals and make plans independently," but Dr. Raymond noted that "this assessment d[id] not coincide with the claimant's actual functional abilities at the time." *Id.* Summing up, "Dr. Raymond opine[d] that there is no evidence in the records to support functional impairment, and no etiology [i.e. cause] to support any neuropsychological diagnoses." *Id.*

Dr. Raymond concluded that "it is this reviewer's opinion within a reasonable degree of neuropsychological certainty that: there is no valid objective evidence to support neurocognitive deficits associated with chronic headache or a plethora of other reported possible etiologies, within the timeframe of 9/27/08 – 3/31/15." [AR2597]. Confusingly, in a section of the peer review report in which the reviewers were asked to answer certain questions that had been posed to them, Dr. Raymond was asked "[b]ased on the medical evidence, from a Neuropsychology perspective, please provide your best assessment of the claimant's functional capacity (including activities of daily living, capacity for work, capacity to travel) during the periods 9/27/2008 through 3/27/2009, and 3/28/09 through 3/31/2015." Dr. Raymond responded "[u]nfortunately, based on a dearth of neuropsychological evidence, the undersigned is unable to render a conclusive clinical opinion regarding functional capability with any degree of neuropsychological certainty within the requested

timeframe. However, the available neuropsychological evidence offered in the medical record does not support presence of neurocognitive impairments or restrictions, including activities of daily living (ADL) for the noted timeframe." [AR2614].

The errors in Raymond's section of the peer review report are legion. First, he, like the other reviewers, improperly rejected any non-objective findings. Second, his finding that there was no evidence of neurocognitive deficits, as noted, answered the wrong question, which was whether Spears was disabled within the meaning of the LTD Plan. Third, Dr. Raymond's admission that he could not opine on Spears' functional limitations due to the "dearth of neuropsychological evidence," made his evaluation useless. Fourth, Dr. Raymond had noted that several other medical professional had found Spears disabled in late 2008 and early 2009, yet Dr. Raymond ignored those findings in his conclusion. Finally, like the other reviewers, Dr. Raymond made no effort whatsoever to reconcile the fact that Liberty had found Spears disabled for over four months during the Elimination Period with his finding that she was not disabled during that time.

Another important error Dr. Raymond made was to consider Spears' medical records from 2010 and earlier "obsolete" because they were six years old. While Dr. Raymond may have been right that records that old may have been obsolete to diagnosing Spears in 2016, when Dr. Raymond wrote his peer review report, they were undoubtedly *not* obsolete to analyzing Spears' physical ability or disability during the Elimination Period and immediately thereafter. Liberty even asked Dr. Raymond to clarify why he thought Spears' older medical records were obsolete.

[AR2557-58; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 135; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 135]. In response, Dr. Raymond provided an addendum that stated, "my opinion from my original report has not changed," and that he considered the records obsolete because "[f]rom a neuropsychological perspective" they were six years old and Dr. Rissenberg's report was "abbreviated, nonstandardized," and Dr. Raymond had "updated neuropsychological information." [AR2511-12; ECF No. 138-2, P's Local Rule 56(a)(1) Statement at ¶ 136; ECF No. 159, D's Local Rule 56(a)(2) Statement at ¶ 136]. This answer is unhelpful.

Further, concentrating on the causes of Spears' physical problems was improper, what mattered as noted was whether she was disabled within the meaning of the LTD Plan. [ECF No. 103 at 78 ("The question is *not* whether Spears' medical records . . . are sufficient to support any particular diagnosis.")]. Citing Dr. Silverman's work, especially his improper finding that there was no "clear-cut" evidence of Spears' disability, which was the wrong standard for finding disability under the LTD Plan, as discussed in detail in the Court's Remand Order, [ECF No. 103 at 68-69], was a glaring error. Finally, Dr. Raymond statement during the conference call that Dr. Raxlen's January 20, 2010 finding that Spears' mental functioning was "markedly limiting . . . d[id] not coincide with the claimant's actual functional abilities at the time" cannot be correct because Dr. Raymond stated in the report that he was unable to assess Spears' functional capabilities due to the dearth of neuropsychological evidence.

In sum, Dr. Raymond's analysis was the worst of the lot and does not provide substantial evidence for Liberty's denial of Spears' LTD Plan benefits.

In sum, the March 4, 2016 peer review report is a fatally flawed document that does not provide substantial evidence supporting Liberty's remand denial; Liberty should not have relied on it in denying Spears' LTD benefits on remand.

### D. Liberty's IME does not Provide Substantial Evidence Supporting Liberty's Denial of Spears' LTD Benefits

As with the peer review report, the problems with Liberty's IME of Spears began with Liberty's IME referral document. [AR2697-98]. For example, in the fifth IME question the medical professional conducting the IME was to provide an "[o]pinion regarding verifiable physical impairment." [AR2698]. In question six, Liberty asked for an "[o]pinion regarding medically-supported physical restrictions/limitations. *Id.* Question seven asked for an "[a]ssessment of excessive or atypical pain behaviors . . . Does the insured's reported pain severity and functional limitations correlate with your clinical exam findings, the diagnostic test evidence, and treatment requirements?" *Id.* Question eight asked for an "[a]ssessment of functional inconsistencies: Compare the insured's functional statements and clinical observations, and discuss any inconsistencies noted." *Id.*

These questions improperly asked about <u>verifiable</u> physical impairment, or <u>medically-supported</u> physical restrictions/limitations, or asked for consistency between "reported pain severity and functional limitations" with "<u>clinical exam findings</u>," or asked for consistency between functional statements and <u>clinical observations</u>. The message these questions transmitted were that medical conditions reported by Spears were not to be credited unless backed by clinically

supported evidence.  But, as discussed, the Court had already held in its Remand Order that failing to consider subjective reports because they are subjective is improper.  [ECF No. 103 at 72-73].  One would think Liberty would have been "once bitten, twice shy" in this regard but such does not appear to be the case.  In addition, nowhere was there any direction to reconcile any findings with the fact that Liberty had found Spears disabled for over four months of the Elimination Period.  Nor did the IME referral ask for an assessment of whether Spears' medical evidence rendered her disabled within the meaning of the LTD Plan.

In any event, the IME that was conducted by Dr. Courtney on March 14, 2016 does not support Liberty's denial of LTD benefits.  During the IME, Dr. Courtney conducted a physical examination of Spears.  He also reviewed Spears' medical file, noting that Spears went to the emergency room for migraine headaches on August 28, 2008 and the abnormal CT scan taken that date.  [AR2497].  He also noted the two abnormal brain MRIs on September 2, 2008 and October 6, 2008.  *Id.* He noted Dr. Gordon's November 3, 2008 finding of migraine headaches and frequent tension type headaches, and that Dr. Gordon prescribed medication including "hydrocodone as necessary."  *Id.*  Dr. Courtney also noted Dr. Silvers' November 11, 2008 finding of migraine headaches and encephalopathy [i.e. brain disease] and that Dr. Silvers issued work restrictions on that date.  [AR2498].  He noted a Yale Brain Tumor Center finding of a "[r]ight temporal lobe signal abnormality of unknown etiology" and "headache."  *Id.*  He noted Dr. Potts' finding that Spears' headaches were severe enough to require work restrictions.  He noted Dr. Zagar's assessment on January 12, 2009 of migraine headaches.  *Id.*  He noted

a follow-up with a physician's assistant on February 3, 2009 in which Spears complained of headaches. [AR2499]. He noted a finding by Dr. Zagar on February 17, 2009 that Spears was still experiencing headaches and "cognitive issues." *Id.* Dr. Courtney also noted that Dr. Zagar confirmed that Spears had Lyme disease. *Id.*

In his analysis, Dr. Courtney noted that his physical examination of Spears was normal. [AR2507]. In discussing Spears' condition during the Elimination Period, in response to question five seeking information regarding "verifiable physical impairment," Dr. Courtney stated that Spears "had multiple complaints that were basically non-verifiable. . . . apparently the patient had multiple physicians who supported her inability to even do sedentary activities. Seeing as I did not see her, I did review her records and find it difficult to dispute their findings, although they are subjective." *Id.* In response to question six regarding "medically-supported physical restrictions/limitations," Dr. Courtney stated "[i]t would be virtually impossible, based on the review of these records, to determine what this patient could have done from September 27, 2008, through March 27, 2009, without examination of the patient; however, her limitations, again, seem to be more subjective than objective regarding her headaches, headache frequency, and her myofascial complaints. Apparently, the patient was able to work at least part time during that period, but seemed to be plagued by fatigue. Again, her limitations would be subjective at best." [AR2508]. In response to question eight concerning inconsistencies between Spears' "functional statements and clinical observations," Dr. Courtney stated that "[p]atient reported debilitating fatigue,

headaches, and cognitive dysfunction which are difficult to objectively document."

*Id.* In conclusion, Dr. Courtney stated that:

> [a]s far as to the extent of which the results of this Independent Medical Examination provide any information concerning the periods of September 27, 2008, through March 27, 2009, apparently the patient was placed on work restrictions, from my review, at least from November of 2008 through January of 2009, in which she was to return to work. Again, there was a reviewer that noted that from March 24, 2009, through May 11, 2009, she had no verifiable evidence of why the patient could not work. As far as that extension from that period of time through March 31, 2015, it does not appear that the patient had any incapacitating diagnosis. She had apparently been previously taken off work. The chiropractic notations of lumbalgia and cervical segment dysfunction and cervicalgia would not be a reason for the patient to not be able to perform at least sedentary work during that period of time.

[AR2508-09].

Focusing as he did on whether there were verifiable or medically supported restrictions, Dr. Courtney, at Liberty's direction, answered the wrong questions. Nowhere did he address whether Spears medical information rendered her disabled within the meaning of the LTD Plan, and he did not reconcile his finding that from March 24, 2009 until March 31, 2015 Spears' had no "incapacitating diagnosis" with the fact that Liberty had found Spears disabled within the meaning of the Plan for four months during the Elimination Period. Dr. Courtney did, however, uncover much evidence that Spears was disabled, as noted *supra*.

In sum, Dr. Courtney's IME does not provide substantial evidence supporting Liberty's denial of LTD benefits.

### E. Liberty's June 16, 2016 Denial of Spears' LTD Benefits was Improper

Liberty's June 16, 2016 Denial Letter was improper for a number of reasons. For one thing, it improperly relied on the peer review and IME just discussed, neither one of which provided substantial evidence for Liberty's denial of LTD benefits.

Liberty's June 16, 2016 Denial Letter also reads as if the Court's Remand Order never issued, in that nowhere in the Denial Letter is there a reconciliation of Liberty's finding that Spears was disabled for four months during the Elimination Period, and the Denial Letter approvingly cites the peer reviews conducted by Drs. Taiwo, Silverman (twice), and Brusch and spins them as supporting Liberty's finding that Spears was not disabled, even though those peer reviews were judged to be "fatally flawed" in the Court's Remand Order.

In its Opposition to Spears' Motion for Summary Judgment, [ECF No. 160 at 57-58], Liberty argues that it did reconcile its denial of LTD benefits with its finding that Sears was disabled during the Elimination Period as follows:

> … Ms. Spears had returned to work part-time on 1/8/09, although she did not progress to full time work on 2/8/09 as had been outlined by Dr. Silvers.  Instead Ms. Spears continued working part time until she left work completely beginning 3/25/09.  Based on the medical documentation on file and Dr. Taiwo's medical review, STD benefits were denied after 2/8/09, since the medical records on file did not support Ms. Spears' inability to perform the material and substantial duties of her job on a full time basis.
> …
> At the onset of the LTD Policy's Elimination Period from 9/27/08 through 3/27/09, Ms. Spears' chief complaint was severe headaches. In the months from September 2008 through January 2009, Ms. Spears was evaluated by five Neurologists, two Rheumatologists, Endocrinology, Gastroenterology, and Cardiology.  Physical examinations were normal.

Ms. Spears' self-reported symptoms increased during the Elimination Period. … Despite the increase in self-reported symptoms, Ms. Spears' cognitive and physical exams remained normal, and she was able to return to work on a part time basis beginning on 1/8/09, remained working part time through 3/24/09.

There are multiple inconsistencies noted in Ms. Spears' medical records. There are no findings on exam including the neurological or musculoskeletal exams by Dr. Giannini on 3/10/09. On 4/21/09, Ms. Spears reported to Dr. Raxlen that she experiences "Horrible migraines (no medicine worked)," while on 4/27/09, Dr. Zagar reported, "Headaches are well controlled, only 2 migraines in the last couple of months."

Since Ms. Spears' self-reported symptoms were not consistent with the medical evidence and her actual functional abilities continuously throughout the Elimination Period, Ms. Spears' STD and LTD claims were denied. As noted previously, STD benefits were paid through the 3/27/09 maximum benefit date based on the fiduciary's decision, not based on Liberty's assessment of Ms. Spears' level of impairment.

[ECF No. 160 at 57-58 (citing AR2384; 2398-99].

This was hardly the "reconciliation" that the Court envisioned when ordering remand. First, citing the discredited Taiwo report as evidence supporting denial of benefits is fatal in light of the Court's Remand Order. Second, Liberty cites no specific evidence showing that Spears medical condition dramatically improved on February 9, 2009. In fact, evidence Liberty cites after February 9, 2009 shows that Spears was still disabled. For example, "Dr. Zagar performed a lumbar puncture on 2/9/09, and reevaluated Spears on 2/17/09 [and] Ms. Spears reported increased headaches after the lumbar puncture." June 16, 2016 Denial Letter at 4. Spears reported headaches to Dr. Giannini on March 10, 2009, *id.*, and on March 16, 2009 Spears saw Dr. Zagar again, who noted that her headaches had improved with the medication he prescribed, but Spears now had "fatigue, stuttering, '[i]ncrease in cognitive problems, spelling, vocabulary, math, etc.[, d]izziness and memory lapses or loss . . . numbness.'" *Id.* at 5. Other data is similar. It is true that some

reports differed, as Liberty suggests, but there is nothing in Liberty's June 16, 2016 Denial Letter reconciling how Spears was disabled on February 8, 2009 and not disabled on February 9, 2009. It appears to the Court that Liberty simply decided to no longer credit Spears self-reported symptoms. That did not meet the Court's reconciliation requirement and was error. "Decisions to terminate benefits in the absence of a change in condition have been held to have been arbitrary and capricious." *Johnson v. Guardian Life Ins. Co. of Am.*, No. 3:16-cv-1141 (MPS), slip op. at 23 (D. Conn. Oct. 27, 2017) (quoting *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *10 (E.D.N.Y. Dec. 11, 2017)); *Rappa*, 2007 WL 4373949, at *10 (finding that despite defendant's position that plaintiff had improved, there was no basis in the record to conclude that the condition defendant originally found to be disabling had in fact improved) (citing *Connors v. Connecticut General Life Ins. Co.,* 272 F.3d 127, 136 (2d Cir. 2001)).

Liberty's June 16, 2016 Denial Letter also includes as justification Dr. Silverman's November 23, 2009 peer review report:

> During the STD appeal review, all the medical documentation in Ms. Spears' disability claim file was reviewed by Michael Silverman, MD, Board Certified in Infectious Disease and in Internal Medicine, and a certified Medical Examiner. Dr. Silverman's 11/23/09 report of that review indicated the medical documentation on file did not support evidence of any infectious disease process, nor did it, despite Ms. Spears' symptoms of headaches, leg and upper back pain, support restrictions and/or limitations for Ms. Spears' work activity, as of 2/8/09 and forward.

Denial Letter at 7. Citing this as support for Liberty's denial determination was improper because in the Remand Order the Court thoroughly discredited Dr. Silverman's peer review on multiple independent grounds, most importantly

because "the bulk of [Dr. Silverman's] report concerns whether or not Spears suffered from Lyme disease," which was "not the relevant question. What [wa]s relevant [wa]s whether or not Spears' condition rendered her disabled within the meaning of the STD Plan. . . . Liberty's reliance on this conclusion to deny benefits was 'necessarily arbitrary and capricious' because the 'decision and the evidence used to support it [we]re based on incorrect premises.'" [ECF No. 103 at 63-64 (quoting *Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ. 3874 LAK, 2005 WL 5253336, at *9 (S.D.N.Y. Sept. 2, 2005) (Kaplan, J.)]. In addition, Dr. Silverman used an improperly high standard, namely, whether there was "clear-cut" evidence proving disability and did not "reconcile Liberty's finding that Spears was disabled at the beginning of the Elimination Period with its conclusion that she was no longer disabled. This is an incongruity which permeated all of Liberty's findings and those of its peer reviewers." *Id.* at 65-69.

Liberty's June 16, 2016 Denial Letter also includes as justification Dr. Silverman's April 10, 2010 peer review report:

> During the second STD appeal review, Dr. Silverman was asked to review all the additional documentation received in support of Ms. Spears' claim. As in Dr. Silverman's first review, multiple attempts to reach Dr. Raxlen were unsuccessful. On 4/8/10, Dr. Silverman did speak with Dr. Kage. Dr. Silverman's summary of that conversation reports, "She stated that there was no clearcut evidence of rheumatological disorder which would explain the claimant's current symptomatology from her perspective," and she would defer to Dr. Raxlen regarding Ms. Spears' tick-borne illness. As a result of this second review, Dr. Silverman continued to report the medical documentation on file did not support evidence of an infectious disease process, and despite Ms. Spears' self-reported symptoms, the medical documentation did not support restrictions and/or limitations for Ms. Spears' work activity to preclude her from performing her job as of 2/8/09 and forward.

Denial Letter at 8-9. Citing this as support for Liberty's denial determination was improper because in the Remand Order the Court thoroughly discredited Dr. Silverman's second peer review on multiple independent grounds. First, use of the same peer reviewer a second time "directly violated the ERISA claims regulations, *see* 29 C.F.R. § 2560.503-1(h)(3)(v)," which do not allow the same reviewer a second review, and "virtually assured that Spears would not receive a full and fair review" because the file now included a letter from the Connecticut Attorney general's office criticizing Dr, Silverman's first peer review report. As the Court saw it, "[i]t is nearly inconceivable that a consultant whose analysis and conclusion has been called into question by a state prosecutorial office would do anything other than defend that conclusion." [ECF No. 103 at 70-71]. In addition, Dr. Silverman mainly addressed Spears' diagnoses, not whether she was disabled within the meaning of the Plan.

Liberty's June 16, 2016 Denial Letter also includes as justification Dr. Brusch's October 14, 2010 peer review report:

> All the medical documentation in Ms. Spears' claim file was reviewed by John Brusch, MD, Board Certified in Internal Medicine and Infectious Disease. The 10/14/10 report of that review indicated, 'Although many diseases have been involved to explain the claimant's clinical picture, there are very few that are substantiated clinically.' Among the substantiated diseases Dr. Brusch listed were peptic ulcer disease, Hashimoto's thyroiditis, migraine headaches, asthma and irritable bowel syndrome. Dr. Brusch reported Ms. Spears 'does not have any significant infectious disease that would impair the claimant's sustainable full time capacity as of 02/08/2009,' and 'There is no evidentiary documentation that her listed medications impair her full-time sustainable capacity; Plaquenil, azithromycin, Mepron, Rifamin, Topamax, Prevacid, Asacol, Singulair, Zoloft, Oracit vitamins, Advair and Proventil.

Denial Letter at 10-11. Citing this as support for Liberty's denial determination was improper because in the Remand Order the Court thoroughly discredited Dr. Silverman's second peer review on multiple independent grounds. First, most of Dr. Brusch's report addressed Spears diagnoses, not if she was disabled, which was improper. [ECF NO. 103 at 71-72]. Second, Liberty had asked Dr. Brusch about whether Spears had any "clinically supported" restrictions an limitations, which the Court found was improper "insofar as the question preclude[d] Dr. Brusch from considering the extent to which Spears suffered from impairments which did not or could not be demonstrated clinically. *See Miles v. Principal Life Ins. Co*., 720 F.3d 472, 486 (2d Cir. 2013) (stating that 'the plan administrator must give sufficient attention to subjective complaints' and that 'it is error to reject subjective evidence simply because it is subjective')." *Id.* at 72-73. The Court found even more troubling Dr. Brusch's response that "[f]rom an infectious disease evaluation, the claimant does not have any restrictions and limitations to her activity from [February 8, 2009] forward." *Id.* at 73. This was so because the Court found that the phrase "from an infectious disease evaluation" was "extremely vague" and "rendere[d] the remainder of his answer non-responsive to the question he was asked." *Id.*

In sum, Liberty should not have cited the four peer review reports that were found fatally flawed by the Court in its Remand Order. Doing so lessened the support for Liberty's decision and leads the Court to the conclusion that Liberty did not commission an independent review of Spears' claim, but rather undertook to justify its original decision to deny her disability benefits.

Liberty's June 16, 2016 Denial Letter makes light of the SSA ALJ's determination that Spears was disabled, but that opinion is very persuasive. The Denial Letter states first the ALJ's Decision "reports Ms. Spears' self-reported symptoms and the intensity and persistence of those symptoms, were considered at 'face value.'" Denial Letter at 25. But the ALJ's Decision does *not* say that the ALJ took Spears' statements at "face value." Those words appear nowhere in the ALJ's Decision, despite Liberty "quoting" them, and in fact, the ALJ made a detailed credibility assessment of Spears:

> After considering the evidence of record, the undersigned feels that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible. The claimant's underlying restrictions related to her symptoms are well documented on the record. She has described daily activities, which are consistent with the complaints of disabling symptoms and limitations. The credibility of the claimant's allegations is further bolstered by her treatment history. The record contains numerous office visit notes reflecting regular trips to the doctor to seek relief from the alleged symptoms. Additionally, the claimant has sought treatment from multiple specialists rather than simply relying on a primary care physician, which is another indication that her symptoms are genuine. The records from the claimant's multiple treatment attempts reflect complaints that are consistent with the allegations made in connection with this application and appeal. Moreover, the symptoms and resulting functional limitations that the claimant has reported are consistent with the type of symptoms usually associated with the alleged impairments. The description of the symptoms and limitations, which the claimant has provided throughout the record, has generally been consistent and persuasive.

[AR145-46]. This paragraph hardly reflects a decisionmaker taking Spears' statements at face value.

In addition, Liberty's June 16, 2016 Denial Letter attempts to downplay the ALJ's Decision by noting that "[p]rior to the 2/25/11 SSA Decision, Liberty obtained

the medical reviews of Dr. Potts, Neurology; Dr. Taiwo, Internal Medicine and Occupational Medicine; Dr. Silverman, Infectious Disease; Dr. Brusch, Infectious Disease. This statement bolsters rather than downplays the ALJ's Decision because Dr. Potts was generally supportive of finding Spears disabled, and the other four peer reviews cited were fatally flawed as described in detail in the Court's Remand Order. [ECF No. 103 at 52-74]. Liberty then notes that its peer review on remand and the IME were not considered by the ALJ, and that other than Dr. Potts "[a]ll other reviewing physicians reported the medical evidence was insufficient to support impairment precluding Ms. Spears from full time work." [AR2404]. But, as noted, the remand peer review was flawed, and the IME was unhelpful to Liberty.

Most importantly, the ALJ's Decision provides ample evidence showing that Spears condition did not dramatically improve on February 9, 2009 but stayed the same or even deteriorated. For example, the ALJ noted that in the fall of 2008 Spears reported headaches, dizziness, vomiting, thought dysfunction, delirium, vision loss, speech dysfunction, memory gaps, and other symptoms and neurologist Dr. Baehring observed that she had word finding difficulties, stuttering, wrote sentences in reverse order, and had poor math skills, in addition to noting that her October 6, 2008 MRI of her brain "showed a lesion lateral to the temporal horns of the right lateral ventricle." [AR143]. The ALJ then notes that Spears was diagnosed with Lyme disease in February 2009, when she was placed on a series of antibiotic treatments. *Id*. In October 2009, Dr. Zagar reported speech improvements and fewer headaches, but Spears still had back and neck pain, short-term memory difficulties, and fatigue, sleeping 8 to 13 hours per day or more.

[AR144]. In March 2010, Dr. Raxlen "reported that due to the claimant's impairment, she was experiencing a symptom of extreme insomnia," which Dr. Raxlen prescribed medicine for, which did not help. *Id.* She also had "fatigue, migraine headaches," and a host of other symptoms. *Id.* In July 2010, Dr. Giannini "found that the claimant's symptoms were severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. *Id.* She therefore "opined that the claimant is unable to work at this time and for the next several years and probably beyond." *Id.* Last, the ALJ noted the August 2010 vocational assessment of Raymond Cestar, which found that Spears could not work in her previous capacity and "would be unable to make a vocational transition to other related or different types of occupations." *Id.* The ALJ also gave the opposing opinions of "State agency medical consultants" "little weight" because "other medical opinions [were] more consistent with the record as a whole" and "evidence received at the hearing level show[ed] that the claimant [was] more limited than determined by the State agency consultants." [AR146]. The consultants also "did not treat or examine the claimant." *Id.* The ALJ summarized by stating that "the undersigned finds that the claimant is unable to sustain even a sedentary level of work activity due to frequent unscheduled breaks and absences of an unpredictable duration" and found Spears "disabled." [AR146-47]. In sum, Liberty's dismissal of the ALJ's Decision was inaccurate and improper.

Liberty's June 16, 2016 Denial Letter also ignores the State of Connecticut's finding that Spears was disabled, Spears' vocational expert report that said Spears was unable to work, which the SSA ALJ had found very persuasive, and the fact

that Liberty refused to provide Spears with life insurance likely because of her ill health.

In sum, Liberty's June 16, 2016 Denial Letter disregarded this Court's Remand Order, inaccurately underplayed the persuasive ALJ Decision, failed to reconcile its finding that Spears was not disabled with Liberty's prior decision that she was, and did not support Liberty's denial of LTD benefits to Spears.

### F. Liberty's May 4, 2017 Denial of Spears' LTD Benefits was Improper

Appealing the denial of LTD benefits, Spears submitted a one-page report by Dr. Saul and a seven-page report by Dr. Raxlen. Both took issue with Liberty's June 16, 2016 Denial Letter and the peer review and IME, and supported finding Spears disabled. On March 17, 2017, Liberty assigned the remand appeal to Nancy Winterer, the same appeal claims consultant who had handled and decided Liberty's remand review. [AR4854 (assigning remand claim to Winterer), AR5004 (assigning remand appeal to Winterer); ECF No. 138-3, Spears' Interrogatory and Response, dated March 16, 2017, No. 2 ("Identify the person or persons who decided, after the court remand, plaintiff's claim for benefits, or decided any appeals. Response: Nancy Winterer, Appeal Review Consultant, Liberty Life Assurance Company of Boston, made the remand determination dated June 16, 2016. No appeal determination has been made.")]. Spears argues that this violated 29 C.F.R. § 2560.503-1(h)(3)(ii), which states that one of the requirements for ensuring a full and fair review of a claim and adverse benefit determination is "[p]rovid[ing] for a review that does not afford deference to the initial adverse benefit determination and that it is conducted by an appropriately named fiduciary

of the plan who is <u>neither the individual who made the adverse benefit determination</u> that is the subject of the appeal, nor the subordinate of such individual." *Id.* (emphasis added).

Spears argues as follows:

The reason for such a rule is obvious: a review of the claim should be decided by fresh eyes, by someone who is not personally invested in the first denial. The individual who made the first denial will likely be very reluctant to reverse his or her own decision; such a reversal can imply that the first denial was in error. Some claims adjustors may not be willing to admit they were wrong. The solution to this problem is to have a different person decide the appeal.

[ECF No. 139 at 45]. Liberty argues that "nowhere in [Spears'] brief, however, does she cite to any statute, regulation, or case law even requiring Liberty to conduct a second review on remand, let alone establishing any requirements for that review. That is because no such law exists." [ECF No. 160 at 54].

The Court agrees with Spears. As to Liberty's argument that no law exists, that is not quite true. The law is sparse, but not non-existent. *See Ward v. Life Ins. Co. of N. Am.*, No. 1:08-cv-675, 2009 WL 2740202, at *6 (M.D.N.C. Aug. 26, 2009) ("While it is true that Plaintiff's second appeal was 'voluntary' under ERISA, it does not necessarily follow that the plan administrator could ignore the appeal or not afford it a full and fair review."); *Cook v. New York Times Co. Long-term Disability Plan*, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *16 (S.D.N.Y. Jan. 30 2004) ("First, by their language, ERISA's regulations, apply equally to all 'notification[s] of benefit determination on review' and do not distinguish among levels of appeal. Second, the requirement of a full and fair review on the first go-round should apply no less simply because an administrator grants an additional level of appeal: a second

appeal that does nothing to cure the procedural deficiencies of the first will not constitute substantial compliance merely by virtue of its existence. Because the notice of denial on plaintiff's second appeal again failed to provide the required information, the denial of the third appeal equally violates ERISA."); *but see DaCosta v. Prudential Ins. Co. of Am.*, No. 10-cv-720 (JS) (ARL), 2010 WL 4722393, at *4-5 (E.D.N.Y. Nov. 12, 2010) (holding that voluntary appeal granted after initial appeal that court ruled provided full and fair review need not comply with all ERISA requirements). Also persuasive on this point is the Department of Labor's amicus brief in *Solnin*, where the DOL said:

> Furthermore, it is significant that claims administrators are fiduciaries, and that the benefit determination is a fiduciary act. Accordingly, the administrator is required to act loyally and prudently in deciding claims, and must do so in a manner that is solely and exclusively for the benefit of the participants and beneficiaries and for the exclusive purpose of providing plan benefits and defraying reasonable plan expenses. This does not mean, of course, that every claim must be granted; but it does require administrators to have and adhere to a reasonable claims process that can accommodate all claims.

DOL Amicus Brief at 19. Given the Department's position that benefit determination is a fiduciary act where the administrator must act "solely and exclusively for the for the benefit of the participants and beneficiaries," *id.*, the Court doubts the Department would endorse *DaCosta's* holding that a voluntary appeal after a full and fair review need not comply with ERISA's procedures.

In any event, compliance with ERISA procedures during voluntary, optional appeals *in this case* is required under the law of the case doctrine. In the Court's Remand Order the Court took Liberty to task for using Dr. Silverman a second time, during a voluntary appeal, which the Court held was a violation of 29 C.F.R. §

2560.503-1(h)(3)(v), which disallows use of the same medical professional "who was consulted in connection with the adverse benefit determination." [ECF No. 103 at 70 n.30.] To date, Liberty has not objected to that determination. In sum, the Court holds that Liberty was required, as it was pre-remand, to review voluntary appeals in accordance with ERISA's claim procedures, especially since the remand review did not afford Spears a full and fair review of her claim.

Liberty's assignment of Winterer to review the remand appeal violated 29 C.F.R. § 2560.503-1(h)(3)(ii) because Winterer was the same person that decided the underlying remand claim, which this subsection prohibits. The Court finds Spears' argument that it would be difficult for Winterer to provide a full and fair review in the face of Spears' attack on her initial judgment persuasive. This is particularly true since Dr. Saul attacked Winterer's decision to use Dr. Courtney for the IME, who Dr. Saul called "not a specialist in Lyme disease . . . [or] infectious disease" and whose examination of Spears, according to Dr. Saul, "had no relevance to Ms. Spears' condition at the time I treated her." [AR2374]. Dr. Raxlen was also very critical of the BMI peer reviewers, whose conclusions he "sharply disagree[d] with." [AR2321-27].

Liberty's use of BMI's four same peer reviewers to review Spears' remand appeal, just as in Liberty's use of Dr. Silverman a second time to review the first voluntary pre-remand appeal, violated 29 C.F.R. § 2560.503-1(h)(3)(v).[26] As noted,

---

[26] "[T]he health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual."

Dr. Raxlen vigorously attacked the peer reviewers' report and conclusions. Thus, referring Spears' case back to the same peer reviewers, as in the pre-remand case of Dr. Silverman, "virtually assured that Spears would not receive a full and fair review" because it is "nearly inconceivable that . . . consultant[s] whose analysis and conclusion has been called into question . . . would do anything other than defend that conclusion, particularly when Liberty asked [them] to ['review this additional documentation in light of your prior medical opinion and please advise us if this documentation changes your prior medical opinion in any way.']" [ECF No. 103 at 71; AR4999].

The remand appeal peer review report suffers from the same infirmities the remand peer review; because of this, the Court will not recount those problems but finds that the remand appeal peer review report does not provide substantial evidence supporting Liberty's denial of LTD benefits.

Liberty's May 4, 2017 Remand Appeal Denial Letter suffers from many of the infirmities that Liberty's June 16, 2016 Remand Denial Letter. The Court pauses to highlight one paragraph, however. On the last page, the letter states:

> We conducted this second thorough review of Haley Spears' entire claim. In summary, we acknowledge that <u>Ms. Spears has reported multiple subjective symptoms allegedly preventing her from working</u>. However, <u>the information provided for review does not contain physical exam findings, mental status and cognitive exam findings, laboratory test results, valid neuropsychological test results, or other forms of medical documentation</u> indicating Ms. Spears' symptoms were of such severity, frequency and duration, that the symptoms resulted in restrictions and/or limitations rendering Ms. Spears unable to perform the material and substantial duties of her occupation continuously throughout and beyond the Policy's Elimination Period, and of any occupation after March 27, 2011.

[AR4915]. This paragraph is significant because it acknowledges Spears subjective symptoms, but then discounts them as "_allegedly_ preventing her from working." In addition, the second underlined section indicates that Liberty improperly only concerned itself with clinical findings, and in fact demanded the production of those to find disability. That was error as the Court stated in its Remand Order. In discussing Liberty asking Dr. Brusch's to "list all clinically supported [restrictions and limitations]" the Court said "Liberty's restriction to 'clinically supported' restrictions and limitations is, in itself troublesome, insofar as the question precludes Dr. Brusch from considering the extent to which Spears suffered from impairments which did not or could not be demonstrated clinically. _See Miles v. Principal Life Ins. Co_., 720 F.3d 472, 486 (2d Cir. 2013) (stating that 'the plan administrator must give sufficient attention to subjective complaints' and that 'it is error to reject subjective evidence simply because it is subjective')." [ECF No. 103 at 72-73].

In sum, the Remand Appeal violated ERISA claim procedures and does not provide sufficient evidence supporting Liberty's denial of Spears' LTD benefits.

## G.     Spears is Disabled within the Meaning of the LTD Plan

As the Court noted in its Remand Order, there is significant evidence in the record demonstrating that Spears was disabled under the LTD Plan throughout the Elimination Period and until she returned to work in August 2014. First is the report and addendum of Dr. Potts, dated December 18 and 23, 2008, upon which Liberty relied in finding Spears disabled. [ECF No. 103 at 8]. In addition, there were records of a

"January 12, 2009 consultation with neurologist, Dr. Zagar, who noted that, while Spears' migraines had improved following her use of medication, they still occurred one to two times per week, lasted approximately four hours, and were accompanied by visual aura, nausea, and occasional vomiting, [AR 58, MDS Note], recommendations from both Spears' rheumatologist, Dr. Kage, *see* [AR 2013-14], and the Medical Department of Spears' employer, UTC, [AR 1925], that Spears continue to work part-time, and records from Dr. Zagar that Spears was receiving treatment via a PICC. [AR 670-72].

[ECF No. 103 at 57-58]. On February 5, Dr. Kage reported Spears suffered from "fatigue, headache, difficulty concentrating, memory loss, and achy arms and legs." *Id.* at 13 n.8 (citing [AR 56 at Claim Note 63]). These symptoms continued as reported by Dr. Kage until at least March 31, 2009. [ECF No. 103 at 15 n.9 (citing AR54 Cliam Note 72)]. As already discussed, *supra*, the June 16, 2016 Denial Letter notes a good deal of evidence showing that there was little change in Spears' condition after February 8, 2009 when Liberty changed its finding to no disability. Spears' October 1, 2009 appeal of Liberty denial of STD benefits included a letter from Drs. Raxlen, Zagar, Kage and Gouin all stating that Spears was disabled. [ECF No. 103 at 16-17]. Although Liberty's question to Dr. Brusch that he report any "clinically supported" restrictions was improper, Dr. Brusch's peer review report did in fact find that Spears' migraines were clinically supported. *Id.* at 28.

One of the key factors that demonstrate Spears' disability is her migraine headaches and the pain she suffered from as a result. That this pain could not be clinically measured is not relevant, because as Dr. Saul wrote in his remand appeal letter, when he criticized Dr. Crossley statement that "the evidence shows [only] self-reported symptoms," "[f]atigue cannot be verified by x-ray or other objective testing. Neither can headaches nor joint pain. [Dr. Crossley] offered no evidence

to refute [Spears'] credible report of fatigue, headaches or pain." [AR2374]. This mirrors the SSA ALJ's Decision, which found Spears credible and disabled. [AR141-48]. This evidence is important. "It has long been the law of [the Second] Circuit that the subjective element of pain is an *important factor* to be considered in determining disability." *Mikrut v. UNUM Life Ins. Co. of Am.*, No. 3:03-cv-1714 (SRU), 2006 WL 3791417, at *8 (D. Conn. Dec. 21, 2006) (quoting *Connors,* 272 F.3d at 136 (emphasis in original); *see also Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ("The subjective evidence of appellant's pain, based on her own testimony and medical reports of examining physicians, is more than ample to establish her disability, if believed."). In addition, the finding of the SSA's ALJ, while not binding, is valid evidence that Spears is disabled. *Id.* at *9 ("Courts have regularly held that the SSA's findings with respect to disability are some evidence of total disability under an ERISA plan, even if they are not binding.") (citing *Billenger v. Bell Atlantic*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003)).

In addition to the evidence of disability discussed, *supra*, and found in the May 16, 2016 Denial Letter, the Remand Order, and the SSA ALJ's finding that Spears was disabled as of August 31, 2008, other evidence includes the State of Connecticut finding Spears "unemployable" due to her disability, [ECF No. 103 at 25 n.16], and Liberty's own denial of life insurance, which the Court assumes was made because Liberty did not think insuring Spears' life was a prudent risk because of her disability.

Regarding Liberty's structural conflict of interest, I afford this significant weight as there are numerous issues indicating that it might have played a part in Liberty's denial of benefits on remand.

First, Liberty seems to have learned nothing from, and, in fact, in several ways disobeyed this Court's Remand Order:

- Liberty did not instruct its peer reviewers "to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period" as required by the Remand Order. [ECF No. 103 at 78].

- Liberty's peer reviewers during remand all failed "to consider whether the medical evidence submitted by Spears rendered her disabled within the meaning of the LTD Plan, reconciling its determination that she was disabled during a portion of the Elimination Period" as required by the Remand Order. *Id.*

- Several pre-remand peer reviewers were criticized in the Remand Order for concentrating on Spears' symptoms rather than whether she was disabled within the meaning of the LTD Plan. [ECF No. 103 at 71, 73-74]. Yet on remand, Dr. Crossley did the same, concluding that "it is the reviewer's opinion within a reasonable degree of clinical probability that there is no evidence the claimant has had Lyme disease or other infections that would be functionally limiting." [AR2597]. This is especially egregious since the Remand Order specified that "[t]he question is *not* whether Spears' medical

records establish that she suffered from Lyme disease, or whether Spears' medical records are sufficient to support any particular diagnosis." [ECF No. 103 at 78 (emphasis in original)].

- The Remand Order criticized Liberty for asking a pre-remand peer reviewer to report only "clinically supported" restrictions, [ECF No. 103 at 72-73 (quoting *Miles*, 720 F.3d at 486)], yet during remand Liberty's peer reviewers improperly rejected evidence of Spears' subjective symptoms of headaches and pain, improperly focusing instead on only clinically supported restrictions.

- The Remand Order also ordered Liberty to "take much greater care in posing relevant questions to its peer reviewers and ensuring that the responses that they receive are both consistent with the terms of the Plan and are responsive to the question asked." *Id.* As discussed, *supra*, this was not done.

- Liberty committed the identical ERISA violation in the optional remand appeal that had been heavily criticized in the Remand Order, namely, having the physicians review Spears' submissions criticizing the same physician reviewer's initial recommendation for denial of benefits, which violated 29 C.F.R. § 2560.503-1(h)(3)(v) again. [ECF No. 103 at 70].

Second, Liberty virtually ignored the SSA ALJ's Decision, and mischaracterized its findings. This Court has found that plan administrators acting similarly was further evidence of a conflict of interest's influence on disability benefit determinations. *Mikrut*, 2006 WL 3791417, at *9.

## V.    Conclusion

In sum, there is evidence that Liberty's conflict of interest influenced its benefit determination in this case.  As there is more than enough evidence to hold that Spears was disabled, in that, like Mikrut, "[h]er credibility has not been questioned by anyone who has treated her," *id.* at *10, the Court finds that Liberty erred in finding Spears not disabled.  Spears' Motion for Summary Judgment, [ECF No. 138], is GRANTED, and Liberty's Motion for Summary judgment, [ECF No. 144], is DENIED.  In addition, Spears' Motion for Leave to File Evidence Outside the Administrative Record, [ECF No. 140], is GRANTED, and Spears' Motion to Amend/Correct the Administrative Record, [ECF No. 162], is DENIED.  Liberty's Motion for Summary Judgment, [ECF No. 137], is DENIED as moot.

Spears shall file an opening damages brief within thirty (30) days of the date of this Order.  The brief must include a spreadsheet, or table, showing the exact amount of damages that Spears claims and exactly how that figure was determined; the body of the brief should contain detailed explanations and argument supporting the spreadsheet or table.  Spears should also address the arguments made by Liberty in their Opposition Brief, [ECF No. 160 at 51], regarding continuous compounding, and the arguments in Liberty's Sur-reply Brief [ECF No. 177], regarding offsetting the damages award by amounts provided by the SSA. Spears must also include an affirmative representation regarding any other disability payments made by, for example, the State of Connecticut, or any other entity, due to Spears' inability to work between 2008 and 2015.

Liberty must file its opposition to Spears' damages brief within twenty-one (21) days of Spears opening damages brief. The brief must include a spreadsheet, or table, showing the exact amount of damages to which Liberty claims Spears is entitled and exactly how that figure was determined; the body of the brief should contain detailed explanations and argument supporting the spreadsheet or table.

Spears may file a Reply to Liberty's opposition brief with fourteen (14) days. The opening and opposition damages briefs are limited to twenty (20) pages and Spears' Reply Brief is limited to ten (10) pages.

Spears' Motion for Attorneys' Fees, [ECF No. 164], is, in light of this Order, DENIED without prejudice to re-filing a comprehensive motion for attorneys' fees within thirty (30) days of this Order. Liberty must file its opposition to Spears' motion for attorneys' fees within twenty-one (21) days of Spears opening damages brief. Spears may file a Reply to Liberty's opposition brief with fourteen (14) days.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2019